**[Exempt From Filing Fee Government Code § 6103]**

1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  JASON H. TOKORO (State Bar No. 252345)
   jtokoro@millerbarondess.com
3  STEVEN G. WILLIAMSON (State Bar No. 343842)
   swilliamson@millerbarondess.com
4  MILLER BARONDESS, LLP
   2121 Avenue of the Stars, Suite 2600
5  Los Angeles, California 90067
   Telephone: (310) 552-4400
6  Facsimile: (310) 552-8400

7  Attorneys for Defendants

8              **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  ALEX VILLANUEVA,                          **CASE NO. 2:24-cv-04979 SVW (JC)**

12          Plaintiff,                        **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION TO DISMISS COMPLAINT**

13      v.

14  COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES
15  SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF
16  SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS
    ANGELES COUNTY OFFICE OF
17  INSPECTOR GENERAL,
    CONSTANCE KOMOROSKI,
18  MERCEDES CRUZ, ROBERTA
    YANG, LAURA LECRIVAIN,
19  SERGIO V. ESCOBEDO, RON
    KOPPERUD, ROBERT G. LUNA,
20  MAX-GUSTAF HUNTSMAN,
    ESTHER LIM, and DOES 1 to 100,
21  inclusive

22          Defendants.

23

*Filed Concurrently with Notice of Motion; Memorandum of Points and Authorities; Declaration of Jason H. Tokoro; and [Proposed] Order*

Date:      September 9, 2024
Time:      1:30 p.m.
Crtrm.:  10A - First Street Courthouse

Assigned to District Hon. Stephen V. Wilson, Crtrm. 10A and Magistrate Judge Jacqueline Chooljian, Crtrm. 750

Trial Date:          None Set

24

25

26

27

28

686686.1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION TO DISMISS COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**TO THE COURT, ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**:

Pursuant to Federal Rule of Evidence 201(b), Defendants respectfully request that this Court take judicial notice of the documents listed below, true and correct copies of which are attached hereto, in support of the Defendants' Motion to Dismiss Complaint.

Rule 201 allows the Court to take judicial notice of facts that are not subject to reasonable dispute where the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Blue v. NFL,* No. 2:23-CV-06907-SVW-JC, 2023 WL 8046260, at *1 n.3 (C.D. Cal. Oct. 10, 2023) (Court may take judicial notice of materials "central to Plaintiff's complaint' where accuracy is not in question).    The County respectfully requests that this Court take judicial notice of the following:

1.    A true and correct copy of County Inspector General Max Huntsman's report dated December 14, 2020, provided to the Civilian Oversight Committee and published on the Inspector General's website in December 2020, is attached hereto as **Exhibit A**.

2.    A true and correct copy of e-mail correspondence between investigator Christine Diaz-Herrera and Plaintiff related to the Los Angeles Sheriff's Department's request to interview Plaintiff regarding misconduct allegations is attached hereto as **Exhibit B**.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    DATED:  August 5, 2024         Respectfully Submitted,

2                                   MILLER BARONDESS, LLP

3

4

5                                   By: _____
                                          /s/ *Jason H. Tokoro*

6                                        JASON H. TOKORO
                                         Attorneys for Defendants
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

686686.1

3

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION TO DISMISS COMPLAINT

1

## INDEX OF EXHIBITS

2

3

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | December 14, 2020 County Inspector General Max Huntsman's report | 5-22 |
| B. | E-mail correspondence between investigator Christine Diaz-Herrera and Plaintiff Alex Villanueva | 23-27 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

686686.1

4

# EXHIBIT A

**COUNTY OF LOS ANGELES**
**OFFICE OF INSPECTOR GENERAL**

312 SOUTH HILL STREET, THIRD FLOOR
LOS ANGELES, CALIFORNIA 90013
(213) 974-6100
http://oig.lacounty.gov

MAX HUNTSMAN
INSPECTOR GENERAL

MEMBERS OF THE BOARD

HILDA L. SOLIS
MARK RIDLEY-THOMAS
SHEILA KUEHL
JANICE HAHN
KATHRYN BARGER

December 14, 2020

TO: The Honorable Lael Rubin, Chair
Los Angeles County Sheriff Civilian Oversight Commission

Brian K. Williams, Executive Director
Los Angeles County Sheriff Civilian Oversight Commission

FROM: Max Huntsman
Inspector General

SUBJECT: **REPORT BACK ON UNLAWFUL CONDUCT OF THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

As requested by Commissioner Priscilla Ocen at the Civilian Oversight Commission meeting of November 19, 2020, I am writing to document examples of unlawful conduct by the Los Angeles County Sheriff's Department (Sheriff's Department) in its effort to remove law enforcement reforms and oversight mechanisms developed since the conviction of the former Sheriff Lee Baca and Undersheriff Paul Tanaka. As I stated before the Civilian Oversight Commission, I believe the Sheriff's position, that his power comes directly from the California Constitution and cannot be limited by charter, statute, or ordinance, has resulted in a constitutional crisis in Los Angeles County.

The law does not support the Sheriff's claim.

The California Constitution provides for charter counties to include an elected governing body and an elected sheriff as well as provisions for the removal of that sheriff (Article XI, section 4(c)).[1] The California Constitution does not state, nor does it suggest, that a sheriff is not responsible to the governing body of the county. In fact, California state law provides that the board of supervisors of a county supervises all officers of the county

---

[1] California Constitution, Article XI, section 4(c) states County charters shall provide for "an elected sheriff, an elected district attorney, an elected assessor, other officers, their election or appointment, compensation, terms and removal."

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 2

(Government Code, § 25303[2]), explicitly including the county's sheriff. Newly passed
Government Code section 25303.7 explicitly authorizes the creation of inspectors
general and civilian oversight commissions, provides for them to possess subpoena
power, and provides that investigations conducted by them "shall not be considered to
obstruct the investigative functions of the sheriff." (Government Code, § 25303.7(d).)

The Charter of the County of Los Angeles (County Charter) provides that all county
officials shall receive the advice of county counsel on legal matters. (County Charter
Article VI, § 21[3].) The County Charter contains no provision supporting the idea that the
Sheriff's Department is above the law or that the Sheriff, as an elected official, may
disregard any state or local law.

Los Angeles County Code (LACC) section 6.44.190[4] provides that the Inspector
General may direct the Sheriff and his deputies to provide documents and give
statements in a manner determined by the Inspector General.

## Legal Rulings that the Sheriff has Violated the Law

Despite clear legal authority requiring oversight, the Sheriff's Department consistently
obstructs investigations into its conduct. Recently three courts have directly contradicted
the claim that the Sheriff's Department need not obey state law limiting its power.

First, a court ruled in September that the Sheriff's Department's attempted rehiring of a
fired deputy who had lied to investigators and who used his membership in a deputy

---

[2] Government Code section 25303 states in part, "[t]he board of supervisors shall supervise the official conduct of
all county officers, and officers of all districts and other subdivisions of the county, and particularly insofar as the
functions and duties of such county officers and officers of all districts and subdivisions of the county relate to the
assessing, collecting, safekeeping, management, or disbursement of public funds. It shall see that they faithfully
perform their duties, direct prosecutions for delinquencies, and when necessary, require them to renew their
official bond, make reports and present their books and accounts for inspection."
"This section shall not be construed to affect the independent and constitutionally and statutorily designated
investigative and prosecutorial functions of the sheriff and district attorney of a county. The board of supervisors
shall not obstruct the investigative function of the sheriff of the county nor shall it obstruct the investigative and
prosecutorial function of the district attorney of a county."
[3] The Charter of the County of Los Angeles, Article VI, Section 21 states, in relevant part, "[t]he County
Counsel shall represent and advise the Board of Supervisors and all County, township and school district
officers, in all matters and questions of law pertaining to their duties, and shall have exclusive charge and
control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party.
." (emphasis added)
[4] Los Angeles County Code section 6.44.190, subd. (I) states "[t]he Departments and their employees and all other
County departments shall cooperate with the OIG and promptly provide any information or records requested by
the OIG, including confidential peace officer personnel records, juvenile records, medical and mental health
records, and protected health information necessary for the OIG to carry out its duties. The OIG may direct the
manner in which information is provided. The OIG shall not make any use of a compelled statement or any
evidence therefrom that would jeopardize a criminal investigation. Failure to comply may result in disciplinary
action at the involved department's discretion."

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 3

gang to intimidate his victim, a fellow deputy, was unlawful. The court observed, "Under
Government Code section 25303, the board of supervisors has oversight authority over
all county officers." (*County v. Villanueva*, Super Ct. Los Angeles County, September
28, 2020, No. 19STCP04760, at page 4.) The court rejected the Sheriff's claim of
independence, stating, "[t]he Sheriff and/or the Department do not 'function[]
independently' over the issues in this litigation – initial qualification and eligibility for
County employment, the County's hiring procedures, and the conduct of the County's
civil litigation." (*Ibid* at page 7). Despite this ruling, the Sheriff's Department has not
complied with lawful requests from the Inspector General as to the specific hiring
process in the litigation and the hiring process generally. (*See* Civilian Oversight
Commission Meeting PowerPoint presentation by Inspector General, January 16, 2020.)

Second, a court vacated an order obtained by the Sheriff's Department on October 29,
2020, directing the County Medical Examiner/Coroner (Coroner) not to release an
autopsy report related to a shooting by a deputy. The order would have required the
Coroner to violate the provisions of Penal Code section 832.7, which requires the
release of such a report unless the Coroner provides in writing "the specific basis for the
agency's determination that the interest in delaying disclosure clearly outweighs the
public interest in disclosure." No law permits the issuance of such an order. Still, in an
act which the judge vacating the order described as a "shock to the conscience," the
Sheriff's Department obtained the order in secret and without consultation with County
Counsel or the Coroner. Although the order has been vacated, the Sheriff's Department
continues to withhold from the Office of Inspector General the affidavit which a detective
claimed was submitted in support of the order. The court clerk stated that no affidavit
was filed.

Third, on November 20, 2020, a court ruled that Sheriff Villanueva must appear at a
contempt hearing on January 21, 2021, for his refusal to appear before the Civilian
Oversight Commission in response to a subpoena for his appearance. The judge cited
and relied upon Government Code sections 25303, 25170[5], 53060.4[6], and 54952(b)[7]
and LACC section 2.02.190.I[8] requiring and permitting oversight in ruling that "[Sheriff
Villanueva] disobeyed the Subpoena even though: (1) the Commission had authority to

[5] Government Code section 25170 allows a board of supervisors when they "deem[] it necessary or important" to
subpoena a person as a witness "upon any subject or matter within the jurisdiction of the board" and to "require
the person or officer to produce all books, papers, and documents in his possession or under his control, relating
to the affairs or interests of the county."

[6] Government Code section 53060.4 allows for the legislative body of a county to delegate to a county "official or
department head its authority to issue subpoenas and to report noncompliance thereof to the judge of the
superior court of the county, in order to enforce any local law or ordinance."

[7] Government Code section 54952 defines a legislative body and includes the governing bodies created by state
statute, charter, or ordinance. Under this definition, the Los Angeles County Board of Supervisors is a legislative
body.

[8] LACC section 2.02.190 designates the chairman of a county commission to be a Department head.

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 4

issue the Subpoena; and (2) the Subpoena required [Sheriff Villanueva's] personal
attendance. Therefore, the Court finds a basis to issue an order to show cause re:
contempt as to [Sheriff Villanueva.]" (*County v. Villanueva (II)*, Super Ct. Los Angeles
County, November 20, 2020, No. 20STCP02073.) The court also observed that the law
provides that, "[t]he Sheriff, or a senior ranking member of the Sheriff's Department,
selected by the Sheriff, shall attend and participate in all Commission meetings." (*Ibid*
citing LACC, § 3.79.070.[9]) Following the Inspector General's January 16, 2020, Civilian
Oversight Commission presentation on the Sheriff's Department's unlawful refusals to
provide documents, in a letter dated January 17, 2020, the Sheriff made clear that he or
his designee would no longer appear at the commission meetings as required by LACC
section 3.79.070. Since the filing of the legal action to enforce the subpoena that the
Sheriff failed to obey, he has sometimes sent a representative to the Civilian Oversight
Commission meeting, but never one above the rank of assistant sheriff and with orders
to participate fully in all aspects of the meeting. For instance, Commissioner Ocen
asked one such representative to restore the Office of Inspector General terminals
accessing county data on the LASD discipline system at a recent meeting, only to be
told by the Sheriff's Department representative that he could only convey the request.
No response was ever received from the Sheriff's Department.

There are numerous other instances in which the Sheriff's Department has not followed
the law and committed unlawful acts. Below are some further examples of these acts.

**Threats Against the CEO, Board of Supervisors and the Inspector General and
Office of Inspector General Staff**

In April of 2020, during a public Board meeting, the Sheriff stated that he possessed
information that multiple County officials had committed felonies, but that he would not
share the information at that time. Supervisor Barger referred to the statement as a
threat, I believe correctly, and the Sheriff never retracted it or elaborated on the conduct
to which he was referring.

Penal Code section 518(a), provides that "[e]xtortion is the obtaining of property or other
consideration from another, with his or her consent, or the obtaining of an official act of
a public officer, induced by a wrongful use of force or fear, or under color of official
right." Penal Code section 519 provides that "[f]ear, such as will constitute extortion,
may be induced by a threat … to accuse the individual threatened … of a crime." When
used to prevent a public officer from discharging their duties, such conduct also violates
Penal Code section 148, which prohibits the willful obstruction of "any public officer… in
the discharge or attempt to discharge any duty of his or her office or employment."

---

[9] Los Angeles County Code section 3.79.070 states "[t]he Sheriff or a senior ranking member of the Sheriff's
Department, selected by the Sheriff, shall attend and participate in all the meetings of the Commission, but shall
not have voting rights."

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 5

On April 1, 2020, the day after Sheriff Villanueva was replaced as the head of the
county's emergency operations center by then Chief Executive Officer Sachi Hamai, the
Sheriff sent a letter to the County effectively accusing CEO Sachi Hamai of refusing to
pay deputies who were quarantined during the pandemic. The allegation in the letter
appeared to be retaliatory given the proximity to his removal. Sheriff Villanueva
subsequently admitted in an internal email that he had the authority to pay his deputies
as a department head. The Sheriff never withdrew the false public representation. The
public statements by the Sheriff about this false accusation, coupled with other verbal
attacks on Ms. Hamai, resulted in threats to her safety by members of the public.

On June 24, 2020, during a live chat on social media,[10] the Sheriff publicly displayed a
document leading the viewer to believe that the document contained a directive from
Ms. Hamai to lay off some two thousand deputies from critical units. This claim was
false and no such document existed. The CEO's office *had* previously asked the
Sheriff's Department for a proposal to balance its budget if COVID-19 required budget
cuts, as it did for all County departments. However, it was the *Sheriff's Department*
that proposed that the cuts come from these critical units and it appears to be language
from this Sheriff's Department response that the Sheriff falsely attributed to Ms. Hamai.
The Sheriff publicly stated that eliminating these units was a threat to public safety.
Following these public false claims, Ms. Hamai received threats from members of the
public. The Board asked the Sheriff to correct the false information, but he never did.

Again, in a public statement on July 22, 2020, the Sheriff claimed that Sachi Hamai
committed a felony by being on the United Way board while simultaneously working on
a proposed ballot initiative supported by the United Way, alleging that such conduct by
Ms. Hamai was a violation of Government Code section 1090. Government Code
section 1090 prohibits a public employee from making a contract in which they have a
*financial* interest. Because Ms. Hamai's position on the United Way Board was unpaid,
the accusation apparently had no basis. Nonetheless, upon receiving a letter stating this
fact from a lawyer working with County Counsel, the Sheriff reported Ms. Hamai to the
Attorney General's Office. Sheriff Villanueva has never retracted his public statement
that Ms. Hamai violated Government Code section 1090, although he did not include it
in his letter to the Attorney General's Office reporting Ms. Hamai's alleged misconduct.

As a result of the Sheriff's public threats and claims, Ms. Hamai was reportedly provided
full-time private security upon retirement.

Beginning before these threats to the Board of Supervisors and CEO, Sheriff Villanueva
had focused his accusations on the Inspector General and his staff. Following the Office

---

[10] Los Angeles County Sheriff's Department Facebook Live June 24, 2020

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 6

of Inspector General's report of July 2019 on the attempted rehiring of Caren
Mandoyan, on August 2, 2019, Undersheriff Murakami sent a letter to the Board of
Supervisors naming the Inspector General as a target of a criminal investigation and
seeking his removal as Inspector General. The alleged "data breach" was the obtaining
of Sheriff's Department computer data on alleged police misconduct, which was
obtained by the Office of Inspector General in the discharge of its official duties under
state and local law, after a written request, and with the authorization of the sitting
Sheriff at the time. Staff at the Office of Inspector General were alleged to have
participated in this "data breach." Despite the Sheriff's Department assuring the Civilian
Oversight Commission that the clear conflict of interest would be resolved by referring
the matter to another law enforcement agency, the Sheriff has kept the investigation
open for two years in an apparent continuing effort to intimidate and obstruct oversight.

### Removal of the Office of Inspector General and County Counsel from Executive Planning Council Meetings

The Los Angeles County Charter provides that all county officials shall receive the
advice of county counsel on legal matters. For many years, the Sheriff's Department
held weekly Executive Planning Council (EPC) meetings. These weekly meetings
included all ranking members of the Sheriff's Department, usually including the Sheriff,
Undersheriff, Assistant Sheriffs and Chiefs. From at least 2001 through 2018, both
representatives of oversight (the Office of Inspector General or, prior to its creation, staff
from the Office of Independent Review) and County Counsel were present during these
meetings. Shortly after this Sheriff took office, the Office of Inspector General was no
longer invited to these meetings and a short time later County Counsel was ousted from
the meetings as well. Often, the discussion at EPC included urgent matters the Sheriff's
Department must attend to, from budgeting to departmental action, and direction on any
number of important issues. For example, on August 14, 2019, the only agenda item for
the meeting was a discussion about Office of Inspector General requests and the
Department's response and protocol towards those requests. By excluding County
Counsel, the Sheriff removed a critical mechanism to ensure his compliance with his
duty to seek counsel under the County Charter. By excluding the Inspector General, he
removed a critical mechanism to ensure his compliance with civilian oversight
requirements under state law.

### Reassignment of the Technical Crew

On December 15, 2019, the Technical Crew of the Sheriff's Department was reassigned
from the Detective Division/Fraud and Cyber Crimes Bureau to reporting directly to the
Undersheriff. The Technical Crew is responsible for surveillance, including video and
audio recordings of the subjects being surveilled. While the reassignment of this unit is
not itself illegal, such a reassignment creates the perception, and the real possibility,
that political enemies can be targeted for secret surveillance. Because orders may be
given by the Undersheriff or Sheriff directly to subordinates who are significantly lower

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 7

in the chain of command, the likelihood of any objection to such tactics is significantly
diminished.

In a previous scandal, Sheriff Baca and Undersheriff Tanaka were convicted in federal
court as a result of directly ordering members of the Internal Criminal Investigations
Bureau (ICIB) to violate the law. Without the proper chain of command, Mr. Baca and
Mr. Tanaka had free reign to task ICIB with doing their bidding and this direct
supervision allowed serious abuses of their power, including tasking ICIB deputies with
hiding a prisoner informant from the Federal Bureau of Investigation and placing a
surveillance team on the FBI agent to learn more about her investigation of the Sheriff's
Department.[11]

Removing the usual chain of command and placing the Technical Crew directly under
the control of the Undersheriff and Sheriff, creates a serious potential for abuse.
Whether or not such abuses have occurred is unknown due to the Sheriff's
Department's failure to follow oversight laws. However, the direct availability of such
tools without appropriate safeguards, coupled with the rehiring of special personnel
tasked with internal and external targeted investigation, adds credibility to the threats
discussed above.[12]

### Re-Evaluation of Discipline and Failure to Allege Dishonesty

Beginning with the attempted reinstatement of Caren Mandoyan, the Sheriff has sought
to re-evaluate discipline or impose more lenient consequences on deputies. In previous
reports,[13] the Office of Inspector General has commented on the inactivation and
modification of many discipline cases in violation of Sheriff's Department policy.
Subsequently, the Office of Inspector General reported on a significant reduction in the
opening of new internal investigations.[14] Through the Office of Inspector General's
attendance at disciplinary reviews, we have noted that there is often a failure to allege
or find dishonesty in circumstances where it appears to be warranted. This is
particularly noteworthy given the recent amendment of Penal Code section 832.7, which
now requires that sustained findings of dishonesty be made available to the public.

---

[11] Hernandez, Miriam and Bartley, Lisa. "FBI agent: This Was purely to intimidate me and get me to back off the
investigation." ABC7, March 7, 2017.

[12] Tchekmedyian, Alene. "Sheriff rehires corruption investigator accused of posing as deputy in bizarre jail
incident." Los Angeles times, October 23, 2019.

[13] Office of Inspector General *Report-Back on LASD Internal Administrative Investigations and Dispositions of
Disciplinary Action* (April 11, 2019); Office of Inspector General *Report-Back on LASD Internal Administrative
Investigations and Dispositions of Disciplinary Action* (July 22, 2019); Office of Inspector General *Report-Back on
LASD Internal Administrative Investigations and Dispositions of Disciplinary Action* (November 6, 2019); Office of
Inspector General *Report-Back on LASD Internal Administrative Investigations and Dispositions of Disciplinary
Action* (March 20, 2020).

[14] Office of Inspector General *Report-Back on LASD Internal Administrative Investigations and Dispositions of
Disciplinary Action* (July 22, 2019).

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 8

By failing to impose discipline or to make findings of dishonesty, the Sheriff's
Department may circumvent the required disclosure of these records under the Public
Records Act. Also, the United States Constitution requires that some conduct that is the
proper subject of discipline, including acts of dishonesty by deputies, must be disclosed
to defense counsel in criminal cases under the seminal case of *Brady v. Maryland*
(1963) 373 U.S. 83. The Sheriff's Department has historically failed to disclose conduct
involving dishonesty under *Brady* more often when it has not properly documented such
conduct through discipline.

**Failure to Ensure Brady Material is Provided to Criminal Defendants**

Following the decision in *Association for Los Angeles Deputy Sheriff's v. Superior Court*
(2019) 8 Cal. 5th 28, the Sheriff's Department did not provide its Brady list, which was
the subject of the litigation, to the Los Angeles County District Attorney's Office (District
Attorney's Office). Given the court's statement in footnote 5,[15] the Sheriff's Department
risks violating a criminal defendant's right to receive exculpatory evidence unless it
implements an effective process to guarantee Brady list information is shared.
(*Ibid* at p. 50.)

**Failure to Release Names of Deputies Involved in Shootings**

In most circumstances, by failing to release the names of deputies involved in
shootings, the Sheriff's Department is violating California law. In *Long Beach Police
Officer's Association v. City of Long Beach,* (2014) 59 Cal. 4th 59 , the California
Supreme Court held that under the California Public Records Act (CPRA) the Long
Beach Police Department was required to disclose the names of the officers involved in
a 2010 police shooting. The court found that the City of Long Beach and its police
department could not refuse to disclose the names of the officers based simply on their
belief that such information may endanger the safety of the officers or their families. The
court found that without a specific threat to an individual officer, that individual officer's
name must be disclosed and that the public's right to know far outweighed an officer's
speculative safety concern, absent a "particularized showing."

---

[15] Footnote 5 of the opinion states: "If anything, the recent amendment to section 832.7(a) tends to indicate that
the condition of confidentiality is meant to shield information from the public's eyes—not from the eyes of
government officials who may need that information to satisfy a constitutional obligation. [See Pen. Code, § 832.7,
subd. (b)(1) [certain records "shall not be confidential and shall be made available for public inspection pursuant to
the California Public Records Act"]; cf. *Copley Press, supra*, 39 Cal.4th at p. 1285 [Pen. Code, § 832.7, subds. (c)–(d),
"specify circumstances under which information may be released to the general public and the scope of
information that may be released"].]" *Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal. 5th
28, 50.

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 9

The LAPD releases the names of their officers involved in shootings within three to seven days of the shooting and posts the name of the officer involved on their website, which is accessible to the public. The Sheriff's Department began posting the records of deputy-involved shootings, which include the names of the deputies, on June 30, 2020. Most of the shootings data posted is from cases from the 1990s or early 2000s.[16] While there are a few cases as recent as 2018, no recent records with the names of the deputies involved in the shootings are on the website and very few names have been released to the press. By contrast, the more current list of deputy-involved shootings excludes the names of deputies.

**Release of Documents Under the California Public Records Act**

On January 1, 2019, California enacted Senate Bill 1421, the Right to Know Act, which amended California Penal Code sections 832.7 and 832.8, to allow for the release of certain records previously made confidential by law, including the records of:

1. Police shootings,
2. Use of force by peace officers against a person that resulted in death or great bodily injury,
3. An incident in which a sustained finding was made by any law enforcement agency of oversight agency that a police officer or custodial officer engaged in sexual assault involving a member of the public, and
4. An incident in which a sustained finding was made by any law enforcement agency or oversight agency of dishonesty by a peace officer relating to the reporting, investigation, or prosecution of a crime.

Withholding records listed above now requires a written statement of the specific need for secrecy. Even when such a need exists, the statue provides rolling deadlines after which records must be disclosed.

A recently released report by the Office of Inspector General[17], documents that in 2019, the Sheriff's Department received 2,909 Penal Code section 832.7 records requests. As of January 23, 2020, over 70% (2,058) of those requests remained outstanding. Moreover, 1,942 of these outstanding requests were pending for over 180 days without a response, well outside the time limits mandated by the California Public Records Act. Based on information received by the Office of Inspector General, as of July 6, 2020, records were produced in only four requests related to deputy-involved shootings..

---

[16] Los Angeles County Sheriff's Department SB-1421 Records, Deputy Involved Shootings
[17] Office of Inspector General *The Right to Know Act: Los Angeles County Sheriff's Departments Response to Police Transparency Reform* (November 2020).

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 10

Since 2011, there have been 196 deputy-involved shootings by Sheriff's Department
deputies. At the time of the Office of Inspector General report on the Right to Know Act,
the Office of Inspector General had determined that in 84 of those shootings, there did
not appear to be a legally permissible reason under Penal Code section 832.7 to delay
disclosure. There are 89 other shootings for which permissible delay under Penal Code
section 832.7 had expired. Yet, as of January 2020, thirteen months after the first CPRA
pursuant to Penal Code section 832.7, the Sheriff's Department Discovery Unit had
released records on only four shootings.

**Failure to Comply with or Enforce COVID-19 Directives**

The Sheriff's Department also does not require Sheriff's Department personnel to wear
masks to reduce the spread of COVID-19 under conditions where such masks are
required. On August 21, 2020, the Inspector General sent a letter to the Board of
Supervisors advising that on many occasions the Sheriff's Department has not complied
with the state mandate requiring face coverings, contrary to Department of Public
Health Guidelines and Executive Order N-33-20 issued by Governor Newsom on March
4, 2020. Violation of such an order is a crime under Government Code section 8655.
When Office of Inspector General staff have been present at the scene of deputy-
involved shootings for a briefing and walk-through, we have repeatedly seen line
personnel and sometimes supervisors not wearing masks. It is notable that the Sheriff's
Department has issued directives on face coverings and, in many instances, the failure
to wear masks is in violation of the Sheriff's Department's own policies. We are aware of
no instances of deputies at shooting scenes being ordered to comply with the legal
requirement to wear a mask despite violations occurring in front of their supervisors. At
present, nearly eight percent of Sheriff's Department personnel are out due to COVID-
19 quarantines; the percentage of sworn deputies out due to quarantine is over nine
percent.

In the same letter addressing the lack of compliance with state and county orders, and
Sheriff's Department directives regarding face coverings, a party at the Sassafras
Saloon in Hollywood was also raised, including concerns that Sheriff's Department
personnel either organized or attended the party in violation of state and county COVID-
19 laws. To date, the Sheriff's Department has not provided the Office of Inspector
General with any information regarding a Sheriff's Department investigation of this
event. Recently, a deputy-involved shooting occurred following a party attended by a
deputy in apparent violation of the Los Angeles County Department of Public Health
orders.

In conformity with his failure to enforce mask wearing among his own personnel, the
Sheriff has tweeted that he has no intention of enforcing mask or stay at home orders
with the general public. On November 19th and again on December 3rd, despite a
dangerous surge in COVID-19 cases, the Sheriff reiterated statements made in March

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 11

of this year, that he would rely upon voluntary compliance with the orders. On
December 3rd, he stated that he would only be conducting targeted enforcement of
superspreader events and no other orders for businesses to close or curtail the number
of customers allowed. A tweet on December 7, 2020, by ABC7 reporter Veronica
Miracle, shows the establishment Original Cronies in Agoura Hills serving numerous
patrons in violation of the state-mandated health orders and references a Facebook
post by Sheriff's Department Captain Sal Becerra that he will not force any business to
shut its doors or curtail any business activities.[18] Recently, a superspreader event
appears to have been allowed to proceed at the direct order of the Sheriff in order to
publicize arrests.[19]

**Conduct Suppressing the Exercise of First Amendment Rights**

The Sheriff's Department has repeatedly taken actions that may violate the United
States Constitution First Amendment's guarantee of freedom of the press. On
September 12, 2020, deputies arrested KPCC reporter Josie Huang while she was
attempting to film an arrest of a protester. Despite Ms. Huang having clearly identified
herself as a reporter, the Sheriff's Department transported her to jail, cited her for
violating Penal Code section 148, and conducted a follow up investigation in an effort to
persuade the District Attorney to prosecute her. During a press conference after her
arrest, the Sheriff's Department made claims about the arrest that appear false based
upon video taken by Ms. Huang and others at the scene. Ms. Huang appears to have
been wearing press identification, to have clearly identified herself verbally as a reporter
and been understood by deputies, and most importantly, committed no crime. The
District Attorney's Office declined to prosecute, citing video evidence obtained from the
internet to contradict the Sheriff's Department's claims. Penal Code section 148,
obstructing a public officer, specifically provides that recording video of a police officer is
not obstruction.

In a previous instance, deputies in riot gear converged on a press conference related to
protests against the Dijon Kizzee shooting. There, a member of the National Lawyers
Guild was grabbed while filming. The Sheriff's Department defended the action by
stating that they were removing the public from the parking lot of a local business at the
request of the manager. The Sheriff's Department refused to cooperate with an Office of
Inspector General investigation, but information gathered independently suggests this
claim was false. Video evidence and witness accounts indicate the event took place in a
parking lot that belongs to the Department of Probation and is open to the public.

---

[18] Veronica Miracle (ABC7Veronica). Twitter Post. December 7, 2020, 7:12 PM.

[19] Tchekmedyian, Alene. "Sheriff's officials knew about a massive house party in Palmdale. Why didn't they stop
it?" Los Angeles Times, December 8, 2020.

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 12

In another incident on September 8, 2020, Pablo Unzueta, a staff member and video
editor of the Daily 49er newspaper at California State University, Long Beach was
arrested by the Sheriff's Department. Mr. Unzueta claims that he identified himself as a
photojournalist to deputies but was arrested for allegedly failing to disperse after the
deputies declared a protest an unlawful assembly. According to Mr. Unzueta, his
camera, which included the memory card and cell phone, were confiscated by the
deputies and although no charges were filed by the District Attorney's Office, the
property has not been returned to him.

On November 18, 2020, Emanuel Padilla was arrested for the attempted derailment of a
train.[20] The arrest occurred during a protest at the home of the Sheriff. Charges were
filed by the District Attorney's Office on November 23, 2020. The Office of Inspector
General does not know the basis of the charges filed by the District Attorney's Office
because our request for the documents relating to the investigation received no
response. The Office of Inspector General has no way of knowing whether the District
Attorney was informed that Mr. Padilla's alleged conduct took place at a protest for the
deputy-involved shooting of Andres Guardado, that Mr. Padilla was arrested at another
Guardado protest at Sheriff Villanueva's home, or that Mr. Padilla is a plaintiff in a class
action suit against the Sheriff for conduct by the Sheriff's Department during earlier
protests.[21] This information might be relevant to the District Attorney's charging decision
given the potential that the Sheriff's Department may have targeted Mr. Padilla for
political activity protected by the First Amendment. On December 8th, the District
Attorney's Office dropped all charges against Mr. Padilla.[22]

### Failure to Investigate and Prohibit Deputy Secret Societies

As detailed in the Office of Inspector General's Report on the "Analysis of the Criminal
Investigation of Alleged Assault by Banditos,"[23] the Sheriff's Department has ignored the
presence of deputy secret societies for years. The 2012 Report on the Citizen's
Commission on Jail Violence, noted that "for years management has known about and
condoned deputy cliques and their destructive subcultures that have undermined the
Core Values articulate [sic] by the Sheriff."[24] Some of these deputy secret subgroups
appear to exclude women and discriminate based on race. One of the deputies
interviewed in the Banditos assault investigation mentioned that "girls" were not part of

---

[20] Miller, Leila. "LA County Sheriff's Department accused of trumped up train-wrecking charges against protester."
Los Angeles Times, November 24, 2020.

[21] Krizia Berg, et al v. County of Los Angeles, Case No.: 2:20-cv-07870

[22] Miller Leila and Queally, James. "Gascón drops charges against protester accused of train-wrecking attempt." Los
Angeles Times, December 8, 2020.

[23] Office of Inspector General *Analysis of the Criminal Investigation of Alleged Assault by Banditos* (October 2020).

[24] Report of the Citizen's Commission on Jail Violence, *Executive Summary* (September 2012).

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 13

the subgroup[25] at the East Los Angeles station. In a government claim filed by Deputy Austreberto Gonzalez, he alleges that the Compton "deputy gang" going by the name "The Executioners," does "not allow African-American or female members."[26] Title VII of the Civil Rights Act of 1964[27], prohibits workplace discrimination based upon sex or race. Turning a blind eye to these groups inevitably results in employment discrimination based on gender and race.

**Destruction of Evidence**

In March of this year, the Sheriff reportedly admitted that he ordered deputies to delete photos of the crash in which Kobe Bryant and others were killed.[28] The Sheriff's actions may have constituted destruction of evidence.[29] While Sheriff's Department deputies or personnel taking photographs of a crime scene for other than official purposes could be the basis for discipline, the deputies were allegedly told that they would not face discipline if they deleted the photographs. Only after the press reported this story did the Sheriff's Department open an investigation. While the Sheriff publicly purported to invite the Office of Inspector General to monitor the investigation, access was strictly limited. The Office of Inspector General has not been informed of the outcome of the investigation, whether the investigation evaluated the allegations against the Sheriff, or whether any Sheriff's Department personnel are facing discipline.

**Coroner's Inquest on Andres Guardado Fatal Shooting**

On November 30, 2020, at the request of the Board of Supervisors, a Coroner's inquest was held on the deputy-involved shooting death of Andres Guardado. During the hearing, four members of the Sheriff's Department refused to testify and answer questions by invoking the Fifth Amendment right against self-incrimination. Only one of the four individuals was directly involved in the fatal shooting as he is the only deputy who fired a weapon at Mr. Guardado. Two of those invoking their Fifth Amendment rights are the homicide investigators assigned to investigate the shooting. There is no indication that either detective was present at the time of the shooting. The Fifth Amendment does not permit law enforcement officers to pick and choose when they will testify absent a substantial basis for believing they will be prosecuted. There is no indication that the homicide detectives have been removed from the case based upon

---

[25] Office of Inspector General Analysis of the Criminal Investigation of Alleged Assault by Banditos (October 2020) at page 13.

[26] Claims for Damages to Person or Property filed by Austreberto Gonzalez, (*Redacted*) June 23, 2020.

[27] U.S. Equal Employment Opportunity Commission: Title VII of the Civil Rights Act of 1964.

[28] Tchekmedyian, Alene and Pringle, Paul. "Sheriff admits he ordered destruction of graphic Kobe Bryant crash photos." Los Angeles Times, March 2, 2020.

[29] Penal Code section 135 prohibits the willful destruction of a digital image which is about to be produced in evidence upon an inquiry or investigation authorized by law. The crash scene in question was the subject of a federal investigation in which the Sheriff's Department was cooperating.

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 14

their apparent concern that they will personally be prosecuted and their invocations
follow the Sheriff publicly referring to the lawful inquiry as a "circus stunt."

**Release of Documents to the Office of Inspector General**

Under LACC section 6.44.190, the Sheriff must provide documents and access when
requested by the Office of Inspector General. Under the previous Sheriff, the Office of
Inspector General had direct access to Sheriff's Department terminals at its office,
which allowed specified staff access to the Performance Monitoring and Recording
System (PRMS). On June 10, 2019, the Sheriff's Department terminated the Office of
Inspector General's access to the terminals at the Office of Inspector General's offices.
This action was taken after the Sheriff's Department received a draft copy of the Office
of Inspector General's report on the unlawful rehiring of Grim Reaper Caren Mandoyan.
On June 17, 2019, the Inspector General personally requested the reactivation of the
terminals. Sheriff Villanueva responded by threatening Mr. Huntsman that if he issued
the report, there would be "consequences," an apparent reference to publicly
designating Mr. Huntsman as a target of a criminal investigation. The Office of Inspector
General has sent numerous document and information requests to the Sheriff's
Department, but the Department has not provided the requested documents or
information. The following is a partial list of outstanding requests to which the Sheriff's
Department has not responded or which it has denied:

- In a letter to Sheriff Villanueva dated December 4, 2018, the Office of Inspector
  General requested the text of all proposed changes, additions or deletions made
  to the Sheriff's Department's policies, practices and procedures. The Office of
  Inspector General also requested to be advised of the Truth and Reconciliation
  Commission's meetings so that the Office of Inspector General could monitor and
  report on the meetings.
- In a letter to Sheriff Villanueva dated February 13, 2019, the Office of Inspector
  General requested the names and employee numbers of six department staff
  members whose prior administrative investigation cases were under review as
  part of the Sheriff's Truth and Reconciliation task force where he claimed they
  were treated unfairly and needed to have their cases reviewed.
- In a letter to the Department dated March 5, 2019, the Office of Inspector
  General requested answers to 42 written questions regarding the Caren
  Mandoyan discipline re-evaluation case.
- Between May 22, 2019 and November 1, 2019, the Office of Inspector General
  through numerous emails requested to review unredacted personnel and
  background files in order to evaluate the Department's hiring process. Only two
  records were provided, both of which had information redacted.
- In an email to Sheriff Villanueva and his executive staff dated June 10, 2019, the
  Office of Inspector General requested all correspondence by and between

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 15

> Sheriff's Department executives and managers which contain direction or
> instruction regarding providing Department information to the Office of Inspector
> General.
>
> - A June 17, 2019 in-person request by Max Huntsman was made to Sheriff
>   Villanueva requesting restoration of access of the PRMS terminals at the Office
>   of Inspector General offices. In many of the requests for information detailed
>   here, the Office of Inspector General has continued to request that PRMS access
>   be restored to the Office of Inspector General terminals.
> - In an email to a Department executive dated August 28, 2019, the Office of
>   Inspector General requested access to documents and files of trainees related to
>   the Sheriff's Department's patrol field training program. The Office of Inspector
>   General also requested the background file and training files for Deputy Angel
>   Reinosa who falsely claimed he was shot while in the parking lot of Lancaster
>   station.
> - In an email dated November 27, 2019, the Office of Inspector General requested
>   from the Sheriff's Department Constitutional Policing Advisor a list of all
>   administrative investigation cases that she was monitoring.
> - In an email dated December 9, 2019, the Office of Inspector General again
>   requested from the Sheriff's Department Constitutional Policing Advisor a list of
>   administrative investigation cases she was monitoring in addition to information
>   on her duties and activities in that role.
> - In an email dated February 27, 2020, the Office of Inspector General requested
>   information from the Sheriff's Department regarding the conduct of Sheriff
>   Department members at the crash site of the fatal helicopter crash involving
>   Kobe Bryant and other persons onboard.
> - In an email dated June 6, 2020, the Office of Inspector General requested from
>   the Sheriff's Department copies of all citizen complaints stemming from the
>   protests that arose after the killing of George Floyd. The request included any
>   videos or documents the Department had in its possession accompanying those
>   complaints, whether recorded by citizens or the Department.
> - In an email dated July 22, 2020, the Office of Inspector General requested that
>   the Sheriff's Department reactivate the Personnel Recording and Monitoring
>   System (PRMS) on the terminals located in the Office of Inspector General.
> - In an email dated August 31, 2020, the Office of Inspector General requested
>   information and documents regarding the July 31, 2020, private party held at the
>   "Sassafras Saloon" where the Sheriff subsequently denied the involvement of
>   any Sheriff's Department personnel's attendance.
> - In a letter dated September 2, 2020, the Office of Inspector General requested
>   specific documents and information regarding a claim filed by Austreberto

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 16

> Gonzalez alleging the existence of a Compton secret deputy gang known as
> "The Executioners."

- In a letter dated September 22, 2020, the Office of Inspector General requested specific documents and information regarding Andres Guardado who was killed in a deputy-involved shooting on June 18, 2020.
- In a letter dated September 22, 2020, the Office of Inspector General requested specific documents and information regarding Terron Jammal Boone, who was killed in a deputy-involved shooting on June 17, 2020.
- In a letter dated September 22, 2020, the Office of Inspector General requested specific documents and information related to the helicopter crash involving Kobe Bryant and others on January 26, 2020.
- In an email dated November 19, 2020, the Office of Inspector General requested information and documents regarding the arrest of KPCC reporter Josie Huang in addition to a list of all incidents in the past five years where a member of the press was arrested for Penal Code section 148 or any other Penal Code section violations.
- In a letter dated November 20, 2020, the Office of Inspector General requested from the Sheriff's Department specific documents and information regarding the Harbor-UCLA deputy-involved shooting of patient Nicholas Burgos on October 6, 2020.
- In a letter dated November 23, 2020, the Office of Inspector General requested from the Sheriff's Department specific documents and information regarding the deputy-involved shooting of Fred Williams on October 16, 2020.
- In a letter dated November 23, 2020, the Office of Inspector General requested from the Sheriff's Department specific documents and information regarding the arrest of Emanuel Padilla who was arrested on November 18, 2020, by the Sheriff's Department on two felony charges for allegedly attempting to derail a passenger train on November 15, 2020.
- On November 30, 2020, the Office of Inspector General requested information regarding deputies who were present at a protest regarding the previous arrest of a protestor, Emanuel Padilla, where deputies appeared to have their names covered with tape on their uniforms in violation of Penal Code section 830.10, which states any uniformed peace officer shall wear a badge, nameplate, other device which bears clearly on its face the identification number or name of the officer. The Office of Inspector General requested information on whether the Department was investigating the incident and made requests for policies and directives to Sheriff's Department personnel requiring compliance with Penal Code section 830.10. The Office of Inspector General also requested information on any instances where a Sheriff's Department employee may have been doxxed. (Doxxing, is the Internet-based practice of researching and publicly

The Honorable Lael Rubin, Commissioner
Brian K. Williams, Executive Director
December 14, 2020
Page 17

> broadcasting private or identifying information about an individual or
> organization.)

The Sheriff's Department has gone to great lengths to keep its conduct secret. The
unlawful acts and potentially unlawful acts enumerated above show a pattern and
practice of the repudiation of oversight by the Office of Inspector General, the Civilian
Oversight Commission, the Board, and the public. State and local laws require
cooperation with oversight bodies and the public has made it abundantly clear that
transparency by law enforcement is a paramount concern. The police must follow the
law if they are to enforce it.

# EXHIBIT B

| From: | Alex Villanueva |
| To: | Christine Diaz-Herrera |
| Subject: | Re: [External] Re: Administrative Investigation Interview Request |
| Date: | Friday, March 10, 2023 9:54:22 PM |
| Attachments: | image001.png |

You don't have a "standard practice" regarding making a subject out of someone you have no jurisdiction over and engaging in something the department has never done before. I'd love to help you, however your terms are unethical and unacceptable. I simply asked you what the issue was about. I don't need to know the specific questions you're going to ask. Example: Captain so and so alleges that he was denied x position because he did xyz.

Regards

On Mon, Mar 6, 2023 at 3:34 PM Christine Diaz-Herrera <cdizzherrera@sandersroberts.com> wrote:

> Mr. Villanueva,
>
> Given your previous role, I assume that you are well aware that the subject of an investigation does not know the questions he or she will be asked before an interview. This is standard practice. Likewise, it is standard practice to give the subject of an investigation the chance to respond to allegations during an interview. You previously stated that you would cooperate with the investigation. I can make myself available based on your schedule. Please let me know if you are still willing to make yourself available to be interviewed
>
> Lastly, I would like to remind you that if you become represented by counsel, please let me know so I can contact them directly.
>
> Best regards,
>
> Christine
>
> 
>
> NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you or any other taxpayer to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Monday, March 6, 2023 3:06 PM
**To:** Christine Diaz-Herrera <cdizzherrera@sandersroberts.com>
**Subject:** Re: [External] Re: Administrative Investigation Interview Request

Your response only confirms my suspicions. For the record there were several incidents that occurred during the McDonnell administration that merited questioning him, but it would have been wildly inappropriate to make him a subject of an administrative investigation - and we never did.

Your actions are unethical and without legal authority or precedent.

Thank you

On Mon, Mar 6, 2023 at 2:51 PM Christine Diaz-Herrera <cdizzherrera@sandersroberts.com> wrote:

> Thank you for your response. I am unable to provide my questions in advance. As I stated below, it is alleged that you acted in an inappropriate, POE related manner and made inappropriate POE related remarks in the workplace. The specific allegations include, but are not limited to, potential Manual of Policy and Procedures ('MPP') violations of the following:
>
> 3-01/121.10 POE – Discrimination
>
> 3-01/121.15 POE – Sexual Harassment (Other Than Sexual)
>
> 3-01/121.20 POE – Discriminatory Harassment (Other Than Sexual)
>
> 3-01/121.25 POE – Third Person Harassment
>
> 3-01/121.30 POE – Inappropriate Conduct Toward Others
>
> 3-01/121.35 POE – Retaliation
>
> I will provide more information during the interview itself. Please let me know when you are available.
>
> Best,
>
> Christine

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <asheriffvillanueva33@gmail.com>
**Sent:** Thursday, February 9, 2023 4:47 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: [External] Re: Administrative Investigation Interview Request

I'm not concerned about what your practices may be, particularly given the challenging optics of making a former sheriff the subject of an administrative investigation. This is troubling on so many levels, and while I am more than happy to cooperate with you, it will be on my terms. Please advise how you wish to proceed.

Alex

On Thu, Feb 9, 2023 at 1:50 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Good afternoon Mr. Villanueva,

Thank you for your response and confirmation that you are not currently represented by counsel. In the event that you become represented by counsel, please let me know and I will communicate directly with your attorney.

It is alleged that you acted in an inappropriate POE related manner and made inappropriate POE related remarks in the workplace. The specific allegations include, but are not limited to, potential Manual of Policy and Procedures ("MPP") violations of the following:

3-01/121.10 POE – Discrimination

3-01/121.15 POE – Sexual Harassment (Other Than Sexual)

3-01/121.20 POE – Discriminatory Harassment (Other Than Sexual)

3-01/121.25 POE – Third Person Harassment

3-01/121.30 POE – Inappropriate Conduct Toward Others

3-01/121.35 POE – Retaliation

It is not our practice to submit questions in advance of the interview. Should you have any further questions, I can be reached at 626-272-4646. Thank you.

Best,

Christine

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <asheriffvillanueva33@gmail.com>
**Sent:** Wednesday, February 8, 2023 5:09 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>

**Subject:** [External] Re: Administrative Investigation Interview Request

Not currently represented. Send me a brief synopsis and questions you'd like me to answer.

Alex

On Wed, Feb 8, 2023 at 10:18 AM Christine Díaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Good Morning Mr. Villanueva,

I wanted to follow up regarding my request to schedule an interview with you. However, pursuant to the California Rules of Professional Conduct (Rule 2-100) I am unable to communicate with you directly if you are currently represented by an attorney. Do you have an attorney representing you in this matter? If so, please provide me with their contact information so that I may speak with them. Thank you.

Best,

Christine



NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Thursday, January 12, 2023 11:23 AM
**To:** Christine Díaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: Administrative Investigation Interview Request

Send me the synopsis and questions first and I'll take it from there

On Mon, Jan 9, 2023 at 2:48 PM Christine Díaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Thank you for your response. Is there an attorney you would like me to contact directly? I am happy to forward my previous interview requests to your attorney.

Best,

Christine



NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Monday, January 9, 2023 2:47 PM
**To:** Christine Díaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Administrative Investigation Interview Request

I received two certified letters regarding interview requests for incidents that allegedly happened in March of last year. In order to properly respond, I will ask you to submit your questions in writing, after providing a brief description of what the allegations are, and then I will reply with counsel. This is the first I have heard of anyone reaching out to me, so please use this email address for all communications.

Regards,

Alex Villanueva

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.