Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
11520 San Vicente Boulevard
Los Angeles, California 90049
Telephone Number: (310) 860-0770
Facsimile Number: (310) 860-0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

ALEX VILLANUEVA,

Plaintiff,

vs.

COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100 inclusive,

Defendants.

Case No.: 2:24-cv-04979 SVW (JC)

**The Honorable Stephen V. Wilson**

**DECLARATION OF ALEX VILLANUEVA SUBMITTED IN SUPPORT OF HIS OPPOSITION DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE**

Date: November 18, 2024
Time: 1:30 p.m.
Dept.: 10A—First Street Courthouse

Trial Date: None Yet

Action Filed: June 13, 2024

**DECLARATION OF ALEX VILLANUEVA**

I, Alex Villanueva, declare as follows:

1. I am the Plaintiff in this case. I am familiar with the files, pleadings, and facts in this case and could and would competently testify to the following facts on the basis of my own personal knowledge.

2. I learned for the first time I had been placed on a "Do Not Rehire" list by the Los Angeles County through the article entitled "'Do Not Rehire': Panel finds Villanueva violated county discrimination, harassment policies" published in the *Los Angeles Times* on January 31, 2024. This was devasting to me. The allegations themselves were false and very damaging to my reputation, even though they are false. An alleged finding of discrimination and harassment is a serious charge and can be career ending; that was made even worse by the fact that it was communicated to a mass news outlet by the County, for these false statements to be disseminated through a channel where countless others would see and read it. These false allegations and the County's conduct in spreading this false information about me, has caused me, and still does cause me, severe emotional distress. These false allegations have also tarnished my good name and caused irreparable harm to my reputation.

3. As a former Los Angeles County Sheriff, I was very familiar with the hiring practices of the Los Angeles County Sheriff Department as I oversaw hiring of employees and was involved in the hiring process for certain positions within the Sheriff's Department. The Los Angeles County Sheriff is directly involved in the hiring of nearly all, if not all at will staff within the Los Angeles County Sheriff's Department. The Los Angeles Sheriff also makes the decision on promotions within the Los Angeles County Sheriff's Department above the rank of Lieutenant and for civilian management positions for a director and above. I was also aware that the hiring practices at the Los Angeles County Sheriff's Department is not unlike the hiring practices for positions in other counties. I know this because I have become familiar with best practices of hiring in law enforcement because of my training and experience in law enforcement. I was a member

of the California State Sheriff's Association and the Major County Sheriff's Association. The Major County Sheriff's organization is a national trade organization for Sheriff's whose counties have half a million residents or more. The California State Sheriff's Association is a trade organization for California Sheriff's. The California State Sheriff and the Major County Sheriff's Association both have annual meetings that I have attended. I have been a panelist at the Major County Sheriff's Association annual meeting that discussed best hiring practices, including how to attract individuals to a career in law enforcement.

4. Based on my knowledge and experience and observations working at the Los Angeles County Sheriff's Department, and my training and experience mention above, I was very aware of the fact that an applicant who is on a "Do Not Rehire" list is not going to get hired within the Los Angeles County Sheriff's Department, and has little to no chance of getting hired in another County either, or for positions of Consultant with the Los Angeles County Sheriff's Department and/or Justice Deputy with the Los Angeles County Sheriff's Department, in any County. It would be the same case with someone who has had findings of discrimination and harassment made against them. I knew that any efforts to apply or obtain a position would be futile with my reputation smeared with these false statements, and it is imperative that I be able to clear my name and be removed from the "Do Not Rehire" list to have opportunities of job prospects in the public sector.

5. As a result of the false statements made about me by the County and others on behalf of the County of Los Angeles, I have had been forced to repeat these false statements to others, including but not limited to, some of my colleagues, such as my former chief of staff, and family, in explaining why I have not been able to procure employment and in discussing any future career prospects, among other reasons.

6. Attached as **Exhibit 1** is a true and correct copy of Los Angeles County Sheriff's Department's Internal Affairs Bureau Investigation Report that I received through a public records request from the Los Angeles Sheriff's Department.

7. Attached as **Exhibit 2** is a true and correct copy of the *Los Angeles Times* article

from which I learned I had been found guilty of harassment and discrimination.

8. Attached as **Exhibit 3** is a true and correct copy of photographs of Max-Gustaf Huntsman's desk plaque copies of Max Gustaf-Huntsman's listing on legal professional websites.

9. Attached as **Exhibit 4** is a true and correct copy of a letter I sent to the Honorable Hilda Solis on or around February 9, 2021, and another letter I sent also on March 4, 2022.

10. Attached as **Exhibit 5** is a true and correct copy of a Motion by the Los Angeles County Board of Supervisors that I received during the course and scope of my duties as Los Angeles County Sheriff.

11. Attached as **Exhibit 6** is the Los Angeles County Policy of Equality Procedures for Equity Complaints. This is substantively the policy that was followed while I was Los Angeles County Sheriff.

I declare, under penalty of perjury under the laws of the State of California and the United States, that the foregoing is true and correct.

Executed on this 28th day of October, 2024, at Los Angeles, California.

[signature]
Alex Villanueva (Oct 28, 2024 08:21 PDT)

Alex Villanueva

# EXHIBIT 1

# LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

***"A Tradition of Service Since 1850"***

Incident Date: Between July 28, 2021, and March 2, 2022
Department Knowledge: March 16, 2022
Statute Date: March 15, 2023

# INTERNAL AFFAIRS BUREAU INVESTIGATIVE REPORT

**IAB #IV 2558101**

# CONFIDENTIAL

10-2-23
CONTENTS
R. KOPPERUD
#[redacted]
NOTED

# TABLE OF CONTENTS

# Table of Contents

IV 2558101


**AUDIO VIDEO TRACKING SHEET**

**PERSONNEL INVESTIGATION FORM**

**INVESTIGATIVE SUMMARY**

**INTERVIEW TRANSCRIPTS**

1-Complainant [redacted]

**EXHIBITS**

**A** County Policy of Equity Report/Notification Form, ICMS #2022-112209

**B** Policy of Equality (POE) Report/Notification Form, #22-046.

**C** One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show

**MISCELLANEOUS DOCUMENTS**

- Request for IAB Investigation Memorandum from Commander Jason P. Wolak to Captain Ron Kopperud, dated June 27, 2022.

- Subject of Administrative Investigation Notification Form signed by Subject Alex Villanueva, dated June 29, 2022.

- Manual of Policy and Procedures:
  3-01/121.10: Policy of Equality - Discrimination
  3-01/121.15: Policy of Equality - Sexual Harassment
  3-01/121.20: Policy of Equality - Harassment (Other than Sexual)
  3-01/121.25: Policy of Equality - Third Party Harassment
  3-01/121.30: Policy of Equality - Inappropriate Conduct Toward Others
  3-01/121.35: Policy of Equality - Retaliation

# AUDIO/VIDEO TRACKING SHEET

# INTERNAL AFFAIRS BUREAU
## - Audio/Video Tracking Sheet -

## # IV 2558101

Investigator's Name: Lieutenant Ann Devane
Total number of USB Flash Drives: 0
Total number of compact discs: 2
Total number of digital audio files: 1

**DIGITAL AUDIO FILES**

| Name |
|---|
| 1-Complainant [redacted] |

**DIGITAL MEDIA**

| | |
|---|---|
| **Transcripts** | One (1) Compact Disc containing: Audio recorded interview and interview transcript |
| **Exhibit C** | One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show |

# PERSONNEL INVESTIGATION FORM

# COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## PERSONNEL INVESTIGATION

PAGE 1 OF 2

DATE: 09/21/2023 | No. OF SUBJECTS: 1 | UNIT(S) INVOLVED: Executive Division | I.A.B. FILE No.: IV 2558101

MANUAL SECTIONS ALLEGEDLY VIOLATED (BY TITLE AND No.):
3-01/121.10,POE-Discrimination; 3-01/121.15, POE-Harassment; 3-01/121.20, POE-Harassment (Other than Sexual);
3-01/121.25, POE-Third Party Harassment; 3-01/121.30, POE-Inappropriate Conduct To Others; 3-01/121.30, POE-Retaliation

DATE, TIME, DAY OF OCCURRENCE: Between July 28, 2021, and March 2, 2022 | RELATED URN FILE No. IF APPLICABLE:

LOCATION OF OCCURRENCE: Unknown

SOURCE OF COMPLAINT: ☐ COMMUNITY ☐ SUPERVISION W/C REPORT No. ____ ☑ OTHER SOURCES (SPECIFY) POE #: 22-046

| SUBJECT | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|
| No. 1 OF 1 | Alex | Villanueva | | Sheriff | [redacted] |

UNIT OF ASSIGNMENT: Executive Division | DATE ASSIGNED: | DIVISION OR REGION: Executive Division

STATUS OF SUBJECT: ☑ CONTINUING ON DUTY ☐ RELIEVED OF DUTY - REASSIGNED TO: ____ ☐ OTHER ____

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| Male | Hispanic | Brown | Brown | 510 | 195 | [redacted] | 60 |

DATE OF HIRE: 12/03/2018 | DATE APPOINTED TO RANK: 12/03/2018 | INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE ____ | TIME ____

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| [redacted] | | | |

| SUBJECT | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|
| No. OF | | | | | |

UNIT OF ASSIGNMENT: | DATE ASSIGNED: | DIVISION OR REGION:

STATUS OF SUBJECT: ☐ CONTINUING ON DUTY ☐ RELIEVED OF DUTY - REASSIGNED TO: ____ ☐ OTHER ____

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

DATE OF HIRE: | DATE APPOINTED TO RANK: | INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE ____ | TIME ____

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**CODE: C** - COMPLAINANT, **W** - WITNESS

ADDITIONAL COMPLAINANTS, WITNESSES, OR SUBJECTS ON SUPPLEMENTAL PAGES ☑ YES ☐ NO

| CODE | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|
| C No. 1 OF 1 | [redacted] | [redacted] | | Female | UNK | Adult |

RESIDENCE ADDRESS: [redacted] | RES. PHONE (AREA CODE) ( )

BUSINESS ADDRESS OR UNIT OF ASSIGNMENT: 856 Kenneth Hahn Hall of Administration, LA, CA. 90012 | CDL OR LASD EMPLOYEE NO.: | BUS. PHONE (AREA CODE): [redacted]

INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE 07/28/2022 | TIME 1317

| CODE | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|
| W No. 1 OF 2 | [redacted] | [redacted] | | Female | UNK | Adult |

RESIDENCE ADDRESS: [redacted] | RES. PHONE (AREA CODE) ( )

BUSINESS ADDRESS OR UNIT OF ASSIGNMENT: Los Angeles, Ca. 90013 | CDL OR LASD EMPLOYEE NO.: | BUS. PHONE (AREA CODE) ( )

INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE 08/04/2022 | TIME ____

PRIMARY INVESTIGATOR: Sanders Roberts LLP | RANK: | EMP. No.: | APPROVED: [signature] | DATE: 10-2-23

ASSISTING INVESTIGATOR: Lieutenant Ann Devane | RANK: LT | EMP. No.: [redacted] | DATE SUBMITTED: 09/26/2023

SH-AD-669-3/15

**IF ADDITIONAL SUBJECTS, WITNESSES, COMPLAINANTS OR DISCIPLINE HISTORIES, LIST ON CONTINUATION PAGES.**

SHERIFF'S DEPARTMENT PERSONNEL INVESTIGATION
COMPLAINANT / WITNESS CONTINUATION PAGE

IV2558101 2 2

CODE: W

M.I. - Female Unk D.O.B. Adult

( )

90012 [redacted]

B 08/01/2022 Unk

No.

( )

( )

OF B

M.I.

( )

CDL OR LAST EMPLOYEE NO. ( )

B

( )

( )

B

NAME

( )

( )

TAPE B

OF

( )

EMPLOYEE NO. ( )

OF B

FIRST NAME

( )

( )

B

M.I.

( )

EMP (AREA ( )

A B

# INTERVIEW TRANSCRIPTS AND AUDIOS


IV 2558101
AUDIOS AND
TRANSCRIPTS

# COMPLAINANT INTERVIEW

**REFER TO INTERVIEW TRANSCRIPTS AND AUDIO CD**

**1. COMPLAINANT [redacted]**

**IV 2558101**

**WITNESS INTERVIEW**

[redacted]

**Herrera:** So my name is Christine Diaz Herrera. I am an attorney with the Law Firm of Sanders Roberts. I have been hired by the county to be an independent investigator. So I'm here in that capacity. I'm a neutral third party and a factfinder. While I don't make any kind of determinations regarding discipline or anything of that manner, I will, you know, certainly conduct interviews and engage in factfinding, regarding the allegations that you've submitted. Let's see here. As a county employee there's an expectation that you'll be honest and truthful, not withhold any relevant information and cooperate with the investigation. This is confidential and so that means that what you tell me I'm not going to be sharing with every single person that I talk to, you know, in subsequent interviews. We do ask that you keep the substance of our interview confidential. Now certainly the fact that you spoke to me or that the investigation exists, does not have to be confidential and I leave that to your discretion of, you know, who'd you want to share that with, but we do ask that the questions themselves remain confidential. Also the.. both, you know, at a county, state and federal level, retaliation is not tolerated so we- if you feel like you've been a victim of retaliation in any way for your participation here today, that's something I would want you to let me know immediately so that I could have that addressed. Likewise we ask that you don't retaliate against anyone participating in this investigation. All allegations of retaliation are, taken very seriously. Today is July 28th 2022. It is 1:17 PM and, could you say your name for the record?

**[redacted]:** [redacted].

**Herrera:** Perfect. I don't know if you have any questions for me before we get started.

**[redacted]:** So after this process, what's next? I'm just kinda curious about next steps.

**Herrera:** So then I- once I complete this investigation, I would, draft a report and then that report would be given to County Counsel. And then my understanding is is from there they have their own process for assessing, you know, whether discipline's appropriate or, you know, all

of that. I don't actually have any role in that part. So the next steps would be me completing the investigation and submitting my report.

**[redacted]:** M-hm. And then kinda prior to- 'cause I was looking things over. My complaint was filed in March, and so I'm just kinda curious what was done between March and, like, now. So in the last kind of, like, four months.

**Herrera:** Yeah, I don't have any kind of information about what their process was or what they had done. I do know that there is an intake process where they've gathered information and I believe, you know, you've been interviewed for that intake process. And then I think, at that point it gets- I'm sure that there's some type of internal process and then they decide whether or not it's, you know, appropriate to go to an external investigator to stay, you know, within the county process and in this case obviously, it's been, you know, sent to an external investigator, which is me. So I don't know what has happened all in those months. I do know that we were recently given this investigation and so we're, you know, now acting on that and I think you have every reason to expect that it'll be handled judici- you know, what's the word.. timely. And, you know, it's certainly our interest to get it, you know, to be as thorough and comprehensive as possible but also as timely as possible as well.

**[redacted]:** From the previous kind of, you know, process, was any of the materials provided to you in terms of, like, what they've done or, you know, the intake materials or anything like that?

**Herrera:** I do have the intake materials. And I do have, you know, I believe the interview itself, like the intake interview, I do have the notes from that. So. But, you know, we will be covering a lot of the same ground in the sense that things that you've told them I'm going to ask you about. So there will be some repeat obviously.

**[redacted]:** Okay. And do you have a sense in terms of, what's been done with the person that I've complained to- or complained about? What I'm complaining about?

**Herrera:** I'm sorry, I don't know--

**[redacted]:** 'Cause my complaint is against the sheriff and so do we know in terms of, like, the process, like, what's been done, like, with him? Like, has he been interviewed? Is he also, you know, part of this process as well?

**Herrera:** Those are not questions that I would be able to answer for you 'cause obviously that's a separate, you know, when someone's a subject. I mean certainly what I can tell you is that when someone is a subject of, you know, an investigation of this nature, they are notified. So I am aware that he, you know, certainly he would've been notified that there's an investigation, although the details would not've been, you know, would not've been provided to him. But certainly there's notification 'cause that's the county's process. But other than that, I wouldn't be able to share any further information.

**[redacted]:** Okay. Sounds good.

**Herrera:** Let's see, so background. I usually start with a little bit of background. How long have you worked for the county?

**[redacted]:** Since June of 2020.

**Herrera:** And, which department or who did you start working with?

**[redacted]:** So I work for the Board of Supervisors, specifically for [redacted], who is supervisor of the first district, and I serve as her [redacted].

**Herrera:** So were you hired in as her [redacted]?

**[redacted]:** [inaudible]

**Herrera:** And, what are your duties?

**[redacted]:** [redacted]

**Herrera:** And, what type of monitoring- like, how do you monitor them?

**[redacted]:** So going into the actual facilities, into the jails, into the halls and camps and, you know, talking with folks who are in there, you know. Just observing what I'm seeing and, you know, and reporting it to either- reporting it both to oversight entities and also to, to my boss.

**Herrera:** And what oversight entities do you interact with?

[redacted]**:** The Probation Oversight Commission, the Office of Inspector General, the Sheriff Civilian Oversight Commission, Sybil Brand Commission.

**Herrera:** I'm sorry, what was the last one you said?

[redacted]**:** Sybil Brand.

**Herrera:** Okay. And you said the Sheriff Oversight--

[redacted]**:** Sheriff Civilian Oversight Commission.

**Herrera:** Sorry I was not hired for my typing abilities so, I try my best. Luckily this is recorded so I guess if I needed to I could go back, but- I generally like to make sure I understand before I move on. And so.. and who do you report to?

[redacted]**:** To my Chief of Staff [redacted] and then also to the supervisor, [redacted].

**Herrera:** Okay. And, prior to doing this work, what had you been- what type of work were you performing prior to this position as the [redacted]?

[redacted]**:** So I was at [redacted]

**Herrera:** And what type of work did you focus on while you were at the [redacted]

[redacted]**:** [redacted]

**Herrera:** So was there any overlap in terms of, like, that there were groups that you had already been interacting with and then that continued in your new role as [redacted]?

[redacted]**:** [redacted] So while I was at the [redacted]

**Herrera:** So, for the basis of your complaint, my understanding is that there was a statement, a July 28th statement, in 2021 by the sheriff in his Facebook Live?

[redacted]: Yeah, there are at least four.. four incidents. I'm sure there are others. I just have not reviewed every single one of his Facebook Lives.

**Herrera:** Okay. So can you walk me through the four different incidences?

[redacted]: Yeah, so one was on July 28th 2021, interestingly exactly a year ago. So the sheriff, while he was in uniform, he frequently goes on Facebook Live and this time he did and he talked about one of the motions that I had drafted on behalf of the supervisor; made comments, you know, to his audience, you know, the live audience and also audience members who, you know, look at his Facebook Live after, and I think his quote was 'I don't think the public realizes when the Board of Supervisors write these motions these are written by [redacted] who are some 20-something woke individuals who are basically putting in words what doesn't pass legal muster at all.'

**Herrera:** And, what was the specific motion he was referencing that day?

[redacted]: So this one was related to a motion that the supervisor put forward the day before on July 27th, and this one was called 'Taking Action For The Protection For Surviving Families From Law Enforcement Harassment and Retaliation'. And in the video, he was holding and reading from, from the motion.

**Herrera:** And so, it was, the motion that he was reading was drafted by you?

[redacted]: M-hm.

**Herrera:** Okay. And was there anyone else that had also participated in drafting the motion?

[redacted]: No.

**Herrera:** Did you have any knowledge of whether he, had awareness that it was you specifically?

[redacted]: The motions have, [redacted] And he does know who I am.

**Herrera:** And how do you know that?

[redacted]: So when I was at the [redacted] in.. I'm gonna say, I think it was [redacted]

[redacted] - this is also kind of part of the, you know, the harassment - and had, with no justification, opened up a, I guess an investigation into [redacted], in his attempt to get me fired. And the OIG and I believe the COC but definitely the OIG has actually requested information from the sheriff's department and the sheriff in terms of why they thought it was appropriate to, open up an investigation into [redacted], which they have yet to this day have not provided any sort of documentation or justification to them.

**Herrera:** Okay. And, had you been, you personally, had you been critical of the sheriff in the past?

[redacted]: Yes 'cause that's part of the accountability that the board of supervisors does. We are critical of the sheriff's department and the sheriff when they engage in misconduct and are not transparent and are not being held accountable or refuse to be held accountable, and does not, you know, when he doesn't collaborate and cooperate with oversight entities, then yes, we are critical.

**Herrera:** And, in what way would he have been aware of- I mean.. So when he hasn't cooperated, like let's say, for example, with the Oversight Commission, is it something that your office addresses? Like, how is that addressed by your office if he's not, for example, cooperating.

[redacted]: Yes. So hier-, like in hierarchy-wise, you know, the board of supervisors, right? is the governance over all of the county departments and that does include the sheriff's department including all the department heads. Even though the sheriff is an elected official, he's still, right?, like there's still supervisory authority that the board of supervisors has. My boss is one of five, and so, you know, we as a [redacted], as a representative of the supervisor, right, like that's part of the hierarchy and how we hold them accountable. And why we would hold them accountable.

**Herrera:** Well I think what I was asking is more specific in the sense that, like, I'm just trying to take something piece by piece. So for example, if he didn't cooperate or, you know, maybe attend a Commission meeting, an Oversight Commission meeting, what if any response does your office give? Like is there a letter that they send, like 'Hey you should've attended' or is it brought up in a board meeting? I guess that's what I'm asking is, what kind of response is there if- something like that.

[redacted]: Something is brought up in a board meeting through motions and we also have the oversight entities or also a representative of the

supervisor, and so that's why the supervisor has oversight entities, so that when the sheriff's department isn't complying or is engaging in misconduct, these oversight entities will, you know, do what they need to do and sometimes that takes the form of, you know, issuing subpoenas to, you know, force the sheriff or his representatives to attend and, you know, talk about whatever, you know, incidents that they engaged in. Other forms, you know, the way that the supervisors will, you know, hold the sheriff's department and the sheriff accountable is through motions, and in this particular one, we were hearing from constituents that they were being harassed by deputies in the sheriff's department, whose loved ones were, you know, shot and killed and these deputies are harassing them and so, you know, given that we kept hearing this, the supervisor decided to do a motion. And she's done, you know, actually many motions, related to sheriff accountability, to basically highlight, you know, this issue that it is, you know, misconduct; it's harassment; it's retaliation. And that the sheriff's department should [inaudible]

**Herrera:** Okay. And I guess what I was asking too is, you know, is there anything - and I know this is kind of a broad question, but - is there anything that you would've done prior to him coming, you know, writing that letter on February 2021 - yeah, 2021 - that would've focused- that he would've known it was you, that it was your work, or. Was there anything in particular that, you know, that would've brought his attention to you, right? 'Cause you're one staff of, you know, a whole office. Like, is there any reason why he would've focused on you that you're aware of?

**[redacted]:** Because my role at the [redacted]. So, you know, being the sheriff, he would've been part of that. I've done several motions related to, you know, sheriff accountability and so, you know, that would probably flag for him that.. you know, that I'm her [redacted]. You know, my information [redacted]

**Herrera:** Okay. And had you been critical of him in your own personal social media?

**[redacted]:** Yes.

**Herrera:** And is your social media public?

**[redacted]:** It is.

**Herrera:** So he may have also been aware just based on your own social media postings?

**[redacted]:** Probably.

**Herrera:** Okay. And so, when he says, you know, 'these are 20-something woke individuals', are you yourself, are you in your 20s?

**[redacted]:** No I'm not.

**Herrera:** Do you have any reason to believe that he would even know your age or have any sense of how young you are?

**[redacted]:** No, and I think it's completely inappropriate 'cause he's- You know, these comments are incredibly disparaging. I mean, not just like being ageist, but also, you know, when he's saying that 'doesn't pass legal muster', right? Like trying to disparage our, like, educational and intellectual levels.

**Herrera:** Okay. And.. and how did you become aware of the, the Facebook Live meeting?

**[redacted]:** So sometimes our county coms, County Communications, will send us a transcript, of his Facebook Lives and I believe that's how I knew about this one. I typically don't, like, actively listen to his, his Facebook Lives or, you know, [redacted] might've also heard the Communications deputy. So, yeah, so that's how we know about the--

**Herrera:** You don't have it in transcript?

**[redacted]:** I- I would have to go back, but again, all of his Facebook Lives are on the sheriff's department Facebook website. It's all there, in terms of, like, all the videos and everything else.

**Herrera:** So to your knowledge that Facebook Live is still available on his Facebook page?

**[redacted]:** Probably. I don't think he's deleting. And, you know, I mean, I'm providing, like, four examples, but again, I have not listened to every single one of his Facebook Lives, so there very well could be, like, more examples of him being, you know, disparaging to me and other [redacted] and other, you know, staff.

**Herrera:** Other than the letter that you referenced, from February 2021, has he ever specifically said your name or, like, raised an issue with you? Other than the February letter?

[redacted]**:** Yes. In a February '22 letter, he also did the same thing, saying why the supervisor, you know, had not, like, disciplined me. So there was another '22- 2022 letter that basically says the same thing. There was a community townhall meeting where, where obviously we recognize each other and during the, during the meeting, he turned to me in front of the audience and said - I do not remember the exact quote, but it was basically, you know, like '[redacted], go tell your boss that I wanna' like, you know, 'that I wanna debate her.'

**Herrera:** Okay. And what was this- when was the townhall meeting?

[redacted]**:** You know, I don't remember. It's not, it's not part of the four examples, but you know, you're question obviously, like, reminded me of, like, when he, you know, said my name. So that was one and obviously the two letters, the 2021 letter and the 2022 letter, was directly about, was directly about me, so.

**Herrera:** Was the- Do you believe the community townhall meeting, was it this year?

[redacted]**:** No. It was.. I'm going to say maybe it was last year.

**Herrera:** After the pandemic but.. that's how I almost see things now, like, you know, is it prior to 2020 or, you know.

[redacted]**:** Yeah. It was definitely last year. I can't even tell you, like, when last year but, yeah, I'm not sure.

**Herrera:** Okay. And, are you, are you often in meetings or in places where you're both and in his presence?

[redacted]**:** I mean because I'm her [redacted] and so whenever there is a [redacted]-related kind of meeting or community townhall, I do go. Our field deputies also go as well, so it's not like I go to all of them. If he is going to be there, I typically am.. assigned to go. So I would say in the, you know, almost two-and-a-half years that I've been, you know, in this position, I probably have seen the sheriff a handful of times.

**Herrera:** And does he attend board meetings?

[redacted]: So our board meetings are all virtual, but he has- Yeah, but he does- You know, he has attended virtually and provided, you know, public comments. Where he also, you know, makes disparaging comments about the [redacted] and also about the board of supervisors as well.

**Herrera:** So he has made disparaging comments that include you--

[redacted]: M-hm.

**Herrera:** --during those meetings as well.

[redacted]: Yeah, m-hm.

**Herrera:** And, and are those comments along the lines of these two about you being woke or whatnot?

[redacted]: Being woke, not passing legal muster. In fact, the comments that he made on the 28th I believe - again, I could be wrong, but - I believe that on the 27th when the motion was actually issued, that he provided public comments, and made these remarks.

**Herrera:** So he may have repeated the same remarks that- Okay.

[redacted]: M-hm.

**Herrera:** And, to your knowledge, where would I- is there a place where I could view it? Is it just online? The board--

[redacted]: Yeah, so the Board of Supervisors' agenda and there is a, a search function where you can look at, like, the transcripts.

**Herrera:** Okay. Got it. And so then kind of going next to July 28th, right, I believe there was.. No wait, that was the--

[redacted]: Yeah, so this is that one, yeah.

**Herrera:** --the one we already did. Okay, we already did that one. So then I think there's another one that's February 16th and, I believe it--

[redacted]: Well there was one- Yeah, there was actually one before that, so October 6th 2021 during another Facebook Live, the sheriff said, quote 'You hear me loud and clear now because if you're.. 'because if you're not watching their entire thing I'm pretty sure your flunkies are going to listen to the whole thing and report back to you.' And so he was making

that comment to the board of supervisors. Obviously the board of supervisors wasn't listening to his Facebook Live. '..and the flunkies at these' you know, pejoratively describing our- me and other [redacted].

**Herrera:** Did he specifically reference the [redacted] or just all county staff or?

**[redacted]:** It would be the [redacted] because we're the ones that, you know, are the liaison to the sheriff's department, and so it would be the [redacted] because they work on the [redacted] portfolio. You know, we would be the ones reporting to our supervisors.

**Herrera:** Got it. And then, when was the next statement or thing?

**[redacted]:** Then the next one was on February 16th. So this one was actually something that another [redacted] had shared with me, that the sheriff was at a community townhall and the quote was 'All the supervisors have 25-year-old [redacted] who are right out of college and writing all their motions.' So that was, you know, another incident.

**Herrera:** And, did you find that offensive?

**[redacted]:** I did.

**Herrera:** And why did you find it offensive?

**[redacted]:** One, I think it's an ageist comment. You know, assuming our ages, and then, you know, saying that we're right out of college, trying to minimize again our education, our intellect, you know, and we're, you know, writing all their motions. I mean that's what, that's what policy deputies do. But, you know- It's not just the fact that he's just making these comments. I think, you know, the weight of his words as a sheriff of Los Angeles County, and then stating these state- making these statements in a very public platform, you know, with- potentially with people who, you know, could engage in, you know, possibly, you know, like.. violent, dangerous, who knows, to retaliate against us, I think, you know, just kind of poses some safety concerns. I also think it's being incredibly unprofessional.

**Herrera:** And.. have you, you know, after his comments, after the comments that he's made, have you ever witnessed an uptick in negative attention or commentary on your social media platform? Like, any of your social media accounts?

| | |
|---|---|
| [redacted]: | So I don't use my social media accounts anymore, but, you know, there are comments made, you know, under, like, the supervisor's social media accounts, 'cause she has social media accounts where they, you know, use disparaging kind of comments there. There was another Facebook Live where the supervisor was issuing a reward to assist a sheriff's department investigation, where I did provide remarks and some of the comments that were made under that Facebook Live comments, you know, there was comments about me under there.. yeah. I'm just, like, not tracking every single kind of one, right? But… |
| **Herrera:** | I'm just wondering if you had noticed, 'cause obviously there could be an element of people that pay attention to him or, you know, like him that, you know, could be dangerous. So I'm wondering if you had seen any type of, like, any kind of threat to you or any kind of, like, negative comment to you based on, you know… |
| [redacted]: | Yeah. I mean, the one that I recall is the comment that was made, when I was providing remarks on behalf of the supervisor for the reward. |
| **Herrera:** | You made remarks on what day? |
| [redacted]: | I'm going to have to find that for you. |
| **Herrera:** | Okay. Maybe- and was it, it was on Facebook Live that you made the comments? |
| [redacted]: | Said something? Yeah, it was on Facebook Live. The supervisor had issued a, I believe it was a 20,000 or 25,000 reward to assist in three homicide investigations. I provided remarks and then under the, you know, under the Facebook Live comments, there was something directly on me. |
| **Herrera:** | Okay. 'Cause I think those are still saved too. If that Facebook Live still exists, I think I can still-- |
| [redacted]: | All the comments and everything, yep, are saved as well. And also, I'm kinda curious too on all these other Facebook Lives if comments were also made there and then. I just have not checked on those. |
| **Herrera:** | Yeah and I'm certain that I will now go through, and check them myself. But, you know, anything, any help you can give me with respect to dates that I make sure that I see, you know, obviously I'd appreciate it. But I will certainly do my own review. |

[redacted]: Of the two, right? the July 28th and the October 6th, are ones that I know of. But again, as I shared, he- you'll see that there are many many many Facebook Lives, and he does use a Facebook Live to be disparaging and, and just really negative and just, like, harassing and intimidating, you know, the supervisors and also, you know, the staff that work for, you know, work for her, work for the respective supervisors, specifically the [redacted] in general.

**Herrera:** And, you know, I didn't ask in the background but I should've. When did you get your undergrad degree? And in what? What school did you go to, what was your degree in and what year did you graduate?

[redacted]: Can I ask about these questions? Like, why, like what I did before and how it pertains to this?

**Herrera:** Just background information.

[redacted]: Okay. So.. [redacted].

**Herrera:** Okay. And what school did you go to for undergrad?

[redacted]: [redacted].

**Herrera:** Okay. And, did you- were you awarded a [redacted]?

[redacted]: Yes.

**Herrera:** Okay. And what was the subject matter?

[redacted]: [redacted].

**Herrera:** Okay. And the, was it [redacted]?

[redacted]: [redacted]

**Herrera:** And so then, I know one of the things that was in the intake was that, you reported that there's been a history of the sheriff trying to intimidate women of color and I wanted to know if you could expand on that a bit more and give me more information in terms of…

[redacted]: Yeah, so he's made comments about the supervisors. Right now we have an all-women board, so he's also made misogynistic comments about the board. You know, saying that he wanted to take all of the board of supervisors to a shed and beat them. He's made comments, a racist sexist slur against [redacted], who is Latina. He called her La

Malinche. You know, he also made disparaging comments about another supervisor, Holly Mitchell, who is, who's a black woman; has intimidated and harassed our former CEO who was an Asian woman; harassed and intimidated members of the Sheriff's Civilian Oversight Commission, many of them women, including one of the chairs who is a black woman. I mean he just, you know.

**Herrera:** And when you say- Can you give me some where you said he harassed the former CEO who was an Asian woman. Do you have any more specific about what he did or said or?

**[redacted]:** Like, opened up a criminal investigation, like, on her in a way to intimidate her. Basically anyone who has the responsibility of overseeing the sheriff and the sheriff's department, he has either tried to open up these arbitrary, like, you know, no reason investigations, criminal or not, to, you know, silence folks. In my time as [redacted], you know, like, on behalf of the supervisor I have, you know, drafted many motions around [redacted] because of the misconduct that he and his department engages in, and as a result he goes after [redacted] and he also goes after me. Yeah.

**Herrera:** What did he say about- you said he made negative comments about.. Supervisor Holly Mitchell. Do you recall what he said?

**[redacted]:** I don't really recall, but, what he exactly says, but, you know, when he's saying that, you know, that we 'worship at the altar of wokeness' or we're 'engaging in an orgy of wokeness'. You know, comments like that. And again, you know, like the general comment about, like, that he wants to take the Board to the shed and beat them. Like, it's just, just completely inappropriate.

**Herrera:** And when he makes these comments is it typically during board meetings so that'd be something I would see in the minutes or something of that nature?

**[redacted]:** It'd be in the board minutes or it would be in his Facebook Lives. And honestly I cannot tell you which one, but he pretty much goes after the board probably in every single one of those Facebook Lives.

**Herrera:** I think- I know you had said that there was four things that you were going to tell me. So is there--

**[redacted]:** So the other one, which I kind of mentioned, right?, were the two letters that he wrote. One was in February of 2021 and then the other one was in, I think it was March of 2022.

**Herrera:** And in those letters, I think, was he saying that you were--

**[redacted]:** Oh you know what? Sorry, my bad. He- So yes, in addition to the 2022 letter, he also in a Facebook Live made.. during a Facebook Live I guess someone had a question about, like, why are there only women on the board and on staff? His quote was 'Good question.' They talk about inclusivity, [redacted]. 'The board should explain why they exclude men from their ranks. The people they hire are all 20-something fresh out of college, don't have a lot of senior people, woke flunkies straight out of college, first job. That's who writes the nonsense board letters.' And there is, you know, [redacted] and that, you know, is from the second district. So there's that. But again, you know, the comments around, like, you know, we're all, like, 20-something, we're fresh out of college, da-da-da-da-da, nonsense board orders…

**Herrera:** Okay and I think the July 27th, the comments were regarding your motion taking action, right? So there's that. And, so for that letter that he wrote about you in February of 2021 regarding, like, I believe it was your social media accounts, is that correct? Was there- Did he ever reference that? So, am I correct in assuming, did he bring this up in a board meeting or was this just a letter that he sent in or?

**[redacted]:** Yes. So he sent it in a letter. I believe he also shared it with KFI, the radio station AM 640. So it got coverage there and it just kind of ended there. But again, you know, it was unjustified in that the Office of the Inspector General also, you know, got involved in terms of requesting, you know, the justification and the reason why the sheriff, or the sheriff's department, would even.. investigate my personal social media accounts.

**Herrera:** And did you have any knowledge or any information given to you that, that the investigation went beyond just looking at your public social media accounts?

**[redacted]:** So, the OIG never got any sort of information from the sheriff's department as to the what, you know, the why, the what or anything like that. We just know that they went through my social media accounts, and then they used that to- or he used that to write the letter to my boss in an attempt to get me terminated. In 2021 and also in 2022.

**Herrera:** And, to your knowledge is there anything in county policy that would.. prevent you from making any of the commentary that you made in your social media?

[redacted]: I don't believe so. When the incident happened.. I think we had made- basically had made a joint decision that I just would not use my social media account. Not that there was, you know, a policy per se, but we just figured I just won't, like, use it. Because I do know that there are other [redacted] who've had, like, social media accounts.

**Herrera:** But that wasn't based on there being any type of policy. It's just you thought to avoid further--

[redacted]: To avoid further, like, you know, harassment from the sheriff.

**Herrera:** M-hm. And in any of those social media posts, did any of his supporters or followers try to harass you through any of those, like, old social media posts that are still up? Like, did anything that's in there, did you get any negative attention based on--

[redacted]: Yeah, I mean I have not been on it so I don't know, but I know, like, screenshots were taken.

**Herrera:** Uh-huh.

[redacted]: But I've had this social media account since, like, 2011, and, you know, we were encouraged to use our social media accounts, at my former job [redacted]. So, it's our personal account and the bio, right? and the Twitter bio, it all says, right?, like these are our personal tweets, right, they're not a reflection of, you know, who we work for or where we work for, you know, that kind of thing. So that disclaimer is part of our bio.

**Herrera:** And to your knowledge, were the screenshots all, like, on a public page so nothing was, like.. protected or?

[redacted]: Yeah. So my account, my account's public, so it's not a private account.

**Herrera:** And this is a Twitter account, correct?

[redacted]: M-hm.

**Herrera:** Let me just make sure I've gone through.. Is there anything else, any other examples or any other.. like any other information that I should know that kind of, that evidence of, that support the allegation?

[redacted]: I mean, I have a part of my CPOE complaint. I did list, I believe it was three witnesses, you know, to the harassment. In many ways they were

also kind of victims of the harassment too. And, I don't know if that's, you know, if you're going to interview them as well as part of the investigation.

**Herrera:** [indiscernible]

**[redacted]:** Okay.

**Herrera:** Can you give me their names again? Just to make sure I have it.

**[redacted]:** Yeah. So it's [redacted].

**Herrera:** Okay. Got it. And, to the notes that I have here, the- some of the comments were related to Ms. [redacted] directly, correct?

**[redacted]:** Yes. So the, the community townhall in February 2022, the community townhall happened in her district. And so, yeah, so she had heard about the comments made and shared them with me.

**Herrera:** And, did she tell you via email, via phone, or like, is there any kind of.. contemporaneous account of exactly what was said? Although I'm--

**[redacted]:** I think she might've either, emailed or, you know, told me about it.

**Herrera:** And did she share with you that she also felt offended by the comments that he had made?

**[redacted]:** Yes. So, you know, I don't think that they file their own CPOE complaints. You know, largely because they- typically people who do make complaints about the sheriff, they get, you know, harassed and intimidated. And so they kinda didn't want to go through that, but they were open to at least being witnesses for my complaint. But they have also been, you know, subjected to kind of the same, like, comments and impact.

**Herrera:** And Ms. [redacted], what did she witness?

**[redacted]:** So she has, you know, sort of listened to the Facebook Live, you know, during board meetings when he's making these comments. You know, we're all listening to it, so she I'm sure has listened to comments, you know, these comments being made.

**Herrera:** And has she communicated to you that she was also offended by the comments?

[redacted]: Yes. Oh I almost forgot. He also filed a [redacted]

**Herrera:** And, did you believe that he had filed that to harass you?

[redacted]: Yes. Again as his way of trying to get me fired.

**Herrera:** Is there any actions- any other direct actions that he's taken against you or, like, that he's taken either directly against you or indirectly? Like mentioning you? Is there anything else?

[redacted]: I'm not trying to be difficult. I just think it's hard because I don't listen to every single thing that he says. And he- you'll find, Christine, that, like, he frequently goes on Facebook Live and he frequently goes on, like, Twitter and his own social media accounts. He also had his own, like, radio show with AM 640, you know, so I'm sure he's, you know, making comments there. I just- you know, I have, right, like we have jobs; I have things to do; not just, like, listen to all of his stuff. Unfortunately you're going to have to do some of that, I'm sorry- But yeah, he- I know that he does do this. I just have not, right, like listened to every single one. But I am certain that it's more than the four kind of examples I have provided. These are kind of examples of the types of comments that he makes. And at least, you know, his two letters about me and his [redacted] I believe are, like, the way that he wanted to get me fired, try to intimidate me and harass me. So there's at least, like, three examples of him doing that directly to me. [redacted] And then his kind of general comments about [redacted] you know, made about me and my other colleagues.

**Herrera:** M-hm. And.. you know, I'm going to ask this because I think it's important for me to, you know, have both sides. His comments in his letter to you, I believe he's saying that, you know, they're vulgar and bullying. So he is accusing you of being vulgar and bullying and using profanity and all of that. Do you have any response to that kind of, you know- 'Cause I have seen the tweets and some of them, you know, do use profanity and are directed at him. So do you think there's any merit

to what he's saying in terms of just the language itself was.. profane and not--

[redacted]: The language that's used does use profanity.

**Herrera:** Yeah.

[redacted]: You know, and so whether that's vulgar I think is subjective. But in terms of the comments and the stuff that he's doing using his platform and who he is and who he represents and the power and influence that he has, and his, I would say, documented history of harassing, intimidating other, you know, people who, you know, oversee him, I think is dangerous. I can't open up a criminal investigation on him whereas, you know, he is using county resources and his influence and power to open up an investigation against me with no justification even when the inspector general requests that information. There's documented history of him opening up criminal investigations against members of the Sheriff Civilian Oversight Commission, who've been, you know, appointed to oversee him. So this is more than just like a complaint against Alex Villanueva; it's a complaint against, you know, as I stated earlier, this is the sheriff of LA County, the largest sheriff's department, you know, in the country, with, you know, access to resources that I, you know, don't have. I don't have the platform that he does, to, you know, possibly incite, you know, people to engage in, you know, possible, you know, who knows what, that endangers not only, you know, my safety and the safety of others.

**Herrera:** Fair point. I just figured I, you know, since I have you here it's important to ask, you know. 'Cause he is essentially saying that you're- he's saying that you're bullying him, the sheriff of Los Angeles, so, you know, I'm just curious the response. And I think that's a- I think I understand what you're saying here. And I think that's all the questions I have. It may be necessary, 'cause what I'm going to do obviously as part of the investigation is I'm going to have to listen to a lot of the Facebook Lives to make sure that I've kind of captured anything that could've touched on you and that's a reference to you. So I may have to, come back to you. I don't always have to come back in terms of once I've conducted, you know, the introductory interview, but I may have to come back to you if I find that there's a lot more that he's referenced just to ask you about it and to see, you know, if, you know.

[redacted]: Totally. I'm very curious about what he said. Do you have, do you have the- I'm not sure as part of the materials that you have, along with my CPOE complaint I had also submitted a letter and the letter does have, like, at least a URLs, the links to at least the--

**Herrera:** I don't believe I have that, no.

[redacted]**:** Okay.

**Herrera:** So if you could send that to me. I can also ask my contact to send it to me as well 'cause it sounds like…

[redacted]**:** Yeah 'cause that one at least does hyperlink to the three: the July 2021, the.. October one and I believe the March Facebook Lives. But also--

**Herrera:** If you can send that to me, I would appreciate it, but I will also reach out to my contact to make sure that if there's anything- 'cause I do believe I am missing that. I have what- I think they call it the, the Policy of Equity report, like a notification form, and so that has a lot of, you know, the information, the pertinent information and then I have the actual intake form. Or, I guess I forget what the term is for this, but it essentially is- I think it's, like, seven, eight- it's several pages long. It's the Intake Assessment Form and so it has a lot of reference, you know, all the information in there, but I don't have the letter. So if there is a letter, I would appreciate having it.

[redacted]**:** I mean, the other thing too is, the sheriff's department - again, this is the other thing too, is, these are, you know, things that he's doing on a, like, a county- he's using a county account. This isn't his personal Alex Villanueva's Facebook. This is a sheriff's department Facebook site. But if you go on there, right? Like, the videos are arranged chronologically. So, since you have the dates, you would at least be able to see, like, the examples that I shared. But again, right, like I'm sure, at least Facebook Lives are fairly long.

**Herrera:** Now I'm curious, is there any- I don't know if you are, if you have motions at every board of supervisors meeting or if there's only- I mean, I wonder, is there a general, like, listing of the motions that would've come from you or from the [redacted] so that I could maybe cross-reference between the dates of memos and then the dates of, you know, the board of supervisors meetings or Facebook Lives? You know, if there's, like, maybe some particularly.. I don't know. I don't know if everything you do is controversial - it might be - but I'm wondering if there's any way to conference.

[redacted]**:** Yeah, it's not controversial to us because, one, it's the board doing it and it's the board that supports these motions, right? It's controversial to him because it's about holding him accountable.

**Herrera:** But that's what I'm saying. I don't know if there's any of that where, like, maybe particularly more of interest to him because maybe they were calling him out more directly. Like, for example, you know, I was reading about his- the commission and him not showing up and the subpoena and all of that. So, you know, I'm assuming that there might've been discussion about that in a board meeting or maybe even a motion about that. So that's what I'm saying. Like, if there's any way to, like, have a- if there's anywhere to look to see a better sense of, like, dates where I might have more fertile ground to look at? 'Cause he might be annoyed.

**[redacted]:** I could definitely- yeah, I can look at the ones that I have done, typically.. and I'll see when we filed the motions that are, like, sheriff related. I can send that over to you and then we can check to see--

**Herrera:** I would love that.

**[redacted]:** Yeah, and you can check to see if there was a, you know, a Facebook Live, you know, by him.

**Herrera:** Right. 'Cause I would imagine he might get irritated, you know, if you're doing something that's regarding accountability or kind of his lack of doing something. So I would imagine that might be more fertile ground, you know, those dates versus other dates.

**[redacted]:** Uh-huh, yeah.

**Herrera:** But anything you could give me, I'd greatly- I will gladly take it and then, you know, as I said, you know, I'm going to be very comprehensive in terms of talking to people and making sure that I have all the information that I need.

**[redacted]:** Great. Can I ask if part of your investigation was also going to be, like, talking to the sheriff?

**Herrera:** Yes.

**[redacted]:** Okay.

**Herrera:** Since he's the subject, yes. It will include talking to the sheriff. So, I guarantee you any social media I have is locked. (laughs) Not that there's anything in there, but, you know, I can't imagine having--

**[redacted]:** [indiscernible] yeah, you've seen it, yeah.

**Herrera:** Seeing what I saw in yours, when I, you know, I did the whole Google search. But, when I saw all yours, I was like, Oh okay.

**[redacted]:** It's more than beyond, you know, mine. It's other people who [indiscernible] he's harassing and intimidating.

**Herrera:** Correct.

**[redacted]:** People who are going to do any sort of investigation on him typically tends to be the subject of something.

**Herrera:** Yeah, that's, that's a fair point. And I certainly already have seen some of that. So that's why I'm saying.. I'm aware.

**[redacted]:** Yeah, okay. As long as you're aware, okay. Yeah, so I will look and take a look at the motions that we've issued.

**Herrera:** Although I'm sure he'd be bored with seeing a bunch of kid pictures, so, you know. Not that exciting. In any event, thank you so much for your time. I really do appreciate it, and I'm sure I'll be in touch because I probably will have to follow up once I've done a more comprehensive look-through.

**[redacted]:** Right. Thank you so much.

**Herrera:** Thank you so much. Have a good rest of your day.

**[redacted]:** You too. Bye.

**Herrera:** Take care.

[redacted] (IAB) IV 2558101
WPU
plw

# EXHIBITS

# EXHIBIT A

For CISU Use:

(Method of Receipt)

☐ Telephone
☐ In-Person
■ Online
☐ Paper Complaint

Reference
#2019-0016591
#2022 - 113209

# COUNTY POLICY OF EQUITY

## REPORT/NOTIFICATION FORM

**Methods of Reporting Potential County Policy of Equity (CPOE) Violations:**

1) You may use this form to report a potential violation of the CPOE;

2) File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);

3) Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or

4) Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

No

**2. Are you filing this complaint for:**

Yourself

---

(**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expectation that the CPOE complaint notification be submitted online at https://ceop.lacounty.gov).

**Section A: Reporting Party Information** **Today's Date:** 3/8/2022

**Name:** [redacted] **Emp. #:** [redacted]
**Title:** [redacted] **Email:** [redacted]
**Work #:** [redacted] **Mobile #:** [redacted] **Work Hrs.:** **RDO:**
**Reporting Party's Department:** BOARD OF SUPERVISORS **Dept. Head:** Celia Zavala
**Reporting Party's Other Department:**

**Reporting Party's Unit of Assignment:** Board of Supervisors, [redacted]
**Reporting Party's Work Address:** 500 West Temple Street Los Angeles, CA 90012
**Reporting Party's Immediate Supervisor:** [redacted]
**Date & Time Form Completed:** 2022-03-08 21:28:13

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

Yes

**Name of Supervisor/Manager Notified:** [redacted]
**Date:** 2022-0308 15:32:00 **How:** Email

---

**Section B: Complainant(s) Information**

**1.**
**Name:** [redacted] **Emp. #** [redacted] **Title:** [redacted]
**Work #:** [redacted] **Mobile #:** [redacted] **Work Hrs.:** **RDO:**
**Complainant's Department:** BOARD OF SUPERVISORS **Dept. Head:**
**Complainant's Other Department:**
**Complainant's Unit of Assignment:** Board of Supervisors, [redacted]
**Complainant's Work Address:**
**Complainant's Immediate Supervisor:** [redacted]

**<u>Section C:</u> Alleged Involved Party(ies) Information**

**1.**

| | | | |
|---|---|---|---|
| **Name:** Alex Villanueva | | **Emp. #:** | **Title:** Sheriff |
| **Work #:** | **Mobile #:** | **Work Hrs.:** | **RDO:** |

**Involved Party's Department:** SHERIFF **Dept. Head:**

**Involved Party's Other Department:**

**Involved Party's Unit of Assignment:** LA Sheriff's Department

**Involved Party's Work Address:**

**Involved Party's Immediate Supervisor:** Alex Villanueva

**Section D:** **Alleged Witness(es) Information (if they can be identified)**

**1.**
**Name:** [redacted] **Emp. #:** [redacted] **Title:** [redacted]
**Work #:** **Mobile #:** [redacted] **Work Hrs.:** **RDO:**
**Witness's Department:** BOARD OF SUPERVISORS **Dept. Head:**
**Witness's Other Department:**
**Witness's Unit of Assignment:** [redacted]
**Witness's Work Address:**
**Witness's Immediate Supervisor:** [redacted]

**2.**
**Name:** [redacted] **Emp. #:** [redacted] **Title:** [redacted]
**Work #:** **Mobile #:** [redacted] **Work Hrs.:** **RDO:**
**Witness's Department:** BOARD OF SUPERVISORS **Dept. Head:**
**Witness's Other Department:**
**Witness's Unit of Assignment:** [redacted]
**Witness's Work Address:**
**Witness's Immediate Supervisor:** [redacted]

**3.**
**Name:** [redacted] **Emp. #:** [redacted] **Title:** [redacted]
**Work #:** **Mobile #:** [redacted] **Work Hrs.:** **RDO:**
**Witness's Department:** OTHER **Dept. Head:**
**Witness's Other Department:** [redacted]
**Witness's Unit of Assignment:** [redacted]
**Witness's Work Address:**
**Witness's Immediate Supervisor:**

**Section E: Nature of Complaint or Issue(s)**

**1. What is the date of the alleged potential violation(s)?:** 07/28/2021

**2. Please provide a detailed summary of the alleged potential violation(s):**

I have four examples. Please see attached letter for additional information.

On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their [redacted] who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

On October 6, 2021, during a Facebook Live, Sheriff Villanueva said, "You hear me loud and clear now because if you're not watching their entire thing, I'm pretty sure your flunkies are going to listen to the whole thing and report back to you." When he uses the term "flunkies" he is pejoratively describing me to malign me and minimize my job as [redacted]

On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that "All the Supervisors have 25-year-old [redacted] who are right out of college and writing all their motions." This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age.

Fourth incident is on 3/22/22

**3. Why does the Complainant(s) believe the treatment occurred/is occurring?:**

Though the comments are made generally about the [redacted] the attack was specifically lodged against me because Sheriff Villanueva is seen in the Facebook Live, holding a hard copy of the motion Supervisor Solis put forward on July 27, 2021 titled, "Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation." The motion he was holding and reading from is one I worked on behalf of Supervisor Solis.

Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as [redacted] and the only Asian [redacted], currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, [redacted]

Additionally, it behooves me that as an Asian woman I need to speak up during a time in which anti-Asian hate is at its all-time peak, due to ignorant, racist, and hateful comments about the cause of the COVID-19 pandemic that has led...

---

**Section F: TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

**Date supervisor/manager observed and/or was notified of the alleged potential violation(s):**

**How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):**

**What action(s), if any, did the supervisor/manager take? (Explain in detail):**

**Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following?**

**Medical Attention:**

**Protection:**

**Separation from Alleged Involved Party(ies):**

**Other Assistance:**

---

**Did the supervisor/manager advise the Complainant(s) that they:**

**May seek confidential counseling or assistance from the County's Employee Assistance Program (EAP) at (213) 738-4200:**

**May contact the County Intake Specialist Unit (CISU) directly at (855)-999-2367, or via email at ceop@bos.lacounty.gov:**

**<u>OPTIONAL:</u> Please provide the information below for statistical purposes only**

**Race/Ethnicity:** Asian (Not Hispanic or Latino)

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." - (eeoc.gov)

**Sex:** Female

**Date Of Birth:** [redacted]

# EXHIBIT B

For I.S.U. Use Only
Method of Receipt
☐ Telephone
☐ In Person
☐ POE Report Form
☑ Other: CPOE
Intake # 22-046

# Policy of Equality
# Report / Notification Form

General Instructions: Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite [redacted] Commerce.

******************************************************************************

Section A: Reporting Party Information Today's Date: 03 / 17 / 2022

Name: [redacted] Emp. # [redacted] Rank/Title [redacted]
Work Tel# [redacted] ; Home Tel# [redacted] ; Work Hours ______ - ______ RDO ______
Unit of Assignment: Board Of Supervisors Office Unit Commander: Supervisor [redacted]
Division LA County Board of Supervisors
Name of Supervisor Completing this form (if different from above): ______________ # ______
Date & Time form completed: ____ / ____ / ____ ______ hours.

☐ Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.)**

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?
☐ Yes (if yes, fill in details)
Who: ______________
When: Date: ____ / ____ / ____ Time: ______ hours.
How ______________
☐ No
☑ Do not know

******************************************************************************

Section B: Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: ____ / ____ / ____ ______ hours or between ____ / ____ / ____ and ____ / ____ / ____

If multiple incidents or unknown, explain:
See narrative.

******************************************************************************

Section C: Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

Same as RP ______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

**Section D:** Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro (Sheriff) Employee # [redacted] UOA LASD

Employee # ______ UOA ______

Employee # ______ UOA ______

Employee # ______ UOA ______

**Section E:** Alleged Witness(es) (if they can be identified)

[redacted] Employee # [redacted] Rank/Title [redacted]
Work Tel# ______ ; Home Tel# [redacted] ; Work Hours ______ - ______ RDO ______

[redacted] Employee # [redacted] Rank/Title [redacted]
Work Tel# ______ ; Home Tel# [redacted] ; Work Hours ______ - ______ RDO ______

[redacted] Employee # [redacted] Rank/Title [redacted]
Work Tel# ______ ; Home Tel# [redacted] ; Work Hours ______ - ______ RDO ______

______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

**Section F:** Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity Report (ICMS #2022-112209) from CEOP Executive Director Vickey Bane, filed by RP/C[redacted] [redacted]heComplainant,[redacted]Board of Supervisors employee, alleged the following, in pertinent part, (verbatim): "On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their [redacted]who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

"On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that 'All the Supervisors

(☑ Check, if narrative is continued onto the next page)

**Ask: "Why do you believe this treatment is occurring?"**

Section F (cont'd): **Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.**

(Continued)

have 25-year-old [redacted] who are right out of college and writing all their motions.' This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age."

In addition, Complainant [redacted] wrote in pertinent part, "Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as [redacted] and the only Asian [redacted] currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer [redacted]"

(ISU Note: A copy of the CPOE complaint is contained in the ISU efile for details.)

*******************************************************************************************************************

**Note: Continue onto the next page**

Section G: Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY DO NOT FILL OUT THIS SECTION IF YOU ARE THE ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made: 03 / 16 / 2022 , 1521 hours.

How did you become aware of the potential violation (explain in detail):
On March 16, 2022, the ISU received CPOE ICMS #2022-112209, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Xochilt Rosas to document the allegations in the County Policy of Equity Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑ Medical Attention
**Response:** to be ascertained

☑ Protection
**Response:** to be ascertained

☑ Other Assistance
**Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑ May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours, request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone ____________ Date & Time: ___ / ___ / ____ , ______ hour.
(Name)

☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time 03 / 16 / 2022 , 1521 hour. How? ☑ e-mail ☐ Fax ☐ County mail

**************************************************************************************************

Section H: **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name: Deputy X. Rosas Emp. # [redacted]

Day, Date and time ISU received form Thursday / 03 / 17 / 2022 , 1140 hours.

☑ Referred to Equity Unit: Date & Time - 04 / 04 / 2022 , 1700 hours.

☐ If not referred to Equity Unit, explain in detail action taken:

Additional Information (if any):

☐ Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☑ Subject's Unit Commander
☑ Reporting Party's Unit Commander
☐ Victim's Unit Commander

# EXHIBIT C


IV 2558101
EXHIBIT C

# MISCELLANEOUS DOCUMENTS

SH-AD-703 Revised (2/22)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: June 27, 2022

FILE NO:

OFFICE CORRESPONDENCE

**FROM:** JASON P. WOLAK, COMMANDER
PROFESSIONAL STANDARDS DIV.

**TO:** RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT:** **REQUEST FOR** INTERNAL AFFAIRS BUREAU ADMINISTRATIVE INVESTIGATION

Incident Date(s): *(use semi-colons to separate multiple dates)*
Between July 28, 2021, and March 2, 2022

Synopsis:

POE 22-046. It is alleged that Subject Villanueva made inappropriate POE related remarks while in the workplace.

Date a Sergeant, or above, became aware of an act, omission, or other misconduct:
March 17, 2022

One Year Statute Date (If criminal monitor, leave blank): March 16, 2023

Alcohol Related? NO

Citizen Complaint? NO If yes, SCR #:

Complainant's Name (Add employee number if a Department member)
[redacted] #[redacted]

## REQUEST FOR IAB INVESTIGATION AND/OR CRIMINAL MONITOR

**Involved Subject** *(For additional subjects, use Subject Continuation Page 703-A)*

**Subject Name, Rank, Employee Number, and Unit of Assignment:**

Alex Villanueva, Sheriff, #[redacted] Office of the Sheriff

Potential MPP Violation(s):

3-01/121.10 - POE Discrimination; 3-01/121.15 - POE Sexual Harassment; 3-01/121.20 - POE Harassment Other than Sexual; 3-01/121.25 - POE Third Party Harassment; 3-01/121.30 -POE Inappropriate Conduct Toward Others; 3-01/121.35 -POE Retaliation

Subject's Assignment/Duty Status:

- ☑ Subject's assignment/duty status unchanged
- ☐ Relieved of Duty (ROD), assigned to home ROD Date:
- ☐ ROD, assigned to a relieved of duty position
- ☐ Probationary Employee

Justification for the subject's assignment/duty status *(required)*:

N/A

Consideration(s) for IAB Request:

* Mandatory IAB Investigation

- ☐ Witnesses are spread over a large geographic area.
- ☐ The nature of the allegation(s) involves incidents of high media attention.
- ☐ A subject is a supervisor or manager (lieutenant or above; assistant director or above).
- ☐ The nature of the allegation(s), if founded, will likely result in discharge.*
- ☐ The allegation(s) concern family/domestic violence.
- ☐ The allegation(s) concern workplace violence.*
- ☐ The allegation(s) concern profiling or bias against members of the public.*
- ☑ Other: Allegations contain Policy of Equality*

☐ Criminal Monitor by IAB (Refer to MPP 3-04/020.30 – Internal Administrative and Criminal Investigations) *enter investigating agency, crime, and report number:*

Supervisory Inquiry authored? ☐ Yes ☑ No

Contact person for source documents (i.e.: supervisory inquiry and/or investigative materials) at the requesting unit:

Prepared by Unit Commander/Director, or designee:

Lieutenant John Carter, #[redacted] Internal Affairs Bureau

**NOTE: Email this form to "IAB Investigation Requests." A review of this request will be conducted by the Internal Affairs Bureau. There may be situations when the Internal Affairs Bureau will decide, upon initial review, to return the case to be conducted as a unit level investigation.**

**For IAB use only**

Assigning Lieutenant Lieutenant John Carter, #[redacted]

IAB Investigator Christine Diaz-Herrera, Esquire, Sanders Roberts LLP

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558101

OFFICE CORRESPONDENCE

**FROM:** EDWIN A. ALVAREZ, CHIEF
PROFESSIONAL STANDARDS DIVISION

**TO:** RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION**

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER.

Alex Villanueva, Sheriff, [redacted]

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct)

03/17/2022

Potential MPP Violation(s) including, but not limited to

3-01/030.10 POE - DISCRIMINATION
3-01/121.15 POE - SEXUAL HARASSMENT
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.30 POE - INAPPROPRIATE CONDUCT TOWARD OTHERS
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description).

It is alleged you acted in an inappropriate POE related manner and made inappropriate POE related remarks while in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been rescinded. You are being ordered by your Unit Commander that during the time this investigation is active, any routine absence request must be submitted directly to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

**SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:**

**Subject:** [signature] **Witness:** [signature]

**Employee#:** [redacted] **Date:** 6/29/22 **Employee #** [redacted] **Date:** 6/29/22

J. SATTERFIELD NOTED

# 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

# 3-01/121.15 - Policy of Equality - Sexual Harassment

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature which meets any one of the following criteria:

- Submission to such conduct is made either explicitly or implicitly as term or condition of an individual's employment;
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
- Such conduct has the purpose or effect of unreasonably interfering with the individual's employment or creating an intimidating, hostile, offensive, or abusive working environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

# 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited. Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

# 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander. When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior. The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

# 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

# 3-01/121.35 - Policy of Equality - Retaliation

Retaliation, for the purposes of this policy, is an adverse employment action against another for reporting protected incident, filing a complaint of conduct or opposing conduct that violates this policy or related state or federal law, participating in an investigation, administrative proceeding, or otherwise exercising their rights or performing their duties under this policy or related state or federal law.

**Revised: 11/20/2020**

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

October 23, 2023

IAB File # IV 2558101

Ms. [redacted]
450 Bauchet Street
Los Angeles, California 90012

Dear Ms. [redacted]:

**NOTIFICATION LETTER**

On or about March 17, 2022, a Policy of Equality (POE) Complaint was filed on your behalf with the LASD Intake Specialist Unit, wherein you complained about workplace matters. As required by California Penal Code Section 832.7 (e)(1), "the department or agency shall provide written notification to the complaining party of the disposition of the complaint within 30 days of the disposition." This letter serves to satisfy such requirement.

Your complaint against Former Sheriff Alex Villanueva was investigated by the LASD's Equity Investigations Unit (EIU). Upon completing the investigation, the EIU forwarded the case to the County Equity Oversight Panel (CEOP). On October 17, 2023, the CEOP met to render its finding.

Upon consideration of the facts developed in the investigation, the Panel's recommended finding is as follows:

> As to Alex Villanueva the panel determined that a violation of the Department's Policy of Equality occurred, and appropriate administrative action will be taken.
>
> No other violations of the Department's policies and procedures were found.

You should be aware that Alex Villanueva has the right to grieve and/or otherwise appeal this recommended determination.

You should also be aware that, "the notification described in this subdivision shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court, or judge of this state or the United States," California Penal Code Section 832.7(e)(2).

Sincerely,

ROBERT G. LUNA, SHERIFF

*ORIGINAL SIGNED*

Ron Kopperud, Captain
Internal Affairs Bureau

SH-AD-32A (3/23)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: October 17, 2023

FILE NO: IV 2558101

OFFICE CORRESPONDENCE

**FROM:** SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:** COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:** **POSSIBLE MANUAL OF POLICY AND PROCEDURES VIOLATIONS**

The following Manual of Policy and Procedures violations relate to the allegations in this case, regarding **Alex Villanueva, Former Sheriff:**

**3-01/121.10 Policy of Equality – Discrimination (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.15 Policy of Equality – Sexual Harassment**

Disposition:
_____ Charge founded
_____ Charge unresolved
__X__ Charge unfounded
_____ Charge exonerated

**3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.25 Policy of Equality– Third Person Harassment (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**Discipline Assessment – Alex Villanueva, [redacted]**

**Review of Applicable "Guidelines for Discipline" Section:**

The Departmental "Guidelines for Discipline" (revised August 1, 2020) includes the Policy of Equality, and lists the following analogous misconduct with the associated disciplinary penalties:

| CONDUCT | STANDARD DISCIPLINE |
|---|---|
| **3-01/121.10 Policy of Equality – Discrimination (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |

| | |
|---|---|
| **3-01/121.15 Policy of Equality – Sexual Harassment** | **Five (5) Days to Discharge** |
| **3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |
| **3-01/121.25 Policy of Equality – Third Person Harassment (Based on Gender and Ethnicity)** | **Written Reprimand to Discharge** |
| **3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity)** | **Written Reprimand to Discharge** |
| **3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |

**Determination of Discipline:**

Based upon the attached assessment of mitigating and aggravating factors, the following discipline has been determined to be appropriate. This discipline is subject to revision upon receipt of the Subject's response or grievance.

**_____ Discharge**
**_____ Reduction in Rank**
**_____ Removal from Bonus Position**
**_____ Suspension with loss of pay and benefits for ___ days with / without the option of EBD**
**_____ Written Reprimand**
**_____ No Discipline**

**__X__ Panel Recommends "Do Not Rehire" notation at top of file**

SVE:WB:wb

SH-AD32A (3/23)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE October 17, 2023
FILE NO IV2558101

OFFICE CORRESPONDENCE

**FROM:** SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:** COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:** **Alex Villanueva, #**[redacted]
Former Sheriff
Office of the Sheriff
Executive Division

The County Equity Oversight Panel, consisting of Constance Komoroski, Mercedes Cruz and Roberta Yang met by teleconference on October 17, 2023. Also attending the teleconference was Department representative Chief Laura Lecrivain.

Upon consideration of the facts developed in this investigation, the Panel determined that the Manual of Policy and Procedures section 3-01/121.15 Policy of Equality – *Sexual Harassment* was **unfounded.** Sections 3-01/121.10 Policy of Equality – *Discrimination (Based on Gender and Ethnicity)*, 3-01/121.20 Policy of Equality – *Discriminatory Harassment (Based on Gender and Ethnicity)*, 3-01/121.25 Policy of Equality – *Third Person Harassment (Based on Gender and Ethnicity)*, 3-01/121.30 Policy of Equality – *Inappropriate Conduct Toward Others (Based on Gender and Ethnicity)*, and 3-01/121.35 Policy of Equality – *Retaliation (Based on Gender and Ethnicity)* were **founded.**

The County Equity Oversight Panel recommended that the Subject should receive **a "Do Not Rehire" notation at the top of their personnel file.**

SVE:WB:wb

# LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

Incident Date: Between March 5, 2022 & March 22, 2022
Department Knowledge: March 16, 2022
Statute Date: March 15, 2023

IAB #IV 2558097

# INTERNAL AFFAIRS BUREAU INVESTIGATIVE REPORT

# CONFIDENTIAL

# TABLE OF CONTENTS

# Table of Contents

IV 2558097

**AUDIO VIDEO TRACKING SHEET**

**PERSONNEL INVESTIGATION FORM**

**INVESTIGATIVE SUMMARY**

**INTERVIEW TRANSCRIPTS**

1-Complainant [redacted]

**EXHIBITS**

- **A** County Policy of Equity Report/Notification Form. ICMS #2022-112213
- **B** Policy of Equality (POE) Report/Notification Form, #22-045.
- **C** One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show; Tweets; email to the Sheriff Department Employees; and two articles from the Los Angeles Times.

**MISCELLANEOUS DOCUMENTS**

- Request for IAB Investigation Memorandum from Commander Jason P. Wolak to Captain Ron Kopperud, dated June 27, 2022.
- Subject of Administrative Investigation Notification Form signed by Subject Alex Villanueva, dated June 29, 2022.
- Manual of Policy and Procedures:
  3-01/121.10: Policy of Equality - Discrimination
  3-01/121.20: Policy of Equality - Harassment (Other than Sexual)
  3-01/121.25: Policy of Equality - Third Party Harassment
  3-01/121.30: Policy of Equality - Inappropriate Conduct Toward Others

**IV 2558097**

# AUDIO/VIDEO TRACKING SHEET

# INTERNAL AFFAIRS BUREAU
## - Audio/Video Tracking Sheet -

## # IV 2558097

Investigator's Name: Lieutenant Ann Devane

Total number of USB Flash Drives: 0

Total number of compact discs: 2

Total number of digital audio files: 1

**DIGITAL AUDIO FILES**

| Name |
|---|
| 1-Complainant [redacted] |

**DIGITAL MEDIA**

| | |
|---|---|
| **Transcripts** | One (1) Compact Disc containing: Audio recorded interview and interview transcript |
| **Exhibit C** | One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show; Tweets; email to the Sheriff Department Employees; and two articles from the Los Angeles Times. |

# PERSONNEL INVESTIGATION FORM

# COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## PERSONNEL INVESTIGATION

1 1

| DATE | No. OF SUBJECTS | UNIT(S) INVOLVED | I.A.B. FILE No. |
|---|---|---|---|
| 09/20/2023 | 1 | Executive Division | IV 2558097 |

MANUAL SECTIONS ALLEGEDLY VIOLATED (BY TITLE AND No.)
3-01/121.10,POE-Discrimination; 3-01/121.20, POE-Harassment(Other than Sexual);
3-01/121.25, POE-Third Party Harassment; 3-01/121.30, POE-Inappropriate Conduct Toward Others

DATE, TIME, DAY OF OCCURRENCE: Between March 5, 2022 and March 22, 2022
RELATED URN FILE No. IF APPLICABLE:
OF OCCURRENCE: Unknown

☐ COMMUNITY ☐ ☑ POE #: 22-045

| SUBJECT | LAST NAME | | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|
| No. 1 OF 1 | Alex | Villanueva | | Sheriff | [redacted] |
| UNIT OF ASSIGNMENT: Executive Division | | DATE ASSIGNED | | DIVISION OR REGION: Executive Division | |

STATUS OF SUBJECT: ☑ CONTINUING ON DUTY ☐ RELIEVED OF DUTY - REASSIGNED TO: ☐ OTHER

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| Male | Hispanic | Brown | Brown | 510 | 195 | [redacted] | 60 |

| DATE OF HIRE | DATE APPOINTED TO RANK | INTERVIEW TAPE RECORDED ON |
|---|---|---|
| 12/03/2018 | 12/03/2018 | TAPE ___ OF ___ SIDE ☐ A ☐ B DATE ___ |

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| [redacted] | | | |

| SUBJECT | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|
| No. OF | | | | | |
| UNIT OF ASSIGNMENT | | DATE ASSIGNED | | DIVISION OR REGION | |

STATUS OF SUBJ ☐ RELIEVED OF DUTY - REASSIGNED TO: ☐ OTHER

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| DATE OF HIRE | DATE APPOINTED T | INTERVIEW TAPE RECORDED ON |
|---|---|---|
| | | OF |

**PREVIOUS FOUNDED INVESTIGATIONS**

| | | | |
|---|---|---|---|
| | | | |

**CODE: C** - COMPLAINANT, **W** - WITNESS

| CODE | No. | LAST NAME | FIRST NAME | SEX | RACE | AGE |
|---|---|---|---|---|---|---|
| C | 1 OF 1 | [redacted] | [redacted] | Male | White | Adult |

RESIDENCE ADDRESS: [redacted]
BUSINESS ADDRESS: 500 W Temple Street Los Angeles, CA. 90013
CDL OR LASD EMPLOYEE NO.: | BUS. PHONE (AREA CODE): [redacted]
INTERVIEW TAPE RECORDED ON: TAPE ___ OF ___ SIDE ☐ A ☐ B 07/21/2022 UNK

| CODE | No. | LAST NAME | FIRST NAME | SEX | RACE | AGE |
|---|---|---|---|---|---|---|
| W | 1 OF 1 | [redacted] | [redacted] | Female | UNK | Adult |

RESIDENCE ADDRESS: [redacted]
BUSINESS ADDRESS OR UNIT OF ASSIGNM: Los Angeles, Ca. 90013
CDL OR LASD EMPLOYEE NO.: | BUS. PHONE (AREA CODE): ( )
INTERVIEW TAPE RECORDED ON: TAPE 08/01/2022

| PRIMARY INVESTIGATOR | | EMP. No. | APPROVED | DATE |
|---|---|---|---|---|
| Sanders Roberts LLP | | | R. [signature] | 10-2-23 |
| ASSISTING INVESTIGATOR | RA | EMP. No. | DATE SUBMITTED | |
| Lieutenant Ann Devane | LT | [redacted] | 09/26/2023 | |

**IF ADDITIONAL SUBJECTS, WITNESSES, COMPLAINANTS OR DISCIPLINE HISTORIES, LIST ON CONTINUATION PAGES.**

# INTERVIEW TRANSCRIPTS AND AUDIOS


IV 2558097
AUDIOS AND
TRANSCRIPTS

# COMPLAINANT INTERVIEW

**REFER TO INTERVIEW TRANSCRIPTS AND AUDIO CD**

**1. COMPLAINANT [redacted]**

**IV 2558097**

**WITNESS INTERVIEW**

[redacted]

**Herrera:** I am an attorney with Sanders Roberts. We have been hired by the county to conduct this independent investigation. The county, because they don't- apparently the Sheriff's Department doesn't know how to use these Teams videos, I'm also going to record via audio on another device. Just letting you know that. 'Cause apparently they haven't figured out- they haven't figured out how to incorporate speech.

[redacted] Why would you be interested in what the Sheriff's Department can do? They have CPOE investigators who have interviewed me and I thought this was an external investigation because the county was not pleased with how the Sheriff's Department was handling it. Is that not correct?

**Herrera:** I think the idea, and I'm sure you're familiar with how the CPOE process is, but typically there's an intake and an assessment done and then depending on, you know, the results of the intake and assessment, you know, it's farmed out to different people to do investigations. In this case, because of the nature of the allegations, I think also the subject of the investigation itself, I think the Sheriff's Department decided that it made more sense, and the county, to have an external, a neutral third party, to conduct this.

[redacted] I hear what you're saying and that's true as to all CPOE investigations except the Sheriff's Department ones. And I was actually contacted by a Sheriff's Department investigator. I wasn't told that it was an Intake decision and then the sheriff, in the link I sent you, he told the Times Editorial Board that I had made a CPOE complaint against him. So I'm pretty sure that they had triggered some process internally that he was informed of. And so I'm just- Look, it doesn't matter. I'm very skeptical about this whole process.

**Herrera:** I'll certainly ask you some questions about that to get a better sense of who you spoke to and I can look into that. So again, for the record, my name is Christine Diaz Herrera. Can you say your name for the record?

[redacted] [redacted]

**Herrera:** Perfect. And today is July 21st 2022. It's 2:05 PM. I have an admonition that I'd like to read. So my admonition states that "You are about to be questioned as a part of an official Los Angeles County Sheriff's Department administrative investigation. You are here as a witness in a matter which concerns another employee, the complainant. You obviously, as you know, are not a subject of the investigation itself and you are not under investigation at this time. I think the question that they typically ask is whether you're aware of the Policy and Ethics chapter of the Manual of Policy and Procedures, and this might be different because you're not actually within the Sheriff's Department.

[redacted] Right. The admonition doesn't quite make any sense, but I note the admonition.

**Herrera:** Right, and, you know, essentially the other piece of it is just that this is a confidential interview and we ask that you keep the contents of- the substance of what we talk about today confidential but certainly that you've talked to me or that this investigation exists is not a secret and, you know, to the extent that you share it with someone else, that's certainly your purview.

[redacted] I'm not part of the Sheriff's Department.

**Herrera:** Correct, I am aware of that.

[redacted] So if you're conducting an internal sheriff's investigation, already I was contacted by the Sheriff's Department. I was told it was confidential and then the sheriff told the LA Times about it. So I don't personally hold any stake in the confidentiality of the sheriff's process. I'm not questioning you or what you're assigned to do, but as soon as you provide this to the sheriff, he will do whatever he thinks is best politically with it and that's how it is. So I'm not going to agree that I won't talk about this with whomever I feel like and including County Counsel, including [redacted], including all the other folks who I think it might be appropriate in order to protect the rights of the individuals who he's been targeting.

**Herrera:** Sure, and I will say that my work is at the direction of County Counsel and because he is the subject, it wouldn't be him that I'm reporting to and it wouldn't be him that I would be actually giving the final report to, but in any event, I do understand.

[redacted] Okay that's fine. The reason my tone has changed is because you read me a Sheriff's Department internal investigation admonition. If you're telling me that you work for County Counsel and this is going to County

Counsel, then I apologize for my tone. It's the Sheriff's Department and their conduct that I take issue with. So if County Counsel just said, 'Hey look, because this is going to go to the sheriff, read this admonition', I understand that and I have no beef with County Counsel. My concern is with the conduct within the Sheriff's Department. Once County Counsel's done with their investigation, if they then make a determination of what they have to tell the sheriff, I don't have any problem with that. I thought this was being conducted by the sheriff, in which case I have a different opinion.

**Herrera:** And that's a fair point, and again, in terms of process, all I can tell you is that, you know, they gave me all of the things that they normally would use because I'm standing in their shoes, so to speak. In some ways that this would normally be done, typically by somebody within the Sheriff's Department.

[redacted] My statement to the Sheriff's Department wasn't given to you?

**Herrera:** [inaudible] it's not.

[redacted] Okay. Because County Counsel has asked you to do this. The Sheriff's Department didn't, okay got it. So you don't- When you get to the questions I'll talk to you about that.

**Herrera:** Okay, fair enough. That's what I'm saying. So, you know, I apologize. It sounds like there's some pieces of information out there that I may not have yet--

[redacted] No no, it's okay.

**Herrera:** --but certainly I will make every effort to make sure that I do get that information. I typically just start with a little bit of background information. So, you know, how long have you worked with the County of Los Angeles?

[redacted] Since 1991.

**Herrera:** And what is your current position?

[redacted] [redacted]

**Herrera:** And how long have you been in that position?

[redacted] Well I was hired in 2013, and the post was sort of officially anointed in 2014. So, depends on how you look at it, but it was late 2013 or early 2014.

**Herrera:** Correct. And, who do you report to?

[redacted] Technically I report to the Executive Officer, Celia Zavala. I have an odd status in that I'm [redacted] to the Board of Supervisors, so she supervises me primarily for administrative purposes and I report to them for substantive matters.

**Herrera:** And when you say you report to them, you mean you report to the Board of Supervisors?

[redacted]

**Herrera:** And what are your duties typically? I know that's a broad question, but--

[redacted]

**Herrera:** Do you have any oversight with regards to, like, use-of-force issues that come up within the Sheriff's Department?

[redacted] Oh yeah, absolutely. Our staff role out to all officer-involved shootings and we are supposed to be able to monitor and actively investigate those instances by law, but the Sheriff's Department does not permit us to properly do it. What they do permit is for us to come on scene for a shooting, get a walk-through -sometimes a partial walk-through- of the scene and some basic information about what's happened. They usually don't cooperate with our investigations after that. So for instance [redacted] We asked for the reports relating to the [redacted] It was the justification for what they did; they refused to give it to us. So there's a disconnect between what our job is under statute and ordinance and what the Sheriff's Department obstructs or does not obstruct. But we do go out to the scenes.

We do a similar thing for in-custody deaths, on a case-by-case basis. So in some instances where there's in-custody deaths or even uses of force, Category 3 -the more serious uses of force- then we sometimes go to the scene again to see the scene, to look at it, but sometimes we don't. Because there are instances where that's not really helpful based on the way things operate in Custody, when we gather any information, so. So we do do that too. And yeah, as to use of force in general, part of our duties are to review.. not on a case-by-case basis but overall, the use of force and the way they're handling policies. We are permitted to do individual investigations but we're not required to.

**Herrera:** What about if someone was injured while in custody? Is that type of allegation, is that something you would look into?

[redacted] Yeah. Again, the way our mandate is worded, we are responsible for monitoring and sometimes investigation matters in Custody, which includes what you describe, as well as many other issues. Any kind of things having to do with the terms of confinement and the manner in which people are held, any complaints they have. So we get complaints directly from people, we go and talk to them, we conduct inspections of the jails as well as limited investigation as to individual incidents. The Sheriff's Department has primary responsibility and our primary model is that we prefer to monitor the Sheriff's Department's investigations. But we are lawfully entitled to conduct a follow-up investigation. So for instance, we have recently in our investigation in assisting the Attorney General's Office have done some onsite interviews and reviews and

taken photographs and whatnot. So I recently was down at the East LA Station and took a photograph of a 3%er logo that has been discussed recently and has been a matter of- I think will be a matter of public concern but has been a matter of concern within the county. So that's kind of how we function. We don't investigate every case. We're not ever the first level of investigation. We're meant to be sort of a second opinion and quality control.

**Herrera:** Have you had any role in- Let me back up. Are you aware of there being an incident where there was someone who was injured while in custody, allegedly by an officer putting his knee on their neck where they couldn't breathe?

[redacted] Oh yes.

**Herrera:** Okay.

[redacted] I'm very much aware of incidents like that. I don't know about the 'couldn't breathe' part.

**Herrera:** That they put the knee on the neck. And that they--

[redacted] Yeah. I think the one that has gotten a lot of attention of late is the [redacted] incident. [redacted]

**Herrera:** And is that an incident that you are investigating separately or looking into or, or you just monitor it?

[redacted] We are attempting to investigate it; however, the Sheriff's Department has been obstructing our investigation.

**Herrera:** And how do they do that? How do they obstruct?

[redacted] Well the tools that we have for investigating are two parts: one is an ordinance, and statutes, that require the cooperation of the Sheriff's Department. The other part is subpoena power, which is also according to both ordinance and statute. And so when it comes to the subpoenas that we issue, the Sheriff's Department does not comply with them, and that's how they obstruct. When it comes to the other part of our ordinance, which is supposed to be self-executing, which is that we have the authority to require any county department and any Sheriff's Department employee to provide information to us upon request in the manner that we directed, they simply refuse. And that's done at the

direction of the sheriff and then, of course, as- we're talking here because of more active efforts the sheriff has taken to obstruct my investigations that began when he first took office and we started to report on his rehiring of a deputy, a law enforcement gang member, Caren Mandoyan, and when we reported on that then he started to take some actions against me: placed me under criminal investigation and the subject of my information I provided to CPOE related to another effort on his part to attack and discredit me, which I believe was for the purpose of obstructing our investigations into his misconduct and law enforcement gangs. But when I was talking about them obstructing our direct investigations, I was referring more to the fact that they refuse to comply with subpoenas and refuse to comply with information requests except on limited bases.

**Herrera:** Now is that something that you can compel them to do so in court or is that something--

[redacted] Yes. The subpoenas have a built-in mechanism and we have- So the sheriff was initially subpoenaed to speak about law enforcement gangs. He refused to talk. The county took the action permitted for in the statutes, certified the matter with contempt proceedings to the court. The court told the sheriff that he could not ignore our subpoenas and then he showed up. He then refused to take the oath and so we had to go back to court and get him compelled to take the oath. So then he took the oath and swore to tell the truth and we asked him a bunch of questions and he refused to answer many of them. So we have to go back to court to compel him again and we're in the process of preparing that. So there is absolutely a mechanism for compelling the subpoena process, which is a very slow mechanism and the sheriff has I think intentionally made it slow, so it hasn't effectively compelled the behavior even though we've won every time we've gone to court, and the court has followed up with us.

The other mechanism I mentioned, that's the subpoena process. Our inherent authority to direct county employees, as an officer of the county given that authority, the Sheriff's Department also does not comply with that. County Counsel - I think it was last week - filed a petition for a writ of mandate in the Superior Court to compel them to comply with that legal duty and.. which should do a bunch of things. Like, when I first came under criminal investigation, they shut off our access to computers. So if we had that access we wouldn't even have to ask them; we would just type in our code word and we would pull up information on the computers. So that's part of that writ of mandate, to say you need to turn that back on. Body cameras for instance. The whole plan with putting out body cameras was that we would have

direct access to that video, without having to ask the Sheriff's Department for it and the Sheriff's Department has refused to comply to that. So then that's part of that writ of mandate that will eventually, I suppose, be litigated in court, but it takes a very long time. We have no, you know, direct ability to enforce or to compel since the Sheriff's Department's a stand-alone entity.

You look like you're frozen. Are you there? I think we have technical difficulties, so I don't know what of this you can hear, if any. I'm going to stop talking. [silence 0:18:09 to 0:18:49] Hello, you're moving again.

**Herrera:** Yeah, I could hear you but you couldn't hear me. So I--

[redacted] Yeah, your picture froze in a one position and then I couldn't hear anything from you. So I kept talking for a while--

**Herrera:** It was the whole thing, I got all of- The last thing I heard was that, you know, that the process to access things like body-worn cameras, that there's no direct ability to enforce or compel, so you've been going through that process to get that type of information.

[redacted] Right, apart from the legal process, we don't have any ability to directly do something. The county, everything it does with respect to the Sheriff's Department is controlled by the sheriff. So for instance, Murakami the undersheriff was [redacted].' Mandoyan, the county had some ability yet they had to sue him to prevent him from rehiring Mandoyan. So it's not like I can say, 'Hey you're a county employee. If you don't answer my questions you're fired' because the sheriff gets to decide who to fire. So effectively I can do nothing without the sheriff's permission and the sheriff does not choose to give it. It's kind of, like, Watergate where they fired the special prosecutor. Unless the person being investigated agrees to it, they can't be investigated. Unfortunately that's the way it currently is.

**Herrera:** Just an aside, but the Board can't target the money? Like for example, the contractors that, like, the body-worn cameras, like 'I'm not gonna pay unless we have access to it.'

[redacted] That's correct and recently something like that has just happened, which is, has to do with school resource officers. So in that context, the Board directed us to approve or disapprove the contracts in those matters rather than- They would basically delegate it to us, their approval authority. All county contracts are controlled by the Board, but

the downside is that these are important contracts and the budget point- they could turn off the sheriff's budget, say 'We're gonna defund the police,' as people have sometimes requested, but they don't want to do that because we need police, you know. So unfortunately the mechanisms they have to control the sheriff are all blunt instruments that would have a negative impact upon the public and less of an impact on the sheriff. And so, it's kind of like sanctions in the international arena where if you put sanctions on a county then the people of the country suffer and the leaders sometimes don't, you know. It's that same kind of problem. In theory they ought to have a lot of power and authority, but they- in practice they don't really have a mechanism to force the sheriff. Which is why - I don't know if you followed it, but recently they voted to put on the ballot for the public to consider whether or not they could remove the sheriff by a four-fifths vote for failing to abide by his legal duties as well as obstruction of investigation. So that's kind of a mechanism that, if the voters approve, they would then have the ability to say to the sheriff, 'Look, you're not following the law and so we're going to remove you if you don't follow the law.' Still, politically that's a big pill to swallow.

**Herrera:** Right.

[redacted] So I don't know if they would actually do it because, again, the impact on the public and the perceived impact on the public is very great and so I think they would be loathe to use that mechanism for enforcement purposes. What we really need is, is court-ordered compliance and that will take time. [redacted] which will also take time. So there are mechanisms, but they're all slow.

**Herrera:** That seems to be a theme everywhere, not just here. With regards to your interactions with the sheriff's office, what's the extent to your typical interactions with them? Like, do you.. I know it's a broad question.

[redacted] Well it is a broad question so I'll break it down into different sort of categories. There's me personally; there's my office; and then there's what you mean by the sheriff. So me personally, honestly that's a laugh. My office, which is roughly 30 people, a little less, have a variety of duties and so we have a variety of interactions with the Sheriff's Department. And some of them are smooth and routine and some of them aren't. So on a daily basis I have monitors who go into the jails and inspect the jails, talk to people, do a variety of things. I have inspectors who gather information regarding reports that we're working on; have communications with people at the middle or bottom of the

Sheriff's Department; I have lawyers who write reports and do analysis who talk to, again, people at the middle or bottom of the Department. And those communications are relatively smooth. Under the current administration, there have been restrictions placed on them so that when we make requests for documents or other things, those have to go up the chain and get approved and they don't get approved, except in cases where they think it's not important. But in all the important cases, such as the incident you're referring to where the man got the knee on his head/neck area, then we don't get anything. So.

But on the day-to-day interactions, there's a fairly polite interaction and that goes for me as well. When I went down to escort the Attorney General's office to do these site visits, we were treated fine. An assistant sheriff was there. He's one who we have a long history of communication with because we're a monitor in the jails under a federal law, see Johnson, having to do with the ADA, and one of my assistants, who has just left to go work in Philadelphia, had a very longstanding good relationship with him. So that was all very smooth. I was able to go in and take the picture that I took of the 3%er logo without any trouble. It's not always quite that smooth, but when it comes to requests for actual evidence in our investigations, that's where we're shut down. So as long as we're polite and we don't cause any trouble, they're polite to us.

And that's my staff, that's me, as to the department in general. As to the sheriff, zero. He sometimes sends letters- his undersheriff sometimes sends letters. They are rarely- they're usually nonsensical, rarely in response directly to what we say. So for instance, in January we requested evidence regarding law enforcement gangs under the new statute, Penal Code 13670, and he didn't respond; Murakami sent us a letter. And he sent a letter to the Board telling me to cease and desist from the use of the term and all these other things. And that's the kind of response we get, or tweets talking about us. The thing that caused me to report to CPOE on this matter was a tweet by him, or a press release by him, attacking me, not communication to me. I haven't talked to the sheriff personally since.. he threatened me back in 2019 and I haven't talked to Murakami. We used to have a little interaction with some of the higher level folks at the Civilian Oversight Commission, but they stopped going, and they're required by ordinance to go to that and they don't do that anymore.

So we don't have any real relationship with the management of the Sheriff's Department at that level. At the assistant sheriff level, [unintelligible ] 2630 Patrol and Custody, we have cordial relations. You

know, I can call them or email them and they email me and we communicate just fine.

**Herrera:** You said in 2019 he threatened you?

[redacted] Yeah, that was in June, June 17th of 2019. I'd mentioned that we wrote a report about Caren Mandoyan, the grim reaper, who he was trying to rehire. The county had sued him because he was doing that unlawfully, and we set about trying to investigate the manner in which the sheriff was saying he was going to rehire a bunch of fired deputies including Caren Mandoyan -what he called a Truth and Reconciliation Committee or Commission- that he was going to set up within his office. So we tried to investigate that and he refused. We wrote a report about it as best we could with the information we could gather, and I gave him a draft of it, and when I did that he shut off our computer access and I was asked by people in the county to try to convince him to change his mind.

So I met with him personally and said, 'Will you please turn back on our computer access?' and he used the opportunity to tell me that I was a political hack, that my report was ridiculous. I have since learned he never read it. But he said that it was all wrong and that his hiring of Mandoyan was correct and wonderful, and that I shouldn't issue the report, because it might influence the civil litigation regarding rehiring Mandoyan. And I said, 'Look, that's my job [redacted] to issue this report and what happens in the civil case isn't my business. I would think it wouldn't have any impact because I think probably it's unlawful, but that's for you to work out. I'm just reporting to the public what happened.' And in that context, he said to me, 'If you issue this report, there'll be consequences,' and he said it in a significant way, but he didn't say what they were and his number two, Mr. Del Mese, who was present, quickly changed the subject. And a short time later, he announced to the press that I was under criminal investigation and sent a letter to the Board asking them to relieve me of duty because of the 'horrible conflict' there was for somebody who is being criminally investigated to be responsible for--

**Herrera:** I'm sorry, you were just a little bit fast. I'm only so good at typing. I was not hired for my typing skills. So you said he announced- what did you say he announced?

[redacted] In a podcast, he told some representative of the media that I was under criminal investigation for stealing from the county, basically, from his department, stealing data, and he had Murakami send a letter to the board asking- saying the same thing and asking that I be removed from office. So he announced it publicly. The reason I point out is

because that's not how you begin a criminal investigation. If you're in law enforcement and you think somebody committed a crime, you prefer to conduct an investigation without the target knowing that you're investigating them. The last thing you do is announce publicly, to start, that you're conducting an investigation. But that's exactly what you do when you want to intimidate somebody. And so that's why I believe what he did then was a violation of 518 of the Penal Code: Extortion of a public official through a threat in order to try to get them to not discharge their duty, in this case; he didn't want me to issue that report. And then when I did, he wanted to inflict the consequence. Since then, he has taken a number of actions against people involved in oversight, all of which designed, I believe, to intimidate them in order to suppress investigation of the law enforcement gangs and of his misconduct- alleged misconduct of various kinds, including the Escalante matter, the Kobe Bryant matter, and other instances which we tried to investigate but didn't. So I think it was the beginning of a process that he then developed as a way to prevent, the officials of the county from conducting oversight over him as they're required to do by law. And I go into that detail because I don't think it's a coincidence the thing that I reported here I think was a part of that process.

**Herrera:** Right and I think it's good for context so I appreciate the background information. With regards to that issue, was there any kind of outcome or.. was there any kind of admonition from the Board about his behavior or was there any type of followup?

[redacted] A bunch of things have happened. The Board did respond and say 'No we're not going to remove [redacted]. We agree with you; there's a conflict, but the conflict is for you to investigate [redacted], especially based on what you are claiming to investigate him on.' What he claimed was my crime was that when he was about to be sheriff, we discovered that the Sheriff's Department had a set of internal documents related to discipline that it kept secret from us, which was in violation of law, and we brought this to their attention and said, 'You need to provide us these hidden files.' We used to have computer access to their discipline records and suddenly we learned that all the runs we'd been making had been inaccurate because some of them, some records just weren't visible. It was as though they never existed. And it was a mechanism used to protect sensitive documents and make them only visible to the people in Internal Affairs. Which wasn't a bad thing; it's just the way- the mechanism they used was bad. So we brought that to their attention. They hemmed and hawed and didn't get around to complying with us, until the sheriff- the current sheriff -won the election. And then pending his election win, [redacted]

[redacted] but he tried to frame that as a crime and presented it to various folks to try to get them to be interested: the FBI, the AG, and this has all been testified to by Del Mese recently at the Civilian Oversight Commission. So that's--

**Herrera:** What's the last name? I'm sorry.

[redacted] Del Mese?

**Herrera:** Yeah. How do I spell it?

[redacted] Del Mese's last name is spelled D-E-L is one word and then the second word is Mese, M-E-S-E. And he was the sheriff's chief of staff. He was on his transition team and became his chief of staff. He was dismissed from that position maybe a year later, but at the time he was being- when these things were happening, Del Mese was his chief of staff, and

at the time that the sheriff threatened me in June, Del Mese was still his chief of staff. And Del Mese testified on July 1st about some of these facts. So the sheriff put together that criminal case, tried to sell it to the FBI, to the Attorney General, to the DA. Nobody bought. He got a letter from the Civilian Oversight Commission, or Murakami, his number two, did, saying, 'You know it's a conflict for you to investigate the [redacted] You shouldn't be doing that,' and Murakami said, 'You know you're right, we agree. We're going to give it to another agency when we reach an appropriate point of handoff' - this is the term he used. They never did. They kept it over my head for years, and the Board had nothing they could do other than say, 'No we're not going to remove [redacted] until near the end of last year and the Civilian Oversight Commission got some traction with getting County Counsel to ask the attorney general to step in.

Actually I've got two agencies- it's- No that's right, I'm confusing two things the attorney general did. [redacted] But we're not going to, like, take over the Sheriff's Department.

When that happened, the sheriff publicly said, 'Well I've already submitted the case on [redacted] to the attorney general. I did it a couple of months ago. So supposedly - I think it was around November of last year - he had submitted it to them for filing and asked them to prosecute me. I haven't seen those documents 'cause it's all part of the criminal investigation, but if it's what I think it is, it's a violation of my constitutional rights because he doesn't have any probable cause. What I did was provided for in my job description and in writing with the approval of the then-sheriff Jim McDonnell, so. So that's kind of the arc of that. So the answer is yeah, there was a response; it wasn't terribly effective in controlling the sheriff's behavior because he has placed himself above the law, and because the mechanisms for dealing with that are slow. But, it is now before the attorney general. There's some

attorney general in San Diego whose job is to review the filing and decide whether or not he should prosecute me. So I'm still under threat of arrest, but I don't really expect to be arrested since Del Mese has testified that everybody- all the professionals who looked at it said there's no crime here, including the sheriff's internal people. So, you know, it's an elaborate process. I apologize for the long answer, but--

**Herrera:** No that's okay. And I--

[redacted] The complete answer is even longer, so I'm gonna stop there. But yeah, there was a reaction, but it's, you know, it's complex and it hasn't changed the situation completely.

**Herrera:** And so my question is, does that end up dovetailing with the racially biased emails and some of this other stuff? Is that- Do they dovetail together or is it, this happened and then there's a chunk of time where there's not as much going on and--

[redacted] No no, there wasn't a chunk of time. I mean, I haven't gone into all the details regarding all the things the sheriff has done, endlessly since then. But the fact of the matter is, there hasn't been a chunk of empty time. The thing I described happened. He then went to, you know, he runs the sheriff's department, so events happen. We report on things. There's discussions publicly. He has a number of times attacked me in the press, claimed that I am corrupt and that I'm a liar. We had a number of run-ins at the Civilian Oversight Commission. They kept- the sheriff just kept sending his staff there to say, 'When [redacted] tells you that he's not getting cooperation in his investigations, that's not true. We give him everything he asks for.' So I had to present to the Civilian Oversight Commission a series of emails in a PowerPoint - I provided the emails detailing the numerous requests we've made and showing the email responses showing that they never gave it to us. And I had to do that twice. The first time was in a presentation to the Civilian Oversight Commission and then a year later I issued a formal report that's up on my website called Unlawful Conduct At the Sheriff's Department and it details a whole series of our investigations that were thwarted as a result of the failure to provide information.

So the false narrative that he's put out to the public, is that I'm a liar and he still to this day continues to do that. And that's gone on nonstop and it's been supplemented by a tax on other individuals: [redacted]

[redacted]

So he took a series of actions throughout this time that have never stopped, including targeting [redacted]

So he's done a series of things like that that haven't really stopped, nonstop. And so I do think- the thing that I'm talking about now is just the latest in a long line of them. It's not like he was silent for a while and then popped back up. And that's why I sent you before this conversation that email I'd gotten with the post recently from [redacted] in which he details in his letter to [redacted] you know, all these- his complaints about various things, including using my name as [redacted] and then at some point [redacted], spelling it a third way--

**Herrera:** I saw that.

[redacted] --and a variety of stuff. Well that guy, [redacted] So when we get into more detail about the actual CPOE claim and the holocaust accusation, which is the second thing I sent you -his claim that I'm a holocaust denier- I think he gets that from [redacted] I think [redacted] is his supposed source based on my reading of that document that you saw, as well as other things that [redacted] has said. Before the sheriff ever in that communication to the department called me [redacted] had used that name as well and nobody else had. Nobody else calls me that.

**Herrera:** And I want to definitely get to the [redacted]. I appreciate you sending me that email and I looked it over. I did want to look at- talk to you about the email that, you know, that was kind of the genesis for this complaint itself, right? So my understanding is that there was an email that was sent by the sheriff. Can you give me some more information? And I don't think it has the date, the information that I have I don't know that I have the date of the email, so do you have--

[redacted] I saw you don't have it. I thought I had forwarded it and so you should've received it. I can try to track it down for you and try to get you another copy. But bas- I don't remember the date. It was earlier this year. But when he sent it, it was- you know, one of the points when he was attacking me publicly, it was sent around to the whole department, I believe, and he again accused me of - I forget what the particular issue is 'cause he accuses me of lying or being corrupt or, you know, whatever - but in that email he referred to me as [redacted] with a [redacted] and that's the thing that caused me to report it, to the CPOE because I believe he was intentionally- He has a base of extremist groups - white supremacists basically - who he dog whistles to and lets them know who their current target is, and that's how he got [redacted] to be targeted; that's why [redacted] had to get security; and by saying [redacted] I believe he was trying to say to those guys 'This guy's a foreigner; he's either German or Jewish or

both' and we now know with the Holocaust denier thing, he wasn't trying to sell to anybody that I was Jewish because he was claiming that I denied the Holocaust. But I think that my German descent was what made me a target for him because I would be an easy target, in the same manner that he targeted [redacted], I believe, because she was an easy target. He liked to target a lot of people, anybody who was a critic of his, but some people because of their race are easier for him to set up as scapegoats with his base who listen to him, including people within the department.

**Herrera:** Actually with [redacted], I believe he sent out something in the past where - I don't know if you're aware of it - I think where he looked at her Twitter feed.

[redacted] Oh I'm very much aware of it.

**Herrera:** Right. And where--

[redacted] I don't know, because my ability to investigate has been obstructed, but if I were investigating, I would investigate my belief that that's part of what he has that dirty tricks squad doing. They're supposedly investigating crime and the sheriff uses his criminal investigative authority as his shield to tell 'Nobody can ask any questions about what I'm doing'. But what I think they're doing is political work. And he had somebody go through all of [redacted] social media to mine statements that he thought were obnoxious. And then he put them together in a long list and sent them.. a year and some change ago to the Board, particularly to [redacted] boss, to complain about her. And then a year later, more recently, he sent it again. And that was after he had taken the shot at the Chinese company that was providing COVID testing. Part of his sort of strategy for remaining sheriff is to appeal to the deputies' union and he described to [redacted] of the Times, his staff as being 80% conservative and right-wing. Now, I'm not sure that that estimate's correct, but that's his viewpoint of his staff. I do know that there is a certain percentage of his staff who are very extremist on the right and who are very anti-Chinese, and he was using that racial component to try to beef up his standing with them, and with voters who- the right wing of voters who he thinks he can get to reelect him. But at the same time, it creates, I think, a great danger to the, the people he targets because these folks are- these are dangerous people. And so that's why I connect these events. What he did with [redacted], I don't think that's a coincidence. Now he could've done it with anybody and he could've done it irrespective of race. But I think he targeted her because she's Chinese.

**Herrera:** Do you have any sense of how many people he has on this squad or, or how many people are [indiscernible]?

[redacted] I think it's about a half dozen or so and I think it's changed a little bit over time. In the early days when he first started it, he hired a guy back to the Sheriff's Department called Lillienfeld and he was a guy - I don't know if you're familiar with him, but - if you were to Google him, you'd see that he had left the Sheriff's Department years ago and he went to work for the DA's office on a contract basis, and he got caught sneaking into the jails. He put on his old sheriff's uniform and snuck into the jails in order to bring contraband to an informant. He did it for the cause of good and justice, because he wanted this informant to help him with a murder case for the DA's office. And the contraband was, supposedly just a burrito -although nobody knows because he snuck it in- but he did it after being told no, he couldn't do it, by the Sheriff's Department. And then he used his old uniform to pretend that, you know, that he had permission and snuck in contraband.

**Herrera:** Can you spell his name again?

[redacted] Lillienfeld?

**Herrera:** Okay, there you go. I've heard- I just didn't hear it, yeah.

[redacted] Yeah, and that happened. I mean, it's on video. What you think about it is questionable, but the event happened. So he rehired that guy and I think he rehired him because he knew this is a guy who'll do whatever I ask him to do. He'll pull out every stop. And he put him in this unit and he also had a guy who's a computer guy, and the computer guy did a lot of computer work for him. Allegedly, I've heard numerous times over the years that he's bugging my emails and, you know, accessing stuff. I'm not sure I believe it, but I have a bug sweeper in my office as a result that I use from time to time, to try to, you know, at least have some kind of protection against it. But other people do believe it and I've been told that over and over. That guy's on the crew. So I wouldn't be surprised if that team was put onto the process of gathering stuff. But the sheriff has a lot- also has- I mentioned the PR firm he wanted to have the county pay for for him. He never got that. So instead he converted the Sheriff's Information Bureau, which is supposed to provide information to the public, which the sheriff has a legal duty to provide and doesn't, he turned them into his PR firm. So they're run by- or were run by a guy named Satterfield, a deputy, now a captain I think, because he's been [redacted] who would put out PR stuff for the sheriff on a nonstop basis. And it's possible that that team did the work as well.

But it's also possible it was done as a supposed criminal investigation. I haven't been able to investigate that. But the bottom line is, I think he collects dirt on his political opponents and then tries to figure out a way to hurt them and he turns most easily to race-based techniques 'cause I think it plays with the people he's trying to curry favor with and he uses whatever means are available to him to do that including public funds for- that should be used for criminal investigation or, in the case of SIB, should be used for Public Records Act requests, you know, all sorts of things. So that's kinda the way I see it unfolding and why I see these things as connected.

**Herrera:** And in terms of your name being [redacted], is that.. a name that you've ever used publicly? Like, as your name?

[redacted] The story of my name is that when I was born I was named [redacted]. My [redacted] was German, and he came- his [redacted] was a soldier with the Nazis, and he supposedly couldn't carry a gun 'cause he had employed Jews before the war, but they lived in Nazi Germany. His [redacted] hid in the woods to avoid being conscripted and when the war was over, he decided that was not a good place to hang out. So he came to Canada and then he came down to San Francisco, where he met [redacted] and [redacted] me. And he wanted to name me a German name. They settled on [redacted], which was a hyphenated name of [redacted] of his; [redacted] was one of 'em and [redacted] was the other. The [redacted] that's in that name is the Swedish spelling of [redacted] and that's 'cause this guy just happened to have the Swedish spelling; I don't know why. This is all stories I've heard from [redacted]. [redacted] quit working when I was born, was doing a lot of drugs, once left me on a street corner to teach me to be self-reliant and after [redacted] and [redacted] got divorced, not long after that she moved down to LA to get away from him.

After that, he left America. He went to New York for a bit and then he went to Sweden and got himself a [redacted], and lived 'til the day he died in Sweden taking care of a [redacted]. He didn't do that with [redacted] and I believe that's because of Nazi Germany. I believe he was raised with a violent hatred for authority. He was an amateur boxer and, you know, he liked punching people. He was a con artist. He actually supposedly did some time in custody. I mean, he was just a piece of work - as a result of the Holocaust. Not what was done to the Jews but the way Nazis functioned, and I think they did a lot of damage. I don't claim that's as bad as the Holocaust, but it had a direct impact on me. So the idea that I would deny the Holocaust is crazy. I have no love for Nazi Germany; quite the opposite.

But back to the name part. So he names me [redacted]. When I was a kid, I said to [redacted]--

**Herrera:** I'm sorry, [redacted] what was the last name?

[redacted] [redacted]. I pronounce it [redacted] because that's the German pronunciation and I'm telling you about the early life.

**Herrera:** And how is that spelled?

[redacted]**:** [redacted]

**Herrera:** Okay. Sorry.

[redacted] And that's- [redacted] is a first name with a hyphen. I have no middle name, never had a middle name.

**Herrera:** Got it.

[redacted] So when I was a kid, I told [redacted], 'I don't want to have the name [redacted] That's [redacted] name. I don't like [redacted]. I like you. You raised me.' Sorry, I get a little emotional about this - I apologize - when I think about it.[redacted] said 'no'. She said 'When you grow up, you can do whatever you want, but until then I'm not changing your name.' So when I grew up - and by growing up, I mean I went to law school, and I was a law clerk at the firm [redacted]. And I got one of the partners there to help me change my name. And I went into court and legally changed it, from- to [redacted] from [redacted] I didn't get rid of the [redacted] legally. So I was [redacted] on paper. I never used [redacted] and nobody ever knew me by that. I just went by [redacted]. And when I became the [redacted] I got lucky and I- I can't really tell you how this happened, but one way or another- 'cause I would use [redacted] and I would write [redacted] on most things, but like on my tax returns I'd write [redacted] and the state bar had me down as [redacted] So, like, you know, my formal name was [redacted] I never hardly used it.

Somehow or another I got a passport that had [redacted] on it, just [redacted] and not [redacted] and so as a result, under California law you can't change your name unless you go to court and do a bunch of things that I didn't want to do, unless you have some documents to show that your name is this other thing. So as soon as I had a passport that said [redacted] on it, I was able to go into the DMV and go, 'Look, my name's [redacted]' and they changed my name to [redacted] And I was able to go to the County and say, 'Look, my name is [redacted] and they changed my name to [redacted] So I

changed my name everywhere to [redacted]. But on some obscure county computers, they never changed it correctly and the state bar still had me down as [redacted]. But in all other contexts: federal government, county government it's [redacted] and I never ever use [redacted] to talk to anybody. Nobody would ever tell you, 'Oh that guy's name is [redacted].' There is one cop I used to work with in the DA's office who used to call me [redacted] just as a joke, and that was it.

But I'd never gotten the state bar changed until the sheriff did this and then I called them up and said, 'Guys, can you pull that?' So they said, 'Yes, yes we'll make you [redacted]' Now if you run me on the state bar, there's an entry for a guy named [redacted] and there's an entry for a guy named [redacted], 'cause they didn't change it; they just stuck another one in. So that's the story of how I use my name and that- it's a long slow burn, all from the fact that I didn't particularly like [redacted] very much. And I didn't want to have anything to do with him. When I got to turn over a new leaf as [redacted], I, 'you know what, I'm just dropping that [redacted] part. I won't even do that,' 'cause I'm not a German. I've got nothing against Germans particularly, aside from Nazis, but I'm not one; I'm an American. He came from Europe and, you know, [redacted] raised me here in America and, you know, that's who I am. So anyway, that's my story.

**Herrera:** And what's [redacted] heritage?

[redacted] Well, [redacted] came from Canada - white, generic white. [redacted] came from Canada. He had come back years earlier from Scotland. I think he actually came from Scotland or maybe [redacted] did or something. But he, he came down out of Canada and on the other side, on my [redacted] side, they were, like, Daughters of the American Revolution. Her [redacted] had been here, like, before the American Revolution. They came- supposedly the story- my [redacted] tells me this isn't true, but my story was that we were related to [redacted] of the Pocahantas story, 'cause one of our ancestors was [redacted], but my [redacted] looked into it and said, 'No that guy had no kids. So you might be related to him, but you're not a descendant of him.' But in any event, they were just Americans, you know, white European-type Americans but not, not anything else.

**Herrera:** Would that be British if they were Daughters of the American Revolution?

[redacted] That side, on that side. If you want to divide me up, on [redacted] side it's half British with a little bit of, like, French or something in there, and on [redacted] side, it's mainly Scottish. So it's like British Scottish

on her side and then on [redacted] side, he's pretty much German with a little bit of Russian and I think a little bit of Polish.

**Herrera:** Okay.

[redacted] But in terms of culture, he didn't raise me with any kind of German culture or anything and [redacted], by the time, you know- [redacted] was a hippie. She was a beatnik; she wasn't a hippie. She was before the hippies.

**Herrera:** San Francisco.

[redacted] Yeah exactly. [redacted]. You can't get more beatnik than that.

**Herrera:** That's a very auspicious beginning.

[redacted] So, you know, that, to the extent that I have a culture, that's my culture. And I've had this conversation with people, you know, I don't feel- I feel like I'm a cultureless person, other than being an American. It's not like it's a supremacy thing at all. I'm not in favor of that approach. I'm jealous of people who have a real culture. And so it's a thing that I wish that I had and I think that's part of my own read psychology 'cause of [redacted]. But the bottom line is, I'm not German.

**Herrera:** Right. Now, my understanding is that there was a KFI.. So there was the email that went out and do you recall who that email went to that the sheriff had sent?

[redacted] I think it was the entire sheriff's department. I'll have to track it down for you since you didn't get it. I sent it in to CPOE and I'm sure I've got a copy of it somewhere.

**Herrera:** I can hunt it down myself as well. I just didn't want to delay talking to you because I think it [indiscernible].

[redacted] No no no, it's not important. But it was- Yeah, it was- I think it was sent out to the entire Sheriff's Department. But it's not, it's not- There's more than one time he used that [redacted], and he talked about it, and I think on KFI he talked about, 'Oh we need to look into why, why did he change his name? What's he trying to hide?' you know. And so, to be clear, like I said, I gave you the reason I changed my name. Since 1991 I've worked for the county and was a [redacted]. I'm not hiding a secret past. You know, there's no fraud or process by which I changed it in order to conceal who I am

in any way, shape or form. It's just I don't like to be associated with a culture that I'm not part of.

**Herrera:** You mentioned - and I didn't ask this, but - so you were a [redacted]

[redacted] When I graduated law school in 1991, I joined the [redacted]

**Herrera:** So when you changed your name, was that while you were in law school? Like, was that a job decision?

[redacted] Yeah, that was- I became [redacted] before I joined the [redacted]. So as a kid I'd been [redacted]; when I was in law school I was [redacted] until, like, my senior year and then I was [redacted]. And then when I graduated from law school and joined the [redacted], I was [redacted] So nobody in the [redacted] ever knew me as [redacted]

**Herrera:** Okay, got it. Because you mentioned you worked at [redacted] so I just wasn't sure of the timing of that. Was that during law school?

[redacted] I was a senior- not senior, a summer law clerk after my second year of law school.

**Herrera:** And so.. aside from the email- So then the KFI, the KFI radio call, do you recall what was said during that KFI radio appearance? And was there more than one or is it just one appearance?

[redacted] I don't now recall. On KFI he talked about it and, like I said, it used to be kind of clear in my head, but then when he went to the Times Editorial Board and told them I was a Holocaust denier, it kind of made the details of what he said about my name irrelevant to me. So I don't remember precisely what he said on KFI.

**Herrera:** You did say something to the effect of, you know, that they should look into why he changed his name or what is he trying to hide?

[redacted] Yeah, I mentioned that. He said that somewhere; I think that may have been on KFI. I don't remember now where he said that, but that's, like, a thing he likes to say and he said the same thing to the Board. But he likes to say, 'Well, somebody should look into that.' He does- he's very fond of, like, Facebook Live videos and Instagram videos in which he'll

have, like, a chat and he'll sit there at his desk and he'll pull pieces of paper and talk about them, like a talk-show host or something, and then just sort of ruminate about them. That's how he talked about [redacted]. He said, 'Woah, I just got this in from.. from Vivian, oh thank you. Oh, somebody should look into this,' you know. And he effects this kind of casual way of talking about things and I think it was in the same context. He said, 'Somebody should look into that,' as sort of a vague allegation that there's some nefarious reason for why my name changed.

**Herrera:** Did you feel like he was casting aspersions or trying to make some type of negative inference?

[redacted] Yeah, absolutely. Yeah, definitely.

**Herrera:** And I know you mentioned that you believe it may have been, like, for example, a dog whistle, but if his people are these radical, maybe right-wing, wouldn't that be more in line with their viewpoint if you were.. you know?

[redacted] It might be if he had presented me as an Aryan, but he didn't, you know. So that's why when he first did it, my take on it was he was trying to imply I was Jewish. And that would be what I was- that's what I thought he was doing. I may not have been correct about that, but that's just- that's how I took it. And so that's the way I took it. What I think was really going on- I mean, again, it's, being a foreigner I think is the main thing. So you're right; if white supremacists really cared about, you know, true Nazism, then none of them would qualify because most of us here in America are not the Aryans that the Third Reich was obsessed with. But that's not how we look at the world.

**Herrera:** Maybe the Third Reich weren't all that Aryan either.

[redacted] Right, exactly. That's my understanding too, but you know, that's ancient history, but for here and now, I think it's really more about an ideology and a way of looking at things and again, I think he was simply designating me as a target and as an 'other' and he didn't really care too much about how people took it. Other than they knew: this is a guy who is an enemy of ours. In the same way that recently the Board had voted to, put before the voters the right to remove the sheriff with a four-fifths vote. As soon as that happened, that was put out on Breitbart, the highly conservative outlet, about it and how Democrats were trying to take away the rights of, you know, a favored sheriff, and immediately there started to be a series of Twitter feeds from right-wing extremists in Florida and other places talking about how outrageous it was. I think

that's the technique that the sheriff uses. It's more about designating the target than about the details of why deputy designated. I think he selected these things because they play well, because the race angle plays well.

But now in hindsight, I think he probably had already had a bunch of conversations with [redacted] about not just the name but about the Holocaust-denying claim. And so I think really he was setting that up. But at the time, I didn't know that. I thought what he was doing was just trying to make me look like, you know, I'm the target. But I think really what was going on was he was preparing for the next one. And of course, it's weird to say somebody's Jewish and a Holocaust denier. So I assume that was not his plan. But again, I think he's getting this stuff from [redacted], who's a little bit crazy I think. From the document you saw, you know, he's- When we subpoenaed from him, he had an interchange with Lillienfeld, the guy I talked about before, when Lillienfeld recorded him- or, [redacted] recorded Lillienfeld while Lillienfeld was kind of threatening [redacted], telling him to back off 'cause he had sent some emails to Murakami. And so Lillienfeld had been dispatched, or voluntarily dispatched himself, to tell [redacted] to settle down. [redacted] recorded it all; we subpoenaed it; he refused to provide it; and I think that's when I got on [redacted] radar as somebody he was going to target. And I think the sheriff had already, taken [redacted] as an ally, used him in his process to try to get a search warrant.

So I think he got from [redacted] the 'Hey I think I've got some dirt on [redacted] I think he's a Holocaust denier. I think he's a bad guy, this is what I think.' I don't know where he gets that from because I have never denied the Holocaust. There isn't some old college paper that I wrote in which I question the Holocaust. You know, it never happened. My guess is that [redacted] ran some database and found some name that sounds kind of German, you know, of somebody who denied the Holocaust. But it sure wasn't me.

**Herrera:** So with regards to, for example, once the email the sheriff sent and then, for example, the KFI, the radio show he's making these statements, did you receive any type of emails or any type of calls or any type of negative attention? Have you received any kind of…

[redacted] Once he accused me of being a Holocaust denier to the LA Times, you know, in a very public way and it became an Op Ed in the Times and a whole discussion, and a number of media sources talked about it because it was such an outrageous claim, especially - I don't know if you watched the video of that, but if you think it's relevant, you might

want to pull up the video - but that Op Ed I sent you kind of encapsulates it. They asked him, 'What's your evidence for that?' He said, 'Well I'm not going to tell you.' And they said, 'Well if you're going to accuse somebody of such a horrible thing but not provide any evidence, should we believe you?' And he said, 'Yes you should believe me.' I mean, it was kinda nutty, so it became a story. After that, I did not receive any death threats or any weird emails from crazy people any more than usual. I certainly have had an increase in, like, when I monitor comments on, certain websites like Witness LA or other places, where there's always kind of a chatter and I'm always kind of the enemy in the eyes of these extremists. I mean, there's certainly stuff like that, but there wasn't a lot of Holocaust stuff because - I shouldn't say because - the sheriff had previously already presented me as sort of his main enemy and there's always been a lot of attacks on me like that. But I didn't- I didn't notice any that were specifically Holocaust-related. I did receive a lot of communications from people I know who, you know, expressions of sympathy and ironically most of them from friends of mine who are Jewish. Because I think if you're Jewish, you know how disgusting and deeply offensive that allegation is. I think if you're not Jewish, it seems wrong to say that about somebody, and if you're Jewish, it's evil. And so a number of my friends who are Jewish were like, 'Oh my God, [redacted] I can't believe you said that. That's horrible,' you know. And so it's actually been a pretty positive thing.

[redacted], which is what I kind of forwarded to CPOE, to go on the record and say, 'Look, it's not true,' because it hurt me so deeply, for the reasons I described. I'm not Jewish, but I have a certain connection to the Holocaust that is not positive. And so I take it to heart more than maybe I otherwise would. I don't know. I don't know what a person would think if they were called that, if they had no connection, I don't know. But all I can tell you is emotionally for me it was hideous. It's still hideous. Like I say, I was tearing up talking about it. But when I was tearing up when we were talking, that wasn't because of the Holocaust; that was because of my history, [redacted]. I'm like an eggshell plaintiff in this. It's not just the threat and the insult and the allegation; it's what it means to me personally.

**Herrera:** Can I take just a one-minute break? I locked [redacted] out of the house, so (laughs).

[redacted] I'll just sit here. Go ahead, don't touch anything and come on back when you're ready.

**Herrera:** I'm so sorry. I'll be right back. I'm just going off the record at 3:15.

**Herrera:** Back on the record. It's 3:16. So, my understanding is that I think on March 31st, you sent - or was it 30th - you sent an email to, is it- I don't know what the DCO stands for: Deputy Chief Officer Seiberg, or Seeberg? - regarding the Editorial Board comments, the comments to the Times about being a Holocaust denier, do you recall doing that?

[redacted] Can you give me the spelling of the name you're saying?

**Herrera:** S-I-E-B-E-R-G.

[redacted] I'm sorry, I don't know who that is. I probably did do something that created what you're talking about and, as I recall it, I sent an email to the Board and then I decided 'No, I'd better tell this to CPOE because it' - Oh I think you're fro-, no you're there; I was afraid you were frozen - 'I think I'd better tell it to CPOE because not only, not that I'm complaining about it because, for the reasons we discussed in the beginning, I'm very cynical about whether or not the sheriff is going to discipline himself, but I figured I had a duty to my employees to do something about this because CPOE rules are pretty strict about reporting when you're aware of certain facts.

**Herrera:** Right.

[redacted] So I sent it- I would've said I sent it to Vicky Bane, who's the head of CPOE, but I'll bet you whatever I sent somehow generated the thing that you're referring to.

**Herrera:** Okay. And then, I think as a followup--

[redacted] Unless Seiberg is Sheriff's Department. That could be an echo of what I sent.

**Herrera:** It could be.

[redacted] It could be, 'cause I sent something to Vicky Bane. The process for CPOE for everybody else in the county is the CPOE investigates. For the sheriff's, they get to investigate themselves. So whenever there's a CPOE complaint regarding the sheriff, they forward it to the sheriff. So that may be the forwarding from the county CPOE to the sheriff's department.

**Herrera:** Right. And then it makes reference to.. I think on April 1st you communicated with this person and it may be that they are in the sheriff's office, stating that 'I'm not blaming you, but be sure to tell all

the victims you interview that the LASD CPOE process is not confidential and the sheriff will discuss them with the media.' So I think that gets into that last point of…

[redacted] That person is the person I told you about who I talked to at the sheriff's department. She called me and then set up an interview and we had an interview, and we went through the same thing I'm going through with you. Not all of it at that point, but he had at the Times said, in addition to the Holocaust thing, he said, 'and [redacted] made a CPOE complaint against me, ha ha.' So that's why I said that to her. I'm, like, 'Look, the whole claim that it's confidential is a joke. The sheriff already was informed about it and he already told the public.' So.

**Herrera:** Okay, now I see what you're saying about the confidentiality, because I wasn't sure what you were referring to, but that makes sense.

[redacted] I was referring to his public announcement, the Times Editorial Board, that I had made a CPOE complaint against him. Which is completely in violation of CPOE rules. So that- I apologize, but--

**Herrera:** Not only they would be--

[redacted] --I'm a little cynical about the sheriff's process and whether or not it was going to be confidential.

**Herrera:** Right. I can only tell you that, I'm not talking to the sheriff. I guarantee that I'm probably not going to be his favorite person.

[redacted] No I understand now. I understand- it was the admonition you gave me 'from the Sheriff's Department' that threw me off for a minute.

**Herrera:** Yeah and I apologize.

[redacted] Probably already, you get hired by County Counsel; County Counsel gave you a task: you're going to collect a bunch of stuff, you're going to give it back to County Counsel. If anybody tells the sheriff anything, it's going to be County Counsel. And to be clear, it doesn't matter. The sheriff already knows all these things. The sheriff knows that I'm no fan of his because I- Sorry, my phone froze for a moment - the sheriff knows because I publicly record all my criticism of him, so he knows how I feel. So if you did call up the sheriff right now and tell him that, it wouldn't do anything worse to me. He already is, you know, fixated on me as much as he is ever going to be. It's just that I'm really- As the [redacted] for the county, and it's my job to protect the constitutional and other rights of our employees and the public from the

sheriff, when I'm aware that the sheriff is simply disregarding the rules of CPOE so he can target individuals, people like [redacted] come to mind. You know, I get paid for this. I used to be a prosecutor. I get paid to take on armed men and do gang busting. She doesn't, nor do any of the other people who he's targeted. So that's why I was a little frustrated with that whole process because it's just- it's so unfair and it's so dishonest, to the people within government service than when we allow somebody like this to engage in this conduct, you know. It just is very disheartening to me, to be a process that CPOE- I've been involved with in my office, and worked with CPOE in investigations and found them to be completely above reproach in their confidentiality and reasonableness in how they deal with things: very careful, very thoughtful, very sensitive to those making complaints and those who are being complained about and, you know, carefully gathering facts, and then crafting the solution that's going to protect people. I mean, it's an amazing process - until you hand it over to the sheriff. So that was my point.

**Herrera:** Okay, so that makes sense. Now I get it. And then- just going back- I think we're almost done, but going back to [redacted], I just want a little bit more information about who exactly he is 'cause I did read - and again, thank you for what you had sent to me - but I'm trying to understand exactly who he is and what your relation or contact has been with him.

[redacted]

[redacted]

[redacted]

[redacted]

**Herrera:** [redacted]

[redacted] [redacted]

[redacted]

**Herrera:** Personally.

[redacted] [redacted]

**Herrera:** And it sounds like the only place where you might've had a public.. where the name [redacted] was used publicly was the maybe the state bar.

[redacted] Yeah, if you look me up on the state bar, it used to say [redacted] now it says [redacted] or [redacted] depending on which one you pull up. But before I changed that, which was when this was all going down, if you had, you know, typed an attorney search, it would say [redacted]. And so my- I have no basis to know this, but my guess is that [redacted] did that: pulled up my name, said 'Hmm this is interesting, I'd better look into this,' and started running my name and, you know. I've done the same thing. I Googled. I was, like, where the hell did he come to this? Is there some guy named [redacted] or [redacted] or something who's a Holocaust denier? And I didn't find anything. But I think [redacted] has more free time on his hands and I think he probably found some Holocaust denier database that is kept by somebody and found some name on it that is close enough that he decided that's me.

**Herrera:** And you say he used your name in the past. Where do you recall him using your name?

[redacted] Either in email communication or maybe in some posting on the AMFED, but I don't recall precisely where I saw it. I could try to hunt it down.

**Herrera:** So would you say that, if I look at his site there's going to be more than that, like more references to you in his site, that there's more than that?

[redacted] Not much. There's a lot of weird stuff on his site and it's come and gone. He mentioned me on the site once or twice I think, but not in any great detail and I- He might've said [redacted] there, but he might've also done it in one of those emails he sent; I don't remember. All I know is, when the sheriff used [redacted] I was, like, 'Woah that's weird!' and then I thought, 'Hm, I've seen that before; I've seen that from [redacted] because I think at some point he had used it in passing. But this letter that you see recently where he uses it repeatedly, as [redacted] in parentheses and then calls me [redacted], or whatever he does, spells it a different way, that's the first time.

**Herrera:** Oh no, I'm saying okay, yeah.

[redacted] Yeah, that's the first time he's, like, really gone into detail in writing that I've seen. So that kind of makes me think I was right about my guess about where the sheriff got this from, but I don't know.

**Herrera:** And to your knowledge, do you have any sense of whether he's talked to you on KFI more than just the information that you provided in terms of that radio call?

[redacted] The sheriff talking about me on KFI?

**Herrera:** Uh-huh.

[redacted] Oh yeah. Oh no, I gave you just a little tiny bit having to do with this issue. The sheriff talks about me all the time on any media outlet he can: FOX, Hannity, the.. he does an Instagram, does video sometimes, his Facebook videos, and he regularly talks about me 'and my evil ways'. Many many times over the past years.

**Herrera:** And is he referring to you as [redacted] in those talks?

[redacted]**:** I don't know that he does in most cases. When this happened, he- there was a brief time where he seemed to use [redacted] more often, but I think he lost it, his attention wavered a bit and so. Usually in correspondence he'd call me [redacted] and he had previous to this until he did that a couple of times, and subsequently he's gone back

to [redacted], with a few exceptions here and there. But in general he does not call me [redacted]. He doesn't, like, every time call me [redacted] and, you know, make a big deal out of it. That's not the case. Usually he calls me [redacted] 'cause that's the name I use and that's what people know. If he talks about [redacted] nobody's going to know who it is. But, now and again he's done it, but not every time at all.

**Herrera:** When he got the scrutiny after the editorial, the comments to the Editorial Board, did he go back to using [redacted]?

[redacted] He has, but I didn't get the impression he did it quickly as a reaction or something, but I don't know. Yes, like in letters and things, they still use [redacted], but they never really went away from it. Like I say, he always threw the [redacted] in once or twice, and from that I drew- He knows darn well my name is [redacted]. He uses [redacted] in formal letters and so he knows. Whenever he uses [redacted] it's an intentional thing that he's doing to make a point. Like I say, I never got the impression that it was a habit. I don't think he switched to calling me [redacted] all the time. I think he did it in a couple of targeted instances. But yeah, no, he didn't- When he got the heat about the Holocaust thing, he didn't have a lot to say except for when the Times Editorial Board was talking to him, in which he said he had two sources, and he wouldn't say who they were. He didn't talk about it much after that, that I'm aware of. He may have, but I didn't hear about it.

**Herrera:** Is there anything else I should know? Anything that I've missed that I haven't asked you about? I know I've taken a lot of your time and I appreciate you being so available.

[redacted] I appreciate you asking all the questions. I'm sure I could think of lots more things to say, but I don't know that they'd be terribly productive and they'd take up even more of your time, so. I think I've kind of laid things out well enough. I think you get the gist of it and.. I'm available if you have any additional questions in the future.

**Herrera:** Thank you so much. I really appreciate it, and to the extent that there's any other articles or any other thing that you think I should be aware of, you're certainly- more than welcome to email it to me and send it to me. I obviously will be doing my own scouring of the internet to make sure that I've caught any type of references or any other referrals to it. But, you know, certainly with, like, for example, the KFI, you know, I'm probably limited in being able to know how many times he's mentioned you 'cause I don't know that they're really going to catalogue that. So if there's any other instances of that or anything else that you become

aware of, I'd be grateful if you would let me know. But certainly on our end we will make sure that we try to do our best to make sure we capture any other references so that we're aware of any other times where he's made those same kind of references to that.

[redacted] And if it comes up again, I mean, if he starts doing it again or something, I will certainly let you know.

**Herrera:** Great. Oh and.. I did forget my part of the admonition of "retaliation is not tolerated at the county. It is against, obviously, county, state and federal law. If you feel like you're a victim of retaliation in any way, I want you to let me know and I would escalate it to the proper person. Likewise, we ask that you don't retaliate against anyone who is participating in this investigation. All allegations of retaliation are taken very seriously." So.

[redacted] Let me extend to that. [redacted] and I have talked, about her concerns. She wanted me to be a representative for her when she thought she was going to be interviewed by the Sheriff's Department. So I'm glad that you are doing it and not them. I would very much like to protect her from retaliation. Me? I get retaliated by the sheriff every chance he gets and he would do that independent of this. So he's not going to retaliate against me for this; he's retaliating against me for previous things. So I'm not too worried about that. He's going to do everything he can and nobody can stop it. But [redacted] she's in a dangerous spot, you know. So if you ever find yourself in a situation where you're aware of some retaliation against her and there's anything I can do to help with it, please let me know. Because like you say, the County is supposed to stop people from being retaliated against and I think she's much more vulnerable than I am.

**Herrera:** Alright. And, you know, this type of work only works to deal with these types of investigations if you make people- you know, if you protect them and make every effort to maintain the confidentiality and so I am very mindful of that and will, you know, make every effort to.

[redacted] And obviously I'm not the first person you should call because that would be breaking confidentiality.

**Herrera:** Which I wouldn't do.

[redacted] But if in the course of finding something out you learned there is a problem and there's anything that somebody whose title is [redacted] can do to help about it, then tell the appropriate parties, 'Hey you know, [redacted] would jump at the chance to be helpful in this

regard.' I have informants who have had retaliation attempts from the sheriff and I have done things using my official powers to try to put him on notice, that we're watching and done things to try to protect informants myself. So I don't know that there's probably much- I mean, all the things he can do he does from a distance and he's going to do anyway, but, and he probably can't get under the skin and do the things that he does to his own employees, but.. anyway. It's a matter of more concern for me than my own personal retaliation 'cause I, you know, I know he's going to unload on me in every way he can every opportunity he gets and it's independent of this. It's not 'cause of this; it's not retaliation. But her, you know, she's a little bit below his radar and this process could quickly onto his radar and that's of concern. So I just mention it in case you find yourself consulting with County Counsel in an opportunity to suggest something, feel free. Just be aware that I would love to help if I could.

**Herrera:** Thank you so much for that information and I appreciate it. You have a great rest of your day. I'm going to go off the record at 3:38 PM. Have a good day. Thank you.

[redacted] Okay. Bye bye.

**Herrera:** Take care.

[redacted] (IAB) IV 2558097
WPU
plw

# EXHIBITS

# EXHIBIT A

For CISU Use:

(Method of Receipt)

**Online**

**ICMS #** 2022-112213

# COUNTY POLICY OF EQUITY

## REPORT / NOTIFICATION FORM

**Methods of Reporting Potential County Policy of Equity (CPOE) Violations:**

1. You may use this form to report a potential violation of the CPOE;
2. File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);
3. Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or
4. Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

☐ Yes **(Do not check 'Yes' if you are a reporting supervisor/manager).**

■ No (If no, please proceed to Question #2).

**2. Are you filing this complaint for** :

☐ **Yourself** (If filing this complaint for yourself, please start at Section A).

■ **Someone else** (If you are filing this complaint for someone else, please start at Section A).

☐ **Someone else: I am a reporting supervisor/manager** (please start at Section A).

---

**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expection that the CPOE complaint notification be submitted online at https://ceop.bos.lacounty.gov.

**Section A: Reporting Party Information** **Today's Date:** 03/09/2022

| | | | | | |
|---|---|---|---|---|---|
| **Name** | [redacted] | **Emp #** | [redacted] | **Title** | [redacted] |
| **Work #** | [redacted] | **Mobile #** | | **Work Hrs** | |
| | | | | **RDO** | |

| | | | |
|---|---|---|---|
| **Department** | BOARD OF SUPERVISORS | **Dept Head** | |
| **Unit of Assignment** | [redacted] | | |
| **Work Address** | | | |
| **Immediate Supervisor** | JEFFREY LEVINSON | | |

**Date & Time Form Completed:** 03/09/2022 07:57 AM

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

☐ Yes (if yes, fill in details):

Name of Supervisor Notified:

Date: NOT AVAILABLE

How:

☐ No

☐ Do not know

**Section B: Complainant(s) Information**

| | | | | | |
|---|---|---|---|---|---|
| **Name** | [redacted] | **Emp #** | [redacted] | **Title** | [redacted] |
| **Work #** | [redacted] | **Mobile #** | | **Work Hrs** | |
| | | | | **RDO** | |

| | | | |
|---|---|---|---|
| **Department** | BOARD OF SUPERVISORS | **Dept Head** | Celia Zavala |
| **Unit of Assignment** | OFFICE OF INSPECTOR GENERAL | | |
| **Work Location** | OFFICE OF INSPECTOR GENERAL | | |
| **Immediate Supervisor** | JEFFREY LEVINSON | | |

**Section C: Alleged Involved Party(ies) Information**

| | | | | | |
|---|---|---|---|---|---|
| **Name** | ALEJANDRO VILLANUEVA | **Emp #** | [redacted] | **Title** | SHERIFF/UNCLASSIFIED |
| **Work #** | [redacted] | **Mobile #** | | **Work Hrs** | |
| | | | | **RDO** | |

| | | | |
|---|---|---|---|
| **Department** | OTHER - Sheriff | **Dept Head** | |
| **Unit of Assignment** | OFFICE OF THE SHERIFF | | |
| **Work Location** | HALL OF JUSTICE | | |
| **Immediate Supervisor** | | | |

**Section D: Alleged Witness(es) Information (if they can be identified)**

**Section E: Nature of Complaint or Issue(s)**

1. What is the date of the alleged potential violation(s)?: March 8, 2022

2. Please provide a detailed summary of the alleged potential violation(s):

   As reported by RP/CP [redacted] "...T[]he Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack." RP/CP writes, " My birth name was [redacted] [redacted] did not participate in raising me and so I took [redacted] name [redacted] as a law student with the help of a firm I clerked for. As [redacted] I have never used any name other than [redacted] which is also my name on my driver's license and passport. A county computer system continues to incorrectly list my first name as [redacted] and the sheriff has repeatedly referred to me as [redacted] in public attacks. I believe this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as foreign (German or Jewish)."

3. Why does the Complainant(s) believe the treatment occurred/is occurring?:

   Race

**Section F: TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

Date & time supervisor/manager observed and/or was notified of the alleged potential violation(s):

n/a

How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):

What action(s), if any, did the supervisor/manager take? (Explain in detail):

Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following? (If so, please explain in space provided):

Medical Attention: ______

Protection: ______

Separation from Alleged Involved Party (ies): ______

Other Assistance: ______

Did the supervisor/manager advise the Complainant(s) that they:

May seek confidential counseling or assistance from County's Employee Assistance Program (EAP) at (213) 738-4200.

May contact the County Intake Specialist Unit (CISU) directly at (855) 999-2367, or via email at ceop@bos.lacounty.gov

**COMPLAINT SUBMISSION**

By submitting this complaint I am declaring, under penalty of perjury under the laws of the State of California, that:

- The facts set forth herein are true and correct and based on my own knowledge, except as to matters stated on my information and belief, and as to those matters I believe to be true;
- I believe that the facts alleged herein are jurisdictional to the County Policy of Equity (accessible at: https://ceop.bos.lacounty.gov), are not duplicative of facts set forth in previously filed County Policy of Equity complaints that I have filed, and
- The filing of this County Policy of Equity complaint is not a misuse or abuse of the County's Policy of Equity Complaint Process.

[redacted]

Printed Name

______________________________

Signature

March 9, 2022

Date

**OPTIONAL: Please provide the information below for statistical purposes only**

**Race/Ethnicity:**

*"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that required the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." - (eeoc.gov)*

☐ Hispanic or Latino - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

■ White (Not Hispanic or Latino) - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

☐ Black or African-American (Not Hispanic or Latino) A person having origins in any of the black racial groups of Africa.

☐ Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino) - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

☐ Asian (Not Hispanic or Latino) - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

☐ American Indian or Alaska Native (Not Hispanic or Latino) - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

☐ Two or More Races (Not Hispanic or Latino) - All persons who identify with more than one of the above five races.

**Gender:**

■ Male

☐ Female

☐ Prefer Not to Answer

**Date of Birth:** [redacted]

# EXHIBIT B

For I.S.U. Use Only
Method of Receipt
- ☐ Telephone
- ☐ In Person
- ☐ POE Report Form
- ☑ Other: CPOE

Intake # 22-045

# Policy of Equality
# Report / Notification Form

General Instructions: Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

********************************************************************************************************

Section A: Reporting Party Information                Today's Date: 03 / 17 / 2022

Name: [redacted] Emp. #: [redacted] Rank/Title [redacted]

Work Tel# [redacted] ; Home Tel# ______ ; Work Hours ____ - ____ RDO ______

Unit of Assignment: Office of Inspector General    Unit Commander: Jeffrey Levinson

Division LA County Board of Supervisors

Name of Supervisor Completing this form (if different from above): B-1 Deputy Jonathan Lested # [redacted]

Date & Time form completed: 03 / 17 / 2022 / 1200 hours.

☐ Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?

☐ Yes (if yes, fill in details)
Who: ______
When Date: ____ / ____ / ____ Time: ____ hours.
How ______

☐ No

☑ Do not know

********************************************************************************************************

Section B: Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: 03 / 08 / 2022 / ____ hours or between ____ / ____ / ____ and ____ / ____ / ____

If multiple incidents or unknown, explain:
See narrative.

********************************************************************************************************

Section C: Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

Same as RP ______ Employee# ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ____ - ____ RDO ______

______ Employee# ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ____ - ____ RDO ______

______ Employee# ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ____ - ____ RDO ______

**Section D:** Alleged Involved Party(ies) (if they can be identified)

| Name | Employee # | UOA |
|---|---|---|
| Villanueva, Alejandro (Sheriff) | [redacted] | Office of Sheriff |
| | | |
| | | |
| | | |

**Section E:** Alleged Witness(es) (if they can be identified)

None Stated Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

______ Employee # ______ Rank/Title ______ UOA ______
Work Tel# ______ ; Home Tel# ______ ; Work Hours ______ - ______ RDO ______

**Section F:** Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity report (ICMS #2022-112213) from CEOP Executive Director Vickey Bane, filed by RP/CP [redacted] on March 9, 2022. The narrative of the complaint stated, in part, the following (verbatim): "...The Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack."

"My birth name was [redacted] did not participate in raising me and so I took [redacted] as a law student with the help of a firm I clerked for. As [redacted] have never used any name other than [redacted] which is also my name on my driver's license and passport. A county computer system continues to incorrectly list my first name as [redacted] and the sheriff has repeatedly referred to me as [redacted] in public attacks. I believe this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as

(☑ Check, if narrative is continued onto the next page)

**Ask: "Why do you believe this treatment is occurring?"**

Race

Section F (cont'd) Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

foreign (German or Jewish)."

(ISU Note: For details, refer to copy of CPOE complaint contained in ISU efile.)

**Note: Continue onto the next page**

Section G. Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY DO NOT FILL OUT THIS SECTION IF YOU ARE THE ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made 03 / 16 / 2022 , 1521 hours.

How did you become aware of the potential violation (explain in detail):
The ISU received CPOE ICMS #2022-112213, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Jonathan Lested to document the allegation in the County Policy of Equity Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑ Medical Attention
**Response:** to be ascertained

☑ Protection
**Response:** to be ascertained

☑ Other Assistance
**Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑ May seek confidential counseling or assistance from Employee Support Services

Notifications

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours, request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: ______________ Date & Time: ____ / ____ / ______ , ______ hour.
(Name)

☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: 03 / 16 / 2022 , 1521 hour. How?: ☑ e-mail ☐ Fax ☐ County mail

****************************************************************************************************************************

Section H: **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name: B-1 Deputy Jonathan A. Lested Emp. #: [redacted]

Day, Date and time ISU received form Thursday / 03 / 17 / 2022 , 1215 hours.

☐ Referred to Equity Unit: Date & Time - ____ / ____ / ____ , ____ hours.

☑ If not referred to Equity Unit, explain in detail action taken:
"B" assessment authored by DCO Sieberg received on 04/07/2022.

Additional Information (if any):

☐ Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☐ Subject's Unit Commander
☐ Reporting Party's Unit Commander
☐ Victim's Unit Commander

# EXHIBIT C


IV 2558097
EXHIBIT C

# MISCELLANEOUS DOCUMENTS

SH-AD-703 Revised (2/22)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: June 27, 2022

FILE NO:

OFFICE CORRESPONDENCE

**FROM:** JASON P. WOLAK, COMMANDER
PROFESSIONAL STANDARDS DIV.

**TO:** RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT:** **REQUEST FOR** INTERNAL AFFAIRS BUREAU ADMINISTRATIVE INVESTIGATION

Incident Date(s): *(use semi-colons to separate multiple dates)*
Between March 5, 2022, and March22, 2022

Synopsis:

| |
|---|
| POE 22-045. It is alleged that Subject Villanueva acted in an inappropriate POE related manner while in the workplace. |

Date a Sergeant, or above, became aware of an act, omission, or other misconduct:
March 16, 2022

One Year Statute Date (If criminal monitor, leave blank): March 15, 2023

Alcohol Related? NO

Citizen Complaint? NO If yes, SCR #:

Complainant's Name (Add employee number if a Department member)
[redacted] Office of Inspector General, #[redacted]

## REQUEST FOR IAB INVESTIGATION AND/OR CRIMINAL MONITOR

**Involved Subject** *(For additional subjects, use Subject Continuation Page 703-A)*

**Subject Name, Rank, Employee Number, and Unit of Assignment:**
Alex Villanueva, Sheriff, #[redacted] Office of the Sheriff

Potential MPP Violation(s):
3-01/121.10 - POE Discrimination; 3-01/121.20 - POE Harassment Other than Sexual;
3-01/121.25 POE Third Party Harassment;
3-01/121.30 POE Inappropriate Conduct Toward Others

Subject's Assignment/Duty Status:
- ☑ Subject's assignment/duty status unchanged
- ☐ Relieved of Duty (ROD), assigned to home ROD Date:
- ☐ ROD, assigned to a relieved of duty position
- ☐ Probationary Employee

Justification for the subject's assignment/duty status *(required)*:
N/A

Consideration(s) for IAB Request:
* Mandatory IAB Investigation

- ☐ Witnesses are spread over a large geographic area.
- ☐ The nature of the allegation(s) involves incidents of high media attention.
- ☐ A subject is a supervisor or manager (lieutenant or above; assistant director or above).
- ☐ The nature of the allegation(s), if founded, will likely result in discharge.*
- ☐ The allegation(s) concern family/domestic violence.
- ☐ The allegation(s) concern workplace violence.*
- ☐ The allegation(s) concern profiling or bias against members of the public.*
- ☑ Other: Allegations contain Policy of Equality*

☐ Criminal Monitor by IAB (Refer to MPP 3-04/020.30 – Internal Administrative and Criminal Investigations) *enter investigating agency, crime, and report number.*

Supervisory Inquiry authored? ☐ Yes ☑ No

Contact person for source documents (i.e.: supervisory inquiry and/or investigative materials) at the requesting unit:

Prepared by Unit Commander/Director, or designee:
Lieutenant John Carter, #[redacted] Internal Affairs Bureau

**NOTE: Email this form to "IAB Investigation Requests." A review of this request will be conducted by the Internal Affairs Bureau. There may be situations when the Internal Affairs Bureau will decide, upon initial review, to return the case to be conducted as a unit level investigation.**

---

**For IAB use only**

Assigning Lieutenant Lieutenant John Carter, #[redacted]

IAB Investigator Christine Diaz-Herrera, Esquire, Sanders Roberts LLP

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558097

OFFICE CORRESPONDENCE

| FROM: | TO: |
|---|---|
| EDWIN A. ALVAREZ, CHIEF<br>PROFESSIONAL STANDARDS DIVISION | RON KOPPERUD, CAPTAIN<br>INTERNAL AFFAIRS BUREAU |

**SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION**

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER:

Alex Villanueva, Sheriff, #[redacted]

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct):

03/16/2022

Potential MPP Violation(s) including, but not limited to:

3-01/121.10 POE - DISCRIMINATION
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description):

It is alleged you acted in an inappropriate POE related manner and in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been rescinded. You are being ordered by your Unit Commander that during the time this investigation is active, any routine absence request must be submitted directly to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

**SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:**

**Subject:** [signature] **Witness:** [signature]

**Employee #:** [redacted] **Date:** 6/29/22 **Employee #:** [redacted] **Date:** 6/29/22

CONTENTS NOTED J. SATTERFIELD

## 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

## 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited. Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

## 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander. When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior. The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

# 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
## HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

October 23, 2023 IAB File # IV 2558097

Mr. [redacted]
500 W. Temple Street
Los Angeles, California 90013

Dear Mr. [redacted]:

**NOTIFICATION LETTER**

On or about March 16, 2022, a Policy of Equality (POE) Complaint was filed on your behalf with the LASD Intake Specialist Unit, wherein you complained about workplace matters. As required by California Penal Code Section 832.7 (e)(1), "the department or agency shall provide written notification to the complaining party of the disposition of the complaint within 30 days of the disposition." This letter serves to satisfy such requirement.

Your complaint against Former Sheriff Alex Villanueva was investigated by the LASD's Equity Investigations Unit (EIU). Upon completing the investigation, the EIU forwarded the case to the County Equity Oversight Panel (CEOP). On October 17, 2023, the CEOP met to render its finding.

Upon consideration of the facts developed in the investigation, the Panel's recommended finding is as follows:

> As to Alex Villanueva the panel determined that a violation of the Department's Policy of Equality occurred, and appropriate administrative action will be taken.
>
> No other violations of the Department's policies and procedures were found.

You should be aware that Alex Villanueva has the right to grieve and/or otherwise appeal this recommended determination.

You should also be aware that, "the notification described in this subdivision shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court, or judge of this state or the United States," California Penal Code Section 832.7(e)(2).

Sincerely,

ROBERT G. LUNA, SHERIFF

***ORIGINAL SIGNED***

Ron Kopperud, Captain
Internal Affairs Bureau

SH-AD-32A (3/23)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: October 17, 2023
FILE NO: IV 2558097

OFFICE CORRESPONDENCE

**FROM:** SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:** COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:** **POSSIBLE MANUAL OF POLICY AND PROCEDURES VIOLATIONS**

The following Manual of Policy and Procedures violations relate to the allegations in this case, regarding **Alex Villanueva, Former Sheriff:**

**3-01/121.10 Policy of Equality – Discrimination (Based on National Origin and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on National Origin and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.25 Policy of Equality – Third Person Harassment (Based on National Origin and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**Discipline Assessment – Alex Villanueva,** [redacted]

**Review of Applicable "Guidelines for Discipline" Section:**

The Departmental "Guidelines for Discipline" (revised August 1, 2020) includes the Policy of Equality, and lists the following analogous misconduct with the associated disciplinary penalties:

| CONDUCT | STANDARD DISCIPLINE |
|---|---|
| **3-01/121.10 Policy of Equality – Discrimination (Based on National Origin and Ethnicity)** | **Five (5) Days to Discharge** |
| **3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on National Origin and Ethnicity)** | **Five (5) Days to Discharge** |
| **3-01/121.25 Policy of Equality – Third Person Harassment (Based on National Origin and Ethnicity)** | **Written Reprimand to Discharge** |
| **3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity)** | **Written Reprimand to Discharge** |

**Determination of Discipline:**

Based upon the attached assessment of mitigating and aggravating factors, the following discipline has been determined to be appropriate. This discipline is subject to revision upon receipt of the Subject's response or grievance.

_____ **Discharge**
_____ **Reduction in Rank**
_____ **Removal from Bonus Position**
_____ **Suspension with loss of pay and benefits for ___ days with / without the option of EBD**
_____ **Written Reprimand**
_____ **No Discipline**

__X__ **Panel Recommends "Do Not Rehire" notation at top of file**

SVE:WB:wb

SH-AD-32A (3/23)

COUNTY OF LOS ANGELES

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: October 17, 2023

FILE NO: IV 2558097

OFFICE CORRESPONDENCE

**FROM:** SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:** COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:** **Alex Villanueva, #[redacted]**
Former Sheriff
Office of the Sheriff
Executive Division

The County Equity Oversight Panel, consisting of Constance Komoroski, Mercedes Cruz and Roberta Yang met by teleconference on October 17, 2023. Also attending the teleconference was Department representative Chief Laura Lecrivain.

Upon consideration of the facts developed in this investigation, the Panel determined that the Manual of Policy and Procedures sections 3-01/121.10 Policy of Equality – *Discrimination (Based on National Origin and Ethnicity)*, 3-01/121.20 Policy of Equality – *Discriminatory Harassment (Based on National Origin and Ethnicity)*, 3-01/121.25 Policy of Equality – *Third Person Harassment (Based on National Origin and Ethnicity)*, and 3-01/121.30 Policy of Equality – *Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity)* were **founded**.

The County Equity Oversight Panel recommended that the Subject should receive **a "Do Not Rehire" notation at the top of their personnel file.**

SVE:WB:wb

# EXHIBIT 2

Los Angeles Times

CALIFORNIA

# 'Do Not Rehire': Panel finds Villanueva violated county discrimination, harassment policies




Then-Los Angeles County Sheriff Alex Villanueva in 2020. (Nick Agro / For The Times)

**By Keri Blakinger**
Staff Writer

Jan. 31, 2024 5:43 PM PT

An oversight panel has recommended that former Los Angeles County Sheriff Alex Villanueva be deemed ineligible for rehire after officials found he discriminated against

Inspector General Max Huntsman, according to records obtained by The Times.

In the initial complaint filed in March 2022, Huntsman accused Villanueva of "dog whistling to the extremists he caters to" when he repeatedly referred to the inspector general by his foreign-sounding birth name, Max-Gustaf. In an interview with The Times editorial board a few weeks later, Villanueva — without any evidence — accused Huntsman of being a Holocaust denier.

"You do realize that Max Huntsman, one, he's a Holocaust denier," Villanueva told the board. "I don't know if you're aware of that. I have it from two separate sources."

At the time, Villanueva refused to identify the sources. This week, he did not address emailed questions about them.

Records show that after the department investigated the allegations, the County Equity Oversight Panel met in 2023 and found that Villanueva had violated several policies against discrimination and harassment. By that point, Villanueva was no longer sheriff, and the panel recommended that he "should receive a 'Do Not Rehire' notation" in his personnel file.

Villanueva is currently running for county supervisor, and it's not clear how the finding could affect his campaign.

"This is but another brazen attempt by the Board of Supervisors to engage in electioneering to influence the outcome of the race for 4th District supervisor," he wrote in an emailed statement to The Times. "Much like the special hearings of the Civilian Oversight Commission, this unprecedented effort by the county is neither supported by fact or the rule of law."




CALIFORNIA

**L.A. County supervisors ask sheriff for report on 'Industry Indians' deputy gang**

Jan. 24, 2024

---

On Wednesday, the Sheriff's Department confirmed to The Times that it upheld the panel's recommendation. Meanwhile, Huntsman said he was "happy" with the finding.

"I'm glad that Villanueva is no longer the sheriff and, now that he is gone, the facts have been treated in a more fair and objective way," he told The Times. "But it doesn't undo the damage that is done when an agency is allowed to operate above the law."

Throughout his time in office, Villanueva repeatedly sparred with Huntsman, who was one of the department's top critics as well as the chief watchdog tasked with its oversight.

Villanueva leveled personal attacks against Huntsman and eventually banned him from the department's facilities and databases, saying he was "a suspect" in two criminal cases.

Huntsman issued subpoenas aimed at forcing the sheriff's cooperation and at one point launched an investigation into whether Villanueva lied about a violent incident involving an inmate.

Amid that tension, on March 9, 2022, Huntsman filed a complaint — which he told The Times this week he was required to do under county policy — accusing Villanueva of sending an email "throughout the Sheriff's Department that was a racially biased attack." In the email, Villanueva allegedly referred to Huntsman by his full name. Around the same time, during an interview on KFI-AM radio, the sheriff raised the issue again, adding, "He's dropped the Gustaf for some reason, and there might be a story behind that."

When Villanueva found out about Huntsman's complaint, he in turn told The Times editorial board about it, adding in the new claim about Huntsman's supposed denial of the Holocaust.

The editorial board functions independently of The Times' newsroom, and the interview — during Villanueva's reelection campaign — came as part of the board's usual endorsement process in the 2022 election cycle.

At the time, Huntsman wrote a letter to the Board of Supervisors, alerting them to the sheriff's allegations and offering a response. He wrote that Villanueva was "dog whistling to his more extreme supporters that I am German and/or Jewish and hence un-American."



CALIFORNIA

**Petition seeks to decertify Undersheriff April Tardy for alleged dishonesty**

Jan. 25, 2024

Huntsman explained his family's history, saying his German grandfather had been conscripted into the Nazi army, but was not allowed to carry a rifle because he had previously employed Jews. Growing up during the Holocaust, he said, his father had developed a deep distrust of authority. Huntsman's father left Europe for North America after the war ended but abandoned the family shortly after his son was born. "He gave me the name Max-Gustaf and so I do not use it," Huntsman wrote. "I would never deny that the Holocaust happened."

During his internal affairs interview about his complaint, records show, Huntsman added that his father was a "piece of work — as a result of the Holocaust." He said that the "way the Nazis functioned" did great damage to his family.

"I don't claim that's as bad as the Holocaust, but it had a direct impact on me," he said, according to a transcript of the summer 2022 interview. "So the idea that I would deny

the Holocaust is crazy. I have no love for Nazi Germany; quite the opposite."

When Villanueva began using the inspector general's birth name, Huntsman said he believed it was an effort to say: "This guy's a foreigner; he's either German or Jewish or both."

During his internal affairs interview — conducted by an independent investigator hired by the county — Huntsman also detailed the genesis of his tensions with the former sheriff, which he said dated to at least 2019 when the Office of Inspector General began investigating Villanueva's controversial decision to rehire a deputy who'd been fired for domestic violence and dishonesty.



CALIFORNIA

**Burger chain manager fined for using 'straw donors' to back ex-Sheriff Alex Villanueva's 2018 campaign**

Jan. 10, 2024

When Huntsman's office prepared to issue a report on the matter, he said, he gave a draft to the Sheriff's Department.

"When I did that he shut off our computer access and I was asked by people in the county to try to convince him to change his mind," Huntsman said, according to the internal affairs transcript. "In that context he said to me, 'If you issue this report, there'll be consequences.'"

Not long after that, Huntsman said, Villanueva announced that the inspector general was the target of a criminal investigation, and sent a letter to the Board of Supervisors requesting that Huntsman be relieved of duty.

Huntsman stayed on the job, and his tensions with Villanueva continued.

Though heavily redacted Internal Affairs Bureau records show Huntsman was interviewed by an investigator in summer 2022, it wasn't until October 2023 that the county oversight panel met to discuss the case and issue its recommendation.

## More to Read

**Ex-deputy says he was fired after refusing to affiliate with alleged deputy gang**

April 3, 2024



**Villanueva denies existence of deputy gangs as L.A. County officials seek accountability**

Jan. 14, 2024



**After years-long fight, ex-sheriff agrees to comply with subpoenas, testify on deputy gangs**

Dec. 26, 2023





**Keri Blakinger**

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in Texas who play clandestine games of "Dungeons & Dragons," countering their extreme isolation with elaborate fantasy. Her work has appeared everywhere from the BBC to the New York Daily News, from Vice to the Washington Post Magazine, where her 2019 reporting on women in jail helped earn a National Magazine Award. She is the author of "Corrections in Ink," a 2022 memoir about her time in prison.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT 3


25 YEARS
COUNTY OF LOS ANGELES
CALIFORNIA
MAX-GUSTAF HUNTSMAN

18:19

transparentcalifornia.com

FRIEDMANS
Where Excellence is Standard
Friedmans Home Experience

Donate

TRANSPARENT CALIFORNIA

California's largest public pay and pension database

Home / Counties / 2015 / Los Angeles County / MAX-GUSTAF HUNTSMAN

# MAX-GUSTAF HUNTSMAN

INSPECTOR GENERAL (UC) (2015)

| | |
|---|---|
| **Regular pay:** | [redacted] |
| **Overtime pay:** | [redacted] |
| **Other pay:** | [redacted] |
| **Total pay:** | [redacted] |
| **Benefits:** | [redacted] |

California Top Lawyers

# Max-Gustaf Huntsman

Attorney

Profile

**Status***
**Active**
This member is active and may practice law in California.
**Firm / org**
L.A. County Office of Inspector General
**County**
Los Angeles
**District**
District 2
**Bar number**
156780

18:27

calsalaries.com

CalSalaries

# MAX-GUSTAF HUNTSMAN

(2012)

Deputy District Attorney
Los Angeles County
[redacted]

## MAX-GUSTAF HUNTSMAN Salary Overview

As Deputy District Attorney at Los Angeles County, MAX-GUSTAF HUNTSMAN made [redacted] in total compensation. Of this total [redacted] was received as a salary, [redacted] was received as benefits and [redacted] came from other types of compensation . This information is according to Los Angeles County payrolls for the 2012 fiscal year.

MAX-GUSTAF HUNTSMAN total

18:27

lawyers.justia.com

JUSTIA

Justia › Lawyer Directory › Los Angeles

[redacted]

Tap to Call This Lawyer



**Max-Gustaf Huntsman**

*Update your profile now!*

Review This Lawyer

Compare Save

Recent (1) Saved (0) Compare (0/3)

22

# EXHIBIT 4

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

March 4, 2022

The Honorable Hilda L. Solis
Chair, Board of Supervisors
County of Los Angeles
856 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisor Solis:

**FOLLOW UP REGARDING ETHICAL VIOLATIONS OF FIRST DISTRICT JUSTICE DEPUTY ESTHER LIM**

On February 9, 2021, you received correspondence from my office outlining the shocking behavior exhibited by your Justice Deputy, Esther Lim. Behavior which displayed hatred, intentional bias, and multiple violations of Los Angeles County policy. In that same letter, you were provided with approximately 40 examples of hatred, to include racial bias, gender bias, age bias, political activism on duty, lewdness, vulgarity, bullying, false representation, support of online "trolling," support of online "doxing," slanderous unsubstantiated allegations of deputies committing "murder," and a gross lack of professionalism and judgment. Additionally, you were provided evidence of her support for anarchists and her disappointment when Los Angeles County did not receive a designation of "anarchist jurisdiction" by the United States Department of Justice.

On February 8, 2021, during a recorded session, a reporter asked you specifically about this matter and you replied, "*It is a personnel matter, and I am not privileged to disclose that information, but it is being handled.*"

But then on March 27, 2021, you, as well as Supervisor Holly Mitchell, actively participated as guests in a forum advertised as, *Exposing L.A. Sheriffs Gangs, Murders, & Harassment of Families*, sponsored by *Black Lives Matter Los Angeles, Centro CSO*, and *Check the Sheriff Coalition*. As you are aware, the *Check the Sheriff Coalition* is comprised of 30 different activist groups, many whom share the same radical and

hateful views displayed by your Justice Deputy. Members of the *Check the Sheriff Coalition* have declared their mission is to defund law enforcement, abolish jails, and harass public officials. At least one group has clearly stated its hatred for the United States of America, the U.S. flag, and calls for a Marxist system over democracy.

During this online anti-law enforcement forum, you spoke on the topic of "deputy gangs." During which you stated the Department has engaged in "*decades of historical discrimination and racism*." You went on to say, "*The Sheriff's Department is a very violent organization, we know in many ways, retaliation and harassment.*" Based on your associations, actions, and behavior, it seems clear you share similar ideological views as Ms. Lim, but you are on the wrong side of history. Fanning the flames of hatred and defunding law enforcement is not the answer.

On March 1, 2022, during his *State of the Union* speech, the 46th President of the United States, Joseph R. Biden Jr., very clearly stated the following, *"We should all agree: the answer is not to defund the police – it's to fund the police. Fund them!"* I agree with President Biden and encourage you to reverse course on your anti-police ideology and embrace President Biden's guidance.

It has been over a year now since you informed the public the deplorable behavior by your Justice Deputy was *"being handled,"* yet to date you have failed to advise my office of the outcome. Although most of the hateful and highly offensive posts have been deleted from Ms. Lim's Twitter account, your lack of public response gives the appearance this was not appropriately "*handled*." The perception to myself, my department, and the public is you believe "transparency and accountability" are words which only apply to others, but not to yourself or your staff.

This matter was obviously of public interest, or a reporter never would have asked you about it. In my original letter, I stated "*I look forward to the outcome of what I trust will be the appropriate administrative action*." To date, there has NEVER been an apology issued by yourself, or Ms. Lim regarding this matter.

Please forward the results of your investigation, as well as provide the actions taken (written apologies, root cause of her hatred, anger management classes, implicit bias training, etc.), or provide a response as to why these do not exist.

In doing so, you can explain to the communities you represent your actions and possibly counter your perceived lack of respect for law enforcement, by clarifying how a trusted advisor and senior member of your staff, who writes your policies and guides you, could openly display such hateful bias to the law enforcement community, who stands ready to assist you whenever you or your staff request.

Thank you for your attention on this matter. Should you have any questions, please contact my Chief of Staff, Captain John Satterfield at [redacted]

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV:JLS:ms
(Office of the Sheriff)

Attachment: Letter to Supervisor Solis, *Ethical Violations of First District Justice Deputy*, February 9, 2021

c: Supervisor Holly J. Mitchell, Second District
Supervisor Shelia Kuehl, Third District
Supervisor Janice Hahn, Fourth District
Supervisor Kathryn Barger, Fifth District
Celia Zavala, Executive Officer, Board of Supervisors
Fesia Davenport, Chief Executive Officer
Lisa Garrett, Director of Personnel – Human Resources

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

## HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

February 9, 2021

The Honorable Hilda Solis
Chair, Board of Supervisors
County of Los Angeles
856 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisor Solis:

**ETHICAL VIOLATIONS OF FIRST DISTRICT JUSTICE DEPUTY**

I would like to bring your attention to the shocking behavior I have been made aware of executed by your Justice Deputy Esther Lim. Behavior, which can only be described as appalling. Ms. Lim's Twitter social media account displays both hatred and intentional bias, two character traits I know you do not endorse. I have attached numerous recent samples from her Twitter account, which illustrate her detestable behavior.

As you review these posts, you will witness examples of racial bias, gender bias, age bias, political activism, lewdness, vulgarity, bullying, false representation, support of online "trolling," support of online "doxing," allegations of deputies committing murder, and a gross lack of professionalism and judgement. Additionally, Ms. Lim tweeted her support for anarchists, and in one post even shared her disappointment Los Angeles County (County) did not make the list of being designated by the United States Department of Justice as an "*anarchist jurisdiction*." As Chair of the Los Angeles County Board of Supervisors and a civic leader during the many examples of civil disorder by ANTIFA in 2020, this must be difficult to learn.

Several of these slanderous and profanity laden examples were disrespectfully and personally directed at numerous elected officials. On one occasion,

Ms. Lim publicized and circulated the link of a "harmful fake account," created to harass me; this account was soon banned by Twitter for numerous policy violations. You may also be surprised to learn the majority of these examples I have presented to you appear to have occurred during her regular work hours. I refuse to believe her attacks on democratically elected officials represent your personal beliefs. I was disappointed by this news, knowing she is a representative of your office.

Also, note several profanity filled posts irresponsibly spread falsehoods and propaganda regarding my voluntary appearance at the December 17, 2020, Civilian Oversight Commission (COC) meeting. Apparently, Ms. Lim was typing these attacks on me during the meeting as I spoke, and in at least one thread, had a real time exchange with COC Commissioner Priscilla Ocen during the meeting. By the standard used for County employees, doing this during working hours and in such a high profile manner, she is viewed as acting in her official capacity and was a representative of your office.

Of equal concern is the fact some of these examples suggest information she may have learned of in a confidential setting. She eludes to allegations as facts in generalized statements regarding the character and criminal behavior of my deputies, which as you know places the County in a vicarious position for civil liability, as well as stokes the fires of hatred.

One disturbing statement, bordering on the incitement of violence, read, "*This is not a few bad apples. The whole damn orchard needs to be torched. #DefundPolice.*" As you can imagine, it was disheartening for our Los Angeles County Sheriff's Department (Department) members to learn of your Justice Deputy's disparagement for them and the entire profession of law enforcement, especially at a time peace officers are being targeted and violently assaulted simply because they wear a uniform. It is also worrisome the hateful bias she publicly exudes on a weekly basis towards the Department, which may be affecting the public safety of the County both indirectly and directly, since she is your gatekeeper for public safety issues and our Departments conduit to you.

Over the last several months, I have requested to meet with you approximately six times and have requested your attendance at no less than two press conferences; all of which were denied or went unanswered until we virtually met yesterday on February 8, 2021. Additionally, we have recently been limited as to the number of Board letters we can present at the Public Safety Cluster Agenda Review (CAR) meetings by Ms. Lim, which significantly reduces our ability to institute positive change towards public safety. A total of

five letters and/or presentations per week from 21 separate County departments is draconian, irresponsible, and does not best serve the residents of the County. In light of Ms. Lim's behavior, I must now suspect whether you were even aware of these issues at all.

The intentional bias displayed by Ms. Lim has surely altered the possibility of a good working relationship, and it is the community who ultimately suffers Her actions and false information contribute to the erosion of trust and have damaged me personally, as well as the perceived legitimacy of the Department. Moving forward, I do not see how Ms. Lim can remain effective as our bridge to you on public safety concerns. Despite the volume of posts provided as examples, I choose to believe they are not indicative of your own beliefs regarding the men and women of this great organization and the law enforcement profession.

The First Amendment does not exempt a person from administrative consequences for their choices and actions, especially when their statements have an easily identified direct nexus to the workplace, are unethical, violate policy, and bring embarrassment to the County. Personally, I immediately removed my former Chief of Staff from his position, as well as took swift administrative action against him for a single occurrence of posting a statement, which was perceived as insensitive in nature; I have provided you with 37 separate occurrences for Ms. Lim, all of which are far more offensive.

As a member of our County family, I look forward to the outcome of what I trust will be the appropriate administrative action.

Should you have any questions or would like to discuss this matter further, please feel free to contact me at [redacted]

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV:JAV:js
(Sheriff's Information Bureau)

c: Supervisor Holly J. Mitchell, Second District, Board of Supervisors
Supervisor Sheila Kuehl, Third District, Board of Supervisors
Supervisor Janice Hahn, Fourth District, Board of Supervisors
Supervisor Kathryn Barger, Fifth District, Board of Supervisors
Fesia Davenport, Chief Executive Officer, Chief Executive Office
Lisa Garrett, Director of Personnel, Department of Human Resources
Rodrigo A. Castro-Silva, County Counsel, Office of the County Counsel

Esther | 에스더 | إستر

Lots of "if they were Black..." tweets going around. Yup we all know what would have happened.
#WhitePrivilege

MSNBC

Esther

... is sleeping IN HER OWN ...

Vera Bergengruen





Esther | 에스더 | سبر

Was wondering when we d see a fake Sheriff account trolling him & the Department!
😂 here it is: twitter.com/joemischo/stat

1



Esther | 에스더 | سبر

And Sheriff Villanueva has the audacity to say he was a sponsor of this bill
Fool what you should have done is not provide cover for your deputies from any wrongdoing & held them accountable
#KobeBryant

AP AP Sports

2

Esther [illegible]

In Los Angeles County, the largest local jurisdiction in the nation, no sheriff should be elected. It's time to face that essential truth and map out the long, contentious but necessary path to bring about that change
#GetHimOut #ResignVillanueva



Esther [illegible]

[illegible] #PPE [illegible]

[illegible]

#COVID19

Alex Villanueva

I want to thank the US Zhejiang General Chamber of Commerce who graciously donated 72,000 masks & 1150+ hand sanitizers to @LASDHQ earlier today. The masks will be dispersed throughout the department to help keep our personnel safe & protected during the #COVID19 pandemic. #LASD

2

Esther | 에 [illegible] 더 | [illegible]

If you're Black you can't do these things otherwise the cops will shoot you

- 😴 in/Enter your [illegible]
- [illegible]
- Stop a fight
- Hold anything in your ✋ because everything [illegible]
- Stand outside your mom's [illegible]
- Be in your 🚗
- Jog 🏃
- Have a MH need

#BlackLivesMatter #DijonKizzee




Esther | 에스더 | استر

Snitches get stitches except if you're a white supremacist then I'm singing like a canary 🐦 🎶

The New York Times




Esther | 에스더 | استر

Sheriff said that it's a cottage industry to sue cops. If the police stopped engaging in idk shooting and murdering people then yeah, Im sure folks will stop suing.

Esther



Esther | 에스더 | سِتر

When the Sheriff of LA says #VictimsMatter he should add an asterisk. It doesn't include the people his deputies shot and killed.

6

Jessica Pishko

💯

Esther

**Alex Villanueva**

We look forward to seeing if the DA will reevaluate these cases and re-apply the enhancements given the nature of these cases.

As Sheriff of LA County, I firmly believe we are not safer by putting the interests of offenders over the needs of victims of crime.

Esther

Esther

Esther | 에 스 더 | ...

Honestly idk why people keep voting for this asshole Mitch McConnell
#COVID19



Esther | 에스더 | سر

Nothing Mitch does surprises me. We should all co lectively agree that he s not going to do anything for anyone even if they re starving or dying.
He s a fuck ng racist asshole

1

Jessica Pishko

Esther |

Priscilla Ocen

Esther

Esther

Esther |

Fuck 2020.

ABC News

Esther | 에스더 | سستر

You called Black boys and Black men "super predators"
They shouldn't be voting for your racist, bigoted, sexist & everything-phobic ass.
*Ahem @kanyewest @50cent @icecube @LilTunechi and whoever the fuck else who lost their damn fucking minds
#VoteBlueToEndTheNightmare
twitter.com/realDonaldTrum...

Esther | 에스더 | سستر

Kind of mad that LA isn t on this list :

NBC New York

Esther | 에스더 | استر

Booyah Sheriff.



Esther | 에스더 | استر

#FuckICE #AbolishICE

Radley Balko

Esther | 에스더 | ___

You think your vote isn't important? Why are the
to fuck with it then???
#GOTV #Vote #VoterSuppression



Esther | | سير

Yikes!! 😬
This needs to get fixed ASAP!
We had all those fuck ups during the Primary, you'd
think this would get resolved for the General!
@LACountyRRCC

(5) KTLA

1

Esther

No more fucking gender reveal
over your kids genitals TF



Deadline Hollywood

Esther |

Oh my fucking God noooooo!!.! Why the fuck would you do this to me @tacobell.!.!
Am I gonna have to freeze these fucking things?.?
#MexicanPizza

CNBC

Esther | 에스더 | ستر

A total slap in the face of all our health workers.
I don t think they want us to applaud they want us to stay the fuck home and wear our fucking masks
#COVID19 #WearAMask

Sith Lord

2 6

Esther | | ستر

Fuck em. #CovidVaccine

Esther | 에스더 | سیر

Not fucking ice cream 😭 #2021Sucks

FOX 11 Los Angeles

Esther

Esther | 에스더 |

... custody deputies ... oooo young ... look super scared & can't tell you ... many of them are fiscal ... & ... they fuck up ... steroids so many

Esther | 에스더 | إستر

Yup & LASD covered it up by protecting the deputies who did it & won't allow the Inspector General to conduct an independent investigation. #KobeBryant

Justin Boldaji بلد جي

2

Esther | 에스더 | إستر

But nothing about his deputies harassing surviving families of deputy violence? Or prematurely or the malicious sharing of victims info of deputy violence to media?
The sheriff & deputies can move, these families can't afford to. Some deputies don't even live in LAC

Claudia Peschiutta

Esther

st of all, wants to complain about their folks getting doxxed but don't give 💩💩 about when they plaster false unchecked or maligning info all over media & harass surviving fams of someone they shot & murdered? Ok, no
At least they can afford to move. These fams can't

2 14

Esther




Esther

#LASD justified killing of #DijonKizzee by showing videos they wanted to show from his cell phone photo gallery & some angles of the fixed camera footage. #LASD said Dijon had his hands up briefly, but you can see his hands up the entire time UNTIL a deputy manhandles him

4 7

Sandra Hernandez

Esther

Esther | 에스더 | استر

Trust if they say they're not scared, they're lying. When they are they'll use force more often than not perceive fear that's not there, or be in fear for every little thing. The other thing is that during training their FTO will perpetuate the us vs them mindset. Not good.

LA County Sheriffs
23.5K Tweets

Tweets

LA County Sheriffs
(2/3) During his arrest, a struggle ensued at which time a female adult ran towards the deputies, ignored repeated commands to stay back as they struggled with the male and interfered with the arrest.

LA County Sheriffs
(3/3) The female adult, who was later identified as a member of the press did not identify herself as press and later admitted she did not have proper press credentials on her

Esther

Also getting killed by the police is now THE lead... cause of death for young Black men in America
atimes.com/science/story/
#BlackLivesMatter



Esther

... #DefundPolice

Kristen Clarke



Esther | 에스더 | استر

It's Math Thursday! Not really.
Why the entire orchard is bad. #CopsLie #DefundPolice

the.goth.chola




Esther | 에스더 | استر

Defunding & abolishing law enforcement isn't "sad" "radical" or unwise
Non law enforcement response is better, people won't get shot/killed & can be regulated
Community is way past "considering", they're there #ResignVillanueva #RecallTheSheriff



Editorial: Villanueva is the best advertisement for muscular sheriff ov

Esther | 에스더 | إستر

Event password is COC123

Esther | 에스더 | إستر

The @LACountyCOC is hosting a virtual town hall to discuss the LA ... Department recent killings of #DijonKizzie & #AndresGuardado

1) Register bit.ly/3lKFI28

2) Speak up! Demand justice! Demand answers! No one is above the law #BlackLivesMatter




Esther

A N... ST READ

#DeputyGang #GangBehindTheBadge #LASD

Loyola Law School



Esther |

Guardado inquest ends without testimony from sheriff's officials or the deputy who killed ...





Esther |

People's City Council - Los Angeles



Esther

No mention of Supervis[illegible] Sol[illegible] but she was the deciding THIRD vote
She also amended to make sure the report back be presented to the PUBLIC at the [illegible] 5 [illegible] board meeting AND to ensure Supervisor Elect Holly M[illegible] would be part of the process



Esther

[illegible] @GeorgeGascon [illegible]

Frank Stoltze

Esther

Esther

# EXHIBIT 5

AGN. NO.

REVISED MOTION BY SUPERVISOR HILDA L. SOLIS July 27, 2021

AND HOLLY J. MITCHELL

**Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation**

In response to the continued complaints and concerns raised by families whose loved ones were killed by LA County Sheriff's Department (LASD) deputies, the LA County Board of Supervisors (Board) unanimously supported the May 4, 2021 motion, "Protecting Surviving Families from Law Enforcement Harassment and Retaliation"[1] directing the Office of Inspector General (OIG) to update its 2020 report back to the Sheriff Civilian Oversight Commission (COC) regarding "incidents of harassment and intimidation experienced by surviving families"[2] and conduct a thorough investigation with recommendation, working with County Counsel to "pursue legal options if there are barriers"[3] to the OIG's ability to "fulfill its directive to report"[4].

---

[1] http://file.lacounty.gov/SDSInter/bos/supdocs/158009.pdf
[2] https://oig.lacounty.gov/Portals/OIG/Reports/Report_on_Protect_ing_Surviving_Families.pdf
[3] Ibid.
[4] Ibid

MOTION

| | |
|---|---|
| MITCHELL | ______________ |
| KUEHL | ______________ |
| HAHN | ______________ |
| BARGER | ______________ |
| SOLIS | ______________ |

As a result, the OIG prepared a memorandum and report back[5] with summaries of its interviewed families; barriers to the OIG's ability to comply with the Board's directive to report back on the harassment and intimidation of families; and its meetings with the LA County District Attorney (DA). The report lays out several recommendations to protect our families from harassment, intimidation, and unnecessary pain and trauma from the misconduct of LASD deputies.

It also lays out the continued and important need for the Family Assistance Program to be fully funded and staffed to ensure those who have been harmed by law enforcement misconduct receive the necessary services to address

The Board needs to continue to stand up for our impacted residents by moving forward on these and other recommendations.

**WE, THEREFORE, MOVE** that the Board of Supervisors:

1. Direct County Counsel, in collaboration with the Office of Inspector General, to pursue all legal remedies, in accordance with State and County laws, to require the LA Sheriff's Department to comply with Government Code Sections 25303, 25303.7, and County Code 6.44.190 by granting the OIG monitoring and investigative requests, including direct OIG access to the Performance Recording and Monitoring System (PRMS) database and body-worn camera videos, so that the OIG can fulfill its obligations as directed by the LA County Board of Supervisors per the May 4, 2021 motion.
2. Direct the Executive Office of the LA County Board of Supervisors'

[5] https://oig.lacounty.gov/Portals/OIG/Reports/Report_on_Protect_ing_Surviving_Families.pdf

Information Technology (IT) Division and the Internal Services Department (ISD), in consultation with County Counsel and the Chief Executive Office, to seek to secure access to Los Angeles County records maintained by the Sheriff's Department in electronic databases and cloud storage systems, including negotiating contracts with outside vendors that require direct access for the Office of Inspector General and, as permitted by law, for other County justice departments, like the Public Defender, Alternate Public Defender, and the District Attorney, and exploring the use of the Information Systems Advisory Body's (ISAB) Enterprise Digital Evidence Management Solution (eDEMS).

   a. Access to the cloud-based storage system for body-worn camera video, evidence.com, shall be granted to the Office of Inspector General, and, as permitted by law, for the Public Defender, Alternate Public Defender, the District Attorney, and other relevant County justice departments as part of the contract between ISD and Axon Enterprises, Inc.

      i. If necessary, additional licenses to evidence.com shall be purchased for the Office of Inspector General, the Public Defender, Alternate Public Defender, the District Attorney, and other relevant County justice departments.

3. Request the LA County District Attorney (DA) to investigate all allegations of criminal conduct by the LA County Sheriff's Department (LASD).

   a. Additionally, should the DA not have sufficient staff to prosecute

criminal conduct by deputies or when LASD's investigations are deficient, the DA, in collaboration with the Chief Executive Office, shall report back, in writing, in 60 days on staffing and funding needs for these specific purposes.

4. Direct the Office of Inspector General (OIG), in collaboration with the Chief Executive Office, County Counsel, LA Sheriff's Department, District Attorney, Public Defender's Office, and Alternate Public Defender's Office to report back in 60 days on the feasibility, cost, operations, and other relevant information on the creation of an independent Office of Law Enforcement Standards as detailed in the OIG's February 2021 report, "Los Angeles County Sheriff's Department: Review and Analysis of Misconduct Investigations and Disciplinary Process."
    a. The report back shall also include any legal considerations on how the Office of Law Enforcement Standards, if created, would handle discipline of LA Sheriff's Department personnel.
    b. Additionally, the report back must include specific need for staffing and funding for the Office of Inspector General, Public Defender, and Alternate Public Defender should the creation of an independent Office of Law Enforcement Standards be established.
5. Request the LA Sheriff's Department to provide all complaints of misconduct to the Office of Inspector General within 48 hours of receipt to allow the OIG to monitor the LA Sheriff's Department's inquiry into the allegations to ensure a quality, thorough, and comprehensive investigation.

6. Request the LA Sheriff's Department, in collaboration with County Counsel, Office of Inspector General, and the Sheriff Civilian Oversight Commission, to develop and adopt a policy regarding memorial sites and vigils involving victims of deputy-involved shootings and killings within 90 days.

**WE FURTHER MOVE** that the Board of Supervisors

7. Direct the Chief Executive Office, in collaboration with the Sheriff Civilian Oversight Commission, Office of Inspector General, Department of Mental Health, Department of Public Health's Office of Violence Prevention, Medical Examiner-Coroner, and other relevant County and community stakeholders, to identify ongoing funding necessary to continue the LA County Board of Supervisors' established Family Assistance Program to support families following an in-custody death or fatal use of force by law enforcement by Supplemental Budget.

# # #

HLS:el

# EXHIBIT 6

Viewer | Table of Contents | View

Manual of Policy and Procedures (/Viewer/Manuals/10008?returnContentID=10235) / Volume 3 - Policy and Ethics (/Viewer/Manuals/10235?returnContentID=10236) / Chapter 1 - Policy and Ethics (/Viewer/Manuals/10236?returnContentID=17362)

# 3-01/122.15 - Policy of Equality - Procedures - Equity Complaint Process

‹ 3-01/122.10 - Policy of Equality - Procedures - Information About the Policy and Procedures (/Viewer/Manuals/10008/Content/17361)

3-01/122.20 - Policy of Equality - Procedures - External Complaint Monitoring › (/Viewer/Manuals/10008/Content/17363)

Reporting Complaints

Any Department member who believes they have been subjected to conduct that violates the policy is encouraged to report the matter to:

- Any Department supervisor or manager (whether or not in the Department member's chain-of-command); or
- The Intake Specialist Unit (ISU) at (323) 890-5371.

Non-supervisory Department members are also encouraged to report potential violations of the policy directed toward another to a supervisor, manager, or to the ISU, the number for which has been provided above.

Supervisors and managers shall report potential violations of the policy in accordance with the procedures detailed above.

The Intake Specialist Unit (ISU)

The ISU, staffed by both sworn and professional staff Department members, is an initial point of contact for Department members who wish to report a potential violation of the policy. Department members are not required to identify themselves when contacting the ISU.

The ISU also shall assist Department members in finding the right point of contact for questions regarding the policy and procedures or equity issues.

The ISU shall be responsible for conducting an assessment of the POE Report/Notification form to determine the appropriate course of action based on the designation below:

- "A" designation indicates that, based on the information obtained during the intake assessment process, it is clear there has been/is a potential violation of the Policy of Equality (POE), which rises to a level requiring a further investigation by the Equity Investigations Unit (EIU)/Internal Affairs Bureau. These cases will be referred to the EIU for investigation and resolution.
- "B" designation indicates that, based upon the information obtained during the intake assessment process, the ISU believes that although the situation may involve, or appear to involve, an equity issue, the situation does not rise to the level requiring a further investigation by the EIU. Cases receiving a "B" designation are typically referred back to the unit involved for follow-up action, including, but not limited to, supervisory inquiry, counseling, re-briefing, training, etc., as may be recommended by the County Equity Oversight Panel (CEOP).
- "C" designation indicates that, based upon the information obtained during the intake assessment process, the ISU determined there is no proven equity issue involved, or that there is insufficient information revealing a causal connection between the alleged adverse or disparate treatment and a protected category enumerated under the POE. Cases receiving a "C" designation may also be referred back to the unit involved for follow-up action, as may be recommended by the CEOP.
- "N" designation indicates the situation involves a Department employee as the complainant and a non-Sheriff employee as an alleged involved party. The complainant will also be forwarded to the non-Sheriff employee's agency/department or employer for investigation.

The ISU shall contact the complainant during the course of the investigation if there is reasonable basis to believe that retaliation is occurring. The ISU shall make prompt notification to the appropriate parties if an issue of retaliation is raised.

- Supervisors and Managers

  Department members also may report potential violations of the policy and/or procedures to any Department supervisor or manager as defined above.

Investigating Complaints: The Equity Investigations Unit (EIU)

The EIU is responsible for promptly and effectively investigating reports of conduct that violates the policy or procedures. EIU investigations shall be immediate, thorough, objective, and complete. EIU investigations shall be as confidential as reasonably possible consistent with the Department's obligation to conduct a full and effective investigation. Upon conclusion of the investigation, the EIU investigators shall present their findings to the CEOP for review.

The EIU investigator(s) assigned to the case shall conduct an initial investigation to determine whether there has been a potential violation of the policy and/or procedures. If the initial investigation indicates a potential violation of the policy and/or procedures, the investigator shall open an administrative investigation at the direction of an EIU lieutenant, who may seek the advice or concurrence of the equity commander. Any decision not to open an administrative investigation shall be forwarded to the CEOP for review.

Review of Equity Investigations Unit's (EIU) Investigations

- The County Equity Oversight Panel (CEOP)

The CEOP is an independent oversight body which, in accordance with the procedures described in this section, shall have authority and be responsible for reviewing the intake assessment process and EIU investigations and making appropriate determinations for violations of the policy and/or procedures. The CEOP shall meet bi-monthly, or more frequently if necessary, to discuss and review each EIU investigation.

In addition, the CEOP shall be responsible for, among other matters, monitoring and evaluating the quality of the EIU investigations and the effectiveness of the policy and procedures. The CEOP shall also serve as an equity policy advisor to the Department.

- The Review Process

The review process shall consist of the following steps:

a. The CEOP shall receive a thorough briefing from and have the opportunity to question the investigator(s) who handled the EIU investigation. The subject's division chief or director and/or unit commander may attend the briefing. In addition, the CEOP shall have the authority to command the appearance of any Department member deemed necessary to a full and effective resolution of the complaint or incident. Any information relied upon by the CEOP to reach its decisions must be reflected in the subject's investigation package, including any new information received from any attendee to the CEOP's briefing.
b. The CEOP shall meet to discuss and deliberate on the EIU case presented. A representative from county counsel may be present to offer advice as required under applicable protocols. The subject's division chief or director and/or unit commander may be present at the request of the CEOP members. After discussion, the CEOP shall determine appropriate dispositions and discipline, if discipline is warranted. The CEOP immediately shall cause to be forwarded to the Sheriff for review all cases where its final recommended discipline determination exceeds 15 days suspension (See "Sheriff's Review of Discipline in Excess of 15 Days Suspension," below.).
c. In all cases, the CEOP may direct the EIU to conduct further investigation. If further investigation is directed, another review shall be held in accordance with this section after the investigation.
d. The CEOP shall communicate its recommendations to the EIU, which shall notify the appropriate parties. The EIU shall issue a Letter of Intent to Impose Discipline to the subject or, where appropriate, inform the subject that the complaint was unfounded or unresolved. At the same time, the EIU shall issue a letter to the complainant indicating that the complaint was either founded, unfounded, or unresolved and that, if founded, appropriate corrective action was determined. Proposed disciplinary action shall be kept confidential until the EIU receives the determinations regarding dispositions and discipline from the CEOP or Sheriff or his delegate.

Sheriff's Review of Discipline in Excess of 15 Days Suspension

The Sheriff shall have the authority to review all cases of discipline in excess of 15 days suspension, including demotion and termination. For these cases, the Sheriff shall have the authority to adopt or modify the discipline and/or reopen the investigation if deemed necessary.

The Sheriff may delegate the aforementioned authority to the Undersheriff or an assistant sheriff.

Skelly Hearings

Where applicable, the subject Department member may elect to have a hearing on discipline (a "Skelly" hearing) before the discipline is imposed. If the subject elects to have a Skelly hearing, the Department shall designate a Skelly officer.

Information presented by the subject at the Skelly hearing that was known to the subject at the time of the subject's EIU investigation but not disclosed shall not be grounds for overturning the CEOP's recommendation. If the subject presents new facts during the Skelly hearing (i.e., facts discovered subsequent to the subject's EIU investigation), the Skelly officer shall send the case back to the EIU for further investigation.

The Skelly officer shall promptly communicate, in writing, the factual and legal basis for any decision to modify the CEOP's determinations to the Sheriff and to the CEOP. Failure to do so may be grounds for discipline.

Grievance Procedures

- Department Member's Rights

  Department members also may grieve disciplinary actions according to the terms of applicable memoranda of understanding (MOU) negotiated by the Department and the union representing said members. As such, these MOUs may require separate or additional procedures according to their respective terms.

- Supervisors' and Managers' Responsibilities

  Any supervisor authorized to conduct grievances shall promptly communicate, in writing, to the CEOP and to the subject's division chief or director the factual and legal basis for any decision to modify the CEOP's determinations. Failure to do so may be cause for discipline.

  Information presented by the subject during the grievance that was known to the subject at the time of the subject's EIU investigation but not disclosed shall not be grounds for overturning the CEOP's recommendation. If the subject presents new facts during the grievance (i.e., facts discovered subsequent to the subject's EIU investigation), the supervisor authorized to conduct the grievance shall send the case back to the EIU for further investigation.

Appeals to Civil Service

Department members also may appeal final determinations of discipline to the Civil Service Commission in accordance with the Civil Service Rules. Where the final discipline determination exceeds 15 days suspension, the Department may not settle a Civil Service Commission case without prior approval by the Sheriff or his designee. In all other cases, the Department may not settle a Civil Service Commission case without prior approval by the CEOP.

Save Topic as PDF (/Viewer/Manuals/GeneratePDF reportIndex=0)

© 2024 - Los Angeles County Sheriff's Department - Version 2024.1.30.1

Back to Table of Contents

## PROOF OF SERVICE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

I am an employee in the County of Riverside, State of California. I am over the age of 18 and not a party to the within action; my business address is 3764 Elizabeth Street, Riverside, California 92506.

On October 28, 2024, I served the foregoing document, described as **"DECLARATION OF ALEX VILLANUEVA SUBMITTED IN SUPPORT OF HIS OPPOSITION DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE,"** on all interested parties in this action as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 28, 2024, at Riverside, California.

Delmy Garcia
Delmy Garcia