LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
JASON H. TOKORO (State Bar No. 252345)
jtokoro@millerbarondess.com
STEVEN G. WILLIAMSON (State Bar No. 343842)
swilliamson@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>Defendants. | **CASE NO. 2:24-cv-04979 SVW (JCx)**<br><br>**COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed Concurrently with Notice of Motion; Memorandum of Points of Points and Authorities; Declarations in Support; Notice of Lodging and [Proposed] Order*]<br><br>Date:    May 19, 2025<br>Time:    1:30 p.m.<br>Crtrm.:  10A<br><br>Assigned to the Hon. Stephen V. Wilson, Crtrm. 10A and Magistrate Judge Jacqueline Chooljian, Crtrm. 750<br><br>Trial Date:    June 3, 2025 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

Defendants hereby submits the following Compendium of Evidence in support of its Motion for Summary Judgment as follows:

## INDEX TO COMPENDIUM OF EVIDENCE

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| 1. | April 9, 2025 Jason Tokoro letter to Alex DiBona | 7-11 |
| 2. | January 3, 2025 County's Requests for Admission to Plaintiff (Set One) | 12-20 |
| 3. | February 3, 2025 Villanueva Responses to RFAs (Set One) | 21-27 |
| 4. | Relevant excerpts from the February 27, 2025 deposition of Constance Marie Komoroski | 28-72 |
| 5. | Relevant excerpts from the February 28, 2025 deposition of Plaintiff | 73-108 |
| 6. | Relevant excerpts from the March 4, 2025 and deposition of Veronica Pawlowski (Vol. I) | 109-130 |
| 7. | Relevant excerpts from the March 5, 2025 deposition of Christine Diaz-Herrera | 131-172 |
| 8. | Relevant excerpts from the March 6, 2025 deposition of Ann Devane | 173-195 |
| 9. | Relevant excerpts from the March 7, 2025 deposition of Max Huntsman | 196-213 |
| 10. | Relevant excerpts from the March 10, 2025 deposition of Roberta Yang | 214-240 |
| 11. | Relevant excerpts from the March 21, 2025 deposition of Esther Lim | 241-264 |
| 12. | Relevant excerpts from the March 25, 2025 deposition of Laura Lecrivain | 265-279 |
| 13. | Relevant excerpts from the March 26, 2025 deposition of Kyla Coates | 280-316 |
| 14. | Relevant excerpts from the March 28, 2025 deposition of Ms. Cruz Mercedes Cruz | 317-352 |
| 15. | Relevant excerpts from the April 4, 2025 and deposition of Veronica Pawlowski (Vol. II) | 353-366 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| 16. | Relevant excerpts from the April 14, 2025 deposition of Jonathan Lested | 367-390 |
| 17. | Relevant excerpts from the April 15, 2025 deposition of Nairi Gevorki | 391-409 |
| 18. | March 8, 2022 Esther Lim CPOE Report Notification Form, IAB 2558101 | 410-416 |
| 19. | March 8, 2022 Esther Lim CISU Assessment Form | 417-420 |
| 20. | March 17, 2022 Esther Lim Policy of Equality Report/Notification Form, IAB 2558101 | 421-426 |
| 21. | March 17, 2022 Esther Lim LASD ISU Intake Assessment Form | 427-437 |
| 22. | June 27, 2022 Administration Investigation Notification, IAB 2558101 | 438-445 |
| 23. | January 4, 2023 Admin Investigation letter to Plaintiff | 446-447 |
| 24. | January through March 2023 emails between Christine Diaz-Herrera and Plaintiff | 448-455 |
| 25. | October 2, 2023 IAB Investigative File, IAB 2558101 | 456-536 |
| 26. | October 2, 2023 IAB 2558101 Investigator's Log | 537-540 |
| 27. | July 28, 2021 Villanueva Facebook Live Recording | 541-542 |
| 28. | October 6, 2021 Facebook Live Recording | 543-544 |
| 29. | August 29, 2021 KFI Radio Show Hour 1 | 545-546 |
| 30. | August 29, 2021 KFI Radio Show Hour 2 | 547-548 |
| 31. | October 17, 2023 CEOP memo, IAB IV2558101 | 549-553 |
| 32. | March 9, 2022 Max Huntsman County Policy of Equity Report/Notification Form, IAB 2558097 | 554-563 |
| 33. | March 9, 2022 Max Huntsman CISU Assessment Form | 564-567 |
| 34. | March 16, 2022 Max Huntsman LASD ISU Intake Assessment Form | 568-576 |
| 35. | March 17, 2022 Max Huntsman Policy of Equality Report/Notification Form, IAB 2558097 | 577-582 |
| 36. | June 27, 2022 Administrative Investigation Notification to Plaintiff, IAB 2550897 | 583-588 |

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| 37. | January 4, 2023 letter from the Department to Plaintiff | 589-590 |
| 38. | October 2, 2023 IAB Investigative File, IAB 2558097 | 591-676 |
| 39. | October 2, 2023 IAB Investigator's Log, IAB 2558097 | 677-680 |
| 40. | October 21, 2021 Villanueva Tweet Thread | 681-683 |
| 41. | March 22, 2021 Tweet from @LaCoSheriff_33 | 684-685 |
| 42. | March 26, 2022 Villanueva Facebook Live Recording | 686-687 |
| 43. | March 29, 2022 Villanueva Facebook Live Recording | 688-689 |
| 44. | April 26, 2022  Villanueva Live Facebook Recording | 690-691 |
| 45. | July 13, 2022 Villanueva Facebook Live Recording | 692-693 |
| 46. | October 26, 2022 Villanueva Facebook Live Recording | 694-695 |
| 47. | March 5, 2022 Message from Sheriff | 696-698 |
| 48. | March 6, 2022 KFI Radio Show recording Hour 1 | 699-700 |
| 49. | March 6, 2022 KFI Radio Show recording Hour 2 | 701-702 |
| 50. | April 1, 2022 Los Angeles Times article titled "Editorial: The Villanueva Saga Just Gets Odder and more Destructive" | 703-708 |
| 51. | April 1, 2022 Los Angeles Times article titled "Sheriff Villanueva Makes Ugly, Unfounded Claim Against County Watchdog" | 709-714 |
| 52. | Video of the April 1, 2022 Los Angeles Times Editorial Board interview | 715-716 |
| 53. | October 17, 2023 CEOP memo, IAB 2558097 | 717-721 |
| 54. | July 11, 2022 Plaintiff's letter to Board of Supervisors | 722-726 |
| 55. | September 21, 2022 Plaintiff's letter to Rob Bonta | 727-729 |
| 56. | September 21, 2022 Plaintiff's letter to Board of Supervisors | 730-732 |
| 57. | October 3, 2022 Plaintiff's letter to Board of Supervisors | 733-795 |
| 58. | October 19, 2022 Plaintiff's letter to Board of Supervisors | 796-874 |
| 59. | October 26, 2022 Plaintiff's letter to Board of Supervisors | 875-950 |
| 60. | Plaintiff's Facebook Live sessions as Sheriff | 951-952 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| 61. | Plaintiff's Facebook Live sessions from December 2022 through January 30, 2024 | 953-955 |
| 62. | Plaintiff's radio show on CRN Digital Talk Radio titled, "The Resistance With Sheriff Alex Villanueva" between May and September 2023 | 956-959 |
| 63. | November 2, 2023 Public Records Act Request | 960-961 |
| 64. | December 22, 2023 County response to Public Records Act (without attachments) | 962-965 |
| 65. | Plaintiff's Facebook Live sessions from January 31, 2024 to present | 966-968 |
| 66. | January 31, 2024 Facebook Live Recording | 969 |
| 67. | May 17, 2023 Facebook Live Recording | 970 |
| 68. | September 25, 2024 Facebook Live Recording | 971 |
| 69. | December 4, 2024 Facebook Live Recording | 972 |
| 70. | Max Huntsman Drivers License | 973-974 |
| 71. | Max Huntsman Passport | 975-976 |
| 72. | Max Huntsman Attorney License Search | 977-978 |
| 73. | October 23, 2023 Notification Letter to Max Huntsman | 979-981 |
| 74. | October 23, 2023 Notification Letter to Esther Lim | 982-984 |
| 75. | Relevant excerpts from the March 14, 2025 deposition of Commander Escobedo | 985-997 |
| 76. | February 22, 2025 Plaintiff's cover letter for MTA position | 998-1001 |
| 77. | February 24, 2025 email from Gary Peterson to Plaintiff re MTA position | 1002-1004 |
| 78. | April 16, 2024 Villanueva Facebook Live Recording | 1005 |
| 79. | Max Huntsman Social Security Card | 1006-1007 |

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   DATED:  April 21, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

MILLER BARONDESS, LLP


By:   /s/ *Jason H. Tokoro*
JASON H. TOKORO
Attorneys for Defendants

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

# EXHIBIT 1

EXHIBIT 01 - Page 7

# MILLER BARONDESS, LLP

ATTORNEYS AT LAW
2121 AVENUE OF THE STARS
26TH FLOOR
LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400
FAX: (310) 552-8400
WWW.MILLERBARONDESS.COM

April 9, 2025

JASON H. TOKORO
DIRECT DIAL: (310) 552-5226
JTOKORO@MILLERBARONDESS.COM

*VIA ELECTRONIC MAIL ONLY*

Alex DiBona
SHEGERIAN & ASSOCIATES, INC.
11520 San Vicente Boulevard
Los Angeles, CA  90049
Email: ADiBona@shegerianlaw.com

Re:    *Alex Villanueva v. County of Los Angeles, et al.*
       USDC Case No. 2:24-cv-04979
       **Meet-and-Confer Re: Defendants' Motion to Dismiss Complaint**

Dear Mr. DiBona:

The letter is sent as a precursor to our April 10, 2025 meet and confer about the County's forthcoming Motion for Summary Judgment regarding Plaintiff's First Amendment claim.  As you are aware, the Court bifurcated this case, such that only Plaintiff's First Amendment claim is currently at issue.  The County reserves the right to move for summary judgment on Plaintiff's other claims at the appropriate time, if necessary.  A summary of our positions is below.

### There is No Genuine Dispute of Material Fact That Neither the Board of Supervisors Nor Sheriff Luna Were Involved

In his First Amended Complaint ("FAC") and throughout this case, Plaintiff has been adamant that the County Board of Supervisors and Sheriff Luna were involved in the complaints made against him, the investigation into those complaints, and the resulting receipt of a "Do Not Rehire" notation.  Plaintiff has conducted 15 fact witness depositions and propounded written discovery and document requests.  It has been made abundantly clear that none of the Board of Supervisors or Sheriff Luna had any knowledge of, or any involvement with, the Lim or Huntsman complaints.  There is no genuine dispute of material fact to the contrary.  Plaintiff cannot rely on his mere allegations at the summary-judgment stage.

### Plaintiff's FAC is Factually Unsupported

It is Plaintiff's burden to establish a *prima facie* First Amendment case.  *Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022).  He cannot meet his burden.  There is no genuine

728643

**EXHIBIT 01 - Page 8**

MILLER BARONDESS, LLP

Alex DiBona
April 9, 2025
Page 2

dispute of material fact that the investigations into Plaintiff's misconduct had nothing to do with his claimed protected speech (i.e. his opposition to Ballot Measures A, J, and R, COVID-19 vaccine mandates, and Fulgent). None of the investigation materials reference those topics, and every single person who was deposed stated that those topics had nothing to do whatsoever with the investigations or their outcome.

Plaintiff cannot point to anything showing, or even suggesting, that his protected speech was the reason for the "Do Not Rehire" notation. And even if he could, any alleged retaliatory animus was not the but-for cause of the notation. Each of the members of the County Equity Oversight Panel testified that their recommendation that Plaintiff receive the notation was based on Plaintiff's harassing and discriminatory statements, which Plaintiff does not deny making. There is simply no genuine dispute of material fact to the contrary.

### Plaintiff's Claim Against the Governmental Entities Fails Under *Monell*

Governmental entities such as the County and its subdivisions cannot be held liable for the acts of their employees based on *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Liability can only attach where a constitutional violation was caused by an official County policy, custom or practice. *See id.*

There is no genuine dispute of material fact that no County policy, practice, or custom caused the harm Plaintiff claims. To the contrary, Plaintiff alleges that he was specifically targeted by the County and treated differently as a part of a smear campaign—the polar opposite of a *Monell* claim. (*See* FAC at 6:20–24.) And Plaintiff himself testified that he was being singled out and harmed in a manner that had not been used against any other Sheriff. Plaintiff's § 1983 claims necessarily fail.

### The Individual Defendants Are Protected by Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Longoria v. Pinal Cnty.*, 873 F.3d 699, 704 (9th Cir. 2017) (citation omitted). Qualified immunity applies for several reasons. First, there is no clearly-established constitutional right to be free from receiving a ministerial "Do Not Rehire" stamp on a personnel file. Second, all of the actions taken by any individual defendants in this case were reasonable and in good faith.

Plaintiff cannot point to a single genuine issue of material fact to show that any of the individual defendants were acting in bad faith, unreasonably, or in a manner intended to violate Plaintiff's constitutional rights. This is a textbook qualified immunity case.

EXHIBIT 01 - Page 9

MILLER BARONDESS, LLP

Alex DiBona
April 9, 2025
Page 3

### Plaintiff Lacks Standing

It is undisputed that Plaintiff has never applied to be rehired by the County. Nor has he sought to become a "consultant" with the Department. There is nothing stopping Plaintiff from applying for any of these positions. In short, Plaintiff cannot continue to maintain that a "Do Not Rehire" notation has prevented him from obtaining County employment without ever having sought such employment in the first place. This is especially true where there is no genuine dispute of material fact that the "Do Not Rehire" notation does not prevent a candidate from being employed, but is merely an administrative flag on a file.

### The County is the Only Proper Defendant

As discussed previously, Plaintiff is suing the County and 14 other defendants for the same conduct. He does not attempt to separate out any of his allegations among the different defendants. This is improper.

There is no genuine dispute of material fact that all of actions taken in this case by the individual defendants were acting in their official capacity. It is well settled that official capacity claims can only be brought against a governmental entity. *Pierce v. San Mateo Cnty. Sheriff's Dep't*, 232 Cal. App. 4th 995, 1018 (2014); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

The same is true for the County subdivision defendants. Such subdivisions should be dismissed where, as here, a party asserts claims that are identical to those asserted against the entity. *See, e.g., Garcia v. Cnty. of Riverside*, No. EDCV 13–00616–JGB (SPX), 2013 WL 12167913, at *8 (C.D. Cal. Aug. 1, 2013). Furthermore, "[a] subsidiary of a public entity is not a proper defendant on a § 1983 claim." *Gordon v. County of Orange*, No. SACV 14-01050-CJC(DFM), 2019 WL 4279036, at *8 (C.D. Cal. Aug. 5, 2019), *aff'd in part, rev'd in part and remanded*, 6 F.4th 961 (9th Cir. 2021); *see also Solesbee v. County of Inyo*, No. 1:13-CV-1548 AWI JLT, 2014 WL 3890680, at *2 (E.D. Cal. Aug. 7, 2014) ("When a subdivision of a county is sued, the suit is construed as being against the county; the subdivision is not a proper party defendant.").

Plaintiff's insistence to keep needless defendants in the case without any factual support is unreasonably vexatious and is done for no other purpose than to harass and multiply proceedings. As we have advised you previously, if the County prevails, it intends to seek fees and costs pursuant to 28 U.S.C. § 1927, and under whatever avenues to which it may be entitled.

We look forward to discussing these issues, and reserve the right to make additional arguments in support of our Motion as necessary.

EXHIBIT 01 - Page 10

MILLER BARONDESS, LLP

Alex DiBona
April 9, 2025
Page 4

Sincerely,

Jason H. Tokoro

JHT

EXHIBIT 01 - Page 11

# EXHIBIT 2

**EXHIBIT 02 - Page 12**

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
JASON H. TOKORO (State Bar No. 252345)
jtokoro@millerbarondess.com
STEVEN G. WILLIAMSON (State Bar No. 343842)
swilliamson@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA,

　　　　　Plaintiff,

　　v.

COUNTY OF LOS ANGELES,
COUNTY OF LOS ANGELES
SHERIFF'S DEPARTMENT, LOS
ANGELES COUNTY BOARD OF
SUPERVISORS, COUNTY EQUITY
OVERSIGHT PANEL, LOS
ANGELES COUNTY OFFICE OF
INSPECTOR GENERAL,
CONSTANCE KOMOROSKI,
MERCEDES CRUZ, ROBERTA
YANG, LAURA LECRIVAIN,
SERGIO V. ESCOBEDO, RON
KOPPERUD, ROBERT G. LUNA,
MAX-GUSTAF HUNTSMAN,
ESTHER LIM, and DOES 1 to 100,
inclusive,

　　　　　Defendants.

CASE NO. 2:24-cv-04979 SVW (JCx)

**DEFENDANT COUNTY OF LOS ANGELES' REQUESTS FOR ADMISSION TO PLAINTIFF ALEX VILLANUEVA (SET ONE)**

Assigned to the Hon. Stephen V. Wilson and Magistrate Judge Jacqueline Chooljian

Trial Date:　　June 3, 2025

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

710389.1

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant County of Los Angeles ("Defendant" or "the County") by and through its attorneys, Miller Barondess, LLP, hereby requests that Plaintiff Alex Villanueva respond to these Requests for Admission ("Requests"), in writing within thirty (30) days.

## **DEFINITIONS**

1.      The terms "COMMUNICATION," "COMMUNICATIONS" and "COMMUNICATE" mean any communication, whether oral, written, or any other action intended to communicate any meaning, including, but not limited to, both: (a) verbal COMMUNICATIONS, whether made in PERSON or by telephone, audio recording, or other means; and (b) written COMMUNICATIONS, including internal emails and correspondence, letters, facsimiles, electronic mail, text messages, direct messages via any online portal or website, and telegraphs.

2.      The "COUNTY" means the County of Los Angeles, its employees, agents, or representatives acting on its behalf, excluding counsel representing any COUNTY DEFENDANT.

3.      The term "DEFENDANTS" means COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX HUNTSMAN, ESTHER LIM, individually or collectively.

4.      The terms "DOCUMENT" and "DOCUMENTS" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation COMMUNICATIONS, as well as written, recorded, graphic, or other matter whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, files, or printouts;

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600    LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**EXHIBIT 02 - Page 14**

1    tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types

2    of voice recording or transcription; computer tapes, databases, e-mails; pictures,

3    photographs, slides, films, microfilms, motion pictures; or any other medium), and

4    any other tangible item or thing of readable, recorded, or visual material of whatever

5    nature, including without limitation originals, drafts, and all non-identical COPIES

6    of each document (which, by reason of any variation, such as the presence or

7    absence of handwritten notes or underlining, represents a distinct version). By way

8    of example, the term "documents" as used herein shall include without limitation:

9    correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs;

10   telegrams; telexes; emails; minutes; agendas; contracts; reports; studies; checks;

11   statements; receipts; returns; summaries; pamphlets; circulars; press releases;

12   advertisements; books; inter-office and intraoffice COMMUNICATIONS;

13   handwritten or typewritten notes; notations or summaries of telephone

14   conversations, meetings, or conferences; bulletins; computer printouts; databases;

15   teletypes; telefax; invoices; worksheets; photographs; tape recordings; and all other

16   tangible items of readable, recorded, or visual material of any kind.

17       5.    The terms "PERSON" shall mean and refer to any natural individual,

18   corporation, firm, partnership, proprietorship, association, business, governmental

19   entity, joint venture, board, authority, commission, agency, or other organization.

20       6.    The terms "YOU" and "YOUR" shall mean and refer to Plaintiff Alex

21   Villanueva, individually.

22       7.    The term "FAC" shall mean the operative First Amended Complaint

23   YOU filed in this LAWSUIT.

24       8.    The term "LAWSUIT" shall mean this action, styled as *Villanueva v.

25   County of Los Angeles, et al.*, Case No. 2:24-cv-04979 SVW (JCx), in the United

26   States District Court for the Central District of California.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' REQUESTS FOR ADMISSION TO PLAINTIFF ALEX
VILLANUEVA (SET ONE)

**EXHIBIT 02 - Page 15**

9.     The term "HUNTSMAN INVESTIGATION" shall mean the COUNTY'S investigation into the County Policy of Equity Complaint filed against YOU by Max Huntsman, as alleged in YOUR FAC.

10.     The term "LIM INVESTIGATION" shall the COUNTY'S investigation into the County Policy of Equity Complaint filed against YOU by Esther Lim, as alleged in YOUR FAC.

## INSTRUCTIONS

1.     Unless you properly object to a Request, YOU must, under Federal Rule of Civil Procedure 36, admit, specifically deny, or state in detail why YOU cannot truthfully admit or deny each of the following Requests based on knowledge and information in YOUR possession, custody or control, or in the possession, custody or control of your representatives, agents, or attorneys.  If you do not respond to each of these Requests within thirty (30) days, the Requests will be deemed admitted under Federal Rule of Civil Procedure 36.

2.     If YOU object to or refuse to answer any Request for Admission on the ground that the answer reflects or would reveal the substance of a confidential or privileged communication, IDENTIFY:

        (a)     the nature of the privilege claimed;

        (b)     the PERSON who made the COMMUNICATION, whether oral or in writing;

        (c)     if the COMMUNICATION was oral, all PERSONS present during the COMMUNICATION;

        (d)     if the COMMUNICATION was written, the author, addressees, and any other recipients;

        (e)     the relationship of the author of the COMMUNICATION to each recipient;

        (f)     the relationship of the PERSONS present to the PERSON who made the COMMUNICATION;

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1        (g)    the date and place of the COMMUNICATION;

2        (h)    the general subject matter of the COMMUNICATION; and

3        (i)    other information sufficient to enable a full assessment of the

4 applicability of the privilege claims, as required by Federal Rule of Civil Procedure

5 26(b)(5), and the Court's local rules.

6      3.    These Requests for Admission are continuing in nature.  If YOU

7 receive or otherwise become aware of information that would change YOUR answer

8 to ANY of these Requests for Admission after YOU have served YOUR response,

9 YOU must comply with Federal Rules of Civil Procedure 26(e) and 36(b) by

10 promptly supplementing YOUR answers or filing the appropriate motion.

11 <u>**REQUESTS FOR ADMISSION**</u>

12 <u>**REQUEST FOR ADMISSION NO. 1:**</u>

13    Admit that YOU have never spoken to Max Huntsman regarding Ballot

14 Measure J.

15 <u>**REQUEST FOR ADMISSION NO. 2:**</u>

16    Admit that YOU have never spoken to Max Huntsman regarding Ballot

17 Measure R.

18 <u>**REQUEST FOR ADMISSION NO. 3:**</u>

19    Admit that YOU have never spoken to Max Huntsman regarding Ballot

20 Measure A.

21 <u>**REQUEST FOR ADMISSION NO. 4:**</u>

22    Admit that YOU have never spoken to Max Huntsman regarding Fulgent

23 Genetics.

24 <u>**REQUEST FOR ADMISSION NO. 5:**</u>

25    Admit that YOU have never spoken to Max Huntsman regarding the

26 COUNTY'S COVID-19 vaccine mandates.

27 <u>**REQUEST FOR ADMISSION NO. 6:**</u>

28    Admit that YOU have never spoken to Esther Lim regarding Ballot Measure

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

EXHIBIT 02 - Page 17

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  J.

2  **REQUEST FOR ADMISSION NO. 7:**

3      Admit that YOU have never spoken to Esther Lim regarding Ballot Measure

4  R.

5  **REQUEST FOR ADMISSION NO. 8:**

6      Admit that YOU have never spoken to Esther Lim regarding Ballot Measure

7  A.

8  **REQUEST FOR ADMISSION NO. 9:**

9      Admit that YOU have never spoken to Esther Lim regarding Fulgent

10  Genetics.

11  **REQUEST FOR ADMISSION NO. 10:**

12      Admit that YOU have never spoken to Esther Lim regarding the COUNTY'S

13  COVID-19 vaccine mandates.

14  **REQUEST FOR ADMISSION NO. 11:**

15      Admit that YOU have never spoken to any member of the County Equity

16  Oversight Panel regarding Ballot Measure J.

17  **REQUEST FOR ADMISSION NO. 12:**

18      Admit that YOU have never spoken to any member of the County Equity

19  Oversight Panel regarding Ballot Measure R.

20  **REQUEST FOR ADMISSION NO. 13:**

21      Admit that YOU have never spoken to any member of the County Equity

22  Oversight Panel regarding Ballot Measure A.

23  **REQUEST FOR ADMISSION NO. 14:**

24      Admit that YOU have never spoken to any member of the County Equity

25  Oversight Panel regarding Fulgent Genetics.

26  **REQUEST FOR ADMISSION NO. 15:**

27      Admit that YOU have never spoken to any member of the County Equity

28  Oversight Panel regarding the COUNTY'S COVID-19 vaccine mandates.

DEFENDANT COUNTY OF LOS ANGELES' REQUESTS FOR ADMISSION TO PLAINTIFF ALEX
VILLANUEVA (SET ONE)

**EXHIBIT 02 - Page 18**

**REQUEST FOR ADMISSION NO. 16:**

Admit that, from January 31, 2024 to January 3, 2025, YOU have not received any mental health treatment for any emotional distress, severe or otherwise, that you allege to have suffered in YOUR FAC.

**REQUEST FOR ADMISSION NO. 17:**

Admit that, from January 31, 2024 to January 3, 2025, YOU have not received any medical treatment for any emotional distress, severe or otherwise, that you allege to have suffered in YOUR FAC.

DATED:  January 3, 2025          MILLER BARONDESS, LLP


By:    /s/ *Steven G. Williamson*
       STEVEN G. WILLIAMSON
       Attorneys for Defendants

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

710389.1

7

## <u>CERTIFICATE OF SERVICE</u>

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 2121 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067.

On January 3, 2025, I served true copies of the following document(s) described as:

**DEFENDANT COUNTY OF LOS ANGELES' REQUESTS FOR ADMISSION TO PLAINTIFF ALEX VILLANUEVA (SET ONE)**

on the interested parties in this action as follows:

| | |
|---|---|
| Carney R. Shegerian | *Attorneys for Plaintiff* |
| Mahru Madjidi | ALEX VILLANUEVA |
| John David | |
| Alex DiBona | Tel.:    (310) 860-0770 |
| SHEGERIAN & ASSOCIATES, INC. | Fax:    (310) 860-0771 |
| 11520 San Vicente Boulevard | Email:  CShegerian@Shegerianlaw.com |
| Los Angeles, CA  90049 | MMadjidi@Shegerianlaw.com |
| | JDavid@Shegerianlaw.com |
| | YCardoza@Shegerianlaw.com |
| | ADiBona@shegerianlaw.com |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address swilliamson@millerbarondess.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 3, 2025, at Los Angeles, California.

/s/ *Steven G. Williamson*
Steven G. Williamson

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX (310) 552-8400

710389.1

1

DEFENDANT COUNTY OF LOS ANGELES' REQUESTS FOR ADMISSION TO PLAINTIFF ALEX VILLANUEVA (SET ONE)

**EXHIBIT 02 - Page 20**

# EXHIBIT 3

EXHIBIT 03 - Page 21

1  Carney R. Shegerian, Esq., State Bar No. 150461
   CShegerian@Shegerianlaw.com
2  Mahru Madjidi Esq., State Bar No. 297906
   MMadjidi@Shegerianlaw.com
3  Alex DiBona. State Bar No. 265744
   ADiBona@shegerianlaw.com
4  SHEGERIAN & ASSOCIATES, INC.
   11520 San Vicente Boulevard
5  Los Angeles, California 90049
   Telephone Number: (310) 860-0770
6  Facsimile Number: (310) 860-0771

7  Attorneys for Plaintiff,
   ALEX VILLANUEVA

8

9            **UNITED STATES DISTRICT COURT**

10    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  ALEX VILLANUEVA,                    Case No.: 2:24-cv-04979 SVW (JC)

13       Plaintiff,                     **The Honorable Stephen V. Wilson and**
                                        **Magistrate Judge Jacqueline Chooljian**
14  vs.
                                        **PLAINTIFF ALEX VILLANUEVA'S**
15  COUNTY OF LOS ANGELES,              **OBJECTIONS AND RESPONSES TO**
    COUNTY OF LOS ANGELES              **REQUEST FOR ADMISSION**
16  SHERIFF'S DEPARTMENT, LOS
    ANGELES COUNTY BOARD OF             Trial Date:   June 3, 2025
17  SUPERVISORS, COUNTY EQUITY          Action Filed: June 13, 2024
    OVERSIGHT PANEL, LOS
18  ANGELES COUNTY OFFICE OF
    INSPECTOR GENERAL,
19  CONSTANCE KOMOROSKI,
    MERCEDES CRUZ, ROBERTA
20  YANG, LAURA LECRIVAIN,
    SERGIO V. ESCOBEDO, RON
21  KOPPERUD, ROBERT G. LUNA,
    MAX-GUSTAF HUNTSMAN,
22  ESTHER LIM, and DOES 1 to 100
    inclusive,
23
         Defendants.
24

25  **REQUEST FOR ADMISSION NO. 1**

26  **Admit that YOU have never spoken to Max Huntsman regarding Ballot Measure J.**

27  Response: Plaintiff objects that this Request for Admission is premature, overbroad,

28  burdensome, calls for attorney work product/attorney-client privileged information, and

---

PLAINTIFF'S OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSIONS

**EXHIBIT 03 - Page 22**

calls for information outside of Plaintiff's personal knowledge. Plaintiff further objects that this Request for Admission is phrased in a manner to circumvent the limits of discovery under the FRCP. Subject to and without waiving these objections, Plaintiff cannot recall any direct and/or in-person communication with Max Huntsman regarding Ballot Measure J. However, Plaintiff believes Huntsman was aware of his public statements regarding Protected Activity as defined in these interrogatories. On or around July 12, 2022, Plaintiff sent a letter to the entire Board of Supervisors stating that Ballot Measure A would "allow corrupt Board members to intimidate sheriffs from carrying out their duties to investigate crime" and that the measure was unconstitutional and illegal. Villanueva's re-election campaign issued a public statement that the Board of Supervisors had "no business" seeking authority to remove a Sheriff. On or around February 10, 2020, Plaintiff, through the Los Angeles County Sheriff's Office, emailed Ballotpedia regarding Ballot Measure R, stating that the measure would lead to unnecessary lawsuits and politically motivated oversight. On or around July 22, 2020, Plaintiff warned on social media that the passage of Ballot Measure J would result in de facto cuts to law enforcement budgets, leading to patrol station closures, officer layoffs, and a dystopian future resembling "a scene from Mad Max." On or around August 5, 2020, Villanueva publicly stated that while he supports mental health and substance abuse programs, the proposal aimed to defund law enforcement. On or around November 29, 2021, Villanueva sent a letter to the Board of Supervisors stating that the Los Angeles Sheriff's Department would not use Fulgent Genetics Corporation due to concerns about DNA data being shared with the Republic of China. On or around October 21, 2021, Villanueva publicly stated on a nationally watched cable news program that he would not enforce the Board of Supervisors' vaccine mandate, citing concerns over staff retention and public safety impact. Villanueva regularly provided public statements and letters to the Board of Supervisors and directly addressed them during their weekly public meetings, including opposition to Ballot Measures A, R, and J,

as well as vaccine mandates. Discovery is continuing.

REQUEST FOR ADMISSION NO. 2

**Admit that YOU have never spoken to Max Huntsman regarding Ballot Measure R.**

Response: Plaintiff objects that this Request for Admission is premature, overbroad, burdensome, calls for attorney work product/attorney-client privileged information, and calls for information outside of Plaintiff's personal knowledge. Plaintiff further objects that this Request for Admission is phrased in a manner to circumvent the limits of discovery under the FRCP. Subject to and without waiving these objections, Plaintiff cannot recall any direct and/or in-person communication with Max Huntsman regarding Ballot Measure R but believes Huntsman was aware of his public statements regarding Protected Activity. Discovery is continuing.

**REQUEST FOR ADMISSION NO. 3**

**Admit that YOU have never spoken to Max Huntsman regarding Ballot Measure A.**

Response: Response: Plaintiff objects that this Request for Admission is premature, overbroad, burdensome, calls for attorney work product/attorney-client privileged information, and calls for information outside of Plaintiff's personal knowledge. Plaintiff further objects that this Request for Admission is phrased in a manner to circumvent the limits of discovery under the FRCP. Subject to and without waiving these objections, Plaintiff cannot recall any direct and/or in-person communication with Max Huntsman regarding Ballot Measure A but believes Huntsman was aware of his public statements regarding Protected Activity. Discovery is continuing.

**REQUEST FOR ADMISSION NO. 4**

**Admit that YOU have never spoken to Max Huntsman regarding Fulgent Genetics.**

Response: Plaintiff objects that this Request for Admission is premature, overbroad, burdensome, calls for attorney work product/attorney-client privileged information, and calls for information outside of Plaintiff's personal knowledge. Plaintiff further objects that this Request for Admission is phrased in a manner to circumvent the limits of discovery under the FRCP. Subject to and without waving these objections, Plaintiff cannot recall

any direct and/or in-person communication with Max Huntsman regarding Fulgent Genetics but believes Huntsman was aware of his public statements regarding Protected Activity. Discovery is continuing.

**REQUEST FOR ADMISSION NO. 5**

**Admit that YOU have never spoken to Max Huntsman regarding the County's COVID-19 mandates.**

Response: Response: Plaintiff objects that this Request for Admission is premature, overbroad, burdensome, calls for attorney work product/attorney-client privileged information, and calls for information outside of Plaintiff's personal knowledge. Plaintiff further objects that this Request for Admission is phrased in a manner to circumvent the limits of discovery under the FRCP. Subject to and without waiving these objections, Plaintiff cannot recall any direct and/or in-person communication with Max Huntsman regarding the County's COVID-19 mandates but believes Huntsman was aware of his public statements regarding Protected Activity. Discovery is continuing.

REQUEST FOR ADMISSION NO. 16

**Admit that, from January 31, 2024, to January 3, 2025, YOU have not received any mental health treatment for any emotional distress, severe or otherwise, that you allege to have suffered in YOUR FAC.**

Response: Plaintiff objects that this Request for Admission is premature, overbroad, burdensome, calls for attorney work product/attorney-client privileged information, and calls for information outside of Plaintiff's personal knowledge and calls for expert testimony. Subject to and without waiving these objections, Plaintiff responds as follows: Discovery is continuing.

**REQUEST FOR ADMISSION NO. 17**

**Admit that, from January 31, 2024, to January 3, 2025, YOU have not received any medical treatment for any emotional distress, severe or otherwise, that you allege to have suffered in YOUR FAC.**

Response: Plaintiff incorporates by reference the objections stated in Response No. 16.

1  Subject to and without waiving these objections, Plaintiff responds as follows: Discovery

2  is continuing.

3

4  Dated:  February 3, 2025          SHEGERIAN & ASSOCIATES, INC.

5

6                                    By:  _Alex DiBona_____

7                                         Alex DiBona, Esq.
                                          Attorneys for Plaintiff,
8                                         ALEX VILLANUEVA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-5-
PLAINTIFF'S OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSIONS

EXHIBIT 03 - Page 26

1    <u>VILLANUEVA v. COUNTY OF LOS ANGELES, et al. USDC Case No. 2:24-cv-04979 SVW (JC)</u>

2                                    **PROOF OF SERVICE**

3                      **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4        I am an employee in the County of Los Angeles, State of California.  I am over the
age of 18 and not a party to the within action; my business address is 11520 San Vicente
5    Boulevard Los Angeles, California 90049.

6    On February 3, 2025, I served the foregoing document, described as **"PLAINTIFF
ALEX VILLANUEVA'S OBJECTIONS AND RESPONSES TO REQUEST FOR
7    ADMISSION,"** on all interested parties in this action as follows:

8    **LOUIS R. MILLER**
**smiller@millerbarondess.com**
9    **JASON H. TOKORO**
**jtokoro@millerbarondess.com**
10   **STEVEN G. WILLIAMSON**
**swilliamson@millerbarondess.com**
11   **MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
12   **Los Angeles, California 90067**

13

14   ☒    **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the
document(s) with the Clerk of the Court by using the CM/ECF system. Participants
15   in the case who are registered CM/ECF users will be served by the CM/ECF system.
Participants in the case who are not registered CM/ECF users will be served by mail
16   or by other means permitted by the court rules.

17   ☒    **(FEDERAL)**  I declare that I am employed in the office of a member of the bar of
this Court at whose direction the service was made.

18
     Executed on February 3, 2025, at Los Angeles, California.
19

20                                          _Amelia Sanchez_
                                            _____
21                                          Amelia Sanchez

22

23

24

25

26

27

28

**EXHIBIT 03 - Page 27**

# EXHIBIT 4

EXHIBIT 04 - Page 28

**CERTIFIED COPY**

In the Matter Of:

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

CONSTANCE MARIE KOMOROSKI, ESQ.

February 27, 2025

Job No. 6455

EXHIBIT 04 - Page 29

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA , WESTERN DIVISION

3

_____

4                                  )
   ALEX VILLANUEVA,                 )
5                                   )
           Plaintiff,               )
6                                   )
        vs.                         ) Case No.:
7                                   ) 2:24-cv-04979 SVW (JCx)
   COUNTY OF LOS ANGELES, COUNTY OF LOS    )
8  ANGELES SHERIFF'S DEPARTMENT, LOS       )
   ANGELES COUNTY BOARD OF SUPERVISORS,    )
9  COUNTY EQUITY OVERSIGHT PANEL, LOS      )
   ANGELES COUNTY OFFICE OF INSPECTOR      )
10 GENERAL, CONSTANCE KOMOROSKI, MERCEDES  )
   CRUZ, ROBERTA YANG, LAURA LECRIVAIN,    )
11 SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT)
   G. LUNA, MAX GUSTAF HUNTSMAN, ESTHER    )
12 LIM, and DOES 1 to 100, inclusive,      )
                                    )
13          Defendants.             )
_____)

14

15

16

17      Videoconference Deposition of

18   CONSTANCE MARIE KOMOROSKI, ESQ., taken on

19   behalf of Plaintiff, Remote Via Zoom, beginning

20   at 10:07 a.m., Thursday, February 27, 2025,

21   before Cila Meyer, No. 4914, a Certified

22   Shorthand Reporter.

23

24

25

EXHIBIT 04 - Page 30

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 3

1  APPEARANCES OF COUNSEL:

2

3  For the Plaintiff:

4        ALEX DiBONA, ATTORNEY AT LAW
         ANNA KHACHATRY, ATTORNEY AT LAW
5        SHEGERIAN & ASSOCIATES, INC.
         11520 San Vicente Boulevard
6        Los Angeles, California 90049
         310.860.0770
7        adibona@shegerianlaw.com
         akhachatry@shegerianlaw.com
8
   For the Defendants:
9
         JASON H. TOKORO, ATTORNEY AT LAW
10       STEVEN WILLIAMSON, ATTORNEY AT LAW
         MILLER BARONDESS, LLP
11       2121 Avenue of the Stars
         Suite 2600
12       Los Angeles, California 90067
         jtokoro@millerbarondess.com
13       swilliamson@millerbarondess.com

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 04 - Page 31**

1  what your assignment was?

2    A    When did it convene?  What's convene?

3    Q    When the three person -- I'll rephrase it.

4         When the three-person panel was formed, what

5  you personally, what did you understand the CEOP was to

6  do?

7    A    If we are -- if a panelist is on the calendar

8  for briefing and it involves the sheriff's department,

9  at some point, 10 days to two weeks prior to the

10  briefing date, the panelist will be sent an invitation

11  by a system called Sharepoint, one word, to review the

12  investigation and accompanying documents.

13         Should I continue?

14    Q    Yes.  If you unders- -- if you're still

15  answering my question, then, yes, you're entitled to

16  give a complete answer.

17    A    After each panelist has completed an initial

18  review of the investigation, probably -- well, strike

19  probably, but they will decide as a group -- if one of

20  the panel believes it should be presented to the

21  department as opposed to deciding with the department

22  not having to appear and making -- no -- recommending --

23  recommendation without the department appearing, then we

24  will tell the department to keep it on calendar for

25  briefing.  Then each panelist will conduct their review

KOMOROSKI, ESQ., CONSTANCE MARIE                                Page 24

1  of the investigation pending the pre briefing on the

2  date of the briefing.

3      Q    You've used the term -- I think you said "keep

4  it on calendar for briefing."

5          In the context you're using it, what does it

6  mean to brief a matter?

7      A    For the sheriff's department?

8      Q    Yes.

9      A    For the sheriff's department it means to appear

10  by WebEx, which is sheriff zoom, with the other two

11  panelists and department representatives, a small number

12  of department representatives initially for a

13  pre briefing, which takes place on the half an hour to

14  an hour before the briefing itself.  Then, having gained

15  an understanding of additional questions or opinions

16  from the department representatives, all the

17  panelists -- the three panelists, those representatives,

18  and the departmental representatives of -- for that

19  particular employee, subject employee, subject, not the

20  complaining party, appear at a briefing along with

21  representatives from civil rights, employee relations,

22  county counsel, and others.

23      Q    Then what does the actual briefing entail?

24      A    The actual briefing, the designated chair

25  introduces the name and IAB number of the case -- well,

1  first, the technical administrator of the sheriff's

2  department does a roll call, so that each individual on

3  the call or on the WebEx is identified.  There's

4  typically 10, more or less, departmental representatives

5  in addition to the panel.  Then the chair of the panel

6  introduces the subject.  Each panelist is given an

7  opportunity to articulate questions and give a proposed

8  recommendation as to whether the allegation or

9  allegations are founded, unfounded, or unresolved, and

10  then requests a response from the department.

11     Q    I think I know, but what does "founded" mean in

12  the context you're using it?

13     A    Founded means that it's the panel's

14  recommendation that the subject be found to have engaged

15  in the policy violation -- engaged in conduct that

16  violates the policy, I should say.

17     Q    What does "unfounded" mean in the context

18  you're using it?

19     A    That it's more likely than not that the

20  individual did not engage in conduct that violates the

21  policy or engaged in conduct that might have been

22  misconduct, but it didn't involve the policy.

23     Q    I think you used a third term.  You said

24  "founded, unfounded," or is it "unresolved"?

25     A    Yes.

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 26

1    Q    In the context you're using it, what does

2    "unresolved" mean?

3    A    Unresolved is a gray term like inconclusive

4    where -- there are a lot of potential examples for

5    unresolved.  It may be -- it may involve corroboration.

6    It may involve credibility.  Something that can't be

7    solved at the briefing.

8    Q    Is it fair to say that "unresolved" means, at

9    least as you use it, that there can't be a determination

10   whether the allegation is either founded or unfounded

11   for the various reasons you identified?

12   A    Yes.

13   Q    One of those reasons, just to take an example,

14   mean there may be credibility issues on both sides that

15   make it unable to be founded or unfounded.

16        Is that a fair characterization of what you

17   said?

18   A    Um.  Yes.  It's more likely that there's just

19   not sufficient information or -- the term evidence is

20   not appropriate for this venue, but support.

21   Q    When you say "the term evidence is not

22   appropriate for this venue, but support" is, can you

23   just explain how you're differentiating "evidence" from

24   "support" in the context of the CEOP panel?

25   A    Yes.  The support may involve whether the

1  guidance taken after the briefing?

2     A    At the briefing.

3     Q    At the briefing.  Did the CEOP adopt

4  recommendations and guidance at the briefing?

5        MR. TOKORO:  Objection; vague and ambiguous,

6  misstates the purpose of the CEOP.

7        THE DEPONENT:  The briefing is concluded when

8  the chair confirms the recommendations the panel has

9  arrived at, verbally confirms the recommendations the

10  panel has arrived at with the assistance of the

11  interactive process in the department.

12  BY MR. DiBONA:

13     Q    Were there recommendations adopted by the

14  panel?

15        MR. TOKORO:  Same objection.

16        THE DEPONENT:  The panel does not adopt

17  recommendations.

18  BY MR. DiBONA:

19     Q    Were there recommendations given by the panel?

20     A    Yes.

21     Q    What were those recommendations?

22     A    I don't recall specifically, but I know from

23  reviewing the stacked report, that the panel recommended

24  f- -- findings of founded.  And on this investigation I

25  believe they were all founded.  I don't recall.

**EXHIBIT 04 - Page 36**

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 58

1    Q    What is the stacked report?

2    A    It's the written report.  That's a -- it's just

3  I don't know where the term comes from.  It's called

4  stacked report.  It's just a written report.

5    Q    Did the panel have any other recommendations,

6  to your recollection?

7    A    The panel recommended that if the employee, the

8  subject were still with the County, they would issue

9  some -- I don't remember what it was, whether it was a

10  suspension of a couple of days or something.  But that

11  since the employee was no longer with the county, they

12  recommended a note on top of the file for human

13  resources.

14    Q    And what was the note -- what was the note on

15  top of the file that was recommended?

16    A    The note is typically a tool called, "Do not

17  rehire," which is meant to guide human resources to look

18  below the note to see whether there were issues

19  involving potential discipline, should the employee

20  elect to return either as an employee or as a

21  contractor.

22    Q    And -- excuse me.  When you say that there

23  was -- strike that.

24        Did you say that there was a chair present at

25  the briefing?

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 59

1    A    I was the administrative chair for the panel,

2  selected at random by the calendaring staff.

3    Q    And what is the role of the chair, to your

4  understanding?

5    A    The vote doesn't count anymore and there is no

6  authority.  It's just someone tasked with the steering

7  of the discussion, making sure it stays on schedule.

8    Q    And why did you believe it would have been

9  appropriate, had Sheriff Villanueva still been employed

10  at the County, for there to be a suspension?

11    A    Well, if, as I recall, the panel with the

12  department's assistance and input decided that the

13  allegations were founded, the penalties under the policy

14  for violating the policy would have included days off

15  suspension.

16    Q    Any other reason other than that?

17    A    That's the whole reason.

18    Q    And why did you believe it was appropriate to

19  recommend "Do not rehire" recommendation?

20    A    The "Do not rehire" note is a tool used

21  whenever an employee who has been brought before a panel

22  for alleged policy violations is found to -- either a

23  finding of founded or in non sheriff it's

24  substantiated -- so that HR knows to look underneath the

25  note for their evaluation of the fitness or the

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 60

1  suitability of the employee if they return as an

2  employee or as a contractor.

3     Q    Why -- why did you believe the charge of

4  harassment on the basis of race or national origin was

5  founded?

6     A    It's not a unilateral recommendation with the

7  assistance of the copanelists and the department's input

8  during the interactive process.  The panel as a whole

9  arrived at that recommendation.

10    Q    I understand.  But why did you -- but you

11  agreed with that, I assume.  Sorry.

12         You agreed with the finding that there was

13  harassment on the basis of race and national origin; is

14  that right?

15    A    Based on the totality of the circumstances,

16  including the information in the report, the

17  availability of confirming video evidence, the

18  transcripts, and the relationship of the subject to the

19  department, those would have influenced my agreement

20  with that recommendation.

21    Q    What about the totality of the circumstances

22  led you to believe that Sheriff Villanueva was harassing

23  Max Huntsman on the basis of his race?

24    A    I would refer to the report.

25    Q    So just to be clear, as you sit here today, do

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 62

1    Q    Understood.  But just want to make that clear.

2         One of the -- what -- what I am asking,

3  Ms. Komoroski, is for your opinion why did you believe

4  under the totality of the circumstances Sheriff

5  Villanueva harassed Max Huntsman on the basis of race?

6    A    After discussion at the briefing, pre briefing

7  and briefing with the panelists in the department, we

8  accepted sufficient number of the articulated policy

9  violations in the report to support a recommendation

10  that it was founded.

11    Q    What about what was said led you to believe

12  there was harassment based on race?

13    A    I would have to look at the report.

14    Q    Do you see the report on your screen?

15    A    Not yet.

16    Q    It should come up.  Do you see it on your

17  screen now?

18    A    I do not.

19    Q    Okay.  One moment.  Sorry about that.

20    A    Here you go.

21    Q    Okay.  There we go.  Do you see the report that

22  was previously marked as Exhibit 2?

23    A    Yes.

24    Q    Let me just go down to it's page COLA 2047,

25  "Sheriff Villanueva's Alleged Harassment."

KOMOROSKI, ESQ., CONSTANCE MARIE                                          Page 63

1        Do you see that?

2    A    Yes.

3    Q    And, again, it's obvious looking at it, but

4    just so the record is clear, it's two paragraphs long.

5        Is that what you see?

6    A    Yes.

7    Q    The first one is the reference to Sheriff

8    Villanueva referring to Max Huntsman as Max Gustaf with

9    an f or Max Gustaf with a v; is that right?

10   A    That's what I'm reading.

11   Q    And why do you believe, based on the totality

12   of the circumstances, that Sheriff Villanueva referring

13   to Max Huntsman as Max Gustaf is harassing on the basis

14   of race or national origin?

15       MR. TOKORO:  Objection; incomplete.

16       THE DEPONENT:  (No audible response)

17   BY MR. DiBONA:

18   Q    I'm sorry, Ms. Komoroski.  If you answered my

19   question, I didn't hear it.  You may answer.

20   A    Oh.  I think you'd have to repeat it.  I was

21   waiting for someone else to talk.  I apologize.

22       MR. DiBONA:  Sure.

23       Ms. Meyer, can you please repeat my -- repeat

24   my question.

25       (The record was read as requested)

KOMOROSKI, ESQ., CONSTANCE MARIE                              Page 64

1          THE DEPONENT:  It was based on the totality of

2    the circumstances which include the reference to

3    Max Gustaf.

4    BY MR. DiBONA:

5       Q    What other circumstances does it include?

6       A    There was testimony supported -- supported

7    testimony that Mr. Villanueva referred to Mr. Huntsman

8    in terms of holocaust denial and published those

9    statements in his capacity as sheriff or former sheriff

10   on social media and radio.

11      Q    Can you tell me what is it about referring to

12   Max Huntsman as the name he was born with that

13   disparages his race or national origin?

14          MR. TOKORO:  Again, objection; vague and

15   ambiguous.  Also, misstates the record.  And, also,

16   misstates the statement that's made by Mr. Villanueva.

17          THE DEPONENT:  In conjunction with the

18   holocaust denial statements --

19   BY MR. DiBONA:

20      Q    Sorry.  Go ahead.  Sorry.

21      A    -- and his position -- Mr. Villanueva's

22   position as sheriff.  I know that's not a complete

23   sentence, but I'm trying to respond to your question

24   about why a year and a half ago the panel determined the

25   allegation was founded or recommended that the

1        MR. TOKORO:  Same objections.

2        THE DEPONENT:  I believe there was a holocaust.

3  BY MR. DiBONA:

4    Q    Un- -- un- -- understood.  But would you agree

5  with me that denying it is a denial of history?

6        MR. TOKORO:  Objection; again, irrelevant.

7        THE DEPONENT:  I suppose.

8  BY MR. DiBONA:

9    Q    So what about a denial of history has to do

10  with an individual's race or national origin?

11        MR. TOKORO:  Objection; asked and answered

12  several times now.  It also misstates her prior

13  testimony about why they reached the recommendation.

14        THE DEPONENT:  The recommendation was not based

15  on historical accuracy by any party.  It was based on

16  attributing holocaust denial to Mr. Huntsman,

17  misarticulation of his name, and denouncing it in a

18  questioning manner, I suppose, on social media and

19  radio.

20  BY MR. DiBONA:

21    Q    You believe that Sheriff Villanueva

22  misarticulated Max Huntsman's name?

23    A    Yes.  And that's what Mr. Huntsman says, I

24  should say.

25    Q    Just to be clear, do you see the sentence under

KOMOROSKI, ESQ., CONSTANCE MARIE                                   Page 67

1  Mr. Huntsman's name, the first sentence says,

2  "Mr. Huntsman was born Max Gustaf Edler"?

3     A    I do.

4     Q    So Max Gustaf was his first name; correct?

5     A    I'm reading the same thing you are.

6     Q    So how is Sheriff Villanueva referring to

7  Max Huntsman as the first name he was born under

8  misarticulating his name?

9          MR. TOKORO:  Objection; vague and ambiguous.

10  It's also misleading.  Does not provide her with the

11  entire context of that testimony under Mr. Huntsman's

12  name.

13         THE DEPONENT:  According to the report,

14  Mr. Huntsman goes by Max Huntsman in the County and has

15  done so for many years.

16  BY MR. DiBONA:

17    Q    And just to be clear, you believe that that's

18  the basis for saying his name was misarticulated?

19    A    According to the report, that's what

20  Mr. Huntsman says.

21    Q    And do you agree with that?

22    A    I found it persuasive or I wouldn't have joined

23  the panel in making the recommendation that it was part

24  of the totality of the circumstances leading to a

25  recommendation.

KOMOROSKI, ESQ., CONSTANCE MARIE                               Page 68

1    Q    The totality of the circumstances that led you

2  to believe there was harassment on the basis of race was

3  misarticulating Max Gustaf's name or Max Gustaf

4  Huntsman's name and referring to him as a holocaust

5  denier; is that fair?

6    A    In conjunction with the -- Mr. Villanueva's

7  position and the method of publication of the

8  statements.

9    Q    And what about his position led you to believe

10  it was harassment on the basis of race?

11    A    As the sheriff and former sheriff -- as the

12  sheriff at the time, he represented the view of the

13  department.

14    Q    What about being the sheriff and

15  representing -- the former sheriff and the sheriff --

16  sorry.  Excuse me.

17         What about being the sheriff at the time and

18  representing the views of the department indicates it's

19  harassment on the basis of race or national origin?

20    A    In conjunction with the statements made in the

21  way in which they were made, it's a power dynamic, I

22  guess.

23    Q    What about it and what about the power dynamic

24  indicates it's harassment on the basis of race or

25  national origin?

KOMOROSKI, ESQ., CONSTANCE MARIE                                Page 78

1  BY MR. DiBONA:

2      Q    Did the CEOP uphold a finding that Alex

3  Villanueva had harassed or discriminated against

4  Esther Lim?

5          MR. TOKORO:  Objection; vague and ambiguous,

6  misuse of the term upheld.

7          THE DEPONENT:  I think you're referring to a

8  different investigation.

9  BY MR. DiBONA:

10     Q    I believe I -- I believe I am.  I'm just saying

11 were you a part of the CEOP's recommendation with

12 respect to the investigation in to Esther Lim?

13     A    In to her complaint against former sheriff,

14 I was -- that was the same briefing, I believe.

15     Q    Understood.  And did you -- and did you also

16 recommend that the finding of harassment or

17 discrimination be upheld with respect to Esther Lim?

18         MR. TOKORO:  Same objection; misuse of the term

19 "upheld."

20         THE DEPONENT:  Were you asking me about what

21 the sheriff's department did or -- or what?

22 BY MR. DiBONA:

23     Q    I'm asking what you -- what -- what the CEOP

24 did.

25     A    To my recollection, the panel followed the same

1  process in the case involving the complaint by Ms. Lim

2  as it did the complaint involving Mr. Huntsman.

3      Q    And do you, as you sit here today, I know I

4  haven't shown a document yet, do you have a recollection

5  of the basis for which there was a recommendation that

6  the charge of harassment or discrimination be founded

7  against Alex Villanueva with respect to Esther Lim?

8      A    To my recollection there was -- there were

9  statements by the sheriff about the number of

10  assistants, of which Ms. Lim was one, being female.  And

11  some statement about one of the supervisors or her

12  assistant related to her Hispanic heritage, I think.

13          MR. DiBONA:  I'm going to send Exhibit 3

14  through the chat.  And I also will share the screen.

15          (Plaintiff's Exhibit 3 was retained by counsel)

16  BY MR. DiBONA:

17      Q    Do you see a document on your screen?

18      A    I do.

19      Q    Exhibit 3 is COLA 002120 and it goes to 2199.

20          Just so we have a clear record, does this look

21  like the IA report you reviewed with respect to Esther

22  Lim's complaint against Sheriff Alex Villanueva?

23      A    I don't see her name, but that's what reports

24  look like.  Yes.  That would be it.

25      Q    Excuse me.  Apart from reviewing this report,

KOMOROSKI, ESQ., CONSTANCE MARIE                                        Page 90

1    Q    And so do you have any reason to believe woke

2  20-somethings that work at the alter of wokeness has

3  anything to do with an individual's race or national

4  origin?

5         MR. TOKORO:  Objection.  Question is vague and

6  ambiguous and does not take into account all of the

7  allegations made in the complaint.

8         THE DEPONENT:  Not specifically, no.

9  BY MR. DiBONA:

10    Q    Do you have any reason to believe that woke

11  20-somethings that prohibit the alter of wokeness has

12  any reference to an individual's gender?

13         MR. TOKORO:  Same objection; incomplete, vague

14  and ambiguous.

15         THE DEPONENT:  It doesn't appear to be directed

16  at gender specifically.

17  BY MR. DiBONA:

18    Q    It goes on.  There's a sentence here:

19  (Reading:)  He said that all -- all are women.  Sheriff

20  Villanueva said that the supervisors promote diversity,

21  but the justice deputies are all women and unqualified.

22         Did I read that correctly?

23    A    That's what I see.

24    Q    Do you see any reference in this to Sheriff

25  Villanueva saying women are unqualified for the position

KOMOROSKI, ESQ., CONSTANCE MARIE                              Page 91

1  because they're women?

2      A    Yes.

3      Q    Where is that?

4      A    It's the dualism of using the words "together"

5  under the introductory word of "Diversity."

6      Q    So just to be clear, you're saying referring to

7  someone as a woman and unqualified implies that

8  they're -- because they're women they're unqualified?

9          MR. TOKORO:  Objection; misstates the

10  testimony.

11          The prior question was about what Villanueva

12  said.

13          THE DEPONENT:  I said when he says here that

14  supervisors promote diversity, the implication in his

15  statement following is that hiring women did not promote

16  diversity because they were unqualified or some such

17  thing.

18  BY MR. DiBONA:

19      Q    Right.  Do you believe that -- did you form the

20  opinion that Sheriff Villanueva was saying women are

21  unqualified by virtue of being women?

22          MR. TOKORO:  Objection; asked and answered two

23  times now.

24          THE DEPONENT:  The implication from the

25  sentence is that unqualified individuals were hired

KOMOROSKI, ESQ., CONSTANCE MARIE                          Page 92

1  because they were women.

2  BY MR. DiBONA:

3    Q    "During those sessions, he has referred to the

4  age of justice deputies which is alive and can be easily

5  be fact checked."

6         Did I read that correctly?

7    A    That's what I see.

8    Q    He also says:

9         "The justice deputies are all female, even

10  though Supervisor Mitchell has two male justice

11  deputies."

12        Did I read that correctly?

13    A    That's what I'm reading.

14    Q    So when there's a reference to all the justice

15  deputies, that includes a group that at least has two

16  men in it; right?

17    A    That's what --

18        MR. TOKORO:  Objection; vague and ambiguous as

19  to whether you're referring to Sheriff Villanueva's

20  statement or the facts generally.

21        THE DEPONENT:  What was the question?

22        MR. DiBONA:  Can you read the question back,

23  Ms. Meyer, please.

24        (The record was read as requested)

25        THE DEPONENT:  A reference by whom?

1  to women, not specifically.

2      Q    Just to be clear, the Los Angeles County

3  policies against harassment on the basis of gender do

4  not prohibit talking to two women at the same time;

5  correct?

6      A    It depends on what they're saying.

7      Q    Does the -- does the Los Angeles County policy

8  against discrimination and harassment on the basis of

9  sex have anything to do with a sheriff saying, "I can

10  tell from your age you are one of those people that hate

11  the police and want to defund us"?

12      A    It could, depending on the totality of the

13  circumstances.

14      Q    In this totality of the circumstances, does it?

15          MR. TOKORO:  Objection; vague and ambiguous as

16  to what you mean by "this."

17          THE DEPONENT:  It could, yes.

18  BY MR. DiBONA:

19      Q    And in your opinion -- in your opinion, did you

20  believe Sheriff Villanueva was engaged in harassment on

21  the basis of sex or gender when he said to Ms. Coates,

22  "I can tell from your age you are one of those people

23  that hate the police and want to defund us"?

24      A    In the totality of the circumstances, yes.

25      Q    What were the totality of the circumstances

1  that you're referring to?

2      A    It would be the other comments about women --

3  deputies and women who aren't qualified.

4      Q    Anything else?

5      A    I would have to read the whole report to come

6  up with more, but that seems like enough.

7          Can we go off for a second?

8      Q    Is there a reason why?  I don't mind taking

9  another break, if you need to.

10     A    No.  I'm just wondering whether we were going

11  to power through.

12     Q    Oh, yeah.  I'm sorry.  Let's go off the record

13  just for a second.

14         (Lunch recess was taken)

15         MR. DiBONA:  Back on the record.

16     Q    Ms. Komoroski, do you understand you're still

17  under oath?

18     A    I do.

19     Q    Any reason you can't continue to give your best

20  testimony?

21     A    No.

22     Q    One moment.  I'm just going to put back

23  something on the screen here.

24         Do you see the document on your screen?

25     A    I do.

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 121

1        THE DEPONENT:  It looks like this is a further

2   indication of him in uniform discussing a motion drafted

3   by the complaining party and referring to it in a

4   disparaging way in that she didn't understand what she

5   was doing.

6   BY MR. DiBONA:

7       Q    Just to be clear, you think that saying she

8   didn't understand her job is somehow inappropriate?

9       A    It's inappropriate in general.

10      Q    Just to be clear, it's inappropriate in

11   general; is that right?

12      A    Yes.

13      Q    How is it inappropriate in general?

14      A    Sheriff Villanueva, in uniform, conducted a

15   Facebook Live session and discussed a motion the

16   complaining party drafted, said he did not approve of

17   it, and that the drafter did not realize the

18   implications of the motion.

19      Q    Yes.  I understand that's what it said.  My

20   question to you is you used the phrase "it's

21   inappropriate in general."

22           I'm asking are you able to explain what you

23   mean by when you say "inappropriate in general"?

24      A    The department head using a social media stream

25   to criticize the justice deputy after having or in the

KOMOROSKI, ESQ., CONSTANCE MARIE                          Page 122

 1  context of having characterized all the justice deputies

 2  as women and unqualified is inappropriate.

 3      Q    See here where it says, "Ms. Lim" -- sorry.

 4          "Justice deputy told Ms. Lim that Sheriff

 5  Villanueva said all supervisors have 25-year-olds right

 6  out of college writing their motions.  Ms. Lim found

 7  this to be an offensive and ageist comment.  She

 8  believes it is ageist because it assume the justice

 9  deputies are right out of college, and it minimizes

10  their education and intellect."

11          Did I read that correctly?

12      A    That's what it says.

13      Q    And, again, it may be obvious, but being

14  under -- being 25 necessarily means you're under

15  40; correct?

16          MR. TOKORO:  Objection.  It's misstating the

17  statement and the intent of what Villanueva was saying.

18          THE DEPONENT:  If you're under 25, you're not

19  40.  But if you are professional and characterized as

20  young, female, and unqualified, it relates to a

21  potential violation under the policy.

22          Time change next weekend.

23  BY MR. DiBONA:

24      Q    Do you see here under "History of intimidation

25  of women of color"?  Do you see that?

KOMOROSKI, ESQ., CONSTANCE MARIE                              Page 129

1  Villanueva.

2  BY MR. DiBONA:

3    Q    What comments are you referring to?

4    A    I can say, for example, that the board of

5  supervisors -- I forget the verb they use -- once it

6  professes to diversity but hired all justice deputies

7  who are women and unqualified, that they worshiped at

8  the alter of wokeness; and that faced with criticism by

9  Ms. Lim, he wrote a letter requesting that her -- the

10  forum for her criticism be investigated, and that she be

11  terminated.  And the comments, disparaging comment

12  towards Supervisor Solis in her language reflecting her

13  gender.

14          A little froggy.

15    Q    I'm sorry.  Let me just go back up.  Do you see

16  here there's a reference to Veronica Pawlowski?

17    A    I do.

18    Q    And you understand that the text below that is

19  the interview summary with respect to Ms. Pawlowski;

20  correct?

21    A    It does appear to be that.

22    Q    Just a moment.  I'm just seeing what I asked

23  you about.

24    A    Of course.

25    Q    Do you see here where it says:

KOMOROSKI, ESQ., CONSTANCE MARIE                              Page 136

1    A    Yes.

2    Q    And how many times have you done that?

3    A    It's hard to say.  It comes up maybe once a

4    month or so, maybe less, maybe every other month or so.

5    Q    Have you recommended that another employee of

6    the sheriff's department be placed on the "Do not hire"

7    list apart from Sheriff Villanueva, again, without

8    telling me a name who that individual may be.

9    A    There's no list.

10   Q    Sorry.  Besides former Sheriff Alex Villanueva,

11   have you recommended that another employee of the

12   sheriff's department have a "Do not rehire" notation

13   placed in their personnel file, without telling me a

14   name.

15   A    I believe so.  A couple.

16   Q    Just to be clear, you believe so for a couple,

17   but are you sure -- are you sure -- sorry.  Just to be

18   clear, are you not sure of the number?  Are you

19   estimating the number?

20   A    Yes.

21   Q    In other words, just so I understand the

22   testimony, "Yes," you remember doing a -- recommending a

23   "Do not rehire" notation in a sheriff's department's

24   employee's file besides Sheriff Alex Villanueva, you're

25   not sure of the number of times; is that fair?

KOMOROSKI, ESQ., CONSTANCE MARIE                    Page 141

1  question, it means public, privately, just you don't

2  have any knowledge of that.  Is that fair to say?

3     A    I don't have any knowledge of that.

4     Q    And were you aware one way or the other of

5  Sheriff Villanueva's enforcement of vaccine mandates?

6     A    No.

7     Q    Do you know one way or the other if Sheriff

8  Villanueva enforced the vaccine mandate with respect to

9  the sheriff's department?

10    A    I don't know.

11    Q    As you sit here today, do you believe any part

12 of your testimony needs to be changed at this time?

13    A    I can't think of anything.  Some names I may

14 get wrong.

15         MR. DiBONA:  I don't have any further

16 questions.

17         Do you, Counsel?

18         MR. TOKORO:  I do.  I do.

19

20              EXAMINATION

21 BY MR. TOKORO:

22    Q    Ms. Komoroski, you were just asked a number of

23 questions by Mr. DiBona about various measures --

24         Ms. Komoroski, Mr. DiBona just asked you

25 questions about various measures and Sheriff Villanueva

1  or Mr. Villanueva's opposition to them.

2        Do you recall that testimony?

3    A    Yes.

4    Q    Okay.  So the first thing that he asked you

5  about was ballot Measure A.  I believe your testimony

6  was you don't know Sheriff Villanueva's position on

7  ballot Measure A; is that correct?

8        MR. DiBONA:  Objection; leading, form.

9        THE DEPONENT:  Yes.

10  BY MR. TOKORO:

11   Q    Okay.  And Sheriff Villanueva in this case has

12  alleged that being given the "Do not rehire" was in

13  retaliation for his position on ballot Measure A.  So I

14  want to ask you about ballot Measure A specifically.

15        When you were coming up with your

16  recommendation or the CEOP was coming up with its

17  recommendation for the "Do not rehire," did ballot

18  Measure A have anything to do with that recommendation?

19        MR. DiBONA:  Objection; form, leading.

20        THE DEPONENT:  No.

21        (Pause in proceedings)

22  BY MR. TOKORO:

23   Q    Did ballot Measure A have anything to do with

24  the CEOP's recommendation that Sheriff Villanueva be

25  given a "Do no rehire" notation?

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 143

1    A    No.

2          MR. DiBONA:  Objection --

3          THE DEPONENT:  No.

4  BY MR. TOKORO:

5    Q    Did Mr. Villanueva's opposition to ballot

6  Measure A have any role in the CEOP's recommendation to

7  give him a "Do not rehire" notation?

8          MR. DiBONA:  Objection; form.

9          THE DEPONENT:  I didn't know he was opposed,

10  but, no, it didn't.

11  BY MR. TOKORO:

12    Q    Okay.  Ballot Measure R., let's talk about that

13  now.  Did ballot Measure R play any role in the CEOP's

14  decision to give Mr. Villanueva or recommend that

15  Mr. Villanueva be given a "Do not rehire" notation at

16  the top of his file?

17          MR. DiBONA:  Objection; form.

18          THE DEPONENT:  No.

19  BY MR. TOKORO:

20    Q    Did Mr. Villanueva's opposition to ballot

21  Measure R play any role in the CEOP's recommendation for

22  a "Do not rehire" notation?

23          MR. DiBONA:  Objection; form.

24          THE DEPONENT:  No.

25  ///

1   BY MR. TOKORO:

2     Q    I want to talk about ballot Measure J now.  Did

3   ballot Measure J play any role in the CEOP's

4   recommendation to give Mr. Villanueva a "Do not rehire"

5   notation?

6     A    No.

7     Q    Did Mr. Villanueva's opposition to ballot

8   Measure J play any role in the CEOP's recommendation to

9   place a "Do not rehire" on the top of his County file?

10        MR. DiBONA:  Objection; form.

11        THE DEPONENT:  No.

12  BY MR. TOKORO:

13    Q    Did sheriff -- did Mr. Villanueva's public

14  statement about any of those ballot measures play any

15  role in the CEOP's recommendation for a "Do not rehire"?

16        MR. DiBONA:  Objection; form.

17        THE DEPONENT:  No.

18  BY MR. TOKORO:

19    Q    Now I want to talk about Fulgent.  Did

20  Fulgent -- did the County's contract with Fulgent play

21  any role in the CEOP's recommendation of a "Do not

22  rehire"?

23        MR. DiBONA:  Objection; form.

24        THE DEPONENT:  No.

25  ///

**EXHIBIT 04 - Page 60**

KOMOROSKI, ESQ., CONSTANCE MARIE                    Page 145

1  BY MR. TOKORO:

2     Q    Did Mr. Villanueva's opposition to the Fulgent

3  contract play any role in the CEOP's recommendation of a

4  "Do not rehire"?

5        MR. DiBONA:  Objection; form.

6        THE DEPONENT:  No.

7  BY MR. TOKORO:

8     Q    Did Mr. Villanueva's public statements about

9  Fulgent play any role in the CEOP's recommendation for a

10  "Do not rehire"?

11    A    No.

12    Q    Did vaccine mandates play any role in the

13  CEOP's recommendation that Mr. Villanueva be given a "Do

14  not rehire" notation?

15       MR. DiBONA:  Objection; form.

16       THE DEPONENT:  No.

17  BY MR. TOKORO:

18    Q    Did Mr. Villanueva's refusal to enforce vaccine

19  mandates as to sworn sheriff deputies play any role in

20  the CEOP's recommendation of a "Do not rehire"?

21    A    No.

22    Q    Did Mr. Villanueva's public statements about

23  vaccine mandates relating to COVID play any role in the

24  CEOP's recommendation that he be given a "Do not rehire"

25  notation?

KOMOROSKI, ESQ., CONSTANCE MARIE                    Page 146

1    A    No.

2    Q    Now, you were asked several questions by

3  Mr. DiBona about whether you reviewed the Facebook Live

4  statements made by Mr. Villanueva or the KFI radio

5  statements made by Mr. Villanueva; do you recall that?

6    A    I do.

7    Q    Okay.  Just to be clear, those materials -- the

8  Facebook Live videos, the KFI radio recordings, and

9  other public statements made by Sheriff Villanueva --

10  those were provided to you as part of the stacked case

11  file; correct?

12        MR. DiBONA:  Objection; form.

13        THE DEPONENT:  Yes.

14 BY MR. TOKORO:

15    Q    Had you had any questions about the accuracy of

16  the report from Sanders Roberts, you could have gone to

17  those recordings to check it; correct?

18    A    Yes.

19    Q    You mentioned an unidentified male from the

20  sheriff's department sitting in on the pre briefing as

21  well as the full briefing of the CEOP.

22        Do you recall that?

23    A    Yes.

24    Q    Was that unidentified male Commander

25  Sergio Escobado?

1    A    Yes.  I always forget his name.

2    Q    Now, you were asked a question by Mr. DiBona --

3  well, a couple of questions.  He asked you to confirm

4  that Mr. Villanueva was not present during the CEOP

5  briefing and that Mr. Huntsman was also not present

6  during the CEOP briefing.

7        Do you recall that?

8    A    Yes.

9    Q    Is it standard practice for the CEOP to meet

10  without the complainant in attendance?

11    A    Yes.  No witnesses should be in attendance

12  either.

13    Q    Does that also go for the subject of the

14  investigation?

15    A    Yes.

16    Q    So neither the complainant nor the subjects

17  attend these CEOP briefings; is that right?

18    A    Correct.

19    Q    And none of the witnesses attend either;

20  correct?

21    A    Correct.

22    Q    Now, Mr. DiBona asked you some questions about

23  the "Do not rehire" notation in this case and,

24  specifically, the fact that Mr. Villanueva was no longer

25  a County employee at the time the recommendation was

1  made.  I want to ask you about the "Do not rehire,"

2  specifically.  You referred to it as a tool.

3         Is the "Do not rehire" notation a form of

4  discipline?

5         MR. DiBONA:  Objection --

6         THE DEPONENT:  No.

7         Sorry.  Please, go ahead.

8         MR. DiBONA:  Objection to form.

9         THE DEPONENT:  No.

10  BY MR. TOKORO:

11     Q     And what exactly -- what is your understanding

12  of what the "Do not rehire" notation means for purposes

13  of someone re applying to the County for a job?

14     A     At or near the top of the individual's

15  personnel folder, from when they worked for the County

16  in any capacity, it's an indication for the interviewing

17  and selecting officials to see whether there was any

18  prior discipline recommended for policy violations

19  recommended for the individual.

20     Q     Got it.  So a former counter -- sorry.  Let me

21  start that over.

22         A former County employee who has a "Do not

23  rehire" notation at the top of their file, can they be

24  hired back by a County department?

25         MR. DiBONA:  Objection; form.

KOMOROSKI, ESQ., CONSTANCE MARIE                              Page 149

1        THE DEPONENT:  They can be or they can come

2   back as a contractor.  It's up to the appraising

3   intervie and selecting officials.

4   BY MR. TOKORO:

5     Q    Got it.  So the "Do not rehire" notation is not

6   a death sentence for working for the County.

7        Do you agree with me?

8        MR. DiBONA:  Objection; form.

9        THE DEPONENT:  I would.

10  BY MR. TOKORO:

11    Q    Now, you were asked a number of questions about

12  Max Huntsman's complaint.  And I just want to follow up

13  on a couple of things there.

14        You were asked a number of questions by

15  Mr. DiBona about Mr. Huntsman's birth name,

16  Max Gustaf Edler.

17        Do you remember that?

18    A    I do.

19    Q    Do you recall, also, though, that when

20  Mr. Huntsman was interviewed by Ms. Diaz Herrera, he

21  told her that he had been using the name Max Huntsman

22  from before he was even made the inspector general?

23        MR. DiBONA:  Objection; form.

24        THE DEPONENT:  I recall that he had been using

25  it for a long time, during most of his employment with

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 151

1   A   That's what it says.

2   Q   She made her complaint in March of 2022;

3 correct?

4   A   That's my understanding.

5   Q   So at the time she would have been over the age

6 of 40 years old; correct?

7   A   That's the math.

8   Q   So the policies that Mr. DiBona was showing to

9 you applying to people 40 and over would apply to

10 Ms. Lim; correct?

11   A   I assume so, yes.  Yes, it would.

12   Q   Now, I want to separate the two investigations,

13 and I'm almost finished here.  But let's talk first

14 about the investigation into complaint filed by Max

15 Huntsman.

16        Was the board of supervisors, as far as you

17 know, involved in the investigation into Mr. Huntsman's

18 complaints?

19   A   No.

20   Q   Was the board involved, as far as you know, in

21 this CEOP's pre briefing?

22   A   No.

23   Q   Was the board involved in the CEOP's briefing

24 of the Huntsman complaint?

25   A   No.

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 152

1    Q    Was the board involved in any way in the CEOP's

2  recommendation that the allegations made by Mr. Huntsman

3  were founded against Mr. Villanueva?

4    A    No.

5    Q    Was Sheriff Luna involved at all in the CEOP's

6  pre brief?

7    A    No.

8    Q    Was Sheriff Luna involved at all in the CEOP's

9  briefing?

10    A    No.

11    Q    Was Sheriff Luna involved in any way in the

12  CEOP's recommendation that the allegations made by

13  Mr. Huntsman be determined founded against

14  Mr. Villanueva?

15    A    No.

16    Q    Was Sheriff Luna at either pre briefing or the

17  briefing?

18    A    No.

19        MR. TOKORO:  Alex, you can take that down, by

20  the way.  Thank you.

21        THE DEPONENT:  I've never met him.

22  BY MR. TOKORO:

23    Q    Now I want to talk about Ms. Lim.  I want to

24  ask you the same questions.

25        As far as you know, was the board involved in

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 153

1  the investigation to Ms. Lim's complaint?

2     A    No.

3     Q    Was the board involved in the CEOP's

4  pre briefing regarding Esther Lim's complaint?

5     A    No.

6     Q    Was the board involved in the briefing relating

7  to Esther Lim's complaint?

8     A    No.

9     Q    Was the board involved in any way in the CEOP's

10  recommendation that the allegations made by Ms. Lim be

11  determined founded against Mr. Villanueva?

12     A    No.

13     Q    Did the board, as far as you know, have any

14  involvement whatsoever in either of these

15  investigations?

16     A    No.

17     Q    Did Sheriff Luna have any involvement in either

18  of these investigations?

19     A    No.

20     Q    Now, one other thing that Mr. Villanueva has

21  alleged in this case is that the "Do not rehire"

22  notation was given to him in retaliation for announcing

23  that he was going to be running for the County Board of

24  Supervisors.

25          Did the CEOP's recommendation that he be given

KOMOROSKI, ESQ., CONSTANCE MARIE                    Page 154

1   the "Do not rehire" notation have anything to do with

2   Sheriff Villanueva -- sorry -- Mr. Villanueva running

3   for a County Board of Supervisor position?

4      A    No.

5          MR. DiBONA:  Objection to form.

6   BY MR. TOKORO:

7      Q    At the time you made the recommendation, were

8   you even aware that Mr. Villanueva was running for that

9   position?

10         MR. DiBONA:  Objection; form.

11         THE DEPONENT:  No.  Sorry.  No.

12  BY MR. TOKORO:

13     Q    And Mr. Villanueva has also alleged that the

14  reason this was given to him, the "Do not rehire"

15  notation is to hinder his prospects of being elected to

16  the County Board of Supervisors.

17         Did that have anything to do with your

18  recommendation that he be given the "Do not rehire"

19  notation?

20         MR. DiBONA:  Objection; form.

21         THE DEPONENT:  No.

22  BY MR. TOKORO:

23     Q    Thank you, Ms. Komoroski.

24         MR. DiBONA:  I'm sorry.  If you're done, I just

25  have one or two follow-up questions related to his

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 159

```
1              (Whereupon, at 2:59 p.m., the deposition

2         of CONSTANCE MARIE KOMOROSKI, ESQ. was concluded)

3                         * * *

4

5

6

7         I have read the foregoing deposition transcript and

8  by signing hereafter, approve same.

9

10  Dated March 12, 2025          .

11

12

13                           CMK____

14                  CONSTANCE MARIE KOMOROSKI, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 160

1              DEPOSITION OFFICER'S CERTIFICATE

2

3         STATE OF CALIFORNIA  )
                               )  ss.
4         COUNTY OF LOS ANGELES)

5

6         I, Cila Meyer, hereby certify:  I am a duly

7  qualified Certified Shorthand

8         Reporter, in the State of California, holder of

9  Certificate Number CSR 4914 issued by the Court

10        Reporters Board of California and which is in

11  full force and effect.  (Bus. & Prof.   8016)

12        I am not financially interested in this action

13  and am not a relative or employee of any attorney of the

14  parties, or of any of the parties.  (Civ. Proc.

15  2025.320(a))

16        I am authorized to administer oaths or

17  affirmations pursuant to California Code of Civil

18  Procedure, Section 2093(b) and prior to being examined,

19  the deponent was first placed under oath or affirmation

20  by me. (Civ. Proc.    2025.320, 2025.540(a))

21        I am the deposition officer that

22  stenographically recorded the testimony in the foregoing

23  deposition and the foregoing transcript is a true record

24  of the testimony given.  (Civ. Proc.   2025.540(a))

25        I have not, and shall not, offer or provide any

KOMOROSKI, ESQ., CONSTANCE MARIE                                    Page 161

1  services or products to any party's attorney or third

2  party who is financing all or part of the action without

3  first offering same to all parties or their attorneys

4  attending the deposition and making same available at

5  the same time to all parties or their attorneys.  (Civ.

6  Proc.  2025.320(b))

7        I shall not provide any service or product

8  consisting of the deposition officer's notations or

9        Comments regarding the demeanor of any witness,

10  attorney, or party present at the deposition to any

11  party or any party's attorney or third party who is

12  financing all or part of the action, nor shall I collect

13  any personal identifying information about the witness

14  as a service or product to be provided to any party or

15  third party who is financing all or part of the action.

16     (Civ. Proc.   2025.320(c))

17

18     Dated: March 10, 2025

19

20

21     _Cila Meyer___

22

23

24

25

# EXHIBIT 5

EXHIBIT 05 - Page 73

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4

 5   ALEX VILLANUEVA,                    No. 2:24-CV-04979

                                         SVW (JCx)

 6         Plaintiff,

 7       vs.

 8   COUNTY OF LOS ANGELES, COUNTY OF

     LOS ANGELES SHERIFF'S DEPARTMENT,

 9   LOS ANGELES COUNTY BOARD OF

     SUPERVISORS, COUNTY EQUITY OVERSIGHT

10   PANEL, LOS ANGELES COUNTY OFFICE OF

     INSPECTOR GENERAL, CONSTANCE

11   KOMOROSKI, MERCEDES CRUZ, ROBERT A.

     YANG, LAURA LECRIVAIN, SERGIO V.

12   ESCOBEDO, RON KOPPERUD, ROBERT G.

     LUNA, MAX-GUSTAF HUNTSMAN, ESTHER

13   LIM, and DOES 1 to 100, inclusive,

14

         Defendants.

15

     _____

16

17

18       VIDEOTAPED DEPOSITION of ALEX VILLANUEVA

19              LOS ANGELES, CALIFORNIA

20             FRIDAY, FEBRUARY 28, 2025

21                    VOLUME 1

22

23   Reported by

     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

24

25   Job No. 7184228,  PAGES 1 - 334
```

Page 1

EXHIBIT 05 - Page 74

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4

 5   ALEX VILLANUEVA,                      No. 2:24-CV-04979
                                               SVW (JCx)
 6          Plaintiff,

 7        vs.

 8   COUNTY OF LOS ANGELES, COUNTY OF

     LOS ANGELES SHERIFF'S DEPARTMENT,

 9   LOS ANGELES COUNTY BOARD OF

     SUPERVISORS, COUNTY EQUITY OVERSIGHT

10   PANEL, LOS ANGELES COUNTY OFFICE OF

     INSPECTOR GENERAL, CONSTANCE

11   KOMOROSKI, MERCEDES CRUZ, ROBERT A.

     YANG, LAURA LECRIVAIN, SERGIO V.

12   ESCOBEDO, RON KOPPERUD, ROBERT G.

     LUNA, MAX-GUSTAF HUNTSMAN, ESTHER

13   LIM, and DOES 1 to 100, inclusive,

14

             Defendants.

15

     _____

16

17

18          VIDEOTAPED DEPOSITION of ALEX VILLANUEVA,

19      at Miller, Barondess, 2121 Avenue of the Stars,

20      Suite 2600, Los Angeles, California, beginning

21      at 10:05 a.m., and ending at 5:16 p.m., on

22      Friday, February 28, 2025, before Daryl Baucum,

23      RPR, CRR, RMR, CSR No. 10356.

24

25
```

Page 2

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF:

 4

 5              SHEGERIAN & ASSOCIATES

 6              BY:  ALEX DI BONA, ATTORNEY AT LAW

 7              11520 San Vicente Boulevard

 8              Los Angeles, California  90049

 9              310.860.0770

10              ADiBona@ShegerianLaw.com

11

12

13        FOR THE DEFENDANTS:

14

15              MILLER, BARONDESS

16              BY:  JASON H. TOKORO, ATTORNEY AT LAW

17                   STEVEN G. WILLIAMSON, ATTORNEY AT LAW

18              2121 Avenue of the Stars

19              Suite 2600

20              Los Angeles, California  90067

21              310.552.4400

22              JTokoro@MillerBarondess.com

23              SWilliamson@MillerBarondess.com

24

25
```

Page 3

EXHIBIT 05 - Page 76

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3

4         ALSO PRESENT:

5              JON MANUEL, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 4

```
 1          A    This is for July 12 of 2022.
   12:41:57
 2          Q    Yep, and I have highlighted all of the
 3     page and line numbers for you to make it easy.
 4          A    No, I spoke at this thing.  I don't think
 5     it aligns but I do know I spoke against in at the
   12:44:49
 6     Board, and I think it was via Zoom but --
 7          Q    I'm just asking -- I'm just asking when
 8     you look at the page and line numbers which you
 9     identified which had been highlighted in Exhibit 12,
10     that is not you speaking, correct?
   12:45:03
11          A    No, these are the supervisors speaking
12     against me.
13          Q    Great.
```

```
14              Now, you understand -- or do you recall
15     that Measure A was not brought before the Board
   12:45:16
16     until July of 2022?
17              MR. DI BONA:  Objection; form.
18              THE WITNESS:  That is more or less the
19     time frame, yes.
20     BY MR. TOKORO:
   12:45:28
21          Q    So that was four months after Max Huntsman
22     and Esther Lim had filed their complaints, correct?
23              MR. DI BONA:  Objection; form.
24              THE WITNESS:  Partially true.
25
```

Page 132

BY MR. TOKORO:

12:45:39

Q In fact, it was four months after you had received notification -- or at least a month after you had received notification of the two pending investigations, correct?

12:45:47

A Wait. I lost you there.

Q So Measure A -- Ballot Measure A comes up to the Board for the first time in July of 2022.

That is your recollection, as well, correct?

12:45:58

A No, the Measure A -- the start of it was the vote from the previous year, let's explore ways to get rid of the Sheriff, and the Measure A was the outcome of that.

Q But Measure A, itself -- I'm just talking

12:46:13

about Ballot Measure A, which you reference in your First Amended Complaint, came up in front of the Board in July of 2022, correct?

A In its final form, yes.

Q And that was several months after Esther

12:46:27

Lim and Max Huntsman had filed their complaints, correct?

MR. DI BONA: Objection; form.

THE WITNESS: Yes.

```
 1          A    Yes.

    14:26:49

 2          Q    Now, the policy of equality is contained

 3     within the Department's Manual of Policies and

 4     Procedures, correct?

 5          A    Yes.

    14:26:53

 6          Q    And as Sheriff of L.A. County, you are

 7     still subject to those policies and procedures,

 8     correct?

 9          A    In theory, yes.

10          Q    And you were subject to the

    14:27:00

11     anti-harassment, anti-discrimination policies,

12     correct?

13          A    Yes.

14          Q    And, in fact, you were notified of the

15     investigation being done into Ms. Lim's complaints,

    14:27:11

16     correct?

17          A    Yes.

18          Q    Let's take a look at that.

19               (Deposition Exhibit 17 was marked

20               for identification by the court

    14:27:28

21               reporter and is attached hereto.)

22     BY MR. TOKORO:

23          Q    Mr. Villaneuva, you have been handed

24     Deposition Exhibit 17.

25               Do you recognize this document?          14:28:02
```

Page 188

```
 1            A    Yes.

     14:28:03

 2            Q    So this is a notification that you were

 3       given in June of 2022, correct?

 4            A    Yes.

 5            Q    And it was -- you see there at the top,

     14:28:11

 6       it's from Ed Alvarez to Ron Kopperud, correct?

 7            A    Yes.

 8            Q    And you are identified as the subject

 9       employee, correct?

10            A    Yes.

     14:28:23

11            Q    And the Department's knowledge date is

12       March 17 of 2022.

13                 Do you see that?

14            A    Yes.

15            Q    That would be the date that the complaint

     14:28:29

16       came in, correct?

17            A    Well, it came into the Department.

18            Q    Correct.  Came into the Department, yes.

19                 And then below there, it lists a number of

20       POEs that allegedly were violated by your conduct,

     14:28:40

21       correct?

22            A    Yeah, allegedly.

23            Q    So you got the POE on discrimination,

24       correct?

25            A    Yes.                              14:28:52
```

                                                    Page 189

```
 1          Q    The POE on sexual harassment, correct?

    14:28:52

 2          A    Yes.

 3          Q    The POE on discriminatory harassment other

 4     than sexual, correct?

 5          A    Yes.

    14:29:03

 6          Q    Third-person harassment, correct?

 7          A    Yes.

 8          Q    Inappropriate conduct towards others,

 9     correct?

10          A    Yes.

    14:29:10

11          Q    And retaliation, right?

12          A    Yes.

13          Q    And it says,

14               "It is alleged that you acted in an

15               inappropriate POE related matter

    14:29:15

16               and made inappropriate POE related

17               remarks while in the workplace."

18               Do you see that?

19          A    Yes.

20          Q    And that's your signature there at the

    14:29:23

21     bottom, right?

22          A    Yes.

23          Q    June 29 of 2022?

24          A    Yes.

25          Q    And that's your employee number?          14:29:27
```

                                                      Page 190

```
 1          A    Yep.

    14:29:29

 2          Q    And who is the witness?

 3          A    John Satterfield.

 4          Q    And you were familiar with these policies

 5     of the Department, correct?

    14:30:02

 6          A    Yes.
```

```
 7          Q    And you were knowledgeable about what they

 8     prohibited sworn deputies from doing, correct?

 9          A    Correct.  All employees.

10          Q    Now, at the time in June of 2022, John

    14:30:44

11     Satterfield was your Chief of Staff, correct?

12          A    I believe so.

13          Q    And are you aware that Christine

14     Diaz-Herrera, the investigator from Sanders,

15     Roberts, reached out to you through Mr. Satterfield

    14:30:57

16     to set up an interview in connection with this

17     investigation -- investigation?

18          A    When?

19          Q    Around this time, around in -- in

20     June/July of 2022.

    14:31:13

21          A    Somebody spoke to me.  I don't remember

22     when or who.

23          Q    What do you recall about that

24     conversation?

25          A    I think they asked me about the -- about        14:31:21
```

Page 191

```
 1        least by investigation number what that related to,

   14:43:25

 2     correct?

 3              MR. DI BONA:  Objection; form.

 4              THE WITNESS:  That meant absolutely

 5     nothing to me because I had no idea what the numbers

   14:43:32

 6     were for.

 7     BY MR. TOKORO:

 8        Q    And I appreciate that that is your

 9     opinion.  I am asking you, you have had --

10        A    That is a fact.

   14:43:39

11        Q    You had received the two letters and they

12     had the investigation numbers on them, correct?

13        A    If you show me the letters with the IAB

14     numbers, yeah, I'll believe it.

15        Q    We will get to that.

   14:43:49

16              And, in fact, you refused to participate

17     in the interviews, right, unless you were given the

18     questions in advance, correct?

19        A    I wanted to provide a written response.

20        Q    Right.

   14:44:04

21              You wanted to be given the questions and

22     you wanted to provide a written response rather than

23     be interviewed like this, correct?

24        A    Correct.

25        Q    And, again, that is not standard          14:44:14
```

Page 205

```
1        process -- procedure for IAB interviews, correct?

     14:44:16

2            A    There is no standard process for what they

3        were doing.  You know that.

4            Q    And again, sitting here today, you're not

5        aware of any IAB investigation where the witness was

     14:44:25

6        given the questions and allowed to provide written

7        responses, correct?

8            A    Again, tell me all the examples of the

9        investigation -- interviews of people who are not

10       members of the Department.

     14:44:43

11           Q    You are missing the point.

12               What I am asking is, in any IAB interview

13       that you have knowledge of, have you ever seen a

14       witness, whether they're part of the Department or

15       not, being given questions in advance and being

     14:44:55

16       allowed to just provide written response?

17               MR. DI BONA:  Objection; form.

18               THE WITNESS:  When it's someone who is not

19       a member of the Department and someone who lives in

20       another state, some of them are done by

     14:45:06

21       correspondence because you have no other choice.

22       BY MR. TOKORO:

23           Q    So you are sitting here today telling me

24       that you are aware of specific examples where IAB

25       simply exchanged letters in order to get a witness's      14:45:15
```

Page 206

```
 1         testimony?

           14:45:19

 2              A    I am not aware of a specific example.  I

 3         am being very commonsense.  How else would you do

 4         it?

 5              Q    You are --

           14:45:27

 6                   MR. DI BONA:  Guys, guys, hold on.

 7                   MR. TOKORO:  Alex, stop.  Alex, stop.

 8                   MR. DI BONA:  Let him finish his answer.

 9                   MR. TOKORO:  Alex stop.

10                   MR. DI BONA:  Jason, let him finish his

           14:45:35

11         answer.

12                   MR. TOKORO:  Stop, stop.

13                   MR. DI BONA:  And do not talk over me.

14                   MR. TOKORO:  Stop.  You are not going to

15         interview -- interrupt this interview.

           14:45:40

16                   MR. DI BONA:  His answer was not finished.

17                   MR. TOKORO:  No, he was not -- he was

18         finished.

19                   MR. DI BONA:  He was not finished.

20                   MR. TOKORO:  You need to calm down, Alex.

           14:45:46

21         You need to calm down.

22                   Those kinds of outbursts are not going

23         to -- I'm not going to tolerate that.  You want to

24         scream and yell and bang the table, we're not going

25         to deal with that.  All right.              14:45:57
```

                                                    Page 207

```
 1        BY MR. TOKORO:

          14:45:58

 2             Q    So I'm asking you a very specific -- I'm

 3        not asking you to guess or assume or speculate.

 4                  I am asking you are you aware of any

 5        instance where an IAB interview was conducted via

          14:46:07

 6        letters.

 7                  MR. DI BONA:  Objection to form.

 8                  THE WITNESS:  I can only guess.  I can

 9        only speculate if it was out of state or the person

10        had retired, you are at the mercy of the person you

          14:46:20

11        want the information from.  That is commonsense.

12        BY MR. TOKORO:

13             Q    Understood.

14                  But sitting here today, you are not aware

15        of a specific instance where that, in fact,

          14:46:29

16        happened, correct?

17             A    I am not an IAB investigator that knows

18        all the body of investigation they have done.

19             Q    That's all I am asking for you to do is

20        confirm that.  Okay.  Let's see.

          14:46:39

21                  MR. DI BONA:  Counsel, I am sorry.  I

22        didn't mean to raise my voice about that.  I was

23        just trying to assert an objection but I didn't mean

24        to raise my voice.  I do apologize for raising my

25        voice.                              14:47:05

                                             Page 208
```

```
 1      in it.
        14:49:40
 2          Q    You are also aware that in March of 2022,
 3      Mr. Huntsman made a complaint against you, correct?
 4          A    Yes.
 5          Q    And what is your understanding of what
        14:49:58
 6      that complaint was?
 7          A    He was complaining about me using his
 8      legal name.
 9          Q    Now, you were notified of that
10      investigation, as well, correct?
        14:50:13
11          A    Yes.
12               (Deposition Exhibit 19 was marked
13               for identification by the court
14               reporter and is attached hereto.)
15      BY MR. TOKORO:
        14:50:14
16          Q    Mr. Villaneuva, you have been handed what
17      has been marked as Deposition Exhibit 19.
18          A    Yes.
19          Q    And do you see it is a notification of --
20      dated June 27 of 2022?
        14:51:14
21          A    Yes.
22          Q    And you see it's for investigation number
23      2558097?
24          A    Yes.
25          Q    And this was sent to you while you were        14:51:27
```

Page 211

```
 1          still Sheriff of L.A. County, correct?
       14:51:29
 2          A    Yes.
 3          Q    And I see you reaching over to the other
       notification that you received, Deposition
 4
       Exhibit 17.
 5
       14:51:37
 6               Deposition Exhibit 17 is for investigation
 7     number 2558101, correct?
 8          A    Yes.
 9          Q    Two separate investigations, correct?
10          A    Yes.
       14:51:46
11          Q    And this investigation -- this
12     notification, again, identifies you as the subject,
13     correct?
14          A    Yes.
15          Q    And it identifies the Department knowledge
       14:51:52
16     date as March 16 of 2022, correct?
17          A    Yes.
18          Q    And it identifies four potential MVP
19     violations, correct?
20          A    Yes.
       14:52:04
21          Q    Discrimination, discriminatory harassment
22     other than sexual, third-party harassment, and
23     retaliation, correct?
24          A    Correct.
25          Q    And it says that you are alleged -- it is    14:52:12
```

Page 212

```
 1        alleged you acted in an inappropriate POE-related
14:52:14
 2     manner and in the workplace.
 3              Do you see that?
 4        A    Yes.
 5        Q    And that's your signature there at the
14:52:21
 6     bottom, correct?
 7        A    Correct.
 8        Q    And that's Mr. Satterfield's signature to
 9     the right, correct?
10        A    Yes.
14:52:29
11        Q    And so you were aware that at least via
12     this notification that on March 16, a complaint had
13     been received against you by the Department,
14     correct?
15        A    Correct.
14:52:43
16        Q    In fact, you were aware that the complaint
17     that had been received by the Department was a
18     complaint filed by Mr. Huntsman, correct?
19        A    Yes.
20        Q    And you were aware of what the substance
14:52:53
21     of the complaint was, correct?
22        A    I believe so, yes.
23        Q    In fact, you gave an interview with the
24     "L.A. Times" on April 1 of 2023 -- sorry -- 2022, in
25     which you talked about the fact that you were aware          14:53:07
```

Page 213

```
 1         of the complaint he had filed against you, correct?
    14:53:09
 2            A    If you say so.
 3            Q    My apologies for the delay.  Too many
    documents here.
 4
 5                 (Deposition Exhibit 20 was marked
    14:54:14
 6                 for identification by the court
 7                 reporter and is attached hereto.)
 8    BY MR. TOKORO:
 9            Q    Mr. Villaneuva, you have been handed a
10    document marked as Exhibit 20.
    14:55:20
11                 It's an "L.A. Times" article titled
12    "Editorial: The Villanueva saga gets odder and more
13    destructive."
14                 Do you see that?
15            A    Yes.
    14:55:30
16            Q    Do you recall this article being published
17    by the "L.A. Times"?
18            A    Oh, yeah.
19            Q    In fact, I think as part of your
20    interview, you told the "L.A. Times" that you pay
    14:55:37
21    attention to the things that they are printing about
22    you, correct?
23            A    Yes.
24            Q    And this was in connection with an
25    interview you were doing with the "L.A. Times" about          14:55:44
```

Page 214

```
 1      who they were going to support in the November 2022

        14:55:47

 2      election, correct?

 3           A    Yes.

 4           Q    And during that interview, you stated

 5      that -- if you go to the top of the third page, that

        14:55:58

 6      Max had filed a complaint that you thought was kind

 7      of humorous.

 8                Do you see that?

 9           A    Which page, third?

10           Q    Third page, 3 of 5.

        14:56:10

11           A    Uh-huh.

12           Q    Do you see there at the top?

13           A    Yes.

14           Q    So you were aware at least April 1 of 2022

15      that Mr. Huntsman had filed a complaint against you

        14:56:18

16      for the statements you were making about him,

17      correct?

18           A    Yes.

19           Q    And who did you find that out from?

20           A    I don't recall.

        14:56:28

21           Q    Was it John Satterfield?

22           A    I couldn't remember.

23           Q    Because Mr. Satterfield, at least

24      according to the Department's records, admonished

25      you on March 23 of 2022.                        14:56:38
```

                                                   Page 215

```
 1                    Do you recall that?

     14:56:42

 2           A    I don't remember, specifically.

 3           Q    In fact, according to Department records

 4     created during the time you were still Sheriff,

 5     Mr. Satterfield admonished you regarding both of the

     14:56:50

 6     complaints, both Ms. Lim as well as Mr. Huntsman.

 7                    Do you recall that?

 8           A    I think at some point he advised me that

 9     they were in existence.

10           Q    So Mr. Satterfield told you about what the

     14:57:02

11     investigations related to, correct?

12           A    Yes.

13           Q    So you were aware of the Esther Lim

14     complaint, correct?

15           A    Yes --

     14:57:11

16           Q    And you were --

17           A    -- at some point, I became aware.

18           Q    Sorry.

19                    And you were aware of the Huntsman

20     complaint, correct?

     14:57:15

21           A    Yes.

22           Q    And the general substance of them,

23     correct?

24           A    Yes.

25           Q    And in that same April 1, 2022, interview,        14:57:20
```

Page 216

```
 1        just a couple of weeks after Mr. Huntsman made this
   14:57:22
 2     complaint, you refer to him as a Holocaust denier,
 3     right?
 4          A    Yes.
 5          Q    That was the first time you had said that
   14:57:31
 6     publicly about Mr. Huntsman, correct?
 7          A    Yes.
 8          Q    You said,
 9               "You do realize that Max Huntsman,
10               one, he is Holocaust denier."
   14:57:39
11               Right?
12          A    Yes.
13          Q    (Reading):
14               "I don't know if you're aware of
15               that.  I have it from two separate
   14:57:43
16               sources."
17               Do you see that?
18          A    Yes.
19          Q    It's on the page 2 of 5.
20               And you go further.  You say,
   14:57:50
21               "He filed a complaint against me
22               because I refer to him as
23               Max-Gustaf Huntsman, his actual
24               legal name that is on his State Bar
25               card."                                    14:58:02
```

                                                    Page 217

```
 1              Do you see that?

   14:58:02

 2       A    Yes.

 3       Q    So you knew exactly what the complaint was

 4    that was being made against you, correct?

 5       A    Yes.

   14:58:06

 6       Q    The substance of it, correct?

 7       A    Yes.

 8       Q    And you went on to say,

 9              "We have it from two credible

10              sources . . . and I am not going to

   14:58:12

11              divulge them at this time.

12              But . . . you give a lot of

13              credibility that he has a title,

14              inspector general, and oh, my God,

15              it sounds like so important and

   14:58:22

16              credible."

17              Do you see that?

18       A    Yes.

19       Q    You didn't provide the information to the

20    "L.A. Times" about your credible sources, correct?

   14:58:27

21       A    No.

22       Q    In fact, you told them that they needed to

23    do their own homework, right?

24       A    Yes.

25       Q    So two weeks after Mr. Huntsman had filed      14:58:36
```

Page 218

```
 1      his complaint and sometime after -- you learned

        14:58:37

 2      about it sometime between then and April 1, correct?

 3          A    At some point, yes.

 4          Q    And then for the first time you refer to

 5      him as a Holocaust denier, correct?

        14:58:46

 6          A    Yes.
```

```
 7          Q    And do you remember when Mr. Satterfield

 8      admonished you in that March 23, 2022, time period?

 9          A    No.

10          Q    So you don't remember what he said to you.

        14:59:38

11          A    No.

12          Q    Now, I want to go over some of the things

13      that Mr. Huntsman had identified that you had said

14      about him.

15              So one of the things he identified was you

        14:59:55

16      gave an interview with KFI on March 6 of 2022.

17              Do you recall that interview?

18          A    Not off the top of my head.

19          Q    Do you recall in that interview that you

20      acknowledged you were aware that Max Huntsman had,

        15:00:09

21      in fact, changed his name to just be Max Huntsman.

22          A    I don't recall.

23          Q    So you don't recall saying,

24              "Our Inspector General, the one and

25              only Max-Gustaf Huntsman, yes, he          15:00:20
```

Page 219

```
1        BY MR. TOKORO:

         15:44:31

2            Q    Now, do you have anything in writing with

3        Mr. Alvarez regarding this conversation that you had

4        with him?

5            A    No.  Phone calls don't generate writing.

         15:44:37

6            Q    Now, even after you found out about the

7        investigations and being put on -- being given the

8        do-not-rehire notation, you continued to make public

9        statements about both Ms. Lim and Mr. Huntsman,

10       correct?

         15:45:44

11               MR. DI BONA:  Objection; form.

12               THE WITNESS:  I believe at some point,

13       yes.

14       BY MR. TOKORO:

15           Q    Yeah.

         15:45:48

16               You continued to go on social media --

17       your own personal at this time, Facebook Live -- and

18       continued to make public statements about

19       Mr. Huntsman, correct?

20           A    No doubt.

         15:45:57

21           Q    You continued to make statements about

22       Ms. Lim, correct?

23           A    Not as much as Mr. Huntsman.

24           Q    Well, you recently commented on the fact

25       that Ms. Lim is now working for the Department    15:46:06

                                                    Page 250
```

```
 1        again, correct -- not the Department -- for the
    15:46:09
 2     Board again, right?
 3          A    Yes.  I believe she got rehired after
 4     getting fired.
 5          Q    Yeah.
    15:46:16
 6               You commented on about her during a
 7     September 25, 2024, Facebook Live video that you
 8     did, right?
 9          A    At some point, I did.
10          Q    Right.
    15:46:26
11               And you said,
12               "Esther Lim, the, I guess,
13               disgruntled former employee or
14               Deputy of Supervisor Solis, she
15               left that office and she's found a
    15:46:34
16               soft landing with George Gascon
17               while working directly under
18               Tiffany Blackwell."
19               That was you, right?
20          A    I am pretty sure.
    15:46:44
21          Q    And,
22               "This is very interesting because
23               she -- her position as being
24               anti-law enforcement is well known,
25               extremely well-documented."              15:46:51
```

                                                  Page 251

```
 1                    Do you see that?

    15:46:52

 2          A    Yes.

 3          Q    So even now, months after you filed this

 4      lawsuit and months after you learned of the

 5      do-not-rehire notation, you continue to make public

    15:46:58

 6      statements about Ms. Lim, correct?

 7          A    I'm going to say yes, but with an "and."

 8          Q    So you, in fact, even went further about

 9      Ms. Lim during this Facebook Live that you did and

10      said,

    15:47:24

11              "She is not an attorney and

12              typically every job that goes to

13              the D.A., particularly along those

14              lines, they're all attorneys and

15              she is not one.  So how does she

    15:47:32

16              land a special job that no one else

17              had the right to apply for?"

18          Do you see that?

19          A    Yes.

20          Q    That was you, right?

    15:47:40

21          A    Pretty sure.

22          Q    Now, December 4 of 2024, just a few months

23      ago, another Facebook Live with you, right, where

24      you said,

25              "Esther Lim, who was kicked out of          15:47:52
```

                                                        Page 252

```
 1              the Hilda Solis's office sought
       15:47:54
 2              refuge with Gascon and she got
 3              fired by Hoffman and that is good."
 4              That was you, right?
 5         A    Yes.
       15:47:59
 6         Q    So even with this lawsuit sitting out
 7       there, you are continuing to go after Ms. Lim and
 8       make public comment about her.
 9         A    I go after corrupt public officials.
10         Q    Got it.
       15:48:11
11              So this -- you're saying through these
12       Facebook Lives that she is corrupt, correct?
13         A    Well, she had demonstrated that, yes.
14         Q    Now, this one jumped out at me and this is
15       from May of 2023.  It's a Facebook Live video that
       15:48:25
16       you did that we pulled down ourselves.
17              And you say,
18              "If you have a station tattoo, even
19              one from one of the stations that
20              allegedly has, you know, all of
       15:48:39
21              this violence and all of this
22              stuff, it doesn't matter as long as
23              are you in -- in the in-crowd.
24              Those are okay."
25              Do you remember saying that?            15:48:49
```

                                                        Page 253

```
 1          A    Oh, yes.

        15:48:51

 2          Q    And you go on,

 3               "It's all the other unwashed

 4               heathens, and by the way, the

 5               overwhelming majority of these are

        15:48:59

 6               Latino deputies that are going to

 7               be impacted by this."

 8               Do you see that?

 9          A    Yes.

10          Q    Do you recall saying that?

        15:49:06

11          A    Yes.

12          Q    Do you recall what you said next?

13          A    No, but I am pretty sure you are going to

14      tell me.

15          Q    I am.

        15:49:12

16               "So is this some sort of ethnic

17               cleansing that Max Huntsman is

18               engaged in.  His family has a long

19               history of persecution and he knows

20               what I am talking about."

        15:49:22

21               That was you, right?

22          A    Yes.

23          Q    You said that about Max, right?

24          A    Yes.

25          Q    This is along the same lines that you were    15:49:27
```

                                                    Page 254

```
 1        saying about him that he complained to you about,

   15:49:29

 2        right?

 3             A    Yes.
```

```
 4             Q    Let's talk about the damages you have

 5        alleged in this case.

   15:50:09

 6                  Now, where you have -- you are seeking two

 7        forms of damages in this case, correct?

 8                  MR. DI BONA:  Objection; calls for

 9        attorney-client privilege and work product.

10                  On that basis, I instruct you not to

   15:50:22

11        answer that question.

12                  MR. TOKORO:  There is no privilege

13        objection when you put it in your discovery

14        responses.

15        BY MR. TOKORO:

   15:50:29

16             Q    So in your -- in your initial disclosures

17        in this case, you stated that you are seeking

18        economic damages well -- believed to be well more

19        than $1 million, correct?

20                  MR. DI BONA:  Objection; form.

   15:50:39

21                  You may answer that.

22                  THE WITNESS:  Yes.

23        BY MR. TOKORO:

24             Q    And you also say that you are seeking

25        noneconomic damages believed to be at least          15:50:44
```

Page 255

```
 1        $25 million, correct?

   15:50:47

 2                MR. DI BONA:  Objection; form.

 3                You may answer that question.

 4                THE WITNESS:  Yes.

 5      BY MR. TOKORO:

   15:50:52

 6        Q    That is for emotional distress that you

 7      are claiming, correct?

 8        A    Yes.

 9        Q    So let's talk about those economic damages

10      first.

   15:50:58

11                You say that you're seeking at least

12      $1 million.

13                What is the exact amount that you are

14      seeking?

15                MR. DI BONA:  Objection; calls for expert

   15:51:06

16      testimony, attorney-client privilege and work

17      product.

18                On that basis, I instruct you not to

19      answer that question.

20                MR. TOKORO:  Add that.

   15:51:17

21      BY MR. TOKORO:

22        Q    So now, I know you produced a document --

23      you recently applied to work at the L.A. Metro,

24      correct?

25        A    Yes.                               15:51:28

                                                  Page 256
```

```
 1            Q    L.A. Metro is a County entity, correct?
    15:51:29
 2            A    No, it's a separate entity.
 3            Q    L.A. Metro, you are saying is not a County
 4       department?
 5            A    It's its own standalone department.  It's
    15:51:39
 6       not part of County government.
 7            Q    It's not funded by the County?
 8            A    It's a combination of county, city, and
 9       what do they call those -- joint powers?
10            Q    Right.
    15:51:52
11                 But it's like the Sheriff's Department and
12       it falls under the umbrella of the County, correct?
13            A    Actually, the Board of Directors of the
14       MTA includes the Mayor of L.A.; four Councilmen, I
15       think, from L.A.; the five Supervisors; two other
    15:52:02
16       City Councilmen from other cities like Whittier, for
17       example.
18            Q    And you have been asked to come in for an
19       interview, right?
20            A    Yes.
    15:52:13
21            Q    So this allegation that you have made that
22       the do-not-rehire prevents you from seeking
23       employment with other government entities, the Metro
24       is willing to interview you, correct?
25                 MR. DI BONA:  Objection; form.        15:52:25

                                                     Page 257
```

```
 1              You may answer.

    15:52:26

 2              THE WITNESS:  I did a preliminary

 3      screening with the headhunting firm and am waiting

 4      for a call back.
```

```
 5      BY MR. TOKORO:

    15:52:35

 6         Q    Great.  Good luck.

 7              And the other thing -- and just to be very

 8      clear, other than applying to L.A. Metro, have you

 9      applied to any other jobs?

10         A    No.

    15:52:48
```

```
11         Q    You haven't applied to any jobs with the

12      County, correct?

13         A    Not yet.
```

```
14         Q    And you haven't applied for any other jobs

15      with other law enforcement agencies, correct?

    15:52:56

16         A    That's the first.

17         Q    Now, in your -- well, actually, let's go

18      back to Trial Exhibit -- sorry, Depo Exhibit 13.

19              This is your discovery responses.

20         A    13.  Got it.

    15:53:12

21         Q    So in this discovery response -- well, the

22      discovery request was to describe in detail all

23      losses of earnings and other employment benefits you

24      claim to have suffered as a result of Defendants'

25      alleged conduct as described in your First Amended        15:53:41
```

Page 258

```
1   STATE OF _____)
                                                 )  Ss.
2   COUNTY OF _____)

3

4           I, DARYL BAUCUM, a Certified Shorthand

5   Reporter of the State of California, do hereby

6   certify;

7           That the foregoing proceedings were taken

8   before me at the time and place herein set forth,

9   at which time the witness named in the foregoing

10  proceeding was placed under oath; that a record

11  of the proceedings was made by me using machine

12  shorthand which was thereafter transcribed under my

13  direction; and that the foregoing pages contain a

14  full, true and accurate record of all proceedings

15  and testimony to the best of my skill and ability.

16          I further certify that I am neither

17  financially interested in the outcome nor a relative

18  or employee of any attorney or any party to this

19  action.

20          IN WITNESS WHEREOF, I have subscribed my

21  name this 5th day of March 2025.

22

23

24

25  DARYL BAUCUM, CSR No. 10356
```

Page 334

```
 1    JASON H. TOKORO, ESQ.

 2    JTokoro@MillerBarondess.com

 3                                    March 5, 2025

 4    RE: Villanueva, Alex v. County Of Los Angeles

 5    2/28/2025, Alex Villanueva , Volume 1, (#7184228).

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20       Contact Veritext when the sealed original is required.

21    __ Waiving the CA Code of Civil Procedure per Stipulation of

22       Counsel - Original transcript to be released for signature

23       as determined at the deposition.

24    __ Signature Waived – Reading & Signature was waived at the

25       time of the deposition.
```

Page 335

 1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

 2       Transcript - The witness should review the transcript and

 3       make any necessary corrections on the errata pages included

 4       below, notating the page and line number of the corrections.

 5       The witness should then sign and date the errata and penalty

 6       of perjury pages and return the completed pages to all

 7       appearing counsel within the period of time determined at

 8       the deposition or provided by the Federal Rules.

 9    _X_ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 336

# EXHIBIT 6

EXHIBIT 06 - Page 109

CERTIFIED COPY



Express Deposition Services
by ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

VERONICA PAWLOWSKI

March 04, 2025

Lynn Ann Waters, RMR, CRR, CSR No. 14432, Job No. 6477

EXHIBIT 06 - Page 110

1                 UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4

5    ALEX VILLANUEVA,

6
             Plaintiff,
7                                        CASE NO. 2:24-cv
     -vs-                                -04979 SVW (JCx)
8
     COUNTY OF LOS ANGELES, et al.,
9
                     Defendants.
10

11                   Deposition of
                  VERONICA PAWLOWSKI
12
                TUESDAY, MARCH 4, 2025
13                   10:00 a.m.

14

15         Taken via Zoom videoconference

16

17    REPORTER: Lynn Ann Waters, RMR, CRR, CSR No. 14432

18

19

20

21

22

23

24

25

EXHIBIT 06 - Page 111

PAWLOWSKI, VERONICA                                    Page 2

```
 1    APPEARANCES:

 2
             ALEX DiBONA, ESQ.
 3           SHEGERIAN & ASSOCIATES, INC.
             11520 San Vicente Blvd.
 4           Los Angeles, CA  90049
             (310) 860-0070,
 5           adibona@shegerianlaw.com

 6
                    On behalf of the Plaintiff;
 7

 8           JASON H. TOKORO, ESQ.
             MILLER, BARONDESS, LLP
 9           2121 Avenue of the Stars
             Suite 2600
10           Los Angeles, CA  90067
             (310) 552-5226,
11           jtokoro@millerbarondess.com

12
                    On behalf of the Defendant.
13

14    ALSO PRESENT:

15           Steven Williamson
             Alex Villanueva
16

17

18

19

20

21

22

23

24

25
```

PAWLOWSKI, VERONICA                           Page 84

```
 1                    Were there any other members of the
 2    board of supervisors you believe he was
 3    disparaging and inappropriate towards?
 4            A.    Yes.
 5            Q.    Who?
 6            A.    The collective board of
 7    supervisors.   Supervisor Salese.
 8                    Supervisor Hahn.   Those are the
 9    ones that come to mind.
10            Q.    And how was, to your recollection,
11    how was Sheriff Villanueva disparaging toward the
12    collective board of supervisors?
13            A.    His comments about how they were
14    all women.
15            Q.    And what did you believe -- and to
16    be clear, do you recall him making those comments
17    in a board of supervisors meeting or in some other
18    forum?
19            A.    I don't recall the exact -- I don't
20    recall exactly about the five minutes, but I know
21    he made those comments in many forums.
22            Q.    And just for the record, it is true
23    all members of the board of supervisors were women
24    at the time he made those comments; is that fair?
25            A.    Yes.
```

PAWLOWSKI, VERONICA                              Page 85

```
1              Q.   And what did you believe was
2   inappropriate or disparaging about the reference
3   to the fact they were all women?
4              A.   It's the inference behind those
5   comments.  The inference that a board made up of
6   five women is somehow deficient or incapable
7   because they are women.
8              Q.   Do you recall Sheriff Villanueva
9   saying anything that led you to believe that was
10  the inference he was intending when he referred to
11  a board of supervisors as all women?
12             A.   Yes.
13             Q.   And what do you recall with respect
14  to that?
15             A.   I don't have specific recollections
16  of specific statements.
17             Q.   And just to be clear as you sit
18  here today, do you remember anything in specific
19  or general that led you to believe that Sheriff
20  Villanueva intended the inference to be the board
21  of supervisors was somehow deficient or incapable
22  because they were women?
23             A.   Can you repeat that?
24             Q.   As you sit here today, do you
25  remember any statements of Sheriff Villanueva in
```

PAWLOWSKI, VERONICA                                Page 86

```
 1    general or in specific that leads you to believe
 2    he was intending the inference to be the board of
 3    supervisors was somehow incapable or deficient
 4    because they were all women?
 5            A.   Yes.
 6            Q.   What statements are those?
 7            A.   So, again, I don't remember exact
 8    statements, but there was a reference to the fact
 9    that they're called, you know, the board is always
10    called the five kings, the five queens and so
11    there was this thing he had at one point about how
12    they were the five queens and those statements
13    were made in a way that was essentially making fun
14    of the fact that it was being held up as an
15    accomplishment of the county that we had five
16    women in those seats.
17            Q.   Just to be clear, you believe that
18    Sheriff Villanueva's reference to the board of
19    supervisors being five queens was him making fun
20    of the accomplishment of an all female board?
21            MR. TOKORO:  Objection.  Misstates
22    her prior testimony about how Sheriff Villanueva
23    was delivering that message, but you can answer
24    again.
25            A.   He would make those comments in a
```

PAWLOWSKI, VERONICA                          Page 87

```
 1   sarcastic manner and it's like he was making fun
 2   of them.
 3            Q.   And do you recall what forum he
 4   made those comments in a quote-unquote sarcastic
 5   manner?
 6            A.   I don't recall the exact forum
 7   because in my position I was always paying
 8   attention to the sheriff regardless of what forum
 9   he was in.  So I don't remember exactly what forum
10   a specific statement was made in.
11            Q.   And apart from the comment of five
12   queens, any other statements that you believe led
13   to the inference that he was being disparaging
14   towards the board of supervisors because they were
15   women?
16            A.   There were many and it was this --
17   the way he addressed them, the way he spoke about
18   them, it was all very condescending and
19   disrespectful.
20            Q.   And do you recall, as you sit here
21   today -- I know you say there are many, but do you
22   recall what those disrespectful statements were?
23            A.   Not specific statements.
24            Q.   Okay.  And do you recall how it was
25   -- just to be clear, when you say there were
```

EXHIBIT 06 - Page 116

```
 1    disrespectful statements, are you referring to the
 2    statements themselves or the manner in which
 3    Sheriff Villanueva delivered them or both?
 4              A.   Both.
 5              Q.   And so just to be clear, do you
 6    remember any statements specifically that were
 7    disrespectful statements that were delivered in a
 8    disrespectful manner?
 9              A.   I don't remember the exact
10    statement word for word.
11              Q.   Do you remember anything about
12    them?
13              A.   Yes.
14              Q.   What do you remember about them?
15              A.   For example, statements that
16    supervisor Hahn somehow lacks intelligence or has
17    achieved her position through favoritism or
18    nepotism or general comments about decisions the
19    board would make and then referencing them as
20    being boneheaded or stupid.
21                   Again, it was just a general
22    minimizing of these five women.
23              Q.   Do you believe it's fair to say
24    that Sheriff Villanueva disagreed with the board
25    of supervisors politically on a number of
```

**EXHIBIT 06 - Page 117**

PAWLOWSKI, VERONICA                                    Page 89

```
 1    occasions?

 2              A.    Yes.

 3              Q.    Just to be clear, other than -- I'm

 4    sorry, any other examples that you remember of

 5    Sheriff Villanueva being disrespectful to the

 6    board of supervisors?

 7              A.    Yes.

 8              Q.    What are those?

 9              A.    Are you talking about the board as

10    a collective group or individual numbers?

11              Q.    At this point collective.

12              A.    No.  As I've stated it was a lot of

13    general condescending and disrespectful tones and

14    statements about the collective five of them.

15              Q.    What specifically, if anything, do

16    you recall Sheriff Villanueva saying that you

17    believe was disparaging and inappropriate about

18    Supervisor Hahn?

19              A.    As I mentioned, statements alluding

20    to her being less than intelligent and not

21    deserving of her position.

22              Q.    And do you recall any statements of

23    Sheriff Villanueva attributing her lack of

24    intelligence to the fact that she's a woman?

25              A.    The implication was there.
```

PAWLOWSKI, VERONICA                                          Page 90

```
 1                Q.    And that is an implication that you
 2      drew, is that fair to say?
 3                A.    I'm sorry, can you repeat it?
 4                Q.    Did you draw -- I'll rephrase that.
 5                      Did you draw the implication that
 6      Sheriff Villanueva was saying she was less than
 7      intelligent because she's a woman?
 8                A.    Yes.
 9                Q.    And what, if anything, did Sheriff
10      Villanueva ever say that led you to believe that
11      he intended the implication to be Sheriff
12      Hahn[sic] is less than intelligent because she's a
13      woman?
14                A.    Can you repeat that?
15                Q.    What, if anything, did Sheriff
16      Villanueva say or do that led you to believe he
17      intended that implication?
18                A.    Again, it was the way he spoke
19      about her.
20                Q.    And what about the way he spoke
21      about her led you to believe that was an intended
22      implication?
23                A.    It was rude and condescending and
24      minimizing her qualifications.
25                Q.    And what qualifications did
```

**EXHIBIT 06 - Page 119**

```
 1   Ms. Hahn have that you believe Sheriff Villanueva
 2   was minimizing?
 3            A.   Maybe the better word is
 4   accomplishment.  She had accomplished a lot in the
 5   various positions that she's had throughout her
 6   career.
 7            Q.   And what accomplishments did you
 8   believe Sheriff Villanueva was minimizing?
 9            A.   So Supervisory Hahn had been a
10   member of Congress, a supervisor for the largest
11   county in the country and yet he referred to her
12   as if she was stupid.
13            Q.   Just to be clear, do you think, in
14   general, it's inappropriate or disparaging to
15   refer to elected members as stupid?
16            A.   I believe it's inappropriate to
17   refer to anyone as stupid based on the fact that
18   they're a woman.
19            Q.   Understood.
20                 And just to be clear, you drew the
21   inference that it was because she was a woman and
22   not because she was doing things as an elected
23   official that he disagreed with; is that fair to
24   say?
25                 MR. TOKORO:  Vague and ambiguous as
```

**EXHIBIT 06 - Page 120**

PAWLOWSKI, VERONICA                                   Page 92

```
1    to what you are referring to.  Objection.
2                    You can answer if you understand.
3           A.   I don't understand the question.
4           Q.   You drew the implication that
5    Sheriff Villanueva thought Janis Hahn was less
6    than intelligent because she's a woman as opposed
7    to disagreeing with her politically; is that fair?
8           A.   It is fair to say that he disagreed
9    with her politically.
10                   It is also fair to say that I don't
11   think that that's the reason he put her down the
12   way he did.
13                   Disagreeing with someone
14   politically when you are an elected official, is
15   part of your job, that is fine.
16          Q.   And besides, I think you -- sorry,
17   apart from -- just to go back -- apart from saying
18   she was less than intelligent and, broadly
19   speaking, minimizing either her qualifications or
20   accomplishments, anything else you believe that
21   Sheriff Villanueva said that was disparaging or
22   inappropriate towards Ms. Hahn?
23          A.   Not that I recall at the moment.
24          Q.   And do you remember anything
25   specifically that Sheriff Villanueva said that was
```

EXHIBIT 06 - Page 121

```
 1   disparaging about Hilda Salese?
 2           A.   Yes.  The most offensive one of all
 3   actually.
 4           Q.   And what was that?
 5           A.   It was when he called La Malinche.
 6           Q.   Do you speak Spanish?
 7           A.   Yes.
 8           Q.   Are you a native speaker of
 9   Spanish?
10           A.   I was raised speaking both
11   languages at the same time and I'm fluent in
12   Spanish.
13           Q.   What is your understanding of what
14   -- and I'm sorry for my pronunciation --
15   La Malinche means, to your understanding?
16           A.   To my understanding, it's a
17   sell-out.  Like a traitor.
18           Q.   And are you aware of any historical
19   connotations of being a sell-out or a traitor?
20   Like was there a specific historical person that
21   had that term applied to them?
22           A.   Yes.  I know that there was a
23   specific historical person, I don't know the
24   entire history.  My understanding of the word
25   comes from being raised in a Mexican community by
```

PAWLOWSKI, VERONICA                          Page 94

```
 1    a bunch of Mexican women.
 2              Q.   So just to be clear, your
 3    understanding, from your experience being raised
 4    in a Mexican community by Mexican women is that
 5    term refers to someone who's a sell-out or a
 6    traitor; is that right?
 7              A.   Yes.  A sell-out, a traitor, but
 8    it's more than that.  It's like you are a sell-out
 9    and a traitor in kind of like a, almost like a --
10    it's like a gross reference, I don't know how else
11    to say it.
12              Q.   It's a sell-out and a traitor and
13    it's considered disparaging at the minimum; would
14    that be a fair way to put it?
15              A.   Yes.
16              Q.   And why do you believe it was --
17    first off, do you recall why -- sorry.
18              Do you recall any reason Sheriff
19    Villanueva gave -- whether you agreed with the
20    reasons or not -- as to why he referred to Hilda
21    Salese that way?
22              A.   I don't remember.
23              Q.   And do you recall, other than the
24    fact he referred to her that way, do you recall
25    anything he said in referring to her as that term?
```

PAWLOWSKI, VERONICA                                    Page 95

1              A.     You know, honestly I don't remember

2       because him using that term publically against an

3       elected official, again, with her qualifications

4       and background, it was so shocking to me, that I

5       don't remember all the details and sort of minutia

6       about why he did it because there was no reason

7       for him to do that that would be reasonable or

8       understandable.  So I don't remember.  It doesn't

9       matter to me.

10             Q.     And why did you believe it was

11      inappropriate for him to say that?

12             A.     Because again, I consider it to be

13      so offensive and disparaging in our culture that I

14      don't see any legitimate reason why the elected

15      sheriff of LA County would use that word in

16      reference to another elected official.

17             Q.     Any other reason other than that?

18             A.      It is specifically a put-down of

19      women.  Right.  You don't call a man a

20      La Malinche.  You don't do that.  It's

21      specifically a put-down of a women.

22                    So again, in the context of

23      everything that was going on at the time and just

24      this chauvinistic rude demeanor that he had toward

25      the board of supervisors, it was just like, I just

EXHIBIT 06 - Page 124

```
 1   remember feeling in that moment that it had just

 2   been ratcheted up for no -- like for no

 3   justifiable reason that I could think of.

 4            Q.   And what's your basis for your

 5   understanding that it's specifically a put-down of

 6   women?

 7            A.   That is my understanding based on

 8   my community, my family and how it's used in my

 9   community.

10            Q.   So just to be clear, your

11   understanding in your community and your family,

12   it's not a general term of being a traitor or a

13   sell-out, it's specifically related to a woman

14   being that?

15            A.   Yes, that is my understanding.

16            Q.   Do you happen to know how Sheriff

17   Villanueva identifies ethnically?

18            A.   I believe he identifies -- I mean,

19   he's from Puerto Rico and I think that he

20   identifies as Latino.

21            Q.   And do you have -- do you know one

22   way or another if he also grew up speaking

23   Spanish?

24            A.   I don't know.

25            Q.   Do you know if there is any
```

EXHIBIT 06 - Page 125

```
 1    community definition in Puerto Rico, as opposed to
 2    Mexico, of the term La Malinche?
 3              A.    I don't know.
 4              Q.    And is there any other way that you
 5    believe Sheriff Villanueva was disparaging or
 6    inappropriate toward Supervisor Salese other than
 7    the use of that term?
 8              A.    Again, there was a general rudeness
 9    and disparaging attitude toward all five of them
10    but I don't remember anything other specific about
11    supervisor Salese.
12              Q.    And is there anything -- we've been
13    talking about the board of supervisors and I think
14    we mentioned the justice deputies at the
15    beginning.
16              Just to go back, do you recall
17    anything specifically related to the justice
18    deputies that you believed Sheriff Villanueva said
19    that was disparaging or inappropriate?
20              A.    Yes.
21              Q.    What is that?
22              A.    So justice deputies, he also
23    referred to as a bunch of women.
24              Well, actually I wouldn't even say
25    women, because with that he made comments about us
```

EXHIBIT 06 - Page 126

PAWLOWSKI, VERONICA                                    Page 98

```
 1   being 20 something year old woke, novices who

 2   didn't understand what we were doing and had no

 3   qualifications, that he could discern of, for the

 4   positions that we had.

 5                 I remember him referring to some of

 6   our policies as a bureaucratic orgy of wokeness,

 7   which is gross.

 8                 And, yeah, he definitely at some

 9   point started to have the justice deputies on his

10   radar for sure.

11          Q.   And so just to take that, do you

12   refer -- do you recall Sheriff Villanueva

13   referring collectively to the justice deputies as

14   all women?

15          A.   Yes.

16          Q.   Do you recall what forum he said

17   that in?

18          A.   No.

19          Q.   Do you recall if he ever said that

20   during a board of supervisors' meetings, one of

21   the public meetings?

22          A.   I don't remember.

23          Q.   And you also said he referred to

24   you as collectively as 20 something woke; is that

25   your recollection?
```

PAWLOWSKI, VERONICA                                      Page 161

1    else.

2              Q.   And after that conversation, did

3    you ever discuss Esther Lim's complaint with

4    Esther Lim again?

5              A.   I don't remember.

6              Q.   At some point in time, were you

7    interviewed with respect to Esther Lim's

8    complaint?

9              A.   Yes.  Yes, I was.

10             Q.   Do you recall the name of who

11   interviewed you?

12             A.   I don't.

13             Q.   Prior to being interviewed --

14   sorry.

15             Apart from Esther Lim but prior to

16   the interview, did you discuss Esther Lim's

17   complaint with anyone else?

18             A.   Oh.  I'm sorry, you froze and I

19   just missed that entire question.

20             Q.   That's fine.

21             Prior to being interviewed, but

22   after Esther Lim told you she had filed the

23   complaint, did you discuss Esther Lim's complaint

24   with anyone else?

25             A.   Yes.

PAWLOWSKI, VERONICA                                   Page 162

```
 1                 Q.   Who did you discuss it with?
 2                      Sorry.  You froze as well, I don't
 3        know who it is, but my question was: Who did you
 4        discuss it with?
 5                 A.   My family.
 6                 Q.   And was there a reason why you
 7        discussed it with your family?
 8                 A.   Yes.
 9                 Q.   What was that reason?
10                 A.   I was scared.
11                 Q.   And what were you scared about?
12                 A.   So the sheriff had targeted Esther
13        in a very personal way and up until the time of
14        this complaint, I safely could assume that he
15        didn't have me personally on his radar.
16                      So when she told me that she filed
17        this complaint and listed me as a witness, I
18        immediately became fearful that somehow that would
19        put me on his radar.
20                      So I went to my family to explain
21        there's this complaint that's been filed against
22        the sheriff, I don't know what that means, I'm
23        listed as a witness, I don't know what that means
24        for me.  And I'm sorry in advance if this causes
25        any, you know, repercussions for us as a family.
```

1    CERTIFICATE

2    OF

3    CERTIFIED SHORTHAND REPORTER

4         *    *    *    *

5

6

7         The undersigned Certified Shorthand

8    Reporter of the State of California does hereby

9    certify:

10        That the foregoing Deposition was taken

11   before me at the time and place therein set forth,

12   at which time the witness was duly sworn by me.

13        That the testimony of the witness and

14   all objections made at the time of the Deposition

15   were recorded stenographically by me and were

16   thereafter transcribed, said transcript being a

17   true and correct copy of the proceedings thereof.

18        In witness whereof, I have subscribed my

19   name, this date:   March 17, 2025.

20

21

22

23                    Lynn Ann Waters

24   _____

25   LYNN ANN WATERS, CSR NO. 14432

PAWLOWSKI, VERONICA

Page 206

EXHIBIT 06 - Page 130

# EXHIBIT 7

EXHIBIT 07 - Page 131

CERTIFIED COPY

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs SHERIFF'S DEPARTMENT

## CHRISTINE DIAZ-HERRERA, ESQ

### March 05, 2025

Cheryl L. Marquis CSR No. 6731, Job No. 6456

EXHIBIT 07 - Page 132

1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   ALEX VILLANUEVA,        )      NO.
                            )      2:24-CV-04979 SVW (JCx)
5          Plaintiff,       )
                            )
6      vs.                  )
                            )
7   COUNTY OF LOS ANGELES,  )
    COUNTY OF LOS ANGELES   )
8   SHERIFF'S DEPARTMENT,   )
    LOS ANGELES COUNTY      )
9   BOARD OF SUPERVISORS,   )
    COUNTY EQUITY OVERSIGHT )
10   PANEL, LOS ANGELES     )
    COUNTY OFFICE OF        )
11   INSPECTOR GENERAL,     )
    CONSTANCE KOMOROSKI,    )
12   MERCEDES CRUZ, ROBERTA )
    YANG, LAURA LECRIVAIN,  )
13   SERGIO ESCOBEDO, RON   )
    KOPPERUD, ROBERT G. LUNA,)
14   MAX-GUSTAF HUNTSMAN,   )
    ESTHER LIM, and DOES 1  )
15   to 100, inclusive,     )
                            )
16          Defendants.     )
    -------------------------

17

18

        Deposition of CHRISTINE DIAZ-HERRERA, ESQ., taken
19
    on behalf of the Plaintiff remotely via Zoom
20
    Videoconferencing, commencing at 10:40 A.M. on
21
    Wednesday, March 5, 2025 before Cheryl L. Marquis,
22
    Certified Shorthand Reporter No. 6731.
23

24

25

**EXHIBIT 07 - Page 133**

DIAZ-HERRERA, ESQ, CHRISTINE                                              Page 2

1   APPEARANCES:

2   For Plaintiff:

3       SHEGERIAN & ASSOCIATES, INC.
        BY:  ALEX DiBONA
4           ARTHUR ADAMIAN
            Attorneys at Law
5        11520 San Vicente Boulevard
        Los Angeles, California 90049
6         (310) 860-0770
        ADiBona@Shegerianlaw.com

7

8   For Defendants:

9       MILLER BARONDESS, LLP
        BY:  JASON H. TOKORO
10          Attorney at Law
        2121 Avenue of the Stars
11       Suite 2600
        Los Angeles, California 90067
12        jtokoro@millerbarondess.com

13
    Also Present:
14
        ALEX VILLANUEVA
15
        S. WILLIAMSON
16

17

18

19

20

21

22

23

24

25
                    INDEX

DIAZ-HERRERA, ESQ, CHRISTINE                              Page 28

1    honestly don't remember.  It's possible my first one

2    could have been in 2021.  For sure, 2022 I had conducted

3    investigations for the county.

4        Q    And do you have any understanding of how it

5    came to be that the County hired you or is it the County

6    hired your law firm, who then chose you?

7        A    The county hired my law firm and they chose me.

8        Q    And do you know who in the County was

9    responsible for hiring your law firm?

10       A    I don't.

11       Q    And do you know how the County became aware

12   that your law firm was -- excuse me -- was able to be

13   hired to conduct such investigations?

14       A    No, I don't.

15       Q    At Sanders Roberts at the time that you were

16   first asked to do an investigation on behalf of the

17   County, who at the firm asked you to do it?

18       A    I don't remember.

19       Q    Did you have a direct report at Sanders Roberts

20   in 2021 or 2022?

21       A    I worked closely with two different attorneys.

22       Q    And what are those attorneys' names?

23       A    Shawn Thomas, and Reginald Roberts.

24       Q    At the time, what was Mr. Thomas' position with

25   the firm?

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 58

1    procedure -- I'm just asking if you have seen it at this

2    point.

3        A    Yes.

4        Q    And this is the admonition that the Sheriff's

5    Department gave you?

6        A    I don't recall.

7        Q    Do you recall one way or another if this is how

8    you began the investigations -- sorry.  Strike that.

9            Do you recall one way or another if this

10   procedure is how you began your interviews with the

11   witnesses with respect to the Sheriff Alex Villanueva

12   investigation?

13       A    That looks like my typical admonition that I

14   have been giving for the last 15 years.

15       Q    And do you see here there is various names?

16       A    Yes.

17       Q    And did you interview Kyla Coates on or around

18   August 4, 2022?

19       A    Yes.

20       Q    And did you interview Esther Lim on or about

21   July 28th, 2022?

22       A    Yes.

23       Q    And did you interview Veronica Pawlowskiski on

24   or about August 1st, 2022?

25       A    Yes.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 136

1      Q    Did you have -- excuse me.

2           When you were going to interview Alex -- sorry.

3    Strike that.

4           If you had the chance to interview Alex

5    Villanueva, did you have a plan to interview him about

6    both allegations at the same time, or did you plan on

7    splitting them up?

8      A    I would have done it at the same time, given

9    that I don't know his schedule or whether he would have

10    been available to meet with me more than once.

11          MR. DiBONA:  All right.  I'm going to share

12    Exhibit 4.

13          (Exhibit 4 was marked for identification

14           and is attached hereto.)

15     Q    BY MR. DiBONA:  Do you see Exhibit 4 on your

16    screen?

17     A    Yes.

18     Q    I do see -- do you recall sending this e-mail

19    on or about February 8th, 2023 to Sheriff Villanueva?

20     A    Yes.

21     Q    And just for the record, it states,

22          "Good morning, Mr. Villanueva,

23          I want to follow up regarding my request to

24    schedule an interview with you.  However, pursuant

25    to California Rules of Professional Conduct Rule

DIAZ-HERRERA, ESQ, CHRISTINE                                              Page 137

1      2100, I am unable to communicate with you directly

2      if you are currently represented by an attorney.  If

3      you have an attorney representing you in this

4      matter, if so, please provide me with their contact

5      information so I may speak to them.

6          Thank you."

7          Did I read that correctly?

8      A    Yes.

9      Q    And do you recall the first time you sent a

10     request to interview Sheriff Villanueva?

11     A    Vaguely, yes.

12     Q    Do you recall would that have been a letter he

13     received while he was Sheriff from the Sheriff's

14     Department?

15     A    No.  I believe it was an e-mail from me to his

16     Chief of Staff, who I don't remember his first name, but

17     the last name was Satterfield.

18     Q    Do you recall when you sent that e-mail to John

19     Satterfield?

20     A    I don't, but it would have been shortly after

21     -- obviously, I don't -- I don't remember.

22     Q    And sorry, I shouldn't have -- do you have a

23     recollection, one way or another, if it's John

24     Satterfield, or I believe you said you don't know his

25     first name -- remember his first name, is that fair?

1    A    I don't remember his first name.  I remember

2    his last name being Satterfield.

3    Q    And I think you answered this, so I apologize,

4    did you ever receive a response from Mr. Satterfield?

5    A    No.

6    Q    When -- do you recall when the first time you

7    ever sent an e-mail directly to Mr. Villanueva to

8    interview him?

9    A    I am actually not sure that I did e-mail him

10   directly.  I believe I received an e-mail from him.

11   Q    So just to be clear, you recall the first time

12   Mr. Villanueva reaching out regarding an interview

13   directly is him e-mailing you?

14   A    Correct.

15   Q    And do you recall when you received that e-mail

16   from him?

17   A    I don't.

18   MR. TOKORO:  I'm just going to object that the

19   document you are showing her speaks for itself.

20   Q    BY MR. DiBONA:  Do you see at the bottom, there

21   is an e-mail from Alex Villanueva on or about

22   January 12, 2023?

23   A    I see that.

24   Q    Sorry, let me go back.  Sorry, let me scroll

25   down.  Sorry.  The document even before that, which is

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 139

1   COLA001888, do you recall receiving this e-mail?

2      A    Yes.

3      Q    All right.  And do you see this e-mail is

4   January 9th, 2023?

5      A    Yes.

6      Q    And looking at it, do you believe this is the

7   e-mail that you were referring to with Mr. Villanueva

8   with respect to your request for an interview?

9      A    Yes.

10     Q    And this is -- to your recollection, this is

11  the first time you ever had any direct communication

12  with former -- with at this time former Sheriff Alex

13  Villanueva, is that fair?

14     A    Yes.

15     Q    Is it your recollection that Sheriff

16  Villanueva, the re-election for Sheriff was November of

17  2022?

18     A    Yes.

19     Q    And so January 9th of 2023, he would have been

20  out of office at this time, is that your understanding?

21     A    Yes.

22     Q    And the reference is I -- I'm sorry.  The

23  statement is,

24          "I received two certified letters regarding

25       interview requests for incidents that allegedly

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 140

1     happened in March of last year.  In order to

2     properly respond, I will ask you to submit your

3     questions in writing after providing a brief

4     description of what the allegations are, and then I

5     will reply with counsel.  That is the first I have

6     heard of anyone reaching out to me, so please use

7     this e-mail for all communications."

8         Did I read that correctly?

9     A    Yes.

10    Q    Did you believe there was anything

11    inappropriate about former Sheriff Alex Villanueva

12    asking you to submit your questions in writing?

13    A    Can you define "inappropriate"?

14    Q    Did you consider it an improper request that he

15    was making of you while you were trying to investigate

16    these allegations?

17    A    I don't know that I would use the word

18    "improper," but I would say that in 15 years of doing

19    investigations, I have never had someone ask me for the

20    questions, and I have never received a request like that

21    in 15 years.

22    Q    And in 15 --

23    A    It wasn't usual.

24    Q    In 15 years, had you ever made a request to

25    interview a former elected official?

DIAZ-HERRERA, ESQ, CHRISTINE                                           Page 141

1     A    No.

2     Q    And in the previous 15 years, had you ever

3  investigated a County Sheriff of any kind?

4     A    A County Sheriff, no.

5     Q    By the way, as I get the next exhibit, I'm

6  going to ask you, there is a reference -- Mr. Villanueva

7  references two certified letters.  Did you send those

8  letters -- sorry.  Did you send the certified letters

9  that are referenced?

10    A    I did not.

11    Q    Do you know who did?

12    A    I do not know.

13    Q    Sorry.  It should come through any moment.

14         (Exhibit 5 was marked for identification

15         and is attached hereto.)

16         All right.  Do you see the document on your

17  screen?

18    A    Yes.

19    Q    Okay.  This is COLA001890 and it goes to 1893.

20         Do you recall receiving -- sorry, sending this

21  e-mail to former Sheriff Alex Villanueva on February 9,

22  2023?

23    A    Yes.

24    Q    And for the record, what does POE stand for?

25    A    Policy of Equity I believe, I think I was

DIAZ-HERRERA, ESQ, CHRISTINE                                     Page 142

1   referencing the CPOE.

2       Q    And there is a reference to which Policy of

3   Equity he's alleged to have violated, is that correct?

4       A    Yes.

5       Q    And there is no reference to who was making the

6   allegations, is that right?

7       A    Yes.

8       Q    And was there any reason why you didn't

9   reference either Esther Lim or Max Huntsman in this

10  e-mail?

11      A    He asked for the allegations and I gave them to

12  him.

13      Q    Understood.  Did you consider -- in your

14  opinion, would there have been anything inappropriate if

15  you said -- if you used the names of who was saying that

16  he violated the policies of equity?

17      A    It's not typically my practice to include that

18  information when someone is asking me for the

19  allegations.

20      Q    And is there any reason it's part of your

21  practice?

22      A    Again, I was asked for the allegations.

23  Provided them.  They are there.

24      Q    Understood.  My question was just a little bit

25  different.  You said it was part of your practice, and I

DIAZ-HERRERA, ESQ, CHRISTINE                              Page 143

1    understand the answer. Is there a particular reason you

2    can articulate that it's part of your practice?

3        A    For the purposes of informing him what the

4    allegations are against him, it's not needed.

5        Q    And did anyone in the Sheriff's Department ever

6    tell you not to say the names of Esther Lim or Max

7    Huntsman to Sheriff Villanueva prior to the interview?

8        A    No.

9        Q    And so just to be clear, the reason you didn't

10   mention the names of Esther Lim or Max Huntsman is

11   because it's not your practice, and you didn't believe

12   it was necessary to answer his question.  Do I have that

13   right?

14       A    He asked for the allegations.  I gave him the

15   allegations that were potentially against him.  I gave

16   him the information that was requested.

17       Q    And any other reason other than that, why you

18   didn't give the names of Esther Lim or Max Huntsman to

19   him in the e-mail?

20       A    He asked for the allegations.  I gave him the

21   information regarding the allegations.

22       Q    Miss Diaz-Herrera, not to go round and round, I

23   understand your answer.  What I just want to make sure

24   is, I want to make sure I have all your reasons.  I

25   think you gave me two or three, depending on how you

DIAZ-HERRERA, ESQ, CHRISTINE                                Page 144

1    count.  I'm just wondering if you had any more than

2    that?

3         MR. TOKORO:  You have asked her this question

4    twice now.  She's answered it twice.

5         You can answer it one more time, Christine, and

6    we'll move on.

7         THE WITNESS:  I gave him the information I

8    believed was relevant to his request.

9    Q    BY MR. DiBONA:  Do you see Exhibit 6 on your

10   screen?

11        (Exhibit 6 was marked for identification

12         and is attached hereto.)

13   A    Yes.

14   Q    So Exhibit 6 is COLA001894, and do you recall

15   receiving this response from then former Sheriff Alex

16   Villanueva on or about February 9, 2023?

17   A    Yes.

18   Q    It says,

19        "I'm not concerned about what your practices

20        may be, particularly given the challenging optics of

21        making a former sheriff the subject of an

22        administrative investigation."

23        First, did I read that correctly?

24   A    Yes.

25   Q    It goes on,

DIAZ-HERRERA, ESQ, CHRISTINE                          Page 145

1          "This is troubling on so many levels, and while

2      I am more than happy to cooperate with you, it will

3      be on my terms.  Please advise how you wish to

4      proceed.

5          Alex."

6          Did I read that correctly?

7      A    Yes.

8      Q    Excuse me.  Were you involved in any

9   determination if there was still jurisdiction to conduct

10   an investigation of Alex Villanueva when he was no

11   longer with the Sheriff's Department?

12     A    No.

13     Q    And were you involved in any determination of

14   whether the statute of limitations on the allegation had

15   run?

16     A    No.

17     Q    I think earlier you made a reference to POBAR.

18   Is that the Peace Officers Bill of Rights, to your

19   understanding?

20     A    Yes.

21     Q    And did you make -- or were you involved in any

22   determination, whether the Peace Officers Bill of Rights

23   was complied with, with respect to the investigation

24   into the former Sheriff Alex Villanueva?

25     A    I don't think I understand your question.

DIAZ-HERRERA, ESQ, CHRISTINE                                Page 146

1      Q    Were you asked, in the course of your

2   investigation to do any investigation into whether the

3   Peace Officers Bill of Rights would be complied with,

4   with respect to any proposed discipline with respect to

5   Alex Villanueva?

6      A    I have zero impact or -- I have zero to do with

7   any type of discipline or anything like that.  I would

8   never have any kind of impact on that or any kind of

9   opinion on that.  I don't -- I don't advocate for

10   discipline.  I don't make any recommendations for

11   discipline.  I have nothing to do with it.

12     Q    Sorry, I'm just marking the next exhibit.

13          Do you see it on your screen?

14          (Exhibit 7 was marked for identification

15           and is attached hereto.)

16     A    Yes.

17     Q    Exhibit 7 is COLA001909, and it goes to 1914.

18          Do you recall receiving this e-mail from

19   Mr. Villanueva on or about March 6, 2023, the one at the

20   top -- or I'm sorry, strike that.

21          Do you recall sending this e-mail to Sheriff

22   Villanueva on or about March 6, 2023?

23     A    Yes.

24     Q    All right.  And is it fair to say in your first

25   paragraph you are saying the subject of an investigation

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 147

1    does not get to know the questions he or she will be

2    asked in your interview.  Do you see that?

3        A    Yes.

4        Q    And do you recall -- this appears to be in

5    response to an e-mail sent by Alex Villanueva on March

6    26, 2023.  Do you see that?

7        A    Yes.

8        Q    And do you recall receiving this e-mail from

9    Sheriff Villanueva on that date and time?

10       A    Yes.

11       Q    Okay.  And in the report it says,

12           "Your response only confirms my suspicion.  For

13       the record, there were several incidents that

14       occurred during the McDonald administration that

15       merited questioning him,  but it would have been

16       wildly inappropriate to make him the subject of an

17       administrative investigation and we never did.  Your

18       actions are unethical and without legal authority or

19       precedent.  Thank you."

20           Did I read that correctly?

21       A    Yes.

22       Q    And are you aware, one way or the other --

23    sorry.  Let me back up for a second.

24           Did you have an understanding that Jim McDonald

25    was the Sheriff before Alex Villanueva?

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 163

1    Q    Does this Allegation 1, does this comport with

2    your understanding of what you were investigating with

3    respect to Max Huntsman?

4    A    Yes.

5    Q    And did you interview Max Huntsman on or about

6    July 21, 2022?

7    A    Yes.

8    Q    And was that interview recorded?

9    A    Yes.

10    Q    Did, by the way, you make any credibility

11    determinations about what Max Huntsman told you during

12    that interview?

13    A    No.

14    Q    Did you ever make any credibility

15    determinations about Esther Lim in her interview with

16    you?

17    A    Since I didn't complete the investigation, no,

18    I didn't.

19    Q    And did you ever make any credibility

20    determinations regarding Kyla Coates with respect to

21    anything she told you?

22    A    Can you explain what you mean by a "credibility

23    determination"?

24    Q    Yes, I mean did you ever come to an opinion one

25    way or the other, that this person is either telling the

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 164

1  truth or this person is not telling the truth, and there

2  may have been more than one, but that's what I mean by

3  credibility determinations.

4      A    So can you ask me the question about Esther

5  again?

6      Q    Yes.  Did you ever make any credibility

7  determinations with respect to Esther Lim and anything

8  she told you during the investigation?

9      A    I interviewed her, and then I went to the

10  Facebook Live statements as well as, you know, other

11  things that were available that I could find, and was

12  able to determine that comments that she said had been

13  made had in fact been made.  So in the sense of was I

14  able to determine if she had been telling the truth,

15  some of the comments that she made, certainly I could

16  see she had told the truth, yes.

17     Q    And was there anything that you determined that

18  Esther Lim told you that was not the truth for whatever

19  reason?

20     A    Not that I could recall.

21     Q    And I will ask it again.  With respect to Kyla

22  Coates, did you make any credibility determinations

23  regarding Miss Coates?

24     A    Again, based on how you have defined it for me,

25  I look -- from her allegations that she made, I was able

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 165

1   to independently verify with Facebook Live streams that

2   some of what she had said I was able to see in the

3   Facebook Live stream, so I was able to see that she was

4   truthful and that, like for example, you know, that she

5   had -- some of the comments she made were in fact in the

6   Facebook Live TV stream, so you could see that she had

7   told the truth.

8       Q    And did you make any credibility determinations

9   that Miss Coates was not telling you the truth regarding

10  anything?

11      A    I did not find evidence that showed she had

12  lied about something specific, no.

13      Q    And did you make any credibility determinations

14  with respect to Veronica Pawlowski?

15      A    Again, in the same way, you know, there was

16  specific comments that she made, and then referring to

17  the Facebook Lives, you know, those are verifiable,

18  right?  You can look and see whether or not what they

19  said was said.

20      Q    And just same question, I will redefine

21  credibility.  Did you ever make any credibility

22  determinations with respect to Max Huntsman?

23      A    So, for example, Max made specific statements

24  regarding comments that were made on KFI.  I was able to

25  pull the interview on KFI and listen to it and hear that

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 166

1     what Max had said had been said on the KFI broadcast.

2     Likewise, I believe there was an L.A. Times article.  I

3     was able to pull the L.A. Times article and see what was

4     said was in the L.A. Times article.  So with regards to

5     was I able to determine if what he had said was true,

6     there are comments that he made or allegations that he

7     made that I was able to verify were true in the KFI

8     interview and in the L.A. Times interview.

9        Q     And were you ever able to make a credibility

10    determination that something Max Huntsman said was not

11    the truth?

12       A     I did not find any evidence that Max Huntsman

13    had lied about something he said to me.

14       Q     And I'm sorry, under the section on background,

15    are you able to tell me, one way or another, if you

16    wrote this section?

17       A     I believe so, yes.  And can I say referring

18    back to earlier in the day, I think I got a little

19    confused with how you were going back and forth, and I

20    think I got confused that you were showing me a report

21    versus notes, and so I just wanted to point that out

22    that I think I got a little confused when we were

23    looking at those documents, because now I can see like,

24    for example, this is the report, right, but I think

25    previous, earlier in the day, you had also -- you were

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 175

1     Q    All right.  If you could go to page 70, which

2   is COLA002104.

3     A    Is that page 70?

4     Q    Yes, it's 70 on the PDF.  it's Bates numbered

5   2104.  So whichever one is easier for you.

6     A    Okay.  Yes, I can see that now.

7     Q    Have you seen this portion of the document

8   before?

9     A    Yes.

10    Q    And is this something you received when you

11   began your investigation into Max Huntsman?

12    A    Yes.

13    Q    Just a moment.  If you go to page 45 on the

14   PDF, which is COLA 002079.

15         MR. TOKORO:  Alex, can you put it up on the

16   screen?  Because I don't have it open.

17         MR. DiBONA:  Yes.

18         MR. TOKORO:  Thank you.

19         THE WITNESS:  45, and you said it's zero --

20   what is it?

21    Q    BY MR. DiBONA:  2079.

22    A    Okay.  Yeah, I have it.

23    Q    Do you see towards the middle of the section of

24   the transcript it says, "It might be..."?

25    A    Yes.

DIAZ-HERRERA, ESQ, CHRISTINE                                          Page 176

1      Q    And just for the record, it says,

2          "It might be if he had presented me as an

3      Aryan, but he didn't, you know.  So that's why when

4      he first did it, my take on it is he was trying to

5      imply I was Jewish.  And that would be what I was --

6      that's what I thought he was doing.  I may not have

7      been correct about that, but that's just how I took

8      it."

9          Did I read that correctly?

10     A    I'm sorry.  What were you saying again?

11     Q    My question was did I just read that portion of

12     the transcript correctly?

13         MR. TOKORO:  I'm just going to make an

14     objection that it's incomplete.  You are only reading

15     her the first half of that paragraph.

16         THE WITNESS:  I don't know what to say.  You

17     read the words on the page.  I don't know that I have

18     any special knowledge, other than what you just read.

19     Q    BY MR. DiBONA:  Do you have a recollection of

20     Mr. Huntsman saying that in your interview with him?

21         MR. TOKORO:  Once again, it's incomplete.  You

22     are reading her a portion of a paragraph rather than the

23     entirety of it.

24         THE WITNESS:  Yes, I recall him saying these

25     words.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 180

1    Q    BY MR. DiBONA:  Ms. Diaz-Herrera, do you

2    understand you are still under oath?

3    A    Yes.

4    Q    Is there any reason you can't continue to give

5    your best testimony?

6    A    No.

7    Q    As you sit here today, do you believe any part

8    of your testimony needs to be changed for whatever

9    reason?

10   A    No.

11       MR. DiBONA:  I don't have any further

12   questions.  Do you, Counsel?

13       MR. TOKORO:  I do.

14                    EXAMINATION

15   BY MR. TOKORO:

16   Q    Miss Diaz-Herrera, I just have a few questions

17   for you to follow up on some of the things that you were

18   asked about by Mr. DiBona.

19       To be clear, when you were conducting your

20   investigation, did any member of the County Board of

21   Supervisors give you any instructions on how that

22   investigation was to be conducted?

23   A    No.

24   Q    Did any member of the County Board of

25   Supervisors communicate with you in any way, shape or

DIAZ-HERRERA, ESQ, CHRISTINE                                Page 181

1    form about your investigation into either Esther Lim or

2    Max Huntsman?

3       A    No.

4       Q    Did Supervisor Solis have any involvement in

5    your investigation into either Max Huntsman or Esther

6    Lim's complaints?

7       A    No.

8       Q    Did Janice Hahn, Supervisor Hahn have any

9    involvement whatsoever in either of your investigations?

10      A    No.

11      Q    Did Sheriff Luna, once he became Sheriff in

12   November of 2022, have any involvement in your

13   investigation into either the Huntsman or Lim

14   complaints?

15         MR. DiBONA:  Objection.  Lack of foundation.

16   Leading.

17         THE WITNESS:  No.

18      Q    BY MR. TOKORO:  Did Sheriff Luna ever

19   communicate with you in any way, shape or form about how

20   you were conducting either the Huntsman or Lim

21   investigations?

22         MR. DiBONA:  Same objections.  Form.

23         THE WITNESS:  No.

24      Q    BY MR. TOKORO:  Have you ever spoken with

25   Sheriff Luna about either the Huntsman or Lim

DIAZ-HERRERA, ESQ, CHRISTINE                              Page 182

1  investigations?

2    A    I have never spoken with Sheriff Luna ever.

3    Q    Now I think you were asked some questions about

4  the distributions or the information that you were given

5  by the department at the beginning of your

6  investigations, but I want to make sure we make the

7  record clear.

8        Did anyone from the department direct you on

9  how to conduct the Huntsman investigation?

10   A    Are you talking about the Sheriff's Department?

11   Q    Yes.

12   A    Nobody directed me how to conduct my

13  investigation.

14   Q    Did anyone from the Sheriff's Department direct

15  you on how to conduct the investigation into Esther

16  Lim's complaint?

17   A    No.

18   Q    Did anyone from the Sheriff's Department direct

19  you on what questions to ask in either of those two

20  investigations?

21   A    No.

22   Q    Did anyone from the Sheriff's Department direct

23  you on who to interview as part of either of those

24  investigations?

25   A    No.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 183

1     Q    Did anyone from the Sheriff's Department direct

2   you on what evidence to collect or not collect in

3   connection with either of those investigations?

4     A    No.

5     Q    Now, one of the things you mentioned,

6   Mr. DiBona was showing you a number of e-mails that you

7   had with Mr. Villanueva after he was no longer in

8   office.

9          I want to talk about the period before he lost

10   the election to Sheriff Luna.  You mentioned, I think --

11   I wrote it down, that you repeatedly tried to set up an

12   interview with him, is that accurate?

13    A    Yes.

14    Q    And can you tell us, I think you mentioned this

15   started around the time when you received the complaint

16   or you received the investigation in June of 2022.  But

17   can you just tell us what you did specifically to try to

18   set up an interview with him while he was still in

19   office?

20    A    I e-mailed his Chief of Staff, Mr. Satterfield,

21   and I tried to set up an interview with him, I believe

22   multiple times.  I did not receive any response.  Then

23   later, Sheriff Villanueva himself e-mailed me directly,

24   and then I interacted with him in trying to schedule an

25   interview.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 184

1     Q     And was your understanding from the e-mail that

2     Sheriff Villanueva sent you that he had received two I

3     believe certified letters asking you to get in touch

4     with him?

5          MR. DiBONA:  Objection.  Leading.  Form.

6          THE WITNESS:  Yes.

7     Q     BY MR. TOKORO:  Okay.  So prior to that,

8     though, John Satterfield or Deputy Satterfield had never

9     responded to any of your requests to set up an interview

10     with Sheriff Villanueva, is that fair?

11     A     Yes, that's accurate.

12     Q     Okay.  And you understood that Deputy

13     Satterfield was Mr. Villanueva's Chief of Staff at the

14     time?

15     A     Yes, that's what I believed.

16     Q     Now, Mr. Villanueva has alleged in this case

17     that the department concluded its investigations into

18     Mr. Huntsman and Miss Lim's complaints in July of 2022.

19          Is that true?

20     A     No, I had just started my investigations so

21     that couldn't be accurate.

22     Q     In fact, in August of 2022, that's when you

23     first interviewed Miss Pawlowski and Miss Coates,

24     correct?

25     A     Correct.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 185

1     Q    And you continued to try to interview

2   Mr. Villanueva even after August of 2022, is that right?

3     A    Yes.

4         MR. DiBONA:  Objection to form.

5     Q    BY MR. TOKORO:  And in fact, based on the

6   communications that Mr. DiBona showed you earlier, I

7   believe it was exhibits -- I'm going back through my

8   notes -- but Exhibits 4 through 8, you were still

9   communicating with Sheriff Villanueva -- well,

10  Mr. Villanueva in March of 2023, to set up interviews in

11  connection with both of those investigations, correct?

12    A    Correct.

13        MR. DiBONA:  Objection to form.

14        MR. TOKORO:  You can answer that again, Miss

15  Diaz-Herrera.

16        THE WITNESS:  Yes, that's accurate.  I was

17  still trying to set up an interview with former Sheriff

18  Villanueva as late as March 2023.

19    Q    BY MR. TOKORO:  Correct.  So when

20  Mr. Villanueva alleges that the investigations by you

21  were concluded in July of 2022, that is not accurate, is

22  it?

23        MR. DiBONA:  Objection.  Form.  Leading.

24        THE WITNESS:  It would not have been possible

25  for my investigations to have been concluded in July of

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 186

1   2022.

2      Q    BY MR. TOKORO:  Okay.  Now, Mr. Villanueva has

3   made two claims in this case, and I want to talk to you

4   about them separately.  Mr. Villanueva has claimed that

5   Deputy Satterfield -- well, he's actually no longer with

6   the department, so Mr. Satterfield advised him in July

7   or August of 2022 that the investigations had been

8   concluded.

9          Did you ever have a conversation with Deputy

10  Satterfield where you told him that the investigations

11  had concluded in July of 2022?

12         MR. DiBONA:  Objection.  Form.  Leading.

13         THE WITNESS:  No, I never actually had any

14  conversation with Mr. Satterfield.  He never responded

15  to my e-mails.  There was no communication between --

16  Mr. Satterfield never communicated anything with me.

17     Q    BY MR. TOKORO:  In fact, based on your prior

18  testimony, it sounds like you continued to try to

19  communicate with Mr. Satterfield to set up this

20  interview even after July of 2022, is that accurate?

21         MR. DiBONA:  Objection to form.  Leading.

22         THE WITNESS:  Yes.

23     Q    BY MR. TOKORO: Okay.  And was Mr. Satterfield,

24  other than you reaching out to him to set up

25  Mr. Villanueva's interviews, was Mr. Satterfield

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 187

1    involved at all in your investigation?

2        A    No.

3        Q    Were you communicating with him about the

4    status of the investigation?

5        A    No.  I have never spoken to Mr. Satterfield.

6        Q    Did you ever e-mail or communicate in any way,

7    shape or form, to Mr. Satterfield that you had concluded

8    your investigations in July of 2022?

9        A    No, the only e-mail that I sent to

10   Mr. Satterfield was to try to coordinate

11   Mr. Villanueva's interview.

12       Q    Did you communicate to anybody, and I mean

13   anyone, anybody in July or August of 2022, that you had

14   completed the investigation into Mr. Huntsman's

15   complaints?

16       A    No.

17       Q    Did you communicate to anybody in July or

18   August of 2022 that you had completed your investigation

19   into Esther Lim's complaints?

20       A    No.

21       Q    Have you ever told anyone at any time that you

22   completed your investigation into Mr. Huntsman's

23   complaints in July of 2022?

24       A    No.

25       Q    Did you ever tell anyone at any time that you

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 188

1   completed your investigations into Esther Lim's

2   complaints in July of 2022?

3       A    No.

4       Q    And you wouldn't have told anyone that because

5   it isn't accurate, correct?

6           MR. DiBONA:  Objection.  Leading.  Form.

7           THE WITNESS:  Correct.  It would have been

8   inaccurate to say my investigation was complete in July

9   2020 or even August 2020.

10      Q    BY MR. TOKORO:  Now, the second claim Mr.

11  Villanueva has made is that he was advised by Ed Alvarez

12  that you had completed your investigations in July of

13  2022 after the department determined that there was no

14  misconduct.

15          Do you know who Ed Alvarez is?

16          MR. DiBONA:  Objection to form.

17          THE WITNESS:  I don't know who Ed Alvarez is.

18  I have never spoken with him.  I have never e-mailed

19  with him.  Have no communication with Ed Alvarez.

20      Q    BY MR. TOKORO:  Was Ed -- and I don't want to

21  assume the answer here, but was Ed Alvarez involved in

22  any way, shape or form, in your investigation into

23  Mr. Huntsman?

24      A    No.  I don't even know who he is.

25      Q    Was Ed Alvarez involved in any way, shape or

DIAZ-HERRERA, ESQ, CHRISTINE                              Page 189

1    form, into your investigation into Esther Lim's

2    complaints?

3        A    No.

4        Q    Did you ever speak with Ed Alvarez, whether in

5    writing or orally, and advise him that you had completed

6    your investigation in July or August of 2022?

7        A    No.

8        Q    Did you ever communicate with Ed Alvarez that

9    you had completed your investigation into Esther Lim's

10   complaints in July or August of 2022?

11       A    No.

12       Q    Now, we started this deposition or at least it

13   was in the morning with Mr. DiBona asking you a number

14   of questions about your best practices about being an

15   employment workplace investigator.  So I want to follow

16   up on some of those questions.

17           And I want to talk about the two investigations

18   separately.  So let's start with Esther Lim's

19   investigation.  So all of these questions relate to that

20   investigation.

21           Do you stand by the investigation that you did?

22       A    Yes.

23       Q    Did you conduct an independent and thorough

24   investigation?

25           MR. DiBONA:  Objection.  Leading.  Form.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 190

1          THE WITNESS:  Yes, I did conduct an independent

2    and thorough investigation.

3      Q    BY MR. TOKORO:  And when you were conducting

4    that investigation, were you acting as a neutral

5    investigator?

6          MR. DiBONA:  Objection.  Leading.  Form.

7          THE WITNESS:  Yes, I was a neutral investigator

8    collecting the facts.

9      Q    BY MR. TOKORO:  An unbiased investigator?

10          MR. DiBONA:  Objection.  Leading.  Form.

11          THE WITNESS:  Yes, I was unbiased.

12      Q    BY MR. TOKORO:  And did you collect all of the

13    evidence that you think you needed for purposes of your

14    investigation?

15          MR. DiBONA:  Objection.  Leading.  Form.

16          THE WITNESS:  Yes, I believe I collected

17    everything that I needed, based on the allegations that

18    were made.

19      Q    BY MR. TOKORO:  And did you review the evidence

20    that you collected in connection with Esther Lim -- the

21    investigation into Esther Lim's complaint?

22      A    Yes, I did, such as the Facebook Live, the

23    videos themselves, as well as, you know, any other

24    documents that were given to me.

25      Q    Now, other than Mr. Villanueva, did you

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 195

1    not receive the summaries?

2      A    No.  I don't believe it was hampered in any

3    way.  I had -- I reviewed the entire Facebook Live

4    sessions that were referred to, as well as others.  So

5    no, I don't believe that it was hampered.

6      Q    Okay.  And I now want to talk about the

7    Huntsman investigation or the investigation you did into

8    Mr. Huntsman's complaint.

9          Do you stand by that investigation?

10     A    Yes.

11     Q    Do you believe that you conducted an

12   independent investigation into Mr. Huntsman's complaint?

13         MR. DiBONA:  Objection.  Leading.  Form.

14         THE WITNESS:  Yes.

15     Q    BY MR. TOKORO:  Do you believe when you

16   conducted that investigation you were acting as a

17   neutral investigator?

18         MR. DiBONA:  Objection.  Leading.  Form.

19         THE WITNESS:  Yes.

20         MR. TOKORO:  Do you believe when you conducted

21   that investigation, you did it in an unbiased manner?

22         MR. DiBONA:  Objection.  Leading.  Form.

23         THE WITNESS:  Yes.

24     Q    BY MR. TOKORO:  And when you conducted that

25   investigation, did you collect all of the evidence that

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 196

1    you thought was relevant to the investigation?

2         MR. DiBONA:  Objection.  Leading.  Form.

3         THE WITNESS:  Yes, I believe I did collect all

4    the evidence that was relevant.

5    Q    BY MR. TOKORO:  And did you review all of that

6    evidence its entirety as part of your investigation?

7    A    Yes, I reviewed all of the evidence in its

8    entirety.

9    Q    And did you interview -- other than

10   Mr. Villanueva, did you interview everyone that you

11   thought you needed to interview in order to evaluate Mr.

12   Huntsman's claims?

13   A    Yes.  Based on Mr. Huntsman's claims that those

14   statements were made, like for example, the KFI

15   interview, they were verifiable by going to the

16   interview themselves and listening to it.  So there was

17   no need for me to interview someone else, because he

18   said that the statement was made, the KFI was available,

19   I listened to it in it's entirety, I confirmed that what

20   Mr. Huntsman was saying was the truth.

21   Q    Got it.  And like the investigation into

22   Miss Lim's complaints, you also went -- did you also go

23   and collect Facebook Live streams in which Mr. Huntsman

24   had stated Mr. Villanueva had made disparaging

25   statements against him?

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 197

1    A    Yes.

2    Q    And did you collect and review those in their

3    entirety?

4    A    I did collect them and review them in their

5    entirety.

6    Q    Okay.  And you were able through that process

7    to confirm that the statements which Mr. Huntsman was

8    complaining about were in fact made by Mr. Villanueva?

9    A    Yes.

10        MR. DiBONA:  Objection.  Form.  Leading.

11        THE WITNESS:  Yes, the Facebook Live sessions

12   confirmed Mr. Huntsman's allegations.

13   Q    BY MR. TOKORO:  Okay.  And were you -- did also

14   collect as part of your evidence collection, some Tweets

15   that were made by Mr. Villanueva about Mr. Huntsman?

16   A    Yes.

17   Q    Okay.  And did you review those as part of your

18   investigation?

19   A    Yes, I did.

20   Q    Now, one of the other complaints that

21   Mr. Huntsman had made as part of this process was that

22   Sheriff Villanueva, Mr. Villanueva had accused him of

23   being a Holocaust denier.  Do you recall that?

24   A    Yes.

25   Q    Was that part of your investigation?

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 198

1    A    I believe it was something that we looked into,

2  yes.

3    Q    And in fact, did you pull two Los Angeles Times

4  articles about the statements that Sheriff Villanueva --

5  Mr. Villanueva had made about Mr. Huntsman being a

6  Holocaust denier?

7    A    Right, yes.  Yes, I had pulled the two L.A.

8  Times articles.

9    Q    And those L.A. Times articles, did they also

10  include a video of the interview of Sheriff Villanueva,

11  or Mr. Villanueva where he made the statement that Mr.

12  Huntsman denied the existence of the Holocaust?

13    A    Yes.

14    Q    I want to just share my screen quickly.  I'm

15  showing you, Miss Diaz-Herrera -- can you see the

16  document I put on the screen.  It's Exhibit No. 9.

17    A    Yes.

18    Q    And do you see here it's the "Documentary

19  Evidence"?

20    A    Yes.

21    Q    Now, Mr. DiBona asked you some questions about

22  this.  I just want to make clear, the evidence listed

23  below here, A through K, does this reflect the Tweets

24  and other evidence that you collected as part of your

25  investigation?

DIAZ-HERRERA, ESQ, CHRISTINE                                      Page 199

1        MR. DiBONA:  Objection.  Form.

2        THE WITNESS:  Yes.

3    Q    BY MR. TOKORO:  And these are all the materials

4    that you reviewed in their entirety in confirming the

5    statements made by Mr. Villanueva?

6    A    Correct.

7    Q    So in your opinion, was there any dispute that

8    Mr. Villanueva had made the statements that Mr. Huntsman

9    complained about?

10   A    No.

11       MR. DiBONA:  Objection.  Form.

12       THE WITNESS:  No.

13       MR. TOKORO:  I have no other questions.

14       MR. DiBONA:  I just have some followups briefly

15   on what you said.

16                  EXAMINATION

17   BY MR. DiBONA:

18   Q    So Ms. Diaz-Herrera, it's fair to say, you

19   didn't complete your investigation either with respect

20   to Max Huntsman allegations, isn't that true?

21   A    I did not complete the final report, yes,

22   that's accurate.

23   Q    And you left Sanders Roberts before the

24   investigation was complete, is that fair?

25   A    I left before the final report was created.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 211

1

2  STATE OF CALIFORNIA)
                          ) ss.
3  COUNTY OF LOS ANGELES          )

4

5

6        I,  CHERYL L. MARQUIS, hereby certify:

7        I am a duly qualified Certified Shorthand

8  Reporter in the State of California, holder of

9  Certificate Number CSR 6731 issued by the Court

10  Reporters Board of California, and which is in full

11  force and effect; (Fed. R. Civ. P. 28(a)).

12        I am authorized to administer oaths or

13  affirmations pursuant to California Code of Civil

14  Procedure, Section 2093(b) and prior to being examined,

15  the witness was first duly sworn by me.  (Fed. R. Civ.

16  P. 28(a), 30(f)(1)).

17        I am not a relative or employee or attorney or

18  counsel of any of the parties nor am I a relative or

19  financially interested in this action.  (Fed. R. Civ. P.

20  28).

21        I am the deposition officer that

22  stenographically recorded the testimony in the foregoing

23  deposition and the foregoing transcript is a true record

24  of the testimony given by the witness.  (Fed R. Civ. P.

25  30(f)(1)).

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 212

```
 1              Before completion of the deposition, review of

 2      the transcript [X] was requested.  If requested, any

 3      changes made by the deponent and provided to the

 4      reporter) during the review period allowed, are appended

 5      hereto.  (Fed. R. Civ. P. 30(e)).

 6

 7      Dated: March 20, 2025

 8

 9                    _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 8

EXHIBIT 08 - Page 173



CERTIFIED COPY

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

ANN DEVANE

March 06, 2025

Vesna Walter, CSR No. 11989, Job No. 6895

EXHIBIT 08 - Page 174

1

2                UNITED STATES DISTRICT COURT

3        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

4

5    ALEX VILLANUEVA,              )
                                   )
6                Plaintiff,        )
                                   )
7            vs.                   )  Case No.
                                   ) 2:24-cv-04979 SVW
8    COUNTY OF LOS ANGELES, COUNTY     ) (JCx)
     OF LOS ANGELES SHERIFF'S          )
9    DEPARTMENT, LOS ANGELES COUNTY    )
     BOARD OF SUPERVISORS, COUNTY      )
10   EQUITY OVERSIGHT PANEL, LOS       )
     ANGELES COUNTY OFFICE OF          )
11   INSPECTOR GENERAL, CONSTANCE      )
     KOMOROSKI, MERCEDES CRUZ,         )
12   ROBERTA YANG, LAURA LECRIVAIN,    )
     SERGIO V. ESCOBEDO, RON           )
13   KOPPERUD, ROBERT G. LUNA,         )
     MAX-GUSTAF HUNTSMAN, ESTHER       )
14   LIM, and DOES 1 to 100,           )
     inclusive,                        )
15                                     )
                 Defendants.           )
16   _____ )

17

18

19                REMOTE DEPOSITION OF

20                  ANN DEVANE

21              Thursday, March 6, 2025

22

23   Stenographically Reported By:
     Vesna Walter, CSR, RPR, CCRR
24   CSR No. 11989
     Job No. 6895
25

EXHIBIT 08 - Page 175

1             UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3
    ALEX VILLANUEVA,                )
4                                   )
            Plaintiff,       )
5                                   )
        vs.                  )  Case No.
6                            ) 2:24-cv-04979 SVW
    COUNTY OF LOS ANGELES, COUNTY     ) (JCx)
7    OF LOS ANGELES SHERIFF'S       )
    DEPARTMENT, LOS ANGELES COUNTY    )
8    BOARD OF SUPERVISORS, COUNTY     )
    EQUITY OVERSIGHT PANEL, LOS     )
9    ANGELES COUNTY OFFICE OF        )
    INSPECTOR GENERAL, CONSTANCE      )
10   KOMOROSKI, MERCEDES CRUZ,        )
    ROBERTA YANG, LAURA LECRIVAIN,   )
11    SERGIO V. ESCOBEDO, RON         )
    KOPPERUD, ROBERT G. LUNA,       )
12   MAX-GUSTAF HUNTSMAN, ESTHER      )
    LIM, and DOES 1 to 100,          )
13   inclusive,                      )
                                     )
14              Defendants.      )
    _____ )
15

16

17

18

19

20

21         Deposition of ANN DEVANE, taken on behalf of

22   Plaintiff, with all parties appearing remotely, beginning

23   at 10:05 a.m. and ending at 3:24 p.m. Pacific time, on

24   Thursday, March 6, 2025, before VESNA WALTER, Certified

25   Shorthand Reporter No. 11989.

DEVANE, ANN                                                      Page 3

1           APPEARANCES (All parties appearing remotely)

2
     For the Plaintiff:
3
             SHEGERIAN & ASSOCIATES, INC.
4             By:  ALEX DiBONA
                 NEIL NABAVI
5            Attorneys at Law
             11520 San Vicente Boulevard
6             Los Angeles, California  90049
             (310) 860-0770
7             Adibona@shegerianlaw.com

8    For the Defendants:

9            MILLER BARONDESS, LLP
              By:  JASON H. TOKORO
10               STEVEN WILLIAMSON
             Attorneys at Law
11            2121 Avenue of the Stars
             Suite 2600
12            Los Angeles, California  90067
             (310) 552-4400
13            Jtokoro@millerbarondess.com

14   ALSO PRESENT:

15           ALEX VILLANUEVA

16

17

18

19

20

21

22

23

24

25

DEVANE, ANN                                          Page 22

1    conduct such investigation?

2        A    I don't understand your question.

3        Q    It's fair.  I'll rephrase it.

4            But do you understand what I mean by "best

5    practices"?

6        A    Not in the respect of investigations.

7        Q    All right.  Are there specific procedures that

8    you believe should be followed in every investigation as

9    an internal affairs investigator with policy of equality?

10       A    There are set procedures for the investigators,

11   but it's not -- it's not, like, a handwritten document.

12       Q    And what are those set procedures?

13       A    To conduct their investigations, to do fair and

14   impartial investigations, to document what was said

15   during the investigations, to transcribe the interviews

16   and put the casebook together in a specific order once

17   the investigation is complete.

18       Q    Being fair and impartial, would that be another

19   way of saying it's important the investigators be free of

20   bias?

21       A    Yes.

22       Q    And when you say to document, does that mean the

23   steps of the investigation should be written down or

24   memorialized?

25       A    Yes.



1    employee would make the personnel jacket unavailable, to

2    your knowledge?

3        A    Yes.  I believe, when you are no longer an

4    employee, the personnel jacket is -- it's not accessible

5    to department employees any longer.

6        Q    Is it the same thing for the training record?

7    Is that generally kept in the personnel jacket?

8        A    Yes.

9        Q    And by the way, you're using the term "personnel

10   jacket" colloquially.  Would that be the personnel file

11   or is it something else?

12       A    I'm sorry.  I'm using jargon.  It's a file

13   folder with all the paperwork during your employment.

14       Q    And it says here you stacked the case and

15   submitted it to IAB Captain Kopperud for review on

16   September 26, 2023; is that right?

17       A    That's correct.

18       Q    And is this your handwriting under October 2nd,

19   2023?

20       A    No.

21       Q    Do you know whose handwriting it is?

22       A    That is Ron Kopperud.

23       Q    And are you able to read what it says?

24       A    It says "review approved."

25       Q    And so Captain Kopperud, he reviewed --

DEVANE, ANN                                                    Page 100

1   according to this investigator log, he reviewed and

2   approved what you did October 2nd, 2023; is that fair?

3       A    That's what's written on the form, yes.

4       Q    Have you had a chance -- and I'm happy to put it

5   back up if you need me to.  But having had a chance to

6   look at this investigator's log, do you believe there are

7   any steps you took with -- related to the paperwork on

8   the IAB investigation with respect to Max Huntsman that

9   for whatever reason are not documented on the

10  investigator's log?

11      A    No.  I didn't take any other steps in paperwork.

12      Q    I'm sending Exhibit 14 through the chat.

13          MR. TOKORO:  Alex, given that you're moving on

14  to the next topic and it's clear we're not going to

15  finish in the next 30 to 60 minutes, I think makes sense

16  to take a lunch break now so we can come back at 1:00.

17          MR. DiBONA:  Off the record just for a moment.

18          (Lunch recess.)

19  BY MR. DiBONA:

20      Q    Lieutenant Devane, do you understand you're

21  still under oath?

22      A    Yes.

23      Q    And is there any reason you can't continue to

24  give your best testimony?

25      A    No.

DEVANE, ANN                                                    Page 166

1   potential violations were?

2      A    No.  I don't recall anything else.

3      Q    And what else -- and excuse me.

4          How did the hearing end?

5      A    The panel recommended that they conclude the

6   investigation as founded, and due to the fact that they

7   are not able to give any discipline to, one, Sheriff

8   Villanueva not being an employee, and two being the fact

9   that he was an elected official, that's what they

10  recommended, to put the "do not rehire" on his employee

11  personnel file.

12     Q    And by the way, how do they do that?  Do they

13  just announce that orally?  Is it something in writing?

14     A    It's oral.  It's done via kind of how -- what

15  we're doing it.  We -- the three of us sat in a

16  conference room, and then the CEOP panel members are in

17  remote locations on the screen, and all three of them are

18  on the screen that are visible to us.

19     Q    Is that done through Webex?

20     A    Yes.

21     Q    And after the panel gave their recommendation,

22  what, if anything, occurred after that?

23     A    Chief Lecrivain concurred.  And I went through

24  the list of charges to determine if they were stating

25  founded or unfounded, and then the hearing concluded.

DEVANE, ANN                                        Page 167

1     Q    Did Chief Lecrivain -- did she explain why she

2    concurred?

3     A    No.

4     Q    Did you have any role in concurring?

5     A    No.

6     Q    Did you ever -- as part of your work with the

7    IAB investigations, did you ever form the opinion that

8    Sheriff Alex Villanueva violated the policy of equality

9    with respect to harassment and discrimination as to Max

10   Huntsman?

11        MR. TOKORO:  I'm just going to make the

12   objection that her opinion is not relevant and that she

13   wasn't the decision-maker or involved with any

14   recommendations.

15        But you can answer give your answer.

16        THE WITNESS:  Yeah.  I had nothing to do with

17   the -- anything to do with the violations, if they were

18   founded or unfounded.

19   BY MR. DiBONA:

20    Q    And did you ever form an opinion one way or the

21   other if Sheriff Alex Villanueva violated the policy of

22   equality with respect to harassment, discrimination, or

23   retaliation with respect to Esther Lim?

24        MR. TOKORO:  Same objections.  Not relevant.

25        But you can answer.

DEVANE, ANN                                                    Page 181

1    internal affairs bureau or any employee in the sheriff's

2    department.

3        Q    I don't have any further questions.

4            Sorry.  Before I say that -- excuse me.

5    Lieutenant Devane, as you sit here today, do you believe

6    any part of your testimony needs to be changed?

7        A    No.

8            MR. DiBONA:  I don't have any further questions.

9            Do you, Counsel?

10            MR. TOKORO:  I do.

11            Are we okay to just continue on, Ms. Walter?

12            (Reporter clarification.)

13                        EXAMINATION

14    BY MR. TOKORO:

15        Q    Lieutenant Devane, I'd like to follow up on some

16    of the questions you were being asked earlier.  And I do

17    want to separate the two investigations.

18            So the first investigation I'd like to talk

19    about is the investigation into complaints made by

20    Mr. Huntsman.  Do you know what I'm referring to?

21        A    Yes.

22        Q    Okay.  Did Sheriff -- from the time that you

23    took over the investigation as the policy-of-equality

24    lieutenant for IAB until -- throughout the time that the

25    CEOP hearing happened, did Sheriff Luna have any

DEVANE, ANN                                                        Page 182

1    involvement with your tasks as part of that

2    investigation?

3    A    No.

4    Q    Did you ever have a conversation with Sheriff

5    Luna about the Huntsman investigation?

6    A    No.

7    Q    Now, I also want to ask you, did Sheriff Luna

8    attend the pre-briefing?

9    A    No.

10    Q    Did Sheriff Luna attend the CEOP briefing on the

11    Huntsman complaint?

12    A    The briefing, no.

13    Q    Did Sheriff Luna concur -- well, let me take

14    that back.

15        You said that Chief Lecrivain is the one who

16    concurred in the CEOP's recommendations; correct?

17    A    That's correct.

18    Q    Okay.  From the time that you took over the

19    Huntsman investigation in July of 2023, did the board of

20    supervisors have any involvement whatsoever in the

21    investigation?

22    A    With me, no.

23    Q    Did any member of the board of supervisors

24    attend the CEOP pre-briefing?

25    A    No.

DEVANE, ANN                                                    Page 183

1    Q    Did any member of the board of supervisors

2    attend the CEOP briefing?

3    A    Are you -- are you meaning the hearing or the

4    briefing?

5    Q    The hearing.

6    A    The hearing, no.

7    Q    Did any member of the board of supervisors

8    direct you in any way on how to conduct the part of the

9    investigation that you handled?

10   A    No.

11   Q    Now, you were asked a number of questions about

12   county counsel and Eduardo Montelongo, and I just want to

13   make sure the record is clear on this.  At any point in

14   time from when you took over the Huntsman investigation

15   in July of 2023, did anyone from county counsel

16   communicate with you about that investigation?

17   A    No.

18   Q    Did Eduardo Montelongo communicate with you at

19   all about the investigation?

20   A    No.

21   Q    The memo that you had looked at, the report from

22   Sanders Roberts, that was part of the stacked case file

23   that you put together for the CEOP; correct?

24   A    Yes.

25   Q    Okay.  Now, with respect to the investigation

DEVANE, ANN                                                    Page 184

1    done by Sanders Roberts into Ms. Lim's complaints, did

2    Sheriff Luna have any involvement in that from the time

3    that you took over that investigation in July of 2023?

4        A    With me, no.

5        Q    And again, he didn't attend the CEOP

6    pre-briefing or hearing; is that right?

7        A    No.

8            MR. DiBONA:  Objection.  Form.

9    BY MR. TOKORO:

10       Q    You can answer.

11       A    No.  He did not -- Sheriff Luna did not attend

12    the pre-briefing or the hearing.

13       Q    Did any member of the board of supervisors have

14    any involvement in the Lim investigation after you took

15    it over in July of 2023?

16       A    No.

17       Q    Did any member of the board of supervisors

18    attend the CEOP pre-briefing?

19       A    No.

20       Q    Did any member of the board of supervisors

21    attend the CEOP hearing?

22       A    No.

23       Q    Now, I'm going to ask you the same questions as

24    to county counsel.

25            Did any the member of county counsel have any

DEVANE, ANN                                          Page 185

1    involvement, to your knowledge, in the Lim investigation

2    after you took it over in July of 2023?

3        A    No.

4        Q    Did any member of county counsel attend the

5    pre-briefing, to your knowledge?

6        A    No.

7        Q    Did any member of county counsel attend the CEOP

8    hearing?

9        A    No.

10       Q    Okay.  Now, Mr. Villanueva has claimed in this

11   case -- it's in his complaint and his amended

12   complaint -- that the Huntsman and Lim investigations

13   were concluded in July of 2022 and the department

14   determined there was no misconduct.  I want to separate

15   the two investigations now.

16            Is it true to say that the Huntsman

17   investigation concluded in July of 2022?

18       A    That's incorrect.

19       Q    Is it true to say that the Lim investigation

20   concluded in July of 2022?

21       A    That's incorrect.

22       Q    In fact, didn't Sanders Roberts conduct

23   interviews through August of 2022?

24            MR. DiBONA:  Objection.  Leading, form.

25            THE WITNESS:  Based on the documentation listed

DEVANE, ANN                                                                     Page 186

1    on the investigator's log stating how the investigation

2    was proceeding, it was still proceeding through 2023.

3    BY MR. TOKORO:

4        Q    In fact, your understanding when you took the

5    file over -- let's separate that.

6            When you took over the Huntsman investigation in

7    July of 2023, was it your understanding that that

8    investigation was still ongoing?

9        A    Yes.

10       Q    And had been ongoing since the department

11   started it in June of 2022?

12       A    Yes.  That's correct.

13       Q    Would you say the same for the Lim

14   investigation, that the Lim investigation, when you took

15   it over in July of 2023, was still ongoing?

16       A    Yes.

17       Q    And, in fact, that investigation didn't conclude

18   until the CEOP heard -- or had its hearing on

19   October 17th of 2023; is that right?

20       A    That's correct.

21       Q    And the same goes for the Huntsman

22   investigation.  It did not conclude until the CEOP

23   meeting in October of 2023; is that right?

24       A    Yes.

25       Q    So when Mr. Villanueva claims that the

DEVANE, ANN                                                    Page 187

1   investigations both concluded in July of 2022 with no

2   determination of misconduct, that's not accurate, is it?

3        MR. DiBONA:  Objection.  Form, leading.

4        THE WITNESS:  In July of 2022, the case was

5   still actively being investigated.

6   BY MR. TOKORO:

7     Q    Now, in your involvement -- and I want to

8   separate these.  Your involvement in the Huntsman

9   investigation, did you ever see anything in the file that

10   would indicate the department had determined that there

11   was no misconduct or no policy-of-equality violations by

12   Mr. Villanueva?

13    A    I did not see any documentation that stated

14   that.

15    Q    And in your involvement in the Lim investigation

16   after you took it over in July of 2023, did you see any

17   indication at all in the file that the department had

18   previously determined that there was no policy-of-

19   equality violations by Mr. Villanueva?

20    A    Relating to that case, no, I did not see

21   anything that stated that.

22    Q    Now, Mr. Villanueva was recently deposed in this

23   case, and he took the position that policy-of-equality

24   complaints could be decided by the department without

25   first being presented to the CEOP.  Is that true?

DEVANE, ANN                                                    Page 188

1          MR. DiBONA:  Objection.  Form, leading.

2          THE WITNESS:  No.  Cases cannot be -- policy-of-

3    equality violations that turn into an internal affairs

4    investigation, which is a Level A case, cannot be

5    concluded unless -- by anyone in the department.  It has

6    to be heard at the CEOP hearings.

7    BY MR. TOKORO:

8      Q    Okay.  So the Huntsman investigation, was that a

9    Level A investigation?

10     A    Yes.

11     Q    The Lim investigation, was that a Level A

12   investigation?

13     A    Yes.

14     Q    So the department had determined that the

15   Huntsman complaint needed to be the subject of an

16   administrative investigation; is that correct?

17     A    That's correct.

18         MR. DiBONA:  Objection.  Leading.

19   BY MR. TOKORO:

20     Q    And that's what Sanders Roberts was retained to

21   do.  Is that your understanding?

22         MR. DiBONA:  Objection.  Leading.

23         THE WITNESS:  I know that Sanders Roberts were

24   the investigators to do the internal affairs

25   investigation for a Level A case regarding a policy-

1   of-equality violation.

2   BY MR. TOKORO:

3      Q    And so the department had also determined that

4   the complaint filed with Ms. Lim -- by Ms. Lim also

5   needed to be subject to an administrative investigation;

6   is that accurate?

7      A    Yes.

8          MR. DiBONA:  Objection.  Leading.

9   BY MR. TOKORO:

10     Q    And so given the fact that the Huntsman

11   investigation was given a Level A notation, is it your

12   understanding that the only way that that could get

13   resolved was when it was presented to the CEOP?

14     A    That's correct.

15     Q    So do you understand -- could that investigation

16   have been decided by the department on its own?

17     A    No.

18     Q    And would the same go for the Lim investigation,

19   meaning in order to conclude the Lim investigation, did

20   it need to be presented to the CEOP?

21         MR. DiBONA:  You can't hear them either, can

22   you?

23         MR. TOKORO:  No.  Our internet got kicked off.

24   It's okay.  I will ask the question again and we can -- I

25   don't know what happened.  Both of our cameras turned

DEVANE, ANN                                                    Page 190

1   off.

2   BY MR. TOKORO:

3       Q    So speaking with respect to the Lim

4   investigation, given that it was given a Level A

5   notation, does that mean it needed to be presented to the

6   CEOP in order to be determined?

7       A    Yes.  The investigation to be concluded had to

8   be presented to the CEOP.

9       Q    Could the department decide the complaint on its

10  own?

11      A    No.

12      Q    You were asked a question earlier by Mr. DiBona

13  about whether you were aware of Mr. Villanueva running

14  for a board seat in 2023.  Do you recall that question?

15      A    Yes.

16      Q    Now, Mr. Villanueva has claimed in this case

17  that the department -- well, that the placement of the

18  "do not rehire" notation on his file was in retaliation

19  for or to hinder his campaign to run for the board, and

20  so I want to ask you some questions about that.

21          Given that you didn't know he was running for

22  the board, did any of the steps you undertook have

23  anything to do with him running for board supervisor?

24          MR. DiBONA:  Objection.  Leading, form.

25          THE WITNESS:  No.  I did not know he was running

DEVANE, ANN                                                    Page 191

1   for the board of supervisors, and that had nothing to do

2   with any of my actions.

3   BY MR. TOKORO:

4       Q    Did anyone tell you, "We need to get this case

5   before the CEOP because Mr. Villanueva is running for the

6   board"?

7       A    No.

8       Q    Was it your understanding that anything that had

9   to do with the "do not rehire" notation had anything to

10   do with Mr. Villanueva running for the board of

11   supervisors?

12      A    No.  I had no information on that.

13          MR. TOKORO:  No further questions.  Thank you.

14          MR. DiBONA:  Just a couple follow-ups.

15          So, Lieutenant Devane, what was Sanders Roberts

16   retained to do in this case?

17          THE WITNESS:  Sanders Roberts were listed as

18   investigators of this policy-of-equality investigation.

19          MR. DiBONA:  And other than that they were

20   listed, do you know who retained them?

21          THE WITNESS:  No.

22          MR. DiBONA:  Do you know why they were retained?

23          THE WITNESS:  No.

24          MR. DiBONA:  No further questions.

25          So unless you have any follow-up on that, I

DEVANE, ANN                                                Page 193

```
 1              DECLARATION UNDER PENALTY OF PERJURY
 2              I, ANN DEVANE, hereby certify under penalty of
 3      perjury under the laws of the State of California that
 4      the foregoing is true and correct.
 5
 6
 7              Executed this  17  day of  MARCH  , 2025, at
 8      INDUSTRY       ,    CALIFORNIA                      .
 9        (City)                      (State)
10
11                        _____
12                            ANN DEVANE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 08 - Page 194

DEVANE, ANN                                                          Page 194

```
 1              I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken before

 4    me at the time and date herein set forth; that any

 5    witnesses in the foregoing proceedings, prior to

 6    testifying, were duly sworn; that a record of the

 7    proceedings was made by me using machine shorthand, which

 8    was thereafter transcribed under my direction; that the

 9    foregoing transcript is a true record of the testimony

10    given.

11              Further, that if the foregoing pertains to the

12    original transcript of a deposition in a federal case,

13    before completion of the proceedings, review of the

14    transcript [XX] was [ ] was not requested.

15

16              I further certify I am neither financially

17    interested in the action nor a relative or employee of

18    any attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

22    Dated: March 17, 2025

23              _____

24              Vesna Walter
                RPR, CCRR, CSR No. 11989
25
```

# EXHIBIT 9

EXHIBIT 09 - Page 196

CERTIFIED COPY



1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

MAX HUNTSMAN

March 07, 2025

John Fahrenwald, CSR No. 14369, RPR, Job No. 6383

EXHIBIT 09 - Page 197

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALEX VILLANUEVA,            )
                                 ) Case No.: 2:24-cv-04979 SVW (JCx)
 5              Plaintiff,       )
                                 )
 6   vs.                         )
                                 )
 7   COUNTY OF LOS ANGELES,      )
     COUNTY OF LOS ANGELES       )
 8   SHERIFF'S DEPARTMENT, LOS   )
     ANGELES COUNTY BOARD OF     )
 9   SUPERVISORS, COUNTY EQUITY  )
     OVERSIGHT PANEL, LOS        )
10   ANGELES COUNTY OFFICE OF    )
     INSPECTOR GENERAL,          )
11   CONSTANCE KOMOROSKI,        )
     MERCEDES CRUZ, ROBERTA      )
12   YANG, LAURA LECRIVAIN,      )
     SERGIO V. ESCOBEDO, RON     )
13   KOPPERUD, ROBERT G. LUNA,   )
     MAX-GUSTAF HUNTSMAN,        )
14   ESTHER LIM, and DOES 1 to   )
     100, inclusive,             )
15                               ) (Pages 1-192)
                Defendants.      )
16   _____)

17

18             VIDEOCONFERENCE DEPOSITION OF

19                     MAX HUNTSMAN

20             Friday, March 7th, 2025

21                   10:02 a.m. PT

22

23

24      Reported by: John Fahrenwald,  CA CSR 14369, RPR

25      _____
```

EXHIBIT 09 - Page 198

```
 1                  UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALEX VILLANUEVA,              )
                                   ) Case No.: 2:24-cv-04979 SVW (JCx)
 5              Plaintiff,         )
                                   )
 6   vs.                           )
                                   )
 7   COUNTY OF LOS ANGELES,        )
     COUNTY OF LOS ANGELES         )
 8   SHERIFF'S DEPARTMENT, LOS     )
     ANGELES COUNTY BOARD OF       )
 9   SUPERVISORS, COUNTY EQUITY    )
     OVERSIGHT PANEL, LOS          )
10   ANGELES COUNTY OFFICE OF      )
     INSPECTOR GENERAL,            )
11   CONSTANCE KOMOROSKI,          )
     MERCEDES CRUZ, ROBERTA        )
12   YANG, LAURA LECRIVAIN,        )
     SERGIO V. ESCOBEDO, RON       )
13   KOPPERUD, ROBERT G. LUNA,     )
     MAX-GUSTAF HUNTSMAN,          )
14   ESTHER LIM, and DOES 1 to     )
     100, inclusive,               )
15                                 )
                Defendants.        )
16   _____)

17

18

19

20           Videoconference Deposition of Deponent MAX

21   HUNTSMAN, deponent, taken on behalf of the Plaintiff,

22   commencing at 10:02 a.m., PT, March 7, 2025, before Reporter

23   John Fahrenwald, Certified Shorthand Reporter for the State

24   of California, CSR No. 14369, RPR.

25
```

**EXHIBIT 09 - Page 199**

HUNTSMAN, MAX                                             Page 3

```
 1    APPEARANCES:

 2
      FOR THE PLAINTIFF:
 3
                 BY: ALEX DIBONA, ESQ.
 4                   SHEGERIAN & ASSOCIATES, INC.
                     11520 San Vicente Boulevard
 5                   Los Angeles, California 90049
                     Telephone Number: (310) 860 0770
 6                   Facsimile Number: (310) 860 0771
                     ADiBona@shegerianlaw.com
 7

 8
      FOR THE DEFENDANT:
 9
                 BY: JASON H. TOKORO, ESQ.
10                   STEVEN G. WILLIAMSON, ESQ.
                     MILLER BARONDESS, LLP
11                   2121 Avenue of the Stars, Suite 2600
                     Los Angeles, California 90067
12                   jtokoro@millerbarondess.com

13

14

15    Also Present:  Mr. Villanueva

16

17

18

19

20

21

22

23

24

25
```

HUNTSMAN, MAX                                        Page 47

1        Q.    (BY MR. DIBONA:) Other than your belief that the

2    criminal investigation was announced to follow through on

3    the threat, do you believe Sheriff Villanueva followed up on

4    that threat in any other way?

5        A.    Oh, yes, repeatedly for years.

6        Q.    How do you believe he followed up?

7        A.    Well, I can't -- sitting here, I cannot remember

8    all the things that he did in the time that he was sheriff.

9    But he constantly threatened publicly to release information

10   about me both in terms of the criminal investigation that he

11   was then going to present to the authorities to get me

12   prosecuted -- so that was an ongoing threat very

13   specifically to me in order to suppress my discharge of my

14   duties -- and he would then also publicly make comments

15   about it, which I took as an ongoing threat myself.

16            He expanded it out to other people, including

17   Diana Teran, Sheila Kuehl; Patti Giggans, who was the chair

18   of the Civilian Oversight Commission; Mary Wickham, Sachi

19   Hamai.  He accused her of conflict of interest when one of

20   the elements of the crime was completely missing and

21   submitted that to the attorney general's office for

22   prosecution as well.

23            So there was a whole series of conduct that was --

24   had the effect of chilling oversight during his time as

25   sheriff.  And then ultimately there is the subject matter of

1   this lawsuit when he started to use a name that I don't use

2   anymore for reasons that were not altogether clear at first

3   but later became clear when he accused me of being a

4   Holocaust denier as well as publicly disclosing my CPOE

5   report against him.

6            That was sort of the main aspect of it.  There's a

7   lot of details to all that stuff that happened over the many

8   years that I, one, can't remember sitting here.  You'd have

9   to dig up documents if you wanted to have a detailed

10  understanding of it.  And, two, I'm not aware of all of it

11  because a lot of other parties were involved.  But that was

12  sort of the arc of it.

13      Q.   And is it fair to say that you believe, as a

14  general matter, Sheriff Villanueva attempted to obstruct

15  oversight of your office?

16      A.   Yes.  And he committed extortion.

17      Q.   And is it your testimony that the legal -- that --

18  excuse me.  Is it -- strike that.

19           Do you, by the way, believe that legally it's

20  completely clear what you have authority to access as a

21  inspector general?

22      A.   Well, that's a complicated question.  Do I believe

23  it?  Yes, I believe the law is clear.  And there are words

24  in the law that, you read them, and they say what they mean

25  and it's very clear.

**EXHIBIT 09 - Page 202**

```
 1              MR. TOKORO:  Absolutely.
 2              (A break was taken from 1:04 p.m. to 1:41 p.m.)
 3         Q.  (BY MR. DIBONA:) Mr. Huntsman, do you understand
 4     you're still under oath?
 5         A.  Yes.
 6         Q.  Is there any reason you can't continue to give
 7     your best testimony?
 8         A.  No.
 9         Q.  At some point in time, did you become aware that
10     Sheriff Alex Villanueva was referring to you as Max-Gustaf?
11         A.  Yes.
12         Q.  How did you become aware of that?
13         A.  I don't recall.
14         Q.  And do you recall all the forums in which he
15     referred to you as Max-Gustaf?
16         A.  No.
17         Q.  And did you decide to file a complaint with anyone
18     at the County relating to him calling you Max-Gustaf?
19         A.  I was required by County rules to do so.
20         Q.  And I might know this, but why do you believe you
21     were required by County rules to do so?
22         A.  County's policy of equity requires supervisors to
23     report incidents of discrimination.  And so in this case, as
24     a supervisor, I had to do it.
25         Q.  And who did you make the complaint to?
```

EXHIBIT 09 - Page 203

HUNTSMAN, MAX                                          Page 134

```
 1        A.   I don't recall, but I assume I sent an email to
 2   Vickey Bane or her office.
 3        Q.   And who is Vickey Bane, to your understanding?
 4        A.   She runs the CPOE intake unit.
 5        Q.   Do you still have a copy of that email?
 6        A.   I don't, but the County email server might.  I
 7   assume it's in the investigative record.
 8        Q.   Why did you believe it was an act of
 9   discrimination for him to refer to you as Max-Gustaf?
10        A.   Because I didn't use that name.  He'd never used
11   that name to refer to me.  And suddenly he started focusing
12   on it and using it repeatedly, even after it was pointed out
13   to him that it wasn't my name.  And he stuck with it.
14             So it was pretty clear, based on his prior
15   behavior in which he had threatened me and had attempted to
16   convince everybody I was a criminal, that he was in some way
17   continuing to target me.  And since he was using a name that
18   is German, that's national origin based.  So that's why I
19   had to report it.
20        Q.   And who do you believe pointed out to him --
21   sorry.
22             Did you ever point out to Sheriff Villanueva that
23   that's not your name?
24        A.   I don't know that I did or I didn't.  I don't
25   recall.
```

HUNTSMAN, MAX                                    Page 140

```
 1   year you sent that email?
 2        A.    No.
 3        Q.    And was Sheriff Villanueva -- he was still the
 4   sheriff at the time you sent the email.  Correct?
 5        A.    Yes.  Because he told the LA Times about the
 6   complaint, which was confidential, and then accused me of
 7   being a Holocaust denier and made some statements about that
 8   to the LA Times board seeking their endorsement for
 9   re-election, I assume that it was some time in the months
10   running up to the election.
11        Q.    And that would have been the second time Sheriff
12   Villanueva ran for office, in 2022; is that right?
13        A.    Re-election.  But I don't remember the year.  2022
14   sounds right, but I'd have to do the math in my head, and
15   all you'd know is whether or not the math in my head is
16   doing well or not.
17        Q.    And do you recall who from the sheriff's office
18   called you?
19        A.    Not as I sit here, no.  I provided the emails.
20        Q.    Did you take any notes during that call with that
21   person from the sheriff's department?
22        A.    I don't think so.
23        Q.    And what do you recall that person asking you, if
24   anything?
25        A.    Just asking about what happened, asking, you know,
```

**EXHIBIT 09 - Page 205**

```
 1   know.
 2        Q.   Prior to you sending Ms. Bane the email that was a
 3   complaint about Sheriff Villanueva, did you discuss the fact
 4   you were going to file that complaint with anyone?
 5        A.   I don't know -- I don't remember necessarily
 6   discussing that I was going to file the complaint with
 7   anyone.  I certainly discussed what Villanueva was doing
 8   with my colleagues, but I don't remember if I said, And I'm
 9   going to file a complaint.
10             I might have.  I mean, I'm a manager and I have
11   fellow managers that work with me and have an obligation, so
12   I might have told the other managers I'm going to file this
13   so they wouldn't have to.  I don't know.  I don't remember.
14        Q.   Do you remember telling anyone at county counsel,
15   I'm going to file this complaint?
16        A.   I don't recall that.
17        Q.   Do you recall telling any member of the Board of
18   Supervisors, I'm going to file this complaint?
19        A.   I don't recall that, and that seems unlikely.
20        Q.   Do you recall telling any member of the Board of
21   Supervisors' staff you were going to file the complaint?
22        A.   I had some conversations with Esther Lim, who was
23   also being targeted by Villanueva, and so we consoled each
24   other a bit.  It's possible in those exchanges that I might
25   have said I'm going to file a complaint about it.  I don't
```

**EXHIBIT 09 - Page 206**

HUNTSMAN, MAX                                          Page 155

```
 1   difficulty with that, you can let me know.  It will just
 2   take a second.  I'm sorry for the delay.
 3              All right.  I've sent it through the chat, and
 4   I'll try to share my screen.
 5              Do you see a document on your screen, sir?
 6        A.   I do.
 7        Q.   For the record, that's COLA001976, and it goes to
 8   2012.
 9              Have you ever seen this document before, sir?
10        A.   I don't know.  It has my name on it, and it has
11   the name Herrera, so it might be a transcript of questions
12   asked by the second investigator we were talking about.
13        Q.   One moment.  Do you recall -- I'm just going to
14   take it off screen for a second.
15              Do you -- even if you haven't seen this
16   transcript, you recall speaking to her; is that right?
17        A.   Yes.  And I'm not saying I haven't seen the
18   transcript.  I don't recall.
19        Q.   And to the best of your recollection, is what you
20   said to Christine Diaz-Herrera accurate?
21        A.   In that transcript that I saw for two seconds?  I
22   have no idea.
23        Q.   No, no.  Just to be clear --
24        A.   Oh.  When I was speaking to her, was I trying to
25   tell the truth?  Yes, yes.
```

*Express Deposition Services - Scheduling @expressdeposition.com*
*(888)286-4264*

EXHIBIT 09 - Page 207

HUNTSMAN, MAX                                              Page 156

```
 1      Q.   Yes, that was it.

 2      A.   I thought you were talking about the transcript.

 3      Q.   I understand you didn't prepare the transcript, so

 4   that was just my question.  When you were speaking to her,

 5   you were trying to tell the truth; is that fair?

 6      A.   I was trying to tell the truth.

 7      Q.   And as you sit here today, you don't believe that

 8   anything you said to her was not the truth; is that fair?

 9      A.   I have no idea.  It certainly wouldn't have been

10   intentionally not the truth.  But whether or not I got

11   something wrong, it was a long time ago, and I don't

12   remember.

13      Q.   Do you see here -- do you see on your screen I

14   have COLA002000?  ^on 002079 of Ex. 1, the investigative

15   report, I found what he's quoting, but 002000 is not part of

16   Ex. 1; I assume he misspoke as to the page number^ Do you

17   see what I have here on the screen?

18      A.   I do.  It's a little small for me, so if you could

19   zoom in a tiny bit, I'd sure appreciate it.

20           Oh, wonderful.  I see it.

21      Q.   All right.  Do you see -- just for the record

22   here, I have a part of the transcript that reads, "It might

23   be if he had presented me as an Aryan, but he didn't, you

24   know.  So that's why, when he first did it, my take on it

25   was he was trying to imply I was Jewish, and that would be
```

```
 1   what I was -- that's what I thought he was doing.  I may not
 2   have been correct about that, but that's just how I took it.
 3   And so that's the way I took it.  What I think was really
 4   going on -- I mean, again, it's, being a foreigner, I think
 5   is the main thing.  So you're right, if white supremacists
 6   really cared about, you know, true Nazism, then none of them
 7   would qualify because most of us here in America are not the
 8   Aryans that the Third Reich was obsessed with.  But that's
 9   not how we look at the world."
10           Do you see that on the screen?
11       A.   Yes.
12       Q.   Do you recall saying that during your interview
13   with Ms. Diaz-Herrera?
14       A.   I recall discussing the subject, and that looks
15   consistent with what I would have said.  But I don't
16   specifically recall.
17       Q.   I'm going to find another portion.
18           While I'm doing that, sir, just to go back to
19   something, you said at some point in time you came to
20   believe that Sheriff Villanueva -- he painted you as a
21   Holocaust denier.  He made those statements.  Correct?
22       A.   He did, yes.
23       Q.   And you also said, correct me if I'm wrong, he
24   took actions that led you to believe that he was catering to
25   supporters that might be anti-Semitic?
```

**EXHIBIT 09 - Page 209**

HUNTSMAN, MAX                                    Page 187

1    your testimony needs to be changed for whatever reason?

2         A.    No.

3               MR. DIBONA:  I don't have any further questions.

4               Do you, Counsel?

5               MR. TOKORO:  I do.

6               I just have a handful of questions for you,

7    Mr. Huntsman.

8                         EXAMINATION

9               BY MR. TOKORO:

10        Q.    You were asked about a number of ballot measures,

11   the County's vaccine mandate, and Fulgent, so I want to

12   follow up on that.

13              Mr. Villanueva has claimed in this case that the

14   investigation into your complaint was in retaliation for the

15   position he took on Ballot Measure R.

16              Did Ballot Measure R have any influence or part of

17   motivation behind you filing your complaint for the POE

18   violations you alleged?

19        A.    No.

20              MR. DIBONA:  Objection.

21        Q.    (BY MR. TOKORO:) Did Ballot Measure A have any

22   influence, motivation, any tie to the POE complaint that you

23   filed against him?

24              MR. DIBONA:  Objection.  Form.

25              THE WITNESS:  No.

```
 1        Q.   (BY MR. TOKORO:) Did Mr. Villanueva's opposition
 2   to Ballot Measure J have anything to do with the POE
 3   complaint that you filed against him?
 4             MR. DIBONA:  Objection.  Form.
 5             THE WITNESS:  No.
 6        Q.   (BY MR. TOKORO:) Did Mr. Villanueva's refusal to
 7   enforce the County vaccine mandate as to the department have
 8   anything to do with you filing your POE complaint against
 9   him?
10        A.   No.
11        Q.   Did Mr. Villanueva's opposition to the County's
12   contract with Fulgent have anything to do with the complaint
13   that you filed with the department for his alleged POE
14   violations?
15        A.   No.  Although I will quibble with the term
16   "complaint."  I filed a report, as I was required to do as a
17   supervisor.  I don't like the term "complaint" because it
18   implies that I'm asking the County to do something, and I
19   was legally required to provide that information to the
20   County.
21        Q.   So just to get a clear record, did
22   Mr. Villanueva's opposition to the Fulgent contract have
23   anything to do with you making your POE report against him?
24        A.   None.  Nothing.
25        Q.   Mr. Villanueva has also claimed that the
```

EXHIBIT 09 - Page 211

```
 1   investigation into your complaint and the eventual "do not
 2   rehire" placed on his file was to hinder his campaign for
 3   election to become a board supervisor.
 4           Is there any truth to that, at least to your
 5   knowledge?
 6       A.   Not to my knowledge.
```

```
 7            MR. TOKORO:  Okay.  No other questions.  Thank
 8   you, Mr. Huntsman.
 9            MR. DIBONA:  I don't have any follow-up to that.
10            MR. TOKORO:  Great.  I think we can go off the
11   record.
12            MR. DIBONA:  Yeah.
13            COURT REPORTER:  Would you like a copy,
14   Mr. Tokoro?
15            MR. TOKORO:  Yes. A copy for review can be sent to
16   my office.  Our office will order one copy of the transcript
17   for our files.
18            (Deposition concluded at 3:09 p.m.)
19                          --0o0--
20
21
22
23
24
25
```

**EXHIBIT 09 - Page 212**

```
 1                   C E R T I F I C A T E

 2              I, the undersigned, a Certified Shorthand Reporter

 3   of the State of California, do hereby certify:

 4              That the foregoing proceedings were taken before

 5   me via videoconferencing at the time and place herein set

 6   forth; that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a verbatim record

 8   of the proceedings was made by me using machine shorthand

 9   which was thereafter transcribed under my direction; that

10   the foregoing transcript is a true record of the testimony

11   given.

12              Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings, review of the

15   transcript was requested.

16              I further certify I am neither financially

17   interested in the action nor a relative or employee of any

18   attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date subscribed my

20   name.

21   Dated:  March 17, 2025

22

23                         JOHN FAHRENWALD
                           CA CSR 14369
24

25
```

**EXHIBIT 09 - Page 213**

# EXHIBIT 10

EXHIBIT 10 - Page 214

CERTIFIED COPY

In the Matter Of:

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

ROBERTA YANG

March 10, 2025

Job No. 6946

EXHIBIT 10 - Page 215

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   ALEX VILLANUEVA,              ) Case No.
                                  ) 2:24-cv-04979 SVW
5            Plaintiff,           ) (JCx)
                                  )
6       vs.                       )
                                  )
7   COUNTY OF LOS ANGELES, COUNTY OF   )
    LOS ANGELES SHERIFF'S DEPARTMENT,  )
8   LOS ANGELES COUNTY BOARD OF        )
    SUPERVISORS, COUNTY EQUITY         )
9   OVERSIGHT PANEL, LOS ANGELES       )
    COUNTY OFFICE OF INSPECTOR GENERAL, )
10  CONSTANCE KOMOROSKI, MERCEDES CRUZ, )
    ROBERTA YANG, LAURA LECRIVAIN,      )
11  SERGIO V. ESCOBEDO, RON KOPPERUD,   )
    ROBERT G. LUNA, MAS-GUSTAF HUNTSMAN,)
12  ESTHER LIM, and DOES 1 to          )
    100, inclusive,                     )
13                                     )
             Defendants.               )
14  _____)

15

16

17          DEPOSITION OF ROBERTA YANG, taken on behalf of

18  Plaintiff, via Zoom video conference, beginning at

19  10:05 a.m., March 10, 2025 before WENDY L. GRAVES, RPR,

20  Certified Shorthand Reporter No. 6138.

21

22

23

24

25

**EXHIBIT 10 - Page 216**

YANG, ROBERTA                                                    Page 2

```
 1            A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3      SHEGERIAN & ASSOCIATES LLP
         BY:  ALEX DiBONA, ESQ.
 4       11520 San Vicente Boulevard
         Los Angeles, California 90049
 5       (310) 860-0770
         ADiBona@shegerianlaw.com
 6

 7   FOR DEFENDANTS:

 8      MILLER BARONDESS, LLP
         BY:  JASON H. TOKORO, ESQ.
 9          STEVEN G. WILLIAMSON, ESQ.
         2121 Avenue of the Stars, Suite 2600
10       Los Angeles, California 90067
         Jtokoro@millerbarondess.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

YANG, ROBERTA                                                        Page 11

1  names.

2      Q.  All right.  What is your understanding, what

3  broadly speaking, what is the County Equity Oversight

4  Panel?

5      A.  The County Equity Oversight Panel is a branch

6  within the County Board of Supervisors' office, and we,

7  a group now of 10 attorneys, we were formerly nine for

8  the first few years after I was appointed, but we

9  recently became 10.

10        We sit on a rotating randomized basis to review

11  equity disciplinary recommendations coming through the

12  county departments for a number of reasons.

13        So we review investigations and only make

14  recommendations that the departmental management can

15  consider.

16      Q.  Separate and apart from your work with the

17  County Equity Oversight Panel, are you currently

18  employed?

19      A.  Yes.

20      Q.  Who are you currently employed by?

21      A.  I have my own law corporation.

22      Q.  How long, broadly speaking, have you had your

23  own law corporation?

24      A.  Well, all time in practice has been about 40

25  plus years, and in California since 1988.

YANG, ROBERTA                                                                Page 38

1  recollection of that?

2     A.  No.  No.

3     Q.  Did you say anything at the hearing itself?

4     A.  I don't recall.

5     Q.  Do you recall anything that was said during the

6  hearing?

7     A.  No.

8     Q.  Do you recall the outcome of the hearing?

9     A.  Not really, but the panel only makes a

10 recommendation, so we don't get involved with what the

11 department does with it.

12     Q.  Do you have an understanding of what your

13 recommendation was?

14     A.  On the merits, I recall at the time of the

15 hearing that the subject was no longer an employee of

16 the Sheriff's Department, correct.

17     Q.  Do you have an understanding if there was any

18 recommendation separate and apart -- excuse me, strike

19 that.

20        Do you have any recollection of any

21 recommendation the panel made to the Sheriff's

22 Department?

23     A.  Yes.  Well, because the individual was no longer

24 an employee of the Sheriff's Department, obviously, we

25 didn't make a disciplinary recommendation, correct.

YANG, ROBERTA                                              Page 39

1      Q.  What, if any, recommendation did you make if

2   there was no disciplinary recommendation?

3      A.  We simply asked that the file be flagged given

4   the issues that were involved, which were substantial.

5      Q.  What do you mean by "the file be flagged"?

6      A.  From time to time, the panel will recommend that

7   a file -- that a do not rehire flag be noted in the

8   file.

9      Q.  Was there a recommendation that Sheriff

10  Villanueva had a do not rehire notation put in his

11  personnel file?

12     A.  It's whatever file they have.  I don't know if

13  it's the personnel file per se.  But correct, the panel

14  made a recommendation that a flag be placed in the file.

15     Q.  It may have been in your previous answer.  Why

16  was there a recommendation for a do not rehire notation

17  with respect to Sheriff Villanueva?

18     A.  It would have been based on what we reviewed.

19     Q.  Do you have -- sorry.  Just to be clear.  Is it

20  your understanding the do not rehire recommendation came

21  from the fact he was no longer an employee of the

22  Sheriff's Department?

23        MR. TOKORO:  Objection.  Misstates her testimony

24  that she gave just now, that the recommendation was

25  based upon what was reviewed and not simply because he

YANG, ROBERTA                                                    Page 40

1  was no longer at the department.

2         But if you can answer the question, go ahead.

3         THE WITNESS:  No.

4         MR. DiBONA:  Q.  And do you recall one way or

5  the other if the Sheriff's Department agreed with the

6  recommendation that a do not rehire notation be placed

7  in the file?

8      A.  I do not recall.

9      Q.  You don't remember what, if any -- I'm sorry.

10  Just to be clear.

11        Do you remember representatives from the

12  Sheriff's Department being there?

13     A.  Yes.

14     Q.  Do you recall anything representatives from the

15  Sheriff's Department said during the panel hearing?

16     A.  No.

17     Q.  Do you recall at the CEOP hearing are charges,

18  is the nomenclature for them, founded, unfounded or

19  unresolved?

20     A.  Correct.  I refer to them as allegations.  I

21  don't call them charges, myself, but maybe others do.

22        Correct, those are the three options for

23  recommendations from the panel, correct.

24     Q.  Do you recall what allegations against Sheriff

25  Villanueva were recommended as founded?

1      A.  I don't recall seeing this version.  I am

2   certainly familiar with the policy of equality, but I

3   don't remember seeing it before this way.

4      Q.  Okay.  Do you have a recollection that as a

5   member of the CEOP you came to the opinion that Sheriff

6   Villanueva subjected Max Huntsman to discrimination on

7   the basis of race or national origin?

8          MR. TOKORO:  Objection.  Vague and ambiguous as

9   to what you mean by "opinion," and also vague and

10  ambiguous as to whether you were referring to Ms. Yang

11  individually or CEOP as a whole.

12         MR. DiBONA:  Q.  You may answer.

13     A.  I don't recall.  The record should be clear what

14  the panel's actions were.

15     Q.  As you sit here today, do you have a

16  recollection of the CEOP panel finding that Sheriff

17  Villanueva engaged in an act of discrimination with

18  respect to Max Huntsman's race or national origin?

19     A.  I don't specifically recall, other than the flag

20  on the file.  But if you could show me the record of

21  what our recommendations were, I could confirm or not.

22     Q.  All right.  And just to be clear, as you sit

23  here today, do you have a recollection as to why the

24  CEOP recommended Sheriff Villanueva have a do not rehire

25  notation in his file?

EXHIBIT 10 - Page 222

YANG, ROBERTA                                                    Page 58

1      A.  It would have been based on the totality of the

2   evidence as it was developed in the investigation, yes.

3      Q.  All right.  And do you have an understanding of

4   what I showed you starting at page 1 of this report all

5   the way to page 85 is the evidence collected in the

6   investigation with respect to Max Huntsman?

7      A.  I don't know if I can answer that question.  The

8   document that I see a partial salmon colored paper on my

9   screen purports to be a Sheriff's Department document.

10        I looked at the investigation report, as well.

11  So that's not here.

12     Q.  Okay.  So just to be clear, there is an

13  investigation report that you looked at with respect to

14  Sheriff Villanueva that's not here, not contained in

15  this document; is that fair?

16     A.  I think that's fair.

17     Q.  Do you -- as you sit here today, do you recall

18  what, in your words, the totality of the evidence was

19  with respect to Mr. Huntsman and Sheriff Villanueva's

20  harassment of him on the basis of race or national

21  origin?

22     A.  There may have been also a couple of other

23  allegations.  But whatever they were, it would have all

24  been referenced in the investigation report that we were

25  provided to review.

YANG, ROBERTA                                                     Page 59

1      Q.  Okay.  And let me just go down for a second

2  here.  This document entitled Investigative Summary, is

3  this the investigative report that you are referring to?

4      A.  Yes, it looks like it.  Uh-huh.

5      Q.  All right.  So what about -- and so do you as

6  you sit here today, do you recall what about this report

7  led you to believe that Max Huntsman was discriminated

8  against on the basis of his race or national origin?

9      A.  Again, there may have been other allegations,

10  but I would have to refer you to the totality of the

11  report itself, yes.

12      Q.  And I understand that.  As you sit here today,

13  can you tell me what the totality of the report says?

14      A.  Well, I'm happy to go through it with you.

15      Q.  Just to be clear, you as you sit here today, you

16  don't even have -- you can't actually me a general

17  understanding of what the totality of the report says;

18  is that fair?

19          MR. TOKORO:  Objection.  Misstates her prior

20  testimony.  She has answered this question repeatedly.

21  If you'd like her to go through specifics she's offered

22  to do so if you want to show her the document and walk

23  through it with her.

24          And also, I'm just going to remind you that

25  Ms. Yang is not here testifying as the 30(b)(6) witness.

YANG, ROBERTA                                                    Page 103

1  look -- okay.  It says Esther Lim is the complainant.

2       So we know that the Esther Lim case ends 8101.

3  Okay.  Thank you.

4       Q.  Let me just put back up Exhibit 8.  Do you see

5  on this document there is a file number that also ends

6  in 8101?

7       A.  You are correct.

8       Q.  All right.  One moment.  Let me just --

9  something is popping up on my screen.  I'm just going to

10  get rid of that real quick.

11      Just what we've done, you don't see a name but

12  based on the file number we just looked at you see it's

13  referenced to Esther Lim, correct?

14      A.  Correct.

15      Q.  All right.  And you see here in reference to

16  Esther Lim there was a charge founded policy of a

17  equality discrimination based on gender and ethnicity?

18      A.  Correct.

19      Q.  And based on the previous exhibit we looked at,

20  which is Exhibit 7, why did you believe that it was more

21  likely than not Sheriff Villanueva engaged in a

22  violation of this policy with respect to Esther Lim?

23      A.  I'd have to refer you to the report.

24      Q.  I understand that, but that's the report we just

25  looked at, so the report you have read at least three

YANG, ROBERTA                                                    Page 104

1  times, can you tell me why you believe the charge should

2  be founded?

3      A.  Well, I think it's for several reasons, but I

4  wouldn't want to give you an incomplete answer.  So

5  comments about women, comments about ethnicity, women of

6  color, those kinds of things.

7      Q.  Just to be clear, when say comments about women

8  of color, do you mean La Malinche?

9      A.  Part of it, yes, but it's the entire context.

10 So, yeah, I would just refer you back to the report.

11     Q.  And the policy of equality relating to sexual

12 harassment, the charge was unfounded in that case,

13 correct?

14     A.  Correct.

15     Q.  Do you recall the basis on which the charge was

16 unfounded?

17     A.  Again, I would have to refer you to the context

18 in the report.  But, obviously, there was nothing that

19 was substantiated for that.

20     Q.  And for policy of equality discriminatory

21 harassment based on gender and ethnicity you see here a

22 charge founded?

23     A.  Yes, I do.

24     Q.  Why do you -- excuse me.

25         Based on the report, can you tell me why you

YANG, ROBERTA                                                    Page 105

1  believe the charge should be founded related to a

2  violation of the policy of equality for discriminatory

3  harassment based on gender and ethnicity?

4      A.  Well, I think a similar answer for the first

5  policy of equality allegation is listed up above.  So

6  same answer.

7      Q.  For policy of equality third person harassment

8  based on gender and ethnicity, do you see here a charge

9  founded?

10      A.  Yes, I do.

11      Q.  Can you tell me why you believed that this

12  charge should be founded?

13      A.  The same answer as for the first allegation.

14      Q.  And for policy of equality, inappropriate

15  conduct towards others based on gender and ethnicity you

16  see here charge founded?

17      A.  Correct.

18      Q.  Can you tell me why you believe this charge

19  should be founded?

20      A.  Uh-hum.  The same response as to the first

21  allegation.

22      Q.  And for policy of equality, retaliation based on

23  gender and ethnicity, do you see here the charge

24  founded?

25      A.  Yes, I do.

YANG, ROBERTA                                                Page 106

1    Q.  Why do you believe the charge should have been

2  founded based on retaliation?

3    A.  The same response as to allegation number one.

4    Q.  And what in the report, to your recollection,

5  references a retaliatory act?

6    A.  There were any number of retaliatory acts.  One

7  I can think of, but it's not limited to just one, so I

8  would hate to give an incomplete answer.  So that's why

9  I want to rely on the totality of what's in the report.

10    Q.  What is the one you can think of?

11    A.  I don't -- I need to look at the report, I

12  think.

13    Q.  Let me just bring that up again.

14    A.  Right.  Is there a way for me to page through

15  it?

16    Q.  If you want time to print out and to page

17  through it, that's perfectly fine.  Do you need time to

18  do that?

19        MR. TOKORO:  Alex, if you can actually give her

20  control of the document on Zoom, she can page up and

21  down on it.  I can walk you through it if you don't know

22  how.

23        MR. DiBONA:  You can tell me the button.  I'm

24  happy to do it for this circumstance.

25        MR. TOKORO:  I'm not sure what you mean by "this

YANG, ROBERTA                                                                Page 110

1  any information as to why the investigation was

2  conducted.  Ms. Lim only knows that they went through

3  her social media accounts.  Sheriff Villanueva wrote

4  Ms. Lim's boss, Supervisor Solis, and tried to use what

5  Ms. Lim wrote in personal social media accounts to get

6  her terminated in 2021 and 2022.  Ms. Lim did not

7  believe she violated any county policy with her social

8  media posts.  However, she decided that she would no

9  longer use her personal social media accounts or

10  Twitter.  Ms. Lim knows there are other deputies with

11  social media accounts.  Sheriff Villanueva complained

12  that Ms. Lim was not fired and asked why the supervisors

13  did not discipline her."

14        Did I read that correctly?

15        A.  Well, supervisors, singular, not plural.  But

16  yes, in general, yes.

17        Q.  So having had a chance to read what's in the

18  letter, what basis is there to connect this to her

19  gender or ethnicity?

20        A.  No, your question was about retaliation.  That's

21  the allegation.

22        Q.  Yes, and the charge founded, if we to go

23  Exhibit 8 is retaliation based on gender and ethnicity.

24        A.  Right.  So again looking at the totality of the

25  evidence that was developed, there was also plenty to

YANG, ROBERTA                                                    Page 111

1  say as to why he targeted her.  She was Asian.  She --

2  as I understand it, these were social media accounts

3  that were personal.  They weren't even related to her

4  job with the county.

5        So, yeah, that's one example from the report of

6  several others.

7     Q.  I understand that.  Sticking with this one, why

8  do you believe there was a reference he sent this letter

9  because she was Asian?

10     A.  Yes.  It was part of his targeting of her is

11  what she said.

12        MR. TOKORO:  Objection.  Asked and answered, and

13  it also says it in the first sentence of what you read

14  to her.  So it misstates -- well, I will leave my

15  objection there.

16        MR. DiBONA:  Q.  You may answer, Ms. Yang.

17     A.  I don't have anything to add.

18     Q.  Over the objection, there wasn't an answer.

19     A.  Well, I would direct you to the two paragraphs

20  you just read to me, the first one starting off,

21  "According to Miss Lim, Sheriff Villanueva targeted her

22  like he had targeted other Asian women," and this was an

23  example.

24     Q.  So just to be clear, you believe what Ms. Lim

25  says is true; that's fair to say?

YANG, ROBERTA                                                              Page 112

1      A.  I believed it to be true in the context of the

2  totality of the investigation, true.

3      Q.  Do you recall any evidence that Ms. Lim had that

4  says she was targeted because she was Asian?

5      A.  Yes, I do.

6      Q.  What was that?

7      A.  The other evidence was there was some other

8  county executive that was also targeted, and so it

9  wasn't just Miss Lim by herself.  That's what I recall.

10     Q.  Yeah, the county executive was a criminal

11  investigation was opened against her, correct?

12     A.  It's whatever the report says about it.

13     Q.  One moment.  Pull that up here.  One moment.

14  Sorry.  I am going to put this back on.

15         All right.  Do you see here under History of

16  Intimidation of Women of Color?

17     A.  Right.

18     Q.  There is a reference:  He also harassed the

19  former -- former County CEO, excuse me, who was also a

20  minority woman.  Did I read that correctly?

21     A.  Yes.  In fact, I'm so glad you pointed out this

22  paragraph, because I think this is the answer to your

23  question, it comes right out of the board itself is this

24  paragraph.

25     Q.  So just to be clear, you believe that opening up

YANG, ROBERTA                                                                    Page 121

1  terminology.

2          You once again, Alex, referred to notification

3  instead of notation.  I'm just making sure the record is

4  clear on that.  You are welcome to leave the question as

5  is or reask it.  It's up to you.

6          MR. DiBONA:  I don't know if I did or not, but

7  just to be clear.

8          Q.  What circumstances is it appropriate to use the

9  do not rehire notification in the context of the CEOP?

10         A.  Number one, it is only a notation.  Number two,

11  it simply what I call a flag.  That the file may need

12  additional review in the event the individual who was

13  the subject of the file desires to seek reemployment

14  with the same department.  It's not something unique to

15  the Sheriff's Department, no.

16         Q.  Is it your testimony, by the way, that the do

17  not rehire notation does not mean do not rehire this

18  person?

19         A.  Correct.

20         Q.  Has that been a tool in the toolbox since 2018,

21  when you came on the CEOP, to your knowledge?

22         A.  Yes.

23         Q.  Without telling me details of who, prior to Alex

24  Villanueva, had you been on panels that recommended a do

25  not retire notation?

1  but I am certainly going to mull over it.

2        MR. DiBONA:  Apologies.  I don't have any

3  further questions, but your counsel might, Miss Yang.

4        MR. TOKORO:  I do.  I have a few follow-up

5  questions.  Wendy, are we okay just continuing.

6        (Discussion off the record.).

7              EXAMINATION BY MR. TOKORO

8        MR. TOKORO:  Q.  Ms. Yang, you were asked some

9  questions about who attended the CEOP prehearing and

10  hearing in this matter by Mr. DiBona.  Do you recall

11  that?

12     A.  Yes.

13     Q.  Has any member of the Board of Supervisors ever

14  attended a CEOP hearing during the time you have been on

15  the panel?

16     A.  No.  Not even a prehearing.  No part of it.

17     Q.  Has any Sheriff of Los Angeles County attended

18  any CEOP prehearing or hearing during the time you have

19  been on the panel?

20     A.  No.

21     Q.  Now, in this case, Mr. Villanueva has claimed

22  that the do not rehire notation was given to him in part

23  in retaliation for positions he took publicly on certain

24  things before the board.

25        I want to ask you about those.

1          Mr. Villanueva has claimed that his public

2    statements about Measure A were part of the reasoning

3    behind the do not rehire notation.  Are you aware of

4    Mr. Villanueva's public statements about Measure A?

5      A.  No, and I don't even know what Measure A is.

6      Q.  Did Measure A have anything to do with the

7    CEOP's recommendation or your recommendation that

8    Mr. Villanueva be given a do not rehire notation?

9      A.  No.

10     Q.  Now, did Measure J -- let me restart that.

11         Are you aware of any public statements made by

12   Mr. Villanueva about Measure J?

13     A.  No.

14     Q.  Did Measure J have anything to do with the

15   recommendation by the CEOP to give Mr. Villanueva a do

16   not rehire notation?

17     A.  I don't know what Measure J is.  No.

18     Q.  Do you know, have you ever heard any public

19   statements made by Mr. Villanueva about Measure R?

20     A.  No.

21     Q.  Did Measure R have anything to do with your --

22   with the panel's recommendation to give Mr. Villanueva a

23   do not rehire notation?

24     A.  No, and I don't know what Measure R is.

25     Q.  Are you aware of any public statements regarding

2        Are you aware of any public statement by

3  Mr. Villanueva regarding the county's vaccine mandate

4  during the Covid pandemic?

5     A.  No.

6     Q.  Did Mr. Villanueva's position on vaccine

7  mandates have anything to do with the panel's

8  recommendation to issue, to give him a do not hire

9  notation?

10    A.  No.

11    Q.  Are you aware of Mr. Villanueva's public

12  statements regarding the county's contract with Cogent

13  regarding Covid testing?

14    A.  No.

15    Q.  Did the county contract -- did Mr. Villanueva's

16  position regarding the Cogent contract have anything to

17  do with the panel's recommendation that he be given the

18  do not hire notation?

19    A.  No.  And I also don't even know what his

20  position regarding that name is.

21    Q.  Now, Mr. Villanueva has also claimed in this

22  case that the panel's recommendation that he be given a

23  do not rehire notation related to the fact that he was

24  running for a seat with the Board of Supervisors.

25        When the pre -- I want to ask you.  When the

YANG, ROBERTA                                                        Page 131

1   briefing, sorry.

2         When the CEOP hearing happened in October of

3   2023, were you aware that Mr. Villanueva was running for

4   the Board of Supervisors?

5       A.  No.

6       Q.  Did Mr. Villanueva running for the Board of

7   Supervisors have anything to do with the panel's

8   recommendation that he be given a do not rehire

9   notation?

10      A.  No, and I didn't even know he was running for

11  the Board of Supervisors.

12      Q.  Now, I want to change topics.

13        Mr. DiBona asked you a question about whether

14  the do not hire notation is appropriate for former

15  employees or a consideration when it comes to former

16  employees of the county.  Do you recall that?

17      A.  Yes.

18      Q.  Now, in what situation would you say the do not

19  hire notation is, as you said, a tool available to the

20  panel?

21      A.  Well, I think it can apply to a couple

22  situations.  I mean, one, after I thought about it after

23  he asked the question.  The panel has from time to time

24  recommended termination or discharge of current

25  employees.

YANG, ROBERTA                                                    Page 132

1        In those situations the panel may consider a do

2  not hire flag on that personnel file just to be sure

3  among hundreds of files that are reviewed by human

4  resources departments throughout the county that there

5  is some history there that's worth looking at.  That's

6  all it really means.

7      Q.  So in that circumstance, since the person hasn't

8  been terminated, is the person a current employee

9  because they haven't been terminated; is that correct?

10     A.  That's correct.

11     Q.  And is the do not rehire also a tool that can be

12  used for former county employees like Mr. Villanueva?

13     A.  Yes.

14     Q.  Now, you were asked a number of questions by

15  Mr. DiBona about whether the CEOP panel makes

16  credibility determinations regarding witnesses.  Do you

17  recall that?

18     A.  Yes.

19     Q.  I think you said you would have to look at it in

20  the totality of the report of what was contained in the

21  report.  Is that fair?

22     A.  Correct.

23     Q.  Now, when you are looking at the credibility of

24  a witness, in addition to having it set forth in the

25  report, would you also look at whether there were

YANG, ROBERTA

1            I have read the foregoing deposition

2   transcript and by signing hereafter, subject to

3   any changes I have made, approve same.

4

5   Dated   March 26, 2025

6

7

8                        Roberta M. V

                         _____
9                        (Signature of Deponent)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 10 - Page 238

```
 1  STATE OF CALIFORNIA      )

 2  COUNTY OF LOS ANGELES    )

 3            I, WENDY L. GRAVES, CSR, hereby certify that the

 4  witness in the foregoing deposition named ROBERTA YANG

 5  was by me duly sworn to tell the truth, the whole truth,

 6  and nothing but the truth in the within-entitled cause;

 7  that said deposition was taken at the time and place

 8  therein stated; that the testimony of said witness was

 9  reported by me in shorthand writing and was thereafter

10  transcribed by computer under my direction; that the

11  foregoing is a full, complete, and true record of said

12  testimony; and that the witness was given an opportunity

13  to read and correct said deposition and to subscribe the

14  same.

15            I further certify that I am not of counsel or

16  attorney for any of the parties in the foregoing

17  deposition or in any way interested in the outcome of

18  the cause named in said caption.

19            IN WITNESS WHEREOF, I have hereunto set my hand

20  this 18th day of March, 2025.

21

22                      Wendy Graves

23                      _____

24                      WENDY L. GRAVES, CSR NO. 6138

25                      STATE OF CALIFORNIA
```

```
1                    Deponent's Correction Sheet

2    To add testimony, indicate "Add" and print the exact
     words you wish to add.  To delete testimony, indicate
3    "Delete" and print the exact words you wish to delete.

4    Deposition of:    ROBERTA YANG
     Deposition Date:  March 10, 2025
5
     I, ROBERTA YANG, have the following changes to my
6    deposition transcript:

7

8    PAGE    LINE         CHANGE (Add/Delete)
9     34  ,  23 ,  Delete  " a  parent "
10    34  ,  23 ,  Add     " an apparent "
11   Exh 2, Label(son) Delete " Wang "
12   Exh 2, label    Add    " Yang "
13     /     /
14     /     /
15     /     /
16     /     /
17     /     /
18     /     /
19     /     /
20     /     /
21     /     /
22     /     /
23                       Roberta M. V , 3-26-25
24
                         ROBERTA YANG        Date
25
```

EXHIBIT 10 - Page 240

# EXHIBIT 11

EXHIBIT 11 - Page 241

CERTIFIED COPY



**Express Deposition Services**

*by* EXPRESSNETWORK

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

### ESTHER LIM

March 21, 2025

Shannon D. Denney, CSR No. 10385, Job No. 6454

EXHIBIT 11 - Page 242

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 ) No: 2:24-cv-04979
                                    )      SVW (JCx)
COUNTY OF LOS ANGELES, COUNTY OF    )
LOS ANGELES SHERIFFS DEPARTMENT,    )
LOS ANGELES COUNTY BOARD OF         )
SUPERVISORS, COUNTY EQUITY          )
OVERSIGHT PANEL, LOS ANGELES COUNTY )
OFFICE OF INSPECTOR GENERAL,        )
CONSTANCE KOMOROSKI, MERCEDES CRUZ, )
ROBERTA YANG, LAURA LECRIVAIN,      )
SERGIO V. ESCOBEDO, RON KOPPERUD,   )
ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN )
ESTHER LIM, and DOES 1 to 100,      )
inclusive,                          )
                                    )
            Defendants.             )
_____)


DEPOSITION OF:  ESTHER LIM


March 21, 2025


REPORTED BY: SHANNON D. DENNEY, CSR No. 10385

EXHIBIT 11 - Page 243

LIM, ESTHER                                          Page 2

```
 1                        APPEARANCES

 2

 3    For the Plaintiff:

 4         SHEGERIAN & ASSOCIATES, INC.
           BY:  ALEX DIBONA, ESQ.
 5         aDiBona@shegerianlaw.com
           11520 San Vicente Boulevard
 6         Los Angeles, CA  90049

 7

 8    For the Defendants:

 9         MILLER BARONDESS, LLP
           BY:   JASON H. TOKORO, ESQ.
10             STEVEN WILLIAMSON, ESQ.
           jtokoro@millerbarondess.com
11         2121 Avenue of the Stars, Suite 2600
           Los Angeles, CA  90067
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LIM, ESTHER                                                      Page 149

```
 1        Q.   Apart from acknowledging it, did she ever
 2   send any other response?
 3        A.   I don't recall.
 4        Q.   By the way, did you feel the need to tell Ms.
 5   Chen you put a lot of thought into this, even before
 6   the March 4th letter to Supervisor Solis?
 7        A.   I was conveying to my supervisor, out of
 8   courtesy, that I was filing this, but also why.
 9        Q.   I'm going to send Exhibit 7 through the chat.
10             I'm sorry, one moment.
11             Do you see a document on your screen, Ms.
12   Lim?
13        A.   Yes, I do.
14        Q.   Exhibit 7 is COLA02614 to 2618.
15             And again -- excuse me.
16             Is this a confirmation of the complaint you
17   filed with the County Equity Oversight Panel against
18   Sheriff Villanueva on or about March 8, 2022?
19        A.   Yes.
20        Q.   And did you have an understanding, when
21   filling out this complaint, it was important for you to
22   be truthful?
23        A.   Yes.
24        Q.   And did you have an understanding, when
25   filling out this complaint, it was -- it was important
```

```
 1    the time you were interviewed, to your knowledge, did

 2    the CPOE take any action on your complaint, that you're

 3    aware of?

 4         A.   I do not know.  I know -- I don't know.

 5         Q.   At some point in time -- do you know the name

 6    Christina Diaz-Herrera?

 7         A.   Yes.  I believe she interviewed me in

 8    response to my CPOE complaint.

 9         Q.   Prior to Ms. Diaz-Herrera interviewing you,

10    had you ever had any interactions with her?

11         A.   I don't believe so.

12         Q.   And at the time Ms. Diaz-Herrera interviewed

13    you, did you have an understanding she worked for the

14    law firm of Sanders Roberts?

15         A.   Yes.  I believe she shared that that's where

16    she worked.

17         Q.   And prior to your interview with Ms.

18    Diaz-Herrera, had you ever had any interaction with

19    anybody at Sanders Roberts?

20         A.   Not that I recall.

21         Q.   And when you were interviewed, how were you

22    interviewed, did you go in person, was it over Zoom?

23         A.   I believe it was either over zoom or over a

24    phone call.

25         Q.   And to your understanding, was it recorded?
```

**EXHIBIT 11 - Page 246**

LIM, ESTHER                                                          Page 197

1    or suspicion Sheriff Villanueva had to open a criminal

2    investigation on the former CEO?

3            MR. TOKORO:  Objection.  Document speaks for

4    itself.

5            It also misstates her prior testimony when

6    she said, sitting here today she doesn't recall all the

7    details of it.  She referenced COC report she was

8    familiar with at the time.

9            But otherwise, you can answer.

10           THE WITNESS:  Mr. DiBona, I don't know the

11   specifics.

12           And I shared, I did say that I had read

13   documents, whether it was from the Sheriff's Civilian

14   Oversight Commission, or the Office of Inspector

15   General.  I had referenced the investigation into

16   former CEO Sachi Hamai.

17       Q.   MR. DiBONA:  By the way, what motions did you

18   draft around sheriff accountability?

19       A.   I do not have a complete list of all the

20   motions I have written.

21           But as referenced in my CPOE complaint, one

22   of them is around providing further protection against

23   surviving families of law enforcement harassment, and

24   intimidation.

25       Q.   By the way, as far as you know, did you say

LIM, ESTHER                                                    Page 198

1    anything untruthful to Ms. Diaz-Herrera?

2         A.   No.

3         Q.   If I go down just COLA 002175.

4              Have you seen this document before?

5              MR. TOKORO:  Caution you not to disclose any

6    communication you had in connection with us sending you

7    the pleadings, and other materials in connection with

8    this case.

9              But you can otherwise answer these questions.

10             THE WITNESS:  Mr. DiBona, can you scroll

11   down, please?

12        Q.   MR. DiBONA:  Yes.

13        A.   Do you mind if you keep scrolling?  I just

14   need see the full document.

15        Q.   Just if you need me to keep scrolling down,

16   at any point, just let me know.  I'm happy to keep

17   doing it.  If of you need me stop or go back, that's

18   fine.

19        A.   Yes.  I think this is my CPOE.

20        Q.   And so --

21        A.   I don't know if this is my CPOE complaint, or

22   not.  Just doesn't look familiar.

23        Q.   Sorry to ask this.

24             But is your date of birth July 30th, 1981?

25        A.   Yes.

1    question, yes.  Yes, 40 is a larger number than 20.

2              But in reference of Mr. Villanueva's comments

3    about degrading me, and calling me a woke 25 year old,

4    or 20 year old, then it was a very offensive.

5        Q.   MR. DiBONA:  And by the way, what's your

6    understanding of the term "woke?"

7        A.   It depends on the context, Mr. DiBona.

8              So the context which Mr. Villanueva was

9    using, when he was sheriff, it was used as

10   pejorative.

11       Q.   And other than it's pejorative in the context

12   Sheriff Villanueva was using it, what was your

13   understanding of what he was trying to say?

14             MR. TOKORO:  Objection.  Vague and ambiguous.

15             I'm not sure you can answer that question,

16   other than the pejorative.  But otherwise, you can

17   answer the question.

18             THE WITNESS:  I don't believe that Sheriff

19   Villanueva was utilizing the label as "woke" as a

20   friendly term when referencing it to me, and the other

21   justice deputy.

22       Q.   MR. DiBONA:  My question wasn't -- there may

23   not be another answer to this, but that's -- that's

24   still why I'll asking.

25             Other than that it was pejorative, do you

EXHIBIT 11 - Page 249

LIM, ESTHER                                                    Page 201

```
 1   have any opinion about what Sheriff Villanueva was
 2   saying when he referred to you that way?
 3       A.   I took it to be offensive that the reasons
 4   for our motions were based upon either feelings, or
 5   values outside of holding the Sheriff's and the Sheriff
 6   Department accountable for his conduct.
```

```
 7       Q.   And did you ever hear Sheriff Villanueva give
 8   a definition of "woke?"
 9       A.   I have not heard every single Facebook live,
10   or seen every single Facebook live, or Instagram lives
11   or any or all Mr. Villanueva's documents or statements.
12   So I do not know if he has defined "woke."
13       Q.   Did you, by the way, after you were
14   interviewed by Ms. Diaz-Herrera, were you ever informed
15   of any other steps of the investigation?
16            MR. TOKORO:  Object.
17            Again, that calls for you to not disclose any
18   communications you had with your counsel.
19            If you're referring to prior to litigation,
20   if you want to define it in a period of time, I think
21   that might be --
22       Q.   MR. DiBONA:  Yeah.  I don't think that was my
23   question.  But fair enough.  Let me just define.
24            Prior to any conversations you may or may not
25   have had with counsel regarding this lawsuit, were you
```

```
 1   now part of my role as a justice deputy -- I was saying
 2   that my tweets are not part of my role as a justice
 3   deputy.
 4        Q.   So the tweets that you were sending, were you
 5   sending that in your capacity as just a resident of the
 6   county?
 7             MR. DiBONA:  Objection.  Form.
 8             THE WITNESS:  Yes.  As a private citizen.
 9        Q.   MR. TOKORO:  And you been using your private
10   Twitter account, is that correct, or your personal
11   Twitter account?
12        A.   Yes.  I was using my personal Twitter
13   account.
14        Q.   Now Mr. DiBona asked you some questions about
15   whether Mr. Villanueva has ever referred to you on
16   specifically in any of his Facebook live streams.
17             Do you recall that?
18        A.   Yes, I do.
19        Q.   Are you aware that Mr. Villanueva has in fact
20   referred to you specifically in Facebook live streams,
21   even since this lawsuit was filed?
22             MR. DiBONA:  Objection.  Form.
23             THE WITNESS:  Yes.  I am actually aware that
24   he -- that Mr. Villanueva still continues to talk about
25   me on his Facebook lives.
```

**EXHIBIT 11 - Page 251**

1          Q.    MR. TOKORO:  In fact, are you aware that on

2    September 25 of 2024, Mr. Villanueva said, apparently,

3    there's another debate set to happen, and we have some

4    news.  We just learned today Esther Lim the, I guess

5    disgruntled former employee, or deputy of Supervisor

6    Hilda Solis.  She left that office and she's found a

7    soft landing with George Gascon, working directly under

8    Tiffiny Blackwell -- Blacknell.

9               Are you aware of these statements?

10              MR. DiBONA:  Objection.  Form.

11              THE WITNESS:  Yes.  I am.

12         Q.    MR. TOKORO:  And how did you find out about

13   them?

14         A.    I found out about them because a friend told

15   me that Mr. Villanueva was still talking about me on

16   his Facebook lives.

17         Q.    And what was your reaction when you heard

18   that he was still talking about you on his Facebook

19   lives?

20         A.    I think it just shows the pattern of

21   Mr. Villanueva's attempt to again, threaten, harass,

22   intimidate, demean me, not just when I was a justice

23   deputy, but continues to do that.

24              And in fact, this one was particularly -- I

25   would say particularly difficult.

**EXHIBIT 11 - Page 252**

```
 1        Q.   Why would you say it's particularly
 2   difficult?
 3        A.   I would say that because as soon as this
 4   Facebook live happened, a couple days after when
 5   Mr. Villanueva shared that I was at the DA's office, my
 6   house was actually burgled.  In a place that I have
 7   lived for several years.
 8             And I had also learned that another colleague
 9   of mine, her car was vandalized, along with a DA Gascon
10   sign that was also vandalized.
11             And so as I had shared in my earlier
12   testimony, that these are -- that I feel very
13   threatened, and continue to feel threatened because
14   Mr. Villanueva continues to talk about me.  So this
15   particular one was difficult, because of what happened
16   shortly thereafter.
17        Q.   When you heard about these statements, did
18   you have any concern that again, Mr. Villanueva was
19   coming after you, and your employment with the
20   county?
21             MR. DiBONA:  Objection.  Form.
22             THE WITNESS:  Yes.  Yes, I did.
23        Q.   MR. TOKORO:  Much like you did he sent the
24   letters to Supervisor Solis correct?
25             MR. DiBONA:  Objection.  Form.
```

**EXHIBIT 11 - Page 253**

```
1              THE WITNESS:  Correct.  He not only sent
2    those two letters to Supervisor Solis, as well as
3    justice deputy.  But again.  You know, as soon as I
4    start a new employment, with a new employer, District
5    Attorney George Gascon, he then goes back on his
6    Facebook live and again, tries to demean me, and
7    attacks my credibility.
8              And again, you know, I think I already shared
9    this was particular difficult because how it impacted
10   my personal life, but the personal, and professional
11   life.
12        Q.   MR. TOKORO:  Are you aware that, much like
13   Mr. DiBona today, in the same Facebook live from
14   September 25 of 2024 that Mr. Villanueva, repeatedly
15   referred to you as not being a lawyer?
16              MR. DiBONA:  Objection.  Form.
17              THE WITNESS:  Yes.
18        Q.   MR. TOKORO:  In fact, are you aware that he
19   says, now, the weird thing is they created a job just
20   for her.  She's not a lawyer.  Okay.  She's not a
21   lawyer.  What is she doing there?  I have no idea.  In
22   fact, taxpayers should be able to have an answer to
23   that.  Maybe Mr. Gascon can explain what exactly is Ms.
24   Lim doing in your office, and why do this in secret.
25   How come no one else was able to apply to this job.  It
```

**EXHIBIT 11 - Page 254**

```
 1   is quite possible that Mr. Gascon is using her as a
 2   connection to the far-left, ultra-progressive crowd as
 3   she favors and communicates with.
 4           Are you aware of that?
 5   A.    Yes.
 6           MR. DiBONA:  Objection.  Form.
 7           THE WITNESS:  Yes, I am.
 8   Q.    MR. TOKORO:  And when you heard that he had
 9   been making these statements about you, what was your
10   reaction?
11   A.    Again, I think this is Mr. -- I feel like
12   this is the way Mr. Villanueva continues to try to
13   demean me, continues to attack my credibility,
14   continues to attack my experiences, and my expertise in
15   the justice forum space by making these -- by making
16   these type comments, and will demean my employer.
17   Q.    Are you also aware that Mr. Villanueva went
18   on to, again, saying, she is not an attorney.  And
19   typically, every job that goes to the DA particularly
20   along those lines, they're all attorneys.  And she is
21   not one?
22           MR. DiBONA:  Objection to form.
23           I'm sorry.
24           Objection to form.
25   Q.    MR. TOKORO:  I'm still reading, Alex.
```

**EXHIBIT 11 - Page 255**

LIM, ESTHER                                                    Page 248

```
 1                 And she's not one.  So how does she land this
 2       special job that no one else had the right to apply
 3       for?  What were her special skills that merit she
 4       should be the only person to get this job?
 5                 MR. DiBONA:  Objection.  Form.
 6            Q.   MR. TOKORO:  Are you aware that he made those
 7       statements as well?
 8            A.   Yes, I am.
 9            Q.   And when you applied for this job, was it a
10       requirement you have a law degree?
11            A.   No.  It was not.
12            Q.   Now, are you also aware Sheriff Villanueva
13       has made additional comments about you as recently as
14       December of 2024?
15            A.   I am not.  But it does not surprise me.
16            Q.   And these are -- these statements made in
17       September of 2024, those were months after that lawsuit
18       got filed, correct?
19            A.   Yes.
20            Q.   Are you aware that in December of 2024,
21       Mr. Villanueva says, Esther Lim, one of the two
22       complainants, no comment.  But the other one, of
23       course, Max Huntsman, he can't resist, right?  The
24       opinions speaks for itself, he told the Times.
25                 Are you aware of those statements?
```

LIM, ESTHER                                                    Page 249

```
 1       A.    No.
 2             MR. DiBONA:  Objection.  Form.
 3             THE WITNESS:  No, I am not.
 4       Q.    MR. TOKORO:  Are you aware that Sheriff
 5  Villanueva went to -- he was asked a question, sheriff,
 6  what is your opinion of the new DA of LA County?  And
 7  his response, well, he is off to a good start.  His
 8  first day in office he got rid of a bunch of people
 9  that needed to be get -- need to be getting rid of,
10  Esther Lim, who was kicked out of Hilda Solis' office,
11  sought refuge with Gascon.  She got fired by Hochman,
12  and that's good.
13             Did you know that?
14       A.    No.  I did not.
15       Q.    Did you get kicked out of Hilda Solis'
16  office?
17       A.    No.  I did not.
18       Q.    Did you seek refuge with Gascon?
19       A.    No.  I did not.
20             MR. DiBONA:  Objection.  Form.
21       Q.    MR. TOKORO:  What is your reaction to these
22  statements?
23             MR. DiBONA:  Objection.  Form.
24             THE WITNESS:  This is misinformation.  This
25  is, again, trying to ruin my credibility in a
```

```
1   professional space by telling -- actually telling lies
2   about my circumstances and leaving Supervisor Solis'
3   office, or even how I started working with DA Gascon's
4   office.
5        Q.   MR. TOKORO:  So as recently as of December of
6   2024, Mr. Villanueva was specifically referring to you
7   in his Facebook lives, correct?
8        A.   Yes.
9             MR. DiBONA:  Objection.  Form.
10       Q.   MR. TOKORO:  Now, I want to ask you about
11  some of the allegations being made against you in this
12  case, which Mr. DiBona did not ask you about.
13            When you filed your CPOE complaint in March
14  of 2022, did anyone of the Board of Supervisors have
15  any hand in that?
16       A.   No.  They did not.
17       Q.   Did anyone of the Board of Supervisors talk
18  to you before you filed your CPOE complaint?
19       A.   No.  They did not.
20       Q.   Did anyone of the Board of Supervisors direct
21  you to file your CPOE complaint against
22  Mr. Villanueva?
23       A.   No.  They did not.
24       Q.   Did Supervisor Solis direct you to file the
25  complaint against Mr. Villanueva?
```

**EXHIBIT 11 - Page 258**

```
 1          A.    No.  She did not.
 2          Q.    Did Supervisor Kuehl direct you to file the
 3   complaint?
 4          A.    No.  She did not.
 5          Q.    Did Supervisor Hahn direct you to file the
 6   complaint?
 7          A.    No.  She did not.
 8          Q.    Any of the supervisors, at that time, March
 9   2022, direct you to file that complaint?
10          A.    No.  They did not.
11          Q.    Did sheriff Luna have any involvement in you
12   filing your POE complaint in the spring of 2022?
13          A.    No.  He did not.
14          Q.    In fact, in the March of 2022, Mr. Villanueva
15   was still sheriff of the Sheriff's Department,
16   correct?
17          A.    Yes.
18          Q.    So did you have any conversations with
19   Mr. Luna before filing your complaint?
20          A.    No.  I did not.
21          Q.    Have you of had a conversation with Mr. Luna,
22   with Sheriff Luna, at any point in time, regarding your
23   POE complaint against Mr. Villanueva?
24          A.    No.  I did not.
25          Q.    Now, Mr. Villanueva has claimed that your
```

**EXHIBIT 11 - Page 259**

```
 1   complaint was part of retaliation by the Board for
 2   positions he took on board measures, and other issues
 3   in front of the Board.  I want to talk to you about
 4   those.
 5              Did Mr. Villanueva's position on Measure A
 6   have anything to do with your filing of the DOE
 7   complaint?
 8       A.   No.  It did not.
 9       Q.   Did Measure A have anything to do with you
10   filing your POE complaint?
11       A.   No.  It did not.
12       Q.   Did Mr. Villanueva's position on Measure R
13   have anything to do with you filing your POE
14   complaint?
15       A.   No.  It did not.
16       Q.   Did Measure R, in any way, have anything to
17   do with you filing your complaint?
18       A.   No.  It did not.
19       Q.   Did Mr. Villanueva's position on Measure J
20   have anything to do with you filing your complaint?
21       A.   No.  It did not.
22       Q.   Did Measure J, in any way, shape, or form
23   have anything do with you filing your complaint?
24       A.   No.  It did not.
25       Q.   Now, Mr. Villanueva spoke out against
```

**EXHIBIT 11 - Page 260**

LIM, ESTHER                                             Page 253

```
 1   endorsing the COVID vaccine mandate during the
 2   pandemic.
 3           Are you aware of that?
 4      A.   Yes.
 5      Q.   Did his position on the mandatory vaccine --
 6   vaccination of how the employees have anything do with
 7   you filing your POE complaint?
 8      A.   No.  It did not.
 9      Q.   Did vaccine mandates, the county's vaccine
10   mandates have anything do with you filing your
11   complaint?
12      A.   No.  It did not.
13      Q.   Mr. Villanueva also spoke out against a
14   county contract with Full Gen relating to COVID
15   testing.
16           Are you aware of that?
17      A.   Yes, I am.
18      Q.   Did his position or opposition to the Full
19   Gen contract have anything do with your reporting of
20   POE complaint?
21      A.   No.  It did not.
22      Q.   Did the Full Gen contract, in any way, shape,
23   and form, have any way, shape, or form have anything to
24   do with the complaint that you filed?
25      A.   No.  It did not.
```

```
 1        Q.   Now, other than being interviewed by Ms.
 2   Christine Diaz-Herrera, as part of the investigation
 3   into your complaint, did you have any other involvement
 4   into the investigation?
 5             MR. DiBONA:  Objection.  Form.
 6             THE WITNESS:  No.  No.  I did not.
 7        Q.   MR. TOKORO:  Did you have any interactions
 8   with anyone at the Sheriff's Department after the
 9   Sanders Roberts investigation was completed, but before
10   it went to the CEOP?
11        A.   No.  It did not.
12        Q.   Do you know what the CEOP is?
13        A.   Yes, I do.
14        Q.   You understand it's County Equity Oversight
15   Panel?
16        A.   Yes.
17        Q.   Now, did you attend the CEOP hearing at which
18   your complaint was decided?
19        A.   No.
20        Q.   Did you have any involvement in the CEOP's
21   recommendations relating to your complaint, other than
22   filing the complaint?
23        A.   No.
24        Q.   Did you have any involvement into the
25   department concurring with the CEOP's recommendations
```

**EXHIBIT 11 - Page 262**

LIM, ESTHER                                    Page 255

1    about your complaint?

2         A.   No.

3              MR. TOKORO:  That's all I've got, Alex.

4

5                   FURTHER EXAMINATION BY

6         Q.   MR. DiBONA:  Just a couple follow-up

7    questions.

8              Ms. Lim, since your attorney saw fit to ask

9    you about it, why did you leave Hilda Solis' office?

10        A.   I wanted -- I had been with Supervisor Solis'

11   office for four years, and I wanted to gain some

12   different experience.

13        Q.   Did you voluntarily resign from Hilda Solis'

14   office?

15        A.   Yes, I did.

16        Q.   And how long after you resigned did you get

17   your job with George Gascon?

18        A.   I believe it was about a month later.

19        Q.   And at the time you resigned from Hilda

20   Solis' office, did you already have the job with George

21   Gascon lined up?

22        A.   No.  I did not.

23        Q.   And so the -- at the time you resigned, did

24   you know where you were going to work?

25        A.   At the time, I did not.

1    STATE OF CALIFORNIA

2

3

4              I, SHANNON D. DENNEY, CSR 10385, a Certified

5    Shorthand Reporter in and for the State of California,

6    do hereby certify that, prior to being examined, the

7    witness named in the foregoing deposition was by me

8    duly sworn to testify the truth, the whole truth, and

9    nothing but the truth; that said deposition was taken

10   down by me in shorthand at the time and place named

11   therein and was thereafter transcribed under my

12   supervision; that this transcript contains a full, true

13   and correct record of the proceedings which took place

14   at the time and place set forth in the caption hereto.

15             I further certify that I have no interest in

16   the event of this action.

17

18   EXECUTED this 1st day of April, 2025.

19

20

21              *Shannon D. Denney*

22              Shannon D. Denney, CSR 10385

23

24

25

**EXHIBIT 11 - Page 264**

# EXHIBIT 12

EXHIBIT 12 - Page 265

CERTIFIED COPY



1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA , WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

LAURA LECRIVAIN

March 25, 2025

Cila Meyer, CSR No. 4914, Job No. 6901

EXHIBIT 12 - Page 266

1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA , WESTERN DIVISION

3

   _____
4                                          )
   ALEX VILLANUEVA,                        )
5                                          )
                    Plaintiff,             )
6                                          )
             vs.                           ) Case No.:
7                                          ) 2:24-cv-04979 SVW (JCx)
   COUNTY OF LOS ANGELES, COUNTY OF LOS    )
8  ANGELES SHERIFF'S DEPARTMENT, LOS       )
   ANGELES COUNTY BOARD OF SUPERVISORS,    )
9  COUNTY EQUITY OVERSIGHT PANEL, LOS      )
   ANGELES COUNTY OFFICE OF INSPECTOR      )
10 GENERAL, CONSTANCE KOMOROSKI, MERCEDES  )
   CRUZ, ROBERTA YANG, LAURA LECRIVAIN,    )
11 SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT)
   G. LUNA, MAX GUSTAF HUNTSMAN, ESTHER    )
12 LIM, and DOES 1 to 100, inclusive,      )
                                           )
13                  Defendants.            )
   _____)
14

15

16

17         Videoconference Deposition of

18      LAURA LECRIVAIN, taken on behalf of Plaintiff,

19      Remote Via Zoom, beginning at 10:03 a.m.,

20      Tuesday, March 25, 2025, before Cila Meyer,

21      No. 4914, a Certified Shorthand Reporter.

22

23

24

25

EXHIBIT 12 - Page 267

LECRIVAIN, LAURA                                              Page 3

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4       ALEX DiBONA, ATTORNEY AT LAW
         ANNA KHACHATRY, ATTORNEY AT LAW
 5       SHEGERIAN & ASSOCIATES, INC.
         11520 San Vicente Boulevard
 6       Los Angeles, California 90049
         310.860.0770
 7       adibona@shegerianlaw.com
         akhachatry@shegerianlaw.com
 8
     For the Defendants:
 9
         JASON H. TOKORO, ATTORNEY AT LAW
10       STEVEN WILLIAMSON, ATTORNEY AT LAW
         MILLER BARONDESS, LLP
11       2121 Avenue of the Stars
         Suite 2600
12       Los Angeles, California 90067
         jtokoro@millerbarondess.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Express Deposition Services - Scheduling @expressdeposition.com*
*(888)286-4226*

EXHIBIT 12 - Page 268

LECRIVAIN, LAURA                                    Page 31

1      Q      And did he give you any facts about what the
2  case was about?
3      A      No, he did not.
4      Q      And did he tell you how it was going to be
5  adjudicated?
6      A      No, he did not.
7      Q      What, if anything, did you say to Captain
8  Kopperud or Kopperud?  Excuse me.
9      A      I don't recall exactly what I said to him, but
10 I would make a decision who the decision maker would be
11 on the case.
12     Q      And in -- in context, what do you mean by you
13 would make a decision on who the decision maker would
14 be?
15     A      Who would review the facts of the case and
16 present it at the equity panel.
17     Q      As a general matter in the Sheriff's
18 Department, is it the subject supervisor that makes the
19 decision whether to concur with the panel?
20     A      Yes.  Generally.
21     Q      Let me just back up for a second.
22            My understanding -- correct me if I'm wrong --
23 is the County Equity Oversight Panel, among other
24 things, will issue recommendations for discipline or
25 something else to the Sheriff's Department.

**EXHIBIT 12 - Page 269**

```
 1              Is that your understanding?
 2              MR. TOKORO:  Objection; vague and ambiguous as
 3  to what you mean by recommending discipline or something
 4  else.
 5              You can answer, if understand.
 6              THE DEPONENT:  Generally, the equity panel
 7  makes a recommendation on discipline and discipline
 8  only.
 9  BY MR. DiBONA:
10     Q    And excuse me.  Is it -- and the Sheriff's
11  Department can -- can concur or disagree with the
12  panel's decision; is that your understanding?
13     A    Yes.
14     Q    And as -- and as a general matter -- sorry --
15  when I say the subject of the investigation, is that,
16  for lack of a better term, the individual who was
17  accused of wrongdoing in the context of the equity
18  panel?
19     A    Yes.  The subject is the individual who there's
20  an allegation against, yes.
21     Q    And as a general matter, the Sheriff's
22  Department, the person who makes the decision whether to
23  concur or reject the panel's recommendation is the
24  individual supervisor; correct?
25     A    Generally.
```

**EXHIBIT 12 - Page 270**

LECRIVAIN, LAURA                                    Page 50

```
 1     A     Yes, that's correct.

 2     Q     Do you remember anything that was said during

 3 the actual hearing?

 4     A     No, I don't.

 5     Q     And do you remember what, if any,

 6 recommendations the CEOP gave?

 7     A     Yes.

 8     Q     What did they recommend?

 9     A     Their recommendation was the do not hire at the

10 top of the file.

11     Q     And did they recommend anything about any

12 charges?

13           MR. TOKORO:  Objection; vague and ambiguous as

14 to what you mean by "charges."

15           THE DEPONENT:  I -- I don't understand the

16 question.

17 BY MR. DiBONA:

18     Q     Let me ask it this way.  Did the CEOP state why

19 they believed there should be a do not hire notation

20 placed top of file?

21     A     Yes.

22     Q     What was their reasons, to your understanding?

23     A     They deemed the allegations in the case to be

24 founded.

25     Q     What's your understanding of what those
```

```
 1  allegations were?
 2      A    The allegations involved policy of equality
 3  violations.
 4      Q    And did you concur with that recommendation?
 5      A    Yes, I did.
 6      Q    And why did you concur with the recommendation?
 7      A    I concurred because the allegations were in
 8  fact founded based on the investigation, and the fact
 9  that Mr. Villanueva was no longer an employee, so there
10  was no other form of discipline.  There was no
11  discipline.  And the top of file is not considered
12  discipline.  It's a flag in the file.
13      Q    Any other reason you concurred other than that?
14      A    No, sir.
15           MR. DiBONA:  All right.  I'm going to switch
16  subjects.  Is now a good time we can take a five-minute
17  break?
18           MR. TOKORO:  Sounds good.
19           (Recess was taken)
20  BY MR. DiBONA:
21      Q    Chief Lecrivain, do you understand you're still
22  under oath?
23      A    Yes.
24      Q    Is there any reason you can't continue to give
25  your best testimony?
```

EXHIBIT 12 - Page 272

```
 1          If you can't hear me at any point in time,
 2   Cila, just let me know.
 3
 4                    CROSS EXAMINATION
 5   BY MR. TOKORO:
 6      Q    Chief Lecrivain, you were asked a number of
 7   questions by Mr. DiBona, and I want to get to the heart
 8   of the matter.
 9          Did Sheriff Luna have any involvement in your
10   decision to concur with the CEOP's recommendations with
11   respect to Mr. Villanueva?
12      A    No.
13      Q    Did Sheriff Luna attend the CEOP hearing at
14   which those recommendations were made?
15      A    No.
16      Q    Did Sheriff Luna communicate with you or direct
17   you in any way regarding your concurrence with the
18   CEOP's recommendations?
19      A    No.
20      Q    Did anyone from the board of supervisors,
21   specifically a board supervisor, attend the CEOP hearing
22   on October 17 of 2023?
23      A    No.
24      Q    Did you communicate with any of the board of
25   supervisors regarding your concurrence in the CEOP's
```

**EXHIBIT 12 - Page 273**

LECRIVAIN, LAURA                                      Page 139

```
 1   recommendations?

 2       A    No.

 3       Q    Did any of the board of supervisors direct you

 4   on your decision to concur with the CEOP's

 5   recommendations?

 6       A    No.

 7       Q    Have you ever spoken with Supervisor Solis

 8   about Mr. Villanueva?

 9       A    No.

10       Q    Have you ever spoken with Supervisor Hahn about

11   Mr. Villanueva?

12       A    No.

13       Q    Have you ever spoken to any member of the board

14   of supervisors about Mr. Villanueva?

15       A    No.

16       Q    Have you ever spoken to any member of the board

17   of supervisors about the Huntsman investigation into

18   Mr. Villanueva?

19       A    No.

20       Q    Have you ever spoken to any of the board of

21   supervisors regarding the Lim investigation?

22       A    No.

23       Q    Now, Mr. DiBona asked you about a number of

24   ballot measures.  And I want to go back to that, because

25   he didn't ask you the most important questions.
```

LECRIVAIN, LAURA                                    Page 140

```
1              With respect to Measure A, did Measure A have
2    anything to do with your decision to concur in the
3    CEOP's recommendations?
4              MR. DiBONA:  Objection to form.
5              THE DEPONENT:  No, it did not.
6    BY MR. TOKORO:
7        Q    Did Mr. Villanueva's position on Measure A have
8    anything to do with your concurrence in the CEOP's
9    recommendations?
10             MR. DiBONA:  Objection; form.
11             THE DEPONENT:  No, it did not.
12   BY MR. TOKORO:
13       Q    Did Measure J have anything to do with your
14   decision at the October 17, 2023 CEOP hearing?
15             MR. DiBONA:  Objection; form.
16             THE DEPONENT:  No, it did not.
17   BY MR. TOKORO:
18       Q    Did Mr. Villanueva's position or opposition to
19   Measure J have anything to do with your decision to
20   concur in the CEOP's recommendations?
21             MR. DiBONA:  Objection; form.
22             THE DEPONENT:  No, it did not.
23   BY MR. TOKORO:
24       Q    Did Measure R have anything to do with your
25   decision at the October 17, 2023 CEOP hearing?
```

LECRIVAIN, LAURA                                              Page 141

```
 1      A     No.
 2      Q     Did Mr. Villanueva's opposition to Measure R
 3 have anything to do with your decision at the
 4 October 17, 2023 CEOP hearing?
 5           MR. DiBONA:  Objection; form.
 6           THE DEPONENT:  No, it did not.
 7 BY MR. TOKORO:
 8      Q     Now, Mr. DiBona also asked you about a Fulgent
 9 contract.  Do you recall him asking you about that?
10      A     Yes.
11      Q     Did Fulgent have anything to do with your
12 decision to concur with the CEOP's recommendations
13 regarding the allegations against Mr. Villanueva?
14           MR. DiBONA:  Objection; form.
15           THE DEPONENT:  No, it did not.
16 BY MR. TOKORO:
17      Q     Did Mr. Villanueva's opposition to the Fulgent
18 contract with the county have anything to do with your
19 decision on October 17 of 2023?
20           MR. DiBONA:  Objection; form.
21           THE DEPONENT:  No, it did not.
22 BY MR. TOKORO:
23      Q     Mr. DiBona also asked you about
24 Mr. Villanueva's refusal to enforce the vaccine mandate
25 in connection with department personnel.
```

LECRIVAIN, LAURA                                    Page 142

```
 1            Did that -- did the COVID vaccine mandate
 2  implemented by the county have anything to do with your
 3  decision at the October 17, 2023 CEOP hearing?
 4            MR. DiBONA:  Objection; form.
 5            THE DEPONENT:  No, it did not.
 6  BY MR. TOKORO:
 7     Q    Did Mr. Villanueva's refusal to enforce the
 8  county's COVID vaccine mandate have anything to do with
 9  your decision at the October 17, 2023 CEOP hearing?
10            MR. DiBONA:  Objection; form.
11            THE DEPONENT:  No.
12  BY MR. TOKORO:
13     Q    Now, Mr. DiBona also asked you whether you were
14  aware that at the time of the CEOP hearing
15  Mr. Villanueva was also running for a board of
16  supervisors spot; do you recall that?
17     A    Yes.
18     Q    And I believe your testimony was you were not
19  aware of that; is that correct?
20     A    Yes.
21            MR. DiBONA:  Objection; form.
22  BY MR. TOKORO:
23     Q    Did Mr. Villanueva running for the board of
24  supervisor have anything to do with your decision at the
25  October 17, 2023 CEOP hearing?
```

```
1     A     No, it did not.

2     Q     Was your decision to concur in the CEOP's

3  recommendations retaliation for Mr. Villanueva's public

4  statements in any way?

5     A     No.

6     Q     Was your decision to concur in the CEOP's

7  recommendations an attempt by you to hinder

8  Mr. Villanueva's prospects while running for the board

9  of supervisors?

10          MR. DiBONA:  Objection; form.

11          THE DEPONENT:  No.  The answer is no.

12          MR. TOKORO:  That's all I've got.

13          MR. DiBONA:  Just a couple of follow-ups.

14

15                     FURTHER EXAMINATION

16  BY MR. DiBONA:

17     Q     Chief Lecrivain, do you agree that finding a

18  former employee -- sorry.  Strike that.

19          Do you agree that finding a former sheriff

20  having charges founded related to policy of equality

21  violations is a serious matter?

22          MR. TOKORO:  Objection; vague and ambiguous as

23  to what you mean by "charges," because I believe it's

24  been repeatedly testified they're allegations.  But,

25  also, vague and ambiguous as to what you mean by
```

EXHIBIT 12 - Page 278

```
 1   services or products to any party's attorney or third
 2   party who is financing all or part of the action without
 3   first offering same to all parties or their attorneys
 4   attending the deposition and making same available at
 5   the same time to all parties or their attorneys.  (Civ.
 6   Proc.   2025.320(b))
 7           I shall not provide any service or product
 8   consisting of the deposition officer's notations or
 9           Comments regarding the demeanor of any witness,
10   attorney, or party present at the deposition to any
11   party or any party's attorney or third party who is
12   financing all or part of the action, nor shall I collect
13   any personal identifying information about the witness
14   as a service or product to be provided to any party or
15   third party who is financing all or part of the action.
16           (Civ. Proc.   2025.320(c))
17
18           Dated: March 31, 2025
19
20           _Cila Meyer_
21           _____
22
23
24
25
```

**EXHIBIT 12 - Page 279**

# EXHIBIT 13

EXHIBIT 13 - Page 280

CERTIFIED COPY

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

### KYLA COATES

March 26, 2025

Lisa Lemus, CSR No. 11484, Job No. 6902

EXHIBIT 13 - Page 281

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4   ALEX VILLANUEVA,                    )
                                        )
5            Plaintiff,          )
                                        )
6                               ) Case No:
                                ) 2:24-cv-04979 SVW(JCx)
7            vs.                 )
                                        )
8   COUNTY OF LOS ANGELES, COUNTY OF )
    LOS ANGELES SHERIFF'S DEPARTMENT,)
9   LOS ANGELES COUNTY BOARD OF      )
    SUPERVISORS, COUNTY EQUITY       )
10  OVERSIGHT PANEL, LOS ANGELES     )
    COUNTY OFFICE OF INSPECTOR       )
11  GENERAL, CONSTANCE KOMOROSKI,   )
    MERCEDES CRUZ, ROBERTA YANG,     )
12  LAURA LECRIVAIN, SERGIO V.       )
    ESCOBEDO, RON KOPPERUD, ROBERT G.)
13  LUNA, MAX-GUSTAF HUNTSMAN,       )
    ESTHER LIM, and DOES 1 TO 100,   )
14  inclusive,                       )
                                        )
15                               )
            Defendants.         )
16  _____)

17

18          REMOTE VIDEOCONFERENCE DEPOSITION OF

19                 KYLA COATES

20            WEDNESDAY, MARCH 26, 2025

21

22

23

24   Reported by:  Lisa Lemus, CSR No. 11484

25

**EXHIBIT 13 - Page 282**

COATES, KYLA                                                                 Page 2

```
 1              Remote Videoconference Deposition of

 2   KYLA COATES, taken on behalf of Plaintiff via Zoom

 3   appearance at, Los Angeles, California, at 10:02 a.m.,

 4   Wednesday, March 26, 2025, before LISA LEMUS, CSR No.

 5   11484, a Certified Shorthand Reporters within and for the

 6   County of Ventura, State of California, pursuant to

 7   Notice.

 8

 9        *        *        *        *        *

10

11   APPEARANCES:

12    For the Plaintiff:

13        SHEGERIAN & ASSOCIATES, INC.
          BY:  ALEX DIBONA
14         Attorney at Law
           11520 San Vincente Boulevard
15         Los Angeles, California 90049

16
     For the Defendants:
17
          MILLER BARONDESS, LLP
18         BY:  JASON H. TOKORO
          Attorney at Law
19         2121 Avenue of the Stars
          Suite 2600
20         Los Angeles, California 90067

21

22

23

24

25
```

COATES, KYLA                                                    Page 28

1   up.

2         Was there a particular purpose to each meeting or

3   was it just a regularly scheduled check-in of some type?

4       A.  Regularly scheduled check-ins.

5       Q.  Did Sheriff Villanueva say anything during those

6   Zoom meetings that you found offensive or inappropriate?

7       A.  Yes.

8       Q.  What -- what did he say during those meetings

9   that you found offensive or inappropriate?

10      A.  I remember one meeting he pointed to me and he

11  said that I looked like a woke 20-something year old

12  who's never had a job before, who worshipped at the alter

13  of wokeness.

14      Q.  I apologize for asking this, but what is your

15  date of birth?

16      A.  June 25, 1989.  So I was not in my twenties at

17  the time.

18      Q.  Did Sheriff Villanueva say -- sorry.  Do you

19  recall the context in which he made that remark?

20      A.  No.

21      Q.  And did Sheriff Villanueva explain any of those

22  terms?

23      A.  No.

24      Q.  Do you have an understanding of what Sheriff

25  Villanueva -- sorry.  Have you ever heard Sheriff

COATES, KYLA                                                            Page 29

1    Villanueva say what he means when he uses the term

2    "woke"?

3        A.  No.

4        Q.  And -- and I take it from your response, Sheriff

5    Villanueva didn't say to you what he meant during that

6    conversation; is that right?

7        A.  That is correct.

8        Q.  How many times did -- sorry, just to be clear,

9    the words were something to the effect of you looked like

10   a woke 20-something that worshipped in the alter -- at

11   the alter of wokeness.  Do I have that right?

12       A.  Yes.

13       Q.  How many times did he make such a remark?

14       A.  Directly to me or in public?

15       Q.  Sorry, fair question.  How many times did Sheriff

16   Villanueva say that directly to you?

17       A.  I think just that one time.

18       Q.  And Ms. Hahn, she was on the Zoom meeting so

19   presumably she heard it; is that your understanding?

20       A.  Yes.

21       Q.  Did you and Ms. Hahn discuss that comment at all

22   afterwards?

23       A.  I don't remember.

24       Q.  Did you memorialize that remark when it happened

25   in any way, like sending an email, writing a personal

COATES, KYLA                                                    Page 30

1    note, anything like that?

2        A.  No.

3        Q.  Other than -- did you report that remark to

4    anyone in the -- in the county outside of Ms. Hahn?

5        A.  No.

6        Q.  And is there any reason why not?

7        A.  No.

8        Q.  Other than the remark we just mentioned, did

9    Sheriff Villanueva say anything else in these Zoom

10   meetings that you found inappropriate or offensive?

11       A.  Not that I remember.

12       Q.  And was there ever a time when you and Sheriff

13   Villanueva interacted directly in person that you recall?

14       A.  Yes.

15       Q.  And how many times did that happen?

16       A.  Multiple times.  I would say definitely a

17   handful.

18       Q.  And were -- were those interactions, were they at

19   board of supervisors' public meetings?

20       A.  Sometimes.

21       Q.  Outside of the -- outside of the board of

22   supervisors public meetings, how many times do you think

23   you had direct interaction with Sheriff Villanueva?

24       A.  We would interact at press conferences, so a

25   handful of times outside of the supervisors meetings.

COATES, KYLA                                                      Page 40

1    A.  No.

2    Q.  Did she ever say that she would make any attempts

3  to contact the sheriff herself?

4    A.  No.

5    Q.  And did she ever say that she would in any way

6  reach out to anyone in the Sheriff's Department about the

7  Facebook lives?

8    A.  No.

9    Q.  Do you have -- do you have a recollection of the

10  name of the individual that sent you that email?

11    A.  What email?

12    Q.  Sorry.  Fair question.  Let me go back.  The

13  email that was requesting an interview for you with

14  respect to Ester Lim's complaint, do you remember who

15  sent you that email?

16    A.  I think her name was Christina Diaz Hernandez, if

17  I'm remembering correctly.  I could be getting something

18  wrong there, it could be Christine not Christina.  I

19  would have to go back and look but they were in the

20  documents that I had submitted.

21    Q.  All right.  Does Christine Diaz Herrera sound --

22    A.  Yeah.

23    Q.  -- right.  And prior to this email, had you ever

24  had any interaction with Christine Diaz Herrera?

25    A.  No.

COATES, KYLA                                                    Page 41

1      Q.  And did Ms. Diaz Herrera, did she tell you that

2   she was -- excuse me, an attorney with the law firm by

3   the name of Sanders Roberts?

4      A.  I think so.

5      Q.  Prior to the email with Ms. Diaz Herrera, had you

6   ever interacted with anyone from Sanders Roberts before?

7      A.  No.

8      Q.  And prior to that email, did you even know of the

9   existence of the law firm Sanders Roberts?

10     A.  No.

11     Q.  So to your understanding, had the Sanders

12   Roberts, had they done any other work on behalf of the

13   county?

14     A.  Not that I know of.

15     Q.  Did Ms. Diaz Herrera tell you who she was doing

16   the investigation on behalf of?

17     A.  I think so.

18     Q.  And who did she tell you she was doing it on

19   behalf of?

20     A.  I think she said Esther Lim.

21     Q.  And did she say that she was doing the

22   investigation on behalf of the sheriff's department or

23   the County of Los Angeles, or did she not make any

24   distinction?

25     A.  I don't remember.

COATES, KYLA                                                    Page 42

1    Q.  And were you interviewed?

2    A.  Yes.

3    Q.  And how did that interview take place?

4    A.  I remember that she emailed me requesting an

5    interview.  I emailed her back and said I was about to be

6    in the car driving home, could I give her a call.  And so

7    she responded with her cell phone number, and I called

8    her from my phone in the car while I was driving home.

9    Q.  Do you recall how long the interview took place?

10   A.  I don't.

11   Q.  Do you recall one way or the other -- sorry.  Do

12   you know one way or the other if the interview was

13   recorded?

14   A.  I don't think it was recorded.  I don't remember

15   her saying this is going to be recorded.

16   Q.  That was going to be my next question, but just

17   so the record is clear, did Ms. Diaz Herrera ask you if

18   she could record the conversation?

19   A.  I don't think so.

20   Q.  Did you take any -- sorry.  Did you summarize

21   that interview in any way?

22   A.  What do you mean?

23   Q.  For example, after the interview, did you send

24   the follow-up email to Ms. Diaz Herrera saying words to

25   the effect of just to summarize what we -- what I said in

COATES, KYLA                                                    Page 51

1      Q.  And for lack of a better word, colloquially,

2   meaning they made you upset since you were weren't

3   clinically diagnosed?

4      A.  Exactly.

5      Q.  Can you explain how it was that they made you

6   upset?

7          MR. TOKORO:  Just -- I'm interposing an objection

8   to the last question that it's vague and ambiguous.

9          But you can answer the next question.

10         THE WITNESS:  Can you repeat that?

11  BY MR. DiBONA:

12     Q.  Yeah, might be obvious from the context we're

13  talking about, but just can you describe how it was that

14  listening to Sheriff Villanueva's Facebook live sessions

15  made you upset?

16     A.  Yes.  The former sheriff would say a lot of lies

17  on his Facebook live streams, and he would come after my

18  boss, our bosses, and the justice deputies as a whole.

19  And sometimes he would specifically come after Esther

20  Lim, as an individual justice deputy, and it was

21  upsetting to me.  And I decided that the amount of upset

22  that it caused me did not mean -- let me rephrase that.

23         It made me upset and it didn't positively

24  contribute to my job and so I stopped watching them.  And

25  instead if there was a Facebook live that specifically

COATES, KYLA                                                      Page 52

1   talked about the justice deputies or Supervisor Hahn,

2   Liz, the communications director would forward me the

3   transcript so I could read it and then I could know how

4   to respond or talk to Supervisor Hahn about it.

5       Q.  And excuse me, I think you made a reference to

6   lies that Mr. -- or that then Sheriff Villanueva was

7   saying, what were the lies you heard him say?

8       A.  So many things.  For example, he once said that

9   the supervisors only hire women and that all of their

10  deputies are women, which is not true.  John Matthews was

11  Supervisor Mitchell's justice deputy at the time, he's a

12  man.  He also said we were all in our twenties and had

13  never had a job in our lives, which was not true.  None

14  of us were in our twenties.  All of us had prior careers.

15  All of us had other degrees as well.

16          He would say things about the supervisors.  He

17  would say that they were defunding the sheriff's

18  department.  He would say they didn't support the

19  sheriff's department, that they didn't support law

20  enforcement.  And he would tell explicit lies many times

21  on his Facebook lives.

22      Q.  When, to your understanding, was Holly Mitchell

23  elected to the board of supervisors?

24      A.  Hold on, I can figure this out.  She is on the

25  same term 2022 I want to say.  Yes, she just got

COATES, KYLA                                                      Page 53

1    re-elected, so 2022 she was first elected.

2        Q.  Is it your understanding, did Holly Mitchell, did

3    she -- did she represent the same district that Mark

4    Ridley-Thomas used to represent?

5        A.  That is correct.

6        Q.  And what district is that?  Do you know off the

7    top of your head?

8        A.  Yeah, the second district.

9        Q.  And so from your statement, Ms. Mitchell would

10   have had justice deputies on a staff after 2022; is that

11   correct?

12       A.  Yes.

13       Q.  And John -- you said the name of the male justice

14   deputy is John Matthews; is that correct?

15       A.  At the time, yes.  Not anymore.

16       Q.  Apologies.  I'll rephrase it just so we have a

17   clear record.  At the time Ms. -- I'm sorry.  When you

18   say "at the time," what time are you referring to so --

19   so I know?

20       A.  When he was doing these lives, so 2022.

21       Q.  Got it.  So in 2022, your -- Holly Mitchell had a

22   male justice deputy named John Matthews, correct?

23       A.  Correct.

24       Q.  And is John Matthews still a justice deputy?

25           MR. TOKORO:  Alex, I'm gonna step in here and

COATES, KYLA                                                    Page 54

1   just make sure that I put it on the record -- and you're

2   free to do whatever you want with it, but I just want to

3   point out that I believe Holly Mitchell was elected in

4   2020 and not 2022.  So again, do what you want with it,

5   but I believe that if she was re-elected in -- recently

6   she would have been first elected in 2020.

7        THE WITNESS:  You're correct.  Thank you.  She

8   was elected in 2020.

9        So he would have been her -- John Matthews would

10  have been her justice deputy from 2021 to very recently.

11  BY MR. DiBONA:

12      Q.  And does Mr. Matthews still work for the County

13  of Los Angeles to your understanding?

14      A.  Yes.

15      Q.  Where does he work now?

16      A.  The public defender's office.

17      Q.  And do you have an understanding of what role he

18  has at the public defender's office?

19      A.  I think he's a chief deputy, but I'm not sure.

20      Q.  Other than -- in -- just in the year 2022,

21  separate and apart from when Ms. Mitchell was elected,

22  other than John Matthews, are you aware of any other male

23  justice deputies?

24      A.  Yes.  Chris Ah San is the associate justice

25  deputy and he was the associate justice deputy under

COATES, KYLA                                                    Page 55

1    supervisor Ridley-Thomas, so he has been there for many

2    years.  He was there before I started working for

3    Supervisor Hahn and he is still there today.

4        Q.  And in the year 2022, how many justice deputies

5    were there?

6        A.  There were five senior justice deputies, and I

7    don't remember how many associate justice deputies.

8        Q.  And of the five senior justice deputies and

9    the -- however many associate deputies, is it your

10   recollection there were two men?

11       A.  In 2022?

12       Q.  Yes, sorry.

13       A.  Yes.

14       Q.  And do you know one way or the other if John

15   Matthews ever interacted with Sheriff Villanueva?

16       A.  Yes, he did.

17       Q.  And how do you know that?

18       A.  Because we all did as part of our job.

19       Q.  And did you -- were you ever in a room with

20   Mr. Matthews, Mr. -- then Sheriff Villanueva and

21   yourself?

22       A.  Probably only in the scope of a board meeting or

23   a press conference.

24       Q.  And do you know if Mr. Ah Sof -- I'm sorry, the

25   other male justice deputy's name was Chris Ah Sof; is

COATES, KYLA                                                    Page 56

1    that right or am I getting that wrong?

2        A.  It's Ah San it's A-h space S-a-n.

3        Q.  Mr. Ah San, do you know one way or another if

4    Sheriff Villanueva interacted with him at all in 2022?

5        A.  I don't know about that.

6        Q.  Did Sheriff Villanueva ever mention you by name,

7    like did he ever say Kyla Coates or anything like that in

8    any of his Facebook lives?

9            MR. TOKORO:  Objection.  Just making sure the

10   record is clear that she answered this question earlier

11   about the one-on-one conversation on Zoom, but if you're

12   limiting it to Facebook live, you can answer.

13           THE WITNESS:  Not -- no.  Not that I recall.

14   BY MR. DiBONA:

15       Q.  And did you ever hear Sheriff Villanueva say the

16   justice deputies are all women and unqualified?

17       A.  I don't think I heard those exact words, but I

18   heard that sentence.  Yes.

19       Q.  And what sentence -- and how did -- it's your

20   recollection, how did Sheriff Villanueva express that

21   sentiment?

22       A.  He would say that we were all in our twenties,

23   that we had never had real jobs, that we were straight

24   out of college and that we were the ones writing these

25   board motions that couldn't stand up to legal muster,

1   that were dumb policy, and he would also say in the same

2   sentence that we were all women.

3      Q.  And do you see still on Exhibit 2, there's a

4   reference here to supervisor Mitchell having two male

5   justice deputies?

6      A.  Yes.

7      Q.  Those -- I think we covered it, those two male

8   deputies would be Chris Ah Sof -- I'm getting that name

9   wrong, I'm sorry, and John Matthews; is that right?

10     A.  Correct.

11        MR. TOKORO:  Alex, it's an N at the -- it's not a

12   P it's Ah San.  N as in Nancy.

13        THE WITNESS:  Correct.

14   BY MR. DiBONA:

15     Q.  Do you believe that Sheriff Villanueva was

16   especially awful to Supervisor Holly Mitchell?

17     A.  I believe he was especially awful to both

18   Supervisor Holly Mitchell and Supervisor Hilda Solis.

19     Q.  And just to break it up, how was Sheriff

20   Villanueva especially awful to Supervisor Mitchell?

21     A.  He would call her out by name more than the other

22   supervisors when he was on his Facebook lives, or at

23   press conferences or in interviews in the scope of his

24   professional capacity, as someone who was acting against

25   public safety, in his words, in the sheriff's words.

COATES, KYLA                                                    Page 58

1      Q.  Any other way that you believe Sheriff Villanueva

2   was acting especially awful to Supervisor Mitchell, other

3   than in your words, acting contrary to public safety?

4          MR. TOKORO:  Misstates her prior testimony.

5          But you can clarify and answer.

6          THE WITNESS:  Yeah, to clarify, he would say that

7   Supervisor Mitchell didn't care about public safety,

8   which is not what I believe to be true, and not what

9   Supervisor Mitchell would say.  And he would also accuse

10   her of trying to defund the sheriff's department.

11   BY MR. DiBONA:

12      Q.  And did Sheriff Villanueva, to your memory, ever

13   make a reference to Ms. Mitchell's race?

14      A.  I do not recall.

15      Q.  Did Sheriff Villanueva ever make a reference to

16   Ms. Mitchell's gender?

17      A.  I do not recall.

18      Q.  And how do you believe that Sheriff Villanueva

19   was especially awful to Hilda Solis?

20      A.  Same thing is that he would explicitly call her

21   out more than others and he would -- there was an LA

22   Times article about him using a term to describe her that

23   is derogatory.  And he would talk about her more

24   derogatorily than the other supervisors.

25      Q.  And do you remember the -- what that derogatory



COATES, KYLA                                                      Page 60

1  was indicted on federal criminal charges while he was

2  still a member of the board of supervisors?

3      A.  No, he wasn't a member of the board when he was

4  indicted, right?  He was on city council.

5      Q.  Do you see here there's a reference to Sheriff

6  Villanueva saying to you, I can tell from your age you're

7  one of those people that hate the police and want to

8  defund us?

9      A.  Yes.

10     Q.  And did Sheriff Villanueva say that to you?

11     A.  Yes.

12     Q.  And was that at a virtual meeting?

13     A.  Yes.

14     Q.  Did you and -- did you and Ms. Hahn discuss that

15  after the meeting?

16     A.  I think so.

17     Q.  And do you remember what, if anything, she said?

18     A.  No.

19     Q.  And excuse me, did you document that comment in

20  any way like through an email or anything like that?

21     A.  No.

22     Q.  And it says here your response is, That is not

23  true.  You don't know me or my personal background.

24         Is that how you responded?

25     A.  I think so, yes.

COATES, KYLA                                                  Page 61

1     Q.  And did Sheriff Villanueva say anything else

2   after that?

3     A.  I can't remember.

4     Q.  And can you recall, as you sit here today, if

5   Supervisor Hahn responded?

6     A.  I can't remember.

7     Q.  You see here there's a reference to Sheriff

8   Villanueva insulting Supervisor Hahn to her face?

9     A.  Yes.

10     Q.  How did Sheriff Villanueva insult Supervisor Hahn

11   to her face?

12     A.  I don't remember what this is specifically

13   referring to, but he would insult everyone he talked to

14   and would constantly insult her and me, and so this

15   doesn't surprise me.  But I don't remember what this is

16   referring to.

17     Q.  Do you have a recollection of saying to Ms. Diaz

18   Herrera that Supervisor Hahn was insulted by Sheriff

19   Villanueva directly to her face?

20     A.  I don't remember saying it, but it sounds like

21   something I would say since he would insult her to her

22   face frequently.

23        MR. DiBONA:  We've been going actually more than

24   an hour, is now a good time for a five minute break?

25        THE WITNESS:  Sure.

COATES, KYLA                                                    Page 62

1          MR. DiBONA:  Thank you.

2

3          (Off the record at 11:15 a.m.)

4          (On the record at 11:23 a.m.)

5

6    BY MR. DiBONA:

7      Q.  Ms. Coates, do you understand you're still under

8    oath?

9      A.  Yes.

10     Q.  Is there any reason you can't continue to give

11   your best testimony?

12     A.  No.

13     Q.  I think the last thing I asked you, it's fair to

14   say you don't remember what the insult was that Sheriff

15   Villanueva said to Supervisor Hahn's face; is that fair?

16     A.  Yes.

17     Q.  And did supervisor Kuehl ever call out Sheriff

18   Villanueva on any of his behavior in general, to your

19   recollection?

20     A.  Yes.

21     Q.  And is that something you witnessed or is that

22   something you heard about?

23     A.  I would witness it at board meetings.

24     Q.  And how would she do that, to your understanding?

25     A.  Yeah, she would counter and question some of the

COATES, KYLA                                                    Page 63

1    things he would say publically and call him out for

2    lying.

3       Q.  Any other way that she would call him out other

4    than that?

5       A.  I can't remember other specific ways.

6       Q.  Did Sheriff Villanueva ever say to you directly

7    that justice deputies were all women?

8       A.  Not directly to me during a meeting.  He said it

9    on his lives that I watched or I heard about.

10      Q.  Did Sheriff Villanueva ever directly say to you

11   anything about the board of supervisors being all women?

12      A.  Not to me during a meeting but he said it during

13   his press conferences that I watched and his lives and on

14   a radio interview, I believe, that I listened to.

15      Q.  Did you ever directly ask Sheriff Villanueva what

16   are you implying even if you are all women, or words to

17   that effect?

18      A.  No.

19      Q.  And did you -- for whatever reason, did you ever

20   tell Ms. Diaz Herrera that you had asked Sheriff

21   Villanueva directly what are you implying by saying we're

22   all women?

23      A.  I don't think so.  I don't remember.

24      Q.  Do you ever recall -- excuse me.  Do you ever

25   recall Sheriff Villanueva saying anything negative

COATES, KYLA                                                Page 64

1    directly to Supervisor Kuehl?

2        A.  He said negative things about Supervisor Kuehl

3    frequently and about all the supervisors frequently.

4        Q.  Did you -- did you ever hear Sheriff Villanueva

5    say to Supervisor Kuehl, I'll stop saying bad things

6    about you publically if you end the hiring freeze, I'll

7    stop being mean to you?

8        A.  I don't remember that but the hiring freeze is --

9        Q.  Sorry, go ahead.  No, go ahead.  I just didn't

10   hear -- hear your answer.  You said I don't remember that

11   but the hiring freeze, then I didn't hear.  Did you say

12   anything after the hiring freeze?

13       A.  That implies that the supervisors had implemented

14   a hiring freeze on his department.  In fact, it was a

15   county wide hiring freeze because of the pandemic and it

16   was not a hard hiring freeze.  All department heads had

17   to do was go to the CEO's office to request the authority

18   to hire.  And in terms of the sheriff's department, the

19   CEO granted that authority multiple times, and the

20   sheriff at the time continued to hire during the

21   so-called hiring freeze.

22       Q.  Was there --

23       A.  The implication of that statement I believe is

24   false.

25       Q.  Okay.  And just to be clear, regardless of

COATES, KYLA                                                      Page 65

1    whether it's true or false, do you -- did you ever hear

2    Sheriff Villanueva say to Supervisor Kuehl, if you end

3    the hiring freeze I'll stop being mean to you?

4        A.  I can't remember.

5        Q.  And -- excuse me.  Do you recall there was a

6    period of time where the hiring freeze, hard or

7    otherwise, was actually lifted county wise --

8    county-wide, excuse me?

9        A.  At one point it was lifted because we are not

10   under a hiring freeze now, so I don't remember when that

11   was.

12       Q.  Do you recall initially when it was lifted

13   county-wide, the hiring freeze for the Sheriff's

14   Department remained in place?

15       A.  I don't remember.

16       Q.  Was there a period of time, to your recollection,

17   that the Sheriff's Department had to go to the county CEO

18   specifically for permission to hire when other department

19   heads wouldn't have to do that?

20       MR. TOKORO:  I'm just gonna make the objection it

21   lacks foundation.  Calls for speculation.  Also gonna

22   make a relevance objection, and I'm also gonna make the

23   objection that it assumes facts not in evidence.  There's

24   been nothing to establish this claim that Mr. DiBona is

25   making.

COATES, KYLA                                                    Page 66

1        But you can otherwise answer if you know.

2        THE WITNESS:  Yeah, I don't remember.  I don't

3    work for the CEO's office, so I haven't been in those

4    conversations.

5    BY MR. DiBONA:

6        Q.  And do you remember Sheriff Villanueva ever

7    saying to Supervisor Kuehl, I'll stop saying bad things

8    about you publically if you end the hiring freeze?

9        MR. TOKORO:  The question's been asked and

10   answered a couple of times now.

11        But you can answer it again.

12        THE WITNESS:  I don't remember -- I don't

13   remember hearing that.

14   BY MR. DiBONA:

15       Q.  Do you -- did you ever hear Sheriff Villanueva

16   use the term la malinche to refer to Hilda Solis?

17       A.  Yes.

18       Q.  I think earlier you said that there was a term

19   began with M but you don't speak Spanish.  Do you

20   remember it being la malinche?

21       A.  Yes.  Now that you say it, that sounds familiar.

22       Q.  And since you don't speak Spanish I won't ask you

23   for the literal definition, but do you have any

24   understanding of what la malinche refers to separate and

25   apart from you don't speak Spanish?

COATES, KYLA                                                    Page 67

1      A.  Yes.

2      Q.  What is your understanding of what it refers to?

3      A.  My understanding is that it is a negative term

4   for a woman, and I know that there's a historical context

5   to it, but I cannot quite remember it right now.

6      Q.  And did you ever read a transcript where Sheriff

7   Villanueva said he would -- he should take the board of

8   supervisors out to a shed and hit them or words to that

9   effect?

10     A.  Yes.  I remember that.

11     Q.  And do you remember, was there any context to him

12  saying that?

13        MR. TOKORO:  Objection.  Vague and ambiguous as

14  to what you mean by "context" as to that.

15        But you can answer if you understand.

16        THE WITNESS:  There's context to every statement.

17  I'm sure there was context to that, but I don't remember

18  what it was.

19  BY MR. DiBONA:

20     Q.  Do you, yourself have an account on what's now

21  known as X, what was formerly known as Twitter?

22     A.  Yes.

23     Q.  And do you follow Esther Lim?

24     A.  No.

25     Q.  And have you ever followed Esther Lim, on

COATES, KYLA                                                    Page 93

1      A.  No.

2      Q.  Does the board of supervisors have any role in

3   the LA County sheriff's department budget?

4      A.  Yes.

5      Q.  What is the board of supervisors' role in the

6   budget to your understanding?

7      A.  They vote to approve the budget.

8      Q.  As you sit here right now, do you believe any

9   part of your testimony needs to be changed?

10     A.  No.

11        MR. DiBONA:  I don't have any further questions.

12   Do you counsel?

13        MR. TOKORO:  I do.

14

15                    EXAMINATION

16

17   BY MR. TOKORO:

18     Q.  Ms. Coates, Mr. DiBona asked you a number of

19   questions about measure A; do you recall that?

20     A.  Yes.

21     Q.  Now, did measure A have anything to do with the

22   interview that you gave to Ms. Diaz Herrera?

23        MR. DiBONA:  Objection.  Form.

24   BY MR. TOKORO:

25     Q.  You can answer.

COATES, KYLA                                            Page 94

1      A.  No.

2      Q.  Did Mr. Villanueva's opposition to measure A have

3   anything to do with your interview that you gave to

4   Ms. Diaz Herrera?

5          MR. DiBONA:  Objection.  Form.

6          And just to let you know, Ms. Coates, I'm

7   objecting for the record.  You may answer your counsel's

8   questions.  Just to avoid having to keep saying that.

9          THE WITNESS:  Okay.  Thank you.

10          The answer is no.

11   BY MR. TOKORO:

12      Q.  When you gave your interview to Ms. Diaz Herrera,

13   was that to retaliate against Mr. Villanueva or his

14   opposition to measure A?

15          MR. DiBONA:  Objection.  Form.

16          THE WITNESS:  No.

17   BY MR. TOKORO:

18      Q.  You also were asked about measure J.  Did measure

19   J have anything to do with the interview you gave to

20   Ms. Diaz Herrera?

21          MR. DiBONA:  Objection.  Form.

22          THE WITNESS:  No.

23   BY MR. TOKORO:

24      Q.  Did Mr. Villanueva's opposition to measure J have

25   anything to do with the interview you gave to Ms. Diaz

COATES, KYLA                                                    Page 95

1    Herrera?

2        MR. DiBONA:  Objection.  Form.

3        THE WITNESS:  No.

4    BY MR. TOKORO:

5        Q.  Did you say the things you said in your interview

6    with Ms. Diaz Herrera to retaliate against

7    Mr. Villanueva's opposition to measure J?

8        A.  No.

9        Q.  You were also asked about measure R.  Did measure

10   R have anything to do with your interview with Ms. Diaz

11   Herrera?

12       MR. DiBONA:  Objection.  Form.

13       THE WITNESS:  No.

14   BY MR. TOKORO:

15       Q.  Did Mr. Villanueva's opposition to measure R have

16   anything to do with the interview you gave to Ms. Diaz

17   Herrera?

18       A.  No.

19       Q.  Was anything you said during your interview with

20   Ms. Diaz Herrera in retaliation for Mr. Villanueva

21   opposing measure R?

22       A.  No.

23       Q.  Did the county's COVID vaccine mandate have

24   anything to do with the interview you gave to Ms. Diaz

25   Herrera?

COATES, KYLA                                                    Page 96

1          MR. DiBONA:  Objection.  Form.

2          THE WITNESS:  No.

3     BY MR. TOKORO:

4      Q.  Did Mr. Villanueva's refusal to enforce the

5     county's COVID vaccine mandate have anything to do with

6     the interview you gave Ms. Diaz Herrera?

7          MR. DiBONA:  Objection.  Form.

8          THE WITNESS:  No.

9     BY MR. TOKORO:

10     Q.  Did you give the interview to Ms. Diaz Herrera

11    and say the things that you said during that interview

12    because you wanted to retaliate against Mr. Villanueva

13    for his opposition to the county's COVID vaccine

14    mandate?

15     A.  No.

16     Q.  Did the Fulgent contract have anything to do

17    with the interview that you gave to Ms. Diaz Herrera?

18          MR. DiBONA:  Objection.  Form.

19          THE WITNESS:  No.

20    BY MR. TOKORO:

21     Q.  Did Mr. Villanueva's opposition to the Fulgent

22    contract have anything to do with the interview you gave

23    to Ms. Diaz Herrera?

24          MR. DiBONA:  Objection.  Form.

25          THE WITNESS:  No.

COATES, KYLA                                                    Page 97

1    BY MR. TOKORO:

2        Q.  Did you say the things you said in the interview

3    with Ms. Diaz Herrera to retaliate against Sheriff

4    Villanueva for his opposition to the Fulgent contract?

5        A.  No.

6        Q.  Now, Mr. Villanueva has claimed in this case that

7    certain people were involved in the investigation and

8    eventual do not hire notation.  And I only want to ask

9    you questions about your personal experiences.  So first

10   I want to ask you, was Sheriff Luna involved in any way

11   in your interview with Ms. Christine Diaz Herrera?

12       A.  No.

13       Q.  Did you ever have a communication with Sheriff

14   Luna about Ester Lim's complaint?

15       A.  No.

16       Q.  Did you ever have a conversation with Sheriff

17   Luna about Max Huntsman's complaint?

18       A.  No.

19       Q.  Have you ever had a conversation with Mr. Luna

20   about the do not rehire notation placed on

21   Mr. Villanueva's file?

22       A.  No.

23       Q.  Have you ever had a conversation with Sheriff

24   Luna about this lawsuit?

25       A.  No.

1      Q.  Have you ever had a conversation with Sheriff

2   Luna about the LA Times article?

3      A.  No.

4      Q.  Now, I want to ask you about the board of

5   supervisors and I want to first ask you about the board

6   generally.  Did any of the members of the board of

7   supervisors communicate with you about your interview

8   with Ms. Diaz Herrera?

9      A.  No.

10     Q.  Did any of the board of supervisors direct you on

11  how you should testify during your interview with

12  Ms. Diaz Herrera?

13     A.  No.

14     Q.  Did Supervisor Solis have any communications with

15  you about your interview with Ms. Diaz Herrera?

16     A.  No.

17     Q.  Did Supervisor Solis direct you on how to testify

18  during your interview with Ms. Diaz Herrera?

19     A.  No.

20     Q.  What about Supervisor Hahn, did she have any

21  communications with you about how to testify during your

22  interview with Ms. Diaz Herrera?

23     A.  No.

24     Q.  Now, Mr. DiBona showed you the Sanders Roberts

25  report as one of the exhibits today.  Do you recall that?

**EXHIBIT 13 - Page 311**

COATES, KYLA                                                                  Page 99

1      A.  Yes.

2      Q.  And he showed you portions of the report that

3   reflected a summary of your interview with Ms. Diaz

4   Herrera; do you recall that?

5      A.  Yes.

6      Q.  Of the portions that Mr. DiBona showed you, do

7   you believe that any part of it is inaccurate?

8          MR. DiBONA:  Objection.  Form.

9          THE WITNESS:  No.

10  BY MR. TOKORO:

11     Q.  Do you believe that the portions Mr. DiBona

12  showed you accurately reflect the interview that you gave

13  to Ms. Diaz Herrera?

14         MR. DiBONA:  Objection.  Form.

15         THE WITNESS:  Yes.

16  BY MR. TOKORO:

17     Q.  Do you believe those portions accurately reflect

18  what you told her about your experiences with

19  Mr. Villanueva?

20     A.  Yes.

21     Q.  Do you believe that those portions accurately

22  reflect what you told Ms. Diaz Herrera what Villanueva

23  said about the board of supervisors?

24         MR. DiBONA:  Objection.  Form.

25         THE WITNESS:  Yes.

COATES, KYLA                                                    Page 100

1   BY MR. TOKORO:

2       Q.  Do you believe the portions that Mr. DiBona

3   showed you accurately reflect what you told Ms. Diaz

4   Herrera about what Mr. Villanueva said about the justice

5   deputies?

6       A.  Yes.

7       Q.  Now, you testified earlier about Mr. Villanueva

8   referring to the board of supervisors as all women.  Do

9   you recall that?

10      A.  Yes.

11      Q.  Now, when Mr. Villanueva made those comments, and

12  I think you said repeatedly made those comments, did you

13  believe that he was using that in a positive way?

14          MR. DiBONA:  Objection.  Form.

15          THE WITNESS:  No.

16  BY MR. TOKORO:

17      Q.  What was your understanding of what

18  Mr. Villanueva was saying when he was referring to the

19  board as being all women?

20          MR. DiBONA:  Objection.  Form.

21          THE WITNESS:  He was saying them always in a

22  negative light.  He would say that they were all women in

23  the same sentence that he then proceeded to insult them

24  and imply that they were bad at their jobs, that they

25  didn't like the police, and that they were inept.  And so

COATES, KYLA                                        Page 105

```
1    STATE OF CALIFORNIA        )
                                )  ss.
2    COUNTY OF LOS ANGELES      )

3

4              I, KYLA COATES, declare under penalty of

5    perjury that the foregoing testimony is true and correct

6    to the best of my knowledge and belief.

7              Dated this   1   day of  April    , 2025.

8

9                                 Kyla Coates

10                                      KYLA COATES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COATES, KYLA                                                    Page 106

```
 1   STATE OF CALIFORNIA     )
                             )
 2   COUNTY OF VENTURA       ) ss.

 3

 4                   CERTIFICATE OF REPORTER

 5

 6           I, Lisa Lemus, CSR No. 11484, a Certified

 7   Shorthand Reporter, hereby certify that the witness in

 8   the foregoing remote videoconference deposition was by me

 9   duly sworn to tell the truth, the whole truth, and

10   nothing but the truth in the within-entitled cause;

11           That said deposition was taken in shorthand

12   by me, a disinterested person, at the time and place

13   wherein stated, and that the testimony of the said

14   witness was thereafter reduced to typewriting, by

15   computer, under my direction and supervision;

16           I further certify that I am not of counsel

17   or attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties hereto.

21

22           Dated this 1st day of April, 2025.

23

24   _____ Lisa Lemus _____
             LISA LEMUS, CSR No. 11484
25           Certified Shorthand Reporter
```

```
1    Errata Sheet

2

3    NAME OF CASE: ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

4    DATE OF DEPOSITION: 03/26/2025

5    NAME OF WITNESS: Kyla Coates

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page  56  Line  18  Reason  3

11   From  Sentence      to  Sentiment

12   Page ____ Line ____ Reason _____

13   From _____ to _____

14   Page ____ Line ____ Reason _____

15   From _____ to _____

16   Page ____ Line ____ Reason _____

17   From _____ to _____

18   Page ____ Line ____ Reason _____

19   From _____ to _____

20   Page ____ Line ____ Reason _____

21   From _____ to _____

22   Page ____ Line ____ Reason _____

23   From _____ to _____

24   Page ____ Line ____ Reason _____

25   From _____ to _____
```

EXHIBIT 13 - Page 316

# EXHIBIT 14

EXHIBIT 14 - Page 317

CERTIFIED COPY



1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

MERCEDES CRUZ

March 28, 2025

Rick Galten, CSR No. 13202, Job No. 6522

EXHIBIT 14 - Page 318

```
 1               UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3
    ALEX VILLANUEVA,                 )
 4                                   )
            Plaintiff,               )
 5                                   )
                vs.                  ) Case No. 2:24-cv-04979
 6                                   )          SVW (JCx)
    COUNTY OF LOS ANGELES, COUNTY    )
 7  OF LOS ANGELES SHERIFF'S         )
    DEPARTMENT, LOS ANGELES COUNTY)
 8  BOARD OF SUPERVISORS, COUNTY     )
    EQUITY OVERSIGHT PANEL, LOS      )
 9  ANGELES COUNTY OFFICE OF         )
    INSPECTOR GENERAL, CONSTANCE     )
10  KOMOROSKI, MERCEDES CRUZ,        )
    ROBERTA YANG, LAURA LECRIVAIN,)
11  SERGIO V. ESCOBEDO, RON          )
    KOPPERUD, ROBERT G. LUNA,        )
12  MAX-GUSTAF HUNTSMAN, ESTHER      )
    LIM, and DOES 1 to 100,          )
13  inclusive,                       )
                                     )
14          Defendants.              )
    _____)
15

16          REMOTE DEPOSITION OF MERCEDES CRUZ

17
                  Friday, March 28, 2025
18
                       --o0o--
19

20

21

22

23

24
    Reported by:
25  Rick Galten, CSR No. 13202
```

EXHIBIT 14 - Page 319

CRUZ, MERCEDES                                          Page 2

```
 1    APPEARANCES:

 2       For the Plaintiff:

 3            Shegerian & Associates, Inc.
              11520 San Vicente Boulevard
 4            Los Angeles, California  90049
              (310) 860-0770
 5            Adibona@shegerianlaw.com
              BY:  Alex DiBona, Esq.
 6

 7

 8       For the Defendants:

 9            Miller Barondess, LLP
              2121 Avenue of the Stars
10            Suite 2600
              Los Angeles, California  90067
11            (310) 552-5226
              jtokoro@millerbarondess.com
12            BY:  Jason H. Tokoro, Esq.

13

14    Also present:

15            Alex Villanueva

16

17

18

19

20

21

22

23
                              --o0o--
24

25
```

CRUZ, MERCEDES                                    Page 14

1          Have your duties on the CEOP changed at all

2     since 2004?

3          A.  Yes.  Because we were the EOP.  And then in

4     2011, it expanded to the CEOP.

5          Q.  What was the change from the EEOP to the CEOP?

6          A.  For the EOP, it was just sheriffs.  And for the

7     CEOP, it was all designated County departments.

8          Q.  Any other change since you've been on the panel

9     other than it from going to the Sheriff's Department to

10    all -- all County employees?

11         A.  Well, they're -- they're constantly tweaking it

12    to make it more efficient, to make it better.  So yes,

13    over the years, there have been changes.

14         Q.  What, broadly speaking, is your understanding

15    currently of what the CEOP does?

16         A.  We oversee all of the internal investigations

17    involving equity.

18         Q.  And are you paid to be on the CEOP panel?

19         A.  It's an hourly rate.

20         Q.  And so without telling me the hourly rate, is it

21    fair to say you bill time to the County for your work?

22         A.  Yes.

23         Q.  And with -- excuse me.

24          How do you get your assignments currently as a

25    panelist?

CRUZ, MERCEDES                                    Page 15

```
 1      A.  Every month we're asked for our availability for
 2  the following month.  And we give the dates that we're
 3  available for the days that the panel meets.  And then
 4  somebody there assigns us to a panel or one or more
 5  panels.
 6      Q.  And when you're on a panel, is it all -- or is
 7  it always the same panel or does it rotate?
 8      A.  It rotates.
 9      Q.  And do you know who makes the decision on the
10  rotation?
11      A.  No.
12      Q.  And how many people are generally on a panel --
13      A.  Three.
14      Q.  -- currently?
15      A.  Sorry.
16      Q.  No, it's fine.  And how long -- excuse me.
17          How long has it been three?
18      A.  I'm sorry, I didn't hear you.
19      Q.  Sorry.  I'll rephrase it.  Excuse me.
20          Since you -- how long has -- when you sat on a
21  panel at the CEOP has it been three members?
22      A.  I want to say since we were the CEOP.  Because
23  at Sheriff's, it was more.
24      Q.  And the recommendations for the panel, is it
25  done by majority vote?
```

CRUZ, MERCEDES                                                    Page 16

```
 1       A.  It's more complicated than that.
 2       Q.  Can you -- if you can, can you explain how it's
 3   more complicated than that.
 4       A.  Well, basically, what happens is that we meet to
 5   discuss what we think the recommendations should be.
 6   And we try to come to a consensus.  And if we don't, we
 7   go inconclusive.  And we're either the Department
 8   doesn't need to attend inconclusive, which means no
 9   matter -- there's just not enough information available
10   to come to any reasonable decision, or we're
11   inconclusive and we want to meet with the Department.
12           And in that case, we have an exchange of
13   information with the Department to see if the panel can
14   come to a consensus.
15           And it's usually a group decision, so you go
16   back and forth.  The Department gives you feedback, then
17   we caucus, and see if we're all on the same page at that
18   point.  So if somebody is inconclusive and two people
19   want to go a different way, we end up inconclusive.  Do
20   you see what I'm saying?  It's a little more
21   complicated.
22       Q.  I do.  Since 2004, apart from
23   Sheriff Villanueva, has a sheriff or former sheriff ever
24   come before the panel?
25       A.  I wouldn't know that, because I would only know
```

CRUZ, MERCEDES                                    Page 26

```
 1   recollection?
 2       A.  I want to say -- I'm terrible with names.  I
 3   want to say Commander -- no, that was the chief.
 4   Laura's the chief.  Ann's the lieutenant.  And Sara
 5   Hough is the commander.  Sorry, I don't remember their
 6   last names.  But if you tell me, I'll know.  I'm
 7   terrible with names, really bad.
 8       Q.  Do you remember anything that was said during
 9   the prebriefing or prehearing, excuse me?
10       A.  Verbatim, no.  But I think it was very
11   straightforward.  It was very short and very
12   straightforward.
13       Q.  Even if you don't remember verbatim, do you
14   remember anything that was discussed at the prehearing?
15       A.  Just, what were we going to do?  Since he was no
16   longer employed, we were founded on all charges except
17   sexual harassment.  And the only thing we can do is --
18   for something like this, a top of file designation.
19   It's pretty routine.
20       Q.  And so just to be clear, at the pre- -- at the
21   prehearing, there was already a determination to be
22   founded on all charges but sexual harassment?
23       A.  No, no, no.  Sorry.  You misunderstood.  We
24   arrived at that decision almost immediately, based on
25   what we had read, based on the two reports that we had.
```

*Express Deposition Services - Scheduling@expressdeposition.com*
*(888)286-4226*

EXHIBIT 14 - Page 324

CRUZ, MERCEDES                                                    Page 27

```
 1        Q.  And so being founded on all charges, when you
 2   say you arrived at that decision almost immediately,
 3   that decision, was that arrived at at the prehearing?
 4        A.  Yes.
 5        Q.  And then there was a discussion about -- at the
 6   prehearing that in light of us arriving at these
 7   conclusions, what are we going to do; is that right?
 8        A.  Right.  I mean, what's the normal thing to do in
 9   such circumstances?  And I -- I know I said top of file.
10   And everyone said yes, that's -- that's the thing to do.
11   'Cause he's not here anymore.  That's all we can do.  We
12   can't suspend him.  We can't fire him.  We can't
13   discipline him.  And so that's what we do.
14            And it's basically a red flag, essentially, that
15   you just say, hey, this person had some issues.  Before
16   you rehire them, if you're going to rehire them, look at
17   the file.
18        Q.  And I think I know, but in the context you're
19   using it, what does top of file mean?
20        A.  It is an administrative piece of paper, as I
21   understand it, that it's a do not hire.  And it's short
22   for do not hire unless you read this file.  That's my
23   understanding.  'Cause -- that's my understanding.
24        Q.  I'm going to send Exhibit 1 through the chat.
25            Do you see a document on your screen, Ms. Cruz?
```

CRUZ, MERCEDES                                              Page 32

```
 1    able to do so?
 2        A.  No.
 3        Q.  Just to go now to the hearing for
 4    Sheriff Villanueva -- by the way, just to back up for a
 5    second, is it -- there were two investigations into
 6    Sheriff Villanueva, correct?
 7        A.  The two that I saw is all I know about.
 8        Q.  And those -- those were decided by the same
 9    panel at the same time, correct?
10        A.  Correct.
11        Q.  And at the hearing, was -- who was present at
12    the actual hearing?
13        A.  Aside from the people that were at the
14    prehearing, it was the chief of equity, Laura.
15        Q.  And do you remember anything that was said at
16    the actual hearing itself?
17        A.  No.  It was pretty straightforward.  We said
18    that we were founded and -- on all charges except sexual
19    harassment.  And we were recommending top of file.  And
20    she agreed.  And that's pretty much it.
21        Q.  So it sounds, by the way, like the hearing was
22    actually pretty short.
23        A.  From my recollection, yes, it was very short.
24        Q.  Less than 15 minutes?
25        A.  That, I can't tell you.  I --
```

**EXHIBIT 14 - Page 326**

CRUZ, MERCEDES                                    Page 40

1      A.  My understanding is, he had the choice to be

2   interviewed.  And for whatever reason, he did not get

3   interviewed.  Here it says that because he wanted the

4   questions.  And of course, they wouldn't allow him to be

5   treated any different than any other witness.  So that

6   wouldn't be permissible.

7      Q.  By the way, do you know one way or the other if

8   there was any type of a rule or practice that in the

9   Sheriff's Department witnesses don't get the

10  interview questions ahead of time?

11     A.  That's my understanding.

12     Q.  And -- and just so I'm clear, it's your

13  understanding, based on what the sheriff's department

14  told you; is that right?

15         MR. TOKORO:  Objection.  It misstates her

16  testimony.  She didn't say anything like that.

17         But you can answer the question.

18         THE WITNESS:  Essentially, I've been on the

19  panel almost 20-something years.  And I've never

20  encountered any situation where they've given the

21  questions ahead of time.

22         MR. DIBONA:  Q.   Do you see here there's a

23  section called Mr. Huntsman's Name?

24     A.  Yes.

25     Q.  And do you see here that there's a reference to

CRUZ, MERCEDES                                    Page 41

```
 1    Mr. Huntsman being born Max-Gustaf Edler?
 2         A.  I see that.
 3         Q.  And you also -- you have an understanding one of
 4    the complaints that Max Huntsman made against
 5    Sheriff Villanueva was that Sheriff Villanueva was
 6    referring to him as Max-Gustaf?
 7         A.  Correct.
 8         Q.  As a general matter, is there anything
 9    inappropriate about someone referring to someone as the
10    name they were born with?
11              MR. TOKORO:  Objection.  It misstates the facts
12    as not what Mr. Villanueva was referring to Mr. Huntsman
13    as.
14              But you can otherwise answer that.
15              THE WITNESS:  Basically, you should not call
16    somebody by a name that they were no longer going by or
17    choose not to go by.  And I think Mr. Huntsman made it
18    very clear that he had changed his name, that he did not
19    go by any other name.  And you should not call an
20    employee by a name that they don't want to be called by
21    if there's no legitimate business reason for doing so.
22              MR. DIBONA:  Q.   And did you have an
23    understanding one way or another if Max-Gustaf -- I'm
24    sorry.
25              Do you have an understanding one way or another
```

**EXHIBIT 14 - Page 328**

CRUZ, MERCEDES                                        Page 42

1   if Max Huntsman had a plaque on his desk that read

2   Max-Gustaf?

3       A.  Quite frankly, I don't really care what he had

4   on his desk.  He made it very clear that he did not want

5   to be called that and did not want to be associated with

6   his German heritage.

7       Q.  And did you have an understanding one way or the

8   other if Max Huntsman was still listed on the California

9   State Bar website as Max-Gustaf Huntsman?

10          MR. TOKORO:  Objection.  Misstates the facts,

11  misstates the record, misstates the exhibits produced

12  and used in this case.

13          But you can answer if you know.

14          THE WITNESS:  Again, I'm really not concerned

15  about what the State Bar says about his name.  My

16  concern is about the employee and his well-being.  And

17  there was no business necessity for calling him a name

18  that made him uncomfortable and that he made clear he

19  did not want to be called.

20          MR. DIBONA:  Q.  And separate and apart from

21  Max-Gustaf Huntsman -- excuse me.

22          Do you have an understanding that at the State

23  Bar, the name you are listed by is your legal name?

24          MR. TOKORO:  Once again, objection.  Misstates

25  the record, misstates the facts, misstates the exhibits.

CRUZ, MERCEDES                                      Page 71

1        Do you believe Sheriff Villanueva ever -- strike

2   that.

3        Do you have any reason to believe that when

4   Sheriff Villanueva discussed the motion Ms. Kim

5   (verbatim) drafted on behalf of Hilda Solis on the July

6   28, 2021, Facebook Live, he was in any way

7   discriminating against her because of her race?

8        A.  I wouldn't know.  All I know is that she felt

9   singled out because at the time it was COVID.  Asians

10  were very sensitive about being singled out, because

11  they were subject to ridicule.  A lot of people had, you

12  know, very bad feelings about anyone who didn't come

13  from the U.S., that they were bringing, you know, these

14  diseases into our country.  And the Asians took it more

15  than anyone else.  And she felt very sensitive about it,

16  that she was being singled out, because she was an easy

17  target.

18        So I don't know what his motivations were.  But

19  as I said, if you ignore the entire Lim report, I had

20  enough on just Max Huntsman to put a top of the file

21  recommendation.  So, you know, all of these

22  contemporaneous little things, it's the totality of the

23  circumstances that I looked at.

24        Q.  Yeah --

25        A.  And I truly believed that he, you know, took the

*Express Deposition Services - Scheduling @expressdeposition.com*
*(888)286-4264*

**EXHIBIT 14 - Page 330**

CRUZ, MERCEDES                                    Page 77

```
 1   it, 'cause it's -- it's much more complicated.  And
 2   that's why I asked if you're an employment attorney,
 3   'cause you know it's gray.  And it -- there's a lot that
 4   goes into that.
 5           Sometimes it's important, sometimes it's not.
 6   Sometimes it goes to the corroboration of other
 7   witnesses who have specifics.  Some witnesses don't have
 8   specifics, but it -- they're saying, yeah, you know,
 9   they don't walk around with tape recorders.  They don't
10   walk around taking notes, generally speaking.  It's just
11   what they can recall.
12           And she recalls him making statements.  She
13   can't recall the specifics.  But others recall
14   specifics.  Maybe not about Holly, but about the other
15   supervisors.
16           So that's what I'm looking at.  Sometimes it's
17   enough that, you know, three or four or five employees
18   are all saying the same thing.  They may not have, you
19   know, the specific words that were used, but they're
20   saying, yeah, you know, I remember him saying something
21   really offensive based on his race.  I just can't
22   remember exactly what it was.
23           But that goes to lending corroboration to the
24   other person saying, I remember exactly what it was.
25           MR. DIBONA:  Q.   And was anything
```

**EXHIBIT 14 - Page 331**

CRUZ, MERCEDES                                              Page 78

```
 1    Sheriff Villanueva said about Holly Mitchell one of the
 2    reasons the CEOP put a do not -- recommended a do not
 3    rehire notation top of file?
 4         A.  Again, the same thing.  It goes to the totality
 5    of the report.  We didn't take a single sentence and
 6    say, oh, that's why we're coming to that conclusion.
```

 7         Q.  So Ms. Cruz, do you agree with me that as a
 8    general matter, in order to use something as a basis to
 9    impose discipline, you would actually need to know what
10    was said?
11              MR. TOKORO:  Objection.  That question was just
12    asked.  And she just answered it.
13              You can answer it again.
14              THE WITNESS:  No, I really can't.  I just want
15    to reiterate, just repeat my answer.
16              MR. DIBONA:  Q.   You can do that.
17         A.  I repeat my answer.
18         Q.  Do you see here there's a reference to,
19              "Ms. Lim has drafted many motions about
20              accountability.  And as a result,
21              Sheriff Villanueva goes after Ms. Lim and
22              Supervisor Solis."
23              Did I read that correctly?
24         A.  That looks like what you read.
25         Q.  And do you have an understanding -- I'm sorry,

EXHIBIT 14 - Page 332

CRUZ, MERCEDES                                      Page 116

```
 1    on -- take it one at a time -- based on ethnicity?
 2         A.  Both Max and Lim.
 3         Q.  And why do you believe he discriminated against
 4    Esther Lim on the basis of her ethnicity?  What's the
 5    reason for the CEOP's recommendation that this charge be
 6    founded?
 7         A.  We believe that he targeted her because of her
 8    Asian -- Asian ancestry and his previous behavior
 9    towards Sachi and the things that happened with her.
10    And it -- and that was the effect that it had on this
11    young woman of Asian ancestry, that she felt singled
12    out.  And there were -- was evidence that, in fact, she
13    was singled out for certain behavior, including being
14    investigated and being, you know, called a flunky and
15    all these different things that occurred.
16              And based on the totality of the reports, we
17    believed that that charge was, in fact, founded.  And
18    again, this is based on a violation of the policy, not
19    the law.
20         Q.  And -- sorry, just to take -- what was -- who is
21    Sachi, that you're referring to?
22         A.  She was the former CEO --
23         Q.  And --
24         A.  -- of the County.
25         Q.  And what was your understanding of
```

CRUZ, MERCEDES                                              Page 118

```
 1    Tweets?
 2         A.  No.  I believe he singled her out because she
 3    was trying to do her job --
 4         Q.  And her job --
 5         A.  -- of oversight.
 6         Q.  Okay.  I'm sorry, you -- I cut you off.
 7              She was singled out because she was trying to do
 8    her job, and her job was oversight?  Was that -- was
 9    that your answer?
10         A.  That was part of her job, yes.
11         Q.  Apologies for cutting that off.
12              Any other reason you believe Sheriff Villanueva
13    was singling out Esther Lim?
14         A.  For the totality of what was in the report.  And
15    I didn't memorize the report.
16         Q.  And for the policy of equality sexual
17    harassment, that charge was unfounded, correct?
18         A.  That's correct.
19         Q.  And it's fair to believe you still believe it
20    should have been unfounded as you sit here today,
21    correct?
22         A.  Absolutely.
23         Q.  For policy of equality discriminatory harassment
24    based on gender and ethnicity, do you see here that
25    there was a charge founded?
```

*Express Deposition Services - Scheduling @expressdeposition.com*
*(888)286-4226*

EXHIBIT 14 - Page 334

CRUZ, MERCEDES                                                    Page 119

```
 1        A.   It was.
 2        Q.   And why do you believe this charge should be
 3   founded?
 4        A.   Because Ms. Lim was subjected to contact that
 5   had the effect or impact of interfering with her ability
 6   to do her job and that was based on a protected basis:
 7   Her gender and her ethnicity.  And I believe that I
 8   testified to numerous different reasons why he behaved
 9   in this way towards her and that she very much was
10   intimidated and felt that she had a hostile work
11   environment and that she was unable to do her job, based
12   on having things been very difficult for her.
13        Q.   You see here there's a policy of equality
14   violation of third-person harassment based on gender and
15   ethnicity, and the charge was founded, correct?
16        A.   Absolutely.
17        Q.   And why do you believe this charge should have
18   been founded?
19        A.   She had to watch while her boss and the other
20   Board of Supervisors members and the deputies were
21   denigrated because of their gender.  It wasn't at all
22   clear to me why the sheriff had a problem with the
23   entire Board being female, when the entire Board has
24   been male in the past, or a combination thereof.
25             And I believe that each of them had to see their
```

```
 1   colleagues being told that they're -- you know, that
 2   they're just a bunch of flunkies out of college,
 3   20-year-olds, when a lot of those women were mature
 4   women with degrees, master degrees, bachelor degrees,
 5   and experience and that he was denigrating their work
 6   performance and what they were trying to do in the
 7   media.  All of that went to third-person harassment.
 8       Q.  And anything else related to third-person
 9   harassment other than what you testified about?
10       A.  Yes.  I would say I -- again, I have not
11   memorized the report, but with the totality of the
12   report.
13       Q.  And for "policy of equality inappropriate
14   conduct towards others (based on gender and ethnicity)."
15           Do you see here the charge was founded?
16       A.  Absolutely.
17       Q.  And --
18       A.  That's a lesser-included charge.  So basically,
19   if you violate the more significant charge, you violated
20   the inappropriate conduct towards others.
21       Q.  What -- I think I know, but what do you mean
22   when you say lesser-included charge?
23       A.  It's a charge that's eaten up by the bigger
24   charge.  The smaller charge, inappropriate conduct
25   towards others, is meant to stop behavior that is
```

EXHIBIT 14 - Page 336

CRUZ, MERCEDES                                          Page 121

```
 1    inappropriate before it violates the bigger charge.
 2        Q.  Okay.
 3        A.  And so it's included, it sort of gets eaten up
 4    by the fact that you violated the bigger charge.
 5        Q.  Okay.  So what I hear you saying -- correct me
 6    if I'm wrong -- because he violated the policy of
 7    equality related to third-person harassment, he also
 8    violated the policy of equality for inappropriate
 9    conduct towards others.
10            Is that what you're saying?
11        A.  And the discrimination one and the harassment
12    one.
13        Q.  Okay.  And so is it the inappropriate conduct
14    towards others, are those the same reasons for the --
15    what we've looked at?  Or are they -- are the --
16    anything different?
17        A.  No, it's the totality of the report.  And again,
18    the more significant charges would encompass the
19    inappropriate conduct.
20        Q.  Let me just ask it this way.
21            Is there anything that you believe goes to
22    upholding the inappropriate conduct towards others based
23    on gender, ethnicity, that you didn't mention for the
24    third-person harassment or the discrimination on the
25    basis of gender and ethnicity?
```

```
 1      A.   Again, the harassment and the discrimination and
 2   the third-party, all of those three charges could go to
 3   the inappropriate conduct towards others, in addition to
 4   the actual report.
 5      Q.   Right.  And my question -- maybe just -- I think
 6   you're answering it.  I just want to be clear.
 7           Is there anything else that -- else besides --
 8   that goes to inappropriate conduct towards others
 9   separate -- that's not included in gender, harassment,
10   and discrimination and third-person harassment?
11      A.   Again, I don't believe that there would be,
12   because it -- the bigger charges eat up the little
13   charge.  The little charge is, as I said, a lesser
14   included charge.  So if you violated the bigger charge,
15   you violated the little charge.
16      Q.   For policy for equality based on retaliation
17   based on gender and ethnicity, the charge was founded?
18      A.   It was.
19      Q.   And why do you believe -- what's the reason for
20   the CEOP's recommendation that the charge be founded for
21   the -- as relates to retaliation?
22      A.   As I testified, again, I haven't memorized the
23   report.  But based on my recollection, this would be him
24   sending the letters, trying to get her fired.  The
25   effect it had on her.  The effect that his comments were
```

**EXHIBIT 14 - Page 338**

CRUZ, MERCEDES                                                    Page 123

```
 1    having on her job and her ability to do her job.  And
 2    all of this, the investigation that he opened on her, be
 3    it -- however you want to characterize it, he was using
 4    his position as the sheriff to open an investigation
 5    into her personal social media.
 6          And I don't believe that was appropriate.  And I
 7    do believe that it interferes with her ability to do her
 8    job and was retaliatory for her trying to do her job.
```

```
 9    Q.  Do you believe -- just to be clear, do you
10    believe the Tweets were her trying to do her job?
11    A.  No.  The -- well, it depends on which Tweets
12    we're talking about.  There were many Tweets.  And there
13    were Tweets that were her personal Tweets and then there
14    were Tweets that she did as the ACLU person.
15          But the fact that he was trying to get into her
16    personal Tweets and bring it into the business arena and
17    trying to get her fired for those things was
18    intimidating to her and it caused her not to be able to
19    do her job effectively, which was to oversee the
20    Sheriff's Department, turning off computers, not
21    responding to subpoenas, not allowing her access to the
22    materials she needed for her job, denigrating her job,
23    denigrating her, denigrating the supervisors.  I mean,
24    on and on.
25    Q.  So Ms. Cruz, just to be clear, you have an
```

CRUZ, MERCEDES                                                    Page 127

```
 1   violations?
 2            MR. TOKORO:  Objection.  Assumes facts not in
 3   evidence, is a hypothetical, given that he was not the
 4   sheriff at the time of the CEOP hearing.  May also call
 5   for a legal conclusion.
 6            But you can answer.
 7            THE WITNESS:  It didn't come up.
 8            MR. DIBONA:  Q.   And the reason for the do not
 9   rehire notation was because since he was no longer with
10   the Sheriff's Department, the -- you didn't believe you
11   could give him any discipline, correct?
12            MR. TOKORO:  Objection.  It misstates her
13   testimony for why they recommended a do not rehire.  All
14   the reasons in the report, as she's testified
15   repeatedly.
16            But you can answer.
17            THE WITNESS:  Again, the reason for a do not
18   rehire is that the investigation is founded.  The
19   employee or the person is no longer part of the County.
20   And it is the only thing that we can do in response if
21   the charges are significant.  And here, they were.
22            MR. DIBONA:  Q.   And my question -- just to
23   follow up on that, the reason it's the only thing you
24   could do in this case is because Sheriff Villanueva was
25   no longer with the Sheriff's Department; is that right?
```

CRUZ, MERCEDES                                    Page 131

```
 1          MR. TOKORO:  I'm going to object and instruct
 2     the witness not to answer that question for the reasons
 3     we've discussed already.
 4          MR. DIBONA:  Q.   And Ms. Cruz, are you going to
 5     take your attorney's advice and not answer the question?
 6     A.  Yes.
 7     Q.  Since the CEOP hearing, have you had any
 8     discussions with Max Huntsman?
 9     A.  No.
10     Q.  Since the CEOP hearing, have you had any
11     discussions with Esther Lim?
12     A.  No.
13     Q.  Since the CEOP hearing, have you had any
14     discussions with Alex Villanueva?
15     A.  No.
16     Q.  And since the CEOP hearing, have you had any
17     discussions with Veronica Pawlowski?
18     A.  No.
19     Q.  And since the CEOP hearing, have you had any
20     discussions with Kyla Coates?
21     A.  No.
22     Q.  And is it fair to say if someone asked to be
23     testified -- to testify on behalf of the County
24     regarding the reasons for the CEOP's recommendation for
25     the do not rehire, you personally believe the charges
```

**EXHIBIT 14 - Page 341**

CRUZ, MERCEDES                                                Page 132

```
 1    should have been founded against Sheriff Villanueva,
 2    correct?
 3        A.  I do.
 4        Q.  And you stand by the CEOP's recommendation,
 5    correct?
 6        A.  I do.
 7        Q.  And it's -- it's fair to say nothing you've seen
 8    at all since the CEOP's recommendation, including at
 9    this deposition, has caused you to rethink any of that,
10    has it?
11        A.  No, not at all.
12            MR. DIBONA:  Okay.  I think I'll be close to
13    done soon, if not already done.  I understand you might
14    have some questions, Counsel.
15            But can we just take another five-minute break
16    and then I'll wrap up at least my questioning very soon.
17            MR. TOKORO:  Sounds good.  Let's go off the
18    record.
19            (Off the record from 2:03 to 2:13.)
20            MR. DIBONA:  Q.   Ms. Cruz, do you understand
21    you're still under oath?
22        A.  I do.
23        Q.  Is there any reason you can't continue to give
24    your best testimony?
25        A.  No.
```

CRUZ, MERCEDES                                                    Page 137

```
 1    time to see if Sheriff Villanueva was available for an
 2    interview?
 3        A.  No.
 4        Q.  Did you ever -- excuse me.
 5            Is there any part of your testimony that you
 6    believe needs to be changed as you sit here today?
 7        A.  I wouldn't know that without seeing the
 8    transcript.
 9            MR. DIBONA:  And I don't have any further
10    questions.
11            Do you, Counsel?
12            MR. TOKORO:  I do.
13            And Rick, I'm going to get as close as possible
14    and speak as loudly as possible.  I'm not intending to
15    yell at anyone.  I just want to make sure you hear my
16    questions loud and clear.
17            And if you don't hear me, for whatever reason,
18    just let me know and I'm happy to re-ask.
19            That work for you, Rick?
20            THE REPORTER:  Yes, thank you.
21                          EXAMINATION
22            BY MR. TOKORO:  Q.   Ms. Cruz, did Sheriff
23    Robert Luna have anything to do with the CEOP's
24    recommendations regarding the Huntsman and Lim
25    complaints?
```

CRUZ, MERCEDES                                        Page 138

```
 1        A.   No.
 2        Q.   Okay.  Did Sheriff Robert Luna attend the CEOP
 3   prehearing?
 4        A.   No.
 5        Q.   Okay.  Did Sheriff Robert Luna attend the CEOP
 6   hearing?
 7        A.   No.
 8        Q.   Did you ever at any time speak with Sheriff
 9   Robert Luna about the Huntsman complaint?
10        A.   No.
11        Q.   Did you at any time ever speak with Sheriff Luna
12   about the Lim complaint?
13        A.   No.
14        Q.   Okay.  Did any of the Board supervisors for the
15   Los Angeles County Board of Supervisors have any
16   involvement in the CEOP's recommendations regarding the
17   Huntsman and Lim complaints?
18        A.   No.
19        Q.   Okay.  Did any of the Board of Supervisors
20   attend the CEOP hearing?
21        A.   No.
22        Q.   Okay.  Did any of the Board of Supervisors
23   attend the CEOP prehearing?
24        A.   No.
25        Q.   Did you have communications with any member of
```

CRUZ, MERCEDES                                                Page 140

```
 1        Q.  Now, you were asked earlier whether you were
 2   aware that Mr. Villanueva was running for the Board of
 3   Supervisors when the CEOP hearing happened.
 4             Do you recall that?
 5        A.  I do.
 6        Q.  I believe you said you were not aware; is that
 7   true?
 8        A.  I totally was not aware of that.
 9        Q.  So was Mr. Villanueva running for the Board of
10   Supervisors -- did that have any impact on the CEOP's
11   recommendations regarding the Huntsman complaint?
12        A.  No.
13        Q.  Okay.  Did it have any impact on the CEOP's
14   recommendations regarding the Lim complaint?
15        A.  No.
16        Q.  Were the CEOP's recommendations regarding the
17   Huntsman complaint an attempt by the County to prevent
18   Mr. Villanueva from being elected to the Board of
19   Supervisors?
20             MR. DIBONA:  Objection.  Form.
21             THE WITNESS:  Could you repeat the question.
22             MR. TOKORO:  Sure.
23        Q.  Were the CEOP's recommendations regarding the
24   Huntsman complaint an attempt to prevent Mr. Villanueva
25   from being elected to the Board of Supervisors?
```

**EXHIBIT 14 - Page 345**

CRUZ, MERCEDES                                          Page 141

```
 1      A.  No.
 2      Q.  Were the CEOP's recommendations regarding the
 3 Lim complaint an attempt to prevent him from being
 4 elected to the Board of Supervisors?
 5      A.  No.
 6      Q.  Now, Mr. Villanueva has alleged in this case
 7 that the CEOP's recommendations and the Department's
 8 concurrence were in retaliation for positions he took on
 9 certain measures and other things before the Board.  I
10 want to talk to you about some of those now.
11          Do you know what Measure A is?
12      A.  No.
13      Q.  Okay.  Did Measure A have anything to do with
14 the CEOP's recommendations regarding the Huntsman and
15 Lim complaints?
16      A.  No.
17      Q.  Okay.  Did Mr. Villanueva's opposition to
18 Measure A have anything to do with the CEOP's
19 recommendations regarding the Huntsman and Lim
20 complaints?
21          MR. DIBONA:  Objection, form.
22          MR. TOKORO:  Q.   Was Measure A discussed in any
23 way during the CEOP prehearing or hearing?
24      A.  No.
25      Q.  Do you know what Measure J is?
```

CRUZ, MERCEDES                                                    Page 142

```
 1        A.   No.
 2        Q.   Okay.  Did Measure J have anything to do with
 3   the CEOP's recommendations?
 4        A.   No.
 5        Q.   Okay.  Did measure -- did Mr. Villanueva's
 6   opposition to Measure J have anything to do with the
 7   CEOP's recommendations?
 8        A.   No.
 9        Q.   Was Measure J discussed in any way during the
10   CEOP hearing or prehearing?
11        A.   No.
12        Q.   Do you know what Measure R is?
13        A.   No.
14        Q.   Was -- did Measure R have any impact on the
15   CEOP's recommendations regarding the Huntsman or Lim
16   complaints?
17        A.   No.
18        Q.   Okay.  Did Mr. Villanueva's opposition to
19   Measure R have any impact on the CEOP's recommendations?
20        A.   No.
21        Q.   Was Measure R discussed in any way during the
22   prehearing or the hearing?
23        A.   No.
24        Q.   Now, what about COVID vaccine mandates?  Was
25   that discussed during the CEOP prehearing or hearing?
```

```
1        A.   No.
2        Q.   Was the County's mandatory COVID vaccine --
3   vaccination any factor in the CEOP's recommendations?
4        A.   No.
5        Q.   Was Mr. Villanueva's refusal to enforce the
6   County's COVID vaccine mandate, did that have any impact
7   on the CEOP's recommendations?
8        A.   No.
9        Q.   Do you know what the Fulgent testing contract
10  is?
11       A.   No.
12       Q.   Did the Fulgent testing contract with the County
13  have anything to do with the CEOP's recommendations?
14       A.   No.
15       Q.   Okay.  Did Mr. Villanueva's opposition to the
16  Fulgent contract have anything to do with the CEOP's
17  recommendations?
18       A.   No.
19       Q.   Was the Fulgent contract discussed in any way,
20  shape, or form during the CEOP prehearing or hearing?
21       A.   No.
22       Q.   Were the CEOP's recommendations retaliation
23  against Mr. Villanueva?
24       A.   Absolutely not.  Don't have anything -- I
25  personally have nothing -- I have no relationship,
```

CRUZ, MERCEDES

1    nothing.  I have no reason for doing that.

2        Q.  Now, when the CEOP was considering the Huntsman

3    complaint, did you treat Mr. Villanueva any differently

4    than you would any other subject of an investigation?

5        A.  Absolutely not.

6        Q.  When the CEOP was considering the Lim

7    investigation, did you treat Mr. Villanueva any

8    differently than you would any other employee of the

9    County?

10       A.  No.

11           MR. TOKORO:  Thank you.

12           MR. DIBONA:  I have just a couple follow-up

13   questions.

14                  FURTHER EXAMINATION

15           BY MR. DIBONA:  Q.   Ms. Cruz, do you know why

16   the other two panel members recommended the do not

17   rehire notation for Sheriff Villanueva?

18       A.  For the reasons that I've given today.  And they

19   may have additional reasons, but basically, we all

20   discussed that we were founded and we all discussed that

21   that was the appropriate result.

22       Q.  Was it ever brought up at the CEOP hearing that

23   Esther Lim was having difficulty doing her job because

24   of the actions of Sheriff Villanueva?

25       A.  I don't recall discussing the specifics of the

```
 1   report.  I know that we were basically all founded,
 2   based on the totality of the two reports and that we
 3   both -- we all agreed there wasn't any, like -- we had
 4   to, you know, twist somebody's arm.  It was pretty
 5   straightforward.
 6       Q.  Was any -- was it discussed at all that Max
 7   Huntsman was having difficulty doing his job?
 8       A.  That's correct.  I don't have a specific
 9   recollection of that being discussed specifically.  All
10   I do remember is that we came to the same result
11   relatively quickly and that there was no disagreement
12   that the charges were founded.  We were very much
13   aligned.  And now, you know, what's the appropriate
14   measure?  We agree on topic by yes, yes.  And that was
15   pretty much it.
16               MR. DIBONA:  I don't have any further questions.
17               MR. TOKORO:  Great.  Let's go off the record.
18               DEPOSITION OFFICER:  Counsel, would you like to
19   order a copy of the transcript?
20               MR. TOKORO:  I do.  So what we've been doing for
21   all of these depositions is having the witness's copy
22   sent to our office.  And we'll forward it to her for
23   signature and errata.
24               And then our office will order a copy.  And I
25   believe my assistant has been coordinating that.  But
```

**EXHIBIT 14 - Page 350**

CRUZ, MERCEDES                                              Page 148

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2    STATE OF CALIFORNIA     )
                              ) ss.
 3    COUNTY OF SAN FRANCISCO)

 4

 5

 6          I, Rick Galten, hereby certify:

 7          I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number CSR 13202 issued by the Court

10    Reporters Board of California and which is in full force

11    and effect.  (Fed. R. Civ. P. 28(a)).

12          I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a), 30(f)(1)).

17          I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22          I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25    ///
```

CRUZ, MERCEDES                                              Page 149

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3            Before completion of the deposition, review of

4    the transcript [X] was [ ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fe. R. Civ. P. 30(e)).

8    Dated: April 2, 2025

9

10   _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 15

EXHIBIT 15 - Page 353

CERTIFIED COPY



Express Deposition Services
*by* EXPRESSNETWORK

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

## VERONICA PAWLOWSKI, VOLUME II

### April 04, 2025

Shannon D. Denney, CSR No. 10385, Job No. 7156

EXHIBIT 15 - Page 354

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA,                         )
                                         )
          Plaintiff,                     )
                                         )
vs.                                      ) No: 2:24-cv-04979
                                         )     SVW (JCx)
COUNTY OF LOS ANGELES, COUNTY OF         )
LOS ANGELES SHERIFFS DEPARTMENT,         )
LOS ANGELES COUNTY BOARD OF              )
SUPERVISORS, COUNTY EQUITY               )
OVERSIGHT PANEL, LOS ANGELES COUNTY)
OFFICE OF INSPECTOR GENERAL,             )
CONSTANCE KOMOROSKI, MERCEDES CRUZ,)
ROBERTA YANG, LAURA LECRIVAIN,           )
SERGIO V. ESCOBEDO, RON KOPPERUD,  )
ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN)
ESTHER LIM, and DOES 1 to 100,           )
inclusive,                               )
                                         )
          Defendants.                    )
_____)


DEPOSITION OF:  VERONICA PAWLOWSKI

VOLUME II

April 4, 2025



REPORTED BY: SHANNON D. DENNEY, CSR No. 10385

EXHIBIT 15 - Page 355

PAWLOWSKI, VOLUME II, VERONICA                    Page 2

```
 1                      APPEARANCES

 2

 3   For the Plaintiff:

 4        SHEGERIAN & ASSOCIATES, INC.
          BY:  ALEX DIBONA, ESQ.
 5        aDiBona@shegerianlaw.com
          11520 San Vicente Boulevard
 6        Los Angeles, CA  90049

 7

 8   For the Defendants:

 9        MILLER BARONDESS, LLP
          BY:  JASON H. TOKORO, ESQ.
10        jtokoro@millerbarondess.com
          2121 Avenue of the Stars, Suite 2600
11        Los Angeles, CA  90067

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 15 - Page 356

```
 1                    But, otherwise, you can answer.

 2                    THE WITNESS:  I don't remember.

 3         Q.    MR. DiBONA:  And did you make any public

 4    statements in support of now Sheriff Luna's candidacy

 5    to become sheriff?

 6         A.    No.  I did not.

 7         Q.    Did you tell anyone, privately, that they

 8    should vote for Sheriff Luna?

 9         A.    No.  I did not.

10         Q.    And did you did tell anyone, privately, that

11    they should not vote for then Sheriff Villanueva?

12         A.    No.  I did not.

13         Q.    As you sit here today, do you believe any

14    part of your testimony needs to be changed for any

15    reason?

16         A.    Not that I can think of, no.

17         Q.    And just to be clear, since we ended last

18    deposition, you'll have a chance to review.

19                    Do you have any recollection that anything

20    you said in the first deposition needs to be changed at

21    all?

22         A.    Not that I can think of, no.

23                    MR. DiBONA:  I don't have any further

24    questions.

25                    Do you, Counsel?
```

**EXHIBIT 15 - Page 357**

```
 1
 2                         EXAMINATION BY
 3       Q.   MR. TOKORO:  I do.  Shannon, let me know if
 4  you can't hear me for any reason.  We swapped the
 5  computer, so I'm hoping that it's a little better.  But
 6  I'm also speaking as loudly as I can without yelling.
 7            Ms. Pawlowski, I'd like to ask you a few
 8  questions.
 9            Did you have any conversations with Sheriff
10  Luna, at any time, about Ms. Lim's complaint?
11       A.   No.  I did not.
12       Q.   Did you, at any time, have conversation with
13  Mr. Luna -- sorry, Sheriff Luna about Mr. Huntsman's
14  complaint?
15       A.   No.  I did not.
16       Q.   Did you, at any time, have a conversation
17  with Sheriff Luna about your interview with Christine
18  Dias-Herrera?
19       A.   No.  I did not.
20       Q.   Did you ever have a conversation with --
21  well, I don't need to ask that question.
22            Did you ever have a conversation with anyone
23  while any member of the Board of Supervisors about Ms.
24  Lim's complaint?
25       A.   No.  I did not.
```

**EXHIBIT 15 - Page 358**

1        Q.    Did you ever have any conversations with

2    anyone, any of the Board of Supervisors, regarding Mr.

3    Huntsman's complaint?

4        A.    No.  I did not.

5        Q.    Did you ever have a conversation with

6    Supervisor Solis about Ms. Lim's or Mr. Huntsman's

7    complaints?

8        A.    No.  I did not.

9        Q.    Did you ever have a conversation with

10   Supervisor Kuehl about Mr. Huntsman or Ms. Lim's

11   complaints?

12       A.    No.  I did not.

13       Q.    Did any member of the Board of Supervisors

14   direct you, in any way, regarding your interview with

15   Ms. Christine Dias-Herrera?

16       A.    No.

17       Q.    Now, you were asked a number of questions by

18   Mr. DiBona about ballot measures.  I did want to follow

19   up on those, specifically the question Mr. DiBona did

20   not ask you.

21            Did ballot Measure A have anything to do with

22   the interview you gave with Ms. Christine

23   Dias-Herrera?

24            MR. DiBONA:  Object to form.

25            You can answer, of course.

**EXHIBIT 15 - Page 359**

```
 1            THE WITNESS:  Can you say that again?
 2      Q.   MR. TOKORO:  Did ballot Measure A have
 3 anything to do with the interview you did with Ms.
 4 Dias-Herrera?
 5            MR. DiBONA:  Same objection.
 6            THE WITNESS:  No.
 7      Q.   MR. TOKORO:  Did ballot Measure A, and
 8 Mr. Villanueva's opposition to it, have anything to do
 9 with that interview?
10            MR. DiBONA:  Same objection.
11            THE WITNESS:  No.
12      Q.   MR. TOKORO:  Did ballot Measure J have
13 anything to do with that interview?
14      A.   No.
15      Q.   Did Mr. Villanueva's opposition to ballot
16 Measure J have anything to do with your interview?
17            MR. DiBONA:  Object to form.
18            THE WITNESS:  No.
19      Q.   MR. TOKORO:  Did ballot Measure R have
20 anything to do with the statements you made during your
21 interview?
22            MR. DiBONA:  Object to form.
23            THE WITNESS:  No.
24      Q.   MR. TOKORO:  Did Mr. Villanueva's opposition
25 to ballot Measure R have anything to do with your
```

 1    interview?

 2              MR. DiBONA:  Object to form.

 3              THE WITNESS:  No.

 4       Q.    MR. TOKORO:  Did the COVID vaccine mandate

 5    have anything to do with your interview with Ms.

 6    Dias-Herrera?

 7              MR. DiBONA:  Object to form.

 8              THE WITNESS:  No.

 9       Q.    MR. TOKORO:  Did Mr. Villanueva's opposition

10    to the COVID have anything to do with your interview?

11              MR. DiBONA:  Object to form.

12              THE WITNESS:  No.

13       Q.    MR. TOKORO:  Did the county contract,

14    regarding COVID testing, have anything to do with your

15    interview?

16              MR. DiBONA:  Object to form?

17              THE WITNESS:  No.

18              MR. TOKORO:  Did Mr. Villanueva's opposition

19    to the full again contract have anything to do with

20    your interview?

21              MR. DiBONA:  Object to form.

22              THE WITNESS:  No.

23       Q.    MR. TOKORO:  The interview that you gave to

24    Ms. Christine Dias-Herrera, were you truthful and

25    honest during that interview?

**EXHIBIT 15 - Page 361**

```
 1        A.    Yes.
 2        Q.    Do you stand by the statements you gave to
 3   Ms. Dias-Herrera?
 4        A.    I do.
 5        Q.    The statements that you gave during that
 6   interview, were they intended, in any way, to retaliate
 7   against Mr. Villanueva?
 8        A.    No.
```

```
 9        Q.    Now, you were asked by Mr. DiBona whether the
10   Board was all women at the time that Mr. Villanueva was
11   making these statements about them publicly.
12              Do you recall you that?
13        A.    Yes.
14        Q.    When Mr. Villanueva was going around saying
15   the Board was all women, did you view that as something
16   positive that he was saying, or something that was
17   negative or disparaging?
18              MR. DiBONA:  Object to form.
19              THE WITNESS:  That was definitely negative or
20   disparaging.
21              And I'll share that.  The fact that the
22   county had elected a Board of Supervisors of all women
23   was held up in a very positive light in a number of
24   forums.  Writeups in a newspaper, or magazine.  So
25   there were definitely instances in which this fact that
```

**EXHIBIT 15 - Page 362**

```
 1    there were five women was held up as a positive thing
 2    for county.
 3              And so when the Sheriff would say it, and the
 4    way he said it, it was crystal clear that he was not up
 5    lifting it in a is positive way in the manner others
 6    had done so.  It was clear that he was saying it with
 7    negative implications.
 8         Q.   MR. TOKORO:  Now Mr. DiBona asked you a
 9    number of questions about your understanding of how Ms.
10    Lim felt about Mr. Villanueva's comments.
11              Do you recall that?
12         A.   Yes.
13         Q.   I think you said she was distressed, and
14    other things.
15              Do you recall that?
16         A.   Yes.
17              MR. DiBONA:  Object to form.
18         Q.   MR. TOKORO:  One of the things Mr. DiBona
19    asked about, how these comments made you feel.
20              So how did Mr. Villanueva's comments, over
21    these several years, make you feel?
22         A.   I did mention the stress that I felt in my
23    community when a member -- when a person at my child's
24    school is questioning me on the position that I hold,
25    and the person who I work for because of what they've
```

EXHIBIT 15 - Page 363

1    heard the sheriff say.

2            And again, I'll just say that I am a person

3    who has worked extremely hard to get to where I am.  I

4    was the first person in my family to go to a four-year

5    university, I graduated with honors.  I then went on to

6    a prestigious law school on the east coast.  So I left

7    my family for three years to pursue my law degree,

8    because it was important to me to pursue it in at a

9    school that was recognized as being a prestigious

10   institution.

11           And then I had, by the time I joined the

12   Board of Supervisors, I had dedicated roughly 20 years

13   of my life to building my legal and professional

14   reputation.

15           When you're a lawyer, people are going say

16   negative things about you.  That's just par for the

17   course.  When you work for an elected official, people

18   be going to say negative things about you, and your

19   boss, because that's politics.

20           But when the sheriff of Los Angeles County

21   starts to attack your qualifications, your credentials,

22   how well you perform your duties at work, it's an

23   entirely separate matter.

24           And I will say that, for me, you know, I've

25   done a lot of work in the justice space, and Child

**EXHIBIT 15 - Page 364**

```
1   Welfare, these are issues that you've dedicated much --
2   the majority of my career to.  And that includes I was
3   a deputy district attorney my first job out of law
4   school.  So I have a fundamental respect for the legal
5   system, for the criminal justice system.
6            I believe there's a lot of room for reform,
7   but I am not a person who approaches my work from a
8   position of being against law enforcement.  And so to
9   have the sheriff of LA County, the top law enforcement
10  official in the county -- sorry, attacking my position
11  that I hold in the way that Sheriff Villanueva was
12  doing it, it was extremely demoralizing.
13           And ultimately, I left the Board, because I
14  just couldn't be there in an environment where I was
15  putting myself out there in that way, because I was
16  afraid to go through something like that again.
17           So once he left office, and my boss
18  Supervisor Kuehl left office, I left, too.
19                  MR. TOKORO:  No further questions.
20
21                  FURTHER EXAMINATION BY
22      Q.   MR. DiBONA:  Sorry just to couple follow-ups,
23  Ms. Pawlowski.
24           Did you ever tell Sheila Kuehl that you were
25  a witness in Esther Lim's complaint?
```

EXHIBIT 15 - Page 365

1   STATE OF CALIFORNIA

2

3

4           I, SHANNON D. DENNEY, CSR 10385, a Certified

5   Shorthand Reporter in and for the State of California,

6   do hereby certify that, prior to being examined, the

7   witness named in the foregoing deposition was by me

8   duly sworn to testify the truth, the whole truth, and

9   nothing but the truth; that said deposition was taken

10  down by me in shorthand at the time and place named

11  therein and was thereafter transcribed under my

12  supervision; that this transcript contains a full, true

13  and correct record of the proceedings which took place

14  at the time and place set forth in the caption hereto.

15          I further certify that I have no interest in

16  the event of this action.

17

18  EXECUTED this 17th day of April, 2025.

19

20

21          _Shannon D. Denney_
            _____

22                  Shannon D. Denney, CSR 10385

23

24

25

**EXHIBIT 15 - Page 366**

# EXHIBIT 16

EXHIBIT 16 - Page 367

CERTIFIED COPY



1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

JONATHAN LESTED

April 14, 2025

Wendy L. Graves, RPR, CSR No. 6138, Job No. 7522

EXHIBIT 16 - Page 368

```
 1                 UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4  ALEX VILLANUEVA,                    ) Case No.
                                        ) 2:24-cv-04979 SVW
 5              Plaintiff,              ) (JCx)
                                        )
 6     vs.                             )
                                        )
 7  COUNTY OF LOS ANGELES, COUNTY OF    )
    LOS ANGELES SHERIFF'S DEPARTMENT,   )
 8  LOS ANGELES COUNTY BOARD OF         )
    SUPERVISORS, COUNTY EQUITY          )
 9  OVERSIGHT PANEL, LOS ANGELES        )
    COUNTY OFFICE OF INSPECTOR GENERAL, )
10  CONSTANCE KOMOROSKI, MERCEDES       )
    CRUZ, ROBERTA YANG, LAURA LECRIVAIN,)
11  SERGIO V. ESCOBEDO, RON KOPPERUD,   )
    ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN,)
12  ESTHER LIM, and DOES 1 to 100,      )
    inclusive,                          )
13                                      )
                Defendants.            )
14  _____)

15

16

17          DEPOSITION OF JONATHAN LESTED taken on behalf of

18  Plaintiff, via Zoom video conference, beginning at

19  10:04 a.m., April 14, 2025 before WENDY L. GRAVES, RPR,

20  Certified Shorthand Reporter No. 6138.

21

22

23

24

25
```

**EXHIBIT 16 - Page 369**

```
 1              A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3         SHEGERIAN & ASSOCIATES LLP
           BY:  SARA SALINAS, ESQ.
 4         11520 San Vicente Boulevard
           Los Angeles, California 90049
 5         (310) 860-0770
           SSalinas@shegerianlaw.com
 6         ADiBona@shegerianlaw.com

 7    FOR DEFENDANTS:

 8         MILLER BARONDESS, LLP
           BY:  JASON H. TOKORO, ESQ.
 9         2121 Avenue of the Stars, Suite 2600
           Los Angeles, California 90067
10         (310) 552-5226
           Jtokoro@millerbarondess.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LESTED, JONATHAN                                                    Page 23

1    read the prior complaints against someone.  I do not

2    know, I can't speak to the level of research that a DCO

3    will do going into prior histories.

4         Q.  Okay.  So it's up to the discretion of the DCO

5    how deep they want to go into the prior history,

6    correct?

7         A.  Yes.

8         Q.  Okay.  When the assessment is happening, are you

9    aware of a process where the complaint -- strike that.

10   In which the complaint is made against the individual,

11   are they notified at all during the process or no?

12        A.  So are you asking if the involved parties are

13   notified that the complaint has been filed against them

14   or they have been made --

15        Q.  Yeah.

16        A.  -- an involved party in a complaint?  Yes,

17   that's part of our intake process is we would reach out

18   via email to the effect to the unit of assignment of the

19   involved party or parties and have the appropriate level

20   of supervisor or command staff make a notification to

21   them, we call them an admonishment, to the involved

22   party that they have now been -- that the Policy of

23   Equality complaint has been filed against them.

24        Q.  When are they notified about the admonishment,

25   is that after you finish the assessment or is that right

LESTED, JONATHAN                                                    Page 24

```
 1  when you receive the complaint?
 2        A.  We send out that notification right -- you know,
 3  that's the final step in our generation of the
 4  complaint.
 5            How long it may take a unit to get around to
 6  doing that, because part of that email there is a
 7  separate section we put in there, it's pretty
 8  standardized.  It says, it's a paragraph that says:
 9  Admonishment.  Please advise all parties that they have
10  been named in the Policy of Equality, da da da.
11            The name of the involved party or parties is on
12  page 2 of the POE report, which is always attached to
13  that email.  All right?
14        Q.  Okay.
15        A.  And they are advised to contact the ISU when
16  that admonishment is created and to reference that
17  particular POE complaint number that's been assigned so
18  that we get word back and we know they have been
19  admonished.
20            Q.  We talked a lot about this, the different steps
21  of the assessment process.  Are there any steps that you
22  haven't talked about yet?
23        A.  No, I think we've pretty well covered them.
24        Q.  Okay.  Then to the best of your knowledge, do
25  you have any idea how the office, the ISU conducts the
```

LESTED, JONATHAN                                                    Page 35

1   and they will give it to the sergeant.

2           I may step down to the office or send them an

3   email saying, hey, I'm done with the assessment.  But

4   usually that process doesn't take very long to go from

5   me over to the professional staff for database update

6   and then forward to the sergeant for continued review.

7       Q.  Okay.  You say it won't take that long.  Does it

8   take like one day, a couple days?

9       A.  If I'm handing it off at the end of the day,

10  yeah, it will be the next business day.  But if it's

11  something that gets done, if I get it done in the

12  morning the sergeant will have it that afternoon.

13      Q.  Okay.  So then it's fair to say then looking at

14  these dates then you received it then the same day she

15  received it --

16      A.  That is correct.

17      Q.  Okay.  Perfect.  Let me go up.

18          What's a classification mean?

19      A.  Classification is the designation the ISU gives

20  an Equity Complaint Assessment.  We have four different

21  classifications.

22      Q.  And what do classifications mean?  Is A the most

23  egregious?  I don't quite know.

24      A.  A would be considered the most egregious,

25  something that would contain sufficient information as

LESTED, JONATHAN                                                Page 35

```
 1  and they will give it to the sergeant.

 2          I may step down to the office or send them an

 3  email saying, hey, I'm done with the assessment.  But

 4  usually that process doesn't take very long to go from

 5  me over to the professional staff for database update

 6  and then forward to the sergeant for continued review.

 7      Q.  Okay.  You say it won't take that long.  Does it

 8  take like one day, a couple days?

 9      A.  If I'm handing it off at the end of the day,

10  yeah, it will be the next business day.  But if it's

11  something that gets done, if I get it done in the

12  morning the sergeant will have it that afternoon.

13      Q.  Okay.  So then it's fair to say then looking at

14  these dates then you received it then the same day she

15  received it --

16      A.  That is correct.

17      Q.  Okay.  Perfect.  Let me go up.

18          What's a classification mean?

19      A.  Classification is the designation the ISU gives

20  an Equity Complaint Assessment.  We have four different

21  classifications.

22      Q.  And what do classifications mean?  Is A the most

23  egregious?  I don't quite know.

24      A.  A would be considered the most egregious,

25  something that would contain sufficient information as
```

1  severity, egregiousness of the complaint to warrant

2  further investigation by the Equity Investigation Unit.

3         Next in the classifications is a B

4  classification.  Those will be determined if there are

5  equity issues.  However, it's not -- the conduct is not

6  egregious enough to warrant potential discipline.  It's

7  something that could be addressed by the appropriate

8  unit level or administrative supervisor to deal with

9  through like retraining, rebriefing, possibly like a

10 performance log entry.  Something of that nature.

11         A "C" complaint is that it has been determined

12 that there is no proven equity issues or there is

13 insufficient information provided to warrant -- to show

14 any kind of a nexus between the alleged conduct and a

15 protected bases, defined by the Policy of Equality.

16     Q.  Is there a "D" rating?

17     A.  There is no "D."  The last one is an "N."  Those

18 are reserved for complaints that we get where the

19 involved party is not a Sheriff's Department employee,

20 or it's determined that the allegations are

21 nonjurisdictional to the Sheriff's Department for the

22 purposes of potential disciplinary action.

23     Q.  And then if someone receives a complaint either

24 A through N, would that be recorded anywhere in the

25 record or personnel file or no?

1        Q.  Okay.  Then, to the best of your knowledge, do
2    you know why for Exhibit No. 3 was classified as A?
3        A.  I believe that in the course of her assessment
4    in interviewing that Senior DCO Linda Vaisa determined
5    that the conduct was pervasive or egregious enough to
6    warrant further investigation by the Equity
7    Investigation Unit.
8        Q.  Okay.  Let me double check one more thing.
9    Let's see.
10            So I'm actually pretty much done.  I'm going to
11   double check my notes, check with Alex, see if I'm
12   missing anything.  But if you want to take a quick 10
13   minute break and we can wrap up when we get back.
14            MR. TOKORO:  Sounds good.
15            (Recess taken from 11:45 a.m. to 11:54 a.m.)
16            MS. SALINAS:  Q.  All right.  Mr. Lested, I
17   recall we're looking at the assessments, the
18   classifications.  The DCOs handled the classifications,
19   correct?
20       A.  Yes.
21       Q.  Did you ever make an opinion about the
22   classifications made by the DCOs?
23       A.  No.
24       Q.  And those who make the opinions about the
25   classification, that would be the DCO and your sergeant;

LESTED, JONATHAN                                        Page 60

```
 1  is that correct?
 2       A.  The sergeants typically don't weigh in on what
 3  the designation should be either.
 4       Q.  Okay.  Okay.  So the designation is entirely
 5  decided by the DCO then, correct?
 6       A.  That's correct.
 7       Q.  All right.  Well, that's all my questions.  I
 8  will get the email, and then I will ask counsel
 9  questions for deponent, but I'm done for the day.
10            MR. TOKORO:  Great.  I do have some questions
11  for Deputy Lested.
12                    EXAMINATION BY MR. TOKORO
13            MR. TOKORO:  Q.  Deputy Lested, I just wanted to
14  clarify something.
15            In connection with the Huntsman complaint,
16  Mr. Villanueva was notified about that complaint,
17  correct?
18       A.  That's correct.
19       Q.  He was, in fact, admonished on March 23rd of
20  2022 in connection with the Huntsman complaint; is that
21  right?
22       A.  Yes.
23       Q.  And he was also notified in connection with the
24  Lim POE complaint, correct?
25       A.  Correct.
```

```
 1        Q.  He has also admonished by Mr. Satterfield on
 2   March 23rd of 2022; is that right?
 3        A.  Yes.
 4        Q.  Okay.  Now, you were asked a number of questions
 5   about the assessment done of Ms. Lim's complaint by DCO
 6   Vaisa.  Do you agree with the assessment done by DCO
 7   Vaisa of giving it an A classification?
 8        A.  Yes.
 9        Q.  Did you believe based upon your review of the
10   intake assessment form and POE complaint that the
11   allegations against Mr. Villanueva were severe and
12   egregious?
13        A.  Yes.
14        Q.  Now, you were also asked questions about DCO
15   Sieberg's assessment of the Huntsman complaint.  Now
16   having reviewed the assessment form, do you agree with
17   DCO Sieberg's assessment?
18        A.  Yes.
19        Q.  Do you agree with the assignment of the "A"
20   classification for Mr. Huntsman's complaint?
21        A.  Yes.
22        Q.  Did you believe or do you believe that the
23   allegations made against Mr. Villanueva were severe and
24   egregious?
25        A.  Yes.
```

LESTED, JONATHAN                                                    Page 62

```
 1        Q.  Okay.  Now, I'd like to ask you a few things
 2   about some of the claims that Mr. Villanueva has made in
 3   this case.  Specifically, Mr. Villanueva has claimed
 4   that the whole process relating to the Lim and Huntsman
 5   complaints were in retaliation for positions he took on
 6   issues before the Board of Supervisors.  So I do want to
 7   ask you some of those questions.
 8             Did Ballot Measure A have any involvement or be
 9   taken into consideration regarding the intake assessment
10   for the Huntsman complaint?
11        A.  No.
12        Q.  Did it have any role or was it taken into
13   consideration in assessment of the Lim complaint?
14             MS. SALINAS:  Objection.  Vague and ambiguous.
15             You may answer.
16             THE WITNESS:  No.
17             MR. TOKORO:  Q.  Did Ballot Measure J have
18   anything to do with the assessment of Mr. Huntsman's
19   complaint?
20             MS. SALINAS:  The same objections.
21             THE WITNESS:  No.
22             MR. TOKORO:  Q.  Did Ballot Measure J have any
23   role or was it considered in connection with the
24   assessment of Ms. Lim's complaint?
25             MS. SALINAS:  The same objections.
```

LESTED, JONATHAN                                              Page 63

```
 1              THE WITNESS:  No.
 2              MR. TOKORO:  Q.  Did Ballot Measure R, was that
 3  taken into consideration when assessing Mr. Huntsman's
 4  complaint?
 5              MS. SALINAS:  The same objections.
 6              THE WITNESS:  No.
 7              MR. TOKORO:  Q.  Did Ballot Measure R, was that
 8  taken into account when assessing Ms. Lim's complaint?
 9              MS. SALINAS:  The same objections.
10              THE WITNESS:  No.
11              MR. TOKORO:  Q.  Now, was Mr. Villanueva's
12  opposition to any of these ballot measures considered
13  when evaluating Mr. Huntsman's complaint?
14      A.  No.
15      Q.  Was Mr. Villanueva's opposition to these ballot
16  measures considered when evaluating Ms. Lim's complaint?
17              MS. SALINAS:  Objection.  Vague and ambiguous.
18              You may answer.
19              THE WITNESS:  No.
20              MR. TOKORO:  Q.  Now, do you recall
21  Mr. Villanueva publicly stating that he would not
22  enforce the county's Covid vaccine mandate as to
23  Department of Personnel?
24      A.  Yes.
25      Q.  Did Mr. Villanueva's refusal to enforce the
```

LESTED, JONATHAN                                              Page 64

```
 1  vaccine mandate play any role in ISU's assessment of
 2  Mr. Huntsman's complaint?
 3              MS. SALINAS:  Objection.  Vague and ambiguous.
 4              You may answer.
 5              THE WITNESS:  No, it did not.
 6              MR. TOKORO:  Q.  Did Mr. Villanueva's refusal to
 7  enforce the Covid vaccine mandate play any role in the
 8  ISU's assessment of Miss Lim's complaint?
 9              MS. SALINAS:  The same objections.
10              THE WITNESS:  No.
11              MR. TOKORO:  Q.  Did Mr. Villanueva's opposition
12  to the county's contract with Fulgent Genetics regarding
13  Covid testing play any role in ISU's assessment of the
14  Huntsman complaint?
15              MS. SALINAS:  The same objections.
16              THE WITNESS:  No.
17              MR. TOKORO:  Q.  Did Fulgent Genetics and its
18  contract with the county play any role in the assessment
19  of the Lim complaint?
20              MS. SALINAS:  The same objections.
21              THE WITNESS:  No.
22              MR. TOKORO:  Q.  Was the county Covid vaccine
23  mandate discussed in any way, shape or form in
24  connection with Mr. Huntsman's complaint?
25              MS. SALINAS:  The same objections.
```

```
 1              THE WITNESS:  Not to my awareness.

 2              MR. TOKORO:  Q.  Was the county's Covid vaccine

 3   mandate discussed in any way, shape or form in

 4   connection with assessing Miss Lim's complaint?

 5              MS. SALINAS:  The same objections.

 6              THE WITNESS:  No.

 7              MR. TOKORO:  Q.  Was the Fulgent contract

 8   discussed in any way, shape or form in connection with

 9   assessing Mr. Huntman's complaint?

10              MS. SALINAS:  The same objections.

11              THE WITNESS:  No.

12              MR. TOKORO:  Q.  Was Fulgent discussed in any

13   way, shape or form in connection with assessing

14   Ms. Lim's complaint?

15              MS. SALINAS:  The same objections.

16              THE WITNESS:  No.

17              MR. TOKORO:  Q.  Now, you were asked a couple of

18   questions and you gave the answer.  I just want to make

19   sure the record is clear.

20              Have you ever spoken with any member of the

21   Board of Supervisors under any circumstance?

22      A.  No.

23      Q.  Have you ever spoken with Supervisor Solis?

24      A.  No.

25      Q.  Have you ever spoken with Supervisor Hahn?
```

```
 1        A.  No.

 2        Q.  Have you ever spoken with any member of the

 3   Board of Supervisors regarding the Huntsman complaint?

 4        A.  No.

 5        Q.  Have you ever spoken with any member of the

 6   Board of Supervisors regarding the Lim complaint?

 7        A.  No.

 8        Q.  Did you discuss the assessment of the Huntsman

 9   complaint with any member of the Board of Supervisors?

10        A.  No.

11        Q.  Did you discuss the assessment of the Lim

12   complaint with any of the Board of Supervisors?

13        A.  No.

14        Q.  Now, I know this question may seem illogical

15   given who was sheriff at the time, but I have to ask it

16   because of the claims being made in this case.

17            At the time the assessment was being done in

18   March, April of 2022 of the Huntsman complaint, did you

19   have any conversations with Sheriff Luna about the

20   assessment?

21        A.  No.

22        Q.  In fact, in March, April of 2022, Mr. Villanueva

23   was still sheriff of the department, correct?

24        A.  That's correct.

25        Q.  Mr. Luna wasn't even a member of the department
```

1    at that time, correct?

2        A.   Correct.

3        Q.   So in March, April of 2022, did you have any

4    discussions with Mr. Luna, with Sheriff Luna, about the

5    assessment for the Lim complaint?

6        A.   No.

7        Q.   Have you ever at any time had a conversation

8    with Sheriff Luna about the Huntsman complaint?

9        A.   No.

10       Q.   Have you ever at any time had a conversation

11   with Sheriff Luna about the Lim complaint?

12       A.   No.

13       Q.   Have you ever had a conversation with Sheriff

14   Luna at all?

15       A.   I met Sheriff Luna one time.

16       Q.   Okay.  What was -- what were the circumstances

17   surrounding you meeting him the one time?

18       A.   He came by our office to introduce himself and

19   to see who we were.  You know, it was an introductory

20   thing.  Hi, I'm Sheriff Luna.  We introduced ourselves

21   to him, and that was it.

22       Q.   Did he mention anything to you about the

23   Huntsman complaint?

24       A.   No.

25       Q.   Did he mention anything to you about the Lim

LESTED, JONATHAN                                                Page 68

```
 1  complaint?

 2      A.  No.

 3      Q.  Since doing these assessments, have you been

 4  promoted by the department?

 5      A.  No.

 6      Q.  Now, one of the allegations that Mr. Villanueva

 7  has made in this case is that IAB or the county

 8  initially determined that the complaint filed by

 9  Mr. Huntsman, initially determined that Mr. Villanueva

10  did not engage in any of the misconduct alleged by

11  Mr. Huntsman.  Did ISU ever make a determination that

12  Mr. Villanueva did not engage in misconduct?

13          MS. SALINAS:  Objection.  Vague and ambiguous.

14  Calls for a legal contention.

15          You may answer.

16          THE WITNESS:  No.

17          MR. TOKORO:  Q.  Did the ISU ever determine that

18  Mr. Villanueva had not violated department policy?

19          MS. SALINAS:  The same objections.

20          THE WITNESS:  No.

21          MR. TOKORO:  Q.  Did the ISU ever determine that

22  Mr. Villanueva had not violated the department's Policy

23  of Equality in connection with the Huntsman allegations?

24          MS. SALINAS:  The same objections.

25          THE WITNESS:  No.
```

LESTED, JONATHAN                                                    Page 69

```
 1              MR. TOKORO:  Q.  In fact, ISU determined there
 2   was enough in the complaint that it should be subject to
 3   further administrative investigation, correct?
 4        A.  Correct.
```

```
 5        Q.  Did ISU ever determine that Mr. Villanueva did
 6   not engage in the misconduct alleged by Ms. Lim in her
 7   complaint?
 8        A.  No.
 9              MS. SALINAS:  The same objections.
10              MR. TOKORO:  Did you get that, Wendy?
11              THE REPORTER:  Yes.
```

```
12              MR. TOKORO:  Q.  Did the ISU ever determine that
13   Mr. Villanueva did not violate department policy based
14   upon the allegations made in Ms. Lim's complaint?
15              MS. SALINAS:  The same objections.
16              THE WITNESS:  No.
17              MR. TOKORO:  Q.  Did the department ever
18   determine, or did the ISU specifically ever determine
19   that Mr. Villanueva had not violated the department's
20   Policy of Equality based upon the allegations in
21   Ms. Lim's complaint?
22              MS. SALINAS:  The same objections.
23              THE WITNESS:  No.
24              MR. TOKORO:  Q.  In fact, the ISU determined
25   that based upon the allegations in Ms. Lim's complaint
```

LESTED, JONATHAN                                          Page 70

```
 1   that there should be a further administrative
 2   investigation into Mr. Villanueva; is that correct?
 3        A.  That's correct.
 4        Q.  Now, one of the other things that Mr. Villanueva
 5   has alleged in this case is that these -- after a
 6   determination by the county or IAB that there was no
 7   misconduct, that these files, that these complaints were
 8   placed in a suspense file.
 9            Did ISU ever place the Huntsman complaint into a
10   suspense file?
11            MS. SALINAS:  Objection.  Assumes facts not in
12   evidence.  Calls for a legal contention.  Vague and
13   ambiguous.
14            You may answer.
15            THE WITNESS:  No.
16            MR. TOKORO:  Q.  Did ISU ever place the Lim
17   complaint in a suspension file?
18            MS. SALINAS:  The same objections.
19            THE WITNESS:  No.
20            MR. TOKORO:  Q.  Have you ever heard of
21   something called a suspense file at the department?
22        A.  I have never heard of that term before.
23        Q.  Have you ever heard of a suspense file used by
24   the ISU for complaints, POE complaints?
25        A.  No.
```

```
1        Q.  Have you ever heard of a suspense file within
2   the Internal Affairs Bureau at the department for POE
3   complaints?
4        A.  No.
5        Q.  So just to be clear, have you ever heard of a
6   suspense file for any unit or division of the Sheriff's
7   Department?
8        A.  No.
```

```
9              MR. TOKORO:  That's all I have got.
10             MS. SALINAS:  I have one more follow up.
11                 FURTHER EXAMINATION BY MS. SALINAS
12             MS. SALINAS:  Q.  To the best of your knowledge,
13   Mr. Lested, who handled the disciplining of individuals
14   in which complaints were made against, which department
15   handles that?
16        A.  When you say "department," are you talking a
17   specific unit within the Sheriff's Department?
18        Q.  Yes.
19        A.  It would be -- discipline would be handled by
20   the appropriate administrative supervisor for the
21   involved party.
22        Q.  Got it.  And to the best of your knowledge in
23   your department did you handle -- do you handle
24   admonishments or do you provide recommendations who
25   should provide the admonishments?
```

```
 1              I have read the foregoing deposition
 2    transcript and by signing hereafter, subject to
 3    any changes I have made, approve same.
 4
 5    Dated   April 17, 2025   .
 6
 7
 8                                        _____
 9                                        JONATHAN LESTED
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 16 - Page 389

LESTED, JONATHAN                                                    Page 75

```
 1   STATE OF CALIFORNIA      )

 2   COUNTY OF LOS ANGELES    )

 3            I, WENDY L. GRAVES, CSR, hereby certify that the

 4   witness in the foregoing deposition named JONATHAN

 5   LESTED was by me duly sworn to tell the truth, the whole

 6   truth, and nothing but the truth in the within-entitled

 7   cause; that said deposition was taken at the time and

 8   place therein stated; that the testimony of said witness

 9   was reported by me in shorthand writing and was

10   thereafter transcribed by computer under my direction;

11   that the foregoing is a full, complete, and true record

12   of said testimony; and that the witness was given an

13   opportunity to read and correct said deposition and to

14   subscribe the same.

15            I further certify that I am not of counsel or

16   attorney for any of the parties in the foregoing

17   deposition or in any way interested in the outcome of

18   the cause named in said caption.

19            IN WITNESS WHEREOF, I have hereunto set my hand

20   this 17th day of April, 2025.

21

22                            *Wendy Graves*

23                     _____

24                     WENDY L. GRAVES, CSR NO. 6138

25                     STATE OF CALIFORNIA
```

# EXHIBIT 17

EXHIBIT 17 - Page 391

CERTIFIED COPY



Express Deposition Services

by ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

NAIRI GEVORKI

April 15, 2025

CHRISTI KAISER, CSR No. 5983, Job No. 7555

EXHIBIT 17 - Page 392

1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4                              CASE NO. 2:24-cv-04979 SVW (JCx)

5    ALEX VILLANUEVA,              )
                                   )
6              Plaintiff,          )
        vs.                        )
7                                  )
     COUNTY OF LOS ANGELES,        )
8    COUNTY OF LOS ANGELES         )
     SHERIFF'S DEPARTMENT, LOS     )
9    ANGELES COUNTY BOARD OF       )
     SUPERVISORS, COUNTY EQUITY    )
10   OVERSIGHT PANEL, LOS          )
     ANGELES COUNTY OFFICE OF      )
11   INSPECTOR GENERAL,            )
     CONSTANCE KOMOROSKI,          )
12   MERCEDES CRUZ, ROBERTA        )
     YANG, LAURA LECRIVAIN,        )
13   SERGIO V. ESCOBEDO, RON       )
     KOPPERUD, ROBERT G. LUNA,     )
14   MAX-GUSTAF HUNTSMAN,          )
     ESTHER LIM, and DOES 1 to 100,)
15   _____)

16                ZOOM VIDEO CONFERENCE DEPOSITION

17

18   DEPOSITION OF:      NAIRI GEVORKI

19   DATE AND TIME:      TUESDAY, APRIL 15, 2025

20                       10:00 A.M. - 11:15 A.M.

21
     LOCATION:           LOS ANGELES, CALIFORNIA
22

23

24   COURT REPORTER:     CHRISTI KAISER, CSR (VIA ZOOM)

25                       CERTIFICATE NO. 5983
     JOB #7555

EXHIBIT 17 - Page 393

GEVORKI, NAIRI                                   Page 2

```
 1            REMOTE APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF ALEX VILLANUEVA:

 4        SHEGERIAN & ASSOCIATES, INC.
          BY: ALEX DIBONA, ESQ.
 5        11520 San Vicente Boulevard
          Los Angeles, California 90049
 6        Telephone Number: (310) 860 0770
          Facsimile Number: (310) 860 0771
 7        E-mail: ADiBona@shegerianlaw.com

 8

 9
      FOR THE DEFENDANTS:
10
          MILLER BARONDESS, LLP
11        BY: JASON H. TOKORO, ESQ.
          2121 Avenue of the Stars, Suite 2600
12        Los Angeles, California 90067
          E-mail: jtokoro@millerbarondess.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Do you see that there?
 2       A.   Correct, yes.
 3       Q.   Let me just back up for a moment.
 4              In your unit are you only dealing with County
 5  employees?
 6       A.   Can you elaborate what you mean by that or
 7  clarify.  I'm sorry.
 8       Q.   The people who are filing complaints that come
 9  to you in your current role, those are all employees by
10  the County of Los Angeles.
11              Is that fair to say?
12         MR. TOKORO:  Objection.  Assumes facts.
13         THE WITNESS:  No.
14  BY MR. DIBONA:
15       Q.   Who, besides employees of the County of Los
16  Angeles, would file complaints that you would be
17  involved in assessing in your current role?
18       A.   A member of the public.  For example it could
19  be a client or a participant of the County department.
20       Q.   What does it mean in this context to be
21  unrelated to County employment?
22       A.   That it does not relate to one of the County
23  departments that's under the jurisdiction of the County
24  Policy of Equity.
25       Q.   And by the way, are there County departments
```

**EXHIBIT 17 - Page 395**

```
 1   that are not under the jurisdiction of the Policy of
 2   Equity?
 3        A.   Yes.
 4        Q.   What are those departments?
 5        A.   I know the Sheriff's Department.
 6             I don't know if there are others.
 7        Q.   And do you have an understanding as to why the
 8   Sheriff's Department is not under that?
 9        A.   Because they have their own investigative body
10   or unit for those types of complaints.
11        Q.   And what does it mean to be non-jurisdictional
12   to the CPOE?
13        A.   That it's not something that we investigate.
14        Q.   And it may be in your previous answer, but how
15   do you decide what's not something you investigate?
16        A.   If it's -- so it depends.  It depends on.
17             Can I kind of elaborate just a couple of
18   things?
19        Q.   Of course.
20        A.   If it is an allegation against like a
21   Sheriff's Department employee then that will be
22   considered an N designation or non-jurisdictional.
23   Could also be non-jurisdictional if it is a client or
24   participant of a County department making allegations
25   against that department's employee.  It may be
```

GEVORKI, NAIRI                                                    Page 32

```
 1    non-jurisdictional because the department is required to

 2    investigate.

 3            So it depends.
```

 4        Q.   And the E designation "Indicates that the

 5    initial intake investigation reveals that a

 6    discrimination, harassment, and/or retaliation complaint

 7    was received by the County from an external agency such

 8    as the California Department of Fair Employment and

 9    Housing (DFEH), and/or from the Federal Equal Employment

10    Opportunity Commission (EEOC) and will now be assessed

11    internally at the County for appropriate

12    handling/designation."

13            Do you see that there?

14        A.   Yes.

15        Q.   And that I believe that that may be obvious in

16    context, but is that your understanding of how you apply

17    an E designation?

18        A.   Yes.

19        Q.   And at least in this document this is -- you

20    see your name here?

21        A.   Yes.

22        Q.   And there is mention of a CEOP panelist Angela

23    Reddock-Wright.

24            Do you see her name?

25        A.   Yes.

GEVORKI, NAIRI                                          Page 36

```
1        Q.    Under Protected Basis it says "None Alleged."

2              Do you see that?

3        A.    Yes.

4        Q.    What does it mean to say "None Alleged" in the

5   context of a Protected Basis?

6        A.    They're alleging that they were somehow in

7   this case retaliated against.  But they're not alleging

8   that it was due to a Protected Basis under the CPOE or

9   County Policy of Equity.  I'm sorry.

10       Q.    And the overall designation for each of those

11  charges is N, correct?

12       A.    Correct.

13       Q.    And there may be a different reason but let me

14  just -- in the interest of saving time, what's the

15  reason for the N designation for these charges?

16       A.    The Involved Parties status as a Sheriff's

17  Department employee or head of Sheriff's Department.

18       Q.    And it may be obvious, but can you explain why

19  it's an N designation because it involved the Sheriff's

20  Department?

21       A.    Because they have their own investigation body

22  or unit for these types of complaints.

23       Q.    In this instance what happens to the

24  complaint?

25       A.    I believe it's referred to the Sheriff's
```

**EXHIBIT 17 - Page 398**

```
1    Department to do an investigation or to look into the
2    allegations.
```

3        Q.    And did you yourself forward this complaint to
4    the Sheriff's Department?
5        A.    I don't think so, no.
6        Q.    Is it your understanding that someone in your
7    unit would do that?
8        A.    I would think so, yes.
9        Q.    And were you involved in any way in what the
10   Sheriff's Department did with the complaint?
11       A.    No.
12       Q.    And were you at some point in time did you
13   learn that the CEOP had issued a Do Not Rehire
14   designation for or that was placed in Sheriff
15   Villanueva's personnel file?
16       A.    No.
17       Q.    Is it fair to say that you didn't have any
18   role in placing that designation on his file?
19       A.    That's correct.
20       Q.    Were you aware that the LA Times wrote about
21   the placement of the Do Not Rehire notation in Sheriff
22   Villanueva's file?
23       A.    No.
24       Q.    Because you didn't know, is it fair to say no
25   reporter from the LA Times has contacted you about

**EXHIBIT 17 - Page 399**

GEVORKI, NAIRI                                                    Page 42

```
 1        Q.   I don't have any further questions.

 2             Do you, Counsel?

 3             MR. TOKORO:  I do.  Thank you.  And Christi just

 4   as a reminder from earlier and through all the things

 5   that we've gone through already if you have any trouble

 6   hearing me just let me know.  I'm going to do my best to

 7   speak loudly and get as close to the microphone as

 8   possible.

 9             THE COURT REPORTER:  Thank you.

10                          EXAMINATION

11   BY MR. TOKORO:

12        Q.   Ms. Gevorki, do you stand by the testimony

13   that you gave for the assessment of the Lim complaint?

14        A.   Yes.

15        Q.   Do you stand by the assessment that you did

16   for the Huntsman complaint?

17        A.   Yes.

18        Q.   Did you talk to any member of the Board of

19   Supervisors in connection with the Lim complaint?

20        A.   No.

21        Q.   Did you talk to any member of the Board of

22   Supervisors in connection with the Huntsman complaint?

23        A.   No.

24        Q.   Did you talk to Supervisor Solis about the

25   Huntsman or the Lim complaint?
```

*Express Deposition Services - Scheduling @expressdeposition.com*
*(888)286-4226*

EXHIBIT 17 - Page 400

GEVORKI, NAIRI                                           Page 43

```
 1        A.    No.
 2        Q.    Did you talk to Supervisor Hahn about the
 3   Huntsman or the Lim complaint?
 4        A.    No.
 5        Q.    Did you or have you ever spoken to any member
 6   of the Board of Supervisors for any reason?
 7        A.    Yes.
 8        Q.    Okay.  Anything related to either of these
 9   complaints?
10        A.    No.
11        Q.    Have you ever spoken with Sheriff Luna about
12   the Lim complaint?
13        A.    No.
14        Q.    Have you ever spoken with Sheriff Luna about
15   the Huntsman complaint?
16        A.    No.
17        Q.    Have you ever spoken with Sheriff Luna about
18   the assessment that you gave for either the Lim or
19   Huntsman complaints?
20        A.    No.
21        Q.    Now, Mr. Villanueva has alleged in this case
22   that the investigations that were conducted into these
23   complaints were in retaliation for positions he took on
24   let's just say political issues.  So I want to ask you
25   about those now.
```

**EXHIBIT 17 - Page 401**

```
 1              Do you know what Ballot Measure A is?

 2        A.   No.

 3        Q.   Did Ballot Measure A have anything to do with

 4   the assessment that you did for the Huntsman or Lim

 5   complaints?

 6        A.   No.

 7             MR. DIBONA:  Object to form.  You may answer

 8   BY MR. TOKORO:

 9        Q.   Do you know what Ballot Measure J is?

10        A.   No.

11        Q.   Did Ballot Measure J have anything to do with

12   your assessment of the Lim complaint?

13             MR. DIBONA:  Object to form.

14             THE WITNESS:  No.

15   BY MR. TOKORO:

16        Q.   Did it have anything to do with your

17   assessment of the Huntsman complaint?

18             MR. DIBONA:  Object to form.

19             THE WITNESS:  No.

20   BY MR. TOKORO:

21        Q.   Do you know what Ballot R is?

22        A.   No.

23        Q.   Did Ballot Measure R have anything to do with

24   your assessment of the Lim complaint?

25             MR. DIBONA:  Object to form.
```

GEVORKI, NAIRI                                      Page 45

```
 1            THE WITNESS:  No.
 2   BY MR. TOKORO:
 3       Q.   Did Ballot Measure R have anything to do with
 4   your assessment of the Huntsman complaint?
 5            MR. DIBONA:  Object to form.
 6            THE WITNESS:  No.
 7   BY MR. TOKORO:
 8       Q.   Now, we know about the COVID vaccine mandate?
 9       A.   Yes.
10       Q.   Does the County COVID Mandate have anything to
11   do with your assessment of the Lim complaint?
12       A.   No.
13            MR. DIBONA:  Object to form.
14   BY MR. TOKORO:
15       Q.   Did the County COVID Vaccine mandate have
16   anything to do with your assessment of the Huntsman
17   complaint?
18            MR. DIBONA:  Object to form.
19            THE WITNESS:  No.
20   BY MR. TOKORO:
21       Q.   Do you know what Mr. Villanueva's position was
22   on the County's COVID Vaccine Mandate?
23       A.   No.
24       Q.   Did Mr. Villanueva's position on the COVID
25   Vaccine Mandate have anything to do with your assessment
```

**EXHIBIT 17 - Page 403**

GEVORKI, NAIRI                                              Page 46

```
 1   of the Lim or Huntsman complaints?
 2        A.   No.
 3             MR. DIBONA:  Object to form.
 4             THE WITNESS:  No.
 5   BY MR. TOKORO:
 6        Q.   Have you ever heard of a contract between the
 7   County and Fulgent Genetics?
 8        A.   Yes.
 9        Q.   Are you aware that the County had a contract
10   with Fulgent to do COVID testing?
11        A.   Yes.
12        Q.   Did that contract have anything to do with
13   your assessment of the Lim complaint?
14        A.   No.
15        Q.   Did that contract have anything to do with
16   your assessment of the Huntsman complaint?
17             MR. DIBONA:  Object to form.
18             THE WITNESS:  No.
19   BY MR. TOKORO:
20        Q.   Do you know what Mr. Villanueva's position was
21   on the Fulgent contract?
22        A.   No.
23        Q.   Did Mr. Villanueva's position on the Fulgent
24   contract have anything to do with your assessment?
25        A.   No.
```

GEVORKI, NAIRI                                                Page 47

```
 1              MR. DIBONA:  Object to form.
 2              THE WITNESS:  No.
 3   BY MR. TOKORO:
 4         Q.   Now, Mr. Villanueva has alleged in this case
 5   that the County initially determined that he had not
 6   engaged in misconduct and that he had not committed a
 7   policy violation.  I want to talk about the Lim
 8   complaint first.
 9              Did you determine that Mr. Villanueva had not
10   engaged in the misconduct alleged by Ms. Lim?
11         A.   No.
12         Q.   Did you determine that Mr. Villanueva had not
13   violated County policy by the conduct alleged by
14   Ms. Lim?
15         A.   No.
16         Q.   Did you determine that Mr. Villanueva had not
17   violated the County Policy of Equity by the conduct
18   alleged by Ms. Lim?
19         A.   No.
20         Q.   Did you determine that Mr. Villanueva did not
21   violate the department's Policy of Equality by the
22   conduct alleged by Ms. Lim?
23         A.   No.
24         Q.   Now, I want to talk about the Huntsman
25   complaint.  Did you ever determine that Mr. Villanueva
```

```
 1    had not engaged in the misconduct alleged by

 2    Mr. Huntsman?

 3         A.   No.

 4         Q.   Did you ever determine that Mr. Villanueva had

 5    not violated County policy by the conduct alleged by

 6    Mr. Huntsman?

 7         A.   No.

 8         Q.   Did you ever determine that Mr. Villanueva did

 9    not violate the County's Policy of Equity out of conduct

10    alleged by Mr. Huntsman?

11         A.   No.

12         Q.   Did you ever determine that Mr. Villanueva did

13    not violate the department's Policy of Equality by the

14    conduct alleged by Mr. Huntsman?

15         A.   No.

16         Q.   Now, you gave some testimony earlier about why

17    you assigned the two complaints the N designation.

18              Do you remember those questions?

19         A.   Yes.

20         Q.   I just wand to make sure that the record is

21    clear.  The reason you designated the Lim complaint N

22    was because Mr. Villanueva was a member of the Sheriff's

23    Department.

24              Is that correct?

25         A.   Yes.
```

**EXHIBIT 17 - Page 406**

GEVORKI, NAIRI                                    Page 49

```
 1            MR. DIBONA:  Object to form.
 2    BY MR. TOKORO:
 3       Q.   And the same goes for the Huntsman complaint.
 4            Is that correct?
 5            MR. DIBONA:  Object to form.
 6            THE WITNESS:  Yes.
 7    BY MR. TOKORO:
 8       Q.   You designated it N because you understood
 9    Mr. Villanueva was the head of Sheriff's Department.
10            Is that right?
11       A.   Yes.
12       Q.   And as the head of Sheriff's Department does
13    the CISU have jurisdiction over Mr. Villanueva?
14       A.   No.
15       Q.   And I believe you testified about this earlier
16    but I think you said the reason for that is that the
17    department has its own policy of equality.
18            Is that right?
19       A.   Yes.
20            MR. DIBONA:  Object to form.
21    BY MR. TOKORO:
22       Q.   And the Sheriff's Department also had its own
23    Intake Specialist Unit, correct?
24       A.   Yes.
25            MR. DIBONA:  Object to form.
```

```
 1   BY MR. TOKORO:
 2        Q.   Okay.  Now, Mr. Villanueva has also alleged
 3   that at some point in time the Lim complaint and the
 4   Huntsman complaint were placed in a Suspense File.  I
 5   want to ask you about that.
 6             Is there any such thing as a Suspense File in
 7   the County Intake Specialist Unit?
 8        A.   I've never heard of that.
 9        Q.   At any point in time did you place the Lim
10   complaint in a Suspense File?
11        A.   No.
12        Q.   At any point in time did you place the
13   Huntsman complaint in a Suspense File?
14        A.   No.
15        Q.   Thank you.  No other questions.
16        MR. DIBONA:  Just a couple of followup
17   questions.
18                   FURTHER EXAMINATION
19   BY MR. DIBONA:
20        Q.   Did you determine -- for Esther Lim did you
21   determine that Sheriff Villanueva had committed any
22   Policy of Equity Violations?
23        A.   No.
24        Q.   Or Max Lim.  Did you determine that Sheriff
25   Villanueva had committed any Policy of Equity
```

**EXHIBIT 17 - Page 408**

GEVORKI, NAIRI                                    Page 55

```
 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2

 3          I, CHRISTI KAISER, CERTIFIED SHORTHAND REPORTER

 4   IN AND FOR THE STATE OF CALIFORNIA, CSR NO. 5983, do

 5   hereby certify:

 6          That the foregoing deposition of the witness

 7   therein named was taken remotely at the time and place

 8   therein set forth, at which time the witness was put

 9   under oath by me via Zoom Teleconference;

10          That the testimony of the witness and all

11   objections made at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed;

14          That the foregoing deposition is a true record of

15   the testimony and all objections made at the time of the

16   examination.

17

18          IN WITNESS WHEREOF, I have subscribed my name

19   this 16th day of April, 2025.

20

21                          _Christi Kaiser_

22                          _____

23                          CHRISTI KAISER, CSR

24                          CERTIFICATE NO. 5983

25
```

# EXHIBIT 18

EXHIBIT 18 - Page 410

```
For CISU Use:

(Method of Receipt)

☐ Telephone
☐ In-Person
■ Online
☐ Paper Complaint

Reference
#2019-0016591
#2022 - 112209
```

# COUNTY POLICY OF EQUITY

### REPORT/NOTIFICATION FORM

### Methods of Reporting Potential County Policy of Equity (CPOE) Violations:

1) You may use this form to report a potential violation of the CPOE;

2) File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);

3) Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or

4) Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

No

**2. Are you filing this complaint for:**

Yourself

---

(**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expectation that the CPOE complaint notification be submitted online at https://ceop.lacounty.gov).

**Section A: Reporting Party Information**                    Today's Date: 3/8/2022

**Name:** Esther Lim                                 **Emp. #:** e662896
**Title:** Justice Deputy                            **Email:** elim@bos.lacounty.gov
**Work #:** (213) 458-1795        **Mobile #:** ▓▓▓▓       **Work Hrs.:**          **RDO:**
**Reporting Party's Department:** BOARD OF SUPERVISORS          **Dept. Head:** Celia Zavala
**Reporting Party's Other Department:**

**Reporting Party's Unit of Assignment:** Board of Supervisors, Hilda L. Solis
**Reporting Party's Work Address:** 500 West Temple Street Los Angeles, CA 90012
**Reporting Party's Immediate Supervisor:** Cindy Chen
**Date & Time Form Completed:** 2022-03-08 21:28:13

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

   Yes

**Name of Supervisor/Manager Notified:** Cindy Chen
**Date:** 2022-03-08 15:32:00       **How:** Email

---

**Section B: Complainant(s) Information**

**1.**
**Name:** Esther Lim                      **Emp. #:** e662896       **Title:** Justice Deputy
**Work #:** 2134581795          **Mobile #:** ███████          **Work Hrs.:**          **RDO:**
**Complainant's Department:** BOARD OF SUPERVISORS    **Dept. Head:**
**Complainant's Other Department:**
**Complainant's Unit of Assignment:** Board of Supervisors, Hilda L. Solis
**Complainant's Work Address:**
**Complainant's Immediate Supervisor:** Cindy Chen

**CONFIDENTIAL**

**Section C: Alleged Involved Party(ies) Information**

**1.**

**Name:** Alex Villanueva                    **Emp. #:**            **Title:** Sheriff

**Work #:**                **Mobile #:**                **Work Hrs.:**        **RDO:**

**Involved Party's Department:** SHERIFF            **Dept. Head:**

**Involved Party's Other Department:**

**Involved Party's Unit of Assignment:** LA Sheriff's Department

**Involved Party's Work Address:**

**Involved Party's Immediate Supervisor:** Alex Villanueva

**Section D:** Alleged Witness(es) Information (if they can be identified)

**1.**
**Name:** Veronica Pawlowski    **Emp. #:** e552095    **Title:** Senior Justice Deputy
**Work #:**    **Mobile #:** ███████    **Work Hrs.:**    **RDO:**
**Witness's Department:** BOARD OF SUPERVISORS    **Dept. Head:**
**Witness's Other Department:**
**Witness's Unit of Assignment:** Supervisor Sheila Kuehl
**Witness's Work Address:**
**Witness's Immediate Supervisor:** Lisa Mandel

**2.**
**Name:** Kyla Coates    **Emp. #:** e656300    **Title:** Justice and Health Deputy
**Work #:**    **Mobile #:** ███████    **Work Hrs.:**    **RDO:**
**Witness's Department:** BOARD OF SUPERVISORS    **Dept. Head:**
**Witness's Other Department:**
**Witness's Unit of Assignment:** Supervisor Janice Hahn
**Witness's Work Address:**
**Witness's Immediate Supervisor:** Gerardo Pinedo

**3.**
**Name:** Max Huntsman    **Emp. #:** e410745    **Title:** Inspector General
**Work #:**    **Mobile #:** ███████    **Work Hrs.:**    **RDO:**
**Witness's Department:** OTHER    **Dept. Head:**
**Witness's Other Department:** Office of Inspector General
**Witness's Unit of Assignment:** Office of Inspector General
**Witness's Work Address:**
**Witness's Immediate Supervisor:**

**CONFIDENTIAL**

**COLA002178**

**EXHIBIT 18 - Page 414**

**Section E:** Nature of Complaint or Issue(s)

**1. What is the date of the alleged potential violation(s)?:** 07/28/2021

**2. Please provide a detailed summary of the alleged potential violation(s):**

I have four examples. Please see attached letter for additional information.

On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

On October 6, 2021, during a Facebook Live, Sheriff Villanueva said, "You hear me loud and clear now because if you're not watching their entire thing, I'm pretty sure your flunkies are going to listen to the whole thing and report back to you." When he uses the term "flunkies" he is pejoratively describing me to malign me and minimize my job as Justice Deputy.

On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions." This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age.

Fourth incident is on 3/22/22

**3. Why does the Complainant(s) believe the treatment occurred/is occurring?:**

Though the comments are made generally about the Justice Deputies, the attack was specifically lodged against me because Sheriff Villanueva is seen in the Facebook Live, holding a hard copy of the motion Supervisor Solis put forward on July 27, 2021 titled, "Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation." The motion he is holding and reading from is one I worked on behalf of Supervisor Solis.

Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai.

Additionally, it behooves me that as an Asian woman I need to speak up during a time in which anti-Asian hate is at its all-time peak, due to ignorant, racist, and hateful comments about the cause of the COVID-19 pandemic that has led...

**Section F: TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

**Date supervisor/manager observed and/or was notified of the alleged potential violation(s):**

CONFIDENTIAL

**How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):**

**What action(s), if any, did the supervisor/manager take? (Explain in detail):**

**Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following?**

    **Medical Attention:**

    **Protection:**

    **Separation from Alleged Involved Party(ies):**

    **Other Assistance:**

---

**Did the supervisor/manager advise the Complainant(s) that they:**

**May seek confidential counseling or assistance from the County's Employee Assistance Program (EAP) at (213) 738-4200:**

**May contact the County Intake Specialist Unit (CISU) directly at (855)-999-2367, or via email at ceop@bos.lacounty.gov:**

        <u>**OPTIONAL:** Please provide the information below for statistical purposes only</u>

**Race/Ethnicity:** Asian (Not Hispanic or Latino)

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." – (eeoc.gov)

**Sex:** Female

**Date Of Birth:** 1981-07-30

# EXHIBIT 19

EXHIBIT 19 - Page 417

## CISU ASSESSMENT FORM

|  | Final Overall Designation |
|---|---|
| ICMS Number(s): 2022-112209 | ☐ "A" |
| Date CISU Received: March 8, 2022 | ☐ "B" |
| Sworn Personnel: None | ☐ "C" |
| Approximate Statute Date: N/A | ■ "N" |
|  | ☐ "E" |

Reporting Party(ies)

Esther Lim, e662896, BOARD OF SUPERVISORS, Justice Deputy

Complainant(s):

ESTHER LIM, e662896, BOARD OF SUPERVISORS, SUPERVISOR'S DEPUTY III, UNCLASSIFIED

Involved Party(ies):

ALEJANDRO VILLANUEVA, e246296, SHERIFF, SHERIFF/UNCLASSIFIED

**Persons Interviewed**

**Assessment**

CP Lim (Female/Asian; DOB 7/30/1981; 40 years of age) alleges that IP Villanueva (Male/Hispanic or Latino; DOB 02/25/1963/59 years of age) has discriminated against and harassed CP based on age, sex, and race, and retaliated against CP. CP also alleges IP has engaged in "third-party harassment." CP provided four examples of the IP's alleged conduct. CP contends that in a "Facebook Live" appearance on 7/28/2021 IP Villanueva stated, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all." CP contends that while the statement was made generally about all Justice Deputies it was directed more specifically at CP because the motion IP Villanueva referenced was one CP drafted or helped draft.

CP alleges that in another "Facebook Live" on 10/6/2021 IP Villanueva referred to Justice Deputies as "flunkies." CP alleged that in a town hall on 2/16/2022 the IP stated, "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions." CP alleged, "This is another example of Sheriff Villanueva discriminating against me based on age." Lastly, CP alleged that in a 3/2/2022 "Facebook Live" appearance the IP stated there are "[n]o male justice deputy staff" and that "The people they hire are all 20 something fresh out of college. Don't have a lot of senior people. Woke flunkies straight out of college. First job. That's who writes the nonsense board orders." CP asserts CP has "sincere concerns" for CP's safety and that of CP's "peers."

IP Villanueva is the Los Angeles County Sheriff. The Sheriff's Department has its own equity process by which it internally addresses such complaints. Therefore, the facts alleged, even if taken as true, are unrelated to County employment or are otherwise non-jurisdictional under the County Policy of Equity. The County Intake Specialist Unit recommends an "N" designation for ICMS No. 2022-112209 and that the Sheriff's Department consider conducting an independent inquiry into the matter.

CISU Assessment Form

March 21, 2022

CONFIDENTIAL

COLA002399

**EXHIBIT 19 - Page 418**

**Designation**

Based on the information contained in the Report Notification Form(s) and any data indicated on this intake assessment form and/or additional information, it has been determined that this complaint is designated as follows:

**Involved Party**   ALEJANDRO VILLANUEVA, e246296, SHERIFF

Overall Designation:  **N**

| CP | Charge | Protected Basis | Designation |
|---|---|---|---|
| ESTHER LIM | Sec. 6 Retaliation | None Alleged | N |
| ESTHER LIM | Sec. 3 Harassment | Gender | N |
| ESTHER LIM | Sec. 1 Discrimination | Age (40+) | N |
| ESTHER LIM | Sec. 5 Inappropriate Conduct Towards Others | Race | N |
| ESTHER LIM | Sec. 4 Third - Person Harassment | Age (40+) | N |
| ESTHER LIM | Sec. 1 Discrimination | Gender | N |
| ESTHER LIM | Sec. 3 Harassment | Race | N |
| ESTHER LIM | Sec. 3 Harassment | Age (40+) | N |
| ESTHER LIM | Sec. 1 Discrimination | Race | N |
| ESTHER LIM | Sec. 5 Inappropriate Conduct Towards Others | Gender | N |
| ESTHER LIM | Sec. 5 Inappropriate Conduct Towards Others | Age (40+) | N |

**Designation definitions**

**"A" designation.** CISU has concluded that **facts alleged present a potential violation** of the County Policy Of Equity (CPOE), which could warrant discipline (written warning, suspension, or discharge) and therefore further investigation by the County Equity Investigations Unit (CEIU) is recommended. (Reasonable good faith belief standard).

**"B" designation.** CISU has concluded that although the situation may involve, or appear to involve, an equity issue, **the situation does not rise to the level of a potential violation** of the CPOE, which could warrant discipline (written warning, suspension, or discharge). (Reasonable good faith belief standard).

**"C" designation.** CISU has concluded that **the facts alleged, even if taken as true, are not jurisdictional** to the CPOE. (Reasonable good faith belief standard).

**"N" designation.** CISU has concluded that the facts alleged, even if taken as true, are unrelated to County employment or otherwise non-jurisdictional to the CPOE. (Reasonable good faith belief standard).

**CONFIDENTIAL**

**COLA002400**

**EXHIBIT 19 - Page 419**

**"E" designation.** Indicates that the initial intake investigation reveals that a discrimination, harassment, and/or retaliation complaint was received by the County from an external agency, such as the California Department of Fair Employment and Housing (DFEH), and/or from the Federal Equal Employment Opportunity Commission (EEOC) and will now be assessed internally at the County for appropriate handling/designation. (Reasonable good faith belief standard).

**Administrative Process Disclaimer:** The analysis contained herein, including the terminology used, is the result of an administrative process and initial investigation under the County Policy of Equity. The standards of proof and rules governing administrative investigatory and disciplinary processes are different from those that govern court proceedings. No legal conclusions can or should be drawn from this administrative analysis or the terminology contained therein and such would not be appropriate for consideration in any legal proceeding or court of law.

**Confidentiality Notice and Disclaimer:** This document may contain confidential and privileged information and is solely for the use of the person(s) or entity to whom it is intended. Any unauthorized review, use, disclosure, or distribution is prohibited.

| Assessed by CISU Investigator:  Nairi Gevorki |
|---|

| Reviewed by CEOP Panelist: Angela Reddock-Wright |
|---|

| Second Opinion Name: |
|---|

| CISU Investigation Complete Date: March 21, 2022 |
|---|

CISU Assessment  Form

March 21, 2022

**CONFIDENTIAL**

**COLA002401**

**EXHIBIT 19 - Page 420**

# EXHIBIT 20

EXHIBIT 20 - Page 421

<table>
<tr><td>

**For I.S.U. Use Only**
Method of Receipt
☐ Telephone
☐ In Person
☐ POE Report Form
☑ Other: CPOE
Intake # 22-046

</td></tr>
</table>

## Policy of Equality
## Report / Notification Form

**General Instructions:** Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

---

**Section A:**    Reporting Party Information            Today's Date: __03__ / __17__ / __2022__

Name: Esther Lim _____    Emp. #: 662896 _____    Rank/Title Justice Deputy _____

Work Tel# 213-458-1795 _____ ; Home Tel# ████████ ; Work Hours _____ - ____ RDO _____

Unit of Assignment: Board Of Supervisors Office ____    Unit Commander: Supervisor Hilda Solis _____

Division LA County Board of Supervisors _____

Name of Supervisor Completing this form (if different from above): _____ # _____

Date & Time form completed: _____ / _____ / _____ ; _____ hours.

☐    Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?

☐    Yes (if yes, fill in details)
    Who: _____
    When: Date: _____ / _____ / _____ ; Time: _____ hours.
    How _____
☐    No
☑    Do not know

---

**Section B:**    Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: ____ / ____ / _____ ; _____ hours or
between ____ / ____ / _____ and ____ / ____ / _____

If multiple incidents or unknown, explain: _____
See narrative. _____
_____
_____
_____

---

**Section C:**    Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

Same as RP _____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - ____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - ____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - ____ RDO _____

---

CONFIDENTIAL

COLA002182

**EXHIBIT 20 - Page 422**

**********************************************************************************

Section D:    Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro (Sheriff) _____    Employee # 246296 _____ UOA LASD _____

_____    Employee # _____ UOA _____

_____    Employee # _____ UOA _____

_____    Employee # _____ UOA _____

**********************************************************************************

Section E:    Alleged Witness(es) (if they can be identified)

Pawlowski, Veronica _____    Employee # 552095 ____    Rank/Title Senior Justice Deputy UOA BOS _____
Work Tel# _____ ; Home Tel# [redacted] ; Work Hours _____ - _____ RDO _____

Coates,Kyla _____    Employee # 656300 ____    Rank/Title Justice/Health Deputy UOA BOS _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

Huntsman, Max _____    Employee # 410745 ____    Rank/Title Inspector General ____ UOA OIG _____
Work Tel# _____ ; Home Tel# [redacted] ; Work Hours _____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

**********************************************************************************

Section F:    Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity Report (ICMS #2022-112209) from CEOP Executive Director Vickey

Bane, filed by RP/CP Justice Deputy Esther Lim, #662896. The Complainant, Justice Deputy Lim, Board of Supervisors employee,

alleged the following, in pertinent part, (verbatim): "On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook

Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their

Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal

muster at all."


"On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that 'All the Supervisors

**Ask: "Why do you believe this treatment is occurring?"**          (☑ Check, if narrative is continued onto the next page)

_____

_____

_____

_____

_____

_____

_____

Revised 10/06                                   2                          POE -001

CONFIDENTIAL                                                          COLA002183

                                                                    **EXHIBIT 20 - Page 423**

Section F (cont'd):          Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

(Continued)

have 25-year-old justice deputies who are right out of college and writing all their motions.' This comment was made in front of

the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age."

In addition, Complainant Lim, wrote in pertinent part, "Given Sheriff Villanueva's documented history of intimidation and

harassment of women and women of color, as the first, second generation Korean American woman to serve as Justice Deputy

and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28,

2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former

Chief Executive Officer, Sachi Hamai."

(ISU Note: A copy of the CPOE complaint is contained in the ISU efile for details.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Note: Continue onto the next page**

CONFIDENTIAL

セ

<u>Section G:</u>      Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY. DO NOT FILL OUT THIS SECTION IF YOU ARE THE
ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made:   __03__ / __16__ / __2022__ , __1521__ hours.

How did you become aware of the potential violation (explain in detail):
On March 16, 2022, the ISU received CPOE ICMS #2022-112209, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Xochilt Rosas to document the allegations in the County Policy of Equity Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑      Medical Attention
       **Response:** to be ascertained
☑      Protection
       **Response:** to be ascertained
☑      Other Assistance
       **Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑      May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours,
request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: _____ Date & Time: _____ / _____ / _____ , _____ hour.
                                                   (Name)
☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: __03__ / __16__ / __2022__ , __1521__ hour.     How?: ☑ e-mail ☐ Fax ☐ County mail

**********************************************************************************************************************

Revised 10/06                                    4                          POE -001

CONFIDENTIAL

COLA002185
**EXHIBIT 20 - Page 425**

<u>Section H:</u>    **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name:  Deputy X. Rosas                              Emp. #: 468743

Day, Date and time ISU received form Thursday          / 03 / 17 / 2022 ,  1140  hours.

☑ Referred to Equity Unit: Date & Time -  04 / 04 / 2022 ,  1700  hours.

☐ If not referred to Equity Unit, explain in detail action taken:

_____

_____

_____

Additional Information (if any):  _____

_____

_____

☐     Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☑ Subject's Unit Commander
☑ Reporting Party's Unit Commander
☐ Victim's Unit Commander

Revised 07/10                                    5                        POE -001

# EXHIBIT 21

EXHIBIT 21 - Page 427

# INTAKE ASSESSMENT FORM

**Intake No. 22-046**          **Date Dept. Notified: 3/17/22**          **Date ISU Received: 3/17/22**

**Bouman  Yes ☐ No ☒**          ☐ **External**     **Case No.**          **Classification: "A"**

| Alleged Complainant(s): | Involved Party(ies): |
|---|---|
| Esther Lim, #662896, Supervisor's Deputy III, | Alejandro Villanueva, #246296, Sheriff |
| Justice Deputy | |
| | |
| | |
| **UOA:  Board of Supervisors** | **UOA:  Office of the Sheriff** |

**Alleged Act(s) Of Harm**          **Alleged Protected Basis(es):**

☒ **Harassment/HWE**          ☒ **Sex**          ☐ **Sexual Orientation**          ☒ **Ethnicity**
☐ **Differential Treatment**     ☒ **Race**          ☐ **Marital Status**          ☒ **Age (40 and Over)**
☒ **Inappropriate Conduct**     ☐ **Color**          ☒ **National Origin**          ☐ **Disability**
☐ **E-Mail Violation**          ☒ **Ancestry**      ☐ **Medical Condition**          ☐ **Association**
☐ **Failure to Report**          ☐ **Religion**      ☒ **Engaging in a Protected**          ☐ **Other:**
☒ **Retaliatory Treatment**                              **Activity**
☐ **Other:**

Based on the information contained in the POE Report/Notification Form and any data indicated on this intake assessment form and/or attachment(s), it has been determined that this complaint:

☒ **Contains sufficient information to warrant further investigation by EIU**
☐ **Contains equity issues, but the allegations do not rise to a level requiring a further investigation by EIU**
☐ **No proven equity issues; and/or insufficient information showing causal connection to protected basis**
☐ **I/P is a non-department member and/or allegation(s) is/are non-jurisdictional to the POE**

### Persons  Interviewed

| Date | Name | Emp # | Title | UOA |
|---|---|---|---|---|
| 3/30/22 | Esther Lim | 662896 | Supervisor's Dep. III | BOS |
| | | | (Justice Deputy) | |
| | | | | |
| | | | | |
| | | | | |

**Other Persons Referenced in Assessment:**

| | Name | Emp # | Title | UOA |
|---|---|---|---|---|
| | Xochilt Rosas | 468743 | B-1 Deputy Sheriff | ISU |
| | Vickey Bane | | Executive Director | CEOP |
| | John L. Satterfield | 410429 | Commander/Chief of Staff | Office of the Sheriff |
| | Janice Hahn | | Supervisor | BOS |
| | Shiela Kuhl | | Supervisor | BOS |
| | Sachi Hamai | | CEO - retired | LAC |
| | Mary Wickham | | Executive Director | BRCH |
| | Max Huntsman | 410745 | Inspector General | OIG |
| | Hilda Solis | | Supervisor | BOS |
| | Holly Mitchell | | Supervisor | BOS |
| | Kyla Coates | 656300 | Justice Health Deputy | BOS |
| | Veronica Pawlowski | 552095 | Justice Deputy | BOS |
| | Kathryn Barger | | Supervisor | BOS |

COLA002417

**EXHIBIT 21 - Page 428**

**Explanation/Comments:**

On March 16, 2022, the Intake Specialist Unit (ISU) received a County Policy of Equity Report (ICMS #2022-112209) addressed to CEOP Executive Director Vickey Bane. Attached was a March 8, 2022, correspondence from Complainant Esther Lim, functional job title, Justice Deputy, employed by the Board of Supervisors.

On March 17, 2022, Xochilt Rosas, Bonus-1 Deputy, ISU, completed a "Policy of Equality Report/Notification Form" (POE Report) on behalf of Reporting Party (R/P) and Complainant Esther Lim, Justice Deputy. Complainant Lim reported that Involved Party Alejandro Villanueva, Sheriff, subjected her to disparaging remarks based on her age (40), sex (female) and race, national origin, ancestry and ethnicity (Asian/Korean).

Complainant Lim made statements during her ISU interview on March 30, 2022, that warranted the addition of a retaliation allegation based on her engagement in protected activity.

Copies of the CPOE report, associated correspondence, and email are contained in the electronic file and hard copy intake folder.

The POE report contained the following information:

(1) Complainant Lim's letter stated, in pertinent part, (verbatim): "On July 28, 2021, Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

(2) Complainant Lim was told by Kyla Coates, Justice and Mental Health Deputy to Supervisor Janice Hahn, that on February 16, 2022, Sheriff Villanueva said, "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions." This comment was made during a community town hall for the South Bay cities in front of the public and County staff. This was an example of Sheriff Villanueva discriminating based on Complainant Lim's age.

(3) Complainant Lim stated that given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first second-generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, she believed that Sheriff Villanueva unfairly targeted her.

(4) Complainant Lim alleged that I/P Villanueva targeted, intimidated, and harassed another Asian woman, namely former Chief Executive Officer Sachi Hamai who is now retired from County service.

ADDITIONAL INCIDENTS/INFORMATION CONTAINED IN COMPLAINANT LIM'S CORRESPONDENCE:

(1) Besides the CEOP, Complainant Lim sent her letter of complaint to Supervisor Hilda Solis, Ms. Solis' Chief of Staff, the LA County CEO, the County Director of Personnel, the Chief Deputy Counsel, the Inspector General, the Executive Director of the Sheriff Civilian Oversight Commission, and the Chair of the Sheriff Civilian Oversight Commission.

(2) Complainant Lim asked that the CEOP investigate her complaint of retaliation by I/P Sheriff Villanueva and the complaints of others.

(3) Complainant Lim serves as Supervisor Hilda Solis' Justice Deputy.

(4) On October 6, 2021, during a Facebook Live segment, I/P Sheriff Villanueva talked about the Justice Deputies and called them "flunkies". This term maligned and marginalized Complainant Lim's job as a Justice Deputy.

(5) On March 2, 2022, during a Facebook Live segment, in response to an audience question about why there are only women on the Board, I/P Sheriff Villanueva stated, "Good question. They talk about inclusivity. No male justice deputy staff. The Board should explain why they exclude men from their ranks." He further

CONFIDENTIAL

**Intake #22-046**
**Page 3**

stated that the people they hire are all twenty-something fresh out of college; "woke flunkies" straight out of college; in their "first job".  He stated they write the "nonsense" Board orders.

(6) Complainant Lim stated that I/P Villanueva's disparaging and discriminatory comments that discredit her character, education and experience are linked to her age, sex and race.

(7) I/P Villanueva's July 27, 2021, comments were in retaliation to the motion: "Taking Action: Further Protections For Serving Families from Law Enforcement Harassment and Retaliation".

(8) I/P Villanueva's February 16, 2022, comments were made in front of the public, County staff deputies and field staff. The comments were relayed to Kyla Coates, Justice and Mental Health Deputy to Supervisor Janice Hahn, who shared the comments with Complainant Lim and Veronica Pawlowski, Justice Deputy to Supervisor Sheila Kuehl.

(9) Complainant Lim asserted that I/P Villanueva's statements, made by the Sheriff of the largest Sheriff's Department in the country with an extraordinary amount of power, influence and resources, are not just inaccurate but inflammatory and dangerous. Complainant Lim had concerns for her safety and the safety of other victims of I/P Sheriff Villanueva's actions. Complainant Lim noted that the Sheriff was in uniform during the Facebook Live sessions.

**MISCELLANEOUS:**

A review of the Board of Supervisors' website revealed that staff under all Supervisors were comprised of:

| | |
|---|---|
| District 1 Solis: | Approximately 9 males and 20 females |
| District 2 Mitchell: | Approximately 9 males and 28 females |
| District 3 Kuehl: | Approximately 8 males and 30 females |
| District 4 Hahn: | Approximately 6 males and 13 females |
| District 5 Barger: | Approximately 9 males and 13 females |

**ISU INTERVIEW WITH COMPLAINANT JUSTICE DEPUTY ESTHER LIM:**

On March 30, 2022, Senior Deputy Compliance Officer Linda Vaisa interviewed Complainant Lim telephonically. Before the specific interview questions and immediately thereafter, SDCO Vaisa explained the general ISU assessment process.

During the recorded interview, Complainant Lim stated:

(1) Complainant Lim is a Supervisor's Deputy III, with the functional job title of Justice Deputy. She was appointed by the Board of Supervisors and is an 'at-will employee'.  Complainant Lim has been in the position for two years. She self-identified as age 40 years, female and Asian/Korean.

(2) There are five Justice Deputies; one for each Supervisor. Complainant Lim stated that she is the only Asian Justice Deputy. There are four female Justice Deputies. Supervisor Holly Mitchell has one male Justice Deputy. The Board is comprised of five (5) females.

[ISU NOTE: Supervisor Mitchell's male Justice Deputy has the functional title Senior Deputy, Justice. There is another male with the functional job title Deputy, Justice and Arts & Culture.]

(3) There are other Supervisors' Deputies, and the functional title is dependant on the issue area.

 (4) Complainant Lim's area is Public Safety and Justice. Public Safety is comprised of Probation, LASD, District Attorney, Public Defender and the various law enforcement-related commissions that the Board oversees. Complainant Lim described it as a "hefty" law enforcement oversight work portfolio.

(5) Prior to County employment, Complainant Lim worked for the ACLU of Southern California and interacted with prior LASD Sheriffs. She did not have similar (negative) contacts with the prior Sheriffs. She met Sheriff

4

Intake #22-046
Page 4

Villanueva when he was a candidate.

(6) Complainant Lim's contacts with Sheriff Villanueva have been all work-related. They do not engage in social banter. I/P Villanueva has not made direct or overt statements to her regarding age, gender or racial issues. Sheriff Villanueva would be familiar with Complainant Lim both in her role as Supervisor Solis' Justice Deputy and from her prior role with the ACLU.

[ISU NOTE: Related to POE issues in general, on February 9, 2021, I/P Sheriff Villanueva wrote a letter to Supervisor Solis that asserted Complainant Lim's "twitter" social media account contained examples of racial, gender, age bias and other non-POE related characteristics and examples. The letter is available on the LASD intranet and the internet.]

(7) During the July 28, 2021, Facebook Live segment, Complainant Sheriff Villanueva held and read from a motion Complainant Lim had worked on ("Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation). Complainant Lim's initials were on the document. He made negative comments.

[ISU NOTE: As previously described, the comments were: "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, 'woke' individuals, who are basically putting in words what doesn't pass legal muster at all."

(8) I/P Sheriff Villanueva's Facebook Live comments trivialized and minimalized Complainant Lim. She noted that in other instances I/P Villanueva referred to Justice Deputies as "recent" college grads. Complainant Lim has 20 years experience in her field. Therefore, the comments were linked to her age (40) as a 20-something cannot have her years of experience and knowledge.

(9) Complainant Lim noted that Sheriff Villanueva's statements were not private statements but made on a large media platform to a wide audience. [ISU NOTE: As previously noted, I/P Sheriff Villanueva was in his LASD uniform.]

(10) I/P Villanueva used "woke" in a pejorative manner. I/P Sheriff Villanueva used the term to mean radically progressive or an activist and equated the term to "snowflake". "Woke" can be used in a general way to mean reform, but the manner and context used by I/P Sheriff Villanueva was negative.

[ISU NOTE: Merriam Webster online dictionary defined "woke" as: aware of and actively attentive to important facts and issues (especially issues of racial and social justice). One of the definitions of "snowflake" was someone overly sensitive. The Urban online crowd sourced Dictionary of slang, defined "woke" as  an evolving word that is almost always used non-ironically/seriously only by political Progressives. Conservatives or Libertarians use it mostly to poke fun at the others' usage of it. The Urban Dictionary defined snowflake as a very sensitive person, someone who is easily hurt or offended by the statements or actions of others.]

(11) Complainant Lim stated that I/P Sheriff Villanueva's use of the term "flunkies" was about all the Justice Deputies, and it is not a term of endearment. She stated that I/P Villanueva's overall comments were demeaning and negative towards women.

[ISU NOTE: Merriam Webster online dictionary defined "flunky" as a liveried servant; one performing menial or miscellaneous duties; and a yes-man.]

(12) Complainant Lim stated that I/P Sheriff Villanueva has a history of misogynistic comments about women and women of color. She named two additional potential witnesses besides the witnesses named in her CEOP complaint: Veronica Pawloski, Justice Deputy for Supervisor Shiela Kuehl; Kyla Coates, Justice and Health Deputy for Supervisor Janice Hahn, and Max Huntsman, Inspector General, Office of the Inspector General.

[ISU NOTE: Max Huntsman is a complainant in POE/Intake #22-045. I/P Sheriff Villanueva is the Involved Party. The matter is pending an ISU assessment.]

(13) The additional witnesses who were also subjected to I/P Villanueva's ill treatment were Sachi Hamai,

CONFIDENTIAL

5

Intake #22-046
Page 5

Asian, female; and Mary Wickham, female. The issues between Sachi Hamai and I/P Sheriff Villanueva were very public and well documented in the press. Ms. Hamai received a financial settlement.

[ISU NOTES: a) Sachi Hamai was the first Asian American woman to serve as Los Angles County Chief Executive Officer between December 2014 and her retirement on August 31, 2020. The CEO provides Countywide coordination and strategic guidance. Ms. Hamai's retirement and $1.5 million settlement and full-time private security was reported widely in the press. The legal settlement was responsive to Ms. Hamai's claims regarding severe and pervasive harassment, defamation, malicious prosecution and hostility by I/P Villanueva.

b) Ms. Hamai, according to various news sources, stated, "It is so disheartening that I have been subjected to a hostile and toxic work environment created by a fellow department head". She stated, "As I leave Court Service, it is my sincere hope that no other County employee, male or female, in any part of our great organization, should face hostility of this kind, let alone from a department head in a position of power and public trust."

c) Mary Wickham was appointed to serve as Los Angeles County Counsel between 2015 and September 2020. She was elected by the judges of the court along with directors of relevant nonprofits, to serve as LA Superior Court Commissioner in November 2020. She retired in July 2021. On August 31, 2021, Ms. Wickham was rehired and appointed to head the Blue-Ribbon Commission on Homelessness established by the Board of Supervisors.

d) Based on their respective years of County service, both Ms. Hamai and Ms. Wickham are over 40 years old.]

(14) Complainant Lim stated that I/P Villanueva treats Supervisor Kathryn Barger more favorably (than the other Supervisors) because he perceived her to be friendly to law enforcement.

(15) Complainant Lim alleged that during a Supervisors meeting last year, I/P Villanueva stated that the Supervisors should be taken to the shed and beat. He has made similar statements many times.

(16) I/P Sheriff Villanueva sent a complaint letter about Complainant Lim to Supervisor Solis. Complainant Lim stated that the OIG's response was to ask I/P Sheriff Villanueva what the purpose was of his going on Complainant Lim's personal twitter account. I/P Sheriff Villanueva also filed a CPOE complaint against Complainant Lim, but she does not know the details.

[ISU NOTE: Complainant Lim's complaint letter to the CEOP contained a footnote about I/P Sheriff Villanueva's complaint against her. A March 8, 2021, CEOP letter advised Complainant Lim that the allegations (against her) did not present a potential violation of the CPOE. Anecdotally, staff at the CEOP advised SDCO Vaisa that complainants are notified through a standardized email that their complaint was addressed.]

(17) Complainant Lim stated that I/P Sheriff Villanueva has made many other inappropriate comments and provided only the four examples in her letter.

(18) In a March 17, 2022, Facebook Live segment, I/P Sheriff Villanueva made a comment about Complainant Lim's letter of complaint only a week after submission of her letter of complaint.

[ISU NOTE: a) In a March 16, 2022, Facebook Live segment, I/P Sheriff Villanueva referenced Complainant Lim. At the 41 minute 40 second mark, I/P Sheriff Villanueva discussed his February 9, 2021, letter of complaint about Complainant Lim sent to Supervisor Solis. He stated that he was not advised of the outcome and Complainant Lim remains on Supervisor Solis' staff. I/P Sheriff Villanueva stated that on March 4, 2022, he sent Supervisor Solis a follow-up letter regarding Ms. Lim's ethical violations. He advised Supervisor Solis to pick up the pace to look into the matter. b) ISU was unable to locate a March 16, 2022, Facebook Live segment.]

(19) Complainant Lim asserted that the Sheriff's comments were intended to have a chilling effect and stop him from being held accountable. She stated I/P Sheriff Villanueva's comments are dangerous on all levels

COLA002421

EXHIBIT 21 - Page 432

6

Intake #22-046
Page 6

and damaging to careers. He is coming after people who have oversight responsibilities. She added I/P Sheriff Villanueva's comments can trigger those who support the Sheriff, to act against her; such as to find out where she lives.

Admonishment/Supervisory Actions:

On March 23, 2022, Commander John L. Satterfield admonished I/P Sheriff Villanueva.

Prior Related POE Complaint(s):

☐ None        ☒ Prior Related POE Complaint(s) Identified Below

The equity database revealed that Sheriff Villanueva was an Involved Party in five other POE cases.

(1) As previously described, POE #22-045 is pending an ISU assessment. The allegations in that matter relate to race, ethnicity, national origin, ancestry and religion.

(2) In Intake #21-108, an anonymous Complainant alleged that I/P Villanueva engaged in conduct linked to (race, national origin and ethnicity). Intake #21-108 received a "B" classification.

(3) In Intake #12-019, a named CP alleged I/P (then) Lt. Villanueva made a 'racial slur' toward another named CP.  Intake #12-019 received an "A" classification.

(4) In Intake #04-221, a named CP alleged a named I/P used an inappropriate term "Bitches and Whores" and I/P (then) Sgt. Villanueva and two others, named I/Ps, failed to report the alleged conduct. Intake #04-221 received an "A" classification.

(5) In Intake #04-177, a named Complainant (female volunteer) alleged a named I/P (male volunteer) called her a "bitch" and I/P (then) Sgt. Villanueva and another named I/P failed to report the alleged conduct.  Intake #04-177, received an "A" classification.

Conclusion:

MPP 3-01/121.05 (POE - Prohibited Conduct)

MPP 3-01/121.10 (POE - Discrimination)

MPP 3-01/121.15 (POE - Sexual Harassment)

MPP 3-01/121.20 (POE - Harassment (Other Than Sexual)

MPP 3-01/121.25 (POE - Third-Person Harassment)

MPP 3-01/121.30 (POE - Inappropriate Conduct Toward Others)

MPP 3-01/121.35 (POE -Retaliation)

OTHER SOURCE MATERIAL:

(1) Relevant to harassment, the California Department of Fair Employment and Housing Case Analysis Manual stated:

a) Acts qualify as harassment if the focus and/or content of the harassing acts is the complainant's protected status and the acts created an intimidating, oppressive, hostile or offensive working environment;

b) The link between adverse acts and an asserted protected basis may be of a disputed nature; such as when the adverse acts are on the face neutral or do not tell directly the enumerated basis and may be established

Intake #22-046
Page 7

via other analytical factors such as anecdotally, inference and the comparative treatment of others. Other specific areas to consider included a pattern of similar incidents.

c) Conflicting pieces of evidence and the number of pieces of evidence do not cancel one another out. The overall stronger evidence prevails after close evaluation. An enumerated basis need only be one of the factors in the adverse act and not the sole factor.

(2) The EEOC Enforcement Guidance on National Origin Discrimination stated that Title VII also prohibits "intersectional" discrimination, which occurs when someone is discriminated against because of the combination of two or more protected bases (e.g., national origin and race). EEOC specifically noted that "Some characteristics, such as race, color, and national origin, often fuse inextricably. Title VII prohibits employment discrimination based on any of the named characteristics, whether individually or in combination. Because intersectional discrimination targets a specific subgroup of individuals, Title VII prohibits, for example, discrimination against Asian women even if the employer has not also discriminated against Asian men or non-Asian women."

Summary:

Complainant Lim is a 40-year-old Asian/Korean female. There is no dispute that she engaged in protected activity by virtue of her complaint to the CEOP [Reference a, b, c and d below].

(1) At least two of the alleged incidents strongly and logically infer age. Specifically:

a) On July 28, 2021, I/P Sheriff Villanueva, said on Facebook Live, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some twenty-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all." He held up a motion Complainant Lim worked on, and which contained her initials.

b) On February 16, 2022, during a community town hall, Sheriff Villanueva said, "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions."

**Complainant Lim is 40 years old with 20 years experience in her field. Complainant Lim's assertion, that statements equating her years of experience to a new college graduate trivialized and minimalized her experience, appears to be a reasonable conclusion. Ignoring and degenerating twenty years of experience and knowledge is, therefore, logically linked to age in the specific context described.

(2) The other two examples/incidents infer gender. Specifically:

c) On March 2, 2022, during a Facebook Live segment, in response to an audience question about why there are only women on the Board,  I/P Villanueva segued to the Board's staffing. He stated there were no male justice deputy staff, and the Board should explain why men are excluded from their ranks. He stated that the people they hire are all twenty-something fresh out of college, "woke flunkies", in their "first job." He also stated they write the "nonsense" Board orders.

[ISU NOTE: It is unclear why an audience member asked I/P Sheriff Villanueva about an all-female Board, as the Board is elected by the public. I/P Sheriff Villanueva has no control over who the public votes into office.]

d) On October 6, 2021, during a Facebook Live segment, I/P Sheriff Villanueva talked about the Justice Deputies and called them "flunkies".

**I/P Villanueva inaccurately described the Board of Supervisors' Justice Deputies and the Board staff, as all female when there are male Justice Deputies and approximately 41 males on staff. Therefore, the pejorative labels and terms I/P Sheriff Villanueva used in the above-described incidents, appear directed to women exclusively. Complainant Lim named four females as witnesses, all of a very high professional rank, including former CEO Sachi Hamai and former County Counsel Mary Wickham.

CONFIDENTIAL

8

Intake #22-046
Page 8

**(3) The overall data infers race, national origin, ancestry and ethnicity. Specifically:**

It is clear that I/P Sheriff Villanueva's comments were offensive, professionally, to all who shared Complainant Lim's rank/classification of Justice Deputy. Complainant Lim noted that she is the only Asian/Korean Justice Deputy. Mere membership is not sufficient to establish a link between an adverse harm and an asserted enumerated basis. It is also noted that the "Justice Deputy" is a very small employee pool.

However, factors to consider are: a) whether there is a pattern of similar incidents and comparative treatment of others; b) an enumerated basis need not be the sole factor in an adverse act; c) the same adverse acts can be linked to multiple enumerated bases as well as non-enumerated bases; and d) intersectional discrimination, such as Asian female.

**\*\*Complainant Lim named Sachi Hamai, as a witness.** Ms. Hamai was the first Asian American woman to serve as Los Angeles County Chief Executive Office. Ms. Hamai asserted that I/P Sheriff Villanueva subjected her to a hostile and toxic work environment, severe and pervasive harassment, defamation, and malicious prosecution. It is perhaps anecdotal but critical to note that Complainant Lim's motion was the only motion I/P Sheriff Villanueva physically had in his hand and used on Facebook Live, a social media platform with a large audience.

**(4) The overall data inferred that retaliation potentially may be a factor. Specifically:**

As stated previously, Complainant Lim engaged in protected activity by virtue of her March 8, 2022, letter to the CEOP Executive Director and the filing of the CEOP report form. The letter was also sent to various other non-LASD staff. It is of note that the letter and CEOP report are dated March 8, 2022, and LASD was notified March 16, 2022. I/P Villanueva was admonished March 23, 2022.  It is unknown whether he was advised of the Complainant's name. ISU is unaware whether anyone else was notified between March 8, 2022, and March 16, 2022, or if anyone communicated with I/P Sheriff Villanueva in that interval.

**\*\*Complainant Lim's concerns that I/P Sheriff Villanueva's comments were dangerous on all levels and damaging to careers** appeared credible, plausible and mirrored another female's concerns in a legal settlement where the female was awarded private security.

I/P Sheriff Villanueva's disparaging comments were made on LASD communication system and equipment while he was in uniform. The statements used unprofessional slang and portions were factually inaccurate, i.e., there are males on the Board of Supervisors' staff and the motion in question was not written by a twenty-something recent college graduate. The statements were made on a large media platform to a wide audience and thus appear to be a potential employment harm.

A strong inference of retaliation can be drawn when an adverse action occurs shortly after the protected activity.

As stated, Complainant Lim submitted her POE complaint on March 8, 2022. The review of a March 16, 2022, Facebook Live segment revealed that I/P Sheriff Villanueva referenced Complainant Lim and his February 9, 2021, complaint about her. It is, at a minimum, odd timing that I/P Sheriff Villanueva discussed an over-a-year-old complaint shortly after Complainant Lim's POE complaint about I/P Sheriff Villanueva was filed.

Given that: a) the alleged conduct involved a high ranking member of the Department (the Sheriff) and prior high level County employees, as well as staff at the Board of Supervisors and the OIG office; b) the unprofessional and documented language was disseminated to a wide audience via LASD social media and, therefore, the Department's communication system; and c) the subjective nature of the asserted harassing comments that overlap with non-POE memberships (education, politics); the alleged documented conduct warrants further investigation by the IAB's Equity Investigations Unit that includes interviews of the Involved Party, the named witnesses and others determined by IAB. Accordingly, an "A" classification is recommended for Intake #22-046.

Intake #22-046
Page 9

[ISU NOTE: Although federal and state laws and court decisions were referenced, the findings in this Confidential Intake Assessment Form do not reach questions of law as to whether the adverse treatment support a violation of applicable federal (or state) laws, but instead this Confidential Intake Assessment Form addresses whether the alleged conduct, under the Sheriff's Policy of Equality (POE), is equity-related and/or rises to the level of a further investigation by the Sheriff's Equity Investigations Unit.

RECOMMENDATION(S) for UOA, including, but not limited to the following:

☐ Informal conflict resolution with all parties involved, by appropriate supervisor
☐ DHR assisted mediation _____
☐ Referral to Equity Compliance Unit/ADA _____
☐ Referral to Equity Compliance Unit/AA _____
☐ Supervisory inquiry/unit level investigation for Non-Equity based allegations of misconduct, if appropriate
☐ Counseling with PLE regarding the conduct in question, if appropriate
☐ Re-briefing applicable provisions of the Policy Of Equality (POE):
    ☐ POE Sexual Harassment    ☐ POE Retaliation
    ☐ POE Discriminatory Harassment    ☐ POE Duties of Supervisors
    ☐ POE Inappropriate Conduct    ☑ POE Examples of Conduct
    ☐ POE Third Person Harassment    ☐ POE Discrimination
    ☐ Other: _____
☐ Re-briefing applicable provisions of the Manual of Policy & Procedures (MPP):
    ☐ Manner of Giving Orders & Instructions    ☐ Conduct Toward Others
    ☐ Relationship with Subordinates    ☐ Derogatory Language
    ☐ Permissible Use    ☐ System Use
    ☐ General Behavior    ☐ Professional Conduct
    ☐ Other: _____
☐ Re-briefing applicable "Lessons Learned" Bulletins:
    ☐ Supervisor Responsibility–Duty to Report  ☐ ADA Title I Employment Rights
    ☐ Being Offended Is Not An Element    ☐ E-mail – Common Electronic Workplace Violations
    ☐ E-mail – Supervisor Responsibility    ☐ Languages in the Workplace
    ☐ Religious Accommodation and Etiquette  ☐ Prevention is Still the Best Cure - Supervisor
    ☐ Sexual Gossip in the Workplace    ☐ Hostile Work Environment under the POE
    ☐ Lactation Accommodation    ☐ Professional Conduct – Persons With Disabilities
    ☐ Other: _____
☐ Training/Briefing:
    ☐ Disability Awareness/Etiquette    ☐ Interactive Process/Reasonable Accommodation
    ☐ Team Building Skills    ☐ Medical Management/Health Care
    ☐ Respect Based Leadership    ☐ Sexual Harassment Prevention
    ☐ Diversity/Inclusion/Cultural Awareness  ☐ Relationship Management
    ☐ Effective Communication    ☐ Other:
☐ Re-briefing RMB's "Risky Business" newsletters and FOSS newsletter:
    ☐ RMB - Use of Derogatory Terms or Phrases (Vol. 12, No. 03)
    ☐ FOSS - Inappropriate Terms & Phrases-Related Lawsuit (Vol. 14, No. 15)
    ☐ RMB - Inappropriate Behavior (Vol. 15, No. 04)
    ☐ Other: _____
☐ Submit Copy of APIS Roster for Attendees of Re-Briefing and/or Training
☐ As may be appropriate, it is recommended that the Unit Commander or his/her designee inform the Involved Party and Complainant that the complaint was addressed.
☐ Other Recommendation(s): _____
    _____

**Intake #22-046**
**Page 10**

**Assessed by ISU Deputy Compliance Officer:**

| Senior DCO Linda Vaisa | Date Assessed: 4/4/22 | Date Received: 3/17/22 |
| --- | --- | --- |

**Reviewed by ISU Lieutenant or Sergeant:**

| Sgt Steven M. Johnson | Date:  4/06/22 |
| --- | --- |

**Forwarded to EIU by:**

| B-1 Deputy Jonathan Lested | Date:  4/04/22 |
| --- | --- |

**Reviewed by CEOP:**

| | Date: |
| --- | --- |

**CEOP Comments:**

| |
| --- |

# EXHIBIT 22

EXHIBIT 22 - Page 438

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558101

OFFICE CORRESPONDENCE

| FROM: | EDWIN A. ALVAREZ, CHIEF<br>PROFESSIONAL STANDARDS DIVISION | TO: | RON KOPPERUD, CAPTAIN<br>INTERNAL AFFAIRS BUREAU |
|---|---|---|---|

## SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER:

Alex Villanueva, Sheriff, #246296

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct):

03/17/2022

Potential MPP Violation(s) including, but not limited to:

3-01/030.10 POE - DISCRIMINATION
3-01/121.15 POE - SEXUAL HARASSMENT
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.30 POE - INAPPROPRIATE CONDUCT TOWARD OTHERS
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description):

It is alleged you acted in an inappropriate POE related manner and made inappropriate POE related remarks while in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been **rescinded**. You are being ordered by your Unit Commander that during the time this investigation is <u>active</u>, any routine absence request must be submitted <u>directly</u> to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:

| Subject: _____ | Witness: _____ |
|---|---|
| Employee #: 246296  Date: 6/29/22 | Employee #: 410429  Date: 6/29/22 |

Manual of Policy and Procedures : 3-01/121.10 - Policy of Equality - Discrimination

## 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002193
**EXHIBIT 22 - Page 440**

# 3-01/121.15 - Policy of Equality - Sexual Harassment

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature which meets any one of the following criteria:

- Submission to such conduct is made either explicitly or implicitly as term or condition of an individual's employment;
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
- Such conduct has the purpose or effect of unreasonably interfering with the individual's employment or creating an intimidating, hostile, offensive, or abusive working environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

## 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited.  Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

Manual of Policy and Procedures : 3-01/121.25 - Policy of Equality - Third-Person
Harassment

## 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander.  When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior.  The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002196
**EXHIBIT 22 - Page 443**

# 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                    COLA002197
                                                                          **EXHIBIT 22 - Page 444**

## 3-01/121.35 - Policy of Equality - Retaliation

Retaliation, for the purposes of this policy, is an adverse employment action against another for reporting protected incident, filing a complaint of conduct or opposing conduct that violates this policy or related state or federal law, participating in an investigation, administrative proceeding, or otherwise exercising their rights or performing their duties under this policy or related state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL

# EXHIBIT 23

EXHIBIT 23 - Page 446




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

January 4, 2022

Mr. Alejandro Villanueva
2183 El Cajonita Drive,
La Habra, California 90631

Dear Mr. Villanueva:

### ADMINISTRATIVE INVESTIGATION INTERVIEW REQUEST

The Los Angeles County Sheriff's Department is conducting an administrative investigation into a matter in which you are a subject.

The incident occurred at/on March 17, 2022. It is our Department's policy to conduct complete and thorough investigations into complaints or allegations of violations of Department policy on the part of our employees; therefore, it is important that you be interviewed.

Please contact Ms. Christine Diaz-Herrera, attorney at law from Sanders Roberts LLP, at (213) 426-5000 extension 6889 or via email at cdiazherrera@sandersroberts.com, to schedule an interview in person or via telephone. Your cooperation in this matter is appreciated.

If you have any questions, you may also contact Lieutenant John L. Carter at (323) 890-5304.

Sincerely,

ROBERT G. LUNA, SHERIFF

Ron Kopperud, Captain
Internal Affairs Bureau

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

# EXHIBIT 24

EXHIBIT 24 - Page 448

| From: | Alex Villanueva |
|---|---|
| Sent: | Friday, March 10, 2023 6:54 PM PST |
| To: | Christine Diaz-Herrera |
| Subject: | Re: [External] Re: Administrative Investigation Interview Request |

You don't have a "standard practice" regarding making a subject out of someone you have no jurisdiction over and engaging in something the department has never done before. I'd love to help you, however your terms are unethical and unacceptable. I simply asked you what the issue was about, I don't need to know the specific questions you're going to ask. Example: Captain so and so alleges that he was denied x position because he did xyz.

Regards

On Mon, Mar 6, 2023 at 3:34 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Mr. Villanueva,

Given your previous role, I assume that you are well aware that the subject of an investigation does not know the questions he or she will be asked before an interview. This is standard practice. Likewise, it is standard practice to give the subject of an investigation the chance to respond to allegations during an interview. You previously stated that you would cooperate with the investigation. I can make myself available based on your schedule. Please let me know if you are still willing to make yourself available to be interviewed.

Lastly, I would like to remind you that if you become represented by counsel, please let me know so I can contact them directly.

Best regards,

Christine



**Christine Diaz-Herrera,** ATTORNEY AT LAW
cdiazherrera@sandersroberts.com

Sanders Roberts LLP
1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017
p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Monday, March 6, 2023 3:06 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: [External] Re: Administrative Investigation Interview Request

Your response only confirms my suspicions. For the record there were several incidents that occurred during the McDonnell administration that merited questioning him, but it would have been wildly inappropriate to make him a subject of an administrative investigation - and we never did.

Your actions are unethical and without legal authority or precedent.

Thank you

On Mon, Mar 6, 2023 at 2:51 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Thank you for your response. I am unable to provide my questions in advance. As I stated below, it is alleged that you acted in an inappropriate POE related manner and made inappropriate POE related remarks in the workplace. The specific allegations include, but are not limited to, potential Manual of Policy and Procedures ("MPP") violations of the following:

3-01/121.10 POE – Discrimination

3-01/121.15 POE – Sexual Harassment (Other Than Sexual)

3-01/121.20 POE – Discriminatory Harassment (Other Than Sexual)

3-01/121.25 POE – Third Person Harassment

3-01/121.30 POE – Inappropriate Conduct Toward Others

3-01/121.35 POE – Retaliation

I will provide more information during the interview itself. Please let me know when you are available.

Best,

Christine

SANDERS ROBERTS

Christine Diaz-Herrera, ATTORNEY AT LAW
cdiazherrera@sandersroberts.com

Sanders Roberts LLP
1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017
p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

---

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Thursday, February 9, 2023 4:47 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: [External] Re: Administrative Investigation Interview Request

I'm not concerned about what your practices may be, particularly given the challenging optics of making a former sheriff the subject of an administrative investigation. This is troubling on so many levels, and while I am more than happy to cooperate with you, it will be on my terms. Please advise how you wish to proceed.

Alex

On Thu, Feb 9, 2023 at 1:50 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Good afternoon Mr. Villanueva,

Thank you for your response and confirmation that you are not currently represented by counsel. In the event that you become represented by counsel, please let me know and I will communicate directly with your attorney.

It is alleged that you acted in an inappropriate POE related manner and made inappropriate POE related remarks in the workplace. The specific allegations include, but are not limited to, potential Manual of Policy and Procedures ("MPP") violations of the following:

3-01/121.10 POE – Discrimination

3-01/121.15 POE – Sexual Harassment (Other Than Sexual)

3-01/121.20 POE – Discriminatory Harassment (Other Than Sexual)

3-01/121.25 POE – Third Person Harassment

3-01/121.30 POE – Inappropriate Conduct Toward Others

3-01/121.35 POE – Retaliation

It is not our practice to submit questions in advance of the interview. Should you have any further questions, I can be reached at 626-372-4848. Thank you.

Best,

Christine



# Christine Diaz-Herrera, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

## Sanders Roberts LLP

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

---

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Wednesday, February 8, 2023 5:09 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** [External] Re: Administrative Investigation Interview Request

Not currently represented. Send me a brief synopsis and questions you'd like me to answer.

Alex

On Wed, Feb 8, 2023 at 10:18 AM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Good Morning Mr. Villanueva,

I wanted to follow up regarding my request to schedule an interview with you. However, pursuant to the California Rules of Professional Conduct (Rule 2-100) I am unable to communicate with you directly if you are currently represented by an attorney. Do you have an attorney representing you in this matter? If so, please provide me with their contact information so that I may speak with them. Thank you.

Best,

Christine

COLA001918
EXHIBIT 24 - Page 452



# Christine Diaz-Herrera, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

## Sanders Roberts LLP

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Thursday, January 12, 2023 11:23 AM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: Administrative Investigation Interview Request

Send me the synopsis and questions first and I'll take it from there

On Mon, Jan 9, 2023 at 2:48 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Thank you for your response. Is there an attorney you would like me to contact directly? I am happy to forward my previous interview requests to your attorney.

Best,

Christine

COLA001919
EXHIBIT 24 - Page 453



# Christine Diaz-Herrera, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

## Sanders Roberts LLP

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Monday, January 9, 2023 2:47 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Administrative Investigation Interview Request

I received two certified letters regarding interview requests for incidents that allegedly happened in March of last year. In order to properly respond, I will ask you to submit your questions in writing, after providing a brief description of what the allegations are, and then I will reply with counsel. This is the first I have heard of anyone reaching out to me, so please use this email address for all communications.

Regards,

Alex Villanueva

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure: and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure: and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure: and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure: and to lead the movement toward building a more resilient world. To find out more, visit our website.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure: and to lead the movement toward building a more resilient world. To find out more, visit our website.

COLA001921
EXHIBIT 24 - Page 455

# EXHIBIT 25

EXHIBIT 25 - Page 456



# LOS ANGELES COUNTY
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

Incident Date: Between July 28, 2021, and March 2, 2022
Department Knowledge: March 16, 2022
Statute Date: March 15, 2023

# INTERNAL AFFAIRS BUREAU
# INVESTIGATIVE REPORT

# CONFIDENTIAL

IAB #IV 2558101



# TABLE OF CONTENTS

CONFIDENTIAL

# Table of Contents
IV 2558101

**AUDIO VIDEO TRACKING SHEET**

**PERSONNEL INVESTIGATION FORM**

**INVESTIGATIVE SUMMARY**

**INTERVIEW TRANSCRIPTS**

   1-Complainant Esther Lim

**EXHIBITS**

   **A**   County Policy of Equity Report/Notification Form, ICMS #2022-112209

   **B**   Policy of Equality (POE) Report/Notification Form, #22-046.

   **C**   One (1) CD containing recordings of Subject Villanueva conducting
          interviews on Facebook live, and KFI Radio show

**MISCELLANEOUS DOCUMENTS**

   -   Request for IAB Investigation Memorandum from Commander
       Jason P. Wolak to Captain Ron Kopperud, dated June 27, 2022.

   -   Subject of Administrative Investigation Notification Form signed by Subject
       Alex Villanueva, dated June 29, 2022.

   -   Manual of Policy and Procedures:
       3-01/121.10: Policy of Equality - Discrimination
       3-01/121.15: Policy of Equality - Sexual Harassment
       3-01/121.20: Policy of Equality - Harassment (Other than Sexual)
       3-01/121.25: Policy of Equality - Third Party Harassment
       3-01/121.30: Policy of Equality - Inappropriate Conduct Toward Others
       3-01/121.35: Policy of Equality - Retaliation

**IV 2558101**

CONFIDENTIAL

# AUDIO/VIDEO TRACKING SHEET

CONFIDENTIAL

# INTERNAL AFFAIRS BUREAU
## -  Audio/Video Tracking Sheet  -

## # IV 2558101

**Investigator's Name:**   Lieutenant Ann Devane

**Total number of USB Flash Drives:**   0

**Total number of compact discs:**   2

**Total number of digital audio files:**   1

### DIGITAL AUDIO FILES

| Name |
| --- |
| 1-Complainant Esther Lim |

### DIGITAL MEDIA

| | |
| --- | --- |
| **Transcripts** | One (1) Compact Disc containing: Audio recorded interview and interview transcript |
| **Exhibit C** | One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show |

CONFIDENTIAL

# PERSONNEL INVESTIGATION FORM

CONFIDENTIAL

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
### PERSONNEL INVESTIGATION

PAGE 1 OF 2

| DATE 09/21/2023 | No. OF SUBJECTS 1 | UNIT(S) INVOLVED Executive Division | | I.A.B. FILE No. IV 2558101 |
|---|---|---|---|---|

MANUAL SECTIONS ALLEGEDLY VIOLATED (BY TITLE AND No.)
3-01/121.10,POE-Discrimination;  3-01/121.15, POE-Harassment; 3-01/121.20, POE-Harassment (Other than Sexual);
3-01/121.25, POE-Third Party Harassment; 3-01/121.30, POE-Inappropriate Conduct To Others; 3-01/121.30, POE-Retaliation

| DATE, TIME, DAY OF OCCURRENCE Between July 28, 2021, and March 2, 2022 | RELATED URN FILE No. IF APPLICABLE |
|---|---|

LOCATION OF OCCURRENCE
Unknown

| SOURCE OF COMPLAINT: | ☐ COMMUNITY | ☐ SUPERVISION | WIC REPORT No. | ☑ OTHER SOURCES (SPECIFY) POE #: 22-046 |
|---|---|---|---|---|

| SUBJECT No. 1 OF 1 | LAST NAME Villanueva | FIRST NAME Alex | M.I. | RANK OR TITLE Sheriff | EMP. No. 246296 |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT Executive Division | DATE ASSIGNED | DIVISION OR REGION Executive Division |
|---|---|---|

STATUS OF SUBJECT
☑ CONTINUING ON DUTY   ☐ RELIEVED OF DUTY - REASSIGNED TO:   ☐ OTHER

| SEX Male | RACE Hispanic | HAIR Brown | EYES Brown | HEIGHT 510 | WEIGHT 195 | D.O.B. 02/25/1963 | AGE 60 |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE 12/03/2018 | DATE APPOINTED TO RANK 12/03/2018 | INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE ___ | TIME ___ |
|---|---|---|---|---|---|

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| 10/21/1992 | 3132 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 09/15/1993 | 6069 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 11/23/2015 | 2390479 | 3-01/030.10:OBEDIENCE TO LAWS, REGULATIONS; | Written Reprimand |
| | | 3-01/040.97:SAFEGUARDING PERSONS IN CUSTODY; | |
| | | 3-01/050.10:PERFORMANCE TO STANDARDS | |

| SUBJECT No. OF | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT | DATE ASSIGNED | DIVISION OR REGION |
|---|---|---|

STATUS OF SUBJECT
☐ CONTINUING ON DUTY   ☐ RELIEVED OF DUTY - REASSIGNED TO:   ☐ OTHER

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE | DATE APPOINTED TO RANK | INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE ___ | TIME ___ |
|---|---|---|---|---|---|

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| | | | |

**CODE: C** - COMPLAINANT, **W** - WITNESS

ADDITIONAL COMPLAINANTS, WITNESSES, OR SUBJECTS ON SUPPLEMENTAL PAGES  ☑ YES  ☐ NO

| CODE C No. 1 OF 1 | LAST NAME Lim | FIRST NAME Esther | M.I. | SEX Female | RACE UNK | D.O.B. Adult |
|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Justice Deputy for Hilda Solis | RES. PHONE (AREA CODE) ( ) |
|---|---|

| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT 856 Kenneth Hahn Hall of Administration, LA, CA. 90012 | CDL OR LASD EMPLOYEE No. | BUS. PHONE (AREA CODE) (213) 974-4111 |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE 07/28/2022 | TIME 1317 |
|---|---|---|---|

| CODE W No. 1 OF 2 | LAST NAME Pawlowski | FIRST NAME Veronica | M.I. | SEX Female | RACE UNK | D.O.B. Adult |
|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Justice Deputy for Sheila Kuehl | RES. PHONE (AREA CODE) ( ) |
|---|---|

| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT Los Angeles, Ca. 90013 | CDL OR LASD EMPLOYEE No. | BUS. PHONE (AREA CODE) ( ) |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE 08/04/2022 | TIME ___ |
|---|---|---|---|

| PRIMARY INVESTIGATOR Sanders Roberts LLP | RANK | EMP. No. | APPROVED [signature] | DATE 10.2.23 |
|---|---|---|---|---|
| ASSISTING INVESTIGATOR Lieutenant Ann Devane | RANK LT | EMP. No. 478275 | DATE SUBMITTED 09/26/2023 | |

SH-AD-669-3/15    IF ADDITIONAL SUBJECTS, WITNESSES, COMPLAINANTS OR DISCIPLINE HISTORIES, LIST ON CONTINUATION PAGES.

CONFIDENTIAL

SHERIFF'S DEPARTMENT PERSONNEL INVESTIGATION
COMPLAINANT / WITNESS CONTINUATION PAGE

| I.A.B. FILE No. | | | | | | | PAGE | 2 | OF | 2 |
|---|---|---|---|---|---|---|---|---|---|---|
| IV2558101 | | | | | | | | | | |

CODE: **C** - COMPLAINANT, **W** - WITNESS

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| W | No. 2 OF 2 | Coates | Kyla | - | Female | Unk | | Adult |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| Justice and Mental Health Deputy for Janice Hahn | | | | | | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) (213) 974-4444 | | | |
| 500 W. Temple Street Room 822, Los Angeles CA 90012 | | | | | | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE 08/01/2022 | | TIME Unk | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. ___ OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. 4 OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. ___ OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. ___ OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. ___ OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. ___ OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

| CODE | | LAST NAME | FIRST NAME | M.I. | SEX | RACE | | D.O.B. |
|---|---|---|---|---|---|---|---|---|
| | No. ___ OF ___ | | | | | | | |
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | | |
| INTERVIEW TAPE RECORDED ON | | | | | | | | |
| TAPE ____ OF ____ | | SIDE ☐ A ☐ B | DATE ____ | | TIME ____ | | | |

# INVESTIGATIVE SUMMARY

CONFIDENTIAL

**CONFIDENTIAL**

**May 19, 2023**

TO:　　　EDUARDO MONTELONGO,

　　　　　ASSISTANT LOS ANGELES COUNTY COUNSEL

FROM:　　SANDERS ROBERTS LLP

**INVESTIGATION REPORT – FORMER SHERIFF ALEX VILLANUEVA**

### 1.　INTRODUCTION

County Counsel retained the law firm of Sanders Roberts LLP ("Sanders Roberts") to conduct an independent investigation into complaints against Sheriff Alex Villanueva. Sanders Roberts conducted that investigation via witness interviews and a review of relevant documents. This report details the investigation's factual findings with respect to Sheriff Alex Villanueva.

### 2.　ALLEGATIONS

The allegations that form the basis of the complaints against Sheriff Alex Villanueva are as follows:

**ALLEGATION 1:** In various public appearances on Facebook Live and KFI Radio, Sheriff Alex Villanueva subjected several Board of Supervisors Justice Deputies to harassment on the basis of sex.

**ALLEGATION 2:** In various public appearances on Facebook Live and KFI Radio, Sheriff Alex Villanueva subjected several Board of Supervisors Justice Deputies to harassment on the basis of race/ethnicity/ancestry/national origin.

**ALLEGATION 3:** In various public appearances on Facebook Live and KFI Radio, Sheriff Alex Villanueva subjected several Board of Supervisors Justice Deputies to harassment and retaliation on the basis of age.

### 3.　APPLICABLE POLICIES AND GUIDELINES

**Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.015 - County Policy of Equity**

**THE POLICY.** All County of Los Angeles (County) employees are required to conduct themselves in accordance with the entirety of this County Policy of Equity (Policy), and all applicable local, county, state, and federal laws.

**PURPOSE.** This Policy is intended to preserve the dignity and professionalism of the workplace as well as protect the right of employees to be free from discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status. Discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status, are contrary to the values of the County. The County will not tolerate unlawful discrimination on the basis of sex, race, color, ancestry, religion, national origin, ethnicity, age (40 and over), disability, sexual orientation, marital

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 2 of 11

status, medical condition or any other protected characteristic protected by state or federal employment law, nor will it tolerate unlawful harassment, or retaliation. As a preventive measure, the County also will not tolerate inappropriate conduct toward others based on a protected status even if the conduct does not meet the legal definition of discrimination or unlawful harassment. All County employees are responsible for conducting themselves in accordance with this Policy and its associated Procedures. Violation of the Policy and/or Procedures will lead to prompt and appropriate administrative action including, but not limited to, counseling, training, written warning, written reprimand, suspension, demotion, or discharge.

**COUNTY POLICY OF EQUITY PROHIBITED CONDUCT.** Each County employee is responsible for understanding and abiding by these definitions of prohibited conduct as they may impact any administrative process/proceeding for potential violations of this Policy and/or associated Procedures.

**COUNTY POLICY OF EQUITY UNLAWFUL HARASSMENT (OTHER THAN SEXUAL).**
Unlawful harassment of an individual because of the individual's race, color, ancestry, religion, national origin, ethnicity, age, disability, sexual orientation, marital status, medical condition or any other protected characteristic protected by state or federal employment law is also discrimination and prohibited. Unlawful harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment.

**Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability**[1]

"Each Department Head shall:

•Hold their employees accountable for actions that include being dishonest, untruthful, and/or which demonstrate a lack of integrity, consistent with Countywide requirements established by the Board of Supervisors, Director of Personnel, Chief Executive Officer, and Auditor Controller, County Code, Civil Service Rules, and departmental policies;
•Hold their employees, including those working in public safety, patient care, judicial affairs, and those holding fiduciary responsibilities, to high standards of honesty and conduct, which are of essential value to public servants;
•Act affirmatively to abate or prevent performance problems and document those problems when they occur;
•Ensure accountability as set forth in the Los Angeles County Charter, Civil Service Rules, and Countywide and departmental policies;
•Take timely and effective corrective action, commensurate with the offense, which may include remedial measures such as counseling or more formal action such as discipline up to and including discharge from County service; and;
•Retain employees in County service on the basis of the adequacy of their performance, correct inadequate performance, and separate from County service employees whose inadequate performance cannot be corrected.

Failure of an employee to perform their assigned duties so as to meet fully explicitly stated or implied standards of performance may constitute adequate grounds for discharge, reduction, or suspension. Where appropriate, such grounds may include, but are not limited to, qualitative as well as quantitative elements

---

[1] The Los Angeles County BOS Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability can be accessed at https://library.municode.com/ca/la_county_-_bos/codes/board_policy?nodeId=CH9PE_9.020EMAC.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 3 of 11

of performance, such as failure to exercise sound judgment, failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources. Grounds for discharge, reduction, or suspension may also include any behavior or pattern of behavior which negatively affects an employee's productivity, or which is unbecoming a county employee; or any behavior or condition which impairs an employee's qualifications for their position or for continued county employment."

### 4.   PROCEDURE

At the beginning of each interview, the interviewer advised each witness of the following: 1. That the witness's role is to tell the truth and reveal all relevant facts to the investigator; 2. That the witness should maintain confidentiality of the investigation; 3. That the witness must report any retaliation to the investigator; and 4. That the witness must not retaliate against any participant. The investigator then asked each witness whether s/he had any procedural questions.

To determine the merits of the allegations against former Sheriff Villanueva, the investigator interviewed the following persons:

| NAME | DATES OF INTERVIEW | POSITION |
|---|---|---|
| Kyla Coates | 08/04/22 | Justice and Mental Health Deputy |
| Esther Lim | 07/28/22 | Justice Deputy |
| Veronica Pawlowski | 08/01/22 | Justice Deputy |
| Sheriff Alex Villanueva | N/A[2] | Los Angeles County Sheriff |

### 5.   INVESTIGATIVE INTERVIEW SUMMARIES

**Kyla Coates**

On August 4, 2022, attorney Christine Diaz-Herrera interviewed Justice and Mental Health Deputy, Kyla Coates via video conference. Ms. Coates did not have a representative present.

Kyla Coates started with the County as an intern in January 2019. She was later hired as an Associate Justice Deputy in July 2019. In or around February 2020, Ms. Coates was promoted to her current position of Justice and Mental Health Deputy for Supervisor Janice Hahn. Ms. Coates is responsible for handling all matters relating to criminal justice and mental health. Ms. Coates also advises Supervisor Hahn on other issues, helps draft talking points and speeches, and represents Supervisor Hahn and staff on certain occasions. Prior to working for Supervisor Hahn, Ms. Coates taught at Odyssey school. She received her B.A. in Political Science and Statistics from UCLA in 2011 and her master's degree in public policy from USC in 2020.

Ms. Coates interacts regularly with the Sheriff's Department through a board liaison. She recently was

---

[2] The investigators sought repeatedly to schedule an interview with Sheriff Villanueva. Sheriff Villanueva repeatedly ignored such scheduling requests, but ultimately agreed to sit for an interview on the condition that he be provided the investigator's questions ahead of time. The investigator declined that request and accordingly completed this investigation without an interview of Sheriff Villanueva.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 4 of 11

scheduled to meet with the Supervisor and then-Sherriff Villanueva. However, she usually goes through the liaison or subject matter expert. She works with Bruce Chase and Brandon Corbett because they are in charge of jails. Vanessa Chow was the Sheriff's board liaison when Ms. Coates first started and now Christine Corrales has that role. Ms. Coates has a good working relationship with Mr. Chase, Mr. Corbett, and Ms. Corrales that is friendly and collegial.

Sheriff Villanueva Facebook Livestreams

Ms. Coates is aware of Sheriff Villanueva's commentary about the Justice Deputies during his Facebook live sessions. She had to stop listening to the session because they were so upsetting. For her mental health, Ms. Coates stopped listening and would only read the summaries of the sessions. Ms. Coates always kept up to date. She believed she received the summaries from the CEO's office. They were sent to each Board office.

Sheriff Villanueva did not mention Ms. Coates by name, but he often referenced the entire Justice Deputies group. He disparages the group and makes references to their age. He said they are "woke twenty-somethings that worship at the altar of wokeness." Ms. Coates said she is in her thirties and others are in their forties. Sheriff Villanueva has also made reference to their gender. He said that they are all women. Sheriff Villanueva said that the supervisors promote diversity, but the Justice Deputies are all women and unqualified.

Ms. Coates has listened to approximately 15 of his speeches. She also believes at least some of his Facebook live speeches have been transcribed by the CEO's office. Sheriff Villanueva appears to refer to the Justice Deputies about a third of the time he is talking via Facebook live. During those sessions he has referred to the age of the Justice Deputies, which is a lie that can easily be fact checked. He also says the Justice Deputies are all female even though Supervisor Mitchell has two male Justice Deputies. It has stuck out to Ms. Coates that Sheriff Villanueva has chosen to make comments that are "straight up lies" and have nothing to do with their policies.

In the last few years Sheriff Villanueva has blamed the Board for defunding his department. She believes his motivation has been to get support for himself as an elected official. She said that anytime they tried to introduce transparency he would attack. She believes that his discussion about defunding the Sheriff's Department is part of his overall attack on the Board. Ms. Coates did not think Sheriff Villanueva had done any Facebook live sessions for a small period of time and had been relatively quiet compared to the past.

Comments Regarding Supervisors

Sheriff Villanueva acted especially awful to Supervisor Mitchell and Supervisor Solis. She also believed he mentioned Esther Lim by name in public settings. He made negative comments to Ms. Coates in front of Supervisor Hahn. Sheriff Villanueva had requested a quarterly check-in. They had a check-in during November 2021 and another in January/ February 2022. It was a virtual meeting. He said Supervisor Hahn was defunding him. Ms. Coates told him he felt underfunded, but he was not being defunded, let's get that out in the clear. Sheriff Villanueva pointed at Ms. Coates and said, "I can tell from your age you are one of those people that hate the police and want to defund us." Ms. Coates said, "that is not true, you don't know me or my personal background." The conversation upset Ms. Coates and she couldn't believe what he said to her. It was just the three of them in the meeting. Ms. Coates could not recall if Supervisor Hahn responded. He insulted Supervisor Hahn to her face, that is just what he does. Supervisor Kuehl has called him out on his behavior before.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 5 of 11

Sheriff Villanueva also said they were all twenty-year old woke, just out of college, and never had a job in their lives. Ms. Coates told Sheriff Villanueva that he did not know her and what he said about her was untrue. Sheriff Villanueva said it was semantics. He also told her, "I can see from your age that you are one of those people that worships at altar of wokeness, hates the police and wants to defund the police." Ms. Coates was offended because he was discrediting her experiences. Ms. Coates has worked hard and is not anti-police. Sheriff Villanueva also said they were all women. In response Ms. Coates asked him even if they were all women, what was he implying. He did not reply.

Ms. Coates said that Sheriff Villanueva's actions have not impacted her individually. She did not think he ever mentioned her name personally. He usually shares BOS pictures and the general email for Supervisor Kuehl. She said she was lucky she hasn't actually been harmed because of Sheriff Villanueva's words.

Treatment of Women of Color

Ms. Coates was present when Sheriff Villanueva said something negative to Supervisor Kuehl. She told him he had to stop insulting her because it is rude and unproductive. He responded, "I'll stop saying bad things about you publicly if you end the hiring freeze. I'll stop being mean to you."

Sheriff Villanueva also said several negative things about Supervisor Mitchell. However, she could not recall any specific comments he made about her. During a Facebook Live session, he called Supervisor Hilda Solis "La Malinche," because she doesn't support law enforcement which makes her a traitor to her own people.

Ms. Coates recalled reading in a transcript that Sheriff Villanueva said he should take the BOS out to the shed and beat them during one of his Facebook Live sessions. She said Sheriff Villanueva said really inappropriate things about the supervisors.

Commentary on KFI Radio Station

Ms. Coates listened to a few of Sheriff Villanueva's appearances of the radio station KFI. He talked about Justice Deputy Esther Lim during one show. The radio personalities said her name. They made it sound like a huge bombshell of a story because she had all these tweets that made commentary on public affairs.

Community Town Hall February 2022

Ms. Coates did not attend the Town Hall Meeting in February 2022. Usually, the field deputy attends those events. To her knowledge, Sheriff Villanueva made similar comments at this event. At that point it was old news because he was always saying similar disparaging comments. She did not believe he made any comments about Ms. Lim at this event. She recalled his comments were more focused on the supervisors. Jennifer L. and Lauren U. told her about Sheriff Villanueva's comments at the townhall meetings. The comments about the Justice Deputies were usually on Instagram and Facebook Live events.

**Esther Lim**

On August 12, 2022, attorney Christine Diaz-Herrera interviewed Justice Deputy, Esther Lim, via Teams video conference. Ms. Lim did not have a representative present.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 6 of 11

Background

Esther Lim has worked for Los Angeles County Supervisor, Hilda Solis, since June of 2020 as her Justice Deputy. Ms. Lim handles Supervisor Solis's public safety and justice portfolio, which includes the Sheriff, Probation, and District Attorney's office. Lim serves as a liaison for Supervisor Solis with oversight entities and engages with community members, monitors jails and juvenile facilities. As part of her duties, Ms. Lim goes into both jail and juvenile hall facilities to observe. Ms. Lim reports issues to oversight entities and Board of Supervisors. Ms. Lim works with oversight entities such as probation oversight, civil brand commission, Office of Inspector General, and the Sheriff Civilian Oversight Commission. Ms. Lim reports to Chief of Staff Cindy Chan and Supervisor Solis. Ms. Lim previously worked at the ACLU of Southern California for almost a decade. While at the ACLU, she focused on issues such as law enforcement accountability and jail conditions. She also interacted with the LA County Sheriff's Department and the OIG. Ms. Lim received a B.S. in Criminal Justice from Cal State Long Beach in 2006. She received a Master's in Social Work from USC in 2010. She states that there are at least four incidents that have occurred.

Sheriff Alex Villanueva

Sheriff Villanueva knows who Ms. Lim is. They had a working relationship when she worked at the ACLU. She acknowledged that in her previous role at the ACLU she was critical of Sheriff Villanueva. Further, she said that she had been critical of Sheriff Villanueva in her public social media posts. In Feb 2021, Sheriff Villanueva wrote a letter addressed to Supervisor Solis and cc'ed the BOS and CEO. Ms. Lim considered his letter to be harassment. The letter discussed Ms. Lim's social media posts and called for opening up an investigation of her social media accounts. Ms. Lim believed the Sheriff's request was unjustified.

Ms. Lim acknowledged being critical of Sheriff Villanueva in the past. She said it was part of accountability from the BOS. When Sheriff Villanueva does not collaborate, they are critical. The BOS has governance over County departments, including the Sheriff's Department. Even though Sheriff Villanueva is elected, there is still a supervisory authority. Accountability could be brought up in a board meeting or through motions. Oversight entities will issue subpoenas to force the sheriff or his representative to attend a meeting. During one Board meeting discussed by Sheriff Villanueva, the Board heard from a constituent being harassed by deputies.

Sheriff Villanueva referred to Ms. Lim and other Justice Deputies as twenty-somethings that don't know any better. However, Ms. Lim is not in her twenties. She found Sheriff Villanueva's comments disparaging because he was putting down her education and intellectual level. Ms. Lim was aware of this Facebook Live session because sometimes the County's communication department sends her a transcript of Sheriff Villanueva's Facebook live session.

Because Ms. Lim is a Justice Deputy, she frequently attends events where Sheriff Villanueva is present. If Sheriff Villanueva is going to be there, she is typically assigned to go. There was a community town hall meeting where they recognized each other. He said, "Esther go tell your boss that I want to debate her." This was a meeting that occurred in 2021. Ms. Lim has seen him a handful of times at events. The board meetings are virtual, and Sheriff Villanueva has attended virtually. During those meetings he has made disparaging comments about Justice Deputies. She believes he made negative comments about the Justice Deputies during public comments he made on July 27th and 28th.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 7 of 11

July 28, 2021 Statement on Facebook Live

Sheriff Villanueva conducted a Facebook Live session in uniform and discussed a motion Ms. Lim
drafted on behalf of Supervisor Hilda Solis. The motion he was referencing had been put forward the day
before on July 27, 2021. In video he held and read from the motion. Sheriff Villanueva did not approve of
the motion and said he did not think the drafter realized the implications of the motion. Motions are often
drafted by deputies on behalf of their respective Supervisors.

October 6, 2021 Facebook Live Session

During a Facebook Live session Sheriff Villanueva said he heard Ms. Lim "loud and clear" and then
stated that he, was "pretty sure the flunkies are going to listen and get back to you." Ms. Lim said it
would have been the Justice Deputies to respond to the issues he raised because they are a liaison to
Sheriff Villanueva.

February 16, 2021 Statement to Janice Hahn's Health Deputy

A Justice Deputy told Ms. Lim that Sheriff Villanueva said all the Supervisors have twenty-five year olds
right out of college writing their motions. Ms. Lim found this to be an offensive and ageist comment. She
believes it is ageist because it assumes the Justice Deputies are right out of college and it minimizes their
education and intellect. Ms. Lim found his comments particularly troublesome given the weight of his
words as the Sheriff of Los Angeles County being made on a public platform heard by people that could
become violent or dangerous. Ms. Lim had concerns that someone listening to Sheriff Villanueva could
choose to retaliate against the Justice Deputies based on his statements. She believed Sheriff Villanueva's
comments about her, and the other Justice Deputies could pose a safety concern. Lastly, his comments
were "incredibly unprofessional."

Ms. Lim has not observed an uptick in negative comments towards her after Sheriff Villanueva's
comments because she does not use social media anymore. However, there are disparaging comments
made by people that watch Sheriff Villanueva's Facebook page live sessions. Ms. Lim recalled one time
when someone directed a comment toward her during a Facebook live session because she made remarks
at an event where Supervisor Solis issued a 25K reward in three homicide investigations.

History of Intimidation of Women of Color

Sheriff Villanueva has made multiple negative and misogynistic comments about the supervisors. On one
occasion he said he wanted to take all of them back to the shed and beat them. He used the racist and
sexist term, "La Malinche" against Supervisor Solis. He has also made negative comments about
Supervisor Holly Mitchell, though Ms. Lim could not recall exactly what he said. She reported that
Sheriff Villanueva makes comments like, "they worship at the altar of wokeness." He also harassed the
former County CEO who was also a minority woman. He opened up a criminal investigation to intimidate
her. Ms. Lim accused Sheriff Villanueva of harassing the Oversight Committee. She said that Sheriff
Villanueva has tried to attack anyone with oversight of him. He has attempted to open arbitrary criminal
investigations to silence people. Ms. Lim has drafted many motions about accountability and as a result,
Sheriff Villanueva "goes after" Ms. Lim and Supervisor Solis. She said that Sheriff Villanueva goes after
the BOS in every one of his Facebook Live sessions. During one Facebook Live session, Sheriff
Villanueva said they should look into why there are no female Justice Deputies. Ms. Lim disputes this
because there is a male Justice Deputy in the second district.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 8 of 11

<u>Letters Requesting Discipline of Ms. Lim for Her Social Media Commentary</u>

According to Ms. Lim, Sheriff Villanueva targeted her like he had targeted other Asian women. He
authored two letters, one in February 2021 and the other in March 2022 about Ms. Lim's social media
posts on Twitter. Sheriff Villanueva sent a letter to the BOS. In that letter, he included screenshots of her
twitter posts, which were public. She made the posts while she was employed at her former employer, the
ACLU, where she was encouraged to use social media.

Ms. Lim also believes Sheriff Villanueva shared his letter about her with KFI Radio. He received
coverage of his letters, but the coverage ended there. The Office of the Inspector General (OIG) got
involved with asking for justification for investigating an employee's personal social media. The OIG
never got any information as to why the investigation was conducted. Ms. Lim only knows that they went
through her social media accounts. Sheriff Villanueva wrote Ms. Lim's boss, Supervisor Solis, and tried
to use what Ms. Lim wrote in personal social media accounts to get her terminated in 2021 and 2022. Ms.
Lim did not believe she violated any County policy with her social media posts. However, she decided
that she would no longer use her personal social media accounts or Twitter. Ms. Lim knows there are
other deputies with social media accounts. Sheriff Villanueva complained that Ms. Lim was not fired and
asked why the supervisor did not discipline her.

**Veronica Pawlowski**

On August 1, 2022, attorney Christine Diaz-Herrera interviewed Justice Deputy, Veronica Pawlowski via
Teams video conference. Ms. Pawlowski did not have a representative present.

<u>Background</u>

Veronica Pawlowski has worked for the County of Los Angeles since 2012. She served as Supervisor
Sheila Kuehl's Justice Deputy for two and a half years. Previously she held the position of Special
Counsel to the Board of Supervisors on Child Welfare issues. Subsequent to that, she held a position at
County Counsel where she advised the Department of Children and Family Services; the Probation
Department; and the Los Angeles Homeless Services Authority. Pawlowski has been an attorney for 19
years. She received her B.A. in Political Science and Communications from USC in 1997 and her law
degree from Boston College in 2000.

While she worked at County Counsel, Ms. Pawlowski worked on ordinances that give bodies of oversight
their authority. She was really aware about how that relationship is supposed to work. The Supervisor saw
Ms. Pawlowski as a subject matter expert on ordinances because she knew them better than anyone else.

<u>Interaction with Sheriff's Department</u>

Most of Ms. Pawlowski's interactions with the Los Angeles County Sheriff's Department ("Sheriff's
Department") is at the Assistant Sheriff level. Her work with the Sheriff's Department has been very
focused on the jails. Supervisor Sheila Kuehl ("Supervisor Kuehl") called for closure of a main jail in Los
Angeles County. Much of Ms. Pawlowski's work has been focused on this issue. Ms. Pawlowski has
dedicated a lot of time to learning how the jail operates. The Sheriff's Department has a board liaison and
a board liaison team. This team advises Supervisor Kuehl's office of critical incidents.

As part of her work, Ms. Pawlowski meets in "clusters" that are attended by the other Justice Deputies
and County staff with subject matter knowledge of the matters to be placed on the Board of Supervisor

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 9 of 11

meeting agenda. These meetings are scheduled by the CEO's office. Each week the cluster meeting agenda is based who is on the Board of Supervisors meeting agenda. To facilitate these meetings the CEO invites the relevant County departments to speak on items noticed in the Board of Supervisors meeting agenda. Who is speaking at cluster depends on the items being considered that week. All five BOS offices are represented, and the public is also allowed to attend.

The public safety cluster gives Ms. Pawlowski a preview of the issues to be raised and gives her an opportunity to ask questions on behalf of Supervisor Kuehl. These sessions help Ms. Pawlowski and the other Justice Deputies to make recommendations.

Ms. Pawlowski also attends informal briefings that are not open to the public. To address issues related to the pandemic, she used to attend a covid related briefing once a week.

Interaction with Sheriff Alex Villanueva

Ms. Pawlowski does not have to interact directly with the Sheriff Villanueva, but that is by deliberate design. She sat in on a few meetings with the Sheriff Villanueva and Supervisor Kuehl, but it was not required. She sat in on these meetings "maybe two or three times."

Sheriff Villanueva has not used abusive language directly toward Ms. Pawlowski or Supervisor Kuehl. However, during his Facebook live sessions there was a time period when he repeatedly talked about the fact the Board of Supervisors is comprised entirely of women. Similarly, he also made comments about the gender composition of the Justice Deputies.

Sheriff's Alex Villanueva's Facebook Live Sessions

Part of Ms. Pawlowski's responsibilities on behalf of her bosses is to sit in on meetings and keep them informed about what is going on in her portfolio. Ms. Pawlowski started to listen to Sheriff Villanueva's Facebook live sessions to alert her bosses if he said anything newsworthy. Ms. Pawlowski could not recall how many Sheriff Villanueva Facebook live sessions she has listened to. She has listened to them both live and via a recorded session. Ms. Pawlowski has listened to "just about every session" since Sheriff Villanueva started doing them.

In the beginning it was just Ms. Pawlowski listening and taking notes. Somewhere along way, she started to receive summaries of the sessions from the CEO's office, Countywide Communications Unit. Ms. Pawlowski did not know who sent them because she would receive them from Supervisor Kuehl's Communications Deputy. Lenny McGuire is in charge.

Sheriff Villanueva's Comments About the Justice Deputies

Initially Sheriff Villanueva called the Justice Deputies disparaging things. He said they don't know anything about the law. It became so much that Ms. Pawlowski started to "tune his comments out." Sheriff Villanueva called the Justice Deputies "woke twenty-year-old flunkies." During another exchange Sheriff Villanueva said it was "all these women running the show." He asked the question, "what's up with it being all women?" He said it was not just the Supervisors, and that all the Justice Deputies were "young twenty something woke and dumb women." Ms. Pawlowski was offended because Sheriff Villanueva portrayed them as puppets of the Supervisors who are young and dumb and don't know anything. Ms. Pawlowski said she is 46 years old and has a 4-year-old child. She is of Mexican descent and her children are of mixed race. Ms. Pawlowski said she is a proud child of immigrants. She said to

COLA002137

EXHIBIT 25 - Page 474

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 10 of 11

portray her as dumb, naive and not understanding during Sheriff Villanueva's Facebook live sessions was incredibly offensive to her.

Ms. Pawlowski considered filing a CPOE complaint. She has been in County for a long time and has experienced the process first-hand. She said that she does not have a lot of faith in the process. Ms. Pawlowski considered going to the press to tell them who the Justice Deputies really are. She pointed out that one of the Justice Deputies is male contrary to Sheriff Villanueva's remarks. Ms. Pawlowski said the press could do a write up about the situation, but she was "blown off" and told it was not worth the time despite how he was portraying all of them.

Ms. Pawlowski speculated that Sheriff Villanueva was trying to undermine the Justice Deputies and get to the Supervisors. She had concerns that his comments about her and the others would influence the community and his deputies. She drives a County car and lives in a small town where the LA County Sheriff's deputies are very present. The Justice Deputies talked about this issue as a group and wondered if Sheriff Villanueva was gathering information on them. They had concerns that he would look up their addresses or try to impact them in some way. Ms. Pawlowski has not personally received any emails or texts based on Sheriff Villanueva's comments about the Justice Deputies. However, the community she lives in is different. She lives in one of the only conservative parts of the County. She noticed that she would get a reaction if she told anyone that she works for Supervisor Kuehl. They would ask her, "isn't your boss anti-Sheriff?"

Although she was not there and did not hear it personally, Ms. Pawlowski is aware of a recording of a Sheriff Villanueva event where he called the Justice Deputies a "bunch of flunkies." These comments occurred during a period of time when he was holding community town halls. The townhall occurred in East LA. Ms. Pawlowski did not know who recorded the event. She thought the recording was taken by a staff member.

<u>Esther Lim</u>

Ms. Pawlowski reported that Sheriff Villanueva singled out Justice Deputy Esther Lim and highlighted her twitter posts. He wrote a letter to BOS to investigate and fire her. He also wrote another letter to the BOS saying that they had a fascist woman working on the board. Ms. Pawlowski said she saw that this affected Ms. Lim.

<u>History of Intimidation of Women of Color</u>

Ms. Pawlowski reported that Sheriff Villanueva referred to Supervisor Hilda Solis as "La Malinche" in one of his Facebook posts. La Malinche is commonly known as a traitor. He did not explain why he called her this name. At the time, Supervisor Solis took up a BOS motion and the Sheriff "ranted" about how the Supervisor was "full of it." He made comments that he would expect support from the one Latina on the BOS, but Supervisor Solis did not support him.

Ms. Pawlowski said that Sheriff Villanueva also made derogatory comments about Supervisor Kuehl. He had a whole commentary about Patty Giggins to the COC Commission in which he accused her of collusion or an inappropriate granting of funds. He referred to her as corrupt several times.

Similarly, he intimated that Supervisor Holly Mitchell was corrupt and improperly benefitted from some decisions she made.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 11 of 11

Max Huntsman

Ms. Pawlowski reported that Sheriff Villanueva made comments about Max Huntsman, Inspector General, "nonstop." Sheriff Villanueva called him "Gustav Hunstman," alluding that he is "some kind of Nazi." She said that Sheriff Villanueva has made his comments in writing. Ms. Pawlowski believes Sheriff Villanueva referenced it in a letter and does not hide it. Sheriff Villanueva referred to Mr. Huntsman and said his real name was "Gustav." Ms. Pawlowski believed Sheriff Villanueva's comments were intended to be about Mr. Huntsman's national origin.

KFI Radio Talk Show

Ms. Pawlowski reported that Sheriff Villanueva also made comments about the Justice Deputies on the radio station, KFI. Ms. Pawlowski said everything blended together. She listened to his comments in the different forums giving him space. She could not distinguish one from the other. They listened to all of his comments across various media platforms. Ms. Pawlowski believed some of it was captured and could be located by Lenny McGuire.

## 6.   DOCUMENTARY EVIDENCE

  a.   **July 28, 2021 Facebook Live Session**

  b.   **October 6, 2021 Facebook Live Session**

  c.   **August 29, 2021 KFI Radio Show**

CONFIDENTIAL

**Justice Deputy Kyla Coates**

**Interview: August 4, 2022**

<u>Background</u>

Kyla Coates started with the County as an intern in January 2019. She was later hired as an Associate Justice in July 2019. In or around February 2020, Ms. Coates was promoted to her current position of Justice and Mental Health Deputy for Supervisor Janice Hahn. Ms. Coates handles all matters of criminal justice and mental health. Ms. Coates also advises Supervisor Hahn on other issues, drafts talking points and speeches, and represents Supervisor Hahn and staff on certain occasions. Prior to working for Supervisor Hahn, Ms. Coates taught at Odyssey school. She received her B.A. in Political Science and Statistics from UCLA in 2011 and her master's degree from USC in Public Policy in 2020.

Ms. Coates interacts regularly with the Sheriff's Department through a board liaison. She recently was scheduled to meet with the Supervisor and Sheriff Villanueva. In most cases, however, she goes through a liaison or subject matter expert. She works with Ruth Chase and Brandon Corbett because they are in charge of jails. Vanessa Chow was the Sheriff board liaison when Ms. Coates started and now Christine Corrales has that role. Ms. Coates has a positive working relationship with Ms. Chase, Mr. Corbett, and Ms. Corrales that is friendly and collegial.

<u>Sheriff Villanueva Facebook Livestreams</u>

Ms. Coates is aware of Sheriff Villanueva's commentary about justice deputies during his Facebook live sessions. She had to stop listening to the sessions because they were so upsetting. For her mental health, Ms. Coates stopped listening and only read the session summaries. Ms. Coates always kept updated. She believed she had received the summaries from the CEO's office. They were sent to each Board office.

Sheriff Villanueva did not mention Ms. Coates by name, but often referenced the entire justice deputies group. He disparages the group and references their age. He said they are "woke 20 somethings that worship at altar of wokeness." Ms. Coates explained that she is in her 30s and others are in their 40s. Sheriff Villanueva has also made reference to their gender. He said they were all women. Sheriff Villanueva said that the supervisors promote diversity, but the justice deputies are all women and unqualified.

Ms. Coates has listened to approximately 15 of his speeches. She also believes at least some of his Facebook Live speeches have been transcribed by the CEO's office. Sheriff Villanueva refers to justice deputies about a third of the time he talks via Facebook Live. During those sessions he referred to the age of the justice deputies, which is a lie that can easily be fact checked. He also says the justice deputies are all female even though Supervisor Mitchell has two male justice deputies. It has stood out to Ms. Coates that Sheriff Villanueva has chosen to make comments that are straight up lies and have nothing to do with their policies.

1

In the last few years Sheriff Villanueva has blamed the Board for defunding his department. She believes his motivation is to get support for himself as an elected official. Any time they tried to introduce transparency he would attack. His discussion about defunding the Sheriff's Department is part of his overall attack on the Board. Ms. Coates did not think Sheriff Villanueva had done any Facebook live sessions for a small period of time and had been relatively quiet compared to the past.

Comments Regarding Supervisors

Sheriff Villanueva acted especially awful towards Supervisor Mitchell and Supervisor Solis. She also believed he had mentioned Esther Lim by name in public settings. He made negative comments about Ms. Coates in front of Supervisor Hahn. Sheriff Villanueva requested quarterly check-ins. They had a check-in during November 2021 and another in January/ February 2022. It was a virtual meeting. He said Supervisor Hahn was defunding him. Ms. Coates told him he felt underfunded, but he was not being defunded, let's get that out in the clear. Sheriff Villanueva pointed at Ms. Coates and said, "I can tell from your age you are one of those people that hate the police and want to defund us." Ms. Coates said, "that is not true, you don't know me or my personal background." The conversation upset Ms. Coates and she couldn't believe what he said to her. It was just the three of them in the meeting. Ms. Coates could not recall if Supervisor Hahn responded. He insulted Supervisor Hahn to her face, that is just what he does. Supervisor Kuehl has called him out on his behavior before.

Sheriff Villanueva also said they were all 20-year old woke, just out of college, and never had a job in their lives. Ms. Coates told Sheriff Villanueva that he did not know her and what he said about her was untrue. Sheriff Villanueva said it was semantics. He also told her, "I can see from your age that you are one of those people that worships at altar of wokeness, hates the police and wants to defund the police." Ms. Coates was offended because he was discrediting her experiences. Ms. Coates has worked hard and is not anti-police. Sheriff Villanueva also said they were all women. In response Ms. Coates asked him even if they were all women, what was he implying. He did not reply.

Ms. Coates said that Sheriff Villanueva's actions have not impacted her individually. She did not think he mentioned her name personally. He usually shares BOS pictures and the general email for Supervisor Kuehl. She said she was lucky she hadn't actually been harmed because of Sheriff Villanueva's words.

Women of Color

Ms. Coates was present when Sheriff Villanueva said something negative to Supervisor Kuehl. She told him he had to stop insulting her because it is rude and unproductive. He responded, "I'll stop saying bad things about you publicly if you end the hiring freeze. I'll stop being mean to you."

Sheriff Villanueva also said several negative things about Supervisor Mitchell. However she could not recall any specific comments he made about her. During a Facebook Live

2

COLA002141

EXHIBIT 25 - Page 478

session he called Supervisor Hilda Solis "La Malinche," because she doesn't support law enforcement which makes her a traitor to her own people.

Ms. Coates recalled reading in a transcript that Sheriff Villanueva said he should take the BOS out to the shed and beat them. This was during one of his Facebook Live sessions. She said Sheriff Villanueva said inappropriate things about supervisors.

KFI

Ms. Coates listened to a few of Sheriff Villanueva's appearances on the radio station KFI. He talked about justice deputy Esther Lim during one show. Radio personalities mentioned her name. They made it sound like a huge bombshell of a story because she had all these tweets that commented on public affairs.

Community Town Hall February 2022

Ms. Coates did not attend the Town Hall Meeting in February 2022. Usually the field deputy attends those events. To her knowledge, Sheriff Villanueva made similar comments at this event. At that point it was old news because he always said similar disparaging comments. She did not believe he commented about Ms. Lim at this event. She recalled his comments were more focused on the supervisors. Jennifer L. and Lauren U. told her about Sheriff Villanueva's comments at the townhall meetings. The comments about justice deputies were usually on Instagram and Facebook Live events.

3

CONFIDENTIAL

**Justice Deputy Veronica Pawlowski**

**Interview: August 11, 2022**

<u>Background</u>

Veronica Pawlowski has worked for the County of Los Angeles since 2012. She served as Supervisor Sheila Kuehl's Justice Deputy for two and a half years. Previously she held the position of Special Counsel to the Board of Supervisors on Child Welfare issues. Subsequently she held the position of County Counsel where she advised the Department of Children and Family Services; the Probation Department; and the Los Angeles Homeless Services Authority. Pawlowski has been an attorney for 19 years. She received her B.A. in Political Science and Communications from USC in 1997 and her law degree from Boston College in 2000.

While she worked at County Counsel, Ms. Pawlowski worked on ordinances that give bodies of oversight their authority. She was really aware of how that relationship is supposed to function. The Supervisor saw Ms. Pawlowski as a subject matter expert on ordinances because she knew them better than anyone else.

<u>Interaction with Sheriff's Department</u>

Most of Pawlowski's interactions with the Los Angeles County Sheriff's Department ("Sheriff's Department") are at the Assistant Sheriff level. Her work with the Sheriff's Department focuses on the jails. Supervisor Sheila Kuehl ("Supervisor Kuehl") called for the closure of the main jail in Los Angeles County. Much of Pawlowski's work has been focused on this issue. Pawlowski has dedicated a lot of time to learning how the jail operates. The Sheriff's Department has a board liaison and a board liaison team. This team advises Supervisor Kuehl's office of critical incidents.

As part of her work, Pawlowski meets in "clusters" that are attended by other justice deputies and County staff with subject matter knowledge of the matters to be placed on the Board of Supervisor meeting agenda. These meetings are scheduled by the CEO's office. Each week the cluster meeting agenda is based on who is on the Board of Supervisors meeting agenda. To facilitate these meetings the CEO invites the relevant county departments to speak on items noticed on the Board of Supervisors meeting agenda. Who is speaking at cluster depends on the items being considered that week. All five BOS offices are represented, and the public is also allowed to attend.

The public safety cluster gives Pawlowski a preview of the issues to be raised. It also gives her an opportunity to ask questions on behalf of Supervisor Kuehl. These sessions help Pawlowski and the other justice deputies make recommendations.

Pawlowski also attends informal briefings not open to the public. To address issues related to the pandemic, she attended a covid related briefing once a week.

1

<u>Interaction with Sheriff Alex Villanueva</u>

Ms. Pawlowski does not have to interact directly with Sheriff Villanueva, but that is by deliberate design. She attended a few meetings with Sheriff Villanueva and Supervisor Kuehl, but it was not required. She sat in these meetings two or three times.

Sheriff Villanueva has not used abusive language directly toward Ms. Pawlowski or Supervisor Kuehl. However, during his Facebook Live sessions there was a time period when he repeatedly talked about the fact that the Board of Supervisors is comprised entirely of women. Similarly, he also commented on the gender composition of justice deputies.

<u>Sheriff's Alex Villanueva's Facebook Live Sessions</u>

Part of Ms. Pawlowski's responsibilities are to sit in on meetings and keep her bosses informed about what is happening in her portfolio. Ms. Pawlowski started listening to Sheriff Villanueva's Facebook live sessions to alert her bosses if he said anything newsworthy. Ms. Pawlowski could not recall how many Sheriff Villanueva Facebook Live sessions she has listened to. She has listened to them live and via a recorded session. Ms. Pawlowski has listened to just about every session since Sheriff Villanueva started doing them.

At the beginning it was just Ms. Pawlowski listening and taking notes. Somewhere along the way, she started to receive summaries of the sessions from the CEO's office, Countywide Communications Unit. Ms. Pawlowski did not know who sent them because she would receive them from Supervisor Kuehl's Communications Deputy. Lenny McGuire is in charge.

<u>Sheriff Villanueva's Comments About the Justice Deputies</u>

Initially Sheriff Villanueva started to call the justice deputies disparaging things. He said they know nothing about the law. It became so much, Ms. Pawlowski started to tune his comments out. Sheriff Villanueva called them "Woke 20 year old flunkies". During another exchange Sheriff Villanueva said it was all these women running the show. He asked the question, "what's up with it being all women?" He said it was not just the Supervisors, all the justice deputies were young 20 something woke and dumb women. Ms. Pawlowski was offended because Sheriff Villanueva portrayed them as puppets of the Supervisors who are young and dumb and don't know anything. Ms. Pawlowski said she is 46 years old, and has a 4 year old child. She is of Mexican descent and her children are mixed race. Ms. Pawlowski said she is a proud child of immigrants. She said portraying her as dumb, naive and not understanding during Sheriff Villanueva's Facebook live sessions was incredibly offensive to her.

Ms. Pawlowski considered filing a CPOE complaint. She has been in the county for a long time and experienced the process first-hand. She has little faith in the process. Ms. Pawlowski considered speaking to the press to tell them who they really are. She

2

pointed out that one of the justice deputies is male contrary to Sheriff Villanueva's remarks. Ms. Pawlowski said the press could do a write up about situation, but she was blown off and told it was not worth the time despite how he was portraying all of them.

Ms. Pawlowski speculated that Sheriff Villanueva was trying to undermine the justice deputies and get to the Supervisors. She had concerns that his comments about her and the others would influence the community and his deputies. She drives a county car and lives in a small town where the LA County Sheriff's deputies are very present. The justice deputies talked about this issue as a group and wondered if Sheriff Villanueva was gathering information about them. They had concerns that he would look up their addresses or try to impact them in some way. Ms. Pawlowski has not personally received any emails or texts based on Sheriff Villanueva's comments about the justice deputies. However, the community she lives in is different. She lives in one of the only conservative parts of the county. When told anyone she worked for Supervisor Kuehl, she noticed that there would be a reaction. They would ask her, "isn't your boss anti-sheriff?"

Although she was not there and did not hear it personally, Ms. Pawlowski is aware of a recording of a Sheriff Villanueva event where he called them a bunch of flunkies. These comments occurred during a period of time when he was holding community town halls. The town hall occurred in East LA. Ms. Pawlowski did not know who recorded the event. She thought the recording was taken by a staff member.

Esther Lim

Sheriff Villanueva singled out Justice Deputy Esther Lim and highlighted her Twitter posts. A letter was written to the Board of Supervisors (BOS) informing them that she should be investigated and fired. He also wrote another letter to the BOS saying they had a fascist woman working on the board. Ms. Pawlowski said she saw that this affected Ms. Lim.

History of Intimidation of Women of Color

Sheriff Villanueva referred to Supervisor Hilda Solis as "La Malinche" in his Facebook Live session. La Malinche is commonly known as a traitor. He did not explain why he called her by his name. At the time, Supervisor Solis took up a BOS motion and he was on a rant about how the Supervisor was full of it. He commented that he would expect support from the one Latina on the BOS, but Supervisor Solis did not support him.

Sheriff Villanueva also made derogatory comments about Supervisor Kuehl. He also commented about Patty Giggins to the COC Commission. He accused her of collusion or the inappropriate granting of funds. He referred to her as corrupt several times.

Similarly, he suggested that Supervisor Holly Mitchell was corrupt and improperly benefited from some decisions she made.

3

Max Huntsman

Sheriff Villanueva commented about Max Huntsman, Inspector General, nonstop.
Sheriff Villanueva called him "Gustav Huntsman," alluding that he was a child of a Nazi.
Sheriff Villanueva has made his comments about Huntsman in writing. Ms. Pawlowski
believes Sheriff Villanueva referenced it in a letter. He does not hide it. Sheriff
Villanueva referred to Mr. Huntsman and said his real name was "Gustav." Ms.
Pawlowski believed Sheriff Villanueva's comments were intended to be about Mr.
Huntsman's national origin.

KFI Radio Talk Show

Sheriff Villanueva also commented about justice deputies on radio station KFI. Ms.
Pawlowski said everything blended together. She listened to his comments in the
different forums giving him space. She could not distinguish one from the other. They
listened to all of his comments across various media platforms. Ms. Pawlowski believed
some of it was captured and could be located by Lenny McGuire.

4

# INTERVIEW TRANSCRIPTS AND AUDIOS

CONFIDENTIAL



IV 2558101
AUDIOS AND
TRANSCRIPTS

# COMPLAINANT INTERVIEW

CONFIDENTIAL

**REFER TO INTERVIEW TRANSCRIPTS AND AUDIO CD**

**1. COMPLAINANT ESTHER LIM**

CONFIDENTIAL

**IV 2558101**

**WITNESS INTERVIEW**

**JUSTICE DEPUTY ESTHER LIM**


Herrera:      So my name is Christine Diaz Herrera. I am an attorney with the Law
              Firm of Sanders Roberts. I have been hired by the county to be an
              independent investigator. So I'm here in that capacity. I'm a neutral third
              party and a factfinder. While I don't make any kind of determinations
              regarding discipline or anything of that manner, I will, you know,
              certainly conduct interviews and engage in factfinding, regarding the
              allegations that you've submitted. Let's see here. As a county employee
              there's an expectation that you'll be honest and truthful, not withhold
              any relevant information and cooperate with the investigation. This is
              confidential and so that means that what you tell me I'm not going to be
              sharing with every single person that I talk to, you know, in subsequent
              interviews. We do ask that you keep the substance of our interview
              confidential. Now certainly the fact that you spoke to me or that the
              investigation exists, does not have to be confidential and I leave that to
              your discretion of, you know, who'd you want to share that with, but we
              do ask that the questions themselves remain confidential. Also the..
              both, you know, at a county, state and federal level, retaliation is not
              tolerated so we- if you feel like you've been a victim of retaliation in any
              way for your participation here today, that's something I would want you
              to let me know immediately so that I could have that addressed.
              Likewise we ask that you don't retaliate against anyone participating in
              this investigation. All allegations of retaliation are, taken very seriously.
              Today is July 28th 2022. It is 1:17 PM and, could you say your name for
              the record?

Lim:          Esther Lim.

Herrera:      Perfect. I don't know if you have any questions for me before we get
              started.

Lim:          So after this process, what's next? I'm just kinda curious about next
              steps.

Herrera:      So then I- once I complete this investigation, I would, draft a report and
              then that report would be given to County Counsel. And then my
              understanding is is from there they have their own process for
              assessing, you know, whether discipline's appropriate or, you know, all

**IAB IV 2558101**              **Page 1 of 22**                    **ESTHER LIM**

of that. I don't actually have any role in that part. So the next steps would be me completing the investigation and submitting my report.

**Lim:** M-hm. And then kinda prior to- 'cause I was looking things over. My complaint was filed in March, and so I'm just kinda curious what was done between March and, like, now. So in the last kind of, like, four months.

**Herrera:** Yeah, I don't have any kind of information about what their process was or what they had done. I do know that there is an intake process where they've gathered information and I believe, you know, you've been interviewed for that intake process. And then I think, at that point it gets- I'm sure that there's some type of internal process and then they decide whether or not it's, you know, appropriate to go to an external investigator to stay, you know, within the county process and in this case obviously, it's been, you know, sent to an external investigator, which is me. So I don't know what has happened all in those months. I do know that we were recently given this investigation and so we're, you know, now acting on that and I think you have every reason to expect that it'll be handled judici- you know, what's the word.. timely. And, you know, it's certainly our interest to get it, you know, to be as thorough and comprehensive as possible but also as timely as possible as well.

**Lim:** From the previous kind of, you know, process, was any of the materials provided to you in terms of, like, what they've done or, you know, the intake materials or anything like that?

**Herrera:** I do have the intake materials. And I do have, you know, I believe the interview itself, like the intake interview, I do have the notes from that. So. But, you know, we will be covering a lot of the same ground in the sense that things that you've told them I'm going to ask you about. So there will be some repeat obviously.

**Lim:** Okay. And do you have a sense in terms of, what's been done with the person that I've complained to- or complained about? What I'm complaining about?

**Herrera:** I'm sorry, I don't know--

**Lim:** 'Cause my complaint is against the sheriff and so do we know in terms of, like, the process, like, what's been done, like, with him? Like, has he been interviewed? Is he also, you know, part of this process as well?

CONFIDENTIAL

**Herrera:**   Those are not questions that I would be able to answer for you 'cause obviously that's a separate, you know, when someone's a subject. I mean certainly what I can tell you is that when someone is a subject of, you know, an investigation of this nature, they are notified. So I am aware that he, you know, certainly he would've been notified that there's an investigation, although the details would not've been, you know, would not've been provided to him. But certainly there's notification 'cause that's the county's process. But other than that, I wouldn't be able to share any further information.

**Lim:**   Okay. Sounds good.

**Herrera:**   Let's see, so background. I usually start with a little bit of background. How long have you worked for the county?

**Lim:**   Since June of 2020.

**Herrera:**   And, which department or who did you start working with?

**Lim:**   So I work for the Board of Supervisors, specifically for Supervisor Hilda Solis, who is supervisor of the first district, and I serve as her justice deputy.

**Herrera:**   So were you hired in as her justice deputy?

**Lim:**   [inaudible]

**Herrera:**   And, what are your duties?

**Lim:**   So I handle her public safety and justice portfolio; I oversee the Public Safety Department including, you know, the Sheriff's Department, Probation, APB, PD, DA; I assist in, you know, drafting motions, statements, remarks, related to public safety, specifically the supervisors, you know, agenda on public safety; I, you know, serve as the liaison for the supervisor with the various public safety departments including the oversight entities; I engage with community members on this; I go and visit and monitor the jails and the juvenile correctional facilities.

**Herrera:**   And, what type of monitoring- like, how do you monitor them?

**Lim:**   So going into the actual facilities, into the jails, into the halls and camps and, you know, talking with folks who are in there, you know. Just observing what I'm seeing and, you know, and reporting it to either- reporting it both to oversight entities and also to, to my boss.

**IAB IV 2558101**          **Page 3 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**                                              COLA002153

**EXHIBIT 25 - Page 490**

**Herrera:**    And what oversight entities do you interact with?

**Lim:**    The Probation Oversight Commission, the Office of Inspector General, the Sheriff Civilian Oversight Commission, Sybil Brand Commission.

**Herrera:**    I'm sorry, what was the last one you said?

**Lim:**    Sybil Brand.

**Herrera:**    Okay. And you said the Sheriff Oversight--

**Lim:**    Sheriff Civilian Oversight Commission.

**Herrera:**    Sorry I was not hired for my typing abilities so, I try my best. Luckily this is recorded so I guess if I needed to I could go back, but- I generally like to make sure I understand before I move on. And so.. and who do you report to?

**Lim:**    To my Chief of Staff Cindy Chen and then also to the supervisor, Hilda Solis.

**Herrera:**    Okay. And, prior to doing this work, what had you been- what type of work were you performing prior to this position as the justice deputy?

**Lim:**    So I was at the ACLU of Southern California for almost a decade.

**Herrera:**    And what type of work did you focus on while you were at the ACLU?

**Lim:**    Law enforcement accountability and jail conditions.

**Herrera:**    So was there any overlap in terms of, like, that there were groups that you had already been interacting with and then that continued in your new role as justice deputy?

**Lim:**    M-hm. So while I was at the ACLU I did interact with the sheriff's department, with, you know, with the board of supervisors, you know, with oversight entities, specifically the OIG and the Sheriff Civilian Oversight Commission and that continued obviously in this role.

**Herrera:**    So, for the basis of your complaint, my understanding is that there was a statement, a July 28th statement, in 2021 by the sheriff in his Facebook Live?

**IAB IV 2558101**            **Page 4 of 22**            **ESTHER LIM**

**Lim:**          Yeah, there are at least four.. four incidents. I'm sure there are others. I just have not reviewed every single one of his Facebook Lives.

**Herrera:**      Okay. So can you walk me through the four different incidences?

**Lim:**          Yeah, so one was on July 28th 2021, interestingly exactly a year ago. So the sheriff, while he was in uniform, he frequently goes on Facebook Live and this time he did and he talked about one of the motions that I had drafted on behalf of the supervisor; made comments, you know, to his audience, you know, the live audience and also audience members who, you know, look at his Facebook Live after, and I think his quote was 'I don't think the public realizes when the Board of Supervisors write these motions these are written by their justice deputies, who are some 20-something woke individuals who are basically putting in words what doesn't pass legal muster at all.'

**Herrera:**      And, what was the specific motion he was referencing that day?

**Lim:**          So this one was related to a motion that the supervisor put forward the day before on July 27th, and this one was called 'Taking Action For The Protection For Surviving Families From Law Enforcement Harassment and Retaliation'. And in the video, he was holding and reading from, from the motion.

**Herrera:**      And so, it was, the motion that he was reading was drafted by you?

**Lim:**          M-hm.

**Herrera:**      Okay. And was there anyone else that had also participated in drafting the motion?

**Lim:**          No.

**Herrera:**      Did you have any knowledge of whether he, had awareness that it was you specifically?

**Lim:**          The motions have, not only the supervisor's initial but the initials of the deputies who drafted it. So my initials are on there. And he does know who I am.

**Herrera:**      And how do you know that?

**Lim:**          So when I was at the ACLU, we had a working relationship then, and in.. I'm gonna say, I think it was February of 2021, he had written a letter to- addressed to Supervisor Solis, cc'd all the board of

**IAB IV 2558101**              **Page 5 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**                                                          COLA002155

EXHIBIT 25 - Page 492

supervisors, the CEO - this is also kind of part of the, you know, the harassment - and had, with no justification, opened up a, I guess an investigation into my social media accounts, in his attempt to get me fired. And the OIG and I believe the COC but definitely the OIG has actually requested information from the sheriff's department and the sheriff in terms of why they thought it was appropriate to, open up an investigation into my social media accounts, which they have yet to this day have not provided any sort of documentation or justification to them.

**Herrera:**    Okay. And, had you been, you personally, had you been critical of the sheriff in the past?

**Lim:**    Yes 'cause that's part of the accountability that the board of supervisors does. We are critical of the sheriff's department and the sheriff when they engage in misconduct and are not transparent and are not being held accountable or refuse to be held accountable, and does not, you know, when he doesn't collaborate and cooperate with oversight entities, then yes, we are critical.

**Herrera:**    And, in what way would he have been aware of- I mean.. So when he hasn't cooperated, like let's say, for example, with the Oversight Commission, is it something that your office addresses? Like, how is that addressed by your office if he's not, for example, cooperating.

**Lim:**    Yes. So hier-, like in hierarchy-wise, you know, the board of supervisors, right? is the governance over all of the county departments and that does include the sheriff's department including all the department heads. Even though the sheriff is an elected official, he's still, right?, like there's still supervisory authority that the board of supervisors has. My boss is one of five, and so, you know, we as a justice deputy, as a representative of the supervisor, right, like that's part of the hierarchy and how we hold them accountable. And why we would hold them accountable.

**Herrera:**    Well I think what I was asking is more specific in the sense that, like, I'm just trying to take something piece by piece. So for example, if he didn't cooperate or, you know, maybe attend a Commission meeting, an Oversight Commission meeting, what if any response does your office give? Like is there a letter that they send, like 'Hey you should've attended' or is it brought up in a board meeting? I guess that's what I'm asking is, what kind of response is there if- something like that.

**Lim:**    Something is brought up in a board meeting through motions and we also have the oversight entities or also a representative of the

**IAB IV 2558101**          **Page 6 of 22**          **ESTHER LIM**

supervisor, and so that's why the supervisor has oversight entities, so that when the sheriff's department isn't complying or is engaging in misconduct, these oversight entities will, you know, do what they need to do and sometimes that takes the form of, you know, issuing subpoenas to, you know, force the sheriff or his representatives to attend and, you know, talk about whatever, you know, incidents that they engaged in. Other forms, you know, the way that the supervisors will, you know, hold the sheriff's department and the sheriff accountable is through motions, and in this particular one, we were hearing from constituents that they were being harassed by deputies in the sheriff's department, whose loved ones were, you know, shot and killed and these deputies are harassing them and so, you know, given that we kept hearing this, the supervisor decided to do a motion. And she's done, you know, actually many motions, related to sheriff accountability, to basically highlight, you know, this issue that it is, you know, misconduct; it's harassment; it's retaliation. And that the sheriff's department should [inaudible]

**Herrera:** Okay. And I guess what I was asking too is, you know, is there anything - and I know this is kind of a broad question, but - is there anything that you would've done prior to him coming, you know, writing that letter on February 2021 - yeah, 2021 - that would've focused- that he would've known it was you, that it was your work, or. Was there anything in particular that, you know, that would've brought his attention to you, right? 'Cause you're one staff of, you know, a whole office. Like, is there any reason why he would've focused on you that you're aware of?

**Lim:** Because my role at the ACLU was also the same: being critical of the sheriff and the sheriff's department. So, you know, being the sheriff, he would've been part of that. I've done several motions related to, you know, sheriff accountability and so, you know, that would probably flag for him that.. you know, that I'm her justice deputy. You know, my information is on the website, seeing as I'm the supervisor's justice deputy.

**Herrera:** Okay. And had you been critical of him in your own personal social media?

**Lim:** Yes.

**Herrera:** And is your social media public?

**Lim:** It is.

**IAB IV 2558101**          **Page 7 of 22**          **ESTHER LIM**

CONFIDENTIAL

| | |
|---|---|
| **Herrera:** | So he may have also been aware just based on your own social media postings? |
| **Lim:** | Probably. |
| **Herrera:** | Okay. And so, when he says, you know, 'these are 20-something woke individuals', are you yourself, are you in your 20s? |
| **Lim:** | No I'm not. |
| **Herrera:** | Do you have any reason to believe that he would even know your age or have any sense of how young you are? |
| **Lim:** | No, and I think it's completely inappropriate 'cause he's- You know, these comments are incredibly disparaging. I mean, not just like being ageist, but also, you know, when he's saying that 'doesn't pass legal muster', right? Like trying to disparage our, like, educational and intellectual levels. |
| **Herrera:** | Okay. And.. and how did you become aware of the, the Facebook Live meeting? |
| **Lim:** | So sometimes our county coms, County Communications, will send us a transcript, of his Facebook Lives and I believe that's how I knew about this one. I typically don't, like, actively listen to his, his Facebook Lives or, you know, other justice deputies might've also heard the Communications deputy. So, yeah, so that's how we know about the-- |
| **Herrera:** | You don't have it in transcript? |
| **Lim:** | I- I would have to go back, but again, all of his Facebook Lives are on the sheriff's department Facebook website. It's all there, in terms of, like, all the videos and everything else. |
| **Herrera:** | So to your knowledge that Facebook Live is still available on his Facebook page? |
| **Lim:** | Probably. I don't think he's deleting. And, you know, I mean, I'm providing, like, four examples, but again, I have not listened to every single one of his Facebook Lives, so there very well could be, like, more examples of him being, you know, disparaging to me and other justice deputies and other, you know, staff. |

**IAB IV 2558101**                    **Page 8 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**

**Herrera:**     Other than the letter that you referenced, from February 2021, has he ever specifically said your name or, like, raised an issue with you? Other than the February letter?

**Lim:**     Yes. In a February '22 letter, he also did the same thing, saying why the supervisor, you know, had not, like, disciplined me. So there was another '22- 2022 letter that basically says the same thing. There was a community townhall meeting where, where obviously we recognize each other and during the, during the meeting, he turned to me in front of the audience and said - I do not remember the exact quote, but it was basically, you know, like 'Esther, go tell your boss that I wanna' like, you know, 'that I wanna debate her.'

**Herrera:**     Okay. And what was this- when was the townhall meeting?

**Lim:**     You know, I don't remember. It's not, it's not part of the four examples, but you know, you're question obviously, like, reminded me of, like, when he, you know, said my name. So that was one and obviously the two letters, the 2021 letter and the 2022 letter, was directly about, was directly about me, so.

**Herrera:**     Was the- Do you believe the community townhall meeting, was it this year?

**Lim:**     No. It was.. I'm going to say maybe it was last year.

**Herrera:**     After the pandemic but.. that's how I almost see things now, like, you know, is it prior to 2020 or, you know.

**Lim:**     Yeah. It was definitely last year. I can't even tell you, like, when last year but, yeah, I'm not sure.

**Herrera:**     Okay. And, are you, are you often in meetings or in places where you're both and in his presence?

**Lim:**     I mean because I'm her justice deputy and so whenever there is a public safety-related kind of meeting or community townhall, I do go. Our field deputies also go as well, so it's not like I go to all of them. If he is going to be there, I typically am.. assigned to go. So I would say in the, you know, almost two-and-a-half years that I've been, you know, in this position, I probably have seen the sheriff a handful of times.

**Herrera:**     And does he attend board meetings?

**IAB IV 2558101**                    **Page 9 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**

| Lim: | So our board meetings are all virtual, but he has- Yeah, but he does- You know, he has attended virtually and provided, you know, public comments. Where he also, you know, makes disparaging comments about the justice deputies and also about the board of supervisors as well. |
|---|---|
| Herrera: | So he has made disparaging comments that include you-- |
| Lim: | M-hm. |
| Herrera: | --during those meetings as well. |
| Lim: | Yeah, m-hm. |
| Herrera: | And, and are those comments along the lines of these two about you being woke or whatnot? |
| Lim: | Being woke, not passing legal muster. In fact, the comments that he made on the 28th I believe - again, I could be wrong, but - I believe that on the 27th when the motion was actually issued, that he provided public comments, and made these remarks. |
| Herrera: | So he may have repeated the same remarks that- Okay. |
| Lim: | M-hm. |
| Herrera: | And, to your knowledge, where would I- is there a place where I could view it? Is it just online? The board-- |
| Lim: | Yeah, so the Board of Supervisors' agenda and there is a, a search function where you can look at, like, the transcripts. |
| Herrera: | Okay. Got it. And so then kind of going next to July 28th, right, I believe there was.. No wait, that was the-- |
| Lim: | Yeah, so this is that one, yeah. |
| Herrera: | --the one we already did. Okay, we already did that one. So then I think there's another one that's February 16th and, I believe it-- |
| Lim: | Well there was one- Yeah, there was actually one before that, so October 6th 2021 during another Facebook Live, the sheriff said, quote 'You hear me loud and clear now because if you're.. 'because if you're not watching their entire thing I'm pretty sure your flunkies are going to listen to the whole thing and report back to you.' And so he was making |

**IAB IV 2558101**                    **Page 10 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**

that comment to the board of supervisors. Obviously the board of supervisors wasn't listening to his Facebook Live. '..and the flunkies at these' you know, pejoratively describing our- me and other justice deputies.

**Herrera:** Did he specifically reference the justice deputies or just all county staff or?

**Lim:** It would be the justice deputies because we're the ones that, you know, are the liaison to the sheriff's department, and so it would be the justice deputies because they work on the public safety portfolio. You know, we would be the ones reporting to our supervisors.

**Herrera:** Got it. And then, when was the next statement or thing?

**Lim:** Then the next one was on February 16th. So this one was actually something that another justice deputy had shared with me, that the sheriff was at a community townhall and the quote was 'All the supervisors have 25-year-old justice deputies who are right out of college and writing all their motions.' So that was, you know, another incident.

**Herrera:** And, did you find that offensive?

**Lim:** I did.

**Herrera:** And why did you find it offensive?

**Lim:** One, I think it's an ageist comment. You know, assuming our ages, and then, you know, saying that we're right out of college, trying to minimize again our education, our intellect, you know, and we're, you know, writing all their motions. I mean that's what, that's what policy deputies do. But, you know- It's not just the fact that he's just making these comments. I think, you know, the weight of his words as a sheriff of Los Angeles County, and then stating these state- making these statements in a very public platform, you know, with- potentially with people who, you know, could engage in, you know, possibly, you know, like.. violent, dangerous, who knows, to retaliate against us, I think, you know, just kind of poses some safety concerns. I also think it's being incredibly unprofessional.

**Herrera:** And.. have you, you know, after his comments, after the comments that he's made, have you ever witnessed an uptick in negative attention or commentary on your social media platform? Like, any of your social media accounts?

**IAB IV 2558101**          **Page 11 of 22**          **ESTHER LIM**

**CONFIDENTIAL**

| | |
|---|---|
| **Lim:** | So I don't use my social media accounts anymore, but, you know, there are comments made, you know, under, like, the supervisor's social media accounts, 'cause she has social media accounts where they, you know, use disparaging kind of comments there. There was another Facebook Live where the supervisor was issuing a reward to assist a sheriff's department investigation, where I did provide remarks and some of the comments that were made under that Facebook Live comments, you know, there was comments about me under there.. yeah. I'm just, like, not tracking every single kind of one, right? But… |
| **Herrera:** | I'm just wondering if you had noticed, 'cause obviously there could be an element of people that pay attention to him or, you know, like him that, you know, could be dangerous. So I'm wondering if you had seen any type of, like, any kind of threat to you or any kind of, like, negative comment to you based on, you know… |
| **Lim:** | Yeah. I mean, the one that I recall is the comment that was made, when I was providing remarks on behalf of the supervisor for the reward. |
| **Herrera:** | You made remarks on what day? |
| **Lim:** | I'm going to have to find that for you. |
| **Herrera:** | Okay. Maybe- and was it, it was on Facebook Live that you made the comments? |
| **Lim:** | Said something? Yeah, it was on Facebook Live. The supervisor had issued a, I believe it was a 20,000 or 25,000 reward to assist in three homicide investigations. I provided remarks and then under the, you know, under the Facebook Live comments, there was something directly on me. |
| **Herrera:** | Okay. 'Cause I think those are still saved too. If that Facebook Live still exists, I think I can still-- |
| **Lim:** | All the comments and everything, yep, are saved as well. And also, I'm kinda curious too on all these other Facebook Lives if comments were also made there and then. I just have not checked on those. |
| **Herrera:** | Yeah and I'm certain that I will now go through, and check them myself. But, you know, anything, any help you can give me with respect to dates that I make sure that I see, you know, obviously I'd appreciate it. But I will certainly do my own review. |

**IAB IV 2558101**                    **Page 12 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**

| Lim: | Of the two, right? the July 28th and the October 6th, are ones that I know of. But again, as I shared, he- you'll see that there are many many many Facebook Lives, and he does use a Facebook Live to be disparaging and, and just really negative and just, like, harassing and intimidating, you know, the supervisors and also, you know, the staff that work for, you know, work for her, work for the respective supervisors, specifically the justice deputies in general. |
|---|---|
| Herrera: | And, you know, I didn't ask in the background but I should've. When did you get your undergrad degree? And in what? What school did you go to, what was your degree in and what year did you graduate? |
| Lim: | Can I ask about these questions? Like, why, like what I did before and how it pertains to this? |
| Herrera: | Just background information. |
| Lim: | Okay. So.. I graduated in 2006 and then graduated grad school in 2010. |
| Herrera: | Okay. And what school did you go to for undergrad? |
| Lim: | Long Beach State, and USC. |
| Herrera: | Okay. And, did you- were you awarded a BA at Long Beach State? |
| Lim: | Yes. |
| Herrera: | Okay. And what was the subject matter? |
| Lim: | Criminal justice. |
| Herrera: | Okay. And the, was it a master's at USC or a? |
| Lim: | Masters in social work. |
| Herrera: | And so then, I know one of the things that was in the intake was that, you reported that there's been a history of the sheriff trying to intimidate women of color and I wanted to know if you could expand on that a bit more and give me more information in terms of… |
| Lim: | Yeah, so he's made comments about the supervisors. Right now we have an all-women board, so he's also made misogynistic comments about the board. You know, saying that he wanted to take all of the board of supervisors to a shed and beat them. He's made comments, a racist sexist slur against my boss, who is Latina. He called her La |

CONFIDENTIAL

Malinche. You know, he also made disparaging comments about another supervisor, Holly Mitchell, who is, who's a black woman; has intimidated and harassed our former CEO who was an Asian woman; harassed and intimidated members of the Sheriff's Civilian Oversight Commission, many of them women, including one of the chairs who is a black woman. I mean he just, you know.

**Herrera:**  And when you say- Can you give me some where you said he harassed the former CEO who was an Asian woman. Do you have any more specific about what he did or said or?

**Lim:**  Like, opened up a criminal investigation, like, on her in a way to intimidate her. Basically anyone who has the responsibility of overseeing the sheriff and the sheriff's department, he has either tried to open up these arbitrary, like, you know, no reason investigations, criminal or not, to, you know, silence folks. In my time as justice deputy, you know, like, on behalf of the supervisor I have, you know, drafted many motions around sheriff accountability because of the misconduct that he and his department engages in, and as a result he goes after Supervisor Solis and he also goes after me. Yeah.

**Herrera:**  What did he say about- you said he made negative comments about.. Supervisor Holly Mitchell. Do you recall what he said?

**Lim:**  I don't really recall, but, what he exactly says, but, you know, when he's saying that, you know, that we 'worship at the altar of wokeness' or we're 'engaging in an orgy of wokeness'. You know, comments like that. And again, you know, like the general comment about, like, that he wants to take the Board to the shed and beat them. Like, it's just, just completely inappropriate.

**Herrera:**  And when he makes these comments is it typically during board meetings so that'd be something I would see in the minutes or something of that nature?

**Lim:**  It'd be in the board minutes or it would be in his Facebook Lives. And honestly I cannot tell you which one, but he pretty much goes after the board probably in every single one of those Facebook Lives.

**Herrera:**  I think- I know you had said that there was four things that you were going to tell me. So is there--

**Lim:**  So the other one, which I kind of mentioned, right?, were the two letters that he wrote. One was in February of 2021 and then the other one was in, I think it was March of 2022.

**IAB IV 2558101**                    **Page 14 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**

COLA002164

**EXHIBIT 25 - Page 501**

**Herrera:**      And in those letters, I think, was he saying that you were--

**Lim:**         Oh you know what? Sorry, my bad. He- So yes, in addition to the 2022 letter, he also in a Facebook Live made.. during a Facebook Live I guess someone had a question about, like, why are there only women on the board and on staff? His quote was 'Good question.' They talk about inclusivity, no male justice deputy staff. 'The board should explain why they exclude men from their ranks. The people they hire are all 20-something fresh out of college, don't have a lot of senior people, woke flunkies straight out of college, first job. That's who writes the nonsense board letters.' And there is, you know, a male justice deputy and that, you know, is from the second district. So there's that. But again, you know, the comments around, like, you know, we're all, like, 20-something, we're fresh out of college, da-da-da-da-da, nonsense board orders…

**Herrera:**      Okay and I think the July 27th, the comments were regarding your motion taking action, right? So there's that. And, so for that letter that he wrote about you in February of 2021 regarding, like, I believe it was your social media accounts, is that correct? Was there- Did he ever reference that? So, am I correct in assuming, did he bring this up in a board meeting or was this just a letter that he sent in or?

**Lim:**         Yes. So he sent it in a letter. I believe he also shared it with KFI, the radio station AM 640. So it got coverage there and it just kind of ended there. But again, you know, it was unjustified in that the Office of the Inspector General also, you know, got involved in terms of requesting, you know, the justification and the reason why the sheriff, or the sheriff's department, would even.. investigate my personal social media accounts.

**Herrera:**      And did you have any knowledge or any information given to you that, that the investigation went beyond just looking at your public social media accounts?

**Lim:**         So, the OIG never got any sort of information from the sheriff's department as to the what, you know, the why, the what or anything like that. We just know that they went through my social media accounts, and then they used that to- or he used that to write the letter to my boss in an attempt to get me terminated. In 2021 and also in 2022.

**Herrera:**      And, to your knowledge is there anything in county policy that would.. prevent you from making any of the commentary that you made in your social media?

**IAB IV 2558101**              **Page 15 of 22**                    **ESTHER LIM**

**Lim:** I don't believe so. When the incident happened.. I think we had made-basically had made a joint decision that I just would not use my social media account. Not that there was, you know, a policy per se, but we just figured I just won't, like, use it. Because I do know that there are other justice deputies who've had, like, social media accounts.

**Herrera:** But that wasn't based on there being any type of policy. It's just you thought to avoid further--

**Lim:** To avoid further, like, you know, harassment from the sheriff.

**Herrera:** M-hm. And in any of those social media posts, did any of his supporters or followers try to harass you through any of those, like, old social media posts that are still up? Like, did anything that's in there, did you get any negative attention based on--

**Lim:** Yeah, I mean I have not been on it so I don't know, but I know, like, screenshots were taken.

**Herrera:** Uh-huh.

**Lim:** But I've had this social media account since, like, 2011, and, you know, we were encouraged to use our social media accounts, at my former job at the ACLU. So, it's our personal account and the bio, right? and the Twitter bio, it all says, right?, like these are our personal tweets, right, they're not a reflection of, you know, who we work for or where we work for, you know, that kind of thing. So that disclaimer is part of our bio.

**Herrera:** And to your knowledge, were the screenshots all, like, on a public page so nothing was, like.. protected or?

**Lim:** Yeah. So my account, my account's public, so it's not a private account.

**Herrera:** And this is a Twitter account, correct?

**Lim:** M-hm.

**Herrera:** Let me just make sure I've gone through.. Is there anything else, any other examples or any other.. like any other information that I should know that kind of, that evidence of, that support the allegation?

**Lim:** I mean, I have a part of my CPOE complaint. I did list, I believe it was three witnesses, you know, to the harassment. In many ways they were

**IAB IV 2558101**                     **Page 16 of 22**                     **ESTHER LIM**

CONFIDENTIAL                                                        COLA002166

EXHIBIT 25 - Page 503

also kind of victims of the harassment too. And, I don't know if that's, you know, if you're going to interview them as well as part of the investigation.

**Herrera:** [indiscernible]

**Lim:** Okay.

**Herrera:** Can you give me their names again? Just to make sure I have it.

**Lim:** Yeah. So it's Veronica Pawlowski, who is the justice deputy for the third district, and Kyla Coates, who is the justice deputy for the second district- sorry, the fourth district, and Inspector General Max Huntsman.

**Herrera:** Okay. Got it. And, to the notes that I have here, the- some of the comments were related to Ms. Coates directly, correct?

**Lim:** Yes. So the, the community townhall in February 2022, the community townhall happened in her district. And so, yeah, so she had heard about the comments made and shared them with me.

**Herrera:** And, did she tell you via email, via phone, or like, is there any kind of.. contemporaneous account of exactly what was said? Although I'm--

**Lim:** I think she might've either, emailed or, you know, told me about it.

**Herrera:** And did she share with you that she also felt offended by the comments that he had made?

**Lim:** Yes. So, you know, I don't think that they file their own CPOE complaints. You know, largely because they- typically people who do make complaints about the sheriff, they get, you know, harassed and intimidated. And so they kinda didn't want to go through that, but they were open to at least being witnesses for my complaint. But they have also been, you know, subjected to kind of the same, like, comments and impact.

**Herrera:** And Ms. Veronica Pawlowski, what did she witness?

**Lim:** So she has, you know, sort of listened to the Facebook Live, you know, during board meetings when he's making these comments. You know, we're all listening to it, so she I'm sure has listened to comments, you know, these comments being made.

**IAB IV 2558101**          **Page 17 of 22**          **ESTHER LIM**

CONFIDENTIAL

COLA002167

EXHIBIT 25 - Page 504

**Herrera:**    And has she communicated to you that she was also offended by the comments?

**Lim:**    Yes. Oh I almost forgot. He also filed a CPOE complaint against me back in 2021. An investigation was done within a month, and basically the response to his CPOE complaint against me was that, the complaints don't present a potential violation because no protected characteristic was involved and the allegations did not sufficiently connect equity to the conduct.

**Herrera:**    And, did you believe that he had filed that to harass you?

**Lim:**    Yes. Again as his way of trying to get me fired.

**Herrera:**    Is there any actions- any other direct actions that he's taken against you or, like, that he's taken either directly against you or indirectly? Like mentioning you? Is there anything else?

**Lim:**    I'm not trying to be difficult. I just think it's hard because I don't listen to every single thing that he says. And he- you'll find, Christine, that, like, he frequently goes on Facebook Live and he frequently goes on, like, Twitter and his own social media accounts. He also had his own, like, radio show with AM 640, you know, so I'm sure he's, you know, making comments there. I just- you know, I have, right, like we have jobs; I have things to do; not just, like, listen to all of his stuff. Unfortunately you're going to have to do some of that, I'm sorry- But yeah, he- I know that he does do this. I just have not, right, like listened to every single one. But I am certain that it's more than the four kind of examples I have provided. These are kind of examples of the types of comments that he makes. And at least, you know, his two letters about me and his filing the CPOE complaint I believe are, like, the way that he wanted to get me fired, try to intimidate me and harass me. So there's at least, like, three examples of him doing that directly to me. The July 2021, I mean that was one example of him, you know, actually, like, showing the motion that I had drafted and connecting those comments, you know, to me. And then his kind of general comments about justice deputies, you know, made about me and my other colleagues.

**Herrera:**    M-hm. And.. you know, I'm going to ask this because I think it's important for me to, you know, have both sides. His comments in his letter to you, I believe he's saying that, you know, they're vulgar and bullying. So he is accusing you of being vulgar and using profanity and all of that. Do you have any response to that kind of, you know- 'Cause I have seen the tweets and some of them, you know, do use profanity and are directed at him. So do you think there's any merit

**IAB IV 2558101**            **Page 18 of 22**            **ESTHER LIM**

CONFIDENTIAL

COLA002168

EXHIBIT 25 - Page 505

to what he's saying in terms of just the language itself was.. profane and not--

**Lim:**  The language that's used does use profanity.

**Herrera:**  Yeah.

**Lim:**  You know, and so whether that's vulgar I think is subjective. But in terms of the comments and the stuff that he's doing using his platform and who he is and who he represents and the power and influence that he has, and his, I would say, documented history of harassing, intimidating other, you know, people who, you know, oversee him, I think is dangerous. I can't open up a criminal investigation on him whereas, you know, he is using county resources and his influence and power to open up an investigation against me with no justification even when the inspector general requests that information. There's documented history of him opening up criminal investigations against members of the Sheriff Civilian Oversight Commission, who've been, you know, appointed to oversee him. So this is more than just like a complaint against Alex Villanueva; it's a complaint against, you know, as I stated earlier, this is the sheriff of LA County, the largest sheriff's department, you know, in the country, with, you know, access to resources that I, you know, don't have. I don't have the platform that he does, to, you know, possibly incite, you know, people to engage in, you know, possible, you know, who knows what, that endangers not only, you know, my safety and the safety of others.

**Herrera:**  Fair point. I just figured I, you know, since I have you here it's important to ask, you know. 'Cause he is essentially saying that you're- he's saying that you're bullying him, the sheriff of Los Angeles, so, you know, I'm just curious the response. And I think that's a- I think I understand what you're saying here. And I think that's all the questions I have. It may be necessary, 'cause what I'm going to do obviously as part of the investigation is I'm going to have to listen to a lot of the Facebook Lives to make sure that I've kind of captured anything that could've touched on you and that's a reference to you. So I may have to, come back to you. I don't always have to come back in terms of once I've conducted, you know, the introductory interview, but I may have to come back to you if I find that there's a lot more that he's referenced just to ask you about it and to see, you know, if, you know.

**Lim:**  Totally. I'm very curious about what he said. Do you have, do you have the- I'm not sure as part of the materials that you have, along with my CPOE complaint I had also submitted a letter and the letter does have, like, at least a URLs, the links to at least the--

CONFIDENTIAL

**Herrera:**     I don't believe I have that, no.

**Lim:**     Okay.

**Herrera:**     So if you could send that to me. I can also ask my contact to send it to me as well 'cause it sounds like…

**Lim:**     Yeah 'cause that one at least does hyperlink to the three: the July 2021, the.. October one and I believe the March Facebook Lives. But also--

**Herrera:**     If you can send that to me, I would appreciate it, but I will also reach out to my contact to make sure that if there's anything- 'cause I do believe I am missing that. I have what- I think they call it the, the Policy of Equity report, like a notification form, and so that has a lot of, you know, the information, the pertinent information and then I have the actual intake form. Or, I guess I forget what the term is for this, but it essentially is- I think it's, like, seven, eight- it's several pages long. It's the Intake Assessment Form and so it has a lot of reference, you know, all the information in there, but I don't have the letter. So if there is a letter, I would appreciate having it.

**Lim:**     I mean, the other thing too is, the sheriff's department - again, this is the other thing too, is, these are, you know, things that he's doing on a, like, a county- he's using a county account. This isn't his personal Alex Villanueva's Facebook. This is a sheriff's department Facebook site. But if you go on there, right? Like, the videos are arranged chronologically. So, since you have the dates, you would at least be able to see, like, the examples that I shared. But again, right, like I'm sure, at least Facebook Lives are fairly long.

**Herrera:**     Now I'm curious, is there any- I don't know if you are, if you have motions at every board of supervisors meeting or if there's only- I mean, I wonder, is there a general, like, listing of the motions that would've come from you or from the justice deputy so that I could maybe cross-reference between the dates of memos and then the dates of, you know, the board of supervisors meetings or Facebook Lives? You know, if there's, like, maybe some particularly.. I don't know. I don't know if everything you do is controversial - it might be - but I'm wondering if there's any way to conference.

**Lim:**     Yeah, it's not controversial to us because, one, it's the board doing it and it's the board that supports these motions, right? It's controversial to him because it's about holding him accountable.

**IAB IV 2558101**              **Page 20 of 22**              **ESTHER LIM**

CONFIDENTIAL                                                                    COLA002170

EXHIBIT 25 - Page 507

**Herrera:** But that's what I'm saying. I don't know if there's any of that where, like, maybe particularly more of interest to him because maybe they were calling him out more directly. Like, for example, you know, I was reading about his- the commission and him not showing up and the subpoena and all of that. So, you know, I'm assuming that there might've been discussion about that in a board meeting or maybe even a motion about that. So that's what I'm saying. Like, if there's any way to, like, have a- if there's anywhere to look to see a better sense of, like, dates where I might have more fertile ground to look at? 'Cause he might be annoyed.

**Lim:** I could definitely- yeah, I can look at the ones that I have done, typically.. and I'll see when we filed the motions that are, like, sheriff related. I can send that over to you and then we can check to see--

**Herrera:** I would love that.

**Lim:** Yeah, and you can check to see if there was a, you know, a Facebook Live, you know, by him.

**Herrera:** Right. 'Cause I would imagine he might get irritated, you know, if you're doing something that's regarding accountability or kind of his lack of doing something. So I would imagine that might be more fertile ground, you know, those dates versus other dates.

**Lim:** Uh-huh, yeah.

**Herrera:** But anything you could give me, I'd greatly- I will gladly take it and then, you know, as I said, you know, I'm going to be very comprehensive in terms of talking to people and making sure that I have all the information that I need.

**Lim:** Great. Can I ask if part of your investigation was also going to be, like, talking to the sheriff?

**Herrera:** Yes.

**Lim:** Okay.

**Herrera:** Since he's the subject, yes. It will include talking to the sheriff. So, I guarantee you any social media I have is locked. (laughs) Not that there's anything in there, but, you know, I can't imagine having--

**Lim:** [indiscernible] yeah, you've seen it, yeah.

CONFIDENTIAL

**Herrera:**   Seeing what I saw in yours, when I, you know, I did the whole Google search. But, when I saw all yours, I was like, Oh okay.

**Lim:**   It's more than beyond, you know, mine. It's other people who [indiscernible] he's harassing and intimidating.

**Herrera:**   Correct.

**Lim:**   People who are going to do any sort of investigation on him typically tends to be the subject of something.

**Herrera:**   Yeah, that's, that's a fair point. And I certainly already have seen some of that. So that's why I'm saying.. I'm aware.

**Lim:**   Yeah, okay. As long as you're aware, okay. Yeah, so I will look and take a look at the motions that we've issued.

**Herrera:**   Although I'm sure he'd be bored with seeing a bunch of kid pictures, so, you know. Not that exciting. In any event, thank you so much for your time. I really do appreciate it, and I'm sure I'll be in touch because I probably will have to follow up once I've done a more comprehensive look-through.

**Lim:**   Right. Thank you so much.

**Herrera:**   Thank you so much. Have a good rest of your day.

**Lim:**   You too. Bye.

**Herrera:**   Take care.

LIM, ESTHER                    (IAB) IV 2558101
WPU
plw

**IAB IV 2558101**          **Page 22 of 22**          **ESTHER LIM**

**CONFIDENTIAL**

# EXHIBITS

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL

For CISU Use:

(Method of Receipt)

☐ Telephone
☐ In-Person
■ Online
☐ Paper Complaint

Reference
#2019-0016591
#2022 - 112209

# COUNTY POLICY OF EQUITY

### REPORT/NOTIFICATION FORM

### Methods of Reporting Potential County Policy of Equity (CPOE) Violations:

1) You may use this form to report a potential violation of the CPOE;

2) File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);

3) Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or

4) Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

No

**2. Are you filing this complaint for:**

Yourself

---

(**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expectation that the CPOE complaint notification be submitted online at https://ceop.lacounty.gov).

**Section A: Reporting Party Information**                    Today's Date: 3/8/2022

**Name:** Esther Lim                         **Emp. #:** e662896
**Title:** Justice Deputy                    **Email:** elim@bos.lacounty.gov
**Work #:** (213) 458-1795    **Mobile #:** ▮▮▮▮▮    **Work Hrs.:**        **RDO:**
**Reporting Party's Department:** BOARD OF SUPERVISORS        **Dept. Head:** Celia Zavala
**Reporting Party's Other Department:**

CONFIDENTIAL

COLA002175
**EXHIBIT 25 - Page 512**

**Reporting Party's Unit of Assignment:** Board of Supervisors, Hilda L. Solis
**Reporting Party's Work Address:** 500 West Temple Street Los Angeles, CA 90012
**Reporting Party's Immediate Supervisor:** Cindy Chen
**Date & Time Form Completed:** 2022-03-08 21:28:13

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

   Yes

**Name of Supervisor/Manager Notified:** Cindy Chen
**Date:** 2022-03-08 15:32:00       **How:** Email

─────────────────────────────────────────────

**Section B: Complainant(s) Information**

**1.**
**Name:** Esther Lim                    **Emp. #:** e662896       **Title:** Justice Deputy
**Work #:** 2134581795          **Mobile #:** ██████████       **Work Hrs.:**        **RDO:**
**Complainant's Department:** BOARD OF SUPERVISORS   **Dept. Head:**
**Complainant's Other Department:**
**Complainant's Unit of Assignment:** Board of Supervisors, Hilda L. Solis
**Complainant's Work Address:**
**Complainant's Immediate Supervisor:** Cindy Chen

**Section C:** **Alleged Involved Party(ies) Information**

**1.**

**Name:** Alex Villanueva                              **Emp. #:**              **Title:** Sheriff

**Work #:**                    **Mobile #:**                        **Work Hrs.:**        **RDO:**

**Involved Party's Department:** SHERIFF            **Dept. Head:**

**Involved Party's Other Department:**

**Involved Party's Unit of Assignment:** LA Sheriff's Department

**Involved Party's Work Address:**

**Involved Party's Immediate Supervisor:** Alex Villanueva

**CONFIDENTIAL**

**Section D:** Alleged Witness(es) Information (if they can be identified)

**1.**
**Name:** Veronica Pawlowski            **Emp. #:** e552095       **Title:** Senior Justice Deputy
**Work #:**                 **Mobile #:** ▮▮▮▮▮▮▮      **Work Hrs.:**          **RDO:**
**Witness's Department:** BOARD OF SUPERVISORS       **Dept. Head:**
**Witness's Other Department:**
**Witness's Unit of Assignment:** Supervisor Sheila Kuehl
**Witness's Work Address:**
**Witness's Immediate Supervisor:** Lisa Mandel

**2.**
**Name:** Kyla Coates            **Emp. #:** e656300       **Title:** Justice and Health Deputy
**Work #:**                 **Mobile #:** ▮▮▮▮▮▮▮      **Work Hrs.:**          **RDO:**
**Witness's Department:** BOARD OF SUPERVISORS       **Dept. Head:**
**Witness's Other Department:**
**Witness's Unit of Assignment:** Supervisor Janice Hahn
**Witness's Work Address:**
**Witness's Immediate Supervisor:** Gerardo Pinedo

**3.**
**Name:** Max Huntsman            **Emp. #:** e410745       **Title:** Inspector General
**Work #:**                 **Mobile #:** ▮▮▮▮▮▮▮      **Work Hrs.:**          **RDO:**
**Witness's Department:** OTHER       **Dept. Head:**
**Witness's Other Department:** Office of Inspector General
**Witness's Unit of Assignment:** Office of Inspector General
**Witness's Work Address:**
**Witness's Immediate Supervisor:**

**Section E:** Nature of Complaint or Issue(s)

**1. What is the date of the alleged potential violation(s)?:** 07/28/2021

**2. Please provide a detailed summary of the alleged potential violation(s):**

I have four examples. Please see attached letter for additional information.

On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

On October 6, 2021, during a Facebook Live, Sheriff Villanueva said, "You hear me loud and clear now because if you're not watching their entire thing, I'm pretty sure your flunkies are going to listen to the whole thing and report back to you." When he uses the term "flunkies" he is pejoratively describing me to malign me and minimize my job as Justice Deputy.

On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions." This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age.

Fourth incident is on 3/22/22

**3. Why does the Complainant(s) believe the treatment occurred/is occurring?:**

Though the comments are made generally about the Justice Deputies, the attack was specifically lodged against me because Sheriff Villanueva is seen in the Facebook Live, holding a hard copy of the motion Supervisor Solis put forward on July 27, 2021 titled, "Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation." The motion he was holding and reading from is one I worked on behalf of Supervisor Solis.

Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai.

Additionally, it behooves me that as an Asian woman I need to speak up during a time in which anti-Asian hate is at its all-time peak, due to ignorant, racist, and hateful comments about the cause of the COVID-19 pandemic that has led...

**Section F: TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

**Date supervisor/manager observed and/or was notified of the alleged potential violation(s):**

COLA002179
**EXHIBIT 25 - Page 516**

**How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):**

**What action(s), if any, did the supervisor/manager take? (Explain in detail):**

**Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following?**

    **Medical Attention:**

    **Protection:**

    **Separation from Alleged Involved Party(ies):**

    **Other Assistance:**

---

**Did the supervisor/manager advise the Complainant(s) that they:**

**May seek confidential counseling or assistance from the County's Employee Assistance Program (EAP) at (213) 738-4200:**

**May contact the County Intake Specialist Unit (CISU) directly at (855)-999-2367, or via email at ceop@bos.lacounty.gov:**

        <u>**OPTIONAL:**</u> **Please provide the information below for statistical purposes only**

**Race/Ethnicity:** Asian (Not Hispanic or Latino)

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." – (eeoc.gov)

**Sex:** Female

**Date Of Birth:** 1981-07-30

# EXHIBIT B

CONFIDENTIAL

<table>
<tr><td>

**For I.S.U. Use Only**
Method of Receipt
☐ Telephone
☐ In Person
☐ POE Report Form
☑ Other: CPOE
Intake # 22-046

</td><td>

## Policy of Equality
### Report / Notification Form

General Instructions: Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

</td></tr>
</table>

**********************************************************************************

__Section A:__    Reporting Party Information                     Today's Date: __03__ / __17__ / __2022__

Name: Esther Lim _____    Emp. #: 662896 _____    Rank/Title Justice Deputy _____

Work Tel# 213-458-1795 _____ ; Home Tel# ████████ ; Work Hours _____ - _____ RDO _____

Unit of Assignment: Board Of Supervisors Office _____    Unit Commander: Supervisor Hilda Solis _____

Division LA County Board of Supervisors _____

Name of Supervisor Completing this form (if different from above): _____ # _____

Date & Time form completed: _____ / _____ / _____ , _____ hours.

☐    Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?

☐    Yes (if yes, fill in details)
Who: _____
When: Date: ____ / ____ / ____ , Time: _____ hours.
How _____

☐    No
☑    Do not know

**********************************************************************************

__Section B:__    Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: ____ / ____ / _____ , _____ hours or
between ____ / ____ / _____ and ____ / ____ / _____

If multiple incidents or unknown, explain: _____
See narrative. _____
_____
_____
_____

**********************************************************************************

__Section C:__    Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

Same as RP _____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

Revised 06/10                                    1                          POE -001

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

**Section D:**    Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro (Sheriff)            Employee # 246296        UOA LASD

_____            Employee # _____ UOA _____

_____            Employee # _____ UOA _____

_____            Employee # _____ UOA _____

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

**Section E:**    Alleged Witness(es) (if they can be identified)

Pawlowski, Veronica          Employee # 552095    Rank/Title Senior Justice Deputy UOA BOS
Work Tel# _____ ; Home Tel# ▉▉▉▉ ; Work Hours _____ - _____ RDO _____

Coates,Kyla          Employee # 656300    Rank/Title Justice/Health Deputy UOA BOS
Work Tel# _____ ; Home Tel# ▉▉▉▉ ; Work Hours _____ - _____ RDO _____

Huntsman, Max          Employee # 410745    Rank/Title Inspector General    UOA OIG
Work Tel# _____ ; Home Tel# ▉▉▉▉ ; Work Hours _____ - _____ RDO _____

_____          Employee # _____    Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

**Section F:**      Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.
On March 16, 2022, the ISU received a County Policy of Equity Report (ICMS #2022-112209) from CEOP Executive Director Vickey

Bane, filed by RP/CP Justice Deputy Esther Lim, #662896. The Complainant, Justice Deputy Lim, Board of Supervisors employee,

alleged the following, in pertinent part, (verbatim): "On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook

Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their

Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal

muster at all."

"On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that 'All the Supervisors

**Ask: "Why do you believe this treatment is occurring?"**          ( ☑ Check, if narrative is continued onto the next page)

_____

_____

_____

_____

_____

_____

_____

Revised 10/06                                        2                        POE -001

**CONFIDENTIAL**

COLA002183
**EXHIBIT 25 - Page 520**

Section F (cont'd):          Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

(Continued)

have 25-year-old justice deputies who are right out of college and writing all their motions.' This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age."

In addition, Complainant Lim, wrote in pertinent part, "Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai."

(ISU Note: A copy of the CPOE complaint is contained in the ISU efile for details.)

*********************************************************************************************************

**Note: Continue onto the next page**

Revised 10/06                                 3                              POE -001

CONFIDENTIAL

COLA002184

**EXHIBIT 25 - Page 521**

<u>Section G:</u>    Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY. DO NOT FILL OUT THIS SECTION IF YOU ARE THE
ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made:   __03__ / __16__ / __2022__ , __1521__ hours.

How did you become aware of the potential violation (explain in detail):
On March 16, 2022, the ISU received CPOE ICMS #2022-112209, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Xochilt Rosas to document the allegations in the County Policy of Equity Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑    Medical Attention
     **Response:** to be ascertained
☑    Protection
     **Response:** to be ascertained
☑    Other Assistance
     **Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑    May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours,
request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: _____ Date & Time: _____ / _____ / _____ , _____ hour.
                                              (Name)
☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: __03__ / __16__ / __2022__ , __1521__ hour.    How?: ☑ e-mail ☐ Fax ☐ County mail

Revised 10/06                              4                         POE -001

CONFIDENTIAL

COLA002185
**EXHIBIT 25 - Page 522**

Section H:    **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name: <u>Deputy X. Rosas</u>                    Emp. #: <u>468743</u>

Day, Date and time ISU received form <u>Thursday</u>        / <u>03</u> / <u>17</u> / <u>2022</u> , <u>1140</u> hours.

☑ Referred to Equity Unit: Date & Time - <u>04</u> / <u>04</u> / <u>2022</u> , <u>1700</u> hours.

☐ If not referred to Equity Unit, explain in detail action taken:

_____

_____

_____

Additional Information (if any):    _____

_____

_____

☐      Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☑ Subject's Unit Commander
☑ Reporting Party's Unit Commander
☐ Victim's Unit Commander

Revised 07/10                                5                        POE -001

CONFIDENTIAL

COLA002186

**EXHIBIT 25 - Page 523**

# EXHIBIT C

CONFIDENTIAL



IV 2558101
EXHIBIT C

CONFIDENTIAL

# MISCELLANEOUS DOCUMENTS

CONFIDENTIAL

SH-AD-703 Revised (2/22)

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    June 27, 2022

FILE NO:

OFFICE CORRESPONDENCE

**FROM:** JASON P. WOLAK, COMMANDER      **TO:** RON KOPPERUD, CAPTAIN
PROFESSIONAL STANDARDS DIV.             INTERNAL AFFAIRS BUREAU

**SUBJECT:**   **REQUEST FOR** INTERNAL AFFAIRS BUREAU ADMINISTRATIVE INVESTIGATION

Incident Date(s): *(use semi-colons to separate multiple dates)*
Between July 28, 2021, and March 2, 2022

Synopsis:

POE 22-046. It is alleged that Subject Villanueva made inappropriate POE related
remarks while in the workplace.

Date a Sergeant, or above, became aware of an act, omission, or other misconduct:
March 17, 2022

One Year Statute Date (If criminal monitor, leave blank):   March 16, 2023

Alcohol Related?    NO

Citizen Complaint? NO                    If yes, SCR #:

Complainant's Name (Add employee number if a Department member)
Esther Lim, Supervisor's Deputy III, #662896

CONFIDENTIAL

COLA002190
**EXHIBIT 25 - Page 527**

## REQUEST FOR IAB INVESTIGATION AND/OR CRIMINAL MONITOR

**Involved Subject** *(For additional subjects, use Subject Continuation Page 703-A)*

**Subject Name, Rank, Employee Number, and Unit of Assignment:**

Alex Villanueva, Sheriff, #246296, Office of the Sheriff

Potential MPP Violation(s):

3-01/121.10 - POE Discrimination; 3-01/121.15 - POE Sexual Harassment; 3-01/121.20 -
POE Harassment Other than Sexual; 3-01/121.25 - POE Third Party Harassment;
3-01/121.30 -POE Inappropriate Conduct Toward Others; 3-01/121.35 -POE Retaliation

Subject's Assignment/Duty Status:
- ☑ Subject's assignment/duty status unchanged
- ☐ Relieved of Duty (ROD), assigned to home     ROD Date:
- ☐ ROD, assigned to a relieved of duty position
- ☐ Probationary Employee

Justification for the subject's assignment/duty status *(required)*:

N/A

Consideration(s) for IAB Request:
\* Mandatory IAB Investigation

- ☐ Witnesses are spread over a large geographic area.
- ☐ The nature of the allegation(s) involves incidents of high media attention.
- ☐ A subject is a supervisor or manager (lieutenant or above; assistant director or above).
- ☐ The nature of the allegation(s), if founded, will likely result in discharge.\*
- ☐ The allegation(s) concern family/domestic violence.
- ☐ The allegation(s) concern workplace violence.\*
- ☐ The allegation(s) concern profiling or bias against members of the public.\*
- ☑ Other: Allegations contain Policy of Equality\*

☐ Criminal Monitor by IAB (Refer to MPP 3-04/020.30 – Internal Administrative and
Criminal Investigations) *enter investigating agency, crime, and report number:*

Supervisory Inquiry authored?     ☐ Yes  ☑ No

Contact person for source documents (i.e.: supervisory inquiry and/or
investigative materials) at the requesting unit:

Prepared by Unit Commander/Director, or designee:

Lieutenant John Carter, #435532, Internal Affairs Bureau

**NOTE: Email this form to "IAB Investigation Requests." A review of this request will
be conducted by the Internal Affairs Bureau. There may be situations when the
Internal Affairs Bureau will decide, upon initial review, to return the case to be
conducted as a unit level investigation.**

**For IAB use only**

Assigning Lieutenant  Lieutenant John Carter, #435532

IAB Investigator      Christine Diaz-Herrera, Esquire, Sanders Roberts LLP

CONFIDENTIAL

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558101

OFFICE CORRESPONDENCE

| FROM: | EDWIN A. ALVAREZ, CHIEF<br>PROFESSIONAL STANDARDS DIVISION | TO: | RON KOPPERUD, CAPTAIN<br>INTERNAL AFFAIRS BUREAU |
|---|---|---|---|

## SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER:

Alex Villanueva, Sheriff, #246296

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct):

03/17/2022

Potential MPP Violation(s) including, but not limited to:

3-01/030.10 POE - DISCRIMINATION
3-01/121.15 POE - SEXUAL HARASSMENT
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.30 POE - INAPPROPRIATE CONDUCT TOWARD OTHERS
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description):

It is alleged you acted in an inappropriate POE related manner and made inappropriate POE related remarks while in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been <u>rescinded</u>. You are being ordered by your Unit Commander that during the time this investigation is <u>active</u>, any routine absence request must be submitted <u>directly</u> to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:

| Subject: _____ | Witness: _____ |
|---|---|
| Employee #: 246296   Date: 6/29/22 | Employee #: 410429   Date: 6/29/22 |

COLA002192

**EXHIBIT 25 - Page 529**

## 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL

## 3-01/121.15 - Policy of Equality - Sexual Harassment

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature which meets any one of the following criteria:

- Submission to such conduct is made either explicitly or implicitly as term or condition of an individual's employment;
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
- Such conduct has the purpose or effect of unreasonably interfering with the individual's employment or creating an intimidating, hostile, offensive, or abusive working environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002194

**EXHIBIT 25 - Page 531**

## 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited. Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

## 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander.  When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior.  The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002196

**EXHIBIT 25 - Page 533**

Manual of Policy and Procedures : 3-01/121.30 - Policy of Equality - Inappropriate
Conduct Toward Others

# 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002197
**EXHIBIT 25 - Page 534**

## 3-01/121.35 - Policy of Equality - Retaliation

Retaliation, for the purposes of this policy, is an adverse employment action against another for reporting protected incident, filing a complaint of conduct or opposing conduct that violates this policy or related state or federal law, participating in an investigation, administrative proceeding, or otherwise exercising their rights or performing their duties under this policy or related state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                    COLA002198
**EXHIBIT 25 - Page 535**

CONFIDENTIAL

# EXHIBIT 26

EXHIBIT 26 - Page 537

# INVESTIGATOR'S LOG

| | |
|---|---|
| **FILE NUMBER:** | IV2558101 |
| **INVESTIGATOR:** | Sanders Roberts LLP |
| **DATE DEPARTMENT BECAME AWARE OF ALLEGATION(S):** | 03/16/2022 |
| **DATE IAB INVESTIGATION INITIATED:** | 06/27/2023 |
| **DATE SENT TO ADVOCACY UNIT:** | |
| **DATE RETURNED FROM ADVOCACY UNIT:** | |
| **DATE FORWARDED TO FORCE OR RISK REVIEW:** | |
| **DATE RETURNED FROM FORCE OR RISK REVIEW:** | |
| **DATE TO DIVISION:** | |
| **DATE RETURNED TO IAB:** | |

**CASE SUMMARY:**

| DATE | SUMMARY | NAME |
|---|---|---|
| 06/22/22 | Attorney Client Privilege | Lt. Carter |
| 06/23/22 | Attorney Client Privilege | Lt. Carter |
| 06/24/22 | Commander Wolak called and informed me to handle this matter in the same fashion as the previous involved Sheriff cases. | Lt. Carter |
| 07/07/2022 | Per Ms. Real, hard case delivered to Ms. Diaz Herrera's office | Lt. Carter |
| 08/03/22 | Emailed Ms. Diaz Herrera for an update. | Lt. Carter |
| 10/03/22 | Sent email to Ms. Diaz Herrera re: case status. | Lt. Carter |
| 10/13/22 | All interviews have been completed, except for the Sheriff. Will attempt to schedule a date by 10/14/22. | Lt. Carter |
| 11/02/22 | Sent email to Ms. Diaz Herrera re: case status. | Lt. Carter |
| 11/07/22 | Re-inquired about case status. | Lt. Carter |
| 11/14/22 | Completed all the interviews necessary for the Huntsman matter, with exception of Sheriff Villanueva. She has reached out to Commander Satterfield to schedule Sheriff Villanueva's interview. She does not have a date sched for the interview yet. | Lt. Carter |
| 11/30/22 | I sent Commander Satterfield and Capt. Blanchard an email | Lt. Carter |

Page **1** of **3**

COLA002432
**EXHIBIT 26 - Page 538**

# INVESTIGATOR'S LOG

| | | |
|---|---|---|
| | asking them to contact the attorney in order to set up an interview with Sheriff Villanueva. | |
| 11/30/22 | Commander Satterfield and Capt Blanchard called and informed me that they never received any requests for interviews for Sheriff Villanueva. | Lt. Carter |
| 12/13/22 | Sent email to Ms. Diaz Herrera regarding update. | Lt. Carter |
| 01/04/23 | Certified letter sent requesting an interview with the subject, Villanueva. | Lt. Carter |
| 01/09/23 | Former Sheriff Villanueva contacted the attorney. | Lt. Carter |
| 01/12/23 | Attorney Client Privilege | Lt. Carter |
| 02/02/23 | Sent an email requesting a case status. | Lt. Carter |
| 02/21/23 | Sent another email, no response. | Lt. Carter |
| 03/05/23 | Sent a 3rd email requesting an update. | Lt. Carter |
| 03/09/23 | Ms. Diaz Herrera responded. Villanueva is not cooperating. Attorney Client Privilege | Lt. Carter |
| 03/09/23 | Briefed Chief Lecrivain and are moving forward with the case. | Lt. Carter |
| 04/03/23 | Per Ms. Diaz-Herrera, she advised Shawn Thomas was reassigned all 4 cases. | Lt. Carter |
| 04/18/23 | Sent email to new council Shawn Thomas regarding an update. | Lt. Carter |
| 04/19/23 | Received update- Outside counsel have undertaken to draft a final report using interview and relevant evidence. | Lt. Carter |
| 05/15/23 | Attorney Shawn Thomas sent an email stating he would send the Hunstman case back to IAB this week. | Lt. Carter |
| 06/14/23 | Emailed Mr. Thomas regarding 4 POE cases. 2 cases (Huntsman, Lim) are ready for pick up. IAB LET and Risk Management LET not available until next Tuesday (6/27/23). | Lt. Carter |
| 07/05/23 | Lt. Ann Devane took over the POE team, Lt. John Carter explained the process of reviewing, completing and stacking the case. | Lt. Devane |
| 08/17/23 | Reviewed zoom interview with Complainant Lim | Lt. Devane |
| 08/24/23 | Converted zoom interview to wave file to send out and have the interview transcribed | Lt. Devane |
| 08/28/23 | Received Transcripts | Lt. Devane |

CONFIDENTIAL

COLA002433
**EXHIBIT 26 - Page 539**

# INVESTIGATOR'S LOG

| 09/12/23 | Worked on completing required documents to stack the case | Lt. Devane |
|---|---|---|
| 09/21/23 | Reviewed transcripts and compared to the summary written by Saunders Roberts LLP, and confirmed the statements made by Complainant Lim and Witnesses were all documented in the summary. | Lt. Devane |
| 09/26/23 | Requested Subject Villanueva's training record and copy of Policy of Equality notification form, unable to locate either, per IAB Secretary V. | Lt. Devane |
| 09/26/23 | Stacked case and submitted to IAB Captain Kopperud for review. | Lt. Devane |
| 10.2.23 | *Reviewed, returned for edits Re: spelling.* | *R. Lenspus* |
| 10-2-23 | *Resubmitted. APPROVED* | *R. Kopperud* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Page **3** of **3**

CONFIDENTIAL

# EXHIBIT 27
## (SEPARATELY LODGED WITH COURT)

EXHIBIT 27 - Page 541

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA001970.mp4**

COLA001970

EXHIBIT 27 - Page 542

# EXHIBIT 28

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 28 - Page 543

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA001971.mp4**

COLA001971

EXHIBIT 28 - Page 544

# EXHIBIT 29

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 29 - Page 545

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA001972.mp4**

**COLA001972**

**EXHIBIT 29 - Page 546**

# EXHIBIT 30

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 30 - Page 547

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA001973.mp4**

**COLA001973**

**EXHIBIT 30 - Page 548**

# EXHIBIT 31

EXHIBIT 31 - Page 549

Case 2:24-cv-04979-SVW-JC    Document 89-17    Filed 04/21/25    Page 550 of 1007
Page ID #:3976
Case 2:24-cv-04979-SVW-JC    Document 46    Filed 09/30/24    Page 90 of 249    Page ID
#:684

SH-AD-32A (3/23)

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: October 17, 2023
FILE NO.: IV 2558101

OFFICE CORRESPONDENCE

**FROM:** SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:** COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:** **POSSIBLE MANUAL OF POLICY AND PROCEDURES VIOLATIONS**

The following Manual of Policy and Procedures violations relate to the
allegations in this case, regarding **Alex Villanueva, Former Sheriff:**

**3-01/121.10 Policy of Equality – Discrimination (Based on Gender and
Ethnicity)**

Disposition:
  X   Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.15 Policy of Equality – Sexual Harassment**

Disposition:
_____ Charge founded
_____ Charge unresolved
  X   Charge unfounded
_____ Charge exonerated

**3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on
Gender and Ethnicity)**

Disposition:
  X   Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

64

**EXHIBIT 31 - Page 550**

Case 2:24-cv-04979-SVW-JC    Document 89-17    Filed 04/21/25    Page 551 of 1007
Page ID #:3977
Case 2:24-cv-04979-SVW-JC    Document 46    Filed 09/30/24    Page 91 of 249    Page ID
#:685

-2-                              September 19, 2023

**3-01/121.25 Policy of Equality– Third Person Harassment (Based on Gender and Ethnicity)**

Disposition:
_X_ Charge founded
____ Charge unresolved
____ Charge unfounded
____ Charge exonerated

**3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on Gender and Ethnicity)**

Disposition:
_X_ Charge founded
____ Charge unresolved
____ Charge unfounded
____ Charge exonerated

**3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity)**

Disposition:
_X_ Charge founded
____ Charge unresolved
____ Charge unfounded
____ Charge exonerated

**Discipline Assessment – Alex Villanueva, █████**

**Review of Applicable "Guidelines for Discipline" Section:**

The Departmental "Guidelines for Discipline" (revised August 1, 2020) includes the Policy of Equality, and lists the following analogous misconduct with the associated disciplinary penalties:

| CONDUCT | STANDARD DISCIPLINE |
|---|---|
| 3-01/121.10 Policy of Equality – Discrimination (Based on Gender and Ethnicity) | Five (5) Days to Discharge |

65

EXHIBIT 31 - Page 551

Case 2:24-cv-04979-SVW-JC    Document 89-17    Filed 04/21/25    Page 552 of 1007
Page ID #:3978
Case 2:24-cv-04979-SVW-JC    Document 46    Filed 09/30/24    Page 92 of 249    Page ID
#:686

-3-                                September 19, 2023

| 3-01/121.15 Policy of Equality – Sexual Harassment | Five (5) Days to Discharge |
|---|---|
| 3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on Gender and Ethnicity) | Five (5) Days to Discharge |
| 3-01/121.25 Policy of Equality – Third Person Harassment (Based on Gender and Ethnicity) | Written Reprimand to Discharge |
| 3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity) | Written Reprimand to Discharge |
| 3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity) | Five (5) Days to Discharge |

**Determination of Discipline:**

Based upon the attached assessment of mitigating and aggravating factors, the following discipline has been determined to be appropriate.  This discipline is subject to revision upon receipt of the Subject's response or grievance.

\_\_\_\_\_ **Discharge**
\_\_\_\_\_ **Reduction in Rank**
\_\_\_\_\_ **Removal from Bonus Position**
\_\_\_\_\_ **Suspension with loss of pay and benefits for \_\_\_ days with / without the option of EBD**
\_\_\_\_\_ **Written Reprimand**
\_\_\_\_\_ **No Discipline**

\_\_X\_\_ **Panel Recommends "Do Not Rehire" notation at top of file**


SVE:WB:wb

66

EXHIBIT 31 - Page 552

Case 2:24-cv-04979-SVW-JC    Document 89-17    Filed 04/21/25    Page 553 of 1007
Page ID #:3979
Case 2:24-cv-04979-SVW-JC    Document 46    Filed 09/30/24    Page 93 of 249    Page ID
#:687

SH-AD-32A (3/23)

**COUNTY OF LOS ANGELES**
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    October 17, 2023
FILE NO.    IV2558101

OFFICE CORRESPONDENCE

FROM:    SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

TO:    COUNTY EQUITY
OVERSIGHT PANEL

SUBJECT:    **Alex Villanueva, #** ▉
Former Sheriff
Office of the Sheriff
Executive Division

The County Equity Oversight Panel, consisting of Constance Komoroski, Mercedes Cruz and Roberta Yang met by teleconference on October 17, 2023. Also attending the teleconference was Department representative Chief Laura Lecrivain.

Upon consideration of the facts developed in this investigation, the Panel determined that the Manual of Policy and Procedures section 3-01/121.15 Policy of Equality – *Sexual Harassment* was **unfounded**. Sections 3-01/121.10 Policy of Equality – *Discrimination (Based on Gender and Ethnicity)*, 3-01/121.20 Policy of Equality – *Discriminatory Harassment (Based on Gender and Ethnicity)*, 3-01/121.25 Policy of Equality – *Third Person Harassment (Based on Gender and Ethnicity)*, 3-01/121.30 Policy of Equality – *Inappropriate Conduct Toward Others (Based on Gender and Ethnicity)*, and 3-01/121.35 Policy of Equality – *Retaliation (Based on Gender and Ethnicity)* were **founded**.

The County Equity Oversight Panel recommended that the Subject should receive **a "Do Not Rehire" notation at the top of their personnel file.**

SVE:WB:wb

67

**EXHIBIT 31 - Page 553**

# EXHIBIT 32

EXHIBIT 32 - Page 554

| For CISU Use: |
| --- |
| (Method of Receipt) |
| **Online** |
| **ICMS #** 2022-112213 |

# COUNTY POLICY OF EQUITY

## REPORT / NOTIFICATION FORM

**Methods of Reporting Potential County Policy of Equity (CPOE) Violations:**

1. You may use this form to report a potential violation of the CPOE;
2. File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);
3. Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or
4. Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1.  Do you wish to file this complaint anonymously?**

☐    Yes **(Do not check 'Yes' if you are a reporting supervisor/manager).**

■    No (If no, please proceed to Question #2).

**2.  Are you filing this complaint for :**

☐    **Yourself** (If filing this complaint for yourself, please start at Section A).

■    **Someone else** (If you are filing this complaint for someone else, please start at Section A).

☐    **Someone else: I am a reporting supervisor/manager**  (please start at Section A).

---

**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expection that the CPOE complaint notification be submitted online at https://ceop.bos.lacounty.gov.

CONFIDENTIAL

COLA002094

**EXHIBIT 32 - Page 555**

**Section A:** **Reporting Party Information**                    Today's Date: <u>03/09/2022</u>

| | | | | | |
|---|---|---|---|---|---|
| Name | <u>MAX HUNTSMAN</u> | Emp # | <u>e410745</u> | Title | <u>INSPECTOR GENERAL (UC)</u> |
| Work # | ██████████ | Mobile # | _____ | Work Hrs | _____ |
| | | | | RDO | _____ |

Department                    <u>BOARD OF SUPERVISORS</u>          Dept Head      _____

Unit of Assignment            <u>OFFICE OF INSPECTOR GENERAL</u>

Work Address                  <u>561 BRADFORD ST. PASADENA CA 91105</u>

Immediate Supervisor          <u>JEFFREY LEVINSON</u>

**Date & Time Form Completed:** 03/09/2022 07:57 AM

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

☐  Yes (if yes, fill in details):

Name of Supervisor Notified:

Date:  <u>NOT AVAILABLE</u>

How:

☐  No

☐  Do not know

CONFIDENTIAL                                                      COLA002095

**EXHIBIT 32 - Page 556**

**Section B: Complainant(s) Information**

Name    MAX HUNTSMAN    Emp #    e410745    Title    INSPECTOR GENERAL (UC)

Work #    ████████    Mobile #      Work Hrs

RDO

Department    BOARD OF SUPERVISORS    Dept Head    Celia Zavala

Unit of Assignment    OFFICE OF INSPECTOR GENERAL

Work Location    OFFICE OF INSPECTOR GENERAL

Immediate Supervisor    JEFFREY LEVINSON

CONFIDENTIAL

COLA002096

**EXHIBIT 32 - Page 557**

**Section C:  Alleged Involved Party(ies) Information**

| | | | | | |
|---|---|---|---|---|---|
| **Name** | ALEJANDRO VILLANUEVA | **Emp #** | e246296 | **Title** | SHERIFF/UNCLASSIFIED |
| **Work #** | (562) 694-2400 | **Mobile #** | | **Work Hrs** | |
| | | | | **RDO** | |

| | | | |
|---|---|---|---|
| **Department** | OTHER - Sheriff | **Dept Head** | |
| **Unit of Assignment** | OFFICE OF THE SHERIFF | | |
| **Work Location** | HALL OF JUSTICE | | |
| **Immediate Supervisor** | | | |

CONFIDENTIAL

COLA002097

**EXHIBIT 32 - Page 558**

**Section D:** **Alleged Witness(es) Information (if they can be identified)**

CONFIDENTIAL

COLA002098
**EXHIBIT 32 - Page 559**

**Section E:  Nature of Complaint or Issue(s)**

1. What is the date of the alleged potential violation(s)?:  March 8, 2022

2. Please provide a detailed summary of the alleged potential violation(s):

   As reported by RP/CP Huntsman: "...T[ ]he Sheriff sent an email throughout the Sheriff's Department that was a
   racially biased attack."  RP/CP writes, " My birth name was Max-Gustaf Edler.  My father did not participate in
   raising me and so I took my mother's family name Huntsman as a law student with the help of a firm I clerked for.
   As Inspector General I have never used any name other than Max Huntsman, which is also my name on my
   driver's license and passport.  A county computer system continues to incorrectly list my first name as Max-Gustaf
   and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks.  I believe this is dog whistling to the
   extremists he caters to as the more unusual name might lead some to view me as foreign (German or Jewish)."

3. Why does the Complainant(s) believe the treatment occurred/is occurring?:

   Race

CONFIDENTIAL                                                                     COLA002099

**EXHIBIT 32 - Page 560**

**Section F:  TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

Date & time supervisor/manager observed and/or was notified of the alleged potential violation(s):

n/a

How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):

What action(s), if any, did the supervisor/manager take? (Explain in detail):

Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following? (If so, please explain in space provided):

Medical Attention:

Protection:

Separation from Alleged Involved Party (ies):

Other Assistance:

Did the supervisor/manager advise the Complainant(s) that they:

May seek confidential counseling or assistance from County's Employee Assistance Program (EAP) at (213) 738-4200.

May contact the County Intake Specialist Unit (CISU) directly at (855) 999-2367, or via email at ceop@bos.lacounty.gov

CONFIDENTIAL

COLA002100

**EXHIBIT 32 - Page 561**

**COMPLAINT SUBMISSION**

By submitting this complaint I am declaring, under penalty of perjury under the laws of the State of California, that:

- The facts set forth herein are true and correct and based on my own knowledge, except as to matters stated on my information and belief, and as to those matters I believe to be true;

- I believe that the facts alleged herein are jurisdictional to the County Policy of Equity (accessible at: https://ceop.bos.lacounty.gov), are not duplicative of facts set forth in previously filed County Policy of Equity complaints that I have filed, and

- The filing of this County Policy of Equity complaint is not a misuse or abuse of the County's Policy of Equity Complaint Process.

MAX HUNTSMAN

Printed Name

_____

Signature

March 9, 2022

Date

CONFIDENTIAL                          COLA002101
**EXHIBIT 32 - Page 562**

**OPTIONAL:  Please provide the information below for statistical purposes only**

**Race/Ethnicity:**

*"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that required the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." - (eeoc.gov)*

☐ Hispanic or Latino - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

☑ White (Not Hispanic or Latino) - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

☐ Black or African-American (Not Hispanic or Latino) A person having origins in any of the black racial groups of Africa.

☐ Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino) - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

☐ Asian (Not Hispanic or Latino) - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

☐ American Indian or Alaska Native (Not Hispanic or Latino) - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

☐ Two or More Races (Not Hispanic or Latino) - All persons who identify with more than one of the above five races.

**Gender:**

☑ Male

☐ Female

☐ Prefer Not to Answer

**Date of Birth:** 01/17/1965

CONFIDENTIAL    COLA002102
**EXHIBIT 32 - Page 563**

# EXHIBIT 33

EXHIBIT 33 - Page 564

## CISU ASSESSMENT FORM

| | Final Overall Designation |
|---|---|
| ICMS Number(s): 2022-112213 | ☐ "A" |
| Date CISU Received: March 9, 2022 | ☐ "B" |
| Sworn Personnel: None | ☐ "C" |
| Approximate Statute Date: N/A | ■ "N" |
| | ☐ "E" |

Reporting Party(ies)

MAX HUNTSMAN, e410745, BOARD OF SUPERVISORS, INSPECTOR GENERAL (UC)

Complainant(s):

MAX HUNTSMAN, e410745, BOARD OF SUPERVISORS, INSPECTOR GENERAL (UC)

Involved Party(ies):

ALEJANDRO VILLANUEVA, e246296, SHERIFF, SHERIFF/UNCLASSIFIED

### Persons Interviewed

### Assessment

CP Huntsman (White) alleged that IP Villanueva (Hispanic or Latino) sent an email on 3/5/2022 within the Sheriff's Department that CP considered to be "a racially biased attacked" on CP. CP explains that CP's birth name was Max-Gustaf Edler but as Inspector General CP has only used the name Max Huntsman, which is reflected on CP's passport and driver's license. IP Villanueva has allegedly "repeatedly" referred to CP Huntsman as Max-Gustaf Huntsman "in public attacks" in an alleged effort to cause "extremists [IP] caters to" to view CP as either German or Jewish. For instance, CP also alleged that in a 3/6/2022 appearance on a KFI Radio show IP Villanueva acknowledged that CP no longer uses "Gustaf" as part of CP's name, which CP believes supports CP's allegation that IP "intentionally misnamed [CP] for the purpose of benefiting from the racial animosity that could trigger…" among extremists in IP's "audience."

IP Villanueva is the Los Angeles County Sheriff. The Sheriff's Department has its own equity process by which it internally addresses such complaints. Therefore, the facts alleged, even if taken as true, are unrelated to County employment or are otherwise non-jurisdictional under the County Policy of Equity. The County Intake Specialist Unit recommends an "N" designation for ICMS No. 2022-112213 and that the Sheriff's Department consider conducting an independent inquiry into the matter.

### Designation

Based on the information contained in the Report Notification Form(s) and any data indicated on this intake assessment form and/or additional information, it has been determined that this complaint is designated as follows:

**Involved Party**    ALEJANDRO VILLANUEVA, e246296, SHERIFF

**CONFIDENTIAL**

COLA002402
EXHIBIT 33 - Page 565

Overall Designation: **N**

| CP | Charge | Protected Basis | Designation |
|---|---|---|---|
| MAX HUNTSMAN | Sec. 1 Discrimination | Religion | N |
| MAX HUNTSMAN | Sec. 5 Inappropriate Conduct Towards Others | Religion | N |
| MAX HUNTSMAN | Sec. 1 Discrimination | Ethnicity | N |
| MAX HUNTSMAN | Sec. 3 Harassment | Ethnicity | N |
| MAX HUNTSMAN | Sec. 3 Harassment | Race | N |
| MAX HUNTSMAN | Sec. 3 Harassment | Religion | N |
| MAX HUNTSMAN | Sec. 5 Inappropriate Conduct Towards Others | Ethnicity | N |
| MAX HUNTSMAN | Sec. 5 Inappropriate Conduct Towards Others | Race | N |
| MAX HUNTSMAN | Sec. 1 Discrimination | Race | N |

**Designation definitions**

**"A" designation.** CISU has concluded that **facts alleged present a potential violation** of the County Policy Of Equity (CPOE), which could warrant discipline (written warning, suspension, or discharge) and therefore further investigation by the County Equity Investigations Unit (CEIU) is recommended. (Reasonable good faith belief standard).

**"B" designation.** CISU has concluded that although the situation may involve, or appear to involve, an equity issue, **the situation does not rise to the level of a potential violation** of the CPOE, which could warrant discipline (written warning, suspension, or discharge). (Reasonable good faith belief standard).

**"C" designation.** CISU has concluded that **the facts alleged, even if taken as true, are not jurisdictional** to the CPOE. (Reasonable good faith belief standard).

**"N" designation.** CISU has concluded that the facts alleged, even if taken as true, are unrelated to County employment or otherwise non-jurisdictional to the CPOE. (Reasonable good faith belief standard).

**"E" designation.** Indicates that the initial intake investigation reveals that a discrimination, harassment, and/or retaliation complaint was received by the County from an external agency, such as the California Department of Fair Employment and Housing (DFEH), and/or from the Federal Equal Employment Opportunity Commission (EEOC) and will now be assessed internally at the County for appropriate handling/designation. (Reasonable good faith belief standard).

**Administrative Process Disclaimer:** The analysis contained herein, including the terminology used, is the result of an administrative process and initial investigation under the County Policy of Equity.

**CONFIDENTIAL**                                          **COLA002403**

                                          **EXHIBIT 33 - Page 566**

The standards of proof and rules governing administrative investigatory and disciplinary processes are different from those that govern court proceedings. No legal conclusions can or should be drawn from this administrative analysis or the terminology contained therein and such would not be appropriate for consideration in any legal proceeding or court of law.

**Confidentiality Notice and Disclaimer:** This document may contain confidential and privileged information and is solely for the use of the person(s) or entity to whom it is intended. Any unauthorized review, use, disclosure, or distribution is prohibited.

| |
|---|
| Assessed by CISU Investigator:  Nairi Gevorki |

| |
|---|
| Reviewed by CEOP Panelist: Angela Reddock-Wright |

| |
|---|
| Second Opinion Name: |

| |
|---|
| CISU Investigation Complete Date: March 21, 2022 |

**CONFIDENTIAL**

**COLA002404**

**EXHIBIT 33 - Page 567**

# EXHIBIT 34

EXHIBIT 34 - Page 568

# INTAKE ASSESSMENT FORM

Intake No. 22-045          Date Dept. Notified: 3/16/2022          Date ISU Received: 3/16/2022

Bouman  Yes ☐ No ☒          ☐ External      Case No.          Classification:  **"A"**

| Alleged Complainant(s): | Involved Party(ies): |
|---|---|
| Max Huntsman, #410745, Inspector General | Alejandro Villanueva, #246296, Sheriff |
|  |  |
|  |  |
|  |  |
| UOA:  OIG | UOA:  LASD |

**Alleged Act(s) Of Harm**          **Alleged Protected Basis(es):**

☒ Harassment/HWE          ☐ Sex            ☐ Sexual Orientation       ☒ Ethnicity
☐ Differential Treatment   ☒ Race           ☐ Marital Status            ☐ Age (40 and Over)
☒ Inappropriate Conduct    ☐ Color          ☒ National Origin           ☐ Disability
☐ E-Mail Violation         ☒ Ancestry        ☐ Medical Condition        ☐ Association
☐ Failure to Report        ☒ Religion        ☐ Engaging in a Protected   ☐ Other:
☐ Retaliatory Treatment                          Activity
☐ Other:

Based on the information contained in the POE Report/Notification Form and any data indicated on this intake assessment form and/or attachment(s), it has been determined that this complaint:

☒ Contains sufficient information to warrant further investigation by EIU
☐ Contains equity issues, but the allegations do not rise to a level requiring a further investigation by EIU
☐ No proven equity issues; and/or insufficient information showing causal connection to protected basis
☐ I/P is a non-department member and/or allegation(s) is/are non-jurisdictional to the POE

**Persons Interviewed**

| Date | Name | Emp # | Title | UOA |
|---|---|---|---|---|
| 3/29/2022 | Max Huntsman | 410745 | Inspector General | OIG |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

***Other Persons Referenced in Assessment*:**

| Date | Name | Emp # | Title | UOA |
|---|---|---|---|---|
|  | Jonathan A. Lested | 467422 | B-1 Deputy Sheriff | ISU |
|  | Vickey Bane | N/A | Executive Director | CEOP |
|  | Suon Sieberg | 445349 | Dep. Compliance Ofcr | ISU |
|  | John L. Satterfield | 410429 | Commander | Ofc of the Sheriff |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Intake #22-045
Page 2

**Explanation/Comments:**

On Wednesday, March 16, 2022, B-1 Deputy Jonathan Lested, #467422, Intake Specialist Unit (ISU), completed and submitted a "Policy of Equality Report/Notification Form" (POE Report) on behalf of Complainant (CP) and Reporting Party (R/P) Max Huntsman (herein referred to as CP Inspector General Huntsman), #410745, Inspector General, Office of the Inspector General (OIG), (Non-LASD).  CP Inspector General Huntsman alleged that Involved Party (I/P) Sheriff Alejandro (Alex) Villanueva, #246296, engaged in inappropriate conduct.  B-1 Deputy Lested provided the following additional information:

(1) On March 16, 2022, the ISU received a County Policy of Equity Report/Notification Form (CPOE Report), ICMS #2022-112213, from CEOP Executive Director Vickey Bane, which was filed by R/P and CP Inspector General Huntsman on March 9, 2022.

(2) CP Inspector General Huntsman stated (verbatim):  "The Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack.  My birth name was Max-Gustaf Edler. My father did not participate in raising me and so I took my mother's family name Huntsman as a law student with the help of a firm I clerked for.  As Inspector General I have never used any name other than Max Huntsman, which is also my name on my driver's license and passport. A county computer system continues to incorrectly list my first name as Max-Gustaf and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks. I believe this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as foreign (German or Jewish)."

(3) CP Inspector General Huntsman believes the treatment by I/P Sheriff Villanueva occurred because of race.

[ISU NOTE:  On March 5, 2022, I/P Sheriff Villanueva sent an email announcement to Sheriff's employees titled, "Message from the Sheriff" that stated:  "On Tuesday, March 1st, the corrupt Inspector General, Max-Gustaf Huntsman, told the Board of Supervisors that I've dismantled the discipline system within the department, without providing a shred of evidence. This is a lie".  A copy of the announcement is contained in the intake folder for Intake #22-045.]

**ISU Interview with CP Inspector General Huntsman:**

On March 29, 2022, Deputy Compliance Officer (DCO) Suon Sieberg, #445349, ISU, conducted a recorded interview with CP Inspector General Huntsman.  During the interview, CP Inspector General Huntsman provided the following information:

(1) CP Inspector General Huntsman stated, "The Sheriff, on a number of ocassions, has made personal attacks against me and this is one of them" (referring to the email announcement by I/P Sheriff Villanueva). I/P Sheriff Villanueva's email announcement was in response to the OIG's report to the Board of Supervisors (BOS) that I/P Sheriff Villanueva dismantled discipline and had his supervisors close Internal Affairs cases against the Department's policy, and OIG's investigations into the alleged deputy gangs.

(2) I/P Sheriff Villanueva referred to him in the email announcement as "corrupt" and his report to the BOS was made without providing any facts.  I/P Sheriff Villanueva was trying to designate him with the term "corrupt" and a "criminal", thereby making him a target for some of his constituents who are right-wing extremists, and be seen as a "foreigner".

(3) I/P Sheriff Villanueva's email to Department members contained a POE element whereby he was referred to as "Max-Gustaf Huntsman".  I/P Sheriff Villanueva has called him Max-Gustaf in the past to "attack" him. CP Inspector General Huntsman does not use the name Gustaf.  He stated, "My name is Max; it has been Max for many, many, many years".

(4) I/P Sheriff Villanueva would refer to CP Inspector General Huntsman as "Max-Gustaf Huntsman" during public attacks while in formal letters, he referred to him as "Max Huntsman".  CP Inspector General Huntsman stated I/P Sheriff Villanueva "acknowledged on KFI that he knew that's [Max-Gustaf] not my name and that's why I believe he was doing it with racial malice, and as a political strategy".

Intake #22-045
Page 3

(5) CP Inspector General Huntsman stated his name sounds German or Jewish.  One of the groups he was investigating, the "Executioners", have a Nazi helmet tattoo and there are people who hate Jews and foreigners.  I/P Sheriff Villanueva was using a name he knew CP Inspector General Huntsman did not use.  I/P Sheriff Villanuea was characterising him in a particular way to gain political points.  [ISU NOTE:  CP Inspector General Huntsman stated "Executioners" was not a name the group used, but it's a name used to describe them.]

(6) CP Inspector General Huntsman stated, "That's why he dog-whistled in that way".  He explained it is a political term to refer to using a phrase that is not immediately obvious as racist, or intended to appeal to extremists for I/P Sheriff Villanueva's purpose to get votes.  He stated that this was "racially improper in a CPOE" and dangerous.

(7) CP Inspector General Huntsman stated that at one point, one of the County's computer systems had his original name, although his County paycheck and ID have his name as "Max Huntsman".  The County knew his correct name but some of the computer systems were old and never got his name corrected.  CP Inspector General Huntsman stated the State Bar also had his original name.  After he became the Inspector General, he has since had his name corrected with the State Bar and County (CP Inspector General Huntsman did not provide the year).

[ISU NOTE:  A search in the California Bar Association website revealed two results when conducting an attorney search under the name "Huntsman".  One was "Huntsman, Max" and the other was "Huntsman Max-Gustaf".  The status was active for both names.  However upon selection, the attorney profile listed under both results was "Max Huntsman".]

(8) CP Inspector Genral Huntsman explained his family history, including his father was born in Berlin, Germany and moved to the United States.  His name was spelled with an "f" in a Swedish spelling, which was a name after a relative.  I/P Sheriff Villanueva had recently spelled it with the letter "v", which is a German spelling.  CP Inspector General Huntsman stated this incorrect spelling showed I/P Sheriff's Villanueva's intent in trying to make him sound German.

(9) CP Inspector General Huntsman's passport had his name as Max Huntsman which enabled him to change his name with the County and State, as opposed to filing a name change at the courts.  He never used Max-Gustaf during his County service, except that it was a County system, while he filed his taxes with the IRS or when he dealt with the federal government.  He always used Max when he wrote letters as the Deputy District Attorney, prior to becoming the Inspector General.

(10) CP Inspector General Huntsman became "very upset and very concerned" when he became aware of the email sent by I/P Sheriff Villanueva.  He did not inform the CPOE as a Complainant but did it under law.  In the County Policy, as manager with employees who were negatively impacted by the Sheriff's conduct, he had a duty to report it.

(11) CP Inspector General Huntsman stated he has never corrected I/P Sheriff Villanueva about his name.  I/P Sheriff Villaneuva's statement on KFI radio made it clear that he knew CP Inspector General Huntman's correct name.

<u>I/P Sheriff Villanueva's statement on KFI Radio</u>:

DCO Sieberg reviewed the referenced KFI radio show wherein on March 6, 2022, I/P Sheriff Villanueva was hosting a "live and unscripted" show.  I/P Sheriff Villanueva stated, "Our Inspector General, the one and only Max-Gustaf Huntsman. Yes, he's dropped the Gustaf for some reason.  There might be a story behind that I understand is in the works.  We'll see about that as it develops, why did he drop Gustaf"?

[ISU NOTE:  This comment was referenced in the LA Times on April 1, 2022, in an article titled, "Sheriff Villanueva makes ugly, unfounded claim against county watchdog" (https://www.latimes.com/california/story/2022-04-01/inspector-general-sheriff-villanueva).]

COLA002411
EXHIBIT 34 - Page 571

Intake #22-045
Page 4

Additional Information Provided by CP Inspector General Huntsman:

CP Inspector General Huntsman provided the following additional information to the ISU:

(1) On March 30, 2022, CP Inspector General Huntsman forwarded a copy of his email exchange with Vickey Bane, addressing the alleged conduct of I/P Sheriff Villanueva, which contained the following information (referenced in part):

a. CP Inspector General Huntsman stated, "As you can see from the email chain, the Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack. Because I am a manager and the Sheriff's conduct impacts my employees as well, I believe I am legally required to report this to you."

b. "Here is a recording in comments he made on the radio about my name:

"https://kfiam640.iheart.com/content/2022-03-06-la-county-sheriff-alex-villanueva-live-and-unscripted-on-deputy-gangs/".

(2) On March 30, 2022, CP Inspector General Huntsman sent DCO Sieberg an email and stated, "The Sheriff just told the editorial board of the Times that I am a Holocaust denier.  When asked what evidence he had of that, he said he had none.  When asked who told him that, he declined to say".

(3) On March 31, 2022, CP Inspector General Huntsman sent DCO Sieberg an email and stated, "For your file here is the response to the Sheriff's Holocaust claim which I sent yesterday to the Board of Supervisors, my employers".  CP Inspector General Huntsman included a copy of his email to the BOS.

(4) On April 1, 2022, CP Inspector General Huntsman sent DCO Sieberg an email and stated, "I'm not blaming you, but be sure to tell all the victims you interview that the LASD CPOE process is not confidentail and the Sheriff will discuss them with the media.  CP Inspector General Huntsman provided a link to an April 1, 2022, article related to him and I/P Sheriff Villanueva (https://www.latimes.com/opinion/story/2022-04-01/alex-villanueva-max-huntsman-holocaust-denial).

[ISU NOTE:  The above link provided an article in which I/P Sheriff Villanueva made the statement, "You do realize that Max Huntsman, one, he's a Holocaust denier. I don't know if you're aware of that. I have it from two separate sources. And he filed a complaint against me because I refer to him as Max-Gustaf Huntsman, his actual legal name, that's on his [State] Bar card. And he filed a complaint to the — I thought that was kind of humorous."]

[ISU NOTE:  Copies of the email exchanges from CP Inspector General Huntsman are contained in the intake folder for Intake #22-045.]

Additional Information:

The following information was compiled, as it may provide further information related to Intake #22-045:

(1) On December 4, 20218, in a congratulatory letter from CP Inspector General Huntsman to I/P Sheriff Villanueva, I/P Inspector General Huntsman identified himself as  "Max Huntsman, Inspector General".

(2) On October 5, 2020, in a Sheriff's Department's news release titled, "Max Huntsman Omits the Facts Once Again," I/P Sheriff Villanueva addressed CP Inspector General Huntsman as "Max Huntsman".

(3) On February 18, 2021, in a letter to the BOS, I/P Sheriff Villanueva addressed CP Inspector General Huntsman as "Max-Gustaf Huntsman".

(4) In a Tweet sent on March 22, 2022, I/P Sheriff Villanueva stated, "Once again, we have received unproved allegations alleging 'deputy gangs' by Inspector General Max-Gustav Huntsman.  Sheriff Alex Villanueva remains committted to transparency and accountability." [ISU NOTE:  It was noted the letter "v" was used instead of Gustaf.]

[ISU NOTE:  Copies of the documents referenced in this section are contained in the intake folder for Intake #22-045.]

COLA002412
EXHIBIT 34 - Page 572

Intake #22-045
Page 5

On-line Resources:

The below on-line articles discussed the subject of people's name and how it can influence people:

(1) An article written by the University of Manchester titled, "Four ways your name can affect your job prospects" stated, "What's in a name?  A lot, according to research.  Your name can have a huge influence on your prospects in life.  Much of this is due to bias, stereotyping and other rules of thumb that people employ when making judgements about others…But even if you don't disclose these features…our names can suggest much about us," including ethnicity, alphabetical position, gender, and age. (https://www.manchester.ac.uk/discover/news/four-ways-your-name-can-affect-your-job-prospects/).

(2) An article titled, "This Study Shows Name and Race-Based Discrimination Go Even Deeper Than You Think" stated, "Contrary to famous suppositions by Shakespeare, there is quite a lot in a name. Our names are literally how we introduce ourselves to the world, our initial identifier, often our first foot in the door at work or school. Our names also influence the way we are perceived and, unfortunately, not all names are treated equally (https://www.bustle.com/p/a-new-study-on-name-discrimination-suggests-names-signaling-race-are-also-linked-to-social-status-2348497).

[ISU NOTE:  Copies of the referenced articles are contained in the intake folder for Intake #22-045.]

Admonishment/Supervisory Actions:

Commander John L. Satterfield, #410429, Office of the Sheriff, advised that I/P Sheriff Villanueva was admonished on March 23, 2022.

Prior Related POE Complaint(s):

☐ None        ☒ Prior Related POE Complaint(s) Identified Below

A review of the intake records from 2003 to 2022 revealed prior POE complaints involving Sheriff Villanueva as an I/P.

(1) In Intake #04-177, a named Complainant (female volunteer) alleged a named I/P (male volunteer) called her a "bitch".  I/P (then) Sgt. Villanueva and another named I/P failed to report the alleged conduct.  Intake #04-177, received an "A" classification.

(2) In Intake #04-221, a named CP alleged a named I/P used an inappropriate term, "Bitches and Whores". I/P (then) Sgt. Villanueva and two other named I/Ps failed to report the alleged conduct. Intake #04-221 received an "A" classification.

(3) In Intake #12-019, a named CP alleged I/P (then) Lt. Villanueva made a "racial slur" toward another named CP.  Intake #12-019 received an "A" classification.

(4) In Intake #21-108, an anonymous Complainant alleged that I/P Villanueva engaged in conduct linked to race, national origin and ethnicity. Intake #21-108 received a "B" classification.

(5) In Intake #22-046, a named CP alleged I/P Sheriff Villanueva subjected her to disparaging remarks based on her age, sex, race, national origin, ancestry, and ethnicity.  Intake #22-046 received an "A" classification.

Conclusion:

3-01/121.10 - Policy of Equality – Discrimination

3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

3-01/121.25 - Policy of Equality - Third-Person Harassment

3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

3-01/121.40 - Policy of Equality - Examples of Conduct That May Violate This Policy and Scope of Coverage

COLA002413
EXHIBIT 34 - Page 573

Intake #22-045
Page 6

The POE Report indicated CP Inspector General Max Huntsman alleged I/P Sheriff Villanueva engaged in inappropriate conduct that was linked to race by referring to him as "Max-Gustaf" in an email sent throughout the Sheriff's Department.  CP Inspector General Huntsman considered this to be a "racially biased attack".

During his ISU Interview, CP Inspector General Huntsman confirmed his complaint and the email in question was the Department's announcement sent by I/P Sheriff Villanueva on March 5, 2022.  CP Inspector General Huntsman stated I/P Sheriff Villanueva made "personal attacks" against him and the email was one of them.

CP Inspector General Huntsman stated I/P Sheriff Villanueva was trying to make CP Inspector General Huntsman be seen as a "foreigner" by his (Villanueva) constituents by referring to him as "Max-Gustaf"; a name that he does not use. CP Inspector General Huntsman stated his name "Max-Gustaf" sounds German or Jewish which was given to him by his German-born father.

For personal reasons, he changed his name from "Max-Gustaf Edler" to "Max Huntsman".  In his official capacity as the County's Inspector General (since 2013) and while he was the Deputy District Attorney, CP Inspector General Huntsman always used the name "Max Huntsman", although one of the County's computer systems and the State Bar still had his original name until he had it corrected.  CP Inspector General Huntsman stated I/P Sheriff Villanueva referred to him as "Max-Gustaf" during "public attacks"; however, in formal letters, I/P Sheriff Villanueva referred to him and as "Max Huntsman".

A review of information by the ISU confirmed I/P Sheriff Villanueva referred to CP Inspector General, in writing and in speech, as "Max-Gustaf" or "Max-Gustav". On the March 6, 2022, in a recorded KFI radio show called "L.A. County Sheriff Alex Villanueva Live and Unscripted," I/P Sheriff Villanueva acknowledged CP Inspector General Huntsman had changed his name and does not use the name "Gustaf".  On March 22, 2022, in a Tweet, I/P Sheriff Villanueva commented, "Once again, we have received unproven allegations alleging 'deputy gangs' by Inspector General Max-Gustav Huntsman" [ISU NOTE:  It is noted that in this instance, 'Gustaf' was spelled with the letter "v".]

On-line resources emphasized that one's name can be perceived by others as connected to one's ethnicity and race.  I/P Sheriff Villanueva stated he was aware of CP Inspector General Huntsman's name change and referred to CP Inspector General Huntsman as "Max-Gustaf" during his public speech.  It appears CP Inspector General Huntsman perceived I/P Sheriff Villanueva's calling him "Max-Gustaf/Gustav" was made in reference to CP Inspector General Huntsman's racial/ethnic background.

The alleged conduct (referring to CP Inspector General Max Huntsman as "Max-Gustaf;" a name he does not use) appears to concern protected categories (race, ancestry, religion, national origin, ethnicity) enumerated under the Policy of Equality (POE).  Based on the nature of the allegations against the highest ranking member of the Department, and the ongoing nature of the harm, the alleged conduct warrants further investigation by the Equity Investigations Unit (EIU).  Accordingly, an "A" classification is recommended for Intake #22-045.

Intake #22-045
Page 7

**RECOMMENDATION(S) for UOA, including, but not limited to the following:**

☐ **Informal conflict resolution with all parties involved, by appropriate supervisor**
☐ **DHR assisted mediation _____**
☐ **Referral to Equity Compliance Unit/ADA _____**
☐ **Referral to Equity Compliance Unit/AA _____**
☐ **Supervisory inquiry/unit level investigation for Non-Equity based allegations of misconduct, if appropriate**
☐ **Counseling with PLE regarding the conduct in question, if appropriate**
☐ **Re-briefing applicable provisions of the Policy Of Equality (POE):**
    ☐ **POE Sexual Harassment**     ☐ **POE Retaliation**
    ☐ **POE Discriminatory Harassment**     ☐ **POE Duties of Supervisors**
    ☐ **POE Inappropriate Conduct**     ☐ **POE Examples of Conduct**
    ☐ **POE Third Person Harassment**     ☐ **POE Discrimination**
    ☐ **Other: _____**
☐ **Re-briefing applicable provisions of the Manual of Policy & Procedures (MPP):**
    ☐ **Manner of Giving Orders & Instructions**     ☐ **Conduct Toward Others**
    ☐ **Relationship with Subordinates**     ☐ **Derogatory Language**
    ☐ **Permissible Use**     ☐ **System Use**
    ☐ **General Behavior**     ☑ **Professional Conduct**
    ☐ **Other:**
☐ **Re-briefing applicable "Lessons Learned" Bulletins:**
    ☐ **Supervisor Responsibility–Duty to Report**     ☐ **ADA Title I Employment Rights**
    ☐ **Being Offended Is Not An Element**     ☐ **E-mail – Common Electronic Workplace Violations**
    ☐ **E-mail – Supervisor Responsibility**     ☐ **Languages in the Workplace**
    ☐ **Religious Accommodation and Etiquette**     ☐ **Prevention is Still the Best Cure - Supervisor**
    ☐ **Sexual Gossip in the Workplace**     ☐ **Hostile Work Environment under the POE**
    ☐ **Lactation Accommodation**     ☐ **Professional Conduct – Persons With Disabilities**
    ☐ **Other:_____**
☐ **Training/Briefing:**
    ☐ **Disability Awareness/Etiquette**     ☐ **Interactive Process/Reasonable Accommodation**
    ☐ **Team Building Skills**     ☐ **Medical Management/Health Care**
    ☐ **Respect Based Leadership**     ☐ **Sexual Harassment Prevention**
    ☐ **Diversity/Inclusion/Cultural Awareness**     ☐ **Relationship Management**
    ☐ **Effective Communication**     ☐ **Other:**
☐ **Re-briefing RMB's "Risky Business" newsletters and FOSS newsletter:**
    ☐ **RMB - Use of Derogatory Terms or Phrases (Vol. 12, No. 03)**
    ☐ **FOSS - Inappropriate Terms & Phrases-Related Lawsuit (Vol. 14, No. 15)**
    ☐ **RMB - Inappropriate Behavior (Vol. 15, No. 04)**
    ☐ **Other: _____**
☐ **Submit Copy of APIS Roster for Attendees of Re-Briefing and/or Training**
☐ **As may be appropriate, it is recommended that the Unit Commander or his/her designee inform the Involved Party and Complainant that the complaint was addressed.**
☐ **Other Recommendation(s): _____**
    **_____**

**Intake #22-045**
**Page 8**

**Assessed by ISU Deputy Compliance Officer:**

| DCO Suon Sieberg | Date Assessed: 4/7/2022 | Date Received: 3/16/2022 |
|---|---|---|

**Reviewed by ISU Lieutenant or Sergeant:**

| Sgt Minerva Garrido | Date:  4/7/2022 |
|---|---|

**Forwarded to CEOP by:**

| B-1 Deputy Jonathan Lested | Date:  04/07/22 |
|---|---|

**Reviewed by CEOP:**

|  | Date: |
|---|---|

**CEOP Comments:**

|  |
|---|

COLA002416

**EXHIBIT 34 - Page 576**

# EXHIBIT 35

EXHIBIT 35 - Page 577

**Policy of Equality
Report / Notification Form**

| For I.S.U. Use Only |
|---|
| Method of Receipt |
| ☐ Telephone |
| ☐ In Person |
| ☐ POE Report Form |
| ☑ Other: CPOE |
| Intake # 22-045 |

**General Instructions:** Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Section A:**    Reporting Party Information        Today's Date: __03__ / __17__ / __2022__

Name: Huntsman, Max ____    Emp. #: 410745 ____    Rank/Title Inspector General ____

Work Tel# ▮▮▮▮▮▮ ; Home Tel# _____ ; Work Hours ____ - ____ RDO ____

Unit of Assignment: Office of Inspector General ____    Unit Commander: Jeffrey Levinson ____

Division LA County Board of Supervisors ____

Name of Supervisor Completing this form (if different from above): B-1 Deputy Jonathan Lested ____ # 467422 ____

Date & Time form completed: __03__ / __17__ / __2022__ ' __1200__ hours.

☐    Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?

☐    Yes (if yes, fill in details)
       Who: _____
       When: Date: ____ / ____ / ____ ;Time: _____ hours.
       How _____
☐    No
☑    Do not know

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Section B:**    Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: __03__ / __08__ / __2022__ ' _____ hours or

between ____ / ____ / _____ and ____ / ____ / _____

If multiple incidents or unknown, explain: _____
See narrative. _____
_____
_____
_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Section C:**    Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

Same as RP _____ Employee # _____ Rank/Title _____UOA ____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - ____ RDO ____

_____ Employee # _____ Rank/Title _____UOA ____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - ____ RDO ____

_____ Employee # _____ Rank/Title _____UOA ____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - ____ RDO ____

Revised 06/10                                    1                              POE -001

**************************************************************************************

Section D:     Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro   (Sheriff)_____   Employee # __246296____   UOA Office of Sheriff

_____   Employee # _____   UOA _____

_____   Employee # _____   UOA _____

_____   Employee # _____   UOA _____

**************************************************************************************

Section E:     Alleged Witness(es) (if they can be identified)

None Stated_____   Employee # _____   Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

_____   Employee # _____   Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

_____   Employee # _____   Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

_____   Employee # _____   Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

**************************************************************************************

Section F:     Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity report (ICMS #2022-112213) from CEOP Executive Director Vickey

Bane, filed by RP/CP Max Huntsman on March 9, 2022.  The narrative of the complaint stated, in part, the following

(verbatim): "...The Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack."

"My birth name was Max-Gustaf Edler. My father did not participate in raising me and so I took my mother's family name

Huntsman as a law student with the help of a firm I clerked for.  As Inspector General I have never used any name other than

Max Huntsman, which is also my name on my driver's license and passport. A county computer system continues to incorrectly

list my first name as Max-Gustaf and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks.  I believe

this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as

**Ask: "Why do you believe this treatment is occurring?"**          (☑ Check, if narrative is continued onto the next page)
Race

_____

_____

_____

_____

_____

_____

CONFIDENTIAL

COLA002105
**EXHIBIT 35 - Page 579**

Section F (cont'd):          Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

foreign (German or Jewish)." _____

_____

(ISU Note: For details, refer to copy of CPOE complaint contained in ISU efile.) _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*********************************************************************************************************

**Note: Continue onto the next page**

Revised 10/06                              3                         POE -001

**CONFIDENTIAL**

COLA002106

**EXHIBIT 35 - Page 580**

<u>Section G:</u>     Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY. DO NOT FILL OUT THIS SECTION IF YOU ARE THE ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made:   03  /  16  /  2022 ,  1521   hours.

How did you become aware of the potential violation (explain in detail):
The ISU received CPOE ICMS #2022-112213, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Jonathan Lested to document the allegation in the County Policy of Equity

Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑     Medical Attention
        **Response:** to be ascertained
☑     Protection
        **Response:** to be ascertained
☑     Other Assistance
        **Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑     May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours, request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: _____ Date & Time: ____ / ____ / _____ ,_____ hour.
                                                                              (Name)
☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: _03_ / _16_ / _2022_ , _1521_ hour.     How?: ☑ e-mail  ☐ Fax  ☐ County mail

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

COLA002107
**EXHIBIT 35 - Page 581**

<u>Section H:</u>    **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name:   <u>B-1 Deputy Jonathan A. Lested</u>          Emp. #: <u>467422</u>

Day, Date and time ISU received form <u>Thursday</u>          / <u>03</u> / <u>17</u> / <u>2022</u> , <u>1215</u> hours.

☐ Referred to Equity Unit: Date & Time - ____ / ____ / _____ , _____ hours.

☑ If not referred to Equity Unit, explain in detail action taken:
"B" assessment authored by DCO Sieberg received on 04/07/2022.

_____

_____

Additional Information (if any):    _____

_____

_____

☐      Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☐ Subject's Unit Commander
☐ Reporting Party's Unit Commander
☐ Victim's Unit Commander

Revised 07/10                                        5                          POE -001

CONFIDENTIAL                                        COLA002108
                                                              **EXHIBIT 35 - Page 582**

# EXHIBIT 36

EXHIBIT 36 - Page 583

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558097

<u>OFFICE CORRESPONDENCE</u>

**FROM:**
| |
|---|
| EDWIN A. ALVAREZ, CHIEF<br>PROFESSIONAL STANDARDS DIVISION |

**TO:**
| |
|---|
| RON KOPPERUD, CAPTAIN<br>INTERNAL AFFAIRS BUREAU |

**SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION**

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER:

| |
|---|
| Alex Villanueva, Sheriff, #246296 |

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct):

| |
|---|
| 03/16/2022 |

Potential MPP Violation(s) including, but not limited to:

| |
|---|
| 3-01/121.10 POE - DISCRIMINATION<br>3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)<br>3-01/121.25 POE - THIRD PERSON HARASSMENT<br>3-01/121.35 POE - RETALIATION |

Nature of the investigation (general description):

| |
|---|
| It is alleged you acted in an inappropriate POE related manner and in the workplace. |

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been <u>rescinded</u>. You are being ordered by your Unit Commander that during the time this investigation is <u>active</u>, any routine absence request must be submitted <u>directly</u> to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:

| | |
|---|---|
| Subject: _____<br>Employee #: 246296 Date: 6/29/22 | Witness: _____<br>Employee #: 410429 Date: 6/29/22 |

*J. SATTERFIELD CONTENTS NOTED*

Manual of Policy and Procedures : 3-01/121.10 - Policy of Equality - Discrimination

## 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL

Manual of Policy and Procedures : 3-01/121.20 - Policy of Equality -  Harassment (Other Than Sexual)

## 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited.  Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002116
EXHIBIT 36 - Page 586

# 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander. When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior. The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

CONFIDENTIAL



Manual of Policy and Procedures : 3-01/121.30 - Policy of Equality - Inappropriate
Conduct Toward Others

## 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

CONFIDENTIAL

# EXHIBIT 37

EXHIBIT 37 - Page 589

 





ROBERT G. LUNA, SHERIFF

January 4, 2023

Mr. Alejandro Villanueva
2183 El Cajonita Drive,
La Habra, California  90631

Dear Mr. Villanueva:

### ADMINISTRATIVE INVESTIGATION INTERVIEW REQUEST

The Los Angeles County Sheriff's Department is conducting an administrative investigation into a matter in which you are a subject.

The incident occurred at/on March 16, 2022.  It is our Department's policy to conduct complete and thorough investigations into complaints or allegations of violations of Department policy on the part of our employees; therefore, it is important that you be interviewed.

Please contact Ms. Christine Diaz-Herrera, attorney at law from Sanders Roberts LLP, at (213) 426-5000 extension 6889 or via email at cdiazherrera@sandersroberts.com, to schedule an interview in person or via telephone.  Your cooperation in this matter is appreciated.

If you have any questions, you may also contact Lieutenant John L. Carter at (323) 890-5304.

Sincerely,

ROBERT G. LUNA, SHERIFF


Ron Kopperud, Captain
Internal Affairs Bureau

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
~ Since 1850 ~

# EXHIBIT 38

EXHIBIT 38 - Page 591



# LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

Incident Date: Between March 5, 2022 & March 22, 2022
Department Knowledge: March 16, 2022
Statute Date: March 15, 2023

# INTERNAL AFFAIRS BUREAU INVESTIGATIVE REPORT

# CONFIDENTIAL

IAB #IV 2558097

# TABLE OF CONTENTS

CONFIDENTIAL

# **Table of Contents**
IV 2558097

**AUDIO VIDEO TRACKING SHEET**

**PERSONNEL INVESTIGATION FORM**

**INVESTIGATIVE SUMMARY**

**INTERVIEW TRANSCRIPTS**

    1-Complainant Max Huntsman

**EXHIBITS**

    A    County Policy of Equity Report/Notification Form, ICMS #2022-112213

    B    Policy of Equality (POE) Report/Notification Form, #22-045.

    C    One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show; Tweets; email to the Sheriff Department Employees; and two articles from the Los Angeles Times.

**MISCELLANEOUS DOCUMENTS**

    -    Request for IAB Investigation Memorandum from Commander Jason P. Wolak to Captain Ron Kopperud, dated June 27, 2022.

    -    Subject of Administrative Investigation Notification Form signed by Subject Alex Villanueva, dated June 29, 2022.

    -    Manual of Policy and Procedures:
        3-01/121.10: Policy of Equality - Discrimination
        3-01/121.20: Policy of Equality - Harassment (Other than Sexual)
        3-01/121.25: Policy of Equality - Third Party Harassment
        3-01/121.30: Policy of Equality - Inappropriate Conduct Toward Others

**IV 2558097**

CONFIDENTIAL

# AUDIO/VIDEO TRACKING SHEET

CONFIDENTIAL

COLA002038
EXHIBIT 38 - Page 595

# INTERNAL AFFAIRS BUREAU
## - Audio/Video Tracking Sheet -

## # IV 2558097

Investigator's Name:   Lieutenant Ann Devane

Total number of USB Flash Drives:   0

Total number of compact discs:   2

Total number of digital audio files:   1

### DIGITAL AUDIO FILES

| Name |
|------|
| **1**-Complainant Max Huntsman |

### DIGITAL MEDIA

| | |
|------|------|
| **Transcripts** | One (1) Compact Disc containing: Audio recorded interview and interview transcript |
| **Exhibit C** | One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show; Tweets; email to the Sheriff Department Employees; and two articles from the Los Angeles Times. |

# PERSONNEL INVESTIGATION FORM

CONFIDENTIAL

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
### PERSONNEL INVESTIGATION

PAGE 1 OF 1

| DATE | No. OF SUBJECTS | UNIT(S) INVOLVED | I.A.B. FILE No. |
|---|---|---|---|
| 09/20/2023 | 1 | Executive Division | IV 2558097 |

MANUAL SECTIONS ALLEGEDLY VIOLATED (BY TITLE AND No.)
3-01/121.10, POE-Discrimination;  3-01/121.20, POE-Harassment(Other than Sexual);
3-01/121.25, POE-Third Party Harassment; 3-01/121.30, POE-Inappropriate Conduct Toward Others

| DATE, TIME, DAY OF OCCURRENCE | RELATED URN FILE No. IF APPLICABLE |
|---|---|
| Between March 5, 2022 and March 22, 2022 | |

LOCATION OF OCCURRENCE
Unknown

SOURCE OF COMPLAINT:  ☐ COMMUNITY    ☐ SUPERVISION    WIC REPORT No. ____    ☑ OTHER SOURCES (SPECIFY) POE #: 22-045

| SUBJECT No. 1 OF 1 | LAST NAME Alex | FIRST NAME Villanueva | M.I. | RANK OR TITLE Sheriff | EMP. No. 246296 |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT Executive Division | DATE ASSIGNED | DIVISION OR REGION Executive Division |
|---|---|---|

STATUS OF SUBJECT
☑ CONTINUING ON DUTY    ☐ RELIEVED OF DUTY - REASSIGNED TO: ____    ☐ OTHER ____

| SEX Male | RACE Hispanic | HAIR Brown | EYES Brown | HEIGHT 510 | WEIGHT 195 | D.O.B. 02/25/1963 | AGE 60 |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE 12/03/2018 | DATE APPOINTED TO RANK 12/03/2018 | INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE ____ | TIME ____ |
|---|---|---|---|---|---|

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| 10/21/1992 | 3132 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 09/15/1993 | 6069 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 11/23/2015 | 2390479 | 3-01/030.10:OBEDIENCE TO LAWS, REGULATIONS; | Written Reprimand |
| | | 3-01/040.97:SAFEGUARDING PERSONS IN CUSTODY; | |
| | | 3-01/050.10:PERFORMANCE TO STANDARDS | |

| SUBJECT No. OF | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT | DATE ASSIGNED | DIVISION OR REGION |
|---|---|---|

STATUS OF SUBJECT
☐ CONTINUING ON DUTY    ☐ RELIEVED OF DUTY - REASSIGNED TO: ____    ☐ OTHER ____

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE | DATE APPOINTED TO RANK | INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE ____ | TIME ____ |
|---|---|---|---|---|---|

**PREVIOUS FOUNDED INVESTIGATIONS**

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**CODE: C** - COMPLAINANT. **W** - WITNESS    ADDITIONAL COMPLAINANTS, WITNESSES, OR SUBJECTS ON SUPPLEMENTAL PAGES  ☑ YES  ☐ NO

| CODE C No. 1 OF 1 | LAST NAME Huntsman | FIRST NAME Max | M.I. | SEX Male | RACE White | D.O.B. Adult |
|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Office of Inspector General | RES. PHONE (AREA CODE) ( ) |
|---|---|

| BUSINESS ADDRESS OR UNIT OF ASSIGNMENT 500 W. Temple Street Los Angeles, CA. 90013 | CDL OR LASD EMPLOYEE No. | BUS. PHONE (AREA CODE) (213) 974-6100 |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE 07/21/2022 | TIME UNK |
|---|---|---|---|

| CODE W No. 1 OF 1 | LAST NAME Pawlowski | FIRST NAME Veronica | M.I. | SEX Female | RACE UNK | D.O.B. Adult |
|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Justice Deputy for Sheila Kuehl | RES. PHONE (AREA CODE) ( ) |
|---|---|

| BUSINESS ADDRESS OR UNIT OF ASSIGNMENT Los Angeles, Ca. 90013 | CDL OR LASD EMPLOYEE No. | BUS. PHONE (AREA CODE) ( ) |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B | DATE 08/01/2022 | TIME ____ |
|---|---|---|---|

| PRIMARY INVESTIGATOR Sanders Roberts LLP | RANK | EMP. No. | APPROVED _C. Moreno_ | DATE 10-2-23 |
|---|---|---|---|---|
| ASSISTING INVESTIGATOR Lieutenant Ann Devane | RANK LT | EMP. No. 478275 | DATE SUBMITTED 09/26/2023 | |

SH-AD-669-3/15    IF ADDITIONAL SUBJECTS, WITNESSES, COMPLAINANTS OR DISCIPLINE HISTORIES, LIST ON CONTINUATION PAGES.

# INVESTIGATIVE SUMMARY

CONFIDENTIAL

CONFIDENTIAL

May 19, 2023

TO:          EDUARDO MONTELONGO,

             ASSISTANT LOS ANGELES COUNTY COUNSEL

FROM:        SANDERS ROBERTS LLP

**INVESTIGATION REPORT – FORMER SHERIFF ALEX VILLANUEVA / MAX HUNTSMAN**


## 1.  INTRODUCTION

County Counsel retained the law firm of Sanders Roberts LLP ("Sanders Roberts") to conduct an independent investigation into complaints against Sheriff Alex Villanueva related to his use of Inspector General, Max Huntsman's former first name, "Max-Gustaf," as well as Sheriff Villanueva's accusation that Mr. Huntsman is a Holocaust denier. Sanders Roberts conducted that investigation via witness interviews and a review of relevant documents and audio broadcasts. This report details the investigation's factual findings.

## 2.  ALLEGATIONS

The allegations that form the basis of the complaints against Sheriff Alex Villanueva are as follows:

**ALLEGATION 1:** In various public appearances on Facebook Live, KFI Radio, and on Twitter, Sheriff Alex Villanueva subjected Inspector General, Max Huntsman, to harassment on the basis of race/ethnicity/ancestry/national origin.

## 3.  APPLICABLE POLICIES AND GUIDELINES

**Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.015 - County Policy of Equity**

**THE POLICY.** All County of Los Angeles (County) employees are required to conduct themselves in accordance with the entirety of this County Policy of Equity (Policy), and all applicable local, county, state, and federal laws.

**PURPOSE.** This Policy is intended to preserve the dignity and professionalism of the workplace as well as protect the right of employees to be free from discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status. Discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status, are contrary to the values of the County. The County will not tolerate unlawful discrimination on the basis of sex, race, color, ancestry, religion, national origin, ethnicity, age (40 and over), disability, sexual orientation, marital status, medical condition or any other protected characteristic protected by state or federal employment law, nor will it tolerate unlawful harassment, or retaliation. As a preventive measure, the County also will not tolerate inappropriate conduct toward others based on a protected status even if the conduct does not

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 2 of 8

meet the legal definition of discrimination or unlawful harassment. All County employees are responsible for conducting themselves in accordance with this Policy and its associated Procedures. Violation of the Policy and/or Procedures will lead to prompt and appropriate administrative action including, but not limited to, counseling, training, written warning, written reprimand, suspension, demotion, or discharge.

**COUNTY POLICY OF EQUITY PROHIBITED CONDUCT.** Each County employee is responsible for understanding and abiding by these definitions of prohibited conduct as they may impact any administrative process/proceeding for potential violations of this Policy and/or associated Procedures.

**COUNTY POLICY OF EQUITY UNLAWFUL HARASSMENT (OTHER THAN SEXUAL).** Unlawful harassment of an individual because of the individual's race, color, ancestry, religion, national origin, ethnicity, age, disability, sexual orientation, marital status, medical condition or any other protected characteristic protected by state or federal employment law is also discrimination and prohibited. Unlawful harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment.

**<u>Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability</u>[1]**

"Each Department Head shall:

•Hold their employees accountable for actions that include being dishonest, untruthful, and/or which demonstrate a lack of integrity, consistent with Countywide requirements established by the Board of Supervisors, Director of Personnel, Chief Executive Officer, and Auditor Controller, County Code, Civil Service Rules, and departmental policies;
•Hold their employees, including those working in public safety, patient care, judicial affairs, and those holding fiduciary responsibilities, to high standards of honesty and conduct, which are of essential value to public servants;
•Act affirmatively to abate or prevent performance problems and document those problems when they occur;
•Ensure accountability as set forth in the Los Angeles County Charter, Civil Service Rules, and Countywide and departmental policies;
•Take timely and effective corrective action, commensurate with the offense, which may include remedial measures such as counseling or more formal action such as discipline up to and including discharge from County service; and.
•Retain employees in County service on the basis of the adequacy of their performance, correct inadequate performance, and separate from County service employees whose inadequate performance cannot be corrected.

Failure of an employee to perform their assigned duties so as to meet fully explicitly stated or implied standards of performance may constitute adequate grounds for discharge, reduction, or suspension. Where appropriate, such grounds may include, but are not limited to, qualitative as well as quantitative elements of performance, such as failure to exercise sound judgment, failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources. Grounds for discharge, reduction, or suspension may also include

---

[1] The Los Angeles County BOS Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability can be accessed at https://library.municode.com/ca/la_county_-_bos/codes/board_policy?nodeId=CH9PE_9.020EMAC.

COLA002044

EXHIBIT 38 - Page 601

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 3 of 8

any behavior or pattern of behavior which negatively affects an employee's productivity, or which is
unbecoming a county employee; or any behavior or condition which impairs an employee's qualifications
for their position or for continued county employment."

## 4.   PROCEDURE

At the beginning of each interview, the interviewer advised each witness of the following: 1. That the
witness's role is to tell the truth and reveal all relevant facts to the investigator; 2. That the witness should
maintain confidentiality of the investigation; 3. That the witness must report any retaliation to the
investigator; and 4. That the witness must not retaliate against any participant. The investigator then asked
each witness whether s/he had any procedural questions.

To determine the merits of the allegations against former Sheriff Villanueva, the investigator interviewed
the following persons:

| NAME | DATES OF INTERVIEW | POSITION |
|---|---|---|
| Max Huntsman | 07/21/22 | Inspector General |
| Sheriff Alex Villanueva | N/A[2] | Los Angeles County Sheriff |

## 5.   INVESTIGATIVE INTERVIEW SUMMARIES

**Max Huntsman**

     On July 21, 2022, investigator Christine Diaz Herrera, Esq. interviewed Inspector General Max
Huntsman via Teams videoconference. Mr. Huntsman did not have a representative present. Initially, Mr.
Huntsman made clear that he is not a Sheriff's Department employee and would not feel constrained to
keep the contents of his conversation with Ms. Diaz Herrera confidential, should he feel that his work
required divulging them.

Background

     Mr. Huntsman has been employed by the County of Los Angeles since 1991. He has been
Inspector General ("IG") since "late 2013 or early 2014," depending on how the official start date is
calculated. He currently reports to Executive Officer, Celia Zavala "for administrative purposes," but he
is special counsel to the Board of Supervisors ("BOS"), so he reports to the BOS "for substantive
matters." His duties as IG are set forth by statute and ordinance. His office monitors the Sheriff's
Department to ensure there is no corruption and to ensure compliance with reporting requirements and
public accountability. Over time, Mr. Huntsman's office has expanded to oversee the probation
department and some Department of Public Health skilled nursing facilities. However, primarily, his

---

[2] The investigators sought repeatedly to schedule an interview with Sheriff Villanueva. Sheriff Villanueva
repeatedly ignored such scheduling requests, but ultimately agreed to sit for an interview on the condition that he be
provided the investigator's questions ahead of time. The investigator declined that request and accordingly
completed this investigation without an interview of Sheriff Villanueva.

COLA002045
**EXHIBIT 38 - Page 602**

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 4 of 8

oversight focuses on the Sheriff's Department and jails within the County. The work involves monitoring, inspection, and investigation.

Mr. Huntsman described the IG's role as being primarily to monitor the Sheriff's Department's investigations to provide a "second opinion and quality control," rather than being the primary or initial investigator of incidents. The IG's investigative tools include power to subpoena and statutory directives to the Sheriff's Department to provide information upon request by the IG or otherwise cooperate with the investigations. Mr. Huntsman said that the Sheriff's Department routinely obstructs his investigations. It does so by refusing to comply with subpoenas and refusing to provide information that the IG requests.

Conflicts With Sheriff Villanueva

Mr. Huntsman's office includes "about thirty people." They interact with the Sheriff's Department on a variety of matters on a daily basis. Some of those interactions are "smooth and routine," while "others aren't." For example, most of the day-to-day interactions involving access to jails for routine investigative and oversight purposes are routine and polite. However, when it comes to obtaining "actual evidence," the Sheriff's Department routinely blocks the IG's office's efforts. Mr. Huntsman has no direct interaction with Sheriff Villanueva or Undersheriff Tim Murakami.

Mr. Huntsman reported that he has not communicated directly with Sheriff Villanueva since 2019. He said that in 2019, the County had sued Sheriff Villanueva related to the Sheriff's efforts to rehire several formerly-terminated deputies, including Caren Mandoyan. Mr. Huntsman said that his office tried to investigate those efforts as well as the related "truth and reconciliation committee" Sheriff Villanueva sought to establish. The IG's Office investigated and wrote a report about those issues and provided a draft to the Sheriff's Department. In response the Sheriff's Department turned off the IG's access to the Sheriff's Department's computer systems. Mr. Huntsman said that several people in the County asked him to meet with Sheriff Villanueva to try to convince him to restore the IG's Office's computer access.

During the June 17, 2019 meeting with Sheriff Villanueva, the Sheriff said that Mr. Huntsman was "a political hack" and said the IG's draft report was wrong and ridiculous and that the Sheriff's intention to rehire Caren Mandoyan was legal. Mr. Huntsman described Sheriff Villanueva as having told him that if he issued the report, it would impact the then-ongoing civil litigation related to Caren Mandoyan. He said that Sheriff Villanueva told him, in a "significant way" that if he issued the report, there "would be consequences." Mr. Huntsman credibly described this as a threat from Sheriff Villanueva.

Shortly thereafter, Sheriff Villanueva announced on a podcast that Mr. Huntsman was under criminal investigation. This was contrary to best practices, pursuant to which one would typically keep a criminal investigation secret from the subject of that investigation. Mr. Huntsman said that Sheriff Villanueva's announcement was more consistent with an effort to intimidate him, which he believes amounts to a violation of Penal Code s. 518, Extortion of a Public Official. Mr. Huntsman said that since then, Sheriff Villanueva has attempted to intimidate others from conducting oversight in other matters and contexts. Mr. Huntsman said that the Sheriff "kept [the purported investigation] over [Mr. Huntsman's] head for years" until the Sheriff's Department eventually said that it had turned its investigative files over to the Attorney General's Office and the Sheriff's former Chief of Staff, Larry Del Mese, testified that the investigation had not actually uncovered any criminal wrongdoing.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 5 of 8

Subsequently, Mr. Huntsman and the Sheriff's Department have "clashed" in various settings, including before the BOS and the Civilian Oversight Board. One example Mr. Huntsman provided was when the Sheriff told the Civilian Oversight Board that Mr. Huntsman was wrong when he reported that the Sheriff's Department was failing to provide evidence in response to the IG's requests. Mr. Huntsman said he responded by providing evidence supporting his allegation that the Sheriff's Department was withholding documents.

<u>Sheriff Villanueva's Alleged Harassment</u>

Mr. Huntsman said that Sheriff Villanueva repeatedly refers to people in ways that are intended to "dog whistle" to his base of extremist supporters to "let them know who their current target is." Mr. Huntsman said that he believes that Sheriff Villanueva refers to him as "Max-Gustaf" (or "Max-Gustav") in order to signal to his extremist base that Mr. Huntsman is "a foreigner…German or Jewish or both." However, Mr. Huntsman noted that after Sheriff Villanueva accused him of being a Holocaust denier (see below), it became clear that he was not intending to signal that Mr. Huntsman was Jewish. Mr. Huntsman said he believed that his German background made him "an easy target." He said that Sheriff Villanueva "likes to target a lot of people" and uses a small group of people he referred to as Sheriff Villanueva's "dirty tricks squad" to gather information about them that he can use to discredit them and have his extremist base target them. He said the Sheriff "collects dirt on his political opponents and then tries to figure out a way to hurt them he turns most easily to race-based techniques because it plays with the people he's trying to curry favor with and he uses whatever means are available to him to do that."

Mr. Huntsman described the Sheriff's "dirty tricks squad" as a group of "a half-dozen or so" people, including a deputy named Mark Lillienfeld that Sheriff Villanueva rehired after he had been caught bringing contraband to a County jail inmate. Mr. Huntsman said he believes Sheriff Villanueva hired Lillienfeld because Mr. Lillienfeld was willing to "do whatever [the Sheriff] asks him to do." Mr. Huntsman said the "dirty tricks squad" also includes a "computer guy" who some people believe places listening devices in offices and "sweeps emails." Mr. Huntsman said he does not necessarily believe that the Sheriff's "dirty tricks squad" hacks emails or places "bugs" in offices, but some people do believe that.

<u>Mr. Huntsman's Name</u>

Mr. Huntsman was born Max-Gustaf Edler. His father had been born in Germany and left after World War II. Mr. Huntsman was born after his father had made his way through Canada to San Francisco. He named Mr. Huntsman "Max-Gustaf" after two uncles. The spelling of "Gustaf" with a "f" is the Swedish spelling of the name and just happens to be how the uncle Mr. Huntsman was named after spelled his name. Mr. Huntsman describes his father as having had "problems with drugs," not working, committing crimes, and eventually leaving the U.S., moving to Switzerland, and starting a new family. Mr. Huntsman believes that his father's problems stemmed from having grown up in Nazi Germany and therefore Mr. Huntsman has "no love for Nazi Germany…in fact, quite the opposite" and does not at all deny that the Holocaust occurred.

When Mr. Huntsman was a child, he wanted to change his last name, but his mother would not let him. Eventually, during law school, he was able to have his last name changed from Edler to Huntsman. He said that during all of that time, he did not go by "Max-Gustaf" but rather by "Max." His official name in some places was listed as "Max-Gustaf" but he ultimately was able to have it officially changed to "Max." He said that the State Bar still has a record of him as "Max-Gustaf" and in an old County computer record, he is listed as "Max Gustaf" but he is officially, professionally, and socially "Max." He

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 6 of 8

said that "nobody [who knows him] would ever tell you 'that guy is Max-Gustaf.'" After Sheriff
Villanueva raised the name "Max-Gustaf" Mr. Huntsman took steps to correct the State Bar's record to
"Max" from "Max-Gustaf." Mr. Huntsman said that there is no fraud or effort to conceal anything by
changing his name, but he just does not want to be associated with a culture that he does not feel that he is
a part of.

Sheriff Villanueva's References to "Max-Gustaf"

    Mr. Huntsman became aware of Sheriff Villanueva referring to him as "Max-Gustaf" from a KFI
radio broadcast. He said that the upshot of Sheriff Villanueva's radio remarks was to purport to wonder
why Mr. Huntsman had changed his name and to intimate that "someone should look into that." He said
that he initially thought that Sheriff Villanueva's reference to his former name was an effort to imply that
he was Jewish in order to "dog whistle" to his extremist supporters. However, he said that he has come to
believe that the reference was to more generally cast him as an "other" or a "foreigner." He said that in
hindsight he believes that the Sheriff was using the former name in order to set up the allegation that Mr.
Huntsman is a Holocaust denier.

Holocaust Denier Allegation

    Sheriff Villanueva eventually told the Los Angeles Times editorial board that Mr. Huntsman is a
Holocaust denier. Mr. Huntsman said he believes that this information came from Adam Loew. Mr. Loew
is the husband of a former Metro employee who sends frequent emails to many people in the County
alleging widespread corruption that ultimately led to his wife being terminated. Mr. Huntsman is one of
the people to whom Mr. Loew sends his frequent emails. Mr. Huntsman believes that Mr. Loew and
Sheriff Villanueva became allies because they both dislike and oppose County Supervisor Sheila Kuehl.
Mr. Huntsman said that Mr. Loew was the first person he saw referring to him as "Max-Gustaf." When
Sheriff Villanueva started using the name, it "rang a bell" because he recalled Mr. Loew having used it.

    Mr. Huntsman said that he has never been a Holocaust denier and has no idea what could have
given anyone the idea that he was.

    When Sheriff Villanueva accused Mr. Huntsman of being a Holocaust denier, there were news
stories about it. Mr. Huntsman received communications and messages from friends and acquaintances, in
particular from Jewish friends and acquaintances, expressing sympathy for his having to endure such an
allegation. He said that he otherwise did not receive any negative feedback or harassment as a result of
Sheriff Villanueva's allegation. Mr. Huntsman sent an email to the BOS in response to Sheriff
Villanueva's allegation that he was a Holocaust denier. He also filed a CPOE complaint based on his
belief that the Policy of Equity required him to do so.

**Veronica Pawlowski**

    On August 1, 2022, attorney Christine Diaz-Herrera interviewed Justice Deputy, Veronica
Pawlowski via Teams video conference. Ms. Pawlowski did not have a representative present.

Background

    Veronica Pawlowski has worked for the County of Los Angeles since 2012. She served as
Supervisor Sheila Kuehl's Justice Deputy for two and a half years. Previously she held the position of
Special Counsel to the Board of Supervisors on Child Welfare issues. Subsequent to that, she held a

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 7 of 8

position at County Counsel where she advised the Department of Children and Family Services; the Probation Department; and the Los Angeles Homeless Services Authority. Pawlowski has been an attorney for 19 years. She received her B.A. in Political Science and Communications from USC in 1997 and her law degree from Boston College in 2000.

While she worked at County Counsel, Ms. Pawlowski worked on ordinances that give bodies of oversight their authority. She was really aware about how that relationship is supposed to work. The Supervisor saw Ms. Pawlowski as a subject matter expert on ordinances because she knew them better than anyone else.

Interaction with Sheriff's Department

Most of Ms. Pawlowski's interactions with the Los Angeles County Sheriff's Department ("Sheriff's Department") is at the Assistant Sheriff level. Her work with the Sheriff's Department has been very focused on the jails. Supervisor Sheila Kuehl ("Supervisor Kuehl") called for closure of a main jail in Los Angeles County. Much of Ms. Pawlowski's work has been focused on this issue. Ms. Pawlowski has dedicated a lot of time to learning how the jail operates. The Sheriff's Department has a board liaison and a board liaison team. This team advises Supervisor Kuehl's office of critical incidents.

Sheriff's Alex Villanueva's Facebook Live Sessions

Part of Ms. Pawlowski's responsibilities on behalf of her bosses is to sit in on meetings and keep them informed about what is going on in her portfolio. Ms. Pawlowski started to listen to Sheriff Villanueva's Facebook live sessions to alert her bosses if he said anything newsworthy. Ms. Pawlowski could not recall how many Sheriff Villanueva Facebook live sessions she has listened to. She has listened to them both live and via a recorded session. Ms. Pawlowski has listened to "just about every session" since Sheriff Villanueva started doing them.

In the beginning it was just Ms. Pawlowski listening and taking notes. Somewhere along way, she started to receive summaries of the sessions from the CEO's office, Countywide Communications Unit. Ms. Pawlowski did not know who sent them because she would receive them from Supervisor Kuehl's Communications Deputy. Lenny McGuire is in charge.

Max Huntsman

Ms. Pawlowski reported that Sheriff Villanueva made comments about IG Max Huntsman, "nonstop." Sheriff Villanueva called him "Gustav Hunstman," alluding that he is "some kind of Nazi." She said that Sheriff Villanueva has made his comments in writing. Ms. Pawlowski believes Sheriff Villanueva referenced it in a letter and does not hide it. Sheriff Villanueva referred to Mr. Huntsman and said his real name was "Gustav." Ms. Pawlowski believed Sheriff Villanueva's comments were intended to be about Mr. Huntsman's national origin.

KFI Radio Talk Show

Ms. Pawlowski reported that Sheriff Villanueva also made comments about the Justice Deputies on the radio station, KFI. Ms. Pawlowski said everything blended together. She listened to his comments in the different forums giving him space. She could not distinguish one from the other. They listened to all of his comments across various media platforms. Ms. Pawlowski believed some of it was captured and could be located by Lenny McGuire.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 8 of 8

### 6.  DOCUMENTARY EVIDENCE

a.  October 21, 2021 Tweet from @LACoSheriff_33;

b.  March 22, 2022 Tweet from @LACoSheriff_33;

c.  March 16, 2022 Facebook Live recording;

d.  March 29, 2022 Facebook Live recording;

e.  April 26, 2022 Facebook Live recording;

f.  July 13, 2022 Facebook Live recording;

g.  October 26, 2022 Facebook Live recording;

h.  March 5, 2022 Email From Sheriff Villanueva titled "Message From the Sheriff: Transparency and Accountability";

i.  March 6, 2022 KFI Radio Show recording;

j.  April 1, 2022 Los Angeles Times Editorial titled "Editorial: The Villanueva Saga Just Gets Odder and More Destructive";

k.  April 1, 2022 Los Angeles Times article by Alene Tchekmedyian titled: "Sheriff Villanueva Makes Ugly, Unfounded Claim Against County Watchdog."

CONFIDENTIAL

# INTERVIEW TRANSCRIPTS AND AUDIOS

CONFIDENTIAL



IV 2558097
AUDIOS AND
TRANSCRIPTS

CONFIDENTIAL

# COMPLAINANT INTERVIEW

CONFIDENTIAL

**REFER TO INTERVIEW TRANSCRIPTS AND AUDIO CD**

**1. COMPLAINANT MAX HUNTSMAN**

CONFIDENTIAL

IV 2558097

**WITNESS INTERVIEW**

**INSPECTOR GENERAL MAX HUNTSMAN**


**Herrera:**   I am an attorney with Sanders Roberts. We have been hired by the county to conduct this independent investigation. The county, because they don't- apparently the Sheriff's Department doesn't know how to use these Teams videos, I'm also going to record via audio on another device. Just letting you know that. 'Cause apparently they haven't figured out- they haven't figured out how to incorporate speech.

**Huntsman:**   Why would you be interested in what the Sheriff's Department can do? They have CPOE investigators who have interviewed me and I thought this was an external investigation because the county was not pleased with how the Sheriff's Department was handling it. Is that not correct?

**Herrera:**   I think the idea, and I'm sure you're familiar with how the CPOE process is, but typically there's an intake and an assessment done and then depending on, you know, the results of the intake and assessment, you know, it's farmed out to different people to do investigations. In this case, because of the nature of the allegations, I think also the subject of the investigation itself, I think the Sheriff's Department decided that it made more sense, and the county, to have an external, a neutral third party, to conduct this.

**Huntsman:**   I hear what you're saying and that's true as to all CPOE investigations except the Sheriff's Department ones. And I was actually contacted by a Sheriff's Department investigator. I wasn't told that it was an Intake decision and then the sheriff, in the link I sent you, he told the Times Editorial Board that I had made a CPOE complaint against him. So I'm pretty sure that they had triggered some process internally that he was informed of. And so I'm just- Look, it doesn't matter. I'm very skeptical about this whole process.

**Herrera:**   I'll certainly ask you some questions about that to get a better sense of who you spoke to and I can look into that. So again, for the record, my name is Christine Diaz Herrera. Can you say your name for the record?

**Huntsman:**   Max Huntsman.


**IAB IV 2558097**            **Page 1 of 37**            **MAX HUNTSMAN**

CONFIDENTIAL

COLA002055
EXHIBIT 38 - Page 612

| | |
|---|---|
| **Herrera:** | Perfect. And today is July 21st 2022. It's 2:05 PM. I have an admonition that I'd like to read. So my admonition states that "You are about to be questioned as a part of an official Los Angeles County Sheriff's Department administrative investigation. You are here as a witness in a matter which concerns another employee, the complainant. You obviously, as you know, are not a subject of the investigation itself and you are not under investigation at this time. I think the question that they typically ask is whether you're aware of the Policy and Ethics chapter of the Manual of Policy and Procedures, and this might be different because you're not actually within the Sheriff's Department. |
| **Huntsman:** | Right. The admonition doesn't quite make any sense, but I note the admonition. |
| **Herrera:** | Right, and, you know, essentially the other piece of it is just that this is a confidential interview and we ask that you keep the contents of- the substance of what we talk about today confidential but certainly that you've talked to me or that this investigation exists is not a secret and, you know, to the extent that you share it with someone else, that's certainly your purview. |
| **Huntsman:** | I'm not part of the Sheriff's Department. |
| **Herrera:** | Correct, I am aware of that. |
| **Huntsman:** | So if you're conducting an internal sheriff's investigation, already I was contacted by the Sheriff's Department. I was told it was confidential and then the sheriff told the LA Times about it. So I don't personally hold any stake in the confidentiality of the sheriff's process. I'm not questioning you or what you're assigned to do, but as soon as you provide this to the sheriff, he will do whatever he thinks is best politically with it and that's how it is. So I'm not going to agree that I won't talk about this with whomever I feel like and including County Counsel, including Esther Lim, including all the other folks who I think it might be appropriate in order to protect the rights of the individuals who he's been targeting. |
| **Herrera:** | Sure, and I will say that my work is at the direction of County Counsel and because he is the subject, it wouldn't be him that I'm reporting to and it wouldn't be him that I would be actually giving the final report to, but in any event, I do understand. |
| **Huntsman:** | Okay that's fine. The reason my tone has changed is because you read me a Sheriff's Department internal investigation admonition. If you're telling me that you work for County Counsel and this is going to County |

**IAB IV 2558097**                **Page 2 of 37**                **MAX HUNTSMAN**

**CONFIDENTIAL**

|  | Counsel, then I apologize for my tone. It's the Sheriff's Department and their conduct that I take issue with. So if County Counsel just said, 'Hey look, because this is going to go to the sheriff, read this admonition', I understand that and I have no beef with County Counsel. My concern is with the conduct within the Sheriff's Department. Once County Counsel's done with their investigation, if they then make a determination of what they have to tell the sheriff, I don't have any problem with that. I thought this was being conducted by the sheriff, in which case I have a different opinion. |
|---|---|
| **Herrera:** | And that's a fair point, and again, in terms of process, all I can tell you is that, you know, they gave me all of the things that they normally would use because I'm standing in their shoes, so to speak. In some ways that this would normally be done, typically by somebody within the Sheriff's Department. |
| **Huntsman:** | My statement to the Sheriff's Department wasn't given to you? |
| **Herrera:** | [inaudible] it's not. |
| **Huntsman:** | Okay. Because County Counsel has asked you to do this. The Sheriff's Department didn't, okay got it. So you don't- When you get to the questions I'll talk to you about that. |
| **Herrera:** | Okay, fair enough. That's what I'm saying. So, you know, I apologize. It sounds like there's some pieces of information out there that I may not have yet-- |
| **Huntsman:** | No no, it's okay. |
| **Herrera:** | --but certainly I will make every effort to make sure that I do get that information. I typically just start with a little bit of background information. So, you know, how long have you worked with the County of Los Angeles? |
| **Huntsman:** | Since 1991. |
| **Herrera:** | And what is your current position? |
| **Huntsman:** | Inspector General. |
| **Herrera:** | And how long have you been in that position? |

**IAB IV 2558097**              **Page 3 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

| | |
|---|---|
| **Huntsman:** | Well I was hired in 2013, and the post was sort of officially anointed in 2014. So, depends on how you look at it, but it was late 2013 or early 2014. |
| **Herrera:** | Correct. And, who do you report to? |
| **Huntsman:** | Technically I report to the Executive Officer, Celia Zavala. I have an odd status in that I'm Special Counsel to the Board of Supervisors, so she supervises me primarily for administrative purposes and I report to them for substantive matters. |
| **Herrera:** | And when you say you report to them, you mean you report to the Board of Supervisors? |
| **Huntsman:** | My reports go to the Board of Supervisors. I'm, in addition to County Counsel, I'm the other lawyer for them in the county and so I give them legal opinions from time to time. I interact with them. So I have a kind of a weird status, but technically I'm part of the Executive Office and my boss is Celia Zavala. |
| **Herrera:** | And what are your duties typically? I know that's a broad question, but-- |
| **Huntsman:** | It's a broad question. There's an ordinance that sets forth many of my duties and there are California statutes that set forth my duties. I'm a county officer and so my duties are set forth by statute and ordinance. The short version of them is that, my office was created to monitor, at first the Sheriff's Department, to make sure that we didn't have corruption within the Sheriff's Department of various sorts and to make sure that there were public reports, transparency, accountability for sheriffs' conduct to protect constitutional rights of prisoners and the public in general and so that's how we were created. Over the years we've had our responsibility expanded a bit, to include the Probation Department; we are actively responsible for- at one point we did some work on skilled nursing facilities that involve the Department of Public Health. So our mandate is a little broader under 25.303 of the Government Code. We can advise the sheriff- the supervisors on matters other than the sheriff because they have a duty to supervise all county officers, and we do that from time to time, but it's primarily Sheriff's and Probation, including the jails. We also have responsibility for all the different county and noncounty folks that have any kind of impact on the jails and our work is partly evaluative in terms of reports on procedures and practices, partly investigative. In our earliest days we were less investigative. Our duties were expanded, first by ordinance and then ultimately to some degree by statute. |

**IAB IV 2558097**                    **Page 4 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL

**Herrera:**   Do you have any oversight with regards to, like, use-of-force issues that come up within the Sheriff's Department?

**Huntsman:**   Oh yeah, absolutely. Our staff role out to all officer-involved shootings and we are supposed to be able to monitor and actively investigate those instances by law, but the Sheriff's Department does not permit us to properly do it. What they do permit is for us to come on scene for a shooting, get a walk-through -sometimes a partial walk-through- of the scene and some basic information about what's happened. They usually don't cooperate with our investigations after that. So for instance there was a guy who was arrested in a- Allegedly there had been a kidnapping and so they had done sort of an aggressive attempt to arrest him with other people in the car, that had endangered their lives. We asked for the reports relating to the kidnaping. It was the justification for what they did; they refused to give it to us. So there's a disconnect between what our job is under statute and ordinance and what the Sheriff's Department obstructs or does not obstruct. But we do go out to the scenes.

We do a similar thing for in-custody deaths, on a case-by-case basis. So in some instances where there's in-custody deaths or even uses of force, Category 3 -the more serious uses of force- then we sometimes go to the scene again to see the scene, to look at it, but sometimes we don't. Because there are instances where that's not really helpful based on the way things operate in Custody, when we gather any information, so. So we do do that too. And yeah, as to use of force in general, part of our duties are to review.. not on a case-by-case basis but overall, the use of force and the way they're handling policies. We are permitted to do individual investigations but we're not required to.

**Herrera:**   What about if someone was injured while in custody? Is that type of allegation, is that something you would look into?

**Huntsman:**   Yeah. Again, the way our mandate is worded, we are responsible for monitoring and sometimes investigation matters in Custody, which includes what you describe, as well as many other issues. Any kind of things having to do with the terms of confinement and the manner in which people are held, any complaints they have. So we get complaints directly from people, we go and talk to them, we conduct inspections of the jails as well as limited investigation as to individual incidents. The Sheriff's Department has primary responsibility and our primary model is that we prefer to monitor the Sheriff's Department's investigations. But we are lawfully entitled to conduct a follow-up investigation. So for instance, we have recently in our investigation in assisting the Attorney General's Office have done some onsite interviews and reviews and

**IAB IV 2558097**              **Page 5 of 37**              **MAX HUNTSMAN**

CONFIDENTIAL

taken photographs and whatnot. So I recently was down at the East LA Station and took a photograph of a 3%er logo that has been discussed recently and has been a matter of- I think will be a matter of public concern but has been a matter of concern within the county. So that's kind of how we function. We don't investigate every case. We're not ever the first level of investigation. We're meant to be sort of a second opinion and quality control.

**Herrera:**    Have you had any role in- Let me back up. Are you aware of there being an incident where there was someone who was injured while in custody, allegedly by an officer putting his knee on their neck where they couldn't breathe?

**Huntsman:**    Oh yes.

**Herrera:**    Okay.

**Huntsman:**    I'm very much aware of incidents like that. I don't know about the 'couldn't breathe' part.

**Herrera:**    That they put the knee on the neck. And that they--

**Huntsman:**    Yeah. I think the one that has gotten a lot of attention of late is the Escalante incident. Escalante was the person who got the thing done to them and Deputy Johnson was involved in it, and I'm very much aware of that incident.

**Herrera:**    And is that an incident that you are investigating separately or looking into or, or you just monitor it?

**Huntsman:**    We are attempting to investigate it; however, the Sheriff's Department has been obstructing our investigation.

**Herrera:**    And how do they do that? How do they obstruct?

**Huntsman:**    Well the tools that we have for investigating are two parts: one is an ordinance, and statutes, that require the cooperation of the Sheriff's Department. The other part is subpoena power, which is also according to both ordinance and statute. And so when it comes to the subpoenas that we issue, the Sheriff's Department does not comply with them, and that's how they obstruct. When it comes to the other part of our ordinance, which is supposed to be self-executing, which is that we have the authority to require any county department and any Sheriff's Department employee to provide information to us upon request in the manner that we directed, they simply refuse. And that's done at the

**IAB IV 2558097**                **Page 6 of 37**                **MAX HUNTSMAN**

direction of the sheriff and then, of course, as- we're talking here because of more active efforts the sheriff has taken to obstruct my investigations that began when he first took office and we started to report on his rehiring of a deputy, a law enforcement gang member, Caren Mandoyan, and when we reported on that then he started to take some actions against me: placed me under criminal investigation and the subject of my information I provided to CPOE related to another effort on his part to attack and discredit me, which I believe was for the purpose of obstructing our investigations into his misconduct and law enforcement gangs. But when I was talking about them obstructing our direct investigations, I was referring more to the fact that they refuse to comply with subpoenas and refuse to comply with information requests except on limited bases.

**Herrera:**     Now is that something that you can compel them to do so in court or is that something--

**Huntsman:**     Yes. The subpoenas have a built-in mechanism and we have- So the sheriff was initially subpoenaed to speak about law enforcement gangs. He refused to talk. The county took the action permitted for in the statutes, certified the matter with contempt proceedings to the court. The court told the sheriff that he could not ignore our subpoenas and then he showed up. He then refused to take the oath and so we had to go back to court and get him compelled to take the oath. So then he took the oath and swore to tell the truth and we asked him a bunch of questions and he refused to answer many of them. So we have to go back to court to compel him again and we're in the process of preparing that. So there is absolutely a mechanism for compelling the subpoena process, which is a very slow mechanism and the sheriff has I think intentionally made it slow, so it hasn't effectively compelled the behavior even though we've won every time we've gone to court, and the court has followed up with us.

The other mechanism I mentioned, that's the subpoena process. Our inherent authority to direct county employees, as an officer of the county given that authority, the Sheriff's Department also does not comply with that. County Counsel - I think it was last week - filed a petition for a writ of mandate in the Superior Court to compel them to comply with that legal duty and.. which should do a bunch of things. Like, when I first came under criminal investigation, they shut off our access to computers. So if we had that access we wouldn't even have to ask them; we would just type in our code word and we would pull up information on the computers. So that's part of that writ of mandate, to say you need to turn that back on. Body cameras for instance. The whole plan with putting out body cameras was that we would have

**IAB IV 2558097**          **Page 7 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

direct access to that video, without having to ask the Sheriff's Department for it and the Sheriff's Department has refused to comply to that. So then that's part of that writ of mandate that will eventually, I suppose, be litigated in court, but it takes a very long time. We have no, you know, direct ability to enforce or to compel since the Sheriff's Department's a stand-alone entity.

You look like you're frozen. Are you there? I think we have technical difficulties, so I don't know what of this you can hear, if any. I'm going to stop talking. [silence 0:18:09 to 0:18:49] Hello, you're moving again.

**Herrera:**      Yeah, I could hear you but you couldn't hear me. So I--

**Huntsman:**      Yeah, your picture froze in a one position and then I couldn't hear anything from you. So I kept talking for a while--

**Herrera:**      It was the whole thing, I got all of- The last thing I heard was that, you know, that the process to access things like body-worn cameras, that there's no direct ability to enforce or compel, so you've been going through that process to get that type of information.

**Huntsman:**      Right, apart from the legal process, we don't have any ability to directly do something. The county, everything it does with respect to the Sheriff's Department is controlled by the sheriff. So for instance, Murakami the undersheriff was found by CPOE in the past to have violated CPOE rules and that was submitted to the sheriff and the sheriff said 'I'm not taking any action.' Mandoyan, the county had some ability yet they had to sue him to prevent him from rehiring Mandoyan. So it's not like I can say, 'Hey you're a county employee. If you don't answer my questions you're fired' because the sheriff gets to decide who to fire. So effectively I can do nothing without the sheriff's permission and the sheriff does not choose to give it. It's kind of, like, Watergate where they fired the special prosecutor. Unless the person being investigated agrees to it, they can't be investigated. Unfortunately that's the way it currently is.

**Herrera:**      Just an aside, but the Board can't target the money? Like for example, the contractors that, like, the body-worn cameras, like 'I'm not gonna pay unless we have access to it.'

**Huntsman:**      That's correct and recently something like that has just happened, which is, has to do with school resource officers. So in that context, the Board directed us to approve or disapprove the contracts in those matters rather than- They would basically delegate it to us, their approval authority. All county contracts are controlled by the Board, but

**IAB IV 2558097**                    **Page 8 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                                   COLA002062

EXHIBIT 38 - Page 619

the downside is that these are important contracts and the budget point- they could turn off the sheriff's budget, say 'We're gonna defund the police,' as people have sometimes requested, but they don't want to do that because we need police, you know. So unfortunately the mechanisms they have to control the sheriff are all blunt instruments that would have a negative impact upon the public and less of an impact on the sheriff. And so, it's kind of like sanctions in the international arena where if you put sanctions on a county then the people of the country suffer and the leaders sometimes don't, you know. It's that same kind of problem. In theory they ought to have a lot of power and authority, but they- in practice they don't really have a mechanism to force the sheriff. Which is why - I don't know if you followed it, but recently they voted to put on the ballot for the public to consider whether or not they could remove the sheriff by a four-fifths vote for failing to abide by his legal duties as well as obstruction of investigation. So that's kind of a mechanism that, if the voters approve, they would then have the ability to say to the sheriff, 'Look, you're not following the law and so we're going to remove you if you don't follow the law.' Still, politically that's a big pill to swallow.

**Herrera:**     Right.

**Huntsman:**  So I don't know if they would actually do it because, again, the impact on the public and the perceived impact on the public is very great and so I think they would be loathe to use that mechanism for enforcement purposes. What we really need is, is court-ordered compliance and that will take time. We also have an investigation by the attorney general that could result in court-ordered compliance, which will also take time. So there are mechanisms, but they're all slow.

**Herrera:**     That seems to be a theme everywhere, not just here. With regards to your interactions with the sheriff's office, what's the extent to your typical interactions with them? Like, do you.. I know it's a broad question.

**Huntsman:**  Well it is a broad question so I'll break it down into different sort of categories. There's me personally; there's my office; and then there's what you mean by the sheriff. So me personally, honestly that's a laugh. My office, which is roughly 30 people, a little less, have a variety of duties and so we have a variety of interactions with the Sheriff's Department. And some of them are smooth and routine and some of them aren't. So on a daily basis I have monitors who go into the jails and inspect the jails, talk to people, do a variety of things. I have inspectors who gather information regarding reports that we're working on; have communications with people at the middle or bottom of the

**IAB IV 2558097**          **Page 9 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL                                                      COLA002063

EXHIBIT 38 - Page 620

Sheriff's Department; I have lawyers who write reports and do analysis who talk to, again, people at the middle or bottom of the Department. And those communications are relatively smooth. Under the current administration, there have been restrictions placed on them so that when we make requests for documents or other things, those have to go up the chain and get approved and they don't get approved, except in cases where they think it's not important. But in all the important cases, such as the incident you're referring to where the man got the knee on his head/neck area, then we don't get anything. So.

But on the day-to-day interactions, there's a fairly polite interaction and that goes for me as well. When I went down to escort the Attorney General's office to do these site visits, we were treated fine. An assistant sheriff was there. He's one who we have a long history of communication with because we're a monitor in the jails under a federal law, see Johnson, having to do with the ADA, and one of my assistants, who has just left to go work in Philadelphia, had a very longstanding good relationship with him. So that was all very smooth. I was able to go in and take the picture that I took of the 3%er logo without any trouble. It's not always quite that smooth, but when it comes to requests for actual evidence in our investigations, that's where we're shut down. So as long as we're polite and we don't cause any trouble, they're polite to us.

And that's my staff, that's me, as to the department in general. As to the sheriff, zero. He sometimes sends letters- his undersheriff sometimes sends letters. They are rarely- they're usually nonsensical, rarely in response directly to what we say. So for instance, in January we requested evidence regarding law enforcement gangs under the new statute, Penal Code 13670, and he didn't respond; Murakami sent us a letter. And he sent a letter to the Board telling me to cease and desist from the use of the term and all these other things. And that's the kind of response we get, or tweets talking about us. The thing that caused me to report to CPOE on this matter was a tweet by him, or a press release by him, attacking me, not communication to me. I haven't talked to the sheriff personally since.. he threatened me back in 2019 and I haven't talked to Murakami. We used to have a little interaction with some of the higher level folks at the Civilian Oversight Commission, but they stopped going, and they're required by ordinance to go to that and they don't do that anymore.

So we don't have any real relationship with the management of the Sheriff's Department at that level. At the assistant sheriff level, [unintelligible ] 2630 Patrol and Custody, we have cordial relations. You

**IAB IV 2558097**              **Page 10 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

COLA002064

EXHIBIT 38 - Page 621

know, I can call them or email them and they email me and we communicate just fine.

**Herrera:**      You said in 2019 he threatened you?

**Huntsman:**      Yeah, that was in June, June 17th of 2019. I'd mentioned that we wrote a report about Caren Mandoyan, the grim reaper, who he was trying to rehire. The county had sued him because he was doing that unlawfully, and we set about trying to investigate the manner in which the sheriff was saying he was going to rehire a bunch of fired deputies including Caren Mandoyan -what he called a Truth and Reconciliation Committee or Commission- that he was going to set up within his office. So we tried to investigate that and he refused. We wrote a report about it as best we could with the information we could gather, and I gave him a draft of it, and when I did that he shut off our computer access and I was asked by people in the county to try to convince him to change his mind.

So I met with him personally and said, 'Will you please turn back on our computer access?' and he used the opportunity to tell me that I was a political hack, that my report was ridiculous. I have since learned he never read it. But he said that it was all wrong and that his hiring of Mandoyan was correct and wonderful, and that I shouldn't issue the report, because it might influence the civil litigation regarding rehiring Mandoyan. And I said, 'Look, that's my job as the Inspector General to issue this report and what happens in the civil case isn't my business. I would think it wouldn't have any impact because I think probably it's unlawful, but that's for you to work out. I'm just reporting to the public what happened.' And in that context, he said to me, 'If you issue this report, there'll be consequences,' and he said it in a significant way, but he didn't say what they were and his number two, Mr. Del Mese, who was present, quickly changed the subject. And a short time later, he announced to the press that I was under criminal investigation and sent a letter to the Board asking them to relieve me of duty because of the 'horrible conflict' there was for somebody who is being criminally investigated to be responsible for--

**Herrera:**      I'm sorry, you were just a little bit fast. I'm only so good at typing. I was not hired for my typing skills. So you said he announced- what did you say he announced?

**Huntsman:**      In a podcast, he told some representative of the media that I was under criminal investigation for stealing from the county, basically, from his department, stealing data, and he had Murakami send a letter to the board asking- saying the same thing and asking that I be removed from office. So he announced it publicly. The reason I point that out is

**IAB IV 2558097**                    **Page 11 of 37**                    **MAX HUNTSMAN**

because that's not how you begin a criminal investigation. If you're in law enforcement and you think somebody committed a crime, you prefer to conduct an investigation without the target knowing that you're investigating them. The last thing you do is announce publicly, to start, that you're conducting an investigation. But that's exactly what you do when you want to intimidate somebody. And so that's why I believe what he did then was a violation of 518 of the Penal Code: Extortion of a public official through a threat in order to try to get them to not discharge their duty, in this case; he didn't want me to issue that report. And then when I did, he wanted to inflict the consequence. Since then, he has taken a number of actions against people involved in oversight, all of which designed, I believe, to intimidate them in order to suppress investigation of the law enforcement gangs and of his misconduct- alleged misconduct of various kinds, including the Escalante matter, the Kobe Bryant matter, and other instances which we tried to investigate but didn't. So I think it was the beginning of a process that he then developed as a way to prevent, the officials of the county from conducting oversight over him as they're required to do by law. And I go into that detail because I don't think it's a coincidence the thing that I reported here I think was a part of that process.

**Herrera:**      Right and I think it's good for context so I appreciate the background information. With regards to that issue, was there any kind of outcome or.. was there any kind of admonition from the Board about his behavior or was there any type of followup?

**Huntsman:**   A bunch of things have happened. The Board did respond and say 'No we're not going to remove Huntsman. We agree with you; there's a conflict, but the conflict is for you to investigate Huntsman, especially based on what you are claiming to investigate him on.' What he claimed was my crime was that when he was about to be sheriff, we discovered that the Sheriff's Department had a set of internal documents related to discipline that it kept secret from us, which was in violation of law, and we brought this to their attention and said, 'You need to provide us these hidden files.' We used to have computer access to their discipline records and suddenly we learned that all the runs we'd been making had been inaccurate because some of them, some records just weren't visible. It was as though they never existed. And it was a mechanism used to protect sensitive documents and make them only visible to the people in Internal Affairs. Which wasn't a bad thing; it's just the way- the mechanism they used was bad. So we brought that to their attention. They hemmed and hawed and didn't get around to complying with us, until the sheriff- the current sheriff -won the election. And then pending his election win, he contacted the head of Professional Responsibility - or so has testified Del Mese, his chief of staff, the guy who was there

**IAB IV 2558097**              **Page 12 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL

when he threatened me, has testified that the sheriff directed him to do this - he contacted her and they provided her a settlement agreement for Mandoyan to get his job back. They were trying to get Mandoyan rehired before Sheriff Villanueva took office so that nobody would know that he had done it. And when that happened, the Sheriff's Department changed its mind. Because we had said to them, 'You know, you need to provide us these records, now more than ever that there's a new sheriff coming in. If you were to delete or destroy records, we'd have no way to prove it, but if you give us these records, then we can- we have a copy that we can compare to records in the future.' After that happened - Alicia Ault was the person who got that - she agreed to give it to us. It was approved by the sheriff, I was told. I requested it in writing and we got a copy of discipline records that included the sheriff's discipline records- the current sheriff, Villanueva -and he believes we did that in order to provide them to the Board who could put them into a nifty hit piece, political mailer or do some skullduggery against him. The proof that that didn't happen is the fact that in those discipline records there's proof that things he said about his discipline record are false, and by law the Department can make those public: peace officer bill of rights. The term that's commonly used to refer to Penal Code 832.7, which is actually not part of the peace officer's bill of rights, has restrictions on what can be put out publicly about a law enforcement officer's discipline records, but there's an exception when you yourself give false information.

So he has done that regarding one of his cases and nobody in the press knows about that. And that's because when we got that evidence, we put it on ice, we sealed it, we did not give it to the Board, we didn't give it to anybody. We kept it. We didn't even review it ourselves until much much later after all this happened, but he tried to frame that as a crime and presented it to various folks to try to get them to be interested: the FBI, the AG, and this has all been testified to by Del Mese recently at the Civilian Oversight Commission. So that's--

**Herrera:**     What's the last name? I'm sorry.

**Huntsman:**   Del Mese?

**Herrera:**     Yeah. How do I spell it?

**Huntsman:**   Del Mese's last name is spelled D-E-L is one word and then the second word is Mese, M-E-S-E. And he was the sheriff's chief of staff. He was on his transition team and became his chief of staff. He was dismissed from that position maybe a year later, but at the time he was being- when these things were happening, Del Mese was his chief of staff, and

**IAB IV 2558097**              **Page 13 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                    COLA002067

EXHIBIT 38 - Page 624

at the time that the sheriff threatened me in June, Del Mese was still his chief of staff. And Del Mese testified on July 1st about some of these facts. So the sheriff put together that criminal case, tried to sell it to the FBI, to the Attorney General, to the DA. Nobody bought. He got a letter from the Civilian Oversight Commission, or Murakami, his number two, did, saying, 'You know it's a conflict for you to investigate the inspector general. You shouldn't be doing that,' and Murakami said, 'You know you're right, we agree. We're going to give it to another agency when we reach an appropriate point of handoff' - this is the term he used. They never did. They kept it over my head for years, and the Board had nothing they could do other than say, 'No we're not going to remove Huntsman' until near the end of last year and the Civilian Oversight Commission got some traction with getting County Counsel to ask the attorney general to step in.

Actually I've got two agencies- it's- No that's right, I'm confusing two things the attorney general did. The first one was opening a civil rights investigation against the sheriff, and that happened oh a year and a half ago or so. And then, more like a half a year ago or so is when the County Counsel sent a letter to the AG saying 'Can you please step in and conduct some oversight over the sheriff, a la your question about, you know, what mechanisms are to enforce stuff. And they addressed a number of things including, a group that he has, called the secret police by some people, that targets his political enemies, and that's part of that process I talked about where he's targeted people who oversee him. That warrant investigation against one of the supervisors and an ally of hers in a nonprofit organization, a bunch of things, and the investigation against me. And the attorney general said, 'Well we'll look into that. We'll take a look at what he's got on Huntsman and see what we think about it and we'll look at that warrant process. But we're not going to, like, take over the Sheriff's Department.

When that happened, the sheriff publicly said, 'Well I've already submitted the case on Huntsman to the attorney general. I did it a couple of months ago. So supposedly - I think it was around November of last year - he had submitted it to them for filing and asked them to prosecute me. I haven't seen those documents 'cause it's all part of the criminal investigation, but if it's what I think it is, it's a violation of my constitutional rights because he doesn't have any probable cause. What I did was provided for in my job description and in writing with the approval of the then-sheriff Jim McDonnell, so. So that's kind of the arc of that. So the answer is yeah, there was a response; it wasn't terribly effective in controlling the sheriff's behavior because he has placed himself above the law, and because the mechanisms for dealing with that are slow. But, it is now before the attorney general. There's some

**IAB IV 2558097**          **Page 14 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

|  |  |
|---|---|
|  | attorney general in San Diego whose job is to review the filing and decide whether or not he should prosecute me. So I'm still under threat of arrest, but I don't really expect to be arrested since Del Mese has testified that everybody- all the professionals who looked at it said there's no crime here, including the sheriff's internal people. So, you know, it's an elaborate process. I apologize for the long answer, but-- |
| **Herrera:** | No that's okay. And I-- |
| **Huntsman:** | The complete answer is even longer, so I'm gonna stop there. But yeah, there was a reaction, but it's, you know, it's complex and it hasn't changed the situation completely. |
| **Herrera:** | And so my question is, does that end up dovetailing with the racially biased emails and some of this other stuff? Is that- Do they dovetail together or is it, this happened and then there's a chunk of time where there's not as much going on and-- |
| **Huntsman:** | No no, there wasn't a chunk of time. I mean, I haven't gone into all the details regarding all the things the sheriff has done, endlessly since then. But the fact of the matter is, there hasn't been a chunk of empty time. The thing I described happened. He then went to, you know, runs the sheriff's department, so events happen. We report on things. There's discussions publicly. He has a number of times attacked me in the press, claimed that I am corrupt and that I'm a liar. We had a number of run-ins at the Civilian Oversint Commission. They kept- the sheriff just kept sending his staff there to say, 'When Max tells you that he's not getting cooperation in his investigations, that's not true. We give him everything he asks for.' So I had to present to the Civilian Oversight Commission a series of emails in a PowerPoint - I provided the emails detailing the numerous requests we've made and showing the email responses showing that they never gave it to us. And I had to do that twice. The first time was in a presentation to the Civilian Oversight Commission and then a year later I issued a formal report that's up on my website called Unlawful Conduct At the Sheriff's Department and it details a whole series of our investigations that were thwarted as a result of the failure to provide information.

So the false narrative that he's put out to the public, is that I'm a liar and he still to this day continues to do that. And that's gone on nonstop and it's been supplemented by a tax on other individuals: Sachi Hamai, the former Chief Executive Officer of the county, ran afoul of him because he tried to get money for a PR firm within the sheriff's department and she refused to give that to him and then he targeted her, first claiming that she was refusing to provide sick-time benefits to his deputies if they |

**IAB IV 2558097**              **Page 15 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

COLA002069

EXHIBIT 38 - Page 626

got COVID, which wasn't true. Department heads get to decide who gets sick time and who doesn't, not the CEO, and he never retracted that. And then he actually again claimed she committed a crime. She was on the Board of Directors for the United Way, a volunteer position, and he had a press conference in which he said she voted, or participated in putting up.. I think it was a homelessness initiative on the ballot that United way liked, because they might get some money out of it, therefore it's a conflict of interest. Government Code 1090, the provision that governs conflicts of interest relating to contracts, requires that you have a financial interest. In other words, if you're a volunteer on a board for a nonprofit, it's not triggered, and the sheriff knows that; I know he knows that because his secret police squad put together a report that claimed she was a criminal, and in it they acknowledged the absence of that evidence but still claimed that she had a conflict somehow that she kept secret. And they submitted that up to the AG as well, and publicly accused her of this. And she ended up- When she retired, she got a settlement from the County with an agreement that she'll get security because of the sheriff's threats and threats that she received and other County officials have received after he publicly sets them up for targeting. Because he has an extremist base that will react to whatever he says. So at one point he accused Mary Wickham of County Counsel of going rogue, because she was advising him that what he was doing was illegal, and the next day she got a threatening phone call, from some folks who claimed that there was an arrest warrant out for her and she was going to be arrested. And the phone call came from the Sheriff's Department. And they said 'No no no, it was spoofed, it's not true' and later they claimed that they had done something about it, but they never provided the evidence or the phone records. So she- until the day she retired, she believed that she was being targeted by people as a result of the sheriff's threats.

So he took a series of actions throughout this time that have never stopped, including targeting Patty Giggans, who's the head of a group called Peace Over Violence, and Sheila Kuehl, a supervisor - they are political allies, I think, or friends, from way back. He claimed through conversations with a guy named Adam Lowe, whose wife used to work at the Metro, that there was a conflict of interest in a contract that Patty Giggans had and he got a search warrant to serve and search the Metro and the Metro's Inspector General and a bunch of stuff. And again, there was public allegations of misconduct, all based on the statements of this guy Adam Lowe, who had filed the lawsuit, which didn't go anywhere, and had been investigated by the Inspector General in that organization. And he used all that as a basis to then make Sheila Kuehl think that she was going to be arrested.

**IAB IV 2558097**          **Page 16 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

So he's done a series of things like that that haven't really stopped, nonstop. And so I do think- the thing that I'm talking about now is just the latest in a long line of them. It's not like he was silent for a while and then popped back up. And that's why I sent you before this conversation that email I'd gotten with the post recently from Adam Lowe in which he details in his letter to Merrick Garland, you know, all these- his complaints about various things, including using my name as Max-Gustaf and then at some point Max-Gustof, spelling it a third way--

**Herrera:**    I saw that.

**Huntsman:**    --and a variety of stuff. Well that guy, Adam Lowe, is the affiant in the warrant that they served on Peace Over Violence and Met News. So when we get into more detail about the actual CPOE claim and the holocaust accusation, which is the second thing I sent you -his claim that I'm a holocaust denier- I think he gets that from Adam Lowe. I think Adam Lowe is his supposed source based on my reading of that document that you saw, as well as other things that Adam Lowe has said. Before the sheriff ever in that communication to the department called me Max-Gustaf, Adam Lowe had used that name as well and nobody else had. Nobody else calls me that.

**Herrera:**    And I want to definitely get to the Adam Lowe. I appreciate you sending me that email and I looked it over. I did want to look at- talk to you about the email that, you know, that was kind of the genesis for this complaint itself, right? So my understanding is that there was an email that was sent by the sheriff. Can you give me some more information? And I don't think it has the date, the information that I have I don't know that I have the date of the email, so do you have--

**Huntsman:**    I saw you don't have it. I thought I had forwarded it and so you should've received it. I can try to track it down for you and try to get you another copy. But bas- I don't remember the date. It was earlier this year. But when he sent it, it was- you know, one of the points when he was attacking me publicly, it was sent around to the whole department, I believe, and he again accused me of - I forget what the particular issue is 'cause he accuses me of lying or being corrupt or, you know, whatever - but in that email he referred to me as Max-Gustaf with a Max-hyphen-Gustaf, and that's the thing that caused me to report it, to the CPOE because I believe he was intentionally- He has a base of extremist groups - white supremacists basically - who he dog whistles to and lets them know who their current target is, and that's how he got Mary Wickham to be targeted; that's why Sachi Hamai had to get security; and by saying Max-Gustaf, I believe he was trying to say to those guys 'This guy's a foreigner; he's either German or Jewish or

CONFIDENTIAL

both' and we now know with the Holocaust denier thing, he wasn't trying to sell to anybody that I was Jewish because he was claiming that I denied the Holocaust. But I think that my German descent was what made me a target for him because I would be an easy target, in the same manner that he targeted Esther Lim, I believe, because she was an easy target. He liked to target a lot of people, anybody who was a critic of his, but some people because of their race are easier for him to set up as scapegoats with his base who listen to him, including people within the department.

**Herrera:** Actually with Esther Lim, I believe he sent out something in the past where - I don't know if you're aware of it - I think where he looked at her Twitter feed.

**Huntsman:** Oh I'm very much aware of it.

**Herrera:** Right. And where--

**Huntsman:** I don't know, because my ability to investigate has been obstructed, but if I were investigating, I would investigate my belief that that's part of what he has that dirty tricks squad doing. They're supposedly investigating crime and the sheriff uses his criminal investigative authority as his shield to tell 'Nobody can ask any questions about what I'm doing'. But what I think they're doing is political work. And he had somebody go through all of Esther Lim's social media to mine statements that he thought were obnoxious. And then he put them together in a long list and sent them.. a year and some change ago to the Board, particularly to Supervisor Solis, Esther Lim's boss, to complain about her. And then a year later, more recently, he sent it again. And that was after he had taken the shot at the Chinese company that was providing COVID testing. Part of his sort of strategy for remaining sheriff is to appeal to the deputies' union and he described to Gustavo Ariano of the Times, his staff as being 80% conservative and right-wing. Now, I'm not sure that that estimate's correct, but that's his viewpoint of his staff. I do know that there is a certain percentage of his staff who are very extremist on the right and who are very anti-Chinese, and he was using that racial component to try to beef up his standing with them, and with voters who- the right wing of voters who he thinks he can get to reelect him. But at the same time, it creates, I think, a great danger to the, the people he targets because these folks are- these are dangerous people. And so that's why I connect these events. What he did with Esther, I don't think that's a coincidence. Now he could've done it with anybody and he could've done it irrespective of race. But I think he targeted her because she's Chinese.

**IAB IV 2558097**                    **Page 18 of 37**                    **MAX HUNTSMAN**

**CONFIDENTIAL**

**Herrera:**     Do you have any sense of how many people he has on this squad or, or how many people are [indiscernible]?

**Huntsman:**     I think it's about a half dozen or so and I think it's changed a little bit over time. In the early days when he first started it, he hired a guy back to the Sheriff's Department called Lillienfeld and he was a guy - I don't know if you're familiar with him, but - if you were to Google him, you'd see that he had left the Sheriff's Department years ago and he went to work for the DA's office on a contract basis, and he got caught sneaking into the jails. He put on his old sheriff's uniform and snuck into the jails in order to bring contraband to an informant. He did it for the cause of good and justice, because he wanted this informant to help him with a murder case for the DA's office. And the contraband was, supposedly just a burrito -although nobody knows because he snuck it in- but he did it after being told no, he couldn't do it, by the Sheriff's Department. And then he used his old uniform to pretend that, you know, that he had permission and snuck in contraband.

**Herrera:**     Can you spell his name again?

**Huntsman:**     Lillienfeld?

**Herrera:**     Okay, there you go. I've heard- I just didn't hear it, yeah.

**Huntsman:**     Yeah, and that happened. I mean, it's on video. What you think about it is questionable, but the event happened. So he rehired that guy and I think he rehired him because he knew this is a guy who'll do whatever I ask him to do. He'll pull out every stop. And he put him in this unit and he also had a guy who's a computer guy, and the computer guy did a lot of computer work for him. Allegedly, I've heard numerous times over the years that he's bugging my emails and, you know, accessing stuff. I'm not sure I believe it, but I have a bug sweeper in my office as a result that I use from time to time, to try to, you know, at least have some kind of protection against it. But other people do believe it and I've been told that over and over. That guy's on the crew. So I wouldn't be surprised if that team was put onto the process of gathering stuff. But the sheriff has a lot- also has- I mentioned the PR firm he wanted to have the county pay for for him. He never got that. So instead he converted the Sheriff's Information Bureau, which is supposed to provide information to the public, which the sheriff has a legal duty to provide and doesn't, he turned them into his PR firm. So they're run by- or were run by a guy named Satterfield, a deputy, now a captain I think, because he's been promoted, who would put out PR stuff for the sheriff on a nonstop basis. And it's possible that that team did the work as well.

**IAB IV 2558097**          **Page 19 of 37**          **MAX HUNTSMAN**

**CONFIDENTIAL**

**COLA002073**

**EXHIBIT 38 - Page 630**

But it's also possible it was done as a supposed criminal investigation. I haven't been able to investigate that. But the bottom line is, I think he collects dirt on his political opponents and then tries to figure out a way to hurt them and he turns most easily to race-based techniques 'cause I think it plays with the people he's trying to curry favor with and he uses whatever means are available to him to do that including public funds for- that should be used for criminal investigation or, in the case of SIB, should be used for Public Records Act requests, you know, all sorts of things. So that's kinda the way I see it unfolding and why I see these things as connected.

**Herrera:** And in terms of your name being Max-Gustaf Huntsman, is that.. a name that you've ever used publicly? Like, as your name?

**Huntsman:** The story of my name is that when I was born I was named Max-Gustaf Edler. My dad was German, and he came- his dad was a soldier with the Nazis, and he supposedly couldn't carry a gun 'cause he had employed Jews before the war, but they lived in Nazi Germany. His older brother hid in the woods to avoid being conscripted and when the war was over, he decided that was not a good place to hang out. So he came to Canada and then he came down to San Francisco, where he met my mom and fathered me. And he wanted to name me a German name. They settled on Max-Gustaf, which was a hyphenated name of two uncles of his; Max was one of 'em and Gustaf was the other. The F that's in that name is the Swedish spelling of Gustav and that's 'cause this guy just happened to have the Swedish spelling; I don't know why. This is all stories I've heard from my dad. My dad quit working when I was born, was doing a lot of drugs, once left me on a street corner to teach me to be self-reliant and after my mom and my dad got divorced, not long after that she moved down to LA to get away from him.

After that, he left America. He went to New York for a bit and then he went to Sweden and got himself a real family, and lived 'til the day he died in Sweden taking care of a family. He didn't do that with my family and I believe that's because of Nazi Germany. I believe he was raised with a violent hatred for authority. He was an amateur boxer and, you know, he liked punching people. He was a con artist. He actually supposedly did some time in custody. I mean, he was just a piece of work - as a result of the Holocaust. Not what was done to the Jews but the way Nazis functioned, and I think they did a lot of damage. I don't claim that's as bad as the Holocaust, but it had a direct impact on me. So the idea that I would deny the Holocaust is crazy. I have no love for Nazi Germany; quite the opposite.

**IAB IV 2558097**          **Page 20 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL                                                    COLA002074

EXHIBIT 38 - Page 631

But back to the name part. So he names me Max-Gustaf Edler. When I was a kid, I said to my mom--

**Herrera:**     I'm sorry, Max-Gustaf, what was the last name?

**Huntsman:**    Edler. I pronounce it A-dler because that's the German pronunciation and I'm telling you about the early life.

**Herrera:**     And how is that spelled?

**Huntsman:**    E-D-L-E-R.

**Herrera:**     Okay. Sorry.

**Huntsman:**    And that's- Gustaf is a first name with a hyphen. I have no middle name, never had a middle name.

**Herrera:**     Got it.

**Huntsman:**    So when I was a kid, I told my mom, 'I don't want to have the name Edler. That's my dad's name. I don't like my dad. I like you. You raised me.' Sorry, I get a little emotional about this - I apologize - when I think about it. My mom said 'no'. She said 'When you grow up, you can do whatever you want, but until then I'm not changing your name.' So when I grew up - and by growing up, I mean I went to law school, and I was a law clerk at the firm Tuttle & Taylor, that Jerry Brown used to work at many years ago. And I got one of the partners there to help me change my name. And I went into court and legally changed it, from- to Huntsman from Edler. I didn't get rid of the Max-Gustaf legally. So I was Max-Gustaf Huntsman on paper. I never used Max-Gustaf and nobody ever knew me by that. I just went by Max. And when I became the inspector general, I got lucky and I- I can't really tell you how this happened, but one way or another- 'cause I would use Max and I would write Max on most things, but like on my tax returns I'd write Max-Gustaf and the state bar had me down as Max-Gustaf. So, like, you know, my formal name was Max-Gustaf; I never hardly used it.

Somehow or another I got a passport that had Max on it, just Max and not Max-Gustaf, and so as a result, under California law you can't change your name unless you go to court and do a bunch of things that I didn't want to do, unless you have some documents to show that your name is this other thing. So as soon as I had a passport that said Max on it, I was able to go into the DMV and go, 'Look, my name's Max,' and they changed my name to Max. And I was able to go to the County and say, 'Look, my name is Max' and they changed my name to Max. So I

**CONFIDENTIAL**

changed my name everywhere to Max. But on some obscure county computers, they never changed it correctly and the state bar still had me down as Max-Gustaf. But in all other contexts: federal government, county government it's Max and I never ever use Max-Gustaf to talk to anybody. Nobody would ever tell you, 'Oh that guy's name is Max-Gustaf.' There is one cop I used to work with in the DA's office who used to call me Goose just as a joke, and that was it.

But I'd never gotten the state bar changed until the sheriff did this and then I called them up and said, 'Guys, can you pull that?' So they said, 'Yes, yes we'll make you Max.' Now if you run me on the state bar, there's an entry for a guy named Max Huntsman and there's an entry for a guy named Max-Gustaf Huntsman, 'cause they didn't change it; they just stuck another one in. So that's the story of how I use my name and that- it's a long slow burn, all from the fact that I didn't particularly like my dad very much. And I didn't want to have anything to do with him. When I got to turn over a new leaf as inspector general, I, 'you know what, I'm just dropping that -Gustaf part. I won't even do that,' 'cause I'm not a German. I've got nothing against Germans particularly, aside from Nazis, but I'm not one; I'm an American. He came from Europe and, you know, my mom raised me here in America and, you know, that's who I am. So anyway, that's my story.

**Herrera:**      And what's your mom's heritage?

**Huntsman:**      Well, her dad came from Canada - white, generic white. Her dad came from Canada. He had come back years earlier from Scotland. I think he actually came from Scotland or maybe his dad's dad did or something. But he, he came down out of Canada and on the other side, on my grandmother's side, they were, like, Daughters of the American Revolution. Her family had been here, like, before the American Revolution. They came- supposedly the story- my daughter tells me this isn't true, but my story was that we were related to John Rolf of the Pocahantas story, 'cause one of our ancestors was Rolf, but my daughter looked into it and said, 'No that guy had no kids. So you might be related to him, but you're not a descendant of him.' But in any event, they were just Americans, you know, white European-type Americans but not, not anything else.

**Herrera:**      Would that be British if they were Daughters of the American Revolution?

**Huntsman:**      That side, on that side. If you want to divide me up, on my mom's side it's half British with a little bit of, like, French or something in there, and on my mom's dad's side, it's mainly Scottish. So it's like British Scottish

**IAB IV 2558097**              **Page 22 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

on her side and then on my dad's side, he's pretty much German with a little bit of Russian and I think a little bit of Polish.

**Herrera:**      Okay.

**Huntsman:**    But in terms of culture, he didn't raise me with any kind of German culture or anything and my mom, by the time, you know- my mom was a hippie. She was a beatnik; she wasn't a hippie. She was before the hippies.

**Herrera:**      San Francisco.

**Huntsman:**    Yeah exactly. I was conceived on a houseboat in Mill Valley. You can't get more beatnik than that.

**Herrera:**      That's a very auspicious beginning.

**Huntsman:**    So, you know, that, to the extent that I have a culture, that's my culture. And I've had this conversation with people, you know, I don't feel- I feel like I'm a cultureless person, other than being an American. It's not like it's a supremacy thing at all. I'm not in favor of that approach. I'm jealous of people who have a real culture. And so it's a thing that I wish that I had and I think that's part of my own read psychology 'cause of my dad. But the bottom line is, I'm not German.

**Herrera:**      Right. Now, my understanding is that there was a KFI.. So there was the email that went out and do you recall who that email went to that the sheriff had sent?

**Huntsman:**    I think it was the entire sheriff's department. I'll have to track it down for you since you didn't get it. I sent it in to CPOE and I'm sure I've got a copy of it somewhere.

**Herrera:**      I can hunt it down myself as well. I just didn't want to delay talking to you because I think it [indiscernible].

**Huntsman:**    No no no, it's not important. But it was- Yeah, it was- I think it was sent out to the entire Sheriff's Department. But it's not, it's not- There's more than one time he used that Max-Gustaf, and he talked about it, and I think on KFI he talked about, 'Oh we need to look into why, why did he change his name? What's he trying to hide?' you know. And so, to be clear, like I said, I gave you the reason I changed my name. Since 1991 I've worked for the county and was a deputy district attorney for 20 years before I was this. I'm not hiding a secret past. You know, there's no fraud or process by which I changed it in order to conceal who I am

**IAB IV 2558097**              **Page 23 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

**COLA002077**

**EXHIBIT 38 - Page 634**

in any way, shape or form. It's just I don't like to be associated with a culture that I'm not part of.

**Herrera:**  You mentioned - and I didn't ask this, but - so you were a deputy DA prior to becoming the IG? How long were you with the DA's office?

**Huntsman:**  When I graduated law school in 1991, I joined the DA's office before I passed the bar and I was a DA- once I passed the bar, I became a DA and then I stayed there until 2013, when I took the job as Inspector General.

**Herrera:**  So when you changed your name, was that while you were in law school? Like, was that a job decision?

**Huntsman:**  Yeah, that was- I became Huntsman before I joined the DA's office. So as a kid I'd been Edler; when I was in law school I was Edler until, like, my senior year and then I was Huntsman. And then when I graduated from law school and joined the DA's office, I was Huntsman. So nobody in the DA's office ever knew me as Edler.

**Herrera:**  Okay, got it. Because you mentioned you worked at Jerry Brown's old law firm, so I just wasn't sure of the timing of that. Was that during law school?

**Huntsman:**  I was a senior- not senior, a summer law clerk after my second year of law school.

**Herrera:**  And so.. aside from the email- So then the KFI, the KFI radio call, do you recall what was said during that KFI radio appearance? And was there more than one or is it just one appearance?

**Huntsman:**  I don't now recall. On KFI he talked about it and, like I said, it used to be kind of clear in my head, but then when he went to the Times Editorial Board and told them I was a Holocaust denier, it kind of made the details of what he said about my name irrelevant to me. So I don't remember precisely what he said on KFI.

**Herrera:**  You did say something to the effect of, you know, that they should look into why he changed his name or what is he trying to hide?

**Huntsman:**  Yeah, I mentioned that. He said that somewhere; I think that may have been on KFI. I don't remember now where he said that, but that's, like, a thing he likes to say and he said the same thing to the Board. But he likes to say, 'Well, somebody should look into that.' He does- he's very fond of, like, Facebook Live videos and Instagram videos in which he'll

**IAB IV 2558097**          **Page 24 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

have, like, a chat and he'll sit there at his desk and he'll pull pieces of paper and talk about them, like a talk-show host or something, and then just sort of ruminate about them. That's how he talked about Sachi Hamai when he accused her of the 1090 violation. He said, 'Woah, I just got this in from.. from Vivian, oh thank you. Oh, somebody should look into this,' you know. And he effects this kind of casual way of talking about things and I think it was in the same context. He said, 'Somebody should look into that,' as sort of a vague allegation that there's some nefarious reason for why my name changed.

**Herrera:**    Did you feel like he was casting aspersions or trying to make some type of negative inference?

**Huntsman:**    Yeah, absolutely. Yeah, definitely.

**Herrera:**    And I know you mentioned that you believe it may have been, like, for example, a dog whistle, but if his people are these radical, maybe right-wing, wouldn't that be more in line with their viewpoint if you were.. you know?

**Huntsman:**    It might be if he had presented me as an Aryan, but he didn't, you know. So that's why when he first did it, my take on it was he was trying to imply I was Jewish. And that would be what I was- that's what I thought he was doing. I may not have been correct about that, but that's just-that's how I took it. And so that's the way I took it. What I think was really going on- I mean, again, it's, being a foreigner I think is the main thing. So you're right; if white supremacists really cared about, you know, true Nazism, then none of them would qualify because most of us here in America are not the Aryans that the Third Reich was obsessed with. But that's not how we look at the world.

**Herrera:**    Maybe the Third Reich weren't all that Aryan either.

**Huntsman:**    Right, exactly. That's my understanding too, but you know, that's ancient history, but for here and now, I think it's really more about an ideology and a way of looking at things and again, I think he was simply designating me as a target and as an 'other' and he didn't really care too much about how people took it. Other than they knew: this is a guy who is an enemy of ours. In the same way that recently the Board had voted to, put before the voters the right to remove the sheriff with a four-fifths vote. As soon as that happened, that was put out on Breitbart, the highly conservative outlet, about it and how Democrats were trying to take away the rights of, you know, a favored sheriff, and immediately there started to be a series of Twitter feeds from right-wing extremists in Florida and other places talking about how outrageous it was. I think

**IAB IV 2558097**          **Page 25 of 37**          **MAX HUNTSMAN**

**CONFIDENTIAL**                                    **COLA002079**
**EXHIBIT 38 - Page 636**

that's the technique that the sheriff uses. It's more about designating the target than about the details of why deputy designated. I think he selected these things because they play well, because the race angle plays well.

But now in hindsight, I think he probably had already had a bunch of conversations with Adam Lowe about not just the name but about the Holocaust-denying claim. And so I think really he was setting that up. But at the time, I didn't know that. I thought what he was doing was just trying to make me look like, you know, I'm the target. But I think really what was going on was he was preparing for the next one. And of course, it's weird to say somebody's Jewish and a Holocaust denier. So I assume that was not his plan. But again, I think he's getting this stuff from Adam Lowe, who's a little bit crazy I think. From the document you saw, you know, he's- When we subpoenaed from him, he had an interchange with Lillienfeld, the guy I talked about before, when Lillienfeld recorded him- or, Adam Lowe recorded Lillienfeld while Lillienfeld was kind of threatening Adam Lowe, telling him to back off 'cause he had sent some emails to Murakami. And so Lillienfeld had been dispatched, or voluntarily dispatched himself, to tell Adam Lowe to settle down. Adam Lowe recorded it all; we subpoenaed it; he refused to provide it; and I think that's when I got on Adam Lowe's radar as somebody he was going to target. And I think the sheriff had already, taken Adam Lowe as an ally, used him in his process to try to get a search warrant.

So I think he got from Adam Lowe the 'Hey I think I've got some dirt on Huntsman. I think he's a Holocaust denier. I think he's a bad guy, this is what I think.' I don't know where he gets that from because I have never denied the Holocaust. There isn't some old college paper that I wrote in which I question the Holocaust. You know, it never happened. My guess is that Adam Lowe ran some database and found some name that sounds kind of German, you know, of somebody who denied the Holocaust. But it sure wasn't me.

**Herrera:**       So with regards to, for example, once the email the sheriff sent and then, for example, the KFI, the radio show he's making these statements, did you receive any type of emails or any type of calls or any type of negative attention? Have you received any kind of…

**Huntsman:**     Once he accused me of being a Holocaust denier to the LA Times, you know, in a very public way and it became an Op Ed in the Times and a whole discussion, and a number of media sources talked about it because it was such an outrageous claim, especially - I don't know if you watched the video of that, but if you think it's relevant, you might

**IAB IV 2558097**              **Page 26 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                              COLA002080
                                                                              EXHIBIT 38 - Page 637

want to pull up the video - but that Op Ed I sent you kind of encapsulates it. They asked him, 'What's your evidence for that?' He said, 'Well I'm not going to tell you.' And they said, 'Well if you're going to accuse somebody of such a horrible thing but not provide any evidence, should we believe you?' And he said, 'Yes you should believe me.' I mean, it was kinda nutty, so it became a story. After that, I did not receive any death threats or any weird emails from crazy people any more than usual. I certainly have had an increase in, like, when I monitor comments on, certain websites like Witness LA or other places, where there's always kind of a chatter and I'm always kind of the enemy in the eyes of these extremists. I mean, there's certainly stuff like that, but there wasn't a lot of Holocaust stuff because - I shouldn't say because - the sheriff had previously already presented me as sort of his main enemy and there's always been a lot of attacks on me like that. But I didn't- I didn't notice any that were specifically Holocaust-related. I did receive a lot of communications from people I know who, you know, expressions of sympathy and ironically most of them from friends of mine who are Jewish. Because I think if you're Jewish, you know how disgusting and deeply offensive that allegation is. I think if you're not Jewish, it seems wrong to say that about somebody, and if you're Jewish, it's evil. And so a number of my friends who are Jewish were like, 'Oh my God, Max, I can't believe you said that. That's horrible,' you know. And so it's actually been a pretty positive thing.

I sent an email to the Board about it, which is what I kind of forwarded to CPOE, to go on the record and say, 'Look, it's not true,' because it hurt me so deeply, for the reasons I described. I'm not Jewish, but I have a certain connection to the Holocaust that is not positive. And so I take it to heart more than maybe I otherwise would. I don't know. I don't know what a person would think if they were called that, if they had no connection, I don't know. But all I can tell you is emotionally for me it was hideous. It's still hideous. Like I say, I was tearing up talking about it. But when I was tearing up when we were talking, that wasn't because of the Holocaust; that was because of my history, my dad. I'm like an eggshell plaintiff in this. It's not just the threat and the insult and the allegation; it's what it means to me personally.

**Herrera:**    Can I take just a one-minute break? I locked my husband out of the house, so (laughs).

**Huntsman:**    I'll just sit here. Go ahead, don't touch anything and come on back when you're ready.

**Herrera:**    I'm so sorry. I'll be right back. I'm just going off the record at 3:15.

_____

**IAB IV 2558097**          **Page 27 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

**Herrera:** Back on the record. It's 3:16. So, my understanding is that I think on March 31st, you sent - or was it 30th - you sent an email to, is it- I don't know what the DCO stands for: Deputy Chief Officer Seiberg, or Seeberg? - regarding the Editorial Board comments, the comments to the Times about being a Holocaust denier, do you recall doing that?

**Huntsman:** Can you give me the spelling of the name you're saying?

**Herrera:** S-I-E-B-E-R-G.

**Huntsman:** I'm sorry, I don't know who that is. I probably did do something that created what you're talking about and, as I recall it, I sent an email to the Board and then I decided 'No, I'd better tell this to CPOE because it' - Oh I think you're fro-, no you're there; I was afraid you were frozen - 'I think I'd better tell it to CPOE because not only, not that I'm complaining about it because, for the reasons we discussed in the beginning, I'm very cynical about whether or not the sheriff is going to discipline himself, but I figured I had a duty to my employees to do something about this because CPOE rules are pretty strict about reporting when you're aware of certain facts.

**Herrera:** Right.

**Huntsman:** So I sent it- I would've said I sent it to Vicky Bane, who's the head of CPOE, but I'll bet you whatever I sent somehow generated the thing that you're referring to.

**Herrera:** Okay. And then, I think as a followup--

**Huntsman:** Unless Seiberg is Sheriff's Department. That could be an echo of what I sent.

**Herrera:** It could be.

**Huntsman:** It could be, 'cause I sent something to Vicky Bane. The process for CPOE for everybody else in the county is the CPOE investigates. For the sheriff's, they get to investigate themselves. So whenever there's a CPOE complaint regarding the sheriff, they forward it to the sheriff. So that may be the forwarding from the county CPOE to the sheriff's department.

**Herrera:** Right. And then it makes reference to.. I think on April 1st you communicated with this person and it may be that they are in the sheriff's office, stating that 'I'm not blaming you, but be sure to tell all

**IAB IV 2558097**            **Page 28 of 37**            **MAX HUNTSMAN**

CONFIDENTIAL                                                                **COLA002082**

EXHIBIT 38 - Page 639

the victims you interview that the LASD CPOE process is not confidential and the sheriff will discuss them with the media.' So I think that gets into that last point of…

**Huntsman:** That person is the person I told you about who I talked to at the sheriff's department. She called me and then set up an interview and we had an interview, and we went through the same thing I'm going through with you. Not all of it at that point, but he had at the Times said, in addition to the Holocaust thing, he said, 'and Max Huntsman's made a CPOE complaint against me, ha ha.' So that's why I said that to her. I'm, like, 'Look, the whole claim that it's confidential is a joke. The sheriff already was informed about it and he already told the public.' So.

**Herrera:** Okay, now I see what you're saying about the confidentiality, because I wasn't sure what you were referring to, but that makes sense.

**Huntsman:** I was referring to his public announcement, the Times Editorial Board, that I had made a CPOE complaint against him. Which is completely in violation of CPOE rules. So that- I apologize, but--

**Herrera:** Not only they would be--

**Huntsman:** --I'm a little cynical about the sheriff's process and whether or not it was going to be confidential.

**Herrera:** Right. I can only tell you that, I'm not talking to the sheriff. I guarantee that I'm probably not going to be his favorite person.

**Huntsman:** No I understand now. I understand- it was the admonition you gave me 'from the Sheriff's Department' that threw me off for a minute.

**Herrera:** Yeah and I apologize.

**Huntsman:** Probably already, you get hired by County Counsel; County Counsel gave you a task: you're going to collect a bunch of stuff, you're going to give it back to County Counsel. If anybody tells the sheriff anything, it's going to be County Counsel. And to be clear, it doesn't matter. The sheriff already knows all these things. The sheriff knows that I'm no fan of his because I- Sorry, my phone froze for a moment - the sheriff knows because I publicly record all my criticism of him, so he knows how I feel. So if you did call up the sheriff right now and tell him that, it wouldn't do anything worse to me. He already is, you know, fixated on me as much as he is ever going to be. It's just that I'm really- As the Inspector General for the county, and it's my job to protect the constitutional and other rights of our employees and the public from the

**IAB IV 2558097**          **Page 29 of 37**          **MAX HUNTSMAN**

sheriff, when I'm aware that the sheriff is simply disregarding the rules of CPOE so he can target individuals, people like Esther Lim come to mind. You know, I get paid for this. I used to be a prosecutor. I get paid to take on armed men and do gang busting. She doesn't, nor do any of the other people who he's targeted. So that's why I was a little frustrated with that whole process because it's just- it's so unfair and it's so dishonest, to the people within government service than when we allow somebody like this to engage in this conduct, you know. It just is very disheartening to me, to be a process that CPOE- I've been involved with in my office, and worked with CPOE in investigations and found them to be completely above reproach in their confidentiality and reasonableness in how they deal with things: very careful, very thoughtful, very sensitive to those making complaints and those who are being complained about and, you know, carefully gathering facts, and then crafting the solution that's going to protect people. I mean, it's an amazing process - until you hand it over to the sheriff. So that was my point.

**Herrera:**       Okay, so that makes sense. Now I get it. And then- just going back- I think we're almost done, but going back to Adam Lowe, I just want a little bit more information about who exactly he is 'cause I did read - and again, thank you for what you had sent to me - but I'm trying to understand exactly who he is and what your relation or contact has been with him.

**Huntsman:**   Adam Lowe is the husband of a woman who was employed by Metro. Metro is basically a joint powers agency that's sort of controlled by the county, sort of controlled by LA City and its Board includes, by law, I think two supervisors at a time and they rotate, or whatever, as well as some other folks. They have an inspector general; they have a executive director and they run, you know, the Metro system. So, Adam Lowe's wife was an employee there and she was unhappy. I don't know the details of why, but she didn't feel that she was being treated properly. And she started to complain about that and eventually she quit or was fired or what have you. And once that happened, he made a campaign of attacking first the executive director, a guy named Washington, who is mentioned in that letter that I sent to you; and then somewhere along the line he decided that he was aware of a great corruption and that he needed to let people know. And I think the theory in his head was, this corruption was why my wife got fired, or not treated properly and had to quit, because she was a whistleblower about this and therefore, if I can convince people that this is true, then they will see that my wife is a victim and they will give her money or a new job or whatever.

**IAB IV 2558097**              **Page 30 of 37**                **MAX HUNTSMAN**

CONFIDENTIAL                                                                                           COLA002084
EXHIBIT 38 - Page 641

He filed a federal lawsuit; he spoke to every media outlet that would ever listen to him; and my first relationship with him was maybe a year, two years ago - I forget how long, it was a long time ago - where he stuck me on one of his email lists and he would periodically send out these emails to everybody, I mean, to anybody he could think of to stick on there including the media and he sent out these emails saying, 'You know, I've got the goods. I'm meeting with the FBI tomorrow. I've just given all this stuff to the Grand Jury.' You know, all these claims that, having experience as a corruption prosecutor, I was pretty sure were not true. 'Cause that's not how it works, you know. But in any event, he was saying these things and I remember reading these allegations. Now the allegations were that Sheila Kuehl, in her position as a Board member at the Metro, had caused the issuance of a contract to Patty Giggans' group Peace Over Violence. It is true that Peace Over Violence had a contract with the Metro to provide sexual assault hotline services. I don't think Sheila Kuehl had anything to do with him getting it. I don't know that, but I don't think she did. And again, back to our conflict of interest stuff, I'm not aware of any flow of money that would close that circle, that would prevent Sheila Kuehl from causing Patty Giggans to get a benefit like that; unless Patty Giggans gives her money, right? You can give campaign contributions - that's totally okay. It's crazy, but in American California law, that's okay - but you can't, like, give them a hundred thousand dollars to put into their personal account, or hire them for some other job. So, as far as I know, there's no connection like that.

But that was the claim, was that that contract was somehow bad, and it was looked into by the IG at the Metro, I understand - I don't- haven't read that report - and there was an element of the claim that was interesting, which was that not only was the creation of the contract flawed but also the contract itself was fraudulent. And supposedly the basis for this - and I don't know if it's factually true or not, but this was the claim - was that, you know, when you look at how many calls they've gotten on their hotline? It's not a lot of calls. And they're getting paid by a flat rate or some certain amount of money and if you work out how much it is per call, it's a really small number- I mean it's a really large number. They're getting paid way too much money for each call. And so therefore this is not in the interest of the public and it's a rip-off. That was basically the claim. So he made that claim; he tried to sell it and federal lawsuit didn't go anywhere; it was eventually dismissed. He sent it out to all the media outlets to people like me, to see who would, you know, champion this cause. Nobody. Until he got the attention of the sheriff, and the sheriff I think referred him to his dirty tricks squad and said, 'Hey, this guy has something bad to say about one of the people who has oversight over me, Sheila Kuehl, and Patty Giggans',

**IAB IV 2558097**          **Page 31 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

who was at the time the chairman of the Civilian Oversight Commission. And I think they went to town on it. They got a warrant. There's a whole bunch of litigation regarding that warrant and blah blah blah, so on and so forth, and the warrant included getting personal identifying information for the people who called the hotline, even though the hotline's supposed to be confidential, and they wanted to get the names and contact information for all the people who'd called the hotline, and they got a judge to sign off on that, whatever. So that's how Adam Lowe came into my life and how he became relevant.

And a bunch of things happened after that. Eventually he had that conversation with Lillienfeld, which he- and then he took the tape and put it out on the internet. And we tried to get a copy of it after he put it on the internet and he refused to give it to us and wrote a bunch of weird.. things that looked like motions, like legal motions, but he didn't file them or anything; he just sent them to us. He never showed up, so he's in contempt of court except that we haven't certified it to the court. We told the Attorney General's office 'cause I figured, you know what, at the end of the day I don't have the power to do anything. If Lillienfeld is shaking down citizens with threats from Murakami, I can't do anything about it. I've told the public 'til I'm blue in the face about the illegal things happening at the Sheriff's Department. I've told the Attorney General; I've told the DA's office. You know, what's the point? If they want to go get that recording and litigate it, they can. I've got more important things to litigate. So that was the Adam Lowe thing, but once we subpoenaed that from Adam Lowe, he came to dislike me immensely. And so in that letter, as you can see, he said that I'm harassing his family and doing horrible things. The only thing we did is we served him with a subpoena.

**Herrera:**    [unintelligible 12447] saying that you had an obligation to investigate Sheila Kuehl or anything like that, in your capacity as an IG or in oversight.

**Huntsman:**    No I don't think he said that. I think I ended up just on his email list, because - and I often do - there's a lot of people - not a lot, but a few - very enthusiastic people who might be insane, but I don't know, who send regular emails and they attach me on because I have an interesting title that sounds like I might care. And so I get, like, stuff about the Veterans Administration all the time. It has nothing to do with me. So I don't know that he thought I had any direct responsibility including, I think by now he's had lots of conversations with the sheriff and so he has decided that I'm, you know, part of the evil empire that Sheila Kuehl is running or something. But I don't think in the early days, when he put my name on it, he had any reason to think that I had

**IAB IV 2558097**          **Page 32 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

responsibility over it or did he ever say that to me. He never said, 'Hey Max, you should investigate this.' He did- I've actually talked to him a couple of times 'cause he runs something called the AMFED. He uses a pseudonym: Jack London, I think, and puts out a bunch of kind of odd things on the internet. And he made some PRA requests and whatnot. And I had some conversations with him and he was relatively straightforward in the early days, before he had decided that I was evil, about [unintelligible 12601] that he was trying to collect and do.

He's an interesting fellow, but I think he's- He used the term Max-Gustaf and even before this letter I'd seen him use it - I forget where or when, but in, like, one of his AMFED things. The Federalist Society of course, you probably know from law school, is a conservative group.

**Herrera:**     Personally.

**Huntsman:**     The AMFED is I think something he just made up, but I think he uses that term because he's a sort of conservative- he views himself as a conservative commentator. I don't know if he really is, but that's kind of where his sympathies seem to lie, but I don't- you know, he hasn't said.

**Herrera:**     And it sounds like the only place where you might've had a public.. where the name Max-Gustaf was used publicly was the maybe the state bar.

**Huntsman:**     Yeah, if you look me up on the state bar, it used to say Max-Gustaf; now it says Max-Gustaf or Max, depending on which one you pull up. But before I changed that, which was when this was all going down, if you had, you know, typed an attorney search, it would say Max-Gustaf Huntsman. And so my- I have no basis to know this, but my guess is that Adam Lowe did that: pulled up my name, said 'Hmm this is interesting, I'd better look into this,' and started running my name and, you know. I've done the same thing. I Googled. I was, like, where the hell did he come to this? Is there some guy named Max-Gustaf Edler or Max-Gustaf Huntsman or something who's a Holocaust denier? And I didn't find anything. But I think Adam Lowe has more free time on his hands and I think he probably found some Holocaust denier database that is kept by somebody and found some name on it that is close enough that he decided that's me.

**Herrera:**     And you say he used your name in the past. Where do you recall him using your name?

**IAB IV 2558097**              **Page 33 of 37**              **MAX HUNTSMAN**

**CONFIDENTIAL**

**Huntsman:** Either in email communication or maybe in some posting on the AMFED, but I don't recall precisely where I saw it. I could try to hunt it down.

**Herrera:** So would you say that, if I look at his site there's going to be more than that, like more references to you in his site, that there's more than that?

**Huntsman:** Not much. There's a lot of weird stuff on his site and it's come and gone. He mentioned me on the site once or twice I think, but not in any great detail and I- He might've said Max-Gustaf there, but he might've also done it in one of those emails he sent; I don't remember. All I know is, when the sheriff used Max-Gustaf, I was, like, 'Woah that's weird!' and then I thought, 'Hm, I've seen that before; I've seen that from Adam Lowe' because I think at some point he had used it in passing. But this letter that you see recently where he uses it repeatedly, as Edler in parentheses and then calls me Max-Gustolf, or whatever he does, spells it a different way, that's the first time.

**Herrera:** Oh no, I'm saying okay, yeah.

**Huntsman:** Yeah, that's the first time he's, like, really gone into detail in writing that I've seen. So that kind of makes me think I was right about my guess about where the sheriff got this from, but I don't know.

**Herrera:** And to your knowledge, do you have any sense of whether he's talked to you on KFI more than just the information that you provided in terms of that radio call?

**Huntsman:** The sheriff talking about me on KFI?

**Herrera:** Uh-huh.

**Huntsman:** Oh yeah. Oh no, I gave you just a little tiny bit having to do with this issue. The sheriff talks about me all the time on any media outlet he can: FOX, Hannity, the.. he does an Instagram, does video sometimes, his Facebook videos, and he regularly talks about me 'and my evil ways'. Many many times over the past years.

**Herrera:** And is he referring to you as Max-Gustaf in those talks?

**Huntsman:** I don't know that he does in most cases. When this happened, he- there was a brief time where he seemed to use Max-Gustaf more often, but I think he lost it, his attention wavered a bit and so. Usually in correspondence he'd call me Max Huntsman and he had previous to this until he did that a couple of times, and subsequently he's gone back

IAB IV 2558097                    **Page 34 of 37**                    **MAX HUNTSMAN**

**CONFIDENTIAL**

to Max Huntsman, with a few exceptions here and there. But in general he does not call me Max. He doesn't, like, every time call me Max-Gustaf and, you know, make a big deal out of it. That's not the case. Usually he calls me Max Huntsman 'cause that's the name I use and that's what people know. If he talks about Max-Gustaf, nobody's going to know who it is. But, now and again he's done it, but not every time at all.

**Herrera:**     When he got the scrutiny after the editorial, the comments to the Editorial Board, did he go back to using Max Huntsman?

**Huntsman:**   He has, but I didn't get the impression he did it quickly as a reaction or something, but I don't know. Yes, like in letters and things, they still use Max Huntsman, but they never really went away from it. Like I say, he always threw the Max-Gustaf in once or twice, and from that I drew- He knows darn well my name is Max Huntsman. He uses Max Huntsman in formal letters and so he knows. Whenever he uses Max-Gustaf, it's an intentional thing that he's doing to make a point. Like I say, I never got the impression that it was a habit. I don't think he switched to calling me Max-Gustaf all the time. I think he did it in a couple of targeted instances. But yeah, no, he didn't- When he got the heat about the Holocaust thing, he didn't have a lot to say except for when the Times Editorial Board was talking to him, in which he said he had two sources, and he wouldn't say who they were. He didn't talk about it much after that, that I'm aware of. He may have, but I didn't hear about it.

**Herrera:**     Is there anything else I should know? Anything that I've missed that I haven't asked you about? I know I've taken a lot of your time and I appreciate you being so available.

**Huntsman:**   I appreciate you asking all the questions. I'm sure I could think of lots more things to say, but I don't know that they'd be terribly productive and they'd take up even more of your time, so. I think I've kind of laid things out well enough. I think you get the gist of it and.. I'm available if you have any additional questions in the future.

**Herrera:**     Thank you so much. I really appreciate it, and to the extent that there's any other articles or any other thing that you think I should be aware of, you're certainly- more than welcome to email it to me and send it to me. I obviously will be doing my own scouring of the internet to make sure that I've caught any type of references or any other referrals to it. But, you know, certainly with, like, for example, the KFI, you know, I'm probably limited in being able to know how many times he's mentioned you 'cause I don't know that they're really going to catalogue that. So if there's any other instances of that or anything else that you become

**IAB IV 2558097**              **Page 35 of 37**                **MAX HUNTSMAN**

CONFIDENTIAL

aware of, I'd be grateful if you would let me know. But certainly on our end we will make sure that we try to do our best to make sure we capture any other references so that we're aware of any other times where he's made those same kind of references to that.

**Huntsman:** And if it comes up again, I mean, if he starts doing it again or something, I will certainly let you know.

**Herrera:** Great. Oh and.. I did forget my part of the admonition of "retaliation is not tolerated at the county. It is against, obviously, county, state and federal law. If you feel like you're a victim of retaliation in any way, I want you to let me know and I would escalate it to the proper person. Likewise, we ask that you don't retaliate against anyone who is participating in this investigation. All allegations of retaliation are taken very seriously." So.

**Huntsman:** Let me extend to that. Esther and I have talked, about her concerns. She wanted me to be a representative for her when she thought she was going to be interviewed by the Sheriff's Department. So I'm glad that you are doing it and not them. I would very much like to protect her from retaliation. Me? I get retaliated by the sheriff every chance he gets and he would do that independent of this. So he's not going to retaliate against me for this; he's retaliating against me for previous things. So I'm not too worried about that. He's going to do everything he can and nobody can stop it. But Esther Lim, she's in a dangerous spot, you know. So if you ever find yourself in a situation where you're aware of some retaliation against her and there's anything I can do to help with it, please let me know. Because like you say, the County is supposed to stop people from being retaliated against and I think she's much more vulnerable than I am.

**Herrera:** Alright. And, you know, this type of work only works to deal with these types of investigations if you make people- you know, if you protect them and make every effort to maintain the confidentiality and so I am very mindful of that and will, you know, make every effort to.

**Huntsman:** And obviously I'm not the first person you should call because that would be breaking confidentiality.

**Herrera:** Which I wouldn't do.

**Huntsman:** But if in the course of finding something out you learned there is a problem and there's anything that somebody whose title is Inspector General can do to help about it, then tell the appropriate parties, 'Hey you know, Huntsman would jump at the chance to be helpful in this

**IAB IV 2558097**          **Page 36 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL

COLA002090
EXHIBIT 38 - Page 647

regard.' I have informants who have had retaliation attempts from the sheriff and I have done things using my official powers to try to put him on notice, that we're watching and done things to try to protect informants myself. So I don't know that there's probably much- I mean, all the things he can do he does from a distance and he's going to do anyway, but, and he probably can't get under the skin and do the things that he does to his own employees, but.. anyway. It's a matter of more concern for me than my own personal retaliation 'cause I, you know, I know he's going to unload on me in every way he can every opportunity he gets and it's independent of this. It's not 'cause of this; it's not retaliation. But her, you know, she's a little bit below his radar and this process could quickly onto his radar and that's of concern. So I just mention it in case you find yourself consulting with County Counsel in an opportunity to suggest something, feel free. Just be aware that I would love to help if I could.

**Herrera:**   Thank you so much for that information and I appreciate it. You have a great rest of your day. I'm going to go off the record at 3:38 PM. Have a good day. Thank you.

**Huntsman:**   Okay. Bye bye.

**Herrera:**   Take care.


HUNTSMAN, MAX                (IAB) IV 2558097
WPU
plw

CONFIDENTIAL

# EXHIBITS

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL

<table>
<tr><td>

For CISU Use:

(Method of Receipt)

**Online**

**ICMS #** 2022-112213

</td></tr>
</table>

# COUNTY POLICY OF EQUITY

## REPORT / NOTIFICATION FORM

**Methods of Reporting Potential County Policy of Equity (CPOE) Violations:**

1. You may use this form to report a potential violation of the CPOE;
2. File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);
3. Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or
4. Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

☐  Yes **(Do not check 'Yes' if you are a reporting supervisor/manager).**

☑  No (If no, please proceed to Question #2).

**2. Are you filing this complaint for :**

☐  **Yourself** (If filing this complaint for yourself, please start at Section A).

☑  **Someone else** (If you are filing this complaint for someone else, please start at Section A).

☐  **Someone else: I am a reporting supervisor/manager** (please start at Section A).

---

**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expection that the CPOE complaint notification be submitted online at https://ceop.bos.lacounty.gov.

CONFIDENTIAL

COLA002094

**EXHIBIT 38 - Page 651**

**Section A:** **Reporting Party Information**                                          Today's Date: <u>03/09/2022</u>

| | | | | | |
|---|---|---|---|---|---|
| Name | <u>MAX HUNTSMAN</u> | Emp # | <u>e410745</u> | Title | <u>INSPECTOR GENERAL (UC)</u> |
| Work # | ██████████ | Mobile # | _____ | Work Hrs | _____ |
| | | | | RDO | _____ |

| | |
|---|---|
| Department | <u>BOARD OF SUPERVISORS</u>   Dept Head _____ |
| Unit of Assignment | <u>OFFICE OF INSPECTOR GENERAL</u> |
| Work Address | <u>561 BRADFORD ST. PASADENA CA 91105</u> |
| Immediate Supervisor | <u>JEFFREY LEVINSON</u> |

**Date & Time Form Completed:** 03/09/2022 07:57 AM

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

☐    Yes (if yes, fill in details):

     Name of Supervisor Notified:

     Date:   <u>NOT AVAILABLE</u>

     How:

☐    No

☐    Do not know

---

CONFIDENTIAL

COLA002095

**EXHIBIT 38 - Page 652**

**Section B:  Complainant(s) Information**

| | | | | | |
|---|---|---|---|---|---|
| Name | MAX HUNTSMAN | Emp # | e410745 | Title | INSPECTOR GENERAL (UC) |
| Work # | ███████ | Mobile # | | Work Hrs | |
| | | | | RDO | |

| | | | |
|---|---|---|---|
| Department | BOARD OF SUPERVISORS | Dept Head | Celia Zavala |
| Unit of Assignment | OFFICE OF INSPECTOR GENERAL | | |
| Work Location | OFFICE OF INSPECTOR GENERAL | | |
| Immediate Supervisor | JEFFREY LEVINSON | | |

CONFIDENTIAL

COLA002096

**EXHIBIT 38 - Page 653**

**Section C:  Alleged Involved Party(ies) Information**

| | | | | | |
|---|---|---|---|---|---|
| **Name** | ALEJANDRO VILLANUEVA | **Emp #** | e246296 | **Title** | SHERIFF/UNCLASSIFIED |
| **Work #** | (562) 694-2400 | **Mobile #** | | **Work Hrs** | |
| | | | | **RDO** | |

**Department**          OTHER - Sheriff          **Dept Head**

**Unit of Assignment**          OFFICE OF THE SHERIFF

**Work Location**          HALL OF JUSTICE

**Immediate Supervisor**

CONFIDENTIAL

COLA002097

**EXHIBIT 38 - Page 654**

**Section D:** **Alleged Witness(es) Information (if they can be identified)**

CONFIDENTIAL

COLA002098
**EXHIBIT 38 - Page 655**

**Section E:  Nature of Complaint or Issue(s)**

1.  What is the date of the alleged potential violation(s)?:  March 8, 2022

2.  Please provide a detailed summary of the alleged potential violation(s):

As reported by RP/CP Huntsman: "...T[]he Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack."  RP/CP writes, " My birth name was Max-Gustaf Edler.  My father did not participate in raising me and so I took my mother's family name Huntsman as a law student with the help of a firm I clerked for. As Inspector General I have never used any name other than Max Huntsman, which is also my name on my driver's license and passport.  A county computer system continues to incorrectly list my first name as Max-Gustaf and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks.  I believe this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as foreign (German or Jewish)."

3.  Why does the Complainant(s) believe the treatment occurred/is occurring?:

Race

CONFIDENTIAL                                COLA002099

**EXHIBIT 38 - Page 656**

**Section F:  TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

Date & time supervisor/manager observed and/or was notified of the alleged potential violation(s):

n/a

How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):

What action(s), if any, did the supervisor/manager take? (Explain in detail):

Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following? (If so, please explain in space provided):

Medical Attention:

Protection:

Separation from Alleged Involved Party (ies):

Other Assistance:

Did the supervisor/manager advise the Complainant(s) that they:

May seek confidential counseling or assistance from County's Employee Assistance Program (EAP) at (213) 738-4200.

May contact the County Intake Specialist Unit (CISU) directly at (855) 999-2367, or via email at ceop@bos.lacounty.gov

CONFIDENTIAL

COLA002100

**EXHIBIT 38 - Page 657**

**COMPLAINT SUBMISSION**

By submitting this complaint I am declaring, under penalty of perjury under the laws of the State of California, that:

- The facts set forth herein are true and correct and based on my own knowledge, except as to matters stated on my information and belief, and as to those matters I believe to be true;

- I believe that the facts alleged herein are jurisdictional to the County Policy of Equity (accessible at: https://ceop.bos.lacounty.gov), are not duplicative of facts set forth in previously filed County Policy of Equity complaints that I have filed, and

- The filing of this County Policy of Equity complaint is not a misuse or abuse of the County's Policy of Equity Complaint Process.

MAX HUNTSMAN

Printed Name

_____

Signature

March 9, 2022

Date

CONFIDENTIAL

COLA002101

**EXHIBIT 38 - Page 658**

**OPTIONAL:** **Please provide the information below for statistical purposes only**

**Race/Ethnicity:**

*"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that required the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." - (eeoc.gov)*

☐ Hispanic or Latino - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

☑ White (Not Hispanic or Latino) - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

☐ Black or African-American (Not Hispanic or Latino) A person having origins in any of the black racial groups of Africa.

☐ Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino) - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

☐ Asian (Not Hispanic or Latino) - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

☐ American Indian or Alaska Native (Not Hispanic or Latino) - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

☐ Two or More Races (Not Hispanic or Latino) - All persons who identify with more than one of the above five races.

**Gender:**

☑ Male

☐ Female

☐ Prefer Not to Answer

**Date of Birth:** 01/17/1965

CONFIDENTIAL                                                  COLA002102

**EXHIBIT 38 - Page 659**

# EXHIBIT B

CONFIDENTIAL

<table>
<tr><td>

**For I.S.U. Use Only**
Method of Receipt
☐ Telephone
☐ In Person
☐ POE Report Form
☑ Other: CPOE
Intake # 22-045

</td></tr>
</table>

## Policy of Equality
## Report / Notification Form

**General Instructions:** Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Section A:**    Reporting Party Information           Today's Date: __03__ / __17__ / __2022__

Name: __Huntsman, Max__                Emp. #: __410745__        Rank/Title __Inspector General__

Work Tel# ▓▓▓▓▓▓ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

Unit of Assignment: __Office of Inspector General__    Unit Commander: __Jeffrey Levinson__

Division __LA County Board of Supervisors__

Name of Supervisor Completing this form (if different from above): __B-1 Deputy Jonathan Lested__  # __467422__

Date & Time form completed: __03__ / __17__ / __2022__ ; __1200__ hours.

☐    Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?

    ☐    Yes (if yes, fill in details)

        Who: _____

        When: Date: _____ / _____ / _____ ; Time: _____ hours.

        How _____

    ☐    No

    ☑    Do not know

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Section B:**    Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: __03__ / __08__ / __2022__ ; _____ hours or

between _____ / _____ / _____ and _____ / _____ / _____

If multiple incidents or unknown, explain: _____

See narrative. _____

_____

_____

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Section C:**    Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

__Same as RP_____ Employee # _____ Rank/Title _____ UOA _____

Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____

Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____

Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

CONFIDENTIAL

COLA002104

**EXHIBIT 38 - Page 661**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Section D:</u>    Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro   (Sheriff) _____    Employee # __246296___    UOA Office of Sheriff

_____    Employee # _____    UOA _____

_____    Employee # _____    UOA _____

_____    Employee # _____    UOA _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Section E:</u>    Alleged Witness(es) (if they can be identified)

<u>None Stated</u> _____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours ____ - _____ RDO _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Section F:</u>    Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity report (ICMS #2022-112213) from CEOP Executive Director Vickey

Bane, filed by RP/CP Max Huntsman on March 9, 2022.  The narrative of the complaint stated, in part, the following

(verbatim): "...The Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack."

"My birth name was Max-Gustaf Edler. My father did not participate in raising me and so I took my mother's family name

Huntsman as a law student with the help of a firm I clerked for.  As Inspector General I have never used any name other than

Max Huntsman, which is also my name on my driver's license and passport. A county computer system continues to incorrectly

list my first name as Max-Gustaf and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks.  I believe

this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as

**Ask: "Why do you believe this treatment is occurring?"**    (☑ Check, if narrative is continued onto the next page)
Race

_____

_____

_____

_____

_____

_____

_____

Revised 10/06                                    2                        POE -001

Section F (cont'd):          Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

foreign (German or Jewish)."

(ISU Note: For details, refer to copy of CPOE complaint contained in ISU efile.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Note: Continue onto the next page**

CONFIDENTIAL

COLA002106
**EXHIBIT 38 - Page 663**

<u>Section G:</u>    Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY. DO NOT FILL OUT THIS SECTION IF YOU ARE THE ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made:  __03__ / __16__ / __2022__ , __1521__ hours.

How did you become aware of the potential violation (explain in detail):
The ISU received CPOE ICMS #2022-112213, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Jonathan Lested to document the allegation in the County Policy of Equity

Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑ Medical Attention
   **Response:** to be ascertained
☑ Protection
   **Response:** to be ascertained
☑ Other Assistance
   **Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑ May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours, request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: _____ Date & Time: ____ / ____ / _____ , _____ hour.
                                         (Name)

☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: __03__ / __16__ / __2022__ , __1521__ hour.    How?: ☑ e-mail  ☐ Fax  ☐ County mail

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

COLA002107

**EXHIBIT 38 - Page 664**

Section H:    **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name:   B-1 Deputy Jonathan A. Lested            Emp. #: 467422

Day, Date and time ISU received form Thursday          / 03 / 17 / 2022 , 1215 hours.

☐ Referred to Equity Unit: Date & Time -   ____ /____ / _____ ,  _____hours.

☑ If not referred to Equity Unit, explain in detail action taken:
"B" assessment authored by DCO Sieberg received on 04/07/2022.

Additional Information (if any):   _____

☐    Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☐ Subject's Unit Commander
☐ Reporting Party's Unit Commander
☐ Victim's Unit Commander

Revised 07/10                          5                    POE -001

CONFIDENTIAL                                    COLA002108
                                                  **EXHIBIT 38 - Page 665**

# EXHIBIT C

CONFIDENTIAL



IV 2558097
EXHIBIT C

# MISCELLANEOUS DOCUMENTS

CONFIDENTIAL

SH-AD-703 Revised (2/22)

**COUNTY OF LOS ANGELES**
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    June 27, 2022

FILE NO:

OFFICE CORRESPONDENCE

**FROM:** JASON P. WOLAK, COMMANDER
PROFESSIONAL STANDARDS DIV.

**TO:** RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT:**    **REQUEST FOR** INTERNAL AFFAIRS BUREAU ADMINISTRATIVE INVESTIGATION

Incident Date(s): *(use semi-colons to separate multiple dates)*
Between March 5, 2022, and March22, 2022

Synopsis:

POE 22-045.  It is alleged that Subject Villanueva acted in an inappropriate POE related
manner while in the workplace.

Date a Sergeant, or above, became aware of an act, omission, or other misconduct:
March 16, 2022

One Year Statute Date (If criminal monitor, leave blank):  March 15, 2023

Alcohol Related?    NO

Citizen Complaint? NO            If yes, SCR #:

Complainant's Name (Add employee number if a Department member)
Max Huntsman, Office of Inspector General, #410745

## REQUEST FOR IAB INVESTIGATION AND/OR CRIMINAL MONITOR

**Involved Subject** *(For additional subjects, use Subject Continuation Page 703-A)*

**Subject Name, Rank, Employee Number, and Unit of Assignment:**
Alex Villanueva, Sheriff, #246296, Office of the Sheriff

Potential MPP Violation(s):

3-01/121.10 - POE Discrimination; 3-01/121.20 - POE Harassment Other than Sexual;
3-01/121.25 POE Third Party Harassment;
3-01/121.30 POE Inappropriate Conduct Toward Others

Subject's Assignment/Duty Status:
- ☑ Subject's assignment/duty status unchanged
- ☐ Relieved of Duty (ROD), assigned to home    ROD Date:
- ☐ ROD, assigned to a relieved of duty position
- ☐ Probationary Employee

Justification for the subject's assignment/duty status *(required)*:
N/A

Consideration(s) for IAB Request:
* Mandatory IAB Investigation

- ☐ Witnesses are spread over a large geographic area.
- ☐ The nature of the allegation(s) involves incidents of high media attention.
- ☐ A subject is a supervisor or manager (lieutenant or above; assistant director or above).
- ☐ The nature of the allegation(s), if founded, will likely result in discharge.*
- ☐ The allegation(s) concern family/domestic violence.
- ☐ The allegation(s) concern workplace violence.*
- ☐ The allegation(s) concern profiling or bias against members of the public.*
- ☑ Other: Allegations contain Policy of Equality*

☐ Criminal Monitor by IAB (Refer to MPP 3-04/020.30 – Internal Administrative and Criminal Investigations) *enter investigating agency, crime, and report number:*

Supervisory Inquiry authored?    ☐ Yes  ☑ No

Contact person for source documents (i.e.: supervisory inquiry and/or investigative materials) at the requesting unit:

Prepared by Unit Commander/Director, or designee:
Lieutenant John Carter, #435532, Internal Affairs Bureau

**NOTE:  Email this form to "IAB Investigation Requests."  A review of this request will be conducted by the Internal Affairs Bureau. There may be situations when the Internal Affairs Bureau will decide, upon initial review, to return the case to be conducted as a unit level investigation.**

**For IAB use only**

Assigning Lieutenant  Lieutenant John Carter, #435532

IAB Investigator      Christine Diaz-Herrera, Esquire, Sanders Roberts LLP

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558097

OFFICE CORRESPONDENCE

| FROM: | EDWIN A. ALVAREZ, CHIEF<br>PROFESSIONAL STANDARDS DIVISION | TO: | RON KOPPERUD, CAPTAIN<br>INTERNAL AFFAIRS BUREAU |
|---|---|---|---|

**SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION**

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER:

Alex Villanueva, Sheriff, #246296

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct):

03/16/2022

Potential MPP Violation(s) including, but not limited to:

3-01/121.10 POE - DISCRIMINATION
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description):

It is alleged you acted in an inappropriate POE related manner and in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been rescinded. You are being ordered by your Unit Commander that during the time this investigation is active, any routine absence request must be submitted directly to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:

| Subject: _____ | Witness: _____ |
|---|---|
| Employee #: 246296 Date: 6/29/22 | Employee #: 410429 Date: 6/29/22 |

Manual of Policy and Procedures : 3-01/121.10 - Policy of Equality - Discrimination

## 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL                                                      COLA002115
                                                                      **EXHIBIT 38 - Page 672**

Manual of Policy and Procedures : 3-01/121.20 - Policy of Equality -  Harassment (Other Than Sexual)

## 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited.  Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002116
**EXHIBIT 38 - Page 673**

# 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander. When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior. The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

CONFIDENTIAL                                        COLA002117
**EXHIBIT 38 - Page 674**



## 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

CONFIDENTIAL

CONFIDENTIAL

# EXHIBIT 39

EXHIBIT 39 - Page 677

# INVESTIGATOR'S LOG

| | FILE NUMBER: | IV 2558097 |
|---|---|---|
| | INVESTIGATOR: | Sanders Roberts LLP |
| | DATE DEPARTMENT BECAME AWARE OF ALLEGATION(S): | 03/16/2022 |
| | DATE IAB INVESTIGATION INITIATED: | 06/27/2023 |
| | DATE SENT TO ADVOCACY UNIT: | |
| | DATE RETURNED FROM ADVOCACY UNIT: | |
| | DATE FORWARDED TO FORCE OR RISK REVIEW: | |
| | DATE RETURNED FROM FORCE OR RISK REVIEW: | |
| | DATE TO DIVISION: | |
| | DATE RETURNED TO IAB: | |

**CASE SUMMARY:**

| DATE | SUMMARY | NAME |
|---|---|---|
| 06/22/22 | Attorney Client Privilege | Lt. Carter |
| 06/23/22 | Attorney Client Privilege | Lt. Carter |
| 06/24/22 | Commander Wolak called and informed me to handle this matter in the same fashion as the previous involved Sheriff cases. | Lt. Carter |
| 07/07/2022 | Per Ms. Real, hard case delivered to Ms. Diaz Herrera's office | Lt. Carter |
| 08/03/22 | Emailed Ms. Diaz Herrera for an update. | Lt. Carter |
| 10/03/22 | Sent email to Ms. Diaz Herrera re: case status. | Lt. Carter |
| 10/13/22 | All interviews have been completed, except for the Sheriff. Will attempt to schedule a date by 10/14/22. | Lt. Carter |
| 11/02/22 | Sent email to Ms. Diaz Herrera re: case status. | Lt. Carter |
| 11/07/22 | Re-inquired about case status. | Lt. Carter |
| 11/14/22 | Completed all the interviews necessary for the Huntsman matter, with exception of Sheriff Villanueva. She has reached out to Commander Satterfield to sched Sheriff Villanueva's interview. She does not have a date sched for the interview yet. | Lt. Carter |
| 11/30/22 | I sent Commander Satterfield and Capt. Blanchard an email | Lt. Carter |

Page **1** of 3

# INVESTIGATOR'S LOG

| | | |
|---|---|---|
| | asking them to contact the attorney in order to set up an interview with Sheriff Villanueva. | |
| 11/30/22 | Commander Satterfield and Capt Blanchard called and informed me that they never received any requests for interviews for Sheriff Villanueva. | Lt. Carter |
| 12/13/22 | Sent email to Ms. Diaz Herrera regarding update. | Lt. Carter |
| 01/04/23 | Certified letter sent requesting an interview with the subject, Villanueva. | Lt. Carter |
| 01/09/23 | Former Sheriff Villanueva contacted the attorney. | Lt. Carter |
| 01/12/23 | Attorney Client Privilege | Lt. Carter |
| 02/02/23 | Sent an email requesting a case status. | Lt. Carter |
| 02/21/23 | Sent another email, no response. | Lt. Carter |
| 03/05/23 | Sent a 3rd email requesting an update. | Lt. Carter |
| 03/09/23 | Ms. Diaz Herrera responded. Villanueva is not cooperating. Attorney Client Privilege | Lt. Carter |
| 03/09/23 | Briefed Chief Lecrivain and are moving forward with the case. | Lt. Carter |
| 04/03/23 | Per Ms. Diaz-Herrera, she advised Shawn Thomas was reassigned all 4 cases. | Lt. Carter |
| 04/18/23 | Sent email to new council Shawn Thomas regarding an update. | Lt. Carter |
| 04/19/23 | Received update- Outside counsel have undertaken to draft a final report using interview and relevant evidence. | Lt. Carter |
| 05/15/23 | Attorney Shawn Thomas sent an email stating he would send the Hunstman case back to IAB this week. | Lt. Carter |
| 06/14/23 | Emailed Mr. Thomas regarding 4 POE cases. 2 cases (Huntsman, Lim) are ready for pick up. IAB LET and Risk Management LET not available until next Tuesday (6/27/23). | Lt. Carter |
| 07/05/23 | Lt. Ann Devane took over the POE team, Lt. John Carter explained the process of reviewing, completing and stacking the case. | Lt. Devane |
| 08/16/23 | Reviewed zoom interview with Complainant Huntsman | Lt. Devane |
| 08/24/23 | Converted zoom interview to wave file to send out and have the interview transcribed | Lt. Devane |
| 08/28/23 | Received transcripts | Lt. Devane |

Page **2** of 3

COLA002430
**EXHIBIT 39 - Page 679**

# INVESTIGATOR'S LOG

| 09/12/23 | Worked on completing required documents to stack the case | Lt. Devane |
|---|---|---|
| 09/21/23 | Reviewed transcripts and compared to the summary written by Saunders Roberts LLP, and confirmed the statements made by Complainant Huntsman were all documented in the summary. | Lt. Devane |
| 09/26/23 | Requested Subject Villanueva's training record and copy of Policy of Equality notification form, unable to locate either, per IAB Secretary V. | Lt. Devane |
| 09/26/23 | Stacked case and submitted to IAB Captain Kopperud for review. | Lt. Devane |
| 10.2.23 | *reviewed - approved* | *R Kopperud* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Page **3** of **3**

# EXHIBIT 40

EXHIBIT 40 - Page 681



**Alex Villanueva**
@LACoSheriff_33                                    ...

(1/11) Although I waited 1hr 20min to speak with COC today, I was
unable. Please read my statement:

This commission was informed my legal counsel was not available today.
I am appearing here today without counsel because you refused to
continue this appearance to another date.



10:49 AM · Oct 21, 2021

← **Thread**

💬        ↻        ♡        🔖        ⬆️

👤   Tweet your reply!                              Reply

---

**Relevant people**

**Alex Villanueva**           Follow
@LACoSheriff_33

This is an archive account of the
33rd Sheriff of Los Angeles County.
Account maintained by LASD
Sheriff's Information Bureau (SIB).

---

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(2/11) I am here to answer questions. It is my understanding you want to
ask questions about the statements I made where I implied public
officials have committed crimes, and other issues raised in Commissioner
Sean Kennedy's inaccurate memorandum.

💬 2        ↻ 3        ♡ 16        ᴫ        ⬆️

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(3/11) To be perfectly clear, I am here voluntarily.  I have appeared 3 times
before voluntarily, and I am appearing here again voluntarily; in addition I
do not believe your subpoena authority requires my, or my undersheriff's,
appearance under oath.

💬 1        ↻ 4        ♡ 15        ᴫ        ⬆️

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(4/11) Also know that criminal investigations undertaken by my office are
the exclusive purview of my department and your request for information
while it is still pending exceeds OIG and COC subpoena power authority
under the subpoena statute AB 1185, and is interference.

💬 1        ↻ 2        ♡ 16        ᴫ        ⬆️

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(5/11) The indictment for 20 counts of corruption of Former Chair of the
Board of Supervisors, Mark Ridley-Thomas, who appointed most of you,
should highlight why active investigative information cannot be provided

COLA000001
EXHIBIT 40 - Page 682

to you publicly until completed.

💬 3        🔁 4        ♥ 19        📊        📤

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(6/11) Furthermore, your subpoena to be questioned under oath violates
the Public Safety Officer Bill of Rights of myself and my undersheriff. I will
answer questions about closed investigations with proper advanced
notice and by sending the Person Most Knowledgeable.

💬 1        🔁 3        ♥ 18        📊        📤

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(7/11) However, this seems unnecessary since Commissioner Sean
Kennedy spent almost 4-hours being briefed by my investigators on the
cases in his memorandum; many of which IG Max-Gustaf Huntsman had
been briefed on years earlier and chose not to share the information.

💬 1        🔁 3        ♥ 14        📊        📤

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(8/11) Also know the County had the opportunity to clarify the issue of
being placed under oath during the prior hearing regarding subpoenas,
yet the County intentionally avoided having the judge rule on the issue.

💬 1        🔁 2        ♥ 13        📊        📤

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(9/11) When this issue is addressed, I will argue Government code section
53060.4 limits the scope of the OIG's subpoena power, & 25303.7 must
be read in conjunction with 25303, that subpoening under oath is in
excess of the OIG's powers: monitor, inquire, audit & investigate.

💬 3        🔁 2        ♥ 14        📊        📤

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(10/11) The subpoena is unnecessary, because there is no investigation. I
will have my attorneys argue that I and members of my department
should be protected from undue annoyance, burdensome procedures,
and harassment.

💬 5        🔁 5        ♥ 29        📊        📤

**Alex Villanueva** @LACoSheriff_33 · Oct 21, 2021        ...
(11/11) Since the Board of Supervisors passed a resolution instructing
County Counsel to advise them regarding methods to remove me from
office, this is clearly political, and not a fact finding inquiry, but a gross
abuse of power.

💬 21        🔁 4        ♥ 39        📊        📤

**Relevant people**



**Alex Villanueva**
@LACoSheriff_33

This is an archive account of the
33rd Sheriff of Los Angeles County.
Account maintained by LASD
Sheriff's Information Bureau (SIB).

[ Follow ]

# EXHIBIT 41

EXHIBIT 41 - Page 684

← **Tweet**

 **Alex Villanueva**
@LACoSheriff_33                                                    ⋯

Once again, we have received unproven allegations alleging "deputy gangs" by Inspector General Max-Gustav Huntsman. Sheriff Alex Villanueva remains committed to transparency and accountability. #lasd @LACoSheriff

Report any evidence of misconduct at:
lasd.org/report-employe...



5:05 PM · Mar 22, 2022

COLA000003
**EXHIBIT 41 - Page 685**

# EXHIBIT 42

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 42 - Page 686

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000020.mp4**

**COLA000020**

**EXHIBIT 42 - Page 687**

# EXHIBIT 43

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 43 - Page 688

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000021.mp4**

**COLA000021**

**EXHIBIT 43 - Page 689**

# EXHIBIT 44

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 44 - Page 690

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000022.mp4**

**COLA000022**

**EXHIBIT 44 - Page 691**

# EXHIBIT 45

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 45 - Page 692

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000023.mp4**

# EXHIBIT 46

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 46 - Page 694

## NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000024.mp4**

**COLA000024**

**EXHIBIT 46 - Page 695**

# EXHIBIT 47

EXHIBIT 47 - Page 696

**From:** Sheriff Department Announcement <sheriffdeptannouncement@lasd.org>
**Sent:** Saturday, March 5, 2022 2:24 PM
**To:** Exch_User_Group <all_sdn_users@lasd.org>
**Subject:** MESSAGE FROM THE SHERIFF: TRANSPARENCY AND ACCOUNTABILITY*****



# MESSAGE FROM THE SHERIFF

The Sheriff's Department's social media accounts are a primary tool to communicate with the public directly, without the often-biased filters of traditional news sources. Our Twitter, Facebook, and Instagram accounts provide accurate, relevant information on matters that are of concern to the community and department members. We post both the good and the bad that impacts our department's operations, and we do NOT censor bad news. To do so would turn us into a discredited propaganda machine.

Since I've taken office, we've made a concerted effort to improve our transparency and accountability. Striking a balance between supporting the actions of our personnel and holding them accountable to the rule of law is no easy task.

Any suggestion that posting news about the arraignment of one of our own is driven by politics is sadly misguided. On Tuesday, March 1st, the corrupt Inspector General, Max-Gustaf Huntsman, told the Board of Supervisors that I've dismantled the discipline system within the department, without providing a shred of evidence. This is a lie.

Every deputy involved shooting is tragic for all involved. Regardless of the circumstances of the incident, loved ones will grieve the loss of their family member. We grieve as well, for the deceased and for the deputies who were in harm's way, who will face scrutiny from those who have expressed open hostility to law enforcement and stand to gain financially by fanning the flames of hatred.

The political climate today, post George Floyd, has created a climate where the public expects immediate action against deputies whom they assume are guilty regardless of circumstances.  My job is to support and defend deputies doing good work and hold accountable those who do not.  I will ensure due process and fairness to all, but keep in mind this is 2022, not 1982.

As we continue to serve our community, remember these three rules: Do the right thing, do the best you can, and always show people you care!  I appreciate the dedication, sacrifice, and hard work every member of this organization provides, and I am proud to lead you!

**ALEX VILLANUEVA**
**SHERIFF**

# EXHIBIT 48

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 48 - Page 699

## NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000018.mp3**

**COLA000018**

**EXHIBIT 48 - Page 700**

# EXHIBIT 49

## (SEPARATELY LODGED WITH COURT)

**EXHIBIT 49 - Page 701**

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA000019.mp3**

**COLA000019**

**EXHIBIT 49 - Page 702**

# EXHIBIT 50

EXHIBIT 50 - Page 703

5/31/23, 2:40 PM                    Editorial: Villanueva saga just gets odder, more destructive - Los Angeles Times

☰                          **Los Angeles Times**                SUBSCRIBE        LOG IN    🔍

OPINION

# Editorial: The Villanueva saga just gets odder and more destructive



L.A. County Sheriff Alex Villanueva said Inspector General Max Huntsman denies the Holocaust but gave no evidence. Huntsman called the claim untrue.

BY THE TIMES EDITORIAL BOARD

APRIL 1, 2022 11:01 AM PT

On Tuesday, Los Angeles County Sheriff Alex Villanueva sent the Times editorial board a letter explaining that he would "respectfully decline your invitation to participate in your editorial board's endorsement process for sheriff" and "obviously will not be participating in any associated interviews."

COLA000009
**EXHIBIT 50 - Page 704**

The letter, oddly, was received during our interview with him at 9 a.m., conducted via Zoom, as part of our endorsement process for the June election.

The interview itself was even odder, most notably for the out-of-nowhere, evidence-free assertion that county Inspector General Max Huntsman is a Holocaust denier.

Huntsman, in response to a Times editorial writer's question about Villanueva's accusation, said the allegation is completely false. "Of course the Holocaust was real," he said. He later sent the county Board of Supervisors a letter advising members of the conversation. The assertion is "such a deeply offensive allegation that I wanted you to hear from me that I have never denied the Holocaust," Huntsman wrote to the board.

We have been presented with absolutely no evidence that Huntsman, who is tasked with monitoring and overseeing the Sheriff's Department, is a Holocaust denier. The question this episode raises is about the sheriff: What kind of person — what kind of elected official and what kind of law enforcement officer — makes such a claim about someone and insists that he has proof but refuses to share it?

That's what Villanueva did. We had asked him what event precipitated a rift between him and the board early in his tenure, and he said it was his defeat of incumbent Sheriff Jim McDonnell in 2018, and then for whatever reason he added this non sequitur:

"You do realize that Max Huntsman, one, he's a Holocaust denier. I don't know if you're aware of that. I have it from two separate sources. And he filed a complaint against me because I refer to him as Max-Gustaf Huntsman, his actual legal name, that's on his

COLA000010
EXHIBIT 50 - Page 705

[State] Bar card. And he filed a complaint to the — I thought that was kind of humorous."

The statement was so bizarre that we quickly moved on, but then came back to it. What evidence did he have?

"We have it from two very credible sources," he said. "And I'm not going to divulge them at this time. But…you give a lot of credibility that he has a title, inspector general, and oh, my God, it sounds like so important and credible. But he's just a political appointee from the board. Nothing more."

---

But, an editorial board member pointed out, that's different from being a Holocaust denier, which is what he just claimed. His response:

"There's a lot you need to learn about. And I think you need to start doing your own homework on it."

An editorial board member then asked why that's our homework to do when he is the one who raised the issue and won't back it up.

To which Villanueva answered: "Well, I think we have the information and in due time, we'll release it. But I think you need to do your homework because you don't."

Villanueva's primary task as a law enforcement officer is to collect facts and evidence and present them to prosecutors so courts can make rulings to protect public safety and mete out proper justice, but he seems unable to discern actual facts or evidence.

COLA000011
EXHIBIT 50 - Page 706

The baffling exchange pales in comparison with allegations being investigated against the sheriff and his department of civil rights violations, misconduct    and abuse of deceased suspects' families, and his awful record of financial mismanagement and fecklessness in protecting public safety.

But it's a useful window into his character. He's the man who promised "truth and reconciliation" to people harmed by the Sheriff's Department, only to make clear later that promise was meant only for deputies who had previously been fired for misconduct.

He has accused the people assigned to oversee his department of crimes for doing their jobs, has created a unit to investigate his critics, has claimed credit for cracking down on wage theft while apparently recovering only $450, has warned of rising crime while bragging that crime is down. His lack of transparency over fatal shootings by deputies led to the first L.A. County coroner inquests in decades. His erratic behavior drew an admonition from the cities that contract for his department's law enforcement services, and a demand from the Civilian Oversight Commission that he resign. He inspired a county ballot measure and state legislation to give monitors subpoena power over him. The state attorney general opened a civil rights investigation against his department for patterns and practices of unconstitutional policing. Activists are seeking county power to impeach him.

Villanueva's allegation against Huntsman sounds deranged, but it's deeper than that. He seems willing to say anything to smear an official who challenges his conduct in office. In any event, he is dishonorable and undeserving — of being sheriff or even of wearing a law enforcement uniform.

COLA000012
EXHIBIT 50 - Page 707

The Times Editorial Board

The Los Angeles Times' editorial board determines the positions of The Times as an institution. It operates separately from the newsroom. You can read more about the board's mission and its members at About The Times Editorial Board.

Copyright © 2023, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information |

COLA000013
EXHIBIT 50 - Page 708

# EXHIBIT 51

EXHIBIT 51 - Page 709

Los Angeles Times

CALIFORNIA

# Sheriff Villanueva makes ugly, unfounded claim against county watchdog



L.A. County Sheriff Alex Villanueva said Inspector General Max Huntsman denies the Holocaust but gave no evidence. Huntsman called the claim untrue.

BY ALENE TCHEKMEDYIAN | STAFF WRITER

APRIL 1, 2022 UPDATED 1:17 PM PT

Since Los Angeles County Sheriff Alex Villanueva took office, Inspector General Max Huntsman has not hesitated to call out the sheriff for misconduct.

As the top watchdog of the Sheriff's Department, Huntsman has pushed back against Villanueva's resistance to his oversight, taking the sheriff to task for, among other things, refusing to submit to subpoenas he's issued for investigations into the

department, maintaining a code of silence about gang-like groups of deputies in his ranks and stonewalling his office on deputy shootings.

Villanueva, in turn, conducted a criminal investigation into Huntsman and has vilified him as a political tool of the county's Board of Supervisors. The sheriff has also lashed out at supervisors and members of the Sheriff Civilian Oversight Commission who, like Huntsman, have been highly critical of him.

But Villanueva took his attacks to a new level this week when he made an extraordinary accusation against Huntsman, claiming — without any evidence — that the inspector general is a Holocaust denier.

Villanueva made the comments during an interview Tuesday with the Los Angeles Times editorial board, which had invited him to participate in its endorsement process in the upcoming sheriff's race. The editorial board functions independently of The Times newsroom.

"You do realize that Max Huntsman, one, he's a Holocaust denier. I don't know if you're aware of that. I have it from two separate sources," Villanueva told the board. When pressed for evidence, Villanueva refused to identify the purported sources, saying, "I think we have the information and in due time, we'll release it."

COLA000005
EXHIBIT 51 - Page 711

The sheriff did not respond Friday morning when asked to explain his unfounded claim about Huntsman.

In a letter to the L.A. County Board of Supervisors, Huntsman said he had been contacted by a member of The Times editorial board regarding Villanueva's remarks, which he called untrue.

"The words are such a deeply offensive allegation that I wanted you to hear from me that I have never denied the Holocaust," Huntsman wrote.

The claim to The Times' editorial board was an explicit riff on more vague comments the sheriff has made about Huntsman. Villanueva has made it a point in the past to refer to Huntsman by his full name, Max-Gustaf Huntsman. And during an interview last month on KFI-AM, the sheriff said, "He's dropped the Gustaf for some reason, and there might be a story behind that, I understand is in the works."

In his letter to the Board of Supervisors, Huntsman wrote that Villanueva "is dog whistling to his more extreme supporters that I am German and/or Jewish and hence un-American" and then offered a personal family history.

Huntsman explained that his German father had developed a deep distrust of authority because he grew up during the Holocaust. He said his grandfather was conscripted into the Nazi army, but was not allowed to carry a rifle because he had previously employed Jews.

After the war, Huntsman wrote, his father came to the U.S., but abandoned the family shortly after Huntsman was born. "He gave me the name Max-Gustaf and so I do not

use it. I would never deny that the Holocaust happened nor do I begrudge that in some sense my mother and I have paid a small piece of the penance the human race owes for that sin."

He pointed out that during Villanueva's first year as sheriff, Villanueva's son was hired as a deputy despite posts on his Instagram account making light of the Holocaust.

"The allegation comes from a man devoid of honesty and honor," Huntsman wrote to the board. "So perhaps it goes without saying that such a claim is meaningless from him."

The broadside from Villanueva was not the only odd part of his conversation with The Times editorial board. While he was meeting with the panel, its members received a letter ⊙ from Villanueva's reelection campaign claiming he would not participate in the paper's endorsement process. After the meeting, the sheriff's campaign team released the letter on social media with a message from Villanueva accusing The Times of working in concert with county officials to undermine him.

But the personal attack on Huntsman was a particularly ugly one in Villanueva''s long-running feud with the inspector general, which has been building since early in the sheriff's term. It comes as Villanueva launches his reelection campaign and fits in to a broader campaign strategy of trying to vilify and discredit critics and journalists with ad-hominem, unsubstantiated attacks.

"This is yet another example where, instead of providing a vigorous defense for policy positions and practices, the sheriff is smearing yet another civil servant with whom he

disagrees," said Brian Levin, executive director of the Center for the Study of Hate and Extremism at Cal State San Bernardino. "To accuse someone of being a Holocaust denier, if in fact it is false, opens up a potential defamation suit by the inspector general."

 Alene Tchekmedyian

Alene Tchekmedyian is an investigative reporter at the Los Angeles Times. She previously covered the Los Angeles County Sheriff's Department, focusing on accountability stories and writing about failures by officials to comply with transparency laws. Before joining The Times in 2016, she reported on crime and policing for the Glendale News-Press and Burbank Leader.

Copyright © 2023, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT 52

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 52 - Page 715

# NATIVE DOCUMENT PLACEHOLDER

**Please review the native document COLA001762.mp4**

COLA001762

**EXHIBIT 52 - Page 716**

# EXHIBIT 53

EXHIBIT 53 - Page 717

SH-A.D-32A (3/23)

**COUNTY OF LOS ANGELES**

# SHERIFF'S DEPARTMENT

*"A Tradition of Service Since 1850"*

DATE: **October 17, 2023**

FILE NO: IV 2558097

OFFICE CORRESPONDENCE

**FROM:**   SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:**   COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:**   **POSSIBLE MANUAL OF POLICY AND PROCEDURES VIOLATIONS**

The following Manual of Policy and Procedures violations relate to the
allegations in this case, regarding **Alex Villanueva, Former Sheriff:**

**3-01/121.10 Policy of Equality – Discrimination (Based on National
Origin and Ethnicity)**

Disposition:
  X  Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on
National Origin and Ethnicity)**

Disposition:
  X  Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.25 Policy of Equality – Third Person Harassment (Based on
National Origin and Ethnicity)**

Disposition:
  X  Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

145

**EXHIBIT 53 - Page 718**

Case 2:24-cv-04979-SVW-JC    Document 89-17    Filed 04/21/25    Page 719 of 1007
Page ID #:4145
Case 2:24-cv-04979-SVW-JC    Document 46    Filed 09/30/24    Page 172 of 249    Page
ID #:766

-2-                                September 19, 2023

3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others
(Based on National Origin and Ethnicity)

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**Discipline Assessment** – Alex Villanueva, 

**Review of Applicable "Guidelines for Discipline" Section:**

The Departmental "Guidelines for Discipline" (revised August 1, 2020)
includes the Policy of Equality, and lists the following analogous misconduct
with the associated disciplinary penalties:

| CONDUCT | STANDARD DISCIPLINE |
|---|---|
| 3-01/121.10 Policy of Equality – Discrimination (Based on National Origin and Ethnicity) | Five (5) Days to Discharge |
| 3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on National Origin and Ethnicity) | Five (5) Days to Discharge |
| 3-01/121.25 Policy of Equality – Third Person Harassment (Based on National Origin and Ethnicity) | Written Reprimand to Discharge |
| 3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity) | Written Reprimand to Discharge |

146

EXHIBIT 53 - Page 719

Case 2:24-cv-04979-SVW-JC    Document 89-17    Filed 04/21/25    Page 720 of 1007
Page ID #:4146
Case 2:24-cv-04979-SVW-JC    Document 46    Filed 09/30/24    Page 173 of 249   Page
ID #:767

-3-                              September 19, 2023

**Determination of Discipline:**

Based upon the attached assessment of mitigating and aggravating factors, the following discipline has been determined to be appropriate.   This discipline is subject to revision upon receipt of the Subject's response or grievance.

_____ **Discharge**
_____ **Reduction in Rank**
_____ **Removal from Bonus Position**
_____ **Suspension with loss of pay and benefits for ___ days with / without the option of EBD**
_____ **Written Reprimand**
_____ **No Discipline**

___X___ **Panel Recommends "Do Not Rehire" notation at top of file**

SVE:WB:wb

147

**EXHIBIT 53 - Page 720**

SM-AD-32A (3/23)

**COUNTY OF LOS ANGELES**
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    October 17, 2023
FILE NO:    IV 2558097

OFFICE CORRESPONDENCE

**FROM:**    SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:**    COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT:**    **Alex Villanueva,** #████
Former Sheriff
Office of the Sheriff
Executive Division

The County Equity Oversight Panel, consisting of Constance Komoroski, Mercedes Cruz and Roberta Yang met by teleconference on October 17, 2023. Also attending the teleconference was Department representative Chief Laura Lecrivain.

Upon consideration of the facts developed in this investigation, the Panel determined that the Manual of Policy and Procedures sections 3-01/121.10 Policy of Equality – *Discrimination (Based on National Origin and Ethnicity)*, 3-01/121.20 Policy of Equality – *Discriminatory Harassment (Based on National Origin and Ethnicity)*, 3-01/121.25 Policy of Equality – *Third Person Harassment (Based on National Origin and Ethnicity)*, and 3-01/121.30 Policy of Equality – *Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity)* were **founded**.

The County Equity Oversight Panel recommended that the Subject should receive **a "Do Not Rehire" notation at the top of their personnel file.**

SVE:**WB**:wb

148

**EXHIBIT 53 - Page 721**

# EXHIBIT 54

EXHIBIT 54 - Page 722





# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

July 11, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

**RESPONSE TO AGENDA ITEM #12 - PROMOTING ACCOUNTABILITY AND
COMMUNITY SAFETY THROUGH CHECKS AND BALANCES OF THE
LOS ANGELES COUNTY SHERIFF**

This motion is a continuation of the motion first initiated by former Supervisor Mark Ridley-Thomas, who has now been indicted on 20 counts of public corruption for alleged criminal acts committed while serving as the chair of this Board and awaits trial in November 2022.  If passed, this unprecedented motion would allow corrupt Board members to intimidate sheriffs from carrying out their official duties to investigate crime.

As was the case with the last motion the Board placed on the ballot, Measure J, this measure will likely be ruled by the Courts to be unconstitutional.  The fact the authors of this motion never sought an opinion from County Counsel or a constitutional law expert, regarding its constitutionality, speaks volumes as to the intent.

Currently there are four ways to remove a Sheriff from office: (1) elections, (2) recall elections, (3) convening a civil grand jury, or (4) using the authority already vested in the state attorney general, who has legal authority over all 58 sheriffs and district attorneys throughout the state.  Your Board conveniently forgets to even mention number four (4).

This motion is a recipe for public corruption, particularly when "cause" remains so broad and undefined.  Allowing political appointees with an agenda to determine "cause" is fundamentally flawed.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*— Since 1850 —*

AV000001

**EXHIBIT 54 - Page 723**

The Honorable Board of Supervisors          -2-                    July 11, 2022

This Board is attempting to cheat the system and create a "fast-track" pathway to remove a duly elected sheriff, one which circumvents the law and the foundational principles of due process enshrined in the Fourteenth Amendment of the United States Constitution.  You are not, "putting it in the hands of the voters."  You are putting it in the hands of political activists, the same political activists who wrote the basis for this motion and the same political activists whose mission is to abolish law enforcement and redirect the public safety budget to their own 501(c)3 non-governmental organizations.

Last week, the same day this motion was leaked to the media, over 715,000 signatures were delivered to recall current District Attorney George Gascon for not doing his job, exemplifying that with sufficient public support recalls are a viable tool.  In direct opposition to this, your Board wants to grant yourselves the power to get rid of a sheriff with four votes, nullifying the will of ten million residents.  As you know, each member of your Board represents approximately two million County residents, where I represent all ten million residents.  In supporting this motion, you are removing checks and balances on each of your own power, thus shielding you from all accountabilities.  This is unethical, self-serving, and a conflict of interest.

If this is truly needed, then follow the path San Bernardino County took and amend the motion to include all eight elected positions in Los Angeles County government (1-sheriff, 1-district attorney, 1-assessor, 5-board of supervisors).  Show the public this is truly for accountability and not a cheap political stunt designed to influence an election, or retaliation against a sheriff who supported a successful district attorney recall initiative, or retaliation against a sheriff by a board member who currently is implicated in an active criminal investigation and has actively refused to comply with search warrants, or payback by a board member to activist groups for support during the last election.

This motion differs from the San Bernardino County ordinance language you cite as precedent because it does not include **all elected officials** as subject to removal.  Your ordinance singles out only the elected sheriff, which will likely be suspect in the eyes of the court.  Additionally, you cannot have oversight over the state functions of a sheriff, and your language clearly impedes a sheriff's state functions.  Furthermore, this motion is premised on at least eight false statements.

The only precedent for such an ordinance is in the case of *Penrod v. County of San Bernardino (Penrod) (2005) 126 Cal. App. 4th 185.* The language of your ordinance resembles the one in San Bernardino, but has significant language changes from the one reviewed by the Court in the *Penrod* case.  In *Penrod*, the court stated, "at some point, [should] the board impermissibly intrude on the sheriff's investigative and

AV000002

EXHIBIT 54 - Page 724

The Honorable Board of Supervisors          -3-                    July 11, 2022

prosecutorial functions, such as happened in *Hicks v. Board of Supervisors* (1977) 69 Cal.App.3d 228, the sheriff can raise a challenge then."

The Court in *Penrod* further stated, the ordinance "empowers the board to remove the sheriff **only for cause**, including neglect of duties, misappropriation, legal wrongdoing and falsification. There may be circumstances about which we decline to speculate, when the board would need to act expeditiously to remove a corrupt county officer rather than wait for a grand jury to convene or a recall election to be held." Allowing the court to find later that if this ordinance is ever applied to a sheriff, it would be on the board to show: (1) what circumstance required removal, before a grand jury or a recall was completed, and (2) prove actual "cause" before removal of a sheriff. The court also did not rule out that a four-fifths board vote to remove the sheriff might also violate the **Public Safety Officers Procedural Bill of Rights Act (POBRA)**. These are all outstanding questions to be ruled on by the court.

It appears you are making yourselves the judge, jury, and executioner for the office of the sheriff, nullifying the will of the voters. This illegal motion seeks to undermine the role of the sheriff and render the office subordinate to the Board of Supervisors. On its face, your proposed ordinance language is not a proper reading of the law and will be challenged on these multiple grounds.

Lastly, I believe it is highly unethical for you to put this motion forward when this Board has already announced its public support for my opponent. It appears to me you are using your political offices to willfully affect the outcome of an election, also known as electioneering, and I ask you seek a legal opinion from County Counsel addressing these concerns, prior to a vote.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield, at ▮▮▮▮▮▮▮▮▮.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV000003

**EXHIBIT 54 - Page 725**

The Honorable Board of Supervisors          -4-                    July 11, 2022


AV:JLS:ac
(Office of the Sheriff)

     c:    Dawyn R. Harrison, Acting County Counsel, Office of the County Counsel
            James Wheeler, President, Association for Los Angeles Deputy Sheriffs
            (ALADS)
            Tab Rhodes, President, Professional Peace Officers Association (PPOA)
            Cesar Romero, President, Los Angeles Sheriff's Professional Association
            (LASPA)

AV000004

EXHIBIT 54 - Page 726

# EXHIBIT 55

EXHIBIT 55 - Page 727





**COUNTY OF LOS ANGELES**

**HALL OF JUSTICE**



**ALEX VILLANUEVA, SHERIFF**

September 21, 2022

The Honorable Rob Bonta
The Attorney General of California
California Department of Justice
Post Office Box 944255
Sacramento, California  94244-2550

Dear Attorney General Bonta:

### REQUEST FOR INVESTIGATION

In response to your correspondence dated September 20, 2022, I would like to
thank you for accepting my request to open a criminal investigation for alleged
public corruption by Los Angeles County Inspector General Max Huntsman
and a member(s) of the Los Angeles County Counsel in the form of conspiracy
to obstruct justice by notifying the suspect(s) of the service of our search
warrant.  As previously stated, the illegal acts allegedly committed by
Mr. Huntsman and County Counsel have potentially compromised the integrity
of this criminal investigation including, but not limited to, the concealment or
destruction of evidence.

I would also like to thank you for now accepting our February 10, 2022,
request for your active participation in the investigation of Peace Over
Violence, Los Angeles Metropolitan Transit Authority, Patricia Giggans, and
Los Angeles County Board of Supervisor, Sheila Kuehl, when Undersheriff
Timothy Murakami wrote:

> *I invite any of your deputy attorney generals, special agents,
> investigators, or other employees or representatives from your office to
> review, inspect, work alongside with, or participate in any meaningful
> manner with those sheriff's personnel assigned to the detail charged
> with these sensitive investigations.  I can assure you they will be a
> welcome addition for their expertise and knowledge.  Any
> accommodations needed for them to perform their functions will be met.*

**211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012**

*A Tradition of Service*
— *Since 1850* —

**EXHIBIT 55 - Page 728**

Attorney General Bonta                    -2-                    September 21, 2022

> *Nothing would please me more or better serve the ten million residents
> of this County than a joint law enforcement effort from both of our
> agencies dedicated to ensuring the honest delivery of services from
> public officials.*

As you noted in yesterday's letter, Chief Assistant Attorney General Lance
Winters received quarterly updates on February 4, 2022, and August 23, 2022.
Although it is many months later than our initial request, we appreciate your
attention to this very serious public corruption investigation, which originated
in September 2019, at the request of a whistleblower and an investigative news
report.

As a gentle reminder, we have two other public corruption cases which have
been submitted to your office in which we have not heard anything on since
our last communication with Mr. Winters on January 25, 2022. For the
record, those cases were:

- Possible criminal conduct by former Los Angeles County Chief Executive
  Officer Sachi Hamai.
- Possible criminal conduct by five individuals who purportedly engaged
  in acts to unlawfully obtain and distribute confidential, protected
  personnel records.

I look forward to fully cooperating and offering any assistance with this
matter. Should you have any questions, please feel free to contact
Undersheriff Timothy K. Murakami at

Sincerely,

ALEX VILLANUEVA
SHERIFF

**EXHIBIT 55 - Page 729**

# EXHIBIT 56

EXHIBIT 56 - Page 730



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
## HALL OF JUSTICE



### ALEX VILLANUEVA, SHERIFF

September 21, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

### REQUEST FOR REMOVAL OF MAX HUNTSMAN AS INSPECTOR GENERAL RESULTING FROM ALLEGATIONS OF CONSPIRACY TO COMMITT OBSTRUCTION IN SEARCH WARRANT

On February 18, 2021, in a six-page letter, I informed you of my *"grave concerns with the conduct of your appointed Inspector General, Max Huntsman."* I pointed out his *"zealot-like behavior which continues to create civil liability for the Los Angeles County."* I stated his, *"intellectual dishonesty places the public at an increased risk."* The letter ended with, *"I ask the Board to consider my concerns and replace the IG with one who is accredited, unbiased, and capable of maintaining a professional working relationship."*

As you were also aware at the time, Mr. Huntsman was a felony suspect in a theft of electronic information investigation, which remains an active investigation at the Office of the Attorney General. You had an opportunity to relieve Mr. Huntsman of his duties then, but declined and the Board ignored my request. Unfortunately, your failure to address the issues I pointed out to you in 2021, has now resulted in an even more serious crime allegedly occurring, which is additionally under active investigation by the Office of the Attorney General.

On September 14, 2022, as you are likely aware, public corruption search warrants were served at multiple locations. During the service at Supervisor Shelia Kuehl's residence, she stated to reporters, *"I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning."* In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all Los Angeles County Sheriff's Department's social media accounts.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

AV010470
**EXHIBIT 56 - Page 731**

The Honorable Board of Supervisors          -2-          September 21, 2022

Moreover, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement, Mr. Huntsman and the Los Angeles County Counsel have now become the focus of a criminal investigation by the Office of the Attorney General, and as such, the conflict of interest in Mr. Huntsman remaining in his current assignment is untenable.  For these reasons, I demand that Mr. Huntsman be treated like any other of the over 100,000 Los Angeles County employees and be relieved of his duties, pending the outcome of the Attorney General's criminal investigation.

Given the above, it is the established pattern and practice everywhere in the Los Angeles County, by every department, that an employee is to be relieved of duty and/or reassigned upon reliable knowledge of alleged criminal activity, and an investigation is pending which could lead to termination.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, John L. Satterfield, at █████████

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010471
**EXHIBIT 56 - Page 732**

# EXHIBIT 57

EXHIBIT 57 - Page 733



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE



ALEX VILLANUEVA, SHERIFF



October 5, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

### DEMAND TO RELIEVE SPECIFIED CONFIDENTIAL EMPLOYEES
### FROM THEIR DUTIES OF PUBLIC TRUST

Shortly after I was sworn into office on December 3, 2018, my staff alerted me to a
series of illegal personnel file downloads that were launched by members of the Office
of Inspector General and Constitutional Policing Advisors from the administration of
Sheriff Jim McDonnell.  This data breach appeared to have been initiated immediately
following the primary election that was held in June 2018 and does not appear to have
been done for a lawful reason.  Former Sheriff McDonnell's staff had launched an
inquiry into the matter, only to abandon it without proper resolution.

In early 2019, we initiated a criminal inquiry into the matter and consulted with
representatives from the state Attorney General's office and the Federal Bureau of
Investigation (FBI).  Inspector General Max Huntsman's protestations were centered on
his claims that he had permission from the incumbent to view my confidential personnel
files.  Our investigation indicates no such permission existed, either in writing or
supported by the former sheriff, who refused to answer questions from our investigators.
The investigation was turned over to the Attorney General's office in September 2021
for a prosecutorial decision.  Please note this investigation names five suspects of
criminal conspiracy to commit burglary and illegal removal of personnel files, among
other charges.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

AV010473

**EXHIBIT 57 - Page 734**

The Honorable Board of Supervisors          -2-                    October 5, 2022

We have previously written to your office regarding the liability of permitting named felony suspects to continue working in their official capacity during the pendency of the criminal investigation.  Now we have a whole new set of issues based on the extraordinary admissions from Supervisor Sheila Kuehl during the execution of search warrants by deputies assigned to our Public Corruption Unit.  On live local television, Supervisor Kuehl claimed to have been alerted to the search warrants in advance by Acting County Counsel Dawyn Harrison, with information she received from Inspector General Max Huntsman.  On September 21, 2022, I wrote to you listing the reasons why Mr. Huntsman needed to be relieved of his duties [Attachment A], and I have yet to receive a response.

In addition to Supervisor Kuehl's own public statements, court documents [Attachment B] reveal the names of two other individuals who alerted Supervisor Kuehl of the service of the warrant, in an apparent conspiracy to obstruct justice: Lisa Mandel, Chief of Staff, District 3, and Torie Osborn, Senior Strategist, District 3.  As appointed officials who are considered confidential employees and trusted to maintain confidentiality over internal records and law enforcement operations, the alleged conduct of the four individuals referenced herein, and others who during the course of the Attorney General's investigation may also be identified, can no longer have access to Los Angeles County Sheriff's Department (Department) records, operations, or be involved in decision-making regarding oversight and/or legal representation.

Consistent with standard Department policy, Mr. Huntsman will be removed from all access to Department facilities, personnel, and databases effective immediately.  This standard is applied to all Department personnel who are named as a suspect in a criminal case involving felony crimes.  The list of potential charges Supervisor Kuehl and Commissioner Patricia Giggans include the following:

- California Government Code 1090, Conflict of Interest
- California Penal Code 165, Bribery of a public official or member of a board of supervisors
- California Penal Code 182.5, Conspiracy to obstruct justice
- California Penal Code 182, Conspiracy to commit any crime
- California Penal Code 503, Embezzlement
- California Penal Code 424, Theft, or misappropriation of public funds

The list of potential charges facing Mr. Huntsman, Ms. Harrison, Ms. Mandel, and Ms. Osborn include the following:

AV010474

**EXHIBIT 57 - Page 735**

The Honorable Board of Supervisors          -3-                    October 5, 2022

- California Penal Code 182, Conspiracy to commit any crime
- California Penal Code 182.5, Conspiracy to obstruct justice
- California Penal Code 31, Aiding and abetting a crime
- California Penal Code 135, Destruction of evidence

There is no alternate universe where county counsel can dictate the manner in which
the Department is represented in court, while they are actively involved in allegedly
concealing criminal activity and obstructing the investigative function of the sheriff
[California Government Code 25303].  To the contrary of taking corrective action, both
Supervisor Kuehl and Supervisor Hilda Solis have made public statements on social
media condemning both myself and the Department for the execution of a lawful public
corruption search warrant that was properly vetted, approved by a judge, and reaffirmed
by a second judge.  Acting County Counsel Harrison is in no position to deny
compensating the attorney of our choosing, who won for us in court, based on these
extraordinary set of events [Attachment C].  Her apparent motive in denying counsel
was to see the search warrant overturned by the court for lack of proper counsel.  It is
your moral and legal obligation to pick up the costs for *Werksman Jackson & Quinn
LLP*.  Please refer to Ms. Harrison's own words:

> "... *I wanted to remind you that only the Office of County Counsel, or the law
> firms we retain, may represent you, in your official capacity, and the LASD...
> Therefore, you have no authority to retain your own counsel to represent either
> you or the LASD, nor is the County of Los Angeles responsible for any of the
> costs incurred by those law firms.  I recently discovered that you improperly
> retained Werksman Jackson & Quinn LLP in this matter.  I will notify them that
> they have no authority to represent you or LASD and will not be paid by the
> County of Los Angeles, and I will copy the Attorney General's Office.*"

It is not the first time we have informed you of unethical and/or incompetent
representation by county counsel and contract counsel that have had negative
consequences to the Department.  From failing to adequately present a defense in a
high-profile civil lawsuit, failing to aggressively challenge false assertions in employee
lawsuits, to colluding with the Civilian Oversight Commission and the Inspector
General's office to give the false impression we are not complying with the submission
of subpoenaed information or testimony.  It is clear you have weaponized legal
representation of the Department as another avenue to discredit my administration for
your political interests.  This comes at great expense to the taxpayer and to our
credibility, which seems to be your goal.

AV010475

EXHIBIT 57 - Page 736

The Honorable Board of Supervisors          -4-                    October 5, 2022

To be clear, the investigation is real, my authority is real, and so is that of the Attorney General who has now assumed responsibility for the investigation, which was initiated at our request. The investigation itself regarding *Peace Over Violence* was initiated based on a criminal complaint from a whistleblower, and contrary to false assertions by those involved, we do not investigate people, only allegations of criminal activity. This is true of every investigation initiated by the Department, including those by the Public Corruption Unit.

In closing, as a matter of reference, I wrote a whistleblower memorandum back in December of 2004 regarding the unfolding corrupt actions of then Division Chief Paul Tanaka [Attachment D]. As a young sergeant, I laid out publicly in detail my concerns regarding the unethical conduct and behavior of the administration of then Sheriff Lee Baca. I was laughed at, ridiculed, attacked, and had my career derailed for over a decade. The Board of Supervisors were informed of Baca and Tanaka's corruption, as were members of the Office of Independent Review, but it wasn't until the Citizen's Commission on Jail Violence and the FBI intervened, when the corruption began to halt. Needless to say, I stood my ground and was ultimately vindicated.

Today and again, I am standing my ground. You have two choices: circle the wagons and protect corruption or come clean and stand up for doing the right thing. Choose wisely, history will be your judge.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield at █████████.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010476

**EXHIBIT 57 - Page 737**

The Honorable Board of Supervisors          -5-                    October 5, 2022

AV:JLS:js                                               .

Attachments:      A – Letter for Removal of Max Huntsman
                  B – Court Documents (Declaration)
                  C – County Counsel Correspondence
                  D – Letter to LASD Executives (2004)

AV010477

**EXHIBIT 57 - Page 738**

# ATTACHMENT A

AV010478

**EXHIBIT 57 - Page 739**



# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF




September 21, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### REQUEST FOR REMOVAL OF MAX HUNTSMAN AS INSPECTOR GENERAL RESULTING FROM ALLEGATIONS OF CONSPIRACY TO COMMITT OBSTRUCTION IN SEARCH WARRANT

On February 18, 2021, in a six-page letter, I informed you of my *grave concerns with the conduct of your appointed Inspector General, Max Huntsman.* I pointed out his *zealot-like behavior which continues to create civil liability for the Los Angeles County.* I stated his *intellectual dishonesty places the public at an increased risk.* The letter ended with, *I ask the Board to consider my concerns and replace the IG with one who is accredited, unbiased, and capable of maintaining a professional working relationship.*

As you were also aware at the time, Mr. Huntsman was a felony suspect in a theft of electronic information investigation, which remains an active investigation at the Office of the Attorney General. You had an opportunity to relieve Mr. Huntsman of his duties then, but declined and the Board ignored my request. Unfortunately, your failure to address the issues I pointed out to you in 2021, has now resulted in an even more serious crime allegedly occurring, which is additionally under active investigation by the Office of the Attorney General.

On September 14, 2022, as you are likely aware, public corruption search warrants were served at multiple locations. During the service at Supervisor Shelia Kuehl's residence, she stated to reporters, *"I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning."* In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all Los Angeles County Sheriff's Department's social media accounts.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1851* —

AV010479

**EXHIBIT 57 - Page 740**

The Honorable Board of Supervisors          -2-              September 21, 2022

Moreover, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement, Mr. Huntsman and the Los Angeles County Counsel have now become the focus of a criminal investigation by the Office of the Attorney General, and as such, the conflict of interest in Mr. Huntsman remaining in his current assignment is untenable. For these reasons, I demand that Mr. Huntsman be treated like any other of the over 100,000 Los Angeles County employees and be relieved of his duties, pending the outcome of the Attorney General's criminal investigation.

Given the above, it is the established pattern and practice everywhere in the Los Angeles County, by every department, that an employee is to be relieved of duty and/or reassigned upon reliable knowledge of alleged criminal activity, and an investigation is pending which could lead to termination.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, John L. Satterfield, at ███████████

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010480

EXHIBIT 57 - Page 741

**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I Street
P.O. Box 944266
Sacramento, CA 94244-2550
Telephone
E-Mail Address

January 25, 2022

Timothy K. Murakami
Undersheriff
Office of the Sheriff
County of Los Angeles
Hall of Justice
211 West Temple Street
Los Angeles, CA 90012

VIA EMAIL AND U.S. MAIL

Re: Possible criminal conduct

Dear Undersheriff Murakami:

The Department of Justice (DOJ) is in receipt of your letters regarding possible criminal conduct. Specifically, we have received: (1) letters dated July 23, 2020, and October 20, 2021, regarding possible criminal conduct by Sachi Hamai; and (2) a letter dated November 16, 2021, regarding possible criminal conduct by five individuals who purportedly engaged in acts to "unlawfully obtain and distribute confidential, protected personnel records."

As to the former matter, you request that DOJ "conduct the criminal inquiry"; as to the latter, you implicitly request that DOJ conduct any necessary inquiry and review the matter, noting "the inherent conflict(s)" for further inquiry and asking that, should we decline "further inquiry or review," to refer the matter to a district attorney's office outside of Los Angeles County. DOJ will review these matters.

Additionally, it has come to our attention that your Office has been involved in a criminal investigation of Peace Over Violence and/or Executive Director Patti (Patricia) Giggans. Specifically, it has been reported that, in February and March 2021, your Office executed search warrants at the offices of Peace Over Violence and L.A. Metro as part of a criminal investigation. (E.g., Jason Henry, *LA County Sheriff Investigating Oversight Commissioner's Nonprofit, Search Warrants Show*, L.A. Daily News, June 18, 2021.)

AV010481

**EXHIBIT 57 - Page 742**

January 25, 2022
Page 2

DOJ requests that your Office to provide a report on the status of the investigation of Peace Over Violence and/or Executive Director Patti (Patricia) Giggans. (Cal. Const., art V, § 13 [noting Attorney General has supervisory authority over sheriff and may require "reports concerning the investigation, detection, prosecution, and punishment of crime"].) Your cooperation in this request is appreciated.

Sincerely,

Lance Winters
Chief Assistant Attorney General

For     ROB BONTA
        Attorney General

AV010482

**EXHIBIT 57 - Page 743**

  

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

February 18, 2021

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### THE NEED FOR AN HONEST AND OBJECTIVE INSPECTOR GENERAL

The purpose of this communication is to advise you of my grave concerns with the conduct of your appointed Inspector General (IG), Max-Gustaf Huntsman, and the publications authored by his office which directly influence the unsuspecting public's perceptions regarding both the credibility of the Los Angeles County Sheriff's Department (Department) and the legitimacy of our operations. His zealot-like behavior continues to create civil liability for the County and potentially endangers the life of deputies in the field, as he artificially stokes animosity between the Department and the community.

In addition to potentially endangering the lives of our deputies, his intellectual dishonesty places the public at an increased risk. After utilizing good communication and de-escalation strategies, deputies can only ultimately perform the detention or arrest of an individual one of two ways: 1) The person voluntarily submits to lawful authority; or, 2) The person resists and the deputy uses force to overcome their resistance and gain safe control. As the public continues to be misled by Mr. Huntsman as to the Department being engaged in widespread "unlawful conduct," they are far less likely to voluntarily comply. Statistically, this in and of itself places members of the public in situations that are far less likely to have a peaceful resolution.

The expectation of the public regarding the conduct of an IG is they are dedicated to serving the public's interest by working tirelessly to fairly assess the operations of any given organization and provide meaningful input for reforms, which may be required to adapt to an ever-changing world. Indeed, the National Association of Inspectors General posits this public expectation is best served when:

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— Since 1850 —

SCANNED & E-MAILED TO BOS LIAISON
TEAM 2/18/21

AV010483

**EXHIBIT 57 - Page 744**

The Honorable Board of Supervisors          -2-                    February 19, 2021

This public expectation is best served by inspectors general when they follow the basic principles of integrity, objectivity, independence, confidentiality, professionalism, competence, courage, trust, honesty, fairness, forthrightness, public accountability, and respect for others and themselves (AIG Principles and Standards, pg. 3, 2014).

Please note the first two principles outlined above, integrity and objectivity. I will provide you a brief rundown of the fundamental defects of Mr. Huntsman's work product, starting with the most recent publications and working our way back towards the start of my administration.

The Office of Inspector General (OIG) report "Review and Analysis of Misconduct Investigations and Disciplinary Process" released in February 2021 suffers from multiple fatal defects, chief among them the fallacy of a study period (2015-2019) which encompasses two administrations without distinguishing and contrasting the data from both. Another fatal flaw is the use of individual cases in an anecdotal fashion as representative of the entire Department's operation without providing proper context with the totality of cases investigated and discipline rendered. A select quote from the introduction:

Notwithstanding the current Sheriff's assertions, we were not provided by the Sheriff, and in our review, we did not observe or find, any evidence of falsification of evidence or reports which resulted in the wrongful discipline of a department employee (pg. 4, 2021).

This statement is demonstrably false and illustrative of the nature of the report itself. The Department conducted an in-depth analysis of the Mandoyan case, which is now a public document, wherein it was proven that a key exculpatory witness was identified, interviewed, and the results concealed from both the Civil Service Commission and the employee fighting the discharge (see the Department's Case Analysis, October 1, 2019).

The next production from the OIG, "Report Back on Unlawful Conduct of the Los Angeles County Sheriff's Department" was a letter dated December 14, 2020, addressed to the Civilian Oversight Commission (COC), purportedly in response to a request from Commissioner Priscilla Ocen. The starkly sophomoric report amounted to nothing more than a rehash of current and past litigation and a torturous defense of the legal fallout from Mr. Huntsman's oversteps in a homicide investigation.

This report was designed exclusively as a political tool to discredit the Department and does not appear to have any legitimate purpose in oversight, transparency, or accountability. Perhaps the most startling false statement is the section subtitled

AV010484

EXHIBIT 57 - Page 745

The Honorable Board of Supervisors          -3-                    February 18 2021

"Failure to Investigate and Prohibit Deputy Secret Societies (pg 12)  Mr Huntsman has
the Department's criminal and administrative investigations of the Kennedy Hall incident
from former Sheriff Jim McDonnell's tenure  and he is aware that 26 employees were
disciplined  including four who were terminated as a result of that administrative
investigation  Mr Huntsman is also aware of the Department's new policy regarding
forming or participating in deputy subgroups  which was issued in February 2020 and is
being vigorously enforced

The preceding report  "The Right to Know Act  Los Angeles County Sheriff's
Department Response to Police Transparency Reform" was published in November
2020  and in typical OIG fashion  deliberately used outdated information from January
2020 to make the false claim the Department was not complying with SB 1421  For
the record  as of December 31  2020  the Department achieved full compliance with
SB 1421 with a 96 45 percent rate  a number Mr Huntsman was well aware was in the
making and far different than the 70 percent non compliance rate he reported just a
month earlier

Mr Huntsman is also aware of the issues the Department has had since the inception of
SB 1421  with antiquated databases that do not communicate with each other and the
severe lack of staffing to meet the new requirements (a failure of leadership by the
previous administration)  To wit  in a letter dated July 6  2020  to former Board of
Supervisors (BOS) Chair  Supervisor Kathryn Barger  the Department outlined six
different occasions where we requested additional resources through the Chief
Executive Office and were denied repeatedly  It was only through cannibalizing
different functions of the Department that we were able to muster enough personnel to
satisfy SB 1421 and California Privacy Rights Act requests  Comparing our operation to
Los Angeles Police Department's is a dishonest comparison based on disparate funding
levels  IT infrastructure  and staffing levels

Looking through the sheer number of reports authored by the OIG  a persistent pattern
emerges wherein the OIG ignores Department investigations  results of investigations
and actions taken in response to complaints from the public  The November 17  2020
report back to the COC regarding the alleged harassment of family members after fatal
deputy-involved shootings is one example of this  The report negates in its entirety the
concerns of the public over impromptu memorials and gang members loitering in the
vicinities of their homes  concerns which were addressed properly by the Department's
report

Examining the OIG's report's table of contents alone since its inception reveals a
deferential OIG during former Sheriff McDonnell's administration  with report titles of a
generic and non-inflammatory nature  unlike those published during my administration

AV010485

EXHIBIT 57 - Page 746

The Honorable Board of Supervisors        -4                February 18 2021

As a matter of fact the OIG generated as many reports during my first two years in office as they did during all of former Sheriff McDonnell's tenure and that includes the conspicuously "confidential" report Mr Huntsman prepared to bury the potentially illegal actions of former Sheriff McDonnell's Assistant Sheriff Mike Rothans for his purchase of a stolen vehicle from a contracted tow company

Without question these "reports" would be rejected by any legitimate academic institution They are filled with unproven allegations anecdotal data omissions distortions and an overall permeation of bias and intellectual dishonesty They are truly not the level of accuracy and authenticity expected in County government Furthermore if my own deputies consistently authored documents at this level they would at the very least be placed on a performance improvement plan and in cases of deception omission and lack of honesty an administrative investigation would be conducted I believe the responsibility for performance and accountability issues with Mr Huntsman belongs in part to the COC Yet they seem too hyper-focused on political activism and calls for my own resignation to focus on this duty

Since taking office in December 2018 I have continued my reforms within the Department to enhance public safety and strengthen the ties within our communities As the elected Sheriff serving the most populous county in the nation and employing nearly 18 000 employees this is no easy task Having inherited significant problems from past administrations I remain committed to effecting positive change for the residents of Los Angeles County

As the first progressive democratic sheriff I have delivered on many of my campaign promises to bring reform and transparency to the Department I have instituted major reforms regarding Immigration and Customs Enforcement (ICE) leadership diversity wage theft and the single most important commitment to transparency – body worn cameras Although Mr Huntsman authored multiple reports on the Department's cooperation with ICE he became silent in light of the moratorium on all inmate transfers to ICE custody Again this amounts to false documentation by omission and does not serve to inform either the public or the Department

As a result of these unethical reports the Department is suffering irreparable damage and our standing in the community is being undermined by continual misleading and false attacks It should be of great concern to all of us that his actions are eroding public trust and creating a liability for the Department His hopelessly biased reporting will only invite future frivolous lawsuits which the hardworking taxpayers will have to waste money defending while at the same time artificially rising tensions in the community which can endanger the lives of our deputies This was clearly evidenced by the brutal attack on our two Compton Transit Services Bureau deputies which horrified the entire nation

AV010486

**EXHIBIT 57 - Page 747**

The Honorable Board of Supervisors          -5-                February 18, 2021

The IG serves an advisory role, just like the COC. When their efforts are driven by political agendas and not facts, they fail to serve the public's expectations of oversight and betray the reason for their existence. As a result, their work product does not inform the Department's operations and will not be considered of any value. The Department will continue, however, to provide both entities all the information they are legally entitled to receive.

As you have been advised in writing, the Department continues to investigate a data breach discovered at the beginning of 2019. The Legislature has enacted a statutory scheme defining the powers and duties of a sheriff (Government Code Sections 26600-26778). Section 26600 generally provides:

> The sheriff shall preserve peace, and to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of a crime, or the suppression of delinquency.

A sheriff is also expressly authorized and directed to investigate public offenses that have been committed and to arrest and take before a magistrate all persons who have committed a public offense (Sections 26601-26602). There is no statutory scheme that places anyone, including members of the OIG, above the law. As such, it is with concern that I read a letter from Lawrence Middleton to County Counsel, who had retained him to purportedly provide legal guidance on this very issue. In his words:

> Upon completing my analysis, I wanted to bring to Undersheriff Murakami's attention a number of issues and concerns that cause me to counsel against a continuation or escalation of the investigation. Most notably, as detailed below, because none of the potential charges being investigated are likely to lead to a successful criminal prosecution, Department personnel involved in the investigation could place themselves in jeopardy or criminal prosecution and/or civil liability if they continue (March 6, 2020).

This letter appears to be an attempt to intimidate, coerce, or otherwise dissuade the Department from carrying out our lawful duty and is unacceptable. It should be noted neither County Counsel nor Mr. Middleton has knowledge of the scope or details of the investigation, rendering such opinions ill-informed and ill-advised. I have recused myself from this inquiry and know of its details superficially.

The Department needs an IG who is not ethically compromised and is certified by the National Association of Inspectors General. I expect the work product of the OIG to adhere to professional standards as cited in the Association of Inspectors General's book, "Principles and Standards for Offices of Inspector General," also known as the Green Book. The public, the Department, and BOS all deserve accurate reporting

AV010487

EXHIBIT 57 - Page 748

The Honorable Board of Supervisors          6               February 18 2021

which is not politically motivated  I ask the BOS to consider my concerns and replace
the IG with one who is accredited  unbiased  and capable of maintaining a professional
working relationship  The Department s reputation is being unfairly tarnished by the IG
in his personal attacks towards us  We need an IG who is fair and objective  not
inflammatory and controversial

The Department is a national trendsetter on many important issues  such as the
relationship between local law enforcement and federal immigration enforcement
combatting the spread of COVID-19 in congregate living facilities and super spreader
events  the Wage Theft Task Force, defending the community during periods of civil
unrest  and transparency  Our efforts are often adopted as best practices by other law
enforcement agencies throughout the nation  Our reputation is at stake  The IG's
personal vendetta should not come at the expense of our dedicated employees who put
their lives on the line each and every day in service to the community

Should you have any questions or would like to discuss further  please feel free to
contact me at █████████

Sincerely

ALEX VILLANUEVA
SHERIFF

AV010488

EXHIBIT 57 - Page 749

The Honorable Board of Supervisors          -7-                    February 18, 2021

AV:JAV:ac
(Office of the Sheriff)

c:    Rodrigo A. Castro-Silva, County Counsel, Office of the County Counsel

AV010489

**EXHIBIT 57 - Page 750**

# ATTACHMENT B

AV010490

**EXHIBIT 57 - Page 751**

WERKSMAN JACKSON & QUINN LLP
ALAN J. JACKSON (Bar No. 173647)
CALEB E. MASON (Bar No. 246653)

888 W. 6ᵗʰ St. 4ᵗʰ Floor
Los Angeles, California 90017

Attorneys for Los Angeles County Sheriff's Department

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 2 0 2022

Sherri R. Carter, Executive Officer/Clerk of Court
By: Sheryl R. Humber, Deputy

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES – CENTRAL DISTRICT

IN RE: SEARCH WARRANT SERVED
ON OFFICE OF THE INSPECTOR
GENERAL FOR THE LOS ANGELES
COUNTY METROPOLITAN
TRANSPORTATION AUTHORITY ON
SEPTEMBER 14, 2022

Case No.: Misc. BH014167

(Hon. William C. Ryan – Department
56W)

**DECLARATION OF MAX O.
FERNANDEZ IN RESPONSE TO
COURT'S ORDER DATED
SEPTEMBER 20, 2022.**

Date: September 22, 2022
Time: 1:30 p.m.
Dept.: 56W

## DECLARATION OF SGT. MAX O. FERNANDEZ

I, Max O. Fernandez, declare as follows:

1.      I am employed as a sergeant for the Los Angeles County Sheriff's
Department ("LASD"). I am assigned as the lead investigator in the Department's
investigation of related to possible criminal conduct regarding the awarding of contracts
to Peace Over Violence (POV) by the Metropolitan Transportation Authority (MTA)
("the Matter"). I am the affiant for the search warrants relating to the Matter. There are
two: one signed on February 26, 2021, by Judge Ronald Coen. I am also the Affiant for
the Search Warrant which was signed on September 8, 2022 by Judge Craig Richman. I

-1-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO

1   make this declaration from my own personal knowledge, and if called as a witness, I

2   could and would testify competently to the facts stated below.

3       2.    This Supplemental Declaration supplements my Declaration filed

4   yesterday in this Matter. I make this Declaration in compliance with the Court's

5   September 20, 2022 Order, to ensure that I have fully and completely addressed the

6   questions raised by the Court. My prior Declaration addressed the Court's questions

7   about the application for and issuance of the search warrants in this Matter. This

8   Declaration provides additional information regarding Question No. 5: "Report what

9   searches have already been conducted on any computer seized under the warrant, and

10   who conducted the searches, and what information has been obtained."

11       3.    I joined the LASD's Public Corruption unit in October 2020. This

12   investigation was assigned to me on or about October 26, 2020. The investigation was

13   opened a year before that, on or about September 11, 2019, when a whistleblower from

14   the MTA contacted the LASD to report what she believed to be illegal conduct,

15   including fraudulent conduct in directing contracts to politically connected individuals

16   and entities; and retaliation against her for reporting same.

17       4.    I have seen public statements reported in the media made by various public

18   figures, alleging that this investigation is some sort of political payback by the Sheriff

19   against Supervisor Kuehl because of recent political developments and disagreements.

20   That allegation is false. I know that the allegation is false, because (1) I have worked on

21   this investigation for two years, and the investigation was begun a year before that, in

22   September 2019—long before the current political animosities developed; and most

23   importantly (2) this investigation is based on provable facts, credible witness testimony,

24   and an undisputed documentary record, that provides probable for the allegations that

25   County contracts were improperly awarded to Ms. Giggans and POV. The full details of

26   the investigation, including the evidence reviewed and witnesses interviewed, is set forth

27   in the affidavit I presented to the court in support of the search warrants obtained in the

28   Matter. That evidence is abundant and constitutes probable cause to believe that a crime

<div align="center">-2-</div>

<div align="center">SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO<br>COURT'S ORDER DATED SEPTEMBER 20, 2022</div>

1  has been committed, in my professional opinion. This is a straightforward investigation

2  of corruption in the expenditure of public funds—the sort of investigation that every law

3  enforcement agency in the state conducts on a regular basis, and that prosecutorial

4  agencies regularly prosecute. This investigation has been conducted throughout

5  according to standard investigatory practices.

6       5.    The full list of items seized during the searches of Supervisor Kuehl's and

7  Ms. Giggans' residences is attached hereto as Exhibit 1. As noted in my previous

8  Declaration (Paragraph 7), none of the materials seized in the search of the Office of

9  Inspector General offices have been reviewed or imaged.

10      6.    Exhibit 1 identifies each item, and states whether its contents were imaged.

11  Items 20, 21, 22, 24, and 25 are paper records, and were not imaged. The technicians

12  who worked on the imaging are: Thomas Ferguson; Leo Lo; John Moore; Steven

13  Suarez; Mike Rivas; Julius Gomez; Raquel Gonzales; Claudia Iwasczyszyn; and Brian

14  Moreno. Those technicians did not review the contents of any device.

15      7.    In sum: none of the contents of any computer seized have been reviewed.

16  Of the total of 67 devices seized, 49 have been imaged, and one (1) has been partially

17  imaged. All the imaging was conducted on September 14, 15, and 16, 2022. None of

18  the contents of any of the devices have been reviewed, except for a review of recent text

19  messages and voicemails on Supervisor Kuehl's phones as set forth below.

20      8.    The only devices from which any content has been reviewed are the two

21  phones seized from Supervisor Kuehl, and the only content reviewed from those phones

22  were approximately 250 text messages and two voice mails. I personally conducted that

23  review on the morning of September 16, 2022. I considered that review to be urgent for

24  the reasons set forth below.

25      9.    The review of the text messages and voicemails on Supervisor Kuehl's

26  phone in the period prior to the execution of the warrant was urgent because at 8:00 a.m.

27  on September 14, 2022, while deputies were still at her premises, Supervisor Kuehl gave

28  a live television interview to Fox 11 News, in which she said the following: "KUEHL: I

AV010493

**EXHIBIT 57 - Page 754**

1    heard from County Counsel last night that she got a tip from Max that this search would

2    happen. REPORTER: Max Huntsman? KUEHL: Yes, from Max Huntsman that this

3    search would happen this morning."

4        10.    In my professional opinion, and based on my training and experience,

5    tipping off a target of a search warrant prior to the execution of the warrant is a crime.

6    Penal Code section 148 prohibits obstructing officers in the execution of their duties,

7    including serving search warrants; and Penal Code 168 prohibits public officials

8    (prosecutors, judges, clerks, or peace officers) from disclosing the fact that a search

9    warrant has been issued, prior to its execution, for the purpose of preventing the search

10   or seizure of property. The only people who knew about the issuance of this search

11   warrant when it was issued were among those enumerated categories. So, at a

12   minimum, whoever told Max Huntsman about this warrant committed a crime.

13       11.    In the concurrent search of Patricia Giggans' residence, which took place

14   at the same time as the search of Supervisor Kuehl's residence, we were surprised to

15   find that Ms. Giggans' phone was not present anywhere in the house or on her person.

16   The search warrant was executed at 7 a.m. at Ms. Giggans' residence, and she was

17   personally present when we arrived. Based on my training and experience, individuals

18   keep their phones ready to hand, and I know that Ms. Giggans owns and uses an IPhone,

19   because we have obtained numerous emails sent by her, which contain in the signature

20   line the phrase, "Sent from my IPhone." I know from personal experience and from my

21   training that that phrase is automatically inserted into emails sent from an IPhone. It is

22   also not plausible or likely that Ms. Giggans would manually type that phrase into the

23   bottom of every email she sends.

24       12.    Because I know that Ms. Giggans has an IPhone, and her phone was not

25   present in her residence or on her person, I concluded that the most likely explanation

26   for the absence of her phone was that she was aware that the warrant was going to be

27   executed, and she disposed of the phone in some manner beforehand. Ms. Giggans'

28   attorney, Mr. Austin Dove, arrived at her residence approximately 15 minutes into the

-4-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010494

**EXHIBIT 57 - Page 755**

1   search. Mr. Dove spoke with the detectives executing the warrant, and said the

2   following: "There is no phone. You can search for the phone. You're entitled to search

3   the place." That statement was made by Mr. Dove to Detective Yoon Nam, who told me

4   about it that same day.

5       13.    In addition to constituting a crime under the Penal Code, the act of tipping

6   off a target of a search warrant to existence of the warrant is a major concern for the

7   LASD. It creates safety and security risks for officers executing warrants, and it

8   compromises and impairs the investigation of crimes. In short, we simply cannot have

9   targets of warrants tipped off the night before. The fact that Supervisor Kuehl publicly

10  stated she had been tipped off the night before was a serious concern for me and for the

11  LASD, as to how the information had been obtained and disseminated.

12      14.    Accordingly, I reviewed Ms. Kuehl's phones, looking for recent

13  communications relating to the warrant. I found them. The relevant text messages are

14  attached hereto as Exhibit 2.

15      15.    At 10:17 p.m. on September 13, 2022, Lisa Mandel, Supervisor Kuehl's

16  Chief of Staff, texted Supervisor Kuehl the following (the full message is attached in

17  Exhibit 2): "Just got a call from Dawyn Harrison. She has been informed that the

18  Sheriff may obtained a search warrant for your home and Patti G's…. Per the informant,

19  the warrant is for 7 a.m. tomorrow. Let me know if you want me to do anything."

20      16.    At 11:41 p.m. on September 13, 2022, Dawyn Harrison (who is Acting

21  County Counsel) texted Supervisor Kuehl the following (the full message is attached in

22  Exhibit 2): "Was the first my team heard of it. Max called CoCo tonight with his

23  'intel.'" I know from personal experience and from my training that "CoCo" refers to

24  County Counsel.

25      17.    There are approximately 25 messages relating to the above two messages.

26  And the two voicemails were from Ms. Harrison, also on the evening of September 13,

27  2022. Both stated that she had an urgent matter that she needed to discuss with

28  Supervisor Kuehl.

-5-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010495

EXHIBIT 57 - Page 756

18. The other investigators who have reviewed the same set of text messages I reviewed from Supervisor Kuehl's phones are Detective Rafael Rafino and Lieutenant Oscar Veloz.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 21, 2022, in Los Angeles, California.

MAX O. FERNANDEZ

-6-
SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010496

EXHIBIT 57 - Page 757

# EXHIBIT 1

AV010497

**EXHIBIT 57 - Page 758**

| CAT | ITEM # | QUAN | DESCRIPTION | DATE RECEIVED | IMAGED | PROCESSED | PORTABLE CASE | NOTES |
|---|---|---|---|---|---|---|---|---|
| EV | 1 | 1 | Computers, equipment, & accessories - ███ color, ███, with power cord; from Home Ofc Desk (LOC 6) Article CABLE Make: ███ Model: ███ Serial Number: ███ DOJ File Control Number: ███ Booked At: OTHER | 9/14/2022 | Y | Y | N | |
| EV | 2 | 1 | Computers, equipment, & accessories - ███, Blk, w/cord; home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ███ Model: ███ Serial Number: ███ DOJ File Control Number: ███ Booked At: OTHER | 9/14/2022 | N | N | N | No Data - Drive R/O |
| EV | 3 | 1 | Phones/Cell - Blk ███ blk/gry case (cracked screen protector), IEMI ███; Master BR (LOC 6) Article: Cell Phone Make: ███ Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | N | N | N | No Extraction |

AV010498

EXHIBIT 57 - Page 759

| EV | 4 | 1 | Computers, equipment, & accessories - Silv USB "Homeboy Industries"; center drawer of home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
|---|---|---|---|---|---|---|---|---|
| EV | 5 | 1 | Computers, equipment, & accessories - Blu USB "███████"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 6 | 1 | Computers, equipment, & accessories - Blk/Silv USB "███████"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 7 | 1 | Computers, equipment, & accessories - Blk/Silv USB "███████"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |

AVO10499

**EXHIBIT 57 - Page 760**

| EV | 8 | 1 | Computers, equipment, & accessories - Silv/Wht USB "Futures without violence"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |
|----|---|---|---|---|---|---|---|---|
| EV | 9 | 1 | Computers, equipment, & accessories - Silv/Wht USB "Futures without violence"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |
| EV | 10 | 1 | Computers, equipment, & accessories - Blk, ▓▓▓ Ultra, 8GB in clear case, Prod Code ▓▓▓▓ Top LT drawer home ofc desk (LOC 6) Article: SD CARD Make: ▓▓▓ Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 11 | 1 | Computers, equipment, & accessories - Red USB "denimdayusa.org"; LT middle drawer home ofc desk (LOC 6)   Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | Y | |

AV010500

EXHIBIT 57 - Page 761

| EV | 12 | 1 | Computers, equipment, & accessories - Blu USB with silv color lanyard "AVB"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | N | No Data in Date Range |
|----|----|----|----|----|----|----|----|----|
| EV | 13 | 1 | Computers, equipment, & accessories - L.Blu PNY USB, 8GB, w/blk lanyard; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: PNY Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | Y | N | No Data in Date Range |
| EV | 14 | 1 | Computers, equipment, & accessories - Wht/Red triangle shaped USB "GUESS logo"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 15 | 1 | Other - Silv ▓▓▓▓▓ Digital Voice Recorder, ▓▓▓ ▓▓▓▓▓ LT middle drawer home ofc desk (LOC 6) Serial Number: Unknown Booked At: OTHER | 9/14/2022 | N | N | N | No Data in Date Range |

AVO10501

EXHIBIT 57 - Page 762

| EV | 16 | 1 | Phones/Cell - ▓▓▓▓ Cellphone; top middle dresser drawer in SW BR (LOC 6) Article: Cell Phone<br>Make: ▓▓<br>Model: ▓▓<br>Serial Number: ▓▓▓▓▓▓<br>DOJ File Control Number: ▓▓▓▓▓▓▓<br>Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 17 | 1 | Phones/Cell - ▓▓▓▓▓▓, IMEI ▓▓▓▓▓▓; top middle dresser drawer in SW BR (LOC 6)<br>Article: Cell Phone<br>Make: ▓▓▓▓▓<br>Serial Number: Unknown<br>Booked At: OTHER | 9/14/2022 | N | N | N | No Extraction |
| EV | 18 | 1 | Phones/Cell - Rose Gold color, LG cell phone; top middle dresser drawer in SW BR (LOC 6) Article: Cell Phone<br>Make: ▓▓<br>Model: ▓▓▓▓<br>Serial Number: ▓▓▓▓▓▓<br>DOJ File Control Number: ▓▓▓▓▓<br>Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 19 | 1 | Computers, equipment, & accessories - Silv MacBook Pro Laptop with multiple stickers; RT bottom dresser drawer SW BR (LOC 6)<br>Article: LAP TOP COMPUTER<br>Make: ▓▓▓▓<br>Model: ▓▓▓▓<br>Serial Number: ▓▓▓▓▓▓<br>DOJ File Control Number: ▓▓▓▓▓▓<br>Booked At: OTHER | 9/14/2022 | Y | N | N | Encrypted |
| | 20 | 0 | | | N | N | N | Not Booked at CIC |

AV010502

EXHIBIT 57 - Page 763

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 21 | 0 | | | N | N | N | Not Booked at CIC |
| | 22 | 0 | | | N | N | N | Not Booked at CIC |
| EV | 23 | 1 | Phones/Cell - ███████ Article: Cell Phone<br>Make: ███<br>Model: ████<br>Serial Number: Unknown<br>Booked At: DETECTIVE BUREAU | 9/15/2022 | Y | Y | Y | |
| | 24 | 0 | | | N | N | N | Not Booked at CIC |
| | 25 | 0 | | | N | N | N | Not Booked at CIC |
| EV | 26 | 1 | Computers, equipment, & accessories - Envelope containing black External Hard Drive, ██████, Black plastic , 1 TB located in "Patty Giggins" Office.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ██████<br>Model: ████████<br>Serial Number: ██████<br>Booked At: OTHER | 9/16/2022 | Y | N | N | Terminated per Warrant |
| EV | 27 | 1 | Computers, equipment, & accessories - ██████, Desktop, Silver plastic, located in Patty Giggens Office.<br>Article: COMPUTER DISPLAY SCREEN/MONIT<br>Make: ████<br>Model: Desktop<br>Serial Number: ████████<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

AV010503

EXHIBIT 57 - Page 764

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 28 | 1 | Computers, equipment, & accessories - Thumbdrive, "▮▮▮▮▮▮▮▮", Black plastic with Purple Tether Cord located in Operations Office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 29 | 1 | Computers, equipment, & accessories - Thumbdrive, "▮▮▮▮▮▮▮▮", Black plastic with Purple Tether Cord located in Operations Office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Centon<br>Model: ▮▮▮▮▮▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | Cloned Only |
| EV | 30 | 1 | Computers, equipment, & accessories - Main Server, "Dell Power Edge T-710, gray located in Server Room<br>Article: COMPUTER (CPU)<br>Make: ▮▮▮<br>Model: ▮▮▮▮▮▮▮▮▮▮<br>Serial Number: ▮▮▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Partial | Partial | N | Terminated per Warrant |
| EV | 31 | 1 | Computers, equipment, & accessories - ▮▮▮computer tower taken from Solis's office during MTA search warrant. Service Tag ▮▮▮▮▮▮▮<br>Article: COMPUTER (CPU)<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: Unknown<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |

AV010504

**EXHIBIT 57 - Page 765**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 32 | 1 | Computers, equipment, & accessories - ▇▇▇ Laptop from wiggins office during MTA search warrant<br>Article: LAP TOP COMPUTER<br>Make: ▇▇<br>Model: ▇▇<br>Serial Number: ▇▇▇▇<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |
| EV | 33 | 1 | Computers, equipment, & accessories - blk/sil METRO thumbdrive from wiggins office from MTA search warrant<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Unknown<br>Serial Number: Not Applicable<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |
| EV | 34 | 1 | Computers, equipment, & accessories - ▇▇▇ computer tower from wiggins office from MTA search warrant, ▇▇▇▇▇▇▇<br>Article: COMPUTER (CPU)<br>Make: ▇▇<br>Model: ▇▇<br>Serial Number: Unknown<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |
| EV | 35 | 1 | Computers, equipment, & accessories - Blk/Sil laptop from solis's office during MTA search warrant.<br>Article: LAP TOP COMPUTER<br>Make: ▇▇<br>Model: ▇▇▇<br>Serial Number: ▇▇▇▇<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AVO10505

**EXHIBIT 57 - Page 766**

| EV | 36 | 1 | Computers, equipment, & accessories - Blk/Sil ▉ computer tower from Soli's office during MTA search warrant. ▉▉▉▉ Article: COMPUTER (CPU) Make: ▉ Model: ▉ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 37 | 1 | Computers, equipment, & accessories - Blk/Sil ▉ computer tower from Avila's office during MTA search warrant. ▉▉▉▉ Article: COMPUTER (CPU) Make: ▉ Model: ▉ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 38 | 1 | Computers, equipment, & accessories - Blk/Sil ▉ Computer tower from Bercerra's office during MTA search warrant. ▉▉▉▉ Article: COMPUTER (CPU) Make: ▉ Model: ▉ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 39 | 1 | Computers, equipment, & accessories - Sil/Org portable hard drive from Becerra's office during MTA search warrant and blk cable Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▉ Model: Not Applicable Serial Number: ▉▉▉ Booked At: OTHER | 9/16/2022 | N | N | N | Not Assigned - Not in Search Warrant |

AV010506

**EXHIBIT 57 - Page 767**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 40 | 1 | Computers, equipment, & accessories - Sil/Ylw 2GB ▉▉▉ thumbdrive from Becerra's office during MTA search warrant<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 41 | 1 | Phones/Cell - Blk apple cellphone from Becerra's office during MTA search warrant. Sim card attached to back.<br>Article: Cell Phone<br>Make: ▉▉▉<br>Model: ▉▉▉<br>Serial Number: Unknown<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 42 | 1 | Computers, equipment, & accessories - Blk/Sil ▉▉ computer tower from Hernadez's office during MTA search warrant. ▉▉▉▉▉▉ Article: COMPUTER (CPU)<br>Make: ▉▉▉<br>Model: ▉▉▉<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 43 | 1 | Computers, equipment, & accessories - Blk ▉▉▉▉ 500GB drive from Hernadez's office, inside plastic wrap belonging to Jeniffer Loew.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▉▉▉<br>Model: ▉▉▉▉▉▉<br>Serial Number: ▉▉▉▉▉▉<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AVO10507

EXHIBIT 57 - Page 768

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 44 | 1 | Computers, equipment, & accessories - Blk/Sil ▇ computer tower from Hernandez's office during MTA search warrant. ▇▇▇▇▇▇ Article: COMPUTER (CPU) Make: ▇▇ Model: ▇▇ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | N | N | N | Not Booked at CIC |
| EV | 45 | 1 | Computers, equipment, & accessories - 2 red/blk 32GB ▇▇ thumbdrives from Hernandez's office. Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▇▇ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| A3B | 46 | 1 | Computers, equipment, & accessories - red/blk 4GB Innovera thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▇▇ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 47 | 1 | Computers, equipment, & accessories - blk 32GB ▇▇ thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make ▇▇ Model: Not Applicable Serial Number  Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AV010508

EXHIBIT 57 - Page 769

| EV | 48 | 1 | Computers, equipment, & accessories - whi/grn ▓ 64GB thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▓ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 49 | 1 | Computers, equipment, & accessories - Sil/Blk/Whi METRO thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | N | No Data In Date Range |
| EV | 50 | 1 | Computers, equipment, & accessories - Blk/Sil ▓ computer tower from England's office. S▓ ▓Article: COMPUTER (CPU) Make: ▓ Model: ▓ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 51 | 1 | Computers, equipment, & accessories - red/sil 8GB thumbdrive from Englund's office during MTA search warrant. Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AVO10509

EXHIBIT 57 - Page 770

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 52 | 1 | Electronics (audio, TV) - blk sanyo tape recorder from kuehls house<br>Article: Other<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | N | N | N | No Date in Date Range |
| EV | 53 | 1 | Computers, equipment, & accessories - Silver ▮▮▮▮ computer<br>Article: LAP TOP COMPUTER<br>Make: Unknown<br>Model: Unknown<br>Serial Number: ▮▮▮▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | N | N | N | Encrypted |
| EV | 54 | 1 | Computers, equipment, & accessories - SILVER APPLE COMPUTER<br>Article: LAP TOP COMPUTER<br>Make: ▮▮▮▮<br>Model: Unknown<br>Serial Number: ▮▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | N | N | N | Partial Image |
| EV | 55 | 1 | Phones/Cell - rose gold ▮▮▮▮ cellphone with blu case taken from Kuehl's residence.<br>Article: Cell Phone<br>Make: ▮▮▮▮<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AV010510

EXHIBIT 57 - Page 771

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 56 | 1 | Computers, equipment, & accessories - SILVER ▇▇ COMPUTER<br>Article: LAP TOP COMPUTER<br>Make: ▇▇<br>Model: Unknown<br>Serial Number: ▇▇▇▇▇ | 9/16/2022 | Y | Y | Y | |
| EV | 57 | 1 | Computers, equipment, & accessories - sil ▇▇ cd drive and whi cable from kuehl's residence<br>Article: OTHER<br>Make: ▇▇<br>Model: ▇▇▇▇<br>Serial Number: ▇▇▇▇<br>Booked At: OTHER | 9/16/2022 | N | N | N | CD Player |
| EV | 58 | 1 | Phones/Cell - ROSE GOLD ▇▇ Article: Cell Phone<br>Make: ▇▇<br>Model: ▇▇<br>Serial Number: ▇▇▇▇▇<br>Booked At: OTHER | 9/16/2022 | N | N | N | Damaged Phone/No Extraction |
| EV | 59 | 1 | Computers, equipment, & accessories - sil ▇▇ 80GB computer drive Article: OTHER<br>Make: ▇▇<br>Model: ▇▇<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | N | N | N | Damaged Phone/No Extraction |
| EV | 60 | 1 | Cameras: Equip & Access - sil nikon coolpix digital camera from kuehl's residence<br>Article: CAMERA<br>Make: nikon<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

AV010511

EXHIBIT 57 - Page 772

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 61 | 1 | Cameras: Equip & Access - blk ███████ sx110 digital camera from kuehls residence.<br>Article: CAMERA<br>Make: ████<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 62 | 1 | Computers, equipment, & accessories -<br>red ██████ 4 GB thumbdrive with zelda paperwork from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: sandisk<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 63 | 1 | Computers, equipment, & accessories -<br>blu 16GB ███ thumbdrive from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ███<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 64 | 1 | Computers, equipment, & accessories -<br>USB DRIVE ████████ 1GB<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ███████<br>Model: ████████<br>Serial Number ████████<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

AV010512

**EXHIBIT 57 - Page 773**

| EV | 65 | 1 | Computers, equipment, & accessories -<br>whi 256GB ▓▓▓▓ thumbdrive from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▓▓▓▓<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 66 | 1 | Computers, equipment, & accessories -<br>USB DRIVE 1GB<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: SCAN DISK<br>Model: ▓▓▓▓<br>Serial Number: ▓▓▓▓▓▓<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 67 | 1 | CDs/Video - cd disc labeled LA political roast from kuels<br>residence<br>Booked At: OTHER | 9/16/2022 | N | N | N | Not Assigned -<br>Not in Search<br>Warrant |

AVO010513

EXHIBIT 57 - Page 774

# EXHIBIT 2

AV010514

**EXHIBIT 57 - Page 775**





AV010515

**EXHIBIT 57 - Page 776**

**PROOF OF SERVICE - 1013A(3), 2015.5 C.C.P.)**

1

2

3    STATE OF CALIFORNIA        )
                               ) ss
4    COUNTY OF LOS ANGELES      )

5

6    I am employed in the County of Los Angeles, State of California   a   ove th  ag o 1  an  no    part  t  th  withi
     action  m  busines  addres  i 88  Wes  Sixt  Street  Suit  400 Lo  Angeles  Californi  90017

7    O  Septembe 22 2022, I serv  d t  e foregoi  g document, described as

8
     **SUPPLEMENTAL DECLAR  TION OF SG  ., MAX FERNANDEZ   UR UANT TO COUR 'S**
9    **O  DER DATED SEP  EMBER  0,  022**

10   on all  nterest  d part es li te  below by tr ns  itt ng to all  nterest  d part es a true co  y  hereof as follows:

11

12   | **Cheryl O'Connor, Esq.** | **Robert Dugdale, Esq.** |
13   | JONES DAY | KENDALL BRILL & KELLY LLP |
     | 3161 Michelson Drive, Suite 800 | 10100 Santa Monica Blvd., Suite 1725 |
14   | Irvine, CA 92612 | Los Angeles, CA 90067 |

15

16   | **Harvinder S. Anand, Esq.** | **Dawyn Harrison, Esq.** |
     | ANAND LAW GROUP | Office of the County Counsel, |
17   | 790 E. Colorado Blvd., # 900 | 648 Hahn Hall of Admin. |
     | Pasadena, CA 91101 | 500 W Temple St, |
18   | | Los Angeles, CA 90012 |

19

20   ☒  BY MAIL by placing a true copy thereof enclosed in a sealed envelope addressed as set forth above  I am
21   readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it
     would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles,
22   California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid
     if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.
23

24   ☒   BY ELECTRONIC TRANSMISSION by transmitting a PDF version of the document(s) by electronic mail to the
25   party(s) identified on the service list using the e-mail address(es) indicated

26   ☒  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

27

28   Executed on September 22, 2022, in Los Angeles, California

                                                          Michele Kirk

AV010516

**EXHIBIT 57 - Page 777**

# ATTACHMENT C

AV010517

**EXHIBIT 57 - Page 778**



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
645 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713



TELEPHONE

FACSIMILE

TDD

DAWYN R. HARRISON
Acting County Counsel

September 21, 2022

| CONFIDENTIAL |
| --- |
| THIS MATERIAL IS SUBJECT TO THE ATTORNEY-CLIENT AND/OR THE ATTORNEY WORK PRODUCT PRIVILEGES |

VIA EMAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

Re:    Response to Your September 20, 2022 Letter

Dear Sheriff Villanueva:

This in response to your letter dated September 20, 2022, stating you are refusing Bill Seki as counsel for the County of Los Angeles Sheriff's Department ("LASD")and engaging the appropriate counsel.

First, all the issues raised in your letter are moot. Yesterday, California Attorney General Rob Bonta notified Undersheriff Murakami that his office is assuming responsibility for: a) any investigation into whether individuals committed a crime by giving advance warning of the search warrants to Supervisor Kuehl and Patricia Giggans; and b) the underlying investigation of Peace Over Violence, Patricia Giggans, Supervisor Sheila Kuehl, Los Angeles Metropolitan Transportation Authority, etc., including the warrants issued in 2021 and 2022. As you acknowledged previously, the Attorney General has the authority to assume these responsibilities because he has complete supervisorial authority over you and may direct your and LASD's investigative activities. In the Attorney General's letter he stated the LASD "should cease its investigative activity and refrain from any actions in furtherance of these investigations, including public statements or court filings related to the investigations." Based on that directive, you did not have authority to send your September 20, 2022, letter, nor does the LASD require legal services relating to the continued investigation by the Attorney General. To the extent that counsel is required for the LASD to explain prior conduct in connection with the 2021 and 2022 warrant proceedings, Mr. Seki will continue to represent the LASD.

HOA 103648555 5

AV010518

EXHIBIT 57 - Page 779

The Honorable Alex Villanueva
September 21, 2022
Page 2

     Second, I wanted to remind you that only the Office of County Counsel, or the law firms we retain, may represent you, in your official capacity, and the LASD.[1]  Further, even if all of the requirements of Government Code section 31000.6 – Employment of Legal Counsel to Assist Assessor or Sheriff; Conflicts of Interest - are met and conflict of interest counsel is deemed appropriate for you in your official capacity, the conflict counsel must be retained through my office.[2]  Therefore, you have no authority to retain your own counsel to represent either you or the LASD, nor is the County of Los Angeles responsible for any of the costs incurred by those law firms.  I recently discovered that you improperly retained Werksman Jackson & Quinn LLP in this matter.  I will notify them that they have no authority to represent you or LASD and will not be paid by the County of Los Angeles, and I will copy the Attorney General's Office.

                            Very truly yours,

                            DAWYN R. HARRISON
                            Acting County Counsel

DRH:gl

Enclosures

c:    Timothy K. Murakami, Undersheriff

     John L. Satterfield, Commander
     Chief of Staff

---

    [1] Government Code section 25203 establishes that the board of supervisors shall "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, is a party." Los Angeles County Charter Article VI, section 21 vests County Counsel with "exclusive charge and control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party" (footnotes omitted). By law, the Office of County Counsel is charged with providing legal advice, on behalf of the Board, to constituent entities and officials within the County.  California Government Code section 23005 (County exercises authority "only through the board of supervisors" or its authorized agents); id. § 25203 (the Board shall "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, is a party"); Los Angeles, California, County Charter Article VI, section 21 (County Counsel is vested with "exclusive charge and control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party" (footnotes omitted))

    [2] Government Code section 31000.6. Please see the attached orders from *County of Los Angeles v Sheriff Alex Villanueva, et al.* regarding assignment of counsel.

HOA 103848555.5

AV010519

EXHIBIT 57 - Page 780

 

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE



ALEX VILLANUEVA, SHERIFF

September 20, 2022

Dawyn Harrison, Acting County Counsel
County of Los Angeles – Office of the County Counsel
500 West Temple Street, Suite 648
Los Angeles, California  90012

Dear Ms. Harrison:

**DEMAND FOR DEFENSE COUNSEL**

It appears clear you have no intention of removing your office's control as counsel to the Department on this matter.  Unless I misunderstood, you insist we continue to communicate and seek advice from your Senior Assistant County Counsel, Mr. Jason Gonzalez, and Mr. Bill Seki, as stated in your letter.

As you are aware, the morning of the search warrant service Supervisor Shelia Kuehl stated to reporters, *"I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning."*  In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all LASD social media accounts.

Ms. Kuehl's allegation that you, or a representative from your office, and Mr. Huntsman provided her with advanced knowledge of a criminal search warrant in which she was a suspect makes it unethical and inappropriate for your office to have further access to information or decision making regarding this matter.  Moreover, by retaining the services of Bill Seki, there is a clear further potential for you, or your office, to interfere in the filing of motions and overall employment status of Mr. Seki.  I must also highlight, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement today, both you and your office are likely to become the focus of a criminal investigation by the Office of the Attorney General, and as such the conflict of interest is undeniable.

Since you intend to continue blocking any independent counsel, we are forced to seek appropriate counsel in order to prevent further interference and/or obstruction of our investigation by your office.  Under the State Bar Rule 1.6, the potential for Mr. Seki to report information or communications to your office, and seek approval or denial for legal strategy, regarding our investigation disqualifies him as counsel.  Based on this, we can no longer accept Mr. Seki as counsel and decline his further legal services.

AV010520

**EXHIBIT 57 - Page 781**

Ms. Harrison                    -2-                    September 20, 2022

If I misunderstood your position, please advise. Due to the exigency of this pending matter, the
Department will engage the appropriate counsel and inform you once retained. Should you have
any questions, please contact Undersheriff Timothy Murakami, at ██████████. Thank you for
your anticipated cooperation with this matter.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV:JLS:js

c:      Jason Gonzalez, Senior Assistant County Counsel

AV010521

**EXHIBIT 57 - Page 782**



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713

DAWYN R. HARRISON
Acting County Counsel

September 20, 2022



TELEPHONE

FACSIMILE

TDD

**CONFIDENTIAL**

THIS MATERIAL IS SUBJECT TO THE
ATTORNEY-CLIENT AND/OR THE ATTORNEY
WORK PRODUCT PRIVILEGES

VIA EMAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

    Re:    **Response to Your September 19, 2022 Letter**

Dear Sheriff Villanueva:

        I am in receipt of your letter from yesterday requesting counsel to handle the court proceedings related to the warrants issued on Wednesday, September 14, 2022 ("2022 Warrants"). After reviewing the letter, I believe Undersheriff Murakami has not had a chance to let you know that Bill H. Seki, a partner at Seki, Nishimura & Watase, was assigned to handle the 2022 Warrants matters last week. It was our understanding, based on your and Undersheriff Murakami's press statements, that you were recused from handling the 2022 Warrants. As a result, we communicated directly with Undersheriff Murakami about assigning the defense of the 2022 Warrants to Mr. Seki and his firm on September 16, 2022, the day he made a request for counsel. Your department did not seek my office's assistance when it prepared the 2022 Warrants nor did it request to use Mr. Seki's professional services to assist in the preparation of the 2022 Warrants. Therefore, we had to quickly gather the necessary facts and perform an ethical and legal review when the Undersheriff requested counsel on September 16, 2022.

        By way of background, Mr. Seki has been representing your department on the warrants issued in February and March of 2021 to the Los Angeles County Metropolitan Transportation Authority (Metro), Office of the Inspector General of the Metro (OIG), and Peace Over Violence ("2021 Warrants") since March 2021. Mr. Seki has actively responded to multiple motions challenging the warrants,

HOA.103846887.3

AV010522

**EXHIBIT 57 - Page 783**

The Honorable Alex Villanueva
September 20, 2022
Page 2

communicated with your department about the warrants, and made several
appearances defending the warrants for your department, including the last one in
front of the Honorable Eleanor Hunter on September 1, 2022, addressing the
scope of the 2021 Warrants and ordering the assignment of a Special Master.

When Mr. Seki was retained to provide his professional services for the
2021 and 2022 Warrants, confidentiality silos were created. Those confidentiality
silos are in effect and will remain that way until the conclusion of these matters.
As to the other claims you make in your letter, I deny them and will not further
acknowledge them with a response.

If you have any questions about the 2021 or 2022 Warrants, please contact
Mr. Seki at███████, or Senior Assistant County Counsel Jason Gonzalez
at███████.

Very truly yours.

DAWYN R. HARRISON
Acting County Counsel

DRH:gl

c:     Timothy K. Murakami, Undersheriff

        John L. Satterfield, Commander
        Chief of Staff

HOA.103846887.3

AV010523

**EXHIBIT 57 - Page 784**

 

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

September 19, 2022

Dawyn Harrison, Acting County Counsel
County of Los Angeles – Office of the County Counsel
500 West Temple Street, Suite 648
Los Angeles, California 90012

Dear Ms. Harrison:

*DEMAND FOR DEFENSE COUNSEL*

Per Government Code § 995, this correspondence will serve as my demand as the elected Sheriff of Los Angeles County Sheriff's Department (Department) for defense counsel regarding: the service of search warrants against Metropolitan Transit Authority (MTA)/Kuehl/Giggans/Peace over Violence, wherein the Board of Supervisors is obligated to provide a defense. As you are aware, in Supervisor Kuehl's press interview[1], she explicitly named Max Huntsman, the Head of the Office Inspector General (OIG) and County Counsel, as involved in forewarning her on the service of the search warrant as to the exact date and time, which unequivocally shows your office cannot be involved, or provide legal advice regarding this matter and must assign separate and independent counsel to my office. Based on Supervisor Kuehl's statements, you or your office interfered in this matter, along with Mr. Huntsman. Consequently, your office and Mr. Huntsman, must legally and ethically recuse yourselves and any of your contract counsel from this matter, and provide me and the Los Angeles County Sheriff's Department independent counsel.

As you are aware, Government Code § 996, except as otherwise provided in Sections 995.2 and 995.4, upon request of an employee or former employee, a public entity shall provide for the defense of any civil action or proceeding brought against him, in his official or individual capacity or both, on account of an act or omission in the scope of his employment as an employee of the public entity. For the purposes of this part, a cross-action, counterclaim or cross-complaint against an employee or former employee shall be deemed to be a civil action or proceeding brought against him.

---

LASDHQ Twitter Account, Statement by Supervisor Sheila Kuehl to the media
http://twitter.com/LASDHQ/status/1598444017937526784?s=20&t=...&t=...

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012
*A Tradition of Service*
— Since 1850 —

AV010524

EXHIBIT 57 - Page 785

Ms. Harrison                    -2-                    September 19, 2022

Moreover, Government Code § 995.2 (b), provides in part:  If an employee or former employee requests in writing that the public entity, through its designated legal counsel, provide for a defense, the public entity shall, within 20 days, inform the employee or former employee whether it will or will not provide a defense, and the reason for the refusal to provide a defense.

Furthermore, as you are also aware, Government Code § 25303 provides in part:  This section shall not be construed to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff and district attorney of a county.  The board of supervisors <u>shall not obstruct the investigative function of the sheriff</u> of the county nor shall it obstruct the investigative and prosecutorial function of the district attorney of a county.

Finally, Los Angeles County Code of Ordinances § 6.44.190, provides in part:  The OIG shall not disclose, without the Sheriff's authorization, any of the Sheriff's Department's confidential personnel, investigative, or disciplinary information unless such information is already a matter of public record.

Should you fail to provide defense counsel in this matter, I will ask the court to order you, on behalf of the Board of Supervisors, to comply with their obligation by a Petition for Writ of Mandate.

As you are also aware, if you deny my demand for counsel, I am entitled to recover from the public entity such reasonable attorney's fees, costs and expenses as are necessarily incurred in defending the action or proceeding if the action or proceeding arose out of an act or omission in the scope of his employment as an employee of the public entity.  See, <u>Sparks v. Kern County (2009)</u> 173 Cal App. 4th 194.

Your response in writing is due by the end of the next business day from the date of this letter, <u>Tuesday, September 20, 2022</u>.  Upon receipt, we will advise of the firm of my choosing.  Should you have any questions, please contact my Chief of Staff, Commander John Satterfield, at ███████████.  Thank you for your anticipated cooperation with this matter.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010525

EXHIBIT 57 - Page 786

**Fwd: Latest MTA/Kuehl/Giggans warrants**

From: ███████████@counsel.lacounty.gov>
Sent: Wednesday, September 14, 2022 5:39 PM
To: ███████████aw.com>
Cc: ███████████@counsel.lacounty.gov>
Subject: Latest MTA/Kuehl/Giggans warrants

Hi Bill

I know you've had some conversations with Lana today about the newest round of warrants served by LASD this morning in the MTA/Kuehl/Giggans matter, and I just wanted to advise that County Counsel is not currently authorizing you to appear/work on those warrants on behalf of the Sheriff's Department. Please let me know if you have any questions. Thanks,



Assistant County Counsel
███████ Division

AV010526

EXHIBIT 57 - Page 787

 Los Angeles County Sheriff's Department ✓
September 16 at 11:49 AM · 🌐

⋯

LA County Counsel Terminates LASD's Lawyer Same Day Supervisor Kuehl's Warrant is Challenged in Court

In an unprecedented move of retaliation after Wednesday's lawful service of a search warrant on the residence of Supervisor Sheila Kuehl and others, the Board of Supervisor's Office of County Counsel has terminated the services of LASD's legal representation. Simply put, the Board of Supervisors and County Counsel fired our lawyer the same day our search warrant was challenged in court and an emergency hearing was set for September 22, 2022.

This is exactly the type of obstruction, interference, and political shenanigans which Sheriff Alex Villanueva fights against daily. We are now forced into a position of being unrepresented with no County authorization to pay for legal representation and reduced to solicit pro bono representation in this matter.

If Supervisor Sheila Kuehl, Commissioner Patty Giggins, The Board of Supervisors, County Counsel and the Office of the Inspector General are as committed to transparency and accountability as they continuously state, then why are they scared for these electronic devices to be examined and fighting the search warrant?

Find Latest Attack on Giggans warrants





AV010527

EXHIBIT 57 - Page 788

# ATTACHMENT D

AV010528

EXHIBIT 57 - Page 789

761551N25A · SH  AD  32A (2/72)

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
"A Tradition of Service"

OFFICE CORRESPONDENCE

DATE: December 17, 2004

FILE NO.

| FROM: ALEX VILLANUEVA, SERGEANT | TO: | DIVISION CHIEFS AND COMMANDERS |
|---|---|---|
| CARSON STATION | | |

SUBJECT:     AN OPEN LETTER

The purpose of this memorandum is to dispel any rumors and inform you of my intentions regarding my future with our Department.    As you all well know, I have been exhausting all administrative remedies to address my denial of promotion stemming from the 2003 Lieutenant Examination, and now I have read the most recent Intent to Promote teletype for lieutenants.    As expected, I was not included on this list for reasons you know in more detail than I do, as I can only speculate what transpires behind closed doors.

Up to this point in time my experience, education, leadership, and communication skills have always served me well.    During my ten years experience with the United States military I was privileged to have been promoted six times to positions of higher rank and responsibility.    Perhaps this experience has burnished in me an expectancy of merit based promotions, and this expectancy was unrealistically carried over to our Department.

From what I have come to understand regarding ethical administrative behavior, I find no legal or moral justification for the activities you have engaged in over the course of the last year and a half.    From rewriting oral interview scoring standards in order to deliberately suppress exam scores, providing secret exam preparation classes for the privileged few, and gaming the appeals process in order to gerrymander the candidate pool, you have compromised your integrity and that of the Department's.

Perhaps you have succumbed to a moral inversion, wherein you believe your actions and those of your peers are in the best interest of the Department and supported by civil service rules.    Your decision making is a result of group-think and the feeling of infallibility, making it difficult for you to see beyond your own career success.    I want to encourage each and every one of you to take a moment and engage in critical reflexivity, the ability to see the organization through someone else's experience.

Page 1 of 2

AV010529

**EXHIBIT 57 - Page 790**

My organizational experience has told me that I do not count, no matter what my qualifications may be, how hard I work, or how many bright ideas I possess. I do not get "invited" to apply to jobs, nor are jobs created exclusively for me. There is no captain or higher pushing aside more qualified individuals in order to make room for me, or steering me in the "right" direction. There is no rater who overlooks my shortcomings and gives me undeserved outstanding evaluations or 100 AP's. My queries are addressed with attorneys and mind-numbing technical rationality.

Promoting dozens of individuals to the rank of lieutenant is a wonderful opportunity to assert organizational values such as meritocracy, equality, and diversity, while at the same time promoting efficiency and effectiveness, and boosting the moral of the Department. Instead you deliberately chose the values of cronyism, nepotism, and tokenism. These have been the same values you have been espousing with just about every promotional process within our ranks. This negatively impacts public safety by promoting corruption and incompetence.

I am curious to know just how much public resources you will squander as you attempt to defend the indefensible. Deliberately attempting to suppress or retard the upward mobility of Latinos on our Department is illegal, immoral, and politically incomprehensible. Each and every one of you contributes to this unfolding tragedy by your actions or inactions. I will say this: as a Latino, I do not seek special favors, accommodations, or any sort of "affirmative action" in order to receive a promotion. I expect to be promoted because there is a clearly identified universal standard based on bonafide occupational qualifications, not golf handicaps or quotas.

It has been painful watching you lie, obfuscate, conceal, mislead, or otherwise attempt to hide the truth. I want to encourage you to come to grips with the damage you inflict on our institution, and do what's right. In an interesting parallel to our Department, NASA swore after the Challenger tragedy that it should never happen again, then along came Columbia. After spending over $30 million addressing Bouman, it is truly frightening to behold how little has been learned.

Leadership is defined by action, not position, and I plan to act decisively to assert my rights, not only as an employee, but as a citizen and proud resident of this County. Your legacy and the future of equality and equal opportunity in Los Angeles County are at a crossroads. I hope you make the right choices for the benefit of the County and the Department, and I must remind you that it is 2004, not 1964. Just as in Martin Luther King's day, I am confident of the supremacy of a simple idea - all men are created equal.

AV:av

Page 2 of 2

AV010530

EXHIBIT 57 - Page 791

# ATTACHMENT "D"

AV010531

**EXHIBIT 57 - Page 792**



**From:** Williams, Dara
**Sent:** Wednesday, October 12, 2022 5:54 PM
**To:** Corbett, Brendan J. ███████████ ; Chase, Bruce D. ███████████ Francisco, Holly A.
███████████ ; OIG/COC Requests
**Subject:** Report Card On Sheriff's Department's Reforms 2019 to 2022 - Validation Draft

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments

Dear Assistant Sheriffs Corbett, Chase, and Francisco,
Attached is a validation draft of an Office of Inspector General Report Card on Sheriff's
Department Reforms – 2019 to 2022. Please review the draft and provide any input or requested
changes by the close of business on **October 20, 2022**. As a professional courtesy we have
included the Audit and Accountability Bureau in this email.

As always, we find it beneficial if you bring any requested changes or input to our attention prior
to October 20th in an effort to engage in a dialogue during the time the report is under review
by the Sheriff's Department. If we are not aware of any requests or responses by the Sheriff's
Department prior to that date, it is unlikely that we will make any adjustments prior to our
anticipated report issuance date.

Please do not hesitate to reach out to me if you would like to discuss any portion of the report.
The best way to reach me is on my cell phone, which is listed below.
Best regards,
Dara

**Dara Williams (she/her) | Chief Deputy, Inspector General**
Los Angeles County Office of Inspector General
312 S. Hill Street, 3rd Floor, Los Angeles, CA 90013
(T) ███████████
(C) ███████████
(F) ███████████

*Failure of county employees to timely comply with requests for information from the Office
of Inspector General is a violation of Government Code section 25303, Los Angeles County
Code section 6.44.190 and, under specified circumstances, Penal Code section 13670. Failure
to cooperate with an investigation into potential police misconduct may result in revocation
of peace officer certification. (Penal Code section 13510.8(b)(6).)*

*CONFIDENTIALITY NOTICE: This communication with its contents contains confidential and
legally privileged information. It is solely for the use of the intended recipient. Unauthorized
interception, review, use, or disclosure is prohibited and may violate applicable laws including the
Electronic Communications Privacy Act. If you are not the intended recipient, please contact the
sender and destroy all copies of the communication.*

AV010532

**EXHIBIT 57 - Page 793**



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF



October 28, 2021

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

**IMMINENT THREAT TO PUBLIC SAFETY**

As the elected Sheriff of Los Angeles County serving over ten million residents and managing an organization of 18,000 employees, I am notifying you of the imminent threat to public safety which will be created by your vaccination mandate and ratified by the Los Angeles County Board of Supervisors (Board) on August 10, 2021.  If I were to follow your mandate, I could potentially lose 44 percent of my workforce in one day.  I cannot enforce reckless mandates that put the public's safety at risk.

The Los Angeles County Sheriff's Department (Department) has already been "defunded" by over one thousand positions.  The Los Angeles County Board of Supervisors is the only board in the entire nation that has continued with last year's defund law enforcement movement.  Every other board in the nation has restored funding to their law enforcement agencies.  As of this week, homicide rates are up to 44 percent and aggravated assaults are up nearly 23 percent.  Despite the substantial loss of personnel, increase in workload, and rise in crime, I have been provided no additional resources by the Board, and you continue to defund my department and freeze my service budget.

For the entire course of this pandemic and prior to any vaccination being available, my employees worked tirelessly to fulfill their commitment to public safety by continuing to answer calls for service, maintaining safe jails, and even assisting to vaccinate our most vulnerable at-risk community members.  It is heartbreaking to think that these employees who worked through the pandemic and were called "heroes" are now being threatened with termination because they make a personal medical choice.



211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— Since 1850 —

AV010533

**EXHIBIT 57 - Page 794**

The Honorable Board of Supervisors          -2-                    October 28, 2021

Compounding this issue is the fact my Department is experiencing a mass exodus of employees who are retiring early. I currently have 1,605 employees that have 28 years of service or more. This means they could retire without financial consequence. This mandate would certainly expedite many of these employees decision to retire.

This Board's mandate will cause patrol services to significantly decline. I would be forced to take drastic measures such as reducing services to the County and contract residents, which would cause the closure and realignment of patrol stations. Specialized units including our Aero and Special Enforcement Bureaus, and Headquarters Detectives would be nearly eliminated.

Of great concern is the upcoming fire season. With the reduction of personnel, I would be unable to mobilize and deploy mobile field forces, which are critical in conducting evacuations during disasters. I have conveyed to other local law enforcement partners I could potentially not have resources to deploy in their time of need due to critical staffing shortages created by this Board's mandate.

There are other alternatives that the Department has incorporated to combat the COVID-19 virus. I have ordered my staff to wear masks. Those that have not been vaccinated must submit to COVID-19 testing. With the pandemic waning, there is no justification for your mandate. This mandate is like putting up storm windows after the storm has passed.

Unlike other County departments that can close their doors and merely cause an inconvenience to the general public, the Department operates 24/7 to protect the public. I cannot afford to cut emergency services or choose not to send a patrol car to assist a community member in need. As the Sheriff, I can firmly tell you this mandate will create a pandemic of chaos within our county resulting in tragic losses.

Should you have any questions or would like to discuss further, please feel free to contact me at ██████████.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010534

**EXHIBIT 57 - Page 795**

# EXHIBIT 58

EXHIBIT 58 - Page 796





## OFFICE OF THE SHERIFF

### COUNTY OF LOS ANGELES

#### HALL OF JUSTICE



ALEX VILLANUEVA, SHERIFF



October 19, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

### RETALIATION BY THE OFFICE OF THE INSPECTOR GENERAL

On February 18, 2021, I sent you a letter titled, *"The Need for an Honest and Objective Inspector General"* [Attachment A].  In the letter I documented numerous examples of Mr. Max Huntsman's lack of integrity, objectivity, confidentiality, ethics, professionalism, accountability, and an overall lack of intellectual honesty.

On September 21, 2022, I sent you a letter titled, *"Request for Removal of Max Huntsman as Inspector General Resulting from Allegations of Conspiracy to Commit Obstruction in Search Warrant"* [Attachment B].  I wrote to you listing the reasons why Mr. Huntsman needed to be relieved of his duties.

On October 3, 2022, I sent you a letter titled, *"Demand to Relieve Specified Confidential Employees from their Duties of Public Trust"* [Attachment C].  This was connected to the alleged conspiracy to commit obstruction of justice involving the unlawful sharing of confidential search warrant information with Supervisor Sheila Kuehl by members of her staff, the Office of County Counsel (County Counsel), and Mr. Huntsman.

You have chosen not to provide a response to any of the correspondences mentioned above, and you have failed to take any corrective action regarding these matters.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

AV010458

**EXHIBIT 58 - Page 797**

The Honorable Board of Supervisors    -2-      October 19, 2022

On October 12, 2022, my Assistant Sheriffs received an e-mail from Dara Williams of the Office of the Inspector General (OIG) [Attachment D], advising them of a report being issued by their office on October 21, 2022, titled "*Report Card on Sheriff's Department's Reforms 2019 to 2022.*"

Concocting a new way to recycle old information, thus generating media attention and a false narrative during the election cycle, is blatant retaliation by the OIG in response to my public calls for his removal, pure and simple. This manner of regurgitating past reports and calling it a "report card" has never been done for previous sheriffs, and the timing is obviously designed to affect the outcome of the election. A true "report card" would occur AFTER my first term, not in the final weeks leading up to the election.

Additionally, the manner in which this report was designed is intentionally unethical and harmful. Providing all of the recommendations written over the last four years, while deliberately deleting the volumes of responses the Department has provided to the OIG is specifically engineered to hurt both the Department and me.

The vast majority of OIG's recommendations over the years are unattainable due to either lack of funding or lack of personnel. Never once has anyone from the OIG advocated to add funding, lift the hiring freeze, or increase staffing of the Department in order to achieve some of these recommendations.

As a reminder of the hypocrisy, County Counsel showed deference to the previous sheriff in similar matters, as evidenced by the video depicting Elizabeth Miller of County Counsel, where she explained that County Counsel did not investigate during the months leading up to the election, so they would not potentially influence the outcome.

For the truth about any of these issues, please go to https://lasd.org/transarency/.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield at ████████████.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010459

**EXHIBIT 58 - Page 798**

The Honorable Board of Supervisors          -3-                    October 19, 2022

AV:JLS:ac                        .

Attachments:

A - Letter: The Need for an Honest and Objective Inspector General
B - Letter: Request for Removal of Max Huntsman as Inspector General Resulting from
        Allegations of Conspiracy to Commit Obstruction in Search Warrant
C - Letter: Demand to Relieve Specified Confidential Employees from their Duties of
        Public Trust
D - Email: Dara Williams, OIG

AV010460

**EXHIBIT 58 - Page 799**

# ATTACHMENT "A"

AV010461

**EXHIBIT 58 - Page 800**





# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

February 18, 2021

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### THE NEED FOR AN HONEST AND OBJECTIVE INSPECTOR GENERAL

The purpose of this communication is to advise you of my grave concerns with the conduct of your appointed Inspector General (IG), Max-Gustaf Huntsman, and the publications authored by his office which directly influence the unsuspecting public's perceptions regarding both the credibility of the Los Angeles County Sheriff's Department (Department) and the legitimacy of our operations. His zealot-like behavior continues to create civil liability for the County and potentially endangers the life of deputies in the field, as he artificially stokes animosity between the Department and the community.

In addition to potentially endangering the lives of our deputies, his intellectual dishonesty places the public at an increased risk. After utilizing good communication and de-escalation strategies, deputies can only ultimately perform the detention or arrest of an individual one of two ways: 1) The person voluntarily submits to lawful authority; or, 2) The person resists and the deputy uses force to overcome their resistance and gain safe control. As the public continues to be misled by Mr. Huntsman as to the Department being engaged in widespread "unlawful conduct," they are far less likely to voluntarily comply. Statistically, this in and of itself places members of the public in situations that are far less likely to have a peaceful resolution.

The expectation of the public regarding the conduct of an IG is they are dedicated to serving the public's interest by working tirelessly to fairly assess the operations of any given organization and provide meaningful input for reforms, which may be required to adapt to an ever-changing world. Indeed, the National Association of Inspectors General posits this public expectation is best served when:

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
~ Since 1850 ~

SCANNED & EMAILED TO BOS LIAISON
TEAM 2/18/21

AV010462

**EXHIBIT 58 - Page 801**

The Honorable Board of Supervisors          -2-          February 18, 2021

This public expectation is best served by inspectors general when they follow the basic principles of integrity, objectivity, independence, confidentiality, professionalism, competence, courage, trust, honesty, fairness, forthrightness, public accountability, and respect for others and themselves (AIG Principles and Standards, pg. 3, 2014).

Please note the first two principles outlined above, integrity and objectivity. I will provide you a brief rundown of the fundamental defects of Mr. Huntsman's work product, starting with the most recent publications and working our way back towards the start of my administration.

The Office of Inspector General (OIG) report "Review and Analysis of Misconduct Investigations and Disciplinary Process" released in February 2021 suffers from multiple fatal defects, chief among them the fallacy of a study period (2015-2019) which encompasses two administrations without distinguishing and contrasting the data from both. Another fatal flaw is the use of individual cases in an anecdotal fashion as representative of the entire Department's operation without providing proper context with the totality of cases investigated and discipline rendered. A select quote from the introduction:

Notwithstanding the current Sheriff's assertions, we were not provided by the Sheriff, and in our review, we did not observe or find, any evidence of falsification of evidence or reports which resulted in the wrongful discipline of a department employee (pg. 4, 2021).

This statement is demonstrably false and illustrative of the nature of the report itself. The Department conducted an in-depth analysis of the Mandoyan case, which is now a public document, wherein it was proven that a key exculpatory witness was identified, interviewed, and the results concealed from both the Civil Service Commission and the employee fighting the discharge (see the Department's Case Analysis, October 1, 2019).

The next production from the OIG, "Report Back on Unlawful Conduct of the Los Angeles County Sheriff's Department" was a letter dated December 14, 2020, addressed to the Civilian Oversight Commission (COC), purportedly in response to a request from Commissioner Priscilla Ocen. The starkly sophomoric report amounted to nothing more than a rehash of current and past litigation and a torturous defense of the legal fallout from Mr. Huntsman's oversteps in a homicide investigation.

This report was designed exclusively as a political tool to discredit the Department and does not appear to have any legitimate purpose in oversight, transparency, or accountability. Perhaps the most startling false statement is the section subtitled

AV010463

**EXHIBIT 58 - Page 802**

The Honorable Board of Supervisors          -3-                    February 18 2021

"Failure to Investigate and Prohibit Deputy Secret Societies (pg 12)    Mr Huntsman has
the Department's criminal and administrative investigations of the Kennedy Hall incident
from former Sheriff Jim McDonnell's tenure  and he is aware that 26 employees were
disciplined, including four who were terminated as a result of that administrative
investigation   Mr Huntsman is also aware of the Department's new policy regarding
forming or participating in deputy subgroups  which was issued in February 2020 and is
being vigorously enforced

The preceding report  "The Right to Know Act  Los Angeles County Sheriff's
Department Response to Police Transparency Reform" was published in November
2020  and in typical OIG fashion  deliberately used outdated information from January
2020 to make the false claim the Department was not complying with SB 1421  For
the record  as of December 31  2020  the Department achieved full compliance with
SB 1421 with a 96 45 percent rate  a number Mr  Huntsman was well aware was in the
making and far different than the 70 percent non compliance rate he reported just a
month earlier

Mr Huntsman is also aware of the issues the Department has had since the inception of
SB 1421  with antiquated databases that do not communicate with each other and the
severe lack of staffing to meet the new requirements (a failure of leadership by the
previous administration)   To wit  in a letter dated July 6  2020  to former Board of
Supervisors (BOS) Chair  Supervisor Kathryn Barger  the Department outlined six
different occasions where we requested additional resources through the Chief
Executive Office and were denied repeatedly   It was only through cannibalizing
different functions of the Department that we were able to muster enough personnel to
satisfy SB 1421 and California Privacy Rights Act requests   Comparing our operation to
Los Angeles Police Department's is a dishonest comparison based on disparate funding
levels  IT infrastructure  and staffing levels

Looking through the sheer number of reports authored by the OIG  a persistent pattern
emerges wherein the OIG ignores Department investigations  results of investigations
and actions taken in response to complaints from the public   The November 17  2020
report back to the COC regarding the alleged harassment of family members after fatal
deputy-involved shootings is one example of this  The report negates in its entirety the
concerns of the public over impromptu memorials and gang members loitering in the
vicinities of their homes  concerns which were addressed properly by the Department s
report

Examining the OIG s report s table of contents alone since its inception reveals a
deferential OIG during former Sheriff McDonnell s administration  with report titles of a
generic and non-inflammatory nature  unlike those published during my administration

AV010464

EXHIBIT 58 - Page 803

The Honorable Board of Supervisors          -4-                    February 18  2021

As a matter of fact  the OIG generated as many reports during my first two years in
office as they did during all of former Sheriff McDonnell's tenure  and that includes the
conspicuously "confidential" report Mr  Huntsman prepared to bury the potentially illegal
actions of former Sheriff McDonnell's Assistant Sheriff  Mike Rothans  for his purchase
of a stolen vehicle from a contracted tow company

Without question  these "reports" would be rejected by any legitimate academic
institution   They are filled with unproven allegations  anecdotal data  omissions
distortions  and an overall permeation of bias and intellectual dishonesty  They are truly
not the level of accuracy and authenticity expected in County government
Furthermore  if my own deputies consistently authored documents at this level  they
would at the very least be placed on a performance improvement plan  and in cases of
deception  omission  and lack of honesty  an administrative investigation would be
conducted  I believe the responsibility for performance and accountability issues with
Mr Huntsman belongs  in part  to the COC  Yet  they seem too hyper-focused on
political activism and calls for my own resignation to focus on this duty

Since taking office in December 2018  I have continued my reforms within the
Department to enhance public safety and strengthen the ties within our communities
As the elected Sheriff serving the most populous county in the nation and employing
nearly 18 000 employees  this is no easy task  Having inherited significant problems
from past administrations  I remain committed to effecting positive change for the
residents of Los Angeles County

As the first progressive democratic sheriff  I have delivered on many of my campaign
promises to bring reform and transparency to the Department   I have instituted major
reforms regarding Immigration and Customs Enforcement (ICE)  leadership diversity
wage theft  and the single most important commitment to transparency – body worn
cameras  Although Mr Huntsman authored multiple reports on the Department's
cooperation with ICE  he became silent in light of the moratorium on all inmate transfers
to ICE custody  Again  this amounts to false documentation by omission and does not
serve to inform either the public or the Department

As a result of these unethical reports  the Department is suffering irreparable damage
and our standing in the community is being undermined by continual  misleading  and
false attacks  It should be of great concern to all of us that his actions are eroding
public trust and creating a liability for the Department  His hopelessly biased reporting
will only invite future frivolous lawsuits which the hardworking taxpayers will have to
waste money defending  while at the same time artificially rising tensions in the
community which can endanger the lives of our deputies  This was clearly evidenced
by the brutal attack on our two Compton Transit Services Bureau deputies which
horrified the entire nation

AV010465

EXHIBIT 58 - Page 804

The Honorable Board of Supervisors          -5-                    February 18, 2021

The IG serves an advisory role, just like the COC. When their efforts are driven by political agendas and not facts, they fail to serve the public's expectations of oversight and betray the reason for their existence.   As a result, their work product does not inform the Department's operations and will not be considered of any value.  The Department will continue, however, to provide both entities all the information they are legally entitled to receive.

As you have been advised in writing, the Department continues to investigate a data breach discovered at the beginning of 2019. The Legislature has enacted a statutory scheme defining the powers and duties of a sheriff (Government Code Sections 26600-26778).  Section 26600 generally provides:

> The sheriff shall preserve peace, and to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of a crime, or the suppression of delinquency.

A sheriff is also expressly authorized and directed to investigate public offenses that have been committed and to arrest and take before a magistrate all persons who have committed a public offense (Sections 26601-26602).  There is no statutory scheme that places anyone, including members of the OIG, above the law.  As such, it is with concern that I read a letter from Lawrence Middleton to County Counsel, who had retained him to purportedly provide legal guidance on this very issue.  In his words:

> Upon completing my analysis, I wanted to bring to Undersheriff Murakami's attention a number of issues and concerns that cause me to counsel against a continuation or escalation of the investigation. Most notably, as detailed below, because none of the potential charges being investigated are likely to lead to a successful criminal prosecution, Department personnel involved in the investigation could place themselves in jeopardy or criminal prosecution and/or civil liability if they continue (March 6, 2020).

This letter appears to be an attempt to intimidate, coerce, or otherwise dissuade the Department from carrying out our lawful duty and is unacceptable. It should be noted neither County Counsel nor Mr. Middleton has knowledge of the scope or details of the investigation, rendering such opinions ill-informed and ill-advised.  I have recused myself from this inquiry and know of its details superficially.

The Department needs an IG who is not ethically compromised and is certified by the National Association of Inspectors General.  I expect the work product of the OIG to adhere to professional standards as cited in the Association of Inspectors General's book, "Principles and Standards for Offices of Inspector General," also known as the Green Book.  The public, the Department, and BOS all deserve accurate reporting

AV010466

EXHIBIT 58 - Page 805

The Honorable Board of Supervisors                6                        February 18, 2021

which is not politically motivated. I ask the BOS to consider my concerns and replace
the IG with one who is accredited, unbiased, and capable of maintaining a professional
working relationship. The Department's reputation is being unfairly tarnished by the IG
in his personal attacks towards us. We need an IG who is fair and objective, not
inflammatory and controversial.

The Department is a national trendsetter on many important issues, such as the
relationship between local law enforcement and federal immigration enforcement,
combatting the spread of COVID-19 in congregate living facilities and super spreader
events, the Wage Theft Task Force, defending the community during periods of civil
unrest, and transparency. Our efforts are often adopted as best practices by other law
enforcement agencies throughout the nation. Our reputation is at stake. The IG's
personal vendetta should not come at the expense of our dedicated employees who put
their lives on the line each and every day in service to the community.

Should you have any questions or would like to discuss further, please feel free to
contact me at ████████████

Sincerely,



ALEX VILLANUEVA
SHERIFF

AV010467

EXHIBIT 58 - Page 806

The Honorable Board of Supervisors          -7-                    February 18, 2021

AV:JAV:ac
(Office of the Sheriff)

c:    Rodrigo A. Castro-Silva, County Counsel, Office of the County Counsel

AV010468

EXHIBIT 58 - Page 807

# ATTACHMENT "B"

AV010469

**EXHIBIT 58 - Page 808**



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF



September 21, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors

### REQUEST FOR REMOVAL OF MAX HUNTSMAN AS INSPECTOR GENERAL RESULTING FROM ALLEGATIONS OF CONSPIRACY TO COMMITT OBSTRUCTION IN SEARCH WARRANT

On February 18, 2021, in a six-page letter, I informed you of my *"grave concerns with the conduct of your appointed Inspector General, Max Huntsman."* I pointed out his *"zealot-like behavior which continues to create civil liability for the Los Angeles County."* I stated his, *"intellectual dishonesty places the public at an increased risk."* The letter ended with, *"I ask the Board to consider my concerns and replace the IG with one who is accredited, unbiased, and capable of maintaining a professional working relationship."*

As you were also aware at the time, Mr. Huntsman was a felony suspect in a theft of electronic information investigation, which remains an active investigation at the Office of the Attorney General.  You had an opportunity to relieve Mr. Huntsman of his duties then, but declined and the Board ignored my request.  Unfortunately, your failure to address the issues I pointed out to you in 2021, has now resulted in an even more serious crime allegedly occurring, which is additionally under active investigation by the Office of the Attorney General.

On September 14, 2022, as you are likely aware, public corruption search warrants were served at multiple locations.  During the service at Supervisor Shelia Kuehl's residence, she stated to reporters, *"I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning."*  In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all Los Angeles County Sheriff's Department's social media accounts

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*— Since 1850 —*

AV010470

**EXHIBIT 58 - Page 809**

The Honorable Board of Supervisors      -2-      September 21, 2022

Moreover, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement, Mr. Huntsman and the Los Angeles County Counsel have now become the focus of a criminal investigation by the Office of the Attorney General, and as such, the conflict of interest in Mr. Huntsman remaining in his current assignment is untenable. For these reasons, I demand that Mr. Huntsman be treated like any other of the over 100,000 Los Angeles County employees and be relieved of his duties, pending the outcome of the Attorney General's criminal investigation.

Given the above, it is the established pattern and practice everywhere in the Los Angeles County, by every department, that an employee is to be relieved of duty and/or reassigned upon reliable knowledge of alleged criminal activity, and an investigation is pending which could lead to termination.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, John L. Satterfield, at █████████.

Sincerely,


ALEX VILLANUEVA
SHERIFF


AV010471

**EXHIBIT 58 - Page 810**

# ATTACHMENT "C"

AV010472

**EXHIBIT 58 - Page 811**




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

October 5, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

**DEMAND TO RELIEVE SPECIFIED CONFIDENTIAL EMPLOYEES
FROM THEIR DUTIES OF PUBLIC TRUST**

Shortly after I was sworn into office on December 3, 2018, my staff alerted me to a series of illegal personnel file downloads that were launched by members of the Office of Inspector General and Constitutional Policing Advisors from the administration of Sheriff Jim McDonnell.  This data breach appeared to have been initiated immediately following the primary election that was held in June 2018 and does not appear to have been done for a lawful reason.  Former Sheriff McDonnell's staff had launched an inquiry into the matter, only to abandon it without proper resolution.

In early 2019, we initiated a criminal inquiry into the matter and consulted with representatives from the state Attorney General's office and the Federal Bureau of Investigation (FBI).  Inspector General Max Huntsman's protestations were centered on his claims that he had permission from the incumbent to view my confidential personnel files.  Our investigation indicates no such permission existed, either in writing or supported by the former sheriff, who refused to answer questions from our investigators.  The investigation was turned over to the Attorney General's office in September 2021 for a prosecutorial decision.  Please note this investigation names five suspects of criminal conspiracy to commit burglary and illegal removal of personnel files, among other charges.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
~ Since 1850 ~

AV010473

**EXHIBIT 58 - Page 812**

The Honorable Board of Supervisors          -2-                    October 5, 2022

We have previously written to your office regarding the liability of permitting named felony suspects to continue working in their official capacity during the pendency of the criminal investigation. Now we have a whole new set of issues based on the extraordinary admissions from Supervisor Sheila Kuehl during the execution of search warrants by deputies assigned to our Public Corruption Unit. On live local television, Supervisor Kuehl claimed to have been alerted to the search warrants in advance by Acting County Counsel Dawyn Harrison, with information she received from Inspector General Max Huntsman. On September 21, 2022, I wrote to you listing the reasons why Mr. Huntsman needed to be relieved of his duties [Attachment A], and I have yet to receive a response.

In addition to Supervisor Kuehl's own public statements, court documents [Attachment B] reveal the names of two other individuals who alerted Supervisor Kuehl of the service of the warrant, in an apparent conspiracy to obstruct justice: Lisa Mandel, Chief of Staff, District 3, and Torie Osborn, Senior Strategist, District 3. As appointed officials who are considered confidential employees and trusted to maintain confidentiality over internal records and law enforcement operations, the alleged conduct of the four individuals referenced herein, and others who during the course of the Attorney General's investigation may also be identified, can no longer have access to Los Angeles County Sheriff's Department (Department) records, operations, or be involved in decision-making regarding oversight and/or legal representation.

Consistent with standard Department policy, Mr. Huntsman will be removed from all access to Department facilities, personnel, and databases effective immediately. This standard is applied to all Department personnel who are named as a suspect in a criminal case involving felony crimes. The list of potential charges Supervisor Kuehl and Commissioner Patricia Giggans include the following:

- California Government Code 1090, Conflict of Interest
- California Penal Code 165, Bribery of a public official or member of a board of supervisors
- California Penal Code 182.5, Conspiracy to obstruct justice
- California Penal Code 182, Conspiracy to commit any crime
- California Penal Code 503, Embezzlement
- California Penal Code 424, Theft, or misappropriation of public funds

The list of potential charges facing Mr. Huntsman, Ms. Harrison, Ms. Mandel, and Ms. Osborn include the following:

AV010474

**EXHIBIT 58 - Page 813**

The Honorable Board of Supervisors          -3-                    October 5, 2022

- California Penal Code 182, Conspiracy to commit any crime
- California Penal Code 182.5, Conspiracy to obstruct justice
- California Penal Code 31, Aiding and abetting a crime
- California Penal Code 135, Destruction of evidence

There is no alternate universe where county counsel can dictate the manner in which the Department is represented in court, while they are actively involved in allegedly concealing criminal activity and obstructing the investigative function of the sheriff [California Government Code 25303]. To the contrary of taking corrective action, both Supervisor Kuehl and Supervisor Hilda Solis have made public statements on social media condemning both myself and the Department for the execution of a lawful public corruption search warrant that was properly vetted, approved by a judge, and reaffirmed by a second judge. Acting County Counsel Harrison is in no position to deny compensating the attorney of our choosing, who won for us in court, based on these extraordinary set of events [Attachment C]. Her apparent motive in denying counsel was to see the search warrant overturned by the court for lack of proper counsel. It is your moral and legal obligation to pick up the costs for *Werksman Jackson & Quinn LLP*. Please refer to Ms. Harrison's own words:

> "... I wanted to remind you that only the Office of County Counsel, or the law firms we retain, may represent you, in your official capacity, and the LASD... Therefore, you have no authority to retain your own counsel to represent either you or the LASD, nor is the County of Los Angeles responsible for any of the costs incurred by those law firms. I recently discovered that you improperly retained Werksman Jackson & Quinn LLP in this matter. I will notify them that they have no authority to represent you or LASD and will not be paid by the County of Los Angeles, and I will copy the Attorney General's Office."

It is not the first time we have informed you of unethical and/or incompetent representation by county counsel and contract counsel that have had negative consequences to the Department. From failing to adequately present a defense in a high-profile civil lawsuit, failing to aggressively challenge false assertions in employee lawsuits, to colluding with the Civilian Oversight Commission and the Inspector General's office to give the false impression we are not complying with the submission of subpoenaed information or testimony. It is clear you have weaponized legal representation of the Department as another avenue to discredit my administration for your political interests. This comes at great expense to the taxpayer and to our credibility, which seems to be your goal.

AV010475

**EXHIBIT 58 - Page 814**

The Honorable Board of Supervisors          -4-          October 5, 2022

To be clear, the investigation is real, my authority is real, and so is that of the Attorney General who has now assumed responsibility for the investigation, which was initiated at our request.  The investigation itself regarding *Peace Over Violence* was initiated based on a criminal complaint from a whistleblower, and contrary to false assertions by those involved, we do not investigate people, only allegations of criminal activity.  This is true of every investigation initiated by the Department, including those by the Public Corruption Unit.

In closing, as a matter of reference, I wrote a whistleblower memorandum back in December of 2004 regarding the unfolding corrupt actions of then Division Chief Paul Tanaka [Attachment D].  As a young sergeant, I laid out publicly in detail my concerns regarding the unethical conduct and behavior of the administration of then Sheriff Lee Baca.  I was laughed at, ridiculed, attacked, and had my career derailed for over a decade.  The Board of Supervisors were informed of Baca and Tanaka's corruption, as were members of the Office of Independent Review, but it wasn't until the Citizen's Commission on Jail Violence and the FBI intervened, when the corruption began to halt.  Needless to say, I stood my ground and was ultimately vindicated.

Today and again, I am standing my ground.  You have two choices: circle the wagons and protect corruption or come clean and stand up for doing the right thing.  Choose wisely, history will be your judge.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield at ██████████

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010476

**EXHIBIT 58 - Page 815**

The Honorable Board of Supervisors          -5-                    October 5, 2022

AV:JLS:js

Attachments:          A – Letter for Removal of Max Huntsman
                      B – Court Documents (Declaration)
                      C – County Counsel Correspondence
                      D – Letter to LASD Executives (2004)

AV010477

**EXHIBIT 58 - Page 816**

# ATTACHMENT A

AV010478

**EXHIBIT 58 - Page 817**





## OFFICE OF THE SHERIFF

### COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

September 21, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors

### REQUEST FOR REMOVAL OF MAX HUNTSMAN AS INSPECTOR GENERAL RESULTING FROM ALLEGATIONS OF CONSPIRACY TO COMMITT OBSTRUCTION IN SEARCH WARRANT

On February 18, 2021, in a six-page letter, I informed you of my *grave concerns with the conduct of your appointed Inspector General, Max Huntsman.* I pointed out his *zealot-like behavior which continues to create civil liability for the Los Angeles County* I stated his, *"intellectual dishonesty places the public at an increased risk"* The letter ended with, *"I ask the Board to consider my concerns and replace the IG with one who is accredited, unbiased, and capable of maintaining a professional working relationship"*

As you were also aware at the time, Mr Huntsman was a felony suspect in a theft of electronic information investigation, which remains an active investigation at the Office of the Attorney General. You had an opportunity to relieve Mr Huntsman of his duties then, but declined and the Board ignored my request. Unfortunately, your failure to address the issues I pointed out to you in 2021, has now resulted in an even more serious crime allegedly occurring, which is additionally under active investigation by the Office of the Attorney General

On September 14, 2022, as you are likely aware, public corruption search warrants were served at multiple locations. During the service at Supervisor Shelia Kuehl's residence, she stated to reporters, *"I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning."* In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all Los Angeles County Sheriff's Department's social media accounts

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

AV010479

**EXHIBIT 58 - Page 818**

The Honorable Board of Supervisors          -2-                    September 21, 2022

Moreover, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's
announcement, Mr. Huntsman and the Los Angeles County Counsel have now become
the focus of a criminal investigation by the Office of the Attorney General, and as such,
the conflict of interest in Mr. Huntsman remaining in his current assignment is
untenable. For these reasons, I demand that Mr. Huntsman be treated like any other of
the over 100,000 Los Angeles County employees and be relieved of his duties, pending
the outcome of the Attorney General's criminal investigation.

Given the above, it is the established pattern and practice everywhere in the
Los Angeles County, by every department, that an employee is to be relieved of duty
and/or reassigned upon reliable knowledge of alleged criminal activity, and an
investigation is pending which could lead to termination.

Should you have any questions or would like to discuss further, please feel free to
contact my Chief of Staff, John L. Satterfield, at █████████

Sincerely,


ALEX VILLANUEVA
SHERIFF


AV010480


**EXHIBIT 58 - Page 819**

**ROB BONTA**
*Attorney General*



*State of California*
**DEPARTMENT OF JUSTICE**

1300 I Street
P.O. Box 944255
Sacramento CA 94244-2550
Telephone
E-Mail Address

January 25, 2022

Timothy K. Murakami
Undersheriff
Office of the Sheriff
County of Los Angeles
Hall of Justice
211 West Temple Street
Los Angeles, CA 90012

VIA EMAIL AND U.S. MAIL

Re: Possible criminal conduct

Dear Undersheriff Murakami:

The Department of Justice (DOJ) is in receipt of your letters regarding possible criminal conduct. Specifically, we have received: (1) letters dated July 23, 2020, and October 20, 2021, regarding possible criminal conduct by Sachi Hamai; and (2) a letter dated November 16, 2021, regarding possible criminal conduct by five individuals who purportedly engaged in acts to "unlawfully obtain and distribute confidential, protected personnel records."

As to the former matter, you request that DOJ "conduct the criminal inquiry"; as to the latter, you implicitly request that DOJ conduct any necessary inquiry and review the matter, noting "the inherent conflict(s)" for further inquiry and asking that, should we decline "further inquiry or review," to refer the matter to a district attorney's office outside of Los Angeles County. DOJ will review these matters.

Additionally, it has come to our attention that your Office has been involved in a criminal investigation of Peace Over Violence and/or Executive Director Patti (Patricia) Giggans. Specifically, it has been reported that, in February and March 2021, your Office executed search warrants at the offices of Peace Over Violence and L.A. Metro as part of a criminal investigation. (E.g., Jason Henry, *LA County Sheriff Investigating Oversight Commissioner's Nonprofit, Search Warrants Show*, L.A. Daily News, June 18, 2021.)

AV010481

**EXHIBIT 58 - Page 820**

January 25, 2022
Page 2

DOJ requests that your Office to provide a report on the status of the investigation of Peace Over
Violence and/or Executive Director Patti (Patricia) Giggans. (Cal. Const., art V, § 13 [noting
Attorney General has supervisory authority over sheriff and may require "reports concerning the
investigation, detection, prosecution, and punishment of crime"].)  Your cooperation in this
request is appreciated.

Sincerely,

Lance Winters
Chief Assistant Attorney General

For    ROB BONTA
       Attorney General

AV010482

EXHIBIT 58 - Page 821



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF



February 18, 2021

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### THE NEED FOR AN HONEST AND OBJECTIVE INSPECTOR GENERAL

The purpose of this communication is to advise you of my grave concerns with the conduct of your appointed Inspector General (IG), Max-Gustaf Huntsman, and the publications authored by his office which directly influence the unsuspecting public's perceptions regarding both the credibility of the Los Angeles County Sheriff's Department (Department) and the legitimacy of our operations. His zealot-like behavior continues to create civil liability for the County and potentially endangers the life of deputies in the field, as he artificially stokes animosity between the Department and the community.

In addition to potentially endangering the lives of our deputies, his intellectual dishonesty places the public at an increased risk. After utilizing good communication and de-escalation strategies, deputies can only ultimately perform the detention or arrest of an individual one of two ways: 1) The person voluntarily submits to lawful authority; or, 2) The person resists and the deputy uses force to overcome their resistance and gain safe control. As the public continues to be misled by Mr. Huntsman as to the Department being engaged in widespread "unlawful conduct," they are far less likely to voluntarily comply. Statistically, this in and of itself places members of the public in situations that are far less likely to have a peaceful resolution.

The expectation of the public regarding the conduct of an IG is they are dedicated to serving the public's interest by working tirelessly to fairly assess the operations of any given organization and provide meaningful input for reforms, which may be required to adapt to an ever-changing world. Indeed, the National Association of Inspectors General posits this public expectation is best served when:

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— Since 1850 —

SCANNED & E-MAILED TO BOS LIAISON
TEAM 2/18/21

AV010483

**EXHIBIT 58 - Page 822**

The Honorable Board of Supervisors          -2-                    February 18, 2021

This public expectation is best served by inspectors general when they follow the basic principles of integrity, objectivity, independence, confidentiality, professionalism, competence, courage, trust, honesty, fairness, forthrightness, public accountability, and respect for others and themselves (AIG Principles and Standards, pg. 3, 2014).

Please note the first two principles outlined above, integrity and objectivity. I will provide you a brief rundown of the fundamental defects of Mr. Huntsman's work product, starting with the most recent publications and working our way back towards the start of my administration.

The Office of Inspector General (OIG) report "Review and Analysis of Misconduct Investigations and Disciplinary Process" released in February 2021 suffers from multiple fatal defects, chief among them the fallacy of a study period (2015-2019) which encompasses two administrations without distinguishing and contrasting the data from both. Another fatal flaw is the use of individual cases in an anecdotal fashion as representative of the entire Department's operation without providing proper context with the totality of cases investigated and discipline rendered. A select quote from the introduction:

Notwithstanding the current Sheriff's assertions, we were not provided by the Sheriff, and in our review, we did not observe or find, any evidence of falsification of evidence or reports which resulted in the wrongful discipline of a department employee (pg. 4, 2021).

This statement is demonstrably false and illustrative of the nature of the report itself. The Department conducted an in-depth analysis of the Mandoyan case, which is now a public document, wherein it was proven that a key exculpatory witness was identified, interviewed, and the results concealed from both the Civil Service Commission and the employee fighting the discharge (see the Department's Case Analysis, October 1, 2019).

The next production from the OIG, "Report Back on Unlawful Conduct of the Los Angeles County Sheriff's Department" was a letter dated December 14, 2020, addressed to the Civilian Oversight Commission (COC), purportedly in response to a request from Commissioner Priscilla Ocen. The starkly sophomoric report amounted to nothing more than a rehash of current and past litigation and a torturous defense of the legal fallout from Mr. Huntsman's oversteps in a homicide investigation.

This report was designed exclusively as a political tool to discredit the Department and does not appear to have any legitimate purpose in oversight, transparency, or accountability. Perhaps the most startling false statement is the section subtitled

AV010484

EXHIBIT 58 - Page 823

The Honorable Board of Supervisors                -3-                February 18  2021

"Failure to Investigate and Prohibit Deputy Secret Societies (pg 12)  Mr  Huntsman has
the Department's criminal and administrative investigations of the Kennedy Hall incident
from former Sheriff Jim McDonnell's tenure  and he is aware that 26 employees were
disciplined  including four who were terminated as a result of that administrative
investigation  Mr  Huntsman is also aware of the Department's new policy regarding
forming or participating in deputy subgroups  which was issued in February 2020 and is
being vigorously enforced

The preceding report  "The Right to Know Act  Los Angeles County Sheriff's
Department Response to Police Transparency Reform' was published in November
2020  and in typical OIG fashion  deliberately used outdated information from January
2020 to make the false claim the Department was not complying with SB 1421  For
the record  as of December 31  2020  the Department achieved full compliance with
SB 1421 with a 96 45 percent rate  a number Mr  Huntsman was well aware was in the
making and far different than the 70 percent non compliance rate he reported just a
month earlier

Mr  Huntsman is also aware of the issues the Department has had since the inception of
SB 1421  with antiquated databases that do not communicate with each other and the
severe lack of staffing to meet the new requirements (a failure of leadership by the
previous administration)  To wit  in a letter dated July 6  2020  to former Board of
Supervisors (BOS) Chair  Supervisor Kathryn Barger  the Department outlined six
different occasions where we requested additional resources through the Chief
Executive Office and were denied repeatedly  It was only through cannibalizing
different functions of the Department that we were able to muster enough personnel to
satisfy SB 1421 and California Privacy Rights Act requests  Comparing our operation to
Los Angeles Police Department's is a dishonest comparison based on disparate funding
levels  IT infrastructure  and staffing levels

Looking through the sheer number of reports authored by the OIG  a persistent pattern
emerges wherein the OIG ignores Department investigations  results of investigations
and actions taken in response to complaints from the public  The November 17  2020
report back to the COC regarding the alleged harassment of family members after fatal
deputy-involved shootings is one example of this  The report negates in its entirety the
concerns of the public over impromptu memorials and gang members loitering in the
vicinities of their homes  concerns which were addressed properly by the Department's
report

Examining the OIG's report's table of contents alone since its inception reveals a
deferential OIG during former Sheriff McDonnell's administration  with report titles of a
generic and non-inflammatory nature  unlike those published during my administration

AV010485

EXHIBIT 58 - Page 824

The Honorable Board of Supervisors          -4-                    February 18, 2021

As a matter of fact, the OIG generated as many reports during my first two years in office as they did during all of former Sheriff McDonnell's tenure, and that includes the conspicuously "confidential" report Mr. Huntsman prepared to bury the potentially illegal actions of former Sheriff McDonnell's Assistant Sheriff, Mike Rothans, for his purchase of a stolen vehicle from a contracted tow company.

Without question, these "reports" would be rejected by any legitimate academic institution. They are filled with unproven allegations, anecdotal data, omissions, distortions, and an overall permeation of bias and intellectual dishonesty. They are truly not the level of accuracy and authenticity expected in County government. Furthermore, if my own deputies consistently authored documents at this level, they would at the very least be placed on a performance improvement plan, and in cases of deception, omission, and lack of honesty, an administrative investigation would be conducted. I believe the responsibility for performance and accountability issues with Mr. Huntsman belongs, in part, to the COC. Yet, they seem too hyper-focused on political activism and calls for my own resignation to focus on this duty.

Since taking office in December 2018, I have continued my reforms within the Department to enhance public safety and strengthen the ties within our communities. As the elected Sheriff serving the most populous county in the nation and employing nearly 18,000 employees, this is no easy task. Having inherited significant problems from past administrations, I remain committed to effecting positive change for the residents of Los Angeles County.

As the first progressive democratic sheriff, I have delivered on many of my campaign promises to bring reform and transparency to the Department. I have instituted major reforms regarding Immigration and Customs Enforcement (ICE), leadership diversity, wage theft, and the single most important commitment to transparency – body worn cameras. Although Mr. Huntsman authored multiple reports on the Department's cooperation with ICE, he became silent in light of the moratorium on all inmate transfers to ICE custody. Again, this amounts to false documentation by omission and does not serve to inform either the public or the Department.

As a result of these unethical reports, the Department is suffering irreparable damage and our standing in the community is being undermined by continual, misleading, and false attacks. It should be of great concern to all of us that his actions are eroding public trust and creating a liability for the Department. His hopelessly biased reporting will only invite future frivolous lawsuits which the hardworking taxpayers will have to waste money defending, while at the same time artificially rising tensions in the community which can endanger the lives of our deputies. This was clearly evidenced by the brutal attack on our two Compton Transit Services Bureau deputies which horrified the entire nation.

AV010486

EXHIBIT 58 - Page 825

The Honorable Board of Supervisors          -5-                    February 18, 2021

The IG serves an advisory role, just like the COC. When their efforts are driven by political agendas and not facts, they fail to serve the public's expectations of oversight and betray the reason for their existence. As a result, their work product does not inform the Department's operations and will not be considered of any value. The Department will continue, however, to provide both entities all the information they are legally entitled to receive.

As you have been advised in writing, the Department continues to investigate a data breach discovered at the beginning of 2019. The Legislature has enacted a statutory scheme defining the powers and duties of a sheriff (Government Code Sections 26600-26778). Section 26600 generally provides:

> The sheriff shall preserve peace, and to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of a crime, or the suppression of delinquency.

A sheriff is also expressly authorized and directed to investigate public offenses that have been committed and to arrest and take before a magistrate all persons who have committed a public offense (Sections 26601-26602). There is no statutory scheme that places anyone, including members of the OIG, above the law. As such, it is with concern that I read a letter from Lawrence Middleton to County Counsel, who had retained him to purportedly provide legal guidance on this very issue. In his words:

> Upon completing my analysis, I wanted to bring to Undersheriff Murakami's attention a number of issues and concerns that cause me to counsel against a continuation or escalation of the investigation. Most notably, as detailed below, because none of the potential charges being investigated are likely to lead to a successful criminal prosecution, Department personnel involved in the investigation could place themselves in jeopardy or criminal prosecution and/or civil liability if they continue (March 6, 2020).

This letter appears to be an attempt to intimidate, coerce, or otherwise dissuade the Department from carrying out our lawful duty and is unacceptable. It should be noted neither County Counsel nor Mr. Middleton has knowledge of the scope or details of the investigation, rendering such opinions ill-informed and ill-advised. I have recused myself from this inquiry and know of its details superficially.

The Department needs an IG who is not ethically compromised and is certified by the National Association of Inspectors General. I expect the work product of the OIG to adhere to professional standards as cited in the Association of Inspectors General's book, "Principles and Standards for Offices of Inspector General," also known as the Green Book. The public, the Department, and BOS all deserve accurate reporting

AV010487

EXHIBIT 58 - Page 826

The Honorable Board of Supervisors                6                    February 18  2021

which is not politically motivated   I ask the BOS to consider my concerns and replace
the IG with one who is accredited  unbiased  and capable of maintaining a professional
working relationship   The Department s reputation is being unfairly tarnished by the IG
in his personal attacks towards us   We need an IG who is fair and objective  not
inflammatory and controversial

The Department is a national trendsetter on many important issues  such as the
relationship between local law enforcement and federal immigration enforcement
combatting the spread of COVID-19 in congregate living facilities and super spreader
events  the Wage Theft Task Force, defending the community during periods of civil
unrest  and transparency   Our efforts are often adopted as best practices by other law
enforcement agencies throughout the nation   Our reputation is at stake   The IG's
personal vendetta should not come at the expense of our dedicated employees who put
their lives on the line each and every day in service to the community

Should you have any questions or would like to discuss further  please feel free to
contact me at ▮▮▮▮▮▮▮▮▮▮

Sincerely


ALEX VILLANUEVA
SHERIFF


AV010488


**EXHIBIT 58 - Page 827**

The Honorable Board of Supervisors          -7-                    February 18, 2021

AV:JAV:ac
(Office of the Sheriff)

c:     Rodrigo A. Castro-Silva, County Counsel, Office of the County Counsel

AV010489

**EXHIBIT 58 - Page 828**

# ATTACHMENT B

AV010490

EXHIBIT 58 - Page 829

1    WERKSMAN JACKSON & QUINN LLP
2    ALAN J. JACKSON (Bar No. 173647)
    CALEB E. MASON (Bar No. 246653)
3
    888 W. 6th St. 4th Floor
4    Los Angeles, California 90017
5
    Attorneys for Los Angeles County Sheriff's Department
6

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 2 0 2022

Sherri R. Carter, Executive Officer/Clerk of Court
By: Sheryl R. Humbar, Deputy

7             SUPERIOR COURT OF CALIFORNIA
8
9        COUNTY OF LOS ANGELES – CENTRAL DISTRICT

10   IN RE SEARCH WARRANT SERVED
    ON OFFICE OF THE INSPECTOR
11   GENERAL FOR THE LOS ANGELES
    COUNTY METROPOLITAN
12   TRANSPORTATION AUTHORITY ON
    SEPTEMBER 14, 2022
13
14
15
16
17
18

Case No.: Misc. BH014167

(Hon. William C. Ryan – Department 56W)

**DECLARATION OF MAX O. FERNANDEZ IN RESPONSE TO COURT'S ORDER DATED SEPTEMBER 20, 2022.**

Date: September 22, 2022
Time: 1:30 p.m.
Dept.: 56W

19        <u>DECLARATION OF SGT. MAX O. FERNANDEZ</u>
20
21     I, Max O. Fernandez, declare as follows:
22        1.     I am employed as a sergeant for the Los Angeles County Sheriff's
23   Department ("LASD"). I am assigned as the lead investigator in the Department's
24   investigation of related to possible criminal conduct regarding the awarding of contracts
25   to Peace Over Violence (POV) by the Metropolitan Transportation Authority (MTA)
26   ("the Matter"). I am the affiant for the search warrants relating to the Matter. There are
27   two: one signed on February 26, 2021, by Judge Ronald Coen. I am also the Affiant for
28   the Search Warrant which was signed on September 8, 2022 by Judge Craig Richman. I

-1-
SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO

AV010491

EXHIBIT 58 - Page 830

1  make this declaration from my own personal knowledge, and if called as a witness, I
2  could and would testify competently to the facts stated below.

3        2.       This Supplemental Declaration supplements my Declaration filed
4  yesterday in this Matter. I make this Declaration in compliance with the Court's
5  September 20, 2022 Order, to ensure that I have fully and completely addressed the
6  questions raised by the Court. My prior Declaration addressed the Court's questions
7  about the application for and issuance of the search warrants in this Matter. This
8  Declaration provides additional information regarding Question No. 5: "Report what
9  searches have already been conducted on any computer seized under the warrant, and
10 who conducted the searches, and what information has been obtained."

11       3.       I joined the LASD's Public Corruption unit in October 2020. This
12 investigation was assigned to me on or about October 26, 2020. The investigation was
13 opened a year before that, on or about September 11, 2019, when a whistleblower from
14 the MTA contacted the LASD to report what she believed to be illegal conduct,
15 including fraudulent conduct in directing contracts to politically connected individuals
16 and entities; and retaliation against her for reporting same.

17       4.       I have seen public statements reported in the media made by various public
18 figures, alleging that this investigation is some sort of political payback by the Sheriff
19 against Supervisor Kuehl because of recent political developments and disagreements.
20 That allegation is false. I know that the allegation is false, because (1) I have worked on
21 this investigation for two years, and the investigation was begun a year before that, in
22 September 2019—long before the current political animosities developed; and most
23 importantly (2) this investigation is based on provable facts, credible witness testimony,
24 and an undisputed documentary record, that provides probable for the allegations that
25 County contracts were improperly awarded to Ms. Giggans and POV. The full details of
26 the investigation, including the evidence reviewed and witnesses interviewed, is set forth
27 in the affidavit I presented to the court in support of the search warrants obtained in the
28 Matter. That evidence is abundant and constitutes probable cause to believe that a crime

-2-
SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010492

EXHIBIT 58 - Page 831

1    has been committed, in my professional opinion. This is a straightforward investigation
2    of corruption in the expenditure of public funds—the sort of investigation that every law
3    enforcement agency in the state conducts on a regular basis, and that prosecutorial
4    agencies regularly prosecute. This investigation has been conducted throughout
5    according to standard investigatory practices.

6        5.      The full list of items seized during the searches of Supervisor Kuehl's and
7    Ms. Giggans' residences is attached hereto as Exhibit 1. As noted in my previous
8    Declaration (Paragraph 7), none of the materials seized in the search of the Office of
9    Inspector General offices have been reviewed or imaged.

10       6.      Exhibit 1 identifies each item, and states whether its contents were imaged.
11   Items 20, 21, 22, 24, and 25 are paper records, and were not imaged. The technicians
12   who worked on the imaging are: Thomas Ferguson; Leo Lo; John Moore; Steven
13   Suarez; Mike Rivas; Julius Gomez; Raquel Gonzales; Claudia Iwasczyszyn; and Brian
14   Moreno. Those technicians did not review the contents of any device.

15       7.      In sum: none of the contents of any computer seized have been reviewed.
16   Of the total of 67 devices seized, 49 have been imaged, and one (1) has been partially
17   imaged. All the imaging was conducted on September 14, 15, and 16, 2022. None of
18   the contents of any of the devices have been reviewed, except for a review of recent text
19   messages and voicemails on Supervisor Kuehl's phones as set forth below.

20       8.      The only devices from which any content has been reviewed are the two
21   phones seized from Supervisor Kuehl, and the only content reviewed from those phones
22   were approximately 250 text messages and two voice mails. I personally conducted that
23   review on the morning of September 16, 2022. I considered that review to be urgent for
24   the reasons set forth below.

25       9.      The review of the text messages and voicemails on Supervisor Kuehl's
26   phone in the period prior to the execution of the warrant was urgent because at 8:00 a.m.
27   on September 14, 2022, while deputies were still at her premises, Supervisor Kuehl gave
28   a live television interview to Fox 11 News, in which she said the following: "KUEHL: I

AV010493

**EXHIBIT 58 - Page 832**

1  heard from County Counsel last night that she got a tip from Max that this search would
2  happen. REPORTER: Max Huntsman? KUEHL: Yes, from Max Huntsman that this
3  search would happen this morning."
4      10.    In my professional opinion, and based on my training and experience,
5  tipping off a target of a search warrant prior to the execution of the warrant is a crime.
6  Penal Code section 148 prohibits obstructing officers in the execution of their duties,
7  including serving search warrants; and Penal Code 168 prohibits public officials
8  (prosecutors, judges, clerks, or peace officers) from disclosing the fact that a search
9  warrant has been issued, prior to its execution, for the purpose of preventing the search
10  or seizure of property. The only people who knew about the issuance of this search
11  warrant when it was issued were among those enumerated categories. So, at a
12  minimum, whoever told Max Huntsman about this warrant committed a crime.
13      11.    In the concurrent search of Patricia Giggans' residence, which took place
14  at the same time as the search of Supervisor Kuehl's residence, we were surprised to
15  find that Ms. Giggans' phone was not present anywhere in the house or on her person.
16  The search warrant was executed at 7 a.m. at Ms. Giggans' residence, and she was
17  personally present when we arrived. Based on my training and experience, individuals
18  keep their phones ready to hand, and I know that Ms. Giggans owns and uses an IPhone,
19  because we have obtained numerous emails sent by her, which contain in the signature
20  line the phrase, "Sent from my IPhone." I know from personal experience and from my
21  training that that phrase is automatically inserted into emails sent from an IPhone. It is
22  also not plausible or likely that Ms. Giggans would manually type that phrase into the
23  bottom of every email she sends.
24      12.    Because I know that Ms. Giggans has an IPhone, and her phone was not
25  present in her residence or on her person, I concluded that the most likely explanation
26  for the absence of her phone was that she was aware that the warrant was going to be
27  executed, and she disposed of the phone in some manner beforehand. Ms. Giggans'
28  attorney, Mr. Austin Dove, arrived at her residence approximately 15 minutes into the

-4-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010494

EXHIBIT 58 - Page 833

search. Mr. Dove spoke with the detectives executing the warrant, and said the following: "There is no phone. You can search for the phone. You're entitled to search the place." That statement was made by Mr. Dove to Detective Yoon Nam, who told me about it that same day.

13.    In addition to constituting a crime under the Penal Code, the act of tipping off a target of a search warrant to existence of the warrant is a major concern for the LASD. It creates safety and security risks for officers executing warrants, and it compromises and impairs the investigation of crimes. In short, we simply cannot have targets of warrants tipped off the night before. The fact that Supervisor Kuehl publicly stated she had been tipped off the night before was a serious concern for me and for the LASD, as to how the information had been obtained and disseminated.

14.    Accordingly, I reviewed Ms. Kuehl's phones, looking for recent communications relating to the warrant. I found them. The relevant text messages are attached hereto as Exhibit 2.

15.    At 10:17 p.m. on September 13, 2022, Lisa Mandel, Supervisor Kuehl's Chief of Staff, texted Supervisor Kuehl the following (the full message is attached in Exhibit 2): "Just got a call from Dawyn Harrison. She has been informed that the Sheriff may obtained a search warrant for your home and Patti G's.... Per the informant, the warrant is for 7 a.m. tomorrow. Let me know if you want me to do anything."

16.    At 11:41 p.m. on September 13, 2022, Dawyn Harrison (who is Acting County Counsel) texted Supervisor Kuehl the following (the full message is attached in Exhibit 2): "Was the first my team heard of it. Max called CoCo tonight with his 'intel.'" I know from personal experience and from my training that "CoCo" refers to County Counsel.

17.    There are approximately 25 messages relating to the above two messages. And the two voicemails were from Ms. Harrison, also on the evening of September 13, 2022. Both stated that she had an urgent matter that she needed to discuss with Supervisor Kuehl.

-5-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010495

**EXHIBIT 58 - Page 834**

18.     The other investigators who have reviewed the same set of text messages I reviewed from Supervisor Kuehl's phones are Detective Rafael Rafino and Lieutenant Oscar Veloz.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 21, 2022, in Los Angeles, California.

MAX O. FERNANDEZ

-6-
SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

AV010496

EXHIBIT 58 - Page 835

.

# EXHIBIT 1

AV010497

EXHIBIT 58 - Page 836

| CAT | ITEM # | QUAN | DESCRIPTION | DATE RECEIVED | IMAGED | PROCESSED | PORTABLE CASE | NOTES |
|---|---|---|---|---|---|---|---|---|
| EV | 1 | 1 | Computers, equipment, & accessories - ███ color, ███████, with power cord; from Home Ofc Desk (LOC 6) Article CABLE Make: ███ Model: ███ Serial Number: ███ DOJ File Control Number: ███ Booked At: OTHER | 9/14/2022 | Y | Y | N | |
| EV | 2 | 1 | Computers, equipment, & accessories - ███, Blk, w/cord; home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ███ Model: ███ Serial Number: ███ DOJ File Control Number: ███ Booked At: OTHER | 9/14/2022 | N | N | N | No Data - Drive B/O |
| EV | 3 | 1 | Phones/Cell - Blk ███ blk/gry case (cracked screen protector); IEMI ███; Master BR (LOC 6) Article: Cell Phone Make ███ Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | N | N | N | No Extraction |

AVO10498

**EXHIBIT 58 - Page 837**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 4 | 1 | Computers, equipment, & accessories - Silv USB "Homeboy Industries"; center drawer of home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 5 | 1 | Computers, equipment, & accessories - Blu USB "███████"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 6 | 1 | Computers, equipment, & accessories - Blk/Silv USB "███████"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 7 | 1 | Computers, equipment, & accessories - Blk/Silv USB "███████"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |

AV010499

EXHIBIT 58 - Page 838

| EV | 8 | 1 | Computers, equipment, & accessories - Silv/Wht USB "Futures without violence"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |
|----|----|----|----|----|----|----|----|----|
| EV | 9 | 1 | Computers, equipment, & accessories - Silv/Wht USB "Futures without violence"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |
| EV | 10 | 1 | Computers, equipment, & accessories - Blk, ▓▓▓▓ Ultra, 8GB in clear case, Prod Code ▓▓▓▓▓▓▓. Top LT drawer home ofc desk (LOC 6) Article: SD CARD Make: ▓▓▓▓▓ Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 11 | 1 | Computers, equipment, & accessories - Red USB "denimdayusa.org"; LT middle drawer home ofc desk (LOC 6)    Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | Y | |

AV0110500

EXHIBIT 58 - Page 839

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 12 | 1 | Computers, equipment, & accessories - Blu USB with silv color lanyard "AVB", LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | N | No Data in Date Range |
| EV | 13 | 1 | Computers, equipment, & accessories - L.Blu PNY USB, 8GB, w/blk lanyard; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: PNY Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | Y | N | No Data in Date Range |
| EV | 14 | 1 | Computers, equipment, & accessories - Wht/Red triangle shaped USB "GUESS logo", LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 15 | 1 | Other - Silv ▓▓▓▓ Digital Voice Recorder, ▓▓ ▓▓▓▓ LT middle drawer home ofc desk (LOC 6) Serial Number: Unknown Booked At: OTHER | 9/14/2022 | N | N | N | No Data in Date Range |

AVO10501

**EXHIBIT 58 - Page 840**

| EV | 16 | 1 | Phones/Cell - ▓▓▓▓ Cellphone; top middle dresser drawer in SW BR (LOC 6) Article: Cell Phone<br>Make: ▓▓<br>Model: ▓▓▓<br>Serial Number:<br>DOJ File Control Number: ▓▓▓▓▓▓<br>Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 17 | 1 | Phones/Cell - ▓▓▓▓▓▓▓▓, IMEI ▓▓▓▓▓▓; top middle dresser drawer in SW BR (LOC 6)<br>Article: Cell Phone<br>Make: ▓▓<br>Serial Number: Unknown<br>Booked At: OTHER | 9/14/2022 | N | N | N | No Extraction |
| EV | 18 | 1 | Phones/Cell - Rose Gold color, LG cell phone, top middle dresser drawer in SW BR (LOC 6)<br>Article: Cell Phone<br>Make: ▓▓<br>Model: ▓▓▓<br>Serial Number: ▓▓▓▓▓<br>DOJ File Control Number: ▓▓▓▓▓▓<br>Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 19 | 1 | Computers, equipment, & accessories - Silv MacBook Pro Laptop with multiple stickers; RT bottom dresser drawer SW BR (LOC 6)<br>Article: LAP TOP COMPUTER<br>Make: ▓▓▓<br>Model: ▓▓▓<br>Serial Number: ▓▓▓<br>DOJ File Control Number: ▓▓▓▓▓▓<br>Booked At: OTHER | 9/14/2022 | Y | N | N | Encrypted |
| | 20 | 0 | | | N | N | N | Not Booked at CIC |

AV010502

EXHIBIT 58 - Page 841

| | 21 | 0 | | | N | N | N | Not Booked at CIC |
|---|---|---|---|---|---|---|---|---|
| | 22 | 0 | | | N | N | N | Not Booked at CIC |
| EV | 23 | 1 | Phones/Cell - ▓▓▓▓▓ Article: Cell Phone<br>Make: ▓▓▓<br>Model: ▓▓▓▓▓▓▓<br>Serial Number: Unknown<br>Booked At: DETECTIVE BUREAU | 9/15/2022 | Y | Y | Y | |
| | 24 | 0 | | | N | N | N | Not Booked at CIC |
| | 25 | 0 | | | N | N | N | Not Booked at CIC |
| EV | 26 | 1 | Computers, equipment, & accessories - Envelope containing black External Hard Drive, ▓▓▓▓▓▓, Black plastic, I TB located in "Patty Giggins" Office.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▓▓▓▓▓<br>Model: ▓▓▓▓▓▓<br>Serial Number: ▓▓▓▓▓▓<br>Booked At: OTHER | 9/16/2022 | Y | N | N | Terminated per Warrant |
| EV | 27 | 1 | Computers, equipment, & accessories -<br>▓▓▓▓▓▓ Desktop, Silver plastic, located in Patty Giggens Office.<br>Article: COMPUTER DISPLAY SCREEN/MONIT<br>Make: ▓▓▓▓▓<br>Model: Desktop<br>Serial Number- ▓▓▓▓▓▓▓<br>Booked AT: OTHER | 9/16/2022 | Y | N | N | |

AV010503

EXHIBIT 58 - Page 842

| EV | 28 | 1 | Computers, equipment, & accessories - Thumbdrive, "████████", Black plastic with Purple Tether Cord located in Operations Office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ████<br>Model: ████<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 29 | 1 | Computers, equipment, & accessories - Thumbdrive, "████████", Black plastic with Purple Tether Cord located in Operations Office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Centon<br>Model: ████<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | Cloned Only |
| EV | 30 | 1 | Computers, equipment, & accessories - Main Server, "Dell Power Edge T-710, gray located in Server Room<br>Article: COMPUTER (CPU)<br>Make: ████<br>Model: ████<br>Serial Number: ████████<br>Booked At: OTHER | 9/16/2022 | Partial | Partial | N | Terminated per Warrant |
| EV | 31 | 1 | Computers, equipment, & accessories - ████ computer tower taken from Solis's office during MTA search warrant. Service Tag ████████<br>Article: COMPUTER (CPU)<br>Make: ████<br>Model: ████<br>Serial Number: Unknown<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |

AV010504

**EXHIBIT 58 - Page 843**

| EV | 32 | 1 | Computers, equipment, & accessories - ▓▓▓▓ Laptop from wiggins office during MTA search warrant<br>Article: LAP TOP COMPUTER<br>Make: ▓▓▓<br>Model: ▓▓<br>Serial Number: ▓▓▓▓▓<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |
|---|---|---|---|---|---|---|---|---|
| EV | 33 | 1 | Computers, equipment, & accessories - blk/sil METRO thumbdrive from wiggins office from MTA search warrant<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Unknown<br>Serial Number: Not Applicable<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |
| EV | 34 | 1 | Computers, equipment, & accessories - ▓▓▓▓ computer tower from wiggins office from MTA search warrant, ▓▓▓▓▓▓▓▓▓▓▓<br>Article: COMPUTER (CPU)<br>Make: ▓▓<br>Model: ▓▓<br>Serial Number: Unknown<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |
| EV | 35 | 1 | Computers, equipment, & accessories - Blk/Sil laptop from solis's office during MTA search warrant.<br>Article: LAP TOP COMPUTER<br>Make: ▓▓▓<br>Model: ▓▓<br>Serial Number: ▓▓▓▓▓<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AV010505

**EXHIBIT 58 - Page 844**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 36 | 1 | Computers, equipment, & accessories - Blk/Sil ▮▮ computer tower from Soli's office during MTA search warrant. ▮▮▮▮▮▮▮▮▮▮ Article: COMPUTER (CPU) Make: ▮▮ Model: ▮▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 37 | 1 | Computers, equipment, & accessories - Blk/Sil ▮▮ computer tower from Avila's office during MTA search warrant. ▮▮▮▮▮▮▮▮▮▮ Article: COMPUTER (CPU) Make: ▮▮ Model: ▮▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 38 | 1 | Computers, equipment, & accessories - Blk/Sil Computer tower from Becerra's office during MTA search warrant. ▮▮▮▮▮▮▮▮▮▮ Article: COMPUTER (CPU) Make: ▮▮ Model: ▮▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 39 | 1 | Computers, equipment, & accessories - Sil/Org portable hard drive from Becerra's office during MTA search warrant and blk cable Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▮▮ Model: Not Applicable Serial Number: ▮▮▮▮▮▮ Booked At: OTHER | 9/16/2022 | N | N | N | Not Assigned - Not in Search Warrant |

AV010506

**EXHIBIT 58 - Page 845**

| EV | 40 | 1 | Computers, equipment, & accessories - Sil/Yiw 2GB ▮▮▮▮ thumbdrive from Becerra's office during MTA search warrant<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 41 | 1 | Phones/Cell - Blk apple cellphone from Becerra's office during MTA search warrant. Sim card attached to back.<br>Article: Cell Phone<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: Unknown<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 42 | 1 | Computers, equipment, & accessories - Blk/Sil computer tower from Hernadez's office during MTA search warrant. ▮▮▮▮▮▮▮▮▮▮ Article: COMPUTER (CPU)<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 43 | 1 | Computers, equipment, & accessories - Blk ▮▮▮▮ 500GB drive from Hernadez's office, inside plastic wrap belonging to Jeniffer Loew.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮▮▮▮▮<br>Serial Number: ▮▮▮▮▮▮▮▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AV010507

EXHIBIT 58 - Page 846

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 44 | 1 | Computers, equipment, & accessories - Blk/Sil ▓▓ computer tower from Hernandez's office during MTA search warrant. ▓▓▓▓▓ Article: COMPUTER (CPU) Make: ▓▓ Model: ▓▓▓▓ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | N | N | N | Not Booked at CIC |
| EV | 45 | 1 | Computers, equipment, & accessories - 2 red/blk 32GB ▓▓▓▓ thumbdrives from Hernandez's office. Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▓▓▓ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| A3B: | 46 | 1 | Computers, equipment, & accessories - red/blk 4GB Innovera thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▓▓▓ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 47 | 1 | Computers, equipment, & accessories - blk 32GB ▓▓▓ thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▓▓▓ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AV010508

**EXHIBIT 58 - Page 847**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 48 | 1 | Computers, equipment, & accessories - whi/grn ▓▓▓ 64GB thumbdrive from Hernandez's office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▓▓▓<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 49 | 1 | Computers, equipment, & accessories - Sil/Blk/Whi METRO thumbdrive from Hernandez's office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | N | No Data In Date Range |
| EV | 50 | 1 | Computers, equipment, & accessories - Blk/Sil ▓▓▓ computer tower from Englund's office. S▓▓▓▓▓▓ ▓▓▓▓▓▓Article: COMPUTER (CPU)<br>Make: ▓▓▓<br>Model: ▓▓▓▓<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 51 | 1 | Computers, equipment, & accessories - red/sil 8GB thumbdrive from Englund's office during MTA search warrant.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | | Y | |

AV010509

**EXHIBIT 58 - Page 848**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 52 | 1 | Electronics (audio, TV) - blk sanyo tape recorder from kuehls house<br>Article: Other<br>Make: ▓▓▓▓<br>Model: ▓▓▓▓<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | N | N | N | No Date in Date Range |
| EV | 53 | 1 | Computers, equipment, & accessories   Silver ▓▓▓▓ computer<br>Article: LAP TOP COMPUTER<br>Make: ▓▓▓▓<br>Model: Unknown<br>Serial Number: ▓▓▓▓▓▓▓▓<br>Booked At: OTHER | 9/16/2022 | N | N | N | Encrypted |
| EV | 54 | 1 | Computers, equipment, & accessories - SILVER APPLE COMPUTER<br>Article: LAP TOP COMPUTER<br>Make: ▓▓▓▓<br>Model: Unknown<br>Serial Number: ▓▓▓▓▓▓▓<br>Booked At: OTHER | 9/16/2022 | N | N | N | Partial Image |
| EV | 55 | 1 | Phones/Cell - rose gold ▓▓▓ cellphone with blu case taken from Kuehl's residence.<br>Article: Cell Phone<br>Make: ▓▓▓▓<br>Model: Not Applicable<br>Serial Number  Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

AVO10510

**EXHIBIT 58 - Page 849**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 56 | 1 | Computers, equipment, & accessories - SILVER ▮▮▮▮ COMPUTER<br>Article: LAP TOP COMPUTER<br>Make: ▮▮▮▮<br>Model: Unknown<br>Serial Number: ▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 57 | 1 | Computers, equipment, & accessories - sil ▮▮▮▮ cd drive and whl cable from kuehl's residence<br>Article: OTHER<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: ▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | N | N | N | CD Player |
| EV | 58 | 1 | Phones/Cell - ROSE GOLD ▮▮▮▮ Article: Cell Phone<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: ▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | N | N | N | Damaged Phone/No Extraction |
| EV | 59 | 1 | Computers, equipment, & accessories - sil ▮▮▮▮ 80GB computer drive Article: OTHER<br>Make: ▮▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | N | N | N | Damaged Phone/No Extraction |
| EV | 60 | 1 | Cameras: Equip & Access - sil nikon coolpix digital camera from kuehl's residence<br>Article: CAMERA<br>Make: nikon<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

AV010511

**EXHIBIT 58 - Page 850**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 61 | 1 | Cameras: Equip & Access - blk ▓▓▓▓ sx110 digital camera from kuehls residence.<br>Article: CAMERA<br>Make: ▓▓▓<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 62 | 1 | Computers, equipment, & accessories -<br>red ▓▓▓ 4 GB thumbdrive with zelda paperwork from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: sandisk<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 63 | 1 | Computers, equipment, & accessories -<br>blu 16GB ▓▓ thumbdrive from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▓▓<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 64 | 1 | Computers, equipment, & accessories -<br>USB DRIVE ▓▓▓ 1GB<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▓▓▓▓<br>Model: ▓▓<br>Serial Number ▓▓▓<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

AVO10512

**EXHIBIT 58 - Page 851**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 65 | 1 | Computers, equipment, & accessories - whl 256GB ███ thumbdrive from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ███<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 66 | 1 | Computers, equipment, & accessories - USB DRIVE 1GB<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: SCAN DISK<br>Model: ███<br>Serial Number: ███<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 67 | 1 | CDs/Video - cd disc labeled LA political roast from kuels residence<br>Booked At: OTHER | 9/16/2022 | N | N | N | Not Assigned - Not in Search Warrant |

AV010513

EXHIBIT 58 - Page 852

# EXHIBIT 2

AV010514

**EXHIBIT 58 - Page 853**





AV010515

EXHIBIT 58 - Page 854

**PROOF OF SERVICE - 1013A(3), 2015.5 C.C.P.**

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES  )

I am employed in the County of Los Angeles, State of California   a  ove  th  ag o 1  an  no     part  t  th  withi
action  m  busines  addres  i  88  Wes  Sixt  Street  Suit  400  Lo  Angeles  Californi  90017

O   Septembe  22  2022,  I serv  d t  e foregoi  g document, described as

SUPPLEMENTAL DECLAR  TION OF SG  ., MAX FERNANDEZ   UR  UANT TO COUR 'S
             O  DER DATED SEP  EMBER  0,  022

on all  nterest  d  partes li  te  below by tr  ns  itt ng to all  nterest  d  part es a true co  y  hereof as follows:

| | |
|---|---|
| Cheryl O'Connor, Esq.<br>JONES DAY<br>3161 Michelson Drive, Suite 800<br>Irvine, CA 92612 | Robert Dugdale, Esq.<br>KENDALL BRILL & KELLY LLP<br>10100 Santa Monica Blvd., Suite 1725<br>Los Angeles, CA 90067 |
| Harvinder S. Anand, Esq.<br>ANAND LAW GROUP<br>790 E. Colorado Blvd., # 900<br>Pasadena, CA 91101 | Dawyn Harrison, Esq.<br>Office of the County Counsel.<br>648 Hahn Hall of Admin.<br>500 W Temple St,<br>Los Angeles, CA 90012 |

☒  , BY MAIL by placing a true copy thereof enclosed in a sealed envelope addressed as set forth above   I am
readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it
would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles,
California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid
if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☒   BY ELECTRONIC TRANSMISSION by transmitting a PDF version of the document(s) by electronic mail to the
party(s) identified on the service list using the e-mail address(es) indicated

☒  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 22, 2022, in Los Angeles, California

Michele K irk

AV010516

**EXHIBIT 58 - Page 855**

# ATTACHMENT C

AV010517

EXHIBIT 58 - Page 856



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713



TELEPHONE

FACSIMILE

TDD

DAWYN R. HARRISON
Acting County Counsel

September 21, 2022

| CONFIDENTIAL |
| --- |
| THIS MATERIAL IS SUBJECT TO THE ATTORNEY-CLIENT AND/OR THE ATTORNEY WORK PRODUCT PRIVILEGES |

VIA EMAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

Re:    Response to Your September 20, 2022 Letter

Dear Sheriff Villanueva:

This in response to your letter dated September 20, 2022, stating you are refusing Bill Seki as counsel for the County of Los Angeles Sheriff's Department ("LASD")and engaging the appropriate counsel.

First, all the issues raised in your letter are moot. Yesterday, California Attorney General Rob Bonta notified Undersheriff Murakami that his office is assuming responsibility for: a) any investigation into whether individuals committed a crime by giving advance warning of the search warrants to Supervisor Kuehl and Patricia Giggans; and b) the underlying investigation of Peace Over Violence, Patricia Giggans, Supervisor Sheila Kuehl, Los Angeles Metropolitan Transportation Authority, etc., including the warrants issued in 2021 and 2022. As you acknowledged previously, the Attorney General has the authority to assume these responsibilities because he has complete supervisorial authority over you and may direct your and LASD's investigative activities. In the Attorney General's letter he stated the LASD "should cease its investigative activity and refrain from any actions in furtherance of these investigations, including public statements or court filings related to the investigations." Based on that directive, you did not have authority to send your September 20, 2022, letter, nor does the LASD require legal services relating to the continued investigation by the Attorney General. To the extent that counsel is required for the LASD to explain prior conduct in connection with the 2021 and 2022 warrant proceedings, Mr. Seki will continue to represent the LASD.

HOA 103848555 5

AV010518

EXHIBIT 58 - Page 857

The Honorable Alex Villanueva
September 21, 2022
Page 2


Second, I wanted to remind you that only the Office of County Counsel, or the law firms we retain, may represent you, in your official capacity, and the LASD.[1] Further, even if all of the requirements of Government Code section 31000.6 – Employment of Legal Counsel to Assist Assessor or Sheriff; Conflicts of Interest - are met and conflict of interest counsel is deemed appropriate for you in your official capacity, the conflict counsel must be retained through my office.[2] Therefore, you have no authority to retain your own counsel to represent either you or the LASD, nor is the County of Los Angeles responsible for any of the costs incurred by those law firms. I recently discovered that you improperly retained Werksman Jackson & Quinn LLP in this matter. I will notify them that they have no authority to represent you or LASD and will not be paid by the County of Los Angeles, and I will copy the Attorney General's Office.

Very truly yours,

DAWYN R. HARRISON
Acting County Counsel

DRH:gl

Enclosures

c:      Timothy K. Murakami, Undersheriff

        John L. Satterfield, Commander
        Chief of Staff

---

[1] Government Code section 25203 establishes that the board of supervisors shall "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, is a party." Los Angeles County Charter Article VI, section 21 vests County Counsel with "exclusive charge and control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party" (footnotes omitted). By law, the Office of County Counsel is charged with providing legal advice, on behalf of the Board, to constituent entities and officials within the County. California Government Code section 23005 (County exercises authority "only through the board of supervisors" or its authorized agents), id. § 25203 (the Board shall "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, is a party"); Los Angeles, California, County Charter Article VI, section 21 (County Counsel is vested with "exclusive charge and control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party" (footnotes omitted)).

[2] Government Code section 31000.6. Please see the attached orders from *County of Los Angeles v. Sheriff Alex Villanueva, et al.* regarding assignment of counsel.

HOA.103848555.5

AV010519

EXHIBIT 58 - Page 858


# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE
ALEX VILLANUEVA, SHERIFF


September 20, 2022

Dawyn Harrison, Acting County Counsel
County of Los Angeles – Office of the County Counsel
500 West Temple Street, Suite 648
Los Angeles, California 90012

Dear Ms. Harrison:

### DEMAND FOR DEFENSE COUNSEL

It appears clear you have no intention of removing your office's control as counsel to the Department on this matter. Unless I misunderstood, you insist we continue to communicate and seek advice from your Senior Assistant County Counsel, Mr. Jason Gonzalez, and Mr. Bill Seki, as stated in your letter.

As you are aware, the morning of the search warrant service Supervisor Shelia Kuehl stated to reporters, *"I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning."* In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all LASD social media accounts.

Ms. Kuehl's allegation that you, or a representative from your office, and Mr. Huntsman provided her with advanced knowledge of a criminal search warrant in which she was a suspect makes it unethical and inappropriate for your office to have further access to information or decision making regarding this matter. Moreover, by retaining the services of Bill Seki, there is a clear further potential for you, or your office, to interfere in the filing of motions and overall employment status of Mr. Seki. I must also highlight, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement today, both you and your office are likely to become the focus of a criminal investigation by the Office of the Attorney General, and as such the conflict of interest is undeniable.

Since you intend to continue blocking any independent counsel, we are forced to seek appropriate counsel in order to prevent further interference and/or obstruction of our investigation by your office. Under the State Bar Rule 1.6, the potential for Mr. Seki to report information or communications to your office, and seek approval or denial for legal strategy, regarding our investigation disqualifies him as counsel. Based on this, we can no longer accept Mr. Seki as counsel and decline his further legal services.

AV010520

**EXHIBIT 58 - Page 859**

Ms. Harrison                          -2-                          September 20, 2022

If I misunderstood your position, please advise.  Due to the exigency of this pending matter, the
Department will engage the appropriate counsel and inform you once retained.  Should you have
any questions, please contact Undersheriff Timothy Murakami, at ▮▮▮▮▮▮▮▮▮.  Thank you for
your anticipated cooperation with this matter.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV:JLS:js

c:      Jason Gonzalez, Senior Assistant County Counsel

AV010521

EXHIBIT 58 - Page 860



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713



TELEPHONE

FACSIMILE

TDD

**DAWYN R. HARRISON**
Acting County Counsel

September 20, 2022

| CONFIDENTIAL |
| --- |
| THIS MATERIAL IS SUBJECT TO THE ATTORNEY-CLIENT AND/OR THE ATTORNEY WORK PRODUCT PRIVILEGES |

VIA EMAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

Re:    Response to Your September 19, 2022 Letter

Dear Sheriff Villanueva:

I am in receipt of your letter from yesterday requesting counsel to handle the court proceedings related to the warrants issued on Wednesday, September 14, 2022 ("2022 Warrants"). After reviewing the letter, I believe Undersheriff Murakami has not had a chance to let you know that Bill H. Seki, a partner at Seki, Nishimura & Watase, was assigned to handle the 2022 Warrants matters last week. It was our understanding, based on your and Undersheriff Murakami's press statements, that you were recused from handling the 2022 Warrants. As a result, we communicated directly with Undersheriff Murakami about assigning the defense of the 2022 Warrants to Mr. Seki and his firm on September 16, 2022, the day he made a request for counsel. Your department did not seek my office's assistance when it prepared the 2022 Warrants nor did it request to use Mr. Seki's professional services to assist in the preparation of the 2022 Warrants. Therefore, we had to quickly gather the necessary facts and perform an ethical and legal review when the Undersheriff requested counsel on September 16, 2022.

By way of background, Mr. Seki has been representing your department on the warrants issued in February and March of 2021 to the Los Angeles County Metropolitan Transportation Authority (Metro), Office of the Inspector General of the Metro (OIG), and Peace Over Violence ("2021 Warrants") since March 2021. Mr. Seki has actively responded to multiple motions challenging the warrants,

HOA.103846887.3

AV010522

EXHIBIT 58 - Page 861

The Honorable Alex Villanueva
September 20, 2022
Page 2

communicated with your department about the warrants, and made several appearances defending the warrants for your department, including the last one in front of the Honorable Eleanor Hunter on September 1, 2022, addressing the scope of the 2021 Warrants and ordering the assignment of a Special Master.

When Mr. Seki was retained to provide his professional services for the 2021 and 2022 Warrants, confidentiality silos were created. Those confidentiality silos are in effect and will remain that way until the conclusion of these matters. As to the other claims you make in your letter, I deny them and will not further acknowledge them with a response.

If you have any questions about the 2021 or 2022 Warrants, please contact Mr. Seki at ███████████, or Senior Assistant County Counsel Jason Gonzalez at ███████████.

Very truly yours,

DAWYN R. HARRISON
Acting County Counsel

DRH:gl

c:     Timothy K. Murakami, Undersheriff

       John L. Satterfield, Commander
       Chief of Staff

HOA.103846887.3

AV010523

**EXHIBIT 58 - Page 862**




# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

September 19, 2022

Dawyn Harrison, Acting County Counsel
County of Los Angeles – Office of the County Counsel
500 West Temple Street, Suite 648
Los Angeles, California 90012

Dear Ms. Harrison:

### *DEMAND FOR DEFENSE COUNSEL*

Per Government Code § 995, this correspondence will serve as my demand as the elected Sheriff of Los Angeles County Sheriff's Department (Department) for defense counsel regarding: the service of search warrants against Metropolitan Transit Authority (MTA)/Kuehl/Giggans/Peace over Violence, wherein the Board of Supervisors is obligated to provide a defense. As you are aware, in Supervisor Kuehl's press interview[1], she explicitly named Max Huntsman, the Head of the Office Inspector General (OIG) and County Counsel, as involved in forewarning her on the service of the search warrant as to the exact date and time, which unequivocally shows your office cannot be involved, or provide legal advice regarding this matter and must assign separate and independent counsel to my office. Based on Supervisor Kuehl's statements, you or your office interfered in this matter, along with Mr. Huntsman. Consequently, your office and Mr. Huntsman, must legally and ethically recuse yourselves and any of your contract counsel from this matter, and provide me and the Los Angeles County Sheriff's Department independent counsel.

As you are aware, Government Code § 995, except as otherwise provided in Sections 995.2 and 995.4, upon request of an employee or former employee, a public entity shall provide for the defense of any civil action or proceeding brought against him, in his official or individual capacity or both, on account of an act or omission in the scope of his employment as an employee of the public entity. For the purposes of this part, a cross-action, counterclaim or cross-complaint against an employee or former employee shall be deemed to be a civil action or proceeding brought against him.

---

LASDHQ Twitter Account. Statement by Supervisor Sheila Kuehl to the media
http://twitter.com/LASDHQ/status/1564449037712382081 g    var.com/en/m/mysqus  s

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012
*A Tradition of Service*
— *Since 1850* —

AV010524

EXHIBIT 58 - Page 863

Ms. Harrison                    -2-                September 19, 2022

Moreover, Government Code § 995.2 (b), provides in part:  If an employee or former
employee requests in writing that the public entity, through its designated legal
counsel, provide for a defense, the public entity shall, within 20 days, inform the
employee or former employee whether it will or will not provide a defense, and the
reason for the refusal to provide a defense.

Furthermore, as you are also aware, Government Code § 25303 provides in part:  This
section shall not be construed to affect the independent and constitutionally and
statutorily designated investigative and prosecutorial functions of the sheriff and
district attorney of a county.  The board of supervisors **shall not obstruct the
investigative function of the sheriff** of the county nor shall it obstruct the
investigative and prosecutorial function of the district attorney of a county.

Finally, Los Angeles County Code of Ordinances § 6.44.190. provides in part:  The OIG
shall not disclose, without the Sheriff's authorization, any of the Sheriff's Department's
confidential personnel, investigative, or disciplinary information unless such
information is already a matter of public record.

Should you fail to provide defense counsel in this matter, I will ask the court to order
you, on behalf of the Board of Supervisors, to comply with their obligation by a
Petition for Writ of Mandate.

As you are also aware, if you deny my demand for counsel, I am entitled to recover
from the public entity such reasonable attorney's fees, costs and expenses as are
necessarily incurred in defending the action or proceeding if the action or proceeding
arose out of an act or omission in the scope of his employment as an employee of the
public entity.  See, Sparks v. Kern County (2009) 173 Cal App. 4th 194.

Your response in writing is due by the end of the next business day from the date of
this letter, **Tuesday, September 20, 2022**.  Upon receipt, we will advise of the firm of
my choosing.  Should you have any questions, please contact my Chief of Staff,
Commander John Satterfield, at ▮▮▮▮▮▮▮▮▮▮.  Thank you for your anticipated
cooperation with this matter.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010525

**EXHIBIT 58 - Page 864**

Fwd: Latest MTA/Kuehl/Giggans warrants

From: ██████████████ @counsel.lacounty.gov>
Sent: Wednesday, September 14, 2022 5:39 PM
To: ████████ law.com>
Cc: ████████ @counsel.lacounty.gov>
Subject: Latest MTA/Kuehl/Giggans warrants

Hi Bill,

I know you've had some conversations with Lena today about the newest round of warrants served by LASD this morning in the MTA/Kuehl/Giggans matter, and I just wanted to advise that County Counsel is not currently authorizing you to accept/work on those warrants on behalf of the Sheriff's Department. Please let me know if you have any questions. Thanks,



Assistant County Counsel
████████ Division

AV010526

EXHIBIT 58 - Page 865



Los Angeles County Sheriff's Department ⊘
September 16 at 11:49 AM · ⊙                                          ...

LA County Counsel Terminates LASD's Lawyer Same Day Supervisor Kuehl's Warrant Is Challenged in Court

In an unprecedented move of retaliation after Wednesday's lawful service of a search warrant on the residence of Supervisor Shelia Kuehl and others, the Board of Supervisor's Office of County Counsel has terminated the services of LASD's legal representation. Simply put, the Board of Supervisors and County Counsel fired our lawyer the same day our search warrant was challenged in court and an emergency hearing was set for September 22, 2022.

This is exactly the type of obstruction, interference, and political shenanigans which Sheriff Alex Villanueva fights against daily. We are now forced into a position of being unrepresented with no County authorization to pay for legal representation and reduced to solicit pro bono representation in this matter.

If Supervisor Shelia Kuehl, Commissioner Patty Giggins, The Board of Supervisors, County Counsel and the Office of the Inspector General are as committed to transparency and accountability as they continuously state, then why are they scared for these electronic devices to be examined and fighting the search warrant?

Fwd Latest MTBark  re: Giggans warrant k

AV010527

EXHIBIT 58 - Page 866

# ATTACHMENT D

AV010528

EXHIBIT 58 - Page 867

761551N2SA  SH  AO  32A (2/72)

COUNTY OF LOS ANGELES
## SHERIFF'S DEPARTMENT
"A Tradition of Service"
OFFICE CORRESPONDENCE

DATE: December 17, 2004

FILE NO.

| FROM: ALEX VILLANUEVA, SERGEANT CARSON STATION | TO: DIVISION CHIEFS AND COMMANDERS |
|---|---|

SUBJECT:    AN OPEN LETTER

The purpose of this memorandum is to dispel any rumors and inform you of my intentions regarding my future with our Department.   As you all well know, I have been exhausting all administrative remedies to address my denial of promotion stemming from the 2003 Lieutenant Examination, and now I have read the most recent Intent to Promote teletype for lieutenants.   As expected, I was not included on this list for reasons you know in more detail than I do, as I can only speculate what transpires behind closed doors.

Up to this point in time my experience, education, leadership, and communication skills have always served me well.   During my ten years experience with the United States military I was privileged to have been promoted six times to positions of higher rank and responsibility.   Perhaps this experience has burnished in me an expectancy of merit based promotions, and this expectancy was unrealistically carried over to our Department.

From what I have come to understand regarding ethical administrative behavior, I find no legal or moral justification for the activities you have engaged in over the course of the last year and a half.   From rewriting oral interview scoring standards in order to deliberately suppress exam scores, providing secret exam preparation classes for the privileged few, and gaming the appeals process in order to gerrymander the candidate pool, you have compromised your integrity and that of the Department's.

Perhaps you have succumbed to a moral inversion, wherein you believe your actions and those of your peers are in the best interest of the Department and supported by civil service rules.   Your decision making is a result of group-think and the feeling of infallibility, making it difficult for you to see beyond your own career success.   I want to encourage each and every one of you to take a moment and engage in critical reflexivity, the ability to see the organization through someone else's experience.

Page 1 of 2

AV010529

EXHIBIT 58 - Page 868

My organizational experience has told me that I do not count, no matter what my qualifications may be, how hard I work, or how many bright ideas I possess. I do not get "invited" to apply to jobs, nor are jobs created exclusively for me. There is no captain or higher pushing aside more qualified individuals in order to make room for me, or steering me in the "right" direction. There is no rater who overlooks my shortcomings and gives me undeserved outstanding evaluations or 100 AP's. My queries are addressed with attorneys and mind-numbing technical rationality.

Promoting dozens of individuals to the rank of lieutenant is a wonderful opportunity to assert organizational values such as meritocracy, equality, and diversity, while at the same time promoting efficiency and effectiveness, and boosting the moral of the Department. Instead you deliberately chose the values of cronyism, nepotism, and tokenism. These have been the same values you have been espousing with just about every promotional process within our ranks. This negatively impacts public safety by promoting corruption and incompetence.

I am curious to know just how much public resources you will squander as you attempt to defend the indefensible. Deliberately attempting to suppress or retard the upward mobility of Latinos on our Department is illegal, immoral, and politically incomprehensible. Each and every one of you contributes to this unfolding tragedy by your actions or inactions. I will say this: as a Latino, I do not seek special favors, accommodations, or any sort of "affirmative action" in order to receive a promotion. I expect to be promoted because there is a clearly identified universal standard based on bonafide occupational qualifications, not golf handicaps or quotas.

It has been painful watching you lie, obfuscate, conceal, mislead, or otherwise attempt to hide the truth. I want to encourage you to come to grips with the damage you inflict on our institution, and do what's right. In an interesting parallel to our Department, NASA swore after the Challenger tragedy that it should never happen again, then along came Columbia. After spending over $30 million addressing Bouman, it is truly frightening to behold how little has been learned.

Leadership is defined by action, not position, and I plan to act decisively to assert my rights, not only as an employee, but as a citizen and proud resident of this County. Your legacy and the future of equality and equal opportunity in Los Angeles County are at a crossroads. I hope you make the right choices for the benefit of the County and the Department, and I must remind you that it is 2004, not 1964. Just as in Martin Luther King's day, I am confident of the supremacy of a simple idea - all men are created equal.

AV:av

AV010530

**EXHIBIT 58 - Page 869**

# ATTACHMENT "D"

AV010531

**EXHIBIT 58 - Page 870**

**From:** Williams, Dara███████████████████
**Sent:** Wednesday, October 12, 2022 5:54 PM
**To:** Corbett, Brendan J.███████████████; Chase, Bruce D.████████████ Francisco, Holly A.
████████████; OIG/COC Requests ████████████████
**Subject:** Report Card On Sheriff's Department's Reforms 2019 to 2022 - Validation Draft

This message is from an EXTERNAL SENDER   be CAUTIOUS, particularly with links and attachments

Dear Assistant Sheriffs Corbett, Chase, and Francisco,
Attached is a validation draft of an Office of Inspector General Report Card on Sheriff's
Department Reforms – 2019 to 2022. Please review the draft and provide any input or requested
changes by the close of business on *October 20, 2022*.  As a professional courtesy we have
included the Audit and Accountability Bureau in this email.

As always, we find it beneficial if you bring any requested changes or input to our attention prior
to October 20th in an effort to engage in a dialogue during the time the report is under review
by the Sheriff's Department. If we are not aware of any requests or responses by the Sheriff's
Department prior to that date, it is unlikely that we will make any adjustments prior to our
anticipated report issuance date.

Please do not hesitate to reach out to me if you would like to discuss any portion of the report.
The best way to reach me is on my cell phone, which is listed below.
Best regards,
Dara

**Dara Williams (she/her) | Chief Deputy, Inspector General**
Los Angeles County Office of Inspector General
312 S. Hill Street, 3rd Floor, Los Angeles, CA 90013
(T)███████████
(C)███████████
(F)███████████

*Failure of county employees to timely comply with requests for information from the Office
of Inspector General is a violation of Government Code section 25303, Los Angeles County
Code section 6.44.190 and, under specified circumstances, Penal Code section 13670. Failure
to cooperate with an investigation into potential police misconduct may result in revocation
of peace officer certification. (Penal Code section 13510.8(b)(6).)*

*CONFIDENTIALITY NOTICE: This communication with its contents contains confidential and
legally privileged information. It is solely for the use of the intended recipient. Unauthorized
interception, review, use, or disclosure is prohibited and may violate applicable laws including the
Electronic Communications Privacy Act. If you are not the intended recipient, please contact the
sender and destroy all copies of the communication.*

AV010532

**EXHIBIT 58 - Page 871**



# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF



October 28, 2021

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### IMMINENT THREAT TO PUBLIC SAFETY

As the elected Sheriff of Los Angeles County serving over ten million residents and managing an organization of 18,000 employees, I am notifying you of the imminent threat to public safety which will be created by your vaccination mandate and ratified by the Los Angeles County Board of Supervisors (Board) on August 10, 2021. If I were to follow your mandate, I could potentially lose 44 percent of my workforce in one day. I cannot enforce reckless mandates that put the public's safety at risk.

The Los Angeles County Sheriff's Department (Department) has already been "defunded" by over one thousand positions. The Los Angeles County Board of Supervisors is the only board in the entire nation that has continued with last year's defund law enforcement movement. Every other board in the nation has restored funding to their law enforcement agencies. As of this week, homicide rates are up to 44 percent and aggravated assaults are up nearly 23 percent. Despite the substantial loss of personnel, increase in workload, and rise in crime, I have been provided no additional resources by the Board, and you continue to defund my department and freeze my service budget.

For the entire course of this pandemic and prior to any vaccination being available, my employees worked tirelessly to fulfill their commitment to public safety by continuing to answer calls for service, maintaining safe jails, and even assisting to vaccinate our most vulnerable at-risk community members. It is heartbreaking to think that these employees who worked through the pandemic and were called "heroes" are now being threatened with termination because they make a personal medical choice.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*Since 1850*

AV010533

**EXHIBIT 58 - Page 872**

The Honorable Board of Supervisors          -2-                    October 28, 2021

Compounding this issue is the fact my Department is experiencing a mass exodus of employees who are retiring early. I currently have 1,605 employees that have 28 years of service or more. This means they could retire without financial consequence. This mandate would certainly expedite many of these employees decision to retire.

This Board's mandate will cause patrol services to significantly decline. I would be forced to take drastic measures such as reducing services to the County and contract residents, which would cause the closure and realignment of patrol stations. Specialized units including our Aero and Special Enforcement Bureaus, and Headquarters Detectives would be nearly eliminated.

Of great concern is the upcoming fire season. With the reduction of personnel, I would be unable to mobilize and deploy mobile field forces, which are critical in conducting evacuations during disasters. I have conveyed to other local law enforcement partners I could potentially not have resources to deploy in their time of need due to critical staffing shortages created by this Board's mandate.

There are other alternatives that the Department has incorporated to combat the COVID-19 virus. I have ordered my staff to wear masks. Those that have not been vaccinated must submit to COVID-19 testing. With the pandemic waning, there is no justification for your mandate. This mandate is like putting up storm windows after the storm has passed.

Unlike other County departments that can close their doors and merely cause an inconvenience to the general public, the Department operates 24/7 to protect the public. I cannot afford to cut emergency services or choose not to send a patrol car to assist a community member in need. As the Sheriff, I can firmly tell you this mandate will create a pandemic of chaos within our county resulting in tragic losses.

Should you have any questions or would like to discuss further, please feel free to contact me at █████████████.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010534

**EXHIBIT 58 - Page 873**

EXHIBIT 58 - Page 874

# EXHIBIT 59

EXHIBIT 59 - Page 875





# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

October 26, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

**INSPECTOR GENERAL MAX HUNTSMAN ADMITS UNDER OATH HE IS UNABLE
TO IDENTIFY EVEN ONE "DEPUTY GANG MEMBER"**

On October 25, 2022, Inspector General Max Huntsman, Office of the Inspector
General (OIG), appeared and was sworn in under oath for an 8-hour deposition in the
matter of, *Art Hernandez, et al. v. County of Los Angeles (Case No. 19STCV33158)*.
During which time Mr. Huntsman, contrary to every public statement he has ever made
over the last four-years, was unable to identify or name even one person who was a
"deputy gang member."  Apparently, out of fear of committing perjury, Mr. Huntsman
was forced to finally tell mostly the truth about deputy cliques, sub-groups, and fraternal
organizations.

Mr. Huntsman was forced to admit on the record that he has no personal knowledge of
"deputy gangs," has never witnessed any violations made by "deputy gangs," has no
knowledge of any violence committed by "deputy gangs," and has no knowledge of the
"Banditos" having a creed, meetings, voting, group structure, or meeting the legal
definition of a law enforcement gang, as defined by California Penal Code Section
13670.

He further admitted, other than an anonymous complaint sent on June 19, 2018, he
possesses no knowledge or evidence of harassment, retaliation, withholding of backup
or battery against personnel, other than the "Kennedy Hall" incident, which the Office of
the District Attorney determined to be essentially a drunken brawl, when they declined
to file any criminal charges against the involved parties.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
~ *Since 1850* ~

**EXHIBIT 59 - Page 876**

The Honorable Board of Supervisors            -2-            October 26, 2022

Mr. Huntsman contradicted the declaration of former Los Angeles County Sheriff's
Department (Department) Chief Matthew Burson.  He specifically testified under oath,
that Mr. Burson's statement in paragraph ten of his declaration, "OIG instructed Internal
Criminal Intelligence Bureau to ask questions about the Banditos" was false.
Mr. Huntsman stated he does not have the authority to direct Department investigations.

In a Department of approximately 18,000 employees, Mr. Huntsman had no legal option
but to admit he could not name even one person belonging to a "deputy gang" and his
rhetoric of the last four-years has been based primarily on hearsay, allegations made in
lawsuits, and what he learns from the media, not facts.

Under oath, Mr. Huntsman was also forced to finally acknowledge the Department has
taken steps to address the issue of deputy cliques, sub-groups, and fraternal
organizations, including changing command staff at East Los Angeles Station;
implementing a policy prohibiting cliques and sub-groups; issuing a video regarding the
cliques and sub-groups policy; transferring certain station personnel to different
assignments; having discussions with line personnel; and having discussions with
executive personnel.

As indicated to you in my letter dated, February 16, 2022:

> I openly challenge every elected leader, or their appointees, to provide facts to
> me and name individuals who they can prove are "gang members," as defined by
> California Penal Code section 13670, and subject yourselves to defamation laws
> if wrong.  Using this term as a blanket statement is political cowardice and
> opportunistic pandering [Exhibit A].

Based on Mr. Huntsman's sworn testimony, I trust this puts to rest any further ridiculous
notions suggesting a settlement is warranted in these matters.  As you undoubtedly
recall, your former County Counsel forwarded a settlement agreement over two years
ago on this matter, which I was bypassed on and had I not intervened, would have
become a reality.  This manner of irresponsible litigation is a waste of taxpayer money
and brings harm to the reputation of the Department.

Mr. Huntsman's unhinged obsession to mislead the public into believing he has
knowledge of the existence of "deputy gangs," led to a public spectacle, deliberately
designed to mislead and misinform the public, as well as influence the outcome of an
election, in the form of the Civilian Oversight Commission's (COC) Special Hearings on
"Deputy Gangs."  The COC has engaged in incredibly unethical behavior during their
"kangaroo court," as was noted in my letter dated October 3, 2022, *False and
Irresponsible Statements made at COC Special Meeting* [Exhibit B].

**EXHIBIT 59 - Page 877**

The Honorable Board of Supervisors          -3-          October 26, 2022

The facts show this entire "deputy gangs" farce appears to be nothing more than another example of the weaponization of County resources to defund, de-staff, and defame the Department.  These "deputy gang" attacks are obviously politically motivated, and as stated in a Los Angeles Times article on March 22, 2022, *Inspector general identifies 41 sheriff's deputies who allegedly belong to gang-like groups*, "The timing of this letter suggests Mr. Huntsman is using his public office and resources to campaign against the sheriff leading up to the June primaries."  Based on his own sworn statements, which highlighted he has absolutely no direct knowledge of any law enforcement gangs, Mr. Huntsman must immediately appear before the COC and admit his past inflammatory and unsubstantiated rhetoric was not factual.

You have continued to turn a blind eye to the abhorrent behavior exhibited by your chosen Inspector General and are complicit in allowing him to damage the reputation of the great men and women who comprise the Department, as well as my own reputation. His inflammatory public rhetoric has damaged public safety, public trust, and has driven a wedge into the heart of the community.  Many of his despicable falsehoods, which have been presented time and time again as facts, were cited as a basis for the creation of Measure A.

I demand you order Mr. Huntsman to publicly recant every defamatory statement he has made during the last four-years regarding his false "deputy gang" allegations.
Mr. Huntsman has negatively commented about "deputy gangs" and misled the public in countless interviews, articles, media appearances, documentaries, and public meetings. His irresponsible comments have severely injured public perception of the Department and has hurt the reputation of both my personnel and me.

Additionally, I demand you terminate Mr. Huntsman forthwith as a result of the discovery of his most recent unethical behavior, as well as past ethical transgressions [Exhibit C]. Every time I blow the whistle as to his unethical behavior, this Board has ignored me. Why do the words transparency and accountability only seem to apply to others, not this Board or your political appointees?

Lastly, we have definitive evidence that Mr. Huntsman knowingly and intentionally committed perjury during this deposition.  I am prepared to share this evidence with you immediately in closed session.

**EXHIBIT 59 - Page 878**

The Honorable Board of Supervisors            -4-                    October 26, 2022


Should you have any questions or would like to discuss further, please feel free to
contact my Chief of Staff, Commander John Satterfield at ██████████

Sincerely,

ALEX VILLANUEVA
SHERIFF

**EXHIBIT 59 - Page 879**

The Honorable Board of Supervisors                -4-                October 26, 2022

AV:JLS:js:pg

Attachments:        A –    Letter to Board – Open Challenge for Elected Leaders
                    B –    Letter to COC - False and Irresponsible Statements
                    C –    Letter to Board – Demand to Relieve Employees of Duty

**EXHIBIT 59 - Page 880**

# ATTACHMENT A

EXHIBIT 59 - Page 881





# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

February 16, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### OPEN CHALLENGE FOR ELECTED LEADERS TO IDENTIFY DEPUTY CLIQUE MEMBERS WHO YOU CAN SHOW ARE "GANG MEMBERS"

As the elected Sheriff of Los Angeles County, I demand you and other elected leaders, as well as your appointees, immediately cease and desist from using the derogatory term "deputy gangs" when referring to members of the Los Angeles County Sheriff's Department (Department). This willful defamation of character has injured both individuals and the organization. It also serves no purpose other than to fuel hatred and increase the probability of assault and negative confrontations against our people.

My personnel routinely place themselves in harm's way while serving our community and ask nothing in return, other than a paycheck and maybe a little respect for the tough job they perform. Elected officials have no problem attending the funeral of a peace officer killed in the line of duty and often fight for the opportunity to speak at the podium, but the manner in which some have enthusiastically branded my personnel as "gang members" every opportunity they get is disgusting.

Utilizing the term "gang member" as a reference to members of the Department stems from the false allegations made in a frivolous lawsuit by a now discredited deputy sheriff. The ridiculous claims made by this individual and his attorneys were self-serving, as they increased his chances of receiving a large monetary settlement from Los Angeles County (County), and both the discredited plaintiff and his attorneys were sanctioned monetarily for their failure to comply with orders of the Court.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012
*A Tradition of Service*
*— Since 1850 —*

SCANNED TO BOS LIAISON TEAM
2/16/22

**EXHIBIT 59 - Page 882**

The Honorable Board of Supervisors          -2-                    February 16, 2022

The false and unproven allegations in this case alleging "deputy gangs" was used as
the primary basis for attacks on the Department by some members of the Board of
Supervisors[1] (Board), a former member of the Board (who has been federally indicted
for 20 counts of public corruption), the Office of the Inspector General, the Civilian
Oversight Commission, other elected officials, and the media.  Their statements have
been presented as "facts" in reports by RAND, the Center for Juvenile Law & Policy,
and Knock LA.  The Los Angeles Times alone has referenced these unsubstantiated
allegations in at least a dozen articles.  These writings have served to attack and
undermine the perceived credibility and legitimacy of our organization, even though they
were based on what we now know to be a highly uncredible source.

On November 4, 2021, the case in question was dismissed due to *"lack of evidence and
absence of triable facts."*  The Court also highlighted the complainant *"may not
contradict his deposition testimony by proffering different testimony in a later
declaration."*

On January 14, 2022, the Court additionally stated this case *"was brought for reasons
other than to remedy personal harm to the plaintiff.  To further their mission, plaintiff and
his attorneys came up with a series of unproven allegations, including claims about …
unusual misdemeanor arrests, illegal quota programs and actions involving other
deputies."*

As a sponsor of Assembly Bill 958, it is important for me to point out the specific term
"deputy gangs" is not covered in California Penal Code Section 13670.  The term also
serves to line the pockets of attorneys who have created a "cottage industry" using the
media attention gained through these attacks on the Department.  At least one frivolous
lawsuit actually quoted comments made on the record by the Board regarding "deputy
gangs" in their pleading.[2]

Those who want to further undermine the perception of law enforcement use it as hate
speech to promote their own agendas, such as defunding law enforcement and
redirecting those funds to their own non-profit organizations, many of which are nothing
more than sham corporations who operate with virtually zero accountability.  Further
use of the term will be evidence of your actual underlying intent, which appears to be a
campaign to inflict harm upon the reputation of the Department and myself.

---

[1] Motion by Supervisors Sheila Kuehl and Hilda L. Solis, Assessing County Liability
in Settlements Involving Sheriff "Gangs" (April 30, 2019), available at:
http://file.lacounty.gov/SDSInter/bos/supdocs/136078.pdf.
[2] Civil Rights Complaint https://song-dash.digitalfirstmedia.com/wp-
content/uploads/2020/08/Montano-Complaint-FILED.pdf

EXHIBIT 59 - Page 883

The Honorable Board of Supervisors          -3-                    February 16, 2022

As the first fluently Spanish speaking Latino Sheriff in over a hundred years, who supervises a majority Latino workforce, I hope you can see the blatant racial inferences your conscious bias displays every time you choose to attack our Department with this derogatory term.

It is extremely disheartening that this Board refused to acknowledge or take any corrective action when brought to your attention on November 17, 2021, in regard to the defamatory and slanderous statements from your appointee to the Civilian Oversight Commission, Chair Priscilla Ocen, for the following statements, *"We have a problem with white supremacy in the L.A. County Sheriff's Department. We have a problem with white supremacist gangs. We already knew that LASD has a culture of impunity. They lie, they cover up gangs and murders. LASD as a whole is operating as a gang."*

Similar to the lack of action with Commissioner Ocen's remarks, and very hypocritically, the silence from this Board was deafening when you chose to ignore the shockingly irresponsible and racially charged comments made by Supervisor Holly Mitchell during an online forum advertised as, *Exposing L.A. Sheriffs Gangs, Murders, & Harassment of Families,*[3] on March 27, 2021. During this *Black Lives Matter - Los Angeles* sponsored forum (Attachment A), Supervisor Mitchell stated, among other things, *"Law enforcement, the district attorney's associations, and sheriff's associations of California... are clearly such white supremacist organizations."* These types of biased blanket statements by politicians make the day-to-day challenges peace officers face even more difficult and serve to undermine our ability to safely de-escalate dangerous situations in the field. Even though this Board has chosen to ignore her behavior, we continue to believe Supervisor Mitchell owes a heartfelt apology for her grossly irresponsible and racially charged defamation of our Department, which in fact contains all races, ethnicities, sexes, religions, and sexual identities.

At this same online anti-law enforcement forum, Supervisor Hilda Solis also appeared as a guest and spoke on the topic of "deputy gangs." During which she stated the Department has engaged in *"decades of historical discrimination and racism."* Then went on to say, *"The Sheriff's Department is a very violent organization, we know in many ways, retaliation and harassment."*

Interestingly, this *Exposing L.A. Sheriffs Gangs, Murders, & Harassment of Families* event was also recognized by another guest and speaker, Valarie Vargas, as additionally being sponsored by *Check the Sheriff.* The same organization which submitted a letter to the Board on February 7, 2022, requesting to *"create a procedure to allow impeachment and removal of the sheriff."* They stated their main reason for this was due to "deputy gangs." Not only have your words encouraged much of the

---

[3] Facebook "Exposing L.A. Sheriffs Gangs, Murders, & Harassment of Families"
https://www.facebook.com/blmla/videos/stop-la-sheriff-attacks-family-forum/347471413338304/

EXHIBIT 59 - Page 884

The Honorable Board of Supervisors         -4-                    February 16, 2022

disinformation, but two Board members have actively participated in these activists'
political events.

I openly challenge every elected leader, or their appointees, to provide facts to me and
name individuals who they can prove are "gang members," as defined by California
Penal Code Section 13670, and subject yourself to defamation laws if wrong. Using this
term as a blanket statement is political cowardice and opportunistic pandering.

Should you have any questions or would like to discuss further, please feel free to
contact me at ████████████

Sincerely,

*[signature]*

ALEX VILLANUEVA
SHERIFF

EXHIBIT 59 - Page 885

The Honorable Board of Supervisors          -5-                    February 16, 2022

AV:JLS:ac
(Office of the Sheriff)

c:      Brian K. Williams, Executive Director, Sheriff Civilian Oversight Commission
        Tab Rhodes, Professional Peace Officers Association
        James Wheeler, President, Association for Los Angeles Deputy Sheriffs
        Cesar Romero, President, Los Angeles Sheriff's Professional Association

EXHIBIT 59 - Page 886

ATTACHMENT - A

OPEN CHALLENGE OF ELECTED LEADERS TO IDENTIFY DEPUTY CLIQUE MEMBERS
WHO YOU CAN SHOW ARE "GANG MEMBERS"



**Stop LA Sheriff's Attacks Forum Mar 27 @12 PM**



EXHIBIT 59 - Page 887

**Calderon, Angie M.**

| | |
|---|---|
| **From:** | Wright, Adam R. |
| **Sent:** | Wednesday, February 16, 2022 4:03 PM |
| **To:** | hsolis1@bos.lacounty.gov; hollyjmitchell@bos.lacounty; SKuehl@bos.lacounty.gov; jkhahn@bos.lacounty.gov; KBarger@bos.lacounty.gov |
| **Cc:** | BOS Liaison Team; Chen, Cindy; FMcGee@bos.lacounty.gov; Mande, Lisa; gpinedo@bos.lacounty.gov; Mouradian, Anna |
| **Subject:** | Sheriff, Identification of Department Personnel |
| **Attachments:** | Scanned from a Xerox Multifunction Device.pdf |

Good Afternoon,
Please see attached letter from Sheriff Villanueva.

Respectfully,

**Sergeant Adam Wright**
Liaison to the Board of Supervisors
Los Angeles County Sheriff's Department
211 West Temple Street
Los Angeles, CA 90012
██████████████

1

EXHIBIT 59 - Page 888

# ATTACHMENT B

EXHIBIT 59 - Page 889




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

October 3, 2022

Brian K. Williams, Executive Director
County of Los Angeles
Civilian Oversight Commission
350 South Figueroa Street, Suite 288
Los Angeles, California 90071

Dear Mr. Williams:

### FALSE AND IRRESPONSIBLE ALLEGATIONS MADE AT CIVILIAN OVERSIGHT COMMISSION SPECIAL MEETING

On September 23, 2022, the Civilian Oversight Commission (COC) conducted another special hearing on "deputy gangs." During the hearing, Attorney Bert Deixler introduced information he stated was relayed to him by Captain Angela Walton. Attorney Deixler publicly stated as fact, an unknown dark colored Nissan sedan had been parked on the street directly across from Captain Walton's residence on September 20, 2022, the day she appeared in front of the COC.

Attorney Deixler went on to state Captain Walton recognized the vehicle as an *"undercover sheriff's vehicle."* Attorney Deixler then publicly displayed two images. The first image depicted the drivers side profile of a dark colored sedan. The second image depicted the rear tailgate of a Scion XB with the California license plate displayed.

Attorney Deixler stated Captain Walton told him, "... *she would not be intimidated.*" A statement which denoted Los Angeles County Sheriff's Department (Department) personnel were actively surveilling her because she had testified in front of the Civilian Oversight Commission. This accusatory sentiment was later picked up by the news and on social media.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*~ Since 1850 ~*

**EXHIBIT 59 - Page 890**

Mr. Williams             2             October 3, 2022

The Department initiated an inquiry soon after these allegations were made. The inquiry has concluded, and the findings revealed the vehicle Captain Walton suspected of being involved in surveillance of her, absolutely does not belong to the Department, absolutely was not connected to the Department in any way and was in the vicinity for reasons which absolutely were unrelated to Captain Walton in any way.

The manner in which the Department was portrayed by Attorney Deixler to the COC and public was irresponsible and unethical. A simple vetting of the information through ANY law enforcement entity could have brought forth the same results as we have provided to you. All parties involved were aware of the fact a public forum was not the venue to make those statements until they could be confirmed or disproven. Although, it is highly likely these irresponsible statements were intentionally made, in line with the COC's demonstrated mission of attacking the Department. By introducing "gossip" during your meetings and offering it to the public as reliable information, you show your commission to be unprofessional, unreliable, and desperate disciples of confirmation bias.

Additionally, there was no "full disclosure" of the fact Captain Walton, and her attorney Vincent Miller, stand to significantly gain monetarily by continued portrayal of the Department in a negative light. If the COC is now a tool for civil attorneys with multiple lawsuits against the Department to strengthen their cases, please disclose this fact. If not, then stop acting like you are. I demand the COC issues a public statement correcting the record on every one of your social media platforms.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield at ▓▓▓▓▓▓▓▓▓

Sincerely,


ALEX VILLANUEVA
SHERIFF

EXHIBIT 59 - Page 891

# ATTACHMENT C

EXHIBIT 59 - Page 892



# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE



#### ALEX VILLANUEVA, SHERIFF



October 5, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisors:

### DEMAND TO RELIEVE SPECIFIED CONFIDENTIAL EMPLOYEES
### FROM THEIR DUTIES OF PUBLIC TRUST

Shortly after I was sworn into office on December 3, 2018, my staff alerted me to a series of illegal personnel file downloads that were launched by members of the Office of Inspector General and Constitutional Policing Advisors from the administration of Sheriff Jim McDonnell.  This data breach appeared to have been initiated immediately following the primary election that was held in June 2018 and does not appear to have been done for a lawful reason.  Former Sheriff McDonnell's staff had launched an inquiry into the matter, only to abandon it without proper resolution.

In early 2019, we initiated a criminal inquiry into the matter and consulted with representatives from the state Attorney General's office and the Federal Bureau of Investigation (FBI).  Inspector General Max Huntsman's protestations were centered on his claims that he had permission from the incumbent to view my confidential personnel files.  Our investigation indicates no such permission existed, either in writing or supported by the former sheriff, who refused to answer questions from our investigators. The investigation was turned over to the Attorney General's office in September 2021 for a prosecutorial decision.  Please note this investigation names five suspects of criminal conspiracy to commit burglary and illegal removal of personnel files, among other charges.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*Since 1850*

**EXHIBIT 59 - Page 893**

The Honorable Board of Supervisors          -2-                    October 5, 2022

We have previously written to your office regarding the liability of permitting named felony suspects to continue working in their official capacity during the pendency of the criminal investigation. Now we have a whole new set of issues based on the extraordinary admissions from Supervisor Sheila Kuehl during the execution of search warrants by deputies assigned to our Public Corruption Unit. On live local television, Supervisor Kuehl claimed to have been alerted to the search warrants in advance by Acting County Counsel Dawyn Harrison, with information she received from Inspector General Max Huntsman. On September 21, 2022, I wrote to you listing the reasons why Mr. Huntsman needed to be relieved of his duties [Attachment A], and I have yet to receive a response.

In addition to Supervisor Kuehl's own public statements, court documents [Attachment B] reveal the names of two other individuals who alerted Supervisor Kuehl of the service of the warrant, in an apparent conspiracy to obstruct justice: Lisa Mandel, Chief of Staff, District 3, and Torie Osborn, Senior Strategist, District 3. As appointed officials who are considered confidential employees and trusted to maintain confidentiality over internal records and law enforcement operations, the alleged conduct of the four individuals referenced herein, and others who during the course of the Attorney General's investigation may also be identified, can no longer have access to Los Angeles County Sheriff's Department (Department) records, operations, or be involved in decision-making regarding oversight and/or legal representation.

Consistent with standard Department policy, Mr. Huntsman will be removed from all access to Department facilities, personnel, and databases effective immediately. This standard is applied to all Department personnel who are named as a suspect in a criminal case involving felony crimes. The list of potential charges Supervisor Kuehl and Commissioner Patricia Giggans include the following:

- California Government Code 1090, Conflict of Interest
- California Penal Code 165, Bribery of a public official or member of a board of supervisors
- California Penal Code 182.5, Conspiracy to obstruct justice
- California Penal Code 182, Conspiracy to commit any crime
- California Penal Code 503, Embezzlement
- California Penal Code 424, Theft, or misappropriation of public funds

The list of potential charges facing Mr. Huntsman, Ms. Harrison, Ms. Mandel, and Ms. Osborn include the following:

EXHIBIT 59 - Page 894

The Honorable Board of Supervisors          -3-                    October 5, 2022

- California Penal Code 182, Conspiracy to commit any crime
- California Penal Code 182.5, Conspiracy to obstruct justice
- California Penal Code 31, Aiding and abetting a crime
- California Penal Code 135, Destruction of evidence

There is no alternate universe where county counsel can dictate the manner in which the Department is represented in court, while they are actively involved in allegedly concealing criminal activity and obstructing the investigative function of the sheriff [California Government Code 25303]. To the contrary of taking corrective action, both Supervisor Kuehl and Supervisor Hilda Solis have made public statements on social media condemning both myself and the Department for the execution of a lawful public corruption search warrant that was properly vetted, approved by a judge, and reaffirmed by a second judge. Acting County Counsel Harrison is in no position to deny compensating the attorney of our choosing, who won for us in court, based on these extraordinary set of events [Attachment C]. Her apparent motive in denying counsel was to see the search warrant overturned by the court for lack of proper counsel. It is your moral and legal obligation to pick up the costs for *Werksman Jackson & Quinn LLP*. Please refer to Ms. Harrison's own words:

> "... I wanted to remind you that only the Office of County Counsel, or the law firms we retain, may represent you, in your official capacity, and the LASD... Therefore, you have no authority to retain your own counsel to represent either you or the LASD, nor is the County of Los Angeles responsible for any of the costs incurred by those law firms. I recently discovered that you improperly retained Werksman Jackson & Quinn LLP in this matter. I will notify them that they have no authority to represent you or LASD and will not be paid by the County of Los Angeles, and I will copy the Attorney General's Office."

It is not the first time we have informed you of unethical and/or incompetent representation by county counsel and contract counsel that have had negative consequences to the Department. From failing to adequately present a defense in a high-profile civil lawsuit, failing to aggressively challenge false assertions in employee lawsuits, to colluding with the Civilian Oversight Commission and the Inspector General's office to give the false impression we are not complying with the submission of subpoenaed information or testimony. It is clear you have weaponized legal representation of the Department as another avenue to discredit my administration for your political interests. This comes at great expense to the taxpayer and to our credibility, which seems to be your goal.

EXHIBIT 59 - Page 895

The Honorable Board of Supervisors          -4-          October 5, 2022

To be clear, the investigation is real, my authority is real, and so is that of the Attorney General who has now assumed responsibility for the investigation, which was initiated at our request. The investigation itself regarding *Peace Over Violence* was initiated based on a criminal complaint from a whistleblower, and contrary to false assertions by those involved, we do not investigate people, only allegations of criminal activity. This is true of every investigation initiated by the Department, including those by the Public Corruption Unit.

In closing, as a matter of reference, I wrote a whistleblower memorandum back in December of 2004 regarding the unfolding corrupt actions of then Division Chief Paul Tanaka [Attachment D]. As a young sergeant, I laid out publicly in detail my concerns regarding the unethical conduct and behavior of the administration of then Sheriff Lee Baca. I was laughed at, ridiculed, attacked, and had my career derailed for over a decade. The Board of Supervisors were informed of Baca and Tanaka's corruption, as were members of the Office of Independent Review, but it wasn't until the Citizen's Commission on Jail Violence and the FBI intervened, when the corruption began to halt. Needless to say, I stood my ground and was ultimately vindicated.

Today and again, I am standing my ground. You have two choices: circle the wagons and protect corruption or come clean and stand up for doing the right thing. Choose wisely, history will be your judge.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield at ▮▮▮▮▮▮▮▮▮▮

Sincerely,

ALEX VILLANUEVA
SHERIFF

**EXHIBIT 59 - Page 896**

The Honorable Board of Supervisors          -5-                    October 5, 2022

AV:JLS:js

Attachments:        A – Letter for Removal of Max Huntsman
                    B – Court Documents (Declaration)
                    C – County Counsel Correspondence
                    D – Letter to LASD Executives (2004)

EXHIBIT 59 - Page 897

# ATTACHMENT A

EXHIBIT 59 - Page 898



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF




September 21 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors

**REQUEST FOR REMOVAL OF MAX HUNTSMAN AS INSPECTOR GENERAL
RESULTING FROM ALLEGATIONS OF CONSPIRACY TO COMMITT
OBSTRUCTION IN SEARCH WARRANT**

On February 18, 2021, in a six-page letter, I informed you of my *grave concerns with the conduct of your appointed Inspector General, Max Huntsman.* I pointed out his *zealot-like behavior which continues to create civil liability for the Los Angeles County* I stated his *intellectual dishonesty places the public at an increased risk* The letter ended with *I ask the Board to consider my concerns and replace the IG with one who is accredited, unbiased, and capable of maintaining a professional working relationship*

As you were also aware at the time, Mr. Huntsman was a felony suspect in a theft of electronic information investigation, which remains an active investigation at the Office of the Attorney General. You had an opportunity to relieve Mr. Huntsman of his duties then, but declined and the Board ignored my request. Unfortunately, your failure to address the issues I pointed out to you in 2021 has now resulted in an even more serious crime allegedly occurring, which is additionally under active investigation by the Office of the Attorney General

On September 14, 2022, as you are likely aware, public corruption search warrants were served at multiple locations. During the service at Supervisor Shelia Kuehl's residence, she stated to reporters *I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning* In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all Los Angeles County Sheriff's Department's social media accounts

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— Since —

**EXHIBIT 59 - Page 899**

The Honorable Board of Supervisors      -2-      September 21, 2022

Moreover, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement, Mr. Huntsman and the Los Angeles County Counsel have now become the focus of a criminal investigation by the Office of the Attorney General, and as such, the conflict of interest in Mr. Huntsman remaining in his current assignment is untenable. For these reasons, I demand that Mr. Huntsman be treated like any other of the over 100,000 Los Angeles County employees and be relieved of his duties, pending the outcome of the Attorney General's criminal investigation.

Given the above, it is the established pattern and practice everywhere in the Los Angeles County, by every department, that an employee is to be relieved of duty and/or reassigned upon reliable knowledge of alleged criminal activity, and an investigation is pending which could lead to termination.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, John L. Satterfield, at ██████████.

Sincerely,

ALEX VILLANUEVA
SHERIFF

EXHIBIT 59 - Page 900

**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I Street
P.O. Box 944266
Sacramento, CA 94244-2550
Telephone: 916-210-6009
E-Mail Address: Lance.Winters@doj.ca.gov

January 25, 2022

Timothy K. Murakami
Undersheriff
Office of the Sheriff
County of Los Angeles
Hall of Justice
211 West Temple Street
Los Angeles, CA 90012

VIA EMAIL AND U.S. MAIL

Re: Possible criminal conduct

Dear Undersheriff Murakami:

The Department of Justice (DOJ) is in receipt of your letters regarding possible criminal conduct. Specifically, we have received: (1) letters dated July 23, 2020, and October 20, 2021, regarding possible criminal conduct by Sachi Hamai; and (2) a letter dated November 16, 2021, regarding possible criminal conduct by five individuals who purportedly engaged in acts to "unlawfully obtain and distribute confidential, protected personnel records."

As to the former matter, you request that DOJ "conduct the criminal inquiry"; as to the latter, you implicitly request that DOJ conduct any necessary inquiry and review the matter, noting "the inherent conflict(s)" for further inquiry and asking that, should we decline "further inquiry or review," to refer the matter to a district attorney's office outside of Los Angeles County. DOJ will review these matters.

Additionally, it has come to our attention that your Office has been involved in a criminal investigation of Peace Over Violence and/or Executive Director Patti (Patricia) Giggans. Specifically, it has been reported that, in February and March 2021, your Office executed search warrants at the offices of Peace Over Violence and L.A. Metro as part of a criminal investigation. (E.g., Jason Henry, *LA County Sheriff Investigating Oversight Commissioner's Nonprofit, Search Warrants Show*, L.A. Daily News, June 18, 2021.)

**EXHIBIT 59 - Page 901**

January 25, 2022
Page 2

DOJ requests that your Office to provide a report on the status of the investigation of Peace Over
Violence and/or Executive Director Patti (Patricia) Giggans. (Cal. Const., art V, § 13 [noting
Attorney General has supervisory authority over sheriff and may require "reports concerning the
investigation, detection, prosecution, and punishment of crime"].)  Your cooperation in this
request is appreciated.

Sincerely,

Lance Winters
Chief Assistant Attorney General

For     ROB BONTA
        Attorney General

EXHIBIT 59 - Page 902





### OFFICE OF THE SHERIFF
### COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

February 18, 2021

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

**THE NEED FOR AN HONEST AND OBJECTIVE INSPECTOR GENERAL**

The purpose of this communication is to advise you of my grave concerns with the conduct of your appointed Inspector General (IG), Max-Gustaf Huntsman, and the publications authored by his office which directly influence the unsuspecting public's perceptions regarding both the credibility of the Los Angeles County Sheriff's Department (Department) and the legitimacy of our operations. His zealot-like behavior continues to create civil liability for the County and potentially endangers the life of deputies in the field, as he artificially stokes animosity between the Department and the community.

In addition to potentially endangering the lives of our deputies, his intellectual dishonesty places the public at an increased risk. After utilizing good communication and de-escalation strategies, deputies can only ultimately perform the detention or arrest of an individual one of two ways: 1) The person voluntarily submits to lawful authority; or, 2) The person resists and the deputy uses force to overcome their resistance and gain safe control. As the public continues to be misled by Mr. Huntsman as to the Department being engaged in widespread "unlawful conduct," they are far less likely to voluntarily comply. Statistically, this in and of itself places members of the public in situations that are far less likely to have a peaceful resolution.

The expectation of the public regarding the conduct of an IG is they are dedicated to serving the public's interest by working tirelessly to fairly assess the operations of any given organization and provide meaningful input for reforms, which may be required to adapt to an ever-changing world. Indeed, the National Association of Inspectors General posits this public expectation is best served when:

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012
*A Tradition of Service*
— *Since 1850* —

SCANNED & E-MAILED To BOS LIAISON
TEAM 2/18/21

EXHIBIT 59 - Page 903

The Honorable Board of Supervisors          -2-                    February 18, 2021

This public expectation is best served by inspectors general when they follow the
basic principles of integrity, objectivity, independence, confidentiality,
professionalism, competence, courage, trust, honesty, fairness, forthrightness,
public accountability, and respect for others and themselves (AIG Principles and
Standards, pg. 3, 2014).

Please note the first two principles outlined above, integrity and objectivity. I will provide
you a brief rundown of the fundamental defects of Mr. Huntsman's work product,
starting with the most recent publications and working our way back towards the start of
my administration.

The Office of Inspector General (OIG) report "Review and Analysis of Misconduct
Investigations and Disciplinary Process" released in February 2021 suffers from multiple
fatal defects, chief among them the fallacy of a study period (2015-2019) which
encompasses two administrations without distinguishing and contrasting the data from
both. Another fatal flaw is the use of individual cases in an anecdotal fashion as
representative of the entire Department's operation without providing proper context
with the totality of cases investigated and discipline rendered. A select quote from the
introduction:

Notwithstanding the current Sheriff's assertions, we were not provided by the
Sheriff, and in our review, we did not observe or find, any evidence of falsification
of evidence or reports which resulted in the wrongful discipline of a department
employee (pg. 4, 2021).

This statement is demonstrably false and illustrative of the nature of the report itself.
The Department conducted an in-depth analysis of the Mandoyan case, which is now a
public document, wherein it was proven that a key exculpatory witness was identified,
interviewed, and the results concealed from both the Civil Service Commission and the
employee fighting the discharge (see the Department's Case Analysis, October 1,
2019).

The next production from the OIG, "Report Back on Unlawful Conduct of the Los
Angeles County Sheriff's Department" was a letter dated December 14, 2020,
addressed to the Civilian Oversight Commission (COC), purportedly in response to a
request from Commissioner Priscilla Ocen. The starkly sophomoric report amounted to
nothing more than a rehash of current and past litigation and a torturous defense of the
legal fallout from Mr. Huntsman's oversteps in a homicide investigation.

This report was designed exclusively as a political tool to discredit the Department and
does not appear to have any legitimate purpose in oversight, transparency, or
accountability. Perhaps the most startling false statement is the section subtitled

EXHIBIT 59 - Page 904

The Honorable Board of Supervisors                3                February 18, 2021

"Failure to Investigate and Prohibit Deputy Secret Societies (pg 12)" - Mr. Huntsman has the Department's criminal and administrative investigations of the Kennedy Hall incident from former Sheriff Jim McDonnell's tenure, and he is aware that 26 employees were disciplined, including four who were terminated as a result of that administrative investigation. Mr. Huntsman is also aware of the Department's new policy regarding forming or participating in deputy subgroups, which was issued in February, 2020 and is being vigorously enforced.

The preceding report "The Right to Know Act: Los Angeles County Sheriff's Department Response to Police Transparency Reform" was published in November 2020, and in typical OIG fashion, deliberately used outdated information from January 2020 to make the false claim the Department was not complying with SB 1421. For the record, as of December 31, 2020, the Department achieved full compliance with SB 1421 with a 99.46 percent rate, a number Mr. Huntsman was well aware was in the making and far different than the 70 percent non-compliance rate he reported just a month earlier.

Mr. Huntsman is also aware of the issues the Department has had since the inception of SB 1421, with antiquated databases that do not communicate with each other and the severe lack of staffing to meet the new requirements, a failure of leadership by the previous administration. To wit, in a letter dated July 6, 2020, to former Board of Supervisors (BOS) Chair, Supervisor Kathryn Barger, the Department outlined six different occasions where we requested additional resources through the Chief Executive Office and were denied repeatedly. It was only through cannibalizing different functions of the Department that we were able to muster enough personnel to satisfy SB 1421 and California Privacy Rights Act requests. Comparing our operation to Los Angeles Police Department's is a dishonest comparison based on disparate funding levels, IT infrastructure, and staffing levels.

Looking through the sheer number of reports authored by the OIG, a persistent pattern emerges wherein the OIG ignores Department investigations, results of investigations, and actions taken in response to complaints from the public. The November 17, 2020 report back to the COC regarding the alleged harassment of family members after fatal deputy-involved shootings is one example of this. The report negates in its entirety the concerns of the public over impromptu memorials and gang members loitering in the vicinities of their homes, concerns which were addressed properly by the Department's report.

Examining the OIG's reports' table of contents alone since its inception reveals a deferential OIG during former Sheriff McDonnell's administration, with report titles of a generic and non-inflammatory nature, unlike those published during my administration.

EXHIBIT 59 - Page 905

The Honorable Board of Supervisors          4          February 19, 2021

As a matter of fact, the OIG generated as many reports during my first two years in office as they did during all of former Sheriff McDonnell's tenure, and that includes the conspicuously "confidential" report Mr. Huntsman prepared to bury the potentially illegal actions of former Sheriff McDonnell's Assistant Sheriff, Mike Rothans, for his purchase of a stolen vehicle from a contracted tow company.

Without question, these reports would be rejected by any legitimate academic institution. They are filled with unproven allegations, anecdotal data, omissions, distortions, and an overall permeation of bias and intellectual dishonesty. They are truly not the level of accuracy and authenticity expected in County government. Furthermore, if my own deputies consistently authored documents at this level, they would at the very least be placed on a performance improvement plan, and in cases of deception, omission, and lack of honesty, an administrative investigation would be conducted. I believe the responsibility for performance and accountability issues with Mr. Huntsman belongs, in part, to the COC. Yet, they seem too hyper-focused on political activism and calls for my own resignation to focus on this duty.

Since taking office in December 2018, I have continued my reforms within the Department to enhance public safety, and strengthen the ties within our communities. As the elected Sheriff serving the most populous county in the nation and employing nearly 18,000 employees, this is no easy task. Having inherited significant problems from past administrations, I remain committed to effecting positive change for the residents of Los Angeles County.

As the first progressive democratic sheriff, I have delivered on many of my campaign promises to bring reform and transparency to the Department. I have instituted major reforms regarding Immigration and Customs Enforcement (ICE) leadership diversity, wage theft, and the single most important commitment to transparency, body-worn cameras. Although Mr. Huntsman authored multiple reports on the Department's cooperation with ICE, he became silent in light of the moratorium on all inmate transfers to ICE custody. Again, this amounts to false documentation by omission and does not serve to inform either the public or the Department.

As a result of these unethical reports, the Department is suffering irreparable damage and our standing in the community is being undermined by continual, misleading, and false attacks. It should be of great concern to all of us that his actions are eroding public trust and creating a liability for the Department. His hopelessly biased reporting will only invite future frivolous lawsuits which the hardworking taxpayers will have to waste money defending, while at the same time artificially rising tensions in the community which can endanger the lives of our deputies. This was clearly evidenced by the brutal attack on our two Compton Transit Services Bureau deputies which horrified the entire nation.

**EXHIBIT 59 - Page 906**

The Honorable Board of Supervisors          -5-                    February 18, 2021

The IG serves an advisory role, just like the COC. When their efforts are driven by political agendas and not facts, they fail to serve the public's expectations of oversight and betray the reason for their existence. As a result, their work product does not inform the Department's operations and will not be considered of any value. The Department will continue, however, to provide both entities all the information they are legally entitled to receive.

As you have been advised in writing, the Department continues to investigate a data breach discovered at the beginning of 2019. The Legislature has enacted a statutory scheme defining the powers and duties of a sheriff (Government Code Sections 26600-26778). Section 26600 generally provides:

> The sheriff shall preserve peace, and to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of a crime, or the suppression of delinquency.

A sheriff is also expressly authorized and directed to investigate public offenses that have been committed and to arrest and take before a magistrate all persons who have committed a public offense (Sections 26601-26602). There is no statutory scheme that places anyone, including members of the OIG, above the law. As such, it is with concern that I read a letter from Lawrence Middleton to County Counsel, who had retained him to purportedly provide legal guidance on this very issue. In his words:

> Upon completing my analysis, I wanted to bring to Undersheriff Murakami's attention a number of issues and concerns that cause me to caution against a continuation or escalation of the investigation. Most notably, as detailed below, because none of the potential charges being investigated are likely to lead to a successful criminal prosecution, Department personnel involved in the investigation could place themselves in jeopardy or criminal prosecution and/or civil liability if they continue (March 6, 2020).

This letter appears to be an attempt to intimidate, coerce, or otherwise dissuade the Department from carrying out our lawful duty and is unacceptable. It should be noted neither County Counsel nor Mr. Middleton has knowledge of the scope or details of the investigation, rendering such opinions ill-informed and ill-advised. I have recused myself from this inquiry and know of its details superficially.

The Department needs an IG who is not ethically compromised and is certified by the National Association of Inspectors General. I expect the work product of the OIG to adhere to professional standards as cited in the Association of Inspectors General's book, "Principles and Standards for Offices of Inspector General," also known as the Green Book. The public, the Department, and BOS all deserve accurate reporting

EXHIBIT 59 - Page 907

The Honorable Board of Supervisors                -6-                    February 18, 2021

which is not politically motivated. I ask the BOS to consider my concerns and replace
the IG with one who is accredited, unbiased, and capable of maintaining a professional
working relationship. The Department's reputation is being unfairly tarnished by the IG
in his personal attacks towards us. We need an IG who is fair and objective, not
inflammatory and controversial.

The Department is a national trendsetter on many important issues, such as the
relationship between local law enforcement and federal immigration enforcement,
combatting the spread of COVID-19 in congregate living facilities and super spreader
events, the Wage Theft Task Force, defending the community during periods of civil
unrest, and transparency. Our efforts are often adopted as best practices by other law
enforcement agencies throughout the nation. Our reputation is at stake. The IG's
personal vendetta should not come at the expense of our dedicated employees who put
their lives on the line each and every day in service to the community.

Should you have any questions or would like to discuss further, please feel free to
contact me at ████████████.

Sincerely,



ALEX VILLANUEVA
SHERIFF

EXHIBIT 59 - Page 908

The Honorable Board of Supervisors          -7-                    February 18, 2021


AV:JAV:ac
(Office of the Sheriff)


c:    Rodrigo A. Castro-Silva, County Counsel, Office of the County Counsel

EXHIBIT 59 - Page 909

# ATTACHMENT B

EXHIBIT 59 - Page 910

<pre>
 1   WERKSMAN JACKSON & QUINN LLP        CONFORMED COPY
     ALAN J. JACKSON (Bar No. 173647)    ORIGINAL FILED
 2   CALEB E. MASON (Bar No. 246653)     Superior Court of California
                                         County of Los Angeles
 3   ████████████████████
     888 W. 6th St. 4th Floor            SEP 22 2022
 4   Los Angeles, California 90017       Sherri R. Carter, Executive Officer/Clerk of Court
 5   ████████████████████                By: Sheryl R. Humber, Deputy
 6   Attorneys for Los Angeles County Sheriff's Department
</pre>

<center>SUPERIOR COURT OF CALIFORNIA</center>

<center>COUNTY OF LOS ANGELES – CENTRAL DISTRICT</center>

| | |
|---|---|
| IN RE SEARCH WARRANT SERVED ON OFFICE OF THE INSPECTOR GENERAL FOR THE LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY ON SEPTEMBER 14, 2022 | Case No.: Misc. BH014167 <br><br> (Hon. William C. Ryan – Department 56W) <br><br> **DECLARATION OF MAX O. FERNANDEZ IN RESPONSE TO COURT'S ORDER DATED SEPTEMBER 20, 2022.** <br><br> Date: September 22, 2022 <br> Time: 1:30 p.m. <br> Dept.: 56W |

<center><u>DECLARATION OF SGT. MAX O. FERNANDEZ</u></center>

I, Max O. Fernandez, declare as follows:

1.     I am employed as a sergeant for the Los Angeles County Sheriff's Department ("LASD"). I am assigned as the lead investigator in the Department's investigation of related to possible criminal conduct regarding the awarding of contracts to Peace Over Violence (POV) by the Metropolitan Transportation Authority (MTA) ("the Matter"). I am the affiant for the search warrants relating to the Matter. There are two: one signed on February 26, 2021, by Judge Ronald Coen. I am also the Affiant for the Search Warrant which was signed on September 8, 2022 by Judge Craig Richman. I

<center>-1-</center>
<center>SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO</center>

EXHIBIT 59 - Page 911

1   make this declaration from my own personal knowledge, and if called as a witness, I

2   could and would testify competently to the facts stated below.

3       2.      This Supplemental Declaration supplements my Declaration filed

4   yesterday in this Matter. I make this Declaration in compliance with the Court's

5   September 20, 2022 Order, to ensure that I have fully and completely addressed the

6   questions raised by the Court. My prior Declaration addressed the Court's questions

7   about the application for and issuance of the search warrants in this Matter. This

8   Declaration provides additional information regarding Question No. 5: "Report what

9   searches have already been conducted on any computer seized under the warrant, and

10  who conducted the searches, and what information has been obtained."

11      3.      I joined the LASD's Public Corruption unit in October 2020. This

12  investigation was assigned to me on or about October 26, 2020. The investigation was

13  opened a year before that, on or about September 11, 2019, when a whistleblower from

14  the MTA contacted the LASD to report what she believed to be illegal conduct,

15  including fraudulent conduct in directing contracts to politically connected individuals

16  and entities; and retaliation against her for reporting same.

17      4.      I have seen public statements reported in the media made by various public

18  figures, alleging that this investigation is some sort of political payback by the Sheriff

19  against Supervisor Kuehl because of recent political developments and disagreements.

20  That allegation is false. I know that the allegation is false, because (1) I have worked on

21  this investigation for two years, and the investigation was begun a year before that, in

22  September 2019—long before the current political animosities developed; and most

23  importantly (2) this investigation is based on provable facts, credible witness testimony,

24  and an undisputed documentary record, that provides probable for the allegations that

25  County contracts were improperly awarded to Ms. Giggans and POV. The full details of

26  the investigation, including the evidence reviewed and witnesses interviewed, is set forth

27  in the affidavit I presented to the court in support of the search warrants obtained in the

28  Matter. That evidence is abundant and constitutes probable cause to believe that a crime

EXHIBIT 59 - Page 912

1   has been committed, in my professional opinion. This is a straightforward investigation

2   of corruption in the expenditure of public funds—the sort of investigation that every law

3   enforcement agency in the state conducts on a regular basis, and that prosecutorial

4   agencies regularly prosecute. This investigation has been conducted throughout

5   according to standard investigatory practices.

6       5.      The full list of items seized during the searches of Supervisor Kuehl's and

7   Ms. Giggans' residences is attached hereto as Exhibit 1. As noted in my previous

8   Declaration (Paragraph 7), none of the materials seized in the search of the Office of

9   Inspector General offices have been reviewed or imaged.

10      6.      Exhibit 1 identifies each item, and states whether its contents were imaged.

11  Items 20, 21, 22, 24, and 25 are paper records, and were not imaged. The technicians

12  who worked on the imaging are: Thomas Ferguson; Leo Lo; John Moore; Steven

13  Suarez; Mike Rivas; Julius Gomez; Raquel Gonzales; Claudia Iwasczyszyn; and Brian

14  Moreno. Those technicians did not review the contents of any device.

15      7.      In sum: none of the contents of any computer seized have been reviewed.

16  Of the total of 67 devices seized, 49 have been imaged, and one (1) has been partially

17  imaged. All the imaging was conducted on September 14, 15, and 16, 2022. None of

18  the contents of any of the devices have been reviewed, except for a review of recent text

19  messages and voicemails on Supervisor Kuehl's phones as set forth below.

20      8.      The only devices from which any content has been reviewed are the two

21  phones seized from Supervisor Kuehl, and the only content reviewed from those phones

22  were approximately 250 text messages and two voice mails. I personally conducted that

23  review on the morning of September 16, 2022. I considered that review to be urgent for

24  the reasons set forth below.

25      9.      The review of the text messages and voicemails on Supervisor Kuehl's

26  phone in the period prior to the execution of the warrant was urgent because at 8:00 a.m.

27  on September 14, 2022, while deputies were still at her premises, Supervisor Kuehl gave

28  a live television interview to Fox 11 News, in which she said the following: "KUEHL: I

-3-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

EXHIBIT 59 - Page 913

heard from County Counsel last night that she got a tip from Max that this search would happen. REPORTER: Max Huntsman? KUEHL: Yes, from Max Huntsman that this search would happen this morning."

10.     In my professional opinion, and based on my training and experience, tipping off a target of a search warrant prior to the execution of the warrant is a crime. Penal Code section 148 prohibits obstructing officers in the execution of their duties, including serving search warrants; and Penal Code 168 prohibits public officials (prosecutors, judges, clerks, or peace officers) from disclosing the fact that a search warrant has been issued, prior to its execution, for the purpose of preventing the search or seizure of property. The only people who knew about the issuance of this search warrant when it was issued were among those enumerated categories. So, at a minimum, whoever told Max Huntsman about this warrant committed a crime.

11.     In the concurrent search of Patricia Giggans' residence, which took place at the same time as the search of Supervisor Kuehl's residence, we were surprised to find that Ms. Giggans' phone was not present anywhere in the house or on her person. The search warrant was executed at 7 a.m. at Ms. Giggans' residence, and she was personally present when we arrived. Based on my training and experience, individuals keep their phones ready to hand, and I know that Ms. Giggans owns and uses an IPhone, because we have obtained numerous emails sent by her, which contain in the signature line the phrase, "Sent from my IPhone." I know from personal experience and from my training that that phrase is automatically inserted into emails sent from an IPhone. It is also not plausible or likely that Ms. Giggans would manually type that phrase into the bottom of every email she sends.

12.     Because I know that Ms. Giggans has an IPhone, and her phone was not present in her residence or on her person, I concluded that the most likely explanation for the absence of her phone was that she was aware that the warrant was going to be executed, and she disposed of the phone in some manner beforehand. Ms. Giggans' attorney, Mr. Austin Dove, arrived at her residence approximately 15 minutes into the

EXHIBIT 59 - Page 914

1   search. Mr. Dove spoke with the detectives executing the warrant, and said the
2   following: "There is no phone. You can search for the phone. You're entitled to search
3   the place." That statement was made by Mr. Dove to Detective Yoon Nam, who told me
4   about it that same day.

5       13.     In addition to constituting a crime under the Penal Code, the act of tipping
6   off a target of a search warrant to existence of the warrant is a major concern for the
7   LASD. It creates safety and security risks for officers executing warrants, and it
8   compromises and impairs the investigation of crimes. In short, we simply cannot have
9   targets of warrants tipped off the night before. The fact that Supervisor Kuehl publicly
10  stated she had been tipped off the night before was a serious concern for me and for the
11  LASD, as to how the information had been obtained and disseminated.

12      14.     Accordingly, I reviewed Ms. Kuehl's phones, looking for recent
13  communications relating to the warrant. I found them. The relevant text messages are
14  attached hereto as Exhibit 2.

15      15.     At 10:17 p.m. on September 13, 2022, Lisa Mandel, Supervisor Kuehl's
16  Chief of Staff, texted Supervisor Kuehl the following (the full message is attached in
17  Exhibit 2): "Just got a call from Dawyn Harrison. She has been informed that the
18  Sheriff may obtained a search warrant for your home and Patti G's.... Per the informant,
19  the warrant is for 7 a.m. tomorrow. Let me know if you want me to do anything."

20      16.     At 11:41 p.m. on September 13, 2022, Dawyn Harrison (who is Acting
21  County Counsel) texted Supervisor Kuehl the following (the full message is attached in
22  Exhibit 2): "Was the first my team heard of it. Max called CoCo tonight with his
23  'intel.'" I know from personal experience and from my training that "CoCo" refers to
24  County Counsel.

25      17.     There are approximately 25 messages relating to the above two messages.
26  And the two voicemails were from Ms. Harrison, also on the evening of September 13,
27  2022. Both stated that she had an urgent matter that she needed to discuss with
28  Supervisor Kuehl.

EXHIBIT 59 - Page 915

1    18.    The other investigators who have reviewed the same set of text messages I

2    reviewed from Supervisor Kuehl's phones are Detective Rafael Rafino and Lieutenant

3    Oscar Veloz.

4        I declare under penalty of perjury under the laws of the State of California that

5    the foregoing is true and correct.

6        Executed on September 21, 2022, in Los Angeles, California.

7

8                                    MAX O. FERNANDEZ

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

SUPPLEMENTAL DECLARATION OF SGT. MAX FERNANDEZ PURSUANT TO
COURT'S ORDER DATED SEPTEMBER 20, 2022

EXHIBIT 59 - Page 916

# EXHIBIT 1

EXHIBIT 59 - Page 917

| CAT | ITEM # | QUAN | DESCRIPTION | DATE RECEIVED | IMAGED | PROCESSED | PORTABLE CASE | NOTES |
|---|---|---|---|---|---|---|---|---|
| EV | 1 | 1 | Computers, equipment, & accessories - ████████ color, ████████, with power cord; from Home Ofc Desk (LOC 6)<br>Article: CABLE<br>Make: ████<br>Model: ████<br>Serial Number: ████<br>DOJ File Control Number: ████████<br>Booked At: OTHER | 9/14/2022 | Y | Y | N | |
| EV | 2 | 1 | Computers, equipment, & accessories - ████████, Blk, w/cord; home ofc desk (LOC 6)<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ███<br>Model: ████████<br>Serial Number: ████████<br>DOJ File Control Number: ████████  Booked At: OTHER | 9/14/2022 | N | N | N | No Data - Drive B/O |
| EV | 3 | 1 | Phones/Cell - Blk ████████ blk/gry case (cracked screen protector); IEMI ████████; Master BR (LOC 6) Article: Cell Phone<br>Make: ████<br>Model: Unknown<br>Serial Number: Unknown<br>Booked At: OTHER | 9/14/2022 | N | N | N | No Extraction |

EXHIBIT 59 - Page 918

| EV | 4 | 1 | Computers, equipment, & accessories - Silv USB "Homeboy Industries"; center drawer of home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
|----|---|---|---|---|---|---|---|---|
| EV | 5 | 1 | Computers, equipment, & accessories - Blu USB "▮▮▮▮▮▮"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Not Applicable Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 6 | 1 | Computers, equipment, & accessories - Blk/Silv USB "▮▮▮▮▮▮▮"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 7 | 1 | Computers, equipment, & accessories - Blk/Silv USB "▮▮▮▮▮▮▮"; Top LT drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |

EXHIBIT 59 - Page 919

| EV | 8 | 1 | Computers, equipment, & accessories - Silv/Wht USB "Futures without violence"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |
|---|---|---|---|---|---|---|---|---|
| EV | 9 | 1 | Computers, equipment, & accessories - Silv/Wht USB "Futures without violence"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | N | N | |
| EV | 10 | 1 | Computers, equipment, & accessories - Blk, ▓▓▓ Ultra, 8GB in clear case, Prod Code ▓▓▓▓▓▓▓; Top LT drawer home ofc desk (LOC 6) Article: SD CARD Make: ▓▓▓▓ Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 11 | 1 | Computers, equipment, & accessories - Red USB "denimdayusa.org"; LT middle drawer home ofc desk (LOC 6)   Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | Y | |

EXHIBIT 59 - Page 920

| EV | 12 | 1 | Computers, equipment, & accessories - Blu USB with silv color lanyard "AVB"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/14/2022 | Y | Y | N | No Data in Date Range |
|----|----|---|---|---|---|---|---|---|
| EV | 13 | 1 | Computers, equipment, & accessories - L.Blu PNY USB, 8GB, w/blk lanyard; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: PNY Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | Y | N | No Data in Date Range |
| EV | 14 | 1 | Computers, equipment, & accessories - Wht/Red triangle shaped USB "GUESS logo"; LT middle drawer home ofc desk (LOC 6) Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: Unknown Model: Unknown Serial Number: Unknown Booked At: OTHER | 9/14/2022 | Y | N | N | No Data in Date Range |
| EV | 15 | 1 | Other - Silv ▬▬ Digital Voice Recorder, ▬▬ ▬▬; LT middle drawer home ofc desk (LOC 6) Serial Number: Unknown Booked At: OTHER | 9/14/2022 | N | N | N | No Data in Date Range |

EXHIBIT 59 - Page 921

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 16 | 1 | Phones/Cell - ███ Cellphone; top middle dresser drawer in SW BR (LOC 6) Article: Cell Phone<br>Make: ██<br>Model: ██<br>Serial Number: ██████<br>DOJ File Control Number: ███████<br>Booked At: OTHER | 9/14/2022 | · Y | Y | Y | |
| EV | 17 | 1 | Phones/Cell - ████████, IMEI ██████████;<br>top middle dresser drawer in SW BR (LOC 6)<br>Article: Cell Phone<br>Make: ████████<br>Serial Number: Unknown<br>Booked At: OTHER | 9/14/2022 | N | N | N | No Extraction |
| EV | 18 | 1 | Phones/Cell - Rose Gold color, LG cell phone; top middle dresser drawer in SW BR (LOC 6)<br>Article: Cell Phone<br>Make: ██<br>Model: ██████<br>Serial Number: ██████<br>DOJ File Control Number: ███████<br>Booked At: OTHER | 9/14/2022 | Y | Y | Y | |
| EV | 19 | 1 | Computers, equipment, & accessories - Silv MacBook Pro Laptop with multiple stickers; RT bottom dresser drawer SW BR (LOC 6)<br>Article: LAP TOP COMPUTER<br>Make: █████<br>Model: █████<br>Serial Number: ███████<br>DOJ File Control Number: ███████<br>Booked At: OTHER | 9/14/2022 | Y | N | N | Encrypted |
| | 20 | 0 | | | N | N | N | Not Booked at CIC |

EXHIBIT 59 - Page 922

| | | | | | | N | N | N | Not Booked at CIC |
|---|---|---|---|---|---|---|---|---|---|
| | 21 | 0 | | | | N | N | N | Not Booked at CIC |
| | 22 | 0 | | | | N | N | N | Not Booked at CIC |
| EV | 23 | 1 | Phones/Cell - ▓▓▓ Article: Cell Phone<br>Make: ▓▓▓<br>Model: ▓▓▓<br>Serial Number: Unknown<br>Booked At: DETECTIVE BUREAU | 9/15/2022 | Y | Y | Y | |
| | 24 | 0 | | | | N | N | N | Not Booked at CIC |
| | 25 | 0 | | | | N | N | N | Not Booked at CIC |
| EV | 26 | 1 | Computers, equipment, & accessories - Envelope containing black External Hard Drive, ▓▓▓, Black plastic , I TB located in "Patty Giggins" Office.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▓▓▓<br>Model: ▓▓▓<br>Serial Number: ▓▓▓<br>Booked At: OTHER | 9/16/2022 | Y | N | N | Terminated per Warrant |
| EV | 27 | 1 | Computers, equipment, & accessories - ▓▓▓, Desktop, Silver plastic, located in Patty Giggens Office.<br>Article: COMPUTER DISPLAY SCREEN/MONIT<br>Make: ▓▓▓<br>Model: Desktop<br>Serial Number: ▓▓▓<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

**EXHIBIT 59 - Page 923**

| EV | 28 | 1 | Computers, equipment, & accessories - Thumbdrive, "█████████", Black plastic with Purple Tether Cord located in Operations Office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ████<br>Model: ██████████<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|---|---|---|---|---|---|---|---|---|
| EV | 29 | 1 | Computers, equipment, & accessories - Thumbdrive, "█████████", Black plastic with Purple Tether Cord located in Operations Office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Centon<br>Model: ██████████<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | Cloned Only |
| EV | 30 | 1 | Computers, equipment, & accessories - Main Server, "Dell Power Edge T-710, gray located in Server Room<br>Article: COMPUTER (CPU)<br>Make: ████<br>Model: ██████████████<br>Serial Number: ██████<br>Booked At: OTHER | 9/16/2022 | Partial | Partial | N | Terminated per Warrant |
| EV | 31 | 1 | Computers, equipment, & accessories - ████ computer tower taken from Solis's office during MTA search warrant. Service Tag ██████████<br>Article: COMPUTER (CPU)<br>Make: ████<br>Model: ██████<br>Serial Number: Unknown<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y | |

**EXHIBIT 59 - Page 924**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EV | 32 | 1 | Computers, equipment, & accessories - ▮▮▮ Laptop from wiggins office during MTA search warrant<br>Article: LAP TOP COMPUTER<br>Make: ▮▮<br>Model: ▮▮<br>Serial Number: ▮▮▮▮<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y |
| EV | 33 | 1 | Computers, equipment, & accessories -<br>blk/sil METRO thumbdrive from wiggins<br>office from MTA search warrant<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Unknown<br>Serial Number: Not Applicable<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y |
| EV | 34 | 1 | Computers, equipment, & accessories - ▮▮▮▮<br>computer tower from wiggins office from MTA search<br>warrant, ▮▮▮▮▮▮<br>Article: COMPUTER (CPU)<br>Make: ▮▮<br>Model: ▮▮<br>Serial Number: Unknown<br>Booked At: PATROL STATION | 9/16/2022 | Y | Y | Y |
| EV | 35 | 1 | Computers, equipment, & accessories - Blk/Sil ▮▮<br>laptop from solis's office during MTA search warrant.<br>Article: LAP TOP COMPUTER<br>Make: ▮▮<br>Model: ▮▮<br>Serial Number: ▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y |

**EXHIBIT 59 - Page 925**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 36 | 1 | Computers, equipment, & accessories - Blk/Sil ▮ computer tower from Soli's office during MTA search warrant. ▮ Article: COMPUTER (CPU) Make: ▮ Model: ▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 37 | 1 | Computers, equipment, & accessories - Blk/Sil ▮ computer tower from Avila's office during MTA search warrant. ▮ Article: COMPUTER (CPU) Make: ▮ Model: ▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 38 | 1 | Computers, equipment, & accessories - Blk/Sil ▮ Computer tower from Bercerra's office during MTA search warrant. ▮ Article: COMPUTER (CPU) Make: ▮ Model: ▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 39 | 1 | Computers, equipment, & accessories - Sil/Org portable hard drive from Becerra's office during MTA search warrant and blk cable Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▮ Model: Not Applicable Serial Number: ▮ Booked At: OTHER | 9/16/2022 | N | N | N | Not Assigned - Not in Search Warrant |

EXHIBIT 59 - Page 926

| EV | 40 | 1 | Computers, equipment, & accessories - Sil/Ylw 2GB ▮▮▮ thumbdrive from Becerra's office during MTA search warrant<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 41 | 1 | Phones/Cell - Blk apple cellphone from Becerra's office during MTA search warrant. Sim card attached to back.<br>Article: Cell Phone<br>Make: ▮▮▮<br>Model: ▮▮▮<br>Serial Number: Unknown<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 42 | 1 | Computers, equipment, & accessories - Blk/Sil ▮▮▮ computer tower from Hernadez's office during MTA search warrant. ▮▮▮▮▮▮ Article: COMPUTER (CPU)<br>Make: ▮▮▮<br>Model: ▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 43 | 1 | Computers, equipment, & accessories - Blk ▮▮▮ 500GB drive from Herandez's office, inside plastic wrap belonging to Jeniffer Loew.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▮▮▮<br>Model: ▮▮▮<br>Serial Number: ▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

EXHIBIT 59 - Page 927

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EV | 44 | 1 | Computers, equipment, & accessories - Blk/Sil ▮ computer tower from Hernandez's office during MTA search warrant. ▮▮▮ Article: COMPUTER (CPU) Make: ▮ Model: ▮ Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | N | N | N | Not Booked at CIC |
| EV | 45 | 1 | Computers, equipment, & accessories - 2 red/blk 32GB ▮ thumbdrives from Hernandez's office. Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▮ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| A3B: | 46 | 1 | Computers, equipment, & accessories - red/blk 4GB Innovera thunbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▮ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 47 | 1 | Computers, equipment, & accessories - blk 32GB ▮ thumbdrive from Hernandez's office Article: EXTERNAL DRIVES (HARD DRIVE, USB) Make: ▮ Model: Not Applicable Serial Number: Not Applicable Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

EXHIBIT 59 - Page 928

| EV | 48 | 1 | Computers, equipment, & accessories - whi/grn ▮▮ 64GB thumbdrive from Hernandez's office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▮▮<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|---|---|---|---|---|---|---|---|---|
| EV | 49 | 1 | Computers, equipment, & accessories - Sil/Blk/Whi METRO thunbdrive from Hernandez's office<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | N | No Data In Date Range |
| EV | 50 | 1 | Computers, equipment, & accessories - Blk/Sil ▮▮ computer tower from Englund's office. S▮▮ ▮▮▮▮ Article: COMPUTER (CPU)<br>Make: ▮▮<br>Model: ▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 51 | 1 | Computers, equipment, & accessories - red/sil 8GB thumbdrive from Englund's office during MTA search warrant.<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: Not Applicable<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

EXHIBIT 59 - Page 929

| EV | 52 | 1 | Electronics (audio, TV) - blk sanyo tape recorder from kuehls house<br>Article: Other<br>Make: ▓<br>Model: ▓<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | N | N | N | No Date in Date Range |
|----|----|---|---|-----------|---|---|---|---|
| EV | 53 | 1 | Computers, equipment, & accessories - Silver ▓ computer<br>Article: LAP TOP COMPUTER<br>Make: ▓<br>Model: Unknown<br>Serial Number: ▓<br>Booked At: OTHER | 9/16/2022 | N | N | N | Encrypted |
| EV | 54 | 1 | Computers, equipment, & accessories - SILVER APPLE COMPUTER<br>Article: LAP TOP COMPUTER<br>Make: ▓<br>Model: Unknown<br>Serial Number: ▓<br>Booked At: OTHER | 9/16/2022 | N | N | N | Partial Image |
| EV | 55 | 1 | Phones/Cell - rose gold ▓ cellphone with blu case taken from Kuehl's residence.<br>Article: Cell Phone<br>Make: ▓<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |

EXHIBIT 59 - Page 930

| EV | 56 | 1 | Computers, equipment, & accessories - SILVER ▮▮▮ COMPUTER<br>Article: LAP TOP COMPUTER<br>Make: ▮▮▮<br>Model: Unknown<br>Serial Number: ▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 57 | 1 | Computers, equipment, & accessories - sil ▮▮▮ cd drive and whi cable from kuehl's residence<br>Article: OTHER<br>Make: ▮▮▮<br>Model: ▮▮▮<br>Serial Number: ▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | N | N | N | CD Player |
| EV | 58 | 1 | Phones/Cell - ROSE GOLD ▮▮▮ Article: Cell Phone<br>Make: ▮▮▮<br>Model: ▮▮▮<br>Serial Number: ▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | N | N | N | Damaged Phone/No Extraction |
| EV | 59 | 1 | Computers, equipment, & accessories - sil ▮▮▮ 80GB computer drive Article: OTHER<br>Make: ▮▮▮<br>Model: ▮▮▮▮<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | N | N | N | Damaged Phone/No Extraction |
| EV | 60 | 1 | Cameras: Equip & Access - sil nikon coolpix digital camera from kuehl's residence<br>Article: CAMERA<br>Make: nikon<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

EXHIBIT 59 - Page 931

| EV | 61 | 1 | Cameras: Equip & Access - blk ███████ sx110 digital camera from kuehls residence.<br>Article: CAMERA<br>Make: ████<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 62 | 1 | Computers, equipment, & accessories - red ████ 4 GB thumbdrive with zelda paperwork from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: sandisk<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 63 | 1 | Computers, equipment, & accessories - blu 16GB ███ thumbdrive from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ████<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
| EV | 64 | 1 | Computers, equipment, & accessories - USB DRIVE ██████ 1GB<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ████<br>Model: ████<br>Serial Number: ██████<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |

EXHIBIT 59 - Page 932

| EV | 65 | 1 | Computers, equipment, & accessories - whi 256GB ▮▮▮ thumbdrive from kuehls residence<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: ▮▮▮<br>Model: Not Applicable<br>Serial Number: Not Applicable<br>Booked At: OTHER | 9/16/2022 | Y | Y | Y | |
|----|----|---|---|---|---|---|---|---|
| EV | 66 | 1 | Computers, equipment, & accessories - USB DRIVE 1GB<br>Article: EXTERNAL DRIVES (HARD DRIVE, USB)<br>Make: SCAN DISK<br>Model: ▮▮▮<br>Serial Number: ▮▮▮▮▮<br>Booked At: OTHER | 9/16/2022 | Y | N | N | |
| EV | 67 | 1 | CDs/Video - cd disc labeled LA political roast from kuels residence<br>Booked At: OTHER | 9/16/2022 | N | N | N | Not Assigned Not in Search Warrant |

EXHIBIT 59 - Page 933

# EXHIBIT 2

EXHIBIT 59 - Page 934





EXHIBIT 59 - Page 935

# PROOF OF SERVICE - 1013A(3), 2015.5 C.C.P.

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California   a ove th ag o 1  an  no  part t th  withi
action m  busines  addres i 88 Wes Sixt  Street Suit 400 Lo  Angeles Californi  90017.

O  Septembe 22 2022, I serv d t e foregoi g document, described as

**SUPPLEMENTAL DECLAR TION OF SG ., MAX FERNANDEZ  UR UANT TO COUR 'S
O  DER DATED SEP EMBER 0, 022**

on all nterest d part es li te  below by tr ns  itt ng to all nterest d part es a true co  y  hereof as follows:

| | |
|---|---|
| **Cheryl O'Connor, Esq.**<br>JONES DAY<br>3161 Michelson Drive, Suite 800<br>Irvine, CA 92612 | **Robert Dugdale, Esq.**<br>KENDALL BRILL & KELLY LLP<br>10100 Santa Monica Blvd., Suite 1725<br>Los Angeles, CA 90067 |
| **Harvinder S. Anand, Esq.**<br>ANAND LAW GROUP<br>790 E. Colorado Blvd., # 900<br>Pasadena, CA 91101 | **Dawyn Harrison, Esq.**<br>Office of the County Counsel,<br>648 Hahn Hall of Admin.<br>500 W Temple St,<br>Los Angeles, CA 90012 |

☒   **BY MAIL** by placing a true copy thereof enclosed in a sealed envelope addressed as set forth above.  I am
readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it
would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles,
California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid
if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☒   **BY ELECTRONIC TRANSMISSION** by transmitting a PDF version of the document(s) by electronic mail to the
party(s) identified on the service list using the e-mail address(es) indicated.

☒   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 22, 2022, in Los Angeles, California

_____
Michele K irk

EXHIBIT 59 - Page 936

# ATTACHMENT C

**EXHIBIT 59 - Page 937**



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713

DAWYN R. HARRISON
Acting County Counsel

September 21, 2022

TELEPHONE
(213) 974-1801
FACSIMILE
(213) 626-7446
TDD
(213) 633-0901

```
┌─────────────────────────────────────┐
│             CONFIDENTIAL              │
├─────────────────────────────────────┤
│   THIS MATERIAL IS SUBJECT TO THE     │
│ ATTORNEY-CLIENT AND/OR THE ATTORNEY   │
│        WORK PRODUCT PRIVILEGES        │
└─────────────────────────────────────┘
```

VIA EMAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

    Re:    Response to Your September 20, 2022 Letter

Dear Sheriff Villanueva:

        This in response to your letter dated September 20, 2022, stating you are
refusing Bill Seki as counsel for the County of Los Angeles Sheriff's Department
("LASD")and engaging the appropriate counsel.

        First, all the issues raised in your letter are moot. Yesterday, California
Attorney General Rob Bonta notified Undersheriff Murakami that his office is
assuming responsibility for: a) any investigation into whether individuals
committed a crime by giving advance warning of the search warrants to
Supervisor Kuehl and Patricia Giggans; and b) the underlying investigation of
Peace Over Violence, Patricia Giggans, Supervisor Sheila Kuehl, Los Angeles
Metropolitan Transportation Authority, etc., including the warrants issued in 2021
and 2022. As you acknowledged previously, the Attorney General has the
authority to assume these responsibilities because he has complete supervisorial
authority over you and may direct your and LASD's investigative activities. In
the Attorney General's letter he stated the LASD "should cease its investigative
activity and refrain from any actions in furtherance of these investigations,
including public statements or court filings related to the investigations." Based
on that directive, you did not have authority to send your September 20, 2022,
letter, nor does the LASD require legal services relating to the continued
investigation by the Attorney General. To the extent that counsel is required for
the LASD to explain prior conduct in connection with the 2021 and 2022 warrant
proceedings, Mr. Seki will continue to represent the LASD.

HOA 103838555 5

EXHIBIT 59 - Page 938

The Honorable Alex Villanueva
September 21, 2022
Page 2


       Second, I wanted to remind you that only the Office of County Counsel, or the law firms we retain, may represent you, in your official capacity, and the LASD.[1]  Further, even if all of the requirements of Government Code section 31000.6 – Employment of Legal Counsel to Assist Assessor or Sheriff; Conflicts of Interest - are met and conflict of interest counsel is deemed appropriate for you in your official capacity, the conflict counsel must be retained through my office.[2]  Therefore, you have no authority to retain your own counsel to represent either you or the LASD, nor is the County of Los Angeles responsible for any of the costs incurred by those law firms.  I recently discovered that you improperly retained Werksman Jackson & Quinn LLP in this matter.  I will notify them that they have no authority to represent you or LASD and will not be paid by the County of Los Angeles, and I will copy the Attorney General's Office.

Very truly yours,

DAWYN R. HARRISON
Acting County Counsel

DRH:gl

Enclosures

c:    Timothy K. Murakami, Undersheriff

     John L. Satterfield, Commander
     Chief of Staff

---

[1] Government Code section 25203 establishes that the board of supervisors shall "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, is a party." Los Angeles County Charter Article VI, section 21 vests County Counsel with "exclusive charge and control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party" (footnotes omitted). By law, the Office of County Counsel is charged with providing legal advice, on behalf of the Board, to constituent entities and officials within the County.  California Government Code section 23005 (County exercises authority "only through the board of supervisors" or its authorized agents); id. § 25203 (the Board shall "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, is a party"); Los Angeles, California, County Charter Article VI, section 21 (County Counsel is vested with "exclusive charge and control of all civil actions and proceedings in which the County or any officer thereof, is concerned or is a party" (footnotes omitted)).

[2] Government Code section 31000.6. Please see the attached orders from *County of Los Angeles v. Sheriff Alex Villanueva, et al.* regarding assignment of counsel.

HOA 103848555 5

EXHIBIT 59 - Page 939



# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF



September 20, 2022

Dawyn Harrison, Acting County Counsel
County of Los Angeles – Office of the County Counsel
500 West Temple Street, Suite 648
Los Angeles, California  90012

Dear Ms. Harrison:

### DEMAND FOR DEFENSE COUNSEL

It appears clear you have no intention of removing your office's control as counsel to the Department on this matter. Unless I misunderstood, you insist we continue to communicate and seek advice from your Senior Assistant County Counsel, Mr. Jason Gonzalez, and Mr. Bill Seki, as stated in your letter.

As you are aware, the morning of the search warrant service Supervisor Shelia Kuehl stated to reporters, "*I heard from County Counsel last night that she got a tip from Max Huntsman that the search would happen this morning.*" In the event you have not heard the statement for yourself, it was aired by every local news channel, and it is posted on all LASD social media accounts.

Ms. Kuehl's allegation that you, or a representative from your office, and Mr. Huntsman provided her with advanced knowledge of a criminal search warrant in which she was a suspect makes it unethical and inappropriate for your office to have further access to information or decision making regarding this matter. Moreover, by retaining the services of Bill Seki, there is a clear further potential for you, or your office, to interfere in the filing of motions and overall employment status of Mr. Seki. I must also highlight, based on Supervisor Kuehl's statements and Attorney General Rob Bonta's announcement today, both you and your office are likely to become the focus of a criminal investigation by the Office of the Attorney General, and as such the conflict of interest is undeniable.

Since you intend to continue blocking any independent counsel, we are forced to seek appropriate counsel in order to prevent further interference and/or obstruction of our investigation by your office. Under the State Bar Rule 1.6, the potential for Mr. Seki to report information or communications to your office, and seek approval or denial for legal strategy, regarding our investigation disqualifies him as counsel. Based on this, we can no longer accept Mr. Seki as counsel and decline his further legal services.

**EXHIBIT 59 - Page 940**

Ms. Harrison                            -2-                    September 20, 2022

If I misunderstood your position, please advise. Due to the exigency of this pending matter, the Department will engage the appropriate counsel and inform you once retained. Should you have any questions, please contact Undersheriff Timothy Murakami, at ████████████ Thank you for your anticipated cooperation with this matter.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV:JLS:js

c:      Jason Gonzalez, Senior Assistant County Counsel

EXHIBIT 59 - Page 941



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713

TELEPHONE
(213) 974-1801
FACSIMILE
(213) 626-7446
TDD
(213) 633-0901

DAWYN R. HARRISON
Acting County Counsel

September 20, 2022

---
**CONFIDENTIAL**

THIS MATERIAL IS SUBJECT TO THE
ATTORNEY-CLIENT AND/OR THE ATTORNEY
WORK PRODUCT PRIVILEGES
---

VIA EMAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

   **Re: Response to Your September 19, 2022 Letter**

Dear Sheriff Villanueva:

   I am in receipt of your letter from yesterday requesting counsel to
handle the court proceedings related to the warrants issued on Wednesday,
September 14, 2022 ("2022 Warrants"). After reviewing the letter, I believe
Undersheriff Murakami has not had a chance to let you know that Bill H. Seki, a
partner at Seki, Nishimura & Watase, was assigned to handle the 2022 Warrants
matters last week. It was our understanding, based on your and Undersheriff
Murakami's press statements, that you were recused from handling the 2022
Warrants. As a result, we communicated directly with Undersheriff Murakami
about assigning the defense of the 2022 Warrants to Mr. Seki and his firm on
September 16, 2022, the day he made a request for counsel. Your department did
not seek my office's assistance when it prepared the 2022 Warrants nor did it
request to use Mr. Seki's professional services to assist in the preparation of the
2022 Warrants. Therefore, we had to quickly gather the necessary facts and
perform an ethical and legal review when the Undersheriff requested counsel on
September 16, 2022.

   By way of background, Mr. Seki has been representing your department
on the warrants issued in February and March of 2021 to the Los Angeles County
Metropolitan Transportation Authority (Metro), Office of the Inspector General of
the Metro (OIG), and Peace Over Violence ("2021 Warrants") since March 2021.
Mr. Seki has actively responded to multiple motions challenging the warrants,

HOA.103846887.3

**EXHIBIT 59 - Page 942**

The Honorable Alex Villanueva
September 20, 2022
Page 2

communicated with your department about the warrants, and made several
appearances defending the warrants for your department, including the last one in
front of the Honorable Eleanor Hunter on September 1, 2022, addressing the
scope of the 2021 Warrants and ordering the assignment of a Special Master.

When Mr. Seki was retained to provide his professional services for the
2021 and 2022 Warrants, confidentiality silos were created. Those confidentiality
silos are in effect and will remain that way until the conclusion of these matters.
As to the other claims you make in your letter, I deny them and will not further
acknowledge them with a response.

If you have any questions about the 2021 or 2022 Warrants, please contact
Mr. Seki at (213) 481-2869, or Senior Assistant County Counsel Jason Gonzalez
at (213) 974-1975.

Very truly yours,

DAWYN R. HARRISON
Acting County Counsel

DRH:gl

c:    Timothy K. Murakami, Undersheriff

John L. Satterfield, Commander
Chief of Staff

HOA.103846887.3

**EXHIBIT 59 - Page 943**



# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE



ALEX VILLANUEVA, SHERIFF

September 19, 2022

Dawyn Harrison, Acting County Counsel
County of Los Angeles – Office of the County Counsel
500 West Temple Street, Suite 648
Los Angeles, California 90012

Dear Ms. Harrison:



### *DEMAND FOR DEFENSE COUNSEL*

Per Government Code § 995, this correspondence will serve as my demand as the
elected Sheriff of Los Angeles County Sheriff's Department (Department) for defense
counsel regarding: the service of search warrants against Metropolitan Transit
Authority (MTA)/Kuehl/Giggans/Peace over Violence, wherein the Board of
Supervisors is obligated to provide a defense. As you are aware, in Supervisor Kuehl's
press interview[1], she explicitly named Max Huntsman, the Head of the Office
Inspector General (OIG) and County Counsel, as involved in forewarning her on the
service of the search warrant as to the exact date and time, which unequivocally
shows your office cannot be involved, or provide legal advice regarding this matter
and must assign separate and independent counsel to my office. Based on Supervisor
Kuehl's statements, you or your office interfered in this matter, along with
Mr. Huntsman. Consequently, your office and Mr. Huntsman, must legally and
ethically recuse yourselves and any of your contract counsel from this matter, and
provide me and the Los Angeles County Sheriff's Department independent counsel.

As you are aware, Government Code § 995, except as otherwise provided in Sections
995.2 and 995.4, upon request of an employee or former employee, a public entity
shall provide for the defense of any civil action or proceeding brought against him, in
his official or individual capacity or both, on account of an act or omission in the
scope of his employment as an employee of the public entity. For the purposes of this
part, a cross-action, counterclaim or cross-complaint against an employee or former
employee shall be deemed to be a civil action or proceeding brought against him.

---

[1] LASDHQ Twitter Account. Statement by Supervisor Sheila Kuehl to the media
https://twitter.com/LASDHQ/status/1570508768444097342?s=20&t=...

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*— Since 1850 —*

EXHIBIT 59 - Page 944

Ms. Harrison                        -2-                        September 19, 2022

Moreover, Government Code § 995.2 (b), provides in part:  If an employee or former
employee requests in writing that the public entity, through its designated legal
counsel, provide for a defense, the public entity shall, within 20 days, inform the
employee or former employee whether it will or will not provide a defense, and the
reason for the refusal to provide a defense.

Furthermore, as you are also aware, Government Code § 25303 provides in part:  This
section shall not be construed to affect the independent and constitutionally and
statutorily designated investigative and prosecutorial functions of the sheriff and
district attorney of a county.   The board of supervisors **shall not obstruct the
investigative function of the sheriff** of the county nor shall it obstruct the
investigative and prosecutorial function of the district attorney of a county.

Finally, Los Angeles County Code of Ordinances § 6.44.190. provides in part:  The OIG
shall not disclose, without the Sheriff's authorization, any of the Sheriff's Department's
confidential personnel, investigative, or disciplinary information unless such
information is already a matter of public record.

Should you fail to provide defense counsel in this matter, I will ask the court to order
you, on behalf of the Board of Supervisors, to comply with their obligation by a
Petition for Writ of Mandate.

As you are also aware, if you deny my demand for counsel, I am entitled to recover
from the public entity such reasonable attorney's fees, costs and expenses as are
necessarily incurred in defending the action or proceeding if the action or proceeding
arose out of an act or omission in the scope of his employment as an employee of the
public entity. See, Sparks v. Kern County (2009) 173 Cal App. 4th 194.

Your response in writing is due by the end of the next business day from the date of
this letter, **Tuesday, September 20, 2022**.  Upon receipt, we will advise of the firm of
my choosing.  Should you have any questions, please contact my Chief of Staff,
Commander John Satterfield, at ▓▓▓▓▓▓▓▓▓.  Thank you for your anticipated
cooperation with this matter.

Sincerely,

ALEX VILLANUEVA
SHERIFF

EXHIBIT 59 - Page 945

**Fwd: Latest MTA/Kuehl/Giggans warrants**

From: [redacted] @counsel.lacounty.gov>
Sent: Wednesday, September 14, 2022 5:39 PM
To: [redacted] @lacounty.gov>
Cc: [redacted] @counsel.lacounty.gov>
Subject: Latest MTA/Kuehl/Giggans warrants

Hi [redacted],

I know you've had some conversations with Lana today about the newest round of warrants served by LASD this morning on the MTA/Kuehl/Giggans matter, and I just wanted to advise that County Counsel is not currently authorizing you to approve/waive on those warrants on behalf of the Sheriff's Department. Please let me know if you have any questions. Thanks,

[redacted]

[redacted]
Assistant County Counsel
[redacted] Division

EXHIBIT 59 - Page 946

 **Los Angeles County Sheriff's Department** ✓
September 16 at 11:49 AM · ✚

CA County Counsel Terminates LASD's Lawyer Same Day Supervisor Kuehl's Warrant Is Challenged
in Court

In an unprecedented move of retaliation after Wednesday's lawful service of a search warrant on
the residence of Supervisor Shelia Kuehl and others, the Board of Supervisor's Office of County
Counsel has terminated the services of LASD's legal representation. Simply put, the Board of
Supervisors and County Counsel fired our lawyer the same day our search warrant was challenged
in court and an emergency hearing was set for September 22, 2022.

This is exactly the type of obstruction, interference, and political shenanigans which Sheriff Alex
Villanueva fights against daily. We are now forced into a position of being unrepresented with no
County authorization to pay for legal representation and reduced to solicit pro bono
representation in this matter.

If Supervisor Shelia Kuehl, Commissioner Patty Giggans, The Board of Supervisors, County Counsel
and the Office of the Inspector General are as committed to transparency and accountability as
they continuously state, then why are they scared for these electronic devices to be examined and
fighting the search warrant?

Fwd: Latest MTA/Kuehl/Giggans warrants





**EXHIBIT 59 - Page 947**

# ATTACHMENT D

EXHIBIT 59 - Page 948

761551N25A - SH - AD - 32A (2/72)

COUNTY OF LOS ANGELES
## SHERIFF'S DEPARTMENT
"A Tradition of Service"
### OFFICE CORRESPONDENCE

DATE: December 17, 2004

FILE NO.

| FROM: ALEX VILLANUEVA, SERGEANT | TO: | DIVISION CHIEFS AND COMMANDERS |
|---|---|---|
| CARSON STATION | | |

SUBJECT:    AN OPEN LETTER

The purpose of this memorandum is to dispel any rumors and inform you of my intentions regarding my future with our Department.    As you all well know, I have been exhausting all administrative remedies to address my denial of promotion stemming from the 2003 Lieutenant Examination, and now I have read the most recent Intent to Promote teletype for lieutenants.    As expected, I was not included on this list for reasons you know in more detail than I do, as I can only speculate what transpires behind closed doors.

Up to this point in time my experience, education, leadership, and communication skills have always served me well.    During my ten years experience with the United States military I was privileged to have been promoted six times to positions of higher rank and responsibility.    Perhaps this experience has burnished in me an expectancy of merit based promotions, and this expectancy was unrealistically carried over to our Department.

From what I have come to understand regarding ethical administrative behavior, I find no legal or moral justification for the activities you have engaged in over the course of the last year and a half.    From rewriting oral interview scoring standards in order to deliberately suppress exam scores, providing secret exam preparation classes for the privileged few, and gaming the appeals process in order to gerrymander the candidate pool, you have compromised your integrity and that of the Department's.

Perhaps you have succumbed to a moral inversion, wherein you believe your actions and those of your peers are in the best interest of the Department and supported by civil service rules.    Your decision making is a result of group-think and the feeling of infallibility, making it difficult for you to see beyond your own career success.    I want to encourage each and every one of you to take a moment and engage in critical reflexivity, the ability to see the organization through someone else's experience.

Page 1 of 2

**EXHIBIT 59 - Page 949**

My organizational experience has told me that I do not count, no matter what my
qualifications may be, how hard I work, or how many bright ideas I possess.    I do
not get "invited" to apply to jobs, nor are jobs created exclusively for me.    There is
no captain or higher pushing aside more qualified individuals in order to make room
for me, or steering me in the "right" direction.    There is no rater who overlooks my
shortcomings and gives me undeserved outstanding evaluations or 100 AP's.    My
queries are addressed with attorneys and mind-numbing technical rationality.

Promoting dozens of individuals to the rank of lieutenant is a wonderful opportunity to
assert organizational values such as meritocracy, equality, and diversity, while at the
same time promoting efficiency and effectiveness, and boosting the moral of the
Department.    Instead you deliberately chose the values of cronyism, nepotism, and
tokenism.    These have been the same values you have been espousing with just about
every promotional process within our ranks.    This negatively impacts public safety
by promoting corruption and incompetence.

I am curious to know just how much public resources you will squander as you
attempt to defend the indefensible.    Deliberately attempting to suppress or retard the
upward mobility of Latinos on our Department is illegal, immoral, and politically
incomprehensible.    Each and every one of you contributes to this unfolding tragedy
by your actions or inactions.    I will say this: as a Latino, I do not seek special favors,
accommodations, or any sort of "affirmative action" in order to receive a promotion.
I expect to be promoted because there is a clearly identified universal standard    based
on bonafide occupational qualifications, not golf handicaps or quotas.

It has been painful watching you lie, obfuscate, conceal, mislead, or otherwise attempt
to hide the truth.    I want to encourage you to come to grips with the damage you
inflict on our institution, and do what's right.    In an interesting parallel to our
Department, NASA swore after the Challenger tragedy that it should never happen
again, then along came Columbia.    After spending over $30 million addressing
Bouman, it is truly frightening to behold how little has been learned.

Leadership is defined by action, not position, and I plan to act decisively to assert my
rights, not only as an employee, but as a citizen and proud resident of this County.
Your legacy and the future of equality and equal opportunity in Los Angeles County
are at a crossroads.    I hope you make the right choices for the benefit of the County
and the Department, and I must remind you that it is 2004, not 1964.    Just as in
Martin Luther King's day, I am confident of the supremacy of a simple idea - all men
are created equal.


AV:av

Page 2 of 2

EXHIBIT 59 - Page 950

# EXHIBIT 60

EXHIBIT 60 - Page 951

# Facebook Live Session as Sheriff

| | |
|---|---|
| March 29, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/522728616119043 |
| April 6, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/501939348145181 |
| April 13, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/546392800535820 |
| April 20, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/529858718671404 |
| April 27, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/532969048436229 |
| June 15, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/423962582707176 |
| June 29, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/3174151812859559 |
| July 6, 2022 | http://facebook.com/LosAngelesCountySheriffsDepartment/videos/738191310825776 |
| July 13, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/121687392218530 |
| July 27, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/463477241916098 |
| October 5, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/910390840202738 |
| October 29, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/529232429042986 |
| October 26, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/2239513846207174 |
| November 2, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/1273102586757725 |
| November 3, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/1869313026777410 |
| November 15, 2022 | https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/6029944173723452 |

EXHIBIT 60 - Page 952

# EXHIBIT 61

EXHIBIT 61 - Page 953

# **Facebook Live Sessions December 2022 – January 2024**

| | |
|---|---|
| January 4, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/604840011404230 |
| January 11, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/3437704796546289 |
| January 18, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/152882667125008 |
| January 25, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/862801968161374 |
| February 1, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1190399635175401 |
| February 15, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1642561526514672 |
| February 22, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1162913564390010 |
| March 1, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1400000157414702 |
| March 8, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/746395690474471 |
| March 15, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/763725695174548 |
| March 29, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/3482143328709824 |
| April 5, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1284144142483735 |
| April 12, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1952644871756990 |
| April 26, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/138447085755505 |
| May 3, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1366904644099163 |
| May 10, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/146559301758384 |
| May 17, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/51043588117417 |
| May 24, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/761152789084778 |
| May 31, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/6703313173059854 |
| June 7, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/6207387342712433 |
| June 14, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1710910619344039 |
| June 21, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/969388391011586 |
| June 28, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/222040553545919 |
| July 5, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/939517077278674 |
| July 12, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/201753882525705) |
| July 19, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/285229794026036 |
| July 26, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/2403433039818293 |
| August 2, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/805152664489046 |
| August 9, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/6918639068148147 |
| August 16, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/671383298218510 |
| August 23, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/2775561782587028 |
| August 30, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1229457997722077 |
| September 6, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1651805581998607 |
| September 13, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1359309531684573 |
| September 20, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/780807103802967 |
| September 27, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/247414181632325 |
| October 4, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/3463187880587617 |
| October 18, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/975453756888710 |
| October 25, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/882857893553472 |

1

**EXHIBIT 61 - Page 954**

| November 1, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/645529144294525 |
|---|---|
| November 8, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/630866152588486 |
| November 29, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/701902668711126 |
| December 6, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1326962862034633 |
| December 13, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1835338860232618 |
| December 20, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/1045330763182709 |
| December 27, 2023 | https://www.facebook.com/sheriffvillanueva33/videos/716686013777597 |
| January 3, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/748038136752435 |
| January 11, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1427403044524351 |
| January 17, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/333810862858485 |
| January 26, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/364947409502973 |

EXHIBIT 61 - Page 955

# EXHIBIT 62

EXHIBIT 62 - Page 956

# <u>Weekly Radio Show</u>

| May 8, 2023 | https://rumble.com/v2mqqs4-the-resistance-w-sheriff-alex-villanueva-first-broadcast-5-8-23.html?e9s=src_v1_ucp |
| May 9, 2023 | https://rumble.com/v2n3ix0-the-resistance-w-sheriff-alex-villanueva-5-9-23.html?e9s=src_v1_ucp |
| May 10, 2023 | https://rumble.com/v2n3kmi-the-resistance-w-sheriff-alex-villanueva-5-10-23.html?e9s=src_v1_ucp |
| May 11, 2023 | https://rumble.com/v2nagko-the-resistance-with-alex-villanueva.html?e9s=src_v1_ucp |
| May 12, 2023 | https://rumble.com/v2ngq76-the-resistance-w-sheriff-alex-villanueva-5-12-23.html?e9s=src_v1_ucp |
| May 15, 2023 | https://rumble.com/v2nyg5y-the-resistance-w-sheriff-alex-villanueva-5-15-23.html?e9s=src_v1_ucp |
| May 17, 2023 | https://rumble.com/v2oc2fc-the-resistance-w-sheriff-alex-villanueva-5-17-23.html?e9s=src_v1_ucp |
| May 17, 2023 | https://rumble.com/v2oimem-the-resistance-w-sheriff-alex-villanueva-5-17-23.html?e9s=src_v1_ucp |
| May 19, 2023 | https://rumble.com/v2or9zw-the-resistance-w-sheriff-alex-villanueva-5-19-23.html?e9s=src_v1_ucp |
| May 22, 2023 | https://rumble.com/v2pcmdk-the-resistance-w-sheriff-alex-villanueva-5-22-23.html?e9s=src_v1_ucp |
| May 24, 2023 | https://rumble.com/v2pryyy-the-resistance-w-sheriff-alex-villanueva-5-24-23.html?e9s=src_v1_ucp |
| May 30, 2023 | https://rumble.com/v2r0654-the-resistance-w-sheriff-alex-villanueva-5-30-23.html?e9s=src_v1_ucp |
| May 31, 2023 | https://rumble.com/v2r7ucl-the-resistance-w-sheriff-alex-villanueva-5-31-23.html?e9s=src_v1_ucp |
| June 1, 2023 | https://rumble.com/v2rf30w-the-resistance-w-sheriff-alex-villanueva-6-1-23.html?e9s=src_v1_ucp |
| June 2, 2023 | https://rumble.com/v2rn7b4-the-resistance-w-sheriff-alex-villanueva-6-2-23.html?e9s=src_v1_ucp |
| June 5, 2023 | https://rumble.com/v2s9uvu-the-resistance-w-sheriff-alex-villanueva-6-5-23.html?e9s=src_v1_ucp |
| June 6, 2023 | https://rumble.com/v2shu4q-the-resistance-w-sheriff-alex-villanueva-6-6-23.html?e9s=src_v1_ucp |
| June 8, 2023 | https://rumble.com/v2sy3aw-the-resistance-w-sheriff-alex-villanueva-6-8-23.html?e9s=src_v1_ucp |
| June 9, 2023 | https://rumble.com/v2t5cwm-the-resistance-w-sheriff-alex-villanueva-6-9-23.html?e9s=src_v1_ucp |
| June 12, 2023 | https://rumble.com/v2trvky-the-resistance-w-sheriff-alex-villanueva-6-12-23.html?e9s=src_v1_ucp |
| June 13, 2023 | https://rumble.com/v2tzn6c-the-resistance-w-sheriff-alex-villanueva-6-13-23.html?e9s=src_v1_ucp |

EXHIBIT 62 - Page 957

| June 14, 2023 | https://rumble.com/v2u79p0-the-resistance-w-sheriff-alex-villanueva-6-14-23.html?e9s=src_v1_ucp |
| June 15, 2023 | https://rumble.com/v2uewci-the-resistance-w-sheriff-alex-villanueva-6-15-23.html?e9s=src_v1_ucp |
| June 16, 2023 | https://rumble.com/v2umdse-the-resistance-w-sheriff-alex-villanueva-6-16-23.html?e9s=src_v1_ucp |
| June 19, 2023 | https://rumble.com/v2v6rrz-the-resistance-w-sheriff-alex-villanueva-6-19-23.html?e9s=src_v1_ucp |
| June 20, 2023 | https://rumble.com/v2vdhyh-the-resistance-w-sheriff-alex-villanueva-6-20-23.html?e9s=src_v1_ucp |
| June 21, 2023 | https://rumble.com/v2vk7wa-the-resistance-w-sheriff-alex-villanueva-6-21-23.html?e9s=src_v1_ucp |
| June 26, 2023 | https://rumble.com/v2whov2-the-resistance-w-sheriff-alex-villanueva-6-26-23.html?e9s=src_v1_ucp |
| June 28, 2023 | https://rumble.com/v2wv0vm-the-resistance-w-sheriff-alex-villanueva-6-28-23.html?e9s=src_v1_ucp |
| July 6, 2023 | https://rumble.com/v2yiooc-the-resistance-w-sheriff-alex-villanueva-7-6-23.html?e9s=src_v1_ucp |
| July 7, 2023 | https://rumble.com/v2yoyoa-the-resistance-w-sheriff-alex-villanueva-7-7-23.html?e9s=src_v1_ucp |
| July 10, 2023 | https://rumble.com/v2z941s-the-resistance-w-sheriff-alex-villanueva-7-10-23.html?e9s=src_v1_ucp |
| July 11, 2023 | https://rumble.com/v2zfwv6-the-resistance-w-sheriff-alex-villanueva-7-11-23.html?e9s=src_v1_ucp |
| July 14, 2023 | https://rumble.com/v300ypa-the-resistance-w-sheriff-alex-villanueva-7-14-23.html?e9s=src_v1_ucp |
| July 17, 2023 | https://rumble.com/v30l60e-the-resistance-w-sheriff-alex-villanueva-7-17-23.html?e9s=src_v1_ucp |
| July 18, 2023 | https://rumble.com/v30sah0-the-resistance-w-sheriff-alex-villanueva-7-18-23.html?e9s=src_v1_ucp |
| July 19, 2023 | https://rumble.com/v30zs5m-the-resistance-w-sheriff-alex-villanueva-7-19-23.html?e9s=src_v1_ucp |
| July 24, 2023 | https://rumble.com/v32396s-the-resistance-w-sheriff-alex-villanueva-7-24-23.html?e9s=src_v1_ucp |
| July 25, 2023 | https://rumble.com/v32bdjc-the-resistance-w-sheriff-alex-villanueva-7-25-23.html?e9s=src_v1_ucp |
| July 26, 2023 | https://rumble.com/v32j562-the-resistance-w-sheriff-alex-villanueva-7-26-23.html?e9s=src_v1_ucp |
| July 27, 2023 | https://rumble.com/v32qou2-the-resistance-w-sheriff-villanueva-7-27-23.html?e9s=src_v1_ucp |
| July 28, 2023 | https://rumble.com/v32yq1s-the-resistance-w-sheriff-alex-villanueva-7-28-23.html?e9s=src_v1_ucp |
| July 31, 2023 | https://rumble.com/v33nz61-the-resistance-w-sheriff-alex-villanueva-7-31-23.html?e9s=src_v1_ucp |
| August 1, 2023 | https://rumble.com/v33w61x-the-resistance-w-sheriff-alex-villanueva-8-1-23.html?e9s=src_v1_ucp |

EXHIBIT 62 - Page 958

| August 2, 2023 | https://rumble.com/v345ud3-the-resistance-w-sheriff-alex-villanueva-8-2-23.html?e9s=src_v1_ucp |
| August 4, 2023 | https://rumble.com/v34pdp2-the-resistance-w-sheriff-alex-villanueva-8-4-23.html?e9s=src_v1_ucp |
| | https://rumble.com/v35i0dq-the-resistance-w-sheriff-alex-villanueva.html?e9s=src_v1_ucp |
| August 8, 2023 | https://rumble.com/v35qmc6-the-resistance-w-sheriff-alex-villanueva-8-8-23.html?e9s=src_v1_ucp |
| August 9, 2023 | https://rumble.com/v3604vs-the-resistance-w-alex-villanueva-8-9-23.html?e9s=src_v1_ucp |
| August 10, 2023 | https://rumble.com/v36a3pl-the-resistance-w-sheriff-alex-villanueva-8-10-23.html?e9s=src_v1_ucp |
| August 11, 2023 | https://rumble.com/v36lrxu-the-resistance-w-alex-villanueva-8-11-23.html?e9s=src_v1_ucp |
| August 14, 2023 | https://rumble.com/v37ixqk-the-resistance-w-alex-villanueva-8-14-23.html?e9s=src_v1_ucp |
| August 15, 2023 | https://rumble.com/v37wy32-the-resistance-w-sheriff-alex-villanueva-8-15-23.html?e9s=src_v1_ucp |
| August 2023 | https://rumble.com/v38x6ts-the-resistance-w-sheriff-alex-villanueva.html?e9s=src_v1_ucp |
| August 22, 2023 | https://rumble.com/v3aisw2-the-resistance-w-sheriff-alex-villanueva-8-22-23.html?e9s=src_v1_ucp |
| August 23, 2023 | https://rumble.com/v3awxkn-the-resistance-w-sheriff-alex-villanueva-8-23-23.html?e9s=src_v1_ucp |
| August 17, 2023 | https://rumble.com/v38k6jg-the-resistance-w-sheriff-alex-villanueva-8-17-23.html?e9s=src_v1_ucp |
| August 29, 2023 | https://rumble.com/v3d0vht-the-resistance-w-sheriff-alex-villanueva-8-29-23.html?e9s=src_v1_ucp |
| August 30, 2023 | https://rumble.com/v3dfvwy-the-resistance-w-sheriff-alex-villanueva-8-30-23.html?e9s=src_v1_ucp |
| September 5, 2023 | https://rumble.com/v3f37o5-the-resistance-with-alex-villanueva-9-5-23.html?e9s=src_v1_ucp |
| September 2023 | https://rumble.com/v3fqnkx-the-resistance-with-sheriff-alex-villanueva.html?e9s=src_v1_ucp |
| September 2023 | https://rumble.com/v3fr397-the-resistance-with-sheriff-alex-villanueva.html?e9s=src_v1_ucp |
| September 2023 | https://rumble.com/v3g1av3-the-resistance-with-sherrif-alex-villanueva.html?e9s=src_v1_ucp |

3

EXHIBIT 62 - Page 959

# EXHIBIT 63

EXHIBIT 63 - Page 960

| | |
|---|---|
| **From:** | Blakinger, Keri |
| **Sent:** | Thursday, November 2, 2023 7:49 AM PDT |
| **To:** | Discovery Unit PRA Requests |
| **Subject:** | records request - cpoe |

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments

Hi,

I'm reaching out because I'd like to make a public records request. PC 832.7 b1d makes public any sustained finding that a peace officer discriminated based on race. I would like any findings regarding allegations that former sheriff Alex Villanueva discriminated against either Max Huntsman or Esther Lim, if such findings exist likely from a CPOE probe.

Thank you,

Keri Blakinger

# EXHIBIT 64

EXHIBIT 64 - Page 962




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

December 22, 2023

Keri Blakinger
Los Angeles Times
Keri.blakinger@latimes.com

Dear Ms. Blakinger:

**PUBLIC RECORDS ACT REQUEST #23-14684SE**

This is a follow-up to our letter dated November 30, 2023, in response to your request for records under the California Public Records Act (CPRA) dated and received by the Los Angeles County Sheriff's Department (LASD), Public Records Act Unit, on November 2, 2023.

In your request, you are seeking the following:

I would like any findings regarding allegations that former sheriff Alex Villanueva discriminated against either Max Huntsman or Esther Lim, if such findings exist likely from a CPOE probe.

**Response:** We are providing some non-exempt records disclosable under Penal Code section 832.7 for former sheriff Alex Villanueva because the Sheriff's Department interprets your request to seek these records. Portions of these records are withheld or redacted under, but not limited to, the following authorities: California Constitution, article 1, section 1; attorney-client privilege; attorney work-product doctrine codified as California Code of Civil Procedure section 2018.010, et seq.; deliberative process privilege; Evidence Code section 1040; and Government Code sections 7927.700, 7927.200, 7923.600-7923.625, 7927.705, and 7922.000.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— Since 1850 —

Keri Blakinger                    -2-                    December 22, 2023
PRA #23-14684SE

Specifically, it is undisputed that under California law, the people's right of access is not absolute. (*Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1254.) Government Code section 7927.705 exempts from disclosure "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or State law, including but not limited to, provisions of the Evidence Code relating to privilege." That exemption incorporates other prohibitions established by law. (*County of Los Angeles v. Superior Court* (2015) 242 Cal.App.4th 475, 482.) One such law is the attorney-client privilege, codified as California Evidence Code section 950, et seq. Subject to specified exceptions and waiver, inapplicable here, a client "has a privilege to refuse to disclose, and to prevent another from disclosing a confidential communication between client and lawyer . . . ." (Evid. Code § 954.) Accordingly, portions of the requested records are withheld as attorney-client privileged communications.

In addition, portions of the records you requested are exempt from disclosure because they enjoy the protection of the attorney work-product doctrine, codified in California Code of Civil Procedure section 2018.010 et seq. The protection provided by the work-product doctrine applies to writings prepared by an attorney, whether or not prepared in anticipation of a lawsuit. (*State Comp. Ins. Fund v. Superior Court* (2001) 91 Cal.App.4th 1080, 1091.)

Moreover, portions of the records you requested are protected under the official information privilege, as set forth in Evidence Code section 1040, and the "catchall exception," as set forth in Government Code section 7922.000. Under Evidence Code section 1040, "official information means information acquired in confidence by a public employee in the course of his or her duty . . . ." (Evid. Code, § 1040, subd. (a).) "A public entity has a privilege to refuse to disclose official information" if "(1) [d]isclosure is forbidden by . . . a statute of this state[] or (2) [d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (*Id.*, § 1040, subd. (b).) Government Code section 7922.000, in turn, allows a government agency to withhold records if the public interest served by withholding the records clearly outweighs the public interest served by disclosure. (Gov. Code, § 7922.000.) The weighing process articulated by both sections is the same. (*American Civil Liberties Union of Northern California v. Superior Court* (2011) 202 Cal.App.4th 55, 69.)

Finally, the deliberative process privilege is intended to address concerns that open discussion of policy matters might be impeded if subject to public scrutiny. (*Id.*) It espouses the idea that access to across-the-board opinions and the ability to seek all points of view, and to discuss policies in confidence, are crucial to effective governance in a representative democracy. (*Id.*)

COLA003384
EXHIBIT 64 - Page 964

Keri Blakinger                    -3-                    December 22, 2023
PRA #23-14684SE

We are in the process of reviewing additional potentially responsive documents
and will supplement our response with any non-exempt and non-privileged
documents.  We anticipate having additional information on or before January
6, 2024.  Please note that the Sheriff's Department reserves its right to assert
all other applicable exemptions, privileges, and doctrines.

If you have any questions, please contact the Public Records Act Unit via email
at DiscoveryUnitPRArequests@lasd.org or phone (323) 890-5050.

Sincerely,

ROBERT G. LUNA, SHERIFF

Shawnee N. Hinchman, Captain
Risk Management Bureau

# EXHIBIT 65

EXHIBIT 65 - Page 966

# Facebook Live Sessions January 31, 2024 - Present

| | |
|---|---|
| January 31, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/406309411851101 |
| February 7, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/411725888048923 |
| February 14, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1561086168009198 |
| February 21, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/340547728303848 |
| February 28, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/3458352831121589 |
| March 7. 2024 | https://www.facebook.com/sheriffvillanueva33/videos/942674883626181 |
| March 13, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/328746863040635 |
| March 27, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/380102894858523 |
| April 3, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1602064960545816 |
| April 10, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/935823311536771/ |
| April 17, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/395537683245461/ |
| April 24, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1144032383398847/ |
| May 1, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1144032383398847/ |
| May 8, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/6233350383456745 |
| May 15, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1757417781452086 |
| May 22, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1757417781452086 |
| May 29, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/303970156119084 |
| June 5, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/444629098284264 |
| June 12, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/334934596142610 |
| June 19, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/8153943321297089 |
| June 26, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/478941694726993 |
| July 3, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1257020505676871 |
| August 14, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/378009935322674/ |
| August 21, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/2775083072640317 |
| August 24, 2024 | https://www.facebook.com/watch/?v=898291715480498 |
| August 28, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/495193840131937 |
| September 4, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1026045518827714 |
| September 11, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/411114374946343 |
| September 18, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/3721083021485661 |
| September 25, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/527396439907492 |
| October 2, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1177980293264978/ |
| October 15, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1679087642942896 |
| October 23, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/3863424720565524 |
| November 6, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1091995759216109 |
| November 13, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/536360972638462 |
| November 20, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/2715055342216552 |
| December 4, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/1112066037287729 |

1

EXHIBIT 65 - Page 967

| December 12, 2024 | https://www.facebook.com/sheriffvillanueva33/videos/961257655866684 |
|---|---|
| January 1, 2025 | https://www.facebook.com/watch/?v=1643004632982005 |
| January 8, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/988167379792190 |
| January 15, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/1830029507767543 |
| January 22, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/956557036619181 |
| January 29, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/1794206027787746 |
| February 5, 2025 | https://www.facebook.com/watch/?v=2008747369609339 |
| February 12, 2025 | https://www.facebook.com/watch?v=663560756000168 |
| February 26, 2025 | https://www.facebook.com/watch?v=1807614110084925 |
| March 5, 2025 | https://www.facebook.com/watch?v=1345078196778950 |
| April 2, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/2922724437908607 |
| April 9, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/566347125896871 |
| April 16, 2025 | https://www.facebook.com/sheriffvillanueva33/videos/1015713853865338 |

2

EXHIBIT 65 - Page 968

# EXHIBIT 66

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 66 - Page 969

# EXHIBIT 67

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 67 - Page 970

# EXHIBIT 68

## (SEPARATELY LODGED WITH COURT)

# EXHIBIT 69

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 69 - Page 972

# EXHIBIT 70

EXHIBIT 70 - Page 973



EXHIBIT 70 - Page 974

# EXHIBIT 71

EXHIBIT 71 - Page 975



EXHIBIT 71 - Page 976

# EXHIBIT 72

EXHIBIT 73 - Page 977

Max Huntsman # 156780 - Attorney Licensee Search

 The State Bar *of California*

**Max Huntsman #156780**
License Status: Active

Address: L.A. County Office of Inspector General, 312 S Hill St Fl 3, Los Angeles, CA 90013-1109
Phone: 213-974-6100  |  Fax: Not Available
Email: **mhuntsman@oig.lacounty.gov**  |  Website: **www.oig.lacounty.gov**

**More about This Attorney** ▾

**All changes of license status due to nondisciplinary administrative matters and disciplinary actions.**

| Date | License Status ⓘ | Discipline ⓘ | Administrative Action ⓘ |
|------|------------------|--------------|-------------------------|
| Present | Active | | |
| 12/16/1991 | Admitted to the State Bar of California | | |

Additional Information:
- **About the disciplinary system**

Copyright © 2025 The State Bar of California

  

**EXHIBIT 73 - Page 978**

# EXHIBIT 73

EXHIBIT 73 - Page 979




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

October 23, 2023                                        IAB File # IV 2558097

Mr. 
500 W. Temple Street
Los Angeles, California 90013

Dear Mr. ▇▇▇▇▇:

## NOTIFICATION LETTER

On or about March 16, 2022, a Policy of Equality (POE) Complaint was filed on
your behalf with the LASD Intake Specialist Unit, wherein you complained about
workplace matters. As required by California Penal Code Section 832.7 (e)(1),
"the department or agency shall provide written notification to the complaining
party of the disposition of the complaint within 30 days of the disposition." This
letter serves to satisfy such requirement.

Your complaint against Former Sheriff Alex Villanueva was investigated by the
LASD's Equity Investigations Unit (EIU).  Upon completing the investigation,
the EIU forwarded the case to the County Equity Oversight Panel (CEOP).  On
October 17, 2023, the CEOP met to render its finding.

Upon consideration of the facts developed in the investigation, the Panel's
recommended finding is as follows:

> As to Alex Villanueva the panel determined that a violation of the
> Department's Policy of Equality occurred, and appropriate administrative
> action will be taken.

> No other violations of the Department's policies and procedures were
> found.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
~ Since 1850 ~

COLA003485
**EXHIBIT 73 - Page 980**

Mr. ████████                          2                          October 23, 2023

You should be aware that Alex Villanueva has the right to grieve and/or otherwise appeal this recommended determination.

You should also be aware that, "the notification described in this subdivision shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court, or judge of this state or the United States," California Penal Code Section 832.7(e)(2).

Sincerely,

ROBERT G. LUNA, SHERIFF


*ORIGINAL SIGNED*

Ron Kopperud, Captain
Internal Affairs Bureau

# EXHIBIT 74

EXHIBIT 74 - Page 982




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

October 23, 2023                                    IAB File # IV 2558101

Ms. ███████
450 Bauchet Street
Los Angeles, California  90012

Dear Ms. ███:

### NOTIFICATION LETTER

On or about March 17, 2022, a Policy of Equality (POE) Complaint was filed on
your behalf with the LASD Intake Specialist Unit, wherein you complained about
workplace matters. As required by California Penal Code Section 832.7 (e)(1),
"the department or agency shall provide written notification to the complaining
party of the disposition of the complaint within 30 days of the disposition." This
letter serves to satisfy such requirement.

Your complaint against Former Sheriff Alex Villanueva was investigated by the
LASD's Equity Investigations Unit (EIU).  Upon completing the investigation,
the EIU forwarded the case to the County Equity Oversight Panel (CEOP).  On
October 17, 2023, the CEOP met to render its finding.

Upon consideration of the facts developed in the investigation, the Panel's
recommended finding is as follows:

> As to Alex Villanueva the panel determined that a violation of the
> Department's Policy of Equality occurred, and appropriate administrative
> action will be taken.

> No other violations of the Department's policies and procedures were
> found.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

COLA003475
EXHIBIT 74 - Page 983

Mr. ██                                    2                    October 23, 2023

You should be aware that Alex Villanueva has the right to grieve and/or otherwise appeal this recommended determination.

You should also be aware that, "the notification described in this subdivision shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court, or judge of this state or the United States," California Penal Code Section 832.7(e)(2).

Sincerely,

ROBERT G. LUNA, SHERIFF


*ORIGINAL SIGNED*

Ron Kopperud, Captain
Internal Affairs Bureau

# EXHIBIT 75

EXHIBIT 75 - Page 985

CERTIFIED COPY

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs OF LOS ANGELES SHERIFF'S EQUITY OVERSIGHT PANEL

SERGIO ESCOBEDO

March 14, 2025

Kyle Miller CSR No. 13282, Job No. 7028

EXHIBIT 75 - Page 986

1                 UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4 ALEX VILLANUEVA,                    )
                                      )
5              Plaintiff,     )
                                      )
6                             )
             VS.              )Case No.: 2:24-cv-04979
7                             )        SVW (JCx)
                              )
8 COUNTY OF LOS ANGELES, COUNTY  )
  OF LOS ANGELES SHERIFFS      )
9 DEPARTMENT, LOS ANGELES COUNTY )
  BOARD OF SUPERVISORS, COUNTY   )
10 EQUITY OVERSIGHT PANEL, LOS   )
   ANGELES COUNTY OFFICE OF       )
11 INSPECTOR GENERAL, CONSTANCE   )
   KOMOROSKI, MERCEDES CRUZ,      )
12 ROBERTA YANG, LAURA LECRIVAIN, )
   SERGIO V. ESCOBEDO, RON        )
13 KOPPERUD, ROBERT G. LUNA,      )
   MAX-GUSTAF HUNTSMAN, ESTHER    )
14 LIM, and DOES 1 to 100,        )
   inclusive,                     )
15                                )
               Defendants.    )
16 _____)

17          ,

18                  DEPOSITION OF:

19               SERGIO V. ESCOBEDO

20           CONDUCTED VIA VIDEOCONFERENCE

21              Friday, March 14, 2025

22

23

24 REPORTED BY:
   Kyle Miller
25 CSR No. 13282

**EXHIBIT 75 - Page 987**

ESCOBEDO, SERGIO                                                   Page 2

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            FOR THE COUNTY OF [!COUNTY]

3

4 ALEX VILLANUEVA,              )
                               )
5          Plaintiff,     )
                               )
6                        )
         VS.            )Case No.: 2:24-cv-04979
7                        )        SVW (JCx)
                         )
8 COUNTY OF LOS ANGELES, COUNTY  )
  OF LOS ANGELES SHERIFFŚ       )
9 DEPARTMENT, LOS ANGELES COUNTY )
  BOARD OF SUPERVISORS, COUNTY   )
10 EQUITY OVERSIGHT PANEL, LOS    )
   ANGELES COUNTY OFFICE OF      )
11 INSPECTOR GENERAL, CONSTANCE   )
   KOMOROSKI, MERCEDES CRUZ,     )
12 ROBERTA YANG, LAURA LECRIVAIN, )
   SERGIO V. ESCOBEDO, RON        )
13 KOPPERUD, ROBERT G. LUNA,      )
   MAX-GUSTAF HUNTSMAN, ESTHER    )
14 LIM, and DOES 1 to 100,       )
   inclusive,              )
15                        )
         Defendants.     )
16 _____)

17

18

19     Deposition of Sergio V. Escobedo, Volume 1, taken

20 on behalf of the Plaintiff, before Kyle Miller,

21 Certified Shorthand Reporter No. 13282 and Registered

22 Professional Reporter for the State of California,

23 commencing on Friday, March 14, 2025, via

24 videoconference, beginning at 10:06 a.m. and ending at

25 2:04 p.m.

ESCOBEDO, SERGIO                                                    Page 3

1  APPEARANCES OF COUNSEL:

2

3       FOR THE PLAINTIFF:

4          SHEGERIAN & ASSOCIATES, INC.
            By:  Alex DiBona, Attorney-at-Law
5          11520 San Vicente Boulevard
            Los Angeles, California 90049
6          (310) 860-0770
            adibona@shegerianlaw.com
7

8       FOR THE DEFENDANTS:

9          MILLER BARONDESS, LLP
            By:  Jason H. Tokoro, Attorney-at-Law
10              Steven Williamson, Attorney-at-Law
            2121 Avenue of the Stars
11           Suite 2600
            Los Angeles, California 90067
12           (310) 552-4400
            jtokoro@millerbardondess.com
13

14
       ALSO PRESENT:
15
           Alex Villanueva
16

17

18

19

20

21

22

23

24

25

ESCOBEDO, SERGIO                                                    Page 110

1 under "Charge Founded," there's an "x"?

2    A.    Yes.

3    Q.    And are you the one that put that "x"?

4    A.    No.

5    Q.    Who put that "x"?

6    A.    This form, it comes from ISU, which is our

7 intake services unit.  They prepare the form based on

8 the hearing results, and they provide me that form for

9 signature, since I am the department liaison between the

10 county equity oversight panel and the department.  So

11 it's my -- part of my responsibilities to notify the

12 equity oversight panel of the results, and that is the

13 purpose of this form.

14    Q.    At the hearing itself, did you and

15 Chief Lecrivain discuss the case at all?

16    A.    No.

17    Q.    And did Chief Lecrivain, to your

18 understanding, make the decision to uphold the CEOP

19 panel's recommendation for a "do not rehire" notation?

20    A.    The CEOP made the recommendation, and

21 Chief Lecrivain concurred with that recommendation.

22    Q.    Did Chief Lecrivain tell you why she

23 concurred?

24    A.    No, she did not.

25    Q.    And even if she didn't tell you, as you sit

ESCOBEDO, SERGIO                                                Page 130

1                    EXAMINATION

2

3 BY MR. TOKORO:

4    Q.   Commander Escobedo, I want to follow up on

5 some of the questions you were asked by Mr. DiBona, but

6 first I want to start with asking you about some

7 questions about the board of supervisors.

8         Is that okay?

9    A.   Yes.

10   Q.   Did anyone from the board of supervisors

11 attend the CEOP prehearing on either of the

12 investigations into Mr. Villanueva?

13   A.   No.

14   Q.   Did any of the actual board of supervisors

15 themselves attend that prehearing?

16   A.   No.

17   Q.   Did anyone from the board of supervisors

18 attend the CEOP hearing on the investigations into

19 Mr. Villanueva?

20   A.   No.

21   Q.   Did anyone from the board of supervisors

22 contact you or communicate with you in any way in

23 connection with the Huntsman or Lim complaints?

24   A.   No.

25   Q.   Did Sheriff Luna attend the CEOP prehearing

ESCOBEDO, SERGIO                                                      Page 131

1 on the complaints against Mr. Villanueva?

2      A.   No.

3      Q.   Did Sheriff Luna attend the CEOP hearing

4 itself on those two complaints?

5      A.   No.

6      Q.   Did Sheriff Luna communicate with you in any

7 way in connection with the Huntsman complaint?

8      A.   No.

9      Q.   Did Sheriff Luna communicate with you in any

10 way in connection with the Lim complaint?

11     A.   No.

12     Q.   Did Sheriff Luna, as far as you know, have

13 any involvement in either investigation?

14     A.   No.

15     Q.   Now, Mr. Villanueva has claimed that the

16 investigation and "do not rehire" notation was given to

17 him in retaliation for his exercise of First Amendment

18 speech.  So I want to talk to you about that.  One of

19 the things that Mr. Villanueva claims is that his public

20 statements about Measure A were a reason he was

21 retaliated against by having these investigations done.

22        Was Mr. Villanueva's position on Measure A

23 any part of the CEOP prehearing or hearing on the

24 Huntsman or Lim complaints?

25     A.   No.

ESCOBEDO, SERGIO                                                          Page 132

1     Q.    Did Measure A have anything to do with the

2 department's decision in connection with the Huntsman

3 and Lim complaints?

4     A.    No.

5     Q.    Now, what about Mr. Villanueva's position on

6 Measure J?  Was that taken into account in either the

7 CEOP prehearing or hearing?

8     A.    No.

9     Q.    Did that have anything to do with the outcome

10 of the Huntsman or Lim complaints?

11     A.    No.

12     Q.    What about Sheriff Villanueva's --

13 Mr. Villanueva's position on Measure R?  Did that have

14 anything to do with the CEOP prehearing or hearing?

15     A.    No.

16     Q.    Did that have anything to do with the outcome

17 of the complaints filed by Mr. Huntsman or Ms. Lim?

18     A.    No.

19     Q.    Did that have anything to do with the

20 department's concurrence with the CEOP's

21 recommendations?

22     A.    No.

23     Q.    Did any of these ballot measures come up at

24 any point in time during the prehearing or the hearing?

25     A.    No.

ESCOBEDO, SERGIO                                                      Page 133

1     Q.   Mr. Villanueva also took a position on not

2 enforcing the vaccine mandate with sworn personnel.

3          Did that position have anything to do with

4 the CEOP prehearing or hearing?

5     A.   No.

6     Q.   Did it have anything to do with the Huntsman

7 or Lim investigations?

8     A.   No.

9     Q.   Did it have anything to do with the

10 department's decision or concurrence with the CEOP's

11 recommendations?

12    A.   No.

13    Q.    Now, Mr. Villanueva also made public

14 statements in opposition to a county contract with

15 Fulgent regarding COVID.

16          Did the Fulgent statements have -- by

17 Mr. Villanueva have anything to do with the CEOP

18 prehearing or hearing?

19    A.   No.

20    Q.   Did it have anything to do with either the

21 Huntsman or Lim investigations?

22    A.   No.

23    Q.   Did it have anything to do with the

24 department's concurrence with the CEOP's

25 recommendations?

ESCOBEDO, SERGIO                                                    Page 134

1    A.   No.

2         MR. TOKORO:  I've got nothing else, Alex.

3         MR. DIBONA:  All right.  Let me just follow up on

4 that for a moment.

5

6              FURTHER EXAMINATION

7

8 BY MR. DIBONA:

9    Q.   Commander Escobedo, is it true

10 Laura Lecrivain didn't tell you why she concurred in the

11 CEOP hearing?  Correct?  Or the CE -- sorry.  Let me

12 rephrase that.

13         It's true Chief Lecrivain did not tell you

14 why she concurred in the CEOP's recommendation for a "do

15 not hire" -- "rehire" notation; correct?

16    A.   Correct.

17    Q.   Then how can you say what the basis of her

18 concurrence was?

19    A.   I'm not understanding that.  In what context?

20    Q.   When --

21    A.   To the memo I signed or --

22    Q.   No.

23         When opposing counsel asked you, "Was

24 Measure A part of the department's concurrence?" how are

25 you able to answer "no"?

ESCOBEDO, SERGIO                                                    Page 149

1

2         I, Kyle Miller, CSR No. 13282, certify:

3         That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  prior to testifying, the deponent was placed under oath;

6  that a verbatim record of the proceedings was made by me

7  using machine shorthand which was thereafter transcribed

8  under my direction; further, that the foregoing is an

9  accurate transcription thereof.

10         The deponent's review, correction, and

11  signing of the transcript was requested.

12         The dismantling, unsealing, or unbinding of

13  the original or certified transcript will render the

14  reporter's certificate null and void.

15         I further certify that I am not financially

16  interested in the action and that I am not a relative

17  nor an employee of any attorney or party to this action.

18

19         Dated this 31st day of March, 2025.

20

21

22         _____
           Kyle Miller
23         CSR NO. 13282

24

25

ESCOBEDO, SERGIO                                                    Page 150

```
1  CASE NAME: Villanueva vs. County of Los Angeles, et al.

2  WITNESS NAME:  Sergio V. Escobedo

3  DATE TAKEN:  Friday, March 14, 2025

4                      TRANSCRIPT ERRATA SHEET

5  The reasons for making changes to answers are as
   follows:
6              1. To clarify the record;
               2. To conform to the facts;
7              3. To correct major transcription errors.

8

9  PAGE       LINE            CORRECTION & REASON

10  146         6             "December 2024" not December 1994

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____                      4/2/25
    Signature of Deponent                        Date
25
```

EXHIBIT 75 - Page 997

# EXHIBIT 76

EXHIBIT 76 - Page 998

# ALEX VILLANUEVA

Los Angeles, CA | 562 754-0885 | sheriffvillanueva33@gmail.com |

**FEBRUARY 22, 2025**

Mr. Gary Peterson
CEO/President
Public Sector Search &
Consulting, Inc.
6520 Lonetree Blvd.,
Suite 1040
Rocklin, CA 95765

**DEAR GARY PETERSON**

I was pleasantly surprised to learn the position of Chief of Police and Emergency Management for the new Transit Community Public Safety Department was still being held open. I am submitting my cover letter and resume to signal my interest in this unique leadership opportunity.

Launching a new law enforcement agency and building up the workforce from scratch is no easy task. Recruiting new police officers in today's environment has proven to be difficult even for established law enforcement agencies such as the Los Angeles Sheriff's Department, which I had the privilege to lead, and the Los Angeles Police Department, two of the largest and most prominent agencies in the nation.

In 2019 I set a record by hiring 1,100 deputy sheriff trainees, filling 11 academy classes in a row. There was a lot of work involved, but setting expectations for recruitment, backgrounds, and academy training, and overseeing every phase from start to finish proved to be the deciding factor in successfully hiring so many from our local labor market. Our recruitment slogan was straightforward: "Hometown heroes needed, are you in?

In order to convert the vision of the MTA's board of directors, working in conjunction with the Public Safety Advisory Committee, will require a collaborative approach, one that can marry ideology with the legal framework within which public safety organizations must operate and provide basic services to the community.

Ultimately it's about keeping the transit community safe, and I firmly believe we can accomplish that as a team, one that places customer experience and evidence at the center of the decision making process. Thank you in advance for your assistance in these matters and I look forward to participating in this selection process.

Sincerely,

Alex Villanueva, DPA
Former Sheriff, Los Angeles County



# ALEX VILLANUEVA

Los Angeles, CA | 562 754-0885 | sheriffvillanueva33@gmail.com |

36-year law enforcement veteran who successfully led the nation's largest sheriff's department during a most turbulent time period in law enforcement, managed a workforce of 17,000 employees, a multi-billion dollar budget, converting a $101 million budget deficit into a $74 million budget surplus, hired over 1,500 deputies, all while leading the department through the pandemic and major civil unrest.

## EXPERIENCE

**DEC 2018-**
**DEC 2022**

### SHERIFF, LOS ANGELES COUNTY

Led the Los Angeles Sheriff's Department, overseeing patrol operations of 24 patrol stations spread out over 3115 square miles of Los Angeles County, custody operations of the nation's largest jail system with 17,000 inmates, and provided law enforcement services to the LA Metropolitan Transit Authority, the Los Angeles Community College District, the Los Angeles Superior Court system, in addition to specialized detective, tactical resources, and school resource officers throughout Los Angeles County.

**FEB 1986-**
**FEB 2018**

### SWORN MEMBER OF THE LOS ANGELES SHERIFF'S DEPARTMENT (LASD)

Worked through the ranks of the LASD from deputy assigned to the Inmate Reception Center, then patrol in East Los Angeles, served as Field Training Officer, Academy Staff Instructor, then as a sergeant assigned to Lennox Station, Carson Station, and the Community College Bureau. After a stint at the Academy as a supervisor, served as Lieutenant Watch Commander, Mental Health Liaison to Century Regional Detention Facility, then retired from Pico Rivera Station as the Watch Commander.

**SPRING 2006-**

**SPRING 2010**

### ADJUNT PROFESSOR, CALIFORNIA STATE UNIVERSITY, LONG BEACH

Taught upper division coursework in statistics, criminological theory, corrections, and juvenile justice in the Criminal Justice Department.

## EDUCATION

**MAY 2005**

### DOCTOR OF PUBLIC ADMINISTRATION, UNIVERSITY OF LA VERNE

Dissertation: Leadership Diversity in Law Enforcement, published in 2005

**JUNE 1997**

### MASTER OF PUBLIC ADMINISTRATION, CAL STATE NORTHRIDGE

AV009869

**EXHIBIT 76 - Page 1000**

## SKILLS

- Strong knowledge and experience in community policing
- Excellent communication skills, both verbal and written
- Published author and contributor in several public administration academic works
- Ability to work collaboratively in a multi-cultural environment, including speaking/reading/writing fluently in Spanish

## RELATED EXPERIENCE

Graduate of the FBI's National Executive Institute (2022) and the California Military Academy's Officer Candidate School (1988), commissioned as a lieutenant in the California Army National Guard, taught the Incident Command System coursework to LASD executives (2007-2009), combined 10 years' experience between the active US Air Force, California Air Guard, and National Guard

AV009870

**EXHIBIT 76 - Page 1001**

# EXHIBIT 77

EXHIBIT 77 - Page 1002



---------- Forwarded message ---------

From: Gary Peterson <Gary@publicsectorsearch.com>
Date: Mon, Feb 24, 2025 at 10:57 AM
Subject: Screening Interview - LA Metro Chief of Police & Emergency Management
To: sheriffvillanueva33@gmail.com <sheriffvillanueva33@gmail.com>

Sheriff - Greetings and Congratulations,
You have been selected to participate in a screening interview for the Chief of Police &
Emergency Management for the Los Angeles Metropolitan Transportation Authority (LA
Metro).  My name is Gary Peterson. I am a retired police chief and one of the consultants
working on this project. We use the Microsoft Teams platform to schedule the screening
interviews.
We will review your career history, education, and training during the screening interview.
Please have a copy of your submission in front of you and be prepared to discuss your
leadership style, policing philosophy, and practical experience related to the challenges and
opportunities outlined in the brochure. We will also discuss your background (e.g., OIS,
lawsuits, IAs, etc.) and your internet profile (positive and negative articles and social media).
Finally, we will talk about the next steps.
If something arises or you have technical difficulties, I can be reached at 916-622-5323 cell or
916-789-9990 office.
Gary

_____

Microsoft Teams Need help?
Join the meeting now
Meeting ID: 298 942 473 898
Passcode: qR3f99nQ

_____

Dial in by phone

AV009862

EXHIBIT 77 - Page 1003

+1 442-286-0367,,656487982# United States, Escondido
Find a local number
Phone conference ID: 656 487 982#
For organizers: Meeting options | Reset dial-in PIN

_____

AV009863

**EXHIBIT 77 - Page 1004**

# EXHIBIT 78

## (SEPARATELY LODGED WITH COURT)

EXHIBIT 78 - Page 1005

# EXHIBIT 79

EXHIBIT 79 - Page 1006



her side contains important
n below the signature line.
YOUR SOCIAL SECURITY CARD
ADULTS: Sign this card in ink immediately.
CHILDREN: Do not sign until age 18 or your first job, whichever is earlier.
Keep your card in a safe place to prevent loss or theft.
DO NOT CARRY THIS CARD WITH YOU.
Do not laminate.
SOCIAL SECURITY
[redacted]
THIS NUMBER HAS BEEN ESTABLISHED FOR
MAX
HUNTSMAN
SIGNATURE
USA
09/01/2016