Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
320 North Larchmont Boulevard
Los Angeles, California 9004
Telephone Number:  (310) 860 0770
Facsimile Number:  (310) 860 0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>        Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No.:  2:24  cv 04979 SVW (JC)<br><br>**The Honorable Stephen V. Wilson**<br><br>**DECLARATION OF ALEX DIBONA, ESQ., IN SUPPORT OF PLAINTIFF'S MOTIONS IN LIMINE; EXHIBITS**<br><br>Date:    May 26, 2025<br>Time:    1:30 p.m.<br>Dept.:   10A<br><br>Trial Date:      June 3, 2025<br>Action Filed:  June 13, 2024 |

## DECLARATION OF ALEX DIBONA

I, Alex DiBona, declare as follows:

1.   I am an attorney at law, duly authorized to practice law before all of the courts of the State of California and this honorable Court.  I am an attorney of record for plaintiff, Alex Villanueva, in this case.  I am familiar with the files, pleadings, and facts in this case and could and would competently testify to the following facts on the basis of my own personal knowledge.

2.   Counsels of record for Plaintiff and Defendant met and conferred via teleconference on April 21, 2025.  All intended motions *in limine* and their bases were fully discussed.  The Parties were unable to agree on the motions.

3.   Attached hereto as **Exhibit 1** is a true and correct copy of Defendant's Rule 26 disclosures.

4.   Attached hereto as **Exhibit 2** is a true and correct copy of Marc Cohen's untimely expert report. Dr. Cohen, through Defendant's counsel, produced this report to us on April 8, 2025, at approximately 10:00 p.m. The Rule 26 expert exchange occurred on March 21, 2025. Plaintiff's examination by Dr. Cohen occurred March 26, 2025.

5.   Attached hereto as **Exhibit 2** is a true and correct copy of the relevant excerpts from Dr. Jessica Rowe's deposition transcript.

6.   Attached hereto as **Exhibit 3** is a true and correct copy of Vida Thomas' expert report.

7.   Attached hereto as **Exhibit 4** is an article from the LAist dated March 23, 2022 regarding Plaintiff's alleged involvement in the supposed existence of "deputy gangs."

8.   Attached hereto as **Exhibit 5** is a true and correct copy of the newspaper articles Defendants produced in discovery about Mark Lilienfeld's alleged misconduct.

9.   Attached hereto as **Exhibit 6** is a true and correct copy of campaign material for Nick Wilson, which Defense counsel marked as an exhibit to Nick Wilson's deposition.

10.   Attached hereto as **Exhibit 7** is a true and correct copy of material from the

DECLARATION OF ALEX DIBONA IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

southern poverty law cent, which Defense counsel marked as an exhibit at Nick Wilson's deposition.

11.   Attached hereto as **Exhibit 8** is a true and correct copy of an Instagram page that Nick Wilson followed at the time of his deposition, which Defense counsel marked as an exhibit to Nick Wilson's deposition.

12.   Attached hereto as **Exhibit 9** is a true and correct copy of relevant experts of the deposition of Dr. Jennifer Rowe.

13.   I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed on this 28th day of April, 2025, at Los Angeles, California.

Alex DiBona, Esq.

DECLARATION OF ALEX DIBONA IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

# EXHIBIT 1

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
JASON H. TOKORO (State Bar No. 252345)
jtokoro@millerbarondess.com
STEVEN G. WILLIAMSON (State Bar No. 343842)
swilliamson@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>Defendants. | **CASE NO. 2:24-cv-04979 SVW (JCx)**<br><br>**DEFENDANTS' DISCLOSURE OF EXPERT TESTIMONY PURSUANT TO FED. R. CIV. P. 26(a)(2)**<br><br>Assigned to the Hon. Stephen V. Wilson, Crtrm. 10A and Magistrate Judge Jacqueline Chooljian, Crtrm. 750<br><br>Trial Date:     June 3, 2025 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and the Joint Rule 26(f) Report and Proposed Discovery Plan entered into by the parties to this action, Defendants disclose the following retained experts whose expert opinion testimony may be offered at the trial of this action on their behalf:

1.    **Marc A. Cohen, M.D.**; 333 S. Beverly Drive, Suite 200, Beverly Hills, California 90212. Dr. Cohen will provide expert testimony about the existence, extent, nature and source(s) of Plaintiff's claimed emotional and mental injuries. Dr. Cohen's testimony will be based on a psychiatric examination (independent medical examinations or "IME") of the Plaintiff per Federal Rule of Civil Procedure 35 ("Rule 35"). Plaintiff and Defendants have entered into a February 28, 2025 Stipulation for an Independent Medical Exam (the "Stipulation"). Under the Stipulation, Plaintiff will appear for an IME on March 26, 2025, at 10:00 a.m. Once the IME is completed, Dr. Cohen will prepare a report per Rule 35(b). Dr. Cohen's curriculum vitae is attached hereto as **Exhibit 1**.

2.    **Vida L. Thomas**; 1811 10th Avenue, Sacramento, California 95818. Ms. Thomas will provide expert testimony regarding employment and human resource practices, policies, and procedures relating to acceptable employment practices, especially responding to, investigating, and preventing workplace harassment, discrimination, and retaliation. Ms. Thomas will further testify regarding the investigatory methodology employed by investigator Christine Diaz-Herrera during the investigations into complaints filed by Max Huntsman and Esther Lim against Plaintiff. Ms. Thomas will also testify regarding the standard practice of a notation, such as "Do Not Rehire," being placed on an individual's personnel file. Ms. Thomas will base her testimony on her review of pertinent records, deposition transcripts, and exhibits, including the Sanders Roberts materials that have been produced in this litigation, the IAB "stacked" case file for the Max Huntsman and Esther Lim investigations, and the deposition transcripts of Plaintiff

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

1   Alex Villanueva and Ms. Diaz-Herrera.  Ms. Thomas is issuing a report per Rule

2   26(a)(2)(B).  Ms. Thomas's curriculum vitae is attached hereto as **Exhibit 2**.

3

4   DATED:  March 21, 2025              MILLER BARONDESS, LLP

5

6

7                                      By:    /s/ *Jason H. Tokoro*
                                              _____
8                                             JASON H. TOKORO
                                              Attorneys for Defendants

9

# EXHIBIT 1

# MARC A. COHEN, M.D., M.S.

### FORENSIC CONSULTANT IN PSYCHIATRY AND BEHAVIORAL SCIENCES

## PERSONAL INFORMATION

<u>Office Address</u>: 333 S. Beverly Drive, Suite 200
Beverly Hills, California 90212

<u>Telephone</u>: (310) 724-5500

<u>Facsimile</u>: (310) 836-3002

<u>Academic E-mail</u>: macohen@mednet.ucla.edu

<u>Non-Academic E-mail</u>: mcmd@mac.com

<u>Summary of Background</u>: https://medschool.ucla.edu/people/marc-cohen-md-ms

## EDUCATION

<u>Undergraduate Education</u>
University of California at Los Angeles
Major: History; 09/91 – 06/96
B.A., 06/96

<u>Graduate Education</u>
University of California at Los Angeles
Major: Physiological Science; 09/97 – 06/99
M.S., 06/99

<u>Medical Education</u>
University of Southern California School of Medicine
08/99 –  05/03
M.D., 05/03

<u>Graduate Medical Education</u>
UCLA/San Fernando Valley Psychiatry Residency Program
Internship: 06/03 – 05/04
Residency: 06/04 – 06/07
Chief Resident: 06/06 – 06/07

UCLA Forensic Psychiatry Fellowship Program
06/07 – 06/08

## LICENSURE AND BOARD CERTIFICATION

- California Medical License No.: A91103; Expiration Date: 11/30/26

- Washington Medical License No.: 60859244; Expiration Date: 11/26/26

- DEA Registration No.:  FC2868478; Expiration Date: 08/31/26

**LICENSURE AND BOARD CERTIFICATION, CONT.**

- American Board of Psychiatry and Neurology, Psychiatry (Certificate No.: 59207)

- American Board of Psychiatry and Neurology, Forensic Psychiatry (Certificate No.: 1714)

**PROFESSIONAL EXPERIENCE**

- Assistant Dean for Student Professionalism and Performance, UCLA David Geffen School of Medicine; 7/1/24 – Present

- Special Advisor to the Faculty Executive Committee, UCLA David Geffen School of Medicine; 7/1/24 – Present

- Senior Advisor to the Faculty Executive Committee, Vice Dean for Education, and Chief Medical Education Officer, UCLA David Geffen School of Medicine; 9/1/20 – 6/30/24

- Associate Clinical Professor, UCLA David Geffen School of Medicine, Department of Psychiatry & Biobehavioral Sciences; 7/1/17 - Present

- Staff Psychiatrist, Screening Mental Health Clinic, OIF/OEF Veterans, Greater Los Angeles Healthcare System, Department of Veterans Affairs; 01/12 – 07/14

- Assistant Clinical Professor, UCLA David Geffen School of Medicine, Department of Psychiatry & Biobehavioral Sciences; 08/10 – 06/17

- Staff Psychiatrist, Olive View-UCLA Medical Center; 07/10 – Present

- Psychiatry Expert, Mental Health Court, Superior Criminal Court, Los Angeles County; 07/10 – Present

- Director, Partial Hospitalization Program, Sepulveda Ambulatory Care Center, Department of Veterans Affairs; 09/09 – 07/10

- Psychiatry Expert, Superior Criminal Court Panel, Los Angeles County; 03/09 – Present

- Clinical Instructor, UCLA David Geffen School of Medicine, Department of Psychiatry & Biobehavioral Sciences; 07/08 – 07/10

- Compensation and Disability Evaluator, Greater Los Angeles Veterans Administration, Department of Veterans Affairs; 07/08 – 07/10

- Staff Psychiatrist, Twin Towers Correctional Facility; 03/08 – 06/08

**PROFESSIONAL EXPERIENCE, CONT.**

- Staff Psychiatrist, Greater Los Angeles Healthcare System, Department of Veterans Affairs; 02/08 – 07/10

- Psychiatry Expert, Mental Health Court, Superior Criminal Court, Los Angeles County; 01/08 – 06/08

- Staff Psychiatrist, Metropolitan State Hospital, Forensic Admission Unit; 06/07 – 12/07

- Teaching Associate, University of California at Los Angeles; 06/00 – 07/00

- Graduate Research Assistant, University of California at Los Angeles; 06/98 – 02/99

- Teaching Assistant, University of California at Los Angeles; 09/97 – 06/99

**PROFESSIONAL ACTIVITIES**

Academic Appointments

- Ex-Officio Member, Medical Education Committee, UCLA David Geffen School of Medicine; 09/23 – Present

- Member, Student Conduct Committee, UCLA Office of the Dean of Students; 02/21 – Present

- Mentor, Longitudinal Mentorship Program, UCLA David Geffen School of Medicine; 01/21 – 02/23

- Chair, Committee on Academic Standing, Progress, and Promotion (CASPP), Faculty Executive Subcommittee, UCLA David Geffen School of Medicine; 09/20 – Present

- Chair, Ad Hoc Committee, UCLA Department of Psychiatry & Biobehavioral Sciences; 09/19 – 09/20; 10/21 – 1/23; 3/9/23 – 6/30/24

- Member, Ad Hoc Committee, UCLA Department of Psychiatry & Biobehavioral Sciences; 07/18 – 07/19

- Member, Committee on Academic Standing, Progress, and Promotion (CASPP), Faculty Executive Subcommittee, UCLA David Geffen School of Medicine; 06/14 – 06/20

- Founding Chair, Committee on Academic Standing, Progress, and Promotion (CASPP), Faculty Executive Subcommittee, UCLA David Geffen School of Medicine; 06/12 – 06/14

3

**PROFESSIONAL ACTIVITIES, CONT.**

- Faculty Mentor, Medical Student Well-Being Program, UCLA David Geffen School of Medicine; 01/13 – 01/16

- Member, Medical Student Education Evaluation Subcommittee, UCLA David Geffen School of Medicine; 01/13 – 01/16

Professional Appointments

- Editor, Journal of Forensic Sciences; 02/22 – Present

- Peer Reviewer, Journal of Forensic Sciences; 01/19 – 02/22

- San Fernando Valley Councilor, SCPS; 05/17 – 05/20

- Member, Criminal Behavior Committee, AAPL; 01/14 – Present

- Member, Suicidology Committee, AAPL; 01/14 – Present

- Member, Trauma and Stress Committee, AAPL; 10/12 – Present

- Member, Lawyer Assistance Program, California State Bar; 12/11 –  01/15

**HONORS AND SPECIAL AWARDS**

Phi Beta Kappa
Magna Cum Laude
Golden Key Honor Society
Pi Gamma Mu International Honor Society
Phi Alpha Theta History Honor Society
Outstanding Graduating Resident Award
Fellow, American Psychiatric Association
Fellow, American Academy of Forensic Sciences

**ORGANIZATIONAL MEMBERSHIPS AND AFFILIATIONS**

American Academy of Psychiatry and the Law (AAPL)
American Academy of Forensic Sciences (AAFS)
American Psychiatric Association (APA)
Southern California Psychiatric Society (SCPS)
American Medical Association (AMA)

**SELECTED LECTURES AND PRESENTATIONS**

- *Forensic Psychiatry: The Quest for Excellence,* Olive View-UCLA Medical Center Psychiatry Grand Rounds; September 2023

- *Response to Trauma,* National District Attorney's Association; November 2018

4

**SELECTED LECTURES AND PRESENTATIONS, CONT.**

- *Unusual Mental Health Defenses,* National District Attorney's Association; November 2018

- *Contemporary Forensic Evaluation of Posttraumatic Stress Disorder*, American Academy of Psychiatry and the Law; October 2018

- *Preventing and Responding to Violence in the Workplace*, Employment Law Institute; October 2017

- *Resiliency and Trauma*, American Academy of Forensic Sciences; February 2017

- *Mass Murder:  How Worried Should The Masses Be*, American Academy of Psychiatry and the Law; October 2016

- *Paranoia and Violence*, UCLA/SFV Psychiatry Residency Training Program; September 2016

- *Psychiatric and Psychological Exams of Employees*, Practising Law Institute, Psychological Issues in Employment Law Seminar; March 2015

- *Combat-PTSD and Violence*, American Academy of Forensic Sciences; February 2014

- *Problem-based Learning Instructor,* MS 2 Medical Neurosciences, UCLA David Geffen School of Medicine; January – February 2014

- *PTSD in DSM 5: More Plaintiffs?  More Defenses?  More Awards?*, American Academy of Psychiatry and the Law; October 2013

- *The Uses and Abuses of Psychopharmacology in Conjunction with Psychotherapy,* The Los Angeles Society of Clinical Psychologists; August 2012

- *Combat-related Posttraumatic Stress Disorder,* C.G. Psychoanalytic Institute of Los Angeles; December 2011

- *Combat-related Posttraumatic Stress Disorder*, Los Angeles Chapter of Marriage & Family Therapists; April 2011

- *The Relationship between Combat-related PTSD and Violence*, Mental Health Court, Superior Court of California, Los Angeles County; April 2009

- *MS 3 Psychiatry Clerkship Course: Introduction to the Psychiatric Evaluation*, UCLA David Geffen School of Medicine; November 2008 – Present

**ABSTRACTS AND PUBLICATIONS**

- PTSD in DSM 5:  More Plaintiffs?  More Defenses?  More Awards?; presented at American Academy of Psychiatry and the Law Annual Conference, San Diego, California; October 26, 2013

- Combat-related Posttraumatic Stress Disorder and Violence; presented at American Academy of Forensic Sciences Annual Conference, Seattle, WA; February 20, 2014

- Psychiatric and Psychological Exams of Employees; presented at Psychological Issues in Employment Law Seminar, Practising Law Institute, New York City, NY; March 16, 2015

- Resiliency and Trauma: An Interdisciplinary Team Approach to the Evaluation of Individuals in Mass Tort Cases; presented at American Academy of Forensic Sciences Annual Conference, New Orleans, LA; February 17, 2017

- Preventing and Responding to Violence in the Workplace; presented at Psychological Issues in Employment Law Seminar, Practising Law Institute, New York City, NY; October 13, 2017

- Contemporary Forensic Evaluation of Posttraumatic Stress Disorder; presented at American Academy of Psychiatry and the Law Annual Conference, Austin, TX; October, 27, 2018

**ACADEMIC POLICIES**

- Policy on Medical Student Professionalism, DGSOM

- Policy on Medical Student Academic Professional Standing at DGSOM

- Policy and Guidelines on Progress & Promotion of Medical Students at DGSOM

- Attendance Policy, Absences, Time-off, and Approved Leave of Absence for DGSOM Medical Students

- Bylaws, Committee on Academic Standing, Progress, and Promotion, DGSOM

**EXPERT TESTIMONY[1]**

- State of California v. Simeon Wichmann
  (Case No. ZM014967)
  Testified at trial, 3/15/10, Los Angeles County, California

- State of California v. Deonte Lee
  (Case No. ZM010543)
  Testified at trial, 5/4/10, Los Angeles County, California

- State of California v. Theodore Burley
  (Case No. ZM010622)
  Testified at trial, 7/7/10, Los Angeles County, California

- Ashley Fair v. State of California
  (Case No. 30-2008 00109795)
  Testified at deposition, 10/13/10, Los Angeles County, California

- State of California v. Robert Perez
  (Case No. ZM012906)
  Testified at trial, 11/9/10, Los Angeles County, California

- State of California v. Larry Jessie
  (Case No. ZM005300)
  Testified at trial, 11/22/10, Los Angeles County, California

- State of California v. James Hubbard
  (Case No. ZM013438)
  Testified at trial, 12/1/10, Los Angeles County, California

- State of California v. Lael Battle
  (Case No. ZM013315)
  Testified at trial, 1/27/11, Los Angeles County, California

- State of California v. Sean Hinman
  (Case No. ZM010340)
  Testified at trial, 2/9/11, Los Angeles County, California

- State of California v. Darrell Rideaux
  (Case No. ZM013902)
  Testified at trial, 3/14/11, Los Angeles County, California

---

[1]  Dr. Cohen testified in matters involving dangerousness, the presence and/or absence of mental illness, mental health treatment, the effects of mental illness on daily function, and the need for LPS conservatorship, at the Los Angeles Superior Mental Heath Courthouse, and the Los Angeles Superior Court at the Clara Shortridge Foltz Criminal Justice Center from 3/1/10 to 6/15/11. Testimony was given in additional cases in 2009, but had no records allowing reconstruction of the specifics of these cases when first asked to prepare such a list in May 2011.

7

**EXPERT TESTIMONY, CONT.**

- State of California v. Scott Clay
  (Case No. ZM013515)
  Testified at trial, 4/6/11, Los Angeles County, California

- State of California v. Micah Pendleton
  (Case No. ZM016443)
  Testified at trial, 4/27/11, Los Angeles County, California

- State of California v. Bertram Dominguez
  (Case No. ZM007339)
  Testified at trial, 6/2/11, Los Angeles County, California

- State of California v. John Lowe
  (Case No. ZM016637)
  Testified at trial, 6/14/11, Los Angeles County, California

- Reuben and Mayumi Ishii v. Sears Corporation
  (Case No. SACV 10-00832-JVS) Testified at deposition, 7/6/11, United States
  District Court, Central District of California

- United States v. Larry Lujan
  (Case No. CR 05-924 RB)
  Testified at trial, 8/4/11, United States District Court, District of New Mexico

- State of California v. Mario Grimaldi
  (Case No. ZM017063)
  Testified at trial, 9/20/11, Los Angeles County, California

- United States v. Larry Lujan
  (Case No. CR 05-924 RB)
  Testified at penalty phase, 10/3/11, United States District Court, District of New
  Mexico

- State of California v. Cecilia Trujillo
  (Case No. ZM004255)
  Testified at trial, 10/13/11, Los Angeles County, California

- State of California v. James Hubbard
  (Case No. ZM013438)
  Testified at trial, 11/14/11, Los Angeles County, California

- State of California v. Lael Battle
  (Case No. ZM013315)
  Testified at trial, 11/28/11, Los Angeles County, California

8

**EXPERT TESTIMONY, CONT.**

- <u>State of California v. Marbel Galvez</u>
  (Case No. PJ46936)
  Testified at evidentiary hearing, 1/5/12, Los Angeles County, California

- <u>State of California v. John Doe</u>
  (Case No. ZM021938)
  Testified at trial, 1/17/12, Los Angeles County, California

- <u>State of California v. Sean Hinman</u>
  (Case No. ZM010340)
  Testified at trial, 1/18/12, Los Angeles County, California

- <u>State of California v. Rodney Ward</u>
  (Case No. ZM014708)
  Testified at trial, 1/27/12, Los Angeles County, California

- <u>State of California v. Phillip Despain</u>
  (Case No. ZM013903)
  Testified at trial, 7/18/12, Los Angeles County, California

- <u>State of California v. Reginald Domingo</u>
  (Case No. SA073207)
  Testified at evidentiary hearing, 8/9/12, Los Angeles County, California

- <u>James and Kathleen Ruigomez v. PG&E, a Corporation</u>
  (Case No. 499864)
  Testified at deposition, 9/13/12, San Mateo County, California

- <u>Gregory, Mary, Adam, and Alexa Tafralis v. PG&E, a Corporation</u>
  (Case No. 499864)
  Testified at deposition, 10/18/12, San Mateo County, California

- <u>Watthika and Panaka Chea v. PG&E, a Corporation</u>
  (Case No. 499864)
  Testified at deposition, 11/6/12, San Mateo County, California

- <u>State of California v. Jewel Stuart</u>
  (Case No. ZM018010)
  Testified at trial, 1/16/13, Los Angeles County, California

- <u>State of California v. Dmitry Sheyko</u>
  (Case No. BA383606)
  Testified at trial, 2/27/13, Los Angeles County, California

- <u>State of California v. Barbara Grady</u>
  (Case No. PA067902)
  Testified at trial, 4/24/13, Los Angeles County, California

**EXPERT TESTIMONY, CONT.**

- State of California v. John Bloodworth
  (Case No. YA079410-01)
  Testified at evidentiary hearing, 6/4/13, Los Angeles County, California

- State of California v. Jeffrey Stewart
  (Case No. ZM008685)
  Testified at trial, 10/16/13, Los Angeles County, California

- State of California v. Manuel Suarez
  (Case No. ZM017750)
  Testified at trial, 12/3/13, Los Angeles County, California

- State of California v. James Hubbard
  (Case No. ZM013438)
  Testified at trial, 12/5/13, Los Angeles County, California

- Kimberly Arnold v. Pfizer, Inc.
  (Case No. 3:10-CV-01025-CV)
  Testified at deposition, 1/29/14, United States District Court, District of Oregon

- State of California v. Shakir Azeem
  (Case No. ZM013234)
  Testified at trial, 1/30/14, Los Angeles County, California

- United States v. David Kalai
  (Case No. CR 11-930(A) TJH)
  Testified at competency hearing, 2/24/14, United States District Court, Central District of California

- State of California v. Fernando Gonzalez
  (Case No. ZM011953)
  Testified at trial, 4/1/14, Los Angeles County, California

- William Michael Dennis v. Kevin Chappell
  (Case No. C 98-21027 JF)
  Testified at deposition, 4/9/14, United States District Court, Northern District of California

- State of California v. Frank Palisi
  (Case No. ZM021930)
  Testified at trial, 5/7/14, Los Angeles County, California

- State of California v. Frank Palisi
  (Case No. ZM021930)
  Testified at trial, 5/7/14, Los Angeles County, California

**EXPERT TESTIMONY, CONT.**

- State of California v. Eduardo Vasquez
  (Case No. ZM021646)
  Testified at trial, 5/29/14, Los Angeles County, California

- Kimberly Arnold v. Pfizer, Inc.
  (Case No. Case No. 10-CV-1025-AC)
  Testified at trial, 6/11/14, United States District Court, District of Oregon,
  Portland Division

- Cindi Bright v. Russell Investments and Brian Golob
  (Case No. 12-2-37570-4)
  Testified at deposition, 6/18/14, King County, WA

- Cindi Bright v. Russell Investments
  (Case No. 12-2-37570-4)
  Testified at trial, 7/29/14, King County, WA

- State of California v. Jeffrey Stewart
  (Case No. ZM008685)
  Testified at trial, 10/7/14, Los Angeles County, California

- United States v. Daniel Christian Stanley Powell
  (Case No. 13-CR-98-JLS)
  Testified at trial, 11/4-11/5/14, United States District Court, Central District of
  California

- Tyler Remsen v. Norco Industries Inc. and Top-Line Industrial Products, Inc.
  (Case No. RIC 1216135)
  Testified at deposition, 11/20/14, Riverside County, California

- State of California v. Shakir Azeem
  (Case No. ZM013234)
  Testified at trial, 1/15/15, Los Angeles County, California

- Carrie Moss v. Knowledge Universe Education, LLC; KinderCare Learning Centers
  (Case No. 2:14-CV-03846)
  Testified at deposition, 1/19/15, United States District Court, Central District of
  California

- Joseph Juraszek v. University Behavioral Health of Denton and Asad Islam, M.D.
  (Case No. 2012-71249-431)
  Testified at trial, 2/5/15, 431st Judicial District Court, Denton County, Texas

- State of California v. Richard Lucero
  (Case No. ZM021419)
  Testified at trial, 2/10/15, Los Angeles County, California

**EXPERT TESTIMONY, CONT.**

- <u>Carrie Moss v. Knowledge Universe Education, LLC; KinderCare Learning Centers</u>
  (Case No. 2:14-CV-03846)
  Testified at trial, 3/13/15, United States District Court, Central District of California

- <u>State of California v. Afano Segi</u>
  (Case No. ZM011363)
  Testified at trial, 4/6/15, Los Angeles County, California

- <u>Robert Wascher v. Southern California Permanente Medical Group</u>
  (Case No. 30-2011-00523323-CU-WT-CJC)
  Testified at trial, 6/4/15, Orange County, California

- <u>Christine Ross v. San Diego Gas & Electric</u>
  (Case No. 2008-00093080A)
  Testified at deposition, 7/8/15, San Diego County, California

- <u>Frederick Ronald Thomas, Jr. v. City of Fullerton, et al.</u>
  (Case No. 30-2012-00581299 CU-PO-CJC)
  Testified at deposition, 8/31/15, Orange County, California

- <u>State of California v. Troy Pines</u>
  (Case No. ZM026037)
  Testified at trial, 9/22/15, Los Angeles County, California

- <u>Lorena Guia v. Smart & Final Stores, LLC.</u>
  (Case No. BC554278)
  Testified at deposition, 3/17/16, Los Angeles County, California

- <u>RSCR Inland, Inc. v. State of California Department of Public Health</u>
  (Case No. RIC1407237)
  Testified at deposition, 4/28/16, Riverside County, California

- <u>RSCR Inland, Inc. v. State of California Department of Public Health</u>
  (Case No. RIC1407237)
  Testified at trial, 6/22-6/23/16, Riverside County, California

- <u>Ronald Karsin v. Sheppard, Mullin, Richter & Hampton, LLP</u>
  (Case No. 1220050157)
  Testified at deposition, 7/6/16, Los Angeles, California, Arbitration

- <u>United States v. Julien Jitt Noel</u>
  (Case No. CR 15-173-2 GHK)
  Testified at evidentiary hearing, 8/10/16, United States District Court, Central District of California

**EXPERT TESTIMONY, CONT.**

- <u>Ronald Karsin v. Sheppard, Mullin, Richter & Hampton, LLP</u>
  (Case No. 1220050157)
  Testified at arbitration hearing, 8/16/16, Los Angeles, California

- <u>United States v. Robert Jackson, et al.</u>
  (Case No. CR 13-6743-CaliforniaS)
  Testified at trial, 8/18/16, United States District Court, Central District of California

- <u>Talbert Mitchell v. SEIU Local 721, et al.</u>
  (Case No. BC575572)
  Testified at deposition, 12/29/16, Los Angeles County, California

- <u>Kim Meline v. State of Washington Department of Social and Health Services</u>
  (Case No. 13-2-13022-5)
  Testified at deposition, 1/23/17, Pierce County, Washington

- <u>Hannah Rubenstein v. The Residences at Royal Bellingham, Inc.</u>
  (Case No. EC064881)
  Testified at deposition, 2/28/17, Los Angeles County, California

- <u>State of California v. John Bloodworth</u>
  (Case No. YA079410-01)
  Testified at trial, 5/4/17, Los Angeles County, California

- <u>State of California v. Alexander Sirlo</u>
  (Case No. ZM023903)
  Testified at trial, 5/8/15, Los Angeles County, California

- <u>Kim Meline v. State of Washington Department of Social and Health Services</u>
  (Case No. 13-2-13022-5)
  Testified at trial, 6/12/17, Pierce County, Washington

- <u>Laurie Carranza v. California Department of Corrections and Rehabilitation</u>
  (Case No. CIVRS1201373)
  Testified at deposition, 8/14/17, San Bernardino County, California

- <u>State of California v. Brent Bateman</u>
  (Case No. LA073310)
  Testified at evidentiary hearing, 9/13/17, Los Angeles County, California

- <u>Tyler Shane v. KB Recovery, Inc. DBA KB Recovery Addiction Treatment Center</u>
  (Case No. BC577278)
  Testified at deposition, 9/25/17, Los Angeles County, California

**EXPERT TESTIMONY, CONT.**

- <u>Talbert Mitchell v. SEIU Local 721, et al.</u>
  (Case No. BC575572)
  Testified at trial, 10/31/17-11/1/17, Los Angeles County, California

- <u>Marylin Castillo et al. v. King Taco Restaurant, Inc., et al.</u>
  (Case No. BC560096)
  Testified at deposition, 12/11/17, Los Angeles County, California

- <u>Dominic Archibald v. County of San Bernardino, Kyle Woods, William Kelsey</u>
  (Case No.  5:16-cv-01128)
  Testified at deposition, 2/9/18, United States District Court, Central District of California

- <u>Marylin Castillo et al. v. King Taco Restaurant, Inc., et al.</u>
  (Case No. BC560096)
  Testified at trial, 2/13/18, Los Angeles County, California

- <u>Eliana Alvarez v. King Baby Studio, Inc., et al.</u>
  (Case No. BC639674)
  Testified at deposition, 5/14/18, Los Angeles County, California

- <u>SG Homecare, Inc. v. Verio Healthcare, Inc., et al.</u>
  (Case No. 30-2015-00819810-CU-CO-CJC)
  Testified at deposition, 11/1/18, Orange County, California

- <u>Jason Migas v. State of California</u>
  (Case No. CIVDS1608477)
  Testified at deposition, 1/7/19, San Bernardino County, California

- <u>Alfredo Zamudio v. CEC Entertainment, Inc.</u>
  (Case No. BC671188)
  Testified at deposition, 6/28/19, Los Angeles County, California

- <u>Mara Pelsman v. Gateways Hospital and Mental Health Center, et al.</u>
  (Case No. BC699392)
  Testified at deposition, 7/18/19, Los Angeles County, California

- <u>Serena Yang v. Colony American Finance, et al.</u>
  (Case No. 18-2344-MCS)
  Testified at deposition, 7/25/19, Los Angeles, California, Arbitration

- <u>Serena Yang v. Colony American Finance, et al.</u>
  (Case No. 18-2344-MCS)
  Testified at arbitration hearing, 7/31/19, Los Angeles, California

**EXPERT TESTIMONY, CONT.**

- <u>State of California v. Patrick Lee Barris</u>
  (Case No. 8CJ02744)
  Testified at evidentiary hearing, 11/5/19, Los Angeles County, California

- <u>Rafaela Velasquez v. Legal Aid Foundation of Los Angeles</u>
  (Case No. BC693192)
  Testified at deposition, 11/11/19, Los Angeles County, California

- <u>Lisette Higareda v. Honda North America, Inc. et al.</u>
  (Case No. BC583268; BC587056)
  Testified at deposition, 12/12/19, Los Angeles County, California

- <u>Marzieh Salehi v. Cedars-Sinai Medical Center</u>
  (Case No. 1220062143)
  Testified at deposition, 1/21/20, Los Angeles, California, Arbitration

- <u>Secretary of Labor, U.S. Dept. of Labor v. UHS of Denver, Inc.</u>
  (OSHRC Docket No. 19-0550)
  Testified at deposition, 10/21/20, remotely from Beverly Hills, California

- <u>Darren Gales v. California Department of Corrections and Rehabilitation-Ventura Youth Correctional Facility</u>
  (Case No. 2:19-cv-05025)
  Testified at deposition, 11/16/20-11/17/20, Solano County, California

- <u>Jefferey Lurner v. American Golf and Country Clubs</u>
  (Case No. 30-2018-00992342-CU-CR-CJC)
  Testified at deposition, 11/18/20, Orange County, California

- <u>Kris Doe and Nate Doe v. Bridges to Recovery, LLC, et al.</u>
  (Case No. 2:20-cv-00348-SVW-SK)
  Testified at deposition, 12/14/20, remotely from Beverly Hills, California

- <u>Malcom J. Robbins v. Robert L. Ayers</u>
  (Case No. CV 91-04768-TJH)
  United States District Court, Northern District of California, Western Division;
  Testified at deposition, 3/30/21, remotely from Beverly Hills, California

- <u>Cynthia Moroyoqui v. Solstice Senior Living, LLC, et al.</u>
  (Case No. 20-2185-MCS)
  Testified at deposition, 5/5/21, remotely from Beverly Hills, California

- <u>State of California v. Brent Bateman</u>
  (Case No. LA073310)
  Testified at trial, 5/13/21, Los Angeles County, California

**EXPERT TESTIMONY, CONT.**

- <u>Cynthia Moroyoqui v. Solstice Senior Living, LLC, et al.</u>
  (Case No. 20-2185-MCS)
  Testified at arbitration hearing, 5/14/21, remotely from Beverly Hills, California

- <u>Destiny Ortiz and Sabrina Morgan v. Cedar Fair L.P., et al.</u>
  (Case No. 30-2019-01098356-CU-OE-CJC)
  Testified at deposition, 5/24/21, remotely from Beverly Hills, California

- <u>Secretary of Labor, U.S. Department of Labor v. UHS of Denver, Inc.</u>
  (OSHRC Docket No. 19-0550)
  Testified at trial, 6/17/21 and 6/21/21, Denver, Colorado

- <u>Secretary of Labor, U.S. Department of Labor v. UHS of Fuller, Inc., et al.</u>
  (OSHRC Docket No. 20-0032)
  Testified at trial, 8/9/21-8/10/21, Boston, Massachusetts

- <u>Secretary of Labor, U.S. Dept. of Labor v. UHS of Centennial Peaks, LLC.</u>
  (OSHRC Docket No. 19-1579)
  Testified at deposition, 8/17/21, remotely from Beverly Hills, California

- <u>David J. John v. L.S. McEwen, Warden</u>
  (Case No. 2:12-CV-05174-DMG-PLA)
  Testified at evidentiary hearing, 8/18/21, United States District Court, Central District of California

- <u>Secretary of Labor, U.S. Dept. of Labor v. UHS of Centennial Peaks, LLC.</u>
  (OSHRC Docket No. 19-1579)
  Testified at trial, 9/21/21, Denver, Colorado

- <u>John RF Doe and John RR Doe v. The Roman Catholic Archbishop of Los Angeles</u>
  (Case No. BC695758)
  Testified at deposition, 10/8/21, remotely from Beverly Hills, California

- <u>Glenda Rodger v. Los Angeles County</u>
  (Case No. BC697083)
  Testified at deposition, 10/14/21, remotely from Beverly Hills, California

- <u>Jefferey Lurner v. American Golf and Country Clubs</u>
  (Case No. 30-2018-00992342-CU-CR-CJC)
  Testified at trial, 10/20/21-10/21/21, Orange County, California

- <u>Pratiksha Patel v. Tungsten Network, Inc.</u>
  (Case No. 2:20-cv-07603-RGK-JEM)
  Testified at deposition, 10/22/21 and 10/26/21, remotely from Beverly Hills, California

**EXPERT TESTIMONY, CONT.**

- <u>Glenda Rodger v. Los Angeles County</u>
  (Case No. BC697083)
  Testified at trial, 11/3/21, Los Angeles, California

- <u>United States v. Donna Givens, et al.</u>
  (Case No. EDCR20-0075-JAK)
  Testified at evidentiary hearing, 11/4/21, Los Angeles, California

- <u>Monica Barnett v. Costco Wholesale Corporation</u>
  (Case No. 2:20-cv-4896)
  Testified at deposition, 11/23/21, remotely from Beverly Hills, California

- <u>Margarita Ramirez v. World Oil Corp.</u>
  (Case No. 20STCV22351)
  Testified at deposition, 1/21/22, remotely from Beverly Hills, California

- <u>Martha Chavez v. El Pollo Loco</u>
  (Case No. 20STCV27473)
  Testified at deposition, 2/3/22, remotely from Beverly Hills, California

- <u>John CM Doe, a minor, by and through his Guardian ad Litem, Jane LM Doe v. Norwalk Unified School District, et al.</u>
  (Case No. 19STCV10390)
  Testified at deposition, 2/25/22, remotely from Beverly Hills, California

- <u>Los Angeles Thoracic and Cardiovascular Association v. Merrill Lynch, et al.</u>
  (Case No. 18-0109)
  Testified at arbitration hearing, 3/3/22, 3/4/22, 3/10/22, 3/11/22 remotely from Beverly Hills, California

- <u>Margarita Ramirez v. World Oil Corp.</u>
  (Case No. 20STCV22351)
  Testified at trial, 4/19/22, Los Angeles, California

- <u>Alexander Cordova v. Silver Lake Medical Center, et al.</u>
  (Case No. BC668462)
  Testified at deposition, 4/21/22, remotely from Beverly Hills, California

- <u>John CM Doe, a minor, by and through his Guardian ad Litem, Jane LM Doe v. Norwalk Unified School District, et al.</u>
  (Case No. 19STCV10390)
  Testified at trial, 5/3/22-5/4/22, Norwalk, California

- <u>United States v. Cau Hong, et al.</u>
  (Case No. 2:20-cr-00110-GW)
  Testified at evidentiary hearing, 5/19/22, Santa Ana, California

17

**EXPERT TESTIMONY, CONT.**

- <u>Victoria DeLara and Lydia DeLara v. Motel 6, et al.</u>
  (Case No. PSC1901273)
  Testified at deposition, 6/2/22 and 6/9/22, remotely from Beverly Hills, California

- <u>United States v. Cau Hong, et al.</u>
  (Case No. 2:20-cr-00110-GW)
  Testified at evidentiary hearing, 6/22/22, Santa Ana, California

- <u>Elisa Scalari v. Edoardo Baldi, et al.</u>
  (Case No. YRBXS)
  Testified at deposition, 7/7/22, remotely from Las Vegas, Nevada

- <u>Elisa Scalari v. Edoardo Baldi, et al.</u>
  (Case No. YRBXS)
  Testified at arbitration hearing, 7/14/22, Los Angeles, California

- <u>Vanessa Bryant et al. v. County of Los Angeles</u>
  (Case No. 2:20-cv-09582-JFW-E)
  Testified at deposition, 8/2/22, remotely from Beverly Hills, California

- <u>John Sylvester Penny v. City of Los Angeles, et al.</u>
  (Case No. 2:20-cv-07211 DMG)
  Testified at deposition, 8/9/22, remotely from Beverly Hills, California

- <u>Ernesto Rodriguez v. BNSF Railway Company</u>
  (Case No. 18CECG00679)
  Testified at deposition, 8/24/22, remotely from Beverly Hills, California

- <u>Efrain Ramirez v. Owens Premier, Inc.</u>
  (Case No. 20STCV40357)
  Testified at deposition, 9/28/22, remotely from Beverly Hills, California

- <u>Osama Assaad-Nasr v. State of California Department of Transportation</u>
  (Case No. BC698405)
  Testified at deposition, 10/15/22, remotely from Beverly Hills, California

- <u>Ashanty Gilewski v. San Diego County Credit Union</u>
  (JAMS Ref. No.: 1240024663)
  Testified at deposition, 12/14/22, remotely from Beverly Hills, California

- <u>Estate of Oral Nunis, Sr., By and Through Roxie A. Nunis, As Successor In Interest to the Estate, et al. v. City of Chula Vista, et al.</u>
  (Case No. 21-CV-1627-AJB-DEB)
  Testified at deposition, 1/3/23, remotely from Beverly Hills, California

**EXPERT TESTIMONY, CONT.**

- <u>Ashanty Gilewski v. San Diego County Credit Union</u>
  (JAMS Ref. No.: 1240024663)
  Testified at deposition, 1/4/23, remotely from Beverly Hills, California

- <u>Ashanty Gilewski v. San Diego County Credit Union</u>
  (JAMS Ref. No.: 1240024663)
  Testified at arbitration hearing, 1/31/23, San Diego, California

- <u>Joanna Poppink v. Sally Assin, et al.</u>
  (Case No. BC709341)
  Testified at deposition, 2/2/23, remotely from Beverly Hills, California

- <u>Mary Gordon v. County of Orange, et al.</u>
  (Case No. SACV14-01050 CJC (DFMx))
  Testified at deposition, 2/9/23, remotely from Beverly Hills, California

- <u>Rick Espindola v. Wismettac Asian Foods, Inc.</u>
  (Case No. 2:20-cv-03702-PA-E)
  Testified at trial, 2/13/23, Santa Ana, California

- <u>Jane LT Doe, et al. v. Doe 1, et al.</u>
  (Case No. 30-201901095453-CU-03-NJC)
  Testified at trial, 2/14/23, 2/16/23, 2/21/23, Fullerton, California

- <u>Joanna Poppink v. Sally Assin, et al.</u>
  (Case No. BC709341)
  Testified at trial, 2/24/23, Van Nuys, California

- <u>Gayl Abbey v. The Milken Family Foundation, et al.</u>
  (Case No. 21STCV37404)
  Testified at deposition, 3/15/23, remotely from Beverly Hills, California

- <u>Julia Rosner v. Shayke, Inc., et al.</u>
  (Case No. 20STCV06098)
  Testified at deposition, 4/3/23, remotely from Beverly Hills, California

- <u>Maritza Garcia v. Trinet HR II Holdings, Inc.</u>
  (JAMS Ref. No.: 1240024328)
  Testified at arbitration hearing, 4/6/23 and 6/30/23,  Los Angeles, California

- <u>Cassidy Vogel v. Uber Technologies, Inc.</u>
  (Case No. 30-2020-01148139-CU-PA-CJC)
  Testified at deposition, 4/13/23, remotely from Beverly Hills, California

- <u>In re LPS Conservatorship of Emily J. Hoxie</u>
  (Case No. 23NWMH00075)
  Testified at trial, 4/18/23, Norwalk, California

19

**EXPERT TESTIMONY, CONT.**

- Crystal Carver v. JFK Memorial Hospital, et al.
  (Case No. PSC1803426)
  Testified at deposition, 4/19/23, remotely from Beverly Hills, California

- Julia Rosner v. Shayke, Inc., et al.
  (Case No. 20STCV06098)
  Testified at trial, 4/26/23, Van Nuys, California

- Osama Assaad-Nasr v. State of California Department of Transportation
  (Case No. BC698405)
  Testified at trial, 4/28/23, Los Angeles, California

- Ramiro Huerta v. County of Tulare, et al.
  (Case No. 1:17-cv-01446- DAD-EPG)
  Testified at deposition, 5/22/23, remotely from Beverly Hills, California

- Dawn Barr and Brian Barr v. Jade Valerie Iverson and Nicole Connors
  (Case No. PSC2003735)
  Testified at deposition, 5/26/23, remotely from Beverly Hills, California

- Joaquin Galdamez v. Primary Color Systems Corporation
  (Case No. 30-2021-01182553-CU-WT-CJC)
  Testified at deposition, 6/19/23, remotely from Beverly Hills, California

- Petar Marovic and Rosy Marovic v. Joseph Florentine and Robin Florentine
  (Case No. 30-2018-010050830CU-UD-CJC)
  Testified at deposition, 6/22/23, remotely from Beverly Hills, California

- Richard Pastore v. AutoZone West, Inc., et al.
  (Case No. 21STCV01261)
  Testified at deposition, 7/24/23, remotely from Beverly Hills, California

- Angel Lujan v. Dover Pump Solutions Group, et al.
  (Case No. 20STCV09522)
  Testified at deposition, 8/2/23, remotely from Beverly Hills, California

- Arlyne Magallanez v. Maximus Human Services, Inc., et al.
  (Case No. 30-2019-01097593-CU-WT-NJC)
  Testified at deposition, 8/7/23, remotely from Beverly Hills, California

- Sonia Ortega v. Frontier Communications Corporation, et al.
  (Case No. 19STCV31223)
  Testified at deposition, 8/18/23, remotely from Beverly Hills, California

- Maurilio Wilcox v. Molina Healthcare, Inc., et al.
  (Case No. 21STCV07894)
  Testified at deposition, 8/24/23, remotely from Beverly Hills, California

**EXPERT TESTIMONY, CONT.**

- Art Hernandez, et al. v. County of Los Angeles
  (Case No. 19stCV33158)
  Testified at deposition, 9/5/23, remotely from Beverly Hills, California

- Jose Vigil v. Consolidated Precision Products, et al.
  (Case No. 21STCV21320)
  Testified at deposition, 9/6/23, remotely from Beverly Hills, California

- Scott McLaughlin v. Holland L.P.
  (Case No. 37-2021-00022311- CU-BT-NC)
  Testified at trial, 9/12/23, San Diego, California

- Maurilio Wilcox v. Molina Healthcare, Inc., et al.
  (Case No. 21STCV07894)
  Testified at trial, 9/12/23 and 9/13/21, Los Angeles, California

- Dylan Blaze Huerta v. Monika Arakse Mkhitaryan, et al.
  (Case No. 21STCV44417)
  Testified at deposition, 9/22/23, remotely from Beverly Hills, California

- Jane Roe v. Costco Warehouse Corp.
  (Case No. 30-2018-01037436-CU-OE-CJC)
  Testified at deposition, 9/24/23, remotely from Beverly Hills, California

- E.T. v. Orange County Social Services Agency, et al.
  (Case No. 30-2022-01242907-CU-PO-CJC)
  Testified at deposition, 10/13/23, remotely from Beverly Hills, California

- E.A. v. Orange County Social Services Agency, et al.
  (Case No. 30-2022-01242907-CU-PO-CJC)
  Testified at deposition, 10/13/23, remotely from Beverly Hills, California

- Richard Pastore v. AutoZone West, Inc., et al.
  (Case No. 21STCV01261)
  Testified at trial, 10/26/23, Los Angeles, California

- Joseph Gerardi v. Ken Grody Redlands, LLC.
  (Case No. CIVDS2019997)
  Testified at deposition, 11/7/23, remotely from Beverly Hills, California

- Aaron Nguyen, et al. v. City of Garden Grove, et al.
  (Case No. 8:210cv-01775)
  Testified at deposition, 12/4/23, remotely from Beverly Hills, California

- Crystal Carver v. JFK Memorial Hospital, et al.
  (Case No. PSC1803426)
  Testified at trial, 12/19-12/20/23, Palm Springs, California

**EXPERT TESTIMONY, CONT.**

- <u>Yael Rios v. National Railroad Passenger Corporation</u>
  (Case No. 34-2020-00288579)
  Testified at deposition, 12/27/23, remotely from Beverly Hills, California

- <u>Griselda Garcia v. Perfect 10 Antenna Company</u>
  (Case No. 5:23-cv-00318 GW(KKx))
  Testified at deposition, 2/1/24, remotely from Beverly Hills, California

- <u>John Doe v. County of Orange, et al.</u>
  (Case No. 30-2022-01286908 CU-NP-CJC))
  Testified at trial, 2/14/24, Santa Ana, California

- <u>Martha Chavez v. El Pollo Loco</u>
  (Case No. 20STCV27473)
  Testified at trial, 2/15/24, Los Angeles, California

- <u>Justin Smith v. City of La Verne, et al.</u>
  (Case No. 2:23-cv-00644)
  Testified at deposition, 3/21/24 and 4/11/24, remotely from Beverly Hills, California

- <u>Estate of Oral Nunis, Sr., By and Through Roxie A. Nunis, As Successor In Interest to the Estate, et al. v. City of Chula Vista, et al.</u>
  (Case No. 21-CV-1627-AJB-DEB)
  Testified at trial, 4/25/24, San Diego, California

- <u>Estate of Samuel Herrera, Jr., et al. v. County of Los Angeles, et al.</u>
  (Case No. 21STCV36013)
  Testified at deposition, 5/13/24, remotely from Beverly Hills, California

- <u>Justin Smith v. City of La Verne, et al.</u>
  (Case No. 2:23-cv-00644)
  Testified at trial, 5/14/24, Riverside, California

- <u>Andrew Risk v. United Airlines, et al.</u>
  (Case No. 22STCV37268)
  Testified at deposition, 5/20/24, remotely from Beverly Hills, California

- <u>Sajith Weerasinghe v. Cedars-Sinai Medical Center</u>
  (Case No. 22STCV35760)
  Testified at deposition, 5/24/24, remotely from Beverly Hills, California

- <u>Sajith Weerasinghe v. Cedars-Sinai Medical Center</u>
  (Case No. 22STCV35760)
  Testified at trial, 6/14/24, Los Angeles, California

**EXPERT TESTIMONY, CONT.**

- <u>Sebastian Forbes, et al. v. City of Pasadena</u>
  (Case No. 22STCV30042)
  Testified at deposition, 7/11/24, remotely from Beverly Hills, California

- <u>David Argueta v. The Amaad Institute, et al.</u>
  (Case No. 23STCV09780)
  Testified at deposition, 8/7/24, remotely from Beverly Hills, California

- <u>Robert Coyle v. County of Los Angeles, et al.</u>
  (Case No. 21STCV27463)
  Testified at deposition, 9/19/24, remotely from Beverly Hills, California

- <u>Jane Roe v. Costco Warehouse Corp.</u>
  (Case No. 30-2018-01037436-CU-OE-CJC)
  Testified at trial, 11/18/24, Orange, California

- <u>Gustavo Munoz v. Walmart, Inc.</u>
  (Case No. 5:23-cv-01154)
  Testified at deposition, 11/26/24, remotely from Beverly Hills, California

- <u>In re Justin James Merriman, On Habeas Corpus</u>
  (Capital Case No. S097363)
  Testified at evidentiary hearing, 12/11/24, Ventura, California

- <u>Jennifer Brear Brinker v. AXOS Bank and John Tolla</u>
  (Case No. 3:22-cv-00386-MMA-DDL)
  Testified at deposition, 12/19/24 and 1/9/25 remotely from Beverly Hills, California

- <u>John Doe v. Dye Precision, Inc.</u>
  (Case No. 37-2022-00047300-CU-OE-CTL)
  Testified at deposition, 1/7/25 and 1/16/25, remotely from Beverly Hills, California

- <u>Roberto Garcia v. Pipeline Carriers, Inc.</u>
  (Case No. CIVDS2018643)
  Testified at deposition, 1/7/25, remotely from Beverly Hills, California

- <u>Jane FSC Doe v. Franklin-McKinley School, et al.</u>
  (Case No. 22CV398130)
  Testified at deposition, 2/11/25, remotely from Beverly Hills, California

- <u>Leslie Guy v. Trinity Youth Services</u>
  (JAMS Case No. 5220000572)
  Testified at deposition, 3/7/25, remotely from Beverly Hills, California

**EXPERT TESTIMONY, CONT.**

- <u>Leslie Guy v. Trinity Youth Services</u>
  (JAMS Case No. 5220000572)
  Testified at arbitration, 3/13/25, Los Angeles, California

- <u>Kandi Arnhold v. United States</u>
  (Case No. 19-1407)
  Testified at deposition, 3/14/25, remotely from Beverly Hills, California

# EXHIBIT 2

# VIDA L. THOMAS

1811 10th Avenue, Sacramento, California 95818

**(916) 306-8371**                                                        vida@oiglaw.com

---

**LEGAL EMPLOYMENT**   **Oppenheimer Investigations Group ♦** Berkeley, CA
January 2020 – Present

Managing Partner and Co-Owner
Conduct independent workplace investigation for public and private employers. Supervise attorney investigators.  Conduct employee training regarding harassment, discrimination and retaliation prevention, diversity and inclusion, and how to conduct workplace investigations. Served as legal counsel to public agency discipline appeal boards during employee discipline appeal hearings.  Served as hearing officer in public agency discipline appeal hearings. Served as expert witness in state and federal employment lawsuits.

**Stoel Rives, LLP ♦** Sacramento, CA
March 2018 – January 2020

Of Counsel and Head of California Employment Unit
Conducted outside workplace investigations for public and private employers. Conducted Title IX and Title 5 investigations for public and private colleges and universities, community colleges, and K-12 school districts.  As the head of the firm's California employment practice unit, provided employment advice and counseling for private sector employers concerning compliance with federal and California employment and wage and hour laws. Conducted employee training on topics including sexual harassment, discrimination and retaliation prevention, how to conduct workplace investigations, and diversity and inclusion. Served as legal counsel to public agency discipline appeal boards during employee discipline appeal hearings.  Served as hearing officer in public agency discipline appeal hearings.

**Weintraub Tobin Chediak Coleman Grodin ♦** Sacramento, CA
November 2014 – February 2018

Of Counsel and Head of Investigations Unit
Conducted workplace investigations for public and private employers.  Provided employment advice and counseling for private sector employers concerning compliance with federal and state employment and wage and hour laws.

**Carlsen Thomas, LLP ♦** Sacramento, CA
January 2000 – April 2013

Co-owner of a boutique employment law firm providing employment advice, independent work place investigations and employee training.

**Kronick, Moskovitz, Tiedemann &** Girard ♦ Sacramento, CA
June 1993 – December 1999

<u>Associate and Senior Associate</u>
Worked in the Employment and Labor Litigation section handling all phases of litigation in discrimination, harassment, retaliation and wrongful termination lawsuits filed against public and private employers in state and federal courts, conducting workplace investigations, and employee training.

**PRIOR NON-LEGAL EMPLOYMENT**

**Sacramento First National Bank** ♦Sacramento, CA
Construction Loan Processor ♦ September 1987 – March 1991
Maintained portfolio of residential loans from loan origination to completion of construction.

**The Golden 1 Credit Union** ♦ Sacramento, CA
Mortgage Loan Processor ♦ September 1986 – September 1987
Handled home loans from application through submission to escrow.

**EDUCATION**

University of the Pacific, McGeorge School of Law
*Juris Doctor, 1993*
California State University, Sacramento
*B.S. Degree in Business Administration, 1990*

**PROFESSIONAL & COMMUNITY ACTIVITIES**

- Pacific McGeorge School of Law Diversity & Inclusion Advisory Committee, 2019 to Present
- San Joaquin SHRM, Board Member, 2015 to Present
- Association of Workplace Investigators Teaching Faculty, 2016 to Present
- AWI Board Member, 2011-2012, 2023-present
- AWI Best Practices Committee Chair, 2011-2012
- Sacramento Employer Advisory Council, Board Chair, 2007-2008
- Pacific McGeorge School of Law Alumni Board Member, 2006-2008
- Wiley Manual Bar Association of Sacramento, Treasurer, 2007
- Anthony M. Kennedy Inn of Court, Associate Member, 2000 and 2001
- Sacramento County Bar Association Minority Hiring and Retention Committee, Chair - 1998/99, Co-Chair – 1999/2000
- California State Bar Ethnic Minority Relations Committee, 1997/1998
- Chemical Dependency Center for Women, Board Chair, 1999 and 2000

**HONORS & AWARDS**
♦ Best of the Bar – Sacramento Business Journal – 2017
♦ Women Who Men Business – Sacramento Business Journal – 2023
♦ Champions for DEI Award – Sacramento Business Journal – 2024
♦ Top Women Lawyers – California Daily Journal – 2024

**PUBLISHED ARTICLES**

- Comstock's – *Migroaggression or Dog Whistle? What They are and How to Tell the Difference*, November 2021
- SHRM – *Viewpoint: Tips for Creating Virtual Anti-Harassment Training During the Pandemic* with Christina Ro-Connolly, August 25, 2020
- Bloomberg Law – *"INSIGHT: Conducting Effective Workplace Investigations Without The Workplace,"* with Alezah Trigueros,, Issue date: August 13, 2020

**QUOTED COMMENTS**

- *KRON 4 News* – *"Colleague of San Jose VTA shooter feared he might 'go postal."* Air date: June 10, 2021
- *Daily Journal* – *"Remote working hasn't lessened worker disputes, lawyers say."* Issue date: November 13, 2020

**TRAININGS**

- Unconscious Bias in a Law School Environment for McGeorge School of Law 1L Students – August 2022 and August 2023
- One-Day Investigations Training – University of Cape Town, South African – May 2022 & October 2023
- Diversity & Inclusion Training for Wescom Credit Union – February 27, 2020
- Diversity & Inclusion Training for Diamond Pet Foods – September 2019
- Two-Day Workshop on Advanced Workplace Investigation Technique, for the County of San Luis Obispo – July 2018
- One-Day Workshop on Advanced Workplace Investigation Techniques, for California Employment Development Department – March 2018
- One-Day Workshop on Conducting Effective Workplace Investigations, for California Employment Development Department – January 2016
- One-Day Workshop on Conducting Effective Workplace Investigations, for various Weintraub Tobin Clients – March 3, 2016
- Two-Day Workshop on Conducting Effective Workplace Investigations, for the Santa Clara Valley Transit Agency – July 23-24, 2015
- One-Day Workshop on Conducting Effective Workplace Investigations, for the California Employment Development Department – January 2015
- One-Day Workshop: Mastering the Art of Employment Investigations, for the Labor and Employment Section of the Bar Association of San Francisco and the California Association of Workplace Investigators – June 1 and 3, 2010
- Half-Day Pre-Conference Training Program: How to Conduct Employment Investigations, for the State Bar of California Labor and mployment Law Section Annual Meeting – October 22, 2009

**SPEAKING ENGAGEMENTS**

- ELearn Webinar: Workplace Investigations – CA Public Employers Labor Relations Association
  September 2022

Page 32

September 2023

- ***Microaggression or Dog Whistle? How to Differentiate and Investigate"*** *for Fresno SHRM – March 30, 2022*
- **"*Microaggression or Dog Whistle? How to Differentiate and Investigate*"** for CALPELRA Annual Conference with Christina Ro-Connolly – November 17, 2021
- **"*Microaggression or Dog Whistle? How to Differentiate and Investigate*"** for the AWI Annual Conference, with Christina Ro-Connolly – October 14, 2021
- ***"Understanding and Reducing Unconscious Bias*** for the CalSHRM's 2021 Califonnia State HR Advocacy & Legislative Conference – April 16, 2021
- ***"The Latest Developments in Title IX Investigations, Including Navigating the Intersection of Race & Gender"*** for the Berkeley Center for Comparative Equality and Anti-Discrimination Law 2021 Conference on Sexual Harassment in Education, with Natasha Baker and Nyoki Sacramento – January 29, 2021
- ***"Dynamex and AB 5: What Do They Mean for the Arts?"*** for the Wedding Planners International Association – February 20, 2020
- ***"Developments in Sexual Harassment Law"*** for the Berkeley Center for Comparative Equality and Anti-Discrimination Law – February 7, 2020
- ***"Dynamex and AB 5: What Do They Mean for the Arts?"*** for the Capitol Film      Arts Alliance – January 21, 2020
- ***"Why I Learned to Love AB 5"*** for  the Sacramento County Bar Association Board & Leadership Retreat – January 11, 2020
- ***"The Calm After the Storm? Post-Investigation Issues"*** for the San Joaquin SHRM Annual Conference – January 8, 2020
- **"*Do Generous Leave Policies Contribute to Pay Disparities?"*** for Northstate SHRM Annual Conference – October 9, 2019
- ***"Dynamex and AB 5: What Do They Mean for the Arts?"*** for the California Arts Coalition – December 2019
- ***"Removing Inherent Bias from Employment Decisions"*** for San Joaquin SHRM – August 14, 2019
- ***"Independent Contractor Status and the Arts"*** for California Lawyers for the Arts – June 2019
- **"*Do Generous Leave Policies Contribute to Pay Disparities?"*** for Central California SHRM Annual Conference – March 12, 2019
- ***"Managing the Underperformer: Discipline and Termination"*** February 28, 2019
- ***"Supervisors: Train Them or . . . They'll Cost You"*** for the Northstate SHRM Annual Conference – October 2018
- ***"Supervisors: Train Them or . . . They'll Cost You"*** for the CalSHRM Legislative Conference – April 2018
- ***"Workplace Investigations Basics"*** with Terri Abad Levenfeld, for the Association of Workplace Investigators – April 11, 2018
- ***"Beyond the Basics: Advanced Workplace Investigations Techniques"*** for Central California SHRM Annual Conference – March 8, 2018
- ***"Internal Investigations and Attorney-Client Privilege: How it is Preserved or Refuted",*** for NBI, Inc. – January 2018

- *"Tough, Tougher, Toughest: Navigating Difficult Situations in Interviews"* with Amy Oppenheimer and Alezah Trigueros, CALPELRA Annual Conference – April 2017
- *"The Immigration Landscape for the California Employer"* for the San Joaquin SHRM – February 22, 2017
- *"Behind the Doors of the HR Office,"* for the Greater Stockton Employer Advisor Council – September 18, 2015
- *"Improve Your Workplace Investigations"* for Women in Winesense – September 16, 2015
- *"Conducting Better Workplace Investigations"* for the Central Valley SHRM – August 19, 2015
- *"It Was Colonel Mustard in the Library: Workplace Investigations"* for CalSHRM Annual Conference – June 19, 2015
- *"The Basics of Investigating Workplace Complaints of Harassment, Discrimination and Retaliation"* for the California State Bar Cyber Institute – January 6, 2011
- *"How to Conduct an Effective Workplace Investigation"* for the California Employers Association – August 11, 2010
- *"Workplace Investigations: How to Make Them Legal and Fair"* for the Sacramento Employer Advisory Council - March 3, 2009
- *"Workplace Investigations: How to Make Them Legal and Fair"* for the California Association of Equal Rights Professionals' Annual Conference – June 6, 2008
- *"Sending the Right Message: Investigating Workplace Discrimination and Harassment"* for the Pacific McGeorge School of Law Alumni Association MCLE Program – January 12 and 26, 2008

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 2121 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067.

On March 21, 2025, I served true copies of the following document(s) described as:

**DEFENDANTS' DISCLOSURE OF EXPERT TESTIMONY PURSUANT TO FED. R. CIV. P. 26(A)(2)**

on the interested parties in this action as follows:

| | |
|---|---|
| Carney R. Shegerian | *Attorneys for Plaintiff* |
| Mahru Madjidi | ALEX VILLANUEVA |
| John David | |
| Alex DiBona | Tel.: (310) 860-0770 |
| Angie Escalante (Staff) | Fax: (310) 860-0771 |
| Calendar Clerk | Email: CShegerian@Shegerianlaw.com |
| SHEGERIAN & ASSOCIATES, INC. | MMadjidi@Shegerianlaw.com |
| 11520 San Vicente Boulevard | JDavid@Shegerianlaw.com |
| Los Angeles, CA 90049 | YCardoza@Shegerianlaw.com |
| | ADiBona@shegerianlaw.com |
| | aescalante@shegerianlaw.com |
| | calendarclerk@shegerianlaw.com |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address swilliamson@millerbarondess.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 21, 2025, at Los Angeles, California.

/s/ *Steven Williamson*
_____
Steven Williamson

# EXHIBIT 2

# MARC A. COHEN, M.D., M.S.
## FORENSIC CONSULTANT IN PSYCHIATRY AND BEHAVIORAL SCIENCES

**MARC A. COHEN, M.D.**
**A PROFESSIONAL CORPORATION**

333 S. Beverly Drive
Suite 200
Beverly Hills, California  90212

Tel. No.:  (310) 724-5500
Fax No.:  (310) 836-3002

Email:
MCMD@MAC.COM
MACohen@mednet.ucla.edu

**Executive Assistant**

Heidi Keyes
Tel. No. (310) 498-5997
E-Mail: mcmd_office@icloud.com

April 8, 2025

Jason H. Tokoro, Esq.
Miller Barondess LLP
2121 Avenue of the Stars, 26th Floor
Los Angeles, California 90067

Re:  Alex Villanueva v. County of Los Angeles, et al.
(Case No. 2:24-cv-04979-SVW-JC)

Dear Mr. Tokoro,

At your request, I have conducted a forensic psychiatric evaluation of Alex Villanueva, including a face-to-face examination on 3/26/25, in order to determine what, if any, mental damage or emotional harm Alex Villanueva experienced as a result of his exposure to the Los Angeles County Board of Supervisors, Esther Lim, Max Huntsman, and others, including but not limited to his claims that the aforementioned individuals impacted his reputation and re-election campaign as Los Angeles County Sheriff.  My examination was conducted in a private conference room located at 468 N. Camden Drive, Beverly Hills, California.  The examination was video recorded in its entirety. The examination took place over 6.65 hours, excluding a break for lunch; starting at 10:26 A.M. and ending at 6:00 P.M.  I have included my curriculum vitae, the complete transcript of my psychiatric examination, and the Personality Assessment Inventory (PAI) Clinical Interpretive Report as Appendices to this report.

My intention is to supplement this report with details from additional deposition testimony, medical records, or any other information that may be forthcoming.  I also intend to prepare demonstrative exhibits for use at trial, which will be drawn from this report, from the video recording of my examination, from the Appendices and sources identified below, or from any new information that may be forthcoming.  As always, my opinions are subject to change in the event that I learn of additional evidence or learn that any of the important factual bases of my opinions are incorrect.

While I do not accept the statements of the plaintiff or witnesses at face value, please note that I have generally avoided the awkward convention of inserting the words "said" or "reported" into every sentence derived from my evaluation. All evaluation data other than my own observations of behavior are understood to be as reported by the plaintiff or other identified witnesses.

## QUALIFICATIONS

I am a physician duly licensed to practice medicine in the States of California and Washington.  Before matriculating to medical school, I obtained a Master's of Science degree in Physiological Science from the University of California, Los Angeles.  I received a medical degree from the Keck School of Medicine at the University of Southern California in 2003.  I completed my psychiatric residency at the University of California, Los Angeles-San Fernando Valley Psychiatry Residency Training Program, and thereafter completed a fellowship in forensic psychiatry at the University of California, Los Angeles.  I am board certified in psychiatry and forensic psychiatry by the American Board of Psychiatry and Neurology.  I am an Associate Clinical Professor of Psychiatry and Biobehavioral Sciences and an Assistant Dean at the UCLA School of Medicine.  I am also employed as a staff psychiatrist at Olive View-UCLA Medical Center.  I am approved by the Superior Court of California in Los Angeles County as a psychiatric expert and serve as an expert and consultant to the Mental Health Court in Los Angeles County on a weekly basis.  As a forensic psychiatrist, I have conducted over 400 forensic examinations ("IMEs") assessing mental damage and emotional harm, and have testified as an expert witness on psychiatric matters in criminal and civil cases in both State and federal court.  I have also lectured and given presentations on multiple occasions and on a variety of subjects in the field of psychiatry.  In addition to these activities, I also maintain a private clinical practice in Beverly Hills, California.  My fees in working on this matter are being billed at my customary private rate of $700 per hour.  My credentials are set forth fully in my curriculum vitae, a copy of which is attached as Appendix 1.

## SOURCES OF INFORMATION

Litigation-related Material

- Complaint For Damages, 6/13/24
- First Amended Complaint For Damages, 9/30/24
- Answer to First Amended Complaint, 12/10/24
- Responses to Interrogatories

Los Angeles Sheriff's Department (LASD)

(1) Correspondence

- Letter, From Alex Villanueva to Hilda Solis, Regarding Ethical Violations of First District Justice Esther Lim, 2/9/21 (AV010545)

- Letter, From Alex Villanueva to Hilda Solis, Regarding Ethical Violations of Justice Deputy Esther Lim, 3/4/22

- Letter, From Robert Luna, 10/23/23 (143-144)

(2) Press Conferences: Video Recordings

- 3/29/22 re Allegations of a Coverup
- 4/26/22 re False Claims of a Disgruntled Employee
- 10/26/22 re Attorney General's Investigation

(3) Facebook Live Video Recordings: Sheriff Alex Villanueva

- 3/26/22
- 7/13/22
- 5/17/23
- 6/28/23
- 8/16/23
- 9/6/23
- 2/7/24
- 2/28/24
- 3/13/24
- 3/27/24
- 4/24/24
- 6/12/24
- 9/18/24
- 9/25/24
- 10/2/24
- 12/4/24

(4) Investigation Material: Max Huntsman's Claims of Harassment, et al.

- Custody Investigative Services Unit (CISU) Assessment Form (COLA002402-2404)
- Intake Assessment Form, 3/16/22 (COLA002409-2416)
- Audio Recording, Interview of Max Huntsman, 3/29/22

(5) Investigation Material: Esther Lim's Claims of Harassment, et al.

- Letter, From Esther Lim To Vickey Bane, 3/8/22 (COLA002405-2408)
- Intake Assessment Form, 3/17/22 (COLA002417-2426)
- Audio Recording, Interview of Esther Lim, 3/30/22
- Custody Investigative Services Unit (CISU) Assessment Form (COLA002399-2401)

(6) Administrative Investigation Interview Requests

- Ct. Ron Kopperud to Alejandro (Alex) Villanueva, 1/4/22 (COLA002427)
- Ct. Ron Kopperud to Alejandro (Alex) Villanueva, 1/4/23 (COLA002428)

(7) Investigator's Logs (COLA002429-2434)

(8) Investigative Report, Internal Affairs Bureau, 3/15/23, (No. 2558097) (COLA002035-2118)

(9) Investigative Report, Internal Affairs Bureau, 3/15/23 (No. 2558101) (COLA002120-2198)

(10)   Investigation Report, Sanders Roberts, LLP, 5/18/23 (COLA002388-2398)

(11)  Investigation Report, Sanders Roberts, LLP, 5/19/23 (COLA002376-2383)

(12)  Office Correspondence, Sergio Escobedo, Acting Commander, 10/17/23 (145-148)

(13)  Email Messages

Investigative Interviews: Christine Diaz-Herrera, Esq.

(1) Interviews: Video Recordings

- Max Huntsman, 7/21/22
- Eshter Lim, 7/28/22
- Veronica Pawlowski, 8/11/22

(2) Interviews: Written Summaries

- Esther Lim, 7/28/22
- Kyla Coates, 8/4/22
- Veronica Pawlowski, 8/11/22

(3) E-mail Messages

Newspaper Articles: Los Angeles Times

- "L.A. County's sheriff has a strange obsession with how much media coverage Black people get," 3/24/22

- "Editorial: The Villanueva saga just gets odder, more destructive," 4/1/22

- "Sheriff Villanueva makes ugly, unfounded claim against county watchdog," 4/1/22

- "Claim alleges Villanueva directed coverup of deputy kneeling on inmate - Los Angeles Times," 4/25/22

- "Claim alleges Sheriff Villanueva directed cover-up of deputy kneeling on inmate," 8/25/22

- "L.A. Times protests sheriff's criminal leak investigation against reporter," 8/26/22

- "Alex Villanueva, L.A.'s loosest cannon and pettiest cop," 9/16/22

- "Sheriff Villanueva is at war with nearly everyone. Will it cost him his job?," 10/21/22

- "What Sheriff Villanueva got right (and why it wasn't enough)," 12/4/22

- "Do Not Rehire:' Panel finds Villanueva violated county discrimination, harassment policies," 1/31/24

Medical Records

- PIH Health (partially redacted)

Deposition Testimony: Transcripts and Exhibits

- Constance Marie Komoroski, Esq., 2/27/25
- Alex Villanueva, 2/28/25
- Christine Diaz-Herrera, Esq., 3/5/25
- Ann Devane, 3/6/25
- Max Huntsman, 3/7/25
- Roberta Yang, 3/10/25
- Gilbert Carrillo, 3/11/25
- Laureen Perri, 3/13/25
- Sergio Escobedo, 3/14/25
- Nick Wilson, 3/18/25
- Esther Lim, 3/21/25
- Laura Lecrivain, 3/25/25
- Kyla Coates, 3/26/25
- Mercedes Cruz, 3/28/25

Deposition Testimony: Video Recording

- Alex Villanueva, 2/28/25

Miscellaneous Material

- "Meet Sheriff Alex Villanueva, the Donald Trump of L.A. Law Enforcement," Los Angeles Magazine, 7/19/19

- Revised Motion, Supervisors Hilda Solis and Holly Mitchell, 7/27/21

- Letter, "Taking Action -- Further Protections for Surviving Families From Law Enforcement Harassment and Retaliation," Fesia Davenport, 10/5/21

- "Live and Unscripted," Deputy Gangs, KFI AM 640, 3/6/22

- Public Request to Address the Board of Supervisors County of Los Angeles, 7/13/22

- "Sheriff: Holding the Thin Blue Line in a Deep Blue State," 2024; Alex Villanueva

- Video Recordings, Facebook Live, Alex Villanueva

- Text Messages

Plaintiff's Experts

(1) Jessica Rowe, Psy.D.

- Report, 3/18/25
- Appendix to 3/18/25 Report

(2) Rebecca Udell, M.F.T., Ph.D.

- Biopsychosocial Assessment
- Curriculum Vitae

(3) Nigel Kennedy, M.D., Ph.D.

- Report, 3/20/25

**SYNPOSIS**

On 12/3/18, Alex Villanueva was sworn in as Los Angeles County's 33rd Sheriff, replacing Jim McDonnell, whom he defeated in the November 2018 election.[1,2]  On 12/3/22, Robert Luna was sworn in as Los Angeles County's 34th Sheriff, having defeated Alex Villanueva in the November 2022 election.[3]  On 3/8/22, Esther Lim, Justic Deputy for L.A. County Supervisor Hilda Solis, issued a complaint against Alex Villanueva alleging discrimination, harassment, retaliation, and inappropriate conduct.[4]  L.A. County Counsel engaged the law firm Sanders Roberts LLP to conduct an investigation into the allegations against Alex Villanueva.[5]  Interviews of witnesses were conducted, as enumerated below.  Alex Villanueva did not

---

[1]   **SEE** First Amended Complaint For Damages, 9/30/24, at p. 9
[2]   **NOTE**: Alex Villanueva obtained 1,310,780 votes for Sheriff compared to 1,169,184 votes for Jim McDonnell; or 52.85% of voters voted for Alex Villanueva for Sheriff compared to 47.15% of voters, who voted for Jim McDonnell [**FOUND AT:**  https://results.lavote.gov/#year=2018].
[3]   **NOTE**: Robert Luna obtained 1,370,837 votes for Sheriff compared to 867,029 votes for Alex Villanueva; or 61.26% of voters voted for Robert Luna for Sheriff compared to 38.74% of voters, who voted for Alex Villanueva [**FOUND AT:** https://results.lavote.gov/#year=2022].
[4]   Letter, From Esther Lim To Vickey Bane, 3/8/22, at COLA002405-2408
[5]   **SEE** Investigation Report, Sanders Roberts, LLP, 5/18/23, at COLA002388-2398; and Investigation Report, Sanders Roberts, LLP, 5/19/23, at COLA002376-2383

participate in an interview.[6,7]  Based on the investigation, the Sheriff's Department determined that the following allegations were "founded:" discrimination based on gender and ethnicity;[8] third person harassment;[9] inappropriate conduct towards others; and retaliation.[10]  Based on these findings, the Los Angeles County Equity Oversight Panel recommended a "Do Not Hire" notation be placed at the top of Alex Villaneuva's personnel file.[11]  On 1/31/24, the Los Angeles Times published an article, "Do Not Rehire': Panel finds Villanueva violated county discrimination, harassment policies."[12]  In response to the County Equity Oversight Panel's "Do Not Rehire" designation, Alex Villanueva emailed the following statement to the L.A. Times, "This is but another brazen attempt by the Board of Supervisors to engage in electioneering to influence the outcome of the race for 4TH District supervisor. Much like the special hearings of the Civilian Oversight Commission, this unprecedented effort by the county is neither supported by fact or the rule of law."[13]  On 3/5/24, Alex  Villanueva ran for the Board of Supervisors but lost his bid to replace Janice Hahn as a board member representing the County's 4TH district.[14]

On 6/13/24, Alex Villanueva filed a Complaint For Damages against the Board of Supervisors, Esther Lim, Max Huntsman, and others, claiming the following seven causes of action: 1) violation of due process; 2) violation of the first amendment; 3) violation of California Government Code §3060; 4) defamation, libel, and slander; 5) coerced self-defamation; 6) intentional infliction of emotional distress; and 7) negligent infliction of emotional distress.[15,16]

On 9/30/24, Alex Villanueva filed a First Amended Complaint for Damages, in stating in-part:  "This action was undertaken with actual malice. . . This was done purely to retaliate against political speech that the County did not like and to hurt

---

[6]    **NOTE:**  During my examination, Alex Villanueva stated: "One, [Laura Lecrivain] lied out her ass throughout [her deposition] and had such a cavalier disinterest in the truth and fairness, that it's just frightening to behold.  **I mean, they never interviewed me for this thing**. . .**They tried to pretend that they reached out by email and I refused**. . .And then fast forward to today, I found out she's saying that I refused to be interviewed.  And Laura Lecrivain -- I just heard it yesterday, and this kept me up all night last night -- 'Oh, yeah, he refused to participate in the interviews.'  She has my own number in her phone.  So did all the department people that ever touched this case [**SEE** T., Alex Villanueva, at pp. 155-156].

[7]    **DISCREPANCY:**  On 1/9/23, Alex Villanueva wrote the following email message to Christine Diaz-Herrera: "**I received two certified letters regarding interview requests** for incidents that allegedly happened in March of last year.  In order to properly respond, I will ask you to submit your questions in writing, after providing a brief description of what the allegations are, and then I will reply with counsel.  This is the first I have heard of anyone reaching out to me, so please use this email address for all communications. Regards, Alex Villanueva" [**SEE** Email, Alex Villanueva to Christine Diaz-Herrera, 1/9/23, at COLA001892].

[8]    Office Correspondence, Sergio Escobedo, Acting Commander, 10/17/23, at 145

[9]    Office Correspondence, Sergio Escobedo, Acting Commander, 10/17/23, at 146

[10]    Office Correspondence, Sergio Escobedo, Acting Commander, 10/17/23, at 147

[11]    Office Correspondence, Sergio Escobedo, Acting Commander, 10/17/23, at 147

[12]    **FOUND AT:** https://www.latimes.com/california/story/2024-01-31/do-not-rehire

[13]    **SEE** https://www.latimes.com/2024-01-31/do-not-rehire

[14]    **NOTE:** Janice Hahn obtained 173,324 votes compared to 84,259 votes for Alex Villanueva; or 57.80% of voters voted for Janice Hahn compared to 28.10% of voters, who voted for Alex Villanueva [**FOUND AT:** https://results.lavote.gov/ 2024].

[15]    **SEE** Complaint For Damages, 6/13/24, at pp. 1-19

[16]    **NOTE:** On 9/22/23, Alex Villanueva's Complaint was dismissed in federal court [**SEE** https://www.latimes.com/california/story/2024-09-23/].

Villanueva's political prospects  [Alex] Villanueva did not harass defendant Huntsman or defendant Lim, and the County of Los Angeles, as well as Huntsman and Lim themselves, knew this.  This lawsuit is Villanueva's attempt to clear his name, vindicate his reputation, and be made whole for the emotional distress defendants' actions have caused him."[17]

## ANALYSIS

## ACCOUNTS OF EXPOSURE TO BOARD OF SUPERVISORS AND OTHERS

Account No. 1: 2024

> Now looking at the big picture since 2018, I can state without reservation the board sought to weaponize every resource in county government against me and my administration, and for one illegitimate purpose: avoid criminal accountability.  **The CEO, the COC, the OIG, county counsel, the county's Human Resources director, the Medical Examiner-Coroner, the District Attorney, the director of the Department of Children and Family Services, a handful of disgruntled department executives, and a variety of non-profits who receive support from the board of supervisors, all worked hand in hand and at**[18] the direction of the board of supervisors to convince voters I was some sort of evil human being that needed to be removed from office.[19]

> The language they all used was conspicuously vague: "he resisted oversight," or "he defied subpoenas," "refused to be held accountable," or my favorite "he obstructed independent investigations."[20]  Six years later, looking back it's easy to see how it was all a game of branding the new kid on the block, with the LA Times serving as the faithful scribe to the board.  Probably the only person on earth who faced the same or greater degree of scrutiny than I did was former president Trump, who LA Magazine once compared me to by calling me the "Trump of LA."[21]

> **Six years later, not a single accusation has been proven true**.[22] **Not one.** The only thing that has been proven far beyond a reasonable doubt is the county feared an honest sheriff in office, and **they did everything in their power to get me out of office**.  A full 40% of the board was under criminal investigation, and the state AG ensured that our investigations would not be completed.  The Homeless Industrial Complex, a term I popularized in office, has received billions

---

[17]    **SEE** First Amended Complaint For Damages, 9/30/24, at p. 4
[18]    Sheriff: Holding The Thin Blue Line In A Deep Blue State," Alex Villanueva, 2024; found at p. 435
[19]    *Ib.*; found at p. 436
[20]    *Ib.*; found at p. 436
[21]    *Ib.*; found at p. 436
[22]    *Ib.*; found at p. 436

in taxpayer funds over the years, with the homeless crisis growing like clockwork.[23]

Governor Newsom recently acknowledged not knowing where the state spent over $20 billion in homeless funding, and I'd be willing to bet the county doesn't know either -- all the more reason not to have an honest, proactive sheriff in office with the authority to investigate crime and a willingness to ask questions.[24]

The board of supervisors over the years has expressed an interest in continuing to consolidate power within their offices, and a desire to dismantle the LASD, breaking it up into little pieces they can control.[25] **By illegally using the power of the purse strings, the board has telegraphed their desire to continue defunding the department**, **close Men's Central Jail without a replacement**, **create a county-run Department of Corrections**, **appoint a county Chief of Police to run patrol**, **and strip the sheriff's duties down to little more than process server and bailiff**. The cost in lives alone would be staggering, but that seems of little concern to the board bent on destroying the LASD for their personal gain. The money they think they will be saving will be showered upon all the politically connected non-profits and their highly paid boards of directors.[26]

One hundred and seventy-four years of history serving the good people of Los Angeles County means nothing to the five little queens, whose only interest is expanding their empire.[27] **The department remains the most understaffed law enforcement agency in the**[28] United States, and what the good men and women of the LASD accomplish under hostile working conditions is nothing short of a miracle.[29]

Now that I think about it, what we accomplished in four years of my administration was nothing short of a miracle either, as it was done under a constant barrage of attacks.[30] As the political establishment ran around claiming OMG this or OMG that, our people were busy serving the community, sometimes at great cost. **As the Times ignored every good thing that happened between 2018 to 2022**,[31] the informed people in the community didn't. Unfortunately,

---

23  *Ib.*; found at p. 436
24  *Ib.*; found at p. 437
25  *Ib.*; found at p. 438
26  *Ib.*; found at p. 438
27  *Ib.*; found at p. 438
28  *Ib.*; found at p. 438
29  *Ib.*; found at p. 439
30  *Ib.*; found at p. 439
31  **DISCREPANCY:** On 12/4/22, the Los Angeles Times Editorial Board published an article titled, "What Sheriff Villanueva got right (and why it wasn't enough)," writing: "Villanueva's most obvious on-target policy was to remove federal immigration officials from county jails. He saw, just as Los Angeles Police Department leaders saw decades earlier and state lawmakers more

the results of the re-election campaign are proof that lawfare works when the **mainstream media works in collusion with county government**, never casting a critical eye on the sources of information they rely on or the obvious conflicts of interest they chose to ignore.  Public opinion can be manipulated, especially when unlimited taxpayer funds can facilitate it.[32]  As the dust has settled, it is now obvious the LASD is facing an existential crisis, one that threatens the safety of every resident in Los Angeles County.  Vivian and I rode a massive roller coaster from Day One in office, with highs and lows along the way that will be etched in our memories forever.  Our first beloved lab, Alvin, passed away in 2020 of old age.  We welcomed our[33] new lab Simon, who is a rescue, and he continued the tradition Alvin set as the department's top dog, bringing a smile to the face of all he encountered.[34]

My life experience has taught me that evil-doers never prevail in the long run.[35]  When faced with adversity, the Good Lord has always shown me a way forward, and as said in Romans 5:3:5, "We Rejoice in Our Suffering, Knowing that Suffering Produces Endurance, and Endurance Produces Character, and Character Produces Hope, and Hope Does Not Disappoint Us."[36]

Account No. 2: 3/26/25

During my examination, Alex Villanueva provided the following account of his exposure to the Los Angeles County Board of Supervisors and others.  Boldface has been added to call attention to Alex Villanueva's responses.

Well, it's a -- it was a dream job in many senses, with a horrific downside. . .Well, the LA County is probably the most corrupt local government in the entire nation.[37]

\*          \*          \*

---

recently, that residents -- even those in jail -- must be able to approach local law enforcement agents without fear that doing so will make them or their families targets for deportation. U.S. Immigration and Customs Enforcement agents have their jobs to do, and sheriff's deputies have theirs. They do them best while staying out of each other's way.  Villanueva understood the needs of the county's immigrant and working-class families in other ways as well.  He correctly noted that the most serious theft problem in the county is not high-profile crimes such as shoplifting, but wage theft -- when employers refuse to pay workers what they owe them, to the tune of about $26 million a week in Los Angeles County alone" [**SEE** Los Angeles Times, "What Sheriff Villanueva got right (and why it wasn't enough)," 12/4/22].

[32]  *Ib.*; found at p. 439
[33]  *Ib.*; found at p. 439
[34]  *Ib.*; found at p. 440
[35]  *Ib.*; found at p. 440
[36]  *Ib.*; found at p. 440
[37]  Transcript, Forensic Psychiatric Examination of Alex Villanueva by Marc A. Cohen, M.D., M.S., 3/26/25, at p. 137 [Hereinafter cited as T., Alex Villanueva]

**L.A. County is the most corrupt local government in the entire nation**.[38] We far surpass Chicago in terms of corruption. It's not even close anymore.  You look at all the -- look at all the investigations, all the indictments, all the convictions of elected officials in both city and county.[39]  **You look at the -- the malfeasance, the sole-source contracting, the insider deals, the sweetheart deals, elected officials that, no matter how bad they do, they can never seem to be voted out of office**.  It's -- it's a lot of concentrated corruption, which made my job exponentially harder than it[40] should have been.[41]

\*        \*        \*

Yeah, it was -- it was a -- it was a hell in its own right for -- only because of the actions of the Board.[42]  The job itself, complicated.  But for someone who has spent, you know, my entire adult life in the organization, I knew how everything worked and how we could make it work better, and we did.  But it didn't matter what I did.  Everything I did was countered with, "Oh, my God this," or "Oh, my God that."[43]  And it was a -- **it was like one of those Chinese tortures where you dig a grave and fill it up, dig it, fill it up, dig it, fill it up**.[44]

\*        \*        \*

**They weaponized every resource at their disposal to convince the -- the voters that I was some monster**, **and I could not be trusted, I was rogue, I was a criminal, I was a gang member**.  **I mean, they threw everything they had at me**.[45]

\*        \*        \*

Oh, that's exactly what they were doing to the media.[46]  In fact, on this -- in this lawsuit, a prime example, Esther Lim, one of the complainants, she authored a motion that Hilda Solis put to vote, and the Board approved it, basically, finding ways to make sure that we don't retaliate or harass family members whose loved ones were killed at the hands of law enforcement.[47]  **She made the entire thing up because Hilda Solis asked us to investigate claims of harassment by deputies**.[48]  And we, in good faith, did that

---

[38]  T., Alex Villanueva, at p. 137
[39]  T., Alex Villanueva, at p. 137
[40]  T., Alex Villanueva, at p. 137
[41]  T., Alex Villanueva, at p. 138
[42]  T., Alex Villanueva, at p. 138
[43]  T., Alex Villanueva, at p. 138
[44]  T., Alex Villanueva, at p. 138
[45]  T., Alex Villanueva, at p. 138
[46]  T., Alex Villanueva, at p. 139
[47]  T., Alex Villanueva, at p. 139
[48]  **DISCREPANCY:** On 7/13/22, during a public request to address the board of supervisors, Jaylene Rea made the following comments: "My name is Jaylene Rea[.]  I am a resident of district one and I will speaking on agenda 12.  My 18-year-old brother Paul Rea was killed by the East Los Angeles sheriffs on June 27th 2019 and [I'm] here to say that I support agenda item 12. We have demanded for years that sheriff Villanueva and his officers need to be held accountable! [H]e has went against everything he has ever promised the people.  Time after [t]ime we ask for

investigation.  And we chased down every single watch commander, service counter report we had on the matter.  We talked to every single complainant.  This investigation was, like, 600 pages.  And we concluded that there was no merit to any of it.  None.  We couldn't find no matching video, no evidence.[49]

One video that they claim was looking at, they're harassing, it was a -- it was a picture of a -- a CHP cruiser going through the neighborhood.[50]  **Every complaint from the citizens, turns out they were residents**.  **They were angry at gang members loitering in front of their house, when they had these little makeshift memorials where, you know, one of their loved ones died in a deputy-involved shooting**.[51,52]  It's -- **the citizens were angry at them because they were urinating**, you[53] know, in front of their house and making an ass of themselves.[54]  That's what they were upset at.[55]  So we laid all this out.  We gave it to Hilda Solis.  And what does she do?  **She crafts a motion that basically using the authority of her position as supervisor and the Board of Supervisors that telegraphed it, "Look, deputies harassing and targeting people whose loved ones die in deputy-involved shooting."**[56]  And the whole thing was fake.  And they had the

---

accountability and transparency and get absolutely nothing. Besides the killing of my brother we have lave faced unwanted retaliation for fighting for Paul. I myself was arrested after releasing the name of the bandito prospect who wrongfully killed my brother. We need to overhaul a sheriff's department that has enabled deputy gangs for so long and is clearly rotten to its core. Deputy gangs are on the rise, and it's no surprise that that we have a dramatic increase in deputy shootings and record level deaths in the jails.  This is long overdue.  We need to do something big to fully investigate deputy gangs once and for all.  The charter amendment can be one important step forward.  This is not just another story or more to the story[,] this is our lives we now have to deal with because they took our loved one from us yet they treat us like we took something from them.  We will continue to fight for what is right [**SEE** Public Request to Address the Board of Supervisors County of Los Angeles, 7/13/22, at p. 5].

[49]    T., Alex Villanueva, at p. 139
[50]    T., Alex Villanueva, at p. 139
[51]    T., Alex Villanueva, at p. 139
[52]    **DISCREPANCY:** In addition to the comments made by Jaylene Rea, as detailed above, the Reform Jails L.A. Team, Sarah Bowers, Laura Smith, Maia Zander, Kristine Gerolaga, and others expressed concerns about sheriff deputies engaging in harassment and retaliation [**SEE** Public Request to Address the Board of Supervisors County of Los Angeles, 7/13/22, at pp. 67, 73, 81-82, and 84].
[53]    T., Alex Villanueva, at p. 139
[54]    T., Alex Villanueva, at p. 140
[55]    T., Alex Villanueva, at p. 140
[56]    **COMMENT:** On 7/27/21, the Board of Supervisors established the Family Assistance Program (FAP) to support families following an in-custody death or fatal use of force by law enforcement, by Supplemental Budget [**SEE** Letter, "Taking Action -- Further Protections for Surviving Families From Law Enforcement Harassment and Retaliation," Fesia Davenport, 10/5/21].   In the revised motion Supervisors Hilda Solis and Holly state: "In response to the continued complaints and concerns raised by families whose loved ones were killed by LA County Sheriff's Department (LASD) deputies, the LA County Board of Supervisors (Board) unanimously supported the May 4, 2021 motion, "Protecting Surviving Families from Law Enforcement Harassment and Retaliation" directing the Office of Inspector General (OIG) to update its 2020 report back to the Sheriff Civilian Oversight Commission (COC) regarding "incidents of harassment and intimidation experienced by surviving families" and conduct a thorough investigation with recommendation,

evidence that it was fake, and they didn't care because the idea was to drive a wedge between the sheriff's department and the community.[57]

**Convince the community that the sheriff's department is evil, that I'm a bad person**.[58]  That was but one of so many times they did that over and over again.  **They never stopped to, "Hey, is this the right thing to?"  Or, heck, I had never had a supervisor ask me, "Hey, how can we help you?"**  It was more like, "Oh, what are they doing to hurt us this week?  What's the new game."[59]

\*        \*        \*

They created the false narrative.[60]  And The Times -- they were working hand in hand with the LA Times to put these screaming articles out there. And we[61] had the information, what was the reality, but it didn't matter.[62]  It didn't fit their narrative, so it was not going to be mentioned at all. Case in point, they -- I inherited a budget deficit of $101 million; that was my starting point.[63]  By the end of my first year, I had whittled that down to 60 million.  So it's a $40 million improvement.  No, they had a hearing at the Board of supervisor[s] denouncing my inability to run the sheriff's department's budget.  And they said that my starting point was zero.  So, they literally erased $101 million deficit for my predecessor, and attributed the 60 million to me doing something, we don't know what, that I can't manage my budget.[64]

And the narrative that the LA Times ran with that -- LA Times Editorial Board ran with that.[65]  And I'm thinking, I'm actually -- I got rid of an assistant sheriff position, got rid of a chief position.  Took 14 units, collapsed them into seven units.  I cut overtime by 50 percent.[66]  I -- all the people that were relieved of duty that were not going to be terminated, I got them all back to work, so we weren't paying out all this -- I mean, I did everything the smart way to actually reduce our operational costs.  And I was labeled with the exact opposite.  In fact, when they did their endorsement of Luna on re-election, they said I couldn't manage my budget.[67]

---

working with County Counsel to "pursue legal options if there are barriers" to the OIG's ability to "fulfill its directive to report" [**SEE** Revised Motion by Supervisors Hilda Solis and Holly Mitchell, 7/27/21].

[57]   T., Alex Villanueva, at p. 140
[58]   T., Alex Villanueva, at p. 140
[59]   T., Alex Villanueva, at p. 140
[60]   T., Alex Villanueva, at p. 140
[61]   T., Alex Villanueva, at p. 140
[62]   T., Alex Villanueva, at p. 141
[63]   T., Alex Villanueva, at p. 141
[64]   T., Alex Villanueva, at p. 141
[65]   T., Alex Villanueva, at p. 141
[66]   T., Alex Villanueva, at p. 141
[67]   T., Alex Villanueva, at p. 141

And at that point, that 101 million deficit, it was a[68] $74 million surplus.[69]  That's $175 million turnaround.  And during that time, between those two goalposts, they defunded me twice. They removed 1,281 budgeted positions.  **They froze my ability to hire**, which meant that now I'm racking up overtime because I don't have people out there working because I can't hire anybody.  So the people who stayed behind got to work more to cover -- the workload didn't decrease; it actually increased.  **So I performed budgetary miracles, and all I got was kicked in the teeth by the Board** because they had no interest in the truth.[70]

*          *          *

Oh, they -- they -- by law, they were supposed to control the funding.[71]  I'm supposed to suspend it wisely. But they were putting their fingers in the pot, controlling everything, even how I spent it, which was interfering with my ability to run the department.[72]  And they did this same thing with oversight. Oh -- they're favorite line: "He resists oversight."  And I kept telling again and again, "No, no, no. Oversight is a good thing, and I'd love to have a neutral third party looking at what we're doing to make sure we're doing the right thing."[73]  That is perfectly good.  That's a good governance model. But if you're weaponizing oversight just to convince the public that the sheriff is a criminal or rogue, well, that's not oversight.  That is not. That's just a political attack[74] machine, and that is exactly what they did.[75]  **And this whole thing with putting me on the "Do Not Rehire" list, that's just a culmination of this attack machine**.[76]

*          *          *

Oh, they put -- a part of the attack machine, one of the justice deputies filed a complaint against me.[77]  The inspector general filed a complaint against me.  And this was at retaliation for things I did that was actually part of my job.  And so the County kind of investigated, it looks like, in secret.[78]  And then after I left office and I ran for the Board of Supervisors, they kind of reopened it, put a new name to it, and said, "Oh, look at, we're going to" -- **"we can't discipline him because he's no longer a member of the department.[79]  But we can put him on a 'Do Not Rehire' list.  And, hey, let's give it to the LA Times."  And of course, the LA Times ran with a screaming**

---

[68]   T., Alex Villanueva, at p. 141
[69]   T., Alex Villanueva, at p. 142
[70]   T., Alex Villanueva, at p. 142
[71]   T., Alex Villanueva, at p. 142
[72]   T., Alex Villanueva, at p. 142
[73]   T., Alex Villanueva, at p. 142
[74]   T., Alex Villanueva, at p. 142
[75]   T., Alex Villanueva, at p. 143
[76]   T., Alex Villanueva, at p. 143
[77]   T., Alex Villanueva, at p. 143
[78]   T., Alex Villanueva, at p. 143
[79]   T., Alex Villanueva, at p. 143

headline, **"Do Not Rehire**.**"**[80]  "That is -- I mean, it's just straight -- straight evil.  There's no other way to describe it.[81]

\*          \*          \*

And now I'm on the receiving end as the incumbent and -- the -- we -- at SIB, we were tracking press coverage and board actions, and **we found that 80 percent of negative board motions against the sheriff's**[82] **department happened in my four years on the job**.[83] **80 percent.**  And we went back 40 years, to figure this out, of board motions.  That tells you the amount of activity that was leveled against me.  So, you now, if I was a -- a -- paranoid, you know, that'd be something that well, it does keep me awake at night.  That's for sure.[84]

\*          \*          \*

There's an old saying that an honest man is never welcome in a den of thieves.[85]  And that was my cardinal sin.  **I was too honest for the position that I was occupying**.  I didn't look the other way when required.[86]  Now, we did that with board motions.  We also did that with LA Times coverage.  We compared the coverage of four years under McDonnell and the four years under me.  And night and day coverage.  It's the same organization, same policy, same people.  There was scandals and drama when he was in office.  There's scandals in drama when I'm in office.  There's scandals and drama when Luna has been in office.  It goes with the territory with any large organization.  Bad things are going to happen.[87]  However, the coverage from The Times is comical, it was so radically different.  They went from, I think, 30 percent negative coverage under McDonnell to 90 -- like 93 percent negative coverage under me.  And then went from like,[88] 60-something articles in four years of McDonnell to over, like, 270 or some number like that on mine.[89]  They quadrupled the coverage, and they tripled the negative coverage.  And that was not by accident.[90]

---

[80]    **NOTE:** On 1/31/24, the Los Angeles Times published an article titled, "'Do Not Rehire': Panel finds Villanueva violated county discrimination, harassment policies" [**FOUND AT:** https://www.latimes.com/].
[81]    T., Alex Villanueva, at p. 143
[82]    T., Alex Villanueva, at p. 148
[83]    T., Alex Villanueva, at p. 149
[84]    T., Alex Villanueva, at p. 149
[85]    T., Alex Villanueva, at p. 149
[86]    T., Alex Villanueva, at p. 149
[87]    T., Alex Villanueva, at p. 149
[88]    T., Alex Villanueva, at p. 149
[89]    T., Alex Villanueva, at p. 150
[90]    T., Alex Villanueva, at p. 150

**ALLEGED IMPACT FROM EXPOSURE TO SUPERVISORS AND OTHERS**

Asked to describe how the actions of the Board of Supervisors and others, whom he has identified, have affected him, Alex Villanueva replied:

> Well, I -- I grew up, you know, with the firm belief that the good guys always win in the end.[91]  You know, **the white hat is going to prevail over the black hat**.[92]  And respect for the rule of law and belief that, you know, the -- at -- in the end, the good guys overcome bad actors.  And this -- this has shaken my -- that belief.  I know it has in my wife.  Oh, my God.[93]  And for me, this is -- I'm holding on to that belief, but it's -- it's a tenuous grasp.  **You know, I spend a lot of, you know, sleepless nights just going over the things I'm hearing, the things that are said about me that I know are flat out lies.  And that's the reaction I get all the time.**[94]  People come up to me after they hear me speak or they need me in person. "Oh, my God.  You're so nice."  You know "I can't believe what they say about you."  Because all they get is, you know, what they get out of the swipe of a phone from headline or -- or a hit piece in The Times or one of the local media.[95]

**PERSONALITY ASSESSMENT INVENTORY**

The Personality Assessment Inventory (PAI) was administered to Alex Villanueva at the time of my examination on 3/26/25.  The degree to which response styles may have affected or distorted the report of symptomatology on the inventory was assessed.  Certain of these indicators fall outside of the normal range, suggesting that the respondent, Alex Villanueva, may not have answered in a completely forthright manner.  With respect to positive impression management, the pattern of responses contains subtle indications that positive impression management may be an area of concern.  In particular, he appears hesitant to acknowledge limits to his capabilities and he may repress or deny any dissatisfaction, distress, or undesirable consequences that might arise from such limitations.  With respect to negative impression management, there are subtle suggestions that the client attempted to portray himself in a negative or pathological manner in particular areas. Some concern about distortion of the clinical picture must be raised as a result; the respondent presents with certain patterns or combinations of features that are unusual or atypical in clinical populations but relatively common among individuals feigning mental disorder.  The PAI clinical profile is marked by a significant elevation on the PAR scale, indicating that the content tapped by this scale may reflect a particular area of difficulty for the respondent.  The respondent's self-description indicates significant suspiciousness and hostility in his relations with others.  He is quick to believe that he is being treated inequitably and will hold a grudge against others, even if the perceived affront is unintentional.  Because he is

---

[91]    T., Alex Villanueva, at p. 162
[92]    T., Alex Villanueva, at p. 162
[93]    T., Alex Villanueva, at p. 162
[94]    T., Alex Villanueva, at p. 162
[95]    T., Alex Villanueva, at p. 162

likely to question and mistrust the motives of those around him, working relationships with others are likely to be very strained, despite the efforts of others to demonstrate support and assistance. The respondent reports some difficulties consistent with relatively mild or transient depressive symptomatology. In particular, he appears to have experienced a change in physical functioning in a manner often associated with depression. He is likely to show a disturbance in sleep pattern, a decrease in energy and level of sexual interest, and a loss of appetite and/or weight. Despite these reported difficulties, the responses indicate that he is satisfied with himself as he is, that he is not experiencing marked distress, and that, as a result, he sees little need for changes in his behavior. Based on the response pattern, the PAI Clinical Interpretive Report did not propose a diagnostic hypothesis. However, the PAI Clinical Interpretive Report indicated that the following diagnostic hypotheses were suggested by the response pattern and could not be ruled-out: adjustment disorder with anxiety; persistent depressive disorder (dysthymia); and unspecified personality disorder with paranoid features.[96,97]

## OPINIONS

HARDINESS, DURABILITY, AND RESILIENCY

The material reviewed and analyzed above do not shed any light on Alex Villanueva's response to significant life events, such as his divorce at age 28,[98] or the deaths of his mother and father when he was 27 and 52-years-old, respectively.[99] Still, by all accounts, Alex Villanueva is a hardy, durable, and resilient person. First and foremost, Villanueva never experienced any behavioral or emotional problems as a child[100] nor has he ever engaged in any mental health treatment since he separated from his first wife.[101] Additional evidence demonstrating Alex Villanueva's hardiness and durability stem from his ability to complete basic training in the United States Air Force followed by training with the Los Angeles County Sheriff's Department,[102] and repeated exposure to a variety of stressful life events ranging from divorce,[103] serious medical problems,[104] death threats,[105] and violence while working as a patrol deputy working in East Los

---

96  **SEE** APP. 3, PAI Clinical Interpretive Report re Alex Villanueva, at pp. 1-14
97  **COMMENT:** The PAI Clinical Interpretive Report cautions the reader that the interpretive information contained in this report should be viewed as only one source of hypotheses about the individual being evaluated and decisions should never be based solely on the information contained in this report. In other words, one must consider all other sources of information before reaching any opinions about this individual, including whether or not their response pattern on the PAI is an accurate representation of their personality, problems, and behavior [**SEE** APP. 3, PAI Clinical Interpretive Report re Alex Villanueva, at p. 1].
98  T., Alex Villanueva, at p. 60
99  T., Alex Villanueva, at pp. 29 and 43-44
100 T., Alex Villanueva, at p. 54
101 **COMMENT:** Alex Villanueva may have engaged in court-ordered family therapy at some point near the time of his separation from his first wife, Carmen [**SEE** T., Alex Villanueva, at p. 81].
102 T., Alex Villanueva, at pp. 63 and 97-99
103 T., Alex Villanueva, at p. 60
104 **NOTE:** Alex Villanueva was diagnosed and treated for malignant melanoma on two independent occasions [**SEE** T., Alex Villanueva, at p. 73].
105 T., Alex Villanueva, at p. 224

Angeles.[106]  Even by his own account, Alex Villanueva views himself as a person who has successfully overcome adversity over the course of his life[107] without experiencing any adverse effects or needing to engage in mental health-related treatment.[108,109]

EMOTIONAL RESPONSE TO BOARD OF SUPERVISORS AND OTHERS

Although Alex Villanueva claims, at least by some accounts, that he has experienced a variety of negative effects,[110] Alex Villanueva has not been emotionally harmed or mentally damaged as a result of his exposure to the Los Angeles County Board of Supervisors, Max Huntsman, and others.  This opinion is based on the following evidence:

- Alex Villanueva enjoys spending time with his wife, son, and four grandchildren,[111] and "always like[s] going out to a good place with good food," such as a steak house or Italian restaurant.[112]

- Alex Villanueva attended the depositions of the following witnesses: Ann Devane,[113] a lieutenant with the Los Angeles Sheriff's Department;[114] Christine Diaz-Herrera, Esq.,[115] Max Huntsman, the Inspector General for Los Angeles County;[116] Mercedes Cruz, a member of the County Equity Oversight Panel;[117] and Sergio Escobedo, Acting Chief of Staff for LASD.[118]

- Alex Villanueva did not express making any attempts to avoid distressing memories, thoughts, feelings, or exposure to the Board of Supervisors, Max Huntsman, Esther Lim, or others.[119]

---

[106]  T., Alex Villanueva, at p. 116
[107]  T., Alex Villanueva, at p. 240
[108]  **NOTE:** During the evaluation with Jessica Rowe, Psy.D., Alex Villanueva reported experiencing a variety of adverse effects stemming from his exposure to the Los Angeles County Board of Supervisors and others, including experiencing diminished joy, diminished energy, elevated anxiety, and depression [**SEE** Report, Jessica Rowe, Psy.D., 3/18/25, at ROWE 000006-7].
[109]  **DISCREPANCY:**  During my examination, Alex Villanueva did not express having any symptoms of any kind in contrast to the symptoms and behaviors identified in the reports written by Jessica Rowe, Psy.D.; Rebecca Udell, M.F.T., Ph.D.; and Nigel Kennedy, M.D., Ph.D.
[110]  T., Alex Villanueva, at p. 243
[111]  T., Alex Villanueva, at p. 181
[112]  T., Alex Villanueva, at p. 234
[113]  Transcript, Deposition of Ann Devane, 3/6/25, at p. 3
[114]  Transcript, Deposition of Ann Devane, 3/6/25, at p. 16
[115]  Transcript, Deposition of Christine Diaz-Herrera, Esq., 3/5/25, at p. 2
[116]  Transcript, Deposition of Max Huntsman, 3/7/25, at p. 3
[117]  Transcript, Deposition of Mercedes Cruz, 3/28/25, at pp. 2 and 8
[118]  Transcript, Deposition of Sergio Escobedo, 3/14/25, at pp. 3 and 11
[119]  **COMMENT:**  Asked what, if anything, he avoids, Alex Villanueva replied, "Well, in public, you know, people recognize who I am all the time.  So I'm constantly making sure I don't put myself in situations where, you know, my family or I can be in harm's way or a hostile crowd, for example. . . Well, any event that -- that people are either protesting or anything with any organized protest where these -- the ones that came to protest to my own home -- I had Antifa, Black Lives Matter protestors at my home back in 2020.  And so any -- anything where that crowd is involved or -we keep a wide berth from them" [**SEE** T., Alex Villanueva, at p. 221].  Alex Villanueva also explained that his behavior in public settings is in part related to him receiving death threats [**SEE** T., Alex Villanueva, at p. 222].

- Asked a non-leading question about the psychological impact from his exposure to the Los Angeles County Board of Supervisors, Max Huntsman, and others, Alex Villanueva did not spontaneously express any symptoms other than occasional sleeplessness.[120]

- Alex Villanueva did not express having a foreshortened future, stating, "I'd love to be able to get to the triple, assuming I'm in good health.  You know, mobile and, you know, of sound mind."[121]

- Asked to predict his life in five years, Alex Villanueva did not express feeling hopeless or having a foreshortened future and instead stated:

  > Well, I'd like to be finishing doing something that finishes my -- my public service career in a positive light, for sure.[122]  Spending time with my wife and convincing her to let's travel beyond four days.  She doesn't like to travel much, but maybe see the rest of the world while we're -- we're still healthy.  But I'd like to end my career in public service on a positive and not a negative.[123]

- Asked to describe a typical day, Alex Villanueva did not express having any symptoms of any kind and instead described a normative experience.[124]

- Despite his reported sleep-related problems, Alex Villanueva did display any signs of chronic insomnia, such as frequent yawning or morning headaches.[125]

- Alex Villanueva does not have anger problems.[126]

- Alex Villanueva's responses on the PAI indicate that he is satisfied with himself as he is, that he is not experiencing marked distress, and that, as a result, he sees little need for changes in his behavior.[127]

- Over the course of my examination, Alex Villanueva made no attempts to avoid speaking about the events at issue in the lawsuit, including but not limited to the Board of Supervisors, Esther Lim, Max Huntsman, or others nor did he appear emotionally flooded, overwhelmed, or uncomfortable in any way.[128,129]

---

[120]  T., Alex Villanueva, at p. 162
[121]  T., Alex Villanueva, at p. 230
[122]  T., Alex Villanueva, at p. 226
[123]  T., Alex Villanueva, at p. 226
[124]  T., Alex Villanueva, at pp. 177-178
[125]  T., Alex Villanueva, at p. 232
[126]  T., Alex Villanueva, at p. 233
[127]  **SEE** APP. 3, PAI Clinical Interpretive Report re Alex Villanueva, at pp. 1-14
[128]  **SEE** Video Recording, Forensic Psychiatric Examination of Alex Villanueva by Marc A. Cohen, M.D., M.S., 3/26/25, **FOUND AT:** 03:10:12-03:18:43
[129]  T., Alex Villanueva, at pp. 137-143

- Over the course of the face-to-face examination, Alex Villanueva made a variety of quips[130] and displayed a wide range of facial expressions, including occasionally smiling, which is inconsistent with an acute depressed or anxious state.

Based on the foregoing, Alex Villanueva has not experienced any emotional harm or mental damage as a result of his exposure to the Los Angeles County Board of Supervisors, Esther Lim, Max Huntsman, and/or others.

PERSONALITY FEATURES

Although none of the plaintiff's experts who have examined Alex Villanueva have determined that he possesses maladaptive personality features, the data reviewed above leave no room for doubt that they are incorrect in these assessments.

## Antisocial Personality Disorder

The criteria for antisocial personality disorder are set forth in the *DSM-5i-TR*:

A. A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:

1. Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.
2. Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure.
3. Impulsivity or failure to plan ahead.
4. Irritability and aggressiveness, as indicated by repeated physical fights or assaults.
5. Reckless disregard for safety of self or others.
6. Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.
7. Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

B. The individual is at least age 18 years.

C. There is evidence of conduct disorder with onset before age 15 years.

D. The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or bipolar disorder.[131]

---

[130]  **NOTE:** Over the course of the examination, Alex Villanueva made a variety of quips. For example, at the conclusion of the examination, Villanueva stated. "Well, thanks for the -- the opportunity. And I wonder if I can UPS myself to my home" [**SEE** T., Alex Villanueva, at p. 252].

[131]  American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, 5th ed., Text Revision, Washington D.C.: American Psychiatric Association, 2022, at p. 748

Alex Villanueva displays the following features of antisocial personality disorder:

Repeated lying and baseless claims

Although I do not here attempt to identify each and every instance of deceitfulness, Alex Villanueva has repeatedly made false statements and baseless claims, including the following:

- Hilda Solis "made up" the issue to investigate claims of harassment by deputies.[132,133]

- The Los Angeles Times ignored "every good thing that happened between 2018 to 2022."[134,135]

- The Board of Supervisors "recruited employees to initiate lawsuits against him."[136]

- Max Huntsman is a holocaust denier.[137]

- "So what Max Huntsman wants to do, he wants to suspend the U.S. Constitution by claiming that deputies do not have the right to put a tattoo on their body."[138]

- The law firm Miller Barondess is "not interested in winning the case."[139]

- "L.A. County government is the most corrupt local government in the entire nation.  We have so far past Chicago to earn the number one spot in corruption."[140]

- "So, Mr. Bonta, it occurs to me that if you don't investigate a matter like this before you, you're actually obstructing justice yourself."[141]

- In response to the results that demonstrated Janice Hahn won the election against him for the Board of Supervisors, representing the fourth district, Alex Villanueva stated:

    There is no correlation between the results reported by the registrar/recorder and the numbers we collected as we knocked on doors, phone banked, and spoke with thousands of residents of the

---

[132]  T., Alex Villanueva, at p. 139
[133]  **SEE** Public Request to Address the Board of Supervisors County of Los Angeles, 7/13/22, at p. 5
[134]  **SEE** Los Angeles Times, "What Sheriff Villanueva got right (and why it wasn't enough)," 12/4/22
[135]  **SEE** Los Angeles Times, "What Sheriff Villanueva got right (and why it wasn't enough)," 12/4/22
[136]  T., Alex Villanueva, at p. 147
[137]  **SEE** https://www.latimes.com/opinion/
[138]  **SEE** Facebook Live Video, 5/17/23; at 5:14-6:16
[139]  **SEE** Facebook Live Video, 9/6/23; at 23:40-26:13
[140]  **SEE** Facebook Live Video, 2/28/24; at 23:20-23:48
[141]  **SEE** Facebook Live Video, 3/27/24; at 15:11-15:50

4th District. . . We will use the resources we have at our disposal to ensure the election was legitimate and the results reflect the will of the electorate.  After dealing with county government, both as sheriff and as a candidate, something is amiss and we will figure it out.  Thank you for all the time and energy you spent on the campaign trail.  Vivian and I can never repay you, and your dedication to the cause inspires us to keep pushing forward."[142,143]

Lack of remorse

- Asked to identify any failures during his term as Sheriff, Alex Villanueva replied:

  Yeah, a couple.[144]  One is I went too far too fast under the assumption that people would respect my decisions and my integrity.  I mean, I earned a nickname in patrol as a deputy as "flecha," which in Spanish means "arrow."  I never bent the rules.  I went with the facts and the evidence, and that was it.  You know, I called the balls and the strikes.  And I mistakenly [assumed] -- made the assumption that in the elected office as Sheriff, that people would realize that I don't -- I don't lie, cheat, steal or anything like that.  That's what I am and what I do.[145]

  But, oh, no.[146]  Forget it.  Because who can lie the fastest and the -- the farthest just to manipulate?  The whole thing was about branding when I was a brand new elected official.  I had to jump into -- into the pool of expert sharks with no swimming experience.  That was, literally, what it was like.  So that -- I didn't fully appreciate how bad these people were until once I was in office. So some decisions -- I still would have made the same decisions, but I would have found a way to package them[147] differently, and -- or in different order of events.[148]  Take my time and build credibility.  Because why would you assume that you have no credibility just because you walked into office?[149]

  *       *       *

  With the media.  With the elected officials.[150]  I mean, my -- they hired a law firm to sue me my first month on the job.  Who in their right

---

142   **SEE** https://lapublicpress.org/2024/
143   **DISCREPANCY:**  According to the Los Angeles County Registrar, Janice Hahn obtained 173,324 votes compared to 84,259 votes for Alex Villanueva; or 57.80% of voters voted for Janice Hahn compared to 28.10% of voters, who voted for Alex Villanueva [**FOUND AT:** https://results.lavote.gov/ 2024].
144   T., Alex Villanueva, at p. 213
145   T., Alex Villanueva, at p. 213
146   T., Alex Villanueva, at p. 213
147   T., Alex Villanueva, at p. 213
148   T., Alex Villanueva, at p. 214
149   T., Alex Villanueva, at p. 214
150   T., Alex Villanueva, at p. 214

mind would do that?  I'm, literally, walking into office one month in, they already hired a law firm to sue me.[151]

Based on the foregoing, Alex Villanueva displays features of antisocial personality disorder that includes repeated lying and a lack of remorse.

**Narcissistic Personality Disorder**

While there is some overlap between the features of antisocial and narcissistic personality disorder, individuals with narcissistic personality disorder routinely inflate their accomplishments and generally require excessive admiration. According to the *DSM-5-TR*, "Vulnerability in self-esteem makes individuals with narcissistic personality disorder very sensitive to 'injury' from criticism or defeat. Although they may not show it outwardly, criticism may haunt these individuals and may leave them feeling humiliated, degraded, hollow, and empty.  They may react with disdain, rage, or defiant counterattack."[152,153]

The criteria for narcissistic personality disorder are set forth in the *DSM-5-TR*:

A pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

1. Has a grandiose sense of self-importance (e.g., exaggerates achievements and talents, expects to be recognized as superior without commensurate achievements).
2. Is preoccupied with fantasies of unlimited success, power, brilliance, beauty, or ideal love.
3. Believes that he or she is "special" and unique and can only be understood by, or should associate with, other special or high-status people (or institutions).
4. Requires excessive admiration.
5. Has a sense of entitlement (i.e., unreasonable expectations of especially favorable treatment or automatic compliance with his or her expectations).
6. Is interpersonally exploitative (i.e., takes advantage of others to achieve his or her own ends).
7. Lacks empathy: is unwilling to recognize or identify with the feelings and needs of others.

---

[151]  T., Alex Villanueva, at p. 214

[152]  American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, 5th ed., Text Revision, Washington D.C.: American Psychiatric Association, 2022, at p. 760

[153]  **COMMENT:**  The combination of antisocial and narcissistic features is also referred to as psychopathy.  There is evidence that Alex Villanueva has many attributes of a "white collar" psychopath, including: a grandiose sense of self-worth; lack of remorse; manipulative behavior; pathological lying; and a failure to accept responsibility for his own actions [**SEE** Hare R. *Hare Psychopathy Checklist Revised*, 2nd Ed. North Tonawanda, NY: Multi-Health Systems, 2003].

8. Is often envious of others or believes that others are envious of him or her.
9. Shows arrogant, haughty behaviors or attitudes.[154]

Alex Villanueva displays the following features of narcissistic personality disorder, as detailed and defined below:

Grandiose sense of self-importance

- Alex Villanueva stated:

  ". . .Those are nuisance lawsuits. **I've won almost every single one**. . ."[155]

  \*         \*         \*

  "Well, if you take away all the crap talked about, we had huge accomplishments of sheriff. **Number one, beyond the accomplishment of getting elected in such a underdog fashion, is I brought the department back to full staffing**. I hired 1,100 deputies my very first year on the job, 2019. That was a record.[156]

  Whenever everybody else was struggling with hiring, **I was the hiring left and right because I understood the culture**.[157] I understood what it takes to hire. And people started recruiting employees; that was a big success. Balancing the budget, turning a deficit into a surplus, huge success. Creating the most diverse leadership team ever in the history of the department, that was a huge success.[158] I mean, we were more diverse than all the previous sheriffs combined. Opening up the rank of captain to be a competitive open process for the entire department, that was a huge first.[159]

  Creating the Wage Theft Task Force, another first.[160] That was important.[161] Expanding the Homeless Outreach Service Team, and going into places that the County never seen the sheriff's department go, like Venice, Brentwood, for example, cleaning up homeless encampments. And then the local residents were cheering us like crazy while the Board was condemning us just as a vociferously. Those were big successes.[162]

  And creating the Public Corruption Unit was a huge step forward.[163] Getting body-worn cameras deployed, huge win for the department for

---

[154] American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders*, 5th ed. Arlington, VA: American Psychiatric Association, 2013, at pp. 669-670.
[155] T., Alex Villanueva, at p. 187
[156] T., Alex Villanueva, at p. 194
[157] T., Alex Villanueva, at p. 194
[158] T., Alex Villanueva, at p. 194
[159] T., Alex Villanueva, at p. 194
[160] T., Alex Villanueva, at p. 194
[161] T., Alex Villanueva, at p. 195
[162] T., Alex Villanueva, at p. 195
[163] T., Alex Villanueva, at p. 195

transparency.  These are all concrete things, measurable, and you would never know any of that happened because all you could hear from the Board and the -- the media, "He resists authority." "He defies subpoenas."  You know, stuff like that.[164]

Entitlement

- Alex Villanueva stated, "In fact, Keri Blakinger the latest version, she was the one that wrote the big article, 'Former Sheriff Placed on the 'Do Not Rehire' List.' And she actually had the audacity, the nerve, to write in her article, 'It's unclear how this will impact the supervisors' race.'  Really?  She actually put that in print."[165]

Interpersonally manipulative and exploitative

- If factually accurate, Alex Villanueva's decision to criminally investigate Holly Mitchell as a means to intimidate her would be an example of Villanueva having a lack of empathy and demonstrating manipulative and exploitative behavior.[166]

- Alex Villanueva's decision to criminally investigate L.A. Times reporter Alene Tchekmedyian because she wrote the article "Claim alleges Sheriff Villanueva directed cover-up of deputy kneeling on inmate," would be both an example of Villanueva having a lack of empathy and demonstrating manipulative and exploitative behavior.[167]

- According to his responses on the Personality Assessment Inventory, Alex Villanueva is quick to believe that he is being treated inequitably and will hold a grudge against others, even if the perceived affront is unintentional. Because he is likely to question and mistrust the motives of those around him, working relationships with others are likely to be very strained, despite the efforts of others to demonstrate support and assistance.[168]

Lacks empathy

- Alex Villanueva described L.A. Times reporter, Alene Tchekmedyian, as "profoundly dishonest."[169]

- Sheriff Villanueva referred to Supervisor Hilda Solis as "La Malinche;"[170] a derogatory term that has been used to describe a traitor or slave.[171]

---

[164]  T., Alex Villanueva, at p. 195
[165]  T., pp. 167-168
[166]  **SEE** Transcript, Video Recorded Interview of Esther Lim by Christine Diaz-Herrera, Esq.; **FOUND AT:** COLA002164
[167]  **SEE** Video Recording, Sheriff Villanueva will Discuss Recent Allegations of an Alleged Cover-up, 3/29/22, COLA000022; **FOUND AT:** 13:32
[168]  **SEE** APP. 3, PAI Clinical Interpretive Report re Alex Villanueva, at pp. 1-14
[169]  **SEE** https://www.latimes.com/california/story/2022-09-16/
[170]  **SEE** Transcript, Video Recorded Interview of Esther Lim by Christine Diaz-Herrera, Esq.; **FOUND AT:** COLA002164
[171]  **SEE** https://malincheinfo.wordpress.com/the-meanings-of-malinche/

Arrogance

- Alex Villanueva referred to the Justice Deputies working for the Board as "20-year-old flunkies."[172,173]

- Alex Villanueva has repeatedly referred to Max Huntsman as "Gustav Huntsman,"[174]

Based on the foregoing, Alex Villanueva displays features of narcissistic personality disorder that includes having a grandiose sense of self-importance, arrogance, the belief that he is special, and a sense of entitlement.

## CONCLUSIONS

Based on my face-to-face examination and the sources of material identified above, my opinions as set forth herein, can be summarized as follows:

(1) Alex Villanueva is a hardy, durable, and resilient person.

(2) Alex Villanueva has not experienced any emotional harm or mental damage as a result of his exposure to the actions of the Los Angeles County Board of Supervisors, Esther Lim, Max Huntsman, or any others whom he has identified in the First Amended Complaint For Damages.

(3) Alex Villanueva has features of antisocial and narcissistic personality disorder that includes repeated lying; a lack of remorse; a grandiose sense of self-importance; entitlement; exploitative and manipulative behavior; a lack of empathy; and arrogance.

(4) The combination of antisocial and narcissistic features is also referred to as psychopathy.

(5) There is evidence that Alex Villanueva has many attributes of a "white collar" psychopath, including: a grandiose sense of self-worth; lack of remorse; manipulative behavior; pathological lying; and a failure to accept responsibility for his own actions.

(6) Alex Villanueva's personality features, including his tendency to react with disdain and defiant counterattack to any perceived slights along with his desire to remain in a position of power and authority appear to be the primary motivation for his initiation of the lawsuit after losing the election to join the Board of Supervisors.

(7) While Alex Villanueva claims that the actions of the Los Angeles County Board of Supervisors, Max Huntsman, Esther Lim, and others are the source of his

---

[172]   Transcript, Deposition of Alex Villanueva, 2/28/25, at p. 173
[173]   Investigation Report, 5/19/23, at COLA002139
[174]   Investigation Report, 5/19/23, at COLA002139

alleged emotional distress, he does not acknowledge the extent to which any reputational harm or damage is attributable to his own behavior.

Sincerely,

Marc A. Cohen, M.D., M.S.
Associate Clinical Professor of Psychiatry and Biobehavioral Sciences
David Geffen School of Medicine at U.C.L.A.
Diplomate, American Board of Psychiatry & Neurology
Diplomate, American Board of Forensic Psychiatry

# EXHIBIT 3

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS  |  TRAININGS  |  MEDIATIONS

March 28, 2025

Jason Tokoro
Miller Barondess, LLP
2121 Avenue of the Stars, 26th Floor
Los Angeles, CA 90067

Dear Mr. Tokoro:

The following is a report of my expert opinion in the matter of *Alex Villanueva v. County of Los Angeles, et al,* Case No.: 2-24-cv-04979-SVW-JC, in the U.S. District Court for the Central District of California, Western Division. I have been retained by Miller Barondess on behalf of Defendant County of Los Angeles to render an opinion of the Defendant's actions in response to complaints of workplace discrimination, harassment and retaliation, including what is considered typical and acceptable human resource practice regarding responding to and investigating such complaints.

## I.    Professional Background

1.    I am Managing Partner of Oppenheimer Investigations Group and have been an attorney since 1993.  For 27 years, from 1993 to 2020, I specialized in employment law, defending employers in employment civil lawsuits brought pursuant to federal and state law, and counseling employers on all aspects of employment law compliance, including Title VII and the California Fair Employment Act's prohibitions on sexual harassment, discrimination, and retaliation in employment. As part of my practice, I advised employers and their human resources professionals on responding to complaints of sexual assault. I also advised colleges and universities on compliance with Title IX, including responding to student complaints of



INVESTIGATIONS | TRAININGS | MEDIATIONS

sexual assault.

2.    In January 2020, I stopped providing advice to employers, and since then I have engaged exclusively in conducting impartial investigations, including allegations of sexual assault.

3.    From 1994 to the present, as part of my law practice, I conducted impartial investigations of complaints of harassment, discrimination, retaliation, and other forms of alleged misconduct at work (including sexual assault and threats of violence), as well as whistleblower complaints.  I have provided this service for both public and private sector employers, as well as private and public colleges and universities. I have conducted hundreds of impartial investigations in the workplace and on college and university campuses.

4.    Since 2020, I have been a partner at a law office focused on conducting such investigations and supervise other attorneys who work for me and conduct workplace investigations.

5.    In 2000, I began training employers, human resource professionals and employees in preventing and responding to workplace harassment, discrimination, retaliation, sexual assault, threats of violence and whistleblower complaints, and in conducting workplace investigations.  I have provided such trainings continuously since that time.

6.    In 2009, I became a member of California Association of Workplace Investigators (CAOWI), now known as the Association of Workplace Investigators (AWI).  From 2016 through 2019, I was on the AWI Board's Training Institute Committee.  I am currently a Board member of AWI, which now has over 1,000 members throughout the United States, Canada,

2

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

Europe, New Zealand, Australia and South Africa.

7.     I was part of a committee at AWI that researched and wrote "Guiding Principles" for workplace investigators that have assisted in establishing acceptable practices for investigating workplace harassment. I attended and completed AWI's Workplace Investigation Training Institute, a rigorous week-long course for workplace investigators that has been offered multiple times per year since 2012. I have served as faculty at AWI's Training Institute since 2016.

8.     I have completed T9 Mastered Title IX investigation training, which included training on conduct trauma-informed interviews of victims of sexual assault.

9.     A copy of my CV and a list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition are attached to this report as **Exhibits A** and **B**.  My hourly rate is $750.

**II.    Materials Reviewed**

10.     I have reviewed the following documents in forming my opinions:

   a.  First Amended Complaint

   b.  Deposition of Alex Villanueva

   c.  Deposition of Christine Diaz-Herrera

   d.  Deposition of Roberta Yang

   e.  Deposition of Constance Marie Komoroski

   f.  Deposition of Ann Devane

   g.  IB Investigation File for Esther Lim Complaint

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

h. IB Investigation File for Max Huntsman Complaint

i. Sheriff Department's Policy of Equality

j. Documents: COLA001763 – COLA 002827

11.     I have based my opinions on the materials I have identified. I applied my

education, training, knowledge, and experience concerning employment law, proper human

resource management, and workplace investigations in considering the evidence. My opinions

are expressed to a reasonable degree of professional certainty or probability.

12.     I have studied the material provided to me and listed above regarding this case.

Please be advised that if there are any additional depositions, investigations, policies, reports,

memos, audio/video recordings, photos, or other materials produced in this case, a supplemental

report may be necessary; thus, I reserve the right to supplement my opinions and/or this report.

### III.     Summary of Background Facts

13.     Based on my review of the relevant materials, the facts disclose that Plaintiff Alex

Villanueva served as Sheriff of Los Angeles County from 2018 until 2022. On March 8, 2022,

Justice Deputy Esther Lim brought a formal complaint against Plaintiff alleging during various

public media appearances, Plaintiff harassed Lim and others on the basis of sex, race, ethnicity,

ancestry, national origin and age. On March 9, 2022, Inspector General Max Huntsman brought

a formal complaint against Plaintiff alleging that Plaintiff had engaged in "a racially biased

attack" against Huntsman by repeatedly referring to Huntsman as "Max-Gustaf" in public

comments, to imply that Huntsman is a foreigner of German or Jewish ancestry. The County

retained the law firm Sanders Roberts to conduct an independent fact finding investigation into

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS  |  TRAININGS  |  MEDIATIONS

the two complaints. Christine Diaz-Herrera, an attorney with Sanders Roberts, conducted the investigation.

14.    As part of her investigation, Diaz-Herrera interviewed Huntsman and Lim and obtained detailed information from them about their complaints. Diaz-Herrera also interviewed Veronica Pawlowski  and Kyla Coates, who were identified by Lim, and gathered relevant documentary evidence.

15.    As part of her investigation, Diaz-Herrera repeatedly requested that Plaintiff submit to an investigative interview. Plaintiff did not respond to Diaz-Herrera's requests. On December 5, 2022, having lost his reelection bid, Plaintiff's term as Sheriff ended. The investigation was still pending.

16.    In January 2023, after Plaintiff was no longer employed by the County, Diaz-Herrera contacted Plaintiff again, asking that he agree to an investigative interview. Plaintiff agreed to participate only if Diaz-Herrera provided him a brief description of what the allegations were and sent him all of her questions in writing. Diaz-Herrera refused Plaintiff's request, and Plaintiff did not participate in an investigative interview.

17.    Diaz-Herrera completed her fact-finding investigations. Sanders Roberts submitted two written Investigative Reports on May 19, 2023. The Sheriff's Department's Internal Affairs Bureau packaged these reports, along with the supporting evidence gathered by Diaz-Herrera and various Sheriff's department forms, in what is referred to as a "stacked" case file. These stacked case files were sent to the County Equity Oversight Panel (CEOP) so the panel could reach conclusions and issue recommendations. The CEOP determined that Lim's

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

and Huntsman's allegations against Plaintiff were founded. Because Plaintiff was no longer employed by the County, the CEOP recommended that a "Do Not Rehire" flag be placed in Plaintiff's personnel file.

## IV. Applicable Standards

18.     After the passage of the 1964 Civil Rights Act (Title VII), enforcement agencies, such as the U.S. Equal Employment Opportunity Commission (EEOC) and the California Department of Fair Employment and Housing (DFEH), developed protocols for investigating different types of discrimination and for retaliation for complaining about discrimination. Employers facing complaints of discrimination then followed suit.  In the 1980's, the Federal Government conducted large-scale studies of sexual harassment, finding that such harassment was prevalent.[1]  The studies also showed that most harassment was not reported, in large part due to fears of retaliation.

19.     This led to a focus on prevention of harassment and discrimination, with the employer being held responsible for enacting policies, training its workforce, investigating complaints, taking appropriate disciplinary action when it found there was discrimination or harassment and ensuring that those who complained about discrimination and harassment were not subject to retaliation.  In fact, over time (and certainly before the facts that give rise to this case came about) statutes and regulations relating to discrimination and harassment came to include affirmative duties to prevent harassment, discrimination, and retaliation from occurring.

20.     Then, in 1998, the U.S. Supreme Court decided the twin cases of *Burlington Industries, Inc. v. Ellerth*[2] and *Faragher v. City of Boca Raton*[3] that established an affirmative

---

[1] Sexual Harassment in the Federal Workplace: Is it a Problem" A report of the U.S. Merit Systems Protection Board, Office of Merit Systems Review and Studies, Washington D.D. 1981 (updated 1988 and 1995).
[2] 118 S. Ct. 2257 (1998)
[3] 118 S. Ct. 2275 (1998)

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

defense for charges of discriminatory harassment when the employer had enacted reasonable polices and had responded appropriately to a complaint.  These cases set forth some of the things employers could and should do to prevent and respond to harassment and provided a benefit (protection from liability) for employers who did so.

21.    In the same year, two California cases determined that an employer's good faith and fair investigation of a harassment complaint gave rise to a qualified immunity from liability for wrongful termination when the respondent was terminated because of findings in the investigation.[4]  These cases also contributed to increased awareness in the employer community of what constituted a proper investigation of employee complaints.

22.    As a result of *Faragher* and *Ellerth,* the EEOC established guidance for employers on preventing and responding to unlawful harassment.[5]  These guidelines covered how employers should go about conducting investigations.  At the same time, employers, business organizations and attorneys advising employers became engaged in training human resource professionals on how to properly investigate a charge of discrimination and harassment. In 2016, the California Department of Fair Employment and Housing (now the Civil Rights Division), published its *Workplace Harassment Prevention Guide for California Employers,* providing guidance on, among other things, important components of an effective workplace investigation.

23.    Liability for discrimination and harassment includes liability for retaliation for complaining about discrimination and harassment.  Employees are to be protected from retaliation regardless of whether there was a finding of discrimination or harassment.  That is, an

---

[4] *Cotran v. Rollins Hudig Hall Intl.,* Inc., 17 Cal. 4th 93 (1998*); Silva v. Lucky Stores, Inc.,* 65 Cal App. 4th 256 (1998).
[5] EEOC Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors.  EEOC Notice Number 915.002, 6/18/99.  The EEOC published an updated Guidance in April 2024. However, the 1999 Guidance was in effect during the period at issue here.

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

employee should be able to bring a good faith complaint of harassment without fear of any reprisal.

24.     Thus, there are well-developed standards in the human resource field relating to practices in preventing and responding to workplace complaints of harassment, misconduct, discrimination, threats of violence and retaliation and how to investigate a complaint. These standards include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision. A fair investigation should provide due process (essential fairness) for both the complaining party and the party who the complaint is lodged against. This includes a trained investigator gathering all relevant evidence by, among other things, interviewing the complainant(s), respondent and percipient witnesses. This should be followed by a careful weighing of the evidence along with findings (using a preponderance of the evidence standard) that logically flow from the evidence collected.

25.     As part of my practice, I advised employers and their human resources professionals on responding to complaints of sexual assault. In that capacity, the standard advice I have given is to utilize a complainant-centric approach that focuses on the needs and desires of the complaining employee, while maintaining the safety of the work environment.

**V.      Summary of Opinions**

26.     Based on my review of the evidence in this case, it is my opinion that the County's response to the Lim and Huntsman complaints met well-established HR standards. Specifically:

a.      Christine Diaz-Herrera's investigation met well-established HR standards for conducting workplace investigations.

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

      b.      Placing a "Do Not Rehire" notation in Plaintiff's personnel file was an

acceptable step for the County to take to address substantiated reports of harassment,

discrimination and/or retaliation.

## VI.   Opinions

### A. Christine Diaz-Herrera's Investigation Met Well-Established HR Standards for Conducting Workplace Investigations.

27.    There are well-developed standards in the human resource field relating to

investigating workplace complaints of harassment and retaliation. These standards include a

timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a

reasoned and fair decision. The investigation must be conducted by a trained investigator

gathering all relevant evidence by, among other things, interviewing the complainant(s),

respondent and percipient witnesses.

28.    The EEOC's Enforcement Guidance provides that "[w]hoever conducts the

investigation should be well-trained in the skills that are required for interviewing witnesses and

evaluating credibility." Similarly, the DFEH's Workplace Harassment Prevention Guide

regulations recommends that an individual who conducts workplace investigations should have

the proper qualifications, including an understanding of employment laws.

29.    Diaz-Herrera clearly met this standard. At the time she conducted these

investigations, she had practiced law for over 14 years and had conducted hundreds of

investigations for private and public employers.

30.    Moreover, Diaz-Herrera conducted the two investigations in a fair and thorough



fashion. She interviewed Lim and Huntsman and relevant witnesses. She documented the interviews through recordings or notes. She made reasonable attempts to interview Plaintiff (the respondent) while he was working for the County, but he refused to participate. Even after Plaintiff left his employment with the County, Diaz-Herrera reached out to him again and afforded him the opportunity to participate in an interview during which he would learn of the allegations against him and have a full opportunity to respond. Plaintiff insisted that he would participate only if Diaz-Herrera gave him all her questions in writing in advance. Diaz-Herrera reasonably refused to do so. In my experience, it is inadvisable for an investigator to provide a respondent all the investigator's questions in advance, for three reasons. First, providing the questions in advance compromises the investigator's ability to maintain the confidentiality of the investigation itself. A respondent who is provided a written list of interview questions can share those questions with other investigation participants. Second, a respondent's advance knowledge compromises the investigator's ability to assess the respondent's credibility. With advance knowledge of the investigator's questions, the respondent will have the opportunity to craft and rehearse answers. This deprives the investigator of the opportunity to hear respondent's unrehearsed (and possibly more truthful) responses. It also deprives the investigator of the opportunity to observe respondent's demeanor and manner of response, both of which are important factors in assessing credibility. Finally, advance knowledge affords the respondent the opportunity to tamper with and/or destroy evidence of that respondent's wrongdoing.

    31.    Diaz-Herrera recorded the investigation interviews for Lim, Huntsman, and Pawlowski. I understand that for Coates, there was either no interview recording made, or the



recording could not be located. This fact in and of itself does not diminish the quality of Diaz-Herrera's investigation. From the information I reviewed, it appears that Diaz-Herrera took reasonable steps to preserve the evidence she gathered, including writing detailed summaries of the interviews she conducted with Coates and Pawlowski. Those summaries were part of the investigation file submitted to the CEOP for its consideration.

**B. Placing a "Do No Rehire" Notation in Plaintiff's Personnel File Was an Acceptable Step for the County to Take to Address Substantiated Reports of Harassment, Discrimination and/or Retaliation.**

32.     As mentioned above, after Diaz-Herrera submitted her fact-finding report, the CEOP determined that harassment and discrimination allegations against Plaintiff were founded. FEHC regulations and the Sheriff Department's Policy of Equality require that where misconduct is found to have occurred, an employer take appropriate remedial measures to prevent and correct unlawful behavior. The remedial action must be commensurate with the level of misconduct and discourage or eliminate recurrence. Here, Plaintiff was no longer employed by the County, so he could not be suspended or receive another form of discipline. Thus, the CEOP recommended that a "Do Not Rehire" flag be placed in Plaintiff's personnel file.

33.     Though "Do Not Rehire" warnings are not used by all employers, they are not unheard of. "Do Not Rehire" notices may not be necessary for a smaller employer whose HR function is centralized and, thus, it is easy to track former employees who were dismissed for misconduct. However, for a massive entity such as the County, which employs over 100,000 employees, "Do Not Rehire" notices can be a more effective way of ensuring that persons with hiring power in other departments are aware that an applicant omitted some form of misconduct



INVESTIGATIONS | TRAININGS | MEDIATIONS

in another department. It is my understanding that the County has placed "Do Not Rehire" flags in the personnel files of other former employees, for that exact reason.

34.     I reserve the right to supplement this report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery and through any additional work.   If you have any questions about this report, please do not hesitate to contact me.

Sincerely,

Vida Thomas
 Managing Partner

12

# EXHIBIT 4

# Why LA's Sheriff Won't Help His Watchdog Investigate Possible Deputy Gangs

**LA** laist.com/news/criminal-justice/why-las-sheriff-wont-help-his-watchdog-investigate-possible-deputy-gangs

March 23, 2022

<u>Criminal Justice</u>
By LAist Staff and Frank Stoltze

Published Mar 23, 2022 1:02 PM



Sheriff Alex Villanueva.

()

Los Angeles County Inspector General Max Huntsman says he has leads on 41 deputies who may belong to "gangs," and has asked Sheriff Alex Villanueva to provide any and all relevant documentation as Huntsman continues his investigation.

But the Sheriff's Department says Huntsman has no "actual evidence," and it has already provided "all legally obtainable information." It characterizes his request as an "attack" on it.

1/3

COLA001747

In a letter he sent Monday to Villanueva, Huntsman said he's identified the deputies as alleged members of two groups that may satisfy the legal definition of "law enforcement gangs" under a new state law. Huntsman, who did not name the deputies, said 11 allegedly belong to the East L.A. station's Banditos group, and 30 allegedly belong to the Executioners at the Compton station.

The law requires departments to formally prohibit gangs, and to fire any officer who participates in one.

Support for LAist comes from

Become a sponsor
Huntsman said he learned about the deputies from internal investigations carried out by the Sheriff's Department.

In response to the inspector general's letter, the department posted a statement on Facebook calling it "another irresponsible attempt from Mr. Huntsman to discredit the organization, through omission and misrepresentation." It said the inspector general "has failed to provide any actual evidence or new information," claiming the letter "is consistent with his unhealthy obsession to attack the department."

In his letter, Huntsman said he was repeating a request he first made on Jan. 19. He said the department failed to meet his 30-day deadline to provide the items he requested.

The inspector general said he was also responding to a Feb. 10 letter from Undersheriff Tim Murakami, which "objects to the use of the term 'deputy gangs' and contends that the term 'stems from.... false allegations made by a now discredited deputy sheriff.'" Huntsman said that and similar claims Villanueva made to the Board of Supervisors in a Feb. 16 letter "ignore the plain language of [the new state law] and … misapprehend the legislative history" of the law.

The inspector general said he's required by law to investigate any group that may fall under the new state law's definition of a gang, and said that law "requires the Sheriff's Department to cooperate in the investigation."

The Sheriff's Department "may not refuse to produce the records requested below by unilaterally declaring that no deputy sheriff is a member of a 'law enforcement gang,'" Huntsman wrote.

Support for LAist comes from

Become a sponsor
In an interview, the inspector general said the state law defines a gang as "a group that violates policies [and] encourages the violation of policies," as well as groups "that discriminate in the workplace. So indeed if you get together a bunch of your friends and you

2/3

COLA001748

put Nazi helmets on your calves, and for some reason that doesn't include African Americans or women, that's a law enforcement gang."

By defining gangs "in a real practical way," the law "will allow us to figure out which of these groups are 'harmless fun,' as the sheriff likes to say, and which are not at all," Huntsman said.

Huntsman — as well as the Sheriff Civilian Oversight Commission and the County Board of Supervisors — has clashed repeatedly with Villanueva over issues of transparency and accountability. In 2020 the county gave the oversight panel subpoena power, an authority that was enshrined in state law later that year. Villanueva subsequently defied Oversight Commision subpoenas, and the panel went to court seeking to force him to comply.

## A Sharply Divisive Issue Internally

At least 18 gang-like groups have operated within the Sheriff's Department over the past half century, according to a 2021 report by Loyola Law School's Center for Juvenile Law & Policy.

A 2021 RAND Corporation report did not attempt to quantify how many deputies belong to these groups, but it said the issue is sharply divisive within the department, with responses to a survey ranging from "those who belong to a subgroup hold themselves and each other to a higher standard and are the best the LASD has" to "they [subgroups] have destroyed many honest, hard-working deputies' lives and careers."

Nearly one in six deputies who responded to the RAND survey said they had been invited to join a subgroup at some point in their career, and more than one out of every three deputies and mid-level managers supported banning them.

Support for LAist comes from

Become a sponsor
During his time in office, Villanueva has largely dismissed any problem with deputy subgroups, saying they're merely "people who go to the river and party on the weekend." He has also said any improper behavior amounts to "hazing run amok."

The sheriff even sent a cease-and-desist letter to the Board of Supervisors last month demanding it stop using the term "deputy gangs" when discussing the subgroups.

Villanueva notes that he has instituted a policy he says prohibits deputy gangs across the department. Critics say the policy is weak and that the sheriff has done nothing to eradicate at least seven active gangs or subgroups inside the department.

COLA001749

# EXHIBIT 5

2/28/25, 1:10 PM

Detective accused of giving Nazi-like salute resigns from South Pasadena Police Department - Los Angeles Times

## Los Angeles Times

CALIFORNIA

# Detective accused of giving Nazi-like salute resigns from South Pasadena Police Department



Retired Los Angeles County Sheriff's Detective Mark Lillienfeld smiles after giving testimony at a Civilian Oversight Commission special hearing in October.  (Michael Blackshire / Los Angeles Times)

**By Keri Blakinger**
Staff Writer

Nov. 30, 2024 2:32 PM PT

EXHIBIT
27

A veteran detective who once landed in hot water for disguising himself as a deputy and sneaking into Men's Central Jail has resigned from the South Pasadena Police Department amid recent allegations that he repeatedly gave a Nazi-like salute last year

during a training lecture hosted by the Los Angeles County Sheriff's Department, according to a news release and internal records.

City police officials announced Mark Lillienfeld's decision to step down on Wednesday, hours after The Times first reported on the Sheriff's Department's probe into the 2023 allegations that ultimately saddled him with a "Do Not Rehire" designation.

As documented in a 40-page internal affairs report released by the Sheriff's Department earlier this month, the probe found Lillienfeld had violated an equality policy while delivering a lecture at a May 2023 homicide investigator training session. The report said one of the officers who attended — a Black woman from the Los Angeles Police Department — accused Lillienfeld of making several inappropriate comments, once referring to Asian officers as "Chinamen" and later saying that she and another Black officer in the class would be the most likely suspects if anyone jumped him in the parking lot afterward.

At the time of the lecture, Lillienfeld had already retired from the Sheriff's Department and was working as an outside vendor. State records show he began working as a detective for South Pasadena earlier this year.

"The City of South Pasadena and its Police Department takes this report seriously, and in no way does the department condone this type of behavior from any officer in its department," the South Pasadena news release said last week. "The officer in question submitted his resignation, which Police Chief Brian Solinsky accepted."

Also last week, the Sheriff's Department said it would not hire Lillienfeld as an instructor for future classes. Meanwhile, the California Commission on Peace Officers Standards and Training — which oversees law enforcement training standards statewide — said in a statement that it had only recently learned of the allegations and that it currently approves instructors based on information submitted by local agencies, but does not have a means to remove them.

"The Commission met last week and discussed this regulatory matter and are planning to make changes so that in the future we do have the ability to remove instructors such as this," the statement said.

Though Lillienfeld did not respond to a request for comment on Saturday, his attorney, Tom Yu, said last week that the allegations were "completely baseless." He said that because Lillienfeld had already retired, he had "no standing to appeal or grieve the one-sided investigation."

In 2008, internal affairs records show Lillienfeld was reprimanded for referring to a woman as a "broad" and repeatedly using profanity during a different training lecture. Following his retirement in 2016, he began working as an investigator for the Los Angeles County district attorney's office, where he was later caught on camera posing as a deputy in order to sneak contraband fast food to an inmate at Men's Central Jail.

Afterward, he was temporarily banned from the county jails. In 2019, he returned to the Sheriff's Department to join then-Sheriff Alex Villanueva's controversial public corruption squad, a shadowy unit accused of targeting the sheriff's critics — including oversight officials, county leaders and a former Times reporter who had received a leaked list of problem deputies.

Lillienfeld left the department again in January 2023 after Villanueva lost reelection and has since said the incident at Men's Central Jail was part of a plan to overturn a wrongful conviction by winning the trust of the real killer.

The complaint that led to the "Do Not Rehire" designation stemmed from a two-week homicide investigator course that attracted about 30 officers and deputies from departments across Southern California. The Sheriff's Department redacted all of their names in its 40-page report, as well as the name of the Los Angeles police officer whose concerns spurred the investigation.

"Throughout the entire lecture, Subject Lillienfeld was rude, condescending, unprofessional, and made inappropriate comments to several students in the class," investigators wrote in a summary of their interview with the Los Angeles officer.

They said the officer told them she believed Lillienfeld targeted Asian and Black students with off-color jokes, once calling the only two Asian students "Chinamen" and repeatedly making fun of a woman's name. The officer also told investigators Lillienfeld talked a lot of "crap" about the Los Angeles Police Department and how its investigations were "messed up."

During the lecture, the report says, "Lillienfeld also clicked his heels together and extended one of his arms out like Hitler," while saying something that sounded like "hike" or "height."

The Los Angeles police officer said she thought Lillienfeld might have been doing it as a joke but that it seemed inappropriate because it "looked like something white supremacist groups do," according to the report.

At the end of the class, she alleged, Lillienfeld apologized to her and the other Black woman — a Menifee Police Department officer — and thanked them for letting him make fun of them. Then, she told investigators, Lillienfeld allegedly told class participants that if they saw him outside in the parking lot with two bullets in the back of his head, they should look to the two Black women as the suspects.

The Menifee police officer told investigators that she remembered Lillienfeld was funny, but that she didn't feel singled out by his jokes. Though she told investigators she remembered hearing Lillienfeld's comments about the Black women "jumping him," she said she wasn't offended. She also said she didn't remember seeing him give a Nazi salute.

When internal affairs investigators interviewed the other officers and deputies in the class, most said they didn't recall seeing anything inappropriate. Some said Lillienfeld was funny or spoke highly of his lecture. One — a La Verne police officer whose name was also redacted — said Lillienfeld repeatedly did a "weird thing" during class in which he would click his heels together and throw up his arm in a way the officer described as a "Nazi salute." At one point, Lillienfeld said "Sieg Heil" as he made the gesture, according to what the officer told investigators.

The officer said he thought Lillienfeld did the Nazi-like salute while trying to make a point regarding one of the investigations he taught, but he couldn't remember the specifics.

After the class ended, the Los Angeles police officer detailed her concerns in her class evaluation, which sparked the internal investigation.

When investigators tried to interview Lillienfeld in April, the file says, he asked several questions about the case before refusing to do the interview. This year, after the internal affairs investigation concluded, the department confirmed that it placed a "Do Not Rehire" designation in Lillienfeld's file.

Hours after The Times' story published on Wednesday, Hans Johnson — a member of the county's Sheriff Civilian Oversight Commission — sent an email to South Pasadena officials expressing his concerns.

"Why is someone with such red flags of disqualifying misconduct now on staff with the South Pas. Police Department?" Johnson wrote, according to a copy of his email shared with The Times. "Is South Pasadena P.D. so strapped for staff that it fails to thoroughly review the background of detectives it hires, or worse, detects such red flags but ignores them?"

It's not clear how many others reached out with similar concerns, but in its news release last week the South Pasadena Police Department said it had received "many calls and messages" about the matter.

"I want to make clear that our police department does not tolerate racism or unacceptable epithets of any kind from any member of our organization," Solinsky wrote in the release. "Such acts are not in keeping with our values and the expectations that our City Council and our residents have from members of our police force."

## More to Read

### LAPD watchdog pushes for more transparency amid outcry over officers' alleged racist remarks

Feb. 26, 2025



### LAPD officers accused of making racist and sexist remarks in recruiting office; mayor calls it 'outrageous'

Feb. 14, 2025



### LAPD captain claims she saw cops slamming teen into concrete — then faced union's wrath

Feb. 1, 2025




**Keri Blakinger**

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in

Texas who play clandestine games of "Dungeons & Dragons," countering their extreme isolation with elaborate fantasy. Her work has appeared everywhere from the BBC to the New York Daily News, from Vice to the Washington Post Magazine, where her 2019 reporting on women in jail helped earn a National Magazine Award. She is the author of "Corrections in Ink," a 2022 memoir about her time in prison.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

EXHIBIT 6



DONATE



EXHIBIT 6

NICK WILSON
FOR STATE ASSEMBLY

# WE ARE DISTRICT 53!
# PRINCIPLES
# OVER POLITICS

WHY I AM RUNNING



## JOIN OUR MOVEMENT
## It's time to SAVE California together!

The time has come for a change — a change that brings us together, restores hope, and addresses the fundamental needs of every family. Together, we can build a better future for our community — one that upholds the values of public safety, parental rights, a thriving economy, and solutions for the homeless.

# EXHIBIT 7

3/17/25, 10:33 AM                                                    Antigovernment General



## Jubilee & Justice: The Fight for Civil Rights Isn't History — It's Now

The fight for justice isn't over — it's happening now. Our new podcast, Apathy Is Not An Option, breaks down the movement's legacy and what's at stake today. Real talk. Real stories. No apathy.

**Listen to New Episode** 

# ANTIGOVERNMENT GENERAL

**IDEOLOGY:** Faith Education Commerce, Moms for Liberty, Veterans on Patrol

 SPLC

 Donate    ≡

**In this article**

| Top Takeaways


EXHIBIT
20

Key Moments

What's Ahead

Background

Three Percenters

Anti-Student Inclusion

Key Moments In Movement History

2023 General Antigovernment Groups

**Antigovernment groups are part of the antidemocratic hard-right movement. They believe the federal government is tyrannical, and they traffic in conspiracy theories about an illegitimate government of leftist elites seeking a "New World Order." In addition to groups that generally espouse these ideas, the movement is composed of sovereign citizens, militias, overt conspiracy propagandists and constitutional sheriff groups. In the past, this movement was referred to as the "Patriot" movement by adherents and critics.**

# Top Takeaways

The Southern Poverty Law Center identified general antigovernment groups in addition to specific militia, sovereign citizens, constitutional sheriffs and conspiracy propagandist groups that also make up the extreme antigovernment movement. In 2021, the conspiratorial and dubious view of government was pervasive, as evidenced by the movement's popular rhetoric on such issues as COVID-19 regulations, local school curriculum, the "Big Lie" of voter fraud, and border security. These views largely continued in 2023, but with a marked and troubling rise in antigovernment activity against inclusive public schools and the continued incorporation of white Christian nationalist ideas.

Several major events have significantly affected antigovernment groups in recent years. The Jan. 6, 2021, attack on the U.S. Capitol and the attempt to stop the democratic transfer of power through the formalized counting of electoral votes was the most public moment for the movement since the Oklahoma City bombing in 1995. In 2023, more people were

3/17/25, 10:33 AM                                                      Antigovernment General

charged, and trials took place for those alleged to be criminally responsible for the events on Jan. 6. More than 1,200 people have been charged with offenses ranging from trespassing to seditious conspiracy for their actions on Jan. 6, and over 80 of them were either members of identified antigovernment organizations or said to be motivated by the movement's conspiracies. All evidence points to the Oath Keepers militia playing a crucial role in coordinating the violence on that day.

Listed as an antigovernment militia organization, the Oath Keepers garnered a wave of national media attention for their key involvement in the Jan. 6 insurrection. Both the U.S. House Select Committee on the January 6 Attack hearings and the Oath Keepers trials kept the spotlight on the group. The group received a nearly fatal blow in May 2023 when its founder and leader, Stewart Rhodes, was sentenced to 18 years in prison for seditious conspiracy for his role in the insurrection. To date, somewhere around 20 Oath Keepers have been convicted for their activities related to the insurrection.

While Rhodes' Oath Keepers continues to be dismantled, that doesn't mean we've seen the last of its supporters. An entity out of Utah is operating as Oath Keepers USA, which claims to be an organization separate from Rhodes' militia. Its founders are remaining board members and state leaders from Rhodes' Oath Keepers. This "new" group says it will uphold "the original spirit of the now defunct 'Oath Keepers' organization."

3/17/25, 10:33 AM                                                    Antigovernment General



David Moerschel (Left) Jessica Marie Watkins (2nd from L) and Donovan Ray Crowl (Center) march down the east front steps of the U.S. Capitol with the Oath Keepers militia group among supporters of U.S. President Donald Trump in Washington, U.S., January 6, 2021. REUTERS/Jim Bourg

Faced with greater scrutiny and deplatforming in the wake of the insurrection, antigovernment groups reorganized and dispersed into communities to focus on localized activities – a mainstay tactic of the antigovernment movement. There is concern in the militia movement that individuals are less likely to join out of fear of legal repercussions in the wake of the Jan. 6 attack. Many militias have deactivated or abandoned their websites and public social media accounts. Those that retain an online presence often try to distance themselves from the image of militias as violent, insurrectionist groups, instead positioning themselves as community disaster response organizations.

As former Oath Keeper Jason Van Tatenhove has noted, this public relations game is the same one played by Rhodes with his militia. Van Tatenhove told the SPLC's Hatewatch that Rhodes' legacy was developing "a blueprint for others to create these kinds of autonomous militia groups based around his community preparedness and team programs." Framing Oath Keepers trainings this way was done to try to help Oath Keepers "avoid the 'M-word' or the militia, which [was] a forbidden word," Van Tatenhove said. "[Rhodes] was very aware of optics." Despite how they were advertised, Van Tatenhove says 99% of the trainings were

"down-and-dirty warfighting taught by actual warfighters that had done it." Following Jan. 6, many militias seem to be trying to use this same model.

During 2023, constitutional sheriffs continued to show their abject disrespect for the rule of law. Dozens of sheriffs across the country took a stand against gun laws, publicly refusing to enforce current rules or future laws that would change the status quo around gun ownership. Antigovernment movement activists worked in 2023 to further popularize both county supremacy and attempts to nullify federal laws. The Constitutional Sheriffs and Peace Officers Association (CSPOA), the flagship constitutional sheriffs organization in the country, continues to try and recruit law officers into the group and its related ideology. CSPOA does this through events targeting law enforcement, an online television show and membership in their association.

In 2023, the sovereign citizens movement continued to prosper and gain supporters from new demographic groups through disinformation channels regarding health and the proliferation of conspiracy theories.

White Christian nationalism continues to influence mainstream political and social movements. However, even more than Christian nationalism, dominionism has been spreading and taking root in conservative movements. Dominionism is the theocratic idea that Christians are called by God to exercise dominion over every aspect of society by taking control of political and cultural institutions.

As noted expert Frederick Clarkson states, "It envisions a very different society than one defined by democratic aspirations and equality for all people." The most significant example of this influence during 2023 was the battle in the GOP to name a new speaker of the House. U.S. Rep. Mike Johnson, who was elected after multiple other candidates lacked enough support within the party, is a dominionist associated with the New Apostolic Reformation. Numerous revivals and other events meant to prop up support for dominionism and to recruit new followers happened in 2023 around the country. The SPLC's monitoring also noted an uptick in right-wing extremists calling political opponents "demons," "Satanists" and similar epithets, another indication of how dominionist ideas have become more common.

Antigovernment groups engaged in campaigns attacking inclusive public education during 2023. These groups evoked "critical race theory" and called liberals and progressives Marxists and communists, continuing to spread conspiracies about the government's role in education.

Most anti-student inclusion groups, which maintain antigovernment ideals and use extremist tactics to combat student diversity and inclusive education, formed in response to COVID-19 mask and vaccine mandates in public schools. However, they quickly evolved their focus to attacks on historically marginalized students. Their tactics include challenging reading materials, mostly pertaining to people of color and the LGBTQ+ community; challenging school policies that allow LGBTQ+ students to be accepted and safe at school; and pushing to eliminate inclusive curriculum that includes the accurate teaching of hard parts of American history.

# Key Moments

Ammon Bundy's so-called People's Rights network launched at the beginning of the pandemic and was a major driver of antigovernment activity, especially in the Pacific Northwest. In 2023, Bundy and his group faced legal challenges. In July, an Idaho jury slapped Bundy and People's Rights with an order to pay St. Luke's Health System $52.5 million in damages for swarming its Boise hospital, forcing it to briefly shut down, and harassing medical personnel. Bundy refused to participate in the trial and made multiple efforts to get his supporters to rally to his property in north Idaho, with little success. As a follow up to the St. Luke's judgment, a judge issued a warrant for Bundy's arrest in November 2023 because he missed a contempt of court hearing. Bundy disappeared following the hearing.

Sovereign citizens continued to have volatile interactions with law enforcement. In March 2023, 25-year-old sovereign citizen Chase Allan was killed by police after he refused to comply with directions during a traffic stop in Farmington, Utah. He tried to grab his loaded gun and managed to get it out of the holster before he was shot. Allan and his parents were members of the sovereign citizen movement and called themselves American State Nationals. Antigovernment activists held rallies in his honor, some of which were attended by members of the People's Rights Utah chapter.

Among the revivals and events meant to prop up support for dominionism and to recruit new followers this year was Sean Feucht's tour that visited every state capital and the U.S. Capitol. Feucht is a major dominionist. He said his tour was meant to "to take back our Capitols for Jesus and expel the demonic heaviness that reigns over those buildings!" Feucht advocates for a country controlled by dominionist and New Apostolic Reformation Christians. U.S. Rep. Lauren Boebert, R-Colorado, helped get him access to hold an event in the U.S. Capitol rotunda.

In 2022, courts ordered conspiracy theorist Alex Jones to pay just shy of $1.5 billion to
families of Sandy Hook Elementary School shooting victims for spreading conspiracy
theories that resulted in the harassment of those families. Jones filed for bankruptcy in an
attempt to protect his resources from being seized to satisfy the judgment. During a
November 2023 court hearing, the Sandy Hook families offered to settle the debt for a
fraction of the amount – $85 million over 10 years. In his most recent bankruptcy filing,
Jones listed about $13 million in total assets. If Jones doesn't accept the families' offer, the
judge will determine how much he will pay the families and other creditors.

Perhaps the biggest conspiracy from 2022 that continued in 2023 was that of "The Big Lie." A
cottage industry of election conspiracy theorists continued to travel around the country and
make their cases claiming that the 2020 presidential election was stolen; local elections lack
security, making it easy to manipulate vote counts; and the 2024 presidential election will
likely be stolen again to keep Trump out of power.

MyPillow's Mike Lindell continues to be a source of these conspiracies. His latest
contribution is "The Plan: The Anti-Steal Dossier," which he published in August 2023. The
stated goal of his plan is to expose election fraud by demonstrating that election equipment
can be manipulated when connected to the internet. Lindell believes nongovernmental
organizations (NGOs) are involved in election fraud, claiming they get privileged access to
election data. To expose this supposed voting fraud, Lindell's plan includes creating a
grassroots movement based around, and using, technology created by him to report on
election fraud in real time, send reports to law enforcement, and eventually get new
legislation passed to make elections secure.

Michael Flynn's "ReAwaken America" road show continued in 2023. At every tour stop,
attendees get a range of conspiracies, from antisemitism and election integrity to Christian
nationalism and QAnon. Flynn's One More Mission group, moreover, is specifically
recruiting veterans to volunteer as poll watchers, saying the sovereignty of our elections
requires "men and women of integrity to step up, again, and perform our civic duty." His
group uses militarized language and imagery to recruit veterans to join "the fight" as
election volunteers.

Antigovernment General



Ammon Bundy attends a campaign event on Jan. 26, 2022, in Shelley, Idaho. (Photo by Natalie Behring/Getty Images)

# What's Ahead

Antigovernment groups will seek to capitalize on the 2024 election season by trying to mainstream their conspiracies and use them to land new recruits. Militias will continue to use a local/regional structure and frame themselves as helpers of the community, while at the same time engaging in combat training. Sovereign citizens will continue offering seminars and classes to train both followers and entice new recruits, all the while trying to remain relevant to the younger crowd they've found over the last few years. Constitutional sheriffs will try to capitalize on interest in both county supremacy and dubious efforts to nullify federal law. Anti-student inclusion groups and white Christian nationalists will continue trying to build political power and be front-and-center in efforts to dismantle our democratic institutions and democracy itself.

The fallout from the COVID-19 pandemic and the Jan. 6 arrests and convictions will continue to affect the trajectory of the antigovernment movement for years to come. Some militia-style groups will grow "security" arms in the name of protecting conservative

protests and events, while also claiming their military-style training is done only to prepare for emergencies. Antigovernment groups will adopt these strategies and develop others to maintain a veneer of credibility and legitimacy.

If the 2020 elections showed anything, it was that the antigovernment movement may inspire political violence leading up to and during the 2024 elections. Those that engage in attacks on elections and voting infrastructure are some of the biggest threats to human rights and a pluralistic democracy in the United States. School board candidates endorsed by Moms for Liberty did not fare as well as expected in November 2023 elections. This could be an indication of increased awareness about the intentions and actions of anti-student inclusion groups, and the empowerment of parents and local grassroots activists to combat their efforts. Despite taking a beating in recent elections, anti-student inclusion groups are likely to continue attacks on inclusive education at the local level, while national groups try to build political power.

# Background

Antigovernment groups are part of the antidemocratic hard-right movement. They believe the federal government is tyrannical, and they traffic in conspiracy theories about an illegitimate government of leftist elites seeking a "New World Order." Adherents and critics have in the past referred to this movement as the "Patriot" movement.

A particularly prominent conspiracy in the antigovernment movement – and one conspiracy propagandist groups often push – posits an effort to create a New World Order through a One World Government, often facilitated by the United Nations to institute communism/socialism and take away private property rights. Another conspiracy alleges there are plans to merge the United States, Canada and Mexico into a single country. Other notable conspiracies include the idea that the federal government is secretly planning to round up citizens and place them in concentration camps run by the Federal Emergency Management Agency (FEMA). Fears of impending gun control or weapons confiscations, either by the government or international agencies, also run rampant in antigovernment circles.

These conspiracy theories identify grievances, both real and imagined, and demonize groups deemed responsible for them. Conspiracy propagandists offer simple answers to complex problems but often stop short of offering a specific solution to the perceived threats, instead hinting at actions to be taken by movement members while being careful to

maintain plausible deniability. Such groups and outlets as the John Birch Society, WorldNetDaily (WND) and Infowars are crucial to the antigovernment extremist movement in that they help craft and nurture the very conspiracy theories that animate the movement's activists.

The antigovernment movement has experienced waves of popularity, including during the 1990s. In 1996, the year after the Oklahoma City bombing, 858 groups were documented active in the U.S. Timothy McVeigh, one of the Oklahoma City bombers, was motivated by extreme antigovernment beliefs then circulating in the militia movement. He was also inspired by the racist novel *The Turner Diaries,* modeling his attack on a scene from the book. The antigovernment movement of the 1990s, typified by the proliferation of militias, was fueled by a string of incidents where antigovernment figures clashed with law enforcement, including the 1992 Ruby Ridge standoff, the 1993 Branch Davidian Waco compound siege and the 1996 Montana Freemen standoff. Other factors included the struggling economy in the early 1990s, particularly in Western states, and the election of President Bill Clinton, who was characterized by antigovernment activists as a liberal intent on seizing their weapons.

Similarly, in the late 2000s and 2010s, the antigovernment movement was animated by the Tea Party movement, with both national and local groups mobilizing resentment around the economic challenges of the Great Recession and in opposition to the presidency of Barack Obama.

Historically, the militia movement engages in paramilitary training aimed at protecting citizens from the pervasive fear of an impending government crackdown. Militia groups often engage in firearm and field training, maintain internal hierarchical command structures, obsess over guns and the Second Amendment and oppose immigration. Notable groups have included the Wolverine Watchmen, Ohio Defense Force, Hutaree Militia, Oath Keepers, Minutemen American Defense, Militia of Montana and various Three Percenters-affiliated groups. The Wolverine Watchmen were charged, and later convicted, in connection to the 2020 plot to kidnap Michigan Gov. Gretchen Whitmer. Oath Keepers and Three Percenters group members have been arrested for charges relating to the Jan. 6 insurrection. Three Percenters groups adhere to the dubious historical claim that only 3% of American colonists fought against the British during the War of Independence.

The Oath Keepers were founded in 2009 by Elmer Stewart Rhodes, a veteran Army paratrooper, law school graduate and former Ron Paul congressional staffer. Like some antigovernment groups and activists such as Jack McLamb's Police Against the New World

Antigovernment General

Order, Oath Keepers primarily sought to recruit current and former law enforcement, military and first-responder personnel, though they also accepted civilians. Unlike many other militia groups that are local, geographically based groups, Oath Keepers had a centralized hierarchical leadership and tiered structure at national, state and local levels. It was a leading antigovernment group that helped plan and stage the Jan. 6 insurrection.



Oath Keepers militia founder Stewart Rhodes holds a radio as he departs with volunteers from a rally held by U.S. President Donald Trump on Oct. 10, 2019, in Minneapolis, Minnesota. (Credit: Jim Urquhart/REUTERS)

Many of its members, including founder and leader Stewart Rhodes, were charged and convicted of crimes pertaining to the insurrection. In May 2023, Rhodes was sentenced to 18 years in prison after being convicted of seditious conspiracy charges. A small but influential and foundational segment of the antigovernment movement is the constitutional sheriff movement. These groups adhere to the concept of county supremacy and the idea that the county sheriff has the ultimate law enforcement authority in the United States. This idea was pioneered in the 1970s and described as "Posse Comitatus." The Constitutional Sheriffs and Peace Officers Association (CSPOA) is the largest and oldest national constitutional sheriffs organization.

The second tenet of county supremacy centers on the idea that county government should have control of all the land within its borders, taking this power away from the state and federal government. Antigovernment groups who focus on this tenet are often active in the antipublic lands movement popular in the Western U.S., also known in previous decades as the Sagebrush Rebellion or Wise Use movement.

Sovereign citizens, a subset of the antigovernment movement, believe that they, not judges, juries, law enforcement or elected officials, decide which laws they must obey and which to ignore. They also think they shouldn't have to pay taxes.

Sovereign citizen ideology is highly conspiratorial, and its adherents are best known for clogging up the courts with indecipherable filings and bogus liens targeting public officials. Sovereign citizens are frequently engaged in criminal activity and have been violent, particularly when confronted by government officials such as police officers. Some concerning groups are part of a subset of sovereign citizens termed Moorish sovereign citizens.

The antigovernment movement has also included groups whose focus was on tax protest and survivalism. While groups associated with both segments still exist, their prevalence has diminished in recent years. Though the antigovernment movement has changed in the last 50 years, with different segments either growing or shrinking, the key conspiracies and ideas are always taken up by other antigovernment groups and often reemerge later.

# Three Percenters

In recent years, Three Percenterism was one of the three leading core components within the antigovernment militia movement, along with the Oath Keepers and traditional militia groups. The reference to 3% stems from the dubious historical claim that only 3% of American colonists fought against the British during the War of Independence. Numerous Jan. 6 insurrectionists had connections to Three Percenters and were charged and convicted for the roles they played. While Three Percenter groups still exist, their prominence and influence took a hit after Jan. 6.

3/17/25, 10:33 AM



Chris Hill, who goes by the name General Bloodagent, conducts a drill with his militia group in November 2016. (Photo by Mohammed Elshamy/Anadolu Agency/Getty Images)

# Anti-Student Inclusion

The main goal of these groups is to gain power, mostly at the local level, and bring their extremist agenda into the classroom, often focusing on approaches that deny LGBTQ+ and Black students representation and quality education. The driving narrative of anti-student inclusion groups is that public schools and educators are attempting to indoctrinate and sexualize students through a radical Marxist agenda. They push this theory by driving the ban of reading and instructional materials, seeking to eliminate policies that protect LGBTQ+ students, and pushing for a curriculum that restricts teaching the hard parts of American history.

# Key Moments In Movement History

- The John Birch Society is founded in 1958. The organization is dedicated to opposing communism but also pushes conspiracy theories that become standard in the antigovernment movement.

- The beginning of the antitax movement in the 1950s and into the 1960s, which opposed a federal income tax, is often seen as an important source for the antigovernment and militia movements that take off in the 1980s and 1990s.

- Christian Reconstruction and Christian Identity, two movements that have influenced militias in the United States, begin to take form in the 1950s. Although never large in terms of direct adherents, Christian Reconstruction introduced the idea of dominionism – the rule of society and politics by certain and specific types of Christians and Christian institutions – which some white Christian nationalists have adopted, as well as others in patriot and antigovernment groups. Their influence on the extremist right and militia groups begins in earnest in the late 1970s into the 1980s.

- The Posse Comitatus begins in the Western United States in the 1960s. Adherents argue that there is no legitimate government above the county level. There are many strong connections between Posse Comitatus and Christian Identity, including common anti-Black and antisemitic beliefs.

- At a joint session of Congress in 1991, President George H.W. Bush describes the first Gulf War as an effort to protect a "new world order" of international collaboration birthed after the Cold War's end. This feeds conspiracy theories popular with militias and antigovernment activists that globalist political elites conspire to create a worldwide government at the expense of U.S. sovereignty.

- Louis Beam publishes an essay in 1992 on "leaderless resistance," a concept that becomes influential in antigovernment organizations.

- The 11-day Ruby Ridge standoff with the Weaver family and law enforcement occurs in Boundary County, Idaho. In August 1992, U.S. marshals moved to arrest Randy Weaver under a warrant. Weaver refused, and a standoff ensued. Weaver's son, his wife and a deputy U.S. marshal were killed. This serves as a rallying cry to the growing antigovernment and militia movements.

- At the "Gathering of Christian Men," also know as the "Rocky Mountain Rendezvous." in Estes Park, Colorado, in 1992, 160 neo-Nazis, Klan members, antisemitic Christian Identity adherents and others arguably lay the groundwork for the militia movement that would explode in 1994.

- The 1993 federal siege of the Branch Davidian compound in Waco, Texas, ends with nearly 80 dead and the compound burned to the ground. The Ruby Ridge standoff and the lethal siege in Waco become seminal events in the lore of the extreme right, in particular the antigovernment movement, which has also been called the "Patriot" movement in the past.

- Passage of gun control laws – such as the Brady Handgun Violence Prevention Act, more commonly known as the "Brady Bill," in 1993 – is viewed by the antigovernment right as a sign of a growing tyrannical federal government bent on making individual Americans defenseless.

- On April 19, 1995, Timothy McVeigh and Terry Nichols bomb the Alfred P. Murrah Federal Building in Oklahoma City. The bombing killed at least 168 people and injured at least 680 additional individuals. McVeigh and Nichols were motivated by the Waco and Ruby Ridge standoffs, and McVeigh apparently visited the Waco compound both during and after the siege. This attack continues to motivate antigovernment groups decades after the event.

- Montana Freemen, a Christian sovereign citizen group, engage in a standoff with federal authorities that ends with the Freemen's surrender.

- Conspiracy website WorldNetDaily (WND) is founded in 1997 by Joseph Farah.

- On June 27, 1997, the U.S. Supreme Court in *Printz v. U.S.* sides with Sheriff Richard Mack, the future founder of the Constitutional Sheriffs and Peace Officers Association, and Ravalli County Sheriff/Coroner Jay Printz in their case against a provision of the "Brady Bill."

- Infowars is founded in 1999, and with antigovernment conspiracy theorist and supplement salesman Alex Jones, it goes on to craft and nurture the conspiracy theories that animate the antigovernment movement.

- Barack Obama is elected in 2008 as the first Black president of the United States. After a spike of militia activity in the 1990s, the antigovernment movement seemed to wither, only to rebound in the number of groups created during the Obama administration.

- Shawna Forde, leader of the militant group Minutemen American Defense, coordinates a home invasion on May 30, 2009, that results in the murders of Arivaca, Arizona, resident Raul Flores and his 9-year-old daughter Brisenia. Forde and one other group member were sentenced to death; a third member of the group gets life in prison/hatewatch/2009/06/15/nativist-leader-arrested-double-murder.

- Oath Keepers forms in 2009. The organization, made up of present and former law enforcement officials and military veterans, becomes one of the largest far-right antigovernment groups in the United States and will be integral to the violence on Jan. 6.

- Richard Mack, a former sheriff and Oath Keepers board member, establishes the Constitutional Sheriffs and Peace Officers Association in 2011.

- **Cliven Bundy's Battle at Bunkerville**, Nevada, takes place on July 10, 2014. The Bureau of Land Management (BLM) and Las Vegas Metropolitan Police Department engaged in a four-day standoff against Cliven Bundy and his antigovernment followers over unpaid cattle grazing fees. The standoff ended when the BLM withdrew to avoid a violent clash with antigovernment supporters. The Bundys, as well as others in antigovernment circles, see this as a significant and inspirational win against federal authority.

- The Malheur National Wildlife Refuge Occupation begins in January 2016. Antigovernment adherents, including Ammon Bundy and militia members, descend onto the Malheur National Wildlife Refuge for what escalates to a 41-day standoff, with law enforcement demanding that the federal government hand over public lands to states. The standoff ends with four arrests.

- Donald Trump is elected president in 2016 without winning the popular vote. Until the Trump administration, antigovernment activity and membership would increase during Democratic administrations and wane during Republican administrations. In a change to these trends, antigovernment activity holds strong into the Trump administration from the highs from Obama's presidency. At this point, many antigovernment groups shift from opposing the federal government to opposing Trump's perceived enemies. Many antigovernment groups support Trump's election campaign and his administration.

- The height of the COVID pandemic hits in 2020 and 2021. Conspiracy propagandists, including the John Birch Society, find a niche audience with COVID-19 vaccine skeptics, using existing antigovernment mistrust and a historical relationship with the natural-health sector to push population and government control conspiracies. Likewise, constitutional sheriff organizations promoted COVID-19 conspiracy theories and refused to enforce health guidelines enacted by lawmakers.

- The Virginia Citizens Defense League Rally in Richmond, Virginia, is held in January 2020. The event brings together extreme antigovernment militia groups alongside other Second Amendment absolutists. Joining nearly 400 localities in 20 states, 120 localities in Virginia declared themselves "Second Amendment sanctuaries."

- During a rally on April 30, 2020, in Michigan's Capitol building, attendees – some armed – storm the statehouse. Brothers William and Michael Null, members of the Wolverine Watchmen militia, attend the event, which is hosted in part by American Patriot Council's Ryan Kelley.

- In May 2020, a police officer kills George Floyd in Minneapolis, sparking rallies for racial equality and criminal justice reform around the country. In many locations, armed militia groups respond by showing up at the events in full tactical gear, claiming they are

Antigovernment General

protecting the community. A police officer in Kenosha, Wisconsin, shoots Jacob Blake in August 2020. Black Lives Matter protests occur throughout the state. Militias come out to counter them. Kyle Rittenhouse is accused of shooting three people, killing two. He receives an outpouring of support from the far right and is eventually acquitted of all charges, making him a celebrity of the extremist right.

- Violent domestic extremists, including antigovernment militias such as the Oath Keepers, storm the U.S. Capitol building in Washington, D.C., on Jan. 6, 2021, in an attempt to stop the certification of the 2020 general election results. Members of the group face multiple federal charges. At least five people die in connection with the attack. Among those arrested are members of the Proud Boys, the Three Percenters movement and the Oath Keepers. Attacks by antigovernment militia groups also take place at state capitol buildings in Arizona, California, Colorado, Kansas, Kentucky, Pennsylvania, Wisconsin and Wyoming.

- Red Pill festivals in Montana and South Dakota take place in June and July 2021. Conspiracy theorists and lawmakers gather for regional events, which include such organizations such the John Birch Society, Redoubt News, Connecting the Dots, and Constitutional Sheriffs and Peace Officers Association. Speakers include Alex Newman, Caleb Collier, Bill Jasper, Matt Shea, Idaho Rep. Heather Scott, Joey Gibson, John Jacob Schmidt, G. Edward Griffin, Dan Happel and Richard Mack.

- Throughout summer 2021, Ammon Bundy's People's Rights threatens a standoff in Klamath Falls, Oregon, over water rights with the Klamath Tribes (Klamath-Modoc-Yahooskin).

- Arise USA claims it made an 85-stop tour promoting the "Big Lie," QAnon, COVID-19 conspiracies, 9/11 antisemitic conspiracies and county supremacy from May to September 2021. Robert David Steele, who will die from COVID-19 that fall, organized the rally. Speakers included Richard Mack and Kevin Jenkins. Steele was a former CIA agent, 2016 Libertarian candidate for president and Holocaust denier.

- The ReAwaken America Health and Freedom Tour begins in 2021 as QAnon conspiracy theorists gather with other antigovernment activists in Michigan, Florida, Oklahoma, Texas, Colorado and California. Speakers include Clay Clark, Michael Flynn, Roger Stone, Gene Hoe, Richard Mack of the Constitutional Sheriffs and Peace Officers Association, Joe Oltmann of FEC United and Artur Pawlowski, Canadian Black Robe Regiment pastor. This eventually grows into the ReAwaken America tour that occurs throughout 2022 in the run-up to the midterm elections that year. The ReAwaken America events continued to tour the country into 2023.

3/17/25, 10:33 AM                                                    Antigovernment General

- The first American trucker convoy departs Adelanto, California, in February 2022 on its way to Washington, D.C. This "People's Convoy" was an effort by truckers and others to publicly highlight their right-wing beliefs, including opposition to COVID vaccines and public health measures during the pandemic, with a cross-country parade fashioned after the disruptive trucker protest in Canada in early 2022. Convoy organizers and supporters included far-right figures such as Michael Flynn, Patrick Byrne and the Washington III Percent. In September, some of the group reorganized to protest imprisonment of Jan. 6 insurrectionists by flooding the veterans suicide hotline with nonemergency calls.

- Members of the Wolverine Watchmen, along with members of the Michigan Militia, are arrested by the FBI and Michigan State Police on Oct. 8, 2022 after plotting to kidnap Michigan Gov. Gretchen Whitmer. A Jackson County, Michigan, jury in late 2022 found three members of the Wolverine Watchmen guilty on all charges for their plot to kidnap and kill Whitmer.



What is antigovernment extremism?



# 2023 General Antigovernment Groups

Download SPLC's 2023 list of antigovernment groups with EIN (tax ID) numbers.

**2nd Amendment Patches.com**
Halltown, Missouri

**ActionUp America**
Jacksonville, Florida

**American Patriot Party**
Ashland, Oregon

**American Patriot Vanguard**
California
Illinois
Indiana
Minnesota
Rio Rancho, New Mexico
Ohio
Tennessee
Texas

**American Policy Center**

Warrenton, Virginia

**Audit the Vote PA**

Huntingdon Valley, Pennsylvania

**AVOW (Another Voice of Warning)**

Rigby, Idaho

**Awake Illinois**

Naperville, Illinois

**Berks County Patriots**

Blandon, Pennsylvania

**California Three Percenters**

Sanger, California

**Camp Constitution**

Charlotte, North Carolina

**Center for Self Governance**

Republic, Washington

**Child Protection League/Child Protection League Action**

Maple Grove, Minnesota

**Citizens Defending Freedom**

Brevard County, Florida

Duval County, Florida

Hillsborough County, Florida

Miami-Dade County, Florida

Nassau County, Florida

Osceola County, Florida

Polk County, Florida

Chatham County, Georgia

Fulton County, Georgia

Okefenokee District, Georgia

Collin County, Texas

Dallas County, Texas

Denton County, Texas

Harris County, Texas

Montgomery County, Texas

Nueces County, Texas

Tarrant County, Texas

Travis County, Texas

Williamson County, Texas

## Citizens for Responsible Education

Newburyport, Massachusetts

## Citizens Organized to Restore Rights

Fall River, Massachusetts

## Concerned Parents of Texas

Austin, Texas

## Constitution Club

Hemet, California

## Constitution Party

Woodstock, Georgia

Coeur d'Alene, Idaho

Springfield, Illinois

Grand Rapids, Michigan

Piedmont, Missouri

Pulaski County, Missouri

Auburn, New Hampshire

New Lebanon, Ohio

Lancaster County, Pennsylvania*

Lancaster, Pennsylvania

Bountiful, Utah

Weston, West Virginia

## Constitutional Coalition of New York State

Cheektowaga, New York

**Constitutional Education & Consulting**
Wellborn, Florida

**Constitutional Rights PAC**
McLean, Virginia

**Courage Is a Habit**
Indiana

**Cowboys Motorcycle Club**
Idaho

**Defense Distributed**
Austin, Texas

**Eagle Forum**
Birmingham, Alabama
Santa Rosa, California
Brighton, Colorado
Alton, Illinois
Birmingham, Michigan
Missouri
Nebraska
Elko, Nevada
Oklahoma City, Oklahoma
Nashville, Tennessee
Dallas, Texas
Montgomery County, Texas
Spring, Texas
South Jordan, Utah
Lynden, Washington

**Educate Yourself**
Costa Mesa, California

**Education First Alliance**
Apex, North Carolina

**Education Veritas**

Alpharetta, Georgia

**Faith Education Commerce (FEC United)**

Colorado Springs, Colorado

Grosse Pointe, Michigan

Macomb, Michigan

**For Kids and Country**

Lebanon, Pennsylvania

**Free PA**

Cumberland County, Pennsylvania

Dauphin County, Pennsylvania

Lancaster County and South End Chapters, Pennsylvania

Lebanon County, Pennsylvania

Montgomery County, Pennsylvania

Perry County, Pennsylvania

Schuylkill, County

York County, Pennsylvania

**Freedom Coalition**

Butte County, California

Glenn County, California

Live Oak, California

Placer County, California

Sacramento, California

**Freedom First Society**

Colorado Springs, Colorado

**Freedom Law School**

Spring Hill, Florida

**Freedom's Rising Sun**

Logan, Utah

**Garden State 2A Grassroots Organization**

Mullica Hill, New Jersey

**Gorilla Learning Institute**

Citrus Heights, California

**Granite Grok**

Gilford, New Hampshire

**Gun Owners of America**

Florida

Harrisburg, Pennsylvania

Springfield, Virginia

**Illinois Sons of Liberty**

Illinois

**Institute on the Constitution (aka American View)**

Lewes, Delaware

Caroline County, Maryland

Nebraska

New Hampshire

Ohio

Cookeville, Tennessee

Pasadena, Maryland

**LewRockwell.com**

Auburn, Alabama

**Liberty First Society**

Wellborn, Florida

**Liberty News Radio**

American Fork, Utah

**Lions of Liberty**

Chino Valley, Arizona

**Long Island Loud Majority**

Lindenhurst, New York

**Long Island Mutual Assistance Group**

Nassau County, New York

**Loving Liberty Network**

Ogden, Utah

**Madison's Militia**

New Lebanon, New York

**Mamalitia**

San Joaquin, California

**Maulitia Motorcycle Club**

Dauphin, Pennsylvania

**Mom Army**

Phoenix, Arizona

Coachella Valley, California

Los Angeles, California

Orange County, California

Sacramento, California

San Diego, California

Ventura County, California

Washington, D.C.

Indianapolis, Indiana

Las Vegas, Nevada

Long Island, New York

Charlotte, North Carolina

Knoxville, Tennessee

Nashville, Tennessee

Austin, Texas

Dallas-Fort Worth, Texas

Houston, Texas

Salt Lake City, Utah

Seattle, Washington

## Moms for America

Arkansas

Brevard County, Florida

Winter Haven, Florida

Palm Beach County, Florida

Polk County, Florida

Sarasota County, Florida

Illinois

Northern Illinois

North Carolina

Englewood, Ohio*

Virginia

## Moms for Liberty

Baldwin, County Alabama

Madison County, Alabama

Shelby County, Alabama

Matanuska-Susitna Borough, Alaska

Maricopa County, Arizona

Pima County, Arizona

Benton County, Arkansas

Craighead County, Arkansas

Lee County, Arkansas

Lonoke County, Arkansas

Pulaski County, Arkansas

Washington County, Arkansas

Alameda County, California

Contra Costa County, California

Lake County, California

Los Angeles County, California

Placer County, California

Riverside County, California

San Bernardino County, California

San Diego County, California

San Luis Obispo County, California

San Mateo, California

Santa Barbara, California

Santa Clara County, California

Antigovernment General

Shasta County, California

Tuolumne County, California

Yolo County, California

Boulder County, Colorado

Garfield County, Colorado

Mesa, Colorado

Weld, Colorado

Fairfield County, Connecticut

Hartford County, Connecticut

Litchfield County, Connecticut

New Castle County, Delaware

Alachua County, Florida

Bay County, Florida

Brevard County, Florida

Broward County, Florida

Citrus County, Florida

Clay County, Florida

Collier County, Florida

Duval County, Florida

Flagler County, Florida

Hernando County, Florida

Highlands County, Florida

Hillsborough County, Florida

Indian River County, Florida

Leon County, Florida

Martin County, Florida

Miami-Dade County, Florida

Monroe County, Florida

Orange County, Florida

Osceola County, Florida

Okaloosa County, Florida

Palm Beach County, Florida

Pasco County, Florida

Pinellas County, Florida

Polk County, Florida

Putnam County, Florida

Santa Rosa County, Florida

Sarasota County, Florida*

3/17/25, 10:33 AM                                                              Antigovernment General

Seminole County, Florida

St. Johns County, Florida

St. Lucie County, Florida

Volusia County, Florida

Walton County, Florida

Chattooga County, Georgia

Fulton County, Georgia

Gwinnett County, Georgia

Hall County, Georgia

Laurens County, Georgia

Oconee County, Georgia

Honolulu County, Hawaii

Nez Perce County, Idaho

Cook County, Illinois

DuPage County, Illinois

Henry County, Illinois

Tazewell County, Illinois

Allen County, Indiana

Cass County, Indiana

Hamilton County, Indiana

Howard County, Indiana

La Porte County, Indiana

Noble County, Indiana

Tipton County, Indiana

Warrick County, Indiana

Carroll County, Iowa

Dallas County, Iowa

Linn County, Iowa

Polk County, Iowa

Warren County, Iowa

Ford County, Iowa

Johnson County, Kansas

Boone County, Kentucky

Campbell County, Kentucky

Jefferson County, Kentucky

Warren County, Kentucky

East Baton Rouge Parish, Louisiana

Kennebec County, Maine

Antigovernment General

Anne Arundel County, Maryland

Baltimore County, Maryland

Carroll County, Maryland

Cecil County, Maryland

Frederick County, Maryland

Harford County, Maryland

Howard County, Maryland

Kent County, Maryland

Montgomery County, Maryland

Talbot County, Maryland

Middlesex County, Massachusetts

Plymouth County, Massachusetts

Branch County, Michigan

Emmet County, Michigan

Grand Traverse County, Michigan

Isabella County, Michigan

Kent County, Michigan

Livingston County, Michigan

Macomb County, Michigan

Midland County, Michigan

Monroe County, Michigan

Oakland County, Michigan

Wayne County, Michigan

Dakota County, Minnesota

Olmsted County, Minnesota

Otter Tail County, Minnesota

Scott County, Minnesota

St. Louis County, Minnesota

Wright County, Minnesota

Madison County, Mississippi

Green County, Missouri

Jackson County, Missouri

St. Charles County, Missouri

St. Louis County, Missouri

Yellowstone County, Montana

Douglas County, Nebraska

Sheridan County, Nebraska

Clark County, Nevada

Hillsborough County, New Hampshire

Rockingham County, New Hampshire

Bergen County, New Jersey

Burlington County, New Jersey

Cape May County, New Jersey

Morris County, New Jersey

Ocean County, New Jersey

Passaic County, New Jersey

Bernalillo County, New Mexico

San Juan County, New Mexico

Dutchess County, New York

Erie County, New York

Monroe County, New York

Nassau County, New York

Niagara, New York

Oneida County, New York

Onondaga County, New York

Orange County, New York

Putnam County, New York

Queens County, New York

Suffolk County, New York

Wayne County, New York

Westchester County, New York

Alexander County, North Carolina

Bladen County, North Carolina

Buncombe County, North Carolina

Cabarrus County, North Carolina

Chatham County, North Carolina

Forsyth County, North Carolina

Gaston County, North Carolina

Guilford County, North Carolina

Iredell County, North Carolina

Johnston County, North Carolina

Mecklenburg, North Carolina

New Hanover County, North Carolina

Onslow County, North Carolina

Orange County, North Carolina

Pender County, North Carolina

Stanly County, North Carolina

Wake County, North Carolina

Wilson County, North Carolina

Williams County, North Dakota

Delaware County, Ohio

Franklin County, Ohio

Hamilton County, Ohio

Lake County, Ohio

Madison County, Ohio

Medina County, Ohio

Stark County, Ohio

Summit County, Ohio

Wood County, Ohio

Canadian County, Oklahoma

Garfield County, Oklahoma

Oklahoma County, Oklahoma

Pottawatomie County, Oklahoma

Tulsa County, Oklahoma

Deschutes County, Oregon

Douglas County, Oregon

Adams County, Pennsylvania

Allegheny County, Pennsylvania

Beaver County, Pennsylvania

Berks County, Pennsylvania

Bucks County, Pennsylvania

Chester County, Pennsylvania

Cumberland County, Pennsylvania

Dauphin County, Pennsylvania

Delaware County, Pennsylvania

Erie County, Pennsylvania

Franklin County, Pennsylvania

Lackawanna County, Pennsylvania

Lancaster County, Pennsylvania

Lehigh County, Pennsylvania

McKean County, Pennsylvania

Monroe County, Pennsylvania

Montgomery County, Pennsylvania

Northampton County, Pennsylvania

3/17/25, 10:33 AM                                                                        Antigovernment General

Northumberland County, Pennsylvania

Philadelphia County, Pennsylvania

Pike County, Pennsylvania

Schuylkill County, Pennsylvania

Union County, Pennsylvania

Washington County, Pennsylvania

Westmoreland County, Pennsylvania

York County, Pennsylvania

Washington County, Rhode Island

Anderson County, South Carolina

Beaufort County, South Carolina

Berkeley County, South Carolina

Charleston County, South Carolina

Colleton County, South Carolina

Dorchester County, South Carolina

Florence County, South Carolina

Georgetown County, South Carolina

Greenville, South Carolina

Horry County, South Carolina

Kershaw County, South Carolina

Lancaster County, South Carolina

Lexington County, South Carolina

Oconee County, South Carolina

Pickens County, South Carolina

Richland County, South Carolina

Spartanburg County, South Carolina

York County, South Carolina

Hughes County, South Dakota

Meade County, South Dakota

Pennington County, South Dakota

Davidson County, Tennessee

Hamilton County, Tennessee

Shelby County, Tennessee

Sumner County, Tennessee

Williamson County, Tennessee

Wilson County, Tennessee

Bexar County, Texas

Collin County, Texas

Anti-Government General

Denton County, Texas

El Paso County, Texas

Fort Bend County, Texas

Gillespie County, Texas

Lubbock County, Texas

Nueces County, Texas

San Patricio County, Texas

Travis County, Texas

Williamson County, Texas

Bedford County, Virginia

Fauquier County, Virginia

Loudoun County, Virginia

Montgomery County, Virginia

Prince William County, Virginia

Roanoke County, Virginia

Spotsylvania County, Virginia

Stafford County, Virginia

Warren County, Virginia

Benton County, Washington

Douglas-Chelan County, Washington

Lewis County, Washington

King County, Washington

Kitsap County, Washington

Pierce County, Washington

Snohomish County, Washington

Spokane County, Washington

Whitman County, Washington

Yakima County, Washington

Kanawha County, West Virginia

Kenosha County, Wisconsin

Marathon County, Wisconsin

Milwaukee County, Wisconsin

Ozaukee County, Wisconsin

Polk County, Wisconsin

Racine County, Wisconsin

St. Croix County, Wisconsin

Washington County, Wisconsin

Winnebago County, Wisconsin

Antigovernment General

Wood County, Wisconsin

Vilas County, Wisconsin

Hot Springs County, Wyoming

Laramie County, Wyoming

Natrona County, Wyoming

Sweetwater County, Wyoming

**National Constitutional Coalition of Patriotic Americans**

Connecticut

Maine

New Jersey

Pennsylvania

Tennessee

Bridgeport, West Virginia

**New California State**

San Luis Obispo, California

**New Jersey Project**

Medford, New Jersey

**News With Views**

Spring Branch, Texas

**Next News Network**

Northbrook, Illinois

**No Left Turn in Education**

Sacramento, California

Hartford, Connecticut

Tallahassee, Florida

Atlanta, Georgia

Cobb County, Georgia

Fulton County, Georgia

Louisville, Kentucky

Augusta, Maine

Annapolis, Maryland

St. Paul, Minnesota

Jefferson City, Missouri
Concord, New Hampshire
Raleigh, North Carolina
Portland, Oregon
Gladwyne, Pennsylvania
Harrisburg, Pennsylvania
Providence, Rhode Island
Richmond, Virginia
Madison, Wisconsin

**Oath Keepers**
Allen County, Indiana
DeKalb County, Indiana

**Oath Keepers USA**
Orem, Utah

**Ohio Patriots Alliance**
Newark, Ohio

**Overpasses for America**
California
Pottawatomie County, Oklahoma
Texas

**Panhandle Patriots Riding Club**
Idaho

**Parents Against Critical Race Theory LLC Ashburn**
Virginia

**Parents Defending Education**
Midlothian, Virginia*
Alabama
Alaska
Arkansas
California
Colorado

Connecticut

Florida

Georgia

Hawaii

Idaho

Illinois

Indiana

Kansas

Kentucky

Maine

Michigan

Minnesota

Missouri

Nebraska

Nevada

New Jersey

North Carolina

North Dakota

Ohio

Oklahoma

Oregon

Rhode Island

South Carolina

South Dakota

Tennessee

Texas

Utah

Vermont

Virginia

Wyoming

## Parents' Rights in Education

Alaska

Arizona

California

Idaho

Illinois

Maine

Montana

New York

Ohio

Oregon

Rhode Island

Texas

Vermont

Virginia

Washington

Wisconsin

**Patriot America**

Middletown, Ohio

**Patriot Party of AZ**

Glendale, Arizona

**Patriot Shit Outfitters**

Bethel, Ohio

**People's Rights**

Southern California

Emmett, Idaho*

Montana

Central Oregon

Oregon

Utah

Washington

**Purple for Parents Indiana**

Nappanee, Indiana

**Reawaken America**

Collinsville, Oklahoma

**Renew America**

Provo, Utah

## Riders United for a Sovereign America Corp.

Tempe, Arizona

## Sarasota Patriots

Sarasota, Florida

## Secure Arkansas

Little Rock, Arkansas

## Sons of Liberty Media (You Can Run But You Cannot Hide)

Annandale, Minnesota

## Sons of Liberty Survival Outfitters

Sparta, New Jersey

## Southern Ohio Outdoorsmen

Peebles, Ohio

## State of Jefferson Formation

Mariposa, California

Shasta County, California

Stanislaus County, California

Josephine County, Oregon

## Stay in the Light Stay in the Fight

Sarasota, Florida

## Super Happy Fun America

Woburn, Massachusetts

## Tactical Civics

San Diego County, California

Florida

South Georgia

Bartow County, Georgia

Chattooga County, Georgia

Cherokee County, Georgia

Cobb County, Georgia

Fannin County, Georgia

Floyd County, Georgia

Haralson County, Georgia

Pickens County, Georgia

Polk County, Georgia

Union County, Georgia

Idaho

Kentucky

Androscoggin County, Maine

Barry County, Michigan

Montcalm County, Michigan

Isabella County, Michigan

Cascade County, Montana

Gallatin County, Montana

Park County, Montana

Silver Bow County, Montana

Nassau County, New York

North Carolina

Clearfield County, Pennsylvania

Allegheny County, Pennsylvania

Carbon County, Pennsylvania

Wilson County, Tennessee

Boerne, Texas*

Denton County, Texas

Freestone County, Texas

Harris County, Texas

Montgomery County, Texas

Parker County, Texas

San Patricio County, Texas

Appomattox County, Virginia

**Tea Party of Kentucky**

Louisville, Kentucky

**Get the latest updates from Southern Poverty Law Center.**



Your Email Address                    Subscribe ⊙

Racial Justice Issues        Support Us              Press Center

Find Resources               Careers                 Contact Us

State Support                Class Action Lawsuits   Member Center

                                                     The Civil Rights Memorial Center

                                                     Learning for Justice

**SPLC**

  

SPLC is a nonprofit, tax-exempt 501(c)(3) organization (EIN: 63-0598743)

The Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104

Privacy & Terms      Accessibility Statement      © Copyright 2025 SPLC. All Rights Reserved.

Texas

Corpus Christi, Texas

**Wild Bill for America**

South Daytona, Florida

EXHIBIT 8

3/17/25, 10:49 AM                     San Bernardino County Patriots (@sbcpatriots) • Instagram photos and videos

 sbcpatriots

 **sbcpatriots** • • •

Follow    Message    

**San Bernardino County Patriots**
Action based group to take back our County, State & Country. We stand for Truth, Freedom, God & our Flag. We are a grassroots movement. WE THE PEOPLE!
🔗 www.sbcountypatriots.com


Website!

| 479 posts | 1,822 followers | 634 following |
|---|---|---|

        

        



                    

https://www.instagram.com/sbcpatriots/                                                                1/3

# EXHIBIT 9

```
 1                UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3                     WESTERN DIVISION
 4
 5      ALEX VILLANUEVA,                    )
                                            )
 6                     Plaintiff,           )
                                            )
 7                  VS.                     ) CASE NO.
                                            ) 2:24-CV-04979
 8      COUNTY OF LOS ANGELES, COUNTY OF    ) SVW (JCx)
        LOS ANGELES SHERIFF'S DEPARTMENT    )
 9      LOS ANGELES COUNTY BOARD OF         )
        SUPERVISORS, COUNTY EQUITY          )
10      OVERSIGHT PANEL, LOS ANGELES        )
        COUNTY OFFICE OF INSPECTOR          )
11      GENERAL, CONSTANCE KOMOROSKI,       )
        MERCEDES CRUZ, ROBERT A. YANG,      )
12      LAURA LECRIVAIN, SERGIO V.          )
        ESCOBEDO, RON KOPPERUD, ROBERT G.   )
13      LUNA, MAX-GUSTAF HUNTSMAN, ESTHER   )
        LIM, and DOES 1 to 100, inclusive, )
14                                          )
                       Defendants.          )
15      _____)
16
17
18         VIDEOTAPED REMOTE DEPOSITION OF DR. JESSICA ROWE
19                       APRIL 12, 2025
20
21                        --ooOoo--
22
23
24      JOB NO.: 7298356
25      REPORTED BY: MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423
```

                                                    Page 1

```
 1              VIDEOTAPED REMOTE DEPOSITION OF DR. JESSICA
 2    ROWE, TAKEN ON BEHALF OF DEFENDANTS, COMMENCING AT 1:01
 3    P.M., SATURDAY, APRIL 12, 2025, AT FOLSOM, CALIFORNIA,
 4    BEFORE MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423.
 5
 6
 7
 8    APPEARANCES OF COUNSEL:
 9    (ALL PARTIES APPEARING REMOTELY)
10
11    FOR PLAINTIFFS:
12                    SHEGERIAN & ASSOCIATES
                      BY: ALEX DIBONA, ESQ.
13                    11520 San Vicente Boulevard
                      Los Angeles, California 90049
14                    310.860.0770
                      adibona@shegerianlaw.com
15
16    FOR DEFENDANTS:
17                    MILLER BARONDESS, LLP
                      BY: BRIAN NEACH, ESQ.
18                    2121 Avenue of the Stars, Suite 2600
                      Los Angeles, California 90067
19                    310.552.4400
                      bneach@millerbarondess.com
20
21    Also Present:
22    FABIAN VENEGAS - THE VIDEOGRAPHER
23    JASON TOKORO - MILLER BARONDESS
24    DR. MARC COHEN - DEFENSE EXPERT
25
```

Page 2

```
 1                      I N D E X

 2   WITNESS           EXAMINATION BY           PAGE

 3   DR. JESSICA ROWE

 4                   (BY MR. NEACH)           5,147

 5                   (BY MR. DIBONA)        128,148

 6

 7

 8

 9                    E X H I B I T S

10   NUMBER         PAGE              DESCRIPTION

11   EXHIBIT 1        19              ROWE CV

12   EXHIBIT 2        25              ENGAGEMENT LETTER

13   EXHIBIT 3        28              DEPOSITION NOTICE

14   EXHIBIT 4        44              ROWE INVOICE

15   EXHIBIT 5        46              EXPERT DISCLOSURE

16   EXHIBIT 6        53              ROWE REPORT

17   EXHIBIT 7        72              MEDICAL RECORDS

18   EXHIBIT 8       104              VALIDITY RESULTS

19   EXHIBIT 9       107              CLINICAL SCORES

20   EXHIBIT 10      109              PAI SCALES

21   EXHIBIT 11      135              COHEN REPORT

22

23

24

25
```

Page 3

```
 1                    FOLSOM, CALIFORNIA

 2              Saturday, April 12, 2025; 1:03 p.m.

 3

 4

 5        THE VIDEOGRAPHER:  Good afternoon.  We're going on    01:03

 6   the record at 1:03 p.m. Pacific on April 12th, 2025.

 7   Please note that this deposition is being conducted

 8   virtually.  Audio and video recording will continue to

 9   take place unless all parties agree to go off the record.

10             This is media unit 1 of the video recorded      01:03

11   deposition of Dr. Jessica Rowe, taken by counsel for

12   defendant in the matter of Alex Villanueva versus County

13   of Los Angeles, et al.  Filed in the United States

14   District Court, Central District of California, Western

15   Division.  Case number 2:24-CV-04979 SVW(JCx).           01:04

16             The location of the witness is Folsom,

17   California.  My name is Fabian Venegas representing

18   Veritext Legal Solutions and I am the videographer.  I'm

19   not related to any party in this action, nor am I

20   financially interested in the outcome.                   01:04

21             If there are any objections to proceeding,

22   please state them at the time of your appearance.

23             Counsel and all present will now state their

24   appearances and affiliations for the record, beginning

25   with the noticing party.                                 01:05
```

Page 4

```
 1          MR. NEACH:  Good afternoon.                    01:05

 2              Brian Neach of Miller Barondess, LLP

 3    representing the defendants.  Also with me from Miller

 4    Barondess is Jason Tokoro.

 5          MR. DIBONA:  And Alex DiBona, Shegerian and     01:05

 6    Associates on behalf of the plaintiff.

 7          THE REPORTER:  My name is Michelle Sabado and my

 8    CSR number is 7423.

 9

10                    DR. JESSICA ROWE,                     01:05

11       having been first duly sworn by the Reporter, was

12              examined and testified as follows:

13

14          MR. NEACH:  Thank you.

15                                                          01:05

16                     EXAMINATION

17    BY MR. NEACH:

18          Q    Good afternoon, Dr. Jessica Rowe.  Can you

19    pronounce -- I'm sorry.  State and spell your name for

20    the record, please.                                  01:06

21          A    Yeah, sure.  Jessica Rowe, J-E-S-S-I-C-A.

22    Last name Rowe, R-O-W-E.

23          Q    And have you had your deposition taken

24    before?

25          A    Yes.                                       01:06

                                                         Page 5
```

```
1    on a reasonable degree of psychological certainty?        04:43

2           A     That is correct.

3           MR. NEACH:  Object as leading.

4    BY MR. DIBONA:

5           Q     In other words, are you -- did you base that   04:43

6    on your clinical experience and education and your exam

7    of him?

8           MR. NEACH:  Object as leading.

9           THE WITNESS:  Yes.  That's -- that's always the

10   process.  We're always looking at a reasonable degree of   04:43

11   psychiatric probability of what caused a particular

12   illness and in the examination and as it's stated in

13   Dr. Cohen's psychological testing, the actual, you know

14   data -- objective data said the same thing.

15   BY MR. DIBONA:                                             04:44

16          Q     What is the DSM-5?  There was a reference to

17   that.  Can you just explain that for the record?

18          A     Yeah.  It's our diagnostic statistical manual

19   fifth edition.  Basically what it is, it's a huge book.

20   It's basically our Bible.  It's what we look to when we    04:44

21   diagnose.  It talks about prevalence of illness,

22   treatment, ruling out diagnoses, thing by nature.  It's

23   -- it's -- it's what we -- what we often use to diagnose.

24          Q     Is it -- and the diagnosis that you gave

25   Former Sheriff Villanueva, is that a diagnosis that's      04:44
```

Page 131

| | | | |
|---|---|---|---|
| 1 | A | Okay.  That's -- I can see -- yes, I can see | 04:49 |

2    it now.

3         Q      All right.  For some reason I had it on the

4    wrong part of the screen.  Have you been provided this

5    document before?                                          04:49

6         A      I have.

7         Q      Okay.  You see here there's a -- a antisocial

8    personality disorder diagnosis?

9         A      I see that.

10        Q      Do you agree or disagree with this diagnosis?    04:49

11        A      I highly disagree and the -- the

12   psychological testing data also states so.

13        Q      And we -- we -- we've gone -- let me just ask

14   you.  From what I remember, is the DSM-5 criteria for

15   antisocial personality disorder, is it laid -- at least    04:50

16   laid out correctly here?

17        A      Yeah, I would say so.

18        Q      Let me just ask you.  Do you see under

19   "repeated lying and baseless claims," do you see that

20   here?                                                      04:50

21        A      I see that.

22        Q      Are baseless claims, clinically speaking, an

23   aspect of antisocial personality disorder?

24        A      No.

25        Q      And for example, this bullet point, "L.A.       04:50

Page 136

```
 1   County government is the most corrupt local government in      04:50

 2   the entire nation.  We have so far past -- we are -- we

 3   have so far past Chicago to earn the number 1 spot in

 4   corruption."

 5           Do you see that there?                                 04:51

 6      A    I do.

 7      Q    Now is -- is that the type of lying or

 8   baseless claim that's clinically significant for an

 9   antisocial personality disorder diagnosis?

10      A    No.                                                    04:51

11      Q    What is an example of the type of lying that

12   would be clinically significant for antisocial

13   personality disorder diagnosis?

14      A    Well, I mean, it could be lying about your

15   credentials to become Sheriff of Los Angeles, for           04:51

16   example.

17      Q    And just one more.  When it says, "So

18   Mr. Bonta, it occurs to me that if you don't investigate

19   a matter like this before you, you're actually

20   obstructing justice yourself."                              04:51

21           Do you see that?

22      A    I do.

23      Q    Is that a type of a clinical -- is that type

24   of quote unquote baseless claim, is that clinically

25   significant in the context of antisocial personality       04:51
```

Page 137

```
 1          Q     And in any of these examples, is this a        04:57
 2    example of a grandiose self of sense importance that's
 3    clinically significant in the context of a -- in the
 4    context of a DSM-5?
 5          A     No.                                             04:57
 6          Q     And let me also just since I showed you a
 7    couple -- for these quote unquote lack of remorse, are
 8    any of these examples of the lack of -- of remorse is
 9    these -- are these -- is any of these clinically
10    significant in the context of DSM-5 for antisocial      04:57
11    personality disorder?
12          A     Let me review them here.
13          Q     Sure.
14                (Document reviewed by the witness.)
15          THE WITNESS:   Number 1 is not indicative of the    04:57
16    personality disorder.   Let me look at the second.
17                (Document reviewed by the witness.)
18          THE WITNESS:   And that is -- no.   It doesn't meet
19    criteria.
20    BY MR. DIBONA:                                             04:58
21          Q     And you see here -- it's in a footnote but
22    you see here there's a reference to "white collar
23    psychopath?"
24          A     Yeah.
25          Q     Is there a term in the DSM-5 white collar     04:58
```

Page 142

1          THE VIDEOGRAPHER:  Mr. DiBona, would you like to          05:05

2     order a copy of the transcript and/or video?

3          MR. DIBONA:  The transcript, yes, at the moment.

4     The video possibly but when -- when it's ready, can you

5     just shoot me an e-mail?  We'll decide at that time but          05:05

6     definitely the transcript, please.

7          THE VIDEOGRAPHER:  Thank you.

8               Mr. Neach, can I confirm your order for the

9     video now or would you like to hold?

10          MR. NEACH:  I -- I thought we had some sort of          05:05

11     pre-standing kind of thing.

12          THE VIDEOGRAPHER:  Yeah, I just like to confirm on

13     the record.  Thank you.  Stand by for --

14          MR. NEACH:  I'll confirm whatever -- I'll confirm

15     whatever you heard before is what -- nothing's changed.          05:06

16          THE VIDEOGRAPHER:  Thank you.

17               Okay.  We're off the record and this

18     concludes today's testimony given by Dr. Jessica Rowe.

19     The total number of media used was five and will be

20     retained by Veritext Legal Solutions.  Thank you.          05:06

21

22               (Whereupon the deposition proceedings

23               were concluded at 5:06 p.m.)

24

25                         -o0o-

                                                  Page 149

1

2

3          I, THE UNDERSIGNED, DO HEREBY CERTIFY UNDER

4     PENALTY OF PERJURY THAT I HAVE READ THE FOREGOING

5     TRANSCRIPT; THAT I HAVE MADE ANY CORRECTIONS AS APPEAR

6     NOTED, IN INK, INITIALED BY ME, OR ATTACHED HERETO; THAT

7     MY TESTIMONY AS CONTAINED HEREIN, AS CORRECTED, IS TRUE

8     AND CORRECT.

9          EXECUTED THIS _____ DAY OF _____,

10    2023, AT _____, _____.

11              (CITY)                      (STATE)

12

13

14         _____

15                        DR. JESSICA ROWE

16

17

18

19

20

                         JOB NO. 7298356

21

22

23

24

25

                                                 Page 150

1

2       I, MICHELLE MEDEL SABADO, RPR, CRR, CSR NO. 7423, IN

3  AND FOR THE STATE OF CALIFORNIA, HEREBY CERTIFY:

4       THAT PRIOR TO BEING EXAMINED, THE WITNESS NAMED IN

5  THE FOREGOING DEPOSITION WAS DULY SWORN BY ME TO TESTIFY

6  THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH;

7       THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

8  SHORTHAND AT THE TIME AND PLACE THEREIN NAMED, AND

9  THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION, AND

10  THE SAME IS A TRUE, CORRECT AND COMPLETE TRANSCRIPT OF

11  SAID PROCEEDINGS;

12       THAT IF THE FOREGOING PERTAINS TO THE ORIGINAL

13  TRANSCRIPT OF AN EXAMINATION IN A FEDERAL CASE, BEFORE

14  COMPLETION OF THE PROCEEDINGS, REVIEW OF THE TRANSCRIPT

15  {XX } WAS  {  } WAS NOT REQUIRED.

16     I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

17  EVENT OF THE ACTION.

18     WITNESS MY HAND THIS 15TH DAY OF APRIL, 2025.

19

20

21     MICHELLE MEDEL SABADO

        RPR, CRR, CSR NO. 7423

22

23

24

25

Page 151

**VILLANUEVA v. COUNTY OF LOS ANGELES, et al. USDC Case No. 2:24 cv 04979 SVW (JC)**

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 11520 San Vicente Boulevard, Los Angeles, California 90049.

On April 28, 2025, I served the foregoing document, described as **"DECLARATION OF ALEX DIBONA, ESQ., IN SUPPORT OF PLAINTIFF'S MOTIONS IN LIMINE; EXHIBITS"** on all interested parties in this action, addressed as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☐ **(BY MAIL)** As follows:

☒ **(BY ELECTRONIC MAIL)** I sent such document via electronic mail to the number(s) noted above.

☒ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare, under penalty of perjury under the laws of the United States of America, that the above is true and correct.

Executed on April 28, 2025, at Los Angeles, California.

_Amelia Sanchez_
Amelia Sanchez