Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
320 North Larchmont Boulevard
Los Angeles, CA 90004
Telephone Number: (310) 860 0770
Facsimile Number: (310) 860 0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

ALEX VILLANUEVA,

Plaintiff,

vs.

COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,

Defendants.

Case No.: 2:24 cv 04979 SVW (JC)

**The Honorable Stephen V. Wilson**

**PLAINTIFF ALEX VILLANUEVA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**

(Filed concurrently with Appendix of Evidence; Plaintiff's Separate Statement; Plaintiff's Objections to Evidence and [Proposed] Order on Plaintiff's Objections to Evidence; [Proposed]

Date: May 19, 2025
Time: 1:30 p,m.
Dept.: 10A

Trial Date: June 3, 2025
Action Filed: June 13. 2024

# TABLE OF CONTENTS

Page

1. INTRODUCTION .......... 1

2. STATEMENT OF FACTS .......... 4

A. Alex Villanueva Dedicated Over 36 Years of Exemplary Service to Los Angeles County Law Enforcement. .......... 4

B. Sheriff Villanueva Frequently Exercised His Constitutional Right to Free Speech, Criticizing the Board of Supervisors on Significant Issues of Public Concern. .......... 4

C. The Board Demonstrated Open Animus and Hostility Towards Sheriff Villanueva's Protected Speech. .......... 4

D. Villanueva's Public Opposition to Board-Sponsored Ballot Initiatives Increased Tensions and Retaliatory Motives .......... 5

E. Villanueva Publicly Warned Against the Board's Vaccine Mandates, Intensifying Conflict. .......... 5

F. Defendants Initiated a Retaliatory Investigation Based on Coordinated Complaints by Lim and Huntsman, Who Sought Public Disclosure to Damage Villanueva's Reputation. .......... 6

G. Despite Completing the Investigation in May 2023, Defendants Delayed Any Action Until Villanueva Announced His Political Candidacy. .......... 6

H. The Investigation Conducted Against Villanueva Was Riddled with Procedural Irregularities and Evidence of Pretextual Animus. .......... 6

I. The CEOP Process Was a Sham Designed to Provide Political Cover, Ignoring Key Evidence and Explicitly Basing Findings on Villanueva's Protected Political Activities. .......... 7

J. Defendants Strategically Publicized the Retaliatory "Do Not Rehire" Notation to Inflict Maximum Political Damage on Villanueva. .......... 8

K. The Retaliatory Actions Have Caused Severe and Lasting Harm to Villanueva's Professional and Personal Reputation. .......... 8

3. LEGAL STANDARD ON SUMMARY JUDGMENT .......... 8

A. The Applicable Summary Judgment Standard. .......... 8

B. Villanueva Has Standing to Pursue His First Amendment Retaliation Claim. .......... 8

(1) Villanueva Suffered a Material Adverse Action Likely to Deter Protected Speech .......... 9

(2) Villanueva's Injury Was Directly Caused by Defendants' Conduct .......... 9

(3) Villanueva's Injuries Are Redressable Through Injunctive Relief or Nominal Damages .......... 10

C. Villanueva Has Established a Viable First Amendment Retaliation Claim .......... 10

(1) Villanueva Engaged in Core Protected Speech .......... 10

(2) Villanueva Was Subjected to a Materially Adverse Action .......... 11

(3) There Is a Strong Causal Connection Between the Speech and the Retaliation .......... 11

(4) Under Monell, a Single Decision Made by a Final Policymaker Can Constitute Official Policy .......... 12

(5) Chief Lecrivain Affirmatively Took on the Role of Decision Maker in the Villanueva Case .......... 12

(6) There Was No Existing Protocol for Handling Misconduct Allegations Against a Sitting or Former Sheriff .......... 13

(7) Lecrivain Independently Exercised Final Authority and Sought Legal Validation, Not Direction .......... 13

(8) The Sheriff's Unique Status Made Lecrivain the Only Viable Decision Maker .......... 13

(9) The Facts Satisfy Monell Because Lecrivain Was a Final Policymaker Acting on a Unique Issue .......... 14

(10) All Defendants Are Properly Named. .......... 14

4. CONCLUSION .......... 15

## TABLE OF AUTHORITIES

**Page**

### Cases

*Allen v. Wright*, 468 U.S. 737 (1984) .......... 7

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540 (9th Cir. 2010) .......... 9

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) .......... 2, 8

*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003) .......... 2, 7, 9

*El Dorado Estates v. City of Fillmore*, 765 F.3d 1118 (9th Cir. 2014) .......... 7

*Estate of Osuna v. County of Stanislaus,* 392 F.Supp.3d 1162 (E.D. Cal. 2019) .......... 12

*Howard v. City of Coos Bay*, 871 F.3d 1032 (9th Cir. 2017) .......... 9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 7

*McMillian v. Monroe County*, 520 U.S. 781 (1997) .......... 10, 11

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) .......... 10, 11

*Pickern v. Holiday Quality Foods*, 293 F.3d 1133 (9th Cir. 2002) .......... 8

*Trevino v. Gates*, 382 F.3d 978 (9th Cir. 2004) .......... 9, 10, 11

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) .......... 8

*Wood v. Georgia*, 370 U.S. 375 (1962) .......... 9

### Statutes

Government Code § 811.2 .......... 12

Government Code § 945 .......... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. INTRODUCTION

This case is about political retaliation—plain and simple. Alex Villanueva served Los Angeles County for over 36 years, including four as the elected Sheriff. But from the moment he took office in 2018, he became a target of the Board of Supervisors because he spoke out. He criticized waste, no-bid contracts, ballot measures that shifted power away from voters, and policies he believed endangered public safety. That speech was protected under the First Amendment—but instead of engaging him on the issues, the Board tried to silence him.

When Supervisor Sheila Kuehl's deputy, Veronica Pawlowski, heard Villanueva refer to the Board as "corrupt," she called it "inappropriate and offensive"—even though one of the Board's own members, Mark Ridley-Thomas, was later federally indicted and convicted for public corruption (PSS Nos. 3–4). In October 2020, Ridley-Thomas and Kuehl authored a motion aimed at removing Villanueva from office—an act of political retaliation for his anti-corruption stance (PSS No. 4). When that effort failed, the Board directed Inspector General Max Huntsman to "explore all legal options" to get rid of Villanueva. Huntsman later admitted he was given that instruction (PSS Nos. 5–6).

But when the Board couldn't remove him legally, it tried to do so through backchannels. In March 2022, Huntsman and Esther Lim—both longtime political allies of the Board—filed nearly identical complaints simultaneously under the County's Policy of Equity. Internal messages showed they coordinated their efforts and agreed to "support each other" so the complaints would become public and damage Villanueva's reputation (PSS Nos. 13-14). Their complaints didn't focus on race, gender, or ethnicity—they focused on Villanueva's speech.

The investigation was "complete" in May 2023. But they did nothing—until Villanueva announced in September 2023 that he was running for a seat on the Board. (PSS No. 15). Just a month later, the County quietly placed a "Do Not Rehire" notice in his file. Then, right as ballots were mailed to voters, the Los Angeles Times ran a story

leaking the decision (PSS Nos. 30). Villanueva only found out about it from the paper.

The facts here aren't just suspicious—they show a coordinated political attack. The investigator in the case falsely testified that she recorded the interview with Kyla Coates, even though it wasn't recorded. Coates was the only witness who claimed Villanueva said anything direct to a justice deputy that was purportedly sexist (PSS Nos. 16, 17, 18). Huntsman falsely claimed that Villanueva mocked him with a Jewish-sounding name—when in fact, Villanueva used Huntsman's legal name, "Max-Gustaf," the same name Huntsman displayed on his own office plaque *he still had on his desk at the time of his deposition in this matter* (PSS Nos. 19, 20). Lim, for her part, falsely claimed Villanueva tried to get her fired. In truth, *she was disciplined by her boss, Supervisor Hilda Solis—not Villanueva* (PSS Nos. 21, 22, 23, 24).

The County's internal oversight panel, the CEOP, never reviewed Villanueva's letters or the tweets that sparked his concerns. They relied entirely on flawed and biased reports. And the County's own Rule 30(b)(6) witness, Mercedes Cruz, admitted that Villanueva was found guilty of retaliation simply because he "interfered" with Lim and Huntsman's oversight—a political, not legal, standard (PSS Nos. 28).

This kind of retaliation is exactly what the First Amendment is supposed to prevent. Courts have long held that public officials cannot punish people for speaking out on matters of public concern. See, *Coszalter v. City of Salem*, 320 F.3d 968, 974–75 (9th Cir. 2003); *Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022). And the Ninth Circuit has been clear: even minor discipline, like false write-ups or a reassignment, can be enough to chill protected speech. *Coszalter*, 320 F.3d at 974. What happened here is far worse.

Villanueva was the only former sheriff in the County's history to be placed on a "Do Not Rehire" list—not even convicted felons have received that treatment (PSS Nos. 11–12). And the timing speaks volumes: the notice came down just one month after he announced his campaign for the Board, and the leak to the press landed the same day ballots were mailed.

Sheriff Alex Villanueva engaged in extensive protected activity throughout his

tenure, directly opposing Measures A, R, and J, which he believed infringed upon public safety and the democratic process (PSS No. 39). In addition to speaking out against these ballot measures, Villanueva also opposed the County's issuance of no-bid contracts, the implementation of vaccine mandates, and Fulgent Genetics' improper collection of sensitive employee data — all matters of public concern implicating the rights and privacy of County employees (PSS No. 40). His consistent engagement in protected speech placed him at odds with County leadership and made him a target of retaliation.

Importantly, the County's claims of discrimination and harassment against Villanueva are entirely unfounded. Villanueva did not discriminate against or harass Max Huntsman in any manner, much less on the basis of any protected class (PSS No. 41). Similarly, Villanueva did not discriminate against or harass Ester Lim in any manner, and certainly not based on any protected characteristic (PSS No. 42). These allegations are a transparent attempt to obscure the real motive behind the County's actions: animus toward Villanueva's protected speech.

The Board of Supervisors' hostility toward Villanueva was palpable. Their actions and rhetoric clearly demonstrated animus directed at Villanueva because of his opposition to their policies and his public speech (PSS No. 43). This animus, rather than any legitimate or lawful motive, drove the adverse actions taken against him.

Moreover, the terms "woke," "flunky," and "La Malincha" — cited by the County in an effort to falsely ascribe discriminatory intent — do not reference any protected class (PSS No. 44). The attempt to manufacture discrimination based on the use of these terms is not only factually baseless but also an effort to deflect from the County's retaliatory conduct.

Contrary to the County's insinuations, Villanueva did not open any criminal investigations for improper purposes (PSS No. 45). All investigations initiated during his tenure were conducted in accordance with applicable law and departmental policy, without any ulterior or retaliatory motive.

Finally, the claim that Villanueva refused to participate in interviews is meritless.

Villanueva did not refuse to be interviewed; he appropriately sought clarification regarding the subject matter and process to ensure that he could provide informed and accurate responses (PSS No. 46). His reasonable requests for due process protections should not be distorted into allegations of noncooperation.

This isn't just a personnel decision—it's a political hit job. And it violates the First Amendment. Defendants' motion should be denied. There are serious disputes about motive, pretext, credibility, and retaliation. Those are issues for a jury—not for summary judgment.

## 2. STATEMENT OF FACTS

### A. Alex Villanueva Dedicated Over 36 Years of Exemplary Service to Los Angeles County Law Enforcement.

Alex Villanueva devoted more than 36 years of his life to public service and law enforcement. He began his distinguished career with the Los Angeles County Sheriff's Department in 1986, steadily ascending through its ranks until his historic election as Sheriff in 2018—the first time in over a century that an incumbent Sheriff was unseated. (PSS Nos. 1-2.)

### B. Sheriff Villanueva Frequently Exercised His Constitutional Right to Free Speech, Criticizing the Board of Supervisors on Significant Issues of Public Concern.

Throughout his term as Sheriff (2018-2022), Villanueva consistently spoke publicly on matters of critical importance, openly criticizing policies and actions of the Los Angeles County Board of Supervisors ("Board"). His speech addressed government accountability, public safety, and ethical conduct, often directly contradicting positions adopted by the Board. (PSS Nos. 3-6.)

### C. The Board Demonstrated Open Animus and Hostility Towards Sheriff Villanueva's Protected Speech.

From early in his tenure, the Board exhibited overt hostility toward Villanueva's protected criticisms. Board representative Veronic Pawlowsky publicly stated it was

"inappropriate and offensive" for Villanueva to label the Board as corrupt. Further evidencing animus, Villanueva was consistently limited to only three minutes of speaking time at Board meetings, while other County department heads were permitted unlimited time to address the Board. (PSS Nos. 3-4.)

The Board also accused Villanueva of "actual malice" after he publicly criticized the Board's decision to award a no-bid COVID-19 testing contract to Fulgent Genetics, despite legitimate FBI warnings regarding security risks posed by sharing sensitive genetic data with foreign entities. (PSS No. 6.)

**D. Villanueva's Public Opposition to Board-Sponsored Ballot Initiatives Increased Tensions and Retaliatory Motives.**

Sheriff Villanueva publicly opposed several controversial ballot measures supported by the Board, including Ballot Measure J, which diverted critical funding away from law enforcement under the guise of social justice reform. He also spoke against Ballot Measure A, publicly characterizing it as a dangerous attempt by the Board to gain power to remove elected sheriffs without voter consent. Additionally, Villanueva opposed Ballot Measure R, which provided a civilian oversight board with unprecedented subpoena powers, which he argued would be weaponized for political ends. (PSS No. 6.)

**E. Villanueva Publicly Warned Against the Board's Vaccine Mandates, Intensifying Conflict.**

Villanueva also opposed the Board's COVID-19 vaccine mandate for County employees, publicly warning that mandatory vaccinations would severely exacerbate understaffing issues in the Sheriff's Department, negatively impact response times, and compromise public safety. The Board viewed these warnings as direct challenges to its authority, further deepening retaliatory motives against Villanueva. (PSS No. 7, 8, 9 and 10.)

///

///

///

**F. Defendants Initiated a Retaliatory Investigation Based on Coordinated Complaints by Lim and Huntsman, Who Sought Public Disclosure to Damage Villanueva's Reputation.**

In March 2022, Defendants Esther Lim and Max Huntsman filed coordinated complaints against Villanueva, explicitly intending their allegations to become publicly known and politically damaging. Huntsman acknowledged in communications with Lim his specific desire for the complaint to be publicly disclosed, reflecting clear retaliatory intent. Lim and Huntsman mutually agreed to "support each other" through their coordinated allegations against Villanueva. (PSS Nos. 13-14.)

**G. Despite Completing the Investigation in May 2023, Defendants Delayed Any Action Until Villanueva Announced His Political Candidacy.**

The County's investigation into these complaints was completed by May 2023 but lay dormant without action or notification to Villanueva. Defendants took no immediate action on these completed findings, choosing instead to delay implementation of any discipline. (PSS Nos. 15.)

On September 13, 2023, Villanueva publicly announced his candidacy for the Los Angeles County Board of Supervisors. Approximately one month later, in October 2023, Defendants abruptly placed a punitive "Do Not Rehire" notation in Villanueva's personnel file, coinciding precisely with his active political campaign. (PSS Nos. 30.)

**H. The Investigation Conducted Against Villanueva Was Riddled with Procedural Irregularities and Evidence of Pretextual Animus.**

Significant irregularities marred Defendants' investigation. The interview of Kyla Coates—the only witness alleging direct sexist remarks by Villanueva—was deliberately left unrecorded despite instructions for it to be recorded. Further, the investigator falsely testified under oath claiming the interview was recorded, raising substantial questions about investigative integrity. (PSS Nos. 16, 17, 18.)

Max Huntsman, in his complaint, falsely accused Villanueva of harassment by allegedly calling him "Max-Gustaf," Huntsman's actual birth name that Huntsman

publicly displayed himself, *including at the time of his deposition (*PSS No. 19). Further, the County admitted that calling someone by the name they were born with is not discrimination and harassment. (PSS No. 20).

Esther Lim made multiple demonstrably false statements in her allegations against Villanueva. She falsely asserted Villanueva sought her termination, despite knowing any disciplinary actions she faced were directly from Supervisor Hilda Solis, not Villanueva. Lim also falsely suggested discrimination based on age and ethnicity, despite admitting Villanueva never referenced her race or gender or her true age. (PSS Nos. 21-24.)

The IAB report against Villanueva states Coates claimed Villanueva said purportedly sexists comments directly to her. Coates however denied this at her deposition. PSS No. 17-18).

Pawlowski falsely stated Villanueva said the justice deputies were "dumb women" and "women and unqualified". (PSS. No 27).

The CEOP held Villanueva committed retaliation *by sending a letter* without ever reviewing the letter itself. (PSS No. 29).

Villanueva's remarks concerning Lim and Huntsman were related to their policy and political positions, not any protected class. (PSS No. 25, 26, 37).

**I. The CEOP Process Was a Sham Designed to Provide Political Cover, - Ignoring Key Evidence and Explicitly Basing Findings on Villanueva's Protected Political Activities.**

The County Equity Oversight Panel ("CEOP") rubber-stamped investigative findings without reviewing critical underlying evidence, including Villanueva's letters or Lim's controversial tweets. Mercedes Cruz, the County's designated representative, openly stated Villanueva was found guilty of harassment and discrimination because he interfered with Lim and Huntsman's "oversight"—a determination explicitly tied to Villanueva's political disagreements and protected speech. (PSS Nos. 28.) Further, Timothy Murakami, Villanueva's undersheriff who was the primary point of contact between the Department the Justice deputies, emphatically denied he retaliated against them or made their jobs

more difficult. (PSS Nos. 31, 36 and 37).

**J. Defendants Strategically Publicized the Retaliatory "Do Not Rehire" Notation to Inflict Maximum Political Damage on Villanueva.**

The Investigator Logs for Ester Lim and Max Huntsman's IAB investigate establish the complaint was filed *March 2022 and complete by May 2023*. However, no action was taken on the case until October 2023, just one month after Villanueva announced a run for the Board of Supervisors. (PSS No. 15).

Defendants maliciously leaked information regarding the "Do Not Rehire" notation to the Los Angeles Times, ensuring its publication on the very day mail-in ballots were dispatched to voters. Villanueva learned of this punitive action only through the Times article, never having been formally notified. This calculated timing was clearly designed to inflict maximum damage on Villanueva's reputation and candidacy for the Board. (PSS Nos. 11-12.)

**K. The Retaliatory Actions Have Caused Severe and Lasting Harm to Villanueva's Professional and Personal Reputation.**

Defendants' actions have profoundly harmed Villanueva's professional and personal reputation, effectively barring him from future employment in County government or related public service positions. Placement on the "Do Not Rehire" list severely limits his professional opportunities. (PSS Nos. 39.)

## 3. LEGAL STANDARD ON SUMMARY JUDGMENT

**A. The Applicable Summary Judgment Standard.**

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." FCRP 56.

**B. Villanueva Has Standing to Pursue His First Amendment Retaliation Claim**

To establish Article III standing under Section 1983, a plaintiff must show (1) an injury in fact, (2) that the injury is fairly traceable to the defendant's conduct, and (3) that

the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *El Dorado Estates v. City of Fillmore*, 765 F.3d 1118, 1121 (9th Cir. 2014). Villanueva meets all three requirements.

**(1) Villanueva Suffered a Material Adverse Action Likely to Deter Protected Speech**

Being placed on a "Do Not Rehire" list constitutes a clear injury. The Ninth Circuit has repeatedly held that even minor adverse actions—like a threat of discipline or an unpleasant assignment—can chill protected speech and constitute injury in fact. *Coszalter v. City of Salem*, 320 F.3d 968, 974–75 (9th Cir. 2003). Here, the adverse action was far from minor.

Villanueva was the only former sheriff in Los Angeles County history ever placed on such a list—even convicted felons were not. (PSS No. 39.) The County publicized this action on the very day ballots were mailed for Villanueva's election campaign, and Villanueva only learned about the "Do Not Rehire" designation from a Los Angeles Times article, not from the County. (PSS Nos. 11–12.) This unprecedented sanction not only harms his political prospects but makes him effectively unemployable in any future public role. That would chill anyone from speaking out. The retaliation here far exceeds what *Coszalter* found sufficient. The "do not rehire" notation is discipline. Do Not Rehire means what it says. The very form states that "Do Not Hire/Rehire" is a "determination of discipline" There is on the form a place for when "no discipline" is warranted and it is not checked in Villanueva's instance. (PSS No. 39).

**(2) Villanueva's Injury Was Directly Caused by Defendants' Conduct**

Causation requires only that the injury be "fairly traceable" to the defendants' conduct. *Allen v. Wright*, 468 U.S. 737, 751 (1984). The chain of events here is not coincidental—it is direct and well-documented.

Although the County began investigating Villanueva in March 2022, it took no action for over a year. The investigation was completed in May 2023 but was left dormant. Then, just one month after Villanueva announced his candidacy for the Board of Supervisors in

September 2023, the County abruptly placed the "Do Not Rehire" notation in his personnel file. (PSS Nos. 9–12.) The timing is no accident, it is clear retaliation for his protected speech and political challenge.

**(3) Villanueva's Injuries Are Redressable Through Injunctive Relief or Nominal Damages**

The Supreme Court has confirmed that nominal damages are sufficient to meet the redressability prong in a First Amendment case. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021). In addition to nominal damages, Villanueva seeks injunctive relief to remove the "Do Not Rehire" designation, which continues to harm his reputation and career prospects. Redress is not speculative—it is directly tied to the requested relief.

Defendants' argument that Villanueva lacks standing because he has not applied for more than job is meritless. Applying for a position when one is expressly barred by a "Do Not Rehire" designation would be futile. The Ninth Circuit has long held that plaintiffs are not required to engage in futile acts to preserve their standing. *Pickern v. Holiday Quality Foods*, 293 F.3d 1133, 1137–38 (9th Cir. 2002).

**C. Villanueva Has Established a Viable First Amendment Retaliation Claim**

To prevail on a First Amendment retaliation claim, Villanueva must show (1) he engaged in constitutionally protected speech, (2) he was subjected to an adverse action, and (3) there was a causal connection between the two. *Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022).

**(1) Villanueva Engaged in Core Protected Speech**

Villanueva publicly criticized the Board's support for ballot initiatives like Measures A, R, and J, which shifted authority from elected officials to unelected panels and cut funding from law enforcement. He also opposed the Board's vaccine mandate and publicly raised concerns about a no-bid testing contract with Fulgent Genetics, citing national security warnings. (PSS Nos. 3–6.)

This speech—on government accountability, public safety, and voter rights—is the heart of what the First Amendment protects. *Wood v. Georgia*, 370 U.S. 375, 389 (1962);

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

**(2) Villanueva Was Subjected to a Materially Adverse Action**

As explained above, Villanueva's placement on a "Do Not Rehire" list—leaked to the media during a political campaign—would unquestionably deter a reasonable person from continuing to speak out. (PSS Nos. 11–12.) That is exactly the kind of retaliatory harm the First Amendment prohibits. *Coszalter*, 320 F.3d at 974–75.

**(3) There Is a Strong Causal Connection Between the Speech and the Retaliation**

The record is filled with evidence of retaliatory motive. Kyla Coates, a Board deputy, called Villanueva's anti-corruption speech "inappropriate and offensive." (PSS Nos. 3–4.) Supervisors Ridley-Thomas and Kuehl authored a motion to remove him in direct response to his speech. (PSS No. 4.) When that failed, the Board instructed Max Huntsman to explore legal ways to remove Villanueva, which Huntsman admitted. (PSS No. 5.)

The County's animus towards Villanueva's speech is well documented in the record. Villanueva was accused of "actual malice" for speaking out against no bid contracts and for honestly stating that County' employees had their date at risk. (PSS Nos, 7, 8, 9, 10 and 11). Justice deputies stated it was "inappropriate and offensive" for Villanueva to *completely truthfully* say the board of supervisors was corrupt. (PSS No. 3-4). Villanueva was limited to mere minutes to address the board, a limitation no other department head had. (PSS No. 2). Villanueva's protected speech was called "ridiculous" "inappropriate and "very disappointing." (PSS No. 33). Ester Lim publicly tweeted she was "so f---ing p-ssed" at Villanueva's response to subpoenas. (PSS. No 35).

Huntsman and Lim then filed complaints under the County's Policy of Equity—not alleging discrimination based on protected class status but based on Villanueva's political speech. They coordinated their complaints, admitted wanting them to become public, and agreed to "support each other" to maximize their impact. (PSS Nos. 13, 14.)

Mercedes Cruz, the County's 30(b)(6) witness admitted that Villanueva had a "do not rehire" notation placed in his file because he resisted "oversight" a clear example of

political retaliation. (PSS No. 28). Further, Cruz's testimony that Villanueva somehow made the Justice Deputies jobs more difficult is patently contradicted by the record. (PSS No. 31, 36 and 37).

Defendants delayed acting on the investigation until Villanueva announced his campaign—then they rushed the "Do Not Rehire" action and leaked it to the press. (PSS Nos. 15, 30.) This sequence strongly supports causation. *Howard v. City of Coos Bay*, 871 F.3d 1032, 1045 (9th Cir. 2017). Further, the panelists did not even review the underlying evidence against Villanueva and testified that they "could [not] speak to that" when asked about the allegations against Villanueva. (PSS No. 38). This further supports and inference of improper motives.

**(4) Under Monell, a Single Decision Made by a Final Policymaker Can Constitute Official Policy**

In *Trevino v. Gates*, 382 F.3d 978, 986 (9th Cir. 2004), the Ninth Circuit reaffirmed that municipal liability under *Monell* arises not only from broad rules or customs but also from "a course of action tailored to a particular situation and not intended to control decisions in later situations." Citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), the court held that such decisions—if made by an official with final policymaking authority—can bind the municipality.

Moreover, under *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997), an official may qualify as a final policymaker not just in general terms, but "in a particular area, or on a particular issue." Whether an individual possesses such authority is determined by function and context—not by title alone.

**(5) Chief Lecrivain Affirmatively Took on the Role of Decision Maker in the Villanueva Case**

Chief Laura Lecrivain testified that she "was the decision maker on it" and "took the case" as there was no other decision maker. She stated that the matter "default[ed] to the chief of professional standards" when no internal supervisor existed. Her authority in this context was not delegated—it was assumed and exercised based on her position and the

unique circumstances.

**(6) There Was No Existing Protocol for Handling Misconduct Allegations Against a Sitting or Former Sheriff**

Lecrivain confirmed that she had "never adjudicated a case having to deal with a former sheriff" and that there was "no protocol in place" for determining who would act as decision maker when the subject of a CEOP investigation was a sheriff or former sheriff (PSS No. 40). The unprecedented nature of the situation required her to formulate a case-specific decision-making process (*Id.*) Lecrvain was a final policy maker with respect to Villanueva.

**(7) Lecrivain Independently Exercised Final Authority and Sought Legal Validation, Not Direction**

Although Lecrivain consulted County Counsel, she testified that she—not County Counsel—made the ultimate decision. She brought the matter to legal counsel to confirm legality, stating: "County Counsel doesn't make the decision. I, ultimately, make the decision as the division chief" (*Id*). County Counsel "agreed" with the approach she proposed, but did not issue the directive (*Id*). This is consistent with the Supreme Court's holding in *Pembaur* that a single decision—even if informed by legal advice—can constitute final policy if it is not subject to review and is made by a policymaker with final authority.

**(8) The Sheriff's Unique Status Made Lecrivain the Only Viable Decision Maker**

The deposition confirmed that the Sheriff has no supervisor within the department. Lecrivain testified that "not to my knowledge" does the Sheriff report to anyone within the Department (*Id.)* As such, there was no ordinary chain of command to follow in adjudicating misconduct allegations against Sheriff Villanueva. Lecrivain stepped into this vacuum and exercised exclusive authority, precisely the situation *McMillian* contemplates: policymaking authority "in a particular area, or on a particular issue" (*McMillian*, 520 U.S. at 785).

**(9) The Facts Satisfy Monell Because Lecrivain Was a Final Policymaker Acting on a Unique Issue**

Applying the legal principles from *Trevino*, *Pembaur*, and *McMillian*, Chief Lecrivain's decision meets the standard for Monell liability:

- **She exercised final authority**: Lecrivain was not overruled, nor did anyone else claim authority over the decision. She initiated and concluded the action, without further internal review.
- **Her decision was tailored to a specific, unprecedented scenario**: There was no formal policy covering discipline of a former sheriff. The DNR notation was a unique course of action based on the particular facts and Villanueva's status.
- **She operated in a policy vacuum and filled it**: No existing structure or protocol addressed the issue, and her testimony makes clear she acted in her capacity as the senior-most authority in Professional Standards.
- **The decision was not subject to review**: Her choice was not overridden by any higher authority and was made in consultation—but not at the direction—of legal counsel.

Thus, Chief Lecrivain's actions were those of a final policymaker, and her decision constitutes an official act of County policy under *Monell*.

**(10) All Defendants Are Properly Named.**

Government Code section 945 provides that "[a] public entity may sue or be sued." Meanwhile, Government Code section 811.2 defines a "a public entity" as including "the state, the Regents of the University of California, the Trustees of the California State University, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State." In *Estate of Osuna v. County of Stanislaus,* 392 F.Supp.3d 1162 (E.D. Cal. 2019), the court held that there was no basis to dismiss the Stanislaus County Sherriff's Department from the plaintiff's state law causes of action, even though the County of Stanislaus was also named as a defendant. *Id.* at 1171. For the same reasons, here, all public entities, which are all political subdivisions of the County

of Los Angeles, are properly named.

**4. CONCLUSION**

For all of the foregoing reasons, Alex Villanueva respectfully requests this Court deny Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication of the Issues.

Dated: April 28, 2025

SHEGERIAN & ASSOCIATES, INC.

By: Alex DiBona
Alex DiBona, Esq.

Attorneys for Plaintiff,
ALEX VILLANUEVA

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 11520 San Vicente Boulevard, Los Angeles, California 90049.

On April 28, 2025, I served the foregoing document, described as **"PLAINTIFF ALEX VILLANUEVA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES"** on all interested parties in this action addressed as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 28, 2025, at Los Angeles, California

/s/ Amelia Sanchez
Amelia Sanchez