Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
320 North Larchmont Boulevard
Los Angeles, CA 90004
Telephone Number:  (310) 860 0770
Facsimile Number:  (310) 860 0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>        Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No.:  2:24  cv 04979 SVW (JC)<br><br>**The Honorable Stephen V. Wilson**<br><br>**PLAINTIFF ALEX VILLANUEVA'S APPENDIX OF EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION, VOLUME 1 OF 5**<br><br><br>Date:    May 19, 2025<br>Time:    1:30 p,m.<br>Dept.:   10A<br><br>Trial Date:      June 3, 2025<br>Action Filed:  June 13. 2024 |

# TABLE OF CONTENTS

| No. | Declaration |
|-----|-------------|
| 1 | Declaration of Alex Villanueva |
| 2 | Declaration of Alex DiBona, Esq. |

| Exhibit[1] | Evidence |
|------------|----------|
| 1 | Los Angeles County Board of Supervisors Motion "Report Regarding Options for Removing the Sheriff" Dated October 27, 2020 |
| 2 | Ordinance allowing Office of Inspector General to Issue Subpoenas written by Veronica Pawlowski dated January 21, 2020 |
| 3 | Email from Vanessa Chow to John Satterfield and Alex Villanueva regarding FBI Briefing on Fulgent dated February 1, 2022 |
| 4 | Letter from Alex Villanueva to Hilda Solis Entitled Ethical Violations of First District Justice Deputy dated February 9, 2021 |
| 5 | "Tweets" from Ester Lim attached to February 9, 2021 letter |
| 6 | Letter from Alex Villanueva to County Counsel asking for Defense in Fulgent Lawsuit dated January 31, 2022 |
| 7 | Denial of Counsel to Alex Villaneuva from Los Angeles County Counsel dated February 15, 2022 |

---

[1] Volume I includes Exhibit Nos. 1-17;

Volume II includes Exhibit Nos. 18-30;

Volume III includes Exhibit Nos. 31-40;

Volume IV includes Exhibit Nos. 41-48;

Volume V includes Exhibit Nos. 49-66;

| Exhibit[1] | Evidence |
|---|---|
| 8 | Letter from Alex Villanueva to Hilda Solis Entitled Ethical Violations of First District Justice Deputy dated March 4, 2022 |
| 9 | Email from Ester Lim to Hilda Solis's Chief of Staff Cindy Chen dated March 8, 2022 |
| 10 | Ester Lim's Letter to Vicky Bane, Executive Director of the County Equity Oversight Panel for the County of Los Angeles dated March 8, 2022 |
| 11 | Ester Lim's submitted online complaint regarding Alex Villanueva dated March 08, 2022 |
| 12 | Texts between Ester Lim and Max Huntsman Re their complaints dated sometime in March 2022. |
| 13 | Letter from Alex Villanueva to Board of Supervisors Opposing Ballot Measure J dated July 11, 2022 |
| 14 | July 12, 2022 Motion of the Los Angeles Board of Supervisors to Place Ballot Measure for the Los Angeles County Board of Supervisors to remove Sheriff by 4/5 vote. |
| 15 | January 4, 2023 Letter from Ron Kopperud to Alex Villanueva regarding request for Interview |
| 16 | Email Chain between Alex Villanueva and Christine Diaz Herrera dated January 9, 2023 to March 10, 2023 |
| 17 | Internal Affairs Bureau "Stacked" Case Filed for Ester Lim's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 18 | Internal Affairs Bureau "Stacked" Case Filed for Max Huntsman's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 19 | Internal Affairs Bureau Investigator's Log regarding Ester Lim's Ester |

| Exhibit[1] | Evidence |
|---|---|
| | Lim's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 20 | Internal Affairs Bureau Investigator's Log regarding Max Huntsman Complaint regarding Alex Villanueva completed October 2, 2023 |
| 21 | Letter from Sergio Escobedo to County Equity Oversight Panel on Charges Founded dated October 17, 2023 |
| 22 | Texts between Ester Lim and Max Huntsman Re wanting their complaint of Alex Villanueva to go public in December 2023 |
| 23 | Desk Plaque for Max Huntsman and Max Hunts Professional Profile. |
| 24 | Devanne, Ann, relevant deposition excerpts |
| 25 | Diaz Herrera, Christian, relevant deposition excerpts |
| 26 | Komoroski, Constance, relevant deposition excerpts |
| 27 | Pawlowski, Veronica, relevant deposition excerpts |
| 28 | Murakami, Timothy, relevant deposition excerpts |
| 29 | Escobedo, Sergia, relevant deposition excerpts |
| 30 | Lilienfeld, Mark, relevant deposition excerpts |
| 31 | Lim, Ester, relevant deposition excerpts |
| 32 | Huntsman, Max, relevant deposition excerpts |
| 33 | Cruz, Mercedes, relevant deposition excerpts |
| 34 | Lecrevian, Laura, relevant deposition excerpts |
| 35 | Coates, Kyla, relevant deposition excerpts |
| 36 | Yang, Roberta, relevant deposition excerpts |
| 37 | 12/18/2018 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 38 | 1/29/219 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 39 | 08/13/19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 40 | 10-01-19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 41 | 10/15/19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 42 | 01/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 43 | 03/31/30 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 44 | 04/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 45 | 06/29/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 46 | 07/07/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 47 | 07/21/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 48 | 07/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 49 | 08/04/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 50 | 09/01/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

PLAINTIFF'S APPENDIX OF EXHIBITS

| Exhibit[1] | Evidence |
|---|---|
| 51 | 09/15/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 52 | 10/13/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 53 | 10/27/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 54 | 11/10/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 55 | 01/26/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 56 | 05/04/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 57 | 05/18/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 58 | 05/19/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 59 | 06/22/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 60 | 07/27/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 61 | 08/10/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 62 | 09/28/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 63 | 12-07-21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 64 | 02/15/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 65 | 03/01/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 66 | 07/12/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

Dated:  April 28, 2025

SHEGERIAN & ASSOCIATES, INC.

By: _____

Alex DiBona, Esq.

Attorneys for Plaintiff,
ALEX VILLANUEVA

# DECLARATION

# DECLARATION OF ALEX VILLANUEVA

I, Alex Villanueva, declare as follows:

1.   I am the Plaintiff in this case. I am familiar with the files, pleadings, and facts in this case and could and would competently testify to the following facts on the basis of my own personal knowledge.

2.   I am the former elected Sheriff of Los Angeles County. I have dedicated my entire adult life to public service. My law enforcement career spans over three decades, beginning in 1986 when I joined the Los Angeles County Sheriff's Department. I retired as a Lieutenant in February 2018, and following my retirement, I was elected by the people of Los Angeles County to serve as their Sheriff. I assumed office on December 3, 2018, becoming the first person in modern history to be elected from the rank of retired Lieutenant directly into the top leadership position. I served a full four-year term and completed my service in December 2022. My tenure as Sheriff was marked by significant efforts to reform internal policy, improve accountability, and restore the independence of the Sheriff's Department from political interference.

3.   I began my career with the Los Angeles County Sheriff's Department as a Deputy Sheriff Trainee. I completed the rigorous training program at the Department's Academy, where I received comprehensive instruction across all major aspects of law enforcement. This included constitutional law, arrest procedures, search and seizure, juvenile law, report writing, cultural diversity, use of force, defensive tactics, emergency vehicle operations, firearms qualification, and ethical policing. Upon graduation, I was assigned to the Inmate Reception Center. I went on active duty in Amy National Guard 1990 to become branch qualified as an artillery officer after my commission in 1988. During my activity duty the first Gulf War started. After completing my initial assignment, I transferred to East Los Angeles Station where I served in patrol operations. I became a Field Training Officer, mentoring new deputies, and subsequently held assignments at multiple stations and bureaus including the Sheriff's Academy, Lennox Station, Carson Station, the Community

College Bureau, CRDF, and Pico Rivera. My final assignment before retirement was at Pico Rivera Station, where I served with distinction until February 2018. Over the course of my career, I rose through the ranks, earning promotions to Sergeant and ultimately Lieutenant.

4.   My service in law enforcement is supported by a strong academic foundation. I earned a bachelor's degree in liberal studies, followed by a master's degree from California State University Northridge. I later obtained a doctorate in public administration from the University of La Verne. I have also served in the United States military. In January 1983, I enlisted in the U.S. Air Force. I later transitioned into the Air National Guard under the Palace Chase program and subsequently joined the Army National Guard, where I completed Officer Candidate School and was commissioned as a Second Lieutenant. I graduated from the U.S. Army's artillery school at Fort Sill, Oklahoma. This combination of military and academic training gave me a comprehensive understanding of leadership, discipline, and public accountability, all of which informed my approach to managing one of the largest law enforcement agencies in the nation.

5.   From the beginning of my tenure, I made decisions based on principle and in defense of constitutional rights and public safety. I engaged in what I believed—and still believe—was protected activity as defined by the Constitution and state law. I publicly and repeatedly opposed several high-profile initiatives and policies advanced by the Los Angeles County Board of Supervisors and their political appointees. These included Ballot Measure A, Ballot Measure R, and Ballot Measure J. I also objected to the County's COVID-19 vaccine mandate for County employees and opposed the contract with Fulgent Genetics, which had been awarded a no-bid agreement to conduct COVID-19 testing on County personnel. Each of these positions was taken in good faith, grounded in facts, law, and public interest. Nevertheless, these positions placed me in direct opposition to the political agenda of the Board, and I believe they served as the catalyst for the retaliation, investigations, and efforts to discredit me that followed.

6.   One of the most serious conflicts between myself and the Board of Supervisors

DECLARATION OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

concerned Ballot Measure A. This measure sought to amend the County Charter to give the Board the unprecedented authority to remove an independently elected Sheriff with a four-fifths vote, using a vaguely defined "for cause" standard. "Cause" included such broad terms as neglect of duty or violation of law, without any clear process or evidentiary threshold. I opposed Ballot Measure A from its inception because I believed it was a direct attempt to circumvent the will of the voters who elected me. The Sheriff's position is a separately elected constitutional office, not a subordinate to the Board. I viewed Measure A as unconstitutional and dangerous—it would have allowed five individuals to remove a separately elected official over political disagreements. I spoke out forcefully against it at multiple Board meetings, in official press conferences, during televised interviews, in Facebook Live updates, and in other public appearances. I emphasized that this was not just a threat to my tenure—it was a threat to the principle of checks and balances and democratic accountability. Despite my opposition, Measure A was placed on the ballot and approved by voters in November 2022. I believe the Board timed and crafted this measure specifically in anticipation of my reelection campaign and as retaliation for my refusal to conform to their directives.

7.    I also opposed Ballot Measure R, which expanded the investigatory and subpoena powers of the Civilian Oversight Commission and directed the County to create a plan to reduce incarceration. While oversight and accountability are essential values in any public safety system, Measure R went beyond transparency and into territory that undermined operational independence. The Commission was already receiving all records they were legally entitled to under California law. However, they demanded unrestricted access to confidential personnel files, records related to ongoing internal and criminal investigations, and information that was protected by the California Peace Officers' Bill of Rights, Penal Code 832.7, and applicable privacy laws. These requests posed serious legal and ethical concerns, including the risk of tainting criminal prosecutions, violating employee rights, and compromising sensitive investigations. On or around February 10, 2020, I directed my office to issue a public statement through Ballotpedia warning that the

Board had already spent over $1 million suing the Sheriff's Department and that Measure R would "open the floodgates for many more ill-advised lawsuits designed to seek documents that are not legally available for public release." I stated that this was "weaponizing oversight" to politically target my administration. Rather than engaging with my concerns, the Board and its allies responded with hostility and mischaracterized my position as one of obstruction or noncompliance.

8.  • I also opposed Ballot Measure J, which mandated that at least 10% of the County's unrestricted general funds be redirected toward alternatives to incarceration, including mental health treatment, housing programs, and youth development. While I support these programs in principle, I strongly opposed the mandatory reallocation of general funds from law enforcement, especially in the absence of proper fiscal planning. The Sheriff's Department was already suffering from severe staffing shortages, declining morale, and increased overtime burdens. Crime was rising countywide, and violent incidents within the jail system were escalating. Measure J had no safeguards to protect core public safety services. It would lead to service cuts, closures of patrol stations, reduced jail staffing, and slower emergency response times. On July 22, 2020, I publicly warned via social media that Measure J would produce a "dystopian future" in Los Angeles that looked "like a scene from *Mad Max*." On August 5, 2020, I clarified my position further, stating that while I support mental health and drug treatment, Measure J was "actually out to defund law enforcement." I also stated that the measure was unconstitutional and unlawful under California budgeting procedures. The backlash to my position was immediate. I was accused of fearmongering, being resistant to reform, and failing to support community investment. I believe my public opposition to Measure J intensified the Board's political hostility toward me and was a direct factor in the Board's continued campaign to discredit my administration.

9.  Another major source of conflict was the County's COVID-19 vaccine mandate. I personally received the vaccine and encouraged members of the public to consider doing so. However, I opposed the mandate as applied to Sheriff's Department personnel. The

vast majority of deputies and employees—many of whom had worked through the pandemic under dangerous conditions—did not wish to be vaccinated. I received feedback from rank-and-file personnel and supervisors alike that they were prepared to quit en masse if forced to comply. I determined that enforcing the mandate would result in a catastrophic loss of staffing across patrol, custody, investigations, and administrative units. I also believed that the mandate infringed on personal privacy and medical autonomy. My decision was not ideological—it was operational. On or around October 21, 2021, I appeared on a nationally televised news program and explained that it takes over a year to recruit and train an entry-level deputy and decades to replace a seasoned homicide detective. I warned that if I enforced the mandate, LASD would lose thousands of employees and that homicides would rise, response times would suffer, and public safety would be compromised. Despite this clear and reasonable justification, the Board of Supervisors, the Inspector General, and aligned media outlets accused me of being reckless and anti-science. I stood firm because I believed enforcing the mandate would devastate the Department's capacity and cause irreversible damage to public safety.

10.    Relatedly, the Board approved a no-bid contract with Fulgent Genetics for COVID-19 testing. After reviewing the contract and conducting due diligence, I became concerned that Fulgent had ties to foreign entities, including the Chinese government. The contract terms did not guarantee that biometric data—including DNA—would remain private and secure. Around Thanksgiving 2021, I attended a briefing at the FBI's Los Angeles field office, where I was informed that Fulgent had Chinese ownership and that there was a substantial risk that genetic information obtained from County employees could be shared with the Chinese Communist Party. Following this meeting, I directed that the Sheriff's Department would not participate in the Fulgent testing program. I issued a public statement and sent formal correspondence to the Board explaining my decision. I believed it was my duty to protect the personal data and privacy of my employees. Instead of taking my concerns seriously, the Board—through their legal counsel—falsely accused me of lying about the FBI briefing and claimed I acted with actual malice. These

accusations were outrageous. The FBI email confirming the contents of the meeting exists and has been shared as part of this record. My actions were reasonable, based on federal intelligence briefings, and consistent with my constitutional duty to safeguard the rights and security of County employees. The Board's response was not rooted in facts but in a continuing effort to discredit me for political purposes.

11.    These decisions I made—whether opposing ballot initiatives, declining to enforce the vaccine mandate, or rejecting the Fulgent contract—were all based on my duty to protect the public, uphold the law, and maintain the operational readiness of the Sheriff's Department. Yet, these independent actions were met with a concerted campaign of retaliation by the Board of Supervisors and their political allies. The response to my independence was not one of respect for the democratic process, but of escalating hostility and a misuse of institutional power. The Board leveraged media, administrative processes, and affiliated oversight offices to vilify me in public and disrupt my leadership internally. I came to refer to these tactics as "lawfare"—using the instruments of government accountability not to uncover misconduct, but to silence and remove an elected official whose views they opposed.

12.    Max Huntsman, the County's appointed Inspector General, was one of the key figures in this campaign. As Inspector General, Mr. Huntsman was supposed to function as a neutral party, monitoring the Sheriff's Department and advising the Board of Supervisors. In practice, he acted more like an adversarial political operative. He routinely issued public statements and reports that mischaracterized my decisions, omitted critical context, and cast my actions in the most negative possible light. Instead of using his platform to encourage transparency, Mr. Huntsman weaponized it to promote a false narrative that I was obstructive, authoritarian, and even dangerous. His reports went beyond oversight and became open attacks, filled with selective citations and conclusions that lacked foundation. With respect to Mr. Huntsman personally, I had every reason to believe that his full legal name was Max Gustaf Huntsman. That name appeared on the plaque on his desk, in official government directories, and in State Bar records, which I

understood to reflect his legal name. Based on information that was provided to me, I came to believe Mr. Huntsman had publicly denied the Holocaust. I had no reason to question that information at the time. My statements regarding Mr. Huntsman were not directed at his religion, ethnicity, or nationality. They were expressions of deep disagreement with how he had abused his office, and they reflected a political, not personal, conflict.

13.    Another key figure in the campaign against me was Esther Lim, who served as a Field Justice Deputy in the office of Supervisor Hilda Solis. In 2023, after I had already completed my service as Sheriff and resumed my status as a retired Lieutenant, Ms. Lim filed a formal complaint against me. That complaint triggered the opening of an administrative investigation by the Department, despite the fact that I was no longer employed and was not subject to the Department's disciplinary jurisdiction. This was the first time in my knowledge that a retired officer had been investigated in such a manner. The basis for the complaint was entirely political—Ms. Lim had previously made public statements supportive of defunding law enforcement and, in my view, had used her platform to advance a policy agenda incompatible with law enforcement cooperation. Prior to her complaint, I had expressed concern to Supervisor Solis about Ms. Lim's statements on social media, including posts that could reasonably be interpreted as hostile toward deputies. My concerns were policy-based and rooted in the operational need for collaboration between the Sheriff's Department and justice deputies. I never asked that Ms. Lim be fired—I simply raised questions about her fitness to serve in a liaison role. The decision to act—or not act—on that feedback was entirely within Supervisor Solis's discretion. The suggestion that I retaliated against Ms. Lim or targeted her based on race, gender, or national origin is false.

14.    From the start of my term, I believed the Board harbored animus toward me not only because of the decisions I made, but because of the way I communicated with the public. I used social media frequently, including Facebook Live, to engage directly with constituents. I did not rely on press releases or filtered talking points. I provided detailed briefings, took questions from viewers, and explained the rationale behind my decisions.

This direct line of communication threatened the Board's narrative and its control over public perception. I was often treated differently from other department heads. When I appeared before the Board, I was frequently limited to just three minutes of speaking time and was only permitted to address them as a private citizen, not in my capacity as Sheriff. Other department heads were routinely allowed to give extensive presentations lasting well over an hour. This disparity in treatment was not procedural—it was personal. It sent a clear message that my voice, though elected by the public, was not welcome in the room. I documented this disparate treatment publicly and privately, and I viewed it as further evidence of the Board's effort to marginalize me politically.

15.  I have also faced false and deeply offensive accusations of sexism, racism, and ageism. I want to make it absolutely clear: I do not, and have never, discriminated against anyone on the basis of race, gender, age, or national origin. These allegations are not only factually untrue—they are personally insulting and contrary to everything I have stood for over my 30-plus years in public service. The Sheriff's Department is one of the most diverse law enforcement agencies in the nation, and I have always made it a point to support, mentor, and promote employees based on merit. During my tenure as Sheriff, I promoted women to leadership roles, supported the advancement of individuals from underrepresented communities, and made hiring decisions based on qualifications and integrity alone. The idea that I held any animus toward an all-woman Board of Supervisors is false. I criticized members of the Board not because of their gender, but because of their policies. For example, I frequently referred to Mark Ridley-Thomas—a male member of the Board—as corrupt, a characterization that was later vindicated. I used the term "woke" not to demean people based on identity, but to describe what I believe is a far-left ideology that lacks common sense, real-world experience, and practical value. I have never used terms like "dumb women" or "unqualified women" to describe the Board or justice deputies, nor have I made statements to that effect in public or private. When I used the word "flunky," I used it in the dictionary sense—to refer to someone who performs menial or subordinate tasks in an obsequious manner. It had nothing to do with gender, age, race

or ethnicity.

16.    My conflict with Supervisor Hilda Solis went beyond isolated disagreements. It reflected a sustained and coordinated effort on her part to undermine my leadership and to reverse the independence of the Sheriff's Department. Throughout my tenure, Supervisor Solis publicly opposed many of my decisions, particularly those relating to immigration enforcement and the role of federal agencies in County jails. One of the key planks of my 2018 campaign for Sheriff was a promise to end the longstanding practice of cooperating with U.S. Immigration and Customs Enforcement (ICE) to facilitate the deportation of individuals in County custody. Under prior administrations, the County had accepted federal funding in exchange for granting ICE access to jail facilities. I opposed this policy because I believed it was inconsistent with the County's values, contributed to fear in immigrant communities, and undermined trust between law enforcement and the public. After taking office, I fulfilled my promise and formally ended ICE's access to jail data and facilities. This was a significant departure from past practice and represented a major policy shift. I made this decision as a Latino public official, fluent in Spanish, with personal and familial ties to Puerto Rico and Latin America. The vast majority of individuals affected by ICE detainers were Latino. My decision was motivated by a commitment to fairness and community safety—not by political pressure. Supervisor Solis had been in office for years and had never taken meaningful action to end the County's collaboration with ICE. I believe she resented that I, as an outsider to the political establishment, was able to achieve reforms she had not prioritized. My use of the term "La Malinche" to describe her stance was not gendered—it was a reference to betrayal. In Mexican history, La Malinche is seen by most as a traitor, not because she was a woman, but because she aligned herself with the oppressors of her people. My use of the term was cultural and political, not sexist.

17.    I never opened or ordered a criminal or administrative investigation based on personal animus or political disagreement. Every investigation that occurred under my administration was initiated in accordance with legal authority and based on evidence of

potential misconduct. The Department has detailed protocols for initiating internal reviews, and those protocols were followed in every case. Any suggestion that I abused my position to retaliate against political opponents or critics is false. It is also important to note that I did not micromanage individual investigations—those were handled by Internal Affairs and the appropriate chain of command. I did not send any letter to Supervisor Solis or anyone else with the intent of getting Esther Lim fired. My concerns were based solely on whether someone who had made public statements that could be perceived as anti-law enforcement was appropriate for a role that required collaboration with the Sheriff's Department. Justice deputies are supposed to work closely with the Department to coordinate public safety policies. I had every right—and arguably a duty—to raise questions when that cooperation appeared to be at risk. Ultimately, it was up to Supervisor Solis to decide what, if anything, to do with the information. I received no response to my letters, which is why I followed up. That is standard protocol in law enforcement, where letters of inquiry are often followed by requests for clarification or confirmation.

18.    The fact that I focused my concern on Ms. Lim was based entirely on her actions and statements—not on her gender, race, or ethnicity. I was not aware of any other justice deputy who had tweeted or publicly supported calls to defund law enforcement or posted what could be construed as hostile messages toward deputies. If another individual had done the same, I would have raised similar concerns. My letters were based on the content of her public statements, the impact those statements might have on her ability to work effectively with the Department, and the public's perception of law enforcement. I did not accuse her of misconduct; I merely asked whether appropriate steps had been taken in light of those statements. That is a standard question in any law enforcement environment. The Board often issues public statements or press releases when discipline has been imposed, and the public reasonably expects some transparency when public officials are involved in controversy. Again, the decision to act—or not act—was entirely within the Board's discretion.

DECLARATION OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

19.  I have never referred to the Board of Supervisors or the justice deputies as "unqualified women," nor have I ever suggested that they were unqualified because of their gender. That claim is categorically false. When I have criticized members of the Board, I have done so based on their decisions, their policies, or their public statements— not their gender. Likewise, my criticism of justice deputies has been based solely on the performance of their duties and the alignment of their actions with public safety goals. The term "flunky," which I have used in some public settings, is defined as someone who performs menial or subordinate tasks, often in an overly deferential or servile way. When I used that word, it was directed at individuals who I believed were acting in a politically motivated and uncritical manner in support of the Board's agenda. It was not related to their gender, and I would have used the same term regardless of whether the person in question was male or female. I have consistently criticized public officials who I believe have misused their authority or failed in their duties, regardless of their background.

20.  I am aware that some have suggested my public criticism of elected officials, oversight bodies, and justice deputies amounts to bullying or harassment. That is not the case. I am an elected official, and I have always believed that the public has a right to hear directly from their Sheriff. I used press conferences, social media, and public statements to explain the Department's position, push back against misinformation, and expose what I viewed as political retaliation. I never used my position to threaten, intimidate, or retaliate against anyone for personal reasons. What I did was speak the truth as I saw it, based on my years of experience, my understanding of the law, and my commitment to public safety. My tenure as Sheriff was defined by transparency and honesty, even when it came at a political cost. I do not regret standing up for my principles, and I believe that the public is better served by officials who speak plainly and act decisively, rather than those who seek to appease political interests or avoid controversy at all costs.

21.  With respect to Defendant Max Huntsman, at all times relevant, I believed that his legal name was Max Gustaf Huntsman. This belief was based on multiple reliable sources. First, I observed that his office desk had a nameplate that read "Max Gustaf

Huntsman." Second, I reviewed public records, including the California State Bar website, which listed his name as Max Gustaf Huntsman. I understood that the State Bar maintains accurate records of legal names for all licensed attorneys. Third, communications and County materials I received during my tenure as Sheriff consistently used that full name. I never questioned this designation, and I had no reason to believe it was inaccurate. Additionally, I made public statements regarding Mr. Huntsman's conduct and beliefs based on information I received in my capacity as an elected official. Among those were statements concerning his reported denial of the Holocaust. That information was provided to me from a source I believed to be credible at the time. I have never had any animus toward Germans, Jews, or any ethnic or religious group. My statements about Mr. Huntsman were political in nature and directed solely at his conduct as Inspector General. I believed then, and still believe now, that he abused his role to further a partisan agenda against me. My statements were expressions of political disagreement and were not meant to denigrate him based on any protected characteristic.

22.   Ms. Esther Lim, as a Field Justice Deputy for Supervisor Hilda Solis, likewise used her office in ways that I believe were politically motivated. She filed a complaint against me in 2022, and it proceeded after I had already left office and returned to retirement. The Luna administrations administrative investigation of a former Sheriff was unprecedented. Despite my retired status, the Department initiated an administrative investigation. To my knowledge, this was the first time in the Department's history that a former sheriff was subjected to such scrutiny. This investigation was improper and, in my view, unlawful. It was further proof of the County's ongoing effort to punish me for my political views and independent stance. Prior to the complaint, I had expressed concern about Ms. Lim's public statements on social media, particularly those that advocated for defunding law enforcement or included language that could be interpreted as hostile toward police officers. I believed these views undermined her ability to fulfill her role as a liaison between the Board and the Department. I never made these concerns about her personal background—only her conduct and public record. My belief that she should not

serve in a liaison role with the Department was based entirely on operational and policy considerations. I did not seek her termination or discipline, but I did want to know whether Supervisor Solis considered her conduct consistent with her role. That is a fair question, and I stand by my right to ask it.

23.    I want to clarify a false narrative that has been circulated regarding my purported refusal to participate in an interview with County investigator Christina Diaz Herrera. I did not refuse to be interviewed. Rather, I inquired about the subject matter of the interview so that I could properly prepare. I was retired from the Los Angeles County Sheriff's department and of course no longer Sheriff at this time. At the time, I was serving as Sheriff and had significant administrative and legal responsibilities. I wanted to be able to review any relevant documentation, consult with legal counsel if needed, and ensure that I could provide accurate and thorough answers. This is standard practice for any public official facing an inquiry, especially when the subject matter is unknown and could pertain to sensitive issues. I was not contacted directly while in office to be interviewed regarding Ester Lim or Max Huntsman.

24.    On the same day that ballots were mailed out in my race against Supervisor Janice Hahn for a seat on the Los Angeles County Board of Supervisors, the Los Angeles Times published a story alleging that a "do not rehire" designation had been placed in my personnel file based on findings of discrimination and harassment. I was never notified that this designation had been made. I was not interviewed in the underlying investigation. I was never given the opportunity to respond to the allegations. I did not receive a letter, a call, or an email.. The timing of the article—coinciding exactly with the start of voting in a high-profile election in which I was a candidate—was not coincidental. It was designed to damage me politically and tarnish my reputation with voters. The use of personnel processes and media leaks to influence an election is deeply inappropriate and undermines trust in both the disciplinary system and the democratic process. I believe the leak of this information was intentional, politically motivated, and retaliatory.

25.    I understand that the County is now attempting to downplay the significance of

DECLARATION OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

a "do not rehire" designation, arguing that it does not actually mean what it says. That claim is not only untrue—it is, in my view, frivolous. I served as the head of an agency with over 18,000 employees. I oversaw hiring, promotions, background investigations, and personnel decisions across every division. In County government, a "do not rehire" designation is definitive. It is a red flag that disqualifies an individual from returning to County employment. It is not a suggestion. It is not symbolic. It is a formal bar to reemployment. Everyone in County administration knows what that label means. It appears in a person's record, and if they apply for a job, it automatically excludes them from consideration. To now claim otherwise is disingenuous and, frankly, insulting to the public's intelligence. The County placed that designation in my file without notifying me, without giving me an opportunity to be heard, and now seeks to deny its meaning. I reject that effort to rewrite the record.

26.  Filed Concurrently as **Exhibit 3** is a true and correct copy of an email thread between myself, my then chief of staff John Satterfield and Vanessa Chow.

27.  Filed Concurrently as **Exhibit 4** is a true and correct copy of a letter I had sent to Hilda Solis related to the ethical violations of Ester Lim.

28.  Filed Concurrently as **Exhibit 5** is a true and correct copy of Ester Lims "tweets" that were attached to my letter as **Exhibit 4.**

29.  Filed Concurrently as **Exhibit 6** is a true and correct copy of a letter I sent to County Counsel for Los Angeles requesting a Defense from a lawsuit filed against me by Fulgent.

30.  Filed Concurrently as **Exhibit 7**is a true and correct copy of a letter I received from County Counsel for Los Angeles denying my request for a Defense from a lawsuit filed against me by Fulgent.

31.  Filed Concurrently as **Exhibit 8** is a true and correct copy of a letter I received from County Counsel for Los Angeles denying my request for a Defense from a lawsuit filed against me by Fulgent.

32.  Filed Concurrently as **Exhibit 15** is a true and correct copy of a letter I sent to

-14-

DECLARATION OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

the Los Angeles County Board of Supervisors opposing the ballot measure that would allow them to remove a Sheriff by a 4/5 vote.

33.  Filed Concurrently as **Exhibit 16** is a true and correct copy of an email chain between myself and Chrstine Diaz Herrera.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed on this 28th day of April, 2025, at Santa Monica, California.

Alex Villanueva (Apr 28, 2025 11:10 PDT)

Alex Villanueva

DECLARATION OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# DECLARATION

1

2

### DECLARATION OF ALEX DIBONA

3

I, Alex DiBona, declare as follows:

4      1.   I am an attorney at law, duly authorized to practice law before all of the courts of

5   the State of California and this honorable Court.  I am an attorney of record for plaintiff,

6   Alex Villanueva, in this case.  I am familiar with the files, pleadings, and facts in this case

7   and could and would competently testify to the following facts on the basis of my own

8   personal knowledge.

9      2.   Attached hereto as Exhibit 1 is a true and correct copy of the Los Angeles County

10   Board of Supervisors Motion titled "Report Regarding Options for Removing the Sheriff"

11   dated October 27, 2020, which was authenticated at the deposition of Kyla Coates, Pages

12   74:1-25.

13     3.   Attached hereto as Exhibit 2 is a true and correct copy of the Ordinance allowing

14   the Office of Inspector General to Issue Subpoenas authored by Veronica Pawlowski dated

15   January 21, 2020, which was produced in discovery by the County of Los Angeles as part

16   of their discovery responses.

17     4.   Attached hereto as Exhibit 5 is a true and correct copy of "Tweets" from Ester

18   Lim which were authenticated at her deposition at pages 83:15-84:12

19     5.   Attached hereto as Exhibit 9 is a true and correct copy of the Email from Ester

20   Lim to Hilda Solis's Chief of Staff Cindy Chen dated March 8, 2022, which was produced

21   in discovery and/or authenticated at deposition of Ester Lim at 143:23-144:2

22     6.   Attached hereto as Exhibit 10 is a true and correct copy of Ester Lim's Letter to

23   Vicky Bane, Executive Director of the County Equity Oversight Panel for the County of

24   Los Angeles, dated March 8, 2022, which was produced in discovery by the County of

25   Los Angels.

26     7.   Attached hereto as Exhibit 11 is a true and correct copy of Ester Lim's submitted

27   online complaint regarding Alex Villanueva dated March 8, 2022, which was produced in

28   discovery and authenticated at deposition of Ester Lim at 149:13-19

-1-

DECLARATION OF ALEX DIBONA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

8. Attached hereto as Exhibit 12 is a true and correct copy of Texts between Ester Lim and Max Huntsman regarding their complaints, dated sometime in March 2022, which were produced in discovery and/or authenticated at deposition of Ester Lim at 203:25-204:5

9. Attached hereto as Exhibit 14 is a true and correct copy of the July 12, 2022 Motion of the Los Angeles Board of Supervisors to place a Ballot Measure to remove the Sheriff by a 4/5 vote

10. Attached hereto as Exhibit 17 is a true and correct copy of the Internal Affairs Bureau "Stacked" Case file for Ester Lim's Complaint regarding Alex Villanueva completed October 2, 2023, which was produced in discovery and/or authenticated at deposition of Anne Devane at P 128:1-25

11. Attached hereto as Exhibit 18 is a true and correct copy of the Internal Affairs Bureau "Stacked" Case file for Max Huntsman's Complaint regarding Alex Villanueva completed October 2, 2023, which was produced in discovery and/or authenticated at deposition deposition of Anne Devane at P 154:1-25.

12. Attached hereto as Exhibit 19 is a true and correct copy of the Internal Affairs Bureau Investigator's Log regarding Ester Lim's Complaint completed October 2, 2023, which was produced in discovery and/or authenticated at deposition of Anne Devane at P 88:1-25

13. Attached hereto as Exhibit 20 is a true and correct copy of the Internal Affairs Bureau Investigator's Log regarding Max Huntsman's Complaint completed October 2, 2023, which was produced in discovery and/or authenticated at deposition Anne Devane at P 101:1-25

14. Attached hereto as Exhibit 21 is a true and correct copy of the Letter from Sergio Escobedo to the County Equity Oversight Panel regarding founded charges dated October 17, 2023, which was produced in discovery and/or authenticated at deposition of Sergio Escobedo at 126;1-12.

15. Attached hereto as Exhibit 22 is a true and correct copy of Texts between Ester

DECLARATION OF ALEX DIBONA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Lim and Max Huntsman regarding wanting their complaints about Alex Villanueva to go public in December 2023, which were produced in discovery and/or authenticated at deposition of Ester Lim at 211:22-212:3.

16. Attached hereto as Exhibit 24 is a true and correct copy of relevant excerpts from the deposition of Anne Devane.

17. Attached hereto as Exhibit 25 is a true and correct copy of relevant excerpts from the deposition of Christian Diaz Herrera.

18. Attached hereto as Exhibit 26 is a true and correct copy of relevant excerpts from the deposition of Constance Komoroski.

19. Attached hereto as Exhibit 27 is a true and correct copy of relevant excerpts from the deposition of Veronica Pawlowski.

20. Attached hereto as Exhibit 28 is a true and correct copy of relevant excerpts from the deposition of Timothy Murakami.

21. Attached hereto as Exhibit 29 is a true and correct copy of relevant excerpts from the deposition of Sergio Escobedo.

22. Attached hereto as Exhibit 30 is a true and correct copy of relevant excerpts from the deposition of Mark Lilienfeld.

23. Attached hereto as Exhibit 31 is a true and correct copy of relevant excerpts from the deposition of Ester Lim.

24. Attached hereto as Exhibit 32 is a true and correct copy of relevant excerpts from the deposition of Max Huntsman.

25. Attached hereto as Exhibit 33 is a true and correct copy of relevant excerpts from the deposition of Mercedes Cruz.

26. Attached hereto as Exhibit 34 is a true and correct copy of relevant excerpts from the deposition of Laura Lecrevian.

27. Attached hereto as Exhibit 35 is a true and correct copy of relevant excerpts from the deposition of Kyla Coates.

28. Attached hereto as Exhibit 36 is a true and correct copy of relevant excerpts from

DECLARATION OF ALEX DIBONA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the deposition of Roberta Yang.

29.   Attached hereto as Exhibit 37 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on December 18, 2018, which were obtained through the Los Angeles County's official website for such transcripts.

30.   Attached hereto as Exhibit 38 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on January 29, 2019, which were obtained through the Los Angeles County's official website for such transcripts.

31.   Attached hereto as Exhibit 39 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on August 13, 2019, which were obtained through the Los Angeles County's official website for such transcripts.

32.   Attached hereto as Exhibit 40 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on October 1, 2019, which were obtained through the Los Angeles County's official website for such transcripts..

33.   Attached hereto as Exhibit 41 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on October 15, 2019, which were obtained through the Los Angeles County's official website for such transcripts.

34.   Attached hereto as Exhibit 42 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on January 28, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

35.   Attached hereto as Exhibit 43 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on March 31, 2020, which were obtained through the Los Angeles County's official website for such

transcripts.

36.    Attached hereto as Exhibit 44 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on April 28, 2020, which which were obtained through the Los Angeles County's official website for such transcripts..

37.    Attached hereto as Exhibit 45 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on June 29, 2020, which which were obtained through the Los Angeles County's official website for such transcripts.

38.    Attached hereto as Exhibit 46 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on July 7, 2020, which which were obtained through the Los Angeles County's official website for such transcripts.

39.    Attached hereto as Exhibit 47 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on July 21, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

40.    Attached hereto as Exhibit 48 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on July 28, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

41.    Attached hereto as Exhibit 49 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on August 4, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

42.    Attached hereto as Exhibit 50 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on September 1, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

43.    Attached hereto as Exhibit 51 is a true and correct copy of the transcript excerpts

from the Los Angeles County Board of Supervisors meeting held on September 15, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

44.   Attached hereto as Exhibit 52 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on October 13, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

45.   Attached hereto as Exhibit 53 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on October 27, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

46.   Attached hereto as Exhibit 54 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on November 10, 2020, which were obtained through the Los Angeles County's official website for such transcripts.

47.   Attached hereto as Exhibit 55 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on January 26, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

48.   Attached hereto as Exhibit 56 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on May 4, 2021, which which were obtained through the Los Angeles County's official website for such transcripts.

49.   Attached hereto as Exhibit 57 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on May 18, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

50.   Attached hereto as Exhibit 58 is a true and correct copy of the transcript excerpts

from the Los Angeles County Board of Supervisors meeting held on May 19, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

51.   Attached hereto as Exhibit 59 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on June 22, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

52.   Attached hereto as Exhibit 60 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on July 27, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

53.   Attached hereto as Exhibit 61 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on August 10, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

54.   Attached hereto as Exhibit 62 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on September 28, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

55.   Attached hereto as Exhibit 63 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on December 7, 2021, which were obtained through the Los Angeles County's official website for such transcripts.

56.   Attached hereto as Exhibit 64 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on February 15, 2022, which were obtained through the Los Angeles County's official website for such transcripts.

57.   Attached hereto as Exhibit 65 is a true and correct copy of the transcript excerpts from the Los Angeles County Board of Supervisors meeting held on March 1, 2022, which were obtained through the Los Angeles County's official website for such transcripts.

58.   Attached hereto as Exhibit 66 is a true and correct copy of the transcript excerpts

DECLARATION OF ALEX DIBONA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

from the Los Angeles County Board of Supervisors meeting held on July 12, 2022, which were obtained through the Los Angeles County's official website for such transcripts.

59.  I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed on this 28th day of April, 2025, at Los Angeles, California.

_____
Alex DiBona, Esq.

DECLARATION OF ALEX DIBONA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EXHIBIT 1


Exhibit 4
3/21/2025
Esther Lim

AGN NO.

MOTION BY SUPERVISORS MARK RIDLEY-THOMAS            OCTOBER 27, 2020
AND SHEILA KUEHL

**Report Regarding Options for Removing the Sheriff**

    The Los Angeles County (County) Board of Supervisors (Board) is ultimately responsible for setting policy and supervising the official conduct of County officers and employees, ensuring that they discharge their duties faithfully.

    The Board's authority to supervise elected officers like the Sheriff, however, is more limited. Specifically, the Board may not obstruct the Sheriff's criminal investigative function. Nonetheless, the Board has general supervisory authority over elected officers to the extent that they function as County officers and may review and assess the officer's performance of those County duties.

    Over the years, challenges have arisen between the Board and certain elected officials.  By way of example, the Sheriff's recent actions have made it clear that reform efforts undertaken to restore public trust and confidence in the Los Angeles County Sheriff's Department (LASD) will continue to be undermined despite current public scrutiny demanding that the Sheriff do otherwise.

    The Board has consistently demonstrated its commitment to accountability and transparency within its law enforcement agencies. Following considerable controversy over troubling incidents of jail violence and the indictment of several LASD personnel, the Board created an oversight structure, consisting of the Office of Inspector General (OIG)

- MORE -

<u>MOTION</u>

SOLIS                    _____

RIDLEY-THOMAS_____

KUEHL                   _____

HAHN                    _____

BARGER                _____

AV010572

**MOTION BY SUPERVISORS RIDLEY-THOMAS AND KUEHL**
**OCTOBER 27, 2020**
**PAGE 2**

(Ridley-Thomas motion, October 2, 2012), and the Civilian Oversight Commission (COC) (Ridley-Thomas – Solis motion, December 9, 2014). In addition, the Board implemented new tools to enhance oversight, including the implementation of body-worn cameras (Ridley-Thomas – Solis motion, September 24, 2019), and subpoena power for the COC (Ridley-Thomas – Kuehl motion, October 15, 2019).

The Board also made efforts to address misconduct by some LASD personnel, by approving a motion to bring LASD into compliance with the Prison Rape Elimination Act (Hahn – Kuehl motion, November 14, 2017), and expanding the OIG's authority to investigate secret societies within the LASD (Hahn – Ridley-Thomas motion, July 23, 2019). Moreover, the Board has taken steps to manage governance issues, addressing the concerning practice of rehiring previously terminated deputies (Ridley-Thomas – Kuehl motion, March 12, 2019), and mitigating the LASD's budget deficit (Solis – Kuehl motion, October 1, 2019).

Unfortunately, this Board has also been forced to address the Sheriff's attempt to block oversight of investigations into fatal deputy-involved shootings, including approval of two motions that took steps to ensure an independent investigation of the shooting of Andres Guardado (Ridley-Thomas motions, June 23, 2020 and September 1, 2020). Despite a high level of Board engagement across an array of LASD issues, achieving a reasonable level of accountability remains a challenge amid waning public confidence.

The ongoing issues with the Sheriff are in notable contrast to the state of law enforcement at the City of Los Angeles (City), where the Los Angeles Police Department (LAPD) Chief of Police (Chief) is appointed by the Mayor, subject to the approval of the Police Commission and City Council.  The Chief can serve a maximum of two five-year terms. The Chief is responsible for the planning, efficient administration and operation of the LAPD but under the authority of the Police Commission.  The Police Commission has five members who are appointed by the Mayor and confirmed by the City Council.  While LAPD policy is guided by the Chief, the Police Commission, which includes an inspector

AV010573

**MOTION BY SUPERVISORS RIDLEY-THOMAS AND KUEHL**
**OCTOBER 27, 2020**
**PAGE 3**

general, has broad authority to investigate allegations of wrongdoing within the LAPD. This structure provides the LAPD with robust civilian oversight.

On the other hand, with an elected Sheriff, the County has had to maneuver different ways to create checks and balances on the Sheriff. Through the Board's leadership, the OIG and COC now have better tools to perform their oversight of LASD and the Board continues to use its budgetary authority. However, it has become increasingly clear that the Sheriff's blatant disregard for transparency and accountability requires a more forceful response.

Moreover, this Sheriff has repeatedly demonstrated his inability to balance the LASD budget to the detriment of County residents, especially during the ongoing COVID-19 crisis. Whereas every other County department director has taken extraordinary measures to curtail costs and maintain an appropriate level of service, the Sheriff has opted to take dramatic unilateral measures to cut critical programs such as the Youth Activity League at multiple locations and eliminate the Parks Services Bureau. The elimination of the Parks Services Bureau is especially egregious as it compromises safety at County parks at a time when these spaces are critical to providing options for community members to interact in outdoor and socially-distanced settings. The Sheriff's misguided resource-allocation decisions have left vulnerable communities less safe as demonstrated by the recent increasing incidents of violence. Moreover, the County has paid more than $149 million over the last 5 years to settle lawsuits and satisfy judgments stemming from Deputy-involved law enforcement incidents such as civil-rights violations, excessive use of force, sexual assaults, and killings. With a Sheriff that is unwilling to demand accountability for Deputy misbehavior, lawsuits will continue to be filed against the Sheriff, and it is the County's taxpayers who will continue to pay for the consequences.

AV010574

**MOTION BY SUPERVISORS RIDLEY-THOMAS AND KUEHL**
**OCTOBER 27, 2020**
**PAGE 4**

Given the recent but persistent refusal to provide the transparency and accountability that the community rightly demands, the County should consider whether the status of the Sheriff's office should be reexamined in order to better serve the more than 10 million residents of the County. The need for mechanisms to hold an elected Sheriff accountable is painfully obvious today, at a time when communities across the County are reeling from violence – including much-too-frequent deputy involved-shootings. Under the current Sheriff, hard-fought vital progress is being undone, and community trust is rapidly eroding. While the Board has been able to navigate challenging times with previous Sheriffs, this Sheriff's actions demonstrate the dire need to explore options for removing a Sheriff who refuses oversight or, at a minimum, mitigating damages caused by unacceptable behavior.

**WE THEREFORE MOVE THAT THE BOARD OF SUPERVISORS**:

1. Instruct County Counsel, in conjunction with the Office of the Inspector General and the Acting Chief Executive Officer (CEO), and in consultation with the Civilian Oversight Commission and justice advocates, to report back, in writing, in 30 days with:

    a. Options for removing or impeaching the Los Angeles County (County) Sheriff (Sheriff), including any necessary changes to the County Charter or County Code;

    b. Legislative changes required to authorize an appointed Sheriff, including the path and timeline required to amend the California Constitution and Los Angeles County Charter as needed;

    c. Legislative changes required to potentially remove certain existing responsibilities of the Sheriff, such as municipal law enforcement services and court services, as well as the authority of the County Board of Supervisors to appoint a County Police Chief to perform municipal law enforcement services; and

AV010575

**MOTION BY SUPERVISORS RIDLEY-THOMAS AND KUEHL**
**OCTOBER 27, 2020**
**PAGE 5**

    d.  Any other mitigation measures that could be taken to curtail the Sheriff's resistance to transparency, accountability and the faithful performance of duties for the benefit of the residents of the County.

# # #

(DBV/CG/CAS/JB)

AV010576

# EXHIBIT 2

**ANALYSIS**

This Ordinance amends Title 3 – Advisory Commissions and Committees of the Los Angeles County Code, Chapter 3.79, relating to the Sheriff Civilian Oversight Commission. The amendments permit the Sheriff Civilian Oversight Commission to access Sheriff's Department information, documents, and testimony necessary for its oversight function and to compel the production of such information by directing the Office of Inspector General to issue a subpoena when deemed necessary by a majority of the Commission members.

MARY C. WICKHAM
County Counsel

By

VERONICA PAWLOWSKI
Deputy County Counsel
Social Services Division

VP:ts

Requested:  1/07/20
Revised:    1/21/20

HOA.102763665.1



EXHIBIT
14

ORDINANCE NO._____

An ordinance amending Title 3 – Advisory Commissions and Committees of the Los Angeles County Code, relating to the Sheriff Civilian Oversight Commission.

The Board of Supervisors of the County of Los Angeles ordains as follows:

**SECTION 1.**        Section 3.79.020 is hereby amended to read as follows:

**3.79.020**        **Purpose.**

The purpose of the Commission is to improve public transparency and accountability with respect to the Los Angeles County Sheriff's Department, by providing robust opportunities for community engagement, ongoing analysis and oversight of the dDepartment's policies, practices, procedures, and advice to the Board of Supervisors, the Sheriff's Department, and the public.

**SECTION 2.**        Section 3.79.030 is hereby amended to read as follows:

**3.79.030**        **Duties.**

The Commission shall, on its own or at the request of the Board of Supervisors or the Sheriff, without ~~interfering with~~obstructing the Sheriff's criminal investigative function:

A.    Advise.  Serve only in an advisory capacity to the Board of Supervisors and the Sheriff, and without the authority to manage or operate the Sheriff's Department or direct the activities of Sheriff's Department employees, including imposition of discipline.

AB.    Make Recommendations.  Review, analyze, and where appropriate solicit input, and make recommendations to the Board of Supervisors and the Sheriff on the Sheriff's Department's operational policies and procedures that affect the community or

make recommendations to create additional operational policies and procedures affecting the community and request a response from the Sheriff.

~~B~~C.    Investigate.  ~~Investigate~~<u>Conduct investigations</u> through the Office of Inspector General (OIG)~~,~~<u>;</u> analyze, solicit input<u>,</u> and make recommendations to the Board of Supervisors and the Sheriff on systemic Sheriff---related issues or complaints affecting the community.  <u>The Commission shall direct, supervise, and evaluate all work performed by the Inspector General that is done at the request of the Commission.</u>

<u>D.    Inspect.  Receive referrals for inspections of jail facilities operated by or within the jurisdiction of the County from the Probation Oversight Commission, and direct the OIG, or refer the matter to the Sybil Brand Commission for Institutional Inspections, to conduct such inspections.</u>

<u>E.    Access Information.  Access information, documents, and testimony necessary to the Commission's oversight function as set forth in this ordinance.  The Commission, in compliance with all laws and confidentiality protections, may compel the production of such information by directing the OIG to issue a subpoena on the Commission's behalf when deemed necessary by action of the Commission.  The requirements and procedures for access to, and review and redaction of, confidential information received by the OIG are set forth in subjection J of County Code Section 6.44.190.</u>

~~C~~F.    Review.  Review policy recommendations made by outside entities at the request of the Board of Supervisors or the Sheriff or recommendations made in other reports that in the judgment of the Commission merit its analysis, and report to the

2

Board of Supervisors or the Sheriff whether or not the recommendation(s) should be implemented by the Board of Supervisors or the Sheriff or, if the recommendation(s) is~~are~~ being implemented, the status of implementation. The Commission's reports shall contain an analysis supporting its recommendations and shall seek the input of the Sheriff before implementing or publishing its reports.

~~D~~G.    Monitor Settlement.  Only at the request of the Board of Supervisors and/or the Sheriff, serve, either collectively or through one or more of its members, as the monitor of the implementation of settlement provisions in litigated matters.

~~E~~H.    Serve as Liaison and Mediator.  Function as a liaison, or at the request of the Board of Supervisors, the Sheriff, and/or community groups or organizations involved, serve as a mediator to help resolve ongoing disputes between the Sheriff's Department and members of the community, or organizations within the County of Los Angeles.

~~F~~I.    Obtain Community Input.  Obtain community input and feedback on specific incidents involving the use of force, detention conditions, or other civil rights concerns regarding the Sheriff's Department, convey to the Board of Supervisors and the Sheriff community complaints, concerns, or positive feedback received by the Commission, and where appropriate, make recommendations.

~~G~~J.    Work with the ~~Office of Inspector General~~OIG.  Work with and assist the ~~Office of Inspector General~~OIG in soliciting community input and feedback on issues being investigated by the Inspector General, and supervise and evaluate all work performed by the Inspector General that is done at the request of the Commission.

3

H̶K. Function as a Bridge. Function as a bridge between the Sheriff's Department and the community by providing the community an additional means of giving input to the Sheriff, obtaining answers from the Sheriff to community concerns about the Sheriff's Department's operations, practices, and activities,; bringing an additional perspective to the Sheriff's Department's decision-making to ensure an ongoing balance between the sometimes competing factors of ensuring public safety and constitutional, civil, and human rights,; and communicating community concerns to the Sheriff that otherwise might not be as clear or might go unnoticed.

I̶L. Seek Sheriff's Input. Seek the input of the Sheriff prior to completing any of its recommendations made pursuant to the duties defined in this section.

J̶.̶ ̶ ̶ ̶A̶d̶v̶i̶s̶e̶.̶ ̶ ̶S̶e̶r̶v̶e̶ ̶o̶n̶l̶y̶ ̶i̶n̶ ̶a̶n̶ ̶a̶d̶v̶i̶s̶o̶r̶y̶ ̶c̶a̶p̶a̶c̶i̶t̶y̶ ̶t̶o̶ ̶t̶h̶e̶ ̶B̶o̶a̶r̶d̶ ̶o̶f̶ ̶S̶u̶p̶e̶r̶v̶i̶s̶o̶r̶s̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶S̶h̶e̶r̶i̶f̶f̶,̶ ̶a̶n̶d̶ ̶w̶i̶t̶h̶o̶u̶t̶ ̶t̶h̶e̶ ̶a̶u̶t̶h̶o̶r̶i̶t̶y̶ ̶t̶o̶ ̶m̶a̶n̶a̶g̶e̶ ̶o̶r̶ ̶o̶p̶e̶r̶a̶t̶e̶ ̶t̶h̶e̶ ̶S̶h̶e̶r̶i̶f̶f̶'̶s̶ ̶D̶e̶p̶a̶r̶t̶m̶e̶n̶t̶ ̶o̶r̶ ̶d̶i̶r̶e̶c̶t̶ ̶t̶h̶e̶ ̶a̶c̶t̶i̶v̶i̶t̶i̶e̶s̶ ̶o̶f̶ ̶S̶h̶e̶r̶i̶f̶f̶'̶s̶ ̶D̶e̶p̶a̶r̶t̶m̶e̶n̶t̶ ̶e̶m̶p̶l̶o̶y̶e̶e̶s̶,̶ ̶i̶n̶c̶l̶u̶d̶i̶n̶g̶ ̶i̶m̶p̶o̶s̶i̶t̶i̶o̶n̶ ̶o̶f̶ ̶d̶i̶s̶c̶i̶p̶l̶i̶n̶e̶.̶

**SECTION 3.** If the initiative titled "Los Angeles County Sheriff Civilian Oversight Commission Ordinance" is approved by the voters at the March 3, 2020 election, s̶Section 3.79.030 is deleted and the following s̶Sections 3.79.030, 3.79.031, and 3.79.032 become operative law.

**3.79.030        Duties.**

The Commission shall, on its own or at the request of the Board of Supervisors or the Sheriff, without interfering with the Sheriff's investigative function:

A. Make Recommendations. Review, analyze, and where appropriate solicit input, and make recommendations to the Board of Supervisors and the Sheriff on the

4

Sheriff's Department's operational policies and procedures that affect the community or make recommendations to create additional operational policies and procedures affecting the community and request a response from the Sheriff.

B.      Investigate.  Investigate through the Office of Inspector General (OIG), or through its own staff, analyze, solicit input and make recommendations to the Board of Supervisors and the Sheriff on systemic Sheriff - related issues or complaints affecting the community.

C.      Review.  Review policy recommendations made by outside entities at the request of the Board of Supervisors or the Sheriff or recommendations made in other reports that in the judgment of the Commission merit its analysis, and report to the Board of Supervisors or the Sheriff whether or not the recommendation(s) should be implemented by the Board of Supervisors or the Sheriff or, if the recommendation(s) is being implemented, the status of implementation.  The Commission's reports shall contain an analysis supporting its recommendations and shall seek the input of the Sheriff before implementing or publishing its reports.

D.      Monitor Settlement.  Only at the request of the Board of Supervisors and/or the Sheriff, serve, either collectively or through one or more of its members, as the monitor of the implementation of settlement provisions in litigated matters.

E.      Serve as Liaison and Mediator.  Function as a liaison, or at the request of the Board of Supervisors, the Sheriff, and/or community groups or organizations involved, serve as a mediator to help resolve ongoing disputes between the Sheriff's

Department and members of the community, or organizations within the County of Los Angeles.

      F.      Obtain Community Input.  Obtain community input and feedback on specific incidents involving the use of force, detention conditions, or other civil rights concerns regarding the Sheriff's Department, convey to the Board of Supervisors and the Sheriff community complaints, concerns or positive feedback received by the Commission, and where appropriate, make recommendations.

      G.      Work with the OIG.  Work with and assist the OIG in soliciting community input and feedback on issues being investigated by the Inspector General, and supervise and evaluate all work performed by the Inspector General that is done at the request of the Commission.

      H.      Function as a Bridge.  Function as a bridge between the Sheriff's Department and the community by providing the community an additional means of giving input to the Sheriff, obtaining answers from the Sheriff to community concerns about the Sheriff's Department's operations, practices and activities, bringing an additional perspective to the Sheriff's Department's decision-making to ensure an ongoing balance between the sometimes competing factors of ensuring public safety and constitutional, civil and human rights, and communicating community concerns to the Sheriff that otherwise might not be as clear or might go unnoticed.

      I.      Seek Sheriff's Input.  Seek the input of the Sheriff prior to completing any of its recommendations made pursuant to the duties defined in this section.

J.      Advise.  Serve only in an advisory capacity to the Board of Supervisors and the Sheriff, and without the authority to manage or operate the Sheriff's Department or direct the activities of Sheriff's Department employees, including imposition of discipline.

### 3.79.031          Inspect.

Receive referrals for inspections of jail facilities operated by or within the jurisdiction of the County from the POC, and direct the OIG, or refer the matter to the Sybil Brand Commission, to conduct such inspections.

### 3.79.032          Access Information.

Access information, documents, and testimony necessary to the Commission's oversight function as set forth in this ordinance.  The Commission, in compliance with all laws and confidentiality protections, may compel production of such information by directing the OIG to issue a subpoena on the Commission's behalf when deemed necessary by action of the Commission.  The requirements and procedures for access to, and review and redaction of, confidential information received by the OIG are set forth in subsection KJ of County Code sSection 6.44.190.

**SECTION 4.**          Section 3.79.035 is hereby added to read as follows:

### 3.79.035          Records.

Any personnel records, complaints against Sheriff's Department personnel, and information obtained from these records, which come into the possession of the Commission or its staff, shall be treated as confidential and shall not be disclosed to any member of the public, except in accordance with applicable laws.  Copies of complaints

7

not already in the Sheriff's Department possession may be made available to the Sheriff's Department upon completion of the Commission's investigation, unless confidentiality mandates otherwise.

Because the Commission is a Brown Act body that is not authorized to conduct closed session, the Commission may not receive records protected by any law protecting the Confidentiality of records, including Penal Code sections 832.7, 11077, and 13300, et al. As permitted by law, and consistent with subsection J of County Code Section 6.44.190, material received by the OIG in response to a subpoena issued at the direction of the Commission may be shared with the Commission by the OIG.

**SECTION 5.**      Section 3.79.040 is hereby amended to read as follows:

**3.79.040**      **Membership.**

A.   The Commission shall consist of nine members. Each shall be a resident of the County of Los Angeles. The members shall be selected as follows:

1.   Five members shall be appointed by the Board, one nominated by each Supervisorial District.

2.   Four community members shall be appointed by the Board upon recommendation by the Executive Officer of the Board of Supervisors, in consultation with County Counsel. Subsequent appointments shall follow a process set forth in the Commission's Handbook.

B.   The following individuals cannot serve as members of the Commission:

1.   A current employee of the County of Los Angeles;

8

2.    A current employee of any law enforcement agency, including ~~but not limited to~~ a police or prosecutorial agency for a government entity, or any individual who has been an employee of such an agency within the previous year.

**SECTION 6.**        Section 3.79.050 is hereby amended to read as follows:

**3.79.050**        **Term of Service.**

A.    Subject to subsection B of this section, each member shall serve for a three-year term.  No member may serve on the Commission for more than two full consecutive terms unless such limitation is waived by the Board of Supervisors.  The term for all members shall begin on July 1st and end on June 30th.  However, the first term of all members who are the initial appointees to the Commission, shall be deemed to commence on the date their appointment is approved by the Board of Supervisors and will end on June 30th of a succeeding year as set forth in subsection B of this section.

B.    As part of the original creation of the Commission only, the initial commission~~ers~~ members shall be divided into three groups, with Group A serving an initial three-year term, Group B serving an initial two year term and Group C serving an initial one-year term.  For groups B and C, this initial one and two-year term shall not be considered towards the restriction of two full year terms as described in ~~s~~Section 3.79.050 (A).  The commission~~ers~~ members shall be placed into three groups by a random selection process.

9

**SECTION 7.**        Section 3.79.060 is hereby amended to read as follows:

**3.79.060**            **Training.**

Each commissioners member must successfully complete a comprehensive training and orientation program within six months of appointment.  Failure to complete the training may result in disqualification.  The training program shall be robust and cover Cconstitutional policing including such topics as use of force, firearms, custody, mental health issues, juvenile justice and patrol.  Each Ccommission member shall actively participate in the ongoing training program.

**SECTION 8.**        Section 3.79.120 is hereby deleted in its entirety.

~~**3.79.120**            **Records.**~~

~~Any personnel records, citizen complaints against Sheriff's Department personnel, and information obtained from these records, which come into the possession of the Commission or its staff, shall be treated as confidential and shall not be disclosed to any member of the public, except in accordance with applicable laws. Copies of citizen complaints not already provided to the Sheriff's Department shall be made available to the Sheriff upon completion of the Commission's investigation, unless prohibited by applicable laws.~~

**SECTION 9.**        Section 3.79.130 is hereby deleted in its entirety.

~~**3.79.130**            **Use of the Office of Inspector General Staff for Investigative Purposes.**~~

~~The Commission shall utilize the staff of the Office of Inspector General to undertake investigations, inquiries, audits and monitoring.  The Commission shall direct,~~

10

supervise and evaluate all work performed by the Inspector General that is done at the request of the Commission.

**SECTION 10.**        Section 3.79.190 is hereby deleted in its entirety.

**3.79.190            Obtaining Documents and Information.**

The Commission shall be bound by the memorandum of agreement between the Office of Inspector General and the Sheriff's Department relating to access to Sheriff's Department documents.  The memorandum of agreement will govern which documents the Commission may access as well as how the Commission will obtain documents and information from the Sheriff's Department.

[CH379VPCC]

# EXHIBIT 3

## Satterfield, John L

| | |
|---|---|
| **From:** | Chow, Vanessa C. |
| **Sent:** | Tuesday, February 1, 2022 1:16 PM |
| **To:** | Satterfield, John L |
| **Cc:** | Villanueva, Alex |
| **Subject:** | Fwd: FBI Briefing 11/26/2021 |

Good afternoon, please see below email notification sent to the Bos as per your request and instructions. This email was sent to the Justice Deputies instead of the Supervisors due to the fact that it was Wednesday afternoon the day before thanksgiving and most of the Supervisors were out of town and was unlikely they would check their email. I also spoke to each Justice Deputy individually over the phone to relay the information. Each one questioned the validity of the meeting and after speaking with you it was authorized that I forward this email thread to confirm the veracity of the meeting.

Thank you

Vanessa

Vanessa C. Chow, Sergeant
Los Angeles County Sheriff's Department
Liaison to the Board of Supervisors
Hall of Justice
Office: (213) 229-3312
Cell: (323) 559-9167
Vcchow@lasd.org

---

**From:** Chow, Vanessa C. <vcchow@lasd.org>
**Sent:** Wednesday, November 24, 2021 2:50 PM
**To:** Lim, Esther (BOS); Mathews, John; Pawlowski, Veronica; Coates, Kyla; Mesesan, Christina
**Subject:** Fwd: FBI Briefing 11/26/2021

Good afternoon please see below email thread with further information regarding Friday's meeting request. Have a great Thanksgiving.

Thank you

Vanessa C. Chow, Sergeant
Los Angeles County Sheriff's Department
Liaison to the Board of Supervisors
Hall of Justice
Office: (213) 229-3312
Cell: (323) 559-9167
Vcchow@lasd.org

---

**From:** Satterfield, John L <JLSatter@lasd.org>
**Sent:** Wednesday, November 24, 2021 2:45 PM
**To:** Chow, Vanessa C.

1

**Cc:** Villanueva, Alex; Murakami, Timothy K.; Valdez, Jorge A.
**Subject:** Fwd: FBI Briefing 11/26/2021

Here is the follow up email...

John Satterfield, Ed.D, MPA
Deputy Sheriff (Captain)
Los Angeles County Sheriff's Department
Sheriff's Information Bureau
Hall of Justice - 1st Floor
211 W. Temple Street
Los Angeles, CA 90012
(213) 229-1670 Office
(323) 415-2934 Fax

"Do What Is Right and Just, No Matter What the Personal Cost"
Colonel Donald G. Cook, USMC (ret), Medal of Honor Recipient

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged
information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is
prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the
intended recipient, please contact the sender and destroy all copies of the communication.
Sent via iPhone

**From:** James Peaco <jwpeaco@fbi.gov>
**Sent:** Wednesday, November 24, 2021 13:50
**To:** Satterfield, John L; Cameron.Schroeder@usdoj.gov; Maggie Carter; Blaine McPhillips; Gatiglio, Cynthia; Robert
Ragland; Joseph Nicchitta; Fesia Davenport; Muntu Davis; Megan McClaire; BMcphillips@counsel.lacounty.gov; Barbara
Ferrer; Lindsay Eberhard-Cook; David Gates; Edward You; Kristine Beardsley; Amir Ehsaei; Peggy Huang; Sarah Peterson;
Chelsea Bill; Dennis.F.Roland.Jr@usdoj.gov; Mario Roldan; Emil Notarfrancesco; Kevin Schadt; Holle Peavy Dukic; Javier
Gomez; Jason To; Krista Lam
**Subject:** FBI Briefing 11/26/2021

This message is from an EXTERNAL SENDER - be CAUTIOUS, particularly with links and attachments

FBI Los Angeles will be holding a briefing on Friday 11/26/2021 at 1030 to discuss security concerns related to
mandatory LA County COVID-19 testing at Fulgent Genetics Laboratory. The meeting will be held in the West Annex
meeting room at FBI Los Angeles main Office located at 11000 Wilshire Blvd, Los Angeles, CA 90024. The West Annex is
located to your left as you walk toward the main building.

Thank you

James W. Peaco III
Weapons Of Mass Destruction Coordinator
FBI Los Angeles
Cell 310 261-9118
Email jwpeaco@fbi.gov

# EXHIBIT 4





## OFFICE OF THE SHERIFF
### COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

February 9, 2021

The Honorable Hilda Solis
Chair, Board of Supervisors
County of Los Angeles
856 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California  90012

Dear Supervisor Solis:

### ETHICAL VIOLATIONS OF FIRST DISTRICT JUSTICE DEPUTY

I would like to bring your attention to the shocking behavior I have been made aware of executed by your Justice Deputy Esther Lim.  Behavior, which can only be described as appalling.  Ms. Lim's Twitter social media account displays both hatred and intentional bias, two character traits I know you do not endorse.  I have attached numerous recent samples from her Twitter account, which illustrate her detestable behavior.

As you review these posts, you will witness examples of racial bias, gender bias, age bias, political activism, lewdness, vulgarity, bullying, false representation, support of online "trolling," support of online "doxing," allegations of deputies committing murder, and a gross lack of professionalism and judgement.  Additionally, Ms. Lim tweeted her support for anarchists, and in one post even shared her disappointment Los Angeles County (County) did not make the list of being designated by the United States Department of Justice as an "*anarchist jurisdiction.*"  As Chair of the Los Angeles County Board of Supervisors and a civic leader during the many examples of civil disorder by ANTIFA in 2020, this must be difficult to learn.

Several of these slanderous and profanity laden examples were disrespectfully and personally directed at numerous elected officials.  On one occasion,

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*— Since 1850 —*

AV010545

Supervisor Solis                    -2-                    February 9, 2021

Ms. Lim publicized and circulated the link of a "harmful fake account," created to harass me; this account was soon banned by Twitter for numerous policy violations. You may also be surprised to learn the majority of these examples I have presented to you appear to have occurred during her regular work hours. I refuse to believe her attacks on democratically elected officials represent your personal beliefs. I was disappointed by this news, knowing she is a representative of your office.

Also, note several profanity filled posts irresponsibly spread falsehoods and propaganda regarding my voluntary appearance at the December 17, 2020, Civilian Oversight Commission (COC) meeting. Apparently, Ms. Lim was typing these attacks on me during the meeting as I spoke, and in at least one thread, had a real time exchange with COC Commissioner Priscilla Ocen during the meeting. By the standard used for County employees, doing this during working hours and in such a high profile manner, she is viewed as acting in her official capacity and was a representative of your office.

Of equal concern is the fact some of these examples suggest information she may have learned of in a confidential setting. She eludes to allegations as facts in generalized statements regarding the character and criminal behavior of my deputies, which as you know places the County in a vicarious position for civil liability, as well as stokes the fires of hatred.

One disturbing statement, bordering on the incitement of violence, read, "*This is not a few bad apples. The whole damn orchard needs to be torched. #DefundPolice.*" As you can imagine, it was disheartening for our Los Angeles County Sheriff's Department (Department) members to learn of your Justice Deputy's disparagement for them and the entire profession of law enforcement, especially at a time peace officers are being targeted and violently assaulted simply because they wear a uniform. It is also worrisome the hateful bias she publicly exudes on a weekly basis towards the Department, which may be affecting the public safety of the County both indirectly and directly, since she is your gatekeeper for public safety issues and our Departments conduit to you.

Over the last several months, I have requested to meet with you approximately six times and have requested your attendance at no less than two press conferences; all of which were denied or went unanswered until we virtually met yesterday on February 8, 2021. Additionally, we have recently been limited as to the number of Board letters we can present at the Public Safety Cluster Agenda Review (CAR) meetings by Ms. Lim, which significantly reduces our ability to institute positive change towards public safety. A total of

AV010546

Supervisor Solis                    -3-                    February 9, 2021

five letters and/or presentations per week from 21 separate County departments is draconian, irresponsible, and does not best serve the residents of the County. In light of Ms. Lim's behavior, I must now suspect whether you were even aware of these issues at all.

The intentional bias displayed by Ms. Lim has surely altered the possibility of a good working relationship, and it is the community who ultimately suffers. Her actions and false information contribute to the erosion of trust and have damaged me personally, as well as the perceived legitimacy of the Department. Moving forward, I do not see how Ms. Lim can remain effective as our bridge to you on public safety concerns. Despite the volume of posts provided as examples, I choose to believe they are not indicative of your own beliefs regarding the men and women of this great organization and the law enforcement profession.

The First Amendment does not exempt a person from administrative consequences for their choices and actions, especially when their statements have an easily identified direct nexus to the workplace, are unethical, violate policy, and bring embarrassment to the County. Personally, I immediately removed my former Chief of Staff from his position, as well as took swift administrative action against him for a single occurrence of posting a statement, which was perceived as insensitive in nature; I have provided you with 37 separate occurrences for Ms. Lim, all of which are far more offensive.

As a member of our County family, I look forward to the outcome of what I trust will be the appropriate administrative action.

Should you have any questions or would like to discuss this matter further, please feel free to contact me at

Sincerely,

ALEX VILLANUEVA
SHERIFF

Supervisor Solis                           -4-                         February 9, 2021

AV:JAV:js
(Sheriff's Information Bureau)

c:     Supervisor Holly J. Mitchell, Second District, Board of Supervisors
       Supervisor Sheila Kuehl, Third District, Board of Supervisors
       Supervisor Janice Hahn, Fourth District, Board of Supervisors
       Supervisor Kathryn Barger, Fifth District, Board of Supervisors
       Fesia Davenport, Chief Executive Officer, Chief Executive Office
       Lisa Garrett, Director of Personnel, Department of Human Resources
       Rodrigo A. Castro-Silva, County Counsel, Office of the County Counsel

AV010548

# EXHIBIT 5



**Esther | 에스더 | إستر |**
@EstherNMNLim

ooo

Lots of "if they were Black..." tweets going around. Yup we all know what would have happened.
#WhitePrivilege



🔵 **MSNBC** ✓ @MSNBC · Jan 12

Republican Reps. Gohmert, Stivers, Taylor, Boebert, Lesko, and Bucshon were among those seen not complying with police at added security checkpoints in the U.S. Capitol, or complaining of its implementation, according to reports.
on.msnbc.com/2MQofmi

7:11 PM · Jan 12, 2021 from Los Angeles, CA · Twitter for iPhone



AV010549

 **Esther | 에스더 | إستر**
@EstherNMNLim

Was wondering when we'd see a fake Sheriff account trolling him & the Department!
 here it is: twitter.com/joemischo/stat...

This Tweet is unavailable.

3:07 PM · Sep 3, 2020 from Los Angeles, CA · Twitter for iPhone

**1** Like



 **Esther | 에스더 | إستر**
@EstherNMNLim

And Sheriff Villanueva has the audacity to say he was a sponsor of this bill.
Fool, what you should have done is not provide cover for your deputies from any wrongdoing & held them accountable.
#KobeBryant

> **AP** **AP Sports** ✔ @AP_Sports · Sep 28, 2020
> There is a new law in California prompted by the helicopter crash that killed Kobe Bryant, his daughter and seven others. It makes it a crime for first responders to take unauthorized photos of deceased people at the scene of an accident or crime.
> apne.ws/3isAK3b

4:26 PM · Sep 29, 2020 from Los Angeles, CA · Twitter for iPhone

**2** Likes



AV010550



Esther | 에스더 | إسثر
@EstherNMNLim

"...In Los Angeles County, the largest local jurisdiction in the nation, no sheriff should be elected. It's time to face that essential truth and map out the long, contentious but necessary path to bring about that change."
#GetHimOut #ResignVillanueva



Editorial: Sheriffs should not be elected
Between elections, sheriffs are accountable to no one. We wouldn't accept that arrangement with city police chiefs or generals. We shouldn't for sheriffs, either.
⅋ latimes.com

8:40 AM · Oct 27, 2020 · Twitter for iPhone

2 Likes

♡        ⇄        ♡        ⬆        ⤴ tip

---

Esther | 에스더 | إسثر
@EstherNMNLim

The Sheriff keeps getting #PPE donated to him and the Department but they don't even use them. They should give it to folk who will and need it—people in jails come to mind. It should go without saying that we need to get people out of the jails NOW! #COVID—19



Alex Villanueva
@LACoSheriff

I want to thank the US Zhejiang General Chamber of Commerce who graciously donated 72,000 masks & 1150+ hand sanitizers to @LASDHQ earlier today. The masks will be dispersed throughout the department to help keep our personnel safe & protected during the #COVID19 pandemic. #LASD





Esther | 에스더 | إستر |
@EstherNMNLim

If you're Black, you can't do these things otherwise the cops will shoot you:
- in/Enter your 🏠
- Stop a fight 😮
- Hold anything in your 🖐🏿 because everything = gun
- Stand outside your mom's 🏠
- Be in your 🚗
- Jog 🏃🏿
- Have a MH need 🧠

#BlackLivesMatter #DijonKizzee

LIVES

6 Retweets   1 Quote Tweet   6 Likes

12:13 PM · Sep 1, 2020 from Los Angeles, CA · Twitter for iPhone

---



Esther | 에스더 | إستر |
@EstherNMNLim

Snitches get stitches except if you're a white supremacist then I'm singing like a canary 🐦 🎶

 The New York Times ✔ @nytimes · Jan 12
An Olympic gold medalist, the swimmer Klete Keller, was part of the pro-Trump mob that sieged the Capitol, former teammates and coaches who identified him said. If confirmed by the authorities, he may face federal charges. nyti.ms/3bys8GX

7:12 PM · Jan 12, 2021 from Los Angeles, CA · Twitter for iPhone



AV010552



**Esther | 에스더 | إستر**
@EstherNMNLim

Sheriff is at the Sheriff Civilian Oversight Commission meeting because of a SUBPOENA. It is not voluntary so I wish the commissioners would stop thanking him for attending. #LASD

♡ 1    ⇅ 1    ♡ 11    ⬆    ⚠ Tip



**Esther | 에스더 | إستر**
@EstherNMNLim

Replying to @EstherNMNLim

Sheriff said that it's a cottage industry to sue cops. If the police stopped engaging in idk shooting and murdering people then yeah, Im sure folks will stop suing.

12:27 PM · Dec 17, 2020 from Los Angeles, CA · Twitter for iPhone

**1 Retweet**   **2 Likes**



AV010553





LA Sheriff loves to spin. He purported that a) he attended COC meeting voluntarily—WRONG & now he said the judge dropped contempt hearing bc there was something wrong w/legality of subpoena—WRONG. He dropped it bc you agreed to come to the next COC meeting

Esther | 에스더 | إستر
@EstherNMNLim

Judge drops contempt hearing after Villanueva agrees to attend oversight meet...
A Superior Court judge cancelled a hearing set for next month where lawyers for Los Angeles County Sheriff Alex Villanueva were going to have to explain why he...
ⓓ latimes.com

1:07 PM · Dec 28, 2020 · Twitter for iPhone

1 Quote Tweet   1 Like



Esther | 에스더 | إستر
@EstherNMNLim

When the Sheriff of LA says #VictimsMatter he should add an asterisk. It doesn't include the people his deputies shot and killed.

2:07 PM · Dec 26, 2020 from Burbank, CA · Twitter for iPhone

6 Likes

Jessica Pishko @JessPish · Dec 26, 2020
Replying to @EstherNMNLim
💯

AV010554



Esther | 에스더 | إستر
@EstherNMNLim

*Except victims of deputy misconduct and violence.

Replying to @ABC7

**Alex Villanueva** ✔
@LACoSheriff

We look forward to seeing if the DA will reevaluate these cases and re- apply the enhancements given the nature of these cases.

As Sheriff of LA County, I firmly believe we are not safer by putting the interests of offenders over the needs of victims of crime.

#VictimsMatter

15:25 · 12/22/20 · Twitter for iPhone

5:15 PM · Dec 22, 2020 · Twitter for iPhone

2 Likes

---

Esther | 에스더 | إستر
@EstherNMNLim

Replying to @EstherNMNLim

Also, sheriff limiting his time to 1 hour for COC meeting? Not how that works. You stay until COC says they're done. Commish shouldn't be rushing through their questions because the sheriff says he's only going to be there for 1 hour. I don't recall subpoena having a time limit.

1:42 PM · Dec 17, 2020 from Los Angeles, CA · Twitter for iPhone

1 Like



Esther | 에스더 | إستر @EstherNMNLim · Dec 17, 2020
Replying to @EstherNMNLim
Also COC needs to just subpoena him to appear for every COC meeting. Also, double check if the sheriff limiting his own time is even legal.

♡ 1    ↺    ♡ 1    ↑    ⚠ Tip

AV010555





**Esther | 에스더 | إستر |**
@EstherNMNLim

Nothing Mitch does surprises me. We should all collectively agree that he's not going to do anything for anyone even if they're starving or dying.
He's a fucking racist asshole.

3:19 PM · Dec 29, 2020 from Los Angeles, CA · Twitter for iPhone

1 Like





Esther | 에스더 | إسنر
@EstherNMNLim

I am so fucking pissed with the COC.

Esther | 에스더 | إسنر @EstherNMNLim · Dec 17, 2020
STOP DEFERRING TO THE SHERIFF. HE WORKS FOR US. HE ANSWERS TO US.
HE KNOWS WHEN THESE MEETINGS TAKE PLACE. STOP THANKING HIS CORRUPT
ASS. DEMAND THAT HE SHOW UP AT ALL COC MEETINGS. IF NOT SUBPOENA
HIM!! twitter.com/EstherNMNLim/s...

12:59 PM · Dec 17, 2020 from Los Angeles, CA · Twitter for iPhone

1 Retweet    4 Likes

○        ⟳        ♡        ↪

Priscilla Ocen @pannocen · Dec 17, 2020
Replying to @EstherNMNLim
Please note that I did not thank him for attending. He is required to attend
COC meetings by ordinance and legally compelled to do so by at least two
pending subpoenas.

○        ⟳        ♡        ↪        ⚠ Tip

Esther | 에스더 | إسنر @EstherNMNLim · Dec 17, 2020
You're always the exception. You should have been given all the time needed
to get your questions answered.
He feigns cooperation. I have no faith that he'll show up when the COC asks.
COC is going to have to keep subpoenaing him.
And yes, you're right. Ordinance + subpoena.

○ 1      ⟳        ♡ 1      ↪        ⚠ Tip


Show replies

Jessica Pishko @essPish · Dec 17, 2020
Replying to @EstherNMNLim
The thank-yous were a little much, and then the sheriff closed by lobbing
bombs at Comm. Ocen.

○        ⟳ 1      ♡ 2      ↪        ⚠ Tip

---


Esther | 에스더 | إسنر
@EstherNMNLim

Fuck 2020.

ABC News ✔ @ABC · Oct 26, 2020
LATEST: Justice Clarence Thomas is expected to administer the official
constitutional oath to Amy Coney Barrett at the White House tonight,
administration official tells @ABC News. Republicans have secured the necessary
votes for her confirmation. abcn.ws/35BVDmz

3:53 PM · Oct 26, 2020 · Twitter for iPhone

1 Like

○        ⟳        ♡        ↑        ⚠ Tip

AV010557



**Esther | 에스더 | إستر|**
@EstherNMNLim

You called Black boys and Black men "super predators".
They shouldn't be voting for your racist, bigoted, sexist,
& everything-phobic ass.
*Ahem @kanyewest @50cent @icecube @LilTunechi
and whoever the fuck else who lost their damn fucking
minds.
#VoteBlueToEndTheNightmare
twitter.com/realDonaldTrum...

This Tweet is unavailable.

10:27 AM · Nov 1, 2020 from Los Angeles, CA · Twitter for iPhone

**1** Like



**Esther | 에스더 | إستر|**
@EstherNMNLim

Kind of mad that LA isn't on this list :/

🔵 **NBC New York** ✓ @NBCNewYork · Sep 21, 2020
#BREAKING: US Department of Justice designates #NYC as an anarchist
jurisdiction 4.nbcny.com/3udQqr4

11:07 AM · Sep 21, 2020 from Los Angeles, CA · Twitter for iPhone

**1** Like



Esther | 에스더 | إستر | @EstherNMNLim

Translate Tweet

Booyah, Sheriff!

L.A. County sheriff cannot ignore watchdog's subpoena, judge rules

A civilian watchdog group is well within its rights to question L.A. County Sheriff Alex Villanueva about coronavirus in the jail system, judge rules.

🔗 latimes.com

6:49 PM · Nov 20, 2020 from Los Angeles, CA · Twitter for iPhone

1 Retweet    3 Likes



**Esther | 에스더 | إستر |**
@EstherNMNLim

## #FuckICE #AbolishICE

**Radley Balko** ✔ @radleybalko · Nov 2, 2020

ICE tried to deport a key witness in the forced hysterectomies story. She's a U.S. citizen.

theintercept.com/2020/11/02/ice...

5:15 PM · Nov 2, 2020 from Los Angeles, CA · Twitter for iPhone



You think your vote isn't important? Why are they trying to fuck with it then????

#GOTV #Vote #VoterSuppression

Esther | 에스더 | إستر
@EstherNMNLim

California Republican Party Admits It Placed Misleading Ballot Boxes Around State

Government officials say the receptacles are illegal and could lead to election fraud, but the party says it will continue the practice.

nytimes.com

9:28 AM · Oct 14, 2020 from Los Angeles, CA · Twitter for iPhone



**Esther | 에스더 | إستر**
@EstherNMNLim

Yikes!!! 😬
This needs to get fixed ASAP!!!
We had all those fuck ups during the Primary, you'd think this would get resolved for the General!
@LACountyRRCC

**KTLA** ✓ @KTLA · Oct 6, 2020
Some 2,100 L.A. County voters received mail-in ballots with no way to vote for president ktla.com/news/californi...



9:54 AM · Oct 6, 2020 from Los Angeles, CA · Twitter for iPhone

1 Like

AV010560





**Esther | 에스더 | إستر**
@EstherNMNLim

Oh my fucking God noooooo!!!! Why the fuck would you do this to me @tacobell!!!!

Am I gonna have to freeze these fucking things?!? #MexicanPizza



🔺 **CNBC** ✅ @CNBC · Sep 3, 2020

Taco Bell removes Mexican Pizza and other items as it finishes menu streamlining cnb.cx/3546sPS

12:46 PM · Sep 3, 2020 from Los Angeles, CA · Twitter for iPhone



◯          ⇅          ♡          ⬆          🔺 Tip

 **Esther | 에스더 | إستر**
@EstherNMNLim

A total slap in the face of all our health workers.
I don't think they want us to applaud, they want us to
stay the fuck home and wear our fucking masks.
#COVID19 #WearAMask 😷

 **Sith Lord** ✦ @MMLXXX · Dec 17, 2020
Bro we really at 0% ICU cap and the fucking mall is open lmaoooo
Show this thread

12:57 PM · Dec 18, 2020 from Los Angeles, CA · Twitter for iPhone

**2** Retweets   **6** Likes

♡         ↻         ♡         ↑         △ Tip

 **Esther | 에스더 | إسنر**
@EstherNMNLim

Fuck 'em. #CovidVaccine

 White House Officials Who Completely Mismanaged The Pan...
Hours after the White House confirmed that administration
officials would receive vaccinations soon, Trump announced ...
🔗 buzzfeednews.com

8:32 PM · Dec 13, 2020 · Twitter for iPhone

♡         ↻         ♡         ↑         △ Tip

AV010562



**Esther | 에스더 | إستر |**
@EstherNMNLim

Not fucking ice cream 😭 #2021Sucks

🦊 **FOX 11 Los Angeles** ✔ @FOXLA · Jan 16
Officials believe the coronavirus was able to survive in the ice cream due to the cold temperature and was likely transferred from a person who had the disease. foxla.com/news/ice-cream...

8:58 PM · Jan 16, 2021 from Los Angeles, CA · Twitter for iPhone



Esther | 에스더 | إستر |
@EstherNMNLim

Replying to @EstherNMNLum

This is v evident w/custody deputies in the jails. They are sooooo young, look super scared, & can't tell you how many of them are fiscally & are socially irresponsible when their shift is done (they fuck up during their shift too) like DUIs, DV, steroids (so many roided cops)

3:16 PM · Dec 8, 2020 from Los Angeles, CA · Twitter for iPhone

Esther | 에스더 | إستر | @EstherNMNLum · Dec 8, 2020
Replying to @EstherNMNLum
Trust, if they say they're not scared, they're lying. When they are, they'll use force more often than not, perceive fear that's not there or be in fear for every little thing.
The other thing is that during training, their FTOs will perpetuate the us vs them mindset. Not good.

AV010563



**Esther | 에스더 | إستر**
@EstherNMNLim

ㅇㅇㅇ

Yup & LASD covered it up by protecting the deputies who did it & won't allow the Inspector General to conduct an independent investigation.
#KobeBryant



**Justin 🐻 Boldaji بلداجي** @justinboldaji · Sep 22, 2020

LA cops took cell phone pictures of the dead bodies of Kobe & his 8 year old daughter & showed them to women at bars to impress them. But yea reform ok

Show this thread

11:04 AM · Sep 22, 2020 from Los Angeles, CA · Twitter for iPhone

**2 Likes**

♡    ⟲    ♡    ↑    ⚐ Tip



**Esther | 에스더 | إستر**
@EstherNMNLim

ㅇㅇㅇ

But nothing about his deputies harassing surviving families of deputy violence? Or prematurely or the malicious sharing of victims info of deputy violence to media?
The sheriff & deputies can move, these families can't afford to. Some deputies don't even live in LAC.



**Claudia Peschiutta** ✔ @ReporterClaudia · Dec 2, 2020

Asked for evidence, Villanueva says: "We also got banners across nine freeways with my name and address...I've had fliers made with my name, my home address and plastered on telephone polls like wanted posters and we've also had the same thing happen to our deputies."

Show this thread

7:54 PM · Dec 2, 2020 from Los Angeles, CA · Twitter for iPhone

♡    ⟲    ♡    ↑    ⚐ Tip

AV010564



**Esther | 에스더 | سیر**
@EstherNMNLum

1st of all, 😭 wants to complain about their folks getting doxxed, but don't give 😡😡 about ⚖️ when they plaster false, unchecked, or maligning info all over media & harass surviving fams of someone they shot & murdered? Ok, no.

At least they can afford to move. These fams can't.

6:22 PM · Nov 28, 2020 from Los Angeles, CA · Twitter for iPhone

2 Retweets    14 Likes

**Esther | 에스더 | سیر** @EstherNMNLum · Nov 28, 2020
Replying to @EstherNMNLum
is RE this



**Esther | 에스더 | سیر** @EstherNMNLum · Nov 28, 2020

LASD Said 'Doxing' Threats Could Have Led To Deputies Violating Policy...
The Los Angeles County Sheriff's Department is investigating its deputies for allegedly hiding their badges so the public could not identify them.
🔗 lrsangeles.cbslocal.com

---



**Esther | 에스더 | سیر**
@EstherNMNLum

#LASD justified killing of #DijonKizzee by showing videos they wanted to show from his cell phone photo gallery & some angles of the fixed camera footage. #LASD said Dijon had his hands up briefly, but you can see his hands up the entire time UNTIL a deputy manhandles him.

3:22 PM · Sep 17, 2020 from Los Angeles, CA · Twitter for iPhone

4 Retweets    7 Likes

**Sandra Hernandez** @sandra_herz · Sep 17, 2020
Replying to @EstherNMNLum
Always curious how law enforcement sez it can't show video for privacy reasons if it might reveal something damning about deputies, but always release video of victims intended to damage that person's reputation.

**Esther | 에스더 | سیر** @EstherNMNLum · Sep 17, 2020
Exactly. I find it unethical that they will disparage a victim DURING an active investigation.

This can affect if the DA will prosecute & impact any civil or criminal lawsuits...

AND it's devastating for the surviving families. Pouring salt on a wound.

Show replies



♡ 1   ⇅   ♡   ⬆   ⚠ Tip

Esther | 에스더 | إستر
@EstherNMNLim

000

Replying to @EstherNMNLim

Trust, if they say they're not scared, they're lying. When they are, they'll use force more often than not, perceive fear that's not there, or be in fear for every little thing. The other thing is that during training, their FTOs will perpetuate the us vs them mindset. Not good.

3:16 PM · Dec 8, 2020 from Los Angeles, CA · Twitter for iPhone

♡   ⇅   ♡   ⬆   ⚠ Tip



Esther | 에스더 | إستر
@EstherNMNLim

What does it say about #LASD that they boldly lie about what happened to @Josie_huang when there are tons of video backing that she identified herself verbally & w/press badge?
#CopsLie

So not surprising that they'll flip the script when there's vid of them murdering someone.

Tweets   Tweets & replies   Media   Likes

LA County Sheriffs
23.5K Tweets

000

LA County Sheriffs ● @LA... ·13h
(2/3) During his arrest, a struggle ensued at which time a female adult ran towards the deputies, ignored repeated commands to stay back as they struggled with the male and interfered with the arrest...

♡ 164   ⇅ 3,350   ♡ 11.1K   ⬆

LA County Sheriffs ● @LA... ·13h
(3/3) The female adult, who was later identified as a member of the press, did not identify herself as press and later admitted she did not have proper press credentials on her



**Esther | 에스더 | إستر**
@EstherNMNum

Replying to @EstherNMNum

Also, getting killed by the police is now THE leading cause of death for young Black men in America.

latimes.com/science/story/....
#BlackLivesMatter ✊🏾



Getting killed by police is a leading cause of death for young black men in Ameri...
About 1 in 1,000 black men and boys in America can expect to die at the hands of police. That risk is 2.5 times higher than for white men, new research shows.
🔗 latimes.com

1:31 PM · Sep 14, 2020 from Los Angeles, CA · Twitter for iPhone

1 Like

○    ↻    ♡    ⤴    ⚠ Tip

---



**Esther | 에스더 | إستر**
@EstherNMNum

This is not about a few bad apples. The whole damn orchard needs to be torched. #DefundPolice

🔵 **Kristen Clarke** ✓ @KristenClarkeJD · Aug 30, 2020
Sacramento police crop kick man in the back while he is fully compliant w/ hands on his head. Turns out this was case of mistaken identity.

This is the same department that shot and killed #StephonClark in his grandmother's backyard.

Systemically broken.

0:15   9.3M views

8:12 PM · Aug 30, 2020 · Twitter for iPad

5 Likes

○    ↻    ♡    ⤴    ⚠ Tip

AV010567







the.goth.chola

Esther | 에스더 | إستر
@EstherNMNLim

It's Math Thursday! Not really.
Why the entire orchard is bad. #CopsLie #DefundPolice



**Esther | 에스더 | إستر** @EstherNMNLim · Sep 17, 2020

Defunding & abolishing law enforcement isn't "sad", "radical", or "unwise"?
Non-law enforcement response is better, people won't get shot/killed, &
can be regulated.
Community is way past "considering"; they're there. #ResignVillanueva
#RecallTheSheriff



Editorial: Villanueva is the best advertisement for muscular sheriff ov...
The arrest and hogtying of a reporter, the childish and racist tweets by
the sheriff's spokesperson, the treatment of the families of people ... ↗
⮑ latimes.com

       1   

AV010568

Esther | 에스더 | إسثر
@EstherNMNLim

A MUST READ!!!
#DeputyGangs #GangBehindTheBadge #LASD

Loyola Law School @LoyolaLawSchool · Jan 12
.@CLP_LLS, part of @LLSJustice released "50 Years of Deputy Gangs in the LA County Sheriff's Department," a comprehensive report documenting how deputy gangs have negatively impacted policing & infected the fairness of legal proceedings in LA. Read: lls.edu/cjpreport



50 YEARS OF DEPUTY

Loyola Law School
Loyola Marymount University
Center for Juvenile Law & Policy

6:17 PM · Jan 12, 2021 from Los Angeles, CA · Twitter for iPhone

4 Likes

---

Esther | 에스더 | إسثر
@EstherNMNLim

Event password is COC123

Esther | 에스더 | إسثر @EstherNMNLim · Sep 2, 2020
The @LACountyCOC is hosting a virtual town hall to discuss the LA Sheriff's Department recent killings of #DijonKizzie & #AndresGuardado
1) Register bit.ly/3lKFl28
2) Speak up! Demand justice! Demand answers! No one is above the law!
#BlackLivesMatter

hosting a virtual town hall. The public is
encouraged to attend and share their thoughts
at this community listening session.

Virtual Town Hall

Thursday, September 3

6:00 - 8:00 pm

As the Commission works to boost
transparency and accountability, community

3:46 PM · Sep 2, 2020 from Los Angeles, CA · Twitter for iPhone

AV010569



Esther | 에스더 | إستر
@EstherNMNLim

Guardado inquest ends without testimony from sheriff's officials or the deputy who killed him



Andres Guardado inquest ends without testimony from sheriff's officials or the d...
A retired judge appointed to hold a public examination of Andres Guardado's death said Friday that she had concluded the inquest without hearing testimony...
⏀ latimes.com

9:37 AM · Jan 16, 2021 · Twitter for iPhone

Esther | 에스더 | إستر @EstherNMNLim · Sep 2, 2020
.@ACLU_SoCal @ACLU #FirstAmendment

People's City Council - Los Angeles @PplsCityCouncil · Sep 2, 2020
This is a suppression of our first amendment rights.

What the fuck is "no protesting beyond this line"???



0:01 | 7.3K views

♡ 2    ⬆ Tip

AV010570



**Esther | 예스더 | إسثر**
@EstherNMNLim

No mention of Supervisor Solis, but she was the deciding THIRD vote.

She also amended to make sure the report back would be presented to the PUBLIC at the 1/5/21 board meeting AND to ensure Supervisor-Elect Holly Mitchell would be part of the process.



3:26 PM · Nov 10, 2020 · Twitter for iPhone

**2** Retweets   **1** Quote Tweet   **7** Likes

LA County supervisors vote to explore options to remove Sheriff Villanueva
The Los Angeles County Board of Supervisors is looking into options for removing Sheriff Alex Villanueva as he faces continued criticism for what many see as his ...
latimes.com

---

**Esther | 예스더 | إسثر**
@EstherNMNLim

It's going to be tough for new DA @GeorgeGascon to get his staff to make these deep cultural shifts to start embracing restorative justice—not punishment.

Incarceration just doesn't work. You can't criminalize poverty, mental illness, & substance use dependencies.

🌐 **Frank Stoltze** @StoltzeFrankly · Dec 9, 2020
There are two interesting things about this case: 1) It reveals intense opposition inside @LADAOffice to Gascon's progressive policies 2) It raises questions whether Emanuel Padilla, a well-known protestor, was targeted by #LASD
lastc.com/2020/12/09/da... via @laistc.com

8:31 PM · Dec 9, 2020 from Los Angeles, CA · Twitter for iPhone

**1** Like



**Esther | 예스더 | إسثر** @EstherNMNLim · Dec 9, 2020
Replying to @EstherNMNLim
I like so many, have been waiting for a real reformer like DA @GeorgeGascon.
I hope his staff start seeing big pic what "real" justice & public safety looks like as status quo wasn't working—it was hurting.
Until then, he has my support & the support of those who voted for him.



**Esther | 예스더 | إسثر** @EstherNMNLim · Dec 9, 2020
Thanks to the work of @miriamkrinsky and so many others, there is a real movement to bring on progressive DAs who believe in creating a system that is fair, equitable, & humane. That's justice. That's public safety.

AV010571

EXHIBIT 6



*agenda*
*County*
*Counsel*

# OFFICE OF THE SHERIFF
## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

January 31, 2022

Rodrigo A. Castro-Silva, County Counsel
Los Angeles County Office of the County Counsel
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Mr. Castro-Silva:

### DEMAND FOR DEFENSE COUNSEL IN CASE
### FULGENT TECHNOLOGIES V. ALEX VILLANUEVA

Per Government Code Section 995, this correspondence will serve as my
demand as the elected Sheriff of Los Angeles County Sheriff's Department
(Department) for defense counsel in the matter of *Fulgent Technologies v. Alex
Villanueva*, wherein the Board of Supervisors is obligated to provide a defense.

Fulgent's characterization that my letter on Sheriff's Department letterhead to
the Board of Supervisors about my concerns regarding the Fulgent contract
was not in my official capacity is ridiculous and not determinative. My letter
dealt with County policy and my oversight of the Department and its
employees, clearly something within the scope of my duties and
responsibilities as the elected Sheriff of this County.

As you are well aware, Government Code 995, except as otherwise provided in
Sections 995.2 and 995.4,

> Upon request of an employee or former employee, a public entity shall
> provide for the defense of any civil action or proceeding brought against
> him, in his official or individual capacity or both, on account of an act or
> omission in the scope of his employment as an employee of the public
> entity. For the purposes of this part, a cross-action, counterclaim or
> cross-complaint against an employee or former employee shall be
> deemed to be a civil action or proceeding brought against him.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— *Since 1850* —

PREPARED & PROCESSED BY ANNA A.
1/31/22 AC

AV010399

Mr. Castro-Silva                    -2-                    Janaury 31, 2022

Moreover, Government Code 995.2 (b), provides in part,

> (b) If an employee or former employee requests in writing that the public entity, through its designated legal counsel, provide for a defense, the public entity shall, within 20 days, inform the employee or former employee whether it will or will not provide a defense, and the reason for the refusal to provide a defense.

Should you fail to provide defense counsel in this matter, I will ask the Court to order you, on behalf of the Board of Supervisors, to comply with their obligation by a Petition for Writ of Mandate.

As you are also aware, pursuant to Government Code Section(s) 825 & 825.2, if you deny my demand for counsel I am entitled to recover from the public entity such reasonable attorney's fees, costs and expenses as are necessarily incurred in defending the action or proceeding, if the action or proceeding arose out of an act or omission in the scope of his employment as an employee of the public entity.

Your response in writing is due 20 days from the date of this letter. Should you have any questions, please feel free to contact me at (213) 229-3000.

Sincerely,

ALEX VILLANUEVA
SHERIFF

AV010400

Mr. Castro-Silva                    -3-                    Janaury 31, 2022


AV:JS:js
(Office of the Sheriff)

c:      Supervisor Holly J. Mitchell, Chair, Board of Supervisors
        Supervisor Hilda L. Solis, First District, Board of Supervisors
        Supervisor Sheila Kuehl, Third District, Board of Supervisors
        Supervisor Janice Hahn, Fourth District, Board of Supervisors
        Supervisor Kathryn Barger, Fifth District, Board of Supervisors

AV010401

# EXHIBIT 7



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713

TELEPHONE
(213) 974-1801
FACSIMILE
(213) 626-7446
TDD
(213) 633-0901
E-MAIL
Rcastro-silva@counsel.lacounty.gov

RODRIGO A. CASTRO-SILVA
County Counsel

February 15, 2022

**CONFIDENTIAL**

THIS MATERIAL IS SUBJECT TO THE
ATTORNEY-CLIENT AND/OR THE ATTORNEY
WORK PRODUCT PRIVILEGES

VIA E-MAIL AND U.S. MAIL

The Honorable Alex Villanueva
Sheriff, Los Angeles County
211 West Temple Street, 8th Floor
Los Angeles, California 90012

Re:    **January 31, 2022 Demand For Defense Counsel In the Matter of** *Fulgent Technologies v. Alex Villanueva*

Dear Sheriff Villanueva:

I write in response to your January 31, 2022 letter requesting that Los Angeles County ("County") provide you a legal defense pursuant to Government Code section 995 in the matter *Fulgent Technologies v. Alex Villanueva* (the "Action"). As explained below, the County will not provide for your defense in the Action. First, your actions were not within the scope of your employment. Second, the facts indicate you acted with actual malice, including your taking actions to undermine the County's vaccination policy, which is contrary to public policy and jeopardizes the health and safety of the County workforce.

A.    **Background**

The County is committed to stopping the spread of the novel COVID-19 coronavirus, which has claimed the lives of thousands of County residents since March 2020. By the end of February 2021, the federal Food and Drug Administration ("FDA") issued Emergency Use Authorizations for the Pfizer-BioNTech, Moderna, and Janssen (Johnson & Johnson) COVID-19 vaccines. The County Department of Public Health ("DPH") and other public health leaders agree that these vaccines are the most effective way to reduce the risk of contracting or spreading the virus and are extremely effective at preventing serious illness and death. Unvaccinated County employees are at a greater risk of contracting and spreading COVID-19 within the workplace, at County facilities,

HOA.103559953.7

AV010402

The Honorable Alex Villanueva
February 15, 2022
Page 2

and to vulnerable communities that depend on County services. In August 2021,
the County Board of Supervisors ("Board") ratified an executive order mandating
that all County employees be fully vaccinated against COVID-19 and provide
proof of full vaccination by October 1, 2021. Pursuant to the Board's mandate,
the County thereafter issued a corresponding COVID-19 policy and selected an
electronic system operated by Fulgent as the means of tracking vaccination status
(the "COVID Policy" or "Policy"). The Policy allows for only religious and
medical exemptions with regular testing by Fulgent, at no cost to employees, to
mitigate the spread of COVID-19.

Fulgent Technologies ("Fulgent") is an accredited clinical laboratory and
COVID-19 testing and records vendor headquartered in Temple City, California.
Fulgent is California's largest COVID-19 tester and has partnerships with six
counties (including Orange and San Bernardino), four states (including Utah and
Colorado), and several federal agencies (including the CDC and the Department
of Homeland Security). Fulgent's contract with the County prohibits it from
disclosing any data collected without the County's permission. Fulgent is also
required to store all County data in the United States.

The Action arises out of a November 29, 2021 letter you sent to the Board,
in which you declared that the Sheriff's Department would not comply with the
COVID Policy and made statements that Fulgent contends are false and
defamatory (the "Fulgent Letter"). In the Fulgent Letter, you said you were
contacted by the Federal Bureau of Investigation Weapons of Mass Destruction
Coordinator ("FBI") for a briefing in which the FBI allegedly provided you with
"very concerning information" about Fulgent. The Fulgent Letter declares that:
(a) Fulgent's registration and testing system has been "compromised"; (b) Fulgent
collects genetic information about County employees; (c) Fulgent has "strong
ties" with Chinese technology and genomics companies; (d) "DNA data" obtained
by Fulgent through "COVID-19 registering or testing . . . will likely be shared
with the Republic of China"; (e) Fulgent "will use" employees' "genetic
information . . . in future studies"; and (f) the County's "vetting process either
failed to discover this, or discovered it, but chose to ignore it."

The Fulgent Letter also broadly attacks the County's COVID Policy. The
Fulgent Letter mischaracterizes the vaccine mandate as "rushed," maligns the
County's process of contracting with Fulgent, and suggests employees are
incapable of giving "informed consent" to Fulgent because "participation is
mandatory, under penalty of discipline." The Fulgent Letter further accuses the

The Honorable Alex Villanueva
February 15, 2022
Page 3

Board of "allowing" Fulgent "to have the DNA data obtained from mandatory COVID-19 testing, for unknown purposes" and says that "[m]any personnel have long suspected [DNA] information was being used in an unnecessary manner."

The Fulgent Letter is not the first time you have defied County public health directives regarding COVID-19. In July 2021, you announced you would not enforce the mask mandate enacted by DPH to combat increased circulation of the highly transmissible Delta variant. You stated that "forcing the vaccinated and those who already contracted COVID-19 to wear masks indoors is not backed by science," which runs contrary to the weight of public health advice. In a recent published decision, the Court of Appeal declared it "undisputed that the COVID-19 virus spreads through airborne transmission from an infected person (who may be asymptomatic) to an uninfected member of the community," and that the risk of transmission increases when individuals are unmasked or interact in close proximity. *County of Los Angeles v. Superior Court*, LASC Case No. 20STCP03881 (March 1, 2021). As the Court of Appeal observed, "best practices dictate that public health departments take steps to mitigate identified risks, particularly as infection rates and hospitalizations surge." *Id.*

In October 2021, you announced in a Facebook Live event that you would not enforce the Policy within the Sheriff's Department. You described mandatory vaccinations as a "politicized" issue and said the County's Policy was forcing the Sheriff's Department to choose "between responding to a violent felony in progress or serving as the 'vaccine mandate police.'" In the Facebook video and the accompanying memorandum, circulated with the inflammatory title "Imminent Threat to Public Safety," you suggested without factual support that the Policy would trigger a mass exodus of officers, resulting in an unprecedented wave of increased homicides and diminished patrols. In fact, the County has not seen an increase in retirements or resignations among sworn staff since the Policy took effect.[1] Nevertheless, you repeated this misrepresentation in a November 1, 2021 television appearance on Fox News, where you told host Tucker Carlson that the County's mandate was causing deputies to leave the Department, homicides to climb, and response times to increase.

---

[1] You have stated publicly that deputies who are not eligible to retire are leaving the County at great numbers. In fact, the attrition rate for deputies (aside from retirements) has hovered at around 2% since 2016. You also stated that deputies are deciding to retire early due to the vaccine mandate. In fact, the retirement rate for deputies now is the same as it was in 2019, the year after you took office. You are duty-bound to provide the public with fair and accurate information. Your recent statements are neither.

HOA.103559953.7

AV010404

The Honorable Alex Villanueva
February 15, 2022
Page 4

Fulgent asserts the Fulgent Letter contains false and defamatory statements, *e.g.*, that Fulgent collects genetic information and is likely to share such information with the Chinese government. Fulgent filed a Petition against you that was verified by Fulgent's Chief Executive Officer and contradicts your claims. Verified Petition For Pre-Filing Discovery And Preservation of Evidence, *Fulgent Genetics, Inc. & Fulgent Therapeutics LLC v. Villanueva*, Case No. 22STCP00226 (L.A. Sup. Ct. Jan. 21, 2022) (the "Petition"). Fulgent, an American company, vehemently denies the FBI accused it of wrongdoing, compromising its clients' private health information, or providing that information to China. (Petition ¶¶ 2, 14–16.)

According to the Petition, Fulgent intends to sue you "personally" for "*per se* defamation" for your statements in the Fulgent Letter. (Petition ¶¶ 6, 8.) The Petition avers that you "personally (outside of [your] official duties)" orchestrated the FBI meeting and "authorized . . . publication" of the Fulgent Letter "in contravention of [your] official duties." (Petition ¶ 2.) The Petition points out that you "ha[ve] publicly stated [your] refusal to enforce the [County's] Mandate on multiple occasions," and characterizes the Fulgent Letter as part of an ongoing "campaign against [Fulgent]" and a "last-ditch effort to get out of complying with the Mandate." (Petition ¶¶ 13, 18.)

Fulgent also notes that you are seeking re-election in 2022 and attributes the Fulgent Letter and your general opposition to mandatory vaccinations to your campaign platform. (*See* Petition ¶¶ 7, 12.) As evidence that your conduct is political in nature, Fulgent states that your allegedly defamatory statements mobilized "anti-vaccine activists" to protest Fulgent and vandalize its California headquarters. (Petition ¶ 19.) In the Petition, Fulgent seeks discovery from you that is unrelated to your official role as Sheriff, including your personal cellphone and private text communications. (Petition ¶ 30.) Moreover, Fulgent accuses you of destroying relevant evidence. (Petition ¶ 31.)

**B.    Section 995**

Under California Government Code section 995, the County has a duty, upon timely request, to provide legal representation in any civil action brought against a public employee because of an act occurring within the scope of his or her employment. *Stewart v. City of Pismo Beach*, 35 Cal. App. 4th 1600, 1605 (1995); *Hall v. Cal. Dep't of Corr.*, 835 F. Supp. 522, 525-26 (N.D. Cal. 1993). There are exceptions to the County's duty to defend: (1) where the act or omission giving rise to suit was not within the scope of employment; (2) in cases of "actual fraud, corruption, or actual malice"; and (3) where defense would create a "specific conflict of interest." Cal. Gov't Code § 995.2(a). Section 995.2(b)

The Honorable Alex Villanueva
February 15, 2022
Page 5

requires the County to inform the employee within 20 days whether it will or will not provide a defense, and the specific reasons for its position. This letter discharges the County's notice obligation under section 995.2.

### C. The County Is Not Required To Defend You In The Action

#### 1. The Fulgent Letter Was Outside The Scope Of Your Employment

Government Code section 995.2(a)(1) provides that a public entity (such as the County) "may refuse to provide for the defense of a civil action or proceeding brought against an employee . . . if the public entity determines . . . [t]he act or omission was not within the scope of employment." Courts interpret the "scope of employment" under the Government Code in accordance with common-law tort principles of *respondeat superior. Farmers Ins. Grp. v. County of Santa Clara*, 11 Cal. 4th 992, 1004 (1995). An employee acts within "the scope of his employment" where there is "a causal nexus" between the employee's work and the injury the employee caused. *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 297 (1995). This nexus exists when the employee was "engaged in work he was employed to perform or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or conveniences." *Neal v. Gaitlin*, 35 Cal. App. 3d 871, 875 (1973) (internal citations and quotation marks omitted).

The Fulgent Letter does not constitute work you were "employed" to perform, nor was it "incident[al]" to your official duties and for the County's "benefit."

Contrary to your January 31, 2022 letter, the Fulgent Letter has nothing to do with your "responsibilities as the elected Sheriff of this County." (*See* Ltr. 1.) The fact that you are a County employee does not bring all County matters or policies within the ambit of your official duties. Under Article XI, section 1(b) of the California Constitution, your official rights and responsibilities as Sheriff are limited to what the Legislature has enacted in Government Code sections 26600, *et seq.* Those responsibilities relate solely to law-enforcement, including, *inter alia*, to:

- "preserve peace, and[,] to accomplish this object . . . sponsor[ing], supervis[ing], or participat[ing] in any project of crime prevention, rehabilitation of persons previously convicted of crime, or the suppression of delinquency." Gov. Code § 26600.

The Honorable Alex Villanueva
February 15, 2022
Page 6

- "arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." *Id.* § 26601.

- "prevent and suppress any affrays, breaches of the peace, riots, and insurrections that come to his or her knowledge, and investigate public offenses." *Id.* § 26602.

- "take charge of and be the sole and exclusive authority to keep the county jail and the prisoners in it. . . ." *Id.* § 26605.

- "endorse upon all process and notices" and "serve all process and notices in the manner prescribed by law." *Id.* §§ 26607–08.

The Fulgent Letter did not involve any of those activities. It did not involve the enforcement of the Penal Code or your keeping the County jails and the prisoners in it. Thus, it is not part of your official duties as Sheriff.

You contend the Fulgent Letter relates to your "oversight of the [Sheriff's] Department." (*See* Ltr. 1.) However, it is the Board's responsibility—not yours—to "supervise the official conduct of all county officers" and to "prescribe . . . conditions of employment of county employees." *Id.* § 25300. The COVID Policy concerns issues of public health and conditions of County employment, which fall under the exclusive authority of the Board. The Board sets policy for the County; as an officer of the County, you are obligated to follow and implement those policies. Your obstructive conduct is improper. Because you do not have the legal authority to undermine the Board with respect to the Policy, your opposition to the mandate is necessarily personal, not official.

It appears your statements in the Fulgent Letter opposing the Policy and linking Fulgent to the Chinese government are part of your re-election campaign, much like your recent media statements rejecting science-based support for vaccines, testing, and masks to stop the spread of COVID-19. The Fulgent Letter's hostility towards the County in contracting with Fulgent, and in linking Fulgent to the Chinese government, is similarly political in nature. The County and its taxpayers are not obligated to, and will not, pay for your political activities.

This kind of electioneering is not part of your job as Sheriff. Indeed, it is unlawful for public officers to use public office for campaign purposes. When you run for reelection, you do so in a private, rather than official, capacity. *Mehau v. Reed*, 869 P.2d 1320, 1332–33 (Haw. 1994) (political "candidacy [is]

The Honorable Alex Villanueva
February 15, 2022
Page 7

not part of [a government] job" where the employee was required "to conduct his campaign separate from his [official] duties"); *see Williams v. Gorton*, 529 F.2d 668, 672 (9th Cir. 1976) (holding that speech relating to "official activity" could be "purely electioneering in a private capacity" due to the campaign context).

The law is clear that the scope of an elected official's employment does not extend to "personal ventures such as electioneering, campaigning or fund raising meetings to pay off campaign debts," because "[t]hose activities are undertaken for the sole benefit of the elected official." *Ennis v. Crenca*, 587 A.2d 485, 490 (Md. 1991) (local legislator's actions were "similar to electioneering activities and not to those activities of a legislator furthering the county's business"); *Glacken v. Incorporated Village of Freeport*, 2014 WL 1836143, at *6 (E.D.N.Y. May 8, 2014) (incumbent mayor's "speech [that] occurred while he was campaigning for re-election at a Candidates Forum" was outside scope of employment); *Anderson v. City of Inkster*, 2014 WL 3747545, at *2 (Mich. Ct. App. July 29, 2014) (reelection campaign activities of an incumbent judge are "not within the scope of employment" because the effort "to further her reelection campaign" was "an individual interest, not an interest of the court").

The Fulgent Letter is also outside the scope of your employment because it is antagonistic towards the Board, the County's COVID Policy, and a County vendor, and harmed the County. The Fulgent Letter was *not* issued for the County's "benefit." *See Neal*, 35 Cal. App. 3d at 875.

As Fulgent notes in its Petition, you openly defied the County's COVID Policy for several weeks leading up to the Fulgent Letter, which you cannot have done in an official capacity because you "lack[] the power or authority to ignore the Mandate or to decline Fulgent['s] services." (Petition ¶¶ 8, 12.) Fulgent says it intends to file suit against you in an individual capacity on the ground that your "campaign" against the company is related to a personal "effort to get out of complying with the Mandate," and to appeal to "anti-vaccine activists." (Petition ¶¶ 13, 18, 19, 37.) These activities are not related to your statutory duties and do not benefit the County.

### 2.    The Fulgent Letter Reflects Actual Malice

Under section 995.2, the County may also decline to provide a defense if it determines you "acted or failed to act because of actual fraud, corruption, or actual malice." "Actual malice" means "personal animosity, malevolence, ill will, or deliberate wrongful intent." *Allen v. City of Los Angeles*, 92 F.3d 842, 847 (9th Cir. 1996) (citation omitted), *overruled on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997) (citing A. Van Alstyne, California

HOA.103559953.7

The Honorable Alex Villanueva
February 15, 2022
Page 8

Government Tort Liability Practice app. 781 (1980)); *see also* Civ. Code § 3294 (defining "malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others").

You acted deliberately and intentionally in drafting and disseminating the Fulgent Letter. Moreover, as described above, the Fulgent Letter tracks your pattern of undermining the County on COVID-19 matters. Accordingly, we believe you did not write the Fulgent Letter for legitimate reasons related to the Sheriff's Department. Instead, your purpose was to sow opposition and justify your refusal to comply with the Policy. Moreover, it was foreseeable that publicizing the Fulgent Letter would cause the company harm. In the Petition, Fulgent describes the Fulgent Letter as part of a "campaign" orchestrated by you against the company. (Petition ¶¶ 18, 31.) The County is not obligated to defend you for suits arising out of your intentional misrepresentations. *See Allen*, 92 F.3d at 851 (holding it would be contrary to public policy to spend public funds "[w]hen law enforcement officers betray the public trust . . . with deliberate wrongful intent").

The public record is replete with examples of your open hostility and animosity towards the Board regarding the COVID Policy. In October 2021, you, without any supporting evidence, claimed that the Policy would jeopardize public safety and that somehow violent felonies would increase because of the Department's obligation to comply with the Policy. On November 14, 2021, you told Spectrum News 1 that "[i]t's political now, it's not about the science." You admitted you were "trying to find ways to work around the Fulgent system." Since then, your rhetoric has only increased.

### 3.    There Are Public Policy Reasons For Denying Your Defense Costs

The County cannot defend you for claims and damages arising from unlawful political activity or attempts to undermine the County's COVID Policy, which is intended to protect the health and safety of County employees and is also a matter of public health. *Tenwolde v. County of San Diego*, 14 Cal. App. 4th 1083, 1092 (1993) (public policy and equitable principles precluded compelling county to cover sheriff's legal expenses for lawsuit challenging sheriff's unlawful conduct that targeted the county). Fulgent's defamation action highlights at least two ways the County is also a victim of the Fulgent Letter.

The Honorable Alex Villanueva
February 15, 2022
Page 9

First, your electioneering activity is calculated to generate fear about public health mandates regarding COVID testing and harness it for your own political benefit. That activity constitutes a wrong against the County and the public it serves. It would violate public policy for the County to pay for your legal defense.

Second, the County's significant interest in enforcing the County's Policy is directly contrary to your challenged conduct in refusing to enforce the Policy. In the Fulgent Letter, you directly attacked the County's decision to provide COVID-related services to the County. It would violate public policy for the County to defend your false claims about the County itself.

For all of the foregoing reasons, the County will not provide for your defense in the Action.

Very truly yours,

RODRIGO A. CASTRO-SILVA
County Counsel

RAC:mag

c:      The Honorable Board of Supervisors

        Fesia A. Davenport
        Chief Executive Officer

        Celia Zavala
        Executive Officer
        Board of Supervisors

HOA.103559953.7

AV010410

# EXHIBIT 8


Exhibit 5
3/28/2025
Mercedes Cruz







# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES
### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

March 4, 2022

The Honorable Hilda L. Solis
Chair, Board of Supervisors
County of Los Angeles
856 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisor Solis:

### FOLLOW UP REGARDING ETHICAL VIOLATIONS
### OF FIRST DISTRICT JUSTICE DEPUTY ESTHER LIM

On February 9, 2021, you received correspondence from my office outlining the shocking behavior exhibited by your Justice Deputy, Esther Lim. Behavior which displayed hatred, intentional bias, and multiple violations of Los Angeles County policy. In that same letter, you were provided with approximately 40 examples of hatred, to include racial bias, gender bias, age bias, political activism on duty, lewdness, vulgarity, bullying, false representation, support of online "trolling," support of online "doxing," slanderous unsubstantiated allegations of deputies committing "murder," and a gross lack of professionalism and judgment. Additionally, you were provided evidence of her support for anarchists and her disappointment when Los Angeles County did not receive a designation of "anarchist jurisdiction" by the United States Department of Justice.

On February 8, 2021, during a recorded session, a reporter asked you specifically about this matter and you replied, *"It is a personnel matter, and I am not privileged to disclose that information, but it is being handled."*

But then on March 27, 2021, you, as well as Supervisor Holly Mitchell, actively participated as guests in a forum advertised as, *Exposing L.A. Sheriffs Gangs, Murders, & Harassment of Families*, sponsored by *Black Lives Matter Los Angeles, Centro CSO*, and *Check the Sheriff Coalition*. As you are aware, the *Check the Sheriff Coalition* is comprised of 30 different activist groups, many whom share the same radical and

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
*— Since 1850 —*

The Honorable Hilda L. Solis     -2-                    March 4, 2022

hateful views displayed by your Justice Deputy. Members of the *Check the Sheriff Coalition* have declared their mission is to defund law enforcement, abolish jails, and harass public officials. At least one group has clearly stated its hatred for the United States of America, the U.S. flag, and calls for a Marxist system over democracy.

During this online anti-law enforcement forum, you spoke on the topic of "deputy gangs." During which you stated the Department has engaged in "*decades of historical discrimination and racism*." You went on to say, "*The Sheriff's Department is a very violent organization, we know in many ways, retaliation and harassment.*" Based on your associations, actions, and behavior, it seems clear you share similar ideological views as Ms. Lim, but you are on the wrong side of history. Fanning the flames of hatred and defunding law enforcement is not the answer.

On March 1, 2022, during his *State of the Union* speech, the 46th President of the United States, Joseph R. Biden Jr., very clearly stated the following, "*We should all agree: the answer is not to defund the police – it's to fund the police. Fund them!*" I agree with President Biden and encourage you to reverse course on your anti-police ideology and embrace President Biden's guidance.

It has been over a year now since you informed the public the deplorable behavior by your Justice Deputy was "*being handled,*" yet to date you have failed to advise my office of the outcome. Although most of the hateful and highly offensive posts have been deleted from Ms. Lim's Twitter account, your lack of public response gives the appearance this was not appropriately "*handled.*" The perception to myself, my department, and the public is you believe "transparency and accountability" are words which only apply to others, but not to yourself or your staff.

This matter was obviously of public interest, or a reporter never would have asked you about it. In my original letter, I stated "*I look forward to the outcome of what I trust will be the appropriate administrative action.*" To date, there has NEVER been an apology issued by yourself, or Ms. Lim regarding this matter.

Please forward the results of your investigation, as well as provide the actions taken (written apologies, root cause of her hatred, anger management classes, implicit bias training, etc.), or provide a response as to why these do not exist.

In doing so, you can explain to the communities you represent your actions and possibly counter your perceived lack of respect for law enforcement, by clarifying how a trusted advisor and senior member of your staff, who writes your policies and guides you, could openly display such hateful bias to the law enforcement community, who stands ready to assist you whenever you or your staff request.

The Honorable Hilda L. Solis       -3-       March 4, 2022

Thank you for your attention on this matter.  Should you have any questions, please contact my Chief of Staff, Captain John Satterfield at ███████████

Sincerely,

ALEX VILLANUEVA
SHERIFF

The Honorable Hilda L. Solis                    -4-                    March 4, 2022


AV:JLS:ms
(Office of the Sheriff)

Attachment: Letter to Supervisor Solis, *Ethical Violations of First District Justice
           Deputy*, February 9, 2021

c:    Supervisor Holly J. Mitchell, Second District
      Supervisor Shelia Kuehl, Third District
      Supervisor Janice Hahn, Fourth District
      Supervisor Kathryn Barger, Fifth District
      Celia Zavala, Executive Officer, Board of Supervisors
      Fesia Davenport, Chief Executive Officer
      Lisa Garrett, Director of Personnel – Human Resources

# EXHIBIT 9

| From: | Lim, Esther |
|---|---|
| Sent: | Tuesday, March 8, 2022 3:32 PM PST |
| To: | esther.lim.msw@gmail.com |
| Subject: | FW: CPOE Complaint Against Sheriff Villanueva |

Thank you,
*Esther*

**Esther Lim, MSW** she/her/hers
*Justice Deputy*
Los Angeles County Supervisor Hilda L. Solis, First District
856 Kenneth Hahn Hall of Administration
500 W. Temple Street
Los Angeles, CA 90012

████████████████

hildalsolis.org





---

**From:** Lim, Esther
**Sent:** Tuesday, March 8, 2022 3:26 PM
**To:** Chen, Cindy <cchen@bos.lacounty.gov>
**Subject:** CPOE Complaint Against Sheriff Villanueva

Good afternoon Cindy,

I wanted to share with you that I intend to file a County Policy of Equity complaint against Sheriff Villanueva today.  I put a lot of thought into this even before his March 4th letter to Supervisor Solis because of discriminatory remarks he has made about me since February 2021.  As a matter of personal and professional protection, I believe I need to ensure I am exhausting all administrative remedies available to me.

I wanted to let you know first before I filed.

Thank you,
*Esther*

**Esther Lim, MSW** she/her/hers
*Justice Deputy*
Los Angeles County Supervisor Hilda L. Solis, First District

856 Kenneth Hahn Hall of Administration
500 W. Temple Street
Los Angeles, CA 90012

hildalsolis.org





# EXHIBIT 10

March 8, 2022

Vickey Bane, Executive Director
County Equity Oversight Panel
County of Los Angeles
Kenneth Hahn Hall of Administration
500 West Temple Street, B-28
Los Angeles, California 90012

RE:  *County Policy of Equity (CPOE) Complaint Against Los Angeles County Sheriff Alex Villanueva for Discrimination, Harassment, Retaliation, and Inappropriate Conduct*

Dear Ms. Bane,

My name is Esther Lim and I serve as Supervisor Hilda L. Solis' Justice Deputy.  I have been in this position for almost two years.

This letter is to accompany my County Policy of Equity (CPOE) complaint against Los Angeles County Sheriff Alex Villanueva for:
- Discrimination and harassment based on age, sex, and race
- Retaliation
- Third-party harassment
- Inappropriate conduct towards others (verbal and visual)

This letter will provide four known examples of Sheriff Villanueva's discrimination against and harassment of me, as a Justice Deputy.  You will also find that his comments and actions were directed at the other Justice Deputies.

I am listing Senior Justice Deputy Veronica Pawlowski, Justice and Mental Health Deputy Kyla Coates, and Inspector General Max Huntsman as witnesses to my CPOE complaint.

<u>Discrimination and Harassment Based on Age, Sex, and Race</u>

On July 28, 2021[1], Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

---

[1] https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/224454886245550

CONFIDENTIAL                                                                    COLA002405

Vickey Bane                                    2                          March 8, 2022

Though the comments are made generally about the Justice Deputies, the attack was specifically lodged against me because Sheriff Villanueva is seen in the Facebook Live, holding a hard copy of the motion Supervisor Solis put forward on July 27, 2021 titled, "Taking Action:  Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation."[2]  The motion he was holding and reading from is one I worked on behalf of Supervisor Solis.

On October 6, 2021[3], during a Facebook Live, Sheriff Villanueva said, "You hear me loud and clear now because if you're not watching their entire thing, I'm pretty sure your flunkies are going to listen to the whole thing and report back to you."  Sheriff Villanueva is 1) talking about the Justice Deputies and 2) his use of the term "flunkies" is used pejoratively to describe me to malign and minimize my job as Justice Deputy.

On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions."  This comment was made in front of the public and County staff.  This is another example of Sheriff Villanueva discriminating against me based on age.

On March 2, 2022[4], Sheriff Villanueva during another Facebook Live, in response to an audience question about why there are only women on the Board and staff responded with, "Good question.  They talk about inclusivity.  No male justice deputy staff. The Board should explain why they exclude men from their ranks.  The people they hire are all 20 something fresh out of college.  Don't have a lot of senior people.  Woke flunkies straight out of college.  First job.  That's who writes the nonsense board orders." He again makes disparaging and discriminatory comments about my age, sex, education, and experiences.  These statements, like others Sheriff Villanueva have made, are not only inaccurate, but are used to discredit and invalidate my character, education, and experience as well as my colleagues.

All four of the examples show Sheriff Villanueva discriminating against me, as a protected class, based on age, sex, and race, intended to degrade and disparage me.

I believe there are other examples of Sheriff Villanueva criticizing, harassing, and discriminating me and others in the many Facebook Lives and community town halls he holds.  I have not reviewed all of them, but the Facebook Live videos are on the LA Sheriff's Department's Facebook page.

Given Sheriff Villanueva's documented history of intimidation and harassment of women, specifically women of color, as the first, second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

---

[2] http://file.lacounty.gov/SDSInter/bos/sop/1110950_072721.pdf
[3] https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/2235512396585802
[4] https://www.facebook.com/LosAngelesCountySheriffsDepartment/videos/2049265731911432

CONFIDENTIAL

Vickey Bane                                    3                         March 8, 2022

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai[5].

Additionally, it behooves me that as an Asian woman I need to speak up during a time in which anti-Asian hate is at its all-time peak, due to ignorant, racist, and hateful comments surrounding the COVID-19 pandemic, that has led to the beating and deaths of Asians, of all ages, throughout this country.  Sheriff Villanueva using his large social media platform, including a national radio show, to make irresponsible and reckless comments and statements have the real potential for me and others to be subjected to harm.

<u>Retaliation</u>

I will again note the July 28, 2021 example I already provided of Sheriff Villanueva retaliating against me for the motion Supervisor Solis put forward during the July 27, 2021 Board of Supervisors meeting titled, "Taking Action:  Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation".

Additionally, despite Sheriff Villanueva filing a CPOE complaint[6] against me, which after a thorough investigation, the allegations were unfounded; he has continued to malign me with my employer.  I believe he is trying to get me fired from my job as Justice Deputy and is also using this to harass Supervisor Solis.

<u>Third-Party Harassment</u>

The February 16, 2022 comments Sheriff Villanueva made against the Justice Deputies during a community townhall with the South Bay cities were made, not just in front of members of the public, but also County staff--deputies and the field staff of Supervisor Hahn.  These comments were then relayed to Kyla Coates, Justice and Mental Health Deputy to Supervisor Hahn, which were then shared with me and Senior Justice Deputy Veronica Pawlowski for Supervisor Sheila Kuehl.

These comments are unnecessary, unprofessional, but also demeaning and are clear examples of Sheriff Villanueva discriminating against me and others based on age.

<u>Inappropriate Conduct Towards Others (Verbal and Visual)</u>

All the examples provided to you in this letter are discriminatory and harassing in nature and are emblematic of Sheriff Villanueva inappropriate conduct towards County staff with his unprofessional remarks and behavior in a workplace setting, whether it is virtual or in-person.

---

[5] https://www.latimes.com/california/story/2020-08-26/los-angeles-county-chief-executive-settlement
[6] March 8, 2021 response:  "The allegations in the complaint do not present a potential violation of the CPOE because (1) no protected characteristic was involved; or 2) the allegations to not sufficiently connect equity to the conduct."

CONFIDENTIAL                                                              COLA002407

Vickey Bane                                 4                         March 8, 2022

I also want to bring to attention to the fact that these statements are not being made by just anyone, but by the Sheriff of the largest sheriff's department in the country with an extraordinary amount of power, influence, resources, and with access to a wide social platform.  Additionally, the statements that he has made about me, and others are not just inaccurate, but they are inflammatory and dangerous.

The statements and actions of Sheriff Villanueva have had a negative impact on both my professional and personal life in his attempt to discredit and embarrass me in front of my employers, colleagues, and the public, as well as my position and reputation in the criminal justice reform space.

Furthermore, the sustained harassment of over a year has caused a mental and physical toll leading to unnecessary stress and other negative outcomes.  I also have sincere concerns for my safety and of other victims of Sheriff Villanueva's actions, including my fellow peers.

I respectfully request that an investigation be conducted on Sheriff Villanueva for these violations.  I also will note that I fear, due to the actions I have taken to protect myself and others, that Sheriff Villanueva will not stop his discriminatory, threatening behavior and retaliatory actions against me but that it will only continue.  I share the same concerns for the witnesses who are named in this letter and my CPOE complaint.

Therefore, I will request that the County Equity Oversight Panel also investigate all additional complaints of retaliation from Sheriff Villanueva against me and others, following the receipt of this letter, throughout the investigation, and after.

Thank you,

Esther Lim, MSW
Justice Deputy
LA County Supervisor Hilda L. Solis, First District

CC:    Hilda L. Solis, LA County Supervisor, First District
        Cindy Chen, Chief of Staff, Supervisor Hilda L. Solis, First District
        Fesia Davenport, Chief Executive Officer
        Lisa Garrett, Director of Personnel
        Nicole Tinkham, Chief Deputy Counsel
        Max Huntsman, Inspector General
        Brian Williams, Executive Director of the Sheriff Civilian Oversight Commission
        Sean Kennedy, Chair of the Sheriff Civilian Oversight Commission

CONFIDENTIAL                                                          COLA002408

EXHIBIT 11



Exhibit 7
3/21/2025
Esther Lim

| | |
|---|---|
| **From:** | Online Complaint System |
| **Sent:** | Tuesday, March 8, 2022 9:28 PM PST |
| **To:** | Lim, Esther |
| **Subject:** | Confirmation: Complaint Filed Ref#2019-0016591 |

Thank you for contacting us. For your records, below is the information provided during submission.

| |
|---|
| **Are you an LA County employee, contractor, vendor, or commission employee?** |
| Yes |
| **Do you wish to file this complaint anonymously?** |
| No |
| **Are you filing this complaint for:** |
| Yourself |
| **I acknowledge** |
| • Accept |
| **Employee Number** |
| e662896 |
| **Title** |
| Justice Deputy |
| **Name** |
| Esther Lim |
| **Work Phone** |
| ▇▇▇▇▇▇ |
| **Mobile Phone** |
| ▇▇▇▇▇▇ |
| **Reporting Party's Unit Of Assignment** |
| Board of Supervisors, Hilda L. Solis |
| **Reporting Party's Department** |
| BOARD OF SUPERVISORS |
| **Reporting Party Email Address** |
| elim@bos.lacounty.gov |
| **Reporting Party's Department Head** |
| Celia Zavala |
| **Reporting Party's Work Address** |
| 500 West Temple Street<br>Los Angeles, CA 90012<br>US_ABBR |

CONFIDENTIAL



[Map It]

**Reporting Party's Immediate Supervisor**

Cindy Chen

**Reporting Party's Immediate Supervisor's Phone Number**

██████████

**Same as reporting party**

- Same as reporting party

**Name of person completing this form (if different from above)**

Esther Lim

**Did the complainant notify a supervisor of this complaint prior to now?**

Yes

**Name of supervisor who was notified**

Cindy Chen

**When was supervisor notified**

03/08/2022

**Time**

03:32 pm

**How was supervisor notified**

Email

**Complainants**

- Same as reporting party

**Employee Number**

e662896

**Name**

Esther Lim

**Title**

Justice Deputy

**Unit of Assignment**

Board of Supervisors, Hilda L. Solis

**Work Phone**

██████████

**Mobile Phone**

██████████

**Department**

BOARD OF SUPERVISORS

**Supervisor's Name**

COLA002615



Cindy Chen

**Supervisor's Phone**

██████████

## Parties

**Employee Name**

Alex Villanueva

**Title**

Sheriff

**Unit Of Assignment**

LA Sheriff's Department

**Department**

SHERIFF

**Supervisor's Name**

Alex Villanueva

## Witnesses

**Employee Number**

e552095

**Employee Name**

Veronica Pawlowski

**Title**

Senior Justice Deputy

**Unit Of Assignment**

Supervisor Sheila Kuehl

**Mobile Phone**

██████████

**Department**

BOARD OF SUPERVISORS

**Supervisor's Name**

Lisa Mandel

**Employee Number**

e656300

**Employee Name**

Kyla Coates

**Title**

Justice and Health Deputy

**Unit Of Assignment**



| | |
|---|---|
| Supervisor Janice Hahn | |
| **Mobile Phone** | |
| ███████ | |
| **Department** | |
| BOARD OF SUPERVISORS | |
| **Supervisor's Name** | |
| Gerardo Pinedo | |
| **Employee Number** | |
| e410745 | |
| **Employee Name** | |
| Max Huntsman | |
| **Title** | |
| Inspector General | |
| **Unit Of Assignment** | |
| Office of Inspector General | |
| **Mobile Phone** | |
| ███████ | |
| **Department** | |
| OTHER | |
| **Other Department** | |
| Office of Inspector General | |

**Date of alleged incident**

07/28/2021

**Nature of the complaint**

I have four examples. Please see attached letter for additional information.

On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

On October 6, 2021, during a Facebook Live, Sheriff Villanueva said, "You hear me loud and clear now because if you're not watching their entire thing, I'm pretty sure your flunkies are going to listen to the whole thing and report back to you." When he uses the term "flunkies" he is pejoratively describing me to malign me and minimize my job as Justice Deputy.

On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions." This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age.

Fourth incident is on 3/22/22

**Why does the Complainant believe this treatment is occurring?**

Though the comments are made generally about the Justice Deputies, the attack was specifically lodged against me because Sheriff Villanueva is seen in the Facebook Live, holding a hard copy of the motion Supervisor Solis put forward on July 27, 2021 titled, "Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation." The motion he was holding and reading from is one I worked on behalf of Supervisor Solis.

Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first,

second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai.

Additionally, it behooves me that as an Asian woman I need to speak up during a time in which anti-Asian hate is at its all-time peak, due to ignorant, racist, and hateful comments about the cause of the COVID-19 pandemic that has led...

**Race/Ethnicity**

Asian (Not Hispanic or Latino)

**Gender**

Female

**DOB**

07/30/1981

**Supporting Document**

- CPOE-Complaint-AV_EL.pdf

**Email Confirmation**

- Yes, I would like to get an e-mail confirmation

**Email Address**

elim@bos.lacounty.gov

**Security Check**

- I'm not a robot

**Reference Number**

2019-0016591

CONFIDENTIAL

EXHIBIT 12

5:16



*Lim*

Update: thought my CPOE interview was pretty pointless.

Please let me know how I can help and support.

> I'd say filing your CPOE complaint was supportive and I hope mine will be the same.  Yes, they'll come to nothing, but we'll always remember that we weren't silent.  (That's not to say the sheriff will win in the end, just that CPOE can't touch him because department heads get a veto)

👍 agree. We won't be silenced 🚢

Thx Max.

Apr 1, 2022 at 1:59 PM

iMessage

CONFIDENTIAL

# EXHIBIT 13

 

# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ALEX VILLANUEVA, SHERIFF

July 11, 2022

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

### RESPONSE TO AGENDA ITEM #12 - PROMOTING ACCOUNTABILITY AND COMMUNITY SAFETY THROUGH CHECKS AND BALANCES OF THE LOS ANGELES COUNTY SHERIFF

This motion is a continuation of the motion first initiated by former Supervisor Mark Ridley-Thomas, who has now been indicted on 20 counts of public corruption for alleged criminal acts committed while serving as the chair of this Board and awaits trial in November 2022. If passed, this unprecedented motion would allow corrupt Board members to intimidate sheriffs from carrying out their official duties to investigate crime.

As was the case with the last motion the Board placed on the ballot, Measure J, this measure will likely be ruled by the Courts to be unconstitutional. The fact the authors of this motion never sought an opinion from County Counsel or a constitutional law expert, regarding its constitutionality, speaks volumes as to the intent.

Currently there are four ways to remove a Sheriff from office: (1) elections, (2) recall elections, (3) convening a civil grand jury, or (4) using the authority already vested in the state attorney general, who has legal authority over all 58 sheriffs and district attorneys throughout the state. Your Board conveniently forgets to even mention number four (4).

This motion is a recipe for public corruption, particularly when "cause" remains so broad and undefined. Allowing political appointees with an agenda to determine "cause" is fundamentally flawed.

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
~ Since 1850 ~

AV010315

The Honorable Board of Supervisors          -2-          July 11, 2022

This Board is attempting to cheat the system and create a "fast-track" pathway to remove a duly elected sheriff, one which circumvents the law and the foundational principles of due process enshrined in the Fourteenth Amendment of the United States Constitution.  You are not, "putting it in the hands of the voters."  You are putting it in the hands of political activists, the same political activists who wrote the basis for this motion and the same political activists whose mission is to abolish law enforcement and redirect the public safety budget to their own 501(c)3 non-governmental organizations.

Last week, the same day this motion was leaked to the media, over 715,000 signatures were delivered to recall current District Attorney George Gascon for not doing his job, exemplifying that with sufficient public support recalls are a viable tool.  In direct opposition to this, your Board wants to grant yourselves the power to get rid of a sheriff with four votes, nullifying the will of ten million residents.  As you know, each member of your Board represents approximately two million County residents, where I represent all ten million residents.  In supporting this motion, you are removing checks and balances on each of your own power, thus shielding you from all accountabilities.  This is unethical, self-serving, and a conflict of interest.

If this is truly needed, then follow the path San Bernardino County took and amend the motion to include all eight elected positions in Los Angeles County government (1-sheriff, 1-district attorney, 1-assessor, 5-board of supervisors).  Show the public this is truly for accountability and not a cheap political stunt designed to influence an election, or retaliation against a sheriff who supported a successful district attorney recall initiative, or retaliation against a sheriff by a board member who currently is implicated in an active criminal investigation and has actively refused to comply with search warrants, or payback by a board member to activist groups for support during the last election.

This motion differs from the San Bernardino County ordinance language you cite as precedent because it does not include **all elected officials** as subject to removal.  Your ordinance singles out only the elected sheriff, which will likely be suspect in the eyes of the court.  Additionally, you cannot have oversight over the state functions of a sheriff, and your language clearly impedes a sheriff's state functions.  Furthermore, this motion is premised on at least eight false statements.

The only precedent for such an ordinance is in the case of *Penrod v. County of San Bernardino (Penrod) (2005) 126 Cal. App. 4th 185*.  The language of your ordinance resembles the one in San Bernardino, but has significant language changes from the one reviewed by the Court in the *Penrod* case.  In *Penrod*, the court stated, "at some point, [should] the board impermissibly intrude on the sheriff's investigative and

AV010316

The Honorable Board of Supervisors          -3-                    July 11, 2022

prosecutorial functions, such as happened in *Hicks v. Board of Supervisors* (1977) 69 Cal.App.3d 228, the sheriff can raise a challenge then."

The Court in *Penrod* further stated, the ordinance "empowers the board to remove the sheriff **only for cause**, including neglect of duties, misappropriation, legal wrongdoing and falsification. There may be circumstances about which we decline to speculate, when the board would need to act expeditiously to remove a corrupt county officer rather than wait for a grand jury to convene or a recall election to be held." Allowing the court to find later that if this ordinance is ever applied to a sheriff, it would be on the board to show: (1) what circumstance required removal, before a grand jury or a recall was completed, and (2) prove actual "cause" before removal of a sheriff. The court also did not rule out that a four-fifths board vote to remove the sheriff might also violate the **Public Safety Officers Procedural Bill of Rights Act (POBRA)**. These are all outstanding questions to be ruled on by the court.

It appears you are making yourselves the judge, jury, and executioner for the office of the sheriff, nullifying the will of the voters. This illegal motion seeks to undermine the role of the sheriff and render the office subordinate to the Board of Supervisors. On its face, your proposed ordinance language is not a proper reading of the law and will be challenged on these multiple grounds.

Lastly, I believe it is highly unethical for you to put this motion forward when this Board has already announced its public support for my opponent. It appears to me you are using your political offices to willfully affect the outcome of an election, also known as electioneering, and I ask you seek a legal opinion from County Counsel addressing these concerns, prior to a vote.

Should you have any questions or would like to discuss further, please feel free to contact my Chief of Staff, Commander John Satterfield, at █████████.

Sincerely,

ALEX VILLANUEVA
SHERIFF

The Honorable Board of Supervisors          -4-                    July 11, 2022

AV:JLS:ac
(Office of the Sheriff)

    c:    Dawyn R. Harrison, Acting County Counsel, Office of the County Counsel
           James Wheeler, President, Association for Los Angeles Deputy Sheriffs
           (ALADS)
           Tab Rhodes, President, Professional Peace Officers Association (PPOA)
           Cesar Romero, President, Los Angeles Sheriff's Professional Association
           (LASPA)

AV010318

EXHIBIT 14

AGN. NO.

**MOTION BY SUPERVISORS HOLLY J. MITCHELL**          July 12, 2022
**AND HILDA L. SOLIS**

<u>**Promoting Accountability and Community Safety Through Checks and Balances
of the Los Angeles County Sheriff**</u>

     In Los Angeles County ("County"), establishing meaningful checks and balances
on the County Sheriff is long overdue. In the United States, no government official should
have unchecked power. Changes to the County Charter can ensure essential oversight
of the Sheriff and protect the lives and liberties of County residents.

     The Sheriff runs a massive law enforcement agency with tremendous reach and
power. The Sheriff manages approximately 17,000 employees, an annual budget of $3.5
billion, and is one of the largest law-enforcement agencies in the United States. The
Sheriff also runs the nation's largest jail system, provides security services for the courts,
operates the Los Angeles Regional Crime Laboratory, and patrols approximately 2,500
of the County's 4,000 square miles, including more than 40 cities and 120 unincorporated
areas. California's State Constitution makes each County Sheriff an independent, elected
official.

     The County Board of Supervisors ("Board") is ultimately responsible for guiding
and setting County policy and supervising the official conduct of County officers and
employees, ensuring that they discharge their duties faithfully. Despite this responsibility
of the Board to supervise elected officers like the Sheriff and to assess the Sheriff's

- MORE -

<u>MOTION</u>

SOLIS          _____

KUEHL          _____

HAHN          _____

BARGER          _____

MITCHELL          _____

AV010435

MOTION BY SUPERVISORS HOLLY J. MITCHELL
AND HILDA L. SOLIS
July 12, 2022
Page 2

performance of County duties pursuant to California Government Code § 25303, the
Board has nevertheless been limited in its ability to serve as a sufficient check against
the Sheriff's flagrant disregard of lawful oversight and accountability.

Lack of accountability has been an enduring feature of County sheriffs. Sheriff Lee
Baca, who went to prison, made it clear in 2012 that the only way he could be held
accountable for his actions was simply for the voters not to elect him. Baca resigned in
2014 amidst an FBI investigation and was imprisoned for obstruction of justice and lying
to federal investigators. In 1973, Sheriff Peter Pitchess, a sheriff who was elected six
times, resisted any involvement in the first internal investigation of deputy gangs from
outside the Department. Sheriff Pitchess sent Sheriff Baca a powerful message: "You
were elected sheriff. You are the sheriff. You and your colleagues will run this department
[without] interference from outside." Without structural changes to strengthen oversight,
future sheriffs, each of whom have seen the actions of their predecessors, will have the
opportunity to operate without meaningful accountability.

Because of the Sheriff's power and the lack of accountability and oversight by the
current and previous sheriffs, this Board has implemented a series of accountability
measures to reform the Sheriff's Department ("LASD"), dating back more than a decade.
Specifically, the Board formed the Citizens' Commission on Jail Violence in 2011, after a
scathing report from the ACLU of Southern California, to address violence in the jails and
recommend reforms for the LASD. The Commission documented a disturbing pattern of
excessive force and a culture of lax accountability within LASD. Based on its report and
recommendations and the indictment of several personnel and leadership of the LASD,
the Board created the Office of the Inspector General ("OIG") on October 2, 2012 and the
Sheriff Civilian Oversight Commission ("COC") on December 9, 2014. The Board, with
support from the community through the passage of Measure R, later took steps to
enhance oversight and strengthen the roles of both the OIG and COC by expanding the
OIG's authority to investigate LASD deputy gangs on July 23, 2019 and granting
subpoena power to the COC on October 15, 2019. This Board has repeatedly been
compelled to intervene in response to attempts by the Sheriff to obstruct oversight of
investigations into fatal shootings of Angelenos by deputies. For example, the Board took

AV010436

MOTION BY SUPERVISORS HOLLY J. MITCHELL
AND HILDA L. SOLIS
July 12, 2022
Page 3

the step of approving two separate motions on <u>June 23, 2020</u> and <u>September 1, 2020</u>, which were intended to ensure the independent investigation of the fatal shooting by deputies of 18-year-old Andres Guardado.

The current Sheriff has been openly hostile to oversight and transparency and has tested the functionality of existing oversight structures by consistently resisting and obstructing these systems of checks and balances. The Sheriff's actions include, but unfortunately are not limited to, <u>defying</u> subpoenas and refusing to appear at COC meetings, refusing to cooperate with the OIG's attempts at independent investigations and monitoring, intimidating and harassing individuals who are tasked with oversight, failing to comply with federal court orders to provide information on deputy misconduct, and litigating with the County to <u>rehire</u> deputies whose employment was terminated due to misconduct. Additionally, for at least the last ten fiscal years, the County has <u>spent</u> the most in litigation expenditures on settlements, judgments, and associated fees for LASD, at the expense of County residents. Notably, in fiscal year 2019-2020, the total litigation cost was <u>$60 million dollars</u>.

The Board has taken significant steps to create a system of accountability and transparency in which the Sheriff can operate lawfully, but this system cannot maintain its integrity when the Sheriff regularly and brazenly flouts its rules. In recognition of this structural deficiency, the Board approved a motion on <u>November 10, 2020</u> that directed County Counsel to research options for removing the Sheriff, including any required changes to the County Charter or County Code, in addition to any other mitigation measures that could be taken to curtail the Sheriff's resistance to transparency, accountability and the faithful performance of duties for the benefit of the residents of the County. On May 19, 2022, after months of witnessing abuse of power by the Sheriff and hearing from families impacted by Sheriff deputy gangs and violence, the COC issued a Resolution urging the Board to place a charter amendment on the November ballot to establish additional checks and balances on the Sheriff. It is now time to act.

Pursuant to California State Constitution, Article IX, Section 4, (b) and (c), the Board may provide for the terms of removal of any elected or appointed County officer. This Board has the fundamental responsibility of strengthening oversight to enhance the

AV010437

MOTION BY SUPERVISORS HOLLY J. MITCHELL
AND HILDA L. SOLIS
July 12, 2022
Page 4

existing system of checks and balances and ensure lawful operations of LASD for all sheriffs elected in the future. Though sheriffs enjoy certain limited areas of independent authority under the California State Constitution as an independent, elected official, it is imperative that such privilege be balanced by accountability and oversight measures. Strengthening our existing accountability structures will bring a much-needed check to a system in which abuse of power has been able to thrive unchecked with few, if any, meaningful consequences. A proposed charter amendment empowering the Board to remove the sheriff only for cause, would allow the Board to act expeditiously to remove a corrupt sheriff rather than wait for a grand jury to convene or a recall election to be held. The justification for removal will not affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff. This authority, combined with the existing oversight structures in the County, will support the Board's responsibility in promoting accountability and transparency in LASD.

**WE THEREFORE MOVE THAT THE BOARD OF SUPERVISORS:**

Instruct the Acting County Counsel to take the following actions for consideration at the July 26, 2022 Board meeting:

1. Draft the necessary documents, including an ordinance, to call a special election to be held on November 8, 2022 for the purpose of voting on an amendment to the County Charter that would:

    a. Grant the Board of Supervisors the authority to remove the Sheriff, by a four-fifths vote for cause defined as a violation of any law related to the performance of their duties as Sheriff; flagrant or repeated neglect of duties; a misappropriation of public funds or property; willful falsification of a relevant official statement or document; or obstruction of any investigation into the conduct of the Sheriff by the Inspector General, Sheriff Civilian Oversight Commission, or any government agency with jurisdiction to conduct such an investigation.

2. Ensure that the proposed County Charter Amendment is clear that it shall not affect the independent and constitutionally designated functions of the Sheriff.

    a. The Board shall not obstruct the investigative function of the Sheriff in

AV010438

MOTION BY SUPERVISORS HOLLY J. MITCHELL
AND HILDA L. SOLIS
July 12, 2022
Page 5

criminal matters and any other statutory or constitutional authority or jurisdictional responsibility, nor shall the sheriff's exercise of investigative or prosecutorial discretion in criminal matters provide cause for removal.

3. Ensure that the proposed County Charter Amendment clarifies that the Sheriff may be removed for cause, after such Sheriff has been served with a written statement of alleged grounds for such removal, and such Sheriff has been given a reasonable opportunity to be heard in the way of explanation or defense.

4. Ensure that the proposed County Charter Amendment is clear that should any provision or part of the proposed County Charter Amendment be found unconstitutional or invalid, it would be severable, and its invalidity or unconstitutionality shall not affect the remaining provisions or application, which would be implemented without the invalid or unconstitutional part.

5. Ensure that the proposed County Charter Amendment is clear that should another proposed County Charter Amendment with conflicting provisions appear on the same ballot, and each proposed County Charter Amendment receives a majority of votes, the proposed County Charter Amendment with the highest affirmative vote shall prevail.

#     #     #

(JM)

EXHIBIT 15




# OFFICE OF THE SHERIFF

## COUNTY OF LOS ANGELES

### HALL OF JUSTICE

ROBERT G. LUNA, SHERIFF

January 4, 2023

Mr. Alejandro Villanueva
2183 El Cajonita Drive,
La Habra, California 90631

Dear Mr. Villanueva:

**ADMINISTRATIVE INVESTIGATION INTERVIEW REQUEST**

The Los Angeles County Sheriff's Department is conducting an administrative investigation into a matter in which you are a subject.

The incident occurred at/on March 16, 2022. It is our Department's policy to conduct complete and thorough investigations into complaints or allegations of violations of Department policy on the part of our employees; therefore, it is important that you be interviewed.

Please contact Ms. Christine Diaz-Herrera, attorney at law from Sanders Roberts LLP, at (213) 426-5000 extension 6889 or via email at cdiazherrera@sandersroberts.com, to schedule an interview in person or via telephone. Your cooperation in this matter is appreciated.

If you have any questions, you may also contact Lieutenant John L. Carter at (323) 890-5304.

Sincerely,

ROBERT G. LUNA, SHERIFF

Ron Kopperud, Captain
Internal Affairs Bureau

211 WEST TEMPLE STREET, LOS ANGELES, CALIFORNIA 90012

*A Tradition of Service*
— Since 1850 —



EXHIBIT
25

EXHIBIT 16

From: Alex Villanueva
Sent: Friday, March 10, 2023 6:54 PM PST
To: Christine Diaz-Herrera
Subject: Re: [External] Re: Administrative Investigation Interview Request

You don't have a "standard practice" regarding making a subject out of someone you have no jurisdiction over and engaging in something the department has never done before. I'd love to help you, however your terms are unethical and unacceptable. I simply asked you what the issue was about, I don't need to know the specific questions you're going to ask. Example: Captain so and so alleges that he was denied x position because he did xyz.

Regards

On Mon, Mar 6, 2023 at 3:34 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Mr. Villanueva,

Given your previous role, I assume that you are well aware that the subject of an investigation does not know the questions he or she will be asked before an interview. This is standard practice. Likewise, it is standard practice to give the subject of an investigation the chance to respond to allegations during an interview. You previously stated that you would cooperate with the investigation, I can make myself available based on your schedule. Please let me know if you are still willing to make yourself available to be interviewed.

Lastly, I would like to remind you that if you become represented by counsel, please let me know so I can contact them directly.

Best regards,

Christine



**Christine Diaz-Herrera,** ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

**SANDERS**
**ROBERTS**

Sanders Roberts LLP
1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017
p. 213.426.5000 x4891 | 213.234.4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Monday, March 6, 2023 3:06 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: [External] Re: Administrative Investigation Interview Request

Your response only confirms my suspicions. For the record there were several incidents that occurred during the McDonnell administration that merited questioning him, but it would have been wildly inappropriate to make him a subject of an administrative investigation - and we never did.

Your actions are unethical and without legal authority or precedent.

Thank you

On Mon, Mar 6, 2023 at 2:51 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:


EXHIBIT 18

Thank you for your response. I am unable to provide my questions in advance. As I stated below, it is alleged that you acted in an inappropriate POE related manner and made inappropriate POE related remarks in the workplace. The specific allegations include, but are not limited to, potential Manual of Policy and Procedures ("MPP") violations of the following:

3-01/1.21.10 POE – Discrimination

3-01/1.21.15 POE – Sexual Harassment (Other Than Sexual)

3-01/1.21.20 POE – Discriminatory Harassment (Other Than Sexual)

3-01/1.21.25 POE – Third Person Harassment

3-01/1.21.30 POE – Inappropriate Conduct Toward Others

3-01/1.21.35 POE – Retaliation

I will provide more information during the interview itself. Please let me know when you are available.

Best,

Christine



## Christine Diaz-Herrera, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

Sanders Roberts LLP

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1996, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Thursday, February 9, 2023 4:47 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: [External] Re: Administrative Investigation Interview Request

I'm not concerned about what your practices may be, particularly given the challenging optics of making a former sheriff the subject of an administrative investigation. This is troubling on so many levels, and while I am more than happy to cooperate with you, it will be on my terms. Please advise how you wish to proceed.

Alex

On Thu, Feb 9, 2023 at 1:50 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Good afternoon Mr. Villanueva,

Thank you for your response and confirmation that you are not currently represented by counsel. In the event that you become represented by counsel, please let me know and I will communicate directly with your attorney.

It is alleged that you acted in an inappropriate POE-related manner and made inappropriate POE-related remarks in the workplace. The specific allegations include, but are not limited to, potential Manual of Policy and Procedures ('MPP') violations of the following:

3-01/121.10 POE – Discrimination

3-01/121.15 POE – Sexual Harassment (Other Than Sexual)

3-01/121.20 POE – Discriminatory Harassment (Other Than Sexual)

3-01/121.25 POE – Third Person Harassment

3-01/121.30 POE – Inappropriate Conduct Toward Others

3-01/121.35 POE – Retaliation

It is not our practice to submit questions in advance of the interview. Should you have any further questions, I can be reached at 626-372-4848. Thank you.

Best,

Christine

**Christine Diaz-Herrera**, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

SANDERS
ROBERTS

Sanders Roberts LLP

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Wednesday, February 8, 2023 5:09 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** [External] Re: Administrative Investigation Interview Request

Not currently represented. Send me a brief synopsis and questions you'd like me to answer.

Alex

On Wed, Feb 8, 2023 at 10:18 AM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Good Morning Mr. Villanueva,

I wanted to follow up regarding my request to schedule an interview with you. However, pursuant to the California Rules of Professional Conduct (Rule 2-100) I am unable to communicate with you directly if you are currently represented by an attorney. Do you have an attorney representing you in this matter? If so, please provide me with their contact information so that I may speak with them. Thank you.

Best,

Christine



# Christine Diaz-Herrera, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

**Sanders Roberts LLP**

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION – This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Thursday, January 12, 2023 11:23 AM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Re: Administrative Investigation Interview Request

Send me the synopsis and questions first and I'll take it from there

On Mon, Jan 9, 2023 at 2:48 PM Christine Diaz-Herrera <cdiazherrera@sandersroberts.com> wrote:

Thank you for your response. Is there an attorney you would like me to contact directly? I am happy to forward my previous interview requests to your attorney.

Best,

Christine



# Christine Diaz-Herrera, ATTORNEY AT LAW

cdiazherrera@sandersroberts.com

Sanders Roberts LLP

1055 West 7th Street, Suite 3200 | Los Angeles, CA 90017

p 213 426 5000 x6889 | f 213 234 4581 | sandersroberts.com

**From:** Alex Villanueva <sheriffvillanueva33@gmail.com>
**Sent:** Monday, January 9, 2023 2:47 PM
**To:** Christine Diaz-Herrera <cdiazherrera@sandersroberts.com>
**Subject:** Administrative Investigation Interview Request

I received two certified letters regarding interview requests for incidents that allegedly happened in March of last year. In order to properly respond, I will ask you to submit your questions in writing, after providing a brief description of what the allegations are, and then I will reply with counsel. This is the first I have heard of anyone reaching out to me, so please use this email address for all communications.

Regards,

Alex Villanueva

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

NOTICE: CONFIDENTIAL AND PRIVILEGED INFORMATION - This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

## Disclaimer

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

## Disclaimer

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

## Disclaimer

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

## Disclaimer

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

EXHIBIT 17



# LOS ANGELES COUNTY SHERIFF'S DEPARTMENT
### *"A Tradition of Service Since 1850"*

Incident Date: Between July 28, 2021, and March 2, 2022
Department Knowledge: March 16, 2022
Statute Date: March 15, 2023

# INTERNAL AFFAIRS BUREAU INVESTIGATIVE REPORT

**IAB #IV 2558101**

**EXHIBIT**

17

# CONFIDENTIAL



10-2-23
CONTENTS
R. KOPPERUD
#442441

# TABLE OF CONTENTS

CONFIDENTIAL

COLA002121

# **Table of Contents**
IV 2558101

**AUDIO VIDEO TRACKING SHEET**

**PERSONNEL INVESTIGATION FORM**

**INVESTIGATIVE SUMMARY**

**INTERVIEW TRANSCRIPTS**

    1-Complainant Esther Lim

**EXHIBITS**

    **A**    County Policy of Equity Report/Notification Form, ICMS #2022-112209

    **B**    Policy of Equality (POE) Report/Notification Form, #22-046.

    **C**    One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show

**MISCELLANEOUS DOCUMENTS**

    -    Request for IAB Investigation Memorandum from Commander Jason P. Wolak to Captain Ron Kopperud, dated June 27, 2022.

    -    Subject of Administrative Investigation Notification Form signed by Subject Alex Villanueva, dated June 29, 2022.

    -    Manual of Policy and Procedures:
        3-01/121.10: Policy of Equality - Discrimination
        3-01/121.15: Policy of Equality - Sexual Harassment
        3-01/121.20: Policy of Equality - Harassment (Other than Sexual)
        3-01/121.25: Policy of Equality - Third Party Harassment
        3-01/121.30: Policy of Equality - Inappropriate Conduct Toward Others
        3-01/121.35: Policy of Equality - Retaliation

**IV 2558101**

# AUDIO/VIDEO TRACKING SHEET

CONFIDENTIAL

COLA002123

# INTERNAL AFFAIRS BUREAU
## - Audio/Video Tracking Sheet -

## # IV 2558101

**Investigator's Name:**  Lieutenant Ann Devane

**Total number of USB Flash Drives:**  0

**Total number of compact discs:**  2

**Total number of digital audio files:**  1

### DIGITAL AUDIO FILES

| Name |
| --- |
| **1**-Complainant Esther Lim |

### DIGITAL MEDIA

| Transcripts | One (1) Compact Disc containing: Audio recorded interview and interview transcript |
| --- | --- |
| **Exhibit C** | One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show |

COLA002124

# PERSONNEL INVESTIGATION FORM

CONFIDENTIAL

COLA002125

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
### PERSONNEL INVESTIGATION

PAGE 1 OF 2

| DATE 09/21/2023 | No. OF SUBJECTS 1 | UNIT(S) INVOLVED Executive Division | | I.A.B. FILE No. IV 2558101 |
|---|---|---|---|---|

MANUAL SECTIONS ALLEGEDLY VIOLATED (BY TITLE AND No.)
3-01/121.10,POE-Discrimination;  3-01/121.15, POE-Harassment; 3-01/121.20, POE-Harassment (Other than Sexual);
3-01/121.25, POE-Third Party Harassment; 3-01/121.30, POE-Inappropriate Conduct To Others; 3-01/121.30, POE-Retaliation

| DATE, TIME, DAY OF OCCURRENCE Between July 28, 2021, and March 2, 2022 | RELATED URN FILE No. IF APPLICABLE |
|---|---|

LOCATION OF OCCURRENCE
Unknown

| SOURCE OF COMPLAINT: | ☐ COMMUNITY | ☐ SUPERVISION | W/C REPORT No. | ☑ OTHER SOURCES (SPECIFY) POE #: 22-046 |
|---|---|---|---|---|

| SUBJECT No. 1 OF 1 | LAST NAME Alex | FIRST NAME Villanueva | M.I. | RANK OR TITLE Sheriff | EMP. No. 246296 |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT Executive Division | DATE ASSIGNED | DIVISION OR REGION Executive Division |
|---|---|---|

STATUS OF SUBJECT
☑ CONTINUING ON DUTY    ☐ RELIEVED OF DUTY - REASSIGNED TO:_____    ☐ OTHER_____

| SEX Male | RACE Hispanic | HAIR Brown | EYES Brown | HEIGHT 510 | WEIGHT 195 | D.O.B. 02/25/1963 | AGE 60 |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE 12/03/2018 | DATE APPOINTED TO RANK 12/03/2018 | INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B DATE ____ | TIME ____ |
|---|---|---|---|---|

### PREVIOUS FOUNDED INVESTIGATIONS

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| 10/21/1992 | 3132 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 09/15/1993 | 6069 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 11/23/2015 | 2390479 | 3-01/030.10:OBEDIENCE TO LAWS, REGULATIONS; | Written Reprimand |
| | | 3-01/040.97:SAFEGUARDING PERSONS IN CUSTODY; | |
| | | 3-01/050.10:PERFORMANCE TO STANDARDS | |

| SUBJECT No. OF | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT | DATE ASSIGNED | DIVISION OR REGION |
|---|---|---|

STATUS OF SUBJECT
☐ CONTINUING ON DUTY    ☐ RELIEVED OF DUTY - REASSIGNED TO:_____    ☐ OTHER_____

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE | DATE APPOINTED TO RANK | INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B DATE ____ | TIME ____ |
|---|---|---|---|---|

### PREVIOUS FOUNDED INVESTIGATIONS

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

CODE: **C** - COMPLAINANT. **W** - WITNESS        ADDITIONAL COMPLAINANTS, WITNESSES, OR SUBJECTS ON SUPPLEMENTAL PAGES ☑ YES   ☐ NO

| CODE C | No. 1 OF 1 | LAST NAME Lim | FIRST NAME Esther | M.I. | SEX Female | RACE UNK | D.O.B. Adult |
|---|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Justice Deputy for Hilda Solis | RES. PHONE (AREA CODE) ( ) |
|---|---|

| BUSINESS ADDRESS OR UNIT OF ASSIGNMENT 856 Kenneth Hahn Hall of Administration, LA, CA. 90012 | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) (213) 974-4111 |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B DATE 07/28/2022 | TIME 1317 |
|---|---|---|

| CODE W | No. 1 OF 2 | LAST NAME Pawlowski | FIRST NAME Veronica | M.I. | SEX Female | RACE UNK | D.O.B. Adult |
|---|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Justice Deputy for Sheila Kuehl | RES. PHONE (AREA CODE) ( ) |
|---|---|

| BUSINESS ADDRESS OR UNIT OF ASSIGNMENT Los Angeles, Ca. 90013 | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ____ OF ____ | SIDE ☐ A ☐ B DATE 08/04/2022 | TIME ____ |
|---|---|---|

| PRIMARY INVESTIGATOR Sanders Roberts LLP | RANK | EMP. No. | APPROVED | DATE 10.2.23 |
|---|---|---|---|---|
| ASSISTING INVESTIGATOR Lieutenant Ann Devane | RANK LT | EMP. No. 478275 | DATE SUBMITTED 09/26/2023 | |

SH-AD-669-3/15        IF ADDITIONAL SUBJECTS, WITNESSES, COMPLAINANTS OR DISCIPLINE HISTORIES, LIST ON CONTINUATION PAGES.

CONFIDENTIAL

SHERIFF'S DEPARTMENT PERSONNEL INVESTIGATION
COMPLAINANT / WITNESS CONTINUATION PAGE

| I.A.B. FILE No. | | | PAGE | 2 | OF | 2 |
|---|---|---|---|---|---|---|
| IV2558101 | | | | | | |

CODE: **C** - COMPLAINANT, **W** - WITNESS

| CODE W | No 2 OF 2 | LAST NAME Coates | FIRST NAME Kyla | M.I. - | SEX Female | RACE Unk | D.O.B. Adult |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS Justice and Mental Health Deputy for Janice Hahn | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT 500 W. Temple Street Room 822, Los Angeles CA 90012 | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) (213) 974-4444 | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE 08/01/2022 | TIME Unk | | |

| CODE | No. OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

| CODE | No 4 OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

| CODE | No. OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

| CODE | No. OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

| CODE | No. OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

| CODE | No. OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

| CODE | No. OF | LAST NAME | FIRST NAME | M.I. | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|---|---|
| RESIDENCE ADDRESS | | | | | RES. PHONE (AREA CODE) ( ) | | |
| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT | | | | CDL OR LASD EMPLOYEE NO. | BUS. PHONE (AREA CODE) ( ) | | |
| INTERVIEW TAPE RECORDED ON    TAPE    OF | | | SIDE ☐ A ☐ B | DATE | TIME | | |

COLA002127

# INVESTIGATIVE SUMMARY

CONFIDENTIAL

COLA002128

CONFIDENTIAL

May 19, 2023

TO:        EDUARDO MONTELONGO,

           ASSISTANT LOS ANGELES COUNTY COUNSEL

FROM:      SANDERS ROBERTS LLP

**INVESTIGATION REPORT – FORMER SHERIFF ALEX VILLANUEVA**

## 1. INTRODUCTION

County Counsel retained the law firm of Sanders Roberts LLP ("Sanders Roberts") to conduct an independent investigation into complaints against Sheriff Alex Villanueva. Sanders Roberts conducted that investigation via witness interviews and a review of relevant documents. This report details the investigation's factual findings with respect to Sheriff Alex Villanueva.

## 2. ALLEGATIONS

The allegations that form the basis of the complaints against Sheriff Alex Villanueva are as follows:

**ALLEGATION 1:** In various public appearances on Facebook Live and KFI Radio, Sheriff Alex Villanueva subjected several Board of Supervisors Justice Deputies to harassment on the basis of sex.

**ALLEGATION 2:** In various public appearances on Facebook Live and KFI Radio, Sheriff Alex Villanueva subjected several Board of Supervisors Justice Deputies to harassment on the basis of race/ethnicity/ancestry/national origin.

**ALLEGATION 3:** In various public appearances on Facebook Live and KFI Radio, Sheriff Alex Villanueva subjected several Board of Supervisors Justice Deputies to harassment and retaliation on the basis of age.

## 3. APPLICABLE POLICIES AND GUIDELINES

**Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.015 - County Policy of Equity**

**THE POLICY.** All County of Los Angeles (County) employees are required to conduct themselves in accordance with the entirety of this County Policy of Equity (Policy), and all applicable local, county, state, and federal laws.

**PURPOSE.** This Policy is intended to preserve the dignity and professionalism of the workplace as well as protect the right of employees to be free from discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status. Discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status, are contrary to the values of the County. The County will not tolerate unlawful discrimination on the basis of sex, race, color, ancestry, religion, national origin, ethnicity, age (40 and over), disability, sexual orientation, marital

COLA002129

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 2 of 11

status, medical condition or any other protected characteristic protected by state or federal employment law, nor will it tolerate unlawful harassment, or retaliation. As a preventive measure, the County also will not tolerate inappropriate conduct toward others based on a protected status even if the conduct does not meet the legal definition of discrimination or unlawful harassment. All County employees are responsible for conducting themselves in accordance with this Policy and its associated Procedures. Violation of the Policy and/or Procedures will lead to prompt and appropriate administrative action including, but not limited to, counseling, training, written warning, written reprimand, suspension, demotion, or discharge.

**COUNTY POLICY OF EQUITY PROHIBITED CONDUCT.** Each County employee is responsible for understanding and abiding by these definitions of prohibited conduct as they may impact any administrative process/proceeding for potential violations of this Policy and/or associated Procedures.

**COUNTY POLICY OF EQUITY UNLAWFUL HARASSMENT (OTHER THAN SEXUAL).** Unlawful harassment of an individual because of the individual's race, color, ancestry, religion, national origin, ethnicity, age, disability, sexual orientation, marital status, medical condition or any other protected characteristic protected by state or federal employment law is also discrimination and prohibited. Unlawful harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment.

**<u>Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability[1]</u>**

"Each Department Head shall:

•Hold their employees accountable for actions that include being dishonest, untruthful, and/or which demonstrate a lack of integrity, consistent with Countywide requirements established by the Board of Supervisors, Director of Personnel, Chief Executive Officer, and Auditor Controller, County Code, Civil Service Rules, and departmental policies;
•Hold their employees, including those working in public safety, patient care, judicial affairs, and those holding fiduciary responsibilities, to high standards of honesty and conduct, which are of essential value to public servants;
•Act affirmatively to abate or prevent performance problems and document those problems when they occur;
•Ensure accountability as set forth in the Los Angeles County Charter, Civil Service Rules, and Countywide and departmental policies;
•Take timely and effective corrective action, commensurate with the offense, which may include remedial measures such as counseling or more formal action such as discipline up to and including discharge from County service; and
•Retain employees in County service on the basis of the adequacy of their performance, correct inadequate performance, and separate from County service employees whose inadequate performance cannot be corrected.

Failure of an employee to perform their assigned duties so as to meet fully explicitly stated or implied standards of performance may constitute adequate grounds for discharge, reduction, or suspension. Where appropriate, such grounds may include, but are not limited to, qualitative as well as quantitative elements

---

[1] The Los Angeles County BOS Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability can be accessed at https://library.municode.com/ca/la_county_-_bos/codes/board_policy?nodeId=CH9PE_9.020EMAC.

COLA002130

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 3 of 11

of performance, such as failure to exercise sound judgment, failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources. Grounds for discharge, reduction, or suspension may also include any behavior or pattern of behavior which negatively affects an employee's productivity, or which is unbecoming a county employee; or any behavior or condition which impairs an employee's qualifications for their position or for continued county employment."

## 4.  PROCEDURE

At the beginning of each interview, the interviewer advised each witness of the following: 1. That the witness's role is to tell the truth and reveal all relevant facts to the investigator; 2. That the witness should maintain confidentiality of the investigation; 3. That the witness must report any retaliation to the investigator; and 4. That the witness must not retaliate against any participant. The investigator then asked each witness whether s/he had any procedural questions.

To determine the merits of the allegations against former Sheriff Villanueva, the investigator interviewed the following persons:

| NAME | DATES OF INTERVIEW | POSITION |
|---|---|---|
| Kyla Coates | 08/04/22 | Justice and Mental Health Deputy |
| Esther Lim | 07/28/22 | Justice Deputy |
| Veronica Pawlowski | 08/01/22 | Justice Deputy |
| Sheriff Alex Villanueva | N/A[2] | Los Angeles County Sheriff |

## 5.  INVESTIGATIVE INTERVIEW SUMMARIES

### Kyla Coates

On August 4, 2022, attorney Christine Diaz-Herrera interviewed Justice and Mental Health Deputy, Kyla Coates via video conference. Ms. Coates did not have a representative present.

Kyla Coates started with the County as an intern in January 2019. She was later hired as an Associate Justice Deputy in July 2019. In or around February 2020, Ms. Coates was promoted to her current position of Justice and Mental Health Deputy for Supervisor Janice Hahn. Ms. Coates is responsible for handling all matters relating to criminal justice and mental health. Ms. Coates also advises Supervisor Hahn on other issues, helps draft talking points and speeches, and represents Supervisor Hahn and staff on certain occasions. Prior to working for Supervisor Hahn, Ms. Coates taught at Odyssey school. She received her B.A. in Political Science and Statistics from UCLA in 2011 and her master's degree in public policy from USC in 2020.

Ms. Coates interacts regularly with the Sheriff's Department through a board liaison. She recently was

---

[2] The investigators sought repeatedly to schedule an interview with Sheriff Villanueva. Sheriff Villanueva repeatedly ignored such scheduling requests, but ultimately agreed to sit for an interview on the condition that he be provided the investigator's questions ahead of time. The investigator declined that request and accordingly completed this investigation without an interview of Sheriff Villanueva.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 4 of 11

scheduled to meet with the Supervisor and then-Sherriff Villanueva. However, she usually goes through
the liaison or subject matter expert. She works with Bruce Chase and Brandon Corbett because they are in
charge of jails. Vanessa Chow was the Sheriff's board liaison when Ms. Coates first started and now
Christine Corrales has that role. Ms. Coates has a good working relationship with Mr. Chase, Mr. Corbett,
and Ms. Corrales that is friendly and collegial.

<u>Sheriff Villanueva Facebook Livestreams</u>

Ms. Coates is aware of Sheriff Villanueva's commentary about the Justice Deputies during his Facebook
live sessions. She had to stop listening to the session because they were so upsetting. For her mental
health, Ms. Coates stopped listening and would only read the summaries of the sessions. Ms. Coates
always kept up to date. She believed she received the summaries from the CEO's office. They were sent
to each Board office.

Sheriff Villanueva did not mention Ms. Coates by name, but he often referenced the entire Justice
Deputies group. He disparages the group and makes references to their age. He said they are "woke
twenty-somethings that worship at the altar of wokeness." Ms. Coates said she is in her thirties and others
are in their forties. Sheriff Villanueva has also made reference to their gender. He said that they are all
women. Sheriff Villanueva said that the supervisors promote diversity, but the Justice Deputies are all
women and unqualified.

Ms. Coates has listened to approximately 15 of his speeches. She also believes at least some of his
Facebook live speeches have been transcribed by the CEO's office. Sheriff Villanueva appears to refer to
the Justice Deputies about a third of the time he is talking via Facebook live. During those sessions he has
referred to the age of the Justice Deputies, which is a lie that can easily be fact checked. He also says the
Justice Deputies are all female even though Supervisor Mitchell has two male Justice Deputies. It has
stuck out to Ms. Coates that Sheriff Villanueva has chosen to make comments that are "straight up lies"
and have nothing to do with their policies.

In the last few years Sheriff Villanueva has blamed the Board for defunding his department. She believes
his motivation has been to get support for himself as an elected official. She said that anytime they tried to
introduce transparency he would attack. She believes that his discussion about defunding the Sheriff's
Department is part of his overall attack on the Board. Ms. Coates did not think Sheriff Villanueva had
done any Facebook live sessions for a small period of time and had been relatively quiet compared to the
past.

<u>Comments Regarding Supervisors</u>

Sheriff Villanueva acted especially awful to Supervisor Mitchell and Supervisor Solis. She also believed
he mentioned Esther Lim by name in public settings. He made negative comments to Ms. Coates in front
of Supervisor Hahn. Sheriff Villanueva had requested a quarterly check-in. They had a check-in during
November 2021 and another in January/ February 2022. It was a virtual meeting. He said Supervisor
Hahn was defunding him. Ms. Coates told him he felt underfunded, but he was not being defunded, let's
get that out in the clear. Sheriff Villanueva pointed at Ms. Coates and said, "I can tell from your age you
are one of those people that hate the police and want to defund us." Ms. Coates said, "that is not true, you
don't know me or my personal background." The conversation upset Ms. Coates and she couldn't believe
what he said to her. It was just the three of them in the meeting. Ms. Coates could not recall if Supervisor
Hahn responded. He insulted Supervisor Hahn to her face, that is just what he does. Supervisor Kuehl has
called him out on his behavior before.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 5 of 11

Sheriff Villanueva also said they were all twenty-year old woke, just out of college, and never had a job in their lives. Ms. Coates told Sheriff Villanueva that he did not know her and what he said about her was untrue. Sheriff Villanueva said it was semantics. He also told her, "I can see from your age that you are one of those people that worships at altar of wokeness, hates the police and wants to defund the police." Ms. Coates was offended because he was discrediting her experiences. Ms. Coates has worked hard and is not anti-police. Sheriff Villanueva also said they were all women. In response Ms. Coates asked him even if they were all women, what was he implying. He did not reply.

Ms. Coates said that Sheriff Villanueva's actions have not impacted her individually. She did not think he ever mentioned her name personally. He usually shares BOS pictures and the general email for Supervisor Kuehl. She said she was lucky she hasn't actually been harmed because of Sheriff Villanueva's words.

Treatment of Women of Color

Ms. Coates was present when Sheriff Villanueva said something negative to Supervisor Kuehl. She told him he had to stop insulting her because it is rude and unproductive. He responded, "I'll stop saying bad things about you publicly if you end the hiring freeze. I'll stop being mean to you."

Sheriff Villanueva also said several negative things about Supervisor Mitchell. However, she could not recall any specific comments he made about her. During a Facebook Live session, he called Supervisor Hilda Solis "La Malinche," because she doesn't support law enforcement which makes her a traitor to her own people.

Ms. Coates recalled reading in a transcript that Sheriff Villanueva said he should take the BOS out to the shed and beat them during one of his Facebook Live sessions. She said Sheriff Villanueva said really inappropriate things about the supervisors.

Commentary on KFI Radio Station

Ms. Coates listened to a few of Sheriff Villanueva's appearances of the radio station KFI. He talked about Justice Deputy Esther Lim during one show. The radio personalities said her name. They made it sound like a huge bombshell of a story because she had all these tweets that made commentary on public affairs.

Community Town Hall February 2022

Ms. Coates did not attend the Town Hall Meeting in February 2022. Usually, the field deputy attends those events. To her knowledge, Sheriff Villanueva made similar comments at this event. At that point it was old news because he was always saying similar disparaging comments. She did not believe he made any comments about Ms. Lim at this event. She recalled his comments were more focused on the supervisors. Jennifer L. and Lauren U. told her about Sheriff Villanueva's comments at the townhall meetings. The comments about the Justice Deputies were usually on Instagram and Facebook Live events.

**Esther Lim**

On August 12, 2022, attorney Christine Diaz-Herrera interviewed Justice Deputy, Esther Lim, via Teams video conference. Ms. Lim did not have a representative present.

COLA002133

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 6 of 11

<u>Background</u>

Esther Lim has worked for Los Angeles County Supervisor, Hilda Solis, since June of 2020 as her Justice
Deputy. Ms. Lim handles Supervisor Solis's public safety and justice portfolio, which includes the
Sheriff, Probation, and District Attorney's office. Lim serves as a liaison for Supervisor Solis with
oversight entities and engages with community members, monitors jails and juvenile facilities. As part of
her duties, Ms. Lim goes into both jail and juvenile hall facilities to observe. Ms. Lim reports issues to
oversight entities and Board of Supervisors. Ms. Lim works with oversight entities such as probation
oversight, civil brand commission, Office of Inspector General, and the Sheriff Civilian Oversight
Commission. Ms. Lim reports to Chief of Staff Cindy Chan and Supervisor Solis. Ms. Lim previously
worked at the ACLU of Southern California for almost a decade. While at the ACLU, she focused on
issues such as law enforcement accountability and jail conditions. She also interacted with the LA County
Sheriff's Department and the OIG. Ms. Lim received a B.S. in Criminal Justice from Cal State Long
Beach in 2006. She received a Master's in Social Work from USC in 2010. She states that there are at
least four incidents that have occurred.

<u>Sheriff Alex Villanueva</u>

Sheriff Villanueva knows who Ms. Lim is. They had a working relationship when she worked at the
ACLU. She acknowledged that in her previous role at the ACLU she was critical of Sheriff Villanueva.
Further, she said that she had been critical of Sheriff Villanueva in her public social media posts. In Feb
2021, Sheriff Villanueva wrote a letter addressed to Supervisor Solis and cc'ed the BOS and CEO. Ms.
Lim considered his letter to be harassment. The letter discussed Ms. Lim's social media posts and called
for opening up an investigation of her social media accounts. Ms. Lim believed the Sheriff's request was
unjustified.

Ms. Lim acknowledged being critical of Sheriff Villanueva in the past. She said it was part of
accountability from the BOS. When Sheriff Villanueva does not collaborate, they are critical. The BOS
has governance over County departments, including the Sheriff's Department. Even though Sheriff
Villanueva is elected, there is still a supervisory authority. Accountability could be brought up in a board
meeting or through motions. Oversight entities will issue subpoenas to force the sheriff or his
representative to attend a meeting. During one Board meeting discussed by Sheriff Villanueva, the Board
heard from a constituent being harassed by deputies.

Sheriff Villanueva referred to Ms. Lim and other Justice Deputies as twenty-somethings that don't know
any better. However, Ms. Lim is not in her twenties. She found Sheriff Villanueva's comments
disparaging because he was putting down her education and intellectual level. Ms. Lim was aware of this
Facebook Live session because sometimes the County's communication department sends her a transcript
of Sheriff Villanueva's Facebook live session.

Because Ms. Lim is a Justice Deputy, she frequently attends events where Sheriff Villanueva is present. If
Sheriff Villanueva is going to be there, she is typically assigned to go. There was a community town hall
meeting where they recognized each other. He said, "Esther go tell your boss that I want to debate her."
This was a meeting that occurred in 2021. Ms. Lim has seen him a handful of times at events. The board
meetings are virtual, and Sheriff Villanueva has attended virtually. During those meetings he has made
disparaging comments about Justice Deputies. She believes he made negative comments about the Justice
Deputies during public comments he made on July 27th and 28th.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 7 of 11

<u>July 28, 2021 Statement on Facebook Live</u>

Sheriff Villanueva conducted a Facebook Live session in uniform and discussed a motion Ms. Lim drafted on behalf of Supervisor Hilda Solis. The motion he was referencing had been put forward the day before on July 27, 2021. In video he held and read from the motion. Sheriff Villanueva did not approve of the motion and said he did not think the drafter realized the implications of the motion. Motions are often drafted by deputies on behalf of their respective Supervisors.

<u>October 6, 2021 Facebook Live Session</u>

During a Facebook Live session Sheriff Villanueva said he heard Ms. Lim "loud and clear" and then stated that he, was "pretty sure the flunkies are going to listen and get back to you." Ms. Lim said it would have been the Justice Deputies to respond to the issues he raised because they are a liaison to Sheriff Villanueva.

<u>February 16, 2021 Statement to Janice Hahn's Health Deputy</u>

A Justice Deputy told Ms. Lim that Sheriff Villanueva said all the Supervisors have twenty-five year olds right out of college writing their motions. Ms. Lim found this to be an offensive and ageist comment. She believes it is ageist because it assumes the Justice Deputies are right out of college and it minimizes their education and intellect. Ms. Lim found his comments particularly troublesome given the weight of his words as the Sheriff of Los Angeles County being made on a public platform heard by people that could become violent or dangerous. Ms. Lim had concerns that someone listening to Sheriff Villanueva could choose to retaliate against the Justice Deputies based on his statements. She believed Sheriff Villanueva's comments about her, and the other Justice Deputies could pose a safety concern. Lastly, his comments were "incredibly unprofessional."

Ms. Lim has not observed an uptick in negative comments towards her after Sheriff Villanueva's comments because she does not use social media anymore. However, there are disparaging comments made by people that watch Sheriff Villanueva's Facebook page live sessions. Ms. Lim recalled one time when someone directed a comment toward her during a Facebook live session because she made remarks at an event where Supervisor Solis issued a 25K reward in three homicide investigations.

<u>History of Intimidation of Women of Color</u>

Sheriff Villanueva has made multiple negative and misogynistic comments about the supervisors. On one occasion he said he wanted to take all of them back to the shed and beat them. He used the racist and sexist term, "La Malinche" against Supervisor Solis. He has also made negative comments about Supervisor Holly Mitchell, though Ms. Lim could not recall exactly what he said. She reported that Sheriff Villanueva makes comments like, "they worship at the altar of wokeness." He also harassed the former County CEO who was also a minority woman. He opened up a criminal investigation to intimidate her. Ms. Lim accused Sheriff Villanueva of harassing the Oversight Committee. She said that Sheriff Villanueva has tried to attack anyone with oversight of him. He has attempted to open arbitrary criminal investigations to silence people. Ms. Lim has drafted many motions about accountability and as a result, Sheriff Villanueva "goes after" Ms. Lim and Supervisor Solis. She said that Sheriff Villanueva goes after the BOS in every one of his Facebook Live sessions. During one Facebook Live session, Sheriff Villanueva said they should look into why there are no female Justice Deputies. Ms. Lim disputes this because there is a male Justice Deputy in the second district.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 8 of 11

<u>Letters Requesting Discipline of Ms. Lim for Her Social Media Commentary</u>

According to Ms. Lim, Sheriff Villanueva targeted her like he had targeted other Asian women. He authored two letters, one in February 2021 and the other in March 2022 about Ms. Lim's social media posts on Twitter. Sheriff Villanueva sent a letter to the BOS. In that letter, he included screenshots of her twitter posts, which were public. She made the posts while she was employed at her former employer, the ACLU, where she was encouraged to use social media.

Ms. Lim also believes Sheriff Villanueva shared his letter about her with KFI Radio. He received coverage of his letters, but the coverage ended there. The Office of the Inspector General (OIG) got involved with asking for justification for investigating an employee's personal social media. The OIG never got any information as to why the investigation was conducted. Ms. Lim only knows that they went through her social media accounts. Sheriff Villanueva wrote Ms. Lim's boss, Supervisor Solis, and tried to use what Ms. Lim wrote in personal social media accounts to get her terminated in 2021 and 2022. Ms. Lim did not believe she violated any County policy with her social media posts. However, she decided that she would no longer use her personal social media accounts or Twitter. Ms. Lim knows there are other deputies with social media accounts. Sheriff Villanueva complained that Ms. Lim was not fired and asked why the supervisor did not discipline her.

**Veronica Pawlowski**

On August 1, 2022, attorney Christine Diaz-Herrera interviewed Justice Deputy, Veronica Pawlowski via Teams video conference. Ms. Pawlowski did not have a representative present.

<u>Background</u>

Veronica Pawlowski has worked for the County of Los Angeles since 2012. She served as Supervisor Sheila Kuehl's Justice Deputy for two and a half years. Previously she held the position of Special Counsel to the Board of Supervisors on Child Welfare issues. Subsequent to that, she held a position at County Counsel where she advised the Department of Children and Family Services; the Probation Department; and the Los Angeles Homeless Services Authority. Pawlowski has been an attorney for 19 years. She received her B.A. in Political Science and Communications from USC in 1997 and her law degree from Boston College in 2000.

While she worked at County Counsel, Ms. Pawlowski worked on ordinances that give bodies of oversight their authority. She was really aware about how that relationship is supposed to work. The Supervisor saw Ms. Pawlowski as a subject matter expert on ordinances because she knew them better than anyone else.

<u>Interaction with Sheriff's Department</u>

Most of Ms. Pawlowski's interactions with the Los Angeles County Sheriff's Department ("Sheriff's Department") is at the Assistant Sheriff level. Her work with the Sheriff's Department has been very focused on the jails. Supervisor Sheila Kuehl ("Supervisor Kuehl") called for closure of a main jail in Los Angeles County. Much of Ms. Pawlowski's work has been focused on this issue. Ms. Pawlowski has dedicated a lot of time to learning how the jail operates. The Sheriff's Department has a board liaison and a board liaison team. This team advises Supervisor Kuehl's office of critical incidents.

As part of her work, Ms. Pawlowski meets in "clusters" that are attended by the other Justice Deputies and County staff with subject matter knowledge of the matters to be placed on the Board of Supervisor

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 9 of 11

meeting agenda. These meetings are scheduled by the CEO's office. Each week the cluster meeting agenda is based who is on the Board of Supervisors meeting agenda. To facilitate these meetings the CEO invites the relevant County departments to speak on items noticed in the Board of Supervisors meeting agenda. Who is speaking at cluster depends on the items being considered that week. All five BOS offices are represented, and the public is also allowed to attend.

The public safety cluster gives Ms. Pawlowski a preview of the issues to be raised and gives her an opportunity to ask questions on behalf of Supervisor Kuehl. These sessions help Ms. Pawlowski and the other Justice Deputies to make recommendations.

Ms. Pawlowski also attends informal briefings that are not open to the public. To address issues related to the pandemic, she used to attend a covid related briefing once a week.

Interaction with Sheriff Alex Villanueva

Ms. Pawlowski does not have to interact directly with the Sheriff Villanueva, but that is by deliberate design. She sat in on a few meetings with the Sheriff Villanueva and Supervisor Kuehl, but it was not required. She sat in on these meetings "maybe two or three times."

Sheriff Villanueva has not used abusive language directly toward Ms. Pawlowski or Supervisor Kuehl. However, during his Facebook live sessions there was a time period when he repeatedly talked about the fact the Board of Supervisors is comprised entirely of women. Similarly, he also made comments about the gender composition of the Justice Deputies.

Sheriff's Alex Villanueva's Facebook Live Sessions

Part of Ms. Pawlowski's responsibilities on behalf of her bosses is to sit in on meetings and keep them informed about what is going on in her portfolio. Ms. Pawlowski started to listen to Sheriff Villanueva's Facebook live sessions to alert her bosses if he said anything newsworthy. Ms. Pawlowski could not recall how many Sheriff Villanueva Facebook live sessions she has listened to. She has listened to them both live and via a recorded session. Ms. Pawlowski has listened to "just about every session" since Sheriff Villanueva started doing them.

In the beginning it was just Ms. Pawlowski listening and taking notes. Somewhere along way, she started to receive summaries of the sessions from the CEO's office, Countywide Communications Unit. Ms. Pawlowski did not know who sent them because she would receive them from Supervisor Kuehl's Communications Deputy. Lenny McGuire is in charge.

Sheriff Villanueva's Comments About the Justice Deputies

Initially Sheriff Villanueva called the Justice Deputies disparaging things. He said they don't know anything about the law. It became so much that Ms. Pawlowski started to "tune his comments out." Sheriff Villanueva called the Justice Deputies "woke twenty-year-old flunkies." During another exchange Sheriff Villanueva said it was "all these women running the show." He asked the question, "what's up with it being all women?" He said it was not just the Supervisors, and that all the Justice Deputies were "young twenty something woke and dumb women." Ms. Pawlowski was offended because Sheriff Villanueva portrayed them as puppets of the Supervisors who are young and dumb and don't know anything. Ms. Pawlowski said she is 46 years old and has a 4-year-old child. She is of Mexican descent and her children are of mixed race. Ms. Pawlowski said she is a proud child of immigrants. She said to

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 10 of 11

portray her as dumb, naive and not understanding during Sheriff Villanueva's Facebook live sessions was incredibly offensive to her.

Ms. Pawlowski considered filing a CPOE complaint. She has been in County for a long time and has experienced the process first-hand. She said that she does not have a lot of faith in the process. Ms. Pawlowski considered going to the press to tell them who the Justice Deputies really are. She pointed out that one of the Justice Deputies is male contrary to Sheriff Villanueva's remarks. Ms. Pawlowski said the press could do a write up about the situation, but she was "blown off" and told it was not worth the time despite how he was portraying all of them.

Ms. Pawlowski speculated that Sheriff Villanueva was trying to undermine the Justice Deputies and get to the Supervisors. She had concerns that his comments about her and the others would influence the community and his deputies. She drives a County car and lives in a small town where the LA County Sheriff's deputies are very present. The Justice Deputies talked about this issue as a group and wondered if Sheriff Villanueva was gathering information on them. They had concerns that he would look up their addresses or try to impact them in some way. Ms. Pawlowski has not personally received any emails or texts based on Sheriff Villanueva's comments about the Justice Deputies. However, the community she lives in is different. She lives in one of the only conservative parts of the County. She noticed that she would get a reaction if she told anyone that she works for Supervisor Kuehl. They would ask her, "isn't your boss anti-Sheriff?"

Although she was not there and did not hear it personally, Ms. Pawlowski is aware of a recording of a Sheriff Villanueva event where he called the Justice Deputies a "bunch of flunkies." These comments occurred during a period of time when he was holding community town halls. The townhall occurred in East LA. Ms. Pawlowski did not know who recorded the event. She thought the recording was taken by a staff member.

<u>Esther Lim</u>

Ms. Pawlowski reported that Sheriff Villanueva singled out Justice Deputy Esther Lim and highlighted her twitter posts. He wrote a letter to BOS to investigate and fire her. He also wrote another letter to the BOS saying that they had a fascist woman working on the board. Ms. Pawlowski said she saw that this affected Ms. Lim.

<u>History of Intimidation of Women of Color</u>

Ms. Pawlowski reported that Sheriff Villanueva referred to Supervisor Hilda Solis as "La Malinche" in one of his Facebook posts. La Malinche is commonly known as a traitor. He did not explain why he called her this name. At the time, Supervisor Solis took up a BOS motion and the Sheriff "ranted" about how the Supervisor was "full of it." He made comments that he would expect support from the one Latina on the BOS, but Supervisor Solis did not support him.

Ms. Pawlowski said that Sheriff Villanueva also made derogatory comments about Supervisor Kuehl. He had a whole commentary about Patty Giggins to the COC Commission in which he accused her of collusion or an inappropriate granting of funds. He referred to her as corrupt several times.

Similarly, he intimated that Supervisor Holly Mitchell was corrupt and improperly benefitted from some decisions she made.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 11 of 11

<u>Max Huntsman</u>

Ms. Pawlowski reported that Sheriff Villanueva made comments about Max Huntsman, Inspector General, "nonstop." Sheriff Villanueva called him "Gustav Hunstman," alluding that he is "some kind of Nazi." She said that Sheriff Villanueva has made his comments in writing. Ms. Pawlowski believes Sheriff Villanueva referenced it in a letter and does not hide it. Sheriff Villanueva referred to Mr. Huntsman and said his real name was "Gustav." Ms. Pawlowski believed Sheriff Villanueva's comments were intended to be about Mr. Huntsman's national origin.

<u>KFI Radio Talk Show</u>

Ms. Pawlowski reported that Sheriff Villanueva also made comments about the Justice Deputies on the radio station, KFI. Ms. Pawlowski said everything blended together. She listened to his comments in the different forums giving him space. She could not distinguish one from the other. They listened to all of his comments across various media platforms. Ms. Pawlowski believed some of it was captured and could be located by Lenny McGuire.

## 6.  DOCUMENTARY EVIDENCE

a.  **July 28, 2021 Facebook Live Session**

b.  **October 6, 2021 Facebook Live Session**

c.  **August 29, 2021 KFI Radio Show**

CONFIDENTIAL

**Justice Deputy Kyla Coates**

**Interview: August 4, 2022**

<u>**Background**</u>

Kyla Coates started with the County as an intern in January 2019. She was later hired as an Associate Justice in July 2019. In or around February 2020, Ms. Coates was promoted to her current position of Justice and Mental Health Deputy for Supervisor Janice Hahn. Ms. Coates handles all matters of criminal justice and mental health. Ms. Coates also advises Supervisor Hahn on other issues, drafts talking points and speeches, and represents Supervisor Hahn and staff on certain occasions. Prior to working for Supervisor Hahn, Ms. Coates taught at Odyssey school. She received her B.A. in Political Science and Statistics from UCLA in 2011 and her master's degree from USC in Public Policy in 2020.

Ms. Coates interacts regularly with the Sheriff's Department through a board liaison. She recently was scheduled to meet with the Supervisor and Sheriff Villanueva. In most cases, however, she goes through a liaison or subject matter expert. She works with Ruth Chase and Brandon Corbett because they are in charge of jails. Vanessa Chow was the Sheriff board liaison when Ms. Coates started and now Christine Corrales has that role. Ms. Coates has a positive working relationship with Ms. Chase, Mr. Corbett, and Ms. Corrales that is friendly and collegial.

<u>**Sheriff Villanueva Facebook Livestreams**</u>

Ms. Coates is aware of Sheriff Villanueva's commentary about justice deputies during his Facebook live sessions. She had to stop listening to the sessions because they were so upsetting. For her mental health, Ms. Coates stopped listening and only read the session summaries. Ms. Coates always kept updated. She believed she had received the summaries from the CEO's office. They were sent to each Board office.

Sheriff Villanueva did not mention Ms. Coates by name, but often referenced the entire justice deputies group. He disparages the group and references their age. He said they are "woke 20 somethings that worship at altar of wokeness." Ms. Coates explained that she is in her 30s and others are in their 40s. Sheriff Villanueva has also made reference to their gender. He said they were all women. Sheriff Villanueva said that the supervisors promote diversity, but the justice deputies are all women and unqualified.

Ms. Coates has listened to approximately 15 of his speeches. She also believes at least some of his Facebook Live speeches have been transcribed by the CEO's office. Sheriff Villanueva refers to justice deputies about a third of the time he talks via Facebook Live. During those sessions he referred to the age of the justice deputies, which is a lie that can easily be fact checked. He also says the justice deputies are all female even though Supervisor Mitchell has two male justice deputies. It has stood out to Ms. Coates that Sheriff Villanueva has chosen to make comments that are straight up lies and have nothing to do with their policies.

1

COLA002140

In the last few years Sheriff Villanueva has blamed the Board for defunding his department. She believes his motivation is to get support for himself as an elected official. Any time they tried to introduce transparency he would attack. His discussion about defunding the Sheriff's Department is part of his overall attack on the Board. Ms. Coates did not think Sheriff Villanueva had done any Facebook live sessions for a small period of time and had been relatively quiet compared to the past.

Comments Regarding Supervisors

Sheriff Villanueva acted especially awful towards Supervisor Mitchell and Supervisor Solis. She also believed he had mentioned Esther Lim by name in public settings. He made negative comments about Ms. Coates in front of Supervisor Hahn. Sheriff Villanueva requested quarterly check-ins. They had a check-in during November 2021 and another in January/ February 2022. It was a virtual meeting. He said Supervisor Hahn was defunding him. Ms. Coates told him he felt underfunded, but he was not being defunded, let's get that out in the clear. Sheriff Villanueva pointed at Ms. Coates and said, "I can tell from your age you are one of those people that hate the police and want to defund us." Ms. Coates said, "that is not true, you don't know me or my personal background." The conversation upset Ms. Coates and she couldn't believe what he said to her. It was just the three of them in the meeting. Ms. Coates could not recall if Supervisor Hahn responded. He insulted Supervisor Hahn to her face, that is just what he does. Supervisor Kuehl has called him out on his behavior before.

Sheriff Villanueva also said they were all 20-year old woke, just out of college, and never had a job in their lives. Ms. Coates told Sheriff Villanueva that he did not know her and what he said about her was untrue. Sheriff Villanueva said it was semantics. He also told her, "I can see from your age that you are one of those people that worships at altar of wokeness, hates the police and wants to defund the police." Ms. Coates was offended because he was discrediting her experiences. Ms. Coates has worked hard and is not anti-police. Sheriff Villanueva also said they were all women. In response Ms. Coates asked him even if they were all women, what was he implying. He did not reply.

Ms. Coates said that Sheriff Villanueva's actions have not impacted her individually. She did not think he mentioned her name personally. He usually shares BOS pictures and the general email for Supervisor Kuehl. She said she was lucky she hadn't actually been harmed because of Sheriff Villanueva's words.

Women of Color

Ms. Coates was present when Sheriff Villanueva said something negative to Supervisor Kuehl. She told him he had to stop insulting her because it is rude and unproductive. He responded, "I'll stop saying bad things about you publicly if you end the hiring freeze. I'll stop being mean to you."

Sheriff Villanueva also said several negative things about Supervisor Mitchell. However she could not recall any specific comments he made about her. During a Facebook Live

2

CONFIDENTIAL

session he called Supervisor Hilda Solis "La Malinche," because she doesn't support law enforcement which makes her a traitor to her own people.

Ms. Coates recalled reading in a transcript that Sheriff Villanueva said he should take the BOS out to the shed and beat them. This was during one of his Facebook Live sessions. She said Sheriff Villanueva said inappropriate things about supervisors.

KFI

Ms. Coates listened to a few of Sheriff Villanueva's appearances on the radio station KFI. He talked about justice deputy Esther Lim during one show. Radio personalities mentioned her name. They made it sound like a huge bombshell of a story because she had all these tweets that commented on public affairs.

Community Town Hall February 2022

Ms. Coates did not attend the Town Hall Meeting in February 2022. Usually the field deputy attends those events. To her knowledge, Sheriff Villanueva made similar comments at this event. At that point it was old news because he always said similar disparaging comments. She did not believe he commented about Ms. Lim at this event. She recalled his comments were more focused on the supervisors. Jennifer L. and Lauren U. told her about Sheriff Villanueva's comments at the townhall meetings. The comments about justice deputies were usually on Instagram and Facebook Live events.

3

    COLA002142

**Justice Deputy Veronica Pawlowski**

**Interview: August 11, 2022**

<u>Background</u>

Veronica Pawlowski has worked for the County of Los Angeles since 2012. She served as Supervisor Sheila Kuehl's Justice Deputy for two and a half years. Previously she held the position of Special Counsel to the Board of Supervisors on Child Welfare issues. Subsequently she held the position of County Counsel where she advised the Department of Children and Family Services; the Probation Department; and the Los Angeles Homeless Services Authority. Pawlowski has been an attorney for 19 years. She received her B.A. in Political Science and Communications from USC in 1997 and her law degree from Boston College in 2000.

While she worked at County Counsel, Ms. Pawlowski worked on ordinances that give bodies of oversight their authority. She was really aware of how that relationship is supposed to function. The Supervisor saw Ms. Pawlowski as a subject matter expert on ordinances because she knew them better than anyone else.

<u>Interaction with Sheriff's Department</u>

Most of Pawlowski's interactions with the Los Angeles County Sheriff's Department ("Sheriff's Department") are at the Assistant Sheriff level. Her work with the Sheriff's Department focuses on the jails. Supervisor Sheila Kuehl ("Supervisor Kuehl") called for the closure of the main jail in Los Angeles County. Much of Pawlowski's work has been focused on this issue. Pawlowski has dedicated a lot of time to learning how the jail operates. The Sheriff's Department has a board liaison and a board liaison team. This team advises Supervisor Kuehl's office of critical incidents.

As part of her work, Pawlowski meets in "clusters" that are attended by other justice deputies and County staff with subject matter knowledge of the matters to be placed on the Board of Supervisor meeting agenda. These meetings are scheduled by the CEO's office. Each week the cluster meeting agenda is based on who is on the Board of Supervisors meeting agenda. To facilitate these meetings the CEO invites the relevant county departments to speak on items noticed on the Board of Supervisors meeting agenda. Who is speaking at cluster depends on the items being considered that week. All five BOS offices are represented, and the public is also allowed to attend.

The public safety cluster gives Pawlowski a preview of the issues to be raised. It also gives her an opportunity to ask questions on behalf of Supervisor Kuehl. These sessions help Pawlowski and the other justice deputies make recommendations.

Pawlowski also attends informal briefings not open to the public. To address issues related to the pandemic, she attended a covid related briefing once a week.

1

    COLA002143

Interaction with Sheriff Alex Villanueva

Ms. Pawlowski does not have to interact directly with Sheriff Villanueva, but that is by deliberate design. She attended a few meetings with Sheriff Villanueva and Supervisor Kuehl, but it was not required. She sat in these meetings two or three times.

Sheriff Villanueva has not used abusive language directly toward Ms. Pawlowski or Supervisor Kuehl. However, during his Facebook Live sessions there was a time period when he repeatedly talked about the fact that the Board of Supervisors is comprised entirely of women. Similarly, he also commented on the gender composition of justice deputies.

Sheriff's Alex Villanueva's Facebook Live Sessions

Part of Ms. Pawlowski's responsibilities are to sit in on meetings and keep her bosses informed about what is happening in her portfolio. Ms. Pawlowski started listening to Sheriff Villanueva's Facebook live sessions to alert her bosses if he said anything newsworthy. Ms. Pawlowski could not recall how many Sheriff Villanueva Facebook Live sessions she has listened to. She has listened to them live and via a recorded session. Ms. Pawlowski has listened to just about every session since Sheriff Villanueva started doing them.

At the beginning it was just Ms. Pawlowski listening and taking notes. Somewhere along the way, she started to receive summaries of the sessions from the CEO's office, Countywide Communications Unit. Ms. Pawlowski did not know who sent them because she would receive them from Supervisor Kuehl's Communications Deputy. Lenny McGuire is in charge.

Sheriff Villanueva's Comments About the Justice Deputies

Initially Sheriff Villanueva started to call the justice deputies disparaging things. He said they know nothing about the law. It became so much, Ms. Pawlowski started to tune his comments out. Sheriff Villanueva called them "Woke 20 year old flunkies". During another exchange Sheriff Villanueva said it was all these women running the show. He asked the question, "what's up with it being all women?" He said it was not just the Supervisors, all the justice deputies were young 20 something woke and dumb women. Ms. Pawlowski was offended because Sheriff Villanueva portrayed them as puppets of the Supervisors who are young and dumb and don't know anything. Ms. Pawlowski said she is 46 years old, and has a 4 year old child. She is of Mexican descent and her children are mixed race. Ms. Pawlowski said she is a proud child of immigrants. She said portraying her as dumb, naive and not understanding during Sheriff Villanueva's Facebook live sessions was incredibly offensive to her.

Ms. Pawlowski considered filing a CPOE complaint. She has been in the county for a long time and experienced the process first-hand. She has little faith in the process. Ms. Pawlowski considered speaking to the press to tell them who they really are. She

2

COLA002144

pointed out that one of the justice deputies is male contrary to Sheriff Villanueva's remarks. Ms. Pawlowski said the press could do a write up about situation, but she was blown off and told it was not worth the time despite how he was portraying all of them.

Ms. Pawlowski speculated that Sheriff Villanueva was trying to undermine the justice deputies and get to the Supervisors. She had concerns that his comments about her and the others would influence the community and his deputies. She drives a county car and lives in a small town where the LA County Sheriff's deputies are very present. The justice deputies talked about this issue as a group and wondered if Sheriff Villanueva was gathering information about them. They had concerns that he would look up their addresses or try to impact them in some way. Ms. Pawlowski has not personally received any emails or texts based on Sheriff Villanueva's comments about the justice deputies. However, the community she lives in is different. She lives in one of the only conservative parts of the county. When she told anyone she worked for Supervisor Kuehl, she noticed that there would be a reaction. They would ask her, "isn't your boss anti-sheriff?"

Although she was not there and did not hear it personally, Ms. Pawlowski is aware of a recording of a Sheriff Villanueva event where he called them a bunch of flunkies. These comments occurred during a period of time when he was holding community town halls. The town hall occurred in East LA. Ms. Pawlowski did not know who recorded the event. She thought the recording was taken by a staff member.

Esther Lim

Sheriff Villanueva singled out Justice Deputy Esther Lim and highlighted her Twitter posts. A letter was written to the Board of Supervisors (BOS) informing them that she should be investigated and fired. He also wrote another letter to the BOS saying they had a fascist woman working on the board. Ms. Pawlowski said she saw that this affected Ms. Lim.

History of Intimidation of Women of Color

Sheriff Villanueva referred to Supervisor Hilda Solis as "La Malinche" in his Facebook Live session. La Malinche is commonly known as a traitor. He did not explain why he called her by his name. At the time, Supervisor Solis took up a BOS motion and he was on a rant about how the Supervisor was full of it. He commented that he would expect support from the one Latina on the BOS, but Supervisor Solis did not support him.

Sheriff Villanueva also made derogatory comments about Supervisor Kuehl. He also commented about Patty Giggins to the COC Commission. He accused her of collusion or the inappropriate granting of funds. He referred to her as corrupt several times.

Similarly, he suggested that Supervisor Holly Mitchell was corrupt and improperly benefited from some decisions she made.

3

COLA002145

<u>Max Huntsman</u>

Sheriff Villanueva commented about Max Huntsman, Inspector General, nonstop. Sheriff Villanueva called him "Gustav Huntsman," alluding that he was a child of a Nazi. Sheriff Villanueva has made his comments about Huntsman in writing. Ms. Pawlowski believes Sheriff Villanueva referenced it in a letter. He does not hide it. Sheriff Villanueva referred to Mr. Huntsman and said his real name was "Gustav." Ms. Pawlowski believed Sheriff Villanueva's comments were intended to be about Mr. Huntsman's national origin.

<u>KFI Radio Talk Show</u>

Sheriff Villanueva also commented about justice deputies on radio station KFI. Ms. Pawlowski said everything blended together. She listened to his comments in the different forums giving him space. She could not distinguish one from the other. They listened to all of his comments across various media platforms. Ms. Pawlowski believed some of it was captured and could be located by Lenny McGuire.

4

COLA002146

# INTERVIEW TRANSCRIPTS AND AUDIOS

COLA002147

**IV 2558101
AUDIOS AND
TRANSCRIPTS**

CONFIDENTIAL

# COMPLAINANT INTERVIEW

CONFIDENTIAL

COLA002149

**REFER TO INTERVIEW TRANSCRIPTS AND AUDIO CD**

**1. COMPLAINANT ESTHER LIM**

**COLA002150**

**IV 2558101**

**WITNESS INTERVIEW**

**JUSTICE DEPUTY ESTHER LIM**

**Herrera:**    So my name is Christine Diaz Herrera. I am an attorney with the Law Firm of Sanders Roberts. I have been hired by the county to be an independent investigator. So I'm here in that capacity. I'm a neutral third party and a factfinder. While I don't make any kind of determinations regarding discipline or anything of that manner, I will, you know, certainly conduct interviews and engage in factfinding, regarding the allegations that you've submitted. Let's see here. As a county employee there's an expectation that you'll be honest and truthful, not withhold any relevant information and cooperate with the investigation. This is confidential and so that means that what you tell me I'm not going to be sharing with every single person that I talk to, you know, in subsequent interviews. We do ask that you keep the substance of our interview confidential. Now certainly the fact that you spoke to me or that the investigation exists, does not have to be confidential and I leave that to your discretion of, you know, who'd you want to share that with, but we do ask that the questions themselves remain confidential. Also the.. both, you know, at a county, state and federal level, retaliation is not tolerated so we- if you feel like you've been a victim of retaliation in any way for your participation here today, that's something I would want you to let me know immediately so that I could have that addressed. Likewise we ask that you don't retaliate against anyone participating in this investigation. All allegations of retaliation are, taken very seriously. Today is July 28th 2022. It is 1:17 PM and, could you say your name for the record?

**Lim:**    Esther Lim.

**Herrera:**    Perfect. I don't know if you have any questions for me before we get started.

**Lim:**    So after this process, what's next? I'm just kinda curious about next steps.

**Herrera:**    So then I- once I complete this investigation, I would, draft a report and then that report would be given to County Counsel. And then my understanding is is from there they have their own process for assessing, you know, whether discipline's appropriate or, you know, all

CONFIDENTIAL                                                                      COLA002151

of that. I don't actually have any role in that part. So the next steps would be me completing the investigation and submitting my report.

**Lim:**     M-hm. And then kinda prior to- 'cause I was looking things over. My complaint was filed in March, and so I'm just kinda curious what was done between March and, like, now. So in the last kind of, like, four months.

**Herrera:**     Yeah, I don't have any kind of information about what their process was or what they had done. I do know that there is an intake process where they've gathered information and I believe, you know, you've been interviewed for that intake process. And then I think, at that point it gets- I'm sure that there's some type of internal process and then they decide whether or not it's, you know, appropriate to go to an external investigator to stay, you know, within the county process and in this case obviously, it's been, you know, sent to an external investigator, which is me. So I don't know what has happened all in those months. I do know that we were recently given this investigation and so we're, you know, now acting on that and I think you have every reason to expect that it'll be handled judici- you know, what's the word.. timely. And, you know, it's certainly our interest to get it, you know, to be as thorough and comprehensive as possible but also as timely as possible as well.

**Lim:**     From the previous kind of, you know, process, was any of the materials provided to you in terms of, like, what they've done or, you know, the intake materials or anything like that?

**Herrera:**     I do have the intake materials. And I do have, you know, I believe the interview itself, like the intake interview, I do have the notes from that. So. But, you know, we will be covering a lot of the same ground in the sense that things that you've told them I'm going to ask you about. So there will be some repeat obviously.

**Lim:**     Okay. And do you have a sense in terms of, what's been done with the person that I've complained to- or complained about? What I'm complaining about?

**Herrera:**     I'm sorry, I don't know--

**Lim:**     'Cause my complaint is against the sheriff and so do we know in terms of, like, the process, like, what's been done, like, with him? Like, has he been interviewed? Is he also, you know, part of this process as well?

**CONFIDENTIAL**                                                                                                          **COLA002152**

| | |
|---|---|
| **Herrera:** | Those are not questions that I would be able to answer for you 'cause obviously that's a separate, you know, when someone's a subject. I mean certainly what I can tell you is that when someone is a subject of, you know, an investigation of this nature, they are notified. So I am aware that he, you know, certainly he would've been notified that there's an investigation, although the details would not've been, you know, would not've been provided to him. But certainly there's notification 'cause that's the county's process. But other than that, I wouldn't be able to share any further information. |
| **Lim:** | Okay. Sounds good. |
| **Herrera:** | Let's see, so background. I usually start with a little bit of background. How long have you worked for the county? |
| **Lim:** | Since June of 2020. |
| **Herrera:** | And, which department or who did you start working with? |
| **Lim:** | So I work for the Board of Supervisors, specifically for Supervisor Hilda Solis, who is supervisor of the first district, and I serve as her justice deputy. |
| **Herrera:** | So were you hired in as her justice deputy? |
| **Lim:** | [inaudible] |
| **Herrera:** | And, what are your duties? |
| **Lim:** | So I handle her public safety and justice portfolio; I oversee the Public Safety Department including, you know, the Sheriff's Department, Probation, APB, PD, DA; I assist in, you know, drafting motions, statements, remarks, related to public safety, specifically the supervisors, you know, agenda on public safety; I, you know, serve as the liaison for the supervisor with the various public safety departments including the oversight entities; I engage with community members on this; I go and visit and monitor the jails and the juvenile correctional facilities. |
| **Herrera:** | And, what type of monitoring- like, how do you monitor them? |
| **Lim:** | So going into the actual facilities, into the jails, into the halls and camps and, you know, talking with folks who are in there, you know. Just observing what I'm seeing and, you know, and reporting it to either- reporting it both to oversight entities and also to, to my boss. |

**IAB IV 2558101**              **Page 3 of 22**                    **ESTHER LIM**

CONFIDENTIAL                                                           COLA002153

**Herrera:**    And what oversight entities do you interact with?

**Lim:**    The Probation Oversight Commission, the Office of Inspector General, the Sheriff Civilian Oversight Commission, Sybil Brand Commission.

**Herrera:**    I'm sorry, what was the last one you said?

**Lim:**    Sybil Brand.

**Herrera:**    Okay. And you said the Sheriff Oversight--

**Lim:**    Sheriff Civilian Oversight Commission.

**Herrera:**    Sorry I was not hired for my typing abilities so, I try my best. Luckily this is recorded so I guess if I needed to I could go back, but- I generally like to make sure I understand before I move on. And so.. and who do you report to?

**Lim:**    To my Chief of Staff Cindy Chen and then also to the supervisor, Hilda Solis.

**Herrera:**    Okay. And, prior to doing this work, what had you been- what type of work were you performing prior to this position as the justice deputy?

**Lim:**    So I was at the ACLU of Southern California for almost a decade.

**Herrera:**    And what type of work did you focus on while you were at the ACLU?

**Lim:**    Law enforcement accountability and jail conditions.

**Herrera:**    So was there any overlap in terms of, like, that there were groups that you had already been interacting with and then that continued in your new role as justice deputy?

**Lim:**    M-hm. So while I was at the ACLU I did interact with the sheriff's department, with, you know, with the board of supervisors, you know, with oversight entities, specifically the OIG and the Sheriff Civilian Oversight Commission and that continued obviously in this role.

**Herrera:**    So, for the basis of your complaint, my understanding is that there was a statement, a July 28th statement, in 2021 by the sheriff in his Facebook Live?

**IAB IV 2558101**              **Page 4 of 22**              **ESTHER LIM**

**CONFIDENTIAL**                                                        **COLA002154**

**Lim:**          Yeah, there are at least four.. four incidents. I'm sure there are others. I just have not reviewed every single one of his Facebook Lives.

**Herrera:**     Okay. So can you walk me through the four different incidences?

**Lim:**          Yeah, so one was on July 28th 2021, interestingly exactly a year ago. So the sheriff, while he was in uniform, he frequently goes on Facebook Live and this time he did and he talked about one of the motions that I had drafted on behalf of the supervisor; made comments, you know, to his audience, you know, the live audience and also audience members who, you know, look at his Facebook Live after, and I think his quote was 'I don't think the public realizes when the Board of Supervisors write these motions these are written by their justice deputies, who are some 20-something woke individuals who are basically putting in words what doesn't pass legal muster at all.'

**Herrera:**     And, what was the specific motion he was referencing that day?

**Lim:**          So this one was related to a motion that the supervisor put forward the day before on July 27th, and this one was called 'Taking Action For The Protection For Surviving Families From Law Enforcement Harassment and Retaliation'. And in the video, he was holding and reading from, from the motion.

**Herrera:**     And so, it was, the motion that he was reading was drafted by you?

**Lim:**          M-hm.

**Herrera:**     Okay. And was there anyone else that had also participated in drafting the motion?

**Lim:**          No.

**Herrera:**     Did you have any knowledge of whether he, had awareness that it was you specifically?

**Lim:**          The motions have, not only the supervisor's initial but the initials of the deputies who drafted it. So my initials are on there. And he does know who I am.

**Herrera:**     And how do you know that?

**Lim:**          So when I was at the ACLU, we had a working relationship then, and in.. I'm gonna say, I think it was February of 2021, he had written a letter to- addressed to Supervisor Solis, cc'd all the board of

**IAB IV 2558101**          **Page 5 of 22**          **ESTHER LIM**

CONFIDENTIAL                                                            COLA002155

supervisors, the CEO - this is also kind of part of the, you know, the harassment - and had, with no justification, opened up a, I guess an investigation into my social media accounts, in his attempt to get me fired. And the OIG and I believe the COC but definitely the OIG has actually requested information from the sheriff's department and the sheriff in terms of why they thought it was appropriate to, open up an investigation into my social media accounts, which they have yet to this day have not provided any sort of documentation or justification to them.

**Herrera:**    Okay. And, had you been, you personally, had you been critical of the sheriff in the past?

**Lim:**    Yes 'cause that's part of the accountability that the board of supervisors does. We are critical of the sheriff's department and the sheriff when they engage in misconduct and are not transparent and are not being held accountable or refuse to be held accountable, and does not, you know, when he doesn't collaborate and cooperate with oversight entities, then yes, we are critical.

**Herrera:**    And, in what way would he have been aware of- I mean.. So when he hasn't cooperated, like let's say, for example, with the Oversight Commission, is it something that your office addresses? Like, how is that addressed by your office if he's not, for example, cooperating.

**Lim:**    Yes. So hier-, like in hierarchy-wise, you know, the board of supervisors, right? is the governance over all of the county departments and that does include the sheriff's department including all the department heads. Even though the sheriff is an elected official, he's still, right?, like there's still supervisory authority that the board of supervisors has. My boss is one of five, and so, you know, we as a justice deputy, as a representative of the supervisor, right, like that's part of the hierarchy and how we hold them accountable. And why we would hold them accountable.

**Herrera:**    Well I think what I was asking is more specific in the sense that, like, I'm just trying to take something piece by piece. So for example, if he didn't cooperate or, you know, maybe attend a Commission meeting, an Oversight Commission meeting, what if any response does your office give? Like is there a letter that they send, like 'Hey you should've attended' or is it brought up in a board meeting? I guess that's what I'm asking is, what kind of response is there if- something like that.

**Lim:**    Something is brought up in a board meeting through motions and we also have the oversight entities or also a representative of the

**IAB IV 2558101**                **Page 6 of 22**                **ESTHER LIM**

CONFIDENTIAL                                                                COLA002156

supervisor, and so that's why the supervisor has oversight entities, so that when the sheriff's department isn't complying or is engaging in misconduct, these oversight entities will, you know, do what they need to do and sometimes that takes the form of, you know, issuing subpoenas to, you know, force the sheriff or his representatives to attend and, you know, talk about whatever, you know, incidents that they engaged in. Other forms, you know, the way that the supervisors will, you know, hold the sheriff's department and the sheriff accountable is through motions, and in this particular one, we were hearing from constituents that they were being harassed by deputies in the sheriff's department, whose loved ones were, you know, shot and killed and these deputies are harassing them and so, you know, given that we kept hearing this, the supervisor decided to do a motion. And she's done, you know, actually many motions, related to sheriff accountability, to basically highlight, you know, this issue that it is, you know, misconduct; it's harassment; it's retaliation. And that the sheriff's department should [inaudible]

**Herrera:** Okay. And I guess what I was asking too is, you know, is there anything - and I know this is kind of a broad question, but - is there anything that you would've done prior to him coming, you know, writing that letter on February 2021 - yeah, 2021 - that would've focused- that he would've known it was you, that it was your work, or. Was there anything in particular that, you know, that would've brought his attention to you, right? 'Cause you're one staff of, you know, a whole office. Like, is there any reason why he would've focused on you that you're aware of?

**Lim:** Because my role at the ACLU was also the same: being critical of the sheriff and the sheriff's department. So, you know, being the sheriff, he would've been part of that. I've done several motions related to, you know, sheriff accountability and so, you know, that would probably flag for him that.. you know, that I'm her justice deputy. You know, my information is on the website, seeing as I'm the supervisor's justice deputy.

**Herrera:** Okay. And had you been critical of him in your own personal social media?

**Lim:** Yes.

**Herrera:** And is your social media public?

**Lim:** It is.

**IAB IV 2558101**              **Page 7 of 22**              **ESTHER LIM**

CONFIDENTIAL
COLA002157

**Herrera:**     So he may have also been aware just based on your own social media postings?

**Lim:**     Probably.

**Herrera:**     Okay. And so, when he says, you know, 'these are 20-something woke individuals', are you yourself, are you in your 20s?

**Lim:**     No I'm not.

**Herrera:**     Do you have any reason to believe that he would even know your age or have any sense of how young you are?

**Lim:**     No, and I think it's completely inappropriate 'cause he's- You know, these comments are incredibly disparaging. I mean, not just like being ageist, but also, you know, when he's saying that 'doesn't pass legal muster', right? Like trying to disparage our, like, educational and intellectual levels.

**Herrera:**     Okay. And.. and how did you become aware of the, the Facebook Live meeting?

**Lim:**     So sometimes our county coms, County Communications, will send us a transcript, of his Facebook Lives and I believe that's how I knew about this one. I typically don't, like, actively listen to his, his Facebook Lives or, you know, other justice deputies might've also heard the Communications deputy. So, yeah, so that's how we know about the--

**Herrera:**     You don't have it in transcript?

**Lim:**     I- I would have to go back, but again, all of his Facebook Lives are on the sheriff's department Facebook website. It's all there, in terms of, like, all the videos and everything else.

**Herrera:**     So to your knowledge that Facebook Live is still available on his Facebook page?

**Lim:**     Probably. I don't think he's deleting. And, you know, I mean, I'm providing, like, four examples, but again, I have not listened to every single one of his Facebook Lives, so there very well could be, like, more examples of him being, you know, disparaging to me and other justice deputies and other, you know, staff.

**IAB IV 2558101**                    **Page 8 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**                                                                **COLA002158**

**Herrera:**    Other than the letter that you referenced, from February 2021, has he ever specifically said your name or, like, raised an issue with you? Other than the February letter?

**Lim:**    Yes. In a February '22 letter, he also did the same thing, saying why the supervisor, you know, had not, like, disciplined me. So there was another '22- 2022 letter that basically says the same thing. There was a community townhall meeting where, where obviously we recognize each other and during the, during the meeting, he turned to me in front of the audience and said - I do not remember the exact quote, but it was basically, you know, like 'Esther, go tell your boss that I wanna' like, you know, 'that I wanna debate her.'

**Herrera:**    Okay. And what was this- when was the townhall meeting?

**Lim:**    You know, I don't remember. It's not, it's not part of the four examples, but you know, you're question obviously, like, reminded me of, like, when he, you know, said my name. So that was one and obviously the two letters, the 2021 letter and the 2022 letter, was directly about, was directly about me, so.

**Herrera:**    Was the- Do you believe the community townhall meeting, was it this year?

**Lim:**    No. It was.. I'm going to say maybe it was last year.

**Herrera:**    After the pandemic but.. that's how I almost see things now, like, you know, is it prior to 2020 or, you know.

**Lim:**    Yeah. It was definitely last year. I can't even tell you, like, when last year but, yeah, I'm not sure.

**Herrera:**    Okay. And, are you, are you often in meetings or in places where you're both and in his presence?

**Lim:**    I mean because I'm her justice deputy and so whenever there is a public safety-related kind of meeting or community townhall, I do go. Our field deputies also go as well, so it's not like I go to all of them. If he is going to be there, I typically am.. assigned to go. So I would say in the, you know, almost two-and-a-half years that I've been, you know, in this position, I probably have seen the sheriff a handful of times.

**Herrera:**    And does he attend board meetings?

**IAB IV 2558101**                    **Page 9 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**                                                                        **COLA002159**

**Lim:**       So our board meetings are all virtual, but he has- Yeah, but he does- You know, he has attended virtually and provided, you know, public comments. Where he also, you know, makes disparaging comments about the justice deputies and also about the board of supervisors as well.

**Herrera:**   So he has made disparaging comments that include you--

**Lim:**       M-hm.

**Herrera:**   --during those meetings as well.

**Lim:**       Yeah, m-hm.

**Herrera:**   And, and are those comments along the lines of these two about you being woke or whatnot?

**Lim:**       Being woke, not passing legal muster. In fact, the comments that he made on the 28th I believe - again, I could be wrong, but - I believe that on the 27th when the motion was actually issued, that he provided public comments, and made these remarks.

**Herrera:**   So he may have repeated the same remarks that- Okay.

**Lim:**       M-hm.

**Herrera:**   And, to your knowledge, where would I- is there a place where I could view it? Is it just online? The board--

**Lim:**       Yeah, so the Board of Supervisors' agenda and there is a, a search function where you can look at, like, the transcripts.

**Herrera:**   Okay. Got it. And so then kind of going next to July 28th, right, I believe there was.. No wait, that was the--

**Lim:**       Yeah, so this is that one, yeah.

**Herrera:**   --the one we already did. Okay, we already did that one. So then I think there's another one that's February 16th and, I believe it--

**Lim:**       Well there was one- Yeah, there was actually one before that, so October 6th 2021 during another Facebook Live, the sheriff said, quote 'You hear me loud and clear now because if you're.. 'because if you're not watching their entire thing I'm pretty sure your flunkies are going to listen to the whole thing and report back to you.' And so he was making

**IAB IV 2558101**              **Page 10 of 22**                    **ESTHER LIM**

CONFIDENTIAL                                                                    COLA002160

that comment to the board of supervisors. Obviously the board of supervisors wasn't listening to his Facebook Live. '..and the flunkies at these' you know, pejoratively describing our- me and other justice deputies.

**Herrera:**    Did he specifically reference the justice deputies or just all county staff or?

**Lim:**    It would be the justice deputies because we're the ones that, you know, are the liaison to the sheriff's department, and so it would be the justice deputies because they work on the public safety portfolio. You know, we would be the ones reporting to our supervisors.

**Herrera:**    Got it. And then, when was the next statement or thing?

**Lim:**    Then the next one was on February 16th. So this one was actually something that another justice deputy had shared with me, that the sheriff was at a community townhall and the quote was 'All the supervisors have 25-year-old justice deputies who are right out of college and writing all their motions.' So that was, you know, another incident.

**Herrera:**    And, did you find that offensive?

**Lim:**    I did.

**Herrera:**    And why did you find it offensive?

**Lim:**    One, I think it's an ageist comment. You know, assuming our ages, and then, you know, saying that we're right out of college, trying to minimize again our education, our intellect, you know, and we're, you know, writing all their motions. I mean that's what, that's what policy deputies do. But, you know- It's not just the fact that he's just making these comments. I think, you know, the weight of his words as a sheriff of Los Angeles County, and then stating these state- making these statements in a very public platform, you know, with- potentially with people who, you know, could engage in, you know, possibly, you know, like.. violent, dangerous, who knows, to retaliate against us, I think, you know, just kind of poses some safety concerns. I also think it's being incredibly unprofessional.

**Herrera:**    And.. have you, you know, after his comments, after the comments that he's made, have you ever witnessed an uptick in negative attention or commentary on your social media platform? Like, any of your social media accounts?

**IAB IV 2558101**          **Page 11 of 22**          **ESTHER LIM**

**CONFIDENTIAL**          COLA002161

**Lim:**      So I don't use my social media accounts anymore, but, you know, there are comments made, you know, under, like, the supervisor's social media accounts, 'cause she has social media accounts where they, you know, use disparaging kind of comments there. There was another Facebook Live where the supervisor was issuing a reward to assist a sheriff's department investigation, where I did provide remarks and some of the comments that were made under that Facebook Live comments, you know, there was comments about me under there.. yeah. I'm just, like, not tracking every single kind of one, right? But…

**Herrera:**      I'm just wondering if you had noticed, 'cause obviously there could be an element of people that pay attention to him or, you know, like him that, you know, could be dangerous. So I'm wondering if you had seen any type of, like, any kind of threat to you or any kind of, like, negative comment to you based on, you know…

**Lim:**      Yeah. I mean, the one that I recall is the comment that was made, when I was providing remarks on behalf of the supervisor for the reward.

**Herrera:**      You made remarks on what day?

**Lim:**      I'm going to have to find that for you.

**Herrera:**      Okay. Maybe- and was it, it was on Facebook Live that you made the comments?

**Lim:**      Said something? Yeah, it was on Facebook Live. The supervisor had issued a, I believe it was a 20,000 or 25,000 reward to assist in three homicide investigations. I provided remarks and then under the, you know, under the Facebook Live comments, there was something directly on me.

**Herrera:**      Okay. 'Cause I think those are still saved too. If that Facebook Live still exists, I think I can still--

**Lim:**      All the comments and everything, yep, are saved as well. And also, I'm kinda curious too on all these other Facebook Lives if comments were also made there and then. I just have not checked on those.

**Herrera:**      Yeah and I'm certain that I will now go through, and check them myself. But, you know, anything, any help you can give me with respect to dates that I make sure that I see, you know, obviously I'd appreciate it. But I will certainly do my own review.

**IAB IV 2558101**               **Page 12 of 22**               **ESTHER LIM**

CONFIDENTIAL                                                    COLA002162

**Lim:**    Of the two, right? the July 28th and the October 6th, are ones that I know of. But again, as I shared, he- you'll see that there are many many many Facebook Lives, and he does use a Facebook Live to be disparaging and, and just really negative and just, like, harassing and intimidating, you know, the supervisors and also, you know, the staff that work for, you know, work for her, work for the respective supervisors, specifically the justice deputies in general.

**Herrera:**    And, you know, I didn't ask in the background but I should've. When did you get your undergrad degree? And in what? What school did you go to, what was your degree in and what year did you graduate?

**Lim:**    Can I ask about these questions? Like, why, like what I did before and how it pertains to this?

**Herrera:**    Just background information.

**Lim:**    Okay. So.. I graduated in 2006 and then graduated grad school in 2010.

**Herrera:**    Okay. And what school did you go to for undergrad?

**Lim:**    Long Beach State, and USC.

**Herrera:**    Okay. And, did you- were you awarded a BA at Long Beach State?

**Lim:**    Yes.

**Herrera:**    Okay. And what was the subject matter?

**Lim:**    Criminal justice.

**Herrera:**    Okay. And the, was it a master's at USC or a?

**Lim:**    Masters in social work.

**Herrera:**    And so then, I know one of the things that was in the intake was that, you reported that there's been a history of the sheriff trying to intimidate women of color and I wanted to know if you could expand on that a bit more and give me more information in terms of…

**Lim:**    Yeah, so he's made comments about the supervisors. Right now we have an all-women board, so he's also made misogynistic comments about the board. You know, saying that he wanted to take all of the board of supervisors to a shed and beat them. He's made comments, a racist sexist slur against my boss, who is Latina. He called her La

**IAB IV 2558101**                    **Page 13 of 22**                    **ESTHER LIM**

Malinche. You know, he also made disparaging comments about another supervisor, Holly Mitchell, who is, who's a black woman; has intimidated and harassed our former CEO who was an Asian woman; harassed and intimidated members of the Sheriff's Civilian Oversight Commission, many of them women, including one of the chairs who is a black woman. I mean he just, you know.

**Herrera:** And when you say- Can you give me some where you said he harassed the former CEO who was an Asian woman. Do you have any more specific about what he did or said or?

**Lim:** Like, opened up a criminal investigation, like, on her in a way to intimidate her. Basically anyone who has the responsibility of overseeing the sheriff and the sheriff's department, he has either tried to open up these arbitrary, like, you know, no reason investigations, criminal or not, to, you know, silence folks. In my time as justice deputy, you know, like, on behalf of the supervisor I have, you know, drafted many motions around sheriff accountability because of the misconduct that he and his department engages in, and as a result he goes after Supervisor Solis and he also goes after me. Yeah.

**Herrera:** What did he say about- you said he made negative comments about.. Supervisor Holly Mitchell. Do you recall what he said?

**Lim:** I don't really recall, but, what he exactly says, but, you know, when he's saying that, you know, that we 'worship at the altar of wokeness' or we're 'engaging in an orgy of wokeness'. You know, comments like that. And again, you know, like the general comment about, like, that he wants to take the Board to the shed and beat them. Like, it's just, just completely inappropriate.

**Herrera:** And when he makes these comments is it typically during board meetings so that'd be something I would see in the minutes or something of that nature?

**Lim:** It'd be in the board minutes or it would be in his Facebook Lives. And honestly I cannot tell you which one, but he pretty much goes after the board probably in every single one of those Facebook Lives.

**Herrera:** I think- I know you had said that there was four things that you were going to tell me. So is there--

**Lim:** So the other one, which I kind of mentioned, right?, were the two letters that he wrote. One was in February of 2021 and then the other one was in, I think it was March of 2022.

**IAB IV 2558101**          **Page 14 of 22**          **ESTHER LIM**

**Herrera:**    And in those letters, I think, was he saying that you were--

**Lim:**    Oh you know what? Sorry, my bad. He- So yes, in addition to the 2022 letter, he also in a Facebook Live made.. during a Facebook Live I guess someone had a question about, like, why are there only women on the board and on staff? His quote was 'Good question.' They talk about inclusivity, no male justice deputy staff. 'The board should explain why they exclude men from their ranks. The people they hire are all 20-something fresh out of college, don't have a lot of senior people, woke flunkies straight out of college, first job. That's who writes the nonsense board letters.' And there is, you know, a male justice deputy and that, you know, is from the second district. So there's that. But again, you know, the comments around, like, you know, we're all, like, 20-something, we're fresh out of college, da-da-da-da-da, nonsense board orders…

**Herrera:**    Okay and I think the July 27th, the comments were regarding your motion taking action, right? So there's that. And, so for that letter that he wrote about you in February of 2021 regarding, like, I believe it was your social media accounts, is that correct? Was there- Did he ever reference that? So, am I correct in assuming, did he bring this up in a board meeting or was this just a letter that he sent in or?

**Lim:**    Yes. So he sent it in a letter. I believe he also shared it with KFI, the radio station AM 640. So it got coverage there and it just kind of ended there. But again, you know, it was unjustified in that the Office of the Inspector General also, you know, got involved in terms of requesting, you know, the justification and the reason why the sheriff, or the sheriff's department, would even.. investigate my personal social media accounts.

**Herrera:**    And did you have any knowledge or any information given to you that, that the investigation went beyond just looking at your public social media accounts?

**Lim:**    So, the OIG never got any sort of information from the sheriff's department as to the what, you know, the why, the what or anything like that. We just know that they went through my social media accounts, and then they used that to- or he used that to write the letter to my boss in an attempt to get me terminated. In 2021 and also in 2022.

**Herrera:**    And, to your knowledge is there anything in county policy that would.. prevent you from making any of the commentary that you made in your social media?

**IAB IV 2558101**              **Page 15 of 22**                    **ESTHER LIM**

**CONFIDENTIAL**                                                                                    **COLA002165**

**Lim:**    I don't believe so. When the incident happened.. I think we had made-basically had made a joint decision that I just would not use my social media account. Not that there was, you know, a policy per se, but we just figured I just won't, like, use it. Because I do know that there are other justice deputies who've had, like, social media accounts.

**Herrera:**    But that wasn't based on there being any type of policy. It's just you thought to avoid further--

**Lim:**    To avoid further, like, you know, harassment from the sheriff.

**Herrera:**    M-hm. And in any of those social media posts, did any of his supporters or followers try to harass you through any of those, like, old social media posts that are still up? Like, did anything that's in there, did you get any negative attention based on--

**Lim:**    Yeah, I mean I have not been on it so I don't know, but I know, like, screenshots were taken.

**Herrera:**    Uh-huh.

**Lim:**    But I've had this social media account since, like, 2011, and, you know, we were encouraged to use our social media accounts, at my former job at the ACLU. So, it's our personal account and the bio, right? and the Twitter bio, it all says, right?, like these are our personal tweets, right, they're not a reflection of, you know, who we work for or where we work for, you know, that kind of thing. So that disclaimer is part of our bio.

**Herrera:**    And to your knowledge, were the screenshots all, like, on a public page so nothing was, like.. protected or?

**Lim:**    Yeah. So my account, my account's public, so it's not a private account.

**Herrera:**    And this is a Twitter account, correct?

**Lim:**    M-hm.

**Herrera:**    Let me just make sure I've gone through.. Is there anything else, any other examples or any other.. like any other information that I should know that kind of, that evidence of, that support the allegation?

**Lim:**    I mean, I have a part of my CPOE complaint. I did list, I believe it was three witnesses, you know, to the harassment. In many ways they were

**CONFIDENTIAL**                                                                          **COLA002166**

also kind of victims of the harassment too. And, I don't know if that's, you know, if you're going to interview them as well as part of the investigation.

**Herrera:** [indiscernible]

**Lim:** Okay.

**Herrera:** Can you give me their names again? Just to make sure I have it.

**Lim:** Yeah. So it's Veronica Pawlowski, who is the justice deputy for the third district, and Kyla Coates, who is the justice deputy for the second district- sorry, the fourth district, and Inspector General Max Huntsman.

**Herrera:** Okay. Got it. And, to the notes that I have here, the- some of the comments were related to Ms. Coates directly, correct?

**Lim:** Yes. So the, the community townhall in February 2022, the community townhall happened in her district. And so, yeah, so she had heard about the comments made and shared them with me.

**Herrera:** And, did she tell you via email, via phone, or like, is there any kind of.. contemporaneous account of exactly what was said? Although I'm--

**Lim:** I think she might've either, emailed or, you know, told me about it.

**Herrera:** And did she share with you that she also felt offended by the comments that he had made?

**Lim:** Yes. So, you know, I don't think that they file their own CPOE complaints. You know, largely because they- typically people who do make complaints about the sheriff, they get, you know, harassed and intimidated. And so they kinda didn't want to go through that, but they were open to at least being witnesses for my complaint. But they have also been, you know, subjected to kind of the same, like, comments and impact.

**Herrera:** And Ms. Veronica Pawlowski, what did she witness?

**Lim:** So she has, you know, sort of listened to the Facebook Live, you know, during board meetings when he's making these comments. You know, we're all listening to it, so she I'm sure has listened to comments, you know, these comments being made.

IAB IV 2558101                    Page 17 of 22                    ESTHER LIM

CONFIDENTIAL                                                                    COLA002167

**Herrera:**      And has she communicated to you that she was also offended by the comments?

**Lim:**      Yes. Oh I almost forgot. He also filed a CPOE complaint against me back in 2021. An investigation was done within a month, and basically the response to his CPOE complaint against me was that, the complaints don't present a potential violation because no protected characteristic was involved and the allegations did not sufficiently connect equity to the conduct.

**Herrera:**      And, did you believe that he had filed that to harass you?

**Lim:**      Yes. Again as his way of trying to get me fired.

**Herrera:**      Is there any actions- any other direct actions that he's taken against you or, like, that he's taken either directly against you or indirectly? Like mentioning you? Is there anything else?

**Lim:**      I'm not trying to be difficult. I just think it's hard because I don't listen to every single thing that he says. And he- you'll find, Christine, that, like, he frequently goes on Facebook Live and he frequently goes on, like, Twitter and his own social media accounts. He also had his own, like, radio show with AM 640, you know, so I'm sure he's, you know, making comments there. I just- you know, I have, right, like we have jobs; I have things to do; not just, like, listen to all of his stuff. Unfortunately you're going to have to do some of that, I'm sorry- But yeah, he- I know that he does do this. I just have not, right, like listened to every single one. But I am certain that it's more than the four kind of examples I have provided. These are kind of examples of the types of comments that he makes. And at least, you know, his two letters about me and his filing the CPOE complaint I believe are, like, the way that he wanted to get me fired, try to intimidate me and harass me. So there's at least, like, three examples of him doing that directly to me. The July 2021, I mean that was one example of him, you know, actually, like, showing the motion that I had drafted and connecting those comments, you know, to me. And then his kind of general comments about justice deputies, you know, made about me and my other colleagues.

**Herrera:**      M-hm. And.. you know, I'm going to ask this because I think it's important for me to, you know, have both sides. His comments in his letter to you, I believe he's saying that, you know, they're vulgar and bullying. So he is accusing you of being vulgar and bullying and using profanity and all of that. Do you have any response to that kind of, you know- 'Cause I have seen the tweets and some of them, you know, do use profanity and are directed at him. So do you think there's any merit

**IAB IV 2558101**          **Page 18 of 22**          **ESTHER LIM**

to what he's saying in terms of just the language itself was.. profane and not--

**Lim:**          The language that's used does use profanity.

**Herrera:**     Yeah.

**Lim:**          You know, and so whether that's vulgar I think is subjective. But in terms of the comments and the stuff that he's doing using his platform and who he is and who he represents and the power and influence that he has, and his, I would say, documented history of harassing, intimidating other, you know, people who, you know, oversee him, I think is dangerous. I can't open up a criminal investigation on him whereas, you know, he is using county resources and his influence and power to open up an investigation against me with no justification even when the inspector general requests that information. There's documented history of him opening up criminal investigations against members of the Sheriff Civilian Oversight Commission, who've been, you know, appointed to oversee him. So this is more than just like a complaint against Alex Villanueva; it's a complaint against, you know, as I stated earlier, this is the sheriff of LA County, the largest sheriff's department, you know, in the country, with, you know, access to resources that I, you know, don't have. I don't have the platform that he does, to, you know, possibly incite, you know, people to engage in, you know, possible, you know, who knows what, that endangers not only, you know, my safety and the safety of others.

**Herrera:**     Fair point. I just figured I, you know, since I have you here it's important to ask, you know. 'Cause he is essentially saying that you're- he's saying that you're bullying him, the sheriff of Los Angeles, so, you know, I'm just curious the response. And I think that's a- I think I understand what you're saying here. And I think that's all the questions I have. It may be necessary, 'cause what I'm going to do obviously as part of the investigation is I'm going to have to listen to a lot of the Facebook Lives to make sure that I've kind of captured anything that could've touched on you and that's a reference to you. So I may have to, come back to you. I don't always have to come back in terms of once I've conducted, you know, the introductory interview, but I may have to come back to you if I find that there's a lot more that he's referenced just to ask you about it and to see, you know, if, you know.

**Lim:**          Totally. I'm very curious about what he said. Do you have, do you have the- I'm not sure as part of the materials that you have, along with my CPOE complaint I had also submitted a letter and the letter does have, like, at least a URLs, the links to at least the--

**CONFIDENTIAL**                                                                                          **COLA002169**

**Herrera:**    I don't believe I have that, no.

**Lim:**    Okay.

**Herrera:**    So if you could send that to me. I can also ask my contact to send it to me as well 'cause it sounds like…

**Lim:**    Yeah 'cause that one at least does hyperlink to the three: the July 2021, the.. October one and I believe the March Facebook Lives. But also--

**Herrera:**    If you can send that to me, I would appreciate it, but I will also reach out to my contact to make sure that if there's anything- 'cause I do believe I am missing that. I have what- I think they call it the, the Policy of Equity report, like a notification form, and so that has a lot of, you know, the information, the pertinent information and then I have the actual intake form. Or, I guess I forget what the term is for this, but it essentially is- I think it's, like, seven, eight- it's several pages long. It's the Intake Assessment Form and so it has a lot of reference, you know, all the information in there, but I don't have the letter. So if there is a letter, I would appreciate having it.

**Lim:**    I mean, the other thing too is, the sheriff's department - again, this is the other thing too, is, these are, you know, things that he's doing on a, like, a county- he's using a county account. This isn't his personal Alex Villanueva's Facebook. This is a sheriff's department Facebook site. But if you go on there, right? Like, the videos are arranged chronologically. So, since you have the dates, you would at least be able to see, like, the examples that I shared. But again, right, like I'm sure, at least Facebook Lives are fairly long.

**Herrera:**    Now I'm curious, is there any- I don't know if you are, if you have motions at every board of supervisors meeting or if there's only- I mean, I wonder, is there a general, like, listing of the motions that would've come from you or from the justice deputy so that I could maybe cross-reference between the dates of memos and then the dates of, you know, the board of supervisors meetings or Facebook Lives? You know, if there's, like, maybe some particularly.. I don't know. I don't know if everything you do is controversial - it might be - but I'm wondering if there's any way to conference.

**Lim:**    Yeah, it's not controversial to us because, one, it's the board doing it and it's the board that supports these motions, right? It's controversial to him because it's about holding him accountable.

**IAB IV 2558101**              **Page 20 of 22**              **ESTHER LIM**

**Herrera:**     But that's what I'm saying. I don't know if there's any of that where, like, maybe particularly more of interest to him because maybe they were calling him out more directly. Like, for example, you know, I was reading about his- the commission and him not showing up and the subpoena and all of that. So, you know, I'm assuming that there might've been discussion about that in a board meeting or maybe even a motion about that. So that's what I'm saying. Like, if there's any way to, like, have a- if there's anywhere to look to see a better sense of, like, dates where I might have more fertile ground to look at? 'Cause he might be annoyed.

**Lim:**     I could definitely- yeah, I can look at the ones that I have done, typically.. and I'll see when we filed the motions that are, like, sheriff related. I can send that over to you and then we can check to see--

**Herrera:**     I would love that.

**Lim:**     Yeah, and you can check to see if there was a, you know, a Facebook Live, you know, by him.

**Herrera:**     Right. 'Cause I would imagine he might get irritated, you know, if you're doing something that's regarding accountability or kind of his lack of doing something. So I would imagine that might be more fertile ground, you know, those dates versus other dates.

**Lim:**     Uh-huh, yeah.

**Herrera:**     But anything you could give me, I'd greatly- I will gladly take it and then, you know, as I said, you know, I'm going to be very comprehensive in terms of talking to people and making sure that I have all the information that I need.

**Lim:**     Great. Can I ask if part of your investigation was also going to be, like, talking to the sheriff?

**Herrera:**     Yes.

**Lim:**     Okay.

**Herrera:**     Since he's the subject, yes. It will include talking to the sheriff. So, I guarantee you any social media I have is locked. (laughs) Not that there's anything in there, but, you know, I can't imagine having--

**Lim:**     [indiscernible] yeah, you've seen it, yeah.

**IAB IV 2558101**          **Page 21 of 22**          **ESTHER LIM**

**CONFIDENTIAL**          COLA002171

**Herrera:**    Seeing what I saw in yours, when I, you know, I did the whole Google search. But, when I saw all yours, I was like, Oh okay.

**Lim:**    It's more than beyond, you know, mine. It's other people who [indiscernible] he's harassing and intimidating.

**Herrera:**    Correct.

**Lim:**    People who are going to do any sort of investigation on him typically tends to be the subject of something.

**Herrera:**    Yeah, that's, that's a fair point. And I certainly already have seen some of that. So that's why I'm saying.. I'm aware.

**Lim:**    Yeah, okay. As long as you're aware, okay. Yeah, so I will look and take a look at the motions that we've issued.

**Herrera:**    Although I'm sure he'd be bored with seeing a bunch of kid pictures, so, you know. Not that exciting. In any event, thank you so much for your time. I really do appreciate it, and I'm sure I'll be in touch because I probably will have to follow up once I've done a more comprehensive look-through.

**Lim:**    Right. Thank you so much.

**Herrera:**    Thank you so much. Have a good rest of your day.

**Lim:**    You too. Bye.

**Herrera:**    Take care.


LIM, ESTHER                     (IAB) IV 2558101
WPU
plw

**CONFIDENTIAL**                                                              **COLA002172**

# EXHIBITS

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL

COLA002174

```
┌─────────────────────────────┐
│ For CISU Use:               │
│                             │
│ (Method of Receipt)         │
│                             │
│ ☐ Telephone                 │
│ ☐ In-Person                 │
│ ■ Online                    │
│ ☐ Paper Complaint           │
│                             │
│ Reference                   │
│ #2019-0016591               │
│ #2022 - 112209              │
└─────────────────────────────┘
```

# COUNTY POLICY OF EQUITY

### REPORT/NOTIFICATION FORM

### <u>Methods of Reporting Potential County Policy of Equity (CPOE) Violations:</u>

1) You may use this form to report a potential violation of the CPOE;

2) File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);

3) Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or

4) Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

No

**2. Are you filing this complaint for:**

Yourself

---

(**<u>Note to Supervisors/Managers:</u>** As a County Manager/Supervisor, it is the County's expectation that the CPOE complaint notification be submitted online at https://ceop.lacounty.gov).

**<u>Section A:</u> Reporting Party Information**                    **Today's Date:** 3/8/2022

**Name:** Esther Lim                              **Emp. #:** e662896
**Title:** Justice Deputy                         **Email:** elim@bos.lacounty.gov
**Work #:** (213) 458-1795        **Mobile #:** ▮▮▮▮▮▮        **Work Hrs.:**        **RDO:**
**Reporting Party's Department:** BOARD OF        **Dept. Head:** Celia Zavala
SUPERVISORS
**Reporting Party's Other Department:**

                                                                 COLA002175

**Reporting Party's Unit of Assignment:** Board of Supervisors, Hilda L. Solis
**Reporting Party's Work Address:** 500 West Temple Street Los Angeles, CA 90012
**Reporting Party's Immediate Supervisor:** Cindy Chen
**Date & Time Form Completed:** 2022-03-08 21:28:13

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

Yes

**Name of Supervisor/Manager Notified:** Cindy Chen
**Date:** 2022-03-08 15:32:00        **How:** Email

---

**Section B: Complainant(s) Information**

**1.**
**Name:** Esther Lim                    **Emp. #:** e662896      **Title:** Justice Deputy
**Work #:** 2134581795        **Mobile #:** ▊▊▊▊▊        **Work Hrs.:**        **RDO:**
**Complainant's Department:** BOARD OF SUPERVISORS    **Dept. Head:**
**Complainant's Other Department:**
**Complainant's Unit of Assignment:** Board of Supervisors, Hilda L. Solis
**Complainant's Work Address:**
**Complainant's Immediate Supervisor:** Cindy Chen

CONFIDENTIAL                                                                                    COLA002176

**Section C:** **Alleged Involved Party(ies) Information**

**1.**

**Name:** Alex Villanueva                    **Emp. #:**                    **Title:** Sheriff

**Work #:**                    **Mobile #:**                    **Work Hrs.:**                    **RDO:**

**Involved Party's Department:** SHERIFF          **Dept. Head:**

**Involved Party's Other Department:**

**Involved Party's Unit of Assignment:** LA Sheriff's Department

**Involved Party's Work Address:**

**Involved Party's Immediate Supervisor:** Alex Villanueva

**Section D:** **Alleged Witness(es) Information (if they can be identified)**

**1.**

**Name:** Veronica Pawlowski                    **Emp. #:** e552095    **Title:** Senior Justice Deputy

**Work #:**                    **Mobile #:** ████████    **Work Hrs.:**        **RDO:**

**Witness's Department:** BOARD OF SUPERVISORS    **Dept. Head:**

**Witness's Other Department:**

**Witness's Unit of Assignment:** Supervisor Sheila Kuehl

**Witness's Work Address:**

**Witness's Immediate Supervisor:** Lisa Mandel

**2.**

**Name:** Kyla Coates                    **Emp. #:** e656300    **Title:** Justice and Health Deputy

**Work #:**                    **Mobile #:** ████████    **Work Hrs.:**        **RDO:**

**Witness's Department:** BOARD OF SUPERVISORS    **Dept. Head:**

**Witness's Other Department:**

**Witness's Unit of Assignment:** Supervisor Janice Hahn

**Witness's Work Address:**

**Witness's Immediate Supervisor:** Gerardo Pinedo

**3.**

**Name:** Max Huntsman                    **Emp. #:** e410745    **Title:** Inspector General

**Work #:**                    **Mobile #:** ████████    **Work Hrs.:**        **RDO:**

**Witness's Department:** OTHER    **Dept. Head:**

**Witness's Other Department:** Office of Inspector General

**Witness's Unit of Assignment:** Office of Inspector General

**Witness's Work Address:**

**Witness's Immediate Supervisor:**

**Section E: Nature of Complaint or Issue(s)**

**1. What is the date of the alleged potential violation(s)?:** 07/28/2021

**2. Please provide a detailed summary of the alleged potential violation(s):**

I have four examples. Please see attached letter for additional information.

On July 28, 2021 , Sheriff Villanueva, while in uniform, went on Facebook Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal muster at all."

On October 6, 2021, during a Facebook Live, Sheriff Villanueva said, "You hear me loud and clear now because if you're not watching their entire thing, I'm pretty sure your flunkies are going to listen to the whole thing and report back to you." When he uses the term "flunkies" he is pejoratively describing me to malign me and minimize my job as Justice Deputy.

On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that "All the Supervisors have 25-year-old justice deputies who are right out of college and writing all their motions." This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age.

Fourth incident is on 3/22/22

**3. Why does the Complainant(s) believe the treatment occurred/is occurring?:**

Though the comments are made generally about the Justice Deputies, the attack was specifically lodged against me because Sheriff Villanueva is seen in the Facebook Live, holding a hard copy of the motion Supervisor Solis put forward on July 27, 2021 titled, "Taking Action: Further Protections for Surviving Families from Law Enforcement Harassment and Retaliation." The motion he was holding and reading from is one I worked on behalf of Supervisor Solis.

Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai.

Additionally, it behooves me that as an Asian woman I need to speak up during a time in which anti-Asian hate is at its all-time peak, due to ignorant, racist, and hateful comments about the cause of the COVID-19 pandemic that has led...

---

**Section F: TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

**Date supervisor/manager observed and/or was notified of the alleged potential violation(s):**

CONFIDENTIAL

**How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):**

**What action(s), if any, did the supervisor/manager take? (Explain in detail):**

**Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following?**

**Medical Attention:**

**Protection:**

**Separation from Alleged Involved Party(ies):**

**Other Assistance:**

---

**Did the supervisor/manager advise the Complainant(s) that they:**

**May seek confidential counseling or assistance from the County's Employee Assistance Program (EAP) at (213) 738-4200:**

**May contact the County Intake Specialist Unit (CISU) directly at (855)-999-2367, or via email at ceop@bos.lacounty.gov:**

<u>**OPTIONAL:**</u> **Please provide the information below for statistical purposes only**

**Race/Ethnicity:** Asian (Not Hispanic or Latino)

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual." – (eeoc.gov)

**Sex:** Female

**Date Of Birth:** 1981-07-30

# EXHIBIT B

CONFIDENTIAL

COLA002181

| For I.S.U. Use Only |
| --- |
| Method of Receipt |
| ☐ Telephone |
| ☐ In Person |
| ☐ POE Report Form |
| ☑ Other: CPOE |
| Intake # 22-046 |

# Policy of Equality
## Report / Notification Form

<u>General Instructions:</u> Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

*******************************************************************************

<u>Section A:</u>    Reporting Party Information        Today's Date: __03__ / __17__ / __2022__

Name: Esther Lim                Emp. #: 662896      Rank/Title Justice Deputy
Work Tel# 213-458-1795    ; Home Tel# ████████ ; Work Hours _____ - _____ RDO _____
Unit of Assignment: Board Of Supervisors Office    Unit Commander: Supervisor Hilda Solis
Division LA County Board of Supervisors

Name of Supervisor Completing this form (if different from above): _____ # _____
Date & Time form completed: _____ / _____ / _____ ; _____ hours.

☐    Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?
  ☐    Yes (if yes, fill in details)
    Who: _____
    When: Date: _____ / _____ / _____ ; Time: _____ hours.
    How _____
  ☐    No
  ☑    Do not know

*******************************************************************************

<u>Section B:</u>    Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: _____ / _____ / _____ ; _____ hours or
between _____ / _____ / _____ and _____ / _____ / _____

If multiple incidents or unknown, explain: _____
See narrative. _____
_____
_____

*******************************************************************************

<u>Section C:</u>    Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

Same as RP _____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____
_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____
_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

CONFIDENTIAL                                    COLA002182

**Section D:**    Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro (Sheriff) _____    Employee # 246296 _____    UOA LASD _____

_____    Employee # _____    UOA _____

_____    Employee # _____    UOA _____

_____    Employee # _____    UOA _____

**Section E:**    Alleged Witness(es) (if they can be identified)

Pawlowski, Veronica _____    Employee # 552095 _____    Rank/Title Senior Justice Deputy UOA BOS
Work Tel# _____    ; Home Tel█████████    ; Work Hours _____ - _____ RDO _____

Coates, Kyla _____    Employee # 656300 _____    Rank/Title Justice/Health Deputy UOA BOS
Work Tel# _____    ; Home Tel█████████    ; Work Hours _____ - _____ RDO _____

Huntsman, Max _____    Employee # 410745 _____    Rank/Title Inspector General    UOA OIG
Work Tel# _____    ; Home Tel█████████    ; Work Hours _____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____    UOA _____
Work Tel# _____    ; Home Tel# _____    ; Work Hours _____ - _____ RDO _____

**Section F:**    Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity Report (ICMS #2022-112209) from CEOP Executive Director Vickey

Bane, filed by RP/CP Justice Deputy Esther Lim, #662896. The Complainant, Justice Deputy Lim, Board of Supervisors employee,

alleged the following, in pertinent part, (verbatim): "On July 28, 2021, Sheriff Villanueva, while in uniform, went on Facebook

Live and said, "I don't think the public realizes, when [the Board of Supervisors] write these motions, these are written by their

Justice Deputies, who are some 20-something, woke individuals, who are basically putting in words what doesn't pass legal

muster at all."


"On February 16, 2022, Sheriff Villanueva during a community town hall for the South Bay cities, said that 'All the Supervisors

**Ask: "Why do you believe this treatment is occurring?"**          (☑ Check, if narrative is continued onto the next page)

CONFIDENTIAL                                                                              COLA002183

Section F (cont'd):          Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

(Continued)

have 25-year-old justice deputies who are right out of college and writing all their motions.' This comment was made in front of the public and County staff. This is another example of Sheriff Villanueva discriminating against me based on age."

In addition, Complainant Lim, wrote in pertinent part, "Given Sheriff Villanueva's documented history of intimidation and harassment of women and women of color, as the first, second generation Korean American woman to serve as Justice Deputy and the only Asian Justice Deputy, currently on staff, I believe Sheriff Villanueva is unfairly targeting me, as shown in the July 28, 2021 example.

I am also aware he has targeted, intimidated, and harassed another Asian woman and LA County employee, former Chief Executive Officer, Sachi Hamai."

(ISU Note: A copy of the CPOE complaint is contained in the ISU efile for details.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Note: Continue onto the next page**

CONFIDENTIAL                                                        COLA002184

Section G:        Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY. DO NOT FILL OUT THIS SECTION IF YOU ARE THE ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made: ___03__ / __16__ / __2022__ , __1521__ hours.

How did you become aware of the potential violation (explain in detail): _____
On March 16, 2022, the ISU received CPOE ICMS #2022-112209, containing the above allegations.
_____
_____
_____
_____
_____

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Xochilt Rosas to document the allegations in the County Policy of Equity Complaint.
_____

_____
_____
_____
_____
_____
_____

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑    Medical Attention
      **Response:** to be ascertained
☑    Protection
      **Response:** to be ascertained
☑    Other Assistance
      **Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑    May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours, request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: _____ Date & Time: _____ / _____ / _____,_____ hour.
                                                              (Name)
☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: __03__ / __16__ / __2022__ , __1521__ hour.    How?: ☑ e-mail  ☐ Fax  ☐ County mail

******************************************************************************************************************

CONFIDENTIAL                                                                          COLA002185

Section H:    **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name:  Deputy X. Rosas                          Emp. #: 468743

Day, Date and time ISU received form Thursday          / 03  / 17  / 2022  , 1140  hours.

☑ Referred to Equity Unit: Date & Time -  04  / 04  / 2022  ,  1700  hours.

☐ If not referred to Equity Unit, explain in detail action taken:

_____

_____

_____

Additional Information (if any):  _____

_____

_____

_____

☐      Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☑ Subject's Unit Commander
☑ Reporting Party's Unit Commander
☐ Victim's Unit Commander

Revised 07/10                                5                        POE -001

CONFIDENTIAL                                                                          COLA002186

# EXHIBIT C

CONFIDENTIAL



IV 2558101
EXHIBIT C

CONFIDENTIAL

COLA002188

# MISCELLANEOUS DOCUMENTS

CONFIDENTIAL

SH-AD-703 Revised (2/22)

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    June 27, 2022

FILE NO:

OFFICE CORRESPONDENCE

**FROM:** JASON P. WOLAK, COMMANDER
PROFESSIONAL STANDARDS DIV.

**TO:** RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT:** **REQUEST FOR** INTERNAL AFFAIRS BUREAU ADMINISTRATIVE INVESTIGATION

Incident Date(s): *(use semi-colons to separate multiple dates)*

Between July 28, 2021, and March 2, 2022

Synopsis:

POE 22-046.  It is alleged that Subject Villanueva made inappropriate POE related remarks while in the workplace.

Date a Sergeant, or above, became aware of an act, omission, or other misconduct:

March 17, 2022

One Year Statute Date (If criminal monitor, leave blank):  March 16, 2023

Alcohol Related?    NO

Citizen Complaint? NO                        If yes, SCR #:

Complainant's Name (Add employee number if a Department member)

Esther Lim, Supervisor's Deputy III, #662896

CONFIDENTIAL                                                              COLA002190

**REQUEST FOR IAB INVESTIGATION AND/OR CRIMINAL MONITOR**

<u>**Involved Subject**</u> *(For additional subjects, use Subject Continuation Page 703-A)*

**Subject Name, Rank, Employee Number, and Unit of Assignment:**

Alex Villanueva, Sheriff, #246296, Office of the Sheriff

Potential MPP Violation(s):

3-01/121.10 - POE Discrimination; 3-01/121.15 - POE Sexual Harassment; 3-01/121.20 -
POE Harassment Other than Sexual; 3-01/121.25 - POE Third Party Harassment;
3-01/121.30 -POE Inappropriate Conduct Toward Others; 3-01/121.35 -POE Retaliation

Subject's Assignment/Duty Status:
- ☑ Subject's assignment/duty status unchanged
- ☐ Relieved of Duty (ROD), assigned to home    ROD Date:
- ☐ ROD, assigned to a relieved of duty position
- ☐ Probationary Employee

Justification for the subject's assignment/duty status *(required)*:

N/A

Consideration(s) for IAB Request:
* Mandatory IAB Investigation

- ☐ Witnesses are spread over a large geographic area.
- ☐ The nature of the allegation(s) involves incidents of high media attention.
- ☐ A subject is a supervisor or manager (lieutenant or above; assistant director or above).
- ☐ The nature of the allegation(s), if founded, will likely result in discharge.*
- ☐ The allegation(s) concern family/domestic violence.
- ☐ The allegation(s) concern workplace violence.*
- ☐ The allegation(s) concern profiling or bias against members of the public.*
- ☑ Other: Allegations contain Policy of Equality*

☐ Criminal Monitor by IAB (Refer to MPP 3-04/020.30 – Internal Administrative and
Criminal Investigations) *enter investigating agency, crime, and report number*:

Supervisory Inquiry authored?    ☐ Yes  ☑ No

Contact person for source documents (i.e.: supervisory inquiry and/or
investigative materials) at the requesting unit:

Prepared by Unit Commander/Director, or designee:

Lieutenant John Carter, #435532, Internal Affairs Bureau

**NOTE:  Email this form to "IAB Investigation Requests."  A review of this request will
be conducted by the Internal Affairs Bureau.  There may be situations when the
Internal Affairs Bureau will decide, upon initial review, to return the case to be
conducted as a unit level investigation.**

**For IAB use only**

Assigning Lieutenant  Lieutenant John Carter, #435532

IAB Investigator    Christine Diaz-Herrera, Esquire, Sanders Roberts LLP

**CONFIDENTIAL**

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558101

OFFICE CORRESPONDENCE

**FROM:** EDWIN A. ALVAREZ, CHIEF
PROFESSIONAL STANDARDS DIVISION

**TO:** RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION**

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER.

Alex Villanueva, Sheriff, #246296

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct)

03/17/2022

Potential MPP Violation(s) including, but not limited to:

3-01/030.10 POE - DISCRIMINATION
3-01/121.15 POE - SEXUAL HARASSMENT
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.30 POE - INAPPROPRIATE CONDUCT TOWARD OTHERS
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description):

It is alleged you acted in an inappropriate POE related manner and made inappropriate POE related remarks while in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been rescinded. You are being ordered by your Unit Commander that during the time this investigation is active, any routine absence request must be submitted directly to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:

Subject: _____    Witness: _____

Employee #: 246296  Date: 6/29/22    Employee #: 410429  Date: 6/29/22

## 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                      COLA002193

Manual of Policy and Procedures : 3-01/121.15 - Policy of Equality - Sexual Harassment

# 3-01/121.15 - Policy of Equality - Sexual Harassment

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature which meets any one of the following criteria:

- Submission to such conduct is made either explicitly or implicitly as term or condition of an individual's employment;
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
- Such conduct has the purpose or effect of unreasonably interfering with the individual's employment or creating an intimidating, hostile, offensive, or abusive working environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                    COLA002194

Manual of Policy and Procedures : 3-01/121.20 - Policy of Equality -  Harassment (Other Than Sexual)

# 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited.  Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

CONFIDENTIAL

COLA002195

## 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander.  When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior.  The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                                                           COLA002196

# 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                                           COLA002197

## 3-01/121.35 - Policy of Equality - Retaliation

Retaliation, for the purposes of this policy, is an adverse employment action against another for reporting protected incident, filing a complaint of conduct or opposing conduct that violates this policy or related state or federal law, participating in an investigation, administrative proceeding, or otherwise exercising their rights or performing their duties under this policy or related state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL    COLA002198

CONFIDENTIAL

VILLANUEVA v. COUNTY OF LOS ANGELES, et al.    USDC CASE NO.: 2:24 cv 04979 SVW (JC)

# PROOF OF SERVICE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 11520 San Vicente Boulevard, Los Angeles, California 90049.

On April 28, 2025, I served the foregoing document, described as **"PLAINTIFF ALEX VILLANUEVA'S APPENDIX OF EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION, VOLUME 1 OF 5,"** on all interested parties in this action addressed as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☒    **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒    **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 28, 2025, at Los Angeles, California.

_Amelia Sanchez_
Amelia Sanchez