Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
320 North Larchmont Boulevard
Los Angeles, CA 90004
Telephone Number:  (310) 860 0770
Facsimile Number:  (310) 860 0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>Defendants. | Case No.:  2:24  cv 04979 SVW (JC)<br><br>**The Honorable Stephen V. Wilson**<br><br>**PLAINTIFF ALEX VILLANUEVA'S APPENDIX OF EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION, VOLUME 2 OF 5**<br><br>Date:    May 19, 2025<br>Time:    1:30 p.m.<br>Dept.:   10A<br><br>Trial Date:    June 3, 2025<br>Action Filed:  June 13. 2024 |

# TABLE OF CONTENTS

| No. | Declaration |
|-----|-------------|
| 1 | Declaration of Alex Villanueva |
| 2 | Declaration of Alex DiBona, Esq. |

| Exhibit[1] | Evidence |
|------------|----------|
| 1 | Los Angeles County Board of Supervisors Motion "Report Regarding Options for Removing the Sheriff" Dated October 27, 2020 |
| 2 | Ordinance allowing Office of Inspector General to Issue Subpoenas written by Veronica Pawlowski dated January 21, 2020 |
| 3 | Email from Vanessa Chow to John Satterfield and Alex Villanueva regarding FBI Briefing on Fulgent dated February 1, 2022 |
| 4 | Letter from Alex Villanueva to Hilda Solis Entitled Ethical Violations of First District Justice Deputy dated February 9, 2021 |
| 5 | "Tweets" from Ester Lim attached to February 9, 2021 letter |
| 6 | Letter from Alex Villanueva to County Counsel asking for Defense in Fulgent Lawsuit dated January 31, 2022 |
| 7 | Denial of Counsel to Alex Villaneuva from Los Angeles County Counsel dated February 15, 2022 |

---

[1] Volume I includes Exhibit Nos. 1-17;

Volume II includes Exhibit Nos. 18-30;

Volume III includes Exhibit Nos. 31-40;

Volume IV includes Exhibit Nos. 41-48;

Volume V includes Exhibit Nos. 49-66;

| Exhibit[1] | Evidence |
|---|---|
| 8 | Letter from Alex Villanueva to Hilda Solis Entitled Ethical Violations of First District Justice Deputy dated March 4, 2022 |
| 9 | Email from Ester Lim to Hilda Solis's Chief of Staff Cindy Chen dated March 8, 2022 |
| 10 | Ester Lim's Letter to Vicky Bane, Executive Director of the County Equity Oversight Panel for the County of Los Angeles dated March 8, 2022 |
| 11 | Ester Lim's submitted online complaint regarding Alex Villanueva dated March 08, 2022 |
| 12 | Texts between Ester Lim and Max Huntsman Re their complaints dated sometime in March 2022. |
| 13 | Letter from Alex Villanueva to Board of Supervisors Opposing Ballot Measure J dated July 11, 2022 |
| 14 | July 12, 2022 Motion of the Los Angeles Board of Supervisors to Place Ballot Measure for the Los Angeles County Board of Supervisors to remove Sheriff by 4/5 vote. |
| 15 | January 4, 2023 Letter from Ron Kopperud to Alex Villanueva regarding request for Interview |
| 16 | Email Chain between Alex Villanueva and Christine Diaz Herrera dated January 9, 2023 to March 10, 2023 |
| 17 | Internal Affairs Bureau "Stacked" Case Filed for Ester Lim's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 18 | Internal Affairs Bureau "Stacked" Case Filed for Max Huntsman's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 19 | Internal Affairs Bureau Investigator's Log regarding Ester Lim's Ester |

| Exhibit[1] | Evidence |
|---|---|
|  | Lim's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 20 | Internal Affairs Bureau Investigator's Log regarding Max Huntsman Complaint regarding Alex Villanueva completed October 2, 2023 |
| 21 | Letter from Sergio Escobedo to County Equity Oversight Panel on Charges Founded dated October 17, 2023 |
| 22 | Texts between Ester Lim and Max Huntsman Re wanting their complaint of Alex Villanueva to go public in December 2023 |
| 23 | Desk Plaque for Max Huntsman and Max Hunts Professional Profile. |
| 24 | Devanne, Ann, relevant deposition excerpts |
| 25 | Diaz Herrera, Christian, relevant deposition excerpts |
| 26 | Komoroski, Constance, relevant deposition excerpts |
| 27 | Pawlowski, Veronica, relevant deposition excerpts |
| 28 | Murakami, Timothy, relevant deposition excerpts |
| 29 | Escobedo, Sergia, relevant deposition excerpts |
| 30 | Lilienfeld, Mark, relevant deposition excerpts |
| 31 | Lim, Ester, relevant deposition excerpts |
| 32 | Huntsman, Max, relevant deposition excerpts |
| 33 | Cruz, Mercedes, relevant deposition excerpts |
| 34 | Lecrevian, Laura, relevant deposition excerpts |
| 35 | Coates, Kyla, relevant deposition excerpts |
| 36 | Yang, Roberta, relevant deposition excerpts |
| 37 | 12/18/2018 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 38 | 1/29/219 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 39 | 08/13/19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 40 | 10-01-19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 41 | 10/15/19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 42 | 01/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 43 | 03/31/30 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 44 | 04/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 45 | 06/29/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 46 | 07/07/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 47 | 07/21/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 48 | 07/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 49 | 08/04/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 50 | 09/01/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 51 | 09/15/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 52 | 10/13/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 53 | 10/27/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 54 | 11/10/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 55 | 01/26/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 56 | 05/04/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 57 | 05/18/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 58 | 05/19/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 59 | 06/22/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 60 | 07/27/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 61 | 08/10/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 62 | 09/28/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 63 | 12-07-21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 64 | 02/15/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 65 | 03/01/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 66 | 07/12/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

Dated:  April 28, 2025                    SHEGERIAN & ASSOCIATES, INC.

By: _____
Alex DiBona, Esq.

Attorneys for Plaintiff,
ALEX VILLANUEVA

# EXHIBIT 18



# LOS ANGELES COUNTY
# SHERIFF'S DEPARTMENT
### *"A Tradition of Service Since 1850"*

Incident Date: Between March 5, 2022 & March 22, 2022
Department Knowledge: March 16, 2022
Statute Date: March 15, 2023

**IAB #IV 2558097**

# INTERNAL AFFAIRS BUREAU
# INVESTIGATIVE REPORT

# CONFIDENTIAL

**EXHIBIT**

**18**

# TABLE OF CONTENTS

CONFIDENTIAL

COLA002036

# Table of Contents
IV 2558097

**AUDIO VIDEO TRACKING SHEET**

**PERSONNEL INVESTIGATION FORM**

**INVESTIGATIVE SUMMARY**

**INTERVIEW TRANSCRIPTS**

    1-Complainant Max Huntsman

**EXHIBITS**

    A    County Policy of Equity Report/Notification Form, ICMS #2022-112213

    B    Policy of Equality (POE) Report/Notification Form, #22-045.

    C    One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show; Tweets; email to the Sheriff Department Employees; and two articles from the Los Angeles Times.

**MISCELLANEOUS DOCUMENTS**

    -    Request for IAB Investigation Memorandum from Commander Jason P. Wolak to Captain Ron Kopperud, dated June 27, 2022.

    -    Subject of Administrative Investigation Notification Form signed by Subject Alex Villanueva, dated June 29, 2022.

    -    Manual of Policy and Procedures:
        3-01/121.10: Policy of Equality - Discrimination
        3-01/121.20: Policy of Equality - Harassment (Other than Sexual)
        3-01/121.25: Policy of Equality - Third Party Harassment
        3-01/121.30: Policy of Equality - Inappropriate Conduct Toward Others

**IV 2558097**

COLA002037

# AUDIO/VIDEO TRACKING SHEET

CONFIDENTIAL

COLA002038

# INTERNAL AFFAIRS BUREAU
## - Audio/Video Tracking Sheet -

## # IV 2558097

**Investigator's Name:** Lieutenant Ann Devane

**Total number of USB Flash Drives:** 0

**Total number of compact discs:** 2

**Total number of digital audio files:** 1

## DIGITAL AUDIO FILES

| Name |
|------|
| **1**-Complainant Max Huntsman |

## DIGITAL MEDIA

| Transcripts | One (1) Compact Disc containing: Audio recorded interview and interview transcript |
|-------------|-----------------------------------------------------------------------------------|
| **Exhibit C** | One (1) CD containing recordings of Subject Villanueva conducting interviews on Facebook live, and KFI Radio show; Tweets; email to the Sheriff Department Employees; and two articles from the Los Angeles Times. |

CONFIDENTIAL

COLA002039

# PERSONNEL INVESTIGATION FORM

**CONFIDENTIAL**

**COLA002040**

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
### PERSONNEL INVESTIGATION

PAGE _1_ OF _1_

| DATE 09/20/2023 | No. OF SUBJECTS 1 | UNIT(S) INVOLVED Executive Division | | I.A.B. FILE No. IV 2558097 |
|---|---|---|---|---|

MANUAL SECTIONS ALLEGEDLY VIOLATED (BY TITLE AND No.)
3-01/121.10,POE-Discrimination;  3-01/121.20, POE-Harassment(Other than Sexual);
3-01/121.25, POE-Third Party Harassment; 3-01/121.30, POE-Inappropriate Conduct Toward Others

| DATE, TIME, DAY OF OCCURRENCE Between March 5, 2022 and March 22, 2022 | RELATED URN FILE No. IF APPLICABLE |
|---|---|

LOCATION OF OCCURRENCE
Unknown

| SOURCE OF COMPLAINT: | ☐ COMMUNITY | ☐ SUPERVISION | WIC REPORT No. | ☑ OTHER SOURCES (SPECIFY) POE #: 22-045 |
|---|---|---|---|---|

| SUBJECT No. 1 OF 1 | LAST NAME Alex | FIRST NAME Villanueva | M.I. | RANK OR TITLE Sheriff | EMP. No. 246296 |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT Executive Division | | | DATE ASSIGNED | DIVISION OR REGION Executive Division | |
|---|---|---|---|---|---|

STATUS OF SUBJECT
☑ CONTINUING ON DUTY      ☐ RELIEVED OF DUTY - REASSIGNED TO:      ☐ OTHER

| SEX Male | RACE Hispanic | HAIR Brown | EYES Brown | HEIGHT 510 | WEIGHT 195 | D.O.B. 02/25/1963 | AGE 60 |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE 12/03/2018 | DATE APPOINTED TO RANK 12/03/2018 | INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE ___ | TIME ___ |
|---|---|---|---|---|---|

### PREVIOUS FOUNDED INVESTIGATIONS

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| 10/21/1992 | 3132 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 09/15/1993 | 6069 | 3-01/090.10:OPERATION OF VEHICLES | Written Reprimand |
| 11/23/2015 | 2390479 | 3-01/030.10:OBEDIENCE TO LAWS, REGULATIONS; | Written Reprimand |
| | | 3-01/040.97:SAFEGUARDING PERSONS IN CUSTODY; | |
| | | 3-01/050.10:PERFORMANCE TO STANDARDS | |

| SUBJECT No. OF | LAST NAME | FIRST NAME | M.I. | RANK OR TITLE | EMP. No. |
|---|---|---|---|---|---|

| UNIT OF ASSIGNMENT | | DATE ASSIGNED | DIVISION OR REGION |
|---|---|---|---|

STATUS OF SUBJECT
☐ CONTINUING ON DUTY      ☐ RELIEVED OF DUTY - REASSIGNED TO:      ☐ OTHER

| SEX | RACE | HAIR | EYES | HEIGHT | WEIGHT | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|

| DATE OF HIRE | DATE APPOINTED TO RANK | INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE ___ | TIME ___ |
|---|---|---|---|---|---|

### PREVIOUS FOUNDED INVESTIGATIONS

| DATE | I.A.B. FILE No. | MANUAL SECTION(S) VIOLATED | DISCIPLINE |
|---|---|---|---|
| | | | |

**CODE: C** - COMPLAINANT. **W** - WITNESS      ADDITIONAL COMPLAINANTS, WITNESSES, OR SUBJECTS ON SUPPLEMENTAL PAGES ☑ YES  ☐ NO

| CODE C No. 1 OF 1 | LAST NAME Huntsman | FIRST NAME Max | M.I. | SEX Male | RACE White | D.O.B. Adult |
|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Office of Inspector General | | RES. PHONE (AREA CODE) ( ) |
|---|---|---|

| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT 500 W. Temple Street Los Angeles, CA. 90013 | CDL OR LASD EMPLOYEE No. | BUS. PHONE (AREA CODE) (213) 974-6100 |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE 07/21/2022 | TIME UNK |
|---|---|---|---|

| CODE W No. 1 OF 1 | LAST NAME Pawlowski | FIRST NAME Veronica | M.I. | SEX Female | RACE UNK | D.O.B. Adult |
|---|---|---|---|---|---|---|

| RESIDENCE ADDRESS Justice Deputy for Sheila Kuehl | | RES. PHONE (AREA CODE) ( ) |
|---|---|---|

| BUSINESS ADDRESS    OR    UNIT OF ASSIGNMENT Los Angeles, Ca. 90013 | CDL OR LASD EMPLOYEE No. | BUS. PHONE (AREA CODE) ( ) |
|---|---|---|

| INTERVIEW TAPE RECORDED ON TAPE ___ OF ___ | SIDE ☐ A ☐ B | DATE 08/01/2022 | TIME ___ |
|---|---|---|---|

| PRIMARY INVESTIGATOR Sanders Roberts LLP | RANK | EMP. No. | APPROVED _(signature)_ R. Moreno | DATE 10-2-23 |
|---|---|---|---|---|
| ASSISTING INVESTIGATOR Lieutenant Ann Devane | RANK LT | EMP. No. 478275 | DATE SUBMITTED 09/26/2023 | |

SH-AD-669-3/15          IF ADDITIONAL SUBJECTS, WITNESSES, COMPLAINANTS OR DISCIPLINE HISTORIES, LIST ON CONTINUATION PAGES.

# INVESTIGATIVE SUMMARY

CONFIDENTIAL

COLA002042

CONFIDENTIAL

May 19, 2023

TO:       EDUARDO MONTELONGO,

          ASSISTANT LOS ANGELES COUNTY COUNSEL

FROM:     SANDERS ROBERTS LLP

**INVESTIGATION REPORT – FORMER SHERIFF ALEX VILLANUEVA / MAX HUNTSMAN**

## 1. INTRODUCTION

County Counsel retained the law firm of Sanders Roberts LLP ("Sanders Roberts") to conduct an independent investigation into complaints against Sheriff Alex Villanueva related to his use of Inspector General, Max Huntsman's former first name, "Max-Gustaf," as well as Sheriff Villanueva's accusation that Mr. Huntsman is a Holocaust denier. Sanders Roberts conducted that investigation via witness interviews and a review of relevant documents and audio broadcasts. This report details the investigation's factual findings.

## 2. ALLEGATIONS

The allegations that form the basis of the complaints against Sheriff Alex Villanueva are as follows:

**ALLEGATION 1:** In various public appearances on Facebook Live, KFI Radio, and on Twitter, Sheriff Alex Villanueva subjected Inspector General, Max Huntsman, to harassment on the basis of race/ethnicity/ancestry/national origin.

## 3. APPLICABLE POLICIES AND GUIDELINES

**Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.015 - County Policy of Equity**

**THE POLICY.** All County of Los Angeles (County) employees are required to conduct themselves in accordance with the entirety of this County Policy of Equity (Policy), and all applicable local, county, state, and federal laws.

**PURPOSE.** This Policy is intended to preserve the dignity and professionalism of the workplace as well as protect the right of employees to be free from discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status. Discrimination, unlawful harassment, retaliation and inappropriate conduct toward others based on a protected status, are contrary to the values of the County. The County will not tolerate unlawful discrimination on the basis of sex, race, color, ancestry, religion, national origin, ethnicity, age (40 and over), disability, sexual orientation, marital status, medical condition or any other protected characteristic protected by state or federal employment law, nor will it tolerate unlawful harassment, or retaliation. As a preventive measure, the County also will not tolerate inappropriate conduct toward others based on a protected status even if the conduct does not

COLA002043

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 2 of 8

meet the legal definition of discrimination or unlawful harassment. All County employees are responsible for conducting themselves in accordance with this Policy and its associated Procedures. Violation of the Policy and/or Procedures will lead to prompt and appropriate administrative action including, but not limited to, counseling, training, written warning, written reprimand, suspension, demotion, or discharge.

**COUNTY POLICY OF EQUITY PROHIBITED CONDUCT.** Each County employee is responsible for understanding and abiding by these definitions of prohibited conduct as they may impact any administrative process/proceeding for potential violations of this Policy and/or associated Procedures.

**COUNTY POLICY OF EQUITY UNLAWFUL HARASSMENT (OTHER THAN SEXUAL).** Unlawful harassment of an individual because of the individual's race, color, ancestry, religion, national origin, ethnicity, age, disability, sexual orientation, marital status, medical condition or any other protected characteristic protected by state or federal employment law is also discrimination and prohibited. Unlawful harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment.

**<u>Los Angeles County Board of Supervisors Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability</u>[1]**

"Each Department Head shall:

•Hold their employees accountable for actions that include being dishonest, untruthful, and/or which demonstrate a lack of integrity, consistent with Countywide requirements established by the Board of Supervisors, Director of Personnel, Chief Executive Officer, and Auditor Controller, County Code, Civil Service Rules, and departmental policies;
•Hold their employees, including those working in public safety, patient care, judicial affairs, and those holding fiduciary responsibilities, to high standards of honesty and conduct, which are of essential value to public servants;
•Act affirmatively to abate or prevent performance problems and document those problems when they occur;
•Ensure accountability as set forth in the Los Angeles County Charter, Civil Service Rules, and Countywide and departmental policies;
•Take timely and effective corrective action, commensurate with the offense, which may include remedial measures such as counseling or more formal action such as discipline up to and including discharge from County service; and
•Retain employees in County service on the basis of the adequacy of their performance, correct inadequate performance, and separate from County service employees whose inadequate performance cannot be corrected.

Failure of an employee to perform their assigned duties so as to meet fully explicitly stated or implied standards of performance may constitute adequate grounds for discharge, reduction, or suspension. Where appropriate, such grounds may include, but are not limited to, qualitative as well as quantitative elements of performance, such as failure to exercise sound judgment, failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources. Grounds for discharge, reduction, or suspension may also include

---

[1] The Los Angeles County BOS Board Policy, Chapter 9 – Personnel - 9.020 - Employee Accountability can be accessed at <u>https://library.municode.com/ca/la_county_-_bos/codes/board_policy?nodeId=CH9PE_9.020EMAC</u>.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 3 of 8

any behavior or pattern of behavior which negatively affects an employee's productivity, or which is unbecoming a county employee; or any behavior or condition which impairs an employee's qualifications for their position or for continued county employment."

## 4.  PROCEDURE

At the beginning of each interview, the interviewer advised each witness of the following: 1. That the witness's role is to tell the truth and reveal all relevant facts to the investigator; 2. That the witness should maintain confidentiality of the investigation; 3. That the witness must report any retaliation to the investigator; and 4. That the witness must not retaliate against any participant. The investigator then asked each witness whether s/he had any procedural questions.

To determine the merits of the allegations against former Sheriff Villanueva, the investigator interviewed the following persons:

| NAME | DATES OF INTERVIEW | POSITION |
|---|---|---|
| Max Huntsman | 07/21/22 | Inspector General |
| Sheriff Alex Villanueva | N/A[2] | Los Angeles County Sheriff |

## 5.  INVESTIGATIVE INTERVIEW SUMMARIES

### Max Huntsman

On July 21, 2022, investigator Christine Diaz Herrera, Esq. interviewed Inspector General Max Huntsman via Teams videoconference. Mr. Huntsman did not have a representative present. Initially, Mr. Huntsman made clear that he is not a Sheriff's Department employee and would not feel constrained to keep the contents of his conversation with Ms. Diaz Herrera confidential, should he feel that his work required divulging them.

### Background

Mr. Huntsman has been employed by the County of Los Angeles since 1991. He has been Inspector General ("IG") since "late 2013 or early 2014," depending on how the official start date is calculated. He currently reports to Executive Officer, Celia Zavala "for administrative purposes," but he is special counsel to the Board of Supervisors ("BOS"), so he reports to the BOS "for substantive matters." His duties as IG are set forth by statute and ordinance. His office monitors the Sheriff's Department to ensure there is no corruption and to ensure compliance with reporting requirements and public accountability. Over time, Mr. Huntsman's office has expanded to oversee the probation department and some Department of Public Health skilled nursing facilities. However, primarily, his

---

[2] The investigators sought repeatedly to schedule an interview with Sheriff Villanueva. Sheriff Villanueva repeatedly ignored such scheduling requests, but ultimately agreed to sit for an interview on the condition that he be provided the investigator's questions ahead of time. The investigator declined that request and accordingly completed this investigation without an interview of Sheriff Villanueva.

COLA002045

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 4 of 8

oversight focuses on the Sheriff's Department and jails within the County. The work involves monitoring, inspection, and investigation.

Mr. Huntsman described the IG's role as being primarily to monitor the Sheriff's Department's investigations to provide a "second opinion and quality control," rather than being the primary or initial investigator of incidents. The IG's investigative tools include power to subpoena and statutory directives to the Sheriff's Department to provide information upon request by the IG or otherwise cooperate with the investigations. Mr. Huntsman said that the Sheriff's Department routinely obstructs his investigations. It does so by refusing to comply with subpoenas and refusing to provide information that the IG requests.

<u>Conflicts With Sheriff Villanueva</u>

Mr. Huntsman's office includes "about thirty people." They interact with the Sheriff's Department on a variety of matters on a daily basis. Some of those interactions are "smooth and routine," while "others aren't." For example, most of the day-to-day interactions involving access to jails for routine investigative and oversight purposes are routine and polite. However, when it comes to obtaining "actual evidence," the Sheriff's Department routinely blocks the IG's office's efforts. Mr. Huntsman has no direct interaction with Sheriff Villanueva or Undersheriff Tim Murakami.

Mr. Huntsman reported that he has not communicated directly with Sheriff Villanueva since 2019. He said that in 2019, the County had sued Sheriff Villanueva related to the Sheriff's efforts to rehire several formerly-terminated deputies, including Caren Mandoyan. Mr. Huntsman said that his office tried to investigate those efforts as well as the related "truth and reconciliation committee" Sheriff Villanueva sought to establish. The IG's Office investigated and wrote a report about those issues and provided a draft to the Sheriff's Department. In response the Sheriff's Department turned off the IG's access to the Sheriff's Department's computer systems. Mr. Huntsman said that several people in the County asked him to meet with Sheriff Villanueva to try to convince him to restore the IG's Office's computer access.

During the June 17, 2019 meeting with Sheriff Villanueva, the Sheriff said that Mr. Huntsman was "a political hack" and said the IG's draft report was wrong and ridiculous and that the Sheriff's intention to rehire Caren Mandoyan was legal. Mr. Huntsman described Sheriff Villanueva as having told him that if he issued the report, it would impact the then-ongoing civil litigation related to Caren Mandoyan. He said that Sheriff Villanueva told him, in a "significant way" that if he issued the report, there "would be consequences." Mr. Huntsman credibly described this as a threat from Sheriff Villanueva.

Shortly thereafter, Sheriff Villanueva announced on a podcast that Mr. Huntsman was under criminal investigation. This was contrary to best practices, pursuant to which one would typically keep a criminal investigation secret from the subject of that investigation. Mr. Huntsman said that Sheriff Villanueva's announcement was more consistent with an effort to intimidate him, which he believes amounts to a violation of Penal Code s. 518, Extortion of a Public Official. Mr. Huntsman said that since then, Sheriff Villanueva has attempted to intimidate others from conducting oversight in other matters and contexts. Mr. Huntsman said that the Sheriff "kept [the purported investigation] over [Mr. Huntsman's] head for years" until the Sheriff's Department eventually said that it had turned its investigative files over to the Attorney General's Office and the Sheriff's former Chief of Staff, Larry Del Mese, testified that the investigation had not actually uncovered any criminal wrongdoing.

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 5 of 8

Subsequently, Mr. Huntsman and the Sheriff's Department have "clashed" in various settings, including
before the BOS and the Civilian Oversight Board. One example Mr. Huntsman provided was when the
Sheriff told the Civilian Oversight Board that Mr. Huntsman was wrong when he reported that the
Sheriff's Department was failing to provide evidence in response to the IG's requests. Mr. Huntsman said
he responded by providing evidence supporting his allegation that the Sheriff's Department was
withholding documents.

Sheriff Villanueva's Alleged Harassment

        Mr. Huntsman said that Sheriff Villanueva repeatedly refers to people in ways that are intended to
"dog whistle" to his base of extremist supporters to "let them know who their current target is." Mr.
Huntsman said that he believes that Sheriff Villanueva refers to him as "Max-Gustaf" (or "Max-Gustav")
in order to signal to his extremist base that Mr. Huntsman is "a foreigner…German or Jewish or both."
However, Mr. Huntsman noted that after Sheriff Villanueva accused him of being a Holocaust denier (see
below), it became clear that he was not intending to signal that Mr. Huntsman was Jewish. Mr. Huntsman
said he believed that his German background made him "an easy target." He said that Sheriff Villanueva
"likes to target a lot of people" and uses a small group of people he referred to as Sheriff Villanueva's
"dirty tricks squad" to gather information about them that he can use to discredit them and have his
extremist base target them. He said the Sheriff "collects dirt on his political opponents and then tries to
figure out a way to hurt them he turns most easily to race-based techniques because it plays with the
people he's trying to curry favor with and he uses whatever means are available to him to do that."

        Mr. Huntsman described the Sheriff's "dirty tricks squad" as a group of "a half-dozen or so"
people, including a deputy named Mark Lillienfeld that Sheriff Villanueva rehired after he had been
caught bringing contraband to a County jail inmate. Mr. Huntsman said he believes Sheriff Villanueva
hired Lillienfeld because Mr. Lillienfeld was willing to "do whatever [the Sheriff] asks him to do." Mr.
Huntsman said the "dirty tricks squad" also includes a "computer guy" who some people believe places
listening devices in offices and "sweeps emails." Mr. Huntsman said he does not necessarily believe that
the Sheriff's "dirty tricks squad" hacks emails or places "bugs" in offices, but some people do believe
that.

Mr. Huntsman's Name

        Mr. Huntsman was born Max-Gustaf Edler. His father had been born in Germany and left after
World War II. Mr. Huntsman was born after his father had made his way through Canada to San
Francisco. He named Mr. Huntsman "Max-Gustaf" after two uncles. The spelling of "Gustaf" with a "f"
is the Swedish spelling of the name and just happens to be how the uncle Mr. Huntsman was named after
spelled his name. Mr. Huntsman describes his father as having had "problems with drugs," not working,
committing crimes, and eventually leaving the U.S., moving to Switzerland, and starting a new family.
Mr. Huntsman believes that his father's problems stemmed from having grown up in Nazi Germany and
therefore Mr. Huntsman has "no love for Nazi Germany…in fact, quite the opposite" and does not at all
deny that the Holocaust occurred.

        When Mr. Huntsman was a child, he wanted to change his last name, but his mother would not let
him. Eventually, during law school, he was able to have his last name changed from Edler to Huntsman.
He said that during all of that time, he did not go by "Max-Gustaf" but rather by "Max." His official name
in some places was listed as "Max-Gustaf" but he ultimately was able to have it officially changed to
"Max." He said that the State Bar still has a record of him as "Max-Gustaf" and in an old County
computer record, he is listed as "Max Gustaf" but he is officially, professionally, and socially "Max." He

COLA002047

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 6 of 8

said that "nobody [who knows him] would ever tell you 'that guy is Max-Gustaf.'" After Sheriff
Villanueva raised the name "Max-Gustaf" Mr. Huntsman took steps to correct the State Bar's record to
"Max" from "Max-Gustaf." Mr. Huntsman said that there is no fraud or effort to conceal anything by
changing his name, but he just does not want to be associated with a culture that he does not feel that he is
a part of.

Sheriff Villanueva's References to "Max-Gustaf"

        Mr. Huntsman became aware of Sheriff Villanueva referring to him as "Max-Gustaf" from a KFI
radio broadcast. He said that the upshot of Sheriff Villanueva's radio remarks was to purport to wonder
why Mr. Huntsman had changed his name and to intimate that "someone should look into that." He said
that he initially thought that Sheriff Villanueva's reference to his former name was an effort to imply that
he was Jewish in order to "dog whistle" to his extremist supporters. However, he said that he has come to
believe that the reference was to more generally cast him as an "other" or a "foreigner." He said that in
hindsight he believes that the Sheriff was using the former name in order to set up the allegation that Mr.
Huntsman is a Holocaust denier.

Holocaust Denier Allegation

        Sheriff Villanueva eventually told the Los Angeles Times editorial board that Mr. Huntsman is a
Holocaust denier. Mr. Huntsman said he believes that this information came from Adam Loew. Mr. Loew
is the husband of a former Metro employee who sends frequent emails to many people in the County
alleging widespread corruption that ultimately led to his wife being terminated. Mr. Huntsman is one of
the people to whom Mr. Loew sends his frequent emails. Mr. Huntsman believes that Mr. Loew and
Sheriff Villanueva became allies because they both dislike and oppose County Supervisor Sheila Kuehl.
Mr. Huntsman said that Mr. Loew was the first person he saw referring to him as "Max-Gustaf." When
Sheriff Villanueva started using the name, it "rang a bell" because he recalled Mr. Loew having used it.

        Mr. Huntsman said that he has never been a Holocaust denier and has no idea what could have
given anyone the idea that he was.

        When Sheriff Villanueva accused Mr. Huntsman of being a Holocaust denier, there were news
stories about it. Mr. Huntsman received communications and messages from friends and acquaintances, in
particular from Jewish friends and acquaintances, expressing sympathy for his having to endure such an
allegation. He said that he otherwise did not receive any negative feedback or harassment as a result of
Sheriff Villanueva's allegation. Mr. Huntsman sent an email to the BOS in response to Sheriff
Villanueva's allegation that he was a Holocaust denier. He also filed a CPOE complaint based on his
belief that the Policy of Equity required him to do so.

**Veronica Pawlowski**

        On August 1, 2022, attorney Christine Diaz-Herrera interviewed Justice Deputy, Veronica
Pawlowski via Teams video conference. Ms. Pawlowski did not have a representative present.

Background

        Veronica Pawlowski has worked for the County of Los Angeles since 2012. She served as
Supervisor Sheila Kuehl's Justice Deputy for two and a half years. Previously she held the position of
Special Counsel to the Board of Supervisors on Child Welfare issues. Subsequent to that, she held a

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 7 of 8

position at County Counsel where she advised the Department of Children and Family Services; the
Probation Department; and the Los Angeles Homeless Services Authority. Pawlowski has been an
attorney for 19 years. She received her B.A. in Political Science and Communications from USC in 1997
and her law degree from Boston College in 2000.

While she worked at County Counsel, Ms. Pawlowski worked on ordinances that give bodies of
oversight their authority. She was really aware about how that relationship is supposed to work. The
Supervisor saw Ms. Pawlowski as a subject matter expert on ordinances because she knew them better
than anyone else.

Interaction with Sheriff's Department

Most of Ms. Pawlowski's interactions with the Los Angeles County Sheriff's Department
("Sheriff's Department") is at the Assistant Sheriff level. Her work with the Sheriff's Department has
been very focused on the jails. Supervisor Sheila Kuehl ("Supervisor Kuehl") called for closure of a main
jail in Los Angeles County. Much of Ms. Pawlowski's work has been focused on this issue. Ms.
Pawlowski has dedicated a lot of time to learning how the jail operates. The Sheriff's Department has a
board liaison and a board liaison team. This team advises Supervisor Kuehl's office of critical incidents.

Sheriff's Alex Villanueva's Facebook Live Sessions

Part of Ms. Pawlowski's responsibilities on behalf of her bosses is to sit in on meetings and keep
them informed about what is going on in her portfolio. Ms. Pawlowski started to listen to Sheriff
Villanueva's Facebook live sessions to alert her bosses if he said anything newsworthy. Ms. Pawlowski
could not recall how many Sheriff Villanueva Facebook live sessions she has listened to. She has listened
to them both live and via a recorded session. Ms. Pawlowski has listened to "just about every session"
since Sheriff Villanueva started doing them.

In the beginning it was just Ms. Pawlowski listening and taking notes. Somewhere along way, she
started to receive summaries of the sessions from the CEO's office, Countywide Communications Unit.
Ms. Pawlowski did not know who sent them because she would receive them from Supervisor Kuehl's
Communications Deputy. Lenny McGuire is in charge.

Max Huntsman

Ms. Pawlowski reported that Sheriff Villanueva made comments about IG Max Huntsman,
"nonstop." Sheriff Villanueva called him "Gustav Hunstman," alluding that he is "some kind of Nazi."
She said that Sheriff Villanueva has made his comments in writing. Ms. Pawlowski believes Sheriff
Villanueva referenced it in a letter and does not hide it. Sheriff Villanueva referred to Mr. Huntsman and
said his real name was "Gustav." Ms. Pawlowski believed Sheriff Villanueva's comments were intended
to be about Mr. Huntsman's national origin.

KFI Radio Talk Show

Ms. Pawlowski reported that Sheriff Villanueva also made comments about the Justice Deputies on
the radio station, KFI. Ms. Pawlowski said everything blended together. She listened to his comments in
the different forums giving him space. She could not distinguish one from the other. They listened to all
of his comments across various media platforms. Ms. Pawlowski believed some of it was captured and
could be located by Lenny McGuire.

CONFIDENTIAL

Investigation Report
Sheriff Alex Villanueva
Date: May 19, 2023
Page 8 of 8

## 6.   DOCUMENTARY EVIDENCE

a.   **October 21, 2021 Tweet from @LACoSheriff_33;**

b.   **March 22, 2022 Tweet from @LACoSheriff_33;**

c.   **March 16, 2022 Facebook Live recording;**

d.   **March 29, 2022 Facebook Live recording;**

e.   **April 26, 2022 Facebook Live recording;**

f.   **July 13, 2022 Facebook Live recording;**

g.   **October 26, 2022 Facebook Live recording;**

h.   **March 5, 2022 Email From Sheriff Villanueva titled "Message From the Sheriff: Transparency and Accountability";**

i.   **March 6, 2022 KFI Radio Show recording;**

j.   **April 1, 2022 Los Angeles Times Editorial titled "Editorial: The Villanueva Saga Just Gets Odder and More Destructive";**

k.   **April 1, 2022 Los Angeles Times article by Alene Tchekmedyian titled: "Sheriff Villanueva Makes Ugly, Unfounded Claim Against County Watchdog."**

CONFIDENTIAL

# INTERVIEW TRANSCRIPTS AND AUDIOS

CONFIDENTIAL

COLA002051

**IV 2558097**
**AUDIOS AND**
**TRANSCRIPTS**

COLA002052

# COMPLAINANT INTERVIEW

CONFIDENTIAL

**REFER TO INTERVIEW TRANSCRIPTS AND AUDIO CD**

**1. COMPLAINANT MAX HUNTSMAN**

**CONFIDENTIAL**

**IV 2558097**

**WITNESS INTERVIEW**

**INSPECTOR GENERAL MAX HUNTSMAN**


| | |
|---|---|
| **Herrera:** | I am an attorney with Sanders Roberts. We have been hired by the county to conduct this independent investigation. The county, because they don't- apparently the Sheriff's Department doesn't know how to use these Teams videos, I'm also going to record via audio on another device. Just letting you know that. 'Cause apparently they haven't figured out- they haven't figured out how to incorporate speech. |
| **Huntsman:** | Why would you be interested in what the Sheriff's Department can do? They have CPOE investigators who have interviewed me and I thought this was an external investigation because the county was not pleased with how the Sheriff's Department was handling it. Is that not correct? |
| **Herrera:** | I think the idea, and I'm sure you're familiar with how the CPOE process is, but typically there's an intake and an assessment done and then depending on, you know, the results of the intake and assessment, you know, it's farmed out to different people to do investigations. In this case, because of the nature of the allegations, I think also the subject of the investigation itself, I think the Sheriff's Department decided that it made more sense, and the county, to have an external, a neutral third party, to conduct this. |
| **Huntsman:** | I hear what you're saying and that's true as to all CPOE investigations except the Sheriff's Department ones. And I was actually contacted by a Sheriff's Department investigator. I wasn't told that it was an Intake decision and then the sheriff, in the link I sent you, he told the Times Editorial Board that I had made a CPOE complaint against him. So I'm pretty sure that they had triggered some process internally that he was informed of. And so I'm just- Look, it doesn't matter. I'm very skeptical about this whole process. |
| **Herrera:** | I'll certainly ask you some questions about that to get a better sense of who you spoke to and I can look into that. So again, for the record, my name is Christine Diaz Herrera. Can you say your name for the record? |
| **Huntsman:** | Max Huntsman. |

**CONFIDENTIAL**                                                                **COLA002055**

| | |
|---|---|
| **Herrera:** | Perfect. And today is July 21st 2022. It's 2:05 PM. I have an admonition that I'd like to read. So my admonition states that "You are about to be questioned as a part of an official Los Angeles County Sheriff's Department administrative investigation. You are here as a witness in a matter which concerns another employee, the complainant. You obviously, as you know, are not a subject of the investigation itself and you are not under investigation at this time. I think the question that they typically ask is whether you're aware of the Policy and Ethics chapter of the Manual of Policy and Procedures, and this might be different because you're not actually within the Sheriff's Department. |
| **Huntsman:** | Right. The admonition doesn't quite make any sense, but I note the admonition. |
| **Herrera:** | Right, and, you know, essentially the other piece of it is just that this is a confidential interview and we ask that you keep the contents of- the substance of what we talk about today confidential but certainly that you've talked to me or that this investigation exists is not a secret and, you know, to the extent that you share it with someone else, that's certainly your purview. |
| **Huntsman:** | I'm not part of the Sheriff's Department. |
| **Herrera:** | Correct, I am aware of that. |
| **Huntsman:** | So if you're conducting an internal sheriff's investigation, already I was contacted by the Sheriff's Department. I was told it was confidential and then the sheriff told the LA Times about it. So I don't personally hold any stake in the confidentiality of the sheriff's process. I'm not questioning you or what you're assigned to do, but as soon as you provide this to the sheriff, he will do whatever he thinks is best politically with it and that's how it is. So I'm not going to agree that I won't talk about this with whomever I feel like and including County Counsel, including Esther Lim, including all the other folks who I think it might be appropriate in order to protect the rights of the individuals who he's been targeting. |
| **Herrera:** | Sure, and I will say that my work is at the direction of County Counsel and because he is the subject, it wouldn't be him that I'm reporting to and it wouldn't be him that I would be actually giving the final report to, but in any event, I do understand. |
| **Huntsman:** | Okay that's fine. The reason my tone has changed is because you read me a Sheriff's Department internal investigation admonition. If you're telling me that you work for County Counsel and this is going to County |

**IAB IV 2558097**                    **Page 2 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                    COLA002056

Counsel, then I apologize for my tone. It's the Sheriff's Department and their conduct that I take issue with. So if County Counsel just said, 'Hey look, because this is going to go to the sheriff, read this admonition', I understand that and I have no beef with County Counsel. My concern is with the conduct within the Sheriff's Department. Once County Counsel's done with their investigation, if they then make a determination of what they have to tell the sheriff, I don't have any problem with that. I thought this was being conducted by the sheriff, in which case I have a different opinion.

**Herrera:** And that's a fair point, and again, in terms of process, all I can tell you is that, you know, they gave me all of the things that they normally would use because I'm standing in their shoes, so to speak. In some ways that this would normally be done, typically by somebody within the Sheriff's Department.

**Huntsman:** My statement to the Sheriff's Department wasn't given to you?

**Herrera:** [inaudible] it's not.

**Huntsman:** Okay. Because County Counsel has asked you to do this. The Sheriff's Department didn't, okay got it. So you don't- When you get to the questions I'll talk to you about that.

**Herrera:** Okay, fair enough. That's what I'm saying. So, you know, I apologize. It sounds like there's some pieces of information out there that I may not have yet--

**Huntsman:** No no, it's okay.

**Herrera:** --but certainly I will make every effort to make sure that I do get that information. I typically just start with a little bit of background information. So, you know, how long have you worked with the County of Los Angeles?

**Huntsman:** Since 1991.

**Herrera:** And what is your current position?

**Huntsman:** Inspector General.

**Herrera:** And how long have you been in that position?

**CONFIDENTIAL**                                                                                              **COLA002057**

**Huntsman:**   Well I was hired in 2013, and the post was sort of officially anointed in 2014. So, depends on how you look at it, but it was late 2013 or early 2014.

**Herrera:**    Correct. And, who do you report to?

**Huntsman:**   Technically I report to the Executive Officer, Celia Zavala. I have an odd status in that I'm Special Counsel to the Board of Supervisors, so she supervises me primarily for administrative purposes and I report to them for substantive matters.

**Herrera:**    And when you say you report to them, you mean you report to the Board of Supervisors?

**Huntsman:**   My reports go to the Board of Supervisors. I'm, in addition to County Counsel, I'm the other lawyer for them in the county and so I give them legal opinions from time to time. I interact with them. So I have a kind of a weird status, but technically I'm part of the Executive Office and my boss is Celia Zavala.

**Herrera:**    And what are your duties typically? I know that's a broad question, but--

**Huntsman:**   It's a broad question. There's an ordinance that sets forth many of my duties and there are California statutes that set forth my duties. I'm a county officer and so my duties are set forth by statute and ordinance. The short version of them is that, my office was created to monitor, at first the Sheriff's Department, to make sure that we didn't have corruption within the Sheriff's Department of various sorts and to make sure that there were public reports, transparency, accountability for sheriffs' conduct to protect constitutional rights of prisoners and the public in general and so that's how we were created. Over the years we've had our responsibility expanded a bit, to include the Probation Department; we are actively responsible for- at one point we did some work on skilled nursing facilities that involve the Department of Public Health. So our mandate is a little broader under 25.303 of the Government Code. We can advise the sheriff- the supervisors on matters other than the sheriff because they have a duty to supervise all county officers, and we do that from time to time, but it's primarily Sheriff's and Probation, including the jails. We also have responsibility for all the different county and noncounty folks that have any kind of impact on the jails and our work is partly evaluative in terms of reports on procedures and practices, partly investigative. In our earliest days we were less investigative. Our duties were expanded, first by ordinance and then ultimately to some degree by statute.

**IAB IV 2558097**               **Page 4 of 37**                    **MAX HUNTSMAN**

**Herrera:**    Do you have any oversight with regards to, like, use-of-force issues that come up within the Sheriff's Department?

**Huntsman:**    Oh yeah, absolutely. Our staff role out to all officer-involved shootings and we are supposed to be able to monitor and actively investigate those instances by law, but the Sheriff's Department does not permit us to properly do it. What they do permit is for us to come on scene for a shooting, get a walk-through -sometimes a partial walk-through- of the scene and some basic information about what's happened. They usually don't cooperate with our investigations after that. So for instance there was a guy who was arrested in a- Allegedly there had been a kidnapping and so they had done sort of an aggressive attempt to arrest him with other people in the car, that had endangered their lives. We asked for the reports relating to the kidnaping. It was the justification for what they did; they refused to give it to us. So there's a disconnect between what our job is under statute and ordinance and what the Sheriff's Department obstructs or does not obstruct. But we do go out to the scenes.

We do a similar thing for in-custody deaths, on a case-by-case basis. So in some instances where there's in-custody deaths or even uses of force, Category 3 -the more serious uses of force- then we sometimes go to the scene again to see the scene, to look at it, but sometimes we don't. Because there are instances where that's not really helpful based on the way things operate in Custody, when we gather any information, so. So we do do that too. And yeah, as to use of force in general, part of our duties are to review.. not on a case-by-case basis but overall, the use of force and the way they're handling policies. We are permitted to do individual investigations but we're not required to.

**Herrera:**    What about if someone was injured while in custody? Is that type of allegation, is that something you would look into?

**Huntsman:**    Yeah. Again, the way our mandate is worded, we are responsible for monitoring and sometimes investigation matters in Custody, which includes what you describe, as well as many other issues. Any kind of things having to do with the terms of confinement and the manner in which people are held, any complaints they have. So we get complaints directly from people, we go and talk to them, we conduct inspections of the jails as well as limited investigation as to individual incidents. The Sheriff's Department has primary responsibility and our primary model is that we prefer to monitor the Sheriff's Department's investigations. But we are lawfully entitled to conduct a follow-up investigation. So for instance, we have recently in our investigation in assisting the Attorney General's Office have done some onsite interviews and reviews and

**IAB IV 2558097**            **Page 5 of 37**            **MAX HUNTSMAN**

CONFIDENTIAL                                                        COLA002059

taken photographs and whatnot. So I recently was down at the East LA Station and took a photograph of a 3%er logo that has been discussed recently and has been a matter of- I think will be a matter of public concern but has been a matter of concern within the county. So that's kind of how we function. We don't investigate every case. We're not ever the first level of investigation. We're meant to be sort of a second opinion and quality control.

**Herrera:**     Have you had any role in- Let me back up. Are you aware of there being an incident where there was someone who was injured while in custody, allegedly by an officer putting his knee on their neck where they couldn't breathe?

**Huntsman:**   Oh yes.

**Herrera:**     Okay.

**Huntsman:**   I'm very much aware of incidents like that. I don't know about the 'couldn't breathe' part.

**Herrera:**     That they put the knee on the neck. And that they--

**Huntsman:**   Yeah. I think the one that has gotten a lot of attention of late is the Escalante incident. Escalante was the person who got the thing done to them and Deputy Johnson was involved in it, and I'm very much aware of that incident.

**Herrera:**     And is that an incident that you are investigating separately or looking into or, or you just monitor it?

**Huntsman:**   We are attempting to investigate it; however, the Sheriff's Department has been obstructing our investigation.

**Herrera:**     And how do they do that? How do they obstruct?

**Huntsman:**   Well the tools that we have for investigating are two parts: one is an ordinance, and statutes, that require the cooperation of the Sheriff's Department. The other part is subpoena power, which is also according to both ordinance and statute. And so when it comes to the subpoenas that we issue, the Sheriff's Department does not comply with them, and that's how they obstruct. When it comes to the other part of our ordinance, which is supposed to be self-executing, which is that we have the authority to require any county department and any Sheriff's Department employee to provide information to us upon request in the manner that we directed, they simply refuse. And that's done at the

**IAB IV 2558097**          **Page 6 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                      COLA002060

direction of the sheriff and then, of course, as- we're talking here
because of more active efforts the sheriff has taken to obstruct my
investigations that began when he first took office and we started to
report on his rehiring of a deputy, a law enforcement gang member,
Caren Mandoyan, and when we reported on that then he started to take
some actions against me: placed me under criminal investigation and
the subject of my information I provided to CPOE related to another
effort on his part to attack and discredit me, which I believe was for the
purpose of obstructing our investigations into his misconduct and law
enforcement gangs. But when I was talking about them obstructing our
direct investigations, I was referring more to the fact that they refuse to
comply with subpoenas and refuse to comply with information requests
except on limited bases.

**Herrera:**     Now is that something that you can compel them to do so in court or is
that something--

**Huntsman:**     Yes. The subpoenas have a built-in mechanism and we have- So the
sheriff was initially subpoenaed to speak about law enforcement gangs.
He refused to talk. The county took the action permitted for in the
statutes, certified the matter with contempt proceedings to the court.
The court told the sheriff that he could not ignore our subpoenas and
then he showed up. He then refused to take the oath and so we had to
go back to court and get him compelled to take the oath. So then he
took the oath and swore to tell the truth and we asked him a bunch of
questions and he refused to answer many of them. So we have to go
back to court to compel him again and we're in the process of preparing
that. So there is absolutely a mechanism for compelling the subpoena
process, which is a very slow mechanism and the sheriff has I think
intentionally made it slow, so it hasn't effectively compelled the behavior
even though we've won every time we've gone to court, and the court
has followed up with us.

The other mechanism I mentioned, that's the subpoena process. Our
inherent authority to direct county employees, as an officer of the
county given that authority, the Sheriff's Department also does not
comply with that. County Counsel - I think it was last week - filed a
petition for a writ of mandate in the Superior Court to compel them to
comply with that legal duty and.. which should do a bunch of things.
Like, when I first came under criminal investigation, they shut off our
access to computers. So if we had that access we wouldn't even have
to ask them; we would just type in our code word and we would pull up
information on the computers. So that's part of that writ of mandate, to
say you need to turn that back on. Body cameras for instance. The
whole plan with putting out body cameras was that we would have

**CONFIDENTIAL**                                                          **COLA002061**

direct access to that video, without having to ask the Sheriff's Department for it and the Sheriff's Department has refused to comply to that. So then that's part of that writ of mandate that will eventually, I suppose, be litigated in court, but it takes a very long time. We have no, you know, direct ability to enforce or to compel since the Sheriff's Department's a stand-alone entity.

You look like you're frozen. Are you there? I think we have technical difficulties, so I don't know what of this you can hear, if any. I'm going to stop talking. [silence 0:18:09 to 0:18:49] Hello, you're moving again.

**Herrera:** Yeah, I could hear you but you couldn't hear me. So I--

**Huntsman:** Yeah, your picture froze in a one position and then I couldn't hear anything from you. So I kept talking for a while--

**Herrera:** It was the whole thing, I got all of- The last thing I heard was that, you know, that the process to access things like body-worn cameras, that there's no direct ability to enforce or compel, so you've been going through that process to get that type of information.

**Huntsman:** Right, apart from the legal process, we don't have any ability to directly do something. The county, everything it does with respect to the Sheriff's Department is controlled by the sheriff. So for instance, Murakami the undersheriff was found by CPOE in the past to have violated CPOE rules and that was submitted to the sheriff and the sheriff said 'I'm not taking any action.' Mandoyan, the county had some ability yet they had to sue him to prevent him from rehiring Mandoyan. So it's not like I can say, 'Hey you're a county employee. If you don't answer my questions you're fired' because the sheriff gets to decide who to fire. So effectively I can do nothing without the sheriff's permission and the sheriff does not choose to give it. It's kind of, like, Watergate where they fired the special prosecutor. Unless the person being investigated agrees to it, they can't be investigated. Unfortunately that's the way it currently is.

**Herrera:** Just an aside, but the Board can't target the money? Like for example, the contractors that, like, the body-worn cameras, like 'I'm not gonna pay unless we have access to it.'

**Huntsman:** That's correct and recently something like that has just happened, which is, has to do with school resource officers. So in that context, the Board directed us to approve or disapprove the contracts in those matters rather than- They would basically delegate it to us, their approval authority. All county contracts are controlled by the Board, but

**IAB IV 2558097**          **Page 8 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL                                        COLA002062

the downside is that these are important contracts and the budget point- they could turn off the sheriff's budget, say 'We're gonna defund the police,' as people have sometimes requested, but they don't want to do that because we need police, you know. So unfortunately the mechanisms they have to control the sheriff are all blunt instruments that would have a negative impact upon the public and less of an impact on the sheriff. And so, it's kind of like sanctions in the international arena where if you put sanctions on a county then the people of the country suffer and the leaders sometimes don't, you know. It's that same kind of problem. In theory they ought to have a lot of power and authority, but they- in practice they don't really have a mechanism to force the sheriff. Which is why - I don't know if you followed it, but recently they voted to put on the ballot for the public to consider whether or not they could remove the sheriff by a four-fifths vote for failing to abide by his legal duties as well as obstruction of investigation. So that's kind of a mechanism that, if the voters approve, they would then have the ability to say to the sheriff, 'Look, you're not following the law and so we're going to remove you if you don't follow the law.' Still, politically that's a big pill to swallow.

**Herrera:**        Right.

**Huntsman:**    So I don't know if they would actually do it because, again, the impact on the public and the perceived impact on the public is very great and so I think they would be loathe to use that mechanism for enforcement purposes. What we really need is, is court-ordered compliance and that will take time. We also have an investigation by the attorney general that could result in court-ordered compliance, which will also take time. So there are mechanisms, but they're all slow.

**Herrera:**        That seems to be a theme everywhere, not just here. With regards to your interactions with the sheriff's office, what's the extent to your typical interactions with them? Like, do you.. I know it's a broad question.

**Huntsman:**    Well it is a broad question so I'll break it down into different sort of categories. There's me personally; there's my office; and then there's what you mean by the sheriff. So me personally, honestly that's a laugh. My office, which is roughly 30 people, a little less, have a variety of duties and so we have a variety of interactions with the Sheriff's Department. And some of them are smooth and routine and some of them aren't. So on a daily basis I have monitors who go into the jails and inspect the jails, talk to people, do a variety of things. I have inspectors who gather information regarding reports that we're working on; have communications with people at the middle or bottom of the

CONFIDENTIAL                                                         COLA002063

Sheriff's Department; I have lawyers who write reports and do analysis who talk to, again, people at the middle or bottom of the Department. And those communications are relatively smooth. Under the current administration, there have been restrictions placed on them so that when we make requests for documents or other things, those have to go up the chain and get approved and they don't get approved, except in cases where they think it's not important. But in all the important cases, such as the incident you're referring to where the man got the knee on his head/neck area, then we don't get anything. So.

But on the day-to-day interactions, there's a fairly polite interaction and that goes for me as well. When I went down to escort the Attorney General's office to do these site visits, we were treated fine. An assistant sheriff was there. He's one who we have a long history of communication with because we're a monitor in the jails under a federal law, see Johnson, having to do with the ADA, and one of my assistants, who has just left to go work in Philadelphia, had a very longstanding good relationship with him. So that was all very smooth. I was able to go in and take the picture that I took of the 3%er logo without any trouble. It's not always quite that smooth, but when it comes to requests for actual evidence in our investigations, that's where we're shut down. So as long as we're polite and we don't cause any trouble, they're polite to us.

And that's my staff, that's me, as to the department in general. As to the sheriff, zero. He sometimes sends letters- his undersheriff sometimes sends letters. They are rarely- they're usually nonsensical, rarely in response directly to what we say. So for instance, in January we requested evidence regarding law enforcement gangs under the new statute, Penal Code 13670, and he didn't respond; Murakami sent us a letter. And he sent a letter to the Board telling me to cease and desist from the use of the term and all these other things. And that's the kind of response we get, or tweets talking about us. The thing that caused me to report to CPOE on this matter was a tweet by him, or a press release by him, attacking me, not communication to me. I haven't talked to the sheriff personally since.. he threatened me back in 2019 and I haven't talked to Murakami. We used to have a little interaction with some of the higher level folks at the Civilian Oversight Commission, but they stopped going, and they're required by ordinance to go to that and they don't do that anymore.

So we don't have any real relationship with the management of the Sheriff's Department at that level. At the assistant sheriff level, [unintelligible ] 2630 Patrol and Custody, we have cordial relations. You

**IAB IV 2558097**          **Page 10 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL          COLA002064

know, I can call them or email them and they email me and we communicate just fine.

**Herrera:**    You said in 2019 he threatened you?

**Huntsman:**    Yeah, that was in June, June 17th of 2019. I'd mentioned that we wrote a report about Caren Mandoyan, the grim reaper, who he was trying to rehire. The county had sued him because he was doing that unlawfully, and we set about trying to investigate the manner in which the sheriff was saying he was going to rehire a bunch of fired deputies including Caren Mandoyan -what he called a Truth and Reconciliation Committee or Commission- that he was going to set up within his office. So we tried to investigate that and he refused. We wrote a report about it as best we could with the information we could gather, and I gave him a draft of it, and when I did that he shut off our computer access and I was asked by people in the county to try to convince him to change his mind.

So I met with him personally and said, 'Will you please turn back on our computer access?' and he used the opportunity to tell me that I was a political hack, that my report was ridiculous. I have since learned he never read it. But he said that it was all wrong and that his hiring of Mandoyan was correct and wonderful, and that I shouldn't issue the report, because it might influence the civil litigation regarding rehiring Mandoyan. And I said, 'Look, that's my job as the Inspector General to issue this report and what happens in the civil case isn't my business. I would think it wouldn't have any impact because I think probably it's unlawful, but that's for you to work out. I'm just reporting to the public what happened.' And in that context, he said to me, 'If you issue this report, there'll be consequences,' and he said it in a significant way, but he didn't say what they were and his number two, Mr. Del Mese, who was present, quickly changed the subject. And a short time later, he announced to the press that I was under criminal investigation and sent a letter to the Board asking them to relieve me of duty because of the 'horrible conflict' there was for somebody who is being criminally investigated to be responsible for--

**Herrera:**    I'm sorry, you were just a little bit fast. I'm only so good at typing. I was not hired for my typing skills. So you said he announced- what did you say he announced?

**Huntsman:**    In a podcast, he told some representative of the media that I was under criminal investigation for stealing from the county, basically, from his department, stealing data, and he had Murakami send a letter to the board asking- saying the same thing and asking that I be removed from office. So he announced it publicly. The reason I point that out is

**IAB IV 2558097**              **Page 11 of 37**                **MAX HUNTSMAN**

CONFIDENTIAL

because that's not how you begin a criminal investigation. If you're in law enforcement and you think somebody committed a crime, you prefer to conduct an investigation without the target knowing that you're investigating them. The last thing you do is announce publicly, to start, that you're conducting an investigation. But that's exactly what you do when you want to intimidate somebody. And so that's why I believe what he did then was a violation of 518 of the Penal Code: Extortion of a public official through a threat in order to try to get them to not discharge their duty, in this case; he didn't want me to issue that report. And then when I did, he wanted to inflict the consequence. Since then, he has taken a number of actions against people involved in oversight, all of which designed, I believe, to intimidate them in order to suppress investigation of the law enforcement gangs and of his misconduct-alleged misconduct of various kinds, including the Escalante matter, the Kobe Bryant matter, and other instances which we tried to investigate but didn't. So I think it was the beginning of a process that he then developed as a way to prevent, the officials of the county from conducting oversight over him as they're required to do by law. And I go into that detail because I don't think it's a coincidence the thing that I reported here I think was a part of that process.

**Herrera:**    Right and I think it's good for context so I appreciate the background information. With regards to that issue, was there any kind of outcome or.. was there any kind of admonition from the Board about his behavior or was there any type of followup?

**Huntsman:**    A bunch of things have happened. The Board did respond and say 'No we're not going to remove Huntsman. We agree with you; there's a conflict, but the conflict is for you to investigate Huntsman, especially based on what you are claiming to investigate him on.' What he claimed was my crime was that when he was about to be sheriff, we discovered that the Sheriff's Department had a set of internal documents related to discipline that it kept secret from us, which was in violation of law, and we brought this to their attention and said, 'You need to provide us these hidden files.' We used to have computer access to their discipline records and suddenly we learned that all the runs we'd been making had been inaccurate because some of them, some records just weren't visible. It was as though they never existed. And it was a mechanism used to protect sensitive documents and make them only visible to the people in Internal Affairs. Which wasn't a bad thing; it's just the way- the mechanism they used was bad. So we brought that to their attention. They hemmed and hawed and didn't get around to complying with us, until the sheriff- the current sheriff -won the election. And then pending his election win, he contacted the head of Professional Responsibility - or so has testified Del Mese, his chief of staff, the guy who was there

**IAB IV 2558097**                **Page 12 of 37**                **MAX HUNTSMAN**

CONFIDENTIAL                                                                                COLA002066

when he threatened me, has testified that the sheriff directed him to do this - he contacted her and they provided her a settlement agreement for Mandoyan to get his job back. They were trying to get Mandoyan rehired before Sheriff Villanueva took office so that nobody would know that he had done it. And when that happened, the Sheriff's Department changed its mind. Because we had said to them, 'You know, you need to provide us these records, now more than ever that there's a new sheriff coming in. If you were to delete or destroy records, we'd have no way to prove it, but if you give us these records, then we can- we have a copy that we can compare to records in the future.' After that happened - Alicia Ault was the person who got that - she agreed to give it to us. It was approved by the sheriff, I was told. I requested it in writing and we got a copy of discipline records that included the sheriff's discipline records- the current sheriff, Villanueva -and he believes we did that in order to provide them to the Board who could put them into a nifty hit piece, political mailer or do some skullduggery against him. The proof that that didn't happen is the fact that in those discipline records there's proof that things he said about his discipline record are false, and by law the Department can make those public: peace officer bill of rights. The term that's commonly used to refer to Penal Code 832.7, which is actually not part of the peace officer's bill of rights, has restrictions on what can be put out publicly about a law enforcement officer's discipline records, but there's an exception when you yourself give false information.

So he has done that regarding one of his cases and nobody in the press knows about that. And that's because when we got that evidence, we put it on ice, we sealed it, we did not give it to the Board, we didn't give it to anybody. We kept it. We didn't even review it ourselves until much much later after all this happened, but he tried to frame that as a crime and presented it to various folks to try to get them to be interested: the FBI, the AG, and this has all been testified to by Del Mese recently at the Civilian Oversight Commission. So that's--

**Herrera:**    What's the last name? I'm sorry.

**Huntsman:**    Del Mese?

**Herrera:**    Yeah. How do I spell it?

**Huntsman:**    Del Mese's last name is spelled D-E-L is one word and then the second word is Mese, M-E-S-E. And he was the sheriff's chief of staff. He was on his transition team and became his chief of staff. He was dismissed from that position maybe a year later, but at the time he was being- when these things were happening, Del Mese was his chief of staff, and

**IAB IV 2558097**          **Page 13 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL          COLA002067

at the time that the sheriff threatened me in June, Del Mese was still his chief of staff. And Del Mese testified on July 1st about some of these facts. So the sheriff put together that criminal case, tried to sell it to the FBI, to the Attorney General, to the DA. Nobody bought. He got a letter from the Civilian Oversight Commission, or Murakami, his number two, did, saying, 'You know it's a conflict for you to investigate the inspector general. You shouldn't be doing that,' and Murakami said, 'You know you're right, we agree. We're going to give it to another agency when we reach an appropriate point of handoff' - this is the term he used. They never did. They kept it over my head for years, and the Board had nothing they could do other than say, 'No we're not going to remove Huntsman' until near the end of last year and the Civilian Oversight Commission got some traction with getting County Counsel to ask the attorney general to step in.

Actually I've got two agencies- it's- No that's right, I'm confusing two things the attorney general did. The first one was opening a civil rights investigation against the sheriff, and that happened oh a year and a half ago or so. And then, more like a half a year ago or so is when the County Counsel sent a letter to the AG saying 'Can you please step in and conduct some oversight over the sheriff, a la your question about, you know, what mechanisms are to enforce stuff. And they addressed a number of things including, a group that he has, called the secret police by some people, that targets his political enemies, and that's part of that process I talked about where he's targeted people who oversee him. That warrant investigation against one of the supervisors and an ally of hers in a nonprofit organization, a bunch of things, and the investigation against me. And the attorney general said, 'Well we'll look into that. We'll take a look at what he's got on Huntsman and see what we think about it and we'll look at that warrant process. But we're not going to, like, take over the Sheriff's Department.

When that happened, the sheriff publicly said, 'Well I've already submitted the case on Huntsman to the attorney general. I did it a couple of months ago. So supposedly - I think it was around November of last year - he had submitted it to them for filing and asked them to prosecute me. I haven't seen those documents 'cause it's all part of the criminal investigation, but if it's what I think it is, it's a violation of my constitutional rights because he doesn't have any probable cause. What I did was provided for in my job description and in writing with the approval of the then-sheriff Jim McDonnell, so. So that's kind of the arc of that. So the answer is yeah, there was a response; it wasn't terribly effective in controlling the sheriff's behavior because he has placed himself above the law, and because the mechanisms for dealing with that are slow. But, it is now before the attorney general. There's some

CONFIDENTIAL                                                                            COLA002068

attorney general in San Diego whose job is to review the filing and decide whether or not he should prosecute me. So I'm still under threat of arrest, but I don't really expect to be arrested since Del Mese has testified that everybody- all the professionals who looked at it said there's no crime here, including the sheriff's internal people. So, you know, it's an elaborate process. I apologize for the long answer, but--

**Herrera:** No that's okay. And I--

**Huntsman:** The complete answer is even longer, so I'm gonna stop there. But yeah, there was a reaction, but it's, you know, it's complex and it hasn't changed the situation completely.

**Herrera:** And so my question is, does that end up dovetailing with the racially biased emails and some of this other stuff? Is that- Do they dovetail together or is it, this happened and then there's a chunk of time where there's not as much going on and--

**Huntsman:** No no, there wasn't a chunk of time. I mean, I haven't gone into all the details regarding all the things the sheriff has done, endlessly since then. But the fact of the matter is, there hasn't been a chunk of empty time. The thing I described happened. He then went to, you know, he runs the sheriff's department, so events happen. We report on things. There's discussions publicly. He has a number of times attacked me in the press, claimed that I am corrupt and that I'm a liar. We had a number of run-ins at the Civilian Oversight Commission. They kept- the sheriff just kept sending his staff there to say, 'When Max tells you that he's not getting cooperation in his investigations, that's not true. We give him everything he asks for.' So I had to present to the Civilian Oversight Commission a series of emails in a PowerPoint - I provided the emails detailing the numerous requests we've made and showing the email responses showing that they never gave it to us. And I had to do that twice. The first time was in a presentation to the Civilian Oversight Commission and then a year later I issued a formal report that's up on my website called Unlawful Conduct At the Sheriff's Department and it details a whole series of our investigations that were thwarted as a result of the failure to provide information.

So the false narrative that he's put out to the public, is that I'm a liar and he still to this day continues to do that. And that's gone on nonstop and it's been supplemented by a tax on other individuals: Sachi Hamai, the former Chief Executive Officer of the county, ran afoul of him because he tried to get money for a PR firm within the sheriff's department and she refused to give that to him and then he targeted her, first claiming that she was refusing to provide sick-time benefits to his deputies if they

CONFIDENTIAL                                                        COLA002069

got COVID, which wasn't true. Department heads get to decide who gets sick time and who doesn't, not the CEO, and he never retracted that. And then he actually again claimed she committed a crime. She was on the Board of Directors for the United Way, a volunteer position, and he had a press conference in which he said she voted, or participated in putting up.. I think it was a homelessness initiative on the ballot that United way liked, because they might get some money out of it, therefore it's a conflict of interest. Government Code 1090, the provision that governs conflicts of interest relating to contracts, requires that you have a financial interest. In other words, if you're a volunteer on a board for a nonprofit, it's not triggered, and the sheriff knows that; I know he knows that because his secret police squad put together a report that claimed she was a criminal, and in it they acknowledged the absence of that evidence but still claimed that she had a conflict somehow that she kept secret. And they submitted that up to the AG as well, and publicly accused her of this. And she ended up- When she retired, she got a settlement from the County with an agreement that she'll get security because of the sheriff's threats and threats that she received and other County officials have received after he publicly sets them up for targeting. Because he has an extremist base that will react to whatever he says. So at one point he accused Mary Wickham of County Counsel of going rogue, because she was advising him that what he was doing was illegal, and the next day she got a threatening phone call, from some folks who claimed that there was an arrest warrant out for her and she was going to be arrested. And the phone call came from the Sheriff's Department. And they said 'No no no, it was spoofed, it's not true' and later they claimed that they had done something about it, but they never provided the evidence or the phone records. So she- until the day she retired, she believed that she was being targeted by people as a result of the sheriff's threats.

So he took a series of actions throughout this time that have never stopped, including targeting Patty Giggans, who's the head of a group called Peace Over Violence, and Sheila Kuehl, a supervisor - they are political allies, I think, or friends, from way back. He claimed through conversations with a guy named Adam Lowe, whose wife used to work at the Metro, that there was a conflict of interest in a contract that Patty Giggans had and he got a search warrant to serve and search the Metro and the Metro's Inspector General and a bunch of stuff. And again, there was public allegations of misconduct, all based on the statements of this guy Adam Lowe, who had filed the lawsuit, which didn't go anywhere, and had been investigated by the Inspector General in that organization. And he used all that as a basis to then make Sheila Kuehl think that she was going to be arrested.

**IAB IV 2558097**                    **Page 16 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                 COLA002070

So he's done a series of things like that that haven't really stopped, nonstop. And so I do think- the thing that I'm talking about now is just the latest in a long line of them. It's not like he was silent for a while and then popped back up. And that's why I sent you before this conversation that email I'd gotten with the post recently from Adam Lowe in which he details in his letter to Merrick Garland, you know, all these- his complaints about various things, including using my name as Max-Gustaf and then at some point Max-Gustof, spelling it a third way--

**Herrera:**    I saw that.

**Huntsman:**    --and a variety of stuff. Well that guy, Adam Lowe, is the affiant in the warrant that they served on Peace Over Violence and Met News. So when we get into more detail about the actual CPOE claim and the holocaust accusation, which is the second thing I sent you -his claim that I'm a holocaust denier- I think he gets that from Adam Lowe. I think Adam Lowe is his supposed source based on my reading of that document that you saw, as well as other things that Adam Lowe has said. Before the sheriff ever in that communication to the department called me Max-Gustaf, Adam Lowe had used that name as well and nobody else had. Nobody else calls me that.

**Herrera:**    And I want to definitely get to the Adam Lowe. I appreciate you sending me that email and I looked it over. I did want to look at- talk to you about the email that, you know, that was kind of the genesis for this complaint itself, right? So my understanding is that there was an email that was sent by the sheriff. Can you give me some more information? And I don't think it has the date, the information that I have I don't know that I have the date of the email, so do you have--

**Huntsman:**    I saw you don't have it. I thought I had forwarded it and so you should've received it. I can try to track it down for you and try to get you another copy. But bas- I don't remember the date. It was earlier this year. But when he sent it, it was- you know, one of the points when he was attacking me publicly, it was sent around to the whole department, I believe, and he again accused me of - I forget what the particular issue is 'cause he accuses me of lying or being corrupt or, you know, whatever - but in that email he referred to me as Max-Gustaf with a Max-hyphen-Gustaf, and that's the thing that caused me to report it, to the CPOE because I believe he was intentionally- He has a base of extremist groups - white supremacists basically - who he dog whistles to and lets them know who their current target is, and that's how he got Mary Wickham to be targeted; that's why Sachi Hamai had to get security; and by saying Max-Gustaf, I believe he was trying to say to those guys 'This guy's a foreigner; he's either German or Jewish or

CONFIDENTIAL                                                                                    COLA002071

both' and we now know with the Holocaust denier thing, he wasn't trying to sell to anybody that I was Jewish because he was claiming that I denied the Holocaust. But I think that my German descent was what made me a target for him because I would be an easy target, in the same manner that he targeted Esther Lim, I believe, because she was an easy target. He liked to target a lot of people, anybody who was a critic of his, but some people because of their race are easier for him to set up as scapegoats with his base who listen to him, including people within the department.

**Herrera:**    Actually with Esther Lim, I believe he sent out something in the past where - I don't know if you're aware of it - I think where he looked at her Twitter feed.

**Huntsman:**    Oh I'm very much aware of it.

**Herrera:**    Right. And where--

**Huntsman:**    I don't know, because my ability to investigate has been obstructed, but if I were investigating, I would investigate my belief that that's part of what he has that dirty tricks squad doing. They're supposedly investigating crime and the sheriff uses his criminal investigative authority as his shield to tell 'Nobody can ask any questions about what I'm doing'. But what I think they're doing is political work. And he had somebody go through all of Esther Lim's social media to mine statements that he thought were obnoxious. And then he put them together in a long list and sent them.. a year and some change ago to the Board, particularly to Supervisor Solis, Esther Lim's boss, to complain about her. And then a year later, more recently, he sent it again. And that was after he had taken the shot at the Chinese company that was providing COVID testing. Part of his sort of strategy for remaining sheriff is to appeal to the deputies' union and he described to Gustavo Ariano of the Times, his staff as being 80% conservative and right-wing. Now, I'm not sure that that estimate's correct, but that's his viewpoint of his staff. I do know that there is a certain percentage of his staff who are very extremist on the right and who are very anti-Chinese, and he was using that racial component to try to beef up his standing with them, and with voters who- the right wing of voters who he thinks he can get to reelect him. But at the same time, it creates, I think, a great danger to the, the people he targets because these folks are- these are dangerous people. And so that's why I connect these events. What he did with Esther, I don't think that's a coincidence. Now he could've done it with anybody and he could've done it irrespective of race. But I think he targeted her because she's Chinese.

**IAB IV 2558097**              **Page 18 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                                  COLA002072

**Herrera:**     Do you have any sense of how many people he has on this squad or, or how many people are [indiscernible]?

**Huntsman:**     I think it's about a half dozen or so and I think it's changed a little bit over time. In the early days when he first started it, he hired a guy back to the Sheriff's Department called Lillienfeld and he was a guy - I don't know if you're familiar with him, but - if you were to Google him, you'd see that he had left the Sheriff's Department years ago and he went to work for the DA's office on a contract basis, and he got caught sneaking into the jails. He put on his old sheriff's uniform and snuck into the jails in order to bring contraband to an informant. He did it for the cause of good and justice, because he wanted this informant to help him with a murder case for the DA's office. And the contraband was, supposedly just a burrito -although nobody knows because he snuck it in- but he did it after being told no, he couldn't do it, by the Sheriff's Department. And then he used his old uniform to pretend that, you know, that he had permission and snuck in contraband.

**Herrera:**     Can you spell his name again?

**Huntsman:**     Lillienfeld?

**Herrera:**     Okay, there you go. I've heard- I just didn't hear it, yeah.

**Huntsman:**     Yeah, and that happened. I mean, it's on video. What you think about it is questionable, but the event happened. So he rehired that guy and I think he rehired him because he knew this is a guy who'll do whatever I ask him to do. He'll pull out every stop. And he put him in this unit and he also had a guy who's a computer guy, and the computer guy did a lot of computer work for him. Allegedly, I've heard numerous times over the years that he's bugging my emails and, you know, accessing stuff. I'm not sure I believe it, but I have a bug sweeper in my office as a result that I use from time to time, to try to, you know, at least have some kind of protection against it. But other people do believe it and I've been told that over and over. That guy's on the crew. So I wouldn't be surprised if that team was put onto the process of gathering stuff. But the sheriff has a lot- also has- I mentioned the PR firm he wanted to have the county pay for for him. He never got that. So instead he converted the Sheriff's Information Bureau, which is supposed to provide information to the public, which the sheriff has a legal duty to provide and doesn't, he turned them into his PR firm. So they're run by- or were run by a guy named Satterfield, a deputy, now a captain I think, because he's been promoted, who would put out PR stuff for the sheriff on a nonstop basis. And it's possible that that team did the work as well.

**IAB IV 2558097**          **Page 19 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL                                                                      COLA002073

But it's also possible it was done as a supposed criminal investigation. I haven't been able to investigate that. But the bottom line is, I think he collects dirt on his political opponents and then tries to figure out a way to hurt them and he turns most easily to race-based techniques 'cause I think it plays with the people he's trying to curry favor with and he uses whatever means are available to him to do that including public funds for- that should be used for criminal investigation or, in the case of SIB, should be used for Public Records Act requests, you know, all sorts of things. So that's kinda the way I see it unfolding and why I see these things as connected.

**Herrera:**     And in terms of your name being Max-Gustaf Huntsman, is that.. a name that you've ever used publicly? Like, as your name?

**Huntsman:**   The story of my name is that when I was born I was named Max-Gustaf Edler. My dad was German, and he came- his dad was a soldier with the Nazis, and he supposedly couldn't carry a gun 'cause he had employed Jews before the war, but they lived in Nazi Germany. His older brother hid in the woods to avoid being conscripted and when the war was over, he decided that was not a good place to hang out. So he came to Canada and then he came down to San Francisco, where he met my mom and fathered me. And he wanted to name me a German name. They settled on Max-Gustaf, which was a hyphenated name of two uncles of his; Max was one of 'em and Gustaf was the other. The F that's in that name is the Swedish spelling of Gustav and that's 'cause this guy just happened to have the Swedish spelling; I don't know why. This is all stories I've heard from my dad. My dad quit working when I was born, was doing a lot of drugs, once left me on a street corner to teach me to be self-reliant and after my mom and my dad got divorced, not long after that she moved down to LA to get away from him.

After that, he left America. He went to New York for a bit and then he went to Sweden and got himself a real family, and lived 'til the day he died in Sweden taking care of a family. He didn't do that with my family and I believe that's because of Nazi Germany. I believe he was raised with a violent hatred for authority. He was an amateur boxer and, you know, he liked punching people. He was a con artist. He actually supposedly did some time in custody. I mean, he was just a piece of work - as a result of the Holocaust. Not what was done to the Jews but the way Nazis functioned, and I think they did a lot of damage. I don't claim that's as bad as the Holocaust, but it had a direct impact on me. So the idea that I would deny the Holocaust is crazy. I have no love for Nazi Germany; quite the opposite.

**IAB IV 2558097**          **Page 20 of 37**          **MAX HUNTSMAN**

                                                   COLA002074

|              | But back to the name part. So he names me Max-Gustaf Edler. When I was a kid, I said to my mom-- |
|--------------|---|
| **Herrera:** | I'm sorry, Max-Gustaf, what was the last name? |
| **Huntsman:** | Edler. I pronounce it A-dler because that's the German pronunciation and I'm telling you about the early life. |
| **Herrera:** | And how is that spelled? |
| **Huntsman:** | E-D-L-E-R. |
| **Herrera:** | Okay. Sorry. |
| **Huntsman:** | And that's- Gustaf is a first name with a hyphen. I have no middle name, never had a middle name. |
| **Herrera:** | Got it. |
| **Huntsman:** | So when I was a kid, I told my mom, 'I don't want to have the name Edler. That's my dad's name. I don't like my dad. I like you. You raised me.' Sorry, I get a little emotional about this - I apologize - when I think about it. My mom said 'no'. She said 'When you grow up, you can do whatever you want, but until then I'm not changing your name.' So when I grew up - and by growing up, I mean I went to law school, and I was a law clerk at the firm Tuttle & Taylor, that Jerry Brown used to work at many years ago. And I got one of the partners there to help me change my name. And I went into court and legally changed it, from- to Huntsman from Edler. I didn't get rid of the Max-Gustaf legally. So I was Max-Gustaf Huntsman on paper. I never used Max-Gustaf and nobody ever knew me by that. I just went by Max. And when I became the inspector general, I got lucky and I- I can't really tell you how this happened, but one way or another- 'cause I would use Max and I would write Max on most things, but like on my tax returns I'd write Max-Gustaf and the state bar had me down as Max-Gustaf. So, like, you know, my formal name was Max-Gustaf; I never hardly used it. |
|              | Somehow or another I got a passport that had Max on it, just Max and not Max-Gustaf, and so as a result, under California law you can't change your name unless you go to court and do a bunch of things that I didn't want to do, unless you have some documents to show that your name is this other thing. So as soon as I had a passport that said Max on it, I was able to go into the DMV and go, 'Look, my name's Max,' and they changed my name to Max. And I was able to go to the County and say, 'Look, my name is Max' and they changed my name to Max. So I |

**IAB IV 2558097**                    **Page 21 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                    COLA002075

changed my name everywhere to Max. But on some obscure county computers, they never changed it correctly and the state bar still had me down as Max-Gustaf. But in all other contexts: federal government, county government it's Max and I never ever use Max-Gustaf to talk to anybody. Nobody would ever tell you, 'Oh that guy's name is Max-Gustaf.' There is one cop I used to work with in the DA's office who used to call me Goose just as a joke, and that was it.

But I'd never gotten the state bar changed until the sheriff did this and then I called them up and said, 'Guys, can you pull that?' So they said, 'Yes, yes we'll make you Max.' Now if you run me on the state bar, there's an entry for a guy named Max Huntsman and there's an entry for a guy named Max-Gustaf Huntsman, 'cause they didn't change it; they just stuck another one in. So that's the story of how I use my name and that- it's a long slow burn, all from the fact that I didn't particularly like my dad very much. And I didn't want to have anything to do with him. When I got to turn over a new leaf as inspector general, I, 'you know what, I'm just dropping that -Gustaf part. I won't even do that,' 'cause I'm not a German. I've got nothing against Germans particularly, aside from Nazis, but I'm not one; I'm an American. He came from Europe and, you know, my mom raised me here in America and, you know, that's who I am. So anyway, that's my story.

**Herrera:**     And what's your mom's heritage?

**Huntsman:**   Well, her dad came from Canada - white, generic white. Her dad came from Canada. He had come back years earlier from Scotland. I think he actually came from Scotland or maybe his dad's dad did or something. But he, he came down out of Canada and on the other side, on my grandmother's side, they were, like, Daughters of the American Revolution. Her family had been here, like, before the American Revolution. They came- supposedly the story- my daughter tells me this isn't true, but my story was that we were related to John Rolf of the Pocahantas story, 'cause one of our ancestors was Rolf, but my daughter looked into it and said, 'No that guy had no kids. So you might be related to him, but you're not a descendant of him.' But in any event, they were just Americans, you know, white European-type Americans but not, not anything else.

**Herrera:**     Would that be British if they were Daughters of the American Revolution?

**Huntsman:**   That side, on that side. If you want to divide me up, on my mom's side it's half British with a little bit of, like, French or something in there, and on my mom's dad's side, it's mainly Scottish. So it's like British Scottish

CONFIDENTIAL

on her side and then on my dad's side, he's pretty much German with a little bit of Russian and I think a little bit of Polish.

**Herrera:** Okay.

**Huntsman:** But in terms of culture, he didn't raise me with any kind of German culture or anything and my mom, by the time, you know- my mom was a hippie. She was a beatnik; she wasn't a hippie. She was before the hippies.

**Herrera:** San Francisco.

**Huntsman:** Yeah exactly. I was conceived on a houseboat in Mill Valley. You can't get more beatnik than that.

**Herrera:** That's a very auspicious beginning.

**Huntsman:** So, you know, that, to the extent that I have a culture, that's my culture. And I've had this conversation with people, you know, I don't feel- I feel like I'm a cultureless person, other than being an American. It's not like it's a supremacy thing at all. I'm not in favor of that approach. I'm jealous of people who have a real culture. And so it's a thing that I wish that I had and I think that's part of my own read psychology 'cause of my dad. But the bottom line is, I'm not German.

**Herrera:** Right. Now, my understanding is that there was a KFI.. So there was the email that went out and do you recall who that email went to that the sheriff had sent?

**Huntsman:** I think it was the entire sheriff's department. I'll have to track it down for you since you didn't get it. I sent it in to CPOE and I'm sure I've got a copy of it somewhere.

**Herrera:** I can hunt it down myself as well. I just didn't want to delay talking to you because I think it [indiscernible].

**Huntsman:** No no no, it's not important. But it was- Yeah, it was- I think it was sent out to the entire Sheriff's Department. But it's not, it's not- There's more than one time he used that Max-Gustaf, and he talked about it, and I think on KFI he talked about, 'Oh we need to look into why, why did he change his name? What's he trying to hide?' you know. And so, to be clear, like I said, I gave you the reason I changed my name. Since 1991 I've worked for the county and was a deputy district attorney for 20 years before I was this. I'm not hiding a secret past. You know, there's no fraud or process by which I changed it in order to conceal who I am

CONFIDENTIAL                                                    COLA002077

in any way, shape or form. It's just I don't like to be associated with a culture that I'm not part of.

**Herrera:** You mentioned - and I didn't ask this, but - so you were a deputy DA prior to becoming the IG? How long were you with the DA's office?

**Huntsman:** When I graduated law school in 1991, I joined the DA's office before I passed the bar and I was a DA- once I passed the bar, I became a DA and then I stayed there until 2013, when I took the job as Inspector General.

**Herrera:** So when you changed your name, was that while you were in law school? Like, was that a job decision?

**Huntsman:** Yeah, that was- I became Huntsman before I joined the DA's office. So as a kid I'd been Edler; when I was in law school I was Edler until, like, my senior year and then I was Huntsman. And then when I graduated from law school and joined the DA's office, I was Huntsman. So nobody in the DA's office ever knew me as Edler.

**Herrera:** Okay, got it. Because you mentioned you worked at Jerry Brown's old law firm, so I just wasn't sure of the timing of that. Was that during law school?

**Huntsman:** I was a senior- not senior, a summer law clerk after my second year of law school.

**Herrera:** And so.. aside from the email- So then the KFI, the KFI radio call, do you recall what was said during that KFI radio appearance? And was there more than one or is it just one appearance?

**Huntsman:** I don't now recall. On KFI he talked about it and, like I said, it used to be kind of clear in my head, but then when he went to the Times Editorial Board and told them I was a Holocaust denier, it kind of made the details of what he said about my name irrelevant to me. So I don't remember precisely what he said on KFI.

**Herrera:** You did say something to the effect of, you know, that they should look into why he changed his name or what is he trying to hide?

**Huntsman:** Yeah, I mentioned that. He said that somewhere; I think that may have been on KFI. I don't remember now where he said that, but that's, like, a thing he likes to say and he said the same thing to the Board. But he likes to say, 'Well, somebody should look into that.' He does- he's very fond of, like, Facebook Live videos and Instagram videos in which he'll

**IAB IV 2558097**          **Page 24 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL          COLA002078

have, like, a chat and he'll sit there at his desk and he'll pull pieces of paper and talk about them, like a talk-show host or something, and then just sort of ruminate about them. That's how he talked about Sachi Hamai when he accused her of the 1090 violation. He said, 'Woah, I just got this in from.. from Vivian, oh thank you. Oh, somebody should look into this,' you know. And he effects this kind of casual way of talking about things and I think it was in the same context. He said, 'Somebody should look into that,' as sort of a vague allegation that there's some nefarious reason for why my name changed.

**Herrera:**     Did you feel like he was casting aspersions or trying to make some type of negative inference?

**Huntsman:**   Yeah, absolutely. Yeah, definitely.

**Herrera:**     And I know you mentioned that you believe it may have been, like, for example, a dog whistle, but if his people are these radical, maybe right-wing, wouldn't that be more in line with their viewpoint if you were.. you know?

**Huntsman:**   It might be if he had presented me as an Aryan, but he didn't, you know. So that's why when he first did it, my take on it was he was trying to imply I was Jewish. And that would be what I was- that's what I thought he was doing. I may not have been correct about that, but that's just- that's how I took it. And so that's the way I took it. What I think was really going on- I mean, again, it's, being a foreigner I think is the main thing. So you're right; if white supremacists really cared about, you know, true Nazism, then none of them would qualify because most of us here in America are not the Aryans that the Third Reich was obsessed with. But that's not how we look at the world.

**Herrera:**     Maybe the Third Reich weren't all that Aryan either.

**Huntsman:**   Right, exactly. That's my understanding too, but you know, that's ancient history, but for here and now, I think it's really more about an ideology and a way of looking at things and again, I think he was simply designating me as a target and as an 'other' and he didn't really care too much about how people took it. Other than they knew: this is a guy who is an enemy of ours. In the same way that recently the Board had voted to, put before the voters the right to remove the sheriff with a four-fifths vote. As soon as that happened, that was put out on Breitbart, the highly conservative outlet, about it and how Democrats were trying to take away the rights of, you know, a favored sheriff, and immediately there started to be a series of Twitter feeds from right-wing extremists in Florida and other places talking about how outrageous it was. I think

**IAB IV 2558097**          **Page 25 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL                                    COLA002079

that's the technique that the sheriff uses. It's more about designating the target than about the details of why deputy designated. I think he selected these things because they play well, because the race angle plays well.

But now in hindsight, I think he probably had already had a bunch of conversations with Adam Lowe about not just the name but about the Holocaust-denying claim. And so I think really he was setting that up. But at the time, I didn't know that. I thought what he was doing was just trying to make me look like, you know, I'm the target. But I think really what was going on was he was preparing for the next one. And of course, it's weird to say somebody's Jewish and a Holocaust denier. So I assume that was not his plan. But again, I think he's getting this stuff from Adam Lowe, who's a little bit crazy I think. From the document you saw, you know, he's- When we subpoenaed from him, he had an interchange with Lillienfeld, the guy I talked about before, when Lillienfeld recorded him- or, Adam Lowe recorded Lillienfeld while Lillienfeld was kind of threatening Adam Lowe, telling him to back off 'cause he had sent some emails to Murakami. And so Lillienfeld had been dispatched, or voluntarily dispatched himself, to tell Adam Lowe to settle down. Adam Lowe recorded it all; we subpoenaed it; he refused to provide it; and I think that's when I got on Adam Lowe's radar as somebody he was going to target. And I think the sheriff had already, taken Adam Lowe as an ally, used him in his process to try to get a search warrant.

So I think he got from Adam Lowe the 'Hey I think I've got some dirt on Huntsman. I think he's a Holocaust denier. I think he's a bad guy, this is what I think.' I don't know where he gets that from because I have never denied the Holocaust. There isn't some old college paper that I wrote in which I question the Holocaust. You know, it never happened. My guess is that Adam Lowe ran some database and found some name that sounds kind of German, you know, of somebody who denied the Holocaust. But it sure wasn't me.

**Herrera:**  So with regards to, for example, once the email the sheriff sent and then, for example, the KFI, the radio show he's making these statements, did you receive any type of emails or any type of calls or any type of negative attention? Have you received any kind of…

**Huntsman:**  Once he accused me of being a Holocaust denier to the LA Times, you know, in a very public way and it became an Op Ed in the Times and a whole discussion, and a number of media sources talked about it because it was such an outrageous claim, especially - I don't know if you watched the video of that, but if you think it's relevant, you might

CONFIDENTIAL

want to pull up the video - but that Op Ed I sent you kind of encapsulates it. They asked him, 'What's your evidence for that?' He said, 'Well I'm not going to tell you.' And they said, 'Well if you're going to accuse somebody of such a horrible thing but not provide any evidence, should we believe you?' And he said, 'Yes you should believe me.' I mean, it was kinda nutty, so it became a story. After that, I did not receive any death threats or any weird emails from crazy people any more than usual. I certainly have had an increase in, like, when I monitor comments on, certain websites like Witness LA or other places, where there's always kind of a chatter and I'm always kind of the enemy in the eyes of these extremists. I mean, there's certainly stuff like that, but there wasn't a lot of Holocaust stuff because - I shouldn't say because - the sheriff had previously already presented me as sort of his main enemy and there's always been a lot of attacks on me like that. But I didn't- I didn't notice any that were specifically Holocaust-related. I did receive a lot of communications from people I know who, you know, expressions of sympathy and ironically most of them from friends of mine who are Jewish. Because I think if you're Jewish, you know how disgusting and deeply offensive that allegation is. I think if you're not Jewish, it seems wrong to say that about somebody, and if you're Jewish, it's evil. And so a number of my friends who are Jewish were like, 'Oh my God, Max, I can't believe you said that. That's horrible,' you know. And so it's actually been a pretty positive thing.

I sent an email to the Board about it, which is what I kind of forwarded to CPOE, to go on the record and say, 'Look, it's not true,' because it hurt me so deeply, for the reasons I described. I'm not Jewish, but I have a certain connection to the Holocaust that is not positive. And so I take it to heart more than maybe I otherwise would. I don't know. I don't know what a person would think if they were called that, if they had no connection, I don't know. But all I can tell you is emotionally for me it was hideous. It's still hideous. Like I say, I was tearing up talking about it. But when I was tearing up when we were talking, that wasn't because of the Holocaust; that was because of my history, my dad. I'm like an eggshell plaintiff in this. It's not just the threat and the insult and the allegation; it's what it means to me personally.

**Herrera:**     Can I take just a one-minute break? I locked my husband out of the house, so (laughs).

**Huntsman:**     I'll just sit here. Go ahead, don't touch anything and come on back when you're ready.

**Herrera:**     I'm so sorry. I'll be right back. I'm just going off the record at 3:15.

_____

**IAB IV 2558097**                    **Page 27 of 37**                    **MAX HUNTSMAN**

| | |
|---|---|
| **Herrera:** | Back on the record. It's 3:16. So, my understanding is that I think on March 31st, you sent - or was it 30th - you sent an email to, is it- I don't know what the DCO stands for: Deputy Chief Officer Seiberg, or Seeberg? - regarding the Editorial Board comments, the comments to the Times about being a Holocaust denier, do you recall doing that? |
| **Huntsman:** | Can you give me the spelling of the name you're saying? |
| **Herrera:** | S-I-E-B-E-R-G. |
| **Huntsman:** | I'm sorry, I don't know who that is. I probably did do something that created what you're talking about and, as I recall it, I sent an email to the Board and then I decided 'No, I'd better tell this to CPOE because it' - Oh I think you're fro-, no you're there; I was afraid you were frozen - 'I think I'd better tell it to CPOE because not only, not that I'm complaining about it because, for the reasons we discussed in the beginning, I'm very cynical about whether or not the sheriff is going to discipline himself, but I figured I had a duty to my employees to do something about this because CPOE rules are pretty strict about reporting when you're aware of certain facts. |
| **Herrera:** | Right. |
| **Huntsman:** | So I sent it- I would've said I sent it to Vicky Bane, who's the head of CPOE, but I'll bet you whatever I sent somehow generated the thing that you're referring to. |
| **Herrera:** | Okay. And then, I think as a followup-- |
| **Huntsman:** | Unless Seiberg is Sheriff's Department. That could be an echo of what I sent. |
| **Herrera:** | It could be. |
| **Huntsman:** | It could be, 'cause I sent something to Vicky Bane. The process for CPOE for everybody else in the county is the CPOE investigates. For the sheriff's, they get to investigate themselves. So whenever there's a CPOE complaint regarding the sheriff, they forward it to the sheriff. So that may be the forwarding from the county CPOE to the sheriff's department. |
| **Herrera:** | Right. And then it makes reference to.. I think on April 1st you communicated with this person and it may be that they are in the sheriff's office, stating that 'I'm not blaming you, but be sure to tell all |

**IAB IV 2558097**                    **Page 28 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                                    COLA002082

the victims you interview that the LASD CPOE process is not confidential and the sheriff will discuss them with the media.' So I think that gets into that last point of…

**Huntsman:**     That person is the person I told you about who I talked to at the sheriff's department. She called me and then set up an interview and we had an interview, and we went through the same thing I'm going through with you. Not all of it at that point, but he had at the Times said, in addition to the Holocaust thing, he said, 'and Max Huntsman's made a CPOE complaint against me, ha ha.' So that's why I said that to her. I'm, like, 'Look, the whole claim that it's confidential is a joke. The sheriff already was informed about it and he already told the public.' So.

**Herrera:**     Okay, now I see what you're saying about the confidentiality, because I wasn't sure what you were referring to, but that makes sense.

**Huntsman:**     I was referring to his public announcement, the Times Editorial Board, that I had made a CPOE complaint against him. Which is completely in violation of CPOE rules. So that- I apologize, but--

**Herrera:**     Not only they would be--

**Huntsman:**     --I'm a little cynical about the sheriff's process and whether or not it was going to be confidential.

**Herrera:**     Right. I can only tell you that, I'm not talking to the sheriff. I guarantee that I'm probably not going to be his favorite person.

**Huntsman:**     No I understand now. I understand- it was the admonition you gave me 'from the Sheriff's Department' that threw me off for a minute.

**Herrera:**     Yeah and I apologize.

**Huntsman:**     Probably already, you get hired by County Counsel; County Counsel gave you a task: you're going to collect a bunch of stuff, you're going to give it back to County Counsel. If anybody tells the sheriff anything, it's going to be County Counsel. And to be clear, it doesn't matter. The sheriff already knows all these things. The sheriff knows that I'm no fan of his because I- Sorry, my phone froze for a moment - the sheriff knows because I publicly record all my criticism of him, so he knows how I feel. So if you did call up the sheriff right now and tell him that, it wouldn't do anything worse to me. He already is, you know, fixated on me as much as he is ever going to be. It's just that I'm really- As the Inspector General for the county, and it's my job to protect the constitutional and other rights of our employees and the public from the

**IAB IV 2558097**                    **Page 29 of 37**                    **MAX HUNTSMAN**

sheriff, when I'm aware that the sheriff is simply disregarding the rules of CPOE so he can target individuals, people like Esther Lim come to mind. You know, I get paid for this. I used to be a prosecutor. I get paid to take on armed men and do gang busting. She doesn't, nor do any of the other people who he's targeted. So that's why I was a little frustrated with that whole process because it's just- it's so unfair and it's so dishonest, to the people within government service than when we allow somebody like this to engage in this conduct, you know. It just is very disheartening to me, to be a process that CPOE- I've been involved with in my office, and worked with CPOE in investigations and found them to be completely above reproach in their confidentiality and reasonableness in how they deal with things: very careful, very thoughtful, very sensitive to those making complaints and those who are being complained about and, you know, carefully gathering facts, and then crafting the solution that's going to protect people. I mean, it's an amazing process - until you hand it over to the sheriff. So that was my point.

**Herrera:**  Okay, so that makes sense. Now I get it. And then- just going back- I think we're almost done, but going back to Adam Lowe, I just want a little bit more information about who exactly he is 'cause I did read - and again, thank you for what you had sent to me - but I'm trying to understand exactly who he is and what your relation or contact has been with him.

**Huntsman:**  Adam Lowe is the husband of a woman who was employed by Metro. Metro is basically a joint powers agency that's sort of controlled by the county, sort of controlled by LA City and its Board includes, by law, I think two supervisors at a time and they rotate, or whatever, as well as some other folks. They have an inspector general; they have a executive director and they run, you know, the Metro system. So, Adam Lowe's wife was an employee there and she was unhappy. I don't know the details of why, but she didn't feel that she was being treated properly. And she started to complain about that and eventually she quit or was fired or what have you. And once that happened, he made a campaign of attacking first the executive director, a guy named Washington, who is mentioned in that letter that I sent to you; and then somewhere along the line he decided that he was aware of a great corruption and that he needed to let people know. And I think the theory in his head was, this corruption was why my wife got fired, or not treated properly and had to quit, because she was a whistleblower about this and therefore, if I can convince people that this is true, then they will see that my wife is a victim and they will give her money or a new job or whatever.

CONFIDENTIAL

He filed a federal lawsuit; he spoke to every media outlet that would ever listen to him; and my first relationship with him was maybe a year, two years ago - I forget how long, it was a long time ago - where he stuck me on one of his email lists and he would periodically send out these emails to everybody, I mean, to anybody he could think of to stick on there including the media and he sent out these emails saying, 'You know, I've got the goods. I'm meeting with the FBI tomorrow. I've just given all this stuff to the Grand Jury.' You know, all these claims that, having experience as a corruption prosecutor, I was pretty sure were not true. 'Cause that's not how it works, you know. But in any event, he was saying these things and I remember reading these allegations. Now the allegations were that Sheila Kuehl, in her position as a Board member at the Metro, had caused the issuance of a contract to Patty Giggans' group Peace Over Violence. It is true that Peace Over Violence had a contract with the Metro to provide sexual assault hotline services. I don't think Sheila Kuehl had anything to do with him getting it. I don't know that, but I don't think she did. And again, back to our conflict of interest stuff, I'm not aware of any flow of money that would close that circle, that would prevent Sheila Kuehl from causing Patty Giggans to get a benefit like that; unless Patty Giggans gives her money, right? You can give campaign contributions - that's totally okay. It's crazy, but in American California law, that's okay - but you can't, like, give them a hundred thousand dollars to put into their personal account, or hire them for some other job. So, as far as I know, there's no connection like that.

But that was the claim, was that that contract was somehow bad, and it was looked into by the IG at the Metro, I understand - I don't- haven't read that report - and there was an element of the claim that was interesting, which was that not only was the creation of the contract flawed but also the contract itself was fraudulent. And supposedly the basis for this - and I don't know if it's factually true or not, but this was the claim - was that, you know, when you look at how many calls they've gotten on their hotline? It's not a lot of calls. And they're getting paid by a flat rate or some certain amount of money and if you work out how much it is per call, it's a really small number- I mean it's a really large number. They're getting paid way too much money for each call. And so therefore this is not in the interest of the public and it's a rip-off. That was basically the claim. So he made that claim; he tried to sell it and federal lawsuit didn't go anywhere; it was eventually dismissed. He sent it out to all the media outlets to people like me, to see who would, you know, champion this cause. Nobody. Until he got the attention of the sheriff, and the sheriff I think referred him to his dirty tricks squad and said, 'Hey, this guy has something bad to say about one of the people who has oversight over me, Sheila Kuehl, and Patty Giggans',

CONFIDENTIAL

COLA002085

who was at the time the chairman of the Civilian Oversight Commission. And I think they went to town on it. They got a warrant. There's a whole bunch of litigation regarding that warrant and blah blah blah, so on and so forth, and the warrant included getting personal identifying information for the people who called the hotline, even though the hotline's supposed to be confidential, and they wanted to get the names and contact information for all the people who'd called the hotline, and they got a judge to sign off on that, whatever. So that's how Adam Lowe came into my life and how he became relevant.

And a bunch of things happened after that. Eventually he had that conversation with Lillienfeld, which he- and then he took the tape and put it out on the internet. And we tried to get a copy of it after he put it on the internet and he refused to give it to us and wrote a bunch of weird.. things that looked like motions, like legal motions, but he didn't file them or anything; he just sent them to us. He never showed up, so he's in contempt of court except that we haven't certified it to the court. We told the Attorney General's office 'cause I figured, you know what, at the end of the day I don't have the power to do anything. If Lillienfeld is shaking down citizens with threats from Murakami, I can't do anything about it. I've told the public 'til I'm blue in the face about the illegal things happening at the Sheriff's Department. I've told the Attorney General; I've told the DA's office. You know, what's the point? If they want to go get that recording and litigate it, they can. I've got more important things to litigate. So that was the Adam Lowe thing, but once we subpoenaed that from Adam Lowe, he came to dislike me immensely. And so in that letter, as you can see, he said that I'm harassing his family and doing horrible things. The only thing we did is we served him with a subpoena.

Herrera:     [unintelligible 12447] saying that you had an obligation to investigate Sheila Kuehl or anything like that, in your capacity as an IG or in oversight.

Huntsman:   No I don't think he said that. I think I ended up just on his email list, because - and I often do - there's a lot of people - not a lot, but a few - very enthusiastic people who might be insane, but I don't know, who send regular emails and they attach me on because I have an interesting title that sounds like I might care. And so I get, like, stuff about the Veterans Administration all the time. It has nothing to do with me. So I don't know that he thought I had any direct responsibility including, I think by now he's had lots of conversations with the sheriff and so he has decided that I'm, you know, part of the evil empire that Sheila Kuehl is running or something. But I don't think in the early days, when he put my name on it, he had any reason to think that I had

**IAB IV 2558097**           **Page 32 of 37**              **MAX HUNTSMAN**

CONFIDENTIAL                                                              COLA002086

responsibility over it or did he ever say that to me. He never said, 'Hey Max, you should investigate this.' He did- I've actually talked to him a couple of times 'cause he runs something called the AMFED. He uses a pseudonym: Jack London, I think, and puts out a bunch of kind of odd things on the internet. And he made some PRA requests and whatnot. And I had some conversations with him and he was relatively straightforward in the early days, before he had decided that I was evil, about [unintelligible 12601] that he was trying to collect and do.

He's an interesting fellow, but I think he's- He used the term Max-Gustaf and even before this letter I'd seen him use it - I forget where or when, but in, like, one of his AMFED things. The Federalist Society of course, you probably know from law school, is a conservative group.

**Herrera:**      Personally.

**Huntsman:**    The AMFED is I think something he just made up, but I think he uses that term because he's a sort of conservative- he views himself as a conservative commentator. I don't know if he really is, but that's kind of where his sympathies seem to lie, but I don't- you know, he hasn't said.

**Herrera:**      And it sounds like the only place where you might've had a public.. where the name Max-Gustaf was used publicly was the maybe the state bar.

**Huntsman:**    Yeah, if you look me up on the state bar, it used to say Max-Gustaf; now it says Max-Gustaf or Max, depending on which one you pull up. But before I changed that, which was when this was all going down, if you had, you know, typed an attorney search, it would say Max-Gustaf Huntsman. And so my- I have no basis to know this, but my guess is that Adam Lowe did that: pulled up my name, said 'Hmm this is interesting, I'd better look into this,' and started running my name and, you know. I've done the same thing. I Googled. I was, like, where the hell did he come to this? Is there some guy named Max-Gustaf Edler or Max-Gustaf Huntsman or something who's a Holocaust denier? And I didn't find anything. But I think Adam Lowe has more free time on his hands and I think he probably found some Holocaust denier database that is kept by somebody and found some name on it that is close enough that he decided that's me.

**Herrera:**      And you say he used your name in the past. Where do you recall him using your name?

**IAB IV 2558097**          **Page 33 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL
COLA002087

**Huntsman:** Either in email communication or maybe in some posting on the AMFED, but I don't recall precisely where I saw it. I could try to hunt it down.

**Herrera:** So would you say that, if I look at his site there's going to be more than that, like more references to you in his site, that there's more than that?

**Huntsman:** Not much. There's a lot of weird stuff on his site and it's come and gone. He mentioned me on the site once or twice I think, but not in any great detail and I- He might've said Max-Gustaf there, but he might've also done it in one of those emails he sent; I don't remember. All I know is, when the sheriff used Max-Gustaf, I was, like, 'Woah that's weird!' and then I thought, 'Hm, I've seen that before; I've seen that from Adam Lowe' because I think at some point he had used it in passing. But this letter that you see recently where he uses it repeatedly, as Edler in parentheses and then calls me Max-Gustolf, or whatever he does, spells it a different way, that's the first time.

**Herrera:** Oh no, I'm saying okay, yeah.

**Huntsman:** Yeah, that's the first time he's, like, really gone into detail in writing that I've seen. So that kind of makes me think I was right about my guess about where the sheriff got this from, but I don't know.

**Herrera:** And to your knowledge, do you have any sense of whether he's talked to you on KFI more than just the information that you provided in terms of that radio call?

**Huntsman:** The sheriff talking about me on KFI?

**Herrera:** Uh-huh.

**Huntsman:** Oh yeah. Oh no, I gave you just a little tiny bit having to do with this issue. The sheriff talks about me all the time on any media outlet he can: FOX, Hannity, the.. he does an Instagram, does video sometimes, his Facebook videos, and he regularly talks about me 'and my evil ways'. Many many times over the past years.

**Herrera:** And is he referring to you as Max-Gustaf in those talks?

**Huntsman:** I don't know that he does in most cases. When this happened, he- there was a brief time where he seemed to use Max-Gustaf more often, but I think he lost it, his attention wavered a bit and so. Usually in correspondence he'd call me Max Huntsman and he had previous to this until he did that a couple of times, and subsequently he's gone back

**IAB IV 2558097**          **Page 34 of 37**          **MAX HUNTSMAN**

CONFIDENTIAL                                                                            COLA002088

to Max Huntsman, with a few exceptions here and there. But in general he does not call me Max. He doesn't, like, every time call me Max-Gustaf and, you know, make a big deal out of it. That's not the case. Usually he calls me Max Huntsman 'cause that's the name I use and that's what people know. If he talks about Max-Gustaf, nobody's going to know who it is. But, now and again he's done it, but not every time at all.

**Herrera:**     When he got the scrutiny after the editorial, the comments to the Editorial Board, did he go back to using Max Huntsman?

**Huntsman:**     He has, but I didn't get the impression he did it quickly as a reaction or something, but I don't know. Yes, like in letters and things, they still use Max Huntsman, but they never really went away from it. Like I say, he always threw the Max-Gustaf in once or twice, and from that I drew- He knows darn well my name is Max Huntsman. He uses Max Huntsman in formal letters and so he knows. Whenever he uses Max-Gustaf, it's an intentional thing that he's doing to make a point. Like I say, I never got the impression that it was a habit. I don't think he switched to calling me Max-Gustaf all the time. I think he did it in a couple of targeted instances. But yeah, no, he didn't- When he got the heat about the Holocaust thing, he didn't have a lot to say except for when the Times Editorial Board was talking to him, in which he said he had two sources, and he wouldn't say who they were. He didn't talk about it much after that, that I'm aware of. He may have, but I didn't hear about it.

**Herrera:**     Is there anything else I should know? Anything that I've missed that I haven't asked you about? I know I've taken a lot of your time and I appreciate you being so available.

**Huntsman:**     I appreciate you asking all the questions. I'm sure I could think of lots more things to say, but I don't know that they'd be terribly productive and they'd take up even more of your time, so. I think I've kind of laid things out well enough. I think you get the gist of it and.. I'm available if you have any additional questions in the future.

**Herrera:**     Thank you so much. I really appreciate it, and to the extent that there's any other articles or any other thing that you think I should be aware of, you're certainly- more than welcome to email it to me and send it to me. I obviously will be doing my own scouring of the internet to make sure that I've caught any type of references or any other referrals to it. But, you know, certainly with, like, for example, the KFI, you know, I'm probably limited in being able to know how many times he's mentioned you 'cause I don't know that they're really going to catalogue that. So if there's any other instances of that or anything else that you become

**IAB IV 2558097**                    **Page 35 of 37**                    **MAX HUNTSMAN**

CONFIDENTIAL                                                                    COLA002089

aware of, I'd be grateful if you would let me know. But certainly on our end we will make sure that we try to do our best to make sure we capture any other references so that we're aware of any other times where he's made those same kind of references to that.

**Huntsman:** And if it comes up again, I mean, if he starts doing it again or something, I will certainly let you know.

**Herrera:** Great. Oh and.. I did forget my part of the admonition of "retaliation is not tolerated at the county. It is against, obviously, county, state and federal law. If you feel like you're a victim of retaliation in any way, I want you to let me know and I would escalate it to the proper person. Likewise, we ask that you don't retaliate against anyone who is participating in this investigation. All allegations of retaliation are taken very seriously." So.

**Huntsman:** Let me extend to that. Esther and I have talked, about her concerns. She wanted me to be a representative for her when she thought she was going to be interviewed by the Sheriff's Department. So I'm glad that you are doing it and not them. I would very much like to protect her from retaliation. Me? I get retaliated by the sheriff every chance he gets and he would do that independent of this. So he's not going to retaliate against me for this; he's retaliating against me for previous things. So I'm not too worried about that. He's going to do everything he can and nobody can stop it. But Esther Lim, she's in a dangerous spot, you know. So if you ever find yourself in a situation where you're aware of some retaliation against her and there's anything I can do to help with it, please let me know. Because like you say, the County is supposed to stop people from being retaliated against and I think she's much more vulnerable than I am.

**Herrera:** Alright. And, you know, this type of work only works to deal with these types of investigations if you make people- you know, if you protect them and make every effort to maintain the confidentiality and so I am very mindful of that and will, you know, make every effort to.

**Huntsman:** And obviously I'm not the first person you should call because that would be breaking confidentiality.

**Herrera:** Which I wouldn't do.

**Huntsman:** But if in the course of finding something out you learned there is a problem and there's anything that somebody whose title is Inspector General can do to help about it, then tell the appropriate parties, 'Hey you know, Huntsman would jump at the chance to be helpful in this

**IAB IV 2558097**          **Page 36 of 37**          **MAX HUNTSMAN**

regard.' I have informants who have had retaliation attempts from the sheriff and I have done things using my official powers to try to put him on notice, that we're watching and done things to try to protect informants myself. So I don't know that there's probably much- I mean, all the things he can do he does from a distance and he's going to do anyway, but, and he probably can't get under the skin and do the things that he does to his own employees, but.. anyway. It's a matter of more concern for me than my own personal retaliation 'cause I, you know, I know he's going to unload on me in every way he can every opportunity he gets and it's independent of this. It's not 'cause of this; it's not retaliation. But her, you know, she's a little bit below his radar and this process could quickly onto his radar and that's of concern. So I just mention it in case you find yourself consulting with County Counsel in an opportunity to suggest something, feel free. Just be aware that I would love to help if I could.

**Herrera:**    Thank you so much for that information and I appreciate it. You have a great rest of your day. I'm going to go off the record at 3:38 PM. Have a good day. Thank you.

**Huntsman:**    Okay. Bye bye.

**Herrera:**    Take care.

HUNTSMAN, MAX                    (IAB) IV 2558097
WPU
plw

CONFIDENTIAL                                                                                    COLA002091

# EXHIBITS

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL

COLA002093

<table>
<tr><td>

For CISU Use:

(Method of Receipt)

**Online**

**ICMS #** 2022-112213

</td></tr>
</table>

## COUNTY POLICY OF EQUITY

### REPORT / NOTIFICATION FORM

**Methods of Reporting Potential County Policy of Equity (CPOE) Violations:**

1. You may use this form to report a potential violation of the CPOE;
2. File an online complaint at https://ceop.bos.lacounty.gov (strongly encouraged);
3. Call the County Intake Specialist Unit (CISU) at (855) 999-CEOP (2367); or
4. Visit the CISU office at the Kenneth Hahn Hall of Administration building located at 500 West Temple Street, Suite B-26, Los Angeles, CA 90012.

---

**1. Do you wish to file this complaint anonymously?**

☐　　　Yes **(Do not check 'Yes' if you are a reporting supervisor/manager).**

■　　　No (If no, please proceed to Question #2).

**2. Are you filing this complaint for :**

☐　　　**Yourself** (If filing this complaint for yourself, please start at Section A).

■　　　**Someone else** (If you are filing this complaint for someone else, please start at Section A).

☐　　　**Someone else: I am a reporting supervisor/manager** (please start at Section A).

---

**Note to Supervisors/Managers:** As a County Manager/Supervisor, it is the County's expection that the CPOE complaint notification be submitted online at https://ceop.bos.lacounty.gov.

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　**COLA002094**

**Section A:** **Reporting Party Information**                    **Today's Date**: 03/09/2022

**Name**    MAX HUNTSMAN    **Emp #**    e410745    **Title**    INSPECTOR GENERAL (UC)

**Work #**    ███████████    **Mobile #**    _____    **Work Hrs**    _____

                                    **RDO**    _____

**Department**    BOARD OF SUPERVISORS    **Dept Head**    _____

**Unit of Assignment**    OFFICE OF INSPECTOR GENERAL

**Work Address**    561 BRADFORD ST. PASADENA CA 91105

**Immediate Supervisor**    JEFFREY LEVINSON

**Date & Time Form Completed:** 03/09/2022 07:57 AM

**Did the complainant notify a supervisor/manager of this complaint prior to now?**

☐    Yes (if yes, fill in details):

        Name of Supervisor Notified:

        Date:    NOT AVAILABLE

        How:

☐    No

☐    Do not know

CONFIDENTIAL                                            COLA002095

<u>**Section B:**</u>  **Complainant(s) Information**

| | | | | | |
|---|---|---|---|---|---|
| **Name** | MAX HUNTSMAN | **Emp #** | e410745 | **Title** | INSPECTOR GENERAL (UC) |
| **Work #** | ████████ | **Mobile #** | | **Work Hrs** | |
| | | | | **RDO** | |

| | | | |
|---|---|---|---|
| **Department** | BOARD OF SUPERVISORS | **Dept Head** | Celia Zavala |
| **Unit of Assignment** | OFFICE OF INSPECTOR GENERAL | | |
| **Work Location** | OFFICE OF INSPECTOR GENERAL | | |
| **Immediate Supervisor** | JEFFREY LEVINSON | | |

CONFIDENTIAL                                                                    COLA002096

**Section C:  Alleged Involved Party(ies) Information**

| | | | | | | |
|---|---|---|---|---|---|---|
| Name | ALEJANDRO VILLANUEVA | Emp # | e246296 | Title | SHERIFF/UNCLASSIFIED | |
| Work # | (562) 694-2400 | Mobile # | | Work Hrs | | |
| | | | | RDO | | |

| | | | |
|---|---|---|---|
| Department | OTHER - Sheriff | Dept Head | |
| Unit of Assignment | OFFICE OF THE SHERIFF | | |
| Work Location | HALL OF JUSTICE | | |
| Immediate Supervisor | | | |

CONFIDENTIAL                                                                                          COLA002097

**Section D:**  **Alleged Witness(es) Information (if they can be identified)**

CONFIDENTIAL

COLA002098

**Section E:** **Nature of Complaint or Issue(s)**

1. What is the date of the alleged potential violation(s)?:   March 8, 2022

2. Please provide a detailed summary of the alleged potential violation(s):

   As reported by RP/CP Huntsman: "...T[]he Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack."  RP/CP writes, " My birth name was Max-Gustaf Edler.  My father did not participate in raising me and so I took my mother's family name Huntsman as a law student with the help of a firm I clerked for. As Inspector General I have never used any name other than Max Huntsman, which is also my name on my driver's license and passport.  A county computer system continues to incorrectly list my first name as Max-Gustaf and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks.  I believe this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as foreign (German or Jewish)."

3. Why does the Complainant(s) believe the treatment occurred/is occurring?:

   Race

CONFIDENTIAL    COLA002099

**Section F:  TO BE COMPLETED BY SUPERVISORS/MANAGERS ONLY**

Date & time supervisor/manager observed and/or was notified of the alleged potential violation(s):

n/a
_____

How was supervisor/manager made aware of the alleged potential violation(s)? (Explain in detail):
_____

What action(s), if any, did the supervisor/manager take? (Explain in detail):


_____

Did the supervisor/manager ascertain whether Complainant(s) is/are in need of any of the following? (If so, please explain in space provided):

     Medical Attention:  _____

     Protection:  _____

     Separation from Alleged Involved Party (ies):  _____

     Other Assistance:  _____


Did the supervisor/manager advise the Complainant(s) that they:

May seek confidential counseling or assistance from County's Employee Assistance Program (EAP) at (213) 738-4200.


_____


May contact the County Intake Specialist Unit (CISU) directly at (855) 999-2367, or via email at ceop@bos.lacounty.gov


_____

CONFIDENTIAL                        COLA002100

**COMPLAINT SUBMISSION**

By submitting this complaint I am declaring, under penalty of perjury under the laws of the State of California, that:

- The facts set forth herein are true and correct and based on my own knowledge, except as to matters stated on my information and belief, and as to those matters I believe to be true;

- I believe that the facts alleged herein are jurisdictional to the County Policy of Equity (accessible at: https://ceop.bos.lacounty.gov), are not duplicative of facts set forth in previously filed County Policy of Equity complaints that I have filed, and

- The filing of this County Policy of Equity complaint is not a misuse or abuse of the County's Policy of Equity Complaint Process.


<u>MAX HUNTSMAN</u>

Printed Name


_____

Signature


<u>March 9, 2022</u>

Date

2022-112213

**8** of **9**
County Policy of Equity Report/Notification Form

CONFIDENTIAL

COLA002101

**OPTIONAL:** **Please provide the information below for statistical purposes only**

**Race/Ethnicity:**

*"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that required the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual."* - (eeoc.gov)

☐ Hispanic or Latino - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

☑ White (Not Hispanic or Latino) - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

☐ Black or African-American (Not Hispanic or Latino) A person having origins in any of the black racial groups of Africa.

☐ Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino) - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

☐ Asian (Not Hispanic or Latino) - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

☐ American Indian or Alaska Native (Not Hispanic or Latino) - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

☐ Two or More Races (Not Hispanic or Latino) - All persons who identify with more than one of the above five races.

**Gender:**

☑ Male

☐ Female

☐ Prefer Not to Answer

**Date of Birth:** 01/17/1965

CONFIDENTIAL                                                          COLA002102

# EXHIBIT B

CONFIDENTIAL

COLA002103

<table>
<tr><td>

**For I.S.U. Use Only**
Method of Receipt
☐ Telephone
☐ In Person
☐ POE Report Form
☑ Other: <u>CPOE</u>
Intake # <u>22-045</u>

</td></tr>
</table>

# Policy of Equality
## Report / Notification Form

<u>General Instructions:</u> Use this form to report a potential violation of the Policy of Equality. Non-supervisors may also report a potential violation of the Policy of Equality by calling the Intake Specialist Unit at (323) 890-5371 or visiting them at 4900 S. Eastern Avenue, Suite 203, Commerce.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Section A:</u>    Reporting Party Information              Today's Date: <u>03</u> / <u>17</u> / <u>2022</u>

Name: <u>Huntsman, Max</u>                    Emp. # <u>410745</u>    Rank/Title <u>Inspector General</u>

Work Tel# ▮▮▮▮▮▮▮ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

Unit of Assignment: <u>Office of Inspector General</u>    Unit Commander: <u>Jeffrey Levinson</u>

Division <u>LA County Board of Supervisors</u>

Name of Supervisor Completing this form (if different from above): <u>B-1 Deputy Jonathan Lested</u> # <u>467422</u>

Date & Time form completed: <u>03</u> / <u>17</u> / <u>2022</u> / <u>1200</u> hours.

☐    Anonymous (Do not provide identifying information above if anonymous. You must, however, fill out the rest of the form. **Do not check if you are a reporting supervisor.**)

Did the complainant and/or alleged victim notify a supervisor of this complaint prior to now?
☐    Yes (if yes, fill in details)
       Who: _____
       When: Date: _____ / _____ / _____ ;Time: _____ hours.
       How _____
☐    No _____
☑    Do not know

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Section B:</u>    Date And Time of Potential Violation

Day, Date and time alleged violation / alleged incident occurred: <u>03</u> / <u>08</u> / <u>2022</u> _____ hours or
between _____ / _____ / _____ and _____ / _____ / _____

If multiple incidents or unknown, explain: _____
See narrative. _____
_____
_____
_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Section C:</u>    Alleged Complainant(s) (if not the same as the Reporting Party and if they can be identified)

<u>Same as RP</u> _____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____ Employee # _____ Rank/Title _____ UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

Revised 06/10                    1                    POE -001

**CONFIDENTIAL**                    COLA002104

*********************************************************************************************

<u>Section D:</u>    Alleged Involved Party(ies) (if they can be identified)

Villanueva, Alejandro  (Sheriff) _____    Employee # __246296___    UOA <u>Office of Sheriff</u>

_____    Employee # _____    UOA _____

_____    Employee # _____    UOA _____

_____    Employee # _____    UOA _____

*********************************************************************************************

<u>Section E:</u>    Alleged Witness(es) (if they can be identified)

<u>None Stated</u>_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

_____    Employee # _____    Rank/Title _____UOA _____
Work Tel# _____ ; Home Tel# _____ ; Work Hours _____ - _____ RDO _____

*********************************************************************************************

<u>Section F:</u>    Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

On March 16, 2022, the ISU received a County Policy of Equity report (ICMS #2022-112213) from CEOP Executive Director Vickey

Bane, filed by RP/CP Max Huntsman on March 9, 2022.  The narrative of the complaint stated, in part, the following

(verbatim): "...The Sheriff sent an email throughout the Sheriff's Department that was a racially biased attack."

"My birth name was Max-Gustaf Edler. My father did not participate in raising me and so I took my mother's family name

Huntsman as a law student with the help of a firm I clerked for.  As Inspector General I have never used any name other than

Max Huntsman, which is also my name on my driver's license and passport. A county computer system continues to incorrectly

list my first name as Max-Gustaf and the sheriff has repeatedly referred to me as Max-Gustaf in public attacks.  I believe

this is dog whistling to the extremists he caters to as the more unusual name might lead some to view me as

**Ask: "Why do you believe this treatment is occurring?"**    ( ☑ Check, if narrative is continued onto the next page)
Race

_____

_____

_____

_____

_____

_____

CONFIDENTIAL                              COLA002105

Section F (cont'd):          Nature of the Complaint or Issue(s) -- Be as detailed as possible, include all incidents & evidence.

foreign (German or Jewish)."

(ISU Note: For details, refer to copy of CPOE complaint contained in ISU efile.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Note: Continue onto the next page**

Revised 10/06                          3                          POE -001

**CONFIDENTIAL**                                                    COLA002106

<u>Section G:</u>        Supervisor -- FOR NON-VICTIM SUPERVISORY USE ONLY. DO NOT FILL OUT THIS SECTION IF YOU ARE THE ALLEGED VICTIM OR A NON-SUPERVISOR.

Date & Time notified of potential violation / observation was made:  __03__ / __16__ / __2022__ , __1521__ hours.

How did you become aware of the potential violation (explain in detail):
The ISU received CPOE ICMS #2022-112213, containing the above allegations.

Supervisor's Actions (if any) (explain in detail)

A POE Report was generated by ISU Deputy Jonathan Lested to document the allegation in the County Policy of Equity

Complaint.

Did you ascertain whether complainant(s) and/or victim(s) are in need of:

☑        Medical Attention
         **Response:** to be ascertained
☑        Protection
         **Response:** to be ascertained
☑        Other Assistance
         **Response:** to be ascertained

Advised the complainant(s) and/or victim(s) that they:

☑        May seek confidential counseling or assistance from Employee Support Services

Notifications:

☐ **Intake Specialist Unit phone notification:** (During business hours, direct telephone (323) 890-5371. After hours, request through Sheriff's Headquarter's Bureau (323) 526-5541)

Intake Specialist notified via telephone: _____ Date & Time: ____ / ____ / _____ , _____ hour.
                                        (Name)
☑ **POE Report/Notification Form forwarded to Intake Specialist Unit**

Date & Time: __03__ / __16__ / __2022__ , ____1521____ hour.    How?: ☑ e-mail  ☐ Fax  ☐ County mail

***************************************************************************************

CONFIDENTIAL                                                                                COLA002107

<u>Section H:</u>    **For Intake Specialist Unit Use Only** - DO NOT FILL OUT IF YOU ARE REPORTING A POTENTIAL VIOLATION TO THE INTAKE SPECIALIST UNIT.

Intake Specialist Name:  <u>B-1 Deputy Jonathan A. Lested</u>          Emp. #: <u>467422</u>

Day, Date and time ISU received form <u>Thursday</u>          / <u>03</u> / <u>17</u> / <u>2022</u> , <u>1215</u> hours.

☐ Referred to Equity Unit: Date & Time - ____ /____ / _____ , _____ hours.

☑ If not referred to Equity Unit, explain in detail action taken:
"B" assessment authored by DCO Sieberg received on 04/07/2022.
_____

_____

_____

Additional Information (if any):   _____

_____

_____

_____

☐        Check here if this violation has already been reported. If so, this form should be attached to the already existing report as an addendum. If the existing report has already been forwarded to the Equity Unit or any other Department entity, this form should be forwarded as well.

CC:
☑ Equity Oversight Panel
☐ Subject's Unit Commander
☐ Reporting Party's Unit Commander
☐ Victim's Unit Commander

CONFIDENTIAL                                                        COLA002108

# EXHIBIT C

CONFIDENTIAL

COLA002109

**IV 2558097**
**EXHIBIT C**

CONFIDENTIAL
COLA002110

# MISCELLANEOUS DOCUMENTS

CONFIDENTIAL

SH-AD-703  Revised (2/22)

### COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    June 27, 2022

FILE NO:

### OFFICE CORRESPONDENCE

**FROM:**  JASON P. WOLAK, COMMANDER
PROFESSIONAL STANDARDS DIV.

**TO:**  RON KOPPERUD, CAPTAIN
INTERNAL AFFAIRS BUREAU

**SUBJECT:    REQUEST FOR** INTERNAL AFFAIRS BUREAU ADMINISTRATIVE INVESTIGATION

Incident Date(s): *(use semi-colons to separate multiple dates)*
Between March 5, 2022, and March22, 2022

Synopsis:

POE 22-045.  It is alleged that Subject Villanueva acted in an inappropriate POE related manner while in the workplace.

Date a Sergeant, or above, became aware of an act, omission, or other misconduct:
March 16, 2022

One Year Statute Date (If criminal monitor, leave blank):  March 15, 2023

Alcohol Related?    NO

Citizen Complaint?  NO              If yes, SCR #:

Complainant's Name (Add employee number if a Department member)
Max Huntsman, Office of Inspector General, #410745

## REQUEST FOR IAB INVESTIGATION AND/OR CRIMINAL MONITOR

**Involved Subject** *(For additional subjects, use Subject Continuation Page 703-A)*

### Subject Name, Rank, Employee Number, and Unit of Assignment:
Alex Villanueva, Sheriff, #246296, Office of the Sheriff

Potential MPP Violation(s):

3-01/121.10 - POE Discrimination; 3-01/121.20 - POE Harassment Other than Sexual;
3-01/121.25 POE Third Party Harassment;
3-01/121.30 POE Inappropriate Conduct Toward Others

Subject's Assignment/Duty Status:
- ☑ Subject's assignment/duty status unchanged
- ☐ Relieved of Duty (ROD), assigned to home    ROD Date:
- ☐ ROD, assigned to a relieved of duty position
- ☐ Probationary Employee

Justification for the subject's assignment/duty status *(required)*:
N/A

Consideration(s) for IAB Request:
\* Mandatory IAB Investigation

- ☐ Witnesses are spread over a large geographic area.
- ☐ The nature of the allegation(s) involves incidents of high media attention.
- ☐ A subject is a supervisor or manager (lieutenant or above; assistant director or above).
- ☐ The nature of the allegation(s), if founded, will likely result in discharge.\*
- ☐ The allegation(s) concern family/domestic violence.
- ☐ The allegation(s) concern workplace violence.\*
- ☐ The allegation(s) concern profiling or bias against members of the public.\*
- ☑ Other: Allegations contain Policy of Equality\*

☐ Criminal Monitor by IAB (Refer to MPP 3-04/020.30 – Internal Administrative and Criminal Investigations) *enter investigating agency, crime, and report number:*

Supervisory Inquiry authored?    ☐ Yes ☑ No

Contact person for source documents (i.e.: supervisory inquiry and/or investigative materials) at the requesting unit:

Prepared by Unit Commander/Director, or designee:
Lieutenant John Carter, #435532, Internal Affairs Bureau

**NOTE: Email this form to "IAB Investigation Requests." A review of this request will be conducted by the Internal Affairs Bureau. There may be situations when the Internal Affairs Bureau will decide, upon initial review, to return the case to be conducted as a unit level investigation.**

### For IAB use only

Assigning Lieutenant  Lieutenant John Carter, #435532

IAB Investigator    Christine Diaz-Herrera, Esquire, Sanders Roberts LLP

CONFIDENTIAL                                                    COLA002113

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: June 27, 2022
IV NO: 2558097

OFFICE CORRESPONDENCE

| FROM: | TO: |
|---|---|
| EDWIN A. ALVAREZ, CHIEF PROFESSIONAL STANDARDS DIVISION | RON KOPPERUD, CAPTAIN INTERNAL AFFAIRS BUREAU |

## SUBJECT: SUBJECT OF ADMINISTRATIVE INVESTIGATION NOTIFICATION

SUBJECT EMPLOYEE NAME, RANK, AND EMPLOYEE NUMBER:

Alex Villanueva, Sheriff, #246296

Department Knowledge Date (The date a sergeant, or above, became aware of an act, omission, or other misconduct):

03/16/2022

Potential MPP Violation(s) including, but not limited to:

3-01/121.10 POE - DISCRIMINATION
3-01/121.20 POE - DISCRIMINATORY HARASSMENT (OTHER THAN SEXUAL)
3-01/121.25 POE - THIRD PERSON HARASSMENT
3-01/121.35 POE - RETALIATION

Nature of the investigation (general description):

It is alleged you acted in an inappropriate POE related manner and in the workplace.

You are advised that the authorization given by your Unit Commander to other supervisors to approve your routine absence requests has been rescinded. You are being ordered by your Unit Commander that during the time this investigation is active, any routine absence request must be submitted directly to him/her, and approval or denial of the request must come directly from them as well. You are additionally reminded of your responsibilities in submitting absence requests under **MPP 3-02/030.05 - ROUTINE ABSENCES.**

SUBJECT EMPLOYEE ACKNOWLEDGEMENT OF NOTIFICATION:

Subject: _____    Witness: _____

Employee #: 246296  Date: 6/29/22    Employee #: 410429  Date: 6/29/22

# 3-01/121.10 - Policy of Equality - Discrimination

Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's:

- Age (40 and over);
- Ancestry;
- Color;
- Denial of family and medical care leave;
- Disability (physical and mental, including HIV and AIDS);
- Ethnicity;
- Gender identity/gender expression;
- Genetic information;
- Marital status;
- Medical condition (genetic characteristics, cancer, or a record or history of cancer);
- Military or veteran status;
- National origin (including language use restrictions);
- Race;
- Religion (includes religious dress and grooming practices);
- Sex/gender (includes pregnancy, childbirth, breastfeeding, and/or related medical conditions);
- Sexual orientation; and
- Any other characteristic protected by state or federal law.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                    COLA002115

Manual of Policy and Procedures : 3-01/121.20 - Policy of Equality - Harassment (Other
Than Sexual)

# 3-01/121.20 - Policy of Equality - Harassment (Other Than Sexual)

Harassment of an individual based on or because of the individual's protected characteristic is also discrimination and prohibited. Harassment is conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, offensive, or abusive work environment, and a reasonable person subjected to the conduct would find that the harassment so altered working conditions as to make it more difficult to do the job.

**Revised: 11/20/2020**

**CONFIDENTIAL**                                                                                    **COLA002116**

## 3-01/121.25 - Policy of Equality - Third-Person Harassment

Third person harassment is indirect harassment of a bystander, even if the person engaging in the conduct is unaware of the presence of the bystander. When an individual engages in potentially harassing behavior, they assumes the risk that someone may pass by or otherwise witness the behavior. The Department considers this to be the same as directing the harassment toward that individual.

**Revised: 11/20/2020**

CONFIDENTIAL                                              COLA002117

## 3-01/121.30 - Policy of Equality - Inappropriate Conduct Toward Others

Inappropriate conduct toward others is any physical, verbal, or visual conduct based on or because of any of the protected characteristics described in this policy, when such conduct reasonably would be considered inappropriate for the workplace.

This provision is intended to stop inappropriate conduct based on a protected characteristic before it becomes discrimination, sexual harassment, retaliation, or harassment under this policy. As such, the conduct need not meet legally actionable state and/or federal standards to violate this policy. An isolated derogatory comment, joke, racial slur, sexual innuendo, etc., may constitute conduct that violates this policy and be grounds for discipline. Similarly, the conduct need not be unwelcome to the party against whom it is directed; if the conduct reasonably would be considered inappropriate by the Department for the workplace, it will violate this policy.

**Revised: 11/20/2020**

CONFIDENTIAL                                                                    COLA002118

CONFIDENTIAL

# EXHIBIT 19

# INVESTIGATOR'S LOG

| | |
|---|---|
| **FILE NUMBER:** | IV 2558097 |
| **INVESTIGATOR:** | Sanders Roberts LLP |
| **DATE DEPARTMENT BECAME AWARE OF ALLEGATION(S):** | 03/16/2022 |
| **DATE IAB INVESTIGATION INITIATED:** | 06/27/2023 |
| **DATE SENT TO ADVOCACY UNIT:** | |
| **DATE RETURNED FROM ADVOCACY UNIT:** | |
| **DATE FORWARDED TO FORCE OR RISK REVIEW:** | |
| **DATE RETURNED FROM FORCE OR RISK REVIEW:** | |
| **DATE TO DIVISION:** | |
| **DATE RETURNED TO IAB:** | |

**CASE SUMMARY:**

| DATE | SUMMARY | NAME |
|---|---|---|
| 06/22/22 | Attorney Client Privilege | Lt. Carter |
| 06/23/22 | Attorney Client Privilege | Lt. Carter |
| 06/24/22 | Commander Wolak called and informed me to handle this matter in the same fashion as the previous involved Sheriff cases. | Lt. Carter |
| 07/07/2022 | Per Ms. Real, hard case delivered to Ms. Diaz Herrera's office | Lt. Carter |
| 08/03/22 | Emailed Ms. Diaz Herrera for an update. | Lt. Carter |
| 10/03/22 | Sent email to Ms. Diaz Herrera re: case status. | Lt. Carter |
| 10/13/22 | All interviews have been completed, except for the Sheriff. Will attempt to schedule a date by 10/14/22. | Lt. Carter |
| 11/02/22 | Sent email to Ms. Diaz Herrera re: case status. | Lt. Carter |
| 11/07/22 | Re-inquired about case status. | Lt. Carter |
| 11/14/22 | Completed all the interviews necessary for the Huntsman matter, with exception of Sheriff Villanueva. She has reached out to Commander Satterfield to sched Sheriff Villanueva's interview. She does not have a date sched for the interview yet. | Lt. Carter |
| 11/30/22 | I sent Commander Satterfield and Capt. Blanchard an email | Lt. Carter |

**EXHIBIT**

**13**

exhibitsticker.com

CONFIDENTIAL                                                                    COLA002429

# INVESTIGATOR'S LOG

|  |  |  |
|---|---|---|
|  | asking them to contact the attorney in order to set up an interview with Sheriff Villanueva. |  |
| 11/30/22 | Commander Satterfield and Capt Blanchard called and informed me that they never received any requests for interviews for Sheriff Villanueva. | Lt. Carter |
| 12/13/22 | Sent email to Ms. Diaz Herrera regarding update. | Lt. Carter |
| 01/04/23 | Certified letter sent requesting an interview with the subject, Villanueva. | Lt. Carter |
| 01/09/23 | Former Sheriff Villanueva contacted the attorney. | Lt. Carter |
| 01/12/23 | Attorney Client Privilege | Lt. Carter |
| 02/02/23 | Sent an email requesting a case status. | Lt. Carter |
| 02/21/23 | Sent another email, no response. | Lt. Carter |
| 03/05/23 | Sent a 3rd email requesting an update. | Lt. Carter |
| 03/09/23 | Ms. Diaz Herrera responded. Villanueva is not cooperating. Attorney Client Privilege | Lt. Carter |
| 03/09/23 | Briefed Chief Lecrivain and are moving forward with the case. | Lt. Carter |
| 04/03/23 | Per Ms. Diaz-Herrera, she advised Shawn Thomas was reassigned all 4 cases. | Lt. Carter |
| 04/18/23 | Sent email to new council Shawn Thomas regarding an update. | Lt. Carter |
| 04/19/23 | Received update- Outside counsel have undertaken to draft a final report using interview and relevant evidence. | Lt. Carter |
| 05/15/23 | Attorney Shawn Thomas sent an email stating he would send the Hunstman case back to IAB this week. | Lt. Carter |
| 06/14/23 | Emailed Mr. Thomas regarding 4 POE cases. 2 cases (Huntsman, Lim) are ready for pick up. IAB LET and Risk Management LET not available until next Tuesday (6/27/23). | Lt. Carter |
| 07/05/23 | Lt. Ann Devane took over the POE team, Lt. John Carter explained the process of reviewing, completing and stacking the case. | Lt. Devane |
| 08/16/23 | Reviewed zoom interview with Complainant Huntsman | Lt. Devane |
| 08/24/23 | Converted zoom interview to wave file to send out and have the interview transcribed | Lt. Devane |
| 08/28/23 | Received transcripts | Lt. Devane |

Page **2** of 3

COLA002430

# INVESTIGATOR'S LOG

| 09/12/23 | Worked on completing required documents to stack the case | Lt. Devane |
|---|---|---|
| 09/21/23 | Reviewed transcripts and compared to the summary written by Saunders Roberts LLP, and confirmed the statements made by Complainant Huntsman were all documented in the summary. | Lt. Devane |
| 09/26/23 | Requested Subject Villanueva's training record and copy of Policy of Equality notification form, unable to locate either, per IAB Secretary V. | Lt. Devane |
| 09/26/23 | Stacked case and submitted to IAB Captain Kopperud for review. | Lt. Devane |
| 10.2.23 | *reviewed. approved.* | *R Kopperud* |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

CONFIDENTIAL                                                  COLA002431

# EXHIBIT 20

Exhibit 6
3/28/2025
Mercedes Cruz



SH-AD-32A (3/23)

**COUNTY OF LOS ANGELES**
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    October 17, 2023
FILE NO:  IV 2558101

OFFICE CORRESPONDENCE

**FROM:**   SERGIO V. ESCOBEDO          **TO:**   COUNTY EQUITY
            ACTING COMMANDER                      OVERSIGHT PANEL
            PROFESSIONAL STANDARDS
            DIVISION

**SUBJECT:**   **POSSIBLE MANUAL OF POLICY AND PROCEDURES VIOLATIONS**

The following Manual of Policy and Procedures violations relate to the
allegations in this case, regarding **Alex Villanueva, Former Sheriff:**

**3-01/121.10 Policy of Equality – Discrimination (Based on Gender and
Ethnicity)**

Disposition:
_X_ Charge founded
____ Charge unresolved
____ Charge unfounded
____ Charge exonerated

**3-01/121.15 Policy of Equality – Sexual Harassment**

Disposition:
____ Charge founded
____ Charge unresolved
_X_ Charge unfounded
____ Charge exonerated

**3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on
Gender and Ethnicity)**

Disposition:
_X_ Charge founded
____ Charge unresolved
____ Charge unfounded
____ Charge exonerated

64

-2-                          **September 19, 2023**

### 3-01/121.25 Policy of Equality– Third Person Harassment (Based on Gender and Ethnicity)

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

### 3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on Gender and Ethnicity)

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

### 3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity)

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**Discipline Assessment – Alex Villanueva, ███**

**Review of Applicable "Guidelines for Discipline" Section:**

The Departmental "Guidelines for Discipline" (revised August 1, 2020) includes the Policy of Equality, and lists the following analogous misconduct with the associated disciplinary penalties:

| CONDUCT | STANDARD DISCIPLINE |
|---|---|
| **3-01/121.10 Policy of Equality – Discrimination (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |

65

-3-                    September 19, 2023

| 3-01/121.15 Policy of Equality – Sexual Harassment | Five (5) Days to Discharge |
|---|---|
| 3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on Gender and Ethnicity) | Five (5) Days to Discharge |
| 3-01/121.25 Policy of Equality – Third Person Harassment (Based on Gender and Ethnicity) | Written Reprimand to Discharge |
| 3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity) | Written Reprimand to Discharge |
| 3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity) | Five (5) Days to Discharge |

**Determination of Discipline:**

Based upon the attached assessment of mitigating and aggravating factors, the following discipline has been determined to be appropriate. This discipline is subject to revision upon receipt of the Subject's response or grievance.

_____ Discharge
_____ Reduction in Rank
_____ Removal from Bonus Position
_____ Suspension with loss of pay and benefits for ___ days with / without the option of EBD
_____ Written Reprimand
_____ No Discipline

__X__ Panel Recommends "Do Not Rehire" notation at top of file


SVE:WB:wb

66

EXHIBIT 21


Exhibit 6
3/28/2025
Mercedes Cruz

SH-AD-32A (3/23)

**COUNTY OF LOS ANGELES**
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE: October 17, 2023
FILE NO.: IV 2558101

OFFICE CORRESPONDENCE

**FROM:** SERGIO V. ESCOBEDO
ACTING COMMANDER
PROFESSIONAL STANDARDS
DIVISION

**TO:** COUNTY EQUITY
OVERSIGHT PANEL

**SUBJECT: POSSIBLE MANUAL OF POLICY AND PROCEDURES VIOLATIONS**

The following Manual of Policy and Procedures violations relate to the allegations in this case, regarding **Alex Villanueva, Former Sheriff:**

**3-01/121.10 Policy of Equality – Discrimination (Based on Gender and Ethnicity)**

Disposition:
_X_ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.15 Policy of Equality – Sexual Harassment**

Disposition:
_____ Charge founded
_____ Charge unresolved
_X_ Charge unfounded
_____ Charge exonerated

**3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on Gender and Ethnicity)**

Disposition:
_X_ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

64

-2-                                   **September 19, 2023**

**3-01/121.25 Policy of Equality– Third Person Harassment (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity)**

Disposition:
__X__ Charge founded
_____ Charge unresolved
_____ Charge unfounded
_____ Charge exonerated

**Discipline Assessment – Alex Villanueva, ▉▉▉▉**

**Review of Applicable "Guidelines for Discipline" Section:**

The Departmental "Guidelines for Discipline" (revised August 1, 2020) includes the Policy of Equality, and lists the following analogous misconduct with the associated disciplinary penalties:

| CONDUCT | STANDARD DISCIPLINE |
|---|---|
| **3-01/121.10 Policy of Equality – Discrimination (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |

65

-3-                          September 19, 2023

| | |
|---|---|
| **3-01/121.15 Policy of Equality – Sexual Harassment** | **Five (5) Days to Discharge** |
| **3-01/121.20 Policy of Equality – Discriminatory Harassment (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |
| **3-01/121.25 Policy of Equality – Third Person Harassment (Based on Gender and Ethnicity)** | **Written Reprimand to Discharge** |
| **3-01/121.30 Policy of Equality – Inappropriate Conduct Toward Others (Based on National Origin and Ethnicity)** | **Written Reprimand to Discharge** |
| **3-01/121.35 Policy of Equality – Retaliation (Based on Gender and Ethnicity)** | **Five (5) Days to Discharge** |

**Determination of Discipline:**

Based upon the attached assessment of mitigating and aggravating factors, the following discipline has been determined to be appropriate. This discipline is subject to revision upon receipt of the Subject's response or grievance.

\_\_\_\_\_ **Discharge**
\_\_\_\_\_ **Reduction in Rank**
\_\_\_\_\_ **Removal from Bonus Position**
\_\_\_\_\_ **Suspension with loss of pay and benefits for \_\_\_ days with / without the option of EBD**
\_\_\_\_ **Written Reprimand**
\_\_\_\_\_ **No Discipline**

\_\_X\_\_ **Panel Recommends "Do Not Rehire" notation at top of file**

SVE:WB:wb

66

# EXHIBIT 22

3:13



*Lim*

Dec 22, 2023 at 4:57 PM

Hi max

Coco told me that lat did a pra request for our cpoe complaint.

They confirmed the dispo for mine. Told them I never got it. Reason was that LASD sent it to jails not Solis office.

> I don't know that LASD or CPOE ever told me about it. I find out through my staff monitoring.

Yours may have gotten lost like mine. Coco sent mine today when I asked for it. The dispo letter was dated late October of this year.

> I might have gotten it.

iMessage

CONFIDENTIAL

3:14



late October of this year.

I might have gotten it. Since I already knew I wouldn't have paid much attention. I was more interested in the law that says it goes to POST and isn't protected.

Yes that part. Even w info redacted I think the lat already knows who is who.

👍

Easy to figure out.

Jan 31, 2024 at 5:52 PM



'Do Not Rehire': Panel finds

iMessage

# EXHIBIT 23



18:19

🔒 transparentcalifornia.com



Where Excellence is Standard
Friedmans Home Experience

Donate

**TRANSPARENT CALIFORNIA**
California's largest public pay and pension database

Home / Counties / 2015 /
Los Angeles County /
MAX-GUSTAF HUNTSMAN

# MAX-GUSTAF HUNTSMAN

INSPECTOR GENERAL (UC) (2015)

Regular pay: ▮▮▮▮▮▮▮

Overtime pay: ▮▮▮▮

Other pay: ▮▮▮▮▮▮

Total pay: ▮▮▮▮▮▮

Benefits: ▮▮▮▮▮▮



californiatoplawyers.com

 **California Top Lawyers**

# Max-Gustaf Huntsman

Attorney

---

## ℹ️ Profile

**Status***

**Active**

This member is active and may practice law in California.

**Firm / org**

L.A. County Office of Inspector General

**County**

Los Angeles

**District**

District 2

**Bar number**

156780



🔒 **calsalaries.com**

 CalSalaries ☰

# MAX-GUSTAF HUNTSMAN

## (2012)

Deputy District Attorney
Los Angeles County

▉▉▉▉▉▉

## MAX-GUSTAF HUNTSMAN Salary Overview

As Deputy District Attorney at Los Angeles County, MAX-GUSTAF HUNTSMAN made ▉▉▉▉▉ in total compensation. Of this total ▉▉▉▉▉ was received as a salary, ▉▉▉▉▉ was received as benefits and ▉▉▉▉▉ came from other types of compensation . This information is according to Los Angeles County payrolls for the 2012 fiscal year.

MAX-GUSTAF HUNTSMAN total



Justia › Lawyer Directory › Los Angeles



# Max-Gustaf Huntsman

*Update your profile now!*



EXHIBIT 24

CERTIFIED COPY

# Express Deposition Services

*by* EXPRESSNETWORK

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

ANN DEVANE

March 06, 2025

Vesna Walter, CSR No. 11989, Job No. 6895

```
 1

 2                    UNITED STATES DISTRICT COURT

 3         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 4

 5   ALEX VILLANUEVA,                      )
                                           )
 6                       Plaintiff,        )
                                           )
 7              vs.                        )  Case No.
                                           ) 2:24-cv-04979 SVW
 8   COUNTY OF LOS ANGELES, COUNTY         ) (JCx)
     OF LOS ANGELES SHERIFF'S              )
 9   DEPARTMENT, LOS ANGELES COUNTY        )
     BOARD OF SUPERVISORS, COUNTY          )
10   EQUITY OVERSIGHT PANEL, LOS           )
     ANGELES COUNTY OFFICE OF              )
11   INSPECTOR GENERAL, CONSTANCE          )
     KOMOROSKI, MERCEDES CRUZ,             )
12   ROBERTA YANG, LAURA LECRIVAIN,        )
     SERGIO V. ESCOBEDO, RON               )
13   KOPPERUD, ROBERT G. LUNA,             )
     MAX-GUSTAF HUNTSMAN, ESTHER           )
14   LIM, and DOES 1 to 100,              )
     inclusive,                           )
15                                         )
                         Defendants.       )
16   _____ )

17

18

19                    REMOTE DEPOSITION OF

20                       ANN DEVANE

21                  Thursday, March 6, 2025

22

23   Stenographically Reported By:
     Vesna Walter, CSR, RPR, CCRR
24   CSR No. 11989
     Job No. 6895
25
```

DEVANE, ANN                                                                    Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3
    ALEX VILLANUEVA,                     )
 4                                       )
                         Plaintiff,      )
 5                                       )
                   vs.                   )  Case No.
 6                                       ) 2:24-cv-04979 SVW
    COUNTY OF LOS ANGELES, COUNTY        ) (JCx)
 7  OF LOS ANGELES SHERIFF'S             )
    DEPARTMENT, LOS ANGELES COUNTY       )
 8  BOARD OF SUPERVISORS, COUNTY         )
    EQUITY OVERSIGHT PANEL, LOS          )
 9  ANGELES COUNTY OFFICE OF             )
    INSPECTOR GENERAL, CONSTANCE         )
10  KOMOROSKI, MERCEDES CRUZ,            )
    ROBERTA YANG, LAURA LECRIVAIN,       )
11  SERGIO V. ESCOBEDO, RON              )
    KOPPERUD, ROBERT G. LUNA,            )
12  MAX-GUSTAF HUNTSMAN, ESTHER          )
    LIM, and DOES 1 to 100,              )
13  inclusive,                           )
                                         )
14                       Defendants.     )
    _____)
15

16

17

18

19

20

21          Deposition of ANN DEVANE, taken on behalf of

22  Plaintiff, with all parties appearing remotely, beginning

23  at 10:05 a.m. and ending at 3:24 p.m. Pacific time, on

24  Thursday, March 6, 2025, before VESNA WALTER, Certified

25  Shorthand Reporter No. 11989.
```

DEVANE, ANN                                                              Page 3

```
 1            APPEARANCES (All parties appearing remotely)

 2
      For the Plaintiff:
 3
                 SHEGERIAN & ASSOCIATES, INC.
 4               By:  ALEX DiBONA
                      NEIL NABAVI
 5               Attorneys at Law
                 11520 San Vicente Boulevard
 6               Los Angeles, California  90049
                 (310) 860-0770
 7               Adibona@shegerianlaw.com

 8    For the Defendants:

 9               MILLER BARONDESS, LLP
                 By:  JASON H. TOKORO
10                    STEVEN WILLIAMSON
                 Attorneys at Law
11               2121 Avenue of the Stars
                 Suite 2600
12               Los Angeles, California  90067
                 (310) 552-4400
13               Jtokoro@millerbarondess.com

14    ALSO PRESENT:

15               ALEX VILLANUEVA

16

17

18

19

20

21

22

23

24

25
```

DEVANE, ANN                                                                    Page 4

```
 1                    I N D E X

 2    WITNESS

 3    ANN DEVANE

 4    Examination by:                              Page

 5          MR. DiBONA                                6

 6          MR. TOKORO                              181

 7

 8

 9                 E X H I B I T S

10    Exhibit        Description                    Page

11    Exhibit 1      Deposition notice               12

12    Exhibit 2      CISU Assessment Form, COLA 2399  41
                     to 2401
13
      Exhibit 3      CISU Assessment Form, COLA 2402  47
14                   to 2404

15    Exhibit 4      Intake Assessment Form, COLA     49
                     2417 to 2426
16
      Exhibit 5      Intake Assessment Form, COLA     51
17                   2409 to 2416

18    Exhibit 6      3/8/22 correspondence, COLA 2405 53
                     to 2408
19
      Exhibit 7      1/4/22 correspondence, COLA 2427 58
20
      Exhibit 8      1/4/23 correspondence, COLA 2428 60
21
      Exhibit 9      5/18/23 correspondence, COLA     62
22                   2388 to 2398

23    Exhibit 10     5/19/23 correspondence, COLA     75
                     2376 TO 2383
24
      Exhibit 11     Email chain, 2373 to 2374        80
25
```

```
 1              E X H I B I T S (Continued)

 2   Exhibit        Description                          Page

 3   Exhibit 12     9/26/23 email, COLA 2375               85

 4   Exhibit 13     Investigator's Log, COLA 2429 to       88
                    2431
 5
     Exhibit 14     Investigator's Log, COLA 2432 to      101
 6                  2434

 7   Exhibit 15     10/2/23 email, COLA 2387              119

 8   Exhibit 16     Email chain, COLA 2384 to 2386        120

 9   Exhibit 17     Investigative report, COLA 2120       128
                    to 2199
10
     Exhibit 18     Investigative report, COLA 2035       154
11                  to 2119

12

13
                WITNESS INSTRUCTED NOT TO ANSWER
14
                         Page      Line
15
                         143         2
16                       172        19

17

18

19

20

21

22

23

24

25
```

DEVANE, ANN                                                    Page 21

1    conduct towards other employees.

2        Q    And how did you get the assignment to be on

3    the -- to be doing investigations on the -- related to

4    the policy of equality?  Excuse me.

5        A    The lieutenant who was doing that prior to me

6    transferred to another location.  So when that position

7    came open, I was put in that position.

8        Q    And do you know who put you in that position?

9        A    I believe that at the time that he was captain,

10   Ron Kopperud -- and that's spelled K-o-p-p-e-r-u-d -- and

11   Commander Sergio Escobedo and Chief Laura Lecrivain.

12       Q    And did you have to interview to be on the

13   policy of equality -- to be a policy-of-equality

14   investigator or was that -- assignment was given to you?

15       A    I did not have to interview.

16       Q    What did you consider to be your primary job

17   responsibility with respect to being a policy-of-equality

18   investigator?

19       A    I had to monitor a team of six sergeants who

20   were the investigators, and I reviewed all of their cases

21   once they completed them.

22       Q    And were you reviewing the cases to ensure that

23   they -- sorry.  Let me ask it this way.  As an internal

24   affairs investigator focusing on policy-of-equality

25   cases, are you familiar with any best practices in how to

DEVANE, ANN                                                    Page 22

```
 1    conduct such investigation?
 2         A    I don't understand your question.
 3         Q    It's fair.  I'll rephrase it.
 4              But do you understand what I mean by "best
 5    practices"?
 6         A    Not in the respect of investigations.
 7         Q    All right.  Are there specific procedures that
 8    you believe should be followed in every investigation as
 9    an internal affairs investigator with policy of equality?
10         A    There are set procedures for the investigators,
11    but it's not -- it's not, like, a handwritten document.
12         Q    And what are those set procedures?
13         A    To conduct their investigations, to do fair and
14    impartial investigations, to document what was said
15    during the investigations, to transcribe the interviews
16    and put the casebook together in a specific order once
17    the investigation is complete.
18         Q    Being fair and impartial, would that be another
19    way of saying it's important the investigators be free of
20    bias?
21         A    Yes.
22         Q    And when you say to document, does that mean the
23    steps of the investigation should be written down or
24    memorialized?
25         A    Yes.
```

DEVANE, ANN                                                    Page 23

1      Q     To transcribe the interviews, does that mean
2   there needs to be a video or audio recording of the
3   actual interviews they conduct themselves?
4      A     Yes.  They are recorded audibly and then
5   transcribed after the interviews are completed.
6      Q     And putting the casebook in a specific order,
7   are you able to say what the order is?
8      A     Yes.  There's -- there is a written guideline
9   for that.  It's -- there's a lot in it, actually.
10  Obviously, the cover page, the table of contents, the
11  personnel investigation form, the witness interviews and
12  their transcripts, the summary, and then an audio/video
13  page and then any miscellaneous documents that they need
14  to add in there.
15     Q     And would you agree with me, as a general
16  matter, internal affairs investigators on
17  policy-of-equality cases, as a general matter, try to
18  interview all relevant witnesses?
19     A     Yes.
20     Q     And would you agree with me that as a general
21  matter, that internal affairs investigators in policy-of-
22  equality cases -- if a witness gives them supporting
23  evidence, they should try to seek out that supporting
24  evidence?
25     A     I don't understand correctly.  Are you talking

DEVANE, ANN                                                    Page 28

1   was from February 2016 until July of 2017.

2        Q    And what does a lieutenant in court services do?

3        A    I was an area lieutenant.  So I was in charge of

4   I believe it was eight different courts, and I would go

5   to the courts.  And I would also handle administrative

6   paperwork similar to what I'm doing now if it was a

7   use-of-force investigation or an employee injury.  And

8   then if there was any problems with any of the employees

9   or the inmates who were going to court, I would handle

10  those situations.

11       Q    And prior to that, were you -- was that the

12  first assignment you had when you were promoted to

13  lieutenant?

14       A    That's correct.

15       Q    And at any point in your career within the

16  sheriff's department, did you ever work with Alex

17  Villanueva prior to him becoming the elected sheriff?

18       A    Yes, I did.

19       Q    And when was that, if you have an estimate of

20  what years?

21       A    There was a short time when I was assigned to

22  CRDF, which is the Century Regional Detention Facility,

23  and that was when I was a sergeant, and I believe that

24  was in 2012, and it was only for maybe a six-month

25  period.  And then I transferred to Temple station.  And

DEVANE, ANN                                                    Page 29

```
 1    then when I was a lieutenant at Pico Rivera station in

 2    July of 2017 until he retired was when I worked with Alex

 3    Villanueva.

 4         Q    And so just to be clear, for CRDF in 2012, did

 5    you work with Alex Villanueva then?

 6         A    Yes.  I was a sergeant and he was a lieutenant;

 7    so we did interact.

 8         Q    And did you have -- excuse me.  Did you have any

 9    reporting relationship other than he was a higher rank?

10    Were you a direct report of his?

11         A    Yes.  If he was my watch commander of my shift,

12    then I would have to report to him during that shift.

13         Q    And did you ever have any issues or concerns

14    with Sheriff Alex Villanueva in 2012 when you reported to

15    him?

16         A    No.

17         Q    In 2012, did Alex Villanueva ever say anything

18    in the workplace that you found to be inappropriate or

19    offensive?

20         A    No.

21         Q    Did you ever hear in 2012 Alex Villanueva make

22    any comments that you felt was offensive related to

23    someone's race?

24         A    No.

25         Q    And did you -- in 2012, did you ever hear Alex
```

DEVANE, ANN                                                    Page 30

1    Villanueva make a comment that you felt was offensive

2    related to someone's gender?

3        A    No.

4        Q    In --

5            MR. TOKORO:  I'm just going to interpose an

6    objection to this line of questioning as it not being

7    relevant to any claims or defenses in this case.  But you

8    can proceed, Alex.

9    BY MR. DiBONA:

10       Q    In 2012, do you believe that Alex Villanueva, as

11   your commander officer, treated you any differently

12   because you're a woman?

13       A    No.

14       Q    And do you feel that Alex Villanueva ever

15   treated you any differently based on your age in 2012?

16       A    No.

17       Q    What were your primary job duties at CRDF?

18       A    I was a sergeant and I was assigned to booking

19   front and reception, which is where the inmates first

20   come into the jail and get processed into the jail.

21       Q    And you -- excuse me.  And how did it come --

22   sorry.

23            At some point in time, you left CRDF; is that

24   right?

25       A    That's correct.

1    itself.  If you're just asking her to say what's on

2    there, she can answer.

3            THE WITNESS:  Well, the date of June 22nd, 2022,

4    is the first entry that Lieutenant Carter made, but that

5    doesn't necessarily mean that that's the date that the

6    investigation started.

7    BY MR. DiBONA:

8        Q   That was going to be my next question.

9            But my question now is:  You see the date

10   June -- 6/27/2023 under date IAB investigation initiated;

11   correct?

12           MR. TOKORO:  Objection.  Vague and ambiguous.  I

13   may have misheard you, but I think you said June 6 27,

14   2023.

15           THE WITNESS:  I'm sorry.

16   BY MR. DiBONA:

17       Q   Just to avoid all the back-and-forth -- because

18   what I thought I said was the number 6, as in the sixth

19   month.  But to avoid all of this -- we don't have to read

20   anything back just so we have a clear record.

21           Do you see the date June 27th, 2023, as the date

22   the IAB investigation was initiated on this document?

23           MR. TOKORO:  Same objection.  Document speaks

24   for itself.

25           But you can answer.

```
 1              THE WITNESS:  Yes.  I do see that date on that
 2    line, yes.
 3    BY MR. DiBONA:
 4        Q    All right.  And do you see on the case summary,
 5    the first entry in this document is June 22nd, 2022?  Do
 6    you see that?
 7        A    Yes.
 8        Q    So can you explain to me how, if the first date
 9    on the entry is June 6 -- sorry -- June 22nd, 2022, how
10    can the investigation have been initiated June 27th,
11    2023 -- sorry -- June 27, 2023?
12        A    I don't know, because this form was initiated by
13    Lieutenant Carter prior to me taking over as the policy-
14    of-equality team lieutenant.
15        Q    Are you familiar with a statute called POBAR?
16        A    Yes.
17        Q    And correct me if I'm wrong.  You're aware,
18    working in IAB, that as a general matter, discipline has
19    to be given within one year of the date of the incident;
20    is that right?
21              MR. TOKORO:  Objection.  Calls for a legal
22    conclusion.  Also misstates the law, lacks foundation,
23    calls for speculation.
24              You can answer if you know.
25              THE WITNESS:  Well, your question was a little
```

DEVANE, ANN                                                      Page 101

```
 1        Q    I'm going to send Exhibit 14 on the screen.

 2             Do you see Exhibit 14 on the screen?

 3        A    Yes.

 4             (Exhibit 14 was marked for identification.)

 5   BY MR. DiBONA:

 6        Q    Exhibit 14 is COLA 002432 to 2434.

 7             And have you seen this document before?

 8        A    Yes.

 9        Q    And is this -- excuse me.  Is this the

10   investigator's log with respect to the complaint filed by

11   Esther Lim against Sheriff Alex Villanueva?

12        A    Yes.

13        Q    And you also -- you see the date here,

14   3/16/2022, is the date the department became aware of the

15   allegations?

16        A    Yes.

17        Q    And do you know how it was the department became

18   aware of the allegations on around March 16, 2022?

19        A    No.

20        Q    And you see the date of June 27, 2023, is the

21   date the IAB investigation initiated?

22        A    Yes.  That's what's documented there.

23        Q    And you also see the first date at the bottom

24   here is June 22nd, 2022?

25        A    Yes.
```

DEVANE, ANN                                                    Page 102

1        Q    And I understand you didn't draft this part.
2    But do you have any explanation for why the first date is
3    June 22nd, 2022, and the date the investigation is
4    purportedly initiated is June 27, 2023?
5            MR. TOKORO:  Lacks foundation.
6            THE WITNESS:  No, I do not, because I did not
7    initiate this form.
8    BY MR. DiBONA:
9        Q    And just a similar question, just so the record
10   is clear.  The entries with Lieutenant Carter, it's your
11   understanding Lieutenant Carter would have been the one
12   wrote those entries; is that right?
13       A    Yes.
14       Q    And did you undertake any steps to ensure that
15   Lieutenant Carter's entries on this log were accurate?
16       A    No.  I did not do any follow-up regarding what
17   he stated and what he did.
18       Q    And conversely, do you have any information that
19   any of his entries are inaccurate?
20       A    I have no information that they are inaccurate.
21           MR. DiBONA:  And just for the record, Alex
22   Villanueva has joined the deposition as well, obviously
23   remotely, but we'll just mark that.
24   BY MR. DiBONA:
25       Q    And, Lieutenant Devane, your first entry is

DEVANE, ANN                                                    Page 103

1   July 5th, 2023.  Do you see that here?

2       A    Yes.  That's correct.

3       Q    And did you -- and the second entry is

4   August 17th, 2023.  There's an entry, "reviewed Zoom

5   interview with Complainant Lim."

6            You see that?

7       A    Yes.  That's right.

8       Q    Did you take any steps with respect to the IAB

9   investigation of Esther Lim's complaints against Alex

10  Villanueva between July 5th, 2023, and August 17, 2023?

11      A    I was not doing the investigation, but I did not

12  do anything relating to the paperwork given to me by

13  Sanders Roberts between those dates.

14      Q    And had you done so, is it fair to say you would

15  have documented it in the investigator's log?

16      A    Yes.  That's correct.

17      Q    Do you see here on September 21, 2023, there's

18  an entry "Reviewed transcripts and compared to the

19  summary written by Sanders Roberts LLP and confirmed the

20  statements made by Complainant Lim and witnesses were all

21  documented in the summary"?

22           Did I read that correctly?

23      A    Yes.

24      Q    Have you -- does this refresh your recollection

25  that you saw a transcript for the interview of Kyla

DEVANE, ANN                                                    Page 104

```
 1    Coates?
 2         A     That does not recall my recollection.  I don't
 3    recall if there were transcripts for an interview --
 4         Q     And --
 5         A     -- for Kyla Coates.
 6         Q     So when you write here that you confirmed the
 7    statements made by Complainant Lim and witnesses were all
 8    documented in the summary, just to break it down, how did
 9    you confirm the statements made by the witnesses were all
10    documented in the summary?
11         A     I don't -- I don't recall.  That could have been
12    a typo.  But I don't recall if there were actual audible
13    interviews that were transcribed for witnesses.
14         Q     So just to be clear, you can't stand by the
15    statement in this investigator's log that you confirmed
16    the statements made by the witnesses were all documented
17    in the summary?
18              MR. TOKORO:  Objection.  Argumentative,
19    misstates her testimony, and is also misleading.  You're
20    not showing her the full stacked case file, which as you
21    know, contains notes from both of those interviews.
22              You can answer the question if you understand
23    it.
24              Also vague and ambiguous.
25              THE WITNESS:  What I can state is I confirmed
```

DEVANE, ANN                                                    Page 105

1    what was written by -- if there was witnesses that were

2    transcribed or if it was written in their summary, that

3    what was -- I just confirmed what they had in their

4    summary.

5    BY MR. DiBONA:

6        Q    Just to be clear, when it says confirmed the

7    statements made by just the witnesses were all documented

8    in the summary, you are -- is your testimony you checked

9    the summary against itself?

10            MR. TOKORO:  Objection.  Vague and ambiguous.

11   Also misstates her testimony and, again, is misleading

12   given you're not showing her the entire case file.

13            You can answer.

14            THE WITNESS:  You know, I really -- I do not

15   recall if what -- I compared witness testimony and

16   summary -- I don't recall exactly what I meant in that

17   written notation.

18   BY MR. DiBONA:

19       Q    Would you agree with me that in order to confirm

20   witness statements are accurate in a summary, you'd need

21   to compare the summary to something?

22            MR. TOKORO:  Objection.  Vague and ambiguous

23   and, again, misleading in that you're not showing her the

24   entire stacked case file, which includes the notes from

25   the interviews.

DEVANE, ANN                                                    Page 113

```
 1   background, Lieutenant Devane, when you join the
 2   sheriff's department, do you take any type of oath?
 3       A    An oath of office?
 4       Q    Yes.
 5       A    Yes.
 6       Q    What does that oath of office, broadly speaking,
 7   entail?  What are you taking an oath to do?
 8       A    My gosh, that was 24 years ago.  I don't know
 9   the exact verbiage of what the oath is that -- when we're
10   sworn in.
11       Q    What is your understanding of what the oath
12   requires you to do?
13       A    To be -- to not -- I'm not -- I have no idea
14   what the oath says.
15       Q    Just to be clear, as a 24-year veteran of the
16   department and as a lieutenant in the sheriff's
17   department, you cannot recall anything about your oath of
18   office as you sit here today?
19           MR. TOKORO:  That's not the question you asked
20   her and that's not the testimony that she gave, and it's
21   also irrelevant and argumentative.
22   BY MR. DiBONA:
23       Q    You may answer.
24       A    I cannot recall the exact verbiage that's in the
25   oath of office.
```

DEVANE, ANN                                                Page 192

1    think we can conclude.

2            I'll reserve all rights with respect to any

3    questions where there's an instruction not to answer, but

4    yeah, we're concluded for today.

5            THE REPORTER:  Mr. Tokoro, do you need a copy of

6    the transcript?

7            MR. TOKORO:  Yes.  As I've been telling the

8    other court reporters, the one that you're going to send

9    for the witness, you can send that to our office, and

10   we'll get that over to her to do her errata and sign it.

11   And then we are -- our office will order one copy for our

12   office.

13           (Deposition concluded at 3:24 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

DEVANE, ANN

```
1              DECLARATION UNDER PENALTY OF PERJURY

2              I, ANN DEVANE, hereby certify under penalty of

3    perjury under the laws of the State of California that

4    the foregoing is true and correct.

5

6

7              Executed this _____ day of _____, 2025, at

8    _____, _____.

9      (City)                        (State)

10

11                       _____

12                       ANN DEVANE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DEVANE, ANN                                                    Page 194

```
 1              I, the undersigned, a Certified Shorthand

 2     Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken before

 4     me at the time and date herein set forth; that any

 5     witnesses in the foregoing proceedings, prior to

 6     testifying, were duly sworn; that a record of the

 7     proceedings was made by me using machine shorthand, which

 8     was thereafter transcribed under my direction; that the

 9     foregoing transcript is a true record of the testimony

10     given.

11              Further, that if the foregoing pertains to the

12     original transcript of a deposition in a federal case,

13     before completion of the proceedings, review of the

14     transcript [XX] was [ ] was not requested.

15

16              I further certify I am neither financially

17     interested in the action nor a relative or employee of

18     any attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date subscribed

20     my name.

21

22     Dated: March 17, 2025

23

24                          _____
                            Vesna Walter
25                          RPR, CCRR, CSR No. 11989
```

EXHIBIT 25

CERTIFIED COPY

# Express Deposition Services
## by EXPRESSNETWORK

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs SHERIFF'S DEPARTMENT

CHRISTINE DIAZ-HERRERA, ESQ

March 05, 2025

Cheryl L. Marquis CSR No. 6731, Job No. 6456

```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALEX VILLANUEVA,            )          NO.
                                 )          2:24-CV-04979 SVW (JCx)
 5            Plaintiff,         )
                                 )
 6       vs.                     )
                                 )
 7   COUNTY OF LOS ANGELES,      )
     COUNTY OF LOS ANGELES       )
 8   SHERIFF'S DEPARTMENT,       )
     LOS ANGELES COUNTY          )
 9   BOARD OF SUPERVISORS,       )
     COUNTY EQUITY OVERSIGHT     )
10   PANEL, LOS ANGELES          )
     COUNTY OFFICE OF            )
11   INSPECTOR GENERAL,          )
     CONSTANCE KOMOROSKI,        )
12   MERCEDES CRUZ, ROBERTA      )
     YANG, LAURA LECRIVAIN,      )
13   SERGIO ESCOBEDO, RON        )
     KOPPERUD, ROBERT G. LUNA,)
14   MAX-GUSTAF HUNTSMAN,        )
     ESTHER LIM, and DOES 1      )
15   to 100, inclusive,         )
                                 )
16            Defendants.        )
     ------------------------

17

18

             Deposition of CHRISTINE DIAZ-HERRERA, ESQ., taken
19
     on behalf of the Plaintiff remotely via Zoom
20
     Videoconferencing, commencing at 10:40 A.M. on
21
     Wednesday, March 5, 2025 before Cheryl L. Marquis,
22
     Certified Shorthand Reporter No. 6731.
23

24

25
```

DIAZ-HERRERA, ESQ, CHRISTINE                                      Page 2

```
 1     APPEARANCES:

 2   For Plaintiff:

 3           SHEGERIAN & ASSOCIATES, INC.
             BY:  ALEX DiBONA
 4               ARTHUR ADAMIAN
                 Attorneys at Law
 5           11520 San Vicente Boulevard
             Los Angeles, California 90049
 6           (310) 860-0770
             ADiBona@Shegerianlaw.com
 7

 8   For Defendants:

 9           MILLER BARONDESS, LLP
             BY:  JASON H. TOKORO
10               Attorney at Law
             2121 Avenue of the Stars
11           Suite 2600
             Los Angeles, California 90067
12           jtokoro@millerbarondess.com

13
     Also Present:
14
             ALEX VILLANUEVA
15
             S. WILLIAMSON
16

17

18

19

20

21

22

23

24

25
                         INDEX
```

DIAZ-HERRERA, ESQ, CHRISTINE                                        Page 3

```
 1
       THE WITNESS:
 2
        Christine Diaz-Herrera, Esq.
 3

 4

 5                     EXAMINATION BY:                 PAGE

 6              Mr. DiBona                       4
                                               199
 7
                Mr. Tokoro                     180
 8

 9                        EXHIBITS

10    NO.            DESCRIPTION                  PAGE

11    Exhibit 1    Plaintiff Alex Villanueva's
                   First Amended Notice of Taking
12                 Deposition of Christina Diaz
                   Herrera: Request For Production
13                 of Documents                   41

14    Exhibit 2    Los Angeles County Sheriff's
                   Department Internal Affairs
15                 Bureau Investigative Report
                   July 28, 2021, Bates
16                 COLA002120-2199                 53

17    Exhibit 3    E-mail, Bates COLA001868-1871  124

18    Exhibit 4    E-mail, Bates COLA001887-1889  136

19    Exhibit 5    E-mail, Bates COLA001890-1893  141

20    Exhibit 6    E-mail, Bates COLA001894-1898  144

21    Exhibit 7    E-mail, Bates COLA001909-1914  146

22    Exhibit 8    E-mail, Bates COLA001915-1921  152

23    Exhibit 9    Los Angeles County Sheriff's
                   Department Internal Affairs
24                 Bureau Investigative Report
                   March 5, 2022, Bates COLA002035-
25                 2119                           160
```

DIAZ-HERRERA, ESQ, CHRISTINE                                          Page 4

1       VIA ZOOM VIDEOCONFERENCING, WEDNESDAY, MARCH 5, 2025

2                           10:40 A.M.

3                              -0-

4            THE REPORTER:  Ms. Diaz-Herrera, I'm going to

5       place you under oath.

6           The witness, CHRISTINE DIAZ-HERRERA, ESQ.,

7              was placed under oath by the Reporter

8                         as follows:

9            THE REPORTER:  Do you solemnly state, under the

10      penalty of perjury, that the testimony you will give in

11      this matter will be the truth, the whole truth, and

12      nothing but the truth?

13           MS. DIAZ HERRERA:  I do.

14           THE REPORTER:  Thank you.

15           You may proceed.

16

17                        EXAMINATION

18      BY MR. DiBONA:

19      Q    Thank you. Can you please say and spell your

20      full name for the record?

21      A    Christine Diaz-Herrera.  First name is spelled

22      C-h-r-i-s-t-i-n-e, last name is D-i-a-z hyphen

23      H-e-r-r-e-r-a.

24      Q    Thank you.  And do you go by Miss Diaz-Herrera?

25      A    That would be fine.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 33

1    with anyone else, at least initially, in the Office of

2    County Counsel?

3        A    No.

4        Q    And what were the names of the two individuals

5    in the Sheriff's Department that they gave you?

6        A    To be honest, I know one was Piero, and I don't

7    know how to spell it because it's a -- and I forget what

8    Piero's last name is.  And then the other person I

9    forget his name as well.  I'm sorry, this -- it was a

10   while back.  It's something with the name John in it.

11   To be honest, I have since forgotten, to be quite frank.

12       Q    Is it John Carter?

13       A    Yes, that's it.

14       Q    And did you speak with -- sorry.

15            Do you have an understanding of what rank John

16   Carter has in the Sheriff's Department?

17       A    If I'm being honest, I did not have a very

18   nuanced understanding of his rank or, you know, where he

19   -- no.

20       Q    Did you have an understanding that John Carter

21   was in the Internal Affairs Bureau?

22       A    That, yes, I was aware of that, yes.

23       Q    And what, if anything, did Mr. Carter tell you?

24       A    Mr. Carter gave me information about generally

25   how they conduct investigations, so for example, they

DIAZ-HERRERA, ESQ, CHRISTINE                              Page 34

```
 1   always record, so he gave me information about like, you
 2   know, when you -- when you conduct an investigation you
 3   should have a recording of it.  I think he would check
 4   in every so often with an e-mail saying, you know, just
 5   wanting an update of who had been interviewed or I think
 6   that's their process for like keeping records of like,
 7   you know, whose been interviewed, who has been contacted
 8   that type of thing.  So I know that he would
 9   occasionally e-mail me and just kind of check in and
10   say, oh, you know, kind of like an update, status
11   update, like who has been interviewed, what's the status
12   of where you are at.
13            Also he and I would e-mail along with Piero if
14   I was having any kind of issue with scheduling an
15   interview or getting a hold of someone.
16            So it was real basic, kind of support.  It
17   wasn't very -- he wasn't telling me how to conduct my
18   investigation or what to do, but you know, giving me
19   basic support.  Because I was outside of the Sheriff's
20   Department, I really didn't have an understanding of,
21   you know, who were like the hierarchy or who I should
22   contact or who was the right person to contact to
23   interview certain people.
24      Q    By the way, is Edward -- is his last name
25   Montelongo?
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 35

1        A      Yes.

2        Q      Okay.  And did you, at least initially in the

3   investigation, did you meet with a woman by the name of

4   Ann Devane?

5        A      Say that name again.

6        Q      Ann Devane.

7        A      It does not sound familiar to me, no.

8        Q      Other than Mr. Carter telling you that your

9   interviews should be recorded, did he give you any other

10  instructions on how to conduct interviews?

11       A      He gave me their admonitions, so he gave me

12  like a sheet.  Because there is a particular process, in

13  terms of setting up an interview with someone who is

14  sworn and so he gave me the admonitions.  He also gave

15  me kind of the notification that you would send out to

16  them prior to try to set up that interview.  So he did

17  give me that -- that information.

18       Q      And anything other than giving you the

19  admonitions and the saying that the interviews should be

20  recorded?  Did he give you anything else on how he

21  conducted investigations or how you were expected to

22  conduct yourself?

23       A      No.  I do think at some point, they did give me

24  -- I think they might have given me a reference to the

25  County policy about, you know, cooperation with

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 51

```
 1    Esther Lim?
 2         A    You have to forgive me.  This was three years
 3    ago, so I'm trying to recall.  As far as I can recall,
 4    that was it.
 5         Q    And did you yourself -- during the
 6    investigation, did you consider that you were an
 7    independent investigator?
 8         A    Yes.
 9         Q    In other words -- and you -- is it fair to say
10    in the process of doing the investigation, you believed
11    it was important that you not pre-judge the outcome, is
12    that fair to say?
13         A    Yes.
14         Q    And -- excuse me.
15              Did you come to any conclusions with respect to
16    your investigation?
17         A    Can you be more clear what you mean by coming
18    to a conclusion?
19         Q    Yes, as an independent investigator, did you
20    make any determinations that Sheriff Villanueva violated
21    any County policy?
22         A    Because I left before the actual report was
23    created, I did not make any determinations.
24         Q    Do you have an understanding -- do you --
25    excuse me.
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 52

1           If you had not left Sanders Roberts, were you
2   intending to make an actual conclusion about whether
3   there was a violation of policy?
4       A    I didn't get the opportunity to interview the
5   Sheriff, so I can't say what findings, if any, I would
6   have made because I never got a chance to interview him.
7   And I didn't get a chance to write the report.
8       Q    Oh, understood.  And just to be clear, what you
9   are saying is -- I think I understand it -- you never
10  got a chance to make any findings, is that fair?
11      A    Right.
12      Q    And I'm sorry, my question might have been
13  unclear.  I will rephrase it.
14           My question was, were you planning, if you had
15  stayed, would your report have included a finding that
16  there was a violation of policy?
17      A    I couldn't say.
18      Q    Let me rephrase it another way.
19           When you are an independent investigator, did
20  you consider it your job in the Sheriff Villanueva
21  investigation to simply lay out the facts and leave it
22  to others to determine what conclusions to draw from
23  those facts, or were you planning to say here are the
24  facts and I conclude, based on these facts, X-Y or Z?
25           MR. TOKORO:  Objection.  Asked and answered.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 54

```
 1      Q    Okay.  And when it says -- do you have any
 2   knowledge of what it means when it says,
 3   "Incident Date:  Between July 28, 2021, and March 2nd
 4   2022"?
 5      A    No.
 6      Q    Do you have an understanding of what it means
 7   when it says, "Department Knowledge:  March 16, 2022"?
 8      A    No.
 9      Q    And do you know what it means when it says,
10   "Statute Date:  March 15, 2023"?  Do you know what that
11   refers to?
12      A    No.  I would have to speculate.
13      Q    And I'm just going to scroll down for a moment
14   to -- this is page 7 of the document.  It's COLA002126.
15   Do you recognize this document?
16           MR. TOKORO:  Alex, can you zoom in?  It's
17   really tiny on our end?
18           THE WITNESS:  Let me put my glasses back on so
19   I don't -- I don't believe I have seen this prior, no.
20   I don't recognize it.
21      Q    BY MR. DiBONA:  And -- excuse me.  The Bates
22   stamp COLA002129, do you recognize this portion of the
23   document?
24      A    No, I -- on May 19, 2023, I did not work for
25   Sanders Roberts.  I had already left, which actually
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 55

```
 1    reminds me, I think when we spoke earlier and I think I
 2    gave you dates, I think I gave you the wrong dates
 3    because I actually in June of 2023 did not work at
 4    Sanders Roberts.  So I think I was off by a year in
 5    terms of the timing of the investigation and when I was
 6    doing my work.  So I apologize for that.  But, yeah, in
 7    2023, I no longer worked at Sanders Roberts, so I had
 8    nothing to do with the creation of this document.  This
 9    doesn't even look like something that I started.  This
10    looks like it has -- I didn't do anything -- this is not
11    my document.  I did not prepare this.
12        Q    Do you see where it just says -- where it says,
13    from Sanders Roberts LLP?
14        A    Correct.
15        Q    And so is it fair to say you don't know who at
16    Sanders Roberts LLP wrote this report?
17        A    I have no idea.
18        Q    And is it fair to say this document does not
19    reflect your work product?
20             MR. TOKORO:  Objection.  Vague and ambiguous.
21    You also haven't shown her the entire document.
22             MR. DiBONA:  You may answer, Ms. Diaz-Herrera.
23             THE WITNESS:  I couldn't say.  I haven't seen
24    the document.
25        Q    BY MR. DiBONA:  All right.  Do you -- separate
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 59

```
 1      Q     And do you see here on number 5, Investigative
 2  Interview Summaries, do you see that?
 3      A     Yes.
 4      Q     Did you draft these interview summaries?
 5      A     Yes.
 6      Q     And so even though you didn't prepare this
 7  document this interview summary is something that you
 8  wrote, is that right?
 9      A     Yes.  I think so.  Honestly.  I will take that
10  back.  I can't see all of these, so I can't say for
11  certain.  What I can see right there for Kyla Coates in
12  that first paragraph looks familiar.  But, again,
13  without having seen all of it, I cannot -- I cannot
14  speak to all of it.  I can speak to only the first two
15  paragraphs that I can see, and that looks like something
16  I wrote.
17      Q     Just to be clear, what you see on the screen
18  right now with regard to Kyla Coates, that's familiar
19  because that's something you wrote, is that fair to say?
20      A     Yes.
21      Q     And did you record your interview with Kyla
22  Coates?
23      A     Yes.
24      Q     How did you record it?
25      A     I believe the interview was over Microsoft
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 60

1    Teams and Microsoft Teams has like a button that you can

2    press that automatically records.

3         Q    And do you still have a copy of that recording?

4         A    It should be with Sanders Roberts.

5         Q    Other than recording it during Microsoft Teams,

6    did you report it in any other way?  Like did you make a

7    separate recording?

8         A    I don't recall.

9         Q    And while you were interviewing Miss Coates, is

10   it fair to say you were taking notes?

11        A    Yes.

12        Q    And those notes, as far as you know, those

13   would still be with Sanders Roberts, is that fair?

14        A    Correct.

15        Q    And I think you have said this, sorry if you

16   did, your practice is not to do handwritten notes. It's

17   to actually type while you are doing the interviews, is

18   that fair?

19        A    Yes.

20        Q    So the notes that you would have taken, those

21   would be, you know, word processor of some type, MS Word

22   or something like that?

23        A    Yes.

24             MR. TOKORO:  Just so the record is clear, Alex,

25   those notes have been provided to you, and it's a part

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 141

```
 1      A    No.
 2      Q    And in the previous 15 years, had you ever
 3  investigated a County Sheriff of any kind?
 4      A    A County Sheriff, no.
 5      Q    By the way, as I get the next exhibit, I'm
 6  going to ask you, there is a reference -- Mr. Villanueva
 7  references two certified letters.  Did you send those
 8  letters -- sorry.  Did you send the certified letters
 9  that are referenced?
10      A    I did not.
11      Q    Do you know who did?
12      A    I do not know.
13      Q    Sorry.  It should come through any moment.
14           (Exhibit 5 was marked for identification
15           and is attached hereto.)
16           All right.  Do you see the document on your
17  screen?
18      A    Yes.
19      Q    Okay.  This is COLA001890 and it goes to 1893.
20           Do you recall receiving -- sorry, sending this
21  e-mail to former Sheriff Alex Villanueva on February 9,
22  2023?
23      A    Yes.
24      Q    And for the record, what does POE stand for?
25      A    Policy of Equity I believe, I think I was
```

DIAZ-HERRERA, ESQ, CHRISTINE                           Page 142

1    referencing the CPOE.

2        Q    And there is a reference to which Policy of

3    Equity he's alleged to have violated, is that correct?

4        A    Yes.

5        Q    And there is no reference to who was making the

6    allegations, is that right?

7        A    Yes.

8        Q    And was there any reason why you didn't

9    reference either Esther Lim or Max Huntsman in this

10   e-mail?

11       A    He asked for the allegations and I gave them to

12   him.

13       Q    Understood.  Did you consider -- in your

14   opinion, would there have been anything inappropriate if

15   you said -- if you used the names of who was saying that

16   he violated the policies of equity?

17       A    It's not typically my practice to include that

18   information when someone is asking me for the

19   allegations.

20       Q    And is there any reason it's part of your

21   practice?

22       A    Again, I was asked for the allegations.

23   Provided them.  They are there.

24       Q    Understood.  My question was just a little bit

25   different.  You said it was part of your practice, and I

DIAZ-HERRERA, ESQ, CHRISTINE                                Page 152

```
 1                MR. DiBONA:  You may answer.
 2                THE WITNESS:  I never got a chance to interview
 3     him, so I don't know what he was thinking.
 4                MR. DiBONA:  I'm going to send Exhibit 8
 5     through the Chat.
 6                (Exhibit 8 was marked for identification
 7                and is attached hereto.)
 8        Q    BY MR. DiBONA:  Okay, see if this one comes up
 9     any better.  Do you see Exhibit 8 on your screen?
10        A    I'm just looking at it from the Chat since I
11     couldn't read it either way, but if you would like for
12     me to look at it from your screen, I will.
13        Q    I apologize --
14        A    No, no that's fine, but I can read it.  That's
15     fine as long as I can read it.
16        Q    And Exhibit 8 is COLA001915, and it goes all
17     the way to 1921.
18             Do you recall receiving this e-mail from
19     Sheriff Villanueva or former Sheriff Villanueva on or
20     about March 10th, 2023?
21        A    You know what, to be honest, I don't know
22     because that's -- actually, what day is that?  March
23     10th?
24        Q    March 10th, 2023 is what the document says.
25        A    That was actually, I believe, my last day at
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 153

1    Sanders Roberts, and based on the time 6:54, it's likely

2    that I may not have seen it.

3        Q    By the way, did you tell-- excuse me.

4            Did you tell -- sorry, strike that.

5            Did you make arrangements with anyone at

6    Sanders Roberts to forward your e-mails to them to take

7    over the investigation?

8        A    (No response)

9        Q    Sorry.  It was an unclear question.

10           Do you know, one way or the other, if anyone at

11   Sanders Roberts forwarded your e-mails to anyone at

12   Sanders Roberts who was doing the investigation after

13   you?

14       A    I don't know what they did with my e-mails

15   after I left.

16       Q    All right.  And so your testimony is -- sorry.

17   Sorry to get so specific, but do you remember what time

18   -- was there a time when you left Sanders Roberts on

19   March 10th, 2023?

20       A    Probably about five o'clock.

21       Q    So is it your testimony that because this

22   e-mail is at 6:54 P.M., you would not have had access to

23   it?

24       A    It's my testimony that Friday, March 10th at

25   6:54 after I had already given notice, I was not

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 154

1    checking that e-mail.

2        Q    Understood.  And do you know -- do you have a

3    recollection, one way or another, if your access was cut

4    off or were you simply not checking it?

5        A    Again, I don't believe my access was cut off on

6    that day that quickly, but again, I -- given that I

7    believe my first day at work at my new job was March

8    13th, I'm pretty sure I was not reading my e-mails from

9    Sanders Roberts on Friday at 6:54 P.M.

10       Q    Understood.  And the reason you weren't reading

11   it is because you no longer worked there, is that fair

12   to say?

13       A    Yes.

14       Q    No other reason other than that, is that fair?

15       A    Correct.

16       Q    All right.  And then just to be clear, is it

17   fair to say, then, the first time you are seeing this

18   e-mail is me showing it to you now?

19       A    I believe so, yes.

20       Q    And I believe -- just so I'm clear, you would

21   have never responded to this e-mail, is that fair?

22       A    I don't recall seeing it.  I believe this is

23   the first time I'm seeing it.  I did not respond to this

24   e-mail.  I know that for a fact.

25       Q    And you -- fair to say you don't know if anyone

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 155

```
 1   at Sanders Roberts responded to this e-mail, is that
 2   fair?
 3        A    I don't know what they did with my e-mails
 4   after I left.
 5        Q    All right.  Just for the record, it says,
 6            "You don't have a standard practice regarding
 7   making a subject out of someone you have no
 8   jurisdiction over and engaging in something the
 9   department has never done before.  I would love to
10   help you, however, your terms are unethical and
11   unacceptable.  I simply asked you what the issue was
12   about.  I don't need to know the specific questions
13   you are going to ask.  Example, Captain So-in-so
14   alleges that he was denied X position because he did
15   X-Y-Z."
16            Did I read that correctly?
17        A    Sure.
18        Q    As you sit here today, do you think there is
19   anything inappropriate about Sheriff Villanueva saying I
20   don't need to know the specific questions, I just want
21   to know so-in-so alleges X because of X-Y-Z?
22            MR. TOKORO:  Objection.  Vague and ambiguous as
23   to what you mean by "inappropriate."  Also lacks
24   foundation and calls for speculation regarding what
25   Sheriff Villanueva was saying. And also irrelevant what
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 156

1    Sheriff Villanueva felt about how the investigation was

2    being conducted.

3              MR. DiBONA:  You may answer.

4              THE WITNESS:  I can't answer that question.

5       Q    BY MR. DiBONA:  Just to be clear, as you sit

6    here today, you don't have an opinion, one way or

7    another, on whether this request is appropriate?

8       A    I believe my request was very appropriate.  I

9    believe that I gave him enough information to be

10   prepared for the interview, to know -- have a sense of

11   what was happening -- I mean to have a sense of what the

12   investigation was about.  I believe what I gave him was

13   standard to what you would give a subject.  I don't --

14   that's -- that's what I think.

15      Q    My question was a little different, because you

16   said "I can't answer that question," so my followup was

17   you don't -- is it fair to say, then, you don't have an

18   opinion, one way or the other as you sit here today, on

19   this request from Sheriff Villanueva?

20             MR. TOKORO:  Objection.  Asked and answered

21   just now.

22             MR. DiBONA:  You may answer.

23             THE WITNESS:  I believe the information I gave

24   him was appropriate and responsive to his request.

25      Q    BY MR. DiBONA:  My question is different.

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 157

1    Because I know you haven't seen this request before, so

2    I'm asking you, are you able to now have an opinion, one

3    way or another, on whether it's appropriate or not?

4              MR. TOKORO:  Same objections.  Asked and

5    answered.  And also not relevant whether she has an

6    opinion now one way or the other.

7              THE WITNESS:  I just can't answer that question

8    whether it's appropriate.  I can tell you that I gave

9    him the information that was requested.

10             MR. DiBONA:  We have been going a while.  Why

11   don't we take a break and come back at 3:30.

12             MR. TOKORO:  Okay.

13             (Recess taken from 3:26 P.M. to

14             3:37 P.M.)

15   Q    BY MR. DiBONA:  Ms. Diaz-Herrera, you

16   understand you are still under oath?

17   A    Of course.

18   Q    And is there any reason you can't continue to

19   give your best testimony?

20   A    No.

21   Q    Did you ever tell Sheriff Villanueva that you

22   were leaving Sanders Roberts?

23   A    I did not.

24   Q    And therefore, you never told him I'm leaving,

25   contact this person for any questions you may have or

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 158

```
 1   anything like that, is that fair?
 2        A    That is fair.
 3        Q    So as far as you know, Sheriff Villanueva
 4   wouldn't have any idea you were no longer at Sanders
 5   Roberts?
 6        A    No.
 7        Q    And as far as you are aware, Sheriff Villanueva
 8   would have no idea that it still wasn't you conducting
 9   the investigation, is that fair?
10        A    I don't know what he knew.
11        Q    I'm going to mark and send Exhibit 9.
12             Let me just ask you while I'm getting
13   Exhibit 9, prior to Esther Lim's complaint, did you ever
14   have any dealings with her?
15             Sorry, unclear question.
16             Prior to you interviewing Esther Lim in the
17   context of this investigation, did you ever have any
18   dealings with her?
19             MR. TOKORO:  I'm going to make the objection
20   that to the extent that you had any communications with
21   Miss Lim in connection with any investigations that you
22   may have done, and I don't know if you did, I would
23   instruct you not to talk about those.  But if you had
24   any discussions with her outside of that context, you
25   are free to answer.
```

DIAZ-HERRERA, ESQ, CHRISTINE                          Page 162

```
 1      A    No.
 2      Q    And more broadly, have you ever given any
 3  statements to any media organization about Sheriff Alex
 4  Villanueva?
 5      A    No.
 6      Q    And to your knowledge, has any -- have you ever
 7  been asked to -- has there ever been a request for
 8  comment from any member of the media to you from Alex --
 9  in respect to Alex Villanueva?
10      A    No.
11      Q    The document it's COLA 002042 -- I'm sorry or
12  43.  It's this page.  Do you recognize this document
13  before -- or sorry, have you seen this document -- this
14  page of the document before me showing it to you just
15  now?
16      A    I believe it was -- I am not familiar -- this
17  -- I didn't write this report, so I am not familiar with
18  it.
19      Q    And to your knowledge, have you seen this
20  document before me showing it to you right now?
21      A    I see it now.  We have read it earlier.  I
22  think you are showing it to me now.  I have not read it.
23  I am not familiar with it.
24      Q    Do you see here under Allegation 1?
25      A    Yes.
```

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 211

1

2    STATE OF CALIFORNIA)
                                        ) ss.
3    COUNTY OF LOS ANGELES              )

4

5

6            I, CHERYL L. MARQUIS, hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 6731 issued by the Court

10   Reporters Board of California, and which is in full

11   force and effect; (Fed. R. Civ. P. 28(a)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties nor am I a relative or

19   financially interested in this action.  (Fed. R. Civ. P.

20   28).

21           I am the deposition officer that

22   stenographically recorded the testimony in the foregoing

23   deposition and the foregoing transcript is a true record

24   of the testimony given by the witness.  (Fed R. Civ. P.

25   30(f)(1)).

DIAZ-HERRERA, ESQ, CHRISTINE                                    Page 212



```
 1           Before completion of the deposition, review of
 2    the transcript [X] was requested.  If requested, any
 3    changes made by the deponent and provided to the
 4    reporter) during the review period allowed, are appended
 5    hereto.  (Fed. R. Civ. P. 30(e)).
 6
 7    Dated: March 20, 2025
 8
 9                 _____
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 26

CERTIFIED COPY

In the Matter Of:

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

CONSTANCE MARIE KOMOROSKI

February 27, 2025

Job No. 6455



```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA , WESTERN DIVISION

 3
   _____
 4                                        )
   ALEX VILLANUEVA,                       )
 5                                        )
                      Plaintiff,          )
 6                                        )
             vs.                          ) Case No.:
 7                                        ) 2:24-cv-04979 SVW (JCx)
   COUNTY OF LOS ANGELES, COUNTY OF LOS   )
 8 ANGELES SHERIFF'S DEPARTMENT, LOS      )
   ANGELES COUNTY BOARD OF SUPERVISORS,   )
 9 COUNTY EQUITY OVERSIGHT PANEL, LOS     )
   ANGELES COUNTY OFFICE OF INSPECTOR     )
10 GENERAL, CONSTANCE KOMOROSKI, MERCEDES )
   CRUZ, ROBERTA YANG, LAURA LECRIVAIN,   )
11 SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT)
   G. LUNA, MAX GUSTAF HUNTSMAN, ESTHER   )
12 LIM, and DOES 1 to 100, inclusive,     )
                                          )
13                    Defendants.         )
   _____)
14

15

16

17          Videoconference Deposition of

18     CONSTANCE MARIE KOMOROSKI, ESQ., taken on

19     behalf of Plaintiff, Remote Via Zoom, beginning

20     at 10:07 a.m., Thursday, February 27, 2025,

21     before Cila Meyer, No. 4914, a Certified

22     Shorthand Reporter.

23

24

25
```

MARIE KOMOROSKI, CONSTANCE                                         Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For the Plaintiff:

 4         ALEX DiBONA, ATTORNEY AT LAW
           ANNA KHACHATRY, ATTORNEY AT LAW
 5         SHEGERIAN & ASSOCIATES, INC.
           11520 San Vicente Boulevard
 6         Los Angeles, California 90049
           310.860.0770
 7         adibona@shegerianlaw.com
           akhachatry@shegerianlaw.com
 8
      For the Defendants:
 9
           JASON H. TOKORO, ATTORNEY AT LAW
10         STEVEN WILLIAMSON, ATTORNEY AT LAW
           MILLER BARONDESS, LLP
11         2121 Avenue of the Stars
           Suite 2600
12         Los Angeles, California 90067
           jtokoro@millerbarondess.com
13         swilliamson@millerbarondess.com

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS

 3   CONSTANCE MARIE KOMOROSKI, ESQ.

 4

 5                   EXAMINATION BY:                PAGE:

 6                   MR. DiBONA                    5,155

 7                   MR. TOKORO                     141

 8

 9                   E X H I B I T S

10   Plaintiff's **                               PAGE:

11   Exhibit 1   Plaintiff Alex Villanueva's First Amended 18
                 Notice of Taking Deposition of Constance
12               Komoroski and Request for Production of
                 Documents
13
     Exhibit 2   Document; Bates Nos. COLA 002035-2119    28
14
     Exhibit 3   Document; Bates Nos. COLA 002120-2199    79
15

16

17

18                 INSTRUCTION NOT TO ANSWER

19                     PAGE     LINE

20                      137      14

21

22

23

24

25
```

MARIE KOMOROSKI, CONSTANCE                                                    Page 5

```
 1              REMOTE VIA ZOOM, THURSDAY, FEBRUARY 27, 2025

 2                            10:07 A.M.

 3                              -oOo-

 4

 5              (The oath was administered to the

 6              deponent, CONSTANCE MARIE KOMOROSKI,

 7              ESQ., as follows:)

 8              THE DEPOSITION OFFICER:  Do you solemnly swear

 9    that the testimony you will give shall be the truth, the

10    whole truth, and nothing but the truth, so help you God?

11              MS. KOMOROSKI:  I do.

12

13                            EXAMINATION

14    BY MR. DiBONA:

15        Q    Thank you.  Can you please say and spell your

16    full name for the record, please.

17        A    Yes.  Constance, C-o-n-s-t-a-n-c-e, middle

18    initial M. as in Mary, last name Komoroski,

19    K-o-m-o-r-o-s-k-i.

20        Q    Thank you.  Do you have a middle name?

21        A    Marie.

22        Q    Other than Constance Marie Komoroski, have you

23    ever been known by any other names?

24        A    Not legally.

25        Q    And have you ever had your deposition taken
```

 1  assigned to a briefing, the panelists will review the

 2  documents, and, possibly, interviews, and exhibits that

 3  are part of an investigation of that individual's

 4  alleged misconduct.

 5  BY MR. DiBONA:

 6      Q    At a certain point in time, did you -- excuse

 7  me -- were you involved on the CEOP in any type of

 8  complaint against former Sheriff Alex Villanueva?

 9      A    I was assigned to a panel that was briefing two

10  investigations that had been completed regarding him as

11  a subject, yes.

12      Q    And who was on that panel?

13      A    Based on my review of the calendar, it would

14  have been myself, Roberta Yang, and Mercedes Cruz.

15      Q    I think you may have touched on this earlier,

16  but how was it that the three of you got on the panel

17  that reviewed the two investigations in to former

18  Sheriff Alex Villanueva?

19      A    That would have been the magic of the staff

20  collecting the availability of the panelists, and the

21  availability of the investigations, and department

22  representatives for a particular date.

23      Q    If you know, how long has Ms. Yang been on the

24  CEOP?

25      A    I believe she started about six months to a

MARIE KOMOROSKI, CONSTANCE                                    Page 40

1    BY MR. DiBONA:

2        Q    So Ms. Komoroski, I know there was some back

3    and forth.  Let me just ask you is referring to someone

4    by the name they were born as an example of a violation

5    of the County's policy and discrimination against race

6    and national origin?

7            MR. TOKORO:  Same objection contrary to your

8    own allegations in your complaint, also contrary to the

9    facts.

10           THE DEPONENT:  In a vacuum, no.

11   BY MR. DiBONA:

12       Q    And did you ever see any evidence that Sheriff

13   Villanueva was listening in on Max Huntsman by a bug?

14       A    I was not presented with anything other than

15   what's in this report.

16       Q    And were you ever presented with any evidence

17   that Sheriff Villanueva sweeped or swept Max Huntsman's

18   emails?

19       A    I was only presented with this report.

20       Q    Understood.  Just to be clear, in this report

21   it says, "Max Huntsman said he does not necessarily

22   believe that the sheriff's dirty tricks" --

23           In this report on the paragraph it says,

24   "Mr. Huntsman said he does not believe" -- sorry.

25   Strike that.

 1  conclusion you reached after reviewing this report that

 2  Sheriff Villanueva's comment about Max Huntsman being

 3  Max Gustaf is a holocaust denier was harassment if you

 4  knew that Max Huntsman's father and grandfather were

 5  members of the Nazi Party?

 6       A    No.

 7       Q    Do you see here the name Veronica -- going

 8  down, it's on page 2048, do you see the name "Veronica

 9  Pawlowski"?

10       A    I do.

11       Q    Prior to receiving this report, did you have

12  any -- excuse me -- did you have any communication with

13  Veronica Pawlowski?

14       A    No.

15       Q    Prior to receiving this report, did you know

16  who Ms. Pawlowski was in the context of working for the

17  County of Los Angeles?

18       A    No.

19       Q    Do you see here where there's a reference to

20  Sheriff Alex Villanueva's Facebook Live sessions?

21       A    Yes.

22       Q    And did you yourself ever review any of

23  Sheriff Villanueva's Facebook Live sessions?

24       A    No.

25       Q    And you see here there's a reference to the

 1   KFI radio talk show?

 2        A    Yes.

 3        Q    Did you yourself ever listen to any audio

 4   recording of the KFI appearances?

 5        A    No.

 6        Q    Just to be particular, did you ever yourself,

 7   whether or not it was reporting, did you ever turn on

 8   the radio and listen to Sheriff Alex Villanueva on KFI?

 9        A    No.

10        Q    And so is it fair to say that your

11   understanding of what the Facebook Live sessions contain

12   come from their description in this report; is that

13   right?

14        A    Yes.

15        Q    And your understanding of what was said on KFI

16   comes from its description in this report, as well; is

17   that right?

18        A    Yes.

19        Q    And you see here, there was -- there's, just

20   for the record, I know you can see it, but there's a

21   manila envelope with audios and transcripts sticker on

22   it.  Do you see that?

23        A    I do.

24        Q    Did you actually go in and listen to any of the

25   audios that were attached to this report?

```
 1                    MR. TOKORO:  Same objections.
 2                    THE DEPONENT:  I believe there was a holocaust.
 3    BY MR. DiBONA:
 4        Q    Un- -- un- -- understood.  But would you agree
 5    with me that denying it is a denial of history?
 6                    MR. TOKORO:  Objection; again, irrelevant.
 7                    THE DEPONENT:  I suppose.
 8    BY MR. DiBONA:
 9        Q    So what about a denial of history has to do
10    with an individual's race or national origin?
11                    MR. TOKORO:  Objection; asked and answered
12    several times now.  It also misstates her prior
13    testimony about why they reached the recommendation.
14                    THE DEPONENT:  The recommendation was not based
15    on historical accuracy by any party.  It was based on
16    attributing holocaust denial to Mr. Huntsman,
17    misarticulation of his name, and denouncing it in a
18    questioning manner, I suppose, on social media and
19    radio.
20    BY MR. DiBONA:
21        Q    You believe that Sheriff Villanueva
22    misarticulated Max Huntsman's name?
23        A    Yes.  And that's what Mr. Huntsman says, I
24    should say.
25        Q    Just to be clear, do you see the sentence under
```

1   Mr. Huntsman's name, the first sentence says,

2   "Mr. Huntsman was born Max Gustaf Edler"?

3        A    I do.

4        Q    So Max Gustaf was his first name; correct?

5        A    I'm reading the same thing you are.

6        Q    So how is Sheriff Villanueva referring to

7   Max Huntsman as the first name he was born under

8   misarticulating his name?

9              MR. TOKORO:  Objection; vague and ambiguous.

10  It's also misleading.  Does not provide her with the

11  entire context of that testimony under Mr. Huntsman's

12  name.

13             THE DEPONENT:  According to the report,

14  Mr. Huntsman goes by Max Huntsman in the County and has

15  done so for many years.

16  BY MR. DiBONA:

17       Q    And just to be clear, you believe that that's

18  the basis for saying his name was misarticulated?

19       A    According to the report, that's what

20  Mr. Huntsman says.

21       Q    And do you agree with that?

22       A    I found it persuasive or I wouldn't have joined

23  the panel in making the recommendation that it was part

24  of the totality of the circumstances leading to a

25  recommendation.

 1   on the totality of the circumstances; is that right?

 2       A    I'm sorry.  I didn't understand that.

 3       Q    I will rephrase.  In reviewing the allegations,

 4   when you, as a member of the CEOP, are reviewing this

 5   report in the transcript, you are trying to determine if

 6   these allegations have support based on the totality of

 7   the circumstances; would that be fair?

 8       A    That sounds correct.

 9       Q    You also have an understanding that the County,

10   this policy against age discrimination applies to

11   individuals age 40 and over.

12            Is that your understanding?

13       A    Yes.

14       Q    And just to be clear, at the very bottom of

15   this page, you see where it says:

16            "The County will not tolerate unlawful

17   discrimination on the basis of sex, race, color,

18   ancestry, religion, national origin, ethnicity, age 40

19   or over," and it goes on.

20            Did I read that correctly?

21       A    That's what I'm reading.

22       Q    So you understood in reviewing these

23   allegations that for there to be a finding of a

24   violation based on the County's policy against age

25   discrimination, the age reference would have to be to

1  above.

2  BY MR. DiBONA:

3      Q    Yes.  So referring to someone as young doesn't

4  reference a protected class; is that right?

5           MR. TOKORO:  Same objection; misstates the

6  record.  Is also potentially calling for a legal

7  conclusion.

8           THE DEPONENT:  I don't have anything to add to

9  my prior response.

10  BY MR. DiBONA:

11     Q    Let me rephrase it slightly.  Under the

12  Los Angeles County's policies against discrimination,

13  there's no protected class young, is there?

14          MR. TOKORO:  Objection; vague and ambiguous,

15  and also may lack foundation, and calls for speculation

16  regarding the County's policies across the board.

17          THE DEPONENT:  I would say that to the extent

18  the word "young" is used to reflect someone under 40, it

19  may not fall into the category that's articulated as a

20  protected class under the policy for age.

21  BY MR. DiBONA:

22     Q    And do you have an understanding of what the

23  term woke means?

24     A    I do not, except that it is a young -- may have

25  to do with consciousness.

1    Q    And so do you have any reason to believe woke

2    20-somethings that work at the alter of wokeness has

3    anything to do with an individual's race or national

4    origin?

5         MR. TOKORO:  Objection.  Question is vague and

6    ambiguous and does not take into account all of the

7    allegations made in the complaint.

8         THE DEPONENT:  Not specifically, no.

9    BY MR. DiBONA:

10   Q    Do you have any reason to believe that woke

11   20-somethings that prohibit the alter of wokeness has

12   any reference to an individual's gender?

13        MR. TOKORO:  Same objection; incomplete, vague

14   and ambiguous.

15        THE DEPONENT:  It doesn't appear to be directed

16   at gender specifically.

17   BY MR. DiBONA:

18   Q    It goes on.  There's a sentence here:

19   (Reading:)  He said that all -- all are women.  Sheriff

20   Villanueva said that the supervisors promote diversity,

21   but the justice deputies are all women and unqualified.

22        Did I read that correctly?

23   A    That's what I see.

24   Q    Do you see any reference in this to Sheriff

25   Villanueva saying women are unqualified for the position

1  because they're women?

2       A    Yes.

3       Q    Where is that?

4       A    It's the dualism of using the words "together"

5  under the introductory word of "Diversity."

6       Q    So just to be clear, you're saying referring to

7  someone as a woman and unqualified implies that

8  they're -- because they're women they're unqualified?

9            MR. TOKORO:  Objection; misstates the

10 testimony.

11           The prior question was about what Villanueva

12 said.

13           THE DEPONENT:  I said when he says here that

14 supervisors promote diversity, the implication in his

15 statement following is that hiring women did not promote

16 diversity because they were unqualified or some such

17 thing.

18 BY MR. DiBONA:

19      Q    Right.  Do you believe that -- did you form the

20 opinion that Sheriff Villanueva was saying women are

21 unqualified by virtue of being women?

22           MR. TOKORO:  Objection; asked and answered two

23 times now.

24           THE DEPONENT:  The implication from the

25 sentence is that unqualified individuals were hired

 1  because they were women.

 2  BY MR. DiBONA:

 3    Q    "During those sessions, he has referred to the

 4  age of justice deputies which is alive and can be easily

 5  be fact checked."

 6          Did I read that correctly?

 7    A    That's what I see.

 8    Q    He also says:

 9          "The justice deputies are all female, even

10  though Supervisor Mitchell has two male justice

11  deputies."

12          Did I read that correctly?

13    A    That's what I'm reading.

14    Q    So when there's a reference to all the justice

15  deputies, that includes a group that at least has two

16  men in it; right?

17    A    That's what --

18          MR. TOKORO:  Objection; vague and ambiguous as

19  to whether you're referring to Sheriff Villanueva's

20  statement or the facts generally.

21          THE DEPONENT:  What was the question?

22          MR. DiBONA:  Can you read the question back,

23  Ms. Meyer, please.

24          (The record was read as requested)

25          THE DEPONENT:  A reference by whom?

```
 1              THE DEPONENT:  There are non CEOP policies that
 2  address truth in, for example, job applications,
 3  et cetera.
 4  BY MR. DiBONA:
 5      Q    Just to be clear, there's no CEOP policy that
 6  you were determining Sheriff Villanueva violated,
 7  whether he told straight-up lies, is there?
 8              MR. TOKORO:  Objection; assumes facts regarding
 9  the existence of CEOP policies.
10              THE DEPONENT:  A statement could be a violation
11  if it is false and contains -- and is also a statement
12  that contains words that violate the policy.
13  BY MR. DiBONA:
14      Q    Understood.  My question was different.  I'll
15  rephrase it.  When you were reviewing this document to
16  determine if there were any County policies that Sheriff
17  Villanueva violated, were you checking to see if he was
18  telling straight-up lies?
19              MR. TOKORO:  Objection; vague and ambiguous.
20              THE DEPONENT:  The context of fact or fiction
21  in his statement is represented by Ms. Coates' statement
22  in this report that says not all the deputies are women.
23  Two are men.
24  BY MR. DiBONA:
25      Q    It goes on, "In the last few years, Sheriff
```

MARIE KOMOROSKI, CONSTANCE                                    Page 95

```
 1   Villanueva has blamed the board for defunding his
 2   department."
 3           Did I read that correctly?
 4      A    I do see that.
 5      Q    Now, is defunding the department, does that
 6   have anything to do with an individual's race?
 7      A    I -- I don't know how to answer that.  I don't
 8   know what's involved in defunding a department.
 9      Q    Do you consider the allegation that Sheriff
10   Villanueva blamed the board for defunding his department
11   to be an allegation there was any type of harassment or
12   discrimination on the basis of race?
13      A    Could you repeat that?
14      Q    Do you believe that the allegation that Sheriff
15   Villanueva has blamed the board for defunding his
16   department has anything to do with harassment on the
17   basis of race?
18      A    I -- I don't understand that -- that question.
19      Q    Did you consider in reviewing this report that
20   if Sheriff Villanueva blames the board for defunding his
21   department, that's a violation of the County's policy
22   based on discrimination based on race?
23      A    His opinion you mean?
24      Q    Yes.
25      A    It doesn't say anything about race.
```

1      Q     And did you consider in reviewing this report

2   that Sheriff Villanueva blaming the board for defunding

3   the department, did you come to the conclusion that had

4   anything to do with violation of the policy against age

5   discrimination?

6      A     It doesn't say anything about age, no.

7      Q     And do you believe -- in reviewing this report,

8   do you believe that the allegation that Sheriff

9   Villanueva blamed the board for defunding the department

10  has anything to do with harassment based on an

11  individual's race or national origin?

12     A     It doesn't specifically say that, no.

13     Q     Do you, by the way, see anything under "Sheriff

14  Villanueva's Live streams" that has a reference to an

15  individual's race or national origin?

16     A     You mean under this section titled --

17     Q     Yes.

18     A     -- "Facebook Live streams"?

19     Q     Yes.

20     A     The sentence you asked me about defunding the

21  department has to do with retaliation.

22     Q     Yes.  I understand.  I'm just asking broadly

23  under "Sheriff Villanueva Facebook Live Streams," do you

24  see any allegation in these four paragraphs that relates

25  to a person's race or national origin?

 1  Villanueva wrote a letter addressed to Supervisor Solis
 2  and cc'd the DOS and CEO."
 3          Did I read that correctly?
 4     A    That's what I see.
 5     Q    "And Ms. Lim considered his letter to be
 6  harassment."
 7          Did I read that correctly?
 8     A    That's what I read.
 9     Q    "The letter discussed Ms. Lim's social media
10  post and called for opening up an investigation of her
11  social media accounts, Ms. Lim believes the sheriff's
12  request was unjustified."
13          Did I read that correctly?
14     A    That's what I see.
15     Q    Do you see anything in this paragraph that
16  leads you to believe that Sheriff Villanueva wrote the
17  letter because of Ms. Lim's race or national origin?
18          MR. TOKORO:  Objection; once again, incomplete.
19  Only referencing one paragraph of a 10-page report.
20          THE DEPONENT:  I would have to read the whole
21  report, put it in context, but it looks like part of the
22  retaliation element.
23  BY MR. DiBONA:
24     Q    What part of the retaliation element -- sorry.
25  What part of the retaliation element are you referring

MARIE KOMOROSKI, CONSTANCE

1  to?

2      A     Retaliation for protected activity is a

3  protected -- is a potential policy violation under the

4  CEOP.

5      Q     What was the protected activity?

6      A     It states here that in her previous role of the

7  ACLU she was critical of Sheriff Villanueva.

8      Q     Just to be clear, you're saying that you read

9  this paragraph as saying because she was critical of

10 Sheriff Villanueva he wrote a letter asking for an

11 investigation into her social media posts?

12     A     I would say that does smack of retaliation,

13 given that the comments were made in her social media

14 posts.

15     Q     What about it smacks of retaliation?

16     A     It reads, "The letter discussed Ms. Lim's

17 social media posts and called for opening up an

18 investigation of her social media accounts."

19     Q     What about that smacks of retaliation to you?

20     A     Investigating an individual's social media post

21 because they were critical of the individual making the

22 request.

23     Q     And where is there any evidence that Sheriff

24 Villanueva investigated the social media post because

25 Ms. Lim was critical of him?

```
 1      A    I do not.

 2      Q    Do you have any knowledge, as you sit here

 3  today, that Ms. Lim used profanity in those accounts

 4  towards Sheriff Villanueva?

 5      A    I do not.

 6      Q    Do you have any information that Ms. Lim said

 7  things that were very critical of law enforcement with

 8  respect to -- in those social media posts?

 9      A    When she was at the ACLU?

10      Q    No.  When she was with justice deputy before

11  Hilda Solis.

12      A    I think you're mistaken.

13      Q    Just to be clear, you don't -- you didn't --

14  you don't know from this report that the social media

15  post at issue are from when Ms. Lim was a justice deputy

16  for Hilda Solis; is that fair?

17      A    I don't think so.  That's what it says.  It

18  says:

19           "She acknowledged that in her previous role at

20  the ACLU she was critical of Sheriff Villanueva.

21  Further, she said she had been critical of Sheriff

22  Villanueva in her public social media post."  That's a

23  close quote.

24           I took that to mean when she was at ACLU.

25      Q    And if it was actually the case that Ms. Lim
```

```
 1  Villanueva.
 2          THE DEPONENT:  I would have to consider the
 3  totality of the statements alleged in the report.
 4  BY MR. DiBONA:
 5     Q    I understand you'd have to consider the
 6  totality.
 7          But my question is just is intellectual level
 8  the same as whether someone is over 40 or not.
 9          MR. TOKORO:  Same objections.
10          THE DEPONENT:  The discrete phrase intellectual
11  level in a vacuum is not the same as a person over 40 in
12  a vacuum.
13  BY MR. DiBONA:
14     Q    Can you see on the last paragraph, it says:
15          "There was a community town hall meeting where
16  they recognized each other.  He said 'Esther, go tell
17  your boss that I want to debate her.'"
18          Did I read that correctly?
19     A    That's what I see.
20     Q    Is there anything inappropriate about Sheriff
21  Villanueva saying to Ms. Lim, "Esther, go tell your boss
22  that I want to debate her," in your opinion?
23          MR. TOKORO:  Objection; incomplete and, once
24  again, misleading.
25          You're trying to limit it to one statement and
```

MARIE KOMOROSKI, CONSTANCE                                    Page 120

```
 1   not the totality of the statements by Villanueva.
 2            THE DEPONENT:  By itself it seems like a fairly
 3   pedestrian statement.  I would have to consider it in
 4   the context of the entire report.
 5   BY MR. DiBONA:
 6       Q    Do you see here there's a reference,
 7   July 28th, '21 statement on Facebook Live?
 8       A    July 28?
 9       Q    Yeah.  "July 28, 2021 statement on Facebook
10   Live."
11            Do you see that?
12       A    I see that.
13       Q    It says:
14            "In video he held and read from the motion.
15   Sheriff Villanueva did not approve of the motion and
16   said he did not think the drafter realized the
17   implications of the motion."
18            Did I read that correctly?
19       A    That's what it says.
20       Q    Is there anything, in your opinion,
21   inappropriate about Sheriff Villanueva saying he doesn't
22   approve of a motion and he doesn't think the drafters
23   realized the implications of it?
24            MR. TOKORO:  Same objection; incomplete and
25   misleading.
```

MARIE KOMOROSKI, CONSTANCE                                    Page 123

```
 1      A    I see that title, yes, subtitle.
 2      Q    All right.  Do you see here where it says:
 3           "Ms. Lim has drafted many motions about
 4  accountability.  As a result, Sheriff Villanueva goes
 5  after Ms. Lim and Supervisor Solis."
 6           Did I read that correctly?
 7      A    I see that, yes.
 8      Q    And before that it says:
 9           "She said that Sheriff Villanueva has tried to
10  attack anyone with oversight of him."
11           Did I read that correctly?
12      A    That's what it says.
13      Q    Someone with oversight over the sheriff's
14  department, that's not related to their sex or gender,
15  is it?
16           MR. TOKORO:  Once again, objection; incomplete,
17  and misleading, and that you're going to a single
18  sentence of a 10-page report.
19           THE DEPONENT:  A person's job description
20  shouldn't include any of the protected categories;
21  correct?
22  BY MR. DiBONA:
23      Q    And someone with accountability over the
24  sheriff's department, that isn't related to their race
25  or national origin, is it?
```

```
 1                MR. TOKORO:  Same objections.
 2                THE DEPONENT:  It's the same response.
 3  BY MR. DiBONA:
 4     Q    "Same response" being someone's job categories
 5  doesn't have any reference to their race or national
 6  origin; correct?
 7     A    Correct.
 8     Q    We don't -- for example, the County of
 9  Los Angeles, to your knowledge, doesn't say "only Asian
10  women" or "only white men can have accountability
11  provisions," nothing like that; correct?
12                MR. TOKORO:  Same objections.
13                THE DEPONENT:  I don't believe so.
14  BY MR. DiBONA:
15     Q    And having oversight over the sheriff's
16  department doesn't relate to whether you're over 40,
17  does it?
18                MR. TOKORO:  Same objections.
19                THE DEPONENT:  It should not.
20  BY MR. DiBONA:
21     Q    As a matter of fact, in this paragraph Ms. Lim
22  states that she's under 40 and, also, that she's drafted
23  many motions related to oversight related to the
24  sheriff's department; correct?
25                MR. TOKORO:  Same objections.
```

```
 1                DEPOSITION OFFICER'S CERTIFICATE

 2

 3          STATE OF CALIFORNIA  )
                                 )  ss.
 4          COUNTY OF LOS ANGELES)

 5

 6          I, Cila Meyer, hereby certify:  I am a duly

 7  qualified Certified Shorthand

 8              Reporter, in the State of California, holder of

 9  Certificate Number CSR 4914 issued by the Court

10              Reporters Board of California and which is in

11  full force and effect.  (Bus. & Prof.   8016)

12              I am not financially interested in this action

13  and am not a relative or employee of any attorney of the

14  parties, or of any of the parties.  (Civ. Proc.

15  2025.320(a))

16              I am authorized to administer oaths or

17  affirmations pursuant to California Code of Civil

18  Procedure, Section 2093(b) and prior to being examined,

19  the deponent was first placed under oath or affirmation

20  by me. (Civ. Proc.   2025.320, 2025.540(a))

21              I am the deposition officer that

22  stenographically recorded the testimony in the foregoing

23  deposition and the foregoing transcript is a true record

24  of the testimony given.  (Civ. Proc.   2025.540(a))

25              I have not, and shall not, offer or provide any
```

MARIE KOMOROSKI, CONSTANCE                                     Page 161

```
 1  services or products to any party's attorney or third
 2  party who is financing all or part of the action without
 3  first offering same to all parties or their attorneys
 4  attending the deposition and making same available at
 5  the same time to all parties or their attorneys.  (Civ.
 6  Proc.   2025.320(b))
 7          I shall not provide any service or product
 8  consisting of the deposition officer's notations or
 9          Comments regarding the demeanor of any witness,
10  attorney, or party present at the deposition to any
11  party or any party's attorney or third party who is
12  financing all or part of the action, nor shall I collect
13  any personal identifying information about the witness
14  as a service or product to be provided to any party or
15  third party who is financing all or part of the action.
16          (Civ. Proc.   2025.320(c))
17
18          Dated: March 10, 2025
19
20
21                  _____
22
23
24
25
```

EXHIBIT 27

CERTIFIED COPY

# Express Deposition Services

*by* ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

### VERONICA PAWLOWSKI

### March 04, 2025

Lynn Ann Waters, RMR, CRR, CSR No. 14432, Job No. 6477

1            UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4

5    ALEX VILLANUEVA,

6
              Plaintiff,
7                                    CASE NO. 2:24-cv
    -vs-                             -04979 SVW (JCx)
8
    COUNTY OF LOS ANGELES, et al.,
9
                  Defendants.
10

11            Deposition of
           VERONICA PAWLOWSKI
12
           TUESDAY, MARCH 4, 2025
13                10:00 a.m.

14
        Taken via Zoom videoconference
15

16
    REPORTER: Lynn Ann Waters, RMR, CRR, CSR No. 14432
17

18

19

20

21

22

23

24

25

PAWLOWSKI, VERONICA                                                      Page 2

```
 1    APPEARANCES:

 2
              ALEX DiBONA, ESQ.
 3            SHEGERIAN & ASSOCIATES, INC.
              11520 San Vicente Blvd.
 4            Los Angeles, CA  90049
              (310) 860-0070,
 5            adibona@shegerianlaw.com

 6
                   On behalf of the Plaintiff;
 7

 8            JASON H. TOKORO, ESQ.
              MILLER, BARONDESS, LLP
 9            2121 Avenue of the Stars
              Suite 2600
10            Los Angeles, CA  90067
              (310) 552-5226,
11            jtokoro@millerbarondess.com

12
                   On behalf of the Defendant.
13

14    ALSO PRESENT:

15        Steven Williamson
          Alex Villanueva
16

17

18

19

20

21

22

23

24

25
```

```
 1
                 W I T N E S S   I N D E X
 2
                                          PAGE
 3

 4
      EXAMINATION
 5    VERONICA PAWLOWSKI
      BY MR. DiBONA                                    4
 6
      CONTINUED EXAMINATION
 7    VERONICA PAWLOWSKI
      BY MR. DiBONA:                        121
 8
                 E X H I B I T   I N D E X
 9
      EXHIBIT                               MARKED
10

11    Exhibit 1, notice to take deposition,    120

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PAWLOWSKI, VERONICA                                    Page 4

```
 1                    VERONICA PAWLOWSKI, of lawful age,
 2    being by me first duly sworn, as hereinafter
 3    certified, deposed and said as follows:
 4                    EXAMINATION OF VERONICA PAWLOWSKI
 5    BY MR. DiBONA:
 6              Q.    Thank you.
 7                    Can you please say and spell your
 8    full name for the record.
 9              A.    Yes.  Veronica Pawlowski.
10    V-E-R-O-N-I-C-A and Pawlowski is P like Peter,
11    A-W-L, like Larry, O-W-S-K-I.
12              Q.    Thank you.
13                    Have you ever had your deposition
14    taken before?
15              A.    No.
16              Q.    So we're on the same page, do you
17    understand that you have been placed under oath?
18              A.    Yes.
19              Q.    And do you understand that even
20    though we're doing this deposition via Zoom that's
21    the same oath you would take if we were in a court
22    of law?
23              A.    Yes.
24              Q.    And, therefore, do you understand
25    your testimony is subject to penalty of perjury
```

PAWLOWSKI, VERONICA                                    Page 56

```
 1   that -- excuse me.
 2                  Do you recall anything specific
 3   that Sheriff Villanueva said that was disparaging
 4   and inappropriate about the board of supervisors
 5   themselves when he was addressing the board?
 6                  MR. TOKORO:  Sorry, Alex.  We lost
 7   you there.
 8                  Can you re-ask the question?
 9                  MR. DiBONA:  Sure.
10   BY MR. DiBONA:
11          Q.   Do you recall anything Sheriff
12   Villanueva said that was disparaging and
13   inappropriate about the board of supervisors
14   themselves in addressing the board?
15          A.   Are you referring to during his
16   five minutes?
17          Q.   Yes, at this point.  Yes.  Sorry.
18               Let me rephrase it.
19               During Sheriff Villanueva's five
20   minutes addressing the board, do you recall
21   anything disparaging and inappropriate he said
22   about the board of supervisors himself?
23          A.   Yes.
24          Q.   What is that?
25          A.   One specific comment I remember was
```

PAWLOWSKI, VERONICA                                                    Page 57

1    about supervisor Mark Ridley Thomas.  And I
2    remember comments being directed at my boss,
3    Supervisor Sheila Kuehl.
4            Q.   What comments do you remember that
5    you considered to be disparaging and inappropriate
6    regarding Mark Ridley Thomas?
7            A.   Alluding to him as -- alluding to
8    him as somehow not being worthy of the position of
9    supervisor.
10           Q.   How did Mark Ridley -- if you know
11   -- how Mark Ridley Thomas left the board of
12   supervisors?
13           A.   Yes.
14           Q.   How did he resign?  Excuse me.  How
15   did he leave?
16           A.   My recollection is that he termed
17   out.
18           Q.   And do you know where Mark Ridley
19   Thomas is now?
20           A.   No.
21           Q.   Are you aware of any media reports
22   of any legal trouble that Mark Ridley Thomas had?
23           A.   Yes.
24           Q.   Did you understand Mark Ridley
25   Thomas to have been indicted for federal crimes?

PAWLOWSKI, VERONICA                                        Page 58

```
 1              A.    Yes.
 2              Q.    And do you have any understanding
 3    that Mark Ridley Thomas was indicted for federal
 4    crimes during the course and scope of his work for
 5    the board of supervisors?
 6              A.    Yes.
 7              Q.    And did you have an understanding
 8    that there was a conviction?
 9              A.    Yes.
10              Q.    And do you have an understanding
11    that Mark Ridley Thomas did spend some time in
12    federal prison?
13              A.    Yes.
14              Q.    And just to be clear, you believed
15    it was disparaging and inappropriate for Sheriff
16    Villanueva to say Mark Ridley Thomas was unworthy
17    of the position on the board of supervisors or at
18    least alluding to that?
19              A.    Yes.
20              Q.    And what disparaging and
21    inappropriate thing, if any, do you remember
22    Sheriff Villanueva saying about your boss
23    Supervisor Kuehl during his five minutes?
24              A.    I cannot remember specifics, but
25    the sheriff made his feelings about Supervisor
```

PAWLOWSKI, VERONICA                                          Page 59

```
 1   Kuehl very well known.
 2              Q.   And even if you can't recall
 3   specifics, what is your understanding of what
 4   Sheriff Villanueva's feelings about Supervisor
 5   Kuehl were?
 6              A.   That she was corrupt.
 7              Q.   And do you recall how Sheriff
 8   Villanueva said she was corrupt?
 9              A.   Sheriff Villanueva had an
10   understanding that Supervisor Kuehl had
11   inappropriately assisted in the Peace over
12   Violence contract with Metro.
13              Q.   And what was your -- do you have an
14   understand -- sorry.  Let me just back up for a
15   second.
16              Mark Ridley Thomas, may be obvious
17   from the name, but he identifies as a man;
18   correct?
19              A.   Correct.
20              Q.   And does he also identify as
21   African-American; is that your understanding?
22              A.   Correct.
23              Q.   Did you ever hear Sheriff
24   Villanueva make any sort of reference to Mark
25   Ridley Thomas's gender at any time?
```

PAWLOWSKI, VERONICA

1    where you referred to Ballot Measure A as a
2    measure that would allow the board to remove
3    Sheriff Villanueva.  You know very well that that
4    is not what the board ballot measure was.
5                    MR. DiBONA:  And I'm sorry,
6    Ms. Waters, can you repeat my last question and
7    answer back just in the back and forth.  I just
8    want to reorient myself.
9                    THE REPORTER:  Sure.  Just a
10   second.
11                    -  -  -  -
12   (Thereupon, the requested portion of the record
13   was read by the Reporter.)
14                    -  -  -  -
15   BY MR. DiBONA:
16           Q.   You may answer subject to the
17   objections of your counsel.
18           A.   I don't recall if the vote was
19   unanimous or if there was a vote.
20           Q.   And just to be clear, you don't
21   recall one way or the other if Sheriff Villanueva
22   ever made any -- sorry.
23                    Separate and apart from what he
24   said or may or may not have said to the board of
25   supervisors, do you recall Sheriff Villanueva ever

PAWLOWSKI, VERONICA



1    publically coming out against Ballot Measure A?

2             A.    I remember that he was against

3    public measure A or I'm sorry, Ballot Measure A.

4             Q.    And did you ever discuss Sheriff

5    Villanueva's opposition to Ballot Measure A with

6    Supervisor Kuehl?

7             A.    No.

8             Q.    Do you recall how you became aware

9    that Sheriff Villanueva was opposed to Ballot

10   Measure A?

11            A.    Because he made public comments

12   that he was against the measure.

13            Q.    And so just to be clear, you're not

14   quite sure the form, but you do recall there were

15   public statements that he was against Ballot

16   Measure A; correct?

17            A.    I recall statements that he was

18   against Ballot Measure A, I don't recall the

19   forum.

20            Q.    Do you recall Sheriff Villanueva

21   ever saying that in his opinion he believed Ballot

22   Measure A was unconstitutional?

23            A.    I don't recall.

24            Q.    Do you recall there being a Ballot

25   Measure R while you were a senior justice deputy

PAWLOWSKI, VERONICA

```
 1    justice deputy, how were you involved in the
 2    implementation of Measure R?
 3              A.   Once Measure R passed, I had -- I
 4    did some work on the study that was passed in
 5    connection with Measure R.  That was my
 6    involvement.
 7              Q.   To your recollection, did
 8    Supervisor Kuehl ever publically state her support
 9    for Ballot Measure A?
10              A.   I don't remember.
11              Q.   Did you ever publically state
12    support for Ballot Measure A?
13              A.   I don't recall.
14              Q.   Did Supervisor Kuehl ever
15    publically state any support for Ballot Measure R?
16              A.   I don't recall.
17              Q.   And do you recall if Supervisor
18    Kuehl ever stated any opposition herself to Ballot
19    Measure A?
20              A.   I don't recall.
21              Q.   And do you recall if Supervisor
22    Kuehl ever stated any opposition to Ballot Measure
23    R publically?
24              A.   I don't recall.
25              Q.   Do you have a recollection of there
```

1    being a Ballot Measure J while you were a senior

2    justice deputy for Supervisor Kuehl?

3             A.    Yes.

4             Q.    And do you recall if Sheriff

5    Villanueva made statements publically opposing

6    Ballot Measure J?

7             A.    Yes.

8             Q.    And what, to your understanding, do

9    you recall what his objections to Ballot Measure J

10   was?

11            A.    I do recall.

12            Q.    What is your recollection?

13            A.    Essentially his complaint was that

14   Ballot Measure J would result in a defunding of

15   the sheriff's department, which is inaccurate.

16            Q.    What is your understanding of what

17   Ballot Measure J does?

18            A.    So Ballot Measure J takes

19   unrestricted -- and it's called MCC, it's

20   essentially the county's flexible funding and

21   allocates it to a couple of different types of

22   social services including housing and

23   community-based services for, you know, like

24   mental health treatment and those types of things.

25            Q.    And do you recall if the board of

PAWLOWSKI, VERONICA

Page 142

```
1    supervisors took a vote on Ballot Measure J?

2              A.    I do recall.

3              Q.    And did they take a vote?

4              A.    Yes.

5              Q.    And was that vote unanimous in

6    favor of a Ballot Measure J?

7              A.    I don't recall if it was unanimous.

8              Q.    And do you recall if it passed?

9              A.    Yes, it passed.

10             Q.    And do you recall how Supervisor

11   Kuehl voted?

12             A.    Yes.

13             Q.    And how did she vote on it?

14             A.    She voted yes.

15             Q.    Would it be fair then to say at

16   least at this point there was a political

17   disagreement in the sense, Supervisor Kuehl voted

18   in favor of it and Sheriff Villanueva publicly

19   opposed it; is that fair?

20             A.    They did have a different point of

21   view on measure J, absolutely.

22             Q.    Did you, yourself, do any work on

23   Ballot Measure J in your capacity as a senior

24   justice deputy?

25             A.    I did.
```

1              Q.   What was your role in working on
2    Ballot Measure J?
3              A.   I wrote the motion to put, for the
4    board to put Ballot Measure J on the ballot and
5    I --
6              Q.   Okay.
7              A.   Oh, go ahead.
8              Q.   No, go ahead.  I'm sorry.  I
9    thought you were done.  I don't want to cut off
10   your answer.  Please continue.
11             A.   You know, and I had, you know, I
12   did sort of like the background research that one
13   must do in order to put a motion together.
14             Q.   Is it fair to say that since you
15   wrote the motion, you supported Ballot Measure J
16   at least as far as your role as senior justice
17   deputy for Supervisor Kuehl?
18             A.   It's not fair to say that I
19   supported it because I wrote the motion.
20                  Deputies sometimes have to write
21   motions and they're being written because it's the
22   boss's position, not the deputy's position.
23             Q.   Did you support Ballot Measure J?
24             A.   I did.
25             Q.   And did you have any position on

PAWLOWSKI, VERONICA

Page 144

```
 1    Ballot Measure R yourself?
 2              A.    I did not support Ballot Measure R.
 3              Q.    And did you have any position on
 4    Ballot Measure A?
 5              A.    Yes.
 6              Q.    Did you support it?
 7              A.    As a voter, yes.
 8              Q.    Do you recall, during Sheriff
 9    Villanueva's tenure the board of supervisors
10    implemented a vaccine mandate that, in part,
11    mandated vaccination by sheriff department
12    employees?
13              A.    Yes.
14              Q.    Do you recall the mandate was
15    broader?  Was it true that all county employees
16    were mandated to be vaccinated against COVID-19?
17              A.    That is my recollection.
18              Q.    And, excuse me, that went to a --
19    was that a vote taken by the board of supervisors?
20              A.    I don't remember.
21              Q.    Do you recall how Supervisor Kuehl
22    -- sorry.  Strike that.
23                    Do you recall if Supervisor Kuehl
24    publically supported the vaccine mandate?
25              A.    I do.  She supported it.
```

PAWLOWSKI, VERONICA

1          Q.   And did you as a justice deputy or
2    senior justice deputy, excuse me, did you do any
3    work on the vaccine mandate in that respect?
4          A.   In what respect?
5          Q.   In your role as a senior justice
6    deputy for Supervisor Kuehl; were you involved in
7    the vaccine mandate in any way?
8          A.   Yes.
9          Q.   And what was your role?
10         A.   I helped write a motion that had to
11   do with the vaccine mandate, but I don't recall
12   right now what the substance of that motion was, I
13   was working on it with other people.
14         Q.   And even if you don't recall the
15   substance, is it fair to say the motion you wrote
16   was in favor of the vaccine mandate; is that fair?
17         A.   Yes.
18         Q.   And did you have an understanding
19   that Sheriff Villanueva publicly said he was not
20   going to enforce the vaccine mandate with respect
21   to disciplining sheriff department employees?
22         A.   Yes.
23         Q.   Unclear question.
24              Did you have an understanding that
25   Sheriff Villanueva publically stated he would not

PAWLOWSKI, VERONICA

1    impose discipline on his employees if they chose

2    not to become vaccinated?

3            A.    Yes.

4            Q.    So you understood he was saying he

5    would not enforce the board of supervisors'

6    mandate; is that fair to say?

7            A.    Yes.

8            Q.    You understood at the bare minimum

9    there was a disagreement between the county's

10    mandate and the sheriff not enforcing it; is that

11    fair to say?

12            A.    Yes.

13            Q.    And did you ever discuss Sheriff

14    Villanueva's public statements that he would not

15    enforce the vaccine mandate with Supervisor Kuehl?

16            A.    Yes.

17            Q.    And what did you say to her with

18    regard -- sorry.

19                    How many conversations did you

20    have?

21            A.    I don't remember how many times we

22    spoke about it.

23            Q.    And what do you recall her --

24    excuse me, what do you recall saying to her?

25            A.    I recall that it was a very

1   and so there was another sort of thought process

2   that, you know, if something like this were to

3   result in, you know, like 70 percent of the

4   sheriff's department saying, well, forget it, I'm

5   not going to get this vaccine or I quit, or I, you

6   know, silent -- what's it called?  Silent quitting

7   or like the probation department would do, I'm

8   just going to -- what's it called?  Like a blue

9   call-out or whatever.

10              So it was a tough call, you know,

11  and so I just remember having conversations with

12  her weighing both sides of this very difficult

13  coin and, so, yeah, those are the conversations I

14  remember having with her.

15              Q.  Do you recall Sheriff Kuehl[sic]

16  ever -- excuse me, expressing any type of

17  displeasure that Sheriff Villanueva was not going

18  to enforce the mandate that the board of

19  supervisors had voted on?

20              A.  I just want to say you said

21  "Sheriff Kuehl."

22              Q.  Oh, excuse me.  Sorry.

23              Do you recall Supervisor Kuehl ever

24  saying or expressing any type of disagreement or

25  disappointment that Sheriff Villanueva was not

PAWLOWSKI, VERONICA

Page 149

```
 1    enforcing the vaccine mandate that had been put in
 2    place by the board of supervisors?
 3              A.    Yes.   It was very disappointing.
 4              Q.    And Supervisor Kuehl, did she ever
 5    express that she believes Sheriff Villanueva was
 6    acting contrary to public health if he didn't
 7    enforce the vaccine mandate?
 8              A.    I can't recall "contrary to public
 9    health," I don't recall that being said.
10              Q.    Do you recall if Sheriff Kuehl ever
11    said to you or words to the effect of that she
12    believes Sheriff Villanueva was defying the board
13    of supervisors?
14              MR. TOKORO:   Same objection that
15    the witness actually raised to your last question.
16    You referred to Supervisor Kuehl as "Sheriff
17    Kuehl" again.
18              MR. DiBONA:   I might have, but --
19    BY MR. DiBONA:
20              Q.    So do you recall Supervisor Kuehl
21    ever saying words to the effect of that she
22    believed that Sheriff Villanueva was defying the
23    board of supervisors?
24              A.    Yes.   Because he was.
25              Q.    It's fair to say Sheriff Kuehl did
```

PAWLOWSKI, VERONICA

```
 1    they're not going -- they're not going to do it.
 2              Q.    And did Supervisor Kuehl ask you to
 3    do any research on how the board of supervisors
 4    could get Sheriff Villanueva to comply with the
 5    vaccine mandate?
 6              A.    Yes.
 7              Q.    And did you do that research?
 8              A.    Yes.
 9              Q.    And what, if anything, did you
10    recommend to Supervisor Kuehl in that respect?
11              A.    I didn't make a recommendation.
12              Q.    What, if anything, did your
13    research find with respect to that assignment that
14    Supervisor Kuehl gave you?
15              A.    I recall that the board did have a
16    possible avenue of recourse.  I don't recall what
17    it was.
18              Q.    Do you recall if the board took
19    that avenue of recourse?
20              A.    The board tried to.
21              Q.    And do you recall what the board
22    tried to do?
23              A.    I don't.  I don't.
24              Q.    Is it fair to say, by the way, that
25    Sheriff Villanueva while he was sheriff never
```

PAWLOWSKI, VERONICA

Page 152

1    enforced the vaccine mandate; is that your

2    understanding?

3              A.    That is my recollection.

4              Q.    And so is it fair to say that

5    whatever the board tried for whatever reason, it

6    was ineffective in actually getting him to do it.

7    Is that fair?

8              A.    Yes.

9              Q.    Do you also recall -- sorry.

10             While you were a senior justice

11   deputy, do you recall sheriff -- excuse me.

12             While you were the senior justice

13   deputy, do you recall the county of Los Angeles

14   contracted with a company named Fulgent?

15             A.    Yes.

16             Q.    And do you recall what the county

17   of LA contracted with Fulgent for in the context

18   of the COVID-19 pandemic?

19             A.    I believe the contract with Fulgent

20   was for COVID testing.

21             Q.    And did you, yourself, as a senior

22   justice deputy, did you have any role in reviewing

23   the contract between LA County and Fulgent?

24             A.    No.

25             Q.    And did -- excuse me.

1                    Did the board of supervisors vote
2    on giving that contract to Fulgent?
3              A.    I don't recall.
4              Q.    And do you recall Sheriff
5    Villanueva making public statements with respect
6    to Fulgent potentially sharing data with the
7    Chinese government?
8              A.    Yes, that did happen.
9              Q.    And did you ever discuss Sheriff
10   Villanueva's public statements with respect to
11   Fulgent and the Chinese government with Supervisor
12   Kuehl?
13             A.    In passing.
14             Q.    What do you recall saying to her?
15             A.    I recall saying to her that I
16   thought it was ridiculous.
17             Q.    And how, if any, way did she
18   respond to that?
19             A.    Again, it was in passing so she
20   just kind of said, you know, it's what he does.
21   And we kept walking.
22             Q.    Why did you believe it was
23   ridiculous?
24             A.    I just thought the whole notion was
25   ridiculous.

PAWLOWSKI, VERONICA

1           Q.   Sorry, what notion did you believe
2    was ridiculous?
3           A.   Fulgent selling information to the
4    Chinese, I thought it was ridiculous.
5           Q.   And why did you believe that?
6           A.   Why did I believe it was
7    ridiculous?
8           Q.   Yes.
9           A.   I don't know.  I just thought it
10   was ridiculous.
11               I thought the notion that Fulgent
12   was selling data to the Chinese was ridiculous
13   because we had no indication that that was
14   happening, it just kind of came out of no where.
15          Q.   Do you know one way or another if
16   Fulgent has any type of physical presence in
17   China?
18          A.   I do not.
19          Q.   Did you ever take any steps to ask
20   Sheriff Villanueva why he believed Fulgent may be
21   selling data to the Chinese government?
22          A.   No, I did not ask him.
23          Q.   Are you aware that Sheriff
24   Villanueva was sued by Fulgent for defamation and
25   other claims?

PAWLOWSKI, VERONICA                                          Page 206

```
1                      CERTIFICATE

2                          OF

3            CERTIFIED SHORTHAND REPORTER

4                    *    *    *    *

5

6

7            The undersigned Certified Shorthand

8    Reporter of the State of California does hereby

9    certify:

10           That the foregoing Deposition was taken

11   before me at the time and place therein set forth,

12   at which time the Witness was duly sworn by me.

13           That the testimony of the Witness and

14   all objections made at the time of the Deposition

15   were recorded stenographically by me and were

16   thereafter transcribed, said transcript being a

17   true and correct copy of the proceedings thereof.

18           In witness whereof, I have subscribed my

19   name, this date:  March 17, 2025.

20

21

22

23

24   _____

25   LYNN ANN WATERS, CSR NO. 14432
```

CERTIFIED COPY

# Express Deposition Services

*by* ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

VERONICA PAWLOWSKI, VOLUME II

April 04, 2025

Shannon D. Denney, CSR No. 10385, Job No. 7156

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTHERN DIVISION

ALEX VILLANUEVA,                          )
                                          )
          Plaintiff,                      )
                                          )
vs.                                       ) No: 2:24-cv-04979
                                          )     SVW (JCx)
COUNTY OF LOS ANGELES, COUNTY OF          )
LOS ANGELES SHERIFFS DEPARTMENT,          )
LOS ANGELES COUNTY BOARD OF               )
SUPERVISORS, COUNTY EQUITY                )
OVERSIGHT PANEL, LOS ANGELES COUNTY)
OFFICE OF INSPECTOR GENERAL,              )
CONSTANCE KOMOROSKI, MERCEDES CRUZ,)
ROBERTA YANG, LAURA LECRIVAIN,            )
SERGIO V. ESCOBEDO, RON KOPPERUD,         )
ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN)
ESTHER LIM, and DOES 1 to 100,            )
inclusive,                                )
                                          )
          Defendants.                     )
_____)


DEPOSITION OF:  VERONICA PAWLOWSKI

VOLUME II

April 4, 2025




REPORTED BY: SHANNON D. DENNEY, CSR No. 10385

```
 1                      APPEARANCES

 2

 3    For the Plaintiff:

 4         SHEGERIAN & ASSOCIATES, INC.
           BY:  ALEX DIBONA, ESQ.
 5         aDiBona@shegerianlaw.com
           11520 San Vicente Boulevard
 6         Los Angeles, CA  90049

 7

 8    For the Defendants:

 9         MILLER BARONDESS, LLP
           BY:  JASON H. TOKORO, ESQ.
10         jtokoro@millerbarondess.com
           2121 Avenue of the Stars, Suite 2600
11         Los Angeles, CA  90067

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PAWLOWSKI, VOLUME II, VERONICA                                              Page 3

```
 1                    INDEX OF EXAMINATION

 2                                                    PAGE

 3   BY MR. DiBONA                                       4

 4   BY MR. TOKORO                                      73

 5   BY MR. DiBONA                                      80

 6

 7                      ---oOo---

 8

 9                  INDEX OF EXHIBITS

10   Exhibit 2   COLA002120 to COLA002199              15

11   Exhibit 3   Letter dated July 11, 2022            90

12   Exhibit 4   AV010572 to AV010576                  62

13
                        ---oOo---
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    the way he's portraying you to be.
 2              And I -- I guess I used the word "blown off."
 3    I don't know she blew me off.  She just said,
 4    basically, you're dreaming.  That will never happen.
 5       Q.   Did you, yourself, ever reach out to any of
 6    the media about Sheriff Villanueva?
 7       A.   No.  I was not allowed to do that.  That is
 8    not something I would have been allowed to do.
 9       Q.   When you say that, is there -- was there a
10    rule of Supervisor Kuehl's office against you reaching
11    out to the media?
12       A.   I would not say that it was against.
13              What I would say, it was a clear
14    understanding.  It's not like it was a written policy
15    or rule.  But there was a very clear understanding in
16    our office that everything media related went through
17    our communications staff.
18       Q.   Understood.  By the way, were you asking
19    Sheila Kuehl's communications director to reach out to
20    the media?
21       A.   No.  No.  I was just saying to her, you know,
22    it would be great if one of these people who write
23    about him all the time had the curiosity to ask me
24    about myself so that I had a way to rebut all these
25    horrible things he's saying about my qualifications.
```

1    And she was, you know, like I said, she was just sort

2    of like, you know, in no world is that going to happen,

3    Veronica.

4         Q.   Do you know the name of an LA Times reporter

5    by the name of Keri Blakinger?

6         A.   Yes.

7         Q.   Has Ms. Blakinger ever reached out to you for

8    comment regarding Sheriff Villanueva?

9         A.   No.

10        Q.   And even if she hasn't reached out, have you

11   ever offered -- excuse me.

12             Have you ever reached out to Ms. Blakinger

13   with respect to Sheriff Villanueva?

14        A.   No.

15        Q.   Do you have an understanding that Ms.

16   Blakinger wrote an article about Sheriff Villanueva

17   about having a "do not retire" notation placed atop his

18   personnel file?

19        A.   I don't recall.

20        Q.   Did you ever speak with Esther Lim about

21   wanting someone in the press to write about Sheriff

22   Villanueva, and what he was saying about the justice

23   deputies?

24        A.   No.  Not that I can remember.

25        Q.   And did Esther Lim ever tell you that she

```
 1   DEPOSITION ERRATA SHEET

 2

 3

 4

 5   Case Caption:  Villanueva vs. County of Los Angeles

 6

 7

 8           DECLARATION UNDER PENALTY OF PERJURY

 9       I declare under penalty of perjury that I have

10   read the entire transcript of my Deposition taken in

11   the captioned matter or the same has been read to me,

12   and the same is true and accurate, save and except for

13   changes and/or corrections, if any, as indicated by me

14   on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18       Signed on the _____ day of _____, 20____.

19

20

21                    _____

22

23

24

25
```

```
 1   STATE OF CALIFORNIA

 2

 3

 4           I, SHANNON D. DENNEY, CSR 10385, a Certified

 5   Shorthand Reporter in and for the State of California,

 6   do hereby certify that, prior to being examined, the

 7   witness named in the foregoing deposition was by me

 8   duly sworn to testify the truth, the whole truth, and

 9   nothing but the truth; that said deposition was taken

10   down by me in shorthand at the time and place named

11   therein and was thereafter transcribed under my

12   supervision; that this transcript contains a full, true

13   and correct record of the proceedings which took place

14   at the time and place set forth in the caption hereto.

15           I further certify that I have no interest in

16   the event of this action.

17

18   EXECUTED this 17th day of April, 2025.

19

20

21                       Shannon D. Denney

22             Shannon D. Denney, CSR 10385

23

24

25
```

EXHIBIT 28

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

     ALEX VILLANUEVA,                )
                                     )
4                                    )
            Plaintiff,               )
5    v.                              )
                                     ) CASE NO.
6    COUNTY OF LOS ANGELES,          ) 2:24-cv-04979 SVW
     COUNTY OF LOS ANGELES           ) (JCx)
7    SHERIFF'S DEPARTMENT,           )
     LOS ANGELES COUNTY BOARD OF     )
8    SUPERVISORS, COUNTY EQUITY      )
     OVERSIGHT PANEL, LOS ANGELES    )
9    COUNTY OFFICE OF INSPECTOR      )
     GENERAL, CONSTANCE KOMOROSKI,   )
10   MERCEDES CRUZ, ROBERTA YANG,    )
     LAURA LECRIVAIN, SERGIO V.      )
11   ESCOBEDO, RON KOPPERUD,         )
     ROBERT G. LUNA, MAX-GUSTAF      )
12   HUNTSMAN, ESTHER LIM, and       )
     DOES 1 to 100, inclusive,       )
13                                   )
            Defendants.              )
14                                   )
                                     )
15

16

17          REMOTE VIDEO-RECORDED DEPOSITION

18                       OF

19               TIMOTHY MURAKAMI

20            MONDAY, APRIL 7, 2025

21

22

23

     Stenographically Reported By:
24   JENNIFER L. SMITH, CA CSR NO. 10358, RMR, CRR, CRC
25   Job Number: 7246481

                                              Page 1

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4         SHEGERIAN & ASSOCIATES, INC.
           By: Alex DiBona, Esq.
 5         11520 San Vicente Boulevard
           Los Angeles, CA 90049
 6         (310) 860-0770
           adibona@shegerianlaw.com
 7
 8    FOR THE DEFENDANTS:
 9         MILLER BARONDESS, LLP
           BY: Brian Neach, Esq.
10             Jason H. Tokoro, Esq.
           2121 Avenue of the Stars, Suite 2600
11         Los Angeles, CA 90067
           (310) 552-4400
12         bneach@millerbarondess.com
           jtokoro@millerbarondess.com
13
14    ALSO PRESENT:
15         Tristan Knudsen, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1                            INDEX

 2

 3    EXAMINATIONS:                              PAGE

 4      TIMOTHY MURAKAMI

 5          Examination By Mr. Neach             7

 6          Examination By Mr. DiBona            57

 7          Examination By Mr. Neach            77

 8          Examination By Mr. DiBona           80

 9

10                          EXHIBITS

11

12    No.            Description              Identified

13     Exhibit 1     Amended Subpoena            14

14     Exhibit 2     Designation Letter dated April  40
                     19, 2023

15

16

17

18

19

20

21

22

23

24

25

                                            Page  3
```

```
 1            PURSUANT TO WRITTEN NOTICE and the
 2    appropriate rules of civil procedure, the Remote
 3    Video-Recorded Deposition of TIMOTHY MURAKAMI,
 4    called for examination by the Defendants, was taken
 5    via Zoom, commencing at 10:03 AM on Monday,
 6    April 7, 2025, before Jennifer L. Smith, California
 7    CSR No. 10358, Washington CCR No. 3101, RMR, CRR,
 8    CRC.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  4

```
 1                    P R O C E E D I N G S

 2

 3            THE VIDEOGRAPHER:  Good morning.  We're

 4    going on the record at 10:03 AM on the 7th of April,     10:03:34

 5    2025.                                                     10:03:39

 6            Please note that the deposition today is          10:03:39

 7    being conducted virtually.  The quality of the            10:03:46

 8    recording depends on the quality of the camera and        10:03:49

 9    the Internet connection of participants.  What is         10:03:52

10    seen from the witness and heard on screen is what         10:03:54

11    will be recorded.                                         10:03:56

12            Audio and video recording will continue to        10:03:57

13    take place unless all parties agree to go off the         10:03:59

14    record.                                                   10:04:02

15            This is Media Unit Number 1 of the                10:04:03

16    video-recorded deposition of Tim Murakami, taken by       10:04:06

17    counsel for defendants in the matter of Alex              10:04:12

18    Villanueva versus County of Los Angeles, et al.,          10:04:15

19    filed in the United States District Court, Central        10:04:20

20    District of California, Western Division, Case Number     10:04:22

21    2:24-cv-04979 SVW (JCx).                                  10:04:26

22            My name is Tristan Knudsen, representing          10:04:28

23    Veritext Legal Solutions, and I'm the videographer.       10:04:42

24    I am not related to any party in this action, nor am      10:04:44

25    I financially interested in the outcome.                  10:04:48
```

Page 5

| | | |
|---|---|---|
| 1 | We're off the record. | 11:24:22 |
| 2 | (Recess taken.) | 11:24:23 |
| 3 | THE VIDEOGRAPHER:  This marks the beginning | 11:29:32 |
| 4 | of Media Number 3.  The time is 11:29 AM.  We're on | 11:29:34 |
| 5 | the record. | 11:29:38 |
| 6 | BY MR. NEACH: | 11:29:38 |
| 7 | Q.   So I've been informed I was consistently | 11:29:42 |
| 8 | referring to Esther Lim as Edith Lim. | 11:29:44 |
| 9 | So when I -- when I asked any questions | 11:29:47 |
| 10 | about it, did you mean that to be Esther Lim when I | 11:29:51 |
| 11 | was asking those questions of you? | 11:29:55 |
| 12 | A.   Yes, sir. | 11:29:57 |
| 13 | Q.   Okay.  And just to make sure, I think one of | 11:29:58 |
| 14 | the last ones I asked, do you recall at any point the | 11:29:59 |
| 15 | Sheriff indicating to you that there needs to be an | 11:30:01 |
| 16 | investigation of Esther Lim? | 11:30:04 |
| 17 | A.   No, sir. | 11:30:05 |
| 18 | Q.   Okay, sir. | 11:30:07 |
| 19 | I appreciate your time, and I don't have any | 11:30:08 |
| 20 | further questions at this point. | 11:30:10 |
| 21 | | 11:30:13 |
| 22 | EXAMINATION | 11:30:13 |
| 23 | BY MR. DIBONA: | 11:30:14 |
| 24 | Q.   Okay.  Sir, just some follow-up questions. | 11:30:14 |
| 25 | Mr. Murakami, at the beginning we | 11:30:17 |

Page 57

| 1 | established you're very familiar with the rules of | 11:30:19 |
| 2 | deposition.  I assume you know the rules still apply | 11:30:21 |
| 3 | even when I'm asking the questions. | 11:30:25 |
| 4 | Is that -- does that make sense to you? | 11:30:27 |
| 5 | A.  Yes, sir. | 11:30:28 |
| 6 | Q.  All right.  And while you were with the | 11:30:29 |
| 7 | Sheriff's Office, was there ever any type of | 11:30:33 |
| 8 | investigation into counsel -- sorry, excuse me. | 11:30:36 |
| 9 | Was there any type of investigation into a | 11:30:39 |
| 10 | member of the Board of Supervisors named Sheila | 11:30:42 |
| 11 | Kuehl? | 11:30:45 |
| 12 | A.  Yes, sir. | 11:30:46 |
| 13 | Q.  And did you have any role in that | 11:30:47 |
| 14 | investigation? | 11:30:49 |
| 15 | A.  Yes, sir. | 11:30:51 |
| 16 | Q.  What was your role in that investigation? | 11:30:52 |
| 17 | A.  Well, the lead unit conducting the | 11:30:56 |
| 18 | investigation was the public corruption detail, and | 11:30:58 |
| 19 | they reported directly to me. | 11:31:03 |
| 20 | Q.  And are you aware that some critics of that | 11:31:05 |
| 21 | investigation have charged that that investigation | 11:31:08 |
| 22 | was politically motivated?  Are you aware of that? | 11:31:11 |
| 23 | A.  Yes, sir. | 11:31:15 |
| 24 | Q.  What's your response?  Was that | 11:31:16 |
| 25 | investigation politically motivated? | 11:31:18 |

Page 58

```
 1          A.  No, sir.                              11:31:21

 2          Q.  And what -- what's the basis for your   11:31:22

 3   opinion?  Meaning, what facts can you put forward, if  11:31:25

 4   any, to show that it wasn't politically motivated?   11:31:29

 5          A.  The -- the investigation itself had nothing,  11:31:34

 6   per se, to do with the department or our interests.   11:31:41

 7   It came across us from a whistleblower within the   11:31:44

 8   MTA.                                            11:31:47

 9          Q.  And do you recall how it came across --   11:31:50

10   sorry.                                          11:31:53

11          Do you recall how that whistleblower came to   11:31:53

12   the department?                                 11:31:56

13          A.  I'm not exactly sure how she contacted us,   11:31:59

14   but I know it came -- became -- it came to our   11:32:02

15   attention, and we believe it warranted further   11:32:05

16   investigation.                                  11:32:09

17          Q.  And did you ever take any action as head of   11:32:10

18   the public corruption unit to retaliate against any   11:32:13

19   perceived political enemies of the Sheriff Alex   11:32:17

20   Villanueva?                                     11:32:21

21          A.  No, sir.                              11:32:22

22          Q.  Did then-Sheriff Alex Villanueva ever ask   11:32:23

23   you to take any action, retaliatory to any of his   11:32:26

24   perceived political enemies?                    11:32:29

25          A.  No, sir.                              11:32:31
```

Page 59

```
 1        Q.   Was the public corruption unit set up by      11:32:32

 2   Alex Villanueva to retaliate against his political      11:32:35

 3   enemies, perceived or otherwise?                        11:32:38

 4        A.   No, sir.                                       11:32:41

 5        Q.   Do you -- earlier opposing counsel asked you  11:32:42

 6   about you skip -- skipping some ranks; is that right?   11:32:47

 7        A.   Yes, sir.                                      11:32:50

 8        Q.   The Sheriff -- and I'm -- your terms in law   11:32:51

 9   enforcement, are you familiar with the term "quid pro   11:32:56

10   quo"?                                                   11:32:58

11        A.   Yes, sir.                                      11:32:59

12        Q.   A Latin term lawyers use meaning this for     11:33:00

13   that.                                                   11:33:04

14             Is that your understanding?                   11:33:05

15        A.   Yes, sir.                                      11:33:06

16        Q.   And more colloquially it means, if I do this  11:33:06

17   for you, will you give me something?  Is that,          11:33:09

18   broadly speaking, your understanding?                   11:33:12

19        A.   Yes, sir.                                      11:33:13

20        Q.   Did Sheriff Villanueva ever ask you for a     11:33:14

21   quid pro quo in return for him skipping -- letting      11:33:16

22   you skip ranks to promote you?                          11:33:23

23        A.   No, sir.  In fact, when I had any concerns    11:33:25

24   about decisions, I would voice my opposition, and I     11:33:31

25   had concerns that maybe I'd be asked to leave, and I    11:33:37
```

Page 60

| | | |
|---|---|---|
| 1 | guess he got wind of that.  He called me in and said, | 11:33:42 |
| 2 | "You're not planning on leaving, are you?" | 11:33:49 |
| 3 | And I said, "No.  I don't plan on it but." | 11:33:51 |
| 4 | And he goes, "No.  Good.  I need you, | 11:33:53 |
| 5 | because I need you to tell me what you think."  So | 11:33:54 |
| 6 | actually he wanted my -- my voice in that room to | 11:33:57 |
| 7 | tell him what I thought. | 11:34:00 |
| 8 | Q.  And if Sheriff Villanueva asked you to do | 11:34:02 |
| 9 | anything illegal, would you do it because you're a | 11:34:04 |
| 10 | friend of his? | 11:34:08 |
| 11 | A.  No, sir. | 11:34:10 |
| 12 | Q.  And if Sheriff Villanueva asked you to do | 11:34:11 |
| 13 | anything unethical, would you do it because you're a | 11:34:13 |
| 14 | friend of his? | 11:34:15 |
| 15 | A.  No, sir. | 11:34:17 |
| 16 | Q.  If Sheriff Villanueva asked you to do | 11:34:18 |
| 17 | anything illegal, would you do it because he had | 11:34:20 |
| 18 | promoted you and had you skip ranks? | 11:34:22 |
| 19 | A.  No, sir. | 11:34:27 |
| 20 | Q.  In your presence did Sheriff Villanueva ever | 11:34:29 |
| 21 | use any offensive language towards anybody's race? | 11:34:33 |
| 22 | A.  No, sir. | 11:34:37 |
| 23 | Q.  And I apologize for asking it, but since | 11:34:38 |
| 24 | this is an issue in the case, how do you identify | 11:34:41 |
| 25 | ethnically, sir? | 11:34:44 |

Page 61

| | | |
|---|---|---|
| 1 | A.   Japanese American, sir. | 11:34:45 |
| 2 | Q.   Did Sheriff Villanueva ever treat you any | 11:34:47 |
| 3 | differently because you're Japanese or Asian? | 11:34:50 |
| 4 | A.   No, sir. | 11:34:53 |
| 5 | Q.   And did Sheriff Villanueva treat -- and, | 11:34:55 |
| 6 | sorry, sir. | 11:34:58 |
| 7 | How old are you, as you sit here today? | 11:34:59 |
| 8 | A.   Oh, gee, I need -- that's -- 67, sir. | 11:35:02 |
| 9 | Q.   And at the time Sheriff Villanueva promoted | 11:35:08 |
| 10 | you, you would have been in your 60s; is that right? | 11:35:11 |
| 11 | A.   Yes, sir. | 11:35:14 |
| 12 | Q.   Did Sheriff Villanueva ever treat you any | 11:35:15 |
| 13 | differently because of your age? | 11:35:17 |
| 14 | A.   No, sir. | 11:35:20 |
| 15 | Q.   Did you ever observe Sheriff Villanueva | 11:35:22 |
| 16 | treating any women in the department differently than | 11:35:24 |
| 17 | he treated men? | 11:35:27 |
| 18 | A.   No, sir. | 11:35:29 |
| 19 | Q.   And did you -- excuse me.  Did you -- and | 11:35:30 |
| 20 | just more pointedly, did you ever -- ever come across | 11:35:32 |
| 21 | a situation you believe Sheriff Villanueva engaged in | 11:35:35 |
| 22 | any type of harassment or discrimination because of | 11:35:39 |
| 23 | someone's gender? | 11:35:42 |
| 24 | A.   No, sir. | 11:35:43 |
| 25 | Q.   Did you ever watch any of Sheriff | 11:35:55 |

Page 62

```
1    Villanueva's Facebook Lives while he was a Sheriff?      11:35:58

2        A.  Yes, sir.                                        11:36:02

3        Q.  And did you ever hear him refer to Esther        11:36:03

4    Lim on any of those Facebook Lives?                      11:36:07

5        A.  I don't -- I can't tell you for sure.  I         11:36:11

6    wouldn't recall if she -- he did or didn't.              11:36:14

7        Q.  Did you ever hear Sheriff Villanueva refer       11:36:16

8    to Max Huntsman on any of those Facebook Lives?          11:36:19

9        A.  He could have, but I don't recall.               11:36:24

10       Q.  Did you ever hear -- sorry.  Did you ever         11:36:27

11   listen to Sheriff Villanueva on KFI radio?               11:36:30

12       A.  Yes, sir.                                         11:36:34

13       Q.  And did you ever hear Sheriff Villanueva          11:36:36

14   refer to Esther Lim on any -- on KFI?                     11:36:39

15       A.  Not that I recall, sir.                           11:36:45

16       Q.  Did you ever hear Sheriff Villanueva refer        11:36:46

17   to Max Huntsman on KFI radio?                             11:36:49

18       A.  Not that I recall, sir.                           11:36:53

19       Q.  While Sheriff Villanueva was actually the         11:36:55

20   Sheriff, did you have any interactions with any of        11:36:57

21   the justice deputies of the Board of Supervisors?         11:37:00

22       A.  Yes, sir.                                         11:37:04

23       Q.  And what would -- which -- if you -- do you       11:37:05

24   recall any of the names of the justice deputies you       11:37:08

25   had interactions with?                                    11:37:11
```

Page 63

```
 1        A.   Actually, the names -- I know Esther Lim.      11:37:12
 2   There was the one for Supervisor Barger, Supervisor      11:37:20
 3   Hahn, and then I don't think I ever acted very much      11:37:36
 4   with Supervisor Ridley Thomas, but the one that          11:37:38
 5   followed -- the one that followed her, I interacted      11:37:42
 6   with her justice deputy.   I think actually with all     11:37:46
 7   of them to one point or another.                         11:37:50
 8        Q.   Did you ever interact with a woman named       11:37:51
 9   Kyla Coates?                                             11:37:56
10        A.   Yes, sir.                                      11:37:57
11        Q.   What would -- what was your interactions       11:37:58
12   with Kyla Coates?                                        11:37:59
13        A.   Basically something that had to do with the    11:38:03
14   problems of OIG and the civilian oversight committee     11:38:08
15   and other things that had to do with the supervisors'   11:38:14
16   cares within her district.                               11:38:20
17        Q.   Did you ever take any action to make it more   11:38:23
18   difficult for Kyla Coates to do her job?                 11:38:26
19        A.   No, sir.   We had a -- a good relationship.    11:38:30
20        Q.   And did Sheriff Villanueva ever instruct you   11:38:32
21   to do not cooperate with Kyla Coates in any manner?      11:38:35
22        A.   No, sir.                                       11:38:39
23        Q.   Did Sheriff Villanueva ever tell you to not    11:38:40
24   cooperate with any justice deputy for whatever           11:38:43
25   reason?                                                  11:38:46
```

                                                     Page  64

```
 1        A.  No, sir.                                 11:38:48
 2        Q.  And had Sheriff Villanueva asked you to not    11:38:49
 3   cooperate with justice deputies because of political    11:38:51
 4   disagreement with the Board of Supervisors, would you   11:38:56
 5   have followed that instruction?                 11:38:58
 6        A.  We would have had a discussion, but --   11:39:00
 7   because even though -- my job was to maintain liaison   11:39:09
 8   with the board.  So I interacted with the justice   11:39:14
 9   deputies and the board members -- and the supervisors   11:39:17
10   themselves on a regular basis.                 11:39:20
11        Q.  Do -- and are you familiar with a woman by    11:39:24
12   the name of Veronica Pawlowsk?                 11:39:26
13        A.  Yes, sir.                               11:39:30
14        Q.  And did you interact with her while Sheriff    11:39:30
15   Villanueva was Sheriff?                         11:39:34
16        A.  Yes, sir.                               11:39:35
17        Q.  And what were your interactions with her    11:39:36
18   like?                                            11:39:37
19        A.  Good.  They were cordial.               11:39:39
20        Q.  And did you ever do anything to make it more   11:39:41
21   difficult for Veronica Pawlowsk to do her job?    11:39:43
22        A.  No, sir.                               11:39:48
23        Q.  Did you ever instruct any of your         11:39:48
24   subordinates to not cooperate with Ms. Pawlowsk in   11:39:50
25   any way?                                         11:39:55
```

Page 65

```
 1          A.   No, sir.                              11:39:56

 2          Q.   More broadly, did you ever instruct any of   11:39:56

 3     your subordinates to not cooperate with any justice    11:39:58

 4     deputy in any way?                             11:40:01

 5          A.   No, sir.                              11:40:03

 6          Q.   And I know you know who Esther Lim is, and   11:40:04

 7     you said you interacted with her, but what were your   11:40:06

 8     interactions with her like?                    11:40:09

 9          A.   They were professional.              11:40:12

10          Q.   Did you ever take any action -- action to    11:40:14

11     make it more difficult for Esther Lim to do her job    11:40:16

12     as a justice deputy?                           11:40:19

13          A.   No, sir.                              11:40:20

14          Q.   And did you ever instruct any of your --     11:40:22

15     anybody that reported to you to make it more          11:40:25

16     difficult for her to do her job?               11:40:29

17          A.   No, sir.                              11:40:31

18          Q.   And did you ever cease cooperating with      11:40:32

19     Esther Lim in the performance of her job duties        11:40:35

20     because of any perceived disagreement she may have     11:40:37

21     had with Sheriff Villanueva?                   11:40:41

22          A.   No, sir.                              11:40:43

23          Q.   Did Sheriff Villanueva ever tell you that he 11:40:45

24     wanted Esther Lim to be fired?                 11:40:49

25          A.   No, sir.                              11:40:52
```

Page 66

| | | |
|---|---|---|
| 1 | Q.  Did Sheriff -- are you aware of Sheriff | 11:40:53 |
| 2 | Villanueva sending a letter to the board of | 11:40:57 |
| 3 | supervisors regarding Esther Lim's tweets? | 11:40:59 |
| 4 | A.  Yes, sir. | 11:41:04 |
| 5 | Q.  Were you involved in the drafting of that | 11:41:05 |
| 6 | letter in any way? | 11:41:06 |
| 7 | A.  I don't believe so, sir. | 11:41:08 |
| 8 | Q.  Did you, yourself, review Esther Lim's | 11:41:10 |
| 9 | tweets? | 11:41:13 |
| 10 | A.  I believe I saw them, sir. | 11:41:16 |
| 11 | Q.  Do you have an opinion one way or another of | 11:41:18 |
| 12 | whether they were appropriate or not? | 11:41:20 |
| 13 | MR. NEACH:  Object to the relevance.  Calls | 11:41:24 |
| 14 | for opinion of an nonexpert witness. | 11:41:28 |
| 15 | THE WITNESS:  Yeah, my -- my opinion would | 11:41:31 |
| 16 | be that they're unprofessional and inappropriate. | 11:41:32 |
| 17 | BY MR. DIBONA: | 11:41:32 |
| 18 | Q.  And why do you believe they were | 11:41:37 |
| 19 | unprofessional or inappropriate? | 11:41:39 |
| 20 | A.  Basically -- basically she's exchanging | 11:41:44 |
| 21 | disparaging remarks about the Sheriff with one of the | 11:41:47 |
| 22 | members of the civilian oversight committee. | 11:41:50 |
| 23 | Q.  Any other reason other than that? | 11:41:54 |
| 24 | A.  I don't think so, sir. | 11:41:58 |
| 25 | Q.  By the way, did you have an understanding | 11:42:00 |

Page 67

```
 1   that one of Esther Lim's job duties as a justice        11:42:01
 2   deputy was to maintain at least a professional          11:42:04
 3   relationship with the Sheriff's Department?             11:42:08
 4       A.  Yes, sir.                                       11:42:11
 5       Q.  Do you have an opinion one way or another if    11:42:11
 6   Esther Lim's tweets made it more difficult for her to   11:42:14
 7   maintain a professional relationship with the           11:42:17
 8   Sheriff's Department?                                   11:42:19
 9           MR. NEACH:  Objection to relevance.             11:42:22
10           THE WITNESS:  Yes, sir.                         11:42:24
11   BY MR. DIBONA:                                          11:42:24
12       Q.  And what's your opinion?                        11:42:25
13           MR. NEACH:  Same objection.                     11:42:27
14           THE WITNESS:  There was --                      11:42:28
15   BY MR. DIBONA:                                          11:42:28
16       Q.  You can go ahead.                               11:42:31
17       A.  Okay.                                           11:42:32
18       Q.  You can let opposing counsel object, but,       11:42:33
19   yeah, you can go ahead.                                 11:42:35
20       A.  There was definitely a violation of trust,      11:42:37
21   and we -- I believe that she showed a bias against      11:42:44
22   the department and the Sheriff himself.                 11:42:46
23       Q.  And did you, yourself -- excuse me.             11:42:52
24           That violation of trust, did it have            11:42:55
25   anything to do with the fact Esther Lim is a woman?     11:42:57
```

Page 68

```
 1        A.  No, sir.                                      11:43:02

 2        Q.  And that violation of trust, did it have      11:43:03

 3   anything to do with the fact that Esther Lim is        11:43:05

 4   Asian?                                                 11:43:09

 5        A.  No, sir.                                       11:43:11

 6        Q.  And did that violation of trust, did it have  11:43:12

 7   anything to do with Esther Lim's age?                  11:43:15

 8        A.  No, sir.                                       11:43:19

 9        Q.  And by the way, were you present during a     11:43:21

10   meeting where Mark Lillienfeld said he had come        11:43:25

11   across information that Max Huntsman had denied the    11:43:29

12   Holocaust?                                             11:43:32

13        A.  I know he made that statement.  Whether       11:43:36

14   other people were present with me when I heard it,     11:43:41

15   that I couldn't tell you, sir.                         11:43:44

16        Q.  So just to be clear, you -- you were -- you   11:43:45

17   were at least present when Mark Lillienfeld made the   11:43:49

18   statement he had come across information that Max      11:43:52

19   Huntsman denied the Holocaust; correct?               11:43:55

20        A.  Yes, sir.                                      11:43:58

21        Q.  And just to be clear, you're not sure if      11:43:59

22   there were other people present during that meeting;   11:44:01

23   is that right?                                         11:44:04

24        A.  Yes, sir.                                      11:44:06

25        Q.  And I just want to be clear.  You're not      11:44:06
```

Page 69

```
 1   saying, no, it was only me and him.  You're just       11:44:08

 2   not aware, or you just don't remember who else was      11:44:11

 3   there, if anyone.                                       11:44:13

 4         Is that fair to say?                              11:44:14

 5      A.  Yes, sir.                                        11:44:15

 6      Q.  Did Mark Lillienfeld ever tell you the          11:44:16

 7   basis -- or, sorry, excuse me.                          11:44:20

 8         Did Mark Lillienfeld ever give you any           11:44:23

 9   details about the information he came across that Max   11:44:25

10   Huntsman was a Holocaust denier?                        11:44:29

11      A.  No, sir.                                         11:44:32

12      Q.  Did Mark Huntsman ever mention Max -- that      11:44:33

13   Max Huntsman was Jewish?                                11:44:37

14      A.  I'm not sure if I heard it from Detective       11:44:41

15   Lillienfeld, but I do recall at some point in time     11:44:48

16   somebody might have mentioned that he was part --      11:44:51

17   either -- might have been part Jewish possibly, but I  11:44:53

18   couldn't tell you for sure, and now I can't tell you   11:44:57

19   whether I read it in the newspaper.                     11:44:59

20      Q.  Did Mark Lillienfeld ever mention that Max      11:45:02

21   Huntsman's father was born in Germany?                  11:45:07

22      A.  I believe so, sir.                              11:45:12

23      Q.  And excuse me.                                  11:45:14

24         Are you aware of any news reports about Mark     11:45:16

25   Lillienfeld being placed on a do-not-rehire list or    11:45:25
```

Page 70

```
 1    having a do-not-rehire notation placed in his file?          11:45:28

 2        A.  I believe so, sir.                                    11:45:32

 3        Q.  Other than what you read in the media, do            11:45:35

 4    you have any personal knowledge of why he was placed         11:45:37

 5    on a do-not -- sorry, why he had a do-not-rehire             11:45:39

 6    notation placed on his file?                                 11:45:43

 7        A.  No, sir.                                              11:45:45

 8        Q.  And what -- do you have an opinion one way           11:45:48

 9    or the other of Mark Lillienfeld as a detective?            11:45:51

10        A.  He is a very smart and hard-working                  11:45:53

11    investigator, and he's well known for his skills to         11:45:58

12    the point where actually he was -- he worked with the      11:46:03

13    DA, LA County DA in the -- I guess people that were         11:46:07

14    falsely accused of crimes, he actually helped them         11:46:13

15    with those investigations.                                   11:46:18

16        Q.  And do -- is it fair to say you have a high         11:46:19

17    opinion of his skills as a detective?                        11:46:21

18            Sorry, sir.  Did you hear the question?  It         11:46:34

19    seems like you might have a technical issue.  I'm           11:46:36

20    sorry.  Did you hear my question?                            11:46:38

21        A.  Right now I just -- the volume kind of went         11:46:40

22    kind of low.                                                 11:46:43

23        Q.  Okay.  That's fine.  I'll just repeat it.           11:46:44

24            My question was is it fair to say you have a         11:46:46

25    high opinion of Mark Lillienfeld's skills as a              11:46:49
```

Page 71

| | | |
|---|---|---|
| 1 | detective? | 11:46:52 |
| 2 | A. Yes, sir. | 11:46:53 |
| 3 | Q. And is that -- at the -- around the time | 11:46:55 |
| 4 | that he told you Max Huntsman denied the Holocaust or | 11:46:58 |
| 5 | he had information that he did, did you have high | 11:47:02 |
| 6 | opinion of his detective skills then? | 11:47:05 |
| 7 | A. Yes, sir. | 11:47:07 |
| 8 | Q. Did you have any reason to disbelieve Mark | 11:47:07 |
| 9 | Lillienfeld when he had told you that information? | 11:47:10 |
| 10 | A. No, sir. | 11:47:14 |
| 11 | Q. Have you ever known Mark Huntsman to | 11:47:15 |
| 12 | fabricate information as a detective? | 11:47:18 |
| 13 | A. I think you mean Mark Lillienfeld, but, no, | 11:47:22 |
| 14 | sir. | 11:47:26 |
| 15 | Q. Sorry. Have you -- just so we have a clear | 11:47:26 |
| 16 | record. | 11:47:28 |
| 17 | Have you ever known Mark Lillienfeld to | 11:47:29 |
| 18 | fabricate information as a detective? | 11:47:36 |
| 19 | A. No, sir. | 11:47:37 |
| 20 | Q. Have you ever known Mark Lillienfeld to be | 11:47:37 |
| 21 | dishonest? | 11:47:40 |
| 22 | A. No, sir. | 11:47:41 |
| 23 | Q. Did you ever ask Mark Lillienfeld to lie? | 11:47:41 |
| 24 | A. No, sir. | 11:47:46 |
| 25 | Q. Did you -- earlier did you ever ask Mark | 11:47:47 |

Page 72

| | | |
|---|---|---|
| 1 | Lillienfeld -- | 11:47:50 |
| 2 | THE COURT REPORTER:  I'm sorry.  Could you | 11:47:55 |
| 3 | repeat the question?  It broke up for a second. | 11:47:56 |
| 4 | BY MR. DIBONA: | 11:47:56 |
| 5 | Q.  Did you ever ask Mark Lillienfeld to dig up | 11:47:58 |
| 6 | dirt on Max Huntsman? | 11:48:01 |
| 7 | A.  No, sir. | 11:48:03 |
| 8 | Q.  Did Sheriff Villanueva ever ask you to dig | 11:48:06 |
| 9 | up dirt on Max Huntsman? | 11:48:08 |
| 10 | A.  No, sir. | 11:48:10 |
| 11 | Q.  If Sheriff Villanueva had asked you to find | 11:48:11 |
| 12 | some dirt on Max Huntsman, what would your response | 11:48:13 |
| 13 | have been? | 11:48:17 |
| 14 | A.  It -- I need clarification on what's meant | 11:48:19 |
| 15 | by "dirt," and what will be the purpose. | 11:48:26 |
| 16 | Q.  Would -- if Sheriff Villanueva ever asked | 11:48:33 |
| 17 | you to find out something -- to make up something | 11:48:35 |
| 18 | that wasn't true about Max Huntsman, would you have | 11:48:37 |
| 19 | instructed your detectives to do that? | 11:48:40 |
| 20 | A.  No, sir. | 11:48:42 |
| 21 | MR. NEACH:  Object -- excuse me, lacks | 11:48:43 |
| 22 | foundation.  Incomplete hypothetical. | 11:48:45 |
| 23 | BY MR. DIBONA: | 11:48:45 |
| 24 | Q.  Did Sheriff Villanueva ever ask you to dig | 11:48:49 |
| 25 | up any dirt on Esther Lim? | 11:48:51 |

Page  73

| | | |
|---|---|---|
| 1 | A. Again, if you are looking at, like, dirt, | 11:48:55 |
| 2 | like, things against her character or -- or stuff | 11:49:03 |
| 3 | like that, I don't -- unless I have some kind of | 11:49:07 |
| 4 | purpose for the investigation, the answer would be | 11:49:12 |
| 5 | no. | 11:49:14 |
| 6 | Q. Did Sheriff Villanueva ever ask you to open | 11:49:15 |
| 7 | an investigation into Esther Lim of any kind? | 11:49:17 |
| 8 | A. No, sir. | 11:49:20 |
| 9 | Q. And as part of your career in law | 11:49:24 |
| 10 | enforcement, do you have an understanding that law | 11:49:26 |
| 11 | enforcement can need either probable cause or | 11:49:28 |
| 12 | reasonable suspicion, depending on the circumstances, | 11:49:29 |
| 13 | to open a criminal investigation? | 11:49:33 |
| 14 | A. Yes, sir. | 11:49:36 |
| 15 | Q. And would you ever investigate a criminal | 11:49:37 |
| 16 | investigation with -- sorry. | 11:49:39 |
| 17 | While you were at the Sheriff's Department, | 11:49:41 |
| 18 | would you ever have investigated -- sorry. Let me | 11:49:43 |
| 19 | start over again. | 11:49:46 |
| 20 | While you were at the Sheriff's Department, | 11:49:47 |
| 21 | would you ever open a criminal investigation without | 11:49:49 |
| 22 | a legal basis to do so? | 11:49:52 |
| 23 | A. No, sir. | 11:49:56 |
| 24 | Q. And would -- and did Sheriff Villanueva ever | 11:49:57 |
| 25 | ask you to open a criminal investigation without a | 11:50:00 |

Page 74

| | | |
|---|---|---|
| 1 | legal basis to do so? | 11:50:03 |
| 2 | A.  No, sir. | 11:50:05 |
| 3 | Q.  And would you have opened a criminal | 11:50:06 |
| 4 | investigation if Sheriff Villanueva asked you to do | 11:50:10 |
| 5 | it if there wasn't the proper predication or legal | 11:50:12 |
| 6 | basis to do it? | 11:50:15 |
| 7 | MR. NEACH:  Object.  Lacks foundation. | 11:50:17 |
| 8 | Incomplete hypothetical. | 11:50:18 |
| 9 | You can answer. | 11:50:20 |
| 10 | THE WITNESS:  No, sir. | 11:50:21 |
| 11 | BY MR. DIBONA: | 11:50:21 |
| 12 | Q.  Did anyone ever ask to -- sorry, excuse me. | 11:50:23 |
| 13 | Other than this deposition, did anyone ever | 11:50:26 |
| 14 | ask -- interview you about Esther Lim or Max | 11:50:29 |
| 15 | Huntsman's complaints? | 11:50:34 |
| 16 | A.  No, sir. | 11:50:36 |
| 17 | Q.  Did anyone, to your knowledge, ever reach | 11:50:36 |
| 18 | out to you about -- about interviewing you regarding | 11:50:39 |
| 19 | Max Huntsman or Esther Lim's complaints? | 11:50:42 |
| 20 | A.  No, sir. | 11:50:45 |
| 21 | Q.  And did anyone ever reach out to you about | 11:50:46 |
| 22 | interviewing Sheriff Villanueva? | 11:50:49 |
| 23 | A.  No, sir. | 11:50:53 |
| 24 | Q.  While you were the Assistant Sheriff under | 11:50:54 |
| 25 | Sheriff Villanueva, if someone had wanted to | 11:50:58 |

Page 75

EXHIBIT 29

1                    UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4 ALEX VILLANUEVA,                    )
                                      )
5                    Plaintiff,       )
                                      )
6                                     )
                 VS.                  )Case No.: 2:24-cv-04979
7                                     )          SVW (JCx)
                                      )
8 COUNTY OF LOS ANGELES, COUNTY  )
  OF LOS ANGELES SHERIFF'S       )
9 DEPARTMENT, LOS ANGELES COUNTY )
  BOARD OF SUPERVISORS, COUNTY   )
10 EQUITY OVERSIGHT PANEL, LOS    )
   ANGELES COUNTY OFFICE OF       )
11 INSPECTOR GENERAL, CONSTANCE   )
   KOMOROSKI, MERCEDES CRUZ,      )
12 ROBERTA YANG, LAURA LECRIVAIN, )
   SERGIO V. ESCOBEDO, RON        )
13 KOPPERUD, ROBERT G. LUNA,      )
   MAX-GUSTAF HUNTSMAN, ESTHER    )
14 LIM, and DOES 1 to 100,        )
   inclusive,                     )
15                                     )
                    Defendants.    )
16 _____)

17            ,

18                    DEPOSITION OF:

19                    SERGIO V. ESCOBEDO

20            CONDUCTED VIA VIDEOCONFERENCE

21                    Friday, March 14, 2025

22

23

24 REPORTED BY:
   Kyle Miller
25 CSR No. 13282

ESCOBEDO, SERGIO                                                    Page 2

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF [!COUNTY]

 3

 4 ALEX VILLANUEVA,                )
                                   )
 5                    Plaintiff,   )
                                   )
 6                                 )
                 VS.               )Case No.: 2:24-cv-04979
 7                                 )          SVW (JCx)
                                   )
 8 COUNTY OF LOS ANGELES, COUNTY   )
   OF LOS ANGELES SHERIFF'S        )
 9 DEPARTMENT, LOS ANGELES COUNTY )
   BOARD OF SUPERVISORS, COUNTY    )
10 EQUITY OVERSIGHT PANEL, LOS     )
   ANGELES COUNTY OFFICE OF        )
11 INSPECTOR GENERAL, CONSTANCE    )
   KOMOROSKI, MERCEDES CRUZ,       )
12 ROBERTA YANG, LAURA LECRIVAIN, )
   SERGIO V. ESCOBEDO, RON         )
13 KOPPERUD, ROBERT G. LUNA,       )
   MAX-GUSTAF HUNTSMAN, ESTHER     )
14 LIM, and DOES 1 to 100,         )
   inclusive,                      )
15                                 )
                    Defendants.    )
16 _____ )

17

18

19       Deposition of Sergio V. Escobedo, Volume 1, taken

20 on behalf of the Plaintiff, before Kyle Miller,

21 Certified Shorthand Reporter No. 13282 and Registered

22 Professional Reporter for the State of California,

23 commencing on Friday, March 14, 2025, via

24 videoconference, beginning at 10:06 a.m. and ending at

25 2:04 p.m.
```

ESCOBEDO, SERGIO                                                    Page 3

 1 APPEARANCES OF COUNSEL:

 2

 3      FOR THE PLAINTIFF:

 4          SHEGERIAN & ASSOCIATES, INC.
            By:  Alex DiBona, Attorney-at-Law
 5          11520 San Vicente Boulevard
            Los Angeles, California 90049
 6          (310) 860-0770
            adibona@shegerianlaw.com
 7

 8      FOR THE DEFENDANTS:

 9          MILLER BARONDESS, LLP
            By:  Jason H. Tokoro, Attorney-at-Law
10              Steven Williamson, Attorney-at-Law
            2121 Avenue of the Stars
11          Suite 2600
            Los Angeles, California 90067
12          (310) 552-4400
            jtokoro@millerbardondess.com
13

14
        ALSO PRESENT:
15
            Alex Villanueva
16

17

18

19

20

21

22

23

24

25

ESCOBEDO, SERGIO                                                    Page 13

1 relations to any incidents occurring within the

2 County of Los Angeles that they may need to be aware of.

3      Q.   And you said it was -- excuse me.

4           Is it fair you got promoted to this position

5 in approximately December of 2024, just a few months

6 ago; is that right?

7      A.   Officially December 9, 2024, I was promoted

8 to acting chief, but I was in the office a month prior

9 as an on-loan position.

10     Q.   And who made the decision to promote you?

11     A.   Sheriff Luna.

12     Q.   Uh-huh.

13          Did you have to interview to be promoted, or

14 was that simply something that you were told you were

15 going to be promoted to?

16     A.   I was recommended to the position by the

17 former chief of staff.  And so the month I was on loan

18 was essentially my trial basis, and the sheriff promoted

19 me --

20     Q.   And then --

21     A.   -- based on my performance.

22     Q.   -- who was the former chief of staff that

23 recommended you?

24     A.   Now-Assistant Sheriff Jason Skeen.

25     Q.   What is your understanding of the role of

ESCOBEDO, SERGIO                                                    Page 125

1      Q.   All right.  So do you have a recollection one

2 way or another if either Mr. Huntsman or Ms. Lim

3 received notification that there was a --

4 Sheriff Villanueva violated department policy?

5      MR. TOKORO:  Objection.  Lacks foundation and calls

6 for speculation, given his prior testimony.

7           But you can answer.

8      THE WITNESS:  I don't recall.

9 BY MR. DIBONA:

10      Q.   Do you see here the words, "You should be

11 aware that Alex Villanueva has the right to grieve

12 and/or otherwise appeal this recommended determination"?

13      MR. TOKORO:  Document speaks for itself.  No need

14 to ask the witness to confirm what the document says.

15           But you can answer.

16      THE WITNESS:  I do see that.

17 BY MR. DIBONA:

18      Q.   And is it your understanding that

19 Alex Villanueva did have the right to appeal the

20 CEO's -- sorry -- the CEOP's recommendation that he have

21 a "do not rehire" notation on top of his file?

22      A.   He would not have a right for grievance.

23      Q.   Uh-huh.

24           And Ron Kopperud is the person who signed

25 this; correct?

 1     A.   It's his name under the title, originally

 2 signed.  I don't know if he signed it or not.  That's --

 3 I'd have to see a signed letter.

 4     Q.   And do you have a -- fair to say, did

 5 Ron Kopperud -- or "Kopperud" -- ever show you this

 6 letter before he sent it?

 7     A.   Not that I recall.

 8     Q.   And do you have any explanation for why

 9 there's a letter signed by one of your reports that

10 incorrectly says Alex Villanueva has a right to grieve

11 or appeal?

12     A.   No.

13     THE REPORTER:  And that was Exhibit 5, for the

14 record.

15     MR. DIBONA:  Yes, it was.

16               (Exhibit 5 marked)

17 BY MR. DIBONA:

18     Q.   All right.  And, sir, for the purposes of

19 sending a subpoena only, can you please put your

20 residential address on the record.

21     MR. TOKORO:  Same objection as with all the other

22 depositions.  That's private information.  I'm

23 instructing the witness not to answer.

24          I know your position.  You know ours.  Happy

25 to meet and confer and also happy to discuss further off

ESCOBEDO, SERGIO

1

2            I, Kyle Miller, CSR No. 13282, certify:

3            That the foregoing proceedings were taken

4 before me at the time and place herein set forth; that

5 prior to testifying, the deponent was placed under oath;

6 that a verbatim record of the proceedings was made by me

7 using machine shorthand which was thereafter transcribed

8 under my direction; further, that the foregoing is an

9 accurate transcription thereof.

10            The deponent's review, correction, and

11 signing of the transcript was requested.

12            The dismantling, unsealing, or unbinding of

13 the original or certified transcript will render the

14 reporter's certificate null and void.

15            I further certify that I am not financially

16 interested in the action and that I am not a relative

17 nor an employee of any attorney or party to this action.

18

19            Dated this 31st day of March, 2025.

20

21

22 _____

            Kyle Miller
23            CSR NO. 13282

24

25

EXHIBIT 30

1              UNITED STATES DISTRICT COURT

          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

2

          ALEX VILLANUEVA,                    )
3                   PLAINTIFF,                 ) CASE NO.
                    VS.                        ) 2:24-cv-04979
4         COUNTY OF LOS ANGELES, COUNTY   ) SVW (JCx)
5         OF LOS ANGELES SHERIFF'S         )
6         DEPARTMENT, LOS ANGELES COUNTY  )
7         BOARD OF SUPERVISORS, COUNTY     )
8         EQUITY OVERSIGHT PANEL,          )
9         LOS ANGELES COUNTY OFFICE OF     )
10        INSPECTOR GENERAL, CONSTANCE     )
11        KOMOROSKI, MERCEDES CRUZ,        )
12        ROBERT A. YANG, LAURA LECRIVAIN,)
13        SERGIO V. ESCOBEDO, RON          )
14        KOPPERUD, ROBERT G. LUNA,        )
15        MAX-GUSTAF HUNTSMAN, ESTHER LIM,)
16        AND DOES 1 TO 100, INCLUSIVE,    )
17                   DEFENDANTS.            )
18        _____)
19            VIDEOTAPED DEPOSITION OF MARK LILLIENFELD
20                   MONDAY, APRIL 14, 2024
21
22        REPORTED BY
23        KIMBERLY EDELEN, CSR. NO. 9042, CRR, RPR.
24        JOB NO.  7246491
25        PAGES 1 - 72

                                              Page 1

1       VIDEOTAPED DEPOSITION OF MARK LILLIENFELD, TAKEN

2       ON BEHALF OF THE DEFENDANTS, AT 10:01 A.M. PDT,

3       MONDAY, APRIL 14, 2024, AT 2121 AVENUE OF THE STARS,

4       SUITE 2600, LOS ANGELES, CALIFORNIA, BEFORE

5       KIMBERLY A. EDELEN, CSR NO. 9042, CRR, RPR.

6

7       APPEARANCES OF COUNSEL

8

9       FOR THE PLAINTIFF:

10                      SHEGERIAN & ASSOCIATES

11                      BY:  ALEX DI BONA, ESQ.

12                      11520 SAN VICENTE BOULEVARD

13                      LOS ANGELES, CALIFORNIA 90049

                        310.860.0770

14                      ADIBONA@SHEGERIANLAW.COM

15

16      FOR THE DEFENDANTS:

17                      MILLER BARONDESS, LLP

18                      BY:  BRIAN NEACH, ESQ.

19                      2121 AVENUE OF THE STARS

20                      SUITE 2600

21                      LOS ANGELES, CALIFORNIA 90067

22                      310.552.4400

23                      BNEACH@MILLERBARONDESS.COM

24

25      ALSO PRESENT:  TRISTAN KNUDSEN, VIDEOGRAPHER

                                                    Page  2

1                          I N D E X

2

3     WITNESS                  EXAMINATION                    PAGE

4     MARK LILLIENFELD

5                          BY MR. NEACH                  7, 66

6                          BY MR. DI BONA               56, 68

7

8

9

10              QUESTIONS NOT ANSWERED BY DEPONENT

11                  PAGE          LINE

12                   36             6

13                   36            15

14                   51            19

15                   53             4

16                   53            11

17

18

19

20

21

22

23

24

25

                                              Page  3

```
 1              E X H I B I T S

 2      NO.           PAGE      DESCRIPTION

 3

 4      EXHIBIT 1       11       DEFENDANT COUNTY OF LOS

 5                               ANGELES AMENDED NOTICE OF

 6                               SUBPOENA TO TESTIFY AT A

 7                               DEPOSITION IN A CIVIL

 8                               ACTION TO MARK LILLIENFELD

 9      EXHIBIT 2       52       ARTICLE TITLED "SHERIFF

10                               HIRES CORRUPTION

11                               INVESTIGATOR ACCUSED OF

12                               POSING AS DEPUTY"

13

14

15      REFERENCED EXHIBITS PREVIOUSLY MARKED

16       NO.           DESCRIPTION

17

18      EXHIBIT 20     ARTICLE TITLED "THE VILLANUEVA SAGA

19                     GETS ODDER AND MORE DESTRUCTIVE"

20

21      EXHIBIT 27     ARTICLE TITLED "DETECTIVE ACCUSED OF

22                     GIVING NAZI-LIKE SALUTE RESIGNS FROM

23                     SOUTH PASADENA POLICE DEPARTMENT"

24

25

                                         Page  4
```

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, APRIL 14, 2024;

 2                  10:01 A.M. PDT

 3

 4

 5          THE VIDEOGRAPHER:  Good morning.  We're        10:01:35

 6     going on the record at 10:01 a.m. on the 14th of    10:01:36

 7     April 2025.                                          10:01:39

 8          Please note the microphones are sensitive       10:01:42

 9     and may pick up whispering and private               10:01:44

10     conversations.  Please mute your phones at this      10:01:47

11     time.                                                10:01:49

12          Audio and video recording will continue to      10:01:50

13     take place unless all parties agree to go off the    10:01:53

14     record.                                              10:01:55

15          This is Media Unit No. 1 of the                 10:01:56

16     video-recorded deposition of Mark Lillienfeld taken  10:01:59

17     by counsel for defendant in the matter of            10:02:04

18     Alex Villanueva versus County of Los Angeles,        10:02:08

19     et al., filed in the United States District Court,   10:02:10

20     Central District of California, Western Division,    10:02:14

21     Case No. 2:24-cv-04979 SVW (JCx).                    10:02:18

22          The location of this deposition is              10:02:30

23     Miller Barondess, LLP, 2121 Avenue of the Stars,     10:02:32

24     Suite 2600, Los Angeles, California 90067.           10:02:37

25          My name is Tristan Knudsen representing         10:02:42
```

Page 5

```
 1    Veritext Legal Solutions, and I'm the videographer      10:02:46

 2    today.  I am not related to any party in this action    10:02:49

 3    nor am I financially interested in the outcome.         10:02:51

 4           If there are any objections -- if there are      10:02:55

 5    any objections to proceeding, please state them at      10:02:57

 6    the time of your appearance.                            10:03:00

 7           Counsel and all present will now state           10:03:01

 8    their appearances and affiliations for the record       10:03:03

 9    beginning with the noticing attorney, please.           10:03:05

10           MR. NEACH:  Good morning.  Brian Neach of        10:03:08

11    Miller Barondess, LLP representing the defendants in    10:03:10

12    this case.                                              10:03:13

13           MR. DI BONA:  Good morning.  Alex DiBona of      10:03:14

14    Shegerian & Associates on behalf of the plaintiff       10:03:17

15    Alex Villanueva.                                        10:03:19

16           THE VIDEOGRAPHER:  Thank you.                    10:03:22

17           Will the court reporter please introduce         10:03:23

18    herself and swear in the witness.                       10:03:24

19           THE REPORTER:  Pursuant to Business and          10:03:27

20    Professions Code 8016(b)(1) and (2), my name is         10:03:27

21    Kim Edelen and my CSR number is 9042.                   10:03:27

22           Would you raise your right hand, please.         10:03:35

23           You do solemnly swear the testimony you're       10:03:40

24    about to give shall be the truth, the whole truth       10:03:40

25    and nothing but the truth?                              10:03:40
```

Page 6

| | | |
|---|---|---|
| 1 | THE WITNESS:  I do. | 10:03:41 |
| 2 | THE REPORTER:  Thank you. | 10:03:42 |
| 3 | | |
| 4 | EXAMINATION | |
| 5 | BY MR. NEACH: | |
| 6 | Q    Good morning, sir. | 10:03:44 |
| 7 | A    Good morning. | 10:03:45 |
| 8 | Q    If you wouldn't mind, if you could state | 10:03:45 |
| 9 | your name and spell it for the court reporter. | 10:03:48 |
| 10 | A    Mark Lillienfeld, M-a-r-k, | 10:03:51 |
| 11 | L-i-l-l-i-e-n-f-e-l-d. | 10:03:52 |
| 12 | Q    All right.  Have you had your deposition | 10:03:57 |
| 13 | taken before? | 10:04:04 |
| 14 | A    Yes, sir. | 10:04:05 |
| 15 | Q    Okay.  How many times, do you think? | 10:04:05 |
| 16 | A    30. | 10:04:07 |
| 17 | Q    30. | 10:04:07 |
| 18 | Okay.  So I'm going to spare you going over | 10:04:08 |
| 19 | all of the basic ground rules, but you understand | 10:04:09 |
| 20 | you're testifying under oath, correct? | 10:04:11 |
| 21 | A    I do. | 10:04:13 |
| 22 | Q    Okay.  And then just let me finish my | 10:04:14 |
| 23 | question, and I'll let you finish your answer so we | 10:04:15 |
| 24 | get a clean record. | 10:04:18 |
| 25 | Does that make sense? | 10:04:20 |

Page 7

| 1  | A    It does. | 10:04:21 |
| 2  | Q    Okay.  Are there any health issue or | 10:04:21 |
| 3  | concerns that are requiring you to take any | 10:04:24 |
| 4  | medication that might impact your memory at all? | 10:04:27 |
| 5  | A    No. | 10:04:29 |
| 6  | Q    Okay.  Any reason why you can't give your | 10:04:29 |
| 7  | best testimony today? | 10:04:31 |
| 8  | A    No. | 10:04:32 |
| 9  | Q    Okay.  When was the last time you had your | 10:04:32 |
| 10 | deposition taken? | 10:04:36 |
| 11 | A    2022. | 10:04:42 |
| 12 | Q    Okay.  Do you recall what case that was? | 10:04:43 |
| 13 | A    I do not. | 10:04:47 |
| 14 | Q    Okay.  Was it -- did it grow out of your | 10:04:48 |
| 15 | work with the Sheriff's Department? | 10:04:52 |
| 16 | A    Yes. | 10:04:54 |
| 17 | Q    Okay.  Were you a party or were you just a | 10:04:54 |
| 18 | witness? | 10:04:57 |
| 19 | A    Witness. | 10:04:58 |
| 20 | Q    You don't recall who the parties were? | 10:04:59 |
| 21 | A    I do not. | 10:05:01 |
| 22 | Q    Are you currently a party in any lawsuit, | 10:05:05 |
| 23 | plaintiff or defendant? | 10:05:09 |
| 24 | A    I am not. | 10:05:10 |
| 25 | Q    Have you ever been a plaintiff or defendant | 10:05:12 |

Page 8

```
 1    in a lawsuit?                                      10:05:13

 2        A    No.                                       10:05:14

 3        Q    Okay.  I -- I'm guessing, but I guess a   10:05:15

 4    pretty educated guess, have you testified in court 10:05:24

 5    before?                                            10:05:27

 6        A    I have.                                   10:05:27

 7        Q    How many times?                           10:05:29

 8        A    300.                                      10:05:36

 9        Q    Yeah.                                     10:05:37

10             And those are -- most of those are -- were 10:05:39

11    all of those in connection with when you were      10:05:42

12    serving at the Sheriff's Department?               10:05:43

13        A    Yes.                                      10:05:44

14        Q    Okay.  Have you had phone conversations   10:05:45

15    with Mr. DiBona, who's sitting next to you?        10:05:50

16        A    Yes.                                      10:05:53

17        Q    How many times -- when is the last time you 10:05:54

18    talked to him on the phone?                        10:05:55

19        A    I believe a week before last.            10:05:56

20        Q    Okay.  How long was that conversation?   10:05:58

21        A    About three minutes.                      10:06:00

22        Q    Okay.  Is this the first time you met him 10:06:01

23    in person?                                         10:06:05

24        A    It is.                                    10:06:06

25        Q    Okay.  What was the substance of your    10:06:06
```

Page 9

| | | |
|---|---|---|
| 1 | three-minute phone call, if you recall? | 10:06:09 |
| 2 | A    The fact that I was not represented by | 10:06:15 |
| 3 | counsel during this deposition. | 10:06:19 |
| 4 | Q    Okay.  And what did he tell you in | 10:06:20 |
| 5 | connection with that? | 10:06:26 |
| 6 | A    That I could hire my own counsel. | 10:06:27 |
| 7 | Q    Uh-huh. | 10:06:29 |
| 8 |      Did you do anything to prepare for the | 10:06:36 |
| 9 | deposition today? | 10:06:38 |
| 10 | A    I've thought about it. | 10:06:43 |
| 11 | Q    Did you look at any documents? | 10:06:44 |
| 12 | A    I am not in possession of any documents. | 10:06:47 |
| 13 | Q    Okay.  Did you speak to anybody about your | 10:06:48 |
| 14 | deposition? | 10:06:57 |
| 15 | A    I spoke to, I believe, an associate of | 10:07:00 |
| 16 | yours named Jason Tokoro. | 10:07:02 |
| 17 | Q    Uh-huh. | 10:07:06 |
| 18 | A    And I spoke to a gentleman from County | 10:07:06 |
| 19 | Counsel who's last name is Bavafa, B-a-v-a-f-a, | 10:07:08 |
| 20 | I believe. | 10:07:14 |
| 21 | Q    Okay. | 10:07:16 |
| 22 | A    I might be wrong in that spelling and | 10:07:17 |
| 23 | pronunciation. | 10:07:18 |
| 24 | Q    Okay.  And that conversation was to see if | 10:07:19 |
| 25 | they would represent you in this deposition? | 10:07:22 |

Page 10

| | | |
|---|---|---|
| 1 | A    Yes. | 10:07:25 |
| 2 | Q    And they said they would not? | 10:07:26 |
| 3 | A    Correct. | 10:07:27 |
| 4 | MR. NEACH:  I'm going to mark as | 10:07:33 |
| 5 | Exhibit 1... | 10:07:34 |
| 6 | (Deposition Exhibit 1 | 10:07:58 |
| 7 | was marked for identification.) | 10:07:58 |
| 8 | MR. NEACH:  I guess I made more copies than | 10:08:00 |
| 9 | I needed.  Thank you. | 10:08:02 |
| 10 | BY MR. NEACH: | 10:08:06 |
| 11 | Q    So what I've put in front of you, sir, as | 10:08:07 |
| 12 | Exhibit 1 is -- it's a caption page, "Defendant | 10:08:09 |
| 13 | County of Los Angeles' Amended Notice of Subpoena to | 10:08:14 |
| 14 | Testify at a Deposition in a Civil Action to | 10:08:18 |
| 15 | Mark Lillienfeld." | 10:08:21 |
| 16 | Do you recognize this document? | 10:08:23 |
| 17 | A    I do. | 10:08:24 |
| 18 | Q    Okay.  You were served this by Mr. Tokoro? | 10:08:25 |
| 19 | A    By his representative, yes.  And thank you | 10:08:30 |
| 20 | and thank him for taking my home address off of it. | 10:08:32 |
| 21 | Q    You're welcome.  Good. | 10:08:36 |
| 22 | At the bottom, there's some numbered pages, | 10:08:42 |
| 23 | like, "Exhibit 1," if you go to the next few pages. | 10:08:44 |
| 24 | A    Yes. | 10:08:49 |
| 25 | Q    Go to the one that says "Exhibit 1 - | 10:08:49 |

Page 11

```
1    Page 9."                                          10:08:51

2        A    You know what, I go from Page 8 to Page 12    10:08:56

3    in this exhibit.                                  10:08:59

4        Q    All right.                               10:09:01

5        A    Yes, sir.                                10:09:04

6        Q    Oh, oh, oh.  Let me see.  I meant at the  10:09:08

7    bottom.  It says -- at the very bottom, it says   10:09:14

8    "Exhibit 1 - Page 9."                             10:09:16

9             But over --                              10:09:21

10       A    Oh, I'm sorry.  Yes, I see that.  My -- my  10:09:22

11   bad.                                              10:09:24

12       Q    No problem.  No problem.                 10:09:25

13            I think you've already kind of answered   10:09:26

14   this question, but I've just got to go through it.  10:09:28

15            So there's several document requests.  Did  10:09:30

16   you look through these requests at all?           10:09:32

17       A    Yes, sir, I did.                         10:09:35

18       Q    Okay.  And did you check anything or --  10:09:35

19   whether it be a computer or any paper files to see  10:09:38

20   if you had any documents that might be responsive?  10:09:40

21       A    I did not because I didn't have to because  10:09:42

22   I knew that I was not in possession of any of the  10:09:44

23   documents that you're requesting here.            10:09:46

24       Q    Okay.  So it's just you know that you don't  10:09:47

25   retain on your computer any documents related to  10:09:51
```

                                                    Page 12

```
 1     your employment with the L.A. Sheriff?              10:09:54

 2         A    That is correct.                           10:09:57

 3         Q    Okay.  And you don't retain any paper      10:09:57

 4     files?                                              10:10:00

 5         A    That is correct.                           10:10:00

 6         Q    Okay.  So you didn't bother looking for    10:10:01

 7     something you knew you didn't have, right?          10:10:07

 8         A    That is correct.                           10:10:09

 9         Q    Okay.  If you don't mind if you just tell  10:10:10

10     me what your educational background is, starting    10:10:24

11     with high school.                                   10:10:26

12         A    A high school grad, I've got about three   10:10:27

13     and a half years of college.                        10:10:30

14         Q    Okay.  Where was that?                     10:10:32

15         A    Western Illinois University, Los Angeles   10:10:34

16     Valley College and California State University,     10:10:37

17     Los Angeles.                                        10:10:38

18         Q    Okay.  Do you have any certifications?     10:10:42

19         A    I have a basic, an intermediate and       10:10:46

20     advanced POST certificates.                         10:10:50

21         Q    And what are those in relation to?        10:10:53

22         A    My employment as a peace officer.         10:10:55

23         Q    In the deposition testimony that you      10:11:08

24     recently gave, do you remember what the substance of 10:11:09

25     it was?                                             10:11:12
```

Page 13

| | | |
|---|---|---|
| 1 | A    I'm sorry, I don't. | 10:11:13 |
| 2 | Q    Okay.  And then do you remember when you | 10:11:15 |
| 3 | got deposed before that? | 10:11:18 |
| 4 | A    Probably around -- oh, you know, during | 10:11:21 |
| 5 | COVID. | 10:11:25 |
| 6 | Q    Okay.  Do you recall what that case was? | 10:11:25 |
| 7 | A    I do not. | 10:11:28 |
| 8 | Q    Okay.  Let's see. | 10:11:28 |
| 9 | Well, I know you worked at the Sheriff's | 10:11:40 |
| 10 | Department.  So before you started work -- well, | 10:11:43 |
| 11 | when did you start working at the Sheriff's | 10:11:45 |
| 12 | Department? | 10:11:47 |
| 13 | A    December 18th, 1980. | 10:11:48 |
| 14 | Q    Okay.  And was that started as training? | 10:11:55 |
| 15 | A    Yes. | 10:11:58 |
| 16 | Q    Okay.  And did that last, what, like | 10:11:59 |
| 17 | roughly six months? | 10:12:02 |
| 18 | A    The academy is about four months long. | 10:12:03 |
| 19 | Q    And then where did you go after training? | 10:12:07 |
| 20 | A    Inmate Reception Center, Custody Division. | 10:12:13 |
| 21 | (Clarification by the Reporter.) | 10:12:16 |
| 22 | BY MR. NEACH: | 10:12:16 |
| 23 | Q    How long were you there? | 10:12:18 |
| 24 | A    One year, one week and six days. | 10:12:19 |
| 25 | Q    Okay.  And after that, sir? | 10:12:25 |

Page 14

| 1  | A | I went to patrol. | 10:12:26 |
| 2  | Q | Which station? | 10:12:27 |
| 3  | A | Firestone. | 10:12:29 |
| 4  | Q | Which one was that? | 10:12:30 |
| 5  | A | Firestone.  It no longer exists. | 10:12:31 |
| 6  | Q | I was going to say... | 10:12:34 |
| 7  |   | How long were you at the Firestone station? | 10:12:35 |
| 8  | A | About five years. | 10:12:40 |
| 9  | Q | Okay.  That gets us to roughly 1986 or so? | 10:12:41 |
| 10 | A | Roughly, yes. | 10:12:48 |
| 11 | Q | And then after being patrol at Firestone, | 10:12:49 |
| 12 |   | what did you do? | 10:12:51 |
| 13 | A | I was a detective at Firestone also during | 10:12:52 |
| 14 |   | that time period. | 10:12:55 |
| 15 | Q | Oh, okay. | 10:12:55 |
| 16 |   | During that five-year period? | 10:12:58 |
| 17 | A | Yes, sir. | 10:12:59 |
| 18 | Q | Okay.  Did that involve a promotion? | 10:13:00 |
| 19 | A | Yes. | 10:13:03 |
| 20 | Q | Okay.  What was the promotion? | 10:13:04 |
| 21 | A | Detective is both a rank and an assignment | 10:13:06 |
| 22 |   | on the Sheriff's Department. | 10:13:09 |
| 23 | Q | Okay.  And then after Firestone station, | 10:13:10 |
| 24 |   | what did you do? | 10:13:15 |
| 25 | A | I worked out of the Office of the Sheriff | 10:13:16 |

Page 15

```
1     very briefly conducting criminal investigations.    10:13:19

2         Q    Okay.  "Briefly," less than a year?        10:13:21

3         A    Yes.                                        10:13:24

4         Q    Okay.  And then after that?                10:13:24

5         A    I was a detective very briefly for about   10:13:29

6     three months in the Forgery Fraud Division.         10:13:31

7         Q    Okay.  I have a feeling there's going to be 10:13:39

8     quite a few movements by you.                       10:13:43

9              After that, sir, what did you do?           10:13:45

10        A    I was a detective in what was then called   10:13:47

11    the Special Investigations Bureau, prison gang      10:13:50

12    section.                                            10:13:56

13        Q    And how long were you in that role?         10:13:58

14        A    About three years.                          10:14:03

15        Q    What does that division refer to now or     10:14:06

16    does it no longer exist?                            10:14:08

17        A    That -- that bureau is now called Major     10:14:10

18    Crimes Bureau.                                      10:14:13

19        Q    Okay.  And then after your three years      10:14:20

20    there what did you do?                              10:14:22

21        A    I promoted to another rank in the detective 10:14:25

22    classification and I went to Homicide Bureau.       10:14:29

23        Q    Okay.  How long were you there?             10:14:31

24        A    24 years, almost 25 years.                  10:14:37

25        Q    So that takes us to when in your timeline?  10:14:43
```

Page 16

| | | | |
|---|---|---|---|
| 1 | A | August 10th, 2016. | 10:14:46 |
| 2 | Q | That's a long time on homicide. | 10:14:53 |
| 3 | A | Yes, sir. | 10:14:55 |
| 4 | Q | Okay.  So after the -- after August 10th, | 10:15:00 |
| 5 | 2016, you leave Homicide Bureau and do what? | | 10:15:03 |
| 6 | A | Well, I was retired.  I was hired | 10:15:08 |
| 7 | subsequent to that by the then-elected District | | 10:15:13 |
| 8 | Attorney Jackie Lacey, and I worked as a civilian | | 10:15:17 |
| 9 | contract investigator in what was then called the | | 10:15:21 |
| 10 | Conviction Review Unit of the Appellate Division. | | 10:15:26 |
| 11 | Q | And generally what does that unit do? | 10:15:37 |
| 12 | A | It reviews convictions that are | 10:15:38 |
| 13 | questionable or new evidence has come to light.  It | | 10:15:44 |
| 14 | is associated with the Habeas Litigation Unit, and | | 10:15:49 |
| 15 | it investigates claims of innocence by convicted | | 10:15:53 |
| 16 | people. | | 10:15:57 |
| 17 | Q | I see. | 10:15:59 |
| 18 | | And was that a full-time position? | 10:16:00 |
| 19 | A | It was at the time, yes.  It was a contract | 10:16:04 |
| 20 | position but, yes. | | 10:16:06 |
| 21 | Q | Okay.  So at that time, you were retired | 10:16:07 |
| 22 | from the Sheriff's Department, right? | | 10:16:15 |
| 23 | A | That is correct. | 10:16:16 |
| 24 | Q | Okay.  And how long did you do that? | 10:16:23 |
| 25 | A | About a year and a half. | 10:16:26 |

Page 17

| | | |
|---|---|---|
| 1 | Q    So then we get to, what, 2018? | 10:16:31 |
| 2 | A    Roughly, yes. | 10:16:36 |
| 3 | Q    Okay.  And then what happens in your | 10:16:38 |
| 4 | career? | 10:16:41 |
| 5 | A    In 2018, Alex Villanueva was elected | 10:16:46 |
| 6 | sheriff, and I had met him through a mutual friend. | 10:16:50 |
| 7 | And in 2019, I hired back on the Sheriff's | 10:16:54 |
| 8 | Department as a part-time detective, what they call | 10:17:01 |
| 9 | a 120-day employee, as those employees are limited | 10:17:06 |
| 10 | in the number of hours they can work per year | 10:17:10 |
| 11 | without affecting their pension. | 10:17:14 |
| 12 | Q    I see. | 10:17:16 |
| 13 | And what was your position -- I guess -- | 10:17:21 |
| 14 | let me rephrase that. | 10:17:25 |
| 15 | You were hired on as a detective, right? | 10:17:27 |
| 16 | A    Yes. | 10:17:31 |
| 17 | Q    And what sort of things would you be | 10:17:32 |
| 18 | investigating? | 10:17:35 |
| 19 | A    Allegations of public corruption. | 10:17:37 |
| 20 | Q    Was this a new -- what would you call it? | 10:17:48 |
| 21 | Is it a task force or a -- what would you call it? | 10:17:51 |
| 22 | A    I would not call it a task force.  It was a | 10:17:54 |
| 23 | newly formed unit that I was assigned to help create | 10:17:56 |
| 24 | and manage. | 10:18:06 |
| 25 | Q    Do you know how many members of the unit | 10:18:11 |

Page 18

```
 1      there were?                                        10:18:13

 2          A    The highest number, I believe, was eight 10:18:15

 3      detectives and a lieutenant.                       10:18:18

 4          Q    And is this just one of the things you were 10:18:31

 5      doing, or was this the only thing you were doing?  10:18:32

 6          A    That was primarily the only thing I was   10:18:35

 7      doing.                                             10:18:36

 8          Q    And how much time was that taking?        10:18:37

 9          A    Again, it was -- you know, I was limited to 10:18:39

10      20 hours a week or 960 hours in a 12-month period, 10:18:42

11      so it varied.  I mean, some weeks I would work 40 or 10:18:47

12      50 hours and then not work for a couple weeks.  So 10:18:51

13      it varied so that I could fulfill those time       10:18:53

14      limitations.                                       10:18:56

15          Q    Right.                                    10:18:56

16               Were you the head of this unit?           10:19:01

17          A    I was not.                                10:19:03

18          Q    Who was the head of the unit?             10:19:04

19          A    The lieutenant in charge of the unit.     10:19:06

20          Q    And who was that?                         10:19:09

21          A    There were two of them.  The first        10:19:10

22      lieutenant was Glenn Walsh.  Glenn is G-l-e-n-n.   10:19:12

23      And the second lieutenant was Andy Myers.  And Myers 10:19:21

24      is M-e-y-e-r-s.                                    10:19:27

25          Q    So were you reporting to the lieutenants? 10:19:40
```

Page 19

| | | |
|---|---|---|
| 1 | A    Yes. | 10:19:43 |
| 2 | Q    Did you have direct reports to you? | 10:19:45 |
| 3 | A    I'm sorry? | 10:19:48 |
| 4 | Q    Did you have direct -- did you have people | 10:19:49 |
| 5 | directly reporting to you? | 10:19:51 |
| 6 | A    No.  Not reporting to me, no. | 10:19:52 |
| 7 | Q    And then how long were you on this -- part | 10:20:15 |
| 8 | of this unit? | 10:20:18 |
| 9 | A    From July of 2019 until January of 202' -- | 10:20:20 |
| 10 | give me one second -- '23. | 10:20:33 |
| 11 | Q    And why did you leave? | 10:20:40 |
| 12 | A    A new sheriff was elected and he disbanded | 10:20:43 |
| 13 | the unit.  Because I was a hire-back employee, I was | 10:20:45 |
| 14 | an at-will employee, so he thanked me for my service | 10:20:49 |
| 15 | and told me it was no longer needed. | 10:20:53 |
| 16 | Q    Sheriff Luna? | 10:20:56 |
| 17 | A    That is correct. | 10:20:58 |
| 18 | Q    Uh-huh. | 10:20:59 |
| 19 |      While you were a part of this unit, do you | 10:21:00 |
| 20 | recall any -- well, what did you call -- anybody who | 10:21:07 |
| 21 | was being investigated, what did you call them? | 10:21:11 |
| 22 | Subject? | 10:21:13 |
| 23 | A    No.  If there was an allegation of criminal | 10:21:15 |
| 24 | conduct against a particular person, they're | 10:21:18 |
| 25 | suspects of a crime. | 10:21:22 |

Page 20

| 1 | Q     Okay.  So what was the process?  Was | 10:21:23 |
| 2 | there -- would there be an intake for getting | 10:21:31 |
| 3 | complaints about a particular kind of crime and it | 10:21:34 |
| 4 | would get reported to your unit? | 10:21:36 |
| 5 | A     Yes. | 10:21:38 |
| 6 | Q     And it was related to public corruption | 10:21:40 |
| 7 | specifically? | 10:21:43 |
| 8 | A     Yes. | 10:21:43 |
| 9 | Q     Do you recall any of the suspects that you | 10:21:48 |
| 10 | investigated while you were there? | 10:21:50 |
| 11 | A     Yes. | 10:21:53 |
| 12 | Q     Which ones? | 10:21:54 |
| 13 | A     I apologize.  A number of them, I can't | 10:22:00 |
| 14 | identify by name.  A number of them, I can't | 10:22:04 |
| 15 | identify my name. | 10:22:07 |
| 16 | There was a number of people in government | 10:22:19 |
| 17 | who were accused of wrongdoing.  One of them was an | 10:22:21 |
| 18 | executive on the Sheriff's Department who had | 10:22:26 |
| 19 | retired and he was accused of perjuring himself | 10:22:28 |
| 20 | during a civil service hearing. | 10:22:32 |
| 21 | And then there was a allegation of theft | 10:22:34 |
| 22 | from a employee working for the City of Carson in | 10:22:38 |
| 23 | the Maintenance Department, I believe. | 10:22:43 |
| 24 | There was an allegation of wrongdoing -- | 10:22:45 |
| 25 | criminal wrongdoing on the part of a firefighter | 10:22:47 |

Page 21

| | | |
|---|---|---|
| 1 | from a smaller incorporated city within Los Angeles | 10:22:51 |
| 2 | County.  I apologize.  I don't even remember the | 10:22:54 |
| 3 | city.  It was somewhere in the San Gabriel Valley. | 10:22:57 |
| 4 | And then there were other cases of | 10:23:00 |
| 5 | wrongdoing, criminal wrongdoing, which is why we're | 10:23:03 |
| 6 | here today, obviously, from the former | 10:23:06 |
| 7 | constitutional police advisor, the inspector | 10:23:10 |
| 8 | general, an L.A. Times reporter, another attorney, a | 10:23:18 |
| 9 | deputy inspector general, and then a Sheriff's | 10:23:23 |
| 10 | Department civilian employee that worked for the | 10:23:27 |
| 11 | constitutional police advisor. | 10:23:30 |
| 12 | And there were -- there were miscellaneous | 10:23:32 |
| 13 | other criminal open active cases that were assigned | 10:23:35 |
| 14 | to that unit that I didn't necessarily handle on a | 10:23:42 |
| 15 | personal level but I was aware of them. | 10:23:46 |
| 16 | Q    Was Max Huntsman one of the ones that were | 10:23:49 |
| 17 | investigated? | 10:23:53 |
| 18 | A    Yes. | 10:23:53 |
| 19 | Q    Okay.  Did you have personal involvement in | 10:23:54 |
| 20 | that? | 10:23:55 |
| 21 | A    Yes. | 10:23:55 |
| 22 | Q    Do you recall how that case came to your | 10:23:56 |
| 23 | unit? | 10:23:58 |
| 24 | A    Yes. | 10:23:59 |
| 25 | Q    How did it come to your unit? | 10:23:59 |

Page  22

| | | |
|---|---|---|
| 1 | A    A number of citizens and government | 10:24:03 |
| 2 | employees had complained to the then-candidate | 10:24:09 |
| 3 | Alex Villanueva regarding what they believed to be | 10:24:14 |
| 4 | criminal conduct. | 10:24:19 |
| 5 |     I believe at some point in time after the | 10:24:21 |
| 6 | election and after Alex Villanueva was sworn in as | 10:24:25 |
| 7 | the sheriff of Los Angeles County, an audit was | 10:24:27 |
| 8 | conducted of databases containing personnel records, | 10:24:32 |
| 9 | and it was during that audit that it was revealed | 10:24:39 |
| 10 | that a large number of personnel records were | 10:24:42 |
| 11 | downloaded from a secured database onto a external | 10:24:46 |
| 12 | hard drive, I believe. | 10:24:50 |
| 13 |     And so that -- because they were protected | 10:24:52 |
| 14 | under the Penal Code, that -- that audit initiated a | 10:24:55 |
| 15 | criminal investigation of the theft of these files. | 10:25:02 |
| 16 | Q    And then what did you do to get that | 10:25:09 |
| 17 | investigation going, personally? | 10:25:11 |
| 18 | A    I did a bunch of interviews, I collected as | 10:25:13 |
| 19 | much evidence as I could that was available, and, | 10:25:17 |
| 20 | you know, went down the path to determine what, if | 10:25:21 |
| 21 | any, crime had occurred and what evidence would be | 10:25:24 |
| 22 | available to prove or disprove that the crime | 10:25:27 |
| 23 | occurred. | 10:25:30 |
| 24 | Q    Do you know what the results of the | 10:25:31 |
| 25 | Huntsman was, specifically? | 10:25:32 |

Page 23

```
 1        A    Yes.                                      10:25:36

 2        Q    What was the result?                      10:25:36

 3        A    Mr. Huntsman would be a unindicted        10:25:41

 4   co-conspirator in a case that is currently being    10:25:44

 5   prosecuted by the Attorney General of California     10:25:48

 6   under the notation or the heading of the People     10:25:51

 7   versus Diana Marie Teran, T-e-r-a-n.                10:25:55

 8        Q    So charges were filed against her, right? 10:26:03

 9        A    That's correct.                           10:26:06

10        Q    Were -- charges were not filed against    10:26:08

11   Mr. Huntsman, right?                                10:26:10

12        A    That is correct.                          10:26:11

13        Q    Had you provided any recommendation or    10:26:13

14   suggestion that there should be charges filed       10:26:15

15   against Mr. Huntsman?                               10:26:17

16        A    I did not.  I presented that case to the  10:26:18

17   California Attorney General, and subsequently those 10:26:21

18   charges were filed.                                 10:26:27

19        Q    When you say "those charges were filed,"  10:26:31

20   the ones against Ms. Teran, right?                  10:26:32

21        A    That is correct.                          10:26:37

22        Q    But not against Mr. Huntsman?             10:26:37

23        A    That is correct.                          10:26:40

24        Q    How about Esther Lim, did you do any kind 10:26:40

25   of -- wait, I always get her name wrong.            10:26:43
```

                                                    Page 24

| 1 | | Do you know who Esther Lim is? | 10:26:43 |
|---|---|---|---|

```
 1              Do you know who Esther Lim is?           10:26:43

 2       A    I know the name.  I don't know the woman,   10:26:45

 3    and...                                              10:26:47

 4       Q    It is Esther, though, right?               10:26:48

 5       A    I believe so, yes.                         10:26:50

 6       Q    I spent a deposition calling her Edith Lim 10:26:51

 7    the whole time, so they kept reminding me.          10:26:55

 8              So did you do any -- were you personally  10:26:57

 9    involved in any investigation of her?              10:26:59

10       A    I was not.                                 10:27:01

11       Q    Okay.  Are you aware of any sort of        10:27:01

12    complaint being filed with respect to her?          10:27:04

13       A    I am not.                                   10:27:05

14       Q    Okay.  Have you met Max Huntsman in person? 10:27:06

15       A    I never have.  I have never shook his hand. 10:27:09

16    I've been in the same room with him.  I've never    10:27:13

17    been introduced to him, no.                         10:27:15

18       Q    Is that the same for Esther Lim?           10:27:17

19       A    Absolutely.                                10:27:20

20              Actually, no.  I've never -- I don't think 10:27:21

21    I've ever seen her in person even.                  10:27:24

22       Q    Okay.  So getting back to -- you said you   10:27:26

23    met Mr. Villanueva through a friend.                10:27:44

24              Who was the friend?                       10:27:47

25       A    Attorney Michael Goldfeder,                10:27:51
```

Page 25

```
 1    G-o-l-d-f-e-d-e-r.                                  10:27:53

 2        Q    And so how did you -- well, how did that  10:28:00

 3    come -- you already knew Mike Goldfeder?           10:28:03

 4        A    Yes.                                       10:28:06

 5        Q    Okay.  And he introduced you to           10:28:06

 6    Mr. Villanueva?                                     10:28:09

 7        A    That's correct.                            10:28:09

 8        Q    Okay.  You had not met -- your paths had  10:28:10

 9    not -- what year was that?                          10:28:15

10        A    2018.                                      10:28:17

11        Q    By that time, was Mr. Villanueva already  10:28:22

12    elected as sheriff?                                 10:28:30

13        A    He was not.                                10:28:31

14        Q    Had he announced that he was running,     10:28:34

15    though?                                             10:28:36

16        A    He was a candidate, yes.                   10:28:36

17        Q    And do you know the purpose for your      10:28:40

18    introduction to Mr. Villanueva by Mr. Goldfeder?   10:28:42

19        A    Yes.                                       10:28:45

20        Q    What was the reason?                       10:28:46

21        A    To discuss the viability of hiring me back 10:28:48

22    on the Sheriff's Department as a part-time         10:28:55

23    detective.                                          10:28:57

24        Q    Is Michael Goldfeder your personal        10:29:04

25    attorney?                                           10:29:06
```

Page 26

```
1        A    He is not.                                   10:29:07

2        Q    Okay.  Does he work for the County?          10:29:07

3        A    He does not.                                 10:29:09

4        Q    Do you know who he works for?                10:29:11

5        A    I do not.                                     10:29:12

6        Q    Do you know if he practices criminal law or  10:29:16

7   civil law?                                              10:29:18

8        A    I believe both.                               10:29:19

9        Q    Okay.  And so did Mr. Goldfeder contact you  10:29:20

10   by phone and say "I think I'd like you to meet         10:29:25

11   Alex Villanueva"?                                      10:29:28

12       A    Yes.                                          10:29:29

13       Q    Okay.  And was your first contact with        10:29:29

14   Mr. Villanueva by phone?                               10:29:32

15       A    No.  I met him in person.                     10:29:35

16       Q    Okay.  So you had never bumped into him all   10:29:37

17   those years on the force?                              10:29:41

18       A    I don't believe so, no.                       10:29:42

19       Q    Do you consider Alex Villanueva a friend?     10:29:54

20       A    No.  I'm friendly with him.  I've never --    10:29:58

21   I don't know that I've ever had a Coca-Cola or a cup   10:30:02

22   of coffee with him.                                    10:30:05

23       Q    Okay.                                         10:30:06

24       A    But I'm friendly with him.                    10:30:08

25       Q    When is the last time you talked to him?      10:30:11
```

Page 27

| | | |
|---|---|---|
| 1 | A    In person was probably a couple of -- you | 10:30:16 |
| 2 | know, about six months ago, I spoke to him briefly | 10:30:24 |
| 3 | at a funeral service. | 10:30:26 |
| 4 | Q    And then when is the last time you talked | 10:30:39 |
| 5 | to him on the phone? | 10:30:41 |
| 6 | A    I would guess at least a year or more. | 10:30:46 |
| 7 | Q    Okay.  Has he ever discussed this lawsuit | 10:30:54 |
| 8 | with you? | 10:30:55 |
| 9 | A    No. | 10:30:56 |
| 10 | Q    Okay. | 10:30:56 |
| 11 | A    I wasn't aware of this lawsuit until I was | 10:30:58 |
| 12 | subpoenaed for it. | 10:31:00 |
| 13 | Q    Okay.  Did you do any work to figure out | 10:31:01 |
| 14 | what's at issue in this case? | 10:31:06 |
| 15 | A    Not a thing. | 10:31:08 |
| 16 | Q    The less you know the better, right? | 10:31:08 |
| 17 | A    No.  I just -- it's not that I don't -- | 10:31:10 |
| 18 | I mean, I care.  It's just I'm not a party to the | 10:31:15 |
| 19 | suit, so the answer is no. | 10:31:20 |
| 20 | Q    Okay.  So when's the last time -- or have | 10:31:26 |
| 21 | you ever got lunch or dinner with Mr. Villanueva? | 10:31:29 |
| 22 | A    Never. | 10:31:31 |
| 23 | Q    Has he ever invited you to a party? | 10:31:34 |
| 24 | A    Yes.  I believe it was a -- I believe it | 10:31:41 |
| 25 | was a birthday celebration.  And it was at a | 10:31:47 |

Page 28

| | | |
|---|---|---|
| 1 | restaurant/bar in East Los Angeles on Olympic.  And | 10:31:51 |
| 2 | I attended that, and that was about -- that had to | 10:32:03 |
| 3 | be around 2019 or something. | 10:32:07 |
| 4 | Q    Okay.  Do you know his family? | 10:32:08 |
| 5 | A    I've met his wife a couple of times. | 10:32:14 |
| 6 | I cannot remember her first name, to be honest with | 10:32:19 |
| 7 | you. | 10:32:22 |
| 8 | Q    Okay. | 10:32:22 |
| 9 | A    Vivian. | 10:32:25 |
| 10 | Q    Nice.  Well done. | 10:32:27 |
| 11 | Do you exchange text messages with | 10:32:34 |
| 12 | Mr. Villanueva? | 10:32:36 |
| 13 | A    Not now, no.  I did during the course and | 10:32:37 |
| 14 | scope of my employment when I was working as a | 10:32:40 |
| 15 | deputy sheriff and I had a County cell phone, yes. | 10:32:42 |
| 16 | Q    You don't have that cell phone anymore? | 10:32:46 |
| 17 | A    I do not. | 10:32:48 |
| 18 | Q    Do you know John Satterfield? | 10:32:57 |
| 19 | A    Yes. | 10:33:00 |
| 20 | Q    When's the last time you talked to | 10:33:01 |
| 21 | John Satterfield? | 10:33:03 |
| 22 | A    Before the election of Robert Luna which | 10:33:09 |
| 23 | was in, I believe, November of -- again, my | 10:33:14 |
| 24 | apologies, November of '23.  So it was before that, | 10:33:16 |
| 25 | the last time I spoke with him. | 10:33:20 |

Page 29

| | | |
|---|---|---|
| 1 | Q    Then how about Tim Murakami, | 10:33:35 |
| 2 | M-u-r-a-k-a-m-i, have you talked to him in the past? | 10:33:39 |
| 3 | A    I spoke to him about five or six months | 10:33:44 |
| 4 | ago. | 10:33:47 |
| 5 | Q    What was the substance of that discussion? | 10:33:49 |
| 6 | A    That's a great question.  And it was not | 10:33:52 |
| 7 | work-related.  It was -- I want to say it had to do | 10:33:54 |
| 8 | with Hawaii. | 10:33:59 |
| 9 | Q    Okay. | 10:34:00 |
| 10 | A    And I really -- I really don't recall. | 10:34:00 |
| 11 | Q    Okay.  It didn't have anything to do with | 10:34:03 |
| 12 | this lawsuit? | 10:34:07 |
| 13 | A    No. | 10:34:07 |
| 14 | I think I can add to that, which of course | 10:34:14 |
| 15 | I shouldn't, but I will.  I believe he and I texted | 10:34:18 |
| 16 | each other maybe a month or two ago regarding this | 10:34:21 |
| 17 | lawsuit regarding getting representation, and he was | 10:34:24 |
| 18 | almost as pissed off as I was that he wasn't able to | 10:34:27 |
| 19 | get counsel to represent him. | 10:34:30 |
| 20 | Q    Okay.  So he didn't talk to you after his | 10:34:43 |
| 21 | deposition which happened in the past -- | 10:34:46 |
| 22 | A    No. | 10:34:49 |
| 23 | Q    -- couple weeks? | 10:34:50 |
| 24 | A    No. | 10:34:51 |
| 25 | Q    So while you were -- the Public Corruptions | 10:34:54 |

Page 30

```
1    Unit?                                              10:35:04

2        A    Yes.                                      10:35:06

3        Q    You know what I'm saying when I talk -- you  10:35:06

4    know what I'm referring to --                      10:35:07

5        A    That's correct.  That's the right term.   10:35:08

6        Q    How often were you interacting directly    10:35:11

7    with Sheriff -- with the sheriff, Villanueva?      10:35:12

8        A    Very rarely.  I would see him moderately   10:35:17

9    often.  And defining that would be, you know, maybe 10:35:24

10   once every two weeks I would see him in the hallway 10:35:28

11   or run into him.  But I had very, very minimal      10:35:31

12   interactions with him regarding my work at that --  10:35:36

13   at the unit.                                        10:35:37

14          The first thing I did when I got there was   10:35:41

15   drafted a letter for him to sign recusing himself   10:35:47

16   from all of the criminal inquiries and appointing,  10:35:53

17   for the limited purpose of those criminal           10:35:56

18   investigations, the undersheriff as the person to be 10:35:59

19   the decision-maker regarding final decisions on     10:36:04

20   those things so that he was recused from those      10:36:07

21   things.                                             10:36:09

22          So we stuck to that pretty religiously and   10:36:10

23   never really spoke about the criminal              10:36:15

24   investigations.                                     10:36:18

25       Q    And was the undersheriff at the time of    10:36:24
```

Page 31

| | | |
|---|---|---|
| 1 | that delegation, was that Tim Murakami? | 10:36:27 |
| 2 | A    No.  It was Ray, and I think it's R-e-y, | 10:36:30 |
| 3 | Leyva, L-e-y-v-a. | 10:36:36 |
| 4 | Q    And he wasn't undersheriff for too long, | 10:36:40 |
| 5 | though, right? | 10:36:43 |
| 6 | A    Correct. | 10:36:44 |
| 7 | Q    Yeah. | 10:36:45 |
| 8 | Did you have any discussions with anybody | 10:36:46 |
| 9 | about his replacement or his being replaced as | 10:36:47 |
| 10 | undersheriff? | 10:36:52 |
| 11 | A    Leyva's? | 10:36:53 |
| 12 | Q    Yeah. | 10:36:55 |
| 13 | A    No. | 10:36:55 |
| 14 | If I could expound on that, it might save | 10:37:01 |
| 15 | you some grief with your future questions. | 10:37:03 |
| 16 | There are nine ranks in the Sheriff's | 10:37:06 |
| 17 | Department.  I can't tell you how low my rank was | 10:37:07 |
| 18 | but it was curb level, and the elected sheriff, of | 10:37:09 |
| 19 | course, is the highest rank. | 10:37:12 |
| 20 | So the interaction between those two ranks | 10:37:14 |
| 21 | is pretty limited, if that will help you formulate | 10:37:16 |
| 22 | your questions regarding me giving advice or input | 10:37:19 |
| 23 | or guidance into at least those kinds of decisions. | 10:37:22 |
| 24 | Q    Uh-huh.  I appreciate that. | 10:37:26 |
| 25 | Going back to the -- revert back to your | 10:37:27 |

Page 32

| | | |
|---|---|---|
| 1 | timeline real quick.  I probably lost track.  I was | 10:37:34 |
| 2 | trying to take notes on this.  Let me play a little | 10:37:37 |
| 3 | catch-up. | 10:37:40 |
| 4 | So you were hired back on in 2018. | 10:37:41 |
| 5 | A    2019. | 10:37:45 |
| 6 | Q    2019. | 10:37:46 |
| 7 | Right.  Because he wins the election in | 10:37:51 |
| 8 | November of '18, and then he starts being sheriff, | 10:37:54 |
| 9 | like, somewhere in December of '18? | 10:37:56 |
| 10 | A    Correct. | 10:37:58 |
| 11 | Q    Okay.  And then you're contacted in 2019? | 10:37:58 |
| 12 | A    Well, in order to get rehired, I had to go | 10:38:03 |
| 13 | through the entire hiring process again. | 10:38:05 |
| 14 | Q    Right. | 10:38:07 |
| 15 | Was this first idea of you being rehired | 10:38:09 |
| 16 | was a conversation that was set up by the | 10:38:12 |
| 17 | attorney -- I've forgotten his name -- Michael and | 10:38:15 |
| 18 | you and Mr. -- and the sheriff? | 10:38:20 |
| 19 | A    That's correct. | 10:38:23 |
| 20 | Q    Okay.  And did the sheriff explain that he | 10:38:24 |
| 21 | was starting a new unit and wanted some help with | 10:38:27 |
| 22 | it? | 10:38:30 |
| 23 | A    He explained that during the campaign, he | 10:38:30 |
| 24 | was approached repeatedly by attorneys, media, | 10:38:33 |
| 25 | citizens, the electorate about -- about public | 10:38:36 |

Page 33

```
 1    corruption in Los Angeles.                            10:38:41

 2          And when I had the meeting with him, that's     10:38:43

 3    what he explained, and he wanted -- he was a little   10:38:45

 4    bit unaware of how public corruption investigations   10:38:48

 5    occurred in Los Angeles County.                       10:38:52

 6          I, at one time, worked on loan to the FBI       10:38:54

 7    in a Public Corruption Unit.  He knew that I had      10:38:57

 8    that experience, and so that was really the primary   10:39:00

 9    purpose of the meeting.  I don't even know -- and I   10:39:04

10    can't recall if at that time during that meeting he   10:39:06

11    had in his head the idea to form, within the          10:39:09

12    Sheriff's Department, a Public Corruption Unit.       10:39:14

13       Q    I see.                                        10:39:16

14          Okay.  So you were kind of on the ground        10:39:18

15    floor starting this?                                  10:39:19

16       A    Yes, sir.                                     10:39:21

17       Q    Okay.  And -- sorry.  I had a question that   10:39:21

18    popped in my head, and it's -- it will come back.     10:39:33

19          Have you had any discussions with               10:39:44

20    Mr. Villanueva about him being designated "Do Not     10:39:46

21    Rehire"?                                              10:39:51

22       A    I have not.                                   10:39:53

23       Q    So he's never talked to you about any         10:39:57

24    emotional distress that he might be suffering         10:39:59

25    because of being designated "Do Not Rehire"?          10:40:01
```

Page 34

```
 1        A    He has not.                               10:40:04

 2        Q    Oh, so do you know, when a -- going back to   10:40:16

 3   this initial meeting with the sheriff, did he       10:40:20

 4   mention to you how your name came up or how -- how  10:40:26

 5   it arose that he wanted to talk to you?             10:40:29

 6        A    I believe Mr. Goldfeder and Villanueva were  10:40:32

 7   friends, and I believe that's how it came up.       10:40:37

 8        Q    Oh, okay.  So he was discussing the idea of  10:40:41

 9   this public corruptions issue, and then            10:40:43

10   Mr. Goldfeder felt you were a good person to talk   10:40:47

11   to?                                                10:40:51

12        A    I believe that's accurate.  I don't know   10:40:54

13   that for a fact, but yes, I believe that's accurate.  10:40:55

14        Q    Okay.  So you're doing work on this Public  10:40:59

15   Corruptions -- Public Corruption Unit, and then how  10:41:08

16   long do you do that?                               10:41:12

17        A    From July of '19 until January of '24 --   10:41:14

18   I'm sorry.  Is it '24?                             10:41:24

19        Q    I think it's '23.                         10:41:26

20        A    I apologize.  I just don't -- whenever     10:41:27

21   Robert Luna was sworn -- he was sworn in            10:41:30

22   December '23, yes, so it was January of '24 that --  10:41:32

23   when I ended my service.                            10:41:34

24        Q    Let's make sure we're right, because I     10:41:37

25   think the election year is '22.                     10:41:38
```

Page 35

| | | |
|---|---|---|
| 1 | A    You know what, then I'm screwed up by a | 10:41:41 |
| 2 | year and I apologize. | 10:41:44 |
| 3 | Then if Robert Luna was elected in '22, | 10:41:45 |
| 4 | I left County service in January of '23.  That | 10:41:48 |
| 5 | sounds right. | 10:41:51 |
| 6 | Q    And I think I -- I apologize, because you | 10:41:51 |
| 7 | actually did say January '23 before. | 10:41:53 |
| 8 | So after January '23, what do you do next? | 10:41:55 |
| 9 | A    In my life? | 10:41:58 |
| 10 | Q    In your career, I guess. | 10:41:59 |
| 11 | A    Oh, essentially, none of your business. | 10:42:01 |
| 12 | Q    Well, you were doing some work with | 10:42:07 |
| 13 | South Pasadena? | 10:42:09 |
| 14 | A    I was. | 10:42:10 |
| 15 | Q    What were you doing there? | 10:42:11 |
| 16 | A    Again, I'm not going to answer that -- | 10:42:11 |
| 17 | Q    You're not going to answer. | 10:42:14 |
| 18 | A    -- Brian. | 10:42:21 |
| 19 | Q    Do you know if you have any kind of "Do Not | 10:42:25 |
| 20 | Rehire" designation from the County? | 10:42:27 |
| 21 | A    I am unaware. | 10:42:30 |
| 22 | Q    Unaware. | 10:42:31 |
| 23 | This is actually previously marked | 10:42:48 |
| 24 | Exhibit 20.  This was marked at Sheriff Villanueva's | 10:42:49 |
| 25 | deposition. | 10:42:59 |

Page 36

```
 1              You're entitled to read the whole thing if      10:43:01

 2     you like.                                                10:43:03

 3        A    Thank you.                                       10:43:04

 4        Q    But do you recognize this article at all?        10:43:04

 5        A    I don't.                                         10:43:08

 6        Q    Okay.  And just for the record, it's an          10:43:09

 7     April 1st, 2022 L.A. Times article.                      10:43:11

 8              And on the second page, there's a second        10:43:17

 9     paragraph.                                               10:43:20

10        A    Yes, sir.                                        10:43:22

11              MR. NEACH:  Do you want a copy, Alex?            10:43:23

12              MR. DI BONA:  Yes, please.                      10:43:25

13              MR. NEACH:  Okay.                                10:43:29

14              I've lost track of it.                          10:43:29

15     BY MR. NEACH:                                            10:43:35

16        Q    The second page, second paragraph, it            10:43:35

17     says -- it's talking about an interview with the         10:43:37

18     sheriff.  And it said "The interview itself was even     10:43:39

19     odder, most notably for the out-of-nowhere               10:43:42

20     evidence-free assertion that county Inspector            10:43:44

21     General Max Huntsman is a Holocaust denier."             10:43:46

22              Did you have any discussions at the time        10:43:51

23     with the sheriff or anybody else about Max Huntsman      10:43:52

24     being an Holocaust denier?                               10:43:55

25        A    I truly do not recall that.                      10:43:59
```

Page 37

```
 1              I would very much intentionally, like          10:44:06

 2     I just testified to previously, keep him out of the     10:44:09

 3     loop.  And the gist of our conversations, "our"         10:44:12

 4     meaning mine and Villanueva's conversations, were       10:44:15

 5     quite frequently about dogs and baseball and, you       10:44:18

 6     know, happenings in, you know, the news and stuff       10:44:21

 7     like that.                                              10:44:24

 8              I never spoke to him about the criminal         10:44:25

 9     investigations on purpose so that if and when the      10:44:27

10     time came that I was under oath during a criminal      10:44:30

11     proceeding, I could truthfully testify that he         10:44:33

12     didn't direct me to do anything and he had no          10:44:36

13     bearing on the decision-making.                        10:44:39

14              And hopefully this will save you some          10:44:43

15     questions here.  It's possible -- and, again,          10:44:45

16     I don't have a clear memory of it -- that in some      10:44:49

17     setting I had mentioned that directly to him.          10:44:52

18              I don't have a clear recollection of doing     10:44:57

19     that.  It is -- it is my memory -- and I could be      10:44:58

20     wrong, but it is my memory that I mentioned this to    10:45:04

21     the undersheriff, Timothy Murakami, and/or the chief   10:45:09

22     of staff --                                            10:45:13

23              Now I'm drawing a blank.                       10:45:16

24        Q    John Satterfield.                              10:45:19

25        A    Thank you.  Yes.                               10:45:20
```

Page 38

```
 1        Q     Satterfield, S-a-t-t-e-r --              10:45:20

 2        A     And that they then imparted it to the    10:45:21

 3   sheriff.                                            10:45:24

 4        It is also possible -- because this            10:45:24

 5   information has zero bearing on a criminal inquiry,  10:45:28

 6   or at least on my criminal inquiry, it is possible  10:45:31

 7   that I mentioned it directly to the sheriff as a    10:45:33

 8   thing of interest or -- or a thing of in passing    10:45:37

 9   type thing, because it had no bearing on any        10:45:42

10   elements of a crime being committed.                10:45:44

11        I simply do not have a clear recollection      10:45:46

12   of actually having that direct conversation with the 10:45:50

13   sheriff.  And in the subpoena, there's a reference  10:45:53

14   to one of the -- here, I'm rambling, not answering  10:45:57

15   your question directly.                             10:46:03

16        But in the subpoena, there's a reference       10:46:04

17   to -- to an actual meeting between the sheriff,     10:46:05

18   myself, the undersheriff, Murakami, and Satterfield. 10:46:09

19   And I don't have a clear recollection of that.      10:46:17

20        There were occasions when the four of us       10:46:19

21   would be together in a room.  It was pretty rare,   10:46:21

22   pretty unusual.  Again, I am the lowest rank on the 10:46:24

23   department and you're talking about the No. 1, the  10:46:27

24   No. 2 and then the No. 1's aide, who was a five or a 10:46:29

25   six rank above me.  And I just didn't deal with     10:46:35
```

Page 39

| | | |
|---|---|---|
| 1 | those people of that rank that often. | 10:46:38 |
| 2 | Q    Uh-huh. | 10:46:41 |
| 3 | A    And I hope that helps you frame some other | 10:46:41 |
| 4 | questions. | 10:46:44 |
| 5 | Q    It does. | 10:46:45 |
| 6 | A    Good. | 10:46:45 |
| 7 | Q    I just want to make sure I -- because, you | 10:46:47 |
| 8 | know, what we always got to make sure is that we | 10:46:48 |
| 9 | cover kind of all the pieces, because if it comes | 10:46:51 |
| 10 | back at trial and if you have to testify at trial, | 10:46:54 |
| 11 | we don't hear something that's going to surprise us. | 10:46:56 |
| 12 | A    I understand. | 10:46:58 |
| 13 | Q    So let me just start that -- so to the | 10:46:59 |
| 14 | extent you have any kind of memory of a conversation | 10:47:02 |
| 15 | with any one of those three individuals, the | 10:47:06 |
| 16 | sheriff, undersheriff or chief of staff, do you | 10:47:09 |
| 17 | recall at all where that conversation may have | 10:47:11 |
| 18 | happened? | 10:47:14 |
| 19 | A    I don't.  I don't.  I'm sorry. | 10:47:19 |
| 20 | Q    You don't have to apologize, sir.  Just to | 10:47:24 |
| 21 | the best of your recollection. | 10:47:26 |
| 22 | And -- well, let me ask it this way:  To | 10:47:27 |
| 23 | the extent you met with any of those three | 10:47:30 |
| 24 | individuals, whether it was one or at any particular | 10:47:32 |
| 25 | time, it sounds like it wasn't that much, but where | 10:47:37 |

Page  40

| | | |
|---|---|---|
| 1 | would those meetings tend to take place? | 10:47:39 |
| 2 | A    They're very limited where we'd all be | 10:47:44 |
| 3 | together in the same room at the same place.  I can | 10:47:46 |
| 4 | remember once or twice being in the undersheriff's | 10:47:49 |
| 5 | office with both the undersheriff and | 10:47:52 |
| 6 | Commander Satterfield. | 10:47:57 |
| 7 |         And I can remember once or twice being | 10:47:58 |
| 8 | in -- I think they call it the executive conference | 10:48:03 |
| 9 | room or the -- there's a -- there's a -- next to the | 10:48:06 |
| 10 | sheriff's office is a small conference room with a | 10:48:09 |
| 11 | table and chairs for maybe eight or ten people, and | 10:48:12 |
| 12 | I remember being in that room, at least once and | 10:48:17 |
| 13 | maybe twice, with the undersheriff and the | 10:48:19 |
| 14 | commander. | 10:48:23 |
| 15 | Q    There is a name for it, and I've forgotten | 10:48:25 |
| 16 | what it was. | 10:48:27 |
| 17 | A    Sometimes they call it the sheriff's | 10:48:28 |
| 18 | library, I believe -- | 10:48:29 |
| 19 | Q    The library is what it is. | 10:48:30 |
| 20 | A    -- but there's not a damn book in sight. | 10:48:32 |
| 21 | Q    It was either Mr. Satterfield or | 10:48:35 |
| 22 | Mr. Murakami that described it as a library. | 10:48:37 |
| 23 |         Does that -- that jives with your memory? | 10:48:40 |
| 24 | A    Yes. | 10:48:43 |
| 25 | Q    Okay.  So to the extent there was any | 10:48:43 |

Page 41

| | | |
|---|---|---|
| 1 | conversation with -- about Max Huntsman being a | 10:48:45 |
| 2 | Holocaust denier, it would have taken place in | 10:48:48 |
| 3 | either the library or one of the offices of | 10:48:51 |
| 4 | Mr. Satterfield or Mr. Murakami, right? | 10:48:54 |
| 5 | A    Yes. | 10:48:56 |
| 6 |      And as a side note, I know why they call it | 10:48:57 |
| 7 | the library.  At one time that was the chambers of | 10:48:59 |
| 8 | the presiding judge of the L.A. County courts and | 10:49:02 |
| 9 | that was the law library for his chambers. | 10:49:05 |
| 10 | Q    Ah, interesting. | 10:49:08 |
| 11 | A    I did know that story, yeah. | 10:49:09 |
| 12 | Q    A little bit of trivia. | 10:49:11 |
| 13 | A    Yeah. | 10:49:13 |
| 14 | Q    Well, let me ask you this way, too:  When | 10:49:13 |
| 15 | you were doing your work, did you come across | 10:49:16 |
| 16 | evidence that led you to believe that Max Huntsman | 10:49:18 |
| 17 | might be a Holocaust denier? | 10:49:21 |
| 18 | A    Yes. | 10:49:22 |
| 19 | Q    And what evidence was that? | 10:49:23 |
| 20 | A    A conversation I had with the woman that | 10:49:25 |
| 21 | was purportedly his housekeeper. | 10:49:27 |
| 22 | Q    And how did you come to be talking to -- | 10:49:31 |
| 23 | well, do you recall what her name is? | 10:49:33 |
| 24 | A    I do not.  I'm sorry. | 10:49:35 |
| 25 | Q    Do you recall where the conversation | 10:49:37 |

Page 42

| | | |
|---|---|---|
| 1 | happened? | 10:49:38 |
| 2 | A    Yes. | 10:49:38 |
| 3 | Q    Where was that? | 10:49:39 |
| 4 | A    The Home Depot on San Fernando Road in the | 10:49:40 |
| 5 | City of Los Angeles about a mile from | 10:49:43 |
| 6 | Dodger Stadium. | 10:49:47 |
| 7 | Q    And how did you come to be there? | 10:49:50 |
| 8 | A    I was conducting sporadic surveillance of | 10:49:53 |
| 9 | Mr. Huntsman's home and activities.  I thought at | 10:49:58 |
| 10 | first I wasn't quite seeing what I was seeing.  But | 10:50:04 |
| 11 | Mr. Huntsman never had any garbage and never put any | 10:50:08 |
| 12 | garbage out on the curb, which was a little -- same | 10:50:12 |
| 13 | look that you have with furrowing your eyebrow, kind | 10:50:15 |
| 14 | of unusual. | 10:50:19 |
| 15 | And it finally came to me that Mr. Huntsman | 10:50:20 |
| 16 | simply doesn't engage those services and he takes | 10:50:22 |
| 17 | his trash to work or somewhere else to get rid it. | 10:50:25 |
| 18 | So there's never any trash cans in front of his | 10:50:30 |
| 19 | home, which, as you're well aware, is a | 10:50:32 |
| 20 | investigative technique sanctioned by the | 10:50:33 |
| 21 | U.S. Supreme Court. | 10:50:36 |
| 22 | And during one of those surveillances, I | 10:50:37 |
| 23 | followed what I believed to be a housekeeper away | 10:50:39 |
| 24 | from his home in the late afternoon, early evening, | 10:50:41 |
| 25 | and I wound up following her to the Home Depot that | 10:50:46 |

Page  43

```
1     I just described.                                    10:50:50

2          Q    Okay.  And so did you ask to talk to her in   10:50:51

3     the parking lot?                                     10:50:54

4          A    Actually inside of the store.              10:50:55

5          Q    Okay.  And what did she tell you?          10:50:57

6          A    That she works for Mr. Huntsman, that the  10:51:04

7     family is kind and loving, and she really didn't --  10:51:09

8     didn't get into -- she told me a lot of things of a  10:51:18

9     personal nature that are -- that have no bearing     10:51:23

10    here or anywhere else, that everybody's              10:51:25

11    housekeeper -- I don't know if you have a            10:51:27

12    housekeeper or anybody else has a housekeeper, but   10:51:29

13    your housekeepers have great intimate knowledge of   10:51:32

14    your personal lives and your feelings and your       10:51:35

15    opinions and everything.                             10:51:37

16         So the one thing she did tell me was that       10:51:38

17    she -- her English was somewhat broken.  My Spanish  10:51:42

18    is very poor, but we were able to -- it was kind of  10:51:46

19    funny and we laughed about it.                       10:51:49

20         It was -- in describing the fact that he        10:51:52

21    didn't believe what the Germans did during          10:51:54

22    World War II, she kept comparing it to people that   10:51:57

23    believe the world is flat.                          10:52:00

24         And there was -- there was a word for that      10:52:01

25    in Spanish, and she was able to translate it into    10:52:03
```

Page 44

| | | |
|---|---|---|
| 1 | English for me.  And we both kind of laughed about | 10:52:05 |
| 2 | that, like some people believe the world is flat. | 10:52:07 |
| 3 | And -- and that was how -- that was how she | 10:52:10 |
| 4 | was able to relate to me that subject matter of | 10:52:15 |
| 5 | Mr. Huntsman not believing that the Nazi Holocaust | 10:52:18 |
| 6 | had occurred. | 10:52:25 |
| 7 | Q    Did she explain, was it a conversation that | 10:52:28 |
| 8 | she had directly with him, or was it something she | 10:52:31 |
| 9 | overheard?  Did you get any knowledge of that? | 10:52:33 |
| 10 | A    No, nothing she had overheard.  It was | 10:52:36 |
| 11 | based on literature and things she had seen in the | 10:52:38 |
| 12 | home. | 10:52:41 |
| 13 | Q    Okay.  So it's nothing that she heard from | 10:52:43 |
| 14 | him? | 10:52:45 |
| 15 | A    That is correct. | 10:52:45 |
| 16 | Q    Okay.  Do you recall what the literature | 10:52:49 |
| 17 | was that she -- | 10:52:51 |
| 18 | A    I do not. | 10:52:52 |
| 19 | Q    Was she able to recall what the literature | 10:52:52 |
| 20 | was? | 10:52:55 |
| 21 | A    Somewhat, yes, both photographs and written | 10:52:58 |
| 22 | literature. | 10:53:01 |
| 23 | And if I can save you, her interview is in | 10:53:02 |
| 24 | my notes.  Her interview is on audio digital tape. | 10:53:06 |
| 25 | It is in the case file in the possession of the | 10:53:09 |

Page 45

| | | |
|---|---|---|
| 1 | Sheriff's Department. | 10:53:12 |
| 2 | I am hoping -- I spoke to your associate, | 10:53:14 |
| 3 | Jason Tokoro, about you have the power of subpoena. | 10:53:15 |
| 4 | I would highly recommend that you ask for those | 10:53:21 |
| 5 | materials from the Sheriff's Department. | 10:53:25 |
| 6 | Q    And this is -- this would be an | 10:53:28 |
| 7 | investigative file related to Max Huntsman? | 10:53:29 |
| 8 | A    That is correct. | 10:53:32 |
| 9 | Q    And these were handwritten notes that you | 10:53:40 |
| 10 | took? | 10:53:42 |
| 11 | A    Yes. | 10:53:42 |
| 12 | Q    Do you recall when the conversation took | 10:53:52 |
| 13 | place? | 10:53:53 |
| 14 | A    I do not. | 10:53:55 |
| 15 | I can see from this L.A. Times article, | 10:53:56 |
| 16 | it's April '22, so obviously at some point in time | 10:53:59 |
| 17 | before that.  And, again, I apologize.  I simply | 10:54:04 |
| 18 | don't recall, you know, when.  My memory is that it | 10:54:07 |
| 19 | was the winter months.  It was dark somewhat early. | 10:54:12 |
| 20 | That happens here in California. | 10:54:15 |
| 21 | Q    Uh-huh. | 10:54:18 |
| 22 | Did you hear anything from -- about | 10:54:26 |
| 23 | Max Huntsman potentially being a Holocaust denier | 10:54:30 |
| 24 | from any other source? | 10:54:33 |
| 25 | A    I did not. | 10:54:35 |

Page 46

```
1        Q    Had somebody directed you to do a              10:54:42

2    surveillance of the Huntsman house?                     10:54:49

3        A    They did not.                                  10:54:51

4        Q    You did that on your own?                      10:54:52

5        A    I did.                                         10:54:53

6        Q    Did you have -- would you have to report       10:55:01

7    the surveillance that you're doing to the lieutenant    10:55:02

8    that you were working for?                              10:55:05

9        A    It would be in my notes.                       10:55:07

10       Q    And your notes would be something you'd        10:55:14

11   turn in as a regular part of things so they know        10:55:17

12   what you're doing?                                      10:55:20

13       A    Correct.  Well, no.                            10:55:21

14       Q    Okay.  How --                                  10:55:22

15       A    The answer to that is no.                      10:55:23

16       Q    Okay.  How would the lieutenant know you're    10:55:24

17   doing surveillance through your notes?                  10:55:27

18       A    I'm sorry.  Either you phrased that            10:55:30

19   question poorly or I answered it poorly.                10:55:34

20            The lieutenant would know I was doing          10:55:36

21   surveillance because I'd verbally tell him, "Hey,       10:55:38

22   I'm going to be out from 4:00 to midnight sitting in    10:55:40

23   the car drinking coffee and doing the thing, so, you    10:55:44

24   know, if something happens or I get hit by a drunk      10:55:47

25   driver or if you want to know why I'm out from          10:55:50
```

Page 47

| | | |
|---|---|---|
| 1 | 4:00 to midnight, this is why." | 10:55:53 |
| 2 | That's how he would know. | 10:55:54 |
| 3 | Q    Right. | 10:55:55 |
| 4 | A    The surveillance would be in my notes. | 10:55:56 |
| 5 | Q    Okay. | 10:55:57 |
| 6 | A    We keep these blue -- well, I keep blue | 10:55:58 |
| 7 | flip-over notebooks that are actually bound and | 10:56:02 |
| 8 | manufactured by the Sheriff's Department from -- | 10:56:05 |
| 9 | they're primarily used by homicide detectives, but | 10:56:07 |
| 10 | because I did that for a very long time, it's a | 10:56:10 |
| 11 | great way to -- to keep notes in -- in these blue -- | 10:56:12 |
| 12 | small blue notebooks, and then they become a | 10:56:17 |
| 13 | permanent part of the case file. | 10:56:20 |
| 14 | Q    I see.  I see. | 10:56:21 |
| 15 | A    So when you subpoena my notes, they'll be | 10:56:22 |
| 16 | in there. | 10:56:24 |
| 17 | Q    All right.  Was there ever a time where you | 10:56:25 |
| 18 | told the lieutenant you were working for -- | 10:56:28 |
| 19 | specifically on this Public Corruptions Unit, just | 10:56:29 |
| 20 | that time period, and they said "Why are you" -- you | 10:56:33 |
| 21 | know, "Don't do that surveillance, that's not | 10:56:35 |
| 22 | necessary"? | 10:56:39 |
| 23 | A    No. | 10:56:40 |
| 24 | Q    Okay.  I'm sorry. | 10:56:40 |
| 25 | So at the time of this Exhibit 20, this | 10:56:55 |

Page 48

```
 1    April 1, 2022, were you aware that shortly before      10:56:57

 2    this a complaint was filed by Max Huntsman with        10:57:00

 3    respect to the sheriff?                                10:57:05

 4        A    I am not.                                     10:57:10

 5        Q    Were you aware that around this time that a   10:57:10

 6    complaint had been filed by Esther Lim with respect    10:57:12

 7    to the sheriff?                                        10:57:14

 8        A    I am not.                                     10:57:15

 9        Q    Did you have any discussions with the         10:57:15

10    sheriff about any complaint that Max Huntsman had      10:57:17

11    filed against him?                                     10:57:20

12        A    No.                                           10:57:22

13        Q    At any time, did you have a conversation      10:57:22

14    with the sheriff about any complaint that Esther Lim   10:57:24

15    had filed against him?                                 10:57:27

16        A    No.                                           10:57:28

17        Q    And same questions, did you have any          10:57:29

18    conversations with Undersheriff Murakami about any     10:57:31

19    complaint that had been filed by Max Huntsman --       10:57:36

20        A    No.                                           10:57:39

21        Q    -- against the sheriff?                       10:57:39

22             Okay.  And did you have any discussions       10:57:41

23    with Mr. Satterfield about that?                       10:57:43

24        A    No.                                           10:57:46

25             MR. NEACH:  We're just at an hour.  Can we    10:57:53
```

Page 49

| | | |
|---|---|---|
| 1 | take a break? | 10:57:55 |
| 2 | MR. DI BONA:  Uh-huh. | 10:57:55 |
| 3 | THE VIDEOGRAPHER:  This marks the end of | 10:57:56 |
| 4 | Media No. 1.  The time is 10:58 a.m.  We're off the | 10:57:57 |
| 5 | record. | 10:58:00 |
| 6 | (Off the record from 10:58 - 11:03 a.m.) | 10:58:01 |
| 7 | THE VIDEOGRAPHER:  This marks the beginning | 11:03:12 |
| 8 | of Media No. 2.  The time is 11:03 a.m.  We're on | 11:03:13 |
| 9 | the record. | 11:03:17 |
| 10 | BY MR. NEACH: | 11:03:34 |
| 11 | Q    Just a few questions about following up on | 11:03:35 |
| 12 | the housekeeper. | 11:03:37 |
| 13 | So you said you don't remember her name? | 11:03:39 |
| 14 | A    I do not. | 11:03:41 |
| 15 | Q    Okay.  She was Hispanic? | 11:03:41 |
| 16 | A    Yes. | 11:03:44 |
| 17 | Q    Okay.  Do you recall what she looks like? | 11:03:44 |
| 18 | A    Yes. | 11:03:47 |
| 19 | Q    What does she look like? | 11:03:48 |
| 20 | A    About 40 years old, shoulder-length brown | 11:03:49 |
| 21 | hair.  She was a little bit short, probably | 11:03:53 |
| 22 | five-foot, five-foot one and about 150 pounds. | 11:03:55 |
| 23 | Q    Any distinguishing facial characteristics | 11:04:06 |
| 24 | that you recall? | 11:04:09 |
| 25 | A    No.  She was driving an older, black, | 11:04:11 |

Page 50

| | | |
|---|---|---|
| 1 | four-door Toyota Camry.  And in my notes are her | 11:04:13 |
| 2 | name and her date of birth and her cell number and | 11:04:17 |
| 3 | the license plate number to the car. | 11:04:22 |
| 4 | Q   I know you previously -- I was going to | 11:04:47 |
| 5 | cover this topic with you.  And you've declined to | 11:04:49 |
| 6 | answer any -- answer any questions, but I kind of | 11:04:52 |
| 7 | have to do it just to make sure. | 11:04:54 |
| 8 | A   Sure.  I'll politely decline before you | 11:04:56 |
| 9 | even ask the question. | 11:04:59 |
| 10 | Q   That's fine.  So I'm just -- this is | 11:05:00 |
| 11 | previously marked Exhibit 27 from Mr. Villanueva's | 11:05:01 |
| 12 | deposition. | 11:05:04 |
| 13 | And this has to do with -- it's reporting | 11:05:07 |
| 14 | about you and the South Pasadena Police Department. | 11:05:10 |
| 15 | Are you declining to answer any questions | 11:05:12 |
| 16 | regarding your work that you did with South Pasadena | 11:05:15 |
| 17 | Police Department? | 11:05:17 |
| 18 | A   Yes. | 11:05:18 |
| 19 | Q   At this time, were you giving presentations | 11:05:21 |
| 20 | for the Sheriff's Department? | 11:05:25 |
| 21 | A   I'm not going to answer that, Brian. | 11:05:27 |
| 22 | Q   So you're not going to answer any | 11:05:29 |
| 23 | questions, anything about anything you did from | 11:05:30 |
| 24 | January '23 forward? | 11:05:33 |
| 25 | A   Regarding the South Pasadena Police | 11:05:36 |

Page 51

| | | |
|---|---|---|
| 1 | Department? | 11:05:39 |
| 2 | Q    Let me -- I was trying to just go broader. | 11:05:40 |
| 3 |     Basically, you're not going to answer any | 11:05:44 |
| 4 | questions about anything in your career from | 11:05:45 |
| 5 | January '23 to the present? | 11:05:47 |
| 6 | A    If you can explain to me, Brian, how that's | 11:05:49 |
| 7 | germane to this or the 14 pages of subpoena, I will | 11:05:52 |
| 8 | consider answering that.  But until you can explain | 11:05:55 |
| 9 | to me how that's germane to this, I will not answer | 11:05:57 |
| 10 | it. | 11:06:00 |
| 11 | Q    Yeah.  Sometimes we're entitled to learn | 11:06:01 |
| 12 | about things, like, bias -- | 11:06:03 |
| 13 | A    I'm aware of it. | 11:06:04 |
| 14 | Q    -- and culpability. | 11:06:05 |
| 15 |     Okay.  So that's fine. | 11:06:06 |
| 16 |         (Deposition Exhibit 2 | 11:06:15 |
| 17 |     was marked for identification.) | 11:06:15 |
| 18 |     MR. NEACH:  Exhibit 2. | 11:06:27 |
| 19 | BY MR. NEACH: | 11:06:29 |
| 20 | Q    Exhibit 2, I'm showing you, this is an | 11:06:29 |
| 21 | October 23, 2019 L.A. Times article titled "Sheriff | 11:06:31 |
| 22 | hires corruption investigator accused of posing as | 11:06:37 |
| 23 | deputy." | 11:06:41 |
| 24 |     Have you seen this article before? | 11:06:42 |
| 25 | A    Yes. | 11:06:44 |

Page 52

```
1        Q    Okay.  And I can sense that you didn't take    11:06:44

2   too kindly to it; is that right?                         11:06:51

3        A    Good sense, Brian.                             11:06:53

4        Q    Yeah.                                          11:06:54

5             And so tell me what your understanding is      11:06:54

6   of this.                                                 11:06:56

7        A    No.                                            11:06:57

8        Q    You're not going to discuss it?  Okay.         11:06:57

9             Is that you in the picture, though?            11:07:00

10       A    Oh, yeah.                                       11:07:02

11       Q    And it had to do with you going into the       11:07:03

12  County jail, right?                                       11:07:07

13       A    Again, I'm not going to answer, Brian.          11:07:09

14       Q    You're not going to answer.  Okay.              11:07:11

15            Were you ever disciplined or reprimanded at     11:07:16

16  any time while in the Sheriff's Department?               11:07:19

17       A    Oh, God, yes.                                   11:07:21

18       Q    Yeah.                                           11:07:23

19            When was the last time?                         11:07:25

20       A    You know, when I was working homicide,          11:07:35

21  I crashed a car and it was my fault.  I'm trying to       11:07:37

22  think.  And I -- it wasn't really a real car crash.       11:07:43

23  I hit a curb.  I was very tired and pulling out of        11:07:46

24  the parking lot at the Homicide Bureau and I went         11:07:50

25  over a curb and messed up a car and I got                 11:07:53
```

Page 53

| | | |
|---|---|---|
| 1 | disciplined for that, which I thought was blatantly | 11:07:55 |
| 2 | unfair, by the way. | 11:07:57 |
| 3 | Q    Do you recall when that was? | 11:08:00 |
| 4 | A    In the teen -- like 2012, 2013, maybe, the | 11:08:04 |
| 5 | last time. | 11:08:10 |
| 6 | Q    I may have asked it more specifically, but | 11:08:17 |
| 7 | it's very -- in a general sense, do you recall any | 11:08:19 |
| 8 | specific discussions you had with the sheriff while | 11:08:23 |
| 9 | you're on the Public Corruption Unit about | 11:08:26 |
| 10 | Max Huntsman? | 11:08:31 |
| 11 | A    Specifically, no.  In general, yes. | 11:08:38 |
| 12 | Q    Okay.  What were the general conversations | 11:08:45 |
| 13 | that you recall? | 11:08:48 |
| 14 | A    Very, very bright guy.  Yale Law School | 11:08:52 |
| 15 | grad.  Kind of an odd childhood and upbringing. | 11:08:56 |
| 16 | A product of divorce.  His true name is not | 11:09:06 |
| 17 | Huntsman.  He's got a different last name. | 11:09:10 |
| 18 | I remember talking about that. | 11:09:13 |
| 19 | And he had, like we all do, kind of a | 11:09:14 |
| 20 | countywide reputation throughout the County because | 11:09:21 |
| 21 | he had been a practicing prosecutor for many years, | 11:09:23 |
| 22 | so -- and I didn't know him.  I had never met the | 11:09:26 |
| 23 | guy.  Like I said, to this day, I've never shook his | 11:09:29 |
| 24 | hand, never met the guy.  I've been in the same room | 11:09:31 |
| 25 | with him.  But he would -- we would talk about that | 11:09:34 |

Page 54

| | | |
|---|---|---|
| 1 | once in a while. | 11:09:36 |
| 2 | Q    Uh-huh. | 11:09:38 |
| 3 | A    He had a couple of high-profile cases when | 11:09:39 |
| 4 | he was a prosecutor -- actually, now that I think | 11:09:41 |
| 5 | about it, dealing with public corruption, oddly | 11:09:44 |
| 6 | enough, with a small incorporated city in Southeast | 11:09:46 |
| 7 | L.A. County, City of Bell. | 11:09:49 |
| 8 | But there were, you know, kind of | 11:09:52 |
| 9 | general -- things of that general nature. | 11:09:55 |
| 10 | Q    Uh-huh. | 11:09:57 |
| 11 | And then how about regarding Esther Lim? | 11:09:58 |
| 12 | A    I'm sorry? | 11:10:00 |
| 13 | Q    Conversations that you recall while with | 11:10:03 |
| 14 | the Public Corruption Unit, any discussions | 11:10:04 |
| 15 | regarding Esther Lim that you recall with the | 11:10:07 |
| 16 | sheriff? | 11:10:10 |
| 17 | A    Never.  I don't -- I know that name. | 11:10:10 |
| 18 | I don't even know what her title was in the County. | 11:10:11 |
| 19 | And I'm pretty comfortable I have never had a | 11:10:13 |
| 20 | discussion about her. | 11:10:17 |
| 21 | MR. NEACH:  Right now, I don't have | 11:10:24 |
| 22 | anything further.  He's got some questions, it | 11:10:26 |
| 23 | sounds like, and I might have follow-up.  But I | 11:10:29 |
| 24 | appreciate your time, sir. | 11:10:31 |
| 25 | \\\ | |

Page 55

```
 1                         EXAMINATION

 2    BY MR. DI BONA:

 3         Q    All right, sir.  Just some brief          11:10:34

 4    follow-ups.                                         11:10:35

 5              I believe you mentioned you were on loan to 11:10:36

 6    the FBI for the Public Corruption Unit; is that    11:10:38

 7    right?                                              11:10:42

 8         A    Yes.                                       11:10:42

 9         Q    Can you explain for those of us that don't 11:10:42

10    work in law enforcement, what does it even mean to  11:10:45

11    be on loan to another department?                   11:10:48

12         A    All of the major federal agencies have a  11:10:49

13    mechanism in place where they take local sworn law  11:10:53

14    enforcement officers under their wing and make them 11:10:56

15    what's commonly referred to as a task force officer. 11:11:00

16    They use the initials TFO.                          11:11:05

17              So both the FBI, the Secret Service,       11:11:07

18    U.S. Treasury, Homeland Security, all of those     11:11:12

19    federal agencies in law enforcement do that.        11:11:15

20              And in the late 1990s, my partner and I,   11:11:20

21    conducting a murder investigation, came across some 11:11:25

22    information regarding pretty widespread public      11:11:29

23    corruption amongst a local Southern California      11:11:33

24    police department.                                  11:11:36

25              We brought it to the attention of the      11:11:37
```

Page 56

```
1    sheriff at the time.  The elected sheriff was          11:11:40

2    Sherman Block.  He directed us to the FBI.  We          11:11:42

3    presented that evidence to the FBI.                     11:11:45

4          And then, ultimately, I was -- I was asked        11:11:47

5    to join in the investigation.  And I worked at the     11:11:51

6    FBI for about a year and a half or so on loan as a     11:11:54

7    task force officer investigating public corruption.    11:12:00

8    Q    And how many years do you have working in a        11:12:05

9    Public Corruption Unit, just overall?                   11:12:08

10   A    Well, the year and a half at the FBI and           11:12:12

11   then, of course, the three-plus years working under   11:12:15

12   the administration of Mr. Villanueva.                   11:12:18

13         And when I was a young new detective, at          11:12:22

14   times back then the Sheriff's Department and the       11:12:28

15   executive staff on the Sheriff's Department would      11:12:33

16   task specific detectives to look at allegations of     11:12:37

17   public corruption, and I was one of those people.      11:12:40

18         So over the years, really, since the --          11:12:42

19   since the mid-1980s, off and on again, I've been       11:12:45

20   tasked with looking at -- at allegations of            11:12:48

21   government employees committing criminal conduct       11:12:52

22   acts.                                                   11:12:55

23   Q    And I know this was mentioned earlier, but         11:12:57

24   just how long do you -- estimate is fine.  How many    11:12:59

25   years did you have as a detective just overall?        11:13:03
```

Page 57

```
1       A    35.                                    11:13:07

2       Q    Thank you for your service.            11:13:07

3            You were -- I know this was mentioned   11:13:10

4    earlier.  Just for the record, you were a member of  11:13:13

5    the Public Corruption Unit for the Los Angeles   11:13:15

6    County Sheriff while Sheriff Villanueva was sheriff;  11:13:18

7    is that right?                                 11:13:23

8       A    Yes.                                   11:13:23

9       Q    And are you aware that there's certain  11:13:24

10   critics of that department that have charged that  11:13:26

11   that unit was formed by Sheriff Villanueva in order  11:13:30

12   to retaliate against his political opponents.   11:13:35

13           Are you broadly aware of that criticism?  11:13:39

14      A    I am.                                  11:13:41

15      Q    I'd like to give you a chance on the record  11:13:42

16   to respond to that.                            11:13:43

17      A    I -- I have zero indication or evidence of  11:13:45

18   that being the case.  I was raised primarily in  11:13:49

19   Chicago.  I am familiar with and grew up around real  11:13:55

20   public corruption.  And I would not have been   11:14:00

21   associated with nor tolerated any of those types of  11:14:04

22   allegations were they true where it was some kind of  11:14:10

23   a secret police or a hit squad.                11:14:12

24           I had no allegiance whatsoever to the   11:14:16

25   elected sheriff.  I, in fact, did not support nor  11:14:18
```

                                                   Page 58

```
 1    did I vote for him, which he's well aware of.          11:14:22

 2    And -- and I -- you know, those allegations, like      11:14:24

 3    many other things, are, quite frankly -- if they are   11:14:29

 4    true, I am unaware of it.  And if they are true,        11:14:34

 5    I would have -- I would have spoken up.                 11:14:36

 6         I had no -- there was nothing -- I'm an            11:14:38

 7    at-will employee.  I -- I had that kind of              11:14:43

 8    relationship with him where I believed I could tell    11:14:45

 9    him this is wrong, don't go down that highway, it's    11:14:48

10    unlawful, it's unethical, it's illegal, it's           11:14:51

11    immoral.  I wouldn't have been afraid at all to say    11:14:54

12    that.  I've said that to other sheriffs under which    11:14:57

13    I have worked.                                          11:15:01

14         And that's my answer to your question.            11:15:01

15    Q    I think it's in the answer, but just to be        11:15:04

16    clear, did Sheriff Villanueva ever ask you to, in      11:15:06

17    your opinion, retaliate against any of his political   11:15:09

18    opponents?                                              11:15:12

19    A    Unequivocally, absolutely not.  I don't           11:15:13

20    know how the sheriff did in his deposition.  If        11:15:15

21    anything, he was somewhat afraid and intimidated by    11:15:19

22    me.  Or I believe that he was.  I hope that he was a   11:15:23

23    little bit, because I presented myself to him as a     11:15:25

24    straight shooter down the line and I wouldn't do       11:15:28

25    anything out of blind loyalty to the unelected        11:15:32
```

Page 59

```
 1    official, especially here in Los Angeles County.          11:15:35

 2         Q    Did Tim Murakami ever ask you to retaliate       11:15:38

 3    against any perceived political opponent of                11:15:42

 4    Sheriff Villanueva?                                        11:15:45

 5         A    Never.                                           11:15:46

 6         Q    And just to make sure I've covered it, did       11:15:47

 7    anybody ever, in your chain of command or in the           11:15:51

 8    Sheriff's Department who had a higher rank than you,       11:15:54

 9    ever ask you to retaliate against any perceived            11:15:58

10    political opponent of Sheriff Villanueva?                  11:16:00

11         A    Never.                                           11:16:02

12         Q    You are aware, I'm assuming, but that's why      11:16:03

13    it's an assumption, I'll ask:  Based on your               11:16:06

14    35 years as a detective, you know in order to              11:16:08

15    establish a criminal investigation, depending on the      11:16:11

16    circumstances, there needs to be either a reasonable      11:16:13

17    suspicion or a probable cause?                             11:16:16

18         Are you aware of that?                                11:16:18

19         A    That's a poorly phrased question.                11:16:20

20         And, no, I don't agree with that.  Any time          11:16:22

21    there's an allegation or evidence or an indication        11:16:25

22    that a crime has occurred, that's what establishes        11:16:27

23    an investigation.                                          11:16:30

24         You don't need to have probable cause to             11:16:31

25    establish an initial criminal inquiry.                     11:16:34
```

Page 60

```
 1        Q    Understood.                                  11:16:39

 2             And it may be a poorly phrased question, so  11:16:39

 3    let me just ask it this way:  While you were in the   11:16:39

 4    Public Corruption Unit for Sheriff Villanueva, did    11:16:42

 5    you ever start an investigation without what you      11:16:44

 6    understood to be the proper legal justification for   11:16:47

 7    an investigation?                                     11:16:51

 8        A    The answer to that is yes.                   11:16:54

 9        Q    And did anybody ever ask you to conduct and  11:16:55

10    take -- conduct any investigation without a proper    11:16:58

11    legal justification?                                  11:17:03

12        A    No.                                          11:17:05

13        Q    And if someone had asked you that, would     11:17:05

14    you have done so?                                      11:17:08

15        A    Absolutely not.                               11:17:09

16        Q    I know you didn't want to answer this so     11:17:14

17    I'm not going to ask anything about this article,     11:17:17

18    but maybe you will.  Just let me know if you -- the   11:17:20

19    date on this --                                       11:17:22

20        A    I will not.                                  11:17:23

21        Q    Okay.  Just for the record, sir, it's fine,  11:17:23

22    let me just say for the record, do you see the date   11:17:25

23    on this article?                                      11:17:28

24        A    I do.                                        11:17:29

25        Q    Are you able to answer "yes" that the date   11:17:30
```

Page 61

| | | |
|---|---|---|
| 1 | is November 30th, 2024? | 11:17:32 |
| 2 | A    Yes. | 11:17:34 |
| 3 | Q    Okay.  And just so the record is clear, the | 11:17:35 |
| 4 | conversation you had with the Sheriff's Department | 11:17:40 |
| 5 | about Max Huntsman being a Holocaust denier, did | 11:17:43 |
| 6 | that happen before or after November 30th, 2024? | 11:17:46 |
| 7 | A    Before. | 11:17:50 |
| 8 | Q    By the way, do you -- excuse me. | 11:17:55 |
| 9 | Do you happen to know one way or the other | 11:17:57 |
| 10 | if Sheriff Villanueva has any personal knowledge -- | 11:17:59 |
| 11 | sorry.  Let me ask it this way:  Did you ever tell | 11:18:02 |
| 12 | Sheriff Villanueva about any of your discipline or | 11:18:06 |
| 13 | reprimands while you were at the Sheriff's | 11:18:08 |
| 14 | Department? | 11:18:10 |
| 15 | A    I think we might have joked about it. | 11:18:18 |
| 16 | That's the answer to that question.  We might have | 11:18:24 |
| 17 | joked about it. | 11:18:26 |
| 18 | Q    Do you recall what you joked about, like | 11:18:27 |
| 19 | what incident was joked about? | 11:18:28 |
| 20 | A    There was no one specific incident.  As I | 11:18:30 |
| 21 | testified earlier, you crash a car, you get | 11:18:37 |
| 22 | disciplined.  You use a bad word, you get | 11:18:39 |
| 23 | disciplined.  You yell at somebody, you get | 11:18:42 |
| 24 | disciplined. | 11:18:44 |
| 25 | I, over the years, have crashed cars and | 11:18:45 |

Page 62

| | | |
|---|---|---|
| 1 | probably yelled at people I shouldn't have yelled at | 11:18:48 |
| 2 | or used a bad word I shouldn't have used, so I've | 11:18:51 |
| 3 | got that discipline. | 11:18:54 |
| 4 | And the flip side to that is that I worked | 11:18:55 |
| 5 | very hard and I am -- I hate saying this, I'm | 11:18:57 |
| 6 | recognized for hard work, and I appreciate that | 11:19:04 |
| 7 | recognition.  And so there's -- you know, there's | 11:19:06 |
| 8 | the yin and the yang, I guess it is. | 11:19:11 |
| 9 | And I appreciate the gracious recognition | 11:19:13 |
| 10 | for my hard work, and I appreciate that somebody can | 11:19:16 |
| 11 | joke about me crashing cars or being a knucklehead | 11:19:19 |
| 12 | when I was younger, stuff like that. | 11:19:21 |
| 13 | Q    Conversely, did the Sheriff's Department | 11:19:23 |
| 14 | ever give you any type of awards or accommodations? | 11:19:25 |
| 15 | A    Yes. | 11:19:28 |
| 16 | Q    Can you describe those? | 11:19:29 |
| 17 | A    I hate patting myself on the back. | 11:19:39 |
| 18 | I've been recognized for hard work a bunch | 11:19:42 |
| 19 | over the years.  I've handled over 400 homicide | 11:19:46 |
| 20 | investigations, including several high-profile ones | 11:19:49 |
| 21 | and hard to solve homicides.  And I've been | 11:19:52 |
| 22 | recognized for that, and I appreciate that. | 11:19:54 |
| 23 | And over the years, I have worked other | 11:19:56 |
| 24 | detective assignments and been recognized for hard | 11:19:59 |
| 25 | work.  I'll leave it at that because it sounds like | 11:20:02 |

Page 63

| | | |
|---|---|---|
| 1 | I'm beating my chest and the court reporter will | 11:20:05 |
| 2 | yell at me if I do. | 11:20:08 |
| 3 | Q    All right, sir.  And just to be clear, I'm | 11:20:09 |
| 4 | not going to force you to do anything you're | 11:20:11 |
| 5 | uncomfortable with, but on the record, if you want | 11:20:13 |
| 6 | to pat yourself on the back, that's okay.  I'm | 11:20:15 |
| 7 | giving you a chance to. | 11:20:18 |
| 8 | But is that -- | 11:20:18 |
| 9 | A    Thank you. | 11:20:19 |
| 10 | Q    -- a complete answer? | 11:20:19 |
| 11 | A    That's a complete answer. | 11:20:20 |
| 12 | Q    Do you have a recollection, as you sit here | 11:20:21 |
| 13 | today, what your clearance rate for homicides was? | 11:20:23 |
| 14 | A    I do. | 11:20:26 |
| 15 | Q    What was that? | 11:20:27 |
| 16 | A    Basically, the national average, around 55 | 11:20:29 |
| 17 | to 60 percent, which is the average in the Sheriff's | 11:20:31 |
| 18 | Department for homicides. | 11:20:35 |
| 19 | Q    And just to be clear, I think this was | 11:20:40 |
| 20 | mentioned earlier, but was there -- did anyone ever | 11:20:43 |
| 21 | ask you to investigate Esther Lim criminally? | 11:20:45 |
| 22 | A    No. | 11:20:49 |
| 23 | Q    And just to be clear, did | 11:20:49 |
| 24 | Sheriff Villanueva specifically ask you to open an | 11:20:52 |
| 25 | investigation into Max Huntsman? | 11:20:55 |

Page 64

```
 1        A    No.                                      11:20:58

 2        Q    I think it was mentioned earlier, but how  11:20:59

 3   was it that you came to be investigating          11:21:01

 4   Max Huntsman?  Who told you to do that?           11:21:04

 5        A    Nobody told me to do that.              11:21:06

 6             My identification of Mr. Huntsman came  11:21:08

 7   across the radar screen because of the inquiry    11:21:12

 8   regarding the downloading of the personnel files by 11:21:17

 9   the then-Constitutional Police Advisor Diana Teran. 11:21:21

10        Q    And did your investigation of Max Huntsman 11:21:26

11   have anything to do with how Sheriff Villanueva may 11:21:28

12   have felt about him?                              11:21:31

13        A    It did not.                             11:21:32

14        Q    And at the time that you -- that you --  11:21:33

15   sorry.                                            11:21:36

16             At the time you began a criminal        11:21:37

17   investigation of a Max Huntsman, did you even know 11:21:38

18   one way or the other how Sheriff Villanueva felt  11:21:42

19   about him?                                        11:21:46

20        A    I did not.                              11:21:46

21             MR. DI BONA:  I don't have any further  11:21:47

22   questions.                                        11:21:47

23             MR. NEACH:  Yes.  The gift that keeps   11:21:48

24   giving, just a few follow-ups.  So -- but not many. 11:21:48

25   \\\
```

Page 65

```
 1                    FURTHER EXAMINATION

 2      BY MR. NEACH:

 3          Q    One thing -- so what I heard you say was in      11:21:51

 4      the course of the Teran -- T-e-r-a-n --                   11:22:00

 5      investigation regarding -- there was a data breach,       11:22:03

 6      right?                                                    11:22:09

 7          A    Yes.                                             11:22:10

 8          Q    Okay.  And then you got information about        11:22:10

 9      Huntsman that related to a data breach?                  11:22:11

10          A    Correct.                                         11:22:13

11          Q    Okay.  How many times did you do                11:22:14

12      surveillance at his house?  Do you recall?               11:22:18

13          A    Maybe eight.                                     11:22:20

14          Q    Did you also do any -- did you follow him        11:22:28

15      to work or anything like that?                           11:22:31

16          A    No.                                              11:22:33

17          Q    What was the purpose of surveying the house     11:22:38

18      with respect to an investigation of a data breach?       11:22:40

19          A    I wanted to see who came and went from the      11:22:43

20      home and who else he communicated with by means          11:22:46

21      other than electronically.                               11:22:49

22               And as I previously testified and you're        11:22:50

23      well aware of the U.S. Supreme Court case regarding       11:22:53

24      trash searches and one person's trash is another          11:22:56

25      person's gold mine.                                       11:22:59
```

Page 66

| 1 | Q    Okay.  And so you went back there to see if | 11:23:03 |
| 2 | there was trash.  That was part of it, at least? | 11:23:05 |
| 3 | A    Yes. | 11:23:08 |
| 4 | Q    And you just didn't see it because he | 11:23:08 |
| 5 | didn't have any, right? | 11:23:10 |
| 6 | A    Correct. | 11:23:12 |
| 7 | Q    Okay.  And then do you recall any of the | 11:23:13 |
| 8 | details -- I asked you about what you remember about | 11:23:17 |
| 9 | the housekeeper. | 11:23:20 |
| 10 | But do you recall any details, when you | 11:23:22 |
| 11 | said literature or photos, what specifically she | 11:23:23 |
| 12 | identified to you? | 11:23:26 |
| 13 | A    I don't recall.  But if you get your | 11:23:27 |
| 14 | subpoena prepared and you have those materials, I'm | 11:23:31 |
| 15 | almost positive I asked her specific questions. | 11:23:33 |
| 16 | And I do recall at one point asking if | 11:23:36 |
| 17 | photographs that she had seen were in color or black | 11:23:40 |
| 18 | and white, and they were clearly -- in the | 11:23:43 |
| 19 | conversation I was having with her, they were | 11:23:47 |
| 20 | obviously World War II like atrocity-type | 11:23:49 |
| 21 | photographs or concentration camp photographs, | 11:23:53 |
| 22 | things along those lines. | 11:23:55 |
| 23 | And I remember asking her if they were -- | 11:23:56 |
| 24 | they were on paper, of course, and I remember asking | 11:24:00 |
| 25 | her if they were in color or black and white. | 11:24:01 |

Page 67

```
 1        Q    Do you recall, was the literature of the        11:24:09

 2    pamphlet variety?  Was it a book?                        11:24:11

 3        A    I -- I don't recall, Brian.  I'd like to        11:24:13

 4    say that it was in, maybe, some kind of a book, a        11:24:16

 5    bound, published book, but -- but I don't recall         11:24:19

 6    clearly.                                                 11:24:23

 7        Q    Did you get any information from her            11:24:23

 8    regarding her ability to read English while you were     11:24:26

 9    talking to her?                                          11:24:28

10        A    Yes.                                            11:24:29

11        Q    Okay.  And what did she tell you about          11:24:29

12    that?                                                    11:24:32

13        A    That she was able to read and write and         11:24:32

14    understand.  It was just -- it was poor, you know,       11:24:34

15    like a grade school-type level, a young grade           11:24:37

16    school-type level.                                       11:24:40

17             MR. NEACH:  Okay.  I don't have anything        11:24:43

18    further.                                                 11:24:44

19             MR. DI BONA:  Just one brief follow-up          11:24:45

20    question.                                                11:24:45

21

22                    FURTHER EXAMINATION

23    BY MR. DI BONA:

24        Q    Did you ask the housekeeper if any of the       11:24:48

25    information was in English or was any of it in           11:24:50
```

Page 68

```
1     Spanish or German?                                  11:24:55

2         A    I didn't ask her that.                     11:24:56

3              MR. DI BONA:  I don't have any further      11:24:58

4     questions.                                          11:24:58

5              THE VIDEOGRAPHER:  This marks the end of   11:25:00

6     Media No. 2 and concludes today's testimony for    11:25:01

7     Mark Lillienfeld.                                   11:25:03

8              We're off the record at 11:25 a.m.         11:25:05

9              (The following proceedings were held       11:25:07

10                  off the video record.)                11:25:07

11            THE REPORTER:  Did you want a copy?          11:25:09

12            MR. DI BONA:  Yes, please.                   11:25:10

13            THE REPORTER:  Did you want your copy        11:25:22

14    expedited?                                          11:25:23

15            MR. DI BONA:  Yes, please.                   11:25:24

16

17        (Whereupon, at 11:25 a.m., the deposition of

18            MARK LILLIENFELD was concluded.)

19

20                     ---oOo---

21

22

23

24

25
```

Page 69

1    STATE OF CALIFORNIA          )

2    COUNTY OF LOS ANGELES        )    ss.

3

4        I, Kimberly A. Edelen, C.S.R. No. 9042, in and

5    for the State of California, do hereby certify:

6        That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify the truth, the whole truth and nothing but

9    the truth;

10        That said deposition was taken down by me in

11    shorthand at the time and place therein named, and

12    thereafter reduced to typewriting under my

13    direction, and the same is a true, correct and

14    complete transcript of said proceedings;

15        That if the foregoing pertains to the original

16    transcript of a deposition in a Federal Case, before

17    completion of the proceedings, review of the

18    transcript { } was {X} was not requested.

19        I further certify that I am not interested in

20    the event of the action.

21        Witness my hand this 17th day of April, 2025.

22

23

24

25    KIMBERLY A. EDELEN, C.S.R. NO. 9042

Page 70

1    BRIAN NEACH, ESQ.

2    BNEACH@MILLERBARONDESS.COM

3                                          April 17, 2025

4    RE: Villanueva, Alex v. County Of Los Angeles, Et Al.

5    4/14/2025, Mark Lillienfeld, (#7246491).

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20      Contact Veritext when the sealed original is required.

21   __ Waiving the CA Code of Civil Procedure per Stipulation of

22      Counsel - Original transcript to be released for signature

23      as determined at the deposition.

24   __ Signature Waived - Reading & Signature was waived at the

25      time of the deposition.

                                              Page 71

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9

10   xx Federal R&S Not Requested - Reading & Signature was not

11      requested before the completion of the deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[& - above]**

| & | | | |
|---|---|---|---|
| **&** | | **6** | |

**&**

**&**   2:10 6:14
71:24 72:10

**0**

**04979**   1:3 5:21

**1**

**1**   1:16,25 4:4
5:15 6:20 11:5
11:6,12,23,25
12:8 39:23
49:1 50:4 72:1
**1's**   39:24
**100**   1:16
**10:01**   2:2 5:2,6
**10:58**   50:4,6
**10th**   17:1,4
**11**   3:16 4:4
**11520**   2:12
**11:03**   50:6,8
**11:25**   69:8,17
**12**   12:2 19:10
**120**   18:9
**14**   1:20 2:3 5:1
52:7
**14th**   5:6
**15**   3:13
**150**   50:22
**17**   71:3
**17th**   70:21
**18**   33:8,9
**18551**   70:24
**18th**   14:13
**19**   3:14 35:17

**1980**   14:13
**1980s**   57:19
**1986**   15:9
**1990s**   56:20
**1st**   37:7

**2**

**2**   4:9 6:20
39:24 50:8
52:16,18,20
69:6
**20**   4:18 19:10
36:24 48:25
**2012**   54:4
**2013**   54:4
**2016**   17:1,5
**2018**   18:1,5
26:10 33:4
**2019**   18:7 20:9
29:3 33:5,6,11
52:21
**202**   20:9
**2022**   8:11 37:7
49:1
**2024**   1:20 2:3
5:1 62:1,6
**2025**   5:7 70:21
71:3
**2025.520**   71:9
71:12
**2121**   2:3,19
5:23
**22**   35:25 36:3
46:16
**23**   20:10 29:24
35:19,22 36:4

36:7,8 51:24
52:5,21
**24**   16:24 35:17
35:18,22
**25**   16:24
**2600**   2:4,20
5:24
**27**   4:21 51:11
**2:24**   1:3 5:21

**3**

**30**   7:16,17 72:1
**300**   9:8
**30th**   62:1,6
**310.552.4400**
2:22
**310.860.0770**
2:13
**35**   58:1 60:14
**36**   3:12,13

**4**

**4**   3:15
**4/14/2025**   71:5
**40**   19:11 50:20
**400**   63:19
**4:00**   47:22 48:1

**5**

**50**   19:12
**51**   3:14
**52**   4:9
**53**   3:15,16
**55**   64:16
**56**   3:6

**6**

**6**   3:12
**60**   64:17
**66**   3:5
**68**   3:6

**7**

**7**   3:5
**72**   1:25
**7246491**   1:24
71:5

**8**

**8**   12:2
**8016**   6:20

**9**

**9**   12:1,8
**90049**   2:13
**90067**   2:21
5:24
**9042**   1:23 2:5
6:21 70:4,25
**960**   19:10

**a**

**a.m.**   2:2 5:2,6
50:4,6,8 69:8
69:17
**ability**   68:8
**able**   30:18
44:18,25 45:4
45:19 61:25
68:13
**above**   39:25
71:6

**[absolutely - attorney]**

**absolutely** 25:19 59:19 61:15
**academy** 14:18
**accommodati...** 63:14
**accurate** 35:12 35:13
**accused** 4:11 4:21 21:17,19 52:22
**action** 4:8 6:2 11:14 70:20
**active** 22:13
**activities** 43:9
**acts** 57:22
**actual** 39:17
**actually** 25:20 36:7,23 39:12 44:4 48:7 55:4
**add** 30:14
**address** 11:20
**adibona** 2:14
**administration** 57:12
**advanced** 13:20
**advice** 32:22
**advisor** 22:7,11 65:9
**affecting** 18:11
**affiliations** 6:8
**afraid** 59:11,21
**afternoon** 43:24

**agencies** 56:12 56:19
**ago** 28:2 30:4 30:16
**agree** 5:13 60:20
**ah** 42:10
**aide** 39:24
**al** 5:19 71:4
**alex** 1:2 2:11 5:18 6:13,15 18:5 23:3,6 27:11,19 37:11 71:4
**allegation** 20:23 21:21,24 60:21
**allegations** 18:19 57:16,20 58:22 59:2
**allegiance** 58:24
**amended** 4:5 11:13
**andy** 19:23
**angeles** 1:4,5,6 1:9 2:4,13,21 4:5 5:1,18,24 11:13 13:15,17 22:1 23:7 29:1 34:1,5 43:5 58:5 60:1 70:2 71:4
**announced** 26:14

**answer** 7:23 28:19 36:16,17 47:15 51:6,6 51:15,21,22 52:3,9 53:13 53:14 59:14,15 61:8,16,25 62:16 64:10,11
**answered** 3:10 12:13 47:19
**answering** 39:14 52:8
**anybody** 10:13 20:20 32:8 37:23 44:12 60:7 61:9
**anymore** 29:16
**apologies** 29:24
**apologize** 21:13 22:2 35:20 36:2,6 40:20 46:17
**appearance** 6:6
**appearances** 2:7 6:8
**appearing** 71:18 72:7
**appellate** 17:10
**appointing** 31:16
**appreciate** 32:24 55:24 63:6,9,10,22
**approached** 33:24

**april** 1:20 2:3 5:1,7 37:7 46:16 49:1 70:21 71:3
**arose** 35:5
**article** 4:9,18 4:21 37:4,7 46:15 52:21,24 61:17,23
**asked** 54:6 57:4 61:13 67:8,15
**asking** 67:16,23 67:24
**assertion** 37:20
**assigned** 18:23 22:13
**assignment** 15:21
**assignments** 63:24
**associate** 10:15 46:2
**associated** 17:14 58:21
**associates** 2:10 6:14
**assuming** 60:12
**assumption** 60:13
**atrocity** 67:20
**attended** 29:2
**attention** 56:25
**attorney** 6:9 17:8 22:8 24:5 24:17 25:25

Page 2

**[attorney - camp]**

26:25 33:17
**attorneys** 33:24
**audio** 5:12
  45:24
**audit** 23:7,9,14
**august** 17:1,4
**available** 23:19
  23:22
**avenue** 2:3,19
  5:23
**average** 64:16
  64:17
**awards** 63:14
**aware** 22:15
  25:11 28:11
  43:19 49:1,5
  52:13 58:9,13
  59:1 60:12,18
  66:23

**b**

**b** 4:1 6:20
  10:19 72:1
**back** 18:7
  20:13 25:22
  26:21 32:25,25
  33:4 34:18
  35:2 40:10
  57:14 63:17
  64:6 67:1
**background**
  13:10
**bad** 12:11
  62:22 63:2
**bar** 29:1

**barondess** 2:17
  5:23 6:11
**baseball** 38:5
**based** 45:11
  60:13
**basic** 7:19
  13:19
**basically** 52:3
  64:16
**bavafa** 10:19
**bearing** 38:13
  39:5,9 44:9
**beating** 64:1
**began** 65:16
**beginning** 6:9
  50:7
**behalf** 2:2 6:14
**believe** 9:19
  10:15,20 19:2
  21:23 23:5,12
  25:5 27:8,18
  28:24,24 29:23
  30:15 35:6,7
  35:12,13 41:18
  42:16 44:21,23
  45:2 56:5
  59:22
**believed** 23:3
  43:23 59:8
**believing** 45:5
**bell** 55:7
**best** 8:7 40:21
**better** 28:16
**bias** 52:12

**birth** 51:2
**birthday** 28:25
**bit** 34:4 42:12
  50:21 59:23
**black** 50:25
  67:17,25
**blank** 38:23
**blatantly** 54:1
**blind** 59:25
**block** 57:2
**blue** 48:6,6,11
  48:12
**bneach** 2:23
  71:2
**board** 1:7
**bona** 2:11 3:6
  6:13 37:12
  50:2 56:2
  65:21 68:19,23
  69:3,12,15
**book** 41:20
  68:2,4,5
**bother** 13:6
**bottom** 11:22
  12:7,7
**boulevard** 2:12
**bound** 48:7
  68:5
**breach** 66:5,9
  66:18
**break** 50:1
**brian** 2:18 6:10
  36:18 51:21
  52:6 53:3,13
  68:3 71:1

**brief** 56:3
  68:19
**briefly** 16:1,2,5
  28:2
**bright** 54:14
**broader** 52:2
**broadly** 58:13
**broken** 44:17
**brought** 56:25
**brown** 50:20
**bumped** 27:16
**bunch** 23:18
  63:18
**bureau** 16:11
  16:17,18,22
  17:5 53:24
**business** 6:19
  36:11

**c**

**c.s.r.** 70:4,25
**ca** 71:9,12,21
**california** 1:1
  2:4,13,21 5:1
  5:20,24 13:16
  24:5,17 46:20
  56:23 70:1,5
**call** 10:1 18:8
  18:20,21,22
  20:20,21 41:8
  41:17 42:6
**called** 16:10,17
  17:9
**calling** 25:6
**camp** 67:21

Page 3

**[campaign - conduct]**

| | | | |
|---|---|---|---|
| **campaign** 33:23 | **certificates** 13:20 | **civilian** 17:8 22:10 | **commander** 41:6,14 |
| **camry** 51:1 | **certifications** 13:18 | **claims** 17:15 | **committed** 39:10 |
| **candidate** 23:2 26:16 | **certify** 70:5,19 | **clarification** 14:21 | **committing** 57:21 |
| **cans** 43:18 | **chain** 60:7 | **classification** 16:22 | **commonly** 56:15 |
| **caption** 11:12 | **chairs** 41:11 | **clean** 7:24 | **communicated** 66:20 |
| **car** 47:23 51:3 53:21,22,25 62:21 | **chambers** 42:7 42:9 | **clear** 38:16,18 39:11,19 59:16 62:3 64:3,19 64:23 | **comparing** 44:22 |
| **care** 28:18 | **chance** 58:15 64:7 | **clearance** 64:13 | **complained** 23:2 |
| **career** 18:4 36:10 52:4 | **characteristics** 50:23 | **clearly** 67:18 68:6 | **complaint** 25:12 49:2,6 49:10,14,19 |
| **cars** 62:25 63:11 | **charge** 19:19 | **coca** 27:21 | **complaints** 21:3 |
| **carson** 21:22 | **charged** 58:10 | **code** 6:20 23:14 71:9,12,19,21 | **complete** 64:10 64:11 70:14 |
| **case** 1:3 5:21 6:12 8:12 14:6 22:22 24:4,16 28:14 45:25 48:13 58:18 66:23 70:16 | **charges** 24:8,10 24:14,18,19 | **coffee** 27:22 47:23 | **completed** 71:7 71:17 72:6 |
| **check** 12:18 | **cola** 27:21 | **completion** 70:17 72:11 |
| **cases** 22:4,13 55:3 | **chest** 64:1 | **collected** 23:18 | **computer** 12:19,25 |
| **catch** 33:3 | **chicago** 58:19 | **college** 13:13 13:16 | **concentration** 67:21 |
| **cause** 60:17,24 | **chief** 38:21 40:16 | **color** 67:17,25 | **concerns** 8:3 |
| **ccp** 71:9,12 | **childhood** 54:15 | **come** 17:13 22:25 26:3 34:18 42:15,22 43:7 | **concluded** 69:18 |
| **celebration** 28:25 | **circumstances** 60:16 | **comes** 40:9 | **concludes** 69:6 |
| **cell** 29:15,16 51:2 | **citizens** 23:1 33:25 | **comfortable** 55:19 | **conduct** 20:24 23:4 57:21 |
| **center** 14:20 | **city** 21:22 22:1 22:3 43:5 55:6 55:7 | **command** 60:7 | |
| **central** 1:1 5:20 | **civil** 4:7 11:14 21:20 27:7 71:19,21 | | |
| **certain** 58:9 | | | |

**[conduct - d]**

61:9,10
**conducted** 23:8
**conducting**
16:1 43:8
56:21
**conference**
41:8,10
**connection**
9:11 10:5
**consider** 27:19
52:8
**conspirator**
24:4
**constance** 1:10
**constitutional**
22:7,11 65:9
**contact** 27:9,13
71:9,20
**contacted**
33:11
**containing** 23:8
**continue** 5:12
**contract** 17:9
17:19
**conversation**
9:20 10:24
33:16 39:12
40:14,17 42:1
42:20,25 45:7
46:12 49:13
62:4 67:19
**conversations**
5:10 9:14 38:3
38:4 49:18
54:12 55:13

**conversely**
63:13
**convicted**
17:15
**conviction**
17:10
**convictions**
17:12
**copies** 11:8
**copy** 37:11
69:11,13
**correct** 7:20
11:3 13:2,5,8
17:23 20:17
24:9,12,21,23
26:7 31:5 32:6
33:10,19 45:15
46:8 47:13
66:10 67:6
70:13
**corrections**
71:14,15 72:3
72:4
**corruption**
4:10 18:19
21:6 34:1,4,7
34:12 35:15
52:22 54:9
55:5,14 56:6
56:23 57:7,9
57:17 58:5,20
61:4
**corruptions**
30:25 35:9,15
48:19

**counsel** 2:7
5:17 6:7 10:3,6
10:19 30:19
71:18,22 72:7
**county** 1:4,4,6
1:7,9 4:4 5:18
10:18 11:13
22:2 23:7 27:2
29:15 34:5
36:4,20 37:20
42:8 53:12
54:20 55:7,18
58:6 60:1 70:2
71:4
**countywide**
54:20
**couple** 19:12
28:1 29:5
30:23 55:3
**course** 29:13
30:14 32:19
57:11 66:4
67:24
**court** 1:1 5:19
6:17 7:9 9:4
43:21 64:1
66:23
**courts** 42:8
**cover** 40:9 51:5
**covered** 60:6
**covid** 14:5
**crash** 53:22
62:21
**crashed** 53:21
62:25

**crashing** 63:11
**create** 18:23
**crime** 20:25
21:3 23:21,22
39:10 60:22
**crimes** 16:18
**criminal** 16:1
20:23 21:25
22:5,13 23:4
23:15 27:6
31:16,17,23
38:8,10 39:5,6
57:21 60:15,25
65:16
**criminally**
64:21
**criticism** 58:13
**critics** 58:10
**crr** 1:23 2:5
**cruz** 1:11
**csr** 1:23 2:5
6:21
**culpability**
52:14
**cup** 27:21
**curb** 32:18
43:12 53:23,25
**currently** 8:22
24:4
**custody** 14:20
**cv** 1:3 5:21

**d**

**d** 3:1 7:11 26:1
26:1

**[damn - division]**

damn  41:20
dark  46:19
data  66:5,9,18
database  23:11
databases  23:8
date  51:2 61:19
    61:22,25 71:16
    72:5
day  18:9 54:23
    70:21
days  14:24
deal  39:25
dealing  55:5
december
    14:13 33:9
    35:22
decision  31:19
    38:13
decisions  31:19
    32:23
decline  51:8
declined  51:5
declining  51:15
defendant  4:4
    5:17 8:23,25
    11:12
defendants
    1:17 2:2,16
    6:11
defining  31:9
delegation  32:1
denier  37:21,24
    42:2,17 46:23
    62:5

department  1:6
    4:23 8:15 9:12
    14:10,12 15:22
    17:22 18:8
    21:18,23 22:10
    26:22 32:17
    34:12 39:23
    46:1,5 48:8
    51:14,17,20
    52:1 53:16
    56:11,24 57:14
    57:15 58:10
    60:8 62:4,14
    63:13 64:18
depending
    60:15
deponent  3:10
deposed  14:3
deposition  1:19
    2:1 4:7 5:16,22
    7:12 8:10 10:3
    10:9,14,25
    11:6,14 13:23
    25:6 30:21
    36:25 51:12
    52:16 59:20
    69:17 70:7,10
    70:16 71:19,23
    71:25 72:8,11
depot  43:4,25
deputy  4:12
    22:9 29:15
    52:23
describe  63:16

described
    41:22 44:1
describing
    44:20
description  4:2
    4:16
designated
    34:20,25
designation
    36:20
destructive
    4:19
details  67:8,10
detective  4:21
    15:13,21 16:5
    16:10,21 18:8
    18:15 26:23
    57:13,25 60:14
    63:24
detectives  19:3
    48:9 57:16
determine
    23:20
determined
    71:18,23 72:7
di  2:11 3:6 6:13
    37:12 50:2
    56:2 65:21
    68:19,23 69:3
    69:12,15
diana  24:7 65:9
dibona  6:13
    9:15
different  54:17

digital  45:24
dinner  28:21
direct  20:2,4
    38:12 39:12
directed  47:1
    57:2
direction  70:13
directly  20:5
    31:6 38:17
    39:7,15 45:8
disbanded
    20:12
discipline
    62:12 63:3
disciplined
    53:15 54:1
    62:22,23,24
discuss  26:21
    53:8
discussed  28:7
discussing  35:8
discussion  30:5
    55:20
discussions
    32:8 34:19
    37:22 49:9,22
    54:8 55:14
disprove  23:22
distinguishing
    50:23
distress  34:24
district  1:1,1
    5:19,20 17:7
division  1:1
    5:20 14:20

Page 6

**[division - extent]**

16:6,15 17:10
**divorce** 54:16
**document**
11:16 12:15
**documents**
10:11,12 12:20
12:23,25
**dodger** 43:6
**dogs** 38:5
**doing** 19:5,5,7
35:14 36:12,15
38:18 42:15
47:7,12,17,20
47:23
**door** 51:1
**downloaded**
23:11
**downloading**
65:8
**drafted** 31:15
**drawing** 38:23
**drinking** 47:23
**drive** 23:12
**driver** 47:25
**driving** 50:25
**drunk** 47:24
**duly** 70:7

**e**

**e** 3:1 4:1 7:11
7:11 19:22,24
19:24 24:7
26:1,1 32:2,3
39:1 66:4 71:9
71:12 72:1

**earlier** 57:23
58:4 62:21
64:20 65:2
**early** 43:24
46:19
**east** 29:1
**edelen** 1:23 2:5
6:21 70:4,25
**edith** 25:6
**educated** 9:4
**educational**
13:10
**eight** 19:2
41:11 66:13
**either** 41:21
42:3 47:18
60:16
**elected** 17:7
18:5 20:12
26:12 32:18
36:3 57:1
58:25
**election** 23:6
29:22 33:7
35:25
**electorate**
33:25
**electronically**
66:21
**elements** 39:10
**emotional**
34:24
**employee** 18:9
20:13,14 21:22
22:10 59:7

**employees** 18:9
23:2 57:21
**employment**
13:1,22 29:14
**ended** 35:23
**enforcement**
56:10,14,19
**engage** 43:16
**english** 44:17
45:1 68:8,25
**entire** 33:13
**entitled** 37:1
52:11
**equity** 1:8
**errata** 71:14,16
72:3,5
**escobedo** 1:13
**especially** 60:1
**esq** 2:11,18
71:1
**essentially**
36:11
**establish** 60:15
60:25
**establishes**
60:22
**esther** 1:15
24:24 25:1,4
25:18 49:6,14
55:11,15 64:21
**estimate** 57:24
**et** 5:19 71:4
**evening** 43:24
**event** 70:20

**everybody's**
44:10
**evidence** 17:13
23:19,21 37:20
42:16,19 57:3
58:17 60:21
**examination**
3:3 7:4 56:1
66:1 68:22
**examined** 70:6
**exchange** 29:11
**excuse** 62:8
**executive** 21:18
41:8 57:15
**exhibit** 4:4,9,18
4:21 11:5,6,12
11:23,25 12:3
12:8 36:24
48:25 51:11
52:16,18,20
**exhibits** 4:15
**exist** 16:16
**exists** 15:5
**expedited**
69:14
**experience** 34:8
**explain** 33:20
45:7 52:6,8
56:9
**explained**
33:23 34:3
**expound** 32:14
**extent** 40:14,23
41:25

Page 7

**[external - going]**

**external** 23:11
**eyebrow** 43:13

**f**

**f** 7:11 10:19
26:1
**facial** 50:23
**fact** 10:2 35:13
44:20 58:25
**familiar** 58:19
**family** 29:4
44:7
**fault** 53:21
**fbi** 34:6 56:6,17
57:2,3,6,10
**federal** 56:12
56:19 70:16
72:1,8,10
**feeling** 16:7
**feelings** 44:14
**felt** 35:10 65:12
65:18
**fernando** 43:4
**figure** 28:13
**file** 45:25 46:7
48:13
**filed** 5:19 24:8
24:10,14,18,19
25:12 49:2,6
49:11,15,19
**files** 12:19 13:4
23:15 65:8
**final** 31:19
**finally** 43:15
**financially** 6:3

**fine** 51:10
52:15 57:24
61:21
**finish** 7:22,23
**firefighter**
21:25
**firestone** 15:3,5
15:7,11,13,23
**first** 9:22 19:21
27:13 29:6
31:14 33:15
43:10
**five** 15:8,16
30:3 39:24
50:22,22
**flat** 44:23 45:2
**flip** 48:7 63:4
**floor** 34:15
**follow** 55:23
56:4 65:24
66:14 68:19
**followed** 43:23
**following** 43:25
50:11 69:9
**follows** 71:8
**foot** 50:22,22
**force** 18:21,22
27:17 56:15
57:7 64:4
**foregoing** 70:7
70:15
**forgery** 16:6
**forgotten** 33:17
41:15

**form** 34:11
**formed** 18:23
58:11
**former** 22:6
**formulate**
32:21
**forward** 51:24
**four** 14:18
39:20 51:1
**frame** 40:3
**frankly** 59:3
**fraud** 16:6
**frcp** 72:1
**free** 37:20
**frequently** 38:5
**friend** 18:6
25:23,24 27:19
**friendly** 27:20
27:24
**friends** 35:7
**front** 11:11
43:18
**fulfill** 19:13
**full** 17:18
**funeral** 28:3
**funny** 44:19
**furrowing**
43:13
**further** 55:22
65:21 66:1
68:18,22 69:3
70:19
**future** 32:15

**g**

**g** 1:14 19:22
26:1
**gabriel** 22:3
**gang** 16:11
**garbage** 43:11
43:12
**general** 1:10
22:8,9 24:5,17
37:21 54:7,11
54:12 55:9,9
**generally** 17:11
**gentleman**
10:18
**german** 69:1
**germane** 52:7,9
**germans** 44:21
**getting** 21:2
25:22 30:17
**gift** 65:23
**gist** 38:3
**give** 6:24 8:6
20:10 58:15
63:14
**giving** 4:22
32:22 51:19
64:7 65:24
**glenn** 19:22,22
**go** 5:13 11:23
11:25 12:2,14
14:19 33:12
52:2 59:9
**god** 53:17
**going** 5:6 7:18
7:18 11:4 15:6

Page 8

**[going - huntsman]**

16:7 23:17
32:25 35:2
36:16,17 40:11
47:22 51:4,21
51:22 52:3
53:8,11,13,14
61:17 64:4
**gold** 66:25
**goldfeder**
25:25 26:3,18
26:24 27:9
35:6,10
**good** 5:5 6:10
6:13 7:6,7
11:21 35:10
40:6 53:3
**government**
21:16 23:1
57:21
**gracious** 63:9
**grad** 13:12
54:15
**grade** 68:15,15
**great** 30:6
44:13 48:11
**grew** 58:19
**grief** 32:15
**ground** 7:19
34:14
**grow** 8:14
**guess** 9:3,4
11:8 18:13
28:6 36:10
63:8

**guessing** 9:3
**guidance** 32:23
**gustaf** 1:15
**guy** 54:14,23
54:24

**h**

**h** 4:1
**habeas** 17:14
**hair** 50:21
**half** 13:13
17:25 57:6,10
**hallway** 31:10
**hand** 6:22
25:15 54:24
70:21
**handle** 22:14
**handled** 63:19
71:8
**handwritten**
46:9
**happen** 62:6,9
**happened**
30:21 40:18
43:1
**happenings**
38:6
**happens** 18:3
46:20 47:24
**hard** 23:12
63:5,6,10,18,21
63:24
**hate** 63:5,17
**hawaii** 30:8
**head** 19:16,18
34:11,18

**heading** 24:6
**health** 8:2
**hear** 40:11
46:22
**heard** 45:13
66:3
**hearing** 21:20
**held** 69:9
**help** 18:23
32:21 33:21
**helps** 40:3
**hey** 47:21
**high** 13:11,12
55:3 63:20
**higher** 60:8
**highest** 19:2
32:19
**highly** 46:4
**highway** 59:9
**hire** 10:6 20:13
**hired** 17:6 18:7
18:15 33:4
**hires** 4:10
52:22
**hiring** 26:21
33:13
**hispanic** 50:15
**hit** 47:24 53:23
58:23
**holocaust**
37:21,24 42:2
42:17 45:5
46:23 62:5
**home** 11:20
43:4,9,19,24,25

45:12 66:20
**homeland**
56:18
**homicide** 16:22
17:2,5 48:9
53:20,24 63:19
**homicides**
63:21 64:13,18
**honest** 29:6
**hope** 40:3
59:22
**hopefully** 38:14
**hoping** 46:2
**hour** 49:25
**hours** 18:10
19:10,10,12
**house** 47:2
66:12,17
**housekeeper**
42:21 43:23
44:11,12,12
50:12 67:9
68:24
**housekeepers**
44:13
**huh** 10:7,17
20:18 32:24
40:2 46:21
50:2 55:2,10
**huntsman** 1:15
22:16 23:25
24:3,11,15,22
25:14 37:21,23
42:1,16 43:11
43:15 44:6

**[huntsman - justification]**

45:5 46:7,23
47:2 49:2,10
49:19 54:10,17
62:5 64:25
65:4,6,10,17
66:9
**huntsman's**
43:9

**i**

**idea** 33:15
34:11 35:8
**identification**
11:7 52:17
65:6
**identified**
67:12
**identify** 21:14
21:15
**ii** 44:22 67:20
**illegal** 59:10
**illinois** 13:15
**immoral** 59:11
**impact** 8:4
**imparted** 39:2
**incident** 62:19
62:20
**included** 71:14
72:3
**including** 63:20
**inclusive** 1:16
**incorporated**
22:1 55:6
**indication**
58:17 60:21

**individuals**
40:15,24
**information**
39:5 56:22
66:8 68:7,25
**initial** 35:3
60:25
**initials** 56:16
**initiated** 23:14
**inmate** 14:20
**innocence**
17:15
**input** 32:22
**inquiries** 31:16
**inquiry** 39:5,6
60:25 65:7
**inside** 44:4
**inspector** 1:10
22:7,9 37:20
**intake** 21:2
**intentionally**
38:1
**interacting**
31:6
**interaction**
32:20
**interactions**
31:12
**interest** 39:8
**interested** 6:3
70:19
**interesting**
42:10
**intermediate**
13:19

**interview** 37:17
37:18 45:23,24
**interviews**
23:18
**intimate** 44:13
**intimidated**
59:21
**introduce** 6:17
**introduced**
25:17 26:5
**introduction**
26:18
**investigate**
64:21
**investigated**
20:21 21:10
22:17
**investigates**
17:15
**investigating**
18:18 57:7
65:3
**investigation**
23:15,17 25:9
56:21 57:5
60:15,23 61:5
61:7,10 64:25
65:10,17 66:5
66:18
**investigations**
16:1,11 31:18
31:24 34:4
38:9 63:20
**investigative**
43:20 46:7

**investigator**
4:11 17:9
52:22
**invited** 28:23
**involve** 15:18
**involved** 25:9
**involvement**
22:19
**issue** 8:2 28:14
35:9

**j**

**jackie** 17:8
**jail** 53:12
**january** 20:9
35:17,22 36:4
36:7,8 51:24
52:5
**jason** 10:16
46:3
**jcx** 1:4 5:21
**jives** 41:23
**job** 1:24
**john** 29:18,21
38:24
**join** 57:5
**joke** 63:11
**joked** 62:15,17
62:18,19
**judge** 42:8
**july** 20:9 35:17
**justification**
61:6,11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[k - look]**

| k | | | |
|---|---|---|---|
| **k**  7:10 30:2 | 54:22 55:8,17 | 30:12,17 | 64:21 |
| **keep**  38:2 48:6 | 55:18 57:23 | **learn**  52:11 | **limitations** |
| 48:6,11 | 58:3 59:2,20 | **leave**  17:5 | 19:14 |
| **keeps**  65:23 | 60:14 61:16,18 | 20:11 63:25 | **limited**  18:9 |
| **kept**  25:7 44:22 | 62:9 63:7 | **lecrivain**  1:12 | 19:9 31:17 |
| **kim**  6:21 | 65:17 68:14 | **led**  42:16 | 32:21 41:2 |
| **kimberly**  1:23 | **knowledge** | **left**  36:4 | **line**  3:11 59:24 |
| 2:5 70:4,25 | 44:13 45:9 | **legal**  6:1 61:6 | 71:15 72:4 |
| **kind**  12:13 21:3 | 62:10 | 61:11 71:7 | **lines**  67:22 |
| 24:24 34:14 | **knucklehead** | **length**  50:20 | **literature** |
| 36:19 40:9,14 | 63:11 | **letter**  31:15 | 45:11,16,19,22 |
| 43:13 44:7,18 | **knudsen**  2:25 | **level**  22:15 | 67:11 68:1 |
| 45:1 51:6 | 5:25 | 32:18 68:15,16 | **litigation**  17:14 |
| 54:15,19 55:8 | **komoroski**  1:11 | **leyva**  32:3 | **little**  33:2 34:3 |
| 58:22 59:7 | **kopperud**  1:14 | **leyva's**  32:11 | 42:12 43:12 |
| 68:4 | | **library**  41:18 | 50:21 59:23 |
| **kindly**  53:2 | l | 41:19,22 42:3 | **lives**  44:14 |
| **kinds**  32:23 | **l**  7:11,11,11,11 | 42:7,9 | **llp**  2:17 5:23 |
| **knew**  12:22 | 19:22 26:1 | **license**  51:3 | 6:11 |
| 13:7 26:3 34:7 | 32:3 | **lieutenant**  19:3 | **loan**  34:6 56:5 |
| **know**  12:2,24 | **l.a.**  13:1 22:8 | 19:19,22,23 | 56:11 57:6 |
| 14:4,9 18:25 | 37:7 42:8 | 47:7,16,20 | **local**  56:13,23 |
| 19:9 23:20,24 | 46:15 52:21 | 48:18 | **location**  5:22 |
| 25:1,2,2 26:17 | 55:7 | **lieutenants** | **locked**  71:12 |
| 27:4,6,21 28:2 | **lacey**  17:8 | 19:25 | 72:1 |
| 28:16 29:4,18 | **large**  23:10 | **life**  36:9 | **long**  9:20 14:18 |
| 31:3,4,9 34:9 | **late**  43:24 | **light**  17:13 | 14:23 15:7 |
| 35:2,12 36:1 | 56:20 | **lillienfeld**  1:19 | 16:13,23 17:2 |
| 36:19 38:6,6 | **laughed**  44:19 | 2:1 3:4 4:8 | 17:24 20:7 |
| 40:8 42:6,11 | 45:1 | 5:16 7:10 | 32:4 35:16 |
| 44:11 46:18 | **laura**  1:12 | 11:15 69:7,18 | 48:10 57:24 |
| 47:11,16,20,24 | **law**  27:6,7 42:9 | 71:5 | **longer**  15:5 |
| 47:25 48:2,21 | 54:14 56:10,13 | **lim**  1:15 24:24 | 16:16 20:15 |
| 51:4 53:20 | 56:19 | 25:1,6,18 49:6 | **look**  10:11 |
| | **lawsuit**  8:22 | 49:14 55:11,15 | 12:16 43:13 |
| | 9:1 28:7,11 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[look - mute]**

50:19 57:16
**looking** 13:6
57:20
**looks** 50:17
**loop** 38:3
**los** 1:4,5,6,9 2:4
2:13,21 4:4 5:1
5:18,24 11:13
13:15,17 22:1
23:7 29:1 34:1
34:5 43:5 58:5
60:1 70:2 71:4
**lost** 33:1 37:14
**lot** 44:3,8 53:24
**loving** 44:7
**low** 32:17
**lowest** 39:22
**loyalty** 59:25
**luna** 1:14 20:16
29:22 35:21
36:3
**lunch** 28:21

**m**

**m** 7:10 19:24
30:2,2
**made** 11:8
**maintenance**
21:23
**major** 16:17
56:12
**make** 7:25
35:24 40:7,8
51:7 56:14
60:6 71:14
72:3

**maker** 31:19
**making** 38:13
**manage** 18:24
**manufactured**
48:8
**marie** 24:7
**mark** 1:19 2:1
3:4 4:8 5:16
7:10 11:4,15
69:7,18 71:5
**marked** 4:15
11:7 36:23,24
51:11 52:17
**marks** 50:3,7
69:5
**materials** 46:5
67:14
**matter** 5:17
45:4
**max** 1:15 22:16
25:14 37:21,23
42:1,16 46:7
46:23 49:2,10
49:19 54:10
62:5 64:25
65:4,10,17
**mean** 19:11
28:18 56:10
**meaning** 38:4
**means** 66:20
**meant** 12:6
**mechanism**
56:13
**media** 5:15
33:24 50:4,8

69:6
**medication** 8:4
**meet** 27:10
**meeting** 34:2,9
34:10 35:3
39:17
**meetings** 41:1
**member** 58:4
**members** 18:25
**memory** 8:4
38:16,19,20
40:14 41:23
46:18
**mention** 35:4
**mentioned**
38:17,20 39:7
56:5 57:23
58:3 64:20
65:2
**mercedes** 1:11
**messages** 29:11
**messed** 53:25
**met** 9:22 18:6
25:14,23 26:8
27:15 29:5
40:23 54:22,24
**michael** 25:25
26:24 33:17
**microphones**
5:8
**mid** 57:19
**midnight** 47:22
48:1
**mike** 26:3

**mile** 43:5
**miller** 2:17
5:23 6:11
**millerbarond...**
2:23 71:2
**mind** 7:8 13:9
**mine** 38:4
66:25
**minimal** 31:11
**minute** 10:1
**minutes** 9:21
**miscellaneous**
22:12
**moderately**
31:8
**monday** 1:20
2:3 5:1
**month** 19:10
30:16
**months** 14:17
14:18 16:6
28:2 30:3
46:19
**morning** 5:5
6:10,13 7:6,7
**movements**
16:8
**murakami** 30:1
32:1 38:21
39:18 41:22
42:4 49:18
60:2
**murder** 56:21
**mute** 5:10

Page 12

**[mutual - old]**

**mutual** 18:6
**myers** 19:23,23

**n**

**n** 3:1 7:11
19:22,22 24:7
66:4
**name** 5:25 6:20
7:9 10:19
21:14,15 24:25
25:2 29:6
33:17 35:4
41:15 42:23
50:13 51:2
54:16,17 55:17
**named** 10:16
70:6,11
**national** 64:16
**nature** 44:9
55:9
**nazi** 4:22 45:5
**neach** 2:18 3:5
6:10,10 7:5
11:4,8,10
14:22 37:11,13
37:15 49:25
50:10 52:18,19
55:21 65:23
66:2 68:17
71:1
**necessarily**
22:14
**necessary**
48:22 71:14
72:3

**need** 60:24
**needed** 11:9
20:15
**needs** 60:16
**never** 25:15,15
25:16,20 27:16
27:20 28:22
31:23 34:23
38:8 43:11,11
43:18 54:22,23
54:24 55:17,19
60:5,11
**new** 17:13
18:20 20:12
33:21 57:13
**newly** 18:23
**news** 38:6
**nice** 29:10
**nine** 32:16
**notably** 37:19
**notating** 71:15
72:4
**notation** 24:6
**note** 5:8 42:6
**notebooks** 48:7
48:12
**notes** 33:2
45:24 46:9
47:9,10,17
48:4,11,15
51:1
**notice** 4:5
11:13
**noticing** 6:9

**november**
29:23,24 33:8
62:1,6
**number** 6:21
18:10 19:2
21:13,14,16
23:1,10 51:2,3
71:15 72:4
**numbered**
11:22

**o**

**o** 26:1
**oath** 7:20 38:10
**objections** 6:4
6:5
**obviously** 22:6
46:16 67:20
**occasions** 39:20
**occurred** 23:21
23:23 34:5
45:6 60:22
**october** 52:21
**odd** 54:15
**odder** 4:19
37:19
**oddly** 55:5
**office** 1:9 15:25
41:5,10 71:11
**officer** 13:22
56:15 57:7
**officers** 56:14
**offices** 42:3
**official** 60:1
**oh** 12:6,6,6,10
14:4 15:15

35:2,8 36:11
53:10,17
**okay** 7:15,18
7:22 8:2,6,9,12
8:14,17 9:3,14
9:20,22,25
10:4,13,21,24
11:18 12:18,24
13:3,6,9,14,18
14:2,6,8,14,16
14:25 15:9,15
15:18,20,23
16:2,4,7,19,23
17:4,21,24
18:3 21:1
22:19 25:11,14
25:22 26:5,8
27:2,9,13,16,23
28:7,10,13,20
29:4,8 30:9,11
30:20 33:11,20
34:14,17 35:8
35:14 37:6,13
41:25 44:2,5
45:13,16 47:14
47:16 48:5,24
49:22 50:15,17
52:15 53:1,8
53:14 54:12
61:21 62:3
64:6 66:8,11
67:1,7 68:11
68:17
**old** 50:20

**[older - politely]**

| | | | |
|---|---|---|---|
| **older**  50:25 | **pamphlet**  68:2 | **penalty**  71:16 | **pertains**  70:15 |
| **olympic**  29:1 | **panel**  1:8 | 72:5 | **phone**  9:14,18 |
| **once**  31:10 41:4 | **paper**  12:19 | **pension**  18:11 | 10:1 27:10,14 |
| 41:7,12 55:1 | 13:3 67:24 | **people**  17:16 | 28:5 29:15,16 |
| **ones**  21:12 | **paragraph** | 20:4 21:16 | **phones**  5:10 |
| 22:16 24:20 | 37:9,16 | 24:6 40:1 | **photographs** |
| 63:20 | **parking**  44:3 | 41:11 44:22 | 45:21 67:17,21 |
| **ooo**  69:20 | 53:24 | 45:2 57:17 | 67:21 |
| **open**  22:13 | **part**  18:8 20:7 | 63:1 | **photos**  67:11 |
| 64:24 | 20:19 21:25 | **perceived**  60:3 | **phrased**  47:18 |
| **opinion**  59:17 | 26:22 47:11 | 60:9 | 60:19 61:2 |
| **opinions**  44:15 | 48:13 67:2 | **percent**  64:17 | **pick**  5:9 |
| **opponent**  60:3 | **particular** | **period**  15:14,16 | **picture**  53:9 |
| 60:10 | 20:24 21:3 | 19:10 48:20 | **pieces**  40:9 |
| **opponents** | 40:24 | 71:18 72:7 | **pissed**  30:18 |
| 58:12 59:18 | **parties**  5:13 | **perjuring** | **place**  5:13 41:1 |
| **order**  33:12 | 8:20 | 21:19 | 41:3 42:2 |
| 58:11 60:14 | **partner**  56:20 | **perjury**  71:17 | 46:13 56:13 |
| **original**  70:15 | **party**  6:2 8:17 | 72:6 | 70:11 |
| 71:10,20,22 | 8:22 28:18,23 | **permanent** | **plaintiff**  1:3 2:9 |
| **outcome**  6:3 | **pasadena**  4:23 | 48:13 | 6:14 8:23,25 |
| **overall**  57:9,25 | 36:13 51:14,16 | **person**  9:23 | **plate**  51:3 |
| **overheard**  45:9 | 51:25 | 20:24 25:14,21 | **play**  33:2 |
| 45:10 | **passing**  39:8 | 27:15 28:1 | **please**  5:8,10 |
| **oversight**  1:8 | **past**  30:2,21 | 31:18 35:10 | 6:5,9,17,22 |
| **own**  10:6 47:4 | **pat**  64:6 | **person's**  66:24 | 37:12 69:12,15 |
| **p** | **path**  23:20 | 66:25 | **plus**  57:11 |
| **page**  3:3,11 4:2 | **paths**  26:8 | **personal**  22:15 | **point**  23:5 |
| 11:12 12:1,2,2 | **patrol**  15:1,11 | 22:19 26:24 | 46:16 67:16 |
| 12:8 37:8,16 | **patting**  63:17 | 44:9,14 62:10 | **police**  4:23 22:7 |
| 71:15 72:4 | **pdf**  71:12 72:1 | **personally** | 22:11 51:14,17 |
| **pages**  1:25 | **pdt**  2:2 5:2 | 23:17 25:8 | 51:25 56:24 |
| 11:22,23 52:7 | **peace**  13:22 | **personnel**  23:8 | 58:23 65:9 |
| 71:14,17,17 | **penal**  23:14 | 23:10 65:8 | **politely**  51:8 |
| 72:3,6,6 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[political - ranks]**

| | | | |
|---|---|---|---|
| political 58:12 | presiding 42:8 | promoted | **q** |
| 59:17 60:3,10 | pretty 9:4 | 16:21 | question 7:23 |
| poor 44:18 | 31:22 32:21 | promotion | 12:14 30:6 |
| 68:14 | 39:21,22 55:19 | 15:18,20 | 34:17 39:15 |
| poorly 47:19 | 56:22 | pronunciation | 47:19 51:9 |
| 47:19 60:19 | previously 4:15 | 10:23 | 59:14 60:19 |
| 61:2 | 36:23 38:2 | proper 61:6,10 | 61:2 62:16 |
| popped 34:18 | 51:4,11 66:22 | prosecuted | 68:20 |
| posing 4:12 | primarily 19:6 | 24:5 | questionable |
| 52:22 | 48:9 58:18 | prosecutor | 17:13 |
| position 17:18 | primary 34:8 | 54:21 55:4 | questions 3:10 |
| 17:20 18:13 | prior 70:6 | protected | 32:15,22 38:15 |
| positive 67:15 | prison 16:11 | 23:13 | 40:4 49:17 |
| possession | private 5:9 | prove 23:22 | 50:11 51:6,15 |
| 10:12 12:22 | probable 60:17 | provided 24:13 | 51:23 52:4 |
| 45:25 | 60:24 | 71:19 72:8 | 55:22 65:22 |
| possible 38:15 | probably 14:4 | public 18:19 | 67:15 69:4 |
| 39:4,6 | 28:1 33:1 | 21:6 30:25 | quick 33:1 |
| post 13:20 | 50:21 63:1 | 33:25 34:4,7 | quite 16:8 38:5 |
| potentially | problem 12:12 | 34:12 35:9,14 | 43:10 59:3 |
| 46:23 | 12:12 | 35:15 48:19 | |
| pounds 50:22 | procedure | 54:9 55:5,14 | **r** |
| power 46:3 | 71:19,21 | 56:6,22 57:7,9 | r 7:10 19:24 |
| practices 27:6 | proceeding 6:5 | 57:17 58:5,20 | 24:7 26:1 30:2 |
| practicing | 38:11 | 61:4 | 32:2 39:1 66:4 |
| 54:21 | proceedings | published 68:5 | r&s 72:1,10 |
| prepare 10:8 | 69:9 70:14,17 | pulling 53:23 | radar 65:7 |
| prepared 67:14 | process 21:1 | purportedly | raise 6:22 |
| present 2:25 | 33:13 | 42:21 | raised 58:18 |
| 6:7 52:5 | product 54:16 | purpose 26:17 | rambling 39:14 |
| presentations | professions | 31:17 34:9 | rank 15:21 |
| 51:19 | 6:20 | 38:9 66:17 | 16:21 32:17,19 |
| presented | profile 55:3 | pursuant 6:19 | 39:22,25 40:1 |
| 24:16 57:3 | 63:20 | put 11:11 43:11 | 60:8 |
| 59:23 | | | ranks 32:16,20 |

Page 15

**[rare - respect]**

| | | | |
|---|---|---|---|
| **rare**  39:21 | **recognize** | 65:8 66:5,23 | 14:21 22:8 |
| **rarely**  31:8 | 11:16 37:4 | 68:8 | 64:1 69:11,13 |
| **rate**  64:13 | **recognized** | **regular**  47:11 | **reporting** |
| **ray**  32:2 | 63:6,18,22,24 | **rehire**  34:21,25 | 19:25 20:5,6 |
| **read**  37:1 68:8 | **recollection** | 36:20 | 51:13 |
| 68:13 | 38:18 39:11,19 | **rehired**  33:12 | **reports**  20:2 |
| **reading**  71:24 | 40:21 64:12 | 33:15 | **represent** |
| 72:10 | **recommend** | **relate**  45:4 | 10:25 30:19 |
| **real**  33:1 53:22 | 46:4 | **related**  6:2 | **representation** |
| 58:19 | **recommendat...** | 12:25 21:6 | 30:17 |
| **really**  30:10,10 | 24:13 | 30:7 46:7 66:9 | **representative** |
| 31:23 34:8 | **record**  5:6,14 | **relation**  13:21 | 11:19 |
| 44:7 53:22 | 6:8 7:24 37:6 | **relationship** | **represented** |
| 57:18 | 50:5,6,9 58:4 | 59:8 | 10:2 |
| **reason**  8:6 | 58:15 61:21,22 | **released**  71:22 | **representing** |
| 26:20 | 62:3 64:5 69:8 | **religiously** | 5:25 6:11 |
| **reasonable** | 69:10 | 31:22 | **reprimanded** |
| 60:16 | **recorded**  5:16 | **remember** | 53:15 |
| **recall**  8:12,20 | **recording**  5:12 | 13:24 14:2 | **reprimands** |
| 10:1 14:6 | **records**  23:8,10 | 22:2 29:6 41:4 | 62:13 |
| 20:20 21:9 | **recused**  31:20 | 41:7,12 50:13 | **reputation** |
| 22:22 30:10 | **recusing**  31:15 | 54:18 67:8,23 | 54:20 |
| 34:10 37:25 | **reduced**  70:12 | 67:24 | **requested** |
| 40:17 42:23,25 | **refer**  16:15 | **reminding**  25:7 | 70:18 72:1,10 |
| 45:16,19 46:12 | **reference**  39:13 | **repeatedly** | 72:11 |
| 46:18 50:17,24 | 39:16 | 33:24 | **requesting** |
| 54:3,7,13 | **referenced**  4:15 | **rephrase**  18:14 | 12:23 |
| 55:13,15 62:18 | 71:6 | **replaced**  32:9 | **requests**  12:15 |
| 66:12 67:7,10 | **referred**  56:15 | **replacement** | 12:16 |
| 67:13,16 68:1 | **referring**  31:4 | 32:9 | **required**  71:20 |
| 68:3,5 | **regarding**  23:3 | **report**  47:6 | **requiring**  8:3 |
| **recently**  13:24 | 30:16,17 31:12 | **reported**  1:22 | **resigns**  4:22 |
| **reception**  14:20 | 31:19 32:22 | 21:4 | **respect**  25:12 |
| **recognition** | 51:16,25 55:11 | **reporter**  6:17 | 49:3,6 66:18 |
| 63:7,9 | 55:15 56:22 | 6:19 7:2,9 | |

**[respond - sheriff's]**

| | | | |
|---|---|---|---|
| **respond**  58:16 | **robert**  1:12,14 | **school**  13:11,12 | **services**  43:16 |
| **responsive** | 29:22 35:21 | 54:14 68:15,16 | **serving**  9:12 |
| 12:20 | 36:3 | **scope**  29:14 | **set**  33:16 |
| **restaurant**  29:1 | **role**  16:13 | **screen**  65:7 | **setting**  38:17 |
| **result**  24:2 | **ron**  1:13 | **screwed**  36:1 | **several**  12:15 |
| **results**  23:24 | **room**  25:16 | **sealed**  71:20 | 63:20 |
| **retain**  12:25 | 39:21 41:3,9 | **searches**  66:24 | **shegerian**  2:10 |
| 13:3 | 41:10,12 54:24 | **second**  19:23 | 6:14 |
| **retaliate**  58:12 | **roughly**  14:17 | 20:10 37:8,8 | **shegerianlaw...** |
| 59:17 60:2,9 | 15:9,10 18:2 | 37:16,16 | 2:14 |
| **retired**  17:6,21 | **rpr**  1:23 2:5 | **secret**  56:17 | **sheriff**  4:9 13:1 |
| 21:19 | **rules**  7:19 72:8 | 58:23 | 15:25 18:6 |
| **return**  71:17 | **run**  31:11 | **section**  16:12 | 20:12,16 23:7 |
| 72:6 | **running**  26:14 | **secured**  23:11 | 26:12 29:15 |
| **revealed**  23:9 | **s** | **security**  56:18 | 31:7,7 32:18 |
| **revert**  32:25 | **s**  4:1 19:24 39:1 | **see**  10:24 12:6 | 33:8,18,20 |
| **review**  17:10 | **saga**  4:18 | 12:10,19 14:8 | 35:3 36:24 |
| 70:17 71:8,10 | **salute**  4:22 | 17:17 18:12 | 37:18,23 39:3 |
| 71:13 72:2 | **san**  2:12 22:3 | 31:8,10 34:13 | 39:7,13,17 |
| **reviews**  17:12 | 43:4 | 46:15 48:14,14 | 40:16 49:3,7 |
| **rid**  43:17 | **sanctioned** | 61:22 66:19 | 49:10,14,21 |
| **right**  6:22 7:12 | 43:20 | 67:1,4 | 52:21 54:8 |
| 12:4 13:7 | **satterfield** | **seeing**  43:10,10 | 55:16 57:1,1 |
| 17:22 18:15 | 29:18,21 38:24 | **seen**  25:21 | 58:6,6,6,11,25 |
| 19:15 24:8,11 | 39:1,18 41:6 | 45:11 52:24 | 59:16,20 60:4 |
| 24:20 25:4 | 41:21 42:4 | 67:17 | 60:10 61:4 |
| 28:16 31:5 | 49:23 | **sense**  7:25 53:1 | 62:10,12 64:24 |
| 32:5 33:7,14 | **save**  32:14 | 53:3 54:7 | 65:11,18 |
| 35:24 36:5 | 38:14 45:23 | **sensitive**  5:8 | **sheriff's**  1:5 |
| 42:4 48:3,17 | **saying**  31:3 | **sergio**  1:13 | 8:15 9:12 14:9 |
| 53:2,12 55:21 | 63:5 | **served**  11:18 | 14:11 15:22 |
| 56:3,7 58:7 | **says**  11:25 12:7 | **service**  20:14 | 17:22 18:7 |
| 64:3 66:6 67:5 | 12:7 37:17 | 21:20 28:3 | 21:18 22:9 |
| **road**  43:4 | **schedule**  71:10 | 35:23 36:4 | 26:22 32:16 |
| | | 56:17 58:2 | 34:12 41:10,17 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[sheriff's - supreme]**

|  |  |  |  |
|---|---|---|---|
| 46:1,5 48:8 | six 14:17,24 | spare 7:18 | 71:9,12 |
| 51:20 53:16 | 28:2 30:3 | speak 10:13 | states 1:1 5:19 |
| 57:14,15 60:8 | 39:25 | special 16:11 | station 15:2,7 |
| 62:4,13 63:13 | small 41:10 | specific 54:8 | 15:23 |
| 64:17 | 48:12 55:6 | 57:16 62:20 | stipulation |
| sheriffs 59:12 | smaller 22:1 | 67:15 | 71:21 |
| sherman 57:2 | solemnly 6:23 | specifically | store 44:4 |
| shook 25:15 | solutions 6:1 | 21:7 23:25 | story 42:11 |
| 54:23 | 71:7 | 48:19 54:6,11 | straight 59:24 |
| shooter 59:24 | solve 63:21 | 64:24 67:11 | stuck 31:22 |
| short 50:21 | somebody 47:1 | spell 7:9 | stuff 38:6 63:12 |
| shorthand | 62:23 63:10 | spelling 10:22 | subject 20:22 |
| 70:11 | somewhat | spent 25:6 | 45:4 |
| shortly 49:1 | 44:17 45:21 | spoke 10:15,18 | subpoena 4:6 |
| shoulder 50:20 | 46:19 59:21 | 28:2 29:25 | 11:13 39:13,16 |
| showing 52:20 | sorry 12:10 | 30:3 31:23 | 46:3 48:15 |
| side 42:6 63:4 | 14:1 20:3 | 38:8 46:2 | 52:7 67:14 |
| sight 41:20 | 34:17 35:18 | spoken 59:5 | subpoenaed |
| sign 31:15 | 40:19 42:24 | sporadic 43:8 | 28:12 |
| 71:16 72:5 | 47:18 48:24 | squad 58:23 | subsequent |
| signature 70:24 | 55:12 62:11 | ss 70:2 | 17:7 |
| 71:22,24,24 | 65:15 | stadium 43:6 | subsequently |
| 72:10 | sort 18:17 | staff 38:22 | 24:17 |
| simply 39:11 | 25:11 | 40:16 57:15 | substance 9:25 |
| 43:16 46:17 | sounds 36:5 | stars 2:3,19 | 13:24 30:5 |
| sir 7:6,14 11:11 | 40:25 55:23 | 5:23 | suffering 34:24 |
| 12:5,17 14:25 | 63:25 | start 14:11 | suggestion |
| 15:17 16:9 | source 46:24 | 40:13 61:5 | 24:14 |
| 17:3 34:16 | south 4:23 | started 14:10 | suit 28:19 |
| 37:10 40:20 | 36:13 51:14,16 | 14:14 | suite 2:4,20 |
| 55:24 56:3 | 51:25 | starting 13:10 | 5:24 |
| 61:21 64:3 | southeast 55:6 | 33:21 34:15 | supervisors 1:7 |
| sit 64:12 | southern 56:23 | starts 33:8 | support 58:25 |
| sitting 9:15 | spanish 44:17 | state 6:5,7 7:8 | supreme 43:21 |
| 47:22 | 44:25 69:1 | 13:16 70:1,5 | 66:23 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[sure - today]**

| | | | |
|---|---|---|---|
| sure  35:24 40:7 | 54:25 | text  29:11 | tim  30:1 32:1 |
| 40:8 51:7,8 | talked  9:18 | texted  30:15 | 60:2 |
| 60:6 | 27:25 28:4 | tfo  56:16 | time  5:11 6:6 |
| surprise  40:11 | 29:20 30:2 | thank  6:16 7:2 | 8:9 9:17,22 |
| surveillance | 34:23 | 11:9,19,20 | 15:14 17:2,18 |
| 43:8 47:2,7,17 | talking  37:17 | 37:3 38:25 | 17:19,21 18:8 |
| 47:21 48:4,21 | 39:23 42:22 | 58:2 64:9 | 19:8,13 23:5 |
| 66:12 | 54:18 68:9 | thanked  20:14 | 25:7 26:11,22 |
| surveillances | tape  45:24 | theft  21:21 | 27:25 28:4,20 |
| 43:22 | task  18:21,22 | 23:15 | 29:20,25 31:25 |
| surveying | 56:15 57:7,16 | thing  19:5,6 | 34:6,10 37:22 |
| 66:17 | tasked  57:20 | 28:15 31:14 | 38:10 40:25 |
| suspects  20:25 | technique | 37:1 39:8,8,9 | 42:7 46:16 |
| 21:9 | 43:20 | 44:16 47:23 | 48:10,17,20,25 |
| suspicion  60:17 | teen  54:4 | 66:3 | 49:5,13 50:4,8 |
| svw  1:4 5:21 | tell  10:4 13:9 | things  18:17 | 51:19 53:16,19 |
| swear  6:18,23 | 32:17 44:5,16 | 19:4 31:20,21 | 54:5 55:24 |
| sworn  23:6 | 47:21 53:5 | 44:8 45:11 | 57:1 60:20 |
| 35:21,21 56:13 | 59:8 62:11 | 47:11 52:12 | 65:14,16 70:11 |
| 70:7 | 68:11 | 55:9 59:3 | 71:10,18,25 |
| | ten  41:11 | 67:22 | 72:7 |
| **t** | tend  41:1 | think  7:15 | timeline  16:25 |
| t  4:1 24:7 39:1 | teran  24:7,20 | 12:13 25:20 | 33:1 |
| 39:1 66:4 | 65:9 66:4 | 27:10 30:14 | times  7:15 9:7 |
| table  41:11 | term  31:5 | 32:2 35:19,25 | 9:17 22:8 29:5 |
| take  5:13 8:3 | testified  9:4 | 36:6 41:8 | 37:7 46:15 |
| 33:2 41:1 50:1 | 38:2 62:21 | 53:22 55:4 | 52:21 57:14 |
| 53:1 56:13 | 66:22 | 59:15 62:15 | 66:11 |
| 61:10 | testify  4:6 | 64:19 65:2 | timothy  38:21 |
| taken  2:1 5:16 | 11:14 38:11 | thought  10:10 | tired  53:23 |
| 7:13 8:10 42:2 | 40:10 70:8 | 43:9 54:1 | title  55:18 |
| 70:10 | testifying  7:20 | three  9:21 10:1 | titled  4:9,18,21 |
| takes  16:25 | testimony  6:23 | 13:12 16:6,14 | 52:21 |
| 43:16 | 8:7 13:23 69:6 | 16:19 40:15,23 | today  6:2 8:7 |
| talk  30:20 31:3 | | 57:11 | 10:9 22:6 |
| 35:5,10 44:2 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[today - villanueva]**

64:13
**today's** 69:6
**together** 39:21
41:3
**tokoro** 10:16
11:18 46:3
**told** 20:15 44:8
48:18 65:4,5
**tolerated** 58:21
**took** 46:10,12
**topic** 51:5
**toyota** 51:1
**track** 33:1
37:14
**training** 14:14
14:19
**transcript**
70:14,16,18
71:6,8,10,13,13
71:22 72:2,2
**translate** 44:25
**trash** 43:17,18
66:24,24 67:2
**treasury** 56:18
**trial** 40:10,10
**tristan** 2:25
5:25
**trivia** 42:12
**true** 54:16
58:22 59:4,4
70:13
**truly** 37:25
**truth** 6:24,24
6:25 70:8,8,9

**truthfully**
38:11
**trying** 33:2
52:2 53:21
**turn** 47:11
**twice** 41:4,7,13
**two** 19:21
30:16 31:10
32:20
**type** 39:9 63:14
67:20 68:15,16
**types** 58:21
**typewriting**
70:12

**u**

**u** 30:2
**u.s.** 43:21 56:18
66:23
**uh** 10:7,17
20:18 32:24
40:2 46:21
50:2 55:2,10
**ultimately** 57:4
**unaware** 34:4
36:21,22 59:4
**uncomfortable**
64:5
**under** 7:20
23:14 24:6
38:10 56:14
57:11 59:12
70:12
**undersheriff**
31:18,25 32:4
32:10 38:21

39:18 40:16
41:5,13 49:18
**undersheriff's**
41:4
**understand**
7:19 40:12
68:14
**understanding**
53:5
**understood**
61:1,6
**unelected**
59:25
**unequivocally**
59:19
**unethical** 59:10
**unfair** 54:2
**unindicted**
24:3
**unit** 5:15 17:10
17:11,14 18:23
18:25 19:16,18
19:19 20:8,13
20:19 21:4
22:14,23,25
31:1,13 33:21
34:7,12 35:15
48:19 54:9
55:14 56:6
57:9 58:5,11
61:4
**united** 1:1 5:19
**university**
13:15,16

**unlawful** 59:10
**unusual** 39:22
43:14
**upbringing**
54:15
**ups** 56:4 65:24
**use** 56:16 62:22
**used** 48:9 63:2
63:2

**v**

**v** 1:13 10:19
32:3 71:4
**valley** 13:16
22:3
**varied** 19:11,13
**variety** 68:2
**verbally** 47:21
**veritext** 6:1
71:7,9,11,20
**versus** 5:18
24:7
**viability** 26:21
**vicente** 2:12
**video** 5:12,16
69:10
**videographer**
2:25 5:5 6:1,16
50:3,7 69:5
**videotaped**
1:19 2:1
**villanueva** 1:2
4:18 5:18 6:15
18:5 23:3,6
25:23 26:6,11
26:18 27:11,14

Page 20

**[villanueva - zero]**

| | | | |
|---|---|---|---|
| 27:19 28:21 | **weeks** 19:11,12 | 36:12 42:15 | **yeah** 9:9 32:7 |
| 29:12 31:7 | 30:23 31:10 | 43:17 51:16 | 32:12 42:11,13 |
| 34:20 35:6 | **welcome** 11:21 | 56:10 63:6,10 | 52:11 53:4,10 |
| 57:12 58:6,11 | **went** 15:1 | 63:18,25 66:15 | 53:18 |
| 59:16 60:4,10 | 16:22 23:20 | **worked** 14:9 | **year** 14:24 |
| 61:4 62:10,12 | 53:24 66:19 | 15:25 17:8 | 15:16 16:2 |
| 64:24 65:11,18 | 67:1 | 22:10 34:6 | 17:25 18:10 |
| 71:4 | **western** 1:1 | 57:5 59:13 | 26:9 28:6 |
| **villanueva's** | 5:20 13:15 | 63:4,23 | 35:25 36:2 |
| 36:24 38:4 | **whatsoever** | **working** 14:11 | 57:6,10 |
| 51:11 | 58:24 | 21:22 29:14 | **years** 13:13 |
| **vivian** 29:9 | **when's** 28:20 | 47:8 48:18 | 15:8 16:14,19 |
| **vote** 59:1 | 29:20 | 53:20 57:8,11 | 16:24,24 27:17 |
| **vs** 1:3 | **whispering** 5:9 | **works** 27:4 | 50:20 54:21 |

| **w** |
|---|

| | | | |
|---|---|---|---|
| **wait** 24:25 | **white** 67:18,25 | 44:6 | 57:8,11,18,25 |
| **waived** 71:24 | **widespread** | **world** 44:22,23 | 60:14 62:25 |
| 71:24 | 56:22 | 45:2 67:20 | 63:19,23 |
| **waiving** 71:21 | **wife** 29:5 | **wound** 43:25 | **yell** 62:23 64:2 |
| **walsh** 19:22 | **wing** 56:14 | **write** 68:13 | **yelled** 63:1,1 |
| **want** 30:7 | **wins** 33:7 | **written** 45:21 | **yin** 63:8 |
| 37:11 40:7 | **winter** 46:19 | **wrong** 10:22 | **young** 57:13 |
| 47:25 61:16 | **witness** 3:3 | 24:25 38:20 | 68:15 |
| 64:5 69:11,13 | 6:18 7:1 8:18 | 59:9 | **younger** 63:12 |
| **wanted** 33:21 | 8:19 70:6,21 | **wrongdoing** | |
| 34:3 35:5 | 71:13,16 72:2 | 21:17,24,25 | **z** |
| 66:19 | 72:5 | 22:5,5 | |
| **war** 44:22 | **woman** 25:2 | | **zero** 39:5 58:17 |
| 67:20 | 42:20 | **x** | |
| **way** 40:22 | **word** 44:24 | | |
| 42:14 48:11 | 62:22 63:2 | **x** 3:1 4:1 70:18 | |
| 54:2 61:3 62:8 | **work** 8:15 | **xx** 72:10 | |
| 62:9,11 65:18 | 14:10 18:10 | | |
| **week** 9:19 | 19:11,12 27:2 | **y** | |
| 14:24 19:10 | 28:13 30:7 | **y** 19:24 32:2,3 | |
| | 31:12 35:14 | **yale** 54:14 | |
| | | **yang** 1:12 63:8 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

VILLANUEVA v. COUNTY OF LOS ANGELES, et al.      USDC CASE NO.:  2:24  cv 04979 SVW (JC)

# PROOF OF SERVICE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

I am an employee in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 11520 San Vicente Boulevard, Los Angeles, California 90049.

On April 28, 2025, I served the foregoing document, described as **"PLAINTIFF ALEX VILLANUEVA'S APPENDIX OF EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION, VOLUME 2 OF 5,"** on all interested parties in this action addressed as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 28, 2025, at Los Angeles, California.

Amelia Sanchez
Amelia Sanchez