Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
320 North Larchmont Boulevard
Los Angeles, CA 90004
Telephone Number:  (310) 860 0770
Facsimile Number:  (310) 860 0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>        Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No.:  2:24  cv 04979 SVW (JC)<br><br>**The Honorable Stephen V. Wilson**<br><br>**PLAINTIFF ALEX VILLANUEVA'S APPENDIX OF EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION, VOLUME 3 OF 5**<br><br><br><br>Date:    May 19, 2025<br>Time:    1:30 p.m.<br>Dept.:   10A<br><br>Trial Date:    June 3, 2025<br>Action Filed:  June 13. 2024 |

# TABLE OF CONTENTS

| No. | Declaration |
|-----|-------------|
| 1 | Declaration of Alex Villanueva |
| 2 | Declaration of Alex DiBona, Esq. |

| Exhibit[1] | Evidence |
|------------|----------|
| 1 | Los Angeles County Board of Supervisors Motion "Report Regarding Options for Removing the Sheriff" Dated October 27, 2020 |
| 2 | Ordinance allowing Office of Inspector General to Issue Subpoenas written by Veronica Pawlowski dated January 21, 2020 |
| 3 | Email from Vanessa Chow to John Satterfield and Alex Villanueva regarding FBI Briefing on Fulgent dated February 1, 2022 |
| 4 | Letter from Alex Villanueva to Hilda Solis Entitled Ethical Violations of First District Justice Deputy dated February 9, 2021 |
| 5 | "Tweets" from Ester Lim attached to February 9, 2021 letter |
| 6 | Letter from Alex Villanueva to County Counsel asking for Defense in Fulgent Lawsuit dated January 31, 2022 |
| 7 | Denial of Counsel to Alex Villaneuva from Los Angeles County Counsel dated February 15, 2022 |

---

[1] Volume I includes Exhibit Nos. 1-17;

Volume II includes Exhibit Nos. 18-30;

Volume III includes Exhibit Nos. 31-40;

Volume IV includes Exhibit Nos. 41-48;

Volume V includes Exhibit Nos. 49-66;

| Exhibit[1] | Evidence |
|---|---|
| 8 | Letter from Alex Villanueva to Hilda Solis Entitled Ethical Violations of First District Justice Deputy dated March 4, 2022 |
| 9 | Email from Ester Lim to Hilda Solis's Chief of Staff Cindy Chen dated March 8, 2022 |
| 10 | Ester Lim's Letter to Vicky Bane, Executive Director of the County Equity Oversight Panel for the County of Los Angeles dated March 8, 2022 |
| 11 | Ester Lim's submitted online complaint regarding Alex Villanueva dated March 08, 2022 |
| 12 | Texts between Ester Lim and Max Huntsman Re their complaints dated sometime in March 2022. |
| 13 | Letter from Alex Villanueva to Board of Supervisors Opposing Ballot Measure J dated July 11, 2022 |
| 14 | July 12, 2022 Motion of the Los Angeles Board of Supervisors to Place Ballot Measure for the Los Angeles County Board of Supervisors to remove Sheriff by 4/5 vote. |
| 15 | January 4, 2023 Letter from Ron Kopperud to Alex Villanueva regarding request for Interview |
| 16 | Email Chain between Alex Villanueva and Christine Diaz Herrera dated January 9, 2023 to March 10, 2023 |
| 17 | Internal Affairs Bureau "Stacked" Case Filed for Ester Lim's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 18 | Internal Affairs Bureau "Stacked" Case Filed for Max Huntsman's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 19 | Internal Affairs Bureau Investigator's Log regarding Ester Lim's Ester |

| Exhibit[1] | Evidence |
|---|---|
| | Lim's Complaint regarding Alex Villanueva completed October 2, 2023 |
| 20 | Internal Affairs Bureau Investigator's Log regarding Max Huntsman Complaint regarding Alex Villanueva completed October 2, 2023 |
| 21 | Letter from Sergio Escobedo to County Equity Oversight Panel on Charges Founded dated October 17, 2023 |
| 22 | Texts between Ester Lim and Max Huntsman Re wanting their complaint of Alex Villanueva to go public in December 2023 |
| 23 | Desk Plaque for Max Huntsman and Max Hunts Professional Profile. |
| 24 | Devanne, Ann, relevant deposition excerpts |
| 25 | Diaz Herrera, Christian, relevant deposition excerpts |
| 26 | Komoroski, Constance, relevant deposition excerpts |
| 27 | Pawlowski, Veronica, relevant deposition excerpts |
| 28 | Murakami, Timothy, relevant deposition excerpts |
| 29 | Escobedo, Sergia, relevant deposition excerpts |
| 30 | Lilienfeld, Mark, relevant deposition excerpts |
| 31 | Lim, Ester, relevant deposition excerpts |
| 32 | Huntsman, Max, relevant deposition excerpts |
| 33 | Cruz, Mercedes, relevant deposition excerpts |
| 34 | Lecrevian, Laura, relevant deposition excerpts |
| 35 | Coates, Kyla, relevant deposition excerpts |
| 36 | Yang, Roberta, relevant deposition excerpts |
| 37 | 12/18/2018 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 38 | 1/29/219 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 39 | 08/13/19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 40 | 10-01-19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 41 | 10/15/19 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 42 | 01/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 43 | 03/31/30 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 44 | 04/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 45 | 06/29/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 46 | 07/07/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 47 | 07/21/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 48 | 07/28/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 49 | 08/04/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 50 | 09/01/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

| Exhibit[1] | Evidence |
|---|---|
| 51 | 09/15/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 52 | 10/13/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 53 | 10/27/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 54 | 11/10/20 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 55 | 01/26/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 56 | 05/04/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 57 | 05/18/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 58 | 05/19/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 59 | 06/22/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 60 | 07/27/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 61 | 08/10/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 62 | 09/28/21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

PLAINTIFF'S APPENDIX OF EXHIBITS

| Exhibit[1] | Evidence |
|---|---|
| 63 | 12-07-21 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 64 | 02/15/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 65 | 03/01/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |
| 66 | 07/12/22 Relevant Excerpts of the Transcript of the Los Angeles County Board of Supervisors |

Dated:  April 28, 2025

SHEGERIAN & ASSOCIATES, INC.

By: _____
Alex DiBona, Esq.

Attorneys for Plaintiff,
ALEX VILLANUEVA

PLAINTIFF'S APPENDIX OF EXHIBITS

# EXHIBIT 31

CERTIFIED COPY



**Express Deposition Services**
*by* EXPRESSNETWORK

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

ESTHER LIM

March 21, 2025

Shannon D. Denney, CSR No. 10385, Job No. 6454

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

```
ALEX VILLANUEVA,                   )
                                   )
          Plaintiff,               )
                                   )
vs.                                ) No: 2:24-cv-04979
                                   )     SVW (JCx)
COUNTY OF LOS ANGELES, COUNTY OF   )
LOS ANGELES SHERIFFS DEPARTMENT,   )
LOS ANGELES COUNTY BOARD OF        )
SUPERVISORS, COUNTY EQUITY         )
OVERSIGHT PANEL, LOS ANGELES COUNTY)
OFFICE OF INSPECTOR GENERAL,       )
CONSTANCE KOMOROSKI, MERCEDES CRUZ,)
ROBERTA YANG, LAURA LECRIVAIN,     )
SERGIO V. ESCOBEDO, RON KOPPERUD,  )
ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN)
ESTHER LIM, and DOES 1 to 100,     )
inclusive,                         )
                                   )
          Defendants.              )
_____)
```

DEPOSITION OF:  ESTHER LIM

March 21, 2025

REPORTED BY: SHANNON D. DENNEY, CSR No. 10385

LIM, ESTHER                                                      Page 2

```
 1                         APPEARANCES

 2

 3   For the Plaintiff:

 4         SHEGERIAN & ASSOCIATES, INC.
           BY:  ALEX DIBONA, ESQ.
 5         aDiBona@shegerianlaw.com
           11520 San Vicente Boulevard
 6         Los Angeles, CA  90049

 7

 8   For the Defendants:

 9         MILLER BARONDESS, LLP
           BY:  JASON H. TOKORO, ESQ.
10             STEVEN WILLIAMSON, ESQ.
           jtokoro@millerbarondess.com
11         2121 Avenue of the Stars, Suite 2600
           Los Angeles, CA  90067
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATION

 2                                                      PAGE

 3   BY MR. DiBONA                                        4

 4   BY MR. TOKORO                                      240

 5   BY MR. DiBONA                                      255

 6

 7                      ---oOo---

 8

 9                   INDEX OF EXHIBITS

10   Exhibit 1  Notice of Taking Deposition            261

11   Exhibit 2  2022.0711 Letter Re Measure J          261

12   Exhibit 3  2021.02.09 Letter                      261

13   Exhibit 4  Board Motion                           261

14   Exhibit 5  Pleading                               261

15   Exhibit 6  2022.03.08                             261

16   Exhibit 7  Complaint                              261

17   Exhibit 8  EL                                     261

18   Exhibit 9  Text                                   261

19   Exhibit 10 Text                                   261

20   Exhibit 11 Text (Dispo)                           261

21   Exhibit 12 Text                                   261

22

23                      ---oOo---

24

25
```

1          BE IT REMEMBERED that on March 21, 2025,

2   commencing at the hour of 10:00 a.m., before me,

3   Shannon D. Denney, a Certified Shorthand Reporter,

4   empowered to administer oaths and affirmations pursuant

5   to Section 2093(b) of the Code of Civil Procedure,

6   personally appeared

7                       ESTHER LIM

8   a witness herein, having been duly sworn, was examined

9   and testified as follows:

10

11          My name is Shannon Denney, CSR number 10385.

12

13                    EXAMINATION BY

14       Q.   MR. DiBONA:  Could you just say, and spell

15   your full name for the record?

16       A.   Esther Lim, E-S-T-H-E-R, L-I-M.

17       Q.   Thank you.  And other than Esther Lim, have

18   you ever been known by any other name?

19       A.   No.

20       Q.   And Ms. Lim, have you ever had your

21   deposition taken before?

22       A.   Yes.

23       Q.   How many times?

24       A.   Once.

25       Q.   And do you recall the general subject matter

LIM, ESTHER

```
 1              Do you recall a ballot measure, Ballot
 2    Measure A?
 3         A.   Which one was Ballot Measure A?
 4         Q.   Let me ask it this way.
 5              Do you recall a ballot measure that
 6    authorized the Board of Supervisors to remove a sheriff
 7    by a four-fifths vote?
 8         A.   Yes.
 9         Q.   Did you have any -- is it your understanding
10    did the board of -- excuse me.  Strike that.
11              Is it your understanding ballot measures are
12    ultimately decided by the voters?
13         A.   Yes.
14         Q.   And is it your understanding that, at least
15    in certain circumstances, in order to be placed on the
16    ballot, the Board of Supervisors has to vote in order
17    to do so?
18         A.   Yes.  There's a process.
19         Q.   And is it your understanding that the Board
20    of Supervisors took a vote to place the ballot measure
21    on whether they could remove the sheriff by a
22    four-fifths vote?
23         A.   Yes.
24         Q.   And did Hilda Solis vote for that?
25         A.   Yes.
```

1        A.   I don't recall.

2        Q.   Are you familiar of a ballot measure that its

3   proponents said it would increase Social Services

4   spending within the County of Los Angeles?

5        A.   Do you have a specific measure?

6        Q.   Yeah.  I believe it was Measure J.

7             But do you recall a ballot measure where that

8   critics said it was an effort to defund the police?

9        A.   I don't recall what critics said Measure J.

10  I am familiar with measure J, though.

11       Q.   Is that a ballot measure that Hilda Solis

12  supported putting on the ballot for voters?

13       A.   Yes.

14       Q.   And did you have any role in drafting that

15  motion?

16       A.   No.

17       Q.   Did you personally support that ballot

18  measure, as a voter of LA County?

19       A.   As a voter of LA County, in my personal

20  capacity, yes.  I did support it.

21       Q.   And did you have any understanding that the

22  sheriff was opposed to that?

23       A.   I don't recall.

24       Q.   Do you recall Sheriff Villanueva saying, at

25  any point in time in the Board of Supervisors meeting,

1    that was an effort to defund the police?

2          A.    Just to clarify.

3                That what was to defund the police, the

4    measure?

5          Q.    Yeah.  Fair enough.  Let me ask it a

6    different way.

7                Do you have a recollection, one way or

8    another, if Sheriff Villanueva said the measure to

9    increase Social Services was actually a method to

10   defund law enforcement?

11         A.    I don't recall if, at the time Sheriff

12   Villanueva made that comment or not.

13         Q.    Do you recall, separate and apart from any

14   measure, do you recall Sheriff Villanueva saying in his

15   opinion, he believed the Board of Supervisors was

16   defunding the police?

17         A.    Yes.

18         Q.    And the Board of Supervisors -- just to back

19   up for a second.

20               The Board of Supervisors is in charge of the

21   Los Angeles County Sheriff's budget.

22               Is that fair?

23         A.    Of the budget, yes.

24         Q.    Is it also, by the way, fair to say that you,

25   yourself, support defunding the police?

LIM, ESTHER

1       A.    What do you mean by "defund the police?"

2       Q.    Have you ever taken a public position in

3  support of just the phrase, "defund the police?"

4       A.    I believe that there -- I believe that the

5  budget could reflect more investments in the community

6  for alternatives to incarceration, and for just general

7  community support.

8       Q.    Did you -- excuse me.

9              When Sheriff Villanueva made the statements

10 that he have believed the Board of Supervisors was

11 defunding the police, did you share that view?

12      A.    Did I share -- I'm sorry.  Can you clarify?

13      Q.    Sorry.  I'll just ask it this way.

14             Do you believe the Board of Supervisors was

15 actually defunding the police while Sheriff Villanueva

16 was in office?

17      A.    I just need clarity in terms of what you mean

18 by the Board of trying to defund the police.

19      Q.    In setting the LA Sheriffs budget, do you

20 believe there were reductions in the LA County

21 Sheriff's Department budget while the Board of

22 Supervisors was in office?

23      A.    I don't recall specific -- I don't recall

24 specific -- recall budget specifics on just the

25 Sheriff's Department.

1      Q.   And so did you have an opinion when Sheriff

2  Villanueva said that he believed the Sheriff's

3  Department was being defunded, did you have an opinion

4  on that one way or another?

5      A.   You know, I mean Alex had his opinion on

6  that.

7           As shared earlier, I believe that there

8  should be more investments in the community, more

9  investments in terms of supporting our youth so that

10  they don't end up in our justice system.

11      Q.   Send Exhibit 2 through the chat.

12           Do you see a document on your screen?

13      A.   No.  I just see a file folder.

14      Q.   Sorry.  Sharing the wrong part of it.

15           MR. TOKORO:  I think it issue, Alex, you keep

16  sharing your desktop instead of the Adobe Acrobat

17  software.  So we keep seeing the folder on your

18  desktop.

19      Q.   MR. DiBONA:  What about now?

20      A.   Yes.  I see the document.

21      Q.   Exhibit 2 is AV '010579 to 582.

22           Ms. Lim, you tell me, do you recall ever

23  seeing -- sorry.  Let me scroll to the bottom so maybe

24  you have an understanding of what this is.

25           Do you see what purports to be Alex

1    Villanueva's signature at the bottom?

2         A.   Yes.

3         Q.   And do you see here it's addressed to the

4    Board of Supervisors?

5         A.   Yes.

6         Q.   And you see the date on here, July 11,

7    2022?

8         A.   Yes.

9         Q.   And do you ever recall seeing this letter?

10        A.   I do not.  I do not.

11        Q.   One moment.  I'm going to send Exhibit 3

12   through the chat.

13             Do you see a document on your screen?

14        A.   Yes, I do.

15        Q.   Exhibit 3 is AV 010545.  And it goes all the

16   way to 571.

17             Just to go to the top, do you recall ever

18   seeing this letter before?

19        A.   Yes, I do.

20        Q.   And is this, to your understanding, a letter

21   that Sheriff Villanueva sent to Hilda Solis on or about

22   February 9, 2021?

23        A.   Yes.

24        Q.   And -- excuse me.

25             Did you and Supervisor Solis ever discuss

LIM, ESTHER

1    this letter?

2        A.    Yes, we did.

3        Q.    How many times did you discuss it?

4        A.    I don't recall.

5        Q.    Do you have an estimate?

6        A.    I don't want to give you false numbers.  So I

7    don't recall how many times.

8        Q.    And excuse me.

9              What do you recall Supervisor Solis saying to

10   you about this letter?

11       A.    That the letter existed, and that it was

12   about my -- my tweets on my Twitter account.

13       Q.    What, if anything, did you say in response to

14   that?

15       A.    I don't recall.  I don't recall the specifics

16   of the conversation.  But I acknowledged that these

17   were tweets on my account, my personal account.

18       Q.    And other than acknowledging the tweets --

19   sorry.

20             You acknowledged the tweets, and what, if

21   anything else, was said after that?

22       A.    This is now about four years ago.  So I don't

23   recall the specifics of the -- of the communication, or

24   the conversation.

25       Q.    Other than you acknowledging -- sorry.

LIM, ESTHER

1              Other than Supervisor Solis informing you of

2    the existence of this letter, and you acknowledging the

3    tweets, do you recall anything else said about that

4    conversation?

5         A.   I don't.  I don't recall the specifics.

6         Q.   And do you recall anything -- do you recall

7    any other -- having another conversation with

8    Supervisor Solis about this letter?

9         A.   As shared, I don't recall how many times.  So

10   I don't want to provide any false estimates.

11        Q.   And did -- were you ever -- excuse me.

12             Following the receipt of this letter, were

13   you ever disciplined by Supervisor Solis' office with

14   respect to any of your tweets?

15        A.   Yes.

16        Q.   And what form did the discipline take?

17        A.   It's a personal HR matter.  So I would like

18   to check in with my counsel on whether or not I can.

19        Q.   You can consult with your counsel with

20   respect to privilege.

21        A.   Okay.  I mean, yes.  I was disciplined.  And

22   I was told not to.

23        Q.   You were told not to what?  Excuse me.

24        A.   Not to -- not to be on my Twitter account.

25        Q.   And just to be -- when you said, not to be on

1  your Twitter, did that mean delete your account?  Stop

2  posting?  What was your understanding of the

3  corrective?

4       A.    To not tweet.

5       Q.    Was the form of discipline any type of

6  written discipline?

7       A.    I don't recall -- I don't recall what form.

8       Q.    And after -- excuse me.

9             You can -- just to be clear.

10            You considered it a directive that you --

11  sorry.

12            Did you -- sorry.  Strike that.

13            Did you have an understanding that Hilda

14  Solis' office was directing you to stop tweeting?

15       A.    Yes.

16       Q.    And did you comply with that directive?

17       A.    Yes.

18       Q.    In other words, after receipt of that

19  directive, did you stop tweeting?

20       A.    Yes.

21       Q.    And to be clear.

22            Did you stop tweeting all entirely, or did

23  you simply make your Twitter account private?

24       A.    I don't recall -- I don't recall if I made my

25  account private.  I also believe -- I think I stopped

1          Q.   And if I scroll down, I understand you may

2     not be able to see all of page two.

3               On the part of page two, you can see, do you

4     see in this part, where -- any part where Sheriff

5     Villanueva calls for you to be fired?

6          A.   No.

7          Q.   And on the remainder of two, do you see any

8     part where he asks for you to be fired?

9          A.   No.

10         Q.   And if I go to page three, do you see -- any

11    part of you seeing on page three where Sheriff

12    Villanueva asks for you to be fired?

13         A.   No.

14         Q.   And if I go down you to the end of the

15    letter, is there any part of this -- what you're seeing

16    now, where Sheriff Villanueva calls for you to be

17    fired?

18         A.   No.

19         Q.   And do you see when I -- I am sorry.

20              The last page, do you see that's just the --

21    who it went to?

22              There's the cc's.

23         A.   Yes.

24         Q.   And if I keep scrolling down, do you see how

25    your tweets are included in the letter?

LIM, ESTHER

1        A.   Yes.

2        Q.   So having had a chance to review the letter,

3   which is page one through four, is there any part of

4   that letter that you -- where you saw Sheriff

5   Villanueva calling for you to be fired?

6        A.   No.

7        Q.   Do you see the tweet on your screen that

8   begins, "And Sheriff Villanueva has?"  Do you see

9   that?

10       A.   Yes.

11       Q.   And it appears to have been sent 4:26 p.m.

12   September 29, 2020.

13            Do you see that at the bottom?

14       A.   Yes.

15       Q.   And you were employed at Hilda Solis' office

16   on September 29, 2020.

17            Is that fair?

18       A.   Yes.

19       Q.   The tweet reads, "And Sheriff Villanueva has

20   the audacity to say he was a sponsor of this bill.

21   Fool.  What you should have done is not provide cover

22   for your deputies from any wrongdoing and held them

23   accountable," hash tag or pound sign Kobe Bryant.

24            Do you see that?

25       A.   Yes.

LIM, ESTHER                                                          Page 93

1          Q.    And is that something you tweeted on or about

2     September 29, 2020?

3          A.    Yes.

4          Q.    And at 4:26 p.m., is that considered business

5     hours at Hilda Solis' office?

6          A.    Yes.

7          Q.    And are you -- the "fool" in this tweet, is

8     the "fool" Sheriff Villanueva?

9          A.    Yes.

10         Q.    And was this tweet, is this -- sorry.  Just

11    to be clear.

12              If you call someone a "fool," is it fair to

13    say you don't think they're very smart?

14         A.    Not necessarily.

15         Q.    And was it your intention to intimidate

16    Sheriff Villanueva, in any way, by making this

17    statement?

18         A.    No.

19         Q.    Was it your attempt, in any way, to

20    intimidate a Hispanic sheriff?

21         A.    No.

22         Q.    Did you make this tweet -- did this tweet

23    have anything whatsoever to do with Sheriff

24    Villanueva's race?

25         A.    No.

```
 1                    Did I read that correctly?
 2         A.    Yes.  And there's two emojies attached, yes.
 3         Q.    The emoji is -- it's a bird and musical
 4    notes, correct?
 5         A.    Yes.
 6         Q.    So is that meant to represent the singing
 7    canary?
 8         A.    Yes.
 9         Q.    And you tweeted this on January 12, 2021,
10    correct?
11         A.    Yes.
12         Q.    And you were employed in Hilda Solis' office
13    on January 12, 2021, correct?
14         A.    Yes.
15         Q.    And what does the phrase, "snitches get
16    stitches" mean?
17         A.    I believe it's a colloquial term that if you
18    tell on someone, that you could get beaten up.
19         Q.    And did you mean that tweet to say that you,
20    yourself, would not cooperate with law enforcement
21    unless the person committing a crime was a white
22    supremacist?
23                    MR. TOKORO:  Objection.  Entirely misstates
24    that tweet.
25                    I don't even know what you're getting that
```

```
 1    the deputies who were involved in the shooting of their

 2    loved ones.

 3         Q.   And to your recollection, did Sheriff

 4    Villanueva ever make comments you considered to be

 5    derogatory towards those families?

 6         A.   I don't have specifics.

 7              But I recall the comments being dismissive of

 8    the families' -- families' complaints.

 9         Q.   Do you have a recollection of how they were

10    dismissive of the families' complaints?

11         A.   I don't have -- I don't recall the

12    specifics.

13         Q.   Do you see here, there's a tweet, "Also

14    sheriff limiting his time to one hour for COC meeting.

15    Not how that works.  You stay until COC says they're

16    done.  Commission shouldn't be rushing through their

17    questions because the sheriff says he's only going to

18    be there for one hour.  I don't recall subpoena having

19    a time limit."

20              Did I read that correctly?

21         A.   Yes.

22         Q.   And you sent that on December 17, 2020.

23              Is that -- you see that at the bottom?

24         A.   Yes.

25         Q.   And the -- you were employed at the -- excuse
```

LIM, ESTHER                                                            Page 103

1    me.

2              You were employed for Hilda Solis in December

3    of 2020, correct?

4         A.   Yes.

5         Q.   And the COC, is that the Civilian Oversight

6    Commission?

7         A.   It's the sheriff Civilian Oversight

8    Commission, yes.

9         Q.   And the Civilian Oversight Commission, may be

10   obvious from the name, but is that a commission made up

11   civilians that, broadly speaking, has oversight over

12   the Sheriff's Department of Los Angeles?

13        A.   Yes.

14        Q.   And the Civilian Oversight Commission was

15   given the authority to Subpoena the sheriff through the

16   ballot measure, correct?

17        A.   I don't recall the timeline on when Measure R

18   had passed.  So if Measure R had -- was voted in by the

19   voters of LA County, then, yes.

20        Q.   And you see at the end you say, "I don't

21   recall a Subpoena having a time limit."

22              Do you see that?

23        A.   Yes.

24        Q.   And do I take from that you understood the

25   Civilian Oversight Commission had subpoenaed Sheriff

LIM, ESTHER

1   Villanueva to appear before the Civilian Oversight

2   Commission?

3        A.   I don't remember the context.  Again, it's

4   about five years ago so I don't remember the context in

5   which this tweet was tweeted.  I don't recall.

6        Q.   It's fair to say, you took exception, or

7   issue with the Sheriff Villanueva saying he would only

8   appear for one hour before the Civilian Oversight

9   Commission, correct?

10        A.   Yes.

11        Q.   And you took issue with that, in your words,

12   the Subpoena didn't have a time limit, correct?

13        A.   Yes.

14        Q.   So you understood there was -- sorry.  Strike

15   that.

16             And do you see here there's a tweet, I'm so

17   fucking pissed with the Civilian -- with the COC?

18   Excuse me.

19        A.   Yes.

20        Q.   And you sent that on December 17, 2020; is

21   that correct?

22        A.   Yes.

23        Q.   And you were employed at Hilda Solis' office

24   on December 17, 2020, correct?

25        A.   Yes.

```
 1    is not the answer.  I didn't ask what the context was.

 2              So what was your answer?

 3              MR. TOKORO:  She's already answered several

 4    times.  I'm going to let her answer one more time, and

 5    we're going to move on.

 6              You can give your answer again.

 7              THE WITNESS:  The -- that I was upset with

 8    the COC.

 9        Q.   MR. DiBONA:  And you believe -- when you

10    said, "Subpoena him," is that fair to say you believe

11    the COC should Subpoena him, correct?

12        A.   Again, the tweet was written in 2020.  Yes.

13        Q.   Do you see here there's a tweet, "Kind of mad

14    that LA isn't on this list," and then an emoji after

15    it?

16        A.   Yes.

17        Q.   And it's quote tweeting an article from NBC

18    New York, which is hash tag, breaking, US Department of

19    Justice designates, hash tag, NYC as an anarchist

20    jurisdiction.

21              Did I read that correctly?

22        A.   Yes.

23        Q.   And you sent that on September 21st, 2020.

24              Do you see that at the bottom?

25        A.   Yes.
```

LIM, ESTHER

1      Q.    And you were employed at Supervisor Solis'

2   office on September 21st, 2020, correct?

3      A.    Yes.

4      Q.    And 11:07 a.m. is that considered business

5   hours at Hilda Solis' office?

6      A.    Yes.

7      Q.    What did you mean when you said, "Kind of mad

8   that LA isn't on the list of anarchist jurisdictions?"

9      A.    I was sharing a personal opinion that -- that

10   I was mad that LA wasn't on the list.

11      Q.    And what is your understanding of the term

12   "anarchist jurisdiction" as it being used in this

13   list?

14      A.    One that doesn't favor government overruling

15   people community.

16      Q.    Do you have an understanding that anarchy,

17   broadly speaking, is anti-government?

18          MR. TOKORO:  Objection.  Vague and ambiguous.

19          Objection.  Also argumentative.

20          And also going to a objection that's not the

21   definition of anarchy.

22          But you can answer.

23          THE WITNESS:  I'm sorry, Mr. DiBona.  Can you

24   repeat the question?

25      Q.    MR. DiBONA:  Do you have an understanding

1    Supervisors meeting?

2        A.    No.

3        Q.    Do you see the tweet, just two hash tags,

4    hash tag, fuck ICE, hash tag, abolish ICE?

5        A.    Yes.

6        Q.    And you send that November 2nd, 2020; is that

7    right?

8        A.    Yes.

9        Q.    What did you mean by "fuck ICE abolish ICE?"

10       A.    Expressing that I don't like ICE.

11       Q.    And do you have an understanding that LA

12   County works with ICE?

13       A.    Depending on the situation.

14       Q.    And did you ever -- excuse me.

15            At the time you were a justice deputy for

16   Hilda Solis, what is your understanding of how LA

17   County worked with ICE?

18       A.    I don't recall -- I don't recall the

19   specifics in terms of the specific relationship with

20   the county had with ICE.

21       Q.    As a justice deputy, did you ever take any

22   steps to limit LA County's involvement with working

23   with ICE?

24       A.    Yes.

25       Q.    What steps were those?

LIM, ESTHER                                                    Page 117

```
 1    involvement in LA County jails?
 2              MR. TOKORO:  Objection.  Vague and ambiguous.
 3              I'm also going to object to the question
 4    being asked, in the way you framed as "refreshing your
 5    recollection," because I don't believe you ever asked
 6    her this question previously where we she said she did
 7    not recall.
 8              But you can answer, if you understand.
 9              THE WITNESS:  Yeah.  I don't recall.
10       Q.   MR. DiBONA:  And isn't it true, by the way,
11    that Sheriff Villanueva called Hilda Solis la malinche
12    in the context of her allowing ICE into LA County
13    jails?
14              MR. TOKORO:  Objection.  This question was
15    asked and answered several times this morning.
16              But you can answer it one more time.
17              THE WITNESS:  Mr. DiBona, that the context
18    around Sheriff Villanueva calling Supervisor Solis la
19    malinche, I don't recall the specifics.  I recall that
20    it was around immigration.
21       Q.   MR. DiBONA:  And do you recall -- just to be
22    clear.
23              You don't recall the immigration issue being
24    ICE's involvement in LA County jails?
25              MR. TOKORO:  Same objection.  Asked and
```

LIM, ESTHER

1    answered, several times.

2              But answer it, again.

3              THE WITNESS:  I feel like I answered it, Mr.

4    DiBona.

5        Q.    MR. DiBONA:  I'm sorry.  Just a moment I'm

6    scrolling down.

7              Do you see here on the right, there's a

8    tweet, "This is not about a few bad apples.  The whole

9    damn orchard needs to be torched," hash tag, defund

10   police?

11       A.    Yes.

12       Q.    And you sent this tweet on August 30th, 2020;

13   is that correct?

14       A.    Yes.

15       Q.    And you were working for Hilda Solis at the

16   time of this tweet.

17             Is that fair?

18       A.    Yes.  At 8:12 p.m.

19       Q.    And what did you mean by using the hash tag,

20   defund police?

21       A.    I take that meaning, as I shared in my

22   earlier answer, that I believe there should be more

23   investment in community, in youth programs, and

24   alternatives to incarceration.

25       Q.    By the way, it's fair to say, none of those

LIM, ESTHER                                              Page 120

```
 1              THE WITNESS:  No.
 2         Q.   MR. DiBONA:  And when you tweeted this on or
 3   about August 30th, 2020, did you have any concern this
 4   would impact your working relationship with the Los
 5   Angeles County Sheriff's Department?
 6         A.   No.
 7         Q.   And did you -- excuse me.
 8              Did you, in any way, have any concern that
 9   this tweet may be interpreted as a call for violence
10   against law enforcement officers?
11              MR. TOKORO:  Argumentative.
12              Also, I don't know where you're getting that
13   from, there's nothing about that tweet that suggests
14   that.
15              But you can answer that question.
16              THE WITNESS:  It doesn't, as Mr. DiBona, I
17   explained in my earlier response, that my belief is
18   that the system needs to be reformed.
19         Q.   MR. DiBONA:  By the way, separate and apart
20   from this tweet, would you believe that setting
21   something on fire is generally a violent act?
22              MR. TOKORO:  Objection.  In fact, I don't --
23   argumentative.  Misstates the document.
24              She's explained this tweet several times to
25   you.
```

1    Mr. Villanueva's time as sheriff of the Sheriff's

2    Department.

3              But you can answer.

4              THE WITNESS:  Mr. DiBona, do you mind

5    repeating your question?

6         Q.   MR. DiBONA:  The Board of Supervisors has the

7    authority to lessen the LA Sheriffs Department budget,

8    correct?

9              MR. TOKORO:  Same objections.

10             THE WITNESS:  I do think this is a

11   hypothetical.

12             I think they have lots of authority in terms

13   of how they set budget for the County.

14        Q.   MR. DiBONA:  When you sent this tweet, did

15   you have any concern it would impact your working

16   relationship with the Los Angeles County Sheriff's

17   Department?

18        A.   No.

19        Q.   By the way, just before we go on.

20             Did these tweets impact your working

21   relationship with the Los Angeles County Sheriff's

22   Department?

23        A.   No.

24        Q.   By the way, I understand we haven't looked at

25   all the tweets.

LIM, ESTHER                                                     Page 139

```
 1  speaking, the letter had been received, do you remember
 2  anything else Ms. Chen said to you?
 3      A.   Again, I'm sorry.  I don't recall the
 4  specifics of the conversation.
 5      Q.   And do you remember anything you said during
 6  that conversation, besides you were unaware of it until
 7  it was brought to your attention?
 8      A.   I don't recall the specifics.  But just
 9  acknowledging that, you know, that the letter exists.
10      Q.   Did you ever have any other follow-up
11  conversation with Ms. Chen after that conversation
12  about this letter?
13      A.   I don't recall the specifics of the -- of the
14  conversations, or parts of the conversation.
15      Q.   I understand.  I'm -- moving on.
16           My question was whether any conversations
17  about this -- about this letter with Ms. Chen after the
18  one where she broadly told you about it?
19      A.   I do not recall.
20      Q.   Did you discuss this letter with Max Huntsman
21  at all?
22      A.   I don't recall.
23      Q.   Did you discuss this letter with Kyla
24  Coates?
25      A.   I don't recall.
```

1        Q.   Let me just back up Kyla Coates, she was also

2   a justice deputy for a different supervisor, is that

3   right, around this time?

4        A.   Yes.

5        Q.   And there was also another justice deputy for

6   a different supervisor named Veronica Pawlowski; is

7   that right?

8        A.   Yes.

9        Q.   Did you discuss this letter with Veronica

10  Pawlowski at all?

11       A.   I believe, Mr. DiBona, I believe this letter

12  was sent to all the supervisors.  I only saw it was

13  addressed to Supervisor Solis.

14       Q.   If you're asking me to scroll down to see if

15  there was a cc, I believe there was cc'ed to all of

16  them.  And I can show you that on page four.

17       A.   Right.  Thank you for that.

18            Yes.  So Veronica, Ms. Pawlowski, had

19  mentioned about -- had asked if I had seen the letter.

20  And I told her that I saw the letter through --

21       Q.   And what else did Ms. Pawlowski say, if

22  anything?

23       A.   I don't recall specifically the conversation.

24  Just that the letter was mentioned.

25       Q.   And so just to be clear.

LIM, ESTHER

```
 1          A.    I believe so.
 2          Q.    And so when you say, "there's a joint
 3    decision," who's the joint decision?
 4                MR. TOKORO:  Objection.  Question has been
 5    asked and answered several times now about the
 6    discipline and instruction she received from Supervisor
 7    Solis.
 8                You can answer one more time.
 9                THE WITNESS:  As shared, Mr. DiBona, the
10    discipline I received from my tweets, I would not use
11    my social media account.
12          Q.    MR. DiBONA:  That was a joint decision?
13                MR. TOKORO:  Same objection.  You just asked,
14    just answered.
15                You can answer again.
16                THE WITNESS:  It was part of the discipline
17    that I not use my social media account.
18          Q.    MR. DiBONA:  My question is, Ms. Lim, you
19    and -- Supervisor Solis jointly made a decision to
20    discipline you.
21                I just want to make sure that's your
22    testimony.
23                MR. TOKORO:  That is not her testimony.  You
24    are absolutely misstating her testimony.  She has
25    repeatedly told you she was told by Supervisor Solis
```

LIM, ESTHER                                                           Page 203

```
 1              MR. TOKORO:  Again, I'm just going to caution
 2    you here, not to disclose any communications with us.
 3              If, Alex, you're still limiting it in time to
 4    prior to the litigation, I think that's the issue.
 5         Q.   MR. DiBONA:  Yes, I am.  Just to be clear.
 6         A.   I did receive the disposition letter, but it
 7    was not mailed to me.
 8         Q.   How did you receive it?
 9         A.   It was through -- I was notified of an LA
10    Times request.  And that is when I was notified there
11    was a disposition to the investigation.
12         Q.   Okay.
13              MR. TOKORO:  Can we take a break?
14              MR. DiBONA:  Yeah.  I'm going onto the next
15    question.  So yeah.
16              How long do you need?
17              MR. TOKORO:  Let's go off the record.
18                   (Off the record.)
19         Q.   MR. DiBONA:  Ms. Lim, do you understand
20    you're still under oath?
21         A.   Yes.
22         Q.   Is there any reason you can't continue to
23    give your best testimony?
24         A.   No.
25         Q.   Send Exhibit 9 through the chat, and share my
```

1    screen.

2           Do you see a document on your screen, Ms.

3    Lim?

4    A.   Yes, I do.

5    Q.   And it COLA 002767.

6           Is this a text exchange that you engaged

7    in?

8    A.   Yes.

9    Q.   And the top where it says, "Update, I thought

10   my CPOE interview was pretty pointless."

11          Is that you writing?

12   A.   I believe so.

13          I guess because I don't know the colors, I'm

14   assuming.

15   Q.   I'm showing it to you how it was produced.

16   But, yeah.

17   A.   Okay.

18   Q.   By the way, you were writing this text to Max

19   Huntsman, correct?

20   A.   Yes.

21   Q.   At the bottom we see here, "Thanks Max;" is

22   that right?

23   A.   Yes.

24   Q.   So the Max is Max Huntsman, correct?

25   A.   Yes.

```
 1          Q.   Do you recall ever texting that to anyone?

 2          A.   I must have, but I don't recall who.

 3          Q.   And what did you mean by when you said, "Like

 4     why would I file two years later?"  What did you mean

 5     by that?

 6          A.   I don't know.

 7          Q.   Did you file your complaint against Sheriff

 8     Villanueva two years after something?

 9          A.   I -- yes.  I -- was it two years later?

10               After the inn -- after Mr. Villanueva's

11     initial letter to Supervisor Solis.  But I shared

12     Mr. Villanueva was making demeaning and disparaging

13     comments from 2021 on, from what I recall.

14          Q.   So just to be clear.

15               At least in this text, the two years later

16     refers to the first time Mr. -- then Sheriff Villanueva

17     sent a letter to Hilda Solis, correct?

18          A.   Yes.

19          Q.   Do you see a document on your screen, Ms.

20     Lim?

21          A.   Yes.

22          Q.   You see COLA -- it's COLA 002782.  And goes

23     to 83.

24               Is this a text exchange between you and Max

25     Huntsman?
```

```
1          A.   Yes.

2          Q.   There's a reference to Max where it says,

3     "Hi, Max."

4               That Max -- that's a reference to Max

5     Huntsman?

6          A.   Yes.

7          Q.   And this is -- the date on this is December

8     22nd, 2023, correct?

9          A.   Yes.

10         Q.   And there's a reference here at the top,

11    "Coco told me that LAT did a PRA request for our CPOE

12    complaint."

13              Do you see that there?

14         A.   Yes.

15         Q.   And "LAT," does that mean the LA Times?

16         A.   Yes.

17         Q.   And "PRA," does that mean Public Records

18    Act?

19         A.   Yes.

20         Q.   I think we mentioned this before.

21              But CPOE is -- is that -- what does CPOE

22    stand for?

23         A.   The County Policy of Equity.

24         Q.   And who is Coco?

25         A.   That is county council.
```

```
 1          Q.   And how did you get it?

 2          A.   I believe it was through e-mail.

 3          Q.   And Mr. Huntsman appears to respond, "I don't

 4     know that LASD or CPOE ever told me about it.  I find

 5     out through my staff monitoring."

 6               Did I read that correctly?

 7          A.   Yes.

 8          Q.   And do you say here -- it appears to be cut

 9     off.  It says, "I might have gotten it."

10               And do you see how there's text here, but

11     doesn't appear -- or you can read it?

12          A.   Yes.

13          Q.   And do you see here, it appears to continue,

14     "I might have gotten it.  Since I already knew I

15     wouldn't have paid much attention.  I was more

16     interested in the law that says it goes to POST and

17     isn't you protected."

18               Did I read that correctly?

19          A.   Yes.

20          Q.   And you write, "Yes, that part."

21               So when you say, "yes, that part," what are

22     you referencing?

23          A.   I am referencing the POST component and that

24     it isn't protected.

25          Q.   What is the POST component, to your
```

LIM, ESTHER

1    understanding?

2        A.    I'm just reading the text.  So that is what

3    I am referencing.

4            I don't recall the specifics around the POST

5    piece, and what is, and what isn't protected.

6        Q.    So it's fair to say that you expected your

7    CPOE complaint against Sheriff Villanueva to, at some

8    point, be made public, correct?

9        A.    I -- I wouldn't say that I -- I don't know.

10    I don't know the context in terms of this particular

11    text.

12        Q.    When you write, "Yes, that part."  Even with

13    info redacted, I think the LA Times, abbreviated, LAT,

14    already knows who is who.

15            Aren't you referencing that the LA Times

16    would know who made the complaint?

17        A.    Yes.

18        Q.    And Max Huntsman writes, "Easy to figure

19    out," correct?

20        A.    Yes.

21        Q.    And you gave a thumbs up reaction to the

22    "easy to figure out?"

23        A.    Yes.

24        Q.    And it's fair to say then you were expressing

25    agreement that it would be easy for the LA Times to

LIM, ESTHER

```
1    figure out who was the complaint?

2         A.   Yes.

3         Q.   And so now that we've gone through the

4    context, is it -- now does that understand in context,

5    you were both saying you expected your complaint would

6    be open to disclosure, correct?

7              MR. TOKORO:  Objection.  Question is vague

8    and ambiguous as to what point in time there were

9    concerns referring to POST ERA.

10             Then you can answer that question.

11             THE WITNESS:  I see that -- I see the text,

12   Mr. DiBona.  But I don't recall the intention on

13   whether or not it's public or disclosure.

14        Q.   MR. DiBONA:  And so when Max Huntsman writes,

15   "I was more interested in the law that says it goes to

16   POST than it isn't protected," and you said, "Yes, that

17   part,"  what are you referring to?

18        A.   Again, in just reading the text, I think I'm

19   saying yes, to that part, to the POST isn't protected.

20   But I don't recall the full context of the

21   conversation.

22        Q.   So what is your understanding of what "going

23   to POST" and "it isn't protected" means?

24        A.   I don't -- I don't know -- I don't know.

25             As I shared, I don't know the full context of
```

LIM, ESTHER                                                    Page 219

```
 1    the -- of the text and what is all written.
 2          Q.   You don't remember the context of the text
 3    that you wrote?
 4          A.   Yes.
 5          Q.   And isn't the context that the LA Times did a
 6    Public Records Act request for the CPOE complaint?
 7          A.   Yes.
 8          Q.   And isn't the context going to be that
 9    because it isn't protected, it would be disclosed as
10    part of the Public Records Act request?
11          A.   I don't want to make any assumptions.
12          Q.   It's not an assumption.  It's what you wrote.
13               "Coco told me the LA Times did a PRA request
14    for our CPOE complaint."
15               So I'm not assuming it.  I'm basing what I am
16    saying on the first sentence you write in this text.
17               Isn't that the context of this text exchange,
18    the Public Records Act request by the LA Times?
19               MR. TOKORO:  Objection.  It misstates the
20    text.  And the problem that you have, Alex, was that
21    you are assuming she understands how PRAs work, whether
22    they would actually be in fact produced, and what would
23    be produced.  So that is the issue with your question.
24               You can answer one more time.
25               THE WITNESS:  Mr. DiBona, I know this is in
```

LIM, ESTHER

1    reference to the CPOE complaint, because that's what

2    the text says.  But I don't recall the full context of

3    the reference or POST.

4         Q.   MR. DiBONA:  Understood.  Did you have an

5    understanding that from county council that your CPOE

6    complaint was going to be disclosed to the LA Times?

7         A.   What do you mean by "disclosed?"

8         Q.   That the PRA request was going to be

9    responded to, and your CPOE complaint would be given to

10   the LA Times?

11        A.   Yes.  That was my understanding, that it

12   would be shared.

13        Q.   And the next thing is January 31st, 2024, you

14   text Mr. Huntsman what appears to be the LA Times story

15   on the do not -- that Sheriff Villanueva was -- had a

16   "do not retire notation" on the stop top of his file,

17   correct?

18        A.   Yes.

19        Q.   Did Mr. Huntsman respond to this text, in any

20   way?

21        A.   I do not recall.

22        Q.   Did you text Mr. Huntsman, at any point in

23   time, between December of 20 -- sorry, between December

24   2022, 2023 and January 31st, 2024?

25        A.   I don't recall if I texted him during that

LIM, ESTHER

1    period.

2        Q.    Do you have an understanding that in January

3    of 2024, Sheriff Villanueva was running for the seat on

4    the Board of Supervisors?

5        A.    I do not recall when Mr. Villa announced his

6    candidacy for it.

7        Q.    And even if you don't remember when he

8    announced his candidacy, did you have an understanding

9    that Sheriff Villanueva was running against who is now

10   your boss, Janice Hahn?

11       A.    Yes.

12       Q.    And is it fair to say even though I don't

13   believe you're working for her at the time, you

14   supported Janice Hahn over Alex Villanueva?

15             MR. TOKORO:  Objection.  Assumes facts not in

16   evidence.

17             You can't ask a question that tells you you

18   assume she's supporting.

19             But you can answer the question.

20             THE WITNESS:  I don't think I had a position

21   on it, given that I don't live in the district.

22       Q.   MR. DiBONA:  Did you publicly tell anyone on

23   vote for -- sorry.  Let me back up.

24             Did you make any public comment, at any

25   forum, supporting Janice Hahn over Alex Villanueva?

1    complaint was part of retaliation by the Board for

2    positions he took on board measures, and other issues

3    in front of the Board.  I want to talk to you about

4    those.

5              Did Mr. Villanueva's position on Measure A

6    have anything to do with your filing of the DOE

7    complaint?

8         A.   No.  It did not.

9         Q.   Did Measure A have anything to do with you

10   filing your POE complaint?

11        A.   No.  It did not.

12        Q.   Did Mr. Villanueva's position on Measure R

13   have anything to do with you filing your POE

14   complaint?

15        A.   No.  It did not.

16        Q.   Did Measure R, in any way, have anything to

17   do with you filing your complaint?

18        A.   No.  It did not.

19        Q.   Did Mr. Villanueva's position on Measure J

20   have anything to do with you filing your complaint?

21        A.   No.  It did not.

22        Q.   Did Measure J, in any way, shape, or form

23   have anything do with you filing your complaint?

24        A.   No.  It did not.

25        Q.   Now, Mr. Villanueva spoke out against

LIM, ESTHER

1    endorsing the COVID vaccine mandate during the

2    pandemic.

3              Are you aware of that?

4    A.    Yes.

5        Q.    Did his position on the mandatory vaccine --

6    vaccination of how the employees have anything do with

7    you filing your POE complaint?

8        A.    No.  It did not.

9        Q.    Did vaccine mandates, the county's vaccine

10   mandates have anything do with you filing your

11   complaint?

12       A.    No.  It did not.

13       Q.    Mr. Villanueva also spoke out against a

14   county contract with Full Gen relating to COVID

15   testing.

16             Are you aware of that?

17   A.    Yes, I am.

18       Q.    Did his position or opposition to the Full

19   Gen contract have anything do with your reporting of

20   POE complaint?

21       A.    No.  It did not.

22       Q.    Did the Full Gen contract, in any way, shape,

23   and form, have any way, shape, or form have anything to

24   do with the complaint that you filed?

25       A.    No.  It did not.

LIM, ESTHER

```
 1                    DEPOSITION ERRATA SHEET

 2

 3

 4

 5    Case Caption:  Villanueva vs. County of LA

 6

 7

 8            DECLARATION UNDER PENALTY OF PERJURY

 9        I declare under penalty of perjury that I have

10    read the entire transcript of my Deposition taken in

11    the captioned matter or the same has been read to me,

12    and the same is true and accurate, save and except for

13    changes and/or corrections, if any, as indicated by me

14    on the DEPOSITION ERRATA SHEET hereof, with the

15    understanding that I offer these changes as if still

16    under oath.

17

18        Signed on the _____ day of _____, 20____.

19

20

21                    _____

22

23

24

25
```

LIM, ESTHER                                                    Page 263

1   STATE OF CALIFORNIA

2

3

4           I, SHANNON D. DENNEY, CSR 10385, a Certified

5   Shorthand Reporter in and for the State of California,

6   do hereby certify that, prior to being examined, the

7   witness named in the foregoing deposition was by me

8   duly sworn to testify the truth, the whole truth, and

9   nothing but the truth; that said deposition was taken

10  down by me in shorthand at the time and place named

11  therein and was thereafter transcribed under my

12  supervision; that this transcript contains a full, true

13  and correct record of the proceedings which took place

14  at the time and place set forth in the caption hereto.

15          I further certify that I have no interest in

16  the event of this action.

17

18  EXECUTED this 1st day of April, 2025.

19

20

                        *Shannon D. Denney*
21                      _____

22                      Shannon D. Denney, CSR 10385

23

24

25

# EXHIBIT 32

**CERTIFIED COPY**

# Express Deposition Services
### by ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

## MAX HUNTSMAN

March 07, 2025

John Fahrenwald, CSR No. 14369, RPR, Job No. 6383

```
 1                    UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALEX VILLANUEVA,              )
                                   ) Case No.: 2:24-cv-04979 SVW (JCx)
 5              Plaintiff,         )
                                   )
 6   vs.                          )
                                   )
 7   COUNTY OF LOS ANGELES,        )
     COUNTY OF LOS ANGELES         )
 8   SHERIFF'S DEPARTMENT, LOS     )
     ANGELES COUNTY BOARD OF       )
 9   SUPERVISORS, COUNTY EQUITY    )
     OVERSIGHT PANEL, LOS          )
10   ANGELES COUNTY OFFICE OF      )
     INSPECTOR GENERAL,            )
11   CONSTANCE KOMOROSKI,          )
     MERCEDES CRUZ, ROBERTA        )
12   YANG, LAURA LECRIVAIN,        )
     SERGIO V. ESCOBEDO, RON       )
13   KOPPERUD, ROBERT G. LUNA,     )
     MAX-GUSTAF HUNTSMAN,          )
14   ESTHER LIM, and DOES 1 to     )
     100, inclusive,               )
15                                 ) (Pages 1-192)
                Defendants.        )
16   _____)

17

18                 VIDEOCONFERENCE DEPOSITION OF

19                        MAX HUNTSMAN

20                  Friday, March 7th, 2025

21                      10:02 a.m. PT

22

23

24        Reported by: John Fahrenwald,  CA CSR 14369, RPR

25   _____
```

```
 1                  UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALEX VILLANUEVA,            )
                                 ) Case No.: 2:24-cv-04979 SVW (JCx)
 5              Plaintiff,       )
                                 )
 6   vs.                         )
                                 )
 7   COUNTY OF LOS ANGELES,      )
     COUNTY OF LOS ANGELES       )
 8   SHERIFF'S DEPARTMENT, LOS   )
     ANGELES COUNTY BOARD OF     )
 9   SUPERVISORS, COUNTY EQUITY  )
     OVERSIGHT PANEL, LOS        )
10   ANGELES COUNTY OFFICE OF    )
     INSPECTOR GENERAL,          )
11   CONSTANCE KOMOROSKI,        )
     MERCEDES CRUZ, ROBERTA      )
12   YANG, LAURA LECRIVAIN,      )
     SERGIO V. ESCOBEDO, RON     )
13   KOPPERUD, ROBERT G. LUNA,   )
     MAX-GUSTAF HUNTSMAN,        )
14   ESTHER LIM, and DOES 1 to   )
     100, inclusive,             )
15                               )
                Defendants.      )
16   _____)

17

18

19

20          Videoconference Deposition of Deponent MAX

21   HUNTSMAN, deponent, taken on behalf of the Plaintiff,

22   commencing at 10:02 a.m., PT, March 7, 2025, before Reporter

23   John Fahrenwald, Certified Shorthand Reporter for the State

24   of California, CSR No. 14369, RPR.

25
```

```
 1    APPEARANCES:

 2

      FOR THE PLAINTIFF:
 3
               BY: ALEX DIBONA, ESQ.
 4                  SHEGERIAN & ASSOCIATES, INC.
                    11520 San Vicente Boulevard
 5                  Los Angeles, California 90049
                    Telephone Number: (310) 860 0770
 6                  Facsimile Number: (310) 860 0771
                    ADiBona@shegerianlaw.com
 7

 8
      FOR THE DEFENDANT:
 9
               BY: JASON H. TOKORO, ESQ.
10                  STEVEN G. WILLIAMSON, ESQ.
                    MILLER BARONDESS, LLP
11                  2121 Avenue of the Stars, Suite 2600
                    Los Angeles, California 90067
12                  jtokoro@millerbarondess.com

13

14

15    Also Present:  Mr. Villanueva

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2

 3   DEPONENT                                    PAGE

 4   MAX HUNTSMAN

 5   Examination by MR. DiBONA                     5

 6   Examination by MR. TOKORO                   187

 7

 8                      EXHIBITS

 9   Exhibit 1 TBD 2022 IA Report (Bates 002035-002119)   159

10   Exhibit 2 Depo NTC RFP Max Huntsman         184

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     Pasadena, California
 2                       (10:02 a.m.)
 3                      MAX HUNTSMAN,
 4   called as a witness herein, having been first duly sworn,
 5             was examined and testified as follows:
 6                      EXAMINATION
 7             BY MR. DIBONA:
 8        Q.   Thank you.  Could you please say and spell your
 9   full name for the record.
10        A.   Max Huntsman, M-A-X H-U-N-T-S-M-A-N.
11        Q.   And, sir, have you ever had your deposition taken
12   before?
13        A.   Yes.
14        Q.   How many times?
15        A.   One that I recall.
16        Q.   And was that -- and do you recall the subject
17   matter of that lawsuit?
18        A.   Yeah.  It was a lawsuit by a deputy district
19   attorney when I was in the DA's office in which they were
20   suing the County regarding not getting promoted.
21        Q.   And were you a witness or a defendant in that
22   matter?
23        A.   I was a witness.
24        Q.   And have you ever testified in court?
25        A.   Yes.
```

1    accommodate that.  But just to let you know, we usually do

2    take breaks every hour, hour and a half, or something like

3    that.

4         A.    That sounds good.  Thank you.

5         Q.    All right.  Yeah.  The only caveat is, if there's

6    a question pending, the practice is answer the question

7    before asking to go on a break.  Does that make sense?

8         A.    Yes.

9         Q.    And I think I asked you had you had your

10   deposition taken before.  Have you ever taken depositions?

11        A.    Depositions?  No.

12        Q.    And you are a member of the California bar; is

13   that right?

14        A.    Yes.

15        Q.    When did you become a member of the California

16   bar?

17        A.    Let's see.  In late 1991.

18        Q.    And where did you go to law school?

19        A.    Yale.

20        Q.    The law degree you obtained from Yale -- this is

21   on the record for people that don't know -- is that a JD or

22   a juris doctorate?

23        A.    Yes.

24        Q.    And apart from your JD or juris doctorate, do you

25   have any other advanced degrees?

HUNTSMAN, MAX

```
1        A.    I don't recall.

2        Q.    Do you have an estimate of when that was filed?

3        A.    Fairly recently.  Some months ago.  But, no, not a

4   precise estimate.

5        Q.    Other than that complaint you mentioned, does

6   anyone else -- to your knowledge, has anyone else filed a

7   complaint with the California bar about you?

8        A.    Not that I'm aware of.  I've been a high-profile

9   corruption prosecutor and inspector general after that for

10  many, many years, so I wouldn't be surprised if there were

11  some complaint or something filed.  But I don't recall

12  anybody ever contacting me from the state bar, apart from

13  this one, over having an investigation that I was aware of

14  from the state bar.  But I don't know.

15       Q.    And, to your knowledge, have you ever been sued

16  for malpractice of any type?

17       A.    Not malpractice, no.

18       Q.    And apart from this lawsuit, have you ever been a

19  defendant in a civil lawsuit before?

20       A.    I'm not sure.  I feel like there was a lawsuit I

21  was a defendant in, but I don't recall the details.  It

22  related to my professional work and -- but I don't recall.

23       Q.    Just a little bit of professional background.  Out

24  of law school, what was your first job?

25       A.    I worked as a deputy district attorney for the
```

HUNTSMAN, MAX

```
 1   officials.
 2           And then after that, Steve Cooley split those two
 3   units up.  He was the DA at the time.  And so from then on,
 4   from that point on, I left there, went to another, and then
 5   went to the public integrity division and had a time out,
 6   and then went back, but I couldn't tell you exactly which
 7   years.  I feel like I was in the public integrity division a
 8   big chunk of that, but I don't remember exactly how many --
 9   or when.
10      Q.   When you -- sorry.  When you left the DA's office
11   in 2013, what was your position?
12      A.   Deputy DA IV.  And I was the assistant head of the
13   public integrity division.
14      Q.   And as the assistant head of the public integrity
15   division, who did you report to?
16      A.   David Demerjian.
17      Q.   Was any of your work as a deputy district
18   attorney, did it ever involve prosecuting anybody from the
19   Los Angeles Sheriff's Department?
20      A.   Yes.
21      Q.   And do you recall how many prosecutions there were
22   related to the Los Angeles Sheriff's Department over your
23   years as a deputy district attorney?
24      A.   No.  At the time that I did that was when I was in
25   the special investigations division, and I had a series of
```

HUNTSMAN, MAX

1    cases, the most important one having to do with a jail

2    scandal.  But it wasn't the only one.  And I don't recall --

3    I had a case involving use of force against an inmate, and I

4    think that was a deputy sheriff, but I don't recall.

5            And then also, as I say, I had a big case that

6    involved a scandal to get prisoners to do work stealing

7    credit cards, and then deputies in custody assistance ended

8    up using them.  And I worked on that case for a time.  And

9    those are the only two that I remember, but I might have had

10   one or two others during that time.  And after that I

11   wouldn't have.  That was the only place that I would have

12   done that.

13       Q.   And after 2013 when you left the DA's office,

14   where did you go to?

15       A.   I became the inspector general for the County of

16   Los Angeles.  I was still employed by the County, but my job

17   changed.

18       Q.   And at least as -- how does one become the

19   inspector general for the County of Los Angeles?  At least

20   how did you do it?

21       A.   Because of a scandal in the sheriff's department,

22   the County had decided to create the office.  They didn't

23   have the office yet.  And they turned to a man named Richard

24   Drulian, who had acted as special counsel for a commission

25   that sort of got the ball rolling.  And he contacted me.  I

HUNTSMAN, MAX                                                    Page 18

1    office.  So the executive officer like does my time cards

2    and things.  At that time, Sachi Hamai was the executive

3    officer, and she didn't tell me how to run my job.  It was

4    fairly independent.

5            The board -- then I would meet with the board from

6    time to time and issue reports to the board, but it was a

7    fairly independent position.

8        Q.   And when you say the IG reports to the board, you

9    mean you report directly to the Board of Supervisors; is

10   that fair?

11       A.   It's kind of fair, but, like I say, it's kind of a

12   dual system, because there's the administrative aspect and

13   then there's the subject matter aspect.  Because it's a

14   position which requires expertise in law enforcement and in

15   prosecution, that's the reason I was hired.  Nobody really

16   tells me how to do my job, or didn't, but they do -- you

17   know, there's management issues.

18           So, like I say, technically speaking, I'm not a

19   direct report to the board like a department head is, but in

20   those days the inspector general and my office in general

21   interacted frequently with the board directly.  And while

22   the executive officer was my titular boss, they didn't tell

23   me what to do.

24       Q.   And do you have an understanding of if, for

25   whatever reason, there was cause to remove you from your

1              And, again, that's the California law.  Your name

2    is the name you use, not what was written down on your birth

3    certificate.  So by then my name was Max.  I just had to

4    make sure that all the documentation of it everywhere was

5    correct.  And so I corrected that all.  Or not all of it.  I

6    failed to correct all of it, but I tried.

7          Q.   At some point in time did you ever have a plaque

8    on your desk that read Max-Gustaf Huntsman?  And by your

9    desk, I should say in an office of the County.

10         A.   I to this day have a bunch of things on that desk

11   and on the wall, most of which have Max on them.  I do have

12   a plaque that says Max-Gustaf that the County spat out,

13   because even when I changed my name to Max and I told the

14   County, they didn't change it in their deep computer.  And

15   so they would still call me Max-Gustaf on rare occasions.

16   Not an emails or anything.

17              But when they decided to give me a 30-year pen set

18   or something for working for the County a long time, that's

19   the name they put on it.  They did not ask me, and they gave

20   it to me.  And it's on my desk to this day.

21         Q.   So just to be clear, you on your desk to this very

22   day have a plaque that says Max-Gustaf Huntsman on it?

23   Would that be fair to say?

24         A.   That would be fair to say.

25         Q.   Is it on your desk now?  Or are you not at your

1    office?

2        A.   I am not at my office, but the last time I was at

3    my office it was sitting there.

4        Q.   All right.

5        A.   It doesn't face the door.  And nobody who's ever

6    been in there has asked about it or have I commented on it

7    to them.  All I know about it -- well, no question pending.

8        Q.   I don't think so.  But I am going to give you a

9    chance to finish your answer.  But I didn't think there was

10   a question pending.

11       A.   No.  I was just going to ramble on.  I rambled

12   enough there.  I feel that my answer that was to a

13   non-pending question is complete.  But thank you for the

14   opportunity.

15       Q.   Was there a -- did you have any concern as

16   inspector general, which is a public position, that

17   Max-Gustaf sounded foreign or anything like that?

18       A.   Not really.  I can't say that from the time I was

19   a kid.  I mean, as I told you the story, my mom didn't want

20   me to be named Horst or Heinz because of the foreign sound

21   to it.  I can't say that as a kid that wasn't a concern,

22   although I got teased plenty with just Max.  And it was an

23   unusual name back then.

24            As an adult, not so much.  I don't think that's a

25   big factor anymore, because, you know, I'm very fond of

HUNTSMAN, MAX

1    remember hearing.

2        Q.   Did Esther Lim ever tell you that Sheriff

3    Villanueva had made a reference to her gender?

4        A.   I just told you about that happening, I think.

5    But I guess maybe I didn't.

6             Yeah, there was a gender element in that.  I

7    believe it had to do with them being women.  I think there

8    was some comment about that.  But, again, it was sort of

9    secondhand and from my memory from years ago.  So I think

10   going to the source would be the best way to do it.

11            I don't really remember precisely what he said or

12   precisely the ways in which, you know, it got analyzed or

13   investigated.  Like I said, he'd done a lot of things over

14   the years, and this particular one I didn't know the

15   details.  I wasn't involved in it.

16       Q.   And did Esther Lim ever tell you that Sheriff

17   Villanueva had made a comment that referenced her race?

18       A.   I don't recall.

19       Q.   Did you ever hear Sheriff Villanueva make a

20   comment about the gender composition of the justice

21   deputies?

22       A.   I don't recall.  If I did, it would have been like

23   a recording or -- not in person.

24       Q.   Did you ever hear Sheriff Villanueva make a

25   comment about the gender composition of the Board of

HUNTSMAN, MAX                                    Page 158

```
 1        A.    Separate thing, but yes.
 2        Q.    If Sheriff Villanueva had supporters that were
 3   anti-Semitic, wouldn't that make -- if supporters are
 4   anti-Semitic, wouldn't that enhance your standing if you
 5   were a Holocaust denier?
 6        A.    I suppose --
 7              MR. TOKORO:  Hold on, Max.  Again, need you to
 8   give me a brief second to make my objections.
 9              Objection.  Argumentative.  Objection.  Also vague
10   and ambiguous.  Entirely irrelevant to any claim in this
11   case.  And I'm not even following what you're saying because
12   I don't necessarily understand it.
13              You can answer if you understand it, Max.
14              THE WITNESS:  I do think there's a small fringe of
15   people who that would -- if they thought I was a Holocaust
16   denier and they hated Jews, that that would make them
17   excited.  But that's such a tiny group that I don't think an
18   elected official would benefit from directly calling that
19   group out.
20              That's why in the sentence below what you showed
21   me in the statement, the question from the investigator was
22   about dog whistling.  And dog whistling is about throwing up
23   signals that certain extremists will identify but the
24   general public won't.
25              So, yeah, there's probably a group of particularly
```

HUNTSMAN, MAX

1   nasty people who would think that is a plus, but that's a

2   pretty small group, I hope.

3           MR. TOKORO:  And I'm also going to interpose an

4   objection that the question suggests or could potentially

5   suggest that Mr. Huntsman has denied the Holocaust, which,

6   as you know from his testimony, is not true.

7           THE WITNESS:  That is true.  I have never denied

8   the Holocaust, and I do not currently deny the Holocaust.  I

9   am not a Holocaust denier.  In my generation, only lunatics

10  would deny the Holocaust.

11      Q.   (BY MR. DIBONA:) Do you see Exhibit 1 back on your

12  screen?  ^This must be the investigative report

13      A.   I see something back on my screen.  I'll take your

14  word for it that it's Exhibit No. 1.

15           (Exhibit 1 was marked for identification.)

16      Q.   Do you see here there's -- I'll just say it for

17  the record.  "But I'd never gotten the state bar changed

18  until they did this and then I called them up and said,

19  'Guys, can you pull that?' So they said, 'Yes, yes, we'll

20  make you Max.'  Now if you run me on the state bar, there's

21  an entry for a guy named Max Huntsman and there's an entry

22  for a guy named Max-Gustaf Huntsman because they didn't

23  change it.  They just stuck another one in."

24           Did I read that correctly?

25      A.   I wasn't following along.  I was just listening.

HUNTSMAN, MAX                                          Page 160

 1  What you said sounded correct to me.

 2      Q.   All right.  So is it fair to say that it was after

 3  Sheriff Villanueva started calling you Max Huntsman that you

 4  called the state bar and asked them to stop listing you as

 5  Max-Gustaf Huntsman?

 6      A.   No.  It would be fair to say that I did do that

 7  after he did it, but it wouldn't be fair to say that was the

 8  only time.

 9      Q.   And so just to be clear, as best you recall, at

10  the time Sheriff Villanueva was calling you Max-Gustaf, you

11  were still listed on the California state bar as Max-Gustaf.

12  Correct?

13      A.   I think that's true.

14      Q.   And if it's true that after he -- you became aware

15  of him -- of Sheriff Villanueva referring to you as

16  Max-Gustaf in public, it's fair to say you did call the

17  state bar and say words to the effect of, "Can you pull

18  that?  That's not my name"?

19          MR. TOKORO:  I'm going to object.  It misstates

20  his prior testimony, and it again suggests that the first

21  time he contacted the state bar was after Mr. Villanueva

22  started calling him that.

23          You can answer, Max.

24          THE WITNESS:  Yeah, I don't think it was the first

25  time, but I did do that.

1          Q.    (BY MR. DIBONA:) And just to be clear, I'm not
2    asking if it was the first time.  My question was just you
3    understand he called you Max-Gustaf and after that -- maybe
4    not for the first time, after that you called the state bar
5    and said, "Guys, can you pull the Max-Gustaf Huntsman"; is
6    that correct?
7          A.    Yes.
8          Q.    Okay.  When was the first time you remember
9    calling the state -- or sorry -- not to get too in the
10   details.
11              When was the first time you remember making any
12   sort of request to the state bar that they refer to you as
13   Max Huntsman?
14         A.    I don't recall.
15         Q.    Do you have anything in writing that indicates you
16   requested Max Huntsman be listed on the state bar prior to
17   the year 2022?
18         A.    I don't know.  I did some looking when I provided
19   all those documents that I think you've gotten in discovery
20   where the name was Max.  And I don't recall seeing anything
21   like that.  But whether or not there is one tucked away
22   somewhere, I don't know.
23         Q.    And do you see here there's a reference to --
24   there's an entry for a guy named Max Huntsman and there's an
25   entry for a guy named Max-Gustaf Huntsman because they

HUNTSMAN, MAX

1  didn't change it?  Do you see that here?

2       A.    I do.

3       Q.    Does that refresh your recollection that there are

4  actually two entries on the state bar; one is Max-Gustaf

5  Huntsman and one is Max Huntsman?

6       A.    No.  That is not the case.

7       Q.    And so how do you read, "Now if you run me on the

8  state bar there's an entry for a guy named Max Huntsman and

9  there's an entry for a guy named Max-Gustaf Huntsman because

10  they didn't change it"?

11       A.    I read it as a correct factual statement from a

12  time in the past.

13       Q.    So just to be clear, when it says "now," you're

14  not referring to that in the present?  You don't read that

15  in the present tense?

16       A.    You're reading it now, and that statement was not

17  made now.  That statement was made in the past.  When that

18  statement was made, I believe that it was true.  If you now

19  run me, I don't think you find two entries.  I think you

20  find one entry.  They eventually fixed it.

21       Q.    Got it.  So just to be clear, there was a period

22  of time when, if you ran you on the state bar, there would

23  have been two entries, one Max-Gustaf Huntsman and one Max

24  Huntsman, both referring to you; is that fair?

25       A.    That's correct.  I ran it and saw two different

HUNTSMAN, MAX

1    ones.

2         Q.    Okay.  When Sheriff Villanueva referred to you

3    publicly as Max-Gustaf, there would have been an entry on

4    the state bar website that referred to you as Max-Gustaf as

5    well.  Correct?

6         A.    I didn't run it at that time, so I don't know, but

7    it seems reasonable to believe that, because later there

8    was.  So probably at that time there was.

9         Q.    But now you have an understanding they have

10   changed it so it doesn't appear that way anymore.  Correct?

11        A.    As of the time that that statement was made, there

12   were dual entries.  After I told them to fix it again, they

13   still didn't fix it.  They just added a new entry.

14             If you run it today -- or at least the last time I

15   ran it; I can't say they haven't changed it again -- it was

16   just one.  It just said Max.

17        Q.    And when was the last time you ran it, to your

18   understanding?

19        A.    I don't recall.  Since this lawsuit came up, but I

20   don't remember when it was.

21        Q.    Do you have a recollection of being interviewed on

22   or about July 22nd, 2022?

23        A.    Not specifically, no.

24        Q.    Do you have a recollection that you were -- that

25   you were interviewed some time in the summer of 2022, the

HUNTSMAN, MAX                                                    Page 168

1    to rehire this guy.  Not relevant if he runs for office, of
2    course, but that was a good thing.
3            But the underlying part about how he had been
4    above the law and all that, that was nothing new.  That was
5    something that I had been aware of before.
6        Q.   What do you recall was the last conversation you
7    had with Sheriff Villanueva?
8        A.   I don't recall.  The last conversation I recall
9    well was the one on June 17th of 2019.  I don't recall ever
10   having any conversations of any importance with him after
11   that.  I think -- like I say, I described a time where we
12   met down at some station when a video was being played.  I
13   wouldn't say we had a conversation, but we might have spoken
14   hello to each other at that time.  And I have a vague
15   feeling that that might have been after that incident, but
16   I'm not sure.  But I don't think we had any conversations
17   after that.
18       Q.   And in addition to writing a complaint about
19   Sheriff Villanueva to a Vickey Bane of the equity panel,
20   isn't it also true you wrote a letter to the Board of
21   Supervisors themselves?
22       A.   About not being a Holocaust denier, yes.
23       Q.   Did you also write a letter to the Board of
24   Supervisors saying words to the effect that "Villanueva was
25   dog whistling to his more extreme supporters that I'm German

1    or Jewish and, hence, unAmerican"?

2         A.    I remember believing that and communicating it to

3    various people.  I don't remember if that was part of that

4    email, but it might well have been.

5         Q.    Just to be clear, you recall sending a letter to

6    the Board of Supervisors about Sheriff Alex Villanueva and

7    him referring to you as Max-Gustaf; you just don't recall if

8    the specific words I said were in that letter?

9         A.    The part about --

10             MR. TOKORO:  Hold on, Max.

11             Objection.  It misstates his prior testimony.  I

12    believe what he said was he recalled sending a letter about

13    the Holocaust denier comment.  Second, the question is vague

14    and ambiguous.  And, third, as we've done in other

15    depositions, if you want to show him the letter, you're free

16    to do so.  But asking him questions and not showing it to

17    him and trying to test his memory is not appropriate.

18             THE WITNESS:  And I would add one which is I don't

19    remember it being a letter.  I think it's an email.  But I

20    sent him an email.  I remember an email about the Holocaust,

21    and that's why I sent it, because that was a big deal.  If

22    I'm the inspector general and somebody says I'm a Holocaust

23    denier, I would expect my bosses to want to know, Is he a

24    Holocaust denier?  So I wanted to let them know, no, I don't

25    deny the Holocaust.

HUNTSMAN, MAX                                        Page 190

```
 1

 2              DECLARATION UNDER PENALTY OF PERJURY

 3

 4         I, _____ do hereby

 5   certify under penalty of perjury that I have read the

 6   foregoing transcript of my deposition taken on _____,

 7   2025; that I have made such corrections as appear noted

 8   herein; that my testimony as contained herein, as corrected,

 9   is true and correct.

10

11           Dated this _____ day of _____2025,

12

13           at _____(city),

14

15           _____(state).

16

17

18

19

20

21       _____

22                       MAX HUNTSMAN

23

24

25
```

HUNTSMAN, MAX                                                    Page 191

```
 1                  C E R T I F I C A T E

 2              I, the undersigned, a Certified Shorthand Reporter

 3   of the State of California, do hereby certify:

 4              That the foregoing proceedings were taken before

 5   me via videoconferencing at the time and place herein set

 6   forth; that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a verbatim record

 8   of the proceedings was made by me using machine shorthand

 9   which was thereafter transcribed under my direction; that

10   the foregoing transcript is a true record of the testimony

11   given.

12              Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings, review of the

15   transcript was requested.

16              I further certify I am neither financially

17   interested in the action nor a relative or employee of any

18   attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date subscribed my

20   name.

21   Dated:  March 17, 2025

22

23                        JOHN FAHRENWALD
                          CA CSR 14369
24

25
```

HUNTSMAN, MAX

```
 1        A.   No.  I don't know -- do you can count a college
 2   degree as advanced?  I have a college degree.  I have a
 3   certificate in acting from a junior college.  That's it.
 4        Q.   Your college degree, is that a bachelor's degree?
 5        A.   Yes.
 6        Q.   And where did you obtain that from?
 7        A.   I graduated from UC Santa Cruz.
 8        Q.   And what's the bachelor's degree in?
 9        A.   Politics.
10        Q.   And have you ever been subject to any professional
11   discipline by the California bar?
12        A.   No.
13        Q.   To your knowledge, has there ever been a complaint
14   filed with the California bar against you?
15        A.   Yes.
16        Q.   And do you have an understanding of what that
17   complaint was about?
18        A.   Yes.
19        Q.   What's your understanding?
20        A.   It was a complaint by Alex Villanueva that he
21   claimed that I and others tipped off the target of a search
22   warrant in order to obstruct justice.
23        Q.   Do you know the status of that complaint?
24        A.   As to me, it is closed.
25        Q.   And do you know when that complaint was filed?
```

EXHIBIT 33

1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

    ALEX VILLANUEVA,                    )
4                                       )
            Plaintiff,                  )
5                                       )
                 vs.                    ) Case No. 2:24-cv-04979
6                                       )            SVW (JCx)
    COUNTY OF LOS ANGELES, COUNTY )
7   OF LOS ANGELES SHERIFF'S           )
    DEPARTMENT, LOS ANGELES COUNTY)
8   BOARD OF SUPERVISORS, COUNTY   )
    EQUITY OVERSIGHT PANEL, LOS    )
9   ANGELES COUNTY OFFICE OF       )
    INSPECTOR GENERAL, CONSTANCE   )
10  KOMOROSKI, MERCEDES CRUZ,      )
    ROBERTA YANG, LAURA LECRIVAIN,)
11  SERGIO V. ESCOBEDO, RON        )
    KOPPERUD, ROBERT G. LUNA,      )
12  MAX-GUSTAF HUNTSMAN, ESTHER    )
    LIM, and DOES 1 to 100,        )
13  inclusive,                     )
                                   )
14          Defendants.            )
    _____)

15

16            REMOTE DEPOSITION OF MERCEDES CRUZ

17

                    Friday, March 28, 2025
18
                         --o0o--
19

20

21

22

23

24
    Reported by:
25  Rick Galten, CSR No. 13202

```
 1     APPEARANCES:

 2        For the Plaintiff:

 3             Shegerian & Associates, Inc.
               11520 San Vicente Boulevard
 4             Los Angeles, California  90049
               (310) 860-0770
 5             Adibona@shegerianlaw.com
               BY:  Alex DiBona, Esq.
 6

 7

 8        For the Defendants:

 9             Miller Barondess, LLP
               2121 Avenue of the Stars
10             Suite 2600
               Los Angeles, California  90067
11             (310) 552-5226
               jtokoro@millerbarondess.com
12             BY:  Jason H. Tokoro, Esq.

13

14     Also present:

15             Alex Villanueva

16

17

18

19

20

21

22

23
                              --o0o--
24

25
```

1        Q.  And do you have -- do you see here there's a

2    reference to la malinche?

3        A.  I see that.

4        Q.  Do you have an understanding of what la malinche

5    refers to?

6        A.  I do.

7        Q.  What is your understanding of that?

8        A.  Well, it has to do with Mexican culture and

9    heritage.  And generally speaking, it's someone who

10   turns against their own people.  This was a woman who

11   was an indigenous person who collaborated with the white

12   Spaniards and was an interpreter for them.  So that's

13   the context of it.

14       Q.  And are you yourself Mexican?

15       A.  I am not.

16       Q.  And do you have any understanding that la

17   malinche refers specifically to someone's race?

18       A.  I think, as I said, it's a historical reference

19   to this person.  And it's a term against their own kind.

20       Q.  And do you have an understanding that la

21   malinche specifically refers to someone's gender?

22       A.  It's a female person.  The person that

23   historically had that last name or was -- that was her

24   name.

25       Q.  Understood.  Do you see here there's a reference

CRUZ, MERCEDES                                                    Page 84

```
 1        Q.  And is a -- is the CEOP panel, does it have
 2   jurisdiction on how the Sheriff's Department should
 3   comply with oversight?
 4        A.  I'm not understanding the question.  But I think
 5   I might understand the question.  And if -- I don't have
 6   any particular authority over the sheriff.
 7        Q.  And is part of -- is the CEOP's purview -- is
 8   it -- does it determine one way or the other whether the
 9   Sheriff's Department is appropriately responding to
10   oversight?
11             MR. TOKORO:  Well, objection.  Incomplete
12   hypothetical, relevance, and not tied to the facts of
13   this case.
14             But you can answer.
15             THE WITNESS:  I think I made it clear in the
16   beginning what the CEOP's duties are.
17             MR. DIBONA:  Understood.
18        Q.  And is one of their duties to -- to -- to
19   determine if the Sheriff's Department has appropriately
20   responded to oversight?
21             MR. TOKORO:  Same objections.  And also, asked
22   and answered.
23             You can answer it again.
24             THE WITNESS:  Again, I did explain what we do.
25   And also, it would be -- depend on whether it came
```

```
 1   before us in a case and the context.

 2            But generally speaking, we don't have any

 3   control over the sheriff.

 4            MR. DIBONA:  Q.   And by the way, why do you

 5   believe Sheriff Villanueva opened a criminal

 6   investigation into Esther Lim?

 7       A.   You would have to ask Sheriff Villanueva that.

 8       Q.   Okay.  And sorry, unclear question.

 9            Why do you believe there was -- there was an

10   underlying fact that Sheriff Villanueva opened a

11   criminal investigation into Esther Lim?

12       A.   Again, misstates my testimony.   Sorry.

13            MR. TOKORO:  Okay, you can go ahead.

14            THE WITNESS:  It's hard to divorce myself from

15   the fact that I'm an attorney.  I'm trying hard.

16            MR. DIBONA:  Q.   I believe your exact words

17   were a criminal investigation or a quasi-criminal

18   investigation into Esther Lim.

19            Does that comport with your recollection?

20       A.   What I --

21            MR. TOKORO:  Objection.  Misstates her prior

22   testimony.  What she said was a semi-criminal

23   investigation into Ms. Lim's personal Tweets.

24            But you can answer.

25            THE WITNESS:  You just did.
```

1    get up, like he did, in his uniform, using the Sheriff's

2    Department's social media to talk about individual

3    employees.  She was talking about her personal opinions

4    on her personal social media.

5        MR. DIBONA:  Q.  And did you ever review Esther

6    Lim's Tweets?

7        A.  As part of the materials that were given to us.

8        Q.  You did review her Tweets, just to be --

9        A.  Just the ones -- just the ones that were

10   included in the report.

11       Q.  Okay.  And so let me just -- and by the way, I

12   know we're at Page -- just -- you probably can't see

13   this, we're at approximately Page 17 of 80.

14           We haven't seen any of Esther Lim's Tweets yet,

15   have we?

16       A.  No.

17       Q.  Okay.  And so I'm just going to scroll down

18   through the report just for a moment.

19           Do you see here under 6, there's Documentary

20   Evidence A, B, C?

21       A.  Yes.

22       Q.  And there's no reference to Esther Lim's Tweets

23   there, is there?

24       A.  In the other one.  In Max -- in Max's, there

25   were Tweets.

1     Q.  Right.  And those were Tweets by

2   Sheriff Villanueva, correct?

3     A.  I believe so.

4     Q.  Okay.  So just to be clear, and that's -- my

5   question was, did you ever see any of Esther Lim's

6   Tweets?

7     A.  I don't think I actually saw them.  I only saw

8   the materials that were included.  I didn't go outside

9   of any of the materials that were included.

10    Q.  So what is your basis for saying what Ms. Lim

11  did or didn't do in those Tweets?

12    A.  According to her testimony.

13    Q.  And you believed her testimony?

14    A.  Absolutely.

15    Q.  Just a moment.  By the way, did you know that

16  Hilda Solis disciplined Esther Lim for the Tweets she

17  sent?

18    A.  Hmm.  That was my understanding.

19    Q.  And so can you explain how it would be that

20  Sheriff Villanueva -- and by the way, do you have any

21  belief that Hilda Solis was retaliating against Esther

22  Lim based on her gender, race, or any other protected

23  characteristic when she disciplined her for sending

24  those Tweets?

25       MR. TOKORO:  Objection.  Lacks foundation and

1   calls for speculation regarding what Supervisor Solis

2   intended.

3           THE WITNESS:  I wouldn't know.  And I wouldn't

4   know which Tweets, because I'm sure she sent a lot.  And

5   I don't know that she disciplined her for every Tweet

6   she sent.  You know, I -- without getting into

7   Ms. Solis's head, without seeing what she was seeing, I

8   have no way of answering that.

9           MR. DIBONA:  Q.   And so just -- and excuse me.

10          Do you believe there's any inconsistency in

11  saying Sheriff Villanueva is retaliating against Ms. Lim

12  or asking for an investigation into these Tweets and for

13  Ms. Solis to actually be the one to discipline her for

14  it?

15          MR. TOKORO:  Objection.  Question is vague and

16  ambiguous.  And it also misstates the report and what

17  Ms. Lim said to the investigator.

18          But you can otherwise answer.

19          THE WITNESS:  I really can't.  I don't really

20  understand the question.  It's kind of convoluted.

21          MR. DIBONA:  Okay.

22     Q.  As a general -- I'll ask a different one.

23          As a general matter, Ms. Cruz, do you take what

24  witnesses say at face value in the -- on the -- in

25  the -- on the CEOP?

CRUZ, MERCEDES

1    actually Alex Villanueva's signature, correct?

2        A.  That is correct.

3        Q.  But you do see that it at least purports to be

4    his signature at the bottom, correct?

5        A.  It says Alex Villanueva.

6        Q.  All right.  And so have you ever -- and just --

7    I'll -- with that context near the top, have you ever

8    seen this letter before me showing it to you right now?

9        A.  I think so, but I'm not sure.

10       Q.  Okay.  You see here the -- it -- it's addressed

11   to Dear Supervisor Solis.

12            You see that?

13       A.  Yes.  That's --

14       Q.  And --

15       A.  Mm-hmm.

16       Q.  And the reference -- sorry, the beginning part

17   of the letter is Ethical Violations of First District

18   Justice Deputy.

19       A.  I see --

20       Q.  Do you see that?

21       A.  -- that, mm-hmm.

22       Q.  And you see here there's a reference to the,

23   quote, "shocking behavior by Justice Deputy Esther Lim."

24            Do you see that?

25       A.  Yes.

1       Q.  And this letter, the date on it is February 9th,

2    2021.

3            Do you see that?

4       A.  I do.

5       Q.  And so with all that context, do you have an

6    understanding that this at least appears to be the

7    letter that Sheriff Villanueva sent to Hilda Solis and

8    the Board of Supervisors regarding her?

9            MR. TOKORO:  Objection.  Lacks foundation and

10    calls for speculation.

11            THE WITNESS:  Again, I have no way of knowing if

12    that's the letter.  But if you purport it to be, then

13    you can proceed.

14            MR. DIBONA:  Q.   Just in the first paragraph,

15    we don't have to read the whole letter, do you see

16    anywhere in this first paragraph where

17    Sheriff Villanueva is asking for Esther Lim to be fired?

18            MR. TOKORO:  And once again, I'm just going to

19    make the objection that it lacks foundation and calls

20    for speculation, not just because she's never seen this

21    letter before, but also, because you're asking her about

22    what Mr. Villanueva intended.

23            And I'm also going to object that the question

24    is misleading, in that you are trying to divorce this

25    from the testimony given by Ms. Lim about her

1           MR. TOKORO:  Lacks foundation, calls for

2    speculation.

3           But you have the answer.

4           THE WITNESS:  Sorry.  I'll slow down.

5           MR. DIBONA:  Q.   And by the way, you don't have

6    any recollection of Esther Lim saying to the

7    investigator that she called Sheriff Villanueva a fool,

8    do you?

9           MR. TOKORO:  I'm just going to make the

10   objection that it is incomplete.  You're reading one

11   word out of a Tweet that is about 40 words.

12           But you can otherwise answer.

13           THE WITNESS:  I don't recall her talking about

14   fool in the report.

15           MR. DIBONA:  Q.   And by the way, do you know

16   one way or the other whether Esther Lim was actually

17   working for Hilda Solis on September 29th, 2020?

18       A.  I wouldn't know that, no.

19       Q.  The report actually says the Tweet she did about

20   Sheriff Villanueva were for a previous employer,

21   correct?

22           MR. TOKORO:  Objection.  Misstates the document.

23           But you can answer.

24           THE WITNESS:  I remember reading that she had

25   done a number of Tweets for the -- when she was working

```
 1                  DEPOSITION OFFICER'S CERTIFICATE

 2     STATE OF CALIFORNIA      )
                                ) ss.
 3     COUNTY OF SAN FRANCISCO)

 4

 5

 6          I, Rick Galten, hereby certify:

 7          I am a duly qualified Certified Shorthand

 8     Reporter in the State of California, holder of

 9     Certificate Number CSR 13202 issued by the Court

10     Reporters Board of California and which is in full force

11     and effect.  (Fed. R. Civ. P. 28(a)).

12          I am authorized to administer oaths or

13     affirmations pursuant to California Code of Civil

14     Procedure, Section 2093(b) and prior to being examined,

15     the witness was first duly sworn by me.  (Fed. R. Civ.

16     P. 28(a), 30(f)(1)).

17          I am not a relative or employee or attorney or

18     counsel of any of the parties, nor am I a relative or

19     employee of such attorney or counsel, nor am I

20     financially interested in this action.  (Fed. R. Civ. P.

21     28).

22          I am the deposition officer that

23     stenographically recorded the testimony in the foregoing

24     deposition and the foregoing transcript is a true record

25     ///
```

CRUZ, MERCEDES

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3        Before completion of the deposition, review of

4   the transcript [X] was [ ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fe. R. Civ. P. 30(e)).

8   Dated: April 2, 2025

9

10   _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 34

# Express Deposition Services

by ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA , WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

## LAURA LECRIVAIN

March 25, 2025

Cila Meyer, CSR No. 4914, Job No. 6901

```
 1                  UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA , WESTERN DIVISION

 3
     _____
 4                                           )
     ALEX VILLANUEVA,                        )
 5                                           )
                    Plaintiff,               )
 6                                           )
            vs.                              ) Case No.:
 7                                           ) 2:24-cv-04979 SVW (JCx)
     COUNTY OF LOS ANGELES, COUNTY OF LOS    )
 8   ANGELES SHERIFF'S DEPARTMENT, LOS       )
     ANGELES COUNTY BOARD OF SUPERVISORS,    )
 9   COUNTY EQUITY OVERSIGHT PANEL, LOS      )
     ANGELES COUNTY OFFICE OF INSPECTOR      )
10   GENERAL, CONSTANCE KOMOROSKI, MERCEDES  )
     CRUZ, ROBERTA YANG, LAURA LECRIVAIN,    )
11   SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT)
     G. LUNA, MAX GUSTAF HUNTSMAN, ESTHER    )
12   LIM, and DOES 1 to 100, inclusive,      )
                                             )
13                  Defendants.              )
     _____)
14

15

16

17          Videoconference Deposition of

18      LAURA LECRIVAIN, taken on behalf of Plaintiff,

19      Remote Via Zoom, beginning at 10:03 a.m.,

20      Tuesday, March 25, 2025, before Cila Meyer,

21      No. 4914, a Certified Shorthand Reporter.

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4        ALEX DiBONA, ATTORNEY AT LAW
          ANNA KHACHATRY, ATTORNEY AT LAW
 5        SHEGERIAN & ASSOCIATES, INC.
          11520 San Vicente Boulevard
 6        Los Angeles, California 90049
          310.860.0770
 7        adibona@shegerianlaw.com
          akhachatry@shegerianlaw.com
 8
     For the Defendants:
 9
          JASON H. TOKORO, ATTORNEY AT LAW
10        STEVEN WILLIAMSON, ATTORNEY AT LAW
          MILLER BARONDESS, LLP
11        2121 Avenue of the Stars
          Suite 2600
12        Los Angeles, California 90067
          jtokoro@millerbarondess.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

LECRIVAIN, LAURA                                                          Page 4

```
 1                    I N D E X

 2  WITNESS

 3  LAURA LECRIVAIN

 4

 5                    EXAMINATION BY:              PAGE:

 6                    MR. DiBONA                   6,143

 7                    MR. TOKORO                   138

 8

 9                  E X H I B I T S

10  Plaintiff's                                    PAGE:

11  Exhibit 1  Plaintiff Alex Villanueva's First    29
               Amended Notice of Taking Deposition of
12             Laura Lecrivain; Request for Production
               of Documents
13
    Exhibit 2  Los Angeles County Sheriff's Department 52
14             Internal Affairs Bureau Investigative
               Report; Bates Nos. COLA2035-2119
15
    Exhibit 3  Los Angeles County Sheriff's Department 66
16             Internal Affairs Bureau Investigative
               Report; Bates Nos. 2120-2199
17
    Exhibit 4  Office Correspondence on the letterhead 86
18             of County of Los Angeles Sheriff's
               Department to County Equity Oversight
19             Panel from Sergio V. Escobedo dated
               October 17, 2023
20
    Exhibit 5  Letter on the letterhead of Office of the 114
21             Sheriff County of Los Angeles to
               Supervisor Solis dated February 9, 2021;
22             Bates Nos. AV10545-10571;
               Letter on the letterhead of Office of the
23             Sheriff County of Los Angeles to
               Supervisor Solis from Alex Villanueva
24             dated March 4, 2022

25  Exhibit 6  Email chain; Bates Nos. COLA1915-1921   114
```

```
 1                  I N D E X (continued)

 2                    E X H I B I T S

 3  Plaintiff's                                              PAGE:

 4  Exhibit 7  Notification Letter on the letterhead of   133
               Office of the Sheriff dated October 23,
 5             2023

 6

 7

 8                 INSTRUCTION NOT TO ANSWER

 9                       PAGE      LINE

10                        117        2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LECRIVAIN, LAURA                                                    Page 56

```
 1  KFI Radio, and on Twitter, Sheriff Alex Villanueva
 2  subjected Inspector General Max Huntsman to harassment
 3  on the basis of race/ethnicity/ancestry/national
 4  origin."
 5          Do you see that there?
 6     A    Yes.
 7     Q    Does that comport with your memory of what one
 8  of the allegations against Sheriff Alex Villanueva was
 9  with respect to the CEOP hearing?
10     A    Yes.
11     Q    Prior to you -- sorry.  Prior to the CEOP
12  hearing, did you know who Max Huntsman was?
13     A    Yes.
14     Q    Had you ever -- prior to the CEOP hearing, had
15  you ever interacted with Max Huntsman at all?
16     A    Yes.
17     Q    How had you interacted with him?
18     A    As the chief of professional standards, he had
19  made some requests regarding other matters at
20  professional standards.
21     Q    Just to back up for a second.  It is in the
22  document.  But you have an understanding that Max
23  Huntsman's title with the county is inspector general;
24  correct?
25     A    Yes.
```

LECRIVAIN, LAURA                                    Page 67

1   Complainant Esther Lim; do you see that?

2       A    Yes.

3       Q    Do you recall actually reading the interview

4   transcript with Esther Lim?

5       A    Yes.

6       Q    And you see here there's a reference to

7   Exhibits for the first two, for the policies.  You

8   recall actually reading those policies as part of the

9   review of this prior to the hearing?

10      A    Yes.

11      Q    And there's another reference to Exhibit C,

12  there's audio CD containing or conducting interviews on

13  Facebook Live and KFI radio show.  Sorry.

14           Do you see that?

15      A    Yes.

16      Q    Did you actually listen to that audio CD?

17      A    Yes.

18      Q    To your recollection, did you actually listen

19  to the whole thing?

20      A    Yes.

21      Q    Prior to the CEOP hearing, did you know who

22  Esther Lim was?

23      A    Yes.

24      Q    And how did you know who she was?

25      A    During my time as the captain of Twin Towers

```
 1    A    I'm sorry.  I don't understand your question.
 2    Q    Do you see here there's a reference to
 3  Supervisor Kuehl.  Do you have an understanding of who
 4  Supervisor Kuehl is?
 5    A    Yes.
 6    Q    Sheila Kuehl, she's a member of the board of
 7  supervisors; correct?
 8    A    Yes.
 9    Q    Is it your understanding that Supervisor Kuehl
10  is a woman of color?
11    A    I don't know anything about Ms. Kuehl's ethnic
12  origin or background.
13    Q    And do you know why Ms. Kuehl is referenced
14  here as part of treatment of women of color?
15    A    I do not.
16    Q    Do you yourself speak Spanish?
17    A    Yes, I do.
18    Q    Do you have an understanding of what the
19  word -- words "La Malinche" refers to?
20    A    Yes, as it pertains to this investigation.
21    Q    What's your understanding of how it pertains to
22  this investigation?
23    A    "La Malinche" was a term that Mr. Villanueva
24  used to describe Supervisor Hilda Solis.  "La Malinche"
25  is considered a derogatory term.  It means traitor.
```

```
 1              Sorry.  Do you see that there?
 2      A     Yes.
 3      Q     Do you read that to be saying that Ms. Lim's
 4  opinion as to why the flunkies are referring to the
 5  justice deputies?
 6      A     I'm sorry.  I don't understand your question.
 7      Q     Sure.  When it says -- I'll rephrase it.
 8              When you see here, "Ms. Lim said it would have
 9  been the Justice Deputies to respond to the issues he
10  raised because they are a liaison to Sheriff
11  Villanueva."
12              Do you see that?
13      A     Yes, I do.
14      Q     In this paragraph, do you have an understanding
15  that Ms. Lim is saying she believed "flunkies" referred
16  to the justice deputies?
17      A     Yes.
18      Q     Do you -- do you believe that Sheriff
19  Villanueva was referring to the justice deputies when he
20  used the term "flunkies"?
21      A     In the context of this investigation, yes,
22  because he -- prior to that he made reference to the
23  supervisors probably not listening to the broadcast, and
24  then referred to the flunkies.  So in that context, yes.
25      Q     Let me just search one thing.
```

```
 1              By the way, while I'm just searching for
 2   something, do you know if there was anyone in the --
 3   excuse me -- anyone in the county listening to Sheriff
 4   Villanueva's Facebook Lives and making summaries of
 5   them?
 6        A    I do not know.
 7        Q    Do you see on your screen -- I'm at, for the
 8   record, COLA002137, do you see -- do you see the
 9   document on your screen?
10        A    Yes, sir.
11        Q    Do you see there's a reference to -- sorry.  Do
12   you see the section, "Sheriff Villanueva's Facebook Live
13   Session"?
14        A    Yes.
15        Q    And do you see here it says:
16              "In the beginning it was just Ms. Pawlowski
17   listening and taking notes.  Somewhere along the way,
18   she started to receive summaries of the sessions from
19   the CEO's office, Countywide Communications Unit.
20   Ms. Pawlowski did not know who sent them because she
21   would receive them from Supervisor Kuehl's
22   Communications Deputy.  Lenny McGuire is in charge."
23              Did I read that correctly?
24        A    Yes.
25        Q    Did you ever see any of these summaries?
```

1       A    I did not.

2       Q    Does this, by the way, refresh your

3   recollection that there were, in the Countywide

4   Communications unit, someone was sending members of the

5   board of supervisors staff summaries?

6            MR. TOKORO:  Lacks foundation and calls for

7   speculation, given that I don't believe there's a

8   reference to the Sheriff's Department.

9            But you can, otherwise, answer, if you know.

10           THE DEPONENT:  Yes.  It reflects my

11  recollection that I read this, that someone from the

12  CEO's office and this Countywide Communication was in

13  fact doing summaries.

14  BY MR. DiBONA:

15      Q    So how do we know -- how do you know, if you

16  do, Sheriff Villanueva was referring to justice deputies

17  as "flunkies" as opposed to the individuals summarizing

18  his Facebook Live chats?

19           MR. TOKORO:  Objection.  Question has already

20  been asked and answered.

21           You can answer again.

22           THE DEPONENT:  I don't know what Sheriff

23  Villanueva was referencing to the justice deputies.  So

24  I don't know what Sheriff Villanueva was referencing to

25  due to the fact that he did not interview, so all I had

1  was Esther Lim's assumption and assertion.

2  BY MR. DiBONA:

3      Q    Just to be clear, is it your testimony that in

4  the absence of an interview by the subject, you go by

5  the interview's assertion and assumptions?

6      A    Not alone.  Not that alone.

7      Q    Do you see here there's a reference to --

8  sorry.  You see here there's a quote, "young

9  20-something woke and dumb women."

10          Do you see that there?

11     A    Yes.

12     Q    Did you ever hear of Facebook Live where

13  Sheriff Villanueva said "woke young 20-something woke

14  and dumb women"?

15     A    I don't recall.

16     Q    Did you ever hear any audio at all of "young

17  20-something woke and dumb women"?

18     A    Not those exact words, not "woke and dumb

19  women."

20     Q    You do agree, you do see it in quotations here;

21  correct?

22     A    Yes.

23     Q    And so did you ever ask anyone where is -- if

24  it's a quote, where is it an actual quote from?

25          MR. TOKORO:  Objection.  Just like you've done

1  in the other depositions, you are misstating what is

2  quoted in this document.  As was testified to, the

3  quotation is about what was being told by Ms. Pawlowski.

4           But you can, otherwise, answer.

5           THE DEPONENT:  So I'm sorry.  What was your

6  question, sir?

7  BY MR. DiBONA:

8    Q    Did you ever ask where -- I'll rephrase it.

9           Did you ever ask where this quote is coming

10  from?

11    A    That's Pawlowski's testimony.

12    Q    And do you actually think it's important one

13  way or another to actually know one way or the other if

14  Sheriff Villanueva actually said that?

15    A    Yes.  I believe it's important.  However, he

16  did not -- he was not willing to participate in the

17  process.

18    Q    And you still had Sheriff Villanueva's actual

19  Facebook Lives and audio of his KFI interviews; correct?

20    A    Yes.

21    Q    And excuse me.  And you listened to them;

22  correct?

23    A    Yes.

24    Q    And you didn't hear the quote "young

25  20-something woke and dumb women" when you listened to

LECRIVAIN, LAURA                                                    Page 81

1      Q     And why -- do you believe Ms. Pawlowski when
2  she said she recalled Sheriff Villanueva using the,
3  quote, "young 20-something woke and dumb women"?
4            MR. TOKORO:  Objection.  You're once again
5  misstating the document.  That is not a quote from what
6  Mr. Villanueva said.  Ms. Lecrivain has repeatedly
7  testified to that.
8            You can ask her one more time.
9            THE DEPONENT:  Again, my decision was based on
10 the totality of this incident, the totality of this
11 investigation, and this was Ms. Pawlowski's testimony.
12 BY MR. DiBONA:
13     Q     Do you believe Ms. Pawlowski's testimony?
14     A     Yes.
15     Q     Why?
16     A     Again, in the totality of everything, it was
17 gathered during this case.  And, again, the subject was
18 afforded the opportunity to participate, and he chose
19 not to participate in the investigation.
20     Q     Totality of the circumstances, does that mean
21 you don't look at all the evidence in isolation, you
22 look at it all together?
23     A     I look at all in context.
24     Q     Yes.  So excuse me.  So for the totality of the
25 circumstances, it's in the name; right?  There have to

```
 1              Did I read that correctly?
 2      A    Yes.
 3      Q    So is it your understanding -- I think we
 4 mentioned earlier, there was a notification letter.
 5 This is the complainant being notified that there was
 6 indeed a policy violation with respect to Alex
 7 Villanueva; correct?
 8      A    Yes.
 9      Q    In terms of the outcome, it says, "appropriate
10 administrative action will be taken"; correct?
11      A    Yes.
12      Q    By the way, the policy and the equality
13 violation, that means things of harassment,
14 discrimination, and retaliation policies of that nature;
15 correct?
16      A    Yes.
17      Q    Do you see here there's a statement:
18           "You should be aware that Alex Villanueva has
19 the right to grieve and/or otherwise appeal this
20 recommended determination"?
21      A    Yes.
22      Q    To your understanding, is this a true
23 statement?
24      A    No.
25      Q    And do you have any explanation as to why
```

LECRIVAIN, LAURA                                                    Page 135

1  whoever wrote this document had that in there?

2      A    I don't know why they wrote that.  I would --

3  if I had to speculate, I would speculate that it's an

4  oversight.  These letters are usually templates.  So I

5  would say that it was an oversight.

6      Q    What is your understanding -- sorry.  Just to

7  ask you -- (indistinct verbiage) what's your understan-

8  -- strike that.

9           Is it your testimony then that Alex Villanueva

10 did not have the right to grieve or otherwise appeal the

11 recommendation of the CEOP that the department concurred

12 with?

13     A    Yes.  That's correct.

14     Q    What's your -- what is your understanding based

15 on?

16     A    My understanding is based on the fact that POBR

17 no longer applied, and he was not an active employee of

18 the Sheriff's Department.  He was not an active sworn

19 employee of the Sheriff's Department.

20          MR. DiBONA:  The answer was the understanding

21 is based on that POBR no longer applied.  He was no

22 longer an active employee of the Sheriff's Department.

23          MR. TOKORO:  The only correction I would say

24 there, Alex, is it was a sworn employee of the Sheriff's

25 Department.  Otherwise, I concur with your recitation.

```
 1              MR. DiBONA:  That's fair.  I didn't hear
 2  "sworn," but I'll believe you, if you heard it.
 3       Q    After the CEOP hearing, did you ever hear in
 4  the media that Sheriff Villanueva -- strike that.
 5              Did you ever become aware of any media reports
 6  that Sheriff Villanueva was at -- the "Do Not Rehire"
 7  notation placed top of his file?
 8       A    I'm sorry.  What was the question?
 9       Q    I'll rephrase it.  Are you aware that the
10  L.A. Times published a story that made public that
11  Sheriff Villanueva was -- had not a "Do Not Rehire"
12  notation placed top of file?
13       A    I was not.
14       Q    Did anyone from the L.A. Times ever contact you
15  about Sheriff Villanueva?
16       A    No.
17       Q    I think my question was clear.  But just in
18  case it's not, at any point in time, did any member of
19  the L.A. Times contact you for comment related to
20  Sheriff Villanueva about anything?
21       A    No.
22       Q    Has any member of the media ever contacted you
23  for comment related to Sheriff Villanueva at any time?
24       A    No.
25       Q    Even if they didn't ask, have you provided any
```

LECRIVAIN, LAURA                                                    Page 137

 1    comments to the media related to Sheriff Villanueva at

 2    any time?

 3        A    No.

 4        Q    At the time of the CEOP hearing, were you aware

 5    that Sheriff Villanueva was currently running for a seat

 6    on the board of supervisors?

 7        A    No.

 8        Q    Have you -- and since the CEOP hearing, have

 9    you had any contact with Sheriff Villanueva?

10        A    No.

11        Q    To your knowledge, has Sheriff Villanueva ever

12    reached out to you since the CEOP hearing?

13        A    No.

14        Q    Since the CEOP hearing, did the department take

15    any action of any kind after that with respect to

16    Sheriff Villanueva?

17        A    Not to my knowledge.

18        Q    Is there any part of your testimony -- as you

19    sit here today, is there any part of your testimony that

20    you believe needs to be changed?

21        A    No.

22             MR. DiBONA:  I don't have any further

23    questions.

24             Do you, Counsel?

25             MR. TOKORO:  I do.

```
 1            If you can't hear me at any point in time,
 2    Cila, just let me know.
 3
 4                      CROSS EXAMINATION
 5    BY MR. TOKORO:
 6        Q    Chief Lecrivain, you were asked a number of
 7    questions by Mr. DiBona, and I want to get to the heart
 8    of the matter.
 9            Did Sheriff Luna have any involvement in your
10    decision to concur with the CEOP's recommendations with
11    respect to Mr. Villanueva?
12        A    No.
13        Q    Did Sheriff Luna attend the CEOP hearing at
14    which those recommendations were made?
15        A    No.
16        Q    Did Sheriff Luna communicate with you or direct
17    you in any way regarding your concurrence with the
18    CEOP's recommendations?
19        A    No.
20        Q    Did anyone from the board of supervisors,
21    specifically a board supervisor, attend the CEOP hearing
22    on October 17 of 2023?
23        A    No.
24        Q    Did you communicate with any of the board of
25    supervisors regarding your concurrence in the CEOP's
```

LECRIVAIN, LAURA

1                    With respect to Measure A, did Measure A have

2    anything to do with your decision to concur in the

3    CEOP's recommendations?

4                    MR. DiBONA:  Objection to form.

5                    THE DEPONENT:  No, it did not.

6    BY MR. TOKORO:

7        Q    Did Mr. Villanueva's position on Measure A have

8    anything to do with your concurrence in the CEOP's

9    recommendations?

10                    MR. DiBONA:  Objection; form.

11                    THE DEPONENT:  No, it did not.

12    BY MR. TOKORO:

13        Q    Did Measure J have anything to do with your

14    decision at the October 17, 2023 CEOP hearing?

15                    MR. DiBONA:  Objection; form.

16                    THE DEPONENT:  No, it did not.

17    BY MR. TOKORO:

18        Q    Did Mr. Villanueva's position or opposition to

19    Measure J have anything to do with your decision to

20    concur in the CEOP's recommendations?

21                    MR. DiBONA:  Objection; form.

22                    THE DEPONENT:  No, it did not.

23    BY MR. TOKORO:

24        Q    Did Measure R have anything to do with your

25    decision at the October 17, 2023 CEOP hearing?

LECRIVAIN, LAURA

```
 1      A    No.

 2      Q    Did Mr. Villanueva's opposition to Measure R

 3  have anything to do with your decision at the

 4  October 17, 2023 CEOP hearing?

 5           MR. DiBONA:  Objection; form.

 6           THE DEPONENT:  No, it did not.

 7  BY MR. TOKORO:

 8      Q    Now, Mr. DiBona also asked you about a Fulgent

 9  contract.  Do you recall him asking you about that?

10      A    Yes.

11      Q    Did Fulgent have anything to do with your

12  decision to concur with the CEOP's recommendations

13  regarding the allegations against Mr. Villanueva?

14           MR. DiBONA:  Objection; form.

15           THE DEPONENT:  No, it did not.

16  BY MR. TOKORO:

17      Q    Did Mr. Villanueva's opposition to the Fulgent

18  contract with the county have anything to do with your

19  decision on October 17 of 2023?

20           MR. DiBONA:  Objection; form.

21           THE DEPONENT:  No, it did not.

22  BY MR. TOKORO:

23      Q    Mr. DiBona also asked you about

24  Mr. Villanueva's refusal to enforce the vaccine mandate

25  in connection with department personnel.
```

```
 1                    DEPOSITION OFFICER'S CERTIFICATE

 2

 3            STATE OF CALIFORNIA  )
                                   )  ss.
 4            COUNTY OF LOS ANGELES)

 5

 6            I, Cila Meyer, hereby certify:  I am a duly

 7   qualified Certified Shorthand

 8            Reporter, in the State of California, holder of

 9   Certificate Number CSR 4914 issued by the Court

10            Reporters Board of California and which is in

11   full force and effect.  (Bus. & Prof.   8016)

12            I am not financially interested in this action

13   and am not a relative or employee of any attorney of the

14   parties, or of any of the parties.  (Civ. Proc.

15   2025.320(a))

16            I am authorized to administer oaths or

17   affirmations pursuant to California Code of Civil

18   Procedure, Section 2093(b) and prior to being examined,

19   the deponent was first placed under oath or affirmation

20   by me. (Civ. Proc.   2025.320, 2025.540(a))

21            I am the deposition officer that

22   stenographically recorded the testimony in the foregoing

23   deposition and the foregoing transcript is a true record

24   of the testimony given.  (Civ. Proc.   2025.540(a))

25            I have not, and shall not, offer or provide any
```

1  services or products to any party's attorney or third

2  party who is financing all or part of the action without

3  first offering same to all parties or their attorneys

4  attending the deposition and making same available at

5  the same time to all parties or their attorneys.  (Civ.

6  Proc.  2025.320(b))

7         I shall not provide any service or product

8  consisting of the deposition officer's notations or

9         Comments regarding the demeanor of any witness,

10  attorney, or party present at the deposition to any

11  party or any party's attorney or third party who is

12  financing all or part of the action, nor shall I collect

13  any personal identifying information about the witness

14  as a service or product to be provided to any party or

15  third party who is financing all or part of the action.

16         (Civ. Proc.  2025.320(c))

17

18         Dated: March 31, 2025

19

20                    _Cila Meyer_

21         _____

22

23

24

25

# EXHIBIT 35

CERTIFIED COPY

# Express Deposition Services

*by* ExpressNetwork

1605 W. Olympic Blvd., Suite 800 Los Angeles, CA 90015

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

## ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

## KYLA COATES

March 26, 2025

Lisa Lemus, CSR No. 11484, Job No. 6902

1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    ALEX VILLANUEVA,                    )
                                         )
5                   Plaintiff,           )
                                         )
6                                        ) Case No:
                                         ) 2:24-cv-04979 SVW(JCx)
7                   vs.                  )
                                         )
8    COUNTY OF LOS ANGELES, COUNTY OF )
     LOS ANGELES SHERIFF'S DEPARTMENT,)
9    LOS ANGELES COUNTY BOARD OF      )
     SUPERVISORS, COUNTY EQUITY       )
10   OVERSIGHT PANEL, LOS ANGELES     )
     COUNTY OFFICE OF INSPECTOR       )
11   GENERAL, CONSTANCE KOMOROSKI,    )
     MERCEDES CRUZ, ROBERTA YANG,     )
12   LAURA LECRIVAIN, SERGIO V.       )
     ESCOBEDO, RON KOPPERUD, ROBERT G.)
13   LUNA, MAX-GUSTAF HUNTSMAN,       )
     ESTHER LIM, and DOES 1 TO 100,   )
14   inclusive,                       )
                                      )
15                                    )
                    Defendants.       )
16   _____)

17

18

               REMOTE VIDEOCONFERENCE DEPOSITION OF
19
                           KYLA COATES
20
                    WEDNESDAY, MARCH 26, 2025
21

22

23

24   Reported by:  Lisa Lemus, CSR No. 11484

25

COATES, KYLA                                                                    Page 2

 1                      Remote Videoconference Deposition of

 2    KYLA COATES, taken on behalf of Plaintiff via Zoom

 3    appearance at, Los Angeles, California, at 10:02 a.m.,

 4    Wednesday, March 26, 2025, before LISA LEMUS, CSR No.

 5    11484, a Certified Shorthand Reporters within and for the

 6    County of Ventura, State of California, pursuant to

 7    Notice.

 8

 9          *          *          *          *          *

10

11    APPEARANCES:

12    For the Plaintiff:

13            SHEGERIAN & ASSOCIATES, INC.
              BY:  ALEX DIBONA
14            Attorney at Law
              11520 San Vincente Boulevard
15            Los Angeles, California 90049

16
      For the Defendants:
17
              MILLER BARONDESS, LLP
18            BY:  JASON H. TOKORO
              Attorney at Law
19            2121 Avenue of the Stars
              Suite 2600
20            Los Angeles, California 90067

21

22

23

24

25

```
 1                          INDEX

 2

 3   Deposition of KYLA COATES                       Page

 4       Examination by Mr. DiBona                      6

 5       Examination by Mr. Tokoro                     93

 6

 7

 8

 9

10

11

12                        EXHIBITS

13
     Plaintiff's                                  Page
14
     Exhibit 1 - Amended Notice of Deposition        34
15
     Exhibit 2 - Document Bates Stamped COLA 002120 to 2199   45
16
     Exhibit 3 - Board Motion Bates Stamped AV010572 to 76    74
17

18

19

20

21

22

23

24

25
```

```
 1    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

 2                    (None.)

 3

 4

 5

 6

 7

 8            REQUESTS FOR INFORMATION

 9                    (None.)

10

11

12

13

14

15

16    TRANSCRIPT MARKED FOR IDENTIFICATION

17                    (None.)

18

19

20

21

22

23

24

25
```

COATES, KYLA                                                      Page 11

1    about this lawsuit outside the presence of your

2    attorneys?

3         A.   No.

4         Q.   And have you had any discussion with Esther Lim

5    about this lawsuit outside the presence of your

6    attorneys?

7         A.   No.

8              MR. TOKORO:   Alex, I'm just gonna interpose an

9    objection to the extent that your questions would suggest

10   that Ms. Coates has had conversation with any of those

11   individuals and her counsel, I can tell you no such

12   meetings have happened.

13   BY MR. DiBONA:

14        Q.   Sorry if I asked you this before.  Have you had

15   any conversations with Veronica Pawlowski outside the

16   presence of your attorneys about this lawsuit?

17        A.   No.

18        Q.   Excuse me.  We've -- I know you said who your

19   boss was, but just for the record, are you currently

20   employed?

21        A.   Yes.

22        Q.   Who are you currently employed by?

23        A.   The County of Los Angeles.

24        Q.   And what is your position?

25        A.   Senior justice and mental health deputy for

1   Sheriff Villanueva was sheriff of Los Angeles County from

2   2018 to 2022?

3       A.  Yes.

4       Q.  Was your interaction with the sheriff's

5   department, professionally speaking, any different from

6   2020 when you had your current role until 2022?

7       A.  No.  Just different people.

8       Q.  Who -- who were your primary points of contact in

9   the Sheriff's Department from 2020 until 2022?

10      A.  So Kim Murakami was the chief of staff -- sorry,

11  assistant sheriff, I would engage with him frequently.

12  And then Christine was still the liaison and I believe

13  Vanessa Chao, I think is her name, was the other liaison

14  for a while.  So they were my two points of contact.  And

15  then I did engage quite frequently during those years

16  directly with Bruce Chase and Brendon Corbett who were

17  over custody and patrol.  So for questions about --

18  specifically about custody or patrol, I would go directly

19  to them.

20      Q.  From 2020 to 2022, did you have any direct

21  interaction with Sheriff Villanueva?

22      A.  With just me, no.  But with my supervisor, with

23  my boss, yes.

24      Q.  Meaning there were occasions where, just to be

25  clear, were there occasions when it was just you,

1    Villanueva say what he means when he uses the term

2    "woke"?

3        A.  No.

4        Q.  And -- and I take it from your response, Sheriff

5    Villanueva didn't say to you what he meant during that

6    conversation; is that right?

7        A.  That is correct.

8        Q.  How many times did -- sorry, just to be clear,

9    the words were something to the effect of you looked like

10   a woke 20-something that worshipped in the alter -- at

11   the alter of wokeness.  Do I have that right?

12       A.  Yes.

13       Q.  How many times did he make such a remark?

14       A.  Directly to me or in public?

15       Q.  Sorry, fair question.  How many times did Sheriff

16   Villanueva say that directly to you?

17       A.  I think just that one time.

18       Q.  And Ms. Hahn, she was on the Zoom meeting so

19   presumably she heard it; is that your understanding?

20       A.  Yes.

21       Q.  Did you and Ms. Hahn discuss that comment at all

22   afterwards?

23       A.  I don't remember.

24       Q.  Did you memorialize that remark when it happened

25   in any way, like sending an email, writing a personal

 1    note, anything like that?
 2        A.  No.
 3        Q.  Other than -- did you report that remark to
 4    anyone in the -- in the county outside of Ms. Hahn?
 5        A.  No.
 6        Q.  And is there any reason why not?
 7        A.  No.
 8        Q.  Other than the remark we just mentioned, did
 9    Sheriff Villanueva say anything else in these Zoom
10    meetings that you found inappropriate or offensive?
11        A.  Not that I remember.
12        Q.  And was there ever a time when you and Sheriff
13    Villanueva interacted directly in person that you recall?
14        A.  Yes.
15        Q.  And how many times did that happen?
16        A.  Multiple times.  I would say definitely a
17    handful.
18        Q.  And were -- were those interactions, were they at
19    board of supervisors' public meetings?
20        A.  Sometimes.
21        Q.  Outside of the -- outside of the board of
22    supervisors public meetings, how many times do you think
23    you had direct interaction with Sheriff Villanueva?
24        A.  We would interact at press conferences, so a
25    handful of times outside of the supervisors meetings.

1      Q.  When you say you interacted with press

2   conferences, what was your role at the press conference?

3      A.  It would depend on the type of press conference.

4   So one that I distinctly remember, our office partnered

5   with the Sheriff's Department to host a gun buy-back and

6   both we -- invited Sheriff Villanueva to come and speak

7   at the press conference.  So that time because our office

8   had helped organize the press conference, we were engaged

9   with him, we provided the podium, both the supervisors

10  spoke together -- or sorry, the supervisor and the former

11  sheriff spoke together.  And then other times it would

12  have been a sheriff hosted press conference, like

13  announcing a reward or a shooting or something.  And so

14  in that case, the Sheriff's Department would have been

15  the ones organizing everything and I would have been

16  there with my boss to speak, to have her speak.

17      Q.  Did Sheriff Villanueva say anything at the press

18  conferences that you found inappropriate or offensive

19  about you?

20      A.  No.

21      Q.  And just to be clear, did you ever have any

22  one-on-one conversations with Sheriff Villanueva when

23  doing these press conferences?

24      A.  I don't think so, no.

25      Q.  And also is it fair to say -- sorry, let me just

1    things he would say publically and call him out for

2    lying.

3        Q.  Any other way that she would call him out other

4    than that?

5        A.  I can't remember other specific ways.

6        Q.  Did Sheriff Villanueva ever say to you directly

7    that justice deputies were all women?

8        A.  Not directly to me during a meeting.  He said it

9    on his lives that I watched or I heard about.

10       Q.  Did Sheriff Villanueva ever directly say to you

11   anything about the board of supervisors being all women?

12       A.  Not to me during a meeting but he said it during

13   his press conferences that I watched and his lives and on

14   a radio interview, I believe, that I listened to.

15       Q.  Did you ever directly ask Sheriff Villanueva what

16   are you implying even if you are all women, or words to

17   that effect?

18       A.  No.

19       Q.  And did you -- for whatever reason, did you ever

20   tell Ms. Diaz Herrera that you had asked Sheriff

21   Villanueva directly what are you implying by saying we're

22   all women?

23       A.  I don't think so.  I don't remember.

24       Q.  Do you ever recall -- excuse me.  Do you ever

25   recall Sheriff Villanueva saying anything negative

COATES, KYLA                                                    Page 74

1       Q.  And just to be clear, do you remember anything

2   Ms. Hahn said in response to the LA times article?

3       A.  No.

4       Q.  And just to be clear, do you remember anything

5   you said to Ms. Hahn after you read the LA times article?

6       A.  No.

7       Q.  I'm sending Exhibit 3 through the chat.

8           Do you see a document on your screen?

9       A.  Yes.

10

11          (Plaintiff's Exhibit 3 was marked for

12   identification.)

13

14   BY MR. DiBONA:

15       Q.  It's AV010572 to 76.  Do you recognize this board

16   motion?

17       A.  Yes.

18       Q.  And did you, yourself have any role in helping to

19   draft this board motion?

20       A.  No.

21       Q.  Do you know -- at the top you see here there was

22   a -- the motion was brought by supervisors Mark

23   Ridley-Thomas and Sheila Kuehl, correct?

24       A.  Yes.

25       Q.  Do you have an understanding of which justice

COATES, KYLA                                                    Page 75

```
 1   deputies on staff would have drafted this motion?
 2        A.  At the time I believe supervisor Ridley-Thomas'
 3   justice deputy was Michelle Newell.  And I cannot
 4   remember who -- I can't remember who Sheila Kuehl's
 5   justice deputy was at this time.
 6        Q.  And do you recall, did Janice Hahn vote for this
 7   in favor of this motion?
 8        A.  Yes.
 9        Q.  And as a justice deputy, do you make any
10   recommendations to Ms. Hahn on how she should vote for
11   motions?
12        A.  We discussed them together, but ultimately she is
13   the person who decides how to vote.
14        Q.  Did you ever discuss this particular motion with
15   Ms. Hahn?
16        A.  Yes.
17        Q.  And did you recommend her voting in favor of it?
18        A.  Yes.
19        Q.  And why did you believe that Ms. Hahn -- sorry,
20   by the way, just so the record's clear, the motion is
21   titled, Report regarding options for removing the
22   sheriff.  You see that there?
23        A.  Yes.  Can you scroll down to the directive so I
24   can --
25        Q.  Yes.  Yes.  I was going to do -- I was going to
```

1        Q.  And did -- excuse me.  At some point in time,
2   there was a ballot -- actually sorry.  I can close this
3   exhibit.
4             At some point in time, there was a ballot measure
5   A voted on by the board of supervisors.  Do you recall
6   that?
7        A.  I'm going to clarify that statement.  The ballot
8   measure was placed on the ballot by the board of
9   supervisors.
10       Q.  Yeah, my --
11       A.  The vote was simply to place the ballot -- sorry.
12  The vote was to place the measure on the ballot, not a
13  vote to approve or not approve the measure.
14       Q.  Understood.  And sorry if my question was
15  unclear.  But so just to -- just so I'm clear, the board
16  of supervisors votes on whether or not the voters of Los
17  Angeles County will vote on the matter; is that fair?
18       A.  Correct.
19       Q.  And ballot measure A was stated that the board of
20  supervisors could remove a Los Angeles County sheriff by
21  a four-fifths vote.  Is that your understanding?
22       A.  Correct.
23       Q.  And did Janice Hahn vote in favor of placing that
24  on the ballot for Los Angeles County voters?
25       A.  Yes.

1      Q.  And it's fair to say you had an understanding
2   Sheriff Villanueva spoke out against measure A; is that
3   right?
4      A.  Yes.
5      Q.  Do you recall ballot -- by the way, in -- I
6   can put it back up if you need me to, but the -- in
7   October -- as of October of 2020 which was the date of
8   the -- excuse me -- which is the date of this motion, do
9   you recall if Sheriff Villanueva had said anything you
10  found inappropriate or offensive prior to October of
11  2020?
12     A.  Yes.
13     Q.  What did he -- just for time, prior to October of
14  2020, what did he say that was inappropriate or
15  offensive?
16     A.  Prior to October 2020, he had already started
17  coming after the board of supervisors, accusing them of
18  falsities and pegging himself against them.
19     Q.  By the way, is there anything inappropriate about
20  an elected official saying that other elected officials
21  are doing something wrong?
22     A.  There's something inappropriate about accusing
23  them of corruption and lying about things that they're
24  doing.
25     Q.  One -- was Mark Ridley-Thomas a corrupt member of

```
 1   happened before October of 2020.
 2        Q.  By the way, do you believe it was offensive that
 3   prior to 2020, Sheriff Villanueva said the board of
 4   supervisors was corrupt?
 5        A.  Yes, because the board is comprised of five
 6   individuals.  And so to lump all of them in an accusation
 7   publically without evidence is inappropriate.
 8        Q.  Are you familiar with measure R?
 9        A.  I know what measure R is.
10        Q.  Is it your understanding measure R gave certain
11   subpoena powers to the civilian oversight commission?
12        A.  Yes.
13        Q.  And did the board of supervisors have to vote to
14   place measure R on the ballot to be decided by voters?
15        A.  I think so, but that vote happened before I
16   worked with the board.  So I don't have any firsthand
17   knowledge of it.
18        Q.  Do you have an understanding one way or another
19   if Ms. Hahn voted to place measure R on the ballot?
20        A.  I don't know.  I would have to look it up.
21        Q.  And do you know one way or another if Sheriff
22   Villanueva took any public stance for or against measure
23   R?
24        A.  I don't know.
25        Q.  And was there a ballot measure that was placed on
```

1    the ballot by this board of supervisors ballot measure J?

2        A.  Yes.

3        Q.  And is it your understanding that ballot measure

4    J had to do with what percentage of the LA County budget

5    went to social services?

6        A.  I'm gonna clarify.  It had to do with what

7    percentage of a certain part of the LA County budget went

8    to social services, and that part is unrestricted net

9    county cost funds.

10       Q.  And did Janice Hahn support placing measure J on

11   the ballot?

12       A.  Yes.  She voted in support of placing measure J

13   on the ballot so that the voters could decide if they

14   wanted to pass measure J.

15       Q.  Was it your understanding, did Janice Hahn also

16   publically support voters voting in favor of measure J?

17       A.  No.  I don't think -- I don't think she -- no.  I

18   don't think so.

19       Q.  And -- excuse me.  Did -- sorry, strike that.

20           Did you recommend that Ms. Hahn vote for

21   measure -- that vote that measure J be placed on the

22   ballot, excuse me?

23       A.  Yes.  So I recommended that Supervisor Hahn vote

24   to approve it being placed on the ballot.

25       Q.  And did you, yourself, also personally support

1    measure J?

2        A.   What do you mean by "personally support"?

3        Q.   Did you vote in favor of it?

4        A.   Yes.

5        Q.   And did -- going back, did you vote in favor of a

6    ballot measure A?

7        A.   Yes.

8        Q.   Do you recall if you voted in favor of ballot

9    measure R?

10       A.   I don't recall.

11       Q.   And did you have an understanding that Sheriff

12   Villanueva publically stated to the board of supervisors

13   that in his opinion, ballot measure J was a defund the

14   police measure?

15       A.   Yes, he stated that, and I disagree with that

16   statement.

17       Q.   And -- excuse me.

18            Are you aware of any -- sorry.  Are you aware at

19   some point in time the board of supervisors did -- excuse

20   me -- implemented a vaccine mandate for the COVID-19

21   vaccine for all employees of the County of Los Angeles?

22       A.   Yes.

23       Q.   And that applied to the Sheriff's Department as

24   well, correct, as employees of the county; is that your

25   understanding?

 1    informed.

 2         Q.  Broadly speaking, it was informational, correct?

 3         A.  Correct.

 4         Q.  And the policy of it would have been handled by

 5    the health deputy, correct?

 6         A.  Correct.

 7         Q.  Who was the health deputy at that time?

 8         A.  That's a good question.  I believe it was Katie

 9    Butler.  It was either Katie Butler or -- you know, I

10    think it was Katie.

11         Q.  And did you ever become aware that Sheriff

12    Villanueva went on Fox news to in part say that he's not

13    enforcing the mandate?

14         A.  Yes.

15         Q.  And did you -- and that was on I believe Tucker

16    Carlson's program; is that your memory?

17         A.  Yes.

18         Q.  And did you, yourself, watch that interview?

19         A.  Yes.

20         Q.  Did you find it distasteful that Sheriff

21    Villanueva was going on Tucker Carlson's program?

22         A.  Yes.

23         Q.  And by the way, just to take it one step, is it

24    also your understanding that not only Sheriff Villanueva

25    said publically he wasn't going to enforce it, he

 1    actually did not enforce it throughout the time he was

 2    sheriff; is that your understanding?

 3        A.  I can't speak to the details of that because I'm

 4    not quite sure what the enforcement looked like.

 5        Q.  And are you aware of -- excuse me.

 6            Are you aware of the company named Fulgent?

 7        A.  Yes.

 8        Q.  And did the County of Los Angeles contract with

 9    Fulgent related to vaccine testing or vaccine

10    administration?

11        A.  Yes.

12        Q.  And did you have any role in Fulgent getting that

13    contract?

14        A.  No.

15        Q.  If you can answer without speculating, do you

16    know who in the county would have been responsible for

17    getting that contract?

18        A.  No.

19        Q.  And did -- do you recall Sheriff Villanueva

20    making public statements that Fulgent may share county

21    employee data, health data with the People's Republic of

22    China?

23        A.  Yes.

24        Q.  Did you ever discuss that with Janice Hahn?

25        A.  Yes.

COATES, KYLA                                              Page 92

1        Q.  And was the reason you were doing that similar to

2    the vaccine, you were her eyes and ears, you wanted to

3    keep her informed?

4        A.  Yes.

5        Q.  What, if anything, did she say in response to

6    that?

7        A.  I don't remember.

8            MR. DiBONA:  We could take another break, and

9    actually I think we might be done before lunch, so is it

10   okay if we take a five minute break now?  If I have to

11   keep going -- if I'm not done by one we'll discuss

12   whether we need to break then, but I think we'll be out

13   of here by one.  Is that okay with everybody?

14           MR. TOKORO:  Works for us.  Let's go off the

15   record then.

16

17           (Off the record at 12:08 p.m.)

18           (On the record at 12:18 a.m.)

19

20   BY MR. DiBONA:

21       Q.  Ms. Coates, do you understand you're still under

22   oath?

23       A.  Yes.

24       Q.  Is there any reason you can't continue to give

25   your best testimony?

COATES, KYLA                                                    Page 105

```
 1    STATE OF CALIFORNIA        )
                                 )  ss.
 2    COUNTY OF LOS ANGELES      )

 3

 4              I, KYLA COATES, declare under penalty of

 5    perjury that the foregoing testimony is true and correct

 6    to the best of my knowledge and belief.

 7              Dated this _____ day of _____, 2025.

 8

 9                              _____

10                                   KYLA COATES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COATES, KYLA                                                          Page 106

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF VENTURA        ) ss.

 3

 4                    CERTIFICATE OF REPORTER

 5

 6            I, Lisa Lemus, CSR No. 11484, a Certified

 7    Shorthand Reporter, hereby certify that the witness in

 8    the foregoing remote videoconference deposition was by me

 9    duly sworn to tell the truth, the whole truth, and

10    nothing but the truth in the within-entitled cause;

11            That said deposition was taken in shorthand

12    by me, a disinterested person, at the time and place

13    wherein stated, and that the testimony of the said

14    witness was thereafter reduced to typewriting, by

15    computer, under my direction and supervision;

16            I further certify that I am not of counsel

17    or attorney for either or any of the parties to the said

18    deposition, nor in any way interested in the event of

19    this cause, and that I am not related to any of the

20    parties hereto.

21

22            Dated this 1st day of April, 2025.

23
                                   _Lisa Lemus_
24    _____
                                   LISA LEMUS, CSR No. 11484
25                                 Certified Shorthand Reporter
```

EXHIBIT 36

CERTIFIED COPY

In the Matter Of:

ALEX VILLANUEVA vs COUNTY OF LOS ANGELES

ROBERTA YANG

March 10, 2025

Job No. 6946




```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ALEX VILLANUEVA,                    ) Case No.
                                         ) 2:24-cv-04979 SVW
 5                  Plaintiff,           ) (JCx)
                                         )
 6       vs.                             )
                                         )
 7   COUNTY OF LOS ANGELES, COUNTY OF    )
     LOS ANGELES SHERIFF'S DEPARTMENT,   )
 8   LOS ANGELES COUNTY BOARD OF         )
     SUPERVISORS, COUNTY EQUITY          )
 9   OVERSIGHT PANEL, LOS ANGELES        )
     COUNTY OFFICE OF INSPECTOR GENERAL, )
10   CONSTANCE KOMOROSKI, MERCEDES CRUZ, )
     ROBERTA YANG, LAURA LECRIVAIN,      )
11   SERGIO V. ESCOBEDO, RON KOPPERUD,   )
     ROBERT G. LUNA, MAS-GUSTAF HUNTSMAN,)
12   ESTHER LIM, and DOES 1 to           )
     100, inclusive,                     )
13                                       )
                    Defendants.          )
14   _____)

15

16

17              DEPOSITION OF ROBERTA YANG, taken on behalf of

18   Plaintiff, via Zoom video conference, beginning at

19   10:05 a.m., March 10, 2025 before WENDY L. GRAVES, RPR,

20   Certified Shorthand Reporter No. 6138.

21

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3          SHEGERIAN & ASSOCIATES LLP
            BY:  ALEX DiBONA, ESQ.
 4          11520 San Vicente Boulevard
            Los Angeles, California 90049
 5          (310) 860-0770
            ADiBona@shegerianlaw.com
 6

 7    FOR DEFENDANTS:

 8          MILLER BARONDESS, LLP
            BY:  JASON H. TOKORO, ESQ.
 9               STEVEN G. WILLIAMSON, ESQ.
            2121 Avenue of the Stars, Suite 2600
10          Los Angeles, California 90067
            Jtokoro@millerbarondess.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

YANG, ROBERTA                                                    Page 3

```
 1                    I N D E X

 2   EXAMINATION BY:                              PAGE

 3       MR. DiBONA ...............................   5

 4       MR. TOKORO................................ 128

 5   FURTHER EXAMINATION BY:

 6       MR. DiBONA................................ 133

 7                        -o0o-

 8                    E X H I B I T S

 9   EXHIBITS              DESCRIPTION            PAGE

10   Exhibit 1   Plaintiff Alex Villanueva's Notice of Taking   15
                 Deposition of Roberta Yang; Request for
11               Production of Documents

12   Exhibit 2   CISU Assessment Form, Reporting Party,         20
                 Esther Lim, dated March 21, 20222.
13               COLA002399 to 2401

14   Exhibit 3   CISU Assessment Form, Reporting Party, Max     25
                 Huntsman, dated March 21, 2022.  COLA002402
15               to 2404

16   Exhibit 4   Confidential May 18, 2023 Investigation        31
                 Report.  COLA002388 to 2398
17
     Exhibit 5   Confidential May 19, 2023 Investigation        33
18               Report re: Max Huntsman.  COLA002376 to 2383

19   Exhibit 6   Internal Affairs Investigative Report,         41
                 Incident Date: Between March 5, 2022 & March
20               22, 2022.  Confidential.  COLA002035 to 2119

21   Exhibit 7   Internal Affairs Bureau Investigative Report   60
                 Incident Date:  Between July 28, 2021, and
22               March 2, 2022.   Confidential.  COLA002120
                 to 2199
23
     Exhibit 8   October 17, 2023 Office Correspondence,        99
24               Sheriff's Department.  Pages 64 through 67

25                        -o0o-
```

YANG, ROBERTA                                                                    Page 4

```
 1  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

 2  Page 71, Line 17:

 3          My question is, and it hasn't been asked before.

 4  It's different.  The audio CD containing the Facebook

 5  Live and KFI Radio show, that's a piece of evidence,

 6  correct?

 7

 8  Page 119, Line 17:

 9      Q.  Excuse me.  For the purposes of sending a

10  subpoena, could you please put your residential address

11  on the record?

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

YANG, ROBERTA                                                    Page 43

1        A.  Well, I see the Table of Contents page.  So
2    probably that's the document.
3        Q.  Do you recall reviewing the transcript of the
4    interview with Max Huntsman?
5        A.  I do.
6        Q.  Do you recall, do you see here under C, do you
7    see it says 1 CD containing recordings of subject
8    Villanueva and references where they got those from?
9        A.  I see.  I do see that.
10        Q.  Do you recall actually listening to the CD?
11        A.  I did not.
12        Q.  Any reason why not?
13        A.  No.
14        Q.  Do you recall actually reviewing -- you see here
15    there is a reference to Tweets?
16        A.  I see that, uh-huh.
17        Q.  Do you recall actually reviewing any screen
18    shots of Tweets?
19        A.  Unless they were in the report itself, no.
20        Q.  Do you see here there is a reference to email to
21    the Sheriff's Department employees?
22        A.  I see that, yes.
23        Q.  Do you recall actually reviewing this email
24    itself?
25        A.  No.

1        Q.   And you see also there is a reference to two

2   articles from the Los Angeles Times?

3        A.   I see that.

4        Q.   Do you recall actually reviewing the two

5   articles from the Los Angeles Times itself?

6        A.   No.

7        Q.   Okay.  So is it fair to say that you recall

8   reading the report itself but you did not read the

9   exhibits attached to the report; would that be a fair

10  characterization?

11       A.   Unless there were excerpts of it perhaps in the

12  report itself but, no, I did not independently review

13  Exhibit C.

14       Q.   Understood.  And do you see here under there is

15  a section Miscellaneous Documents, do you see that?

16       A.   I do.

17       Q.   Do you recall reviewing -- let's just take it

18  one at a time.  There is a request for IAB investigation

19  memorandum.  Do you recall actually reviewing that part

20  of the document?

21       A.   No.  Unless you show it to me, no.

22       Q.   And there is a subject of administrative

23  investigation notification.  Do you recall reviewing

24  that as part of your review as a CEOP panelist into

25  Sheriff Alex Villanueva?

1        A.  No.

2        Q.  And you see here there is a various manual of

3   policy and procedures; do you see that reference under

4   Miscellaneous Documents?

5        A.  I do.

6        Q.  Do you recall reviewing as part of this file the

7   manual of policy and procedures that are excerpted here

8   under Miscellaneous Documents?

9        A.  I did not have a specific recollection in this

10  instance of reviewing it, but it is my practice in all

11  investigation that I review to reread those policies as

12  part of each investigation file review, yes.

13       Q.  And also, I asked you earlier if you read the

14  transcript.  Do you see here there is a reference to an

15  actual compact disk containing the audio of the

16  interview with Max Huntsman?

17       A.  I see that, yes.

18       Q.  Did you actually listen to the audio of the

19  interview?

20       A.  No.

21       Q.  Do you recall, as you see here there is a

22  document Personnel Investigation Form; do you see that

23  on your screen?

24       A.  I do.

25       Q.  Do you recall reviewing this document as part of

YANG, ROBERTA                                                    Page 62

1        Q.  All right.  Do you see here there is a document
2   called Investigative Summary?
3        A.  Yes, I see in that front of me, uh-huh.
4        Q.  Did you review this document as part of your
5   work as a CEOP panelist?
6        A.  Again, if it was included as part of the
7   materials we were given to review in the Esther Lim
8   complaint, then yes, I would have read this.
9        Q.  Do you see here there is allegation 1, "In
10  various public appearances on Facebook live and KFI
11  Radio Sheriff Alex Villanueva subjected several Board of
12  Supervisors, Justice Deputies to harassment on the basis
13  of sex."
14            Does that comport with your recollection of the
15  allegation against Sheriff Villanueva with respect to
16  Esther Lim?
17        A.  Probably one of them, yes.
18        Q.  All right.  Allegation number 2, "In various
19  public appearances on Facebook Live and KFI Radio,
20  Sheriff Alex Villanueva subjected several Board of
21  Supervisors justice deputies to harassment on the basis
22  of race, ethnicity and national origin.
23            Does that comport with your recollection of one
24  of the allegations into Sheriff Villanueva with respect
25  to Esther Lim?

YANG, ROBERTA                                                    Page 63

```
 1          A.  I think it says ancestry, also.  So yes, it was
 2    one of them.
 3          Q.  And allegation number 3, "In various public
 4    appearances on Facebook Live and KFI Radio, Sheriff Alex
 5    Villanueva subjected several Board of Supervisors
 6    justice deputies to harassment and retaliation on the
 7    basis of age."
 8              Does that comport with your recollection of one
 9    of the allegations into Sheriff Villanueva?
10          A.  Yes.
11          Q.  You see here in all three of these allegations
12    there is a reference to Facebook Live and KFI Radio,
13    correct; do you see that?
14          A.  I do see that.
15          Q.  You did not believe it was important to actually
16    listen to the Facebook Lives in determining the truth of
17    these allegations?
18          A.  To the extent there were references to these
19    different appearances in the report itself, I read
20    those, correct.
21          Q.  Understood, but just to be clear.  You didn't
22    find it necessary to actually listen to the Facebook
23    Live itself, correct?
24          A.  No.
25          Q.  And you didn't find it necessary to listen to
```

 1   Is that your understanding?

 2        A.  Yes.

 3        Q.  Did you actually review this letter that Sheriff

 4   Villanueva sent?

 5        A.  No.

 6        Q.  Did you actually review any of the Esther Lim's

 7   public social media posts which she said were attached,

 8   or sorry -- strike that.

 9            Did you actually review any of the public social

10   media posts that Ms. Lim said Mr. Villanueva was

11   critical of in his letter?

12        A.  No.

13        Q.  Okay.  To your recollection, did the CEOP come

14   to the conclusion that Sheriff Villanueva had retaliated

15   against Ms. Lim by sending this letter?

16        A.  I don't recall what our findings were.  I'd have

17   to look at the part of the report where it documents our

18   findings or our recommendations.

19        Q.  On July 28, 2021, you see the statement on

20   Facebook Live.  I'm just asking, do you see that?

21        A.  I see the subheading says that, yes.

22        Q.  Do you see anything in quotation marks?

23        A.  In this particular paragraph, I do not see any

24   quotation marks.

25        Q.  All right.  On October 6, 2021, do you see how

YANG, ROBERTA                                                    Page 91

1  the words "loud and clear" and "I'm pretty sure the
2  flunkies are going to listen and get back to you."
3           Do you see how that's in quotation marks?
4       A.  I see that.
5       Q.  Do you see anything else in quotation marks in
6  that paragraph, other than that?
7       A.  Not in that paragraph, which is one of six
8  paragraphs on that page, correct?
9       Q.  Do you see here there is a reference to "he,"
10 being Sheriff Villanueva, "also harassed the former
11 county CEO, who was also a minority woman."  Did I read
12 that correctly?
13      A.  I don't see that.
14      Q.  Do you see it now?
15      A.  I see the sentence "he also harassed the former
16 county CEO, who was also a minority woman," yes.
17      Q.  And you see, also, it goes on, "He opened up a
18 criminal investigation to intimidate her."
19      A.  I see that.
20      Q.  Okay.  From your understanding of your knowledge
21 of county policies of equality or equity, is opening a
22 criminal investigation an act of harassment?
23      A.  I can't speak to that.
24      Q.  Just to be clear, Miss Yang, you are a member of
25 the CEOP, correct?

 1  circumstance."  So if you go to your share.

 2          MR. DiBONA:  I'm there.

 3          MR. TOKORO:  You should be able to -- if you go

 4  on the top and it should bring up a button, and it has

 5  the share control, and you should be able to assign it

 6  to Roberta.

 7          MR. DiBONA:  Yeah.  One moment.

 8          THE WITNESS:  Well, I could --

 9          MR. DiBONA:  Q.  In this context I don't feel

10  comfortable doing that.

11      A.  Okay.

12      Q.  So what I will say, though, is I'm happy to give

13  you the time to piece through the report.  If you need

14  to do that either on or off the record, that's perfectly

15  fine.

16      A.  Well, let's just keep going, just in the

17  interest of time.  I will share with you one piece only

18  of several acts of retaliation, but the one that comes

19  to mind first for me is when he sent a certain letter.

20      Q.  Okay.  And what about him sending the letter do

21  you believe was retaliatory?

22      A.  Well, I think you are going to have to read the

23  letter.  It's in the letter.  I'm not going to try to

24  remember what was in the letter by memory.

25      Q.  Ms. Yang, a copy of the letter wasn't provided

YANG, ROBERTA                                                Page 108

```
 1   to you in the report, correct?
 2        A.   Right.   But it was certainly referenced in the
 3   report, the contents.
 4        Q.   All right.
 5        A.   So if you want to find that.
 6        Q.   Yeah, there is more than one.   So there is a
 7   reference.  (Reading:)  Sheriff Villanueva wrote a
 8   letter addressed to Supervisor Solis and cc'ed the Board
 9   of Supervisors or BOS and CEOP.  Ms. Lim considered this
10   letter to be harassment.
11        A.   Uh-hum.
12        Q.   (Reading:)  The letter discussed Ms. Lim's
13   social media posts and calls for an opening of an
14   investigation of her social media accounts.  Ms. Lim
15   believed the request was unjustified.
16             First off, did I read that correctly?
17        A.   That appears to be the paragraph, yes.
18        Q.   If I go down, there is another reference to the
19   letter.  Do you see here there is a letter requesting
20   discipline of Ms. Lim for social media commentary, do
21   you see that?
22        A.   Right.   And I also believe there is information
23   where he was trying to get her terminated.   I remember
24   something along those lines in the report.   Again, I
25   have to refer you to the report.
```

1        A.   I believed it to be true in the context of the

2   totality of the investigation, true.

3        Q.   Do you recall any evidence that Ms. Lim had that

4   says she was targeted because she was Asian?

5        A.   Yes, I do.

6        Q.   What was that?

7        A.   The other evidence was there was some other

8   county executive that was also targeted, and so it

9   wasn't just Miss Lim by herself.   That's what I recall.

10       Q.   Yeah, the county executive was a criminal

11   investigation was opened against her, correct?

12       A.   It's whatever the report says about it.

13       Q.   One moment.   Pull that up here.   One moment.

14   Sorry.   I am going to put this back on.

15            All right.   Do you see here under History of

16   Intimidation of Women of Color?

17       A.   Right.

18       Q.   There is a reference:   He also harassed the

19   former -- former County CEO, excuse me, who was also a

20   minority woman.   Did I read that correctly?

21       A.   Yes.   In fact, I'm so glad you pointed out this

22   paragraph, because I think this is the answer to your

23   question, it comes right out of the board itself is this

24   paragraph.

25       Q.   So just to be clear, you believe that opening up

YANG, ROBERTA                                                    Page 113

 1  a criminal investigation is an act of harassment of an
 2  Asian woman?
 3          MR. TOKORO:  Hold on.  Hold on.  Misstates the
 4  record.  In fact, what the sentence says, if you had
 5  read the whole thing, was that Mr. Villanueva opened up
 6  a criminal investigation to intimidate the former county
 7  CEO.  It wasn't simply the fact of opening it, but it
 8  was to intimidate her.  So if you are reading the
 9  entirety I just want to make sure the record is clear
10  what it says.
11          You can answer.
12          THE WITNESS:  Well, I don't have anything to add
13  to this paragraph.
14          Like the report sets out there are numerous
15  instances that belie the recommendation that the panel
16  made that he's asking about, which is retaliation.
17          MR. DiBONA:  Q.  Yes.  So my question is, is
18  just to be clear, do you believe that opening up a
19  criminal investigation was to intimidate the county CEO;
20  is that fair?
21      A.  No, that's not my response.
22      Q.  Do you believe that opening up a criminal
23  investigation purportedly to intimidate the county CEO
24  is an act of harassment towards an Asian woman?
25      A.  Okay.  You are mixing questions.  That wasn't

YANG, ROBERTA                                                    Page 114

1   your question.
2        Q.  Miss Yang, I understand, but can you answer the
3   question I asked, please?
4        A.  Okay.  So this is another question?
5        Q.  Yes.  It's another question.
6        A.  Would you please repeat it?
7        Q.  Yes.  Is opening a criminal investigation to
8   intimidate the former county CEO an act of harassment
9   toward an Asian woman?
10       A.  I can't answer that.
11       Q.  And just let the record reflect, Mr. Tokoro
12   cannot answer for you.  So you can look towards him all
13   you want, but he can't answer for you.  I will move on.
14            MR. TOKORO:  Alex, I am not going to let you
15   leave that record there, because you know that that's
16   not fair.  You asked her a question that she couldn't
17   answer based upon how you asked it.
18            It an incomplete hypothetical, and for you to
19   even attempt to create a false record like that is
20   ridiculous.
21            I am not answering any questions for her.  You
22   know that's the case.  I am sitting with her in the room
23   here.  You can see me just as much as she can see me.
24   There is nothing beyond that.
25            MR. DiBONA:  All right.

YANG, ROBERTA                                                    Page 122

```
 1        A.  Yes.
 2        Q.  Prior to Alex Villanueva, had you recommended a
 3  do not rehire notation for individuals in the Sheriff's
 4  Department?
 5        A.  That, I don't recall.
 6            MR. DiBONA:  All right.  I believe I am almost
 7  done.  Could you please bear with me, just let me review
 8  new notes for about five minutes, and I will get you out
 9  of here very soon, if not by 2:00.  Why don't we come
10  back at 2:00?
11            MR. TOKORO:  Agree.
12            (Recess taken from 1:52 p.m. to 2:03 p.m.)
13            MR. DiBONA:  Q.  Ms. Yang, do you understand you
14  are still under oath?
15        A.  Yes.
16        Q.  Any reason you can't continue to give your best
17  testimony?
18        A.  No.
19        Q.  As a general matter, sitting on panels at the
20  CEOP, is it important to know one way or another if a
21  witness is being truthful or not?
22        A.  First of all, we don't deal with witnesses.
23  What we deal with, we read investigation reports, and we
24  look at the findings in terms of what the investigator
25  found, and we assess, you know, we assess what the
```

YANG, ROBERTA                                                    Page 138

```
 1  STATE OF CALIFORNIA      )

 2  COUNTY OF LOS ANGELES    )

 3          I, WENDY L. GRAVES, CSR, hereby certify that the

 4  witness in the foregoing deposition named ROBERTA YANG

 5  was by me duly sworn to tell the truth, the whole truth,

 6  and nothing but the truth in the within-entitled cause;

 7  that said deposition was taken at the time and place

 8  therein stated; that the testimony of said witness was

 9  reported by me in shorthand writing and was thereafter

10  transcribed by computer under my direction; that the

11  foregoing is a full, complete, and true record of said

12  testimony; and that the witness was given an opportunity

13  to read and correct said deposition and to subscribe the

14  same.

15          I further certify that I am not of counsel or

16  attorney for any of the parties in the foregoing

17  deposition or in any way interested in the outcome of

18  the cause named in said caption.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20  this 18th day of March, 2025.

21

22                      Wendy Graves

23          _____

24                      WENDY L. GRAVES, CSR NO. 6138

25                      STATE OF CALIFORNIA
```

# EXHIBIT 37



# The Meeting Transcript of The Los Angeles County Board of Supervisors

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



## Adobe Acrobat Reader

### Finding Words

You can use the Find command to find a complete word or part of a word in the current PDF document.  Acrobat Reader looks for the word by reading every word on every page in the file, including text in form fields.

### To find a word using the Find command:

1. Click the Find button **(Binoculars)**, or choose Edit > Find.
2. Enter the text to find in the text box.
3. Select search options if necessary:
   Match Whole Word Only finds only occurrences of the complete word you enter in the box.  For example, if you search for the word *stick*, the words *tick* and *sticky* will not be highlighted.

   Match Case finds only words that contain exactly the same capitalization you enter in the box.

   Find Backwards starts the search from the current page and goes backwards through the document.
4. Click Find.  Acrobat Reader finds the next occurrence of the word.

### To find the next occurrence of the word, Do one of the following:

   Choose Edit > Find Again
   Reopen the find dialog box, and click Find Again.
   (The word must already be in the Find text box.)

## Copying and pasting text and graphics to another application

You can select text or a graphic in a PDF document, copy it to the Clipboard, and paste it into another application such as a word processor.  You can also paste text into a PDF document note or into a bookmark.  Once the selected text or graphic is on the Clipboard, you can switch to another application and paste it into another document.

**Note:  *If a font copied from a PDF document is not available on the system displaying the copied text, the font cannot be preserved.  A default font  is substituted.***



THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

**To select and copy it to the clipboard:**

1.    Select the text tool T, and do one of the following:
To select a line of text, select the first letter of the sentence or phrase and drag to the last letter.

To select multiple columns of text (horizontally), hold down Ctrl+Alt (Windows) or Option (Mac OS) as you drag across the width of the document.

To select a column of text (vertically), Hold down Ctrl+Alt (Windows) or Option+Command (Mac OS) as you drag the length of the document.

To  select all the text on the page, choose Edit > Select All.  In single page mode, all the text on the current page is selected.  In Continuous or Continuous – facing mode, most of the text in the document is selected.  When you release the mouse button, the selected text is highlighted.  To deselect the text and start over, click anywhere outside the selected text. The Select All command will not select all the text in the document.  A workaround for this (Windows) is to use the Edit > Copy command.  Choose Edit > Copy to copy the selected text to the clipboard.

2.    To view the text, choose Window > Show Clipboard

In Windows 95, the Clipboard Viewer is not installed by default and you cannot use the Show Clipboard command until it is installed.  To install the Clipboard Viewer, Choose Start > Settings > Control Panel > Add/Remove Programs, and then click the Windows Setup tab.  Double-click Accessories, check Clipboard Viewer, and click OK.

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    **[REPORT OF ACTION TAKEN IN CLOSED SESSION ON**

2    **TUESDAY, DECEMBER 18TH, 2018 ON PAGE 263]**

3

4

5    **SUP. HAHN, CHAIR:** GOOD MORNING, EVERYONE. GOOD MORNING. GOOD

6    MORNING. GOOD MORNING. IT'S TUESDAY, DECEMBER 18TH. AND WE

7    WELCOME EVERYONE TO OUR REGULARLY SCHEDULED MEETING OF THE LOS

8    ANGELES COUNTY BOARD OF SUPERVISORS. WE TAKE NOTE THAT A FULL

9    COMPLEMENT OF THE BOARD IS PRESENT AND LOOKING GOOD. AND THE

10   CHIEF EXECUTIVE OFFICER, COUNTY COUNSEL, EXECUTIVE OFFICER,

11   AND OUR SERGEANT AT ARMS ARE ALL HERE TO ASSIST. WE'LL NOW

12   BEGIN THE MEETING WITH THE INVOCATION, WHICH WILL BE LED THIS

13   MORNING BY RABBI SUSAN GOLDBERG OF THE WILSHIRE BOULEVARD

14   TEMPLE, LOS ANGELES, IN THE SECOND DISTRICT. AND THAT WILL BE

15   FOLLOWED IMMEDIATELY BY THE PLEDGE OF ALLEGIANCE LED BY

16   BENJAMIN MONROY, THE FORMER SPECIALIST, UNITED STATES MARINE

17   CORPS, NORTHRIDGE, IN THE THIRD DISTRICT. LET US BEGIN.

18

19   **RABBI SUSAN GOLDBERG:** GOOD MORNING, I'M HONORED TO BE HERE AND

20   TO GIVE A BLESSING ON THE WORK, THE IMPORTANT WORK, THAT EACH

21   OF YOU DO TO SERVE EVERY PERSON IN THIS GREAT COUNTY OF LOS

22   ANGELES. WE HAVE JUST CONCLUDED THE HOLIDAY OF HANUKKAH, OUR

23   WINTER HOLIDAY, BUT I BRING A BLESSING FORGED FROM THE

24   TEACHINGS OF THAT HOLIDAY. WE KNOW FROM THE LEARNING OF

25   HANUKKAH THAT A SMALL GROUP CAN BATTLE AND OVERCOME GREAT

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   **SUP. HAHN, CHAIR:** OKAY, COLLEAGUES. THIS IS HOW I'M

2   ENVISIONING TODAY. WE'RE GOING TO BEGIN WITH ITEM 52, WHICH IS

3   THE TRUTH ACT COMMUNITY FORUM. AND WE HAVE MANY PEOPLE WHO

4   HAVE SIGNED UP TO SPEAK ON THIS ITEM, SO WE'RE GOING TO LIMIT

5   EVERYONE'S TIME EQUALLY TO ONE MINUTE. AND AFTER WE FINISH

6   ITEM 52, THEN WE'RE GOING TO GO TO ITEMS 59 AND 11 IN THAT

7   ORDER IF THAT'S ALL RIGHT WITH EVERYONE. SO NOW WE'LL START

8   WITH ITEM NUMBER 52. THE TRUTH ACT REQUIRES THAT THE GOVERNING

9   BOARD OF ANY COUNTY IN WHICH A LOCAL LAW ENFORCEMENT AGENCY

10  HAS PROVIDED I.C.E. ACCESS TO AN INDIVIDUAL DURING THE LAST

11  YEAR SHALL HOLD AT LEAST ONE COMMUNITY FORUM DURING THE

12  FOLLOWING YEAR. AND THAT IS WHY WE ARE HERE THIS MORNING. THE

13  BOARD OF SUPERVISORS IS THE GOVERNING BOARD OF LOS ANGELES

14  COUNTY, AND OUR BOARD MEETINGS ARE PUBLIC AND ACCESSIBLE. AND

15  DURING THE MEETINGS, WE RECEIVE PUBLIC COMMENT. [APPLAUSE] SO,

16  THE FIRST -- WE'RE VERY PLEASED TO ACKNOWLEDGE THAT SHERIFF

17  VILLANUEVA IS HERE WITH US AND PRESENT. AND I KNOW YOU WOULD

18  LIKE TO START OFF WITH A FEW REMARKS. SO, WELCOME TO OUR NEW

19  SHERIFF VILLANUEVA. [APPLAUSE]

20

21  **SHERIFF VILLANUEVA:** THANK YOU, MA'AM. MY TIME IS SHORT, BUT I

22  DO WANT TO INFORM YOU THAT WE'VE GONE THROUGH. WE'VE HAD A

23  TOUR OF THE JAIL ON WEDNESDAY AFTER I WAS SWORN IN. AND WE HAD

24  A LONG ANALYSIS OF WHAT WE'RE DOING AND HOW WE'RE GOING TO

25  COMPLY WITH THE TRUTH ACT, WITH S.B.54, AND MOVING FORWARD.

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  WE'VE DEVELOPED A PRETTY SOUND POLICY THAT'S ACTUALLY GOING

2  COMPLY WITH IT  AND WITH MY PROMISE THAT I'VE MADE THROUGHOUT.

3  AND TWO POINTS THAT I WANT TO LEAVE WITH YOU. ONE IS THAT WE

4  ARE GOING TO PHYSICALLY REMOVE I.C.E. FROM THE COUNTY JAILS.

5  [APPLAUSE] (SOME BOOING).

6

7  **SUP. HAHN, CHAIR:** LET ME JUST STOP YOU, SHERIFF. SO, I KNOW WE

8  HAVE A LOT OF FOLKS WHO HAVE COME DOWN HERE. AND OF COURSE WE

9  DO GET PUBLIC COMMENT. EVERYBODY HAS A RIGHT TO SIGN IN ON ANY

10 ITEM AND SPEAK. BUT WE WILL ASK THAT YOU REFRAIN FROM APPLAUSE

11 OR BOOING. AND SOME LIKE TO, WHEN THEY AGREE WITH SOMETHING,

12 RAISE THE ROOF OR DO THIS. AND YOU MAY EVEN DO THIS IF YOU

13 DISAGREE WITH SOMETHING. BUT IT WILL MAKE THE MEETING GO A LOT

14 MORE SMOOTH AND EFFICIENT, AND IT WILL GIVE RESPECT TO

15 EVERYONE WHO HAS THE FLOOR WHEN THEY HAVE THE MICROPHONE. SO

16 IF YOU WOULD ACCOMMODATE US WITH THAT, WE WOULD APPRECIATE IT.

17 SHERIFF, CONTINUE.

18

19 **SHERIFF VILLANUEVA:** THANK YOU. AND THE SECOND ITEM IS THAT

20 OUR, ACCORDING TO S.B.54, THE MISDEMEANOR LIST, WHICH IS

21 ROUGHLY 150 INDIVIDUAL MISDEMEANORS AND WOBBLERS, FELONY

22 MISDEMEANORS. BUT THE ONES THAT ARE FILED AS MISDEMEANOR,

23 WE'RE GOING PARE THAT LIST DOWN SUBSTANTIALLY FROM ITS PRESENT

24 STATE IN KEEPING WITH ANOTHER PROMISE. SO BOTH REMOVING I.C.E.

25 FROM THE JAILS AND PARING DOWN THE LIST AND HONORING THE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    SPIRIT AND THE LETTER OF S.B.54, THAT IS OUR INTENTION. AND

2    I'M GOING LEAVE COMMANDER MOREJON AND ASSISTANT SHERIFF BOB

3    OLMSTEAD WITH ALL THE DETAILS.

4

5    **SUP. HAHN, CHAIR:** THANK YOU, SHERIFF. AND NOW, BEFORE WE TURN

6    TO THE PUBLIC THAT HAS SIGNED UP ON THIS ITEM, WE'RE GOING TO

7    HAVE A PRESENTATION FROM SHADI KARDAN. AND FROM THE OFFICE OF

8    INSP -- (PEOPLE YELLING FROM THE AUDIENCE). OKAY. AGAIN, WE'RE

9    GOING GIVE YOU A WARNING. WE DON'T REALLY APPRECIATE SHOUTS

10   FROM THE AUDIENCE. AND YOU WILL BE REMOVED FROM THIS MEETING

11   IF YOU DISTRACT FROM OUR MEETING. SO, PLEASE, NO SHOUTING FROM

12   THE AUDIENCE. SHADI KARDAN FROM THE OFFICE OF INSPECTOR

13   GENERAL, WHO WILL PROVIDE US SOME BACKGROUND. AND HER

14   PRESENTATION WILL BE FOLLOWED BY A PRESENTATION FROM THE

15   SHERIFF'S DEPARTMENT. AND AT THE END OF THESE TWO

16   PRESENTATIONS, WE WILL CALL -- MY COLLEAGUES WILL BE ASKED IF

17   YOU WOULD LIKE TO ASK QUESTIONS OR SAY SOMETHING. AND THEN

18   WE'LL OPEN IT UP TO THE PUBLIC. SHADI, WELCOME.

19

20   **SHADI KARDAN:** THANK YOU VERY MUCH. THANK YOU FOR HAVING ME. SO

21   THE TRUTH ACT, WHICH IS ASSEMBLY BILL NUMBER 2792, SO WHAT IS

22   THE TRUTH ACT? THE TRUTH ACT ACTUALLY STANDS FOR THE

23   TRANSPARENT REVIEW OF UNJUST TRANSFERS AND HOLDS. WHAT IT IS

24   ESSENTIALLY, IT'S A LAW THAT REQUIRES LOCAL LAW ENFORCEMENT TO

25   BE TRANSPARENT ABOUT THEIR COOPERATION WITH I.C.E. AND TO

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1

2    **CELIA ZAVALA, E.O.:** NO, THOSE ARE IT, MADAM CHAIR.

3

4    **SUP. HAHN, CHAIR:** NOW IT WOULD BE APPROPRIATE TO HAVE MY

5    COLLEAGUES TO SAY A FEW THINGS, OR IF WE WANT TO HAVE THE

6    SHERIFF'S DEPARTMENT RESPOND TO ANY OF THE ISSUES THAT SOME OF

7    OUR PUBLIC BROUGHT UP THAT MIGHT NEED AN ANSWER. OKAY.

8    SUPERVISOR KUEHL.

9

10   **SUP. KUEHL:** THANK YOU, MADAM CHAIR. I DO HAVE SOME QUESTIONS,

11   PARTLY BROUGHT UP BY THE PUBLIC KIND OF ON BOTH SIDES, AND,

12   REALLY, THINGS THAT I DON'T QUITE UNDERSTAND YET AND MAYBE

13   THERE ARE NOT ANSWERS YET BECAUSE WE'VE JUST GONE THROUGH A

14   CHANGE IN LEADERSHIP. AND SOME CHANGES HAVE BEEN ANNOUNCED. SO

15   I GUESS MY FIRST QUESTION IS, IS THERE A TIMELINE FOR

16   IMPLEMENTING THE CHANGES LIKE THE NEW NOTIFICATION FORMS FOR

17   THE TRUTH ACT AND THE UPDATED MISDEMEANOR LIST FOR S.B.54 THAT

18   THE SHERIFF REFERRED TO. LET'S GIVE A MICROPHONE TO THIS

19   TABLE, PLEASE.

20

21   **SPEAKER:** AM I ON? THE SHERIFF HAS INDICATED THAT IT WILL BE

22   IMPLEMENTED BY THE BEGINNING OF 2019.

23

24   **SUP. KUEHL:** AT THE BEGINNING OF THE YEAR,  SO AFTER THE NEXT

25   COUPLE WEEKS. I'M INFORMED THAT THERE'S A NEW FLYER GIVEN TO

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    MIGHT HURT THE COMMUNITY AND MIGHT HURT I.C.E. I MEAN IT'S A

2    COMBINATION OF BALANCE AT THIS PARTICULAR POINT.

3

4    **SUP. SOLIS:** I WOULD HOPE THAT YOU -- THAT THE SHERIFF WOULD

5    ENLIST OUTSIDE STAKEHOLDER INPUT ON SOME OF THAT. I KNOW THAT

6    HE HAS MADE IT AN EFFORT, AND HE'S TALKED ABOUT ABOUT IT IN

7    HIS CAMPAIGN ABOUT SOLICITING SUPPORT FROM THE COMMUNITY. SO I

8    THINK IT WOULD BE IMPORTANT FOR SOME OF THE GROUPS THAT HAVE

9    COME HERE AND TESTIFIED TO BE ABLE TO REACH OUT TO THEM AS A

10   RECOMMENDATION TO DO THAT. AND THEN I JUST HAVE A OTHER SERIES

11   OF QUESTIONS, AS WELL. COOPERATING WITH OTHER TASK FORCE

12   ORGANIZATIONS THAT ARE DEALING WITH, I COULD THINK ABOUT ARMS

13   AND WHATEVER IT MIGHT BE, WHEN THERE ARE STRIKE TEAMS THAT GO

14   OUT IN OUR COMMUNITIES. ALONGSIDE THOSE TASK FORCE, SHERIFF'S

15   DEPUTIES ARE OFTEN CALLED THERE BECAUSE IF THEY'RE GOING IN,

16   AND THEY MAY BE LOOKING AT A SUSPECT THAT HAS A CRIMINAL

17   RECORD, AND I'M ASSUMING THAT SOMETIMES THAT SHERIFF MAY NOT

18   BE AWARE THAT THERE MAY BE OTHER PEOPLE IN THE SAME LOCATION,

19   IN AN APARTMENT, FOR AN EXAMPLE, WHERE OTHER UNINTENDED

20   INDIVIDUALS MAY BE PICKED UP. AND THAT HAS HAPPENED IN THE

21   PAST. HOW DO YOU PROPOSE TO DEAL WITH THAT?

22

23   **SPEAKER:** WELL, THE PATROL SIDE, AS I SAID, WE, AS THE

24   SHERIFF'S DEPARTMENT, DO NOT ENFORCE ANY OF THE CIVIL

25   IMMIGRATION MATTERS IN PATROL. I UNDERSTAND WE ARE -- WE HAVE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   TASK FORCES WITH I.C.E. AGENTS AND OTHER AGENCIES. BUT OUR

2   GOAL IS NOT -- IS ONLY CRIMINAL ACTIVITY, NOT CIVIL

3   IMMIGRATION ACTIVITY. CAN IT HAPPEN? OF COURSE. BUT WE WOULD

4   NOT BE INVOLVED IN THAT. THAT WOULD BE STRICTLY UP TO I.C.E.

5   AND WHAT THEY DO WITH THOSE INDIVIDUALS.

6

7   **SUP. SOLIS:** WILL THERE BE ANY TRAINING PROVIDED TO YOUR

8   DEPUTIES AND OFFICERS WITH THAT, WITH RESPECT TO THAT ISSUE?

9   BECAUSE THAT HAS HAPPENED AS RECENTLY AS LAST -- A FEW MONTHS

10  AGO. AND WE HEAR ABOUT IT IN THE NEWSPAPER AND THE MEDIA WHERE

11  INDIVIDUALS WHO JUST HAPPENED TO BE IN THE SAME LOCATION ARE

12  PICKED UP, AND WE HAVE THE DISPLAY IS OBVIOUSLY I.C.E., BUT WE

13  ALSO HAVE SHERIFF DEPUTIES IN SIGHT. SO I'M JUST WONDERING

14  WHAT PROACTIVE STEPS WILL THIS SHERIFF TAKE TO HELP ENSURE

15  THAT, THAT THERE'S TRAINING THAT GOES ON?

16

17  **SPEAKER:** THERE IS TRAINING. AND I BELIEVE ABOUT A YEAR AGO, WE

18  -- THE ASSISTANT SHERIFF, THEN ASSISTANT SHERIFF RIVERA MADE A

19  VIDEOTAPE THAT WAS SENT THROUGHOUT THE DEPARTMENT TO ALL

20  DEPARTMENT MEMBERS ABOUT OUR POLICIES, SPECIFICALLY OUR PATROL

21  POLICIES AND OUR TASK FORCE POLICIES. AND I BELIEVE IT WAS

22  PART OF THE PRESENTATION THAT I PUT UP THERE, OUR POLICIES ON

23  THAT. SO, YEAH, WE DO CONTINUE TO TRAIN OUR DEPUTIES.

24

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    DEFENDER, AS WELL AS OFFICE OF IMMIGRANT AFFAIRS. I DON'T KNOW

2    NECESSARILY THAT WE NEED A BUDGET REQUEST AT THIS POINT IN

3    TIME. BUT AGAIN, I'D LIKE TO SIT AND TALK TO THE SHERIFF'S

4    DEPARTMENT IN TERMS OF WHAT THEIR NEED IS.

5

6    **SUP. SOLIS:** OKAY. THANK YOU. I STILL HAVE A FEW MORE

7    QUESTIONS. ONE IS DEALING WITH A STATEMENT THAT THE SHERIFF

8    MADE EARLIER ABOUT REDUCING THE 150 MISDEMEANOR CHARGES,

9    LOOKING AT THAT LIST AND COMING UP WITH A SHORTER LIST. CAN

10   YOU TELL ME OR GIVE ME AN IDEA WHAT THAT PROCESS WILL LOOK

11   LIKE AND WHAT THE TIME, AGAIN, THE TIMELINE IS FOR THAT PLAN.

12   AND WILL YOU INVOLVE OUTSIDE STAKEHOLDERS?

13

14   **SPEAKER:** RIGHT. I THINK TIMELINE'S GOING TO PROBABLY REMAIN

15   THE SAME. WE HAVE ALREADY TALKED ABOUT THAT. AND WE SPOKE

16   ABOUT GETTING A WORKING GROUP TOGETHER, MAYBE WITH THE PUBLIC

17   DEFENDER'S OFFICE, OUR COUNTY COUNSEL, AND DIFFERENT GROUPS TO

18   LOOK AT THE LIST AND SEE WHAT TYPES OF CRIMES, IF ANY, WILL BE

19   REMOVED FROM THE MISDEMEANOR LIST. I'M SORRY?

20

21   **SUP. SOLIS:** 30 DAYS OR SO?

22

23   **SPEAKER:** YEAH, WE'RE STILL TRYING TO GET THIS ALL DONE BY THE

24   END OF JANUARY. IT'S ALL INCLUDED.

25

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   **SPEAKER:** CORRECT. S.B.54, YEAH. WE'RE STILL GOING TO CONTINUE

2   WHAT WE'RE CONTINUING NOW AS FAR AS OUR LIST AND WHO

3   QUALIFIES. THAT'S ALL DICTATED BY THE VALUES ACT, WHICH IS

4   ESSENTIALLY S.B.54.

5

6   **SUP. BARGER:** THEN WALK ME THROUGH THAT. IF I'M IN YOUR JAIL,

7   AND I CHECK THE BOX THAT I DO NOT WANT TO BE INTERVIEWED,

8   OKAY, AND I'M THE D.O.J., I'M ALREADY IN THE SYSTEM. SO THE

9   D.O.J. KNOWS THAT I'M THERE. AND I'M UNDOCUMENTED. WALK ME

10  THROUGH WHAT THE NEXT, HOW THIS PLAYS OUT UNDER THE NEW SYSTEM

11  THAT THE SHERIFF'S PROPOSING. AND I'M GETTING READY TO BE

12  RELEASED.

13

14  **SPEAKER:** RIGHT. SO AN INMATE IS GETTING RELEASED. AND WHAT

15  NEEDS TO BE, I GUESS, PUT OUT IS THAT NOT EVERY INMATE I.C.E.

16  INTERVIEWS. SO THERE'S VERY FEW INMATES. I BELIEVE  LIKE LAST

17  YEAR, WE HAD IN THE 20S OR IN THE TEENS THAT THEY ACTUALLY

18  ASKED TO INTERVIEW. THE ONES THEY ASKED TO BE INTERVIEWED ARE

19  INDIVIDUALS THAT THEY'RE NOT SURE IF THEY'RE GOING TO DETAIN

20  OR TAKE CUSTODY OF. SO THE ONES THEY KNOW THEY HAVE A

21  DETAINER, THEY'RE HERE ILLEGALLY, THEY DON'T INTERVIEW.

22  THEY'RE JUST GOING. SO IT DOESN'T MATTER WHETHER THE INMATE

23  SAYS THEY WANT TO SPEAK TO THEM OR NOT, THAT'S JUST PART OF

24  OUR FORM BECAUSE WE HAVE TO GIVE THEM THAT. BUT EVERY

25  INDIVIDUAL GETS THAT FORM.



1  IT TO GO. AS I SAY, WE WERE ABLE TO WORK SOMETHING OUT IN THE

2  JAILS, BUT JUVENILES HAVE A HEIGHTENED PROTECTION. AND WE'RE

3  NOT GOING TO JUST FOLLOW THE LAW. I'M GOING TO FOLLOW WHATEVER

4  RICARDO THINKS IS A GOOD IDEA AND MAKE SURE WE WORK TOGETHER.

5

6  **SUP. KUEHL:** RIGHT. BECAUSE HE ALSO CAN'T WAIVE THEIR RIGHTS,

7  IF YOU KNOW WHAT I MEAN. AND HE KNOWS THAT WELL. BUT I THINK I

8  WANT US TO ABSOLUTELY, YOU KNOW, PAY ATTENTION BECAUSE IT'S

9  IMPORTANT FOR OUR YOUNG PEOPLE TO FEEL SAFE, TO BE ABLE TO SAY

10 WHAT HAPPENED, SAFE FROM PUNISHMENT AND PROBATION, SAFE FROM,

11 YOU KNOW, WHATEVER. AND THE THEORY IN THE LAW IS THAT YOUNG

12 PEOPLE ARE MORE VULNERABLE TO SUGGESTION, TO THREAT, TO POWER,

13 WHICH THEY ARE, AND THAT'S WHY THERE ARE HEIGHTENED

14 PROTECTIONS. SO I WANT TO MAKE SURE THAT WE -- I'M INTERESTED

15 IN GETTING TO THE BOTTOM OF ALL THIS, TOO, THERE'S NO

16 QUESTION. BUT I WANT TO MAKE SURE THAT WE ARE JUST SENSITIVE

17 TO THEIR HEIGHTENED LEVEL OF RIGHTS. THANK YOU, MADAM CHAIR.

18

19 **SUP. HAHN, CHAIR:** THANK YOU. SUPERVISOR SOLIS.

20

21 **SUP. SOLIS:** THANK YOU. I WANT TO THANK SUPERVISOR RIDLEY-

22 THOMAS AND YOURSELF, MADAM CHAIR, FOR BRINGING THIS ISSUE

23 FORWARD. AND I, TOO, WAS SURPRISED TO READ IN THE NEWSPAPER

24 REGARDING THIS INCIDENT. SO I DO THINK THAT WE HAVE TO HAVE

25 BETTER COMMUNICATION AS WE DO WITH THE SHERIFF OR THE JAILS

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   WHEN THERE IS INCIDENTS THAT OCCUR AND FOLKS IN OUR CARE, IN
2   PARTICULAR, WE SHOULD KNOW RIGHT AWAY WHEN THINGS OF THIS
3   NATURE OCCUR. I WAS VERY DISAPPOINTED TO HEAR WHAT HAPPENED. I
4   WON'T GO INTO THAT. BUT I WILL TELL YOU THAT, FOR SOMEONE
5   WHO'S BEEN ON THE BOARD NOW FOR FOUR YEARS ADVOCATING FOR THE
6   HOPE CENTERS, FOR ELIMINATION OF SOLITARY CONFINEMENT, WHAT
7   I'M FINDING IS THAT THERE STILL SEEMS TO BE SOME RESISTANCE ON
8   THE PART OF STAFF IN TERMS OF WANTING TO MAKE THESE OVERALL
9   CHANGES THAT YOU ALL HAVE BEEN PROVIDING THROUGH TRAINING AND
10  EDUCATION. AND I'M FRUSTRATED BECAUSE I'D LIKE TO SEE WHERE WE
11  CAN IMPROVE UPON THAT. AND IT ISN'T JUST ABOUT TRAINING, IT'S
12  ABOUT ALSO THE MINDSET OF ALL THE STAFF. SO IT ISN'T JUST THE
13  PROBATION OFFICERS, BUT IT'S THE ENTIRE WORKFORCE THAT'S THERE
14  IN PLACE. I THINK EVERYONE HAS A ROLE TO PLAY HERE. THEY
15  OBVIOUSLY HAVE ACCESS TO THESE YOUNGSTERS WHILE THEY'RE THERE
16  IN OUR CARE. AND A LOT GOES ON. AND I AM, AS YOU KNOW, AS I'VE
17  EXPRESSED TO YOU, SHEILA, HOW IMPORTANT IT IS FOR US TO
18  MAINTAIN RESPECT FOR THESE YOUNGSTERS AND HOPEFULLY GET OUR
19  EMPLOYEES, OUR STAFF, TO UNDERSTAND THE KINDS OF CHANGES THAT
20  WE'RE MAKING BECAUSE THE CASELOADS HAVE DIMINISHED. THEY HAVE.
21  BUT WE DO HAVE YOUNG PEOPLE THAT ARE A LITTLE BIT CHALLENGING.
22  AND MAYBE MORE THAN JUST A LITTLE BIT. AND THAT REQUIRES
23  PROFESSIONAL ASSISTANCE. AND MAYBE WE NEED TO HAVE SOME MENTAL
24  HEALTH PROFESSIONALS OR A CLOSER LOOK AT WHAT THAT MEANS IN
25  TERMS OF PROVIDING THAT KIND OF SUPPORT TO THESE YOUNG

EXHIBIT 38



# The Meeting Transcript of
# The Los Angeles County
# Board of Supervisors

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



## Adobe Acrobat Reader

### Finding Words

You can use the Find command to find a complete word or part of a word in the current PDF document.  Acrobat Reader looks for the word by reading every word on every page in the file, including text in form fields.

### To find a word using the Find command:

1.  Click the Find button **(Binoculars)**, or choose Edit > Find.
2.  Enter the text to find in the text box.
3.  Select search options if necessary:
    Match Whole Word Only finds only occurrences of the complete word you enter in the box.  For example, if you search for the word *stick*, the words *tick* and *sticky* will not be highlighted.

    Match Case finds only words that contain exactly the same capitalization you enter in the box.

    Find Backwards starts the search from the current page and goes backwards through the document.
4.  Click Find.  Acrobat Reader finds the next occurrence of the word.

### To find the next occurrence of the word, Do one of the following:

Choose Edit > Find Again
Reopen the find dialog box, and click Find Again.
(The word must already be in the Find text box.)

## Copying and pasting text and graphics to another application

You can select text or a graphic in a PDF document, copy it to the Clipboard, and paste it into another application such as a word processor.  You can also paste text into a PDF document note or into a bookmark.  Once the selected text or graphic is on the Clipboard, you can switch to another application and paste it into another document.

**Note:  *If a font copied from a PDF document is not available on the system displaying the copied text, the font cannot be preserved.  A default font  is substituted.***

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



**To select and copy it to the clipboard:**

1.   Select the text tool T, and do one of the following:
 To select a line of text, select the first letter of the sentence or phrase and drag to
 the last letter.

To select multiple columns of text (horizontally), hold down Ctrl+Alt (Windows) or Option
(Mac OS) as you drag across the width of the document.

To select a column of text (vertically), Hold down Ctrl+Alt (Windows) or Option+Command
(Mac OS) as you drag the length of the document.

To  select all the text on the page, choose Edit > Select All.  In single page mode, all the text
on the current page is selected.  In Continuous or Continuous – facing mode, most of the text
in the document is selected.  When you release the mouse button, the selected text is
highlighted.  To deselect the text and start over, click anywhere outside the selected text.
The Select All command will not select all the text in the document.  A workaround for this
(Windows) is to use the Edit > Copy command.  Choose Edit > Copy to copy the selected
text to the clipboard.

2.   To view the text, choose Window > Show Clipboard

In Windows 95, the Clipboard Viewer is not installed by default and you cannot use the
Show Clipboard command until it is installed.  To install the Clipboard Viewer, Choose
Start > Settings > Control Panel > Add/Remove Programs, and then click the Windows
Setup tab.  Double-click Accessories, check Clipboard Viewer, and click OK.

# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1           **[REPORT OF ACTION TAKEN IN CLOSED SESSION ON**

2              **TUESDAY, JANUARY 29, 2019 ON PAGE 150]**

3

4

5    **SUP. BARGER, CHAIR PRO TEM:** ALL RIGHT. GOOD MORNING, EVERYONE.

6    GOOD MORNING. IF YOU'D LIKE TO TAKE A SEAT, WE'RE GOING TO GET

7    THE BOARD MEETING STARTED. WE WELCOME YOU TO THE REGULARLY

8    SCHEDULED MEETING OF THE LOS ANGELES COUNTY BOARD OF

9    SUPERVISORS. TODAY IS TUESDAY, JANUARY 29TH. WE TAKE NOTE THAT

10    THERE ARE THREE SUPERVISORS PRESENT. SUPERVISOR HAHN AND

11    SUPERVISOR RIDLEY-THOMAS WILL NOT BE HERE TODAY. WE ALSO NOTE

12    THAT THE CHIEF EXECUTIVE OFFICER, COUNTY COUNSEL, AND

13    EXECUTIVE OFFICER, AND OUR SERGEANT-AT-ARMS ARE HERE TO

14    ASSIST. WE WILL NOW BEGIN WITH THE INVOCATION, LED BY REVEREND

15    SANDY LIDDELL FROM THE MALIBU UNITED METHODIST CHURCH IN

16    MALIBU, IN THE THIRD DISTRICT, FOLLOWED BY THE PLEDGE OF

17    ALLEGIANCE BY MARNISHA MINTLOW, FORMER LANCE CORPORAL, UNITED

18    STATES MARINE CORPS IN LOS ANGELES, WHICH IS IN THE SECOND

19    DISTRICT. IF YOU ARE ABLE, PLEASE STAND.

20

21    **REV. SANDY LIDDELL:** PLEASE BE WITH ME IN A SPIRIT OF PRAYER. O

22    HOLY ONE, WE ARE GRATEFUL WITH YOUR PRESENCE WITH US ALWAYS,

23    ESPECIALLY HERE TODAY IN THIS PLACE, AS WE COME TOGETHER TO

24    CONSIDER THE NEEDS OF OUR COMMUNITY. WE ARE MINDFUL OF THE

25    DIVERSITY OF OUR CONSTITUENTS, DEVELOPERS, REAL-ESTATE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  SALESPEOPLE, RESTAURATEURS, UNION MEMBERS, AND, OF COURSE,

2  THOSE THAT HAVE NO VOICE: THE HUNGRY, THE HOMELESS, THE

3  POWERLESS, PEOPLE WHO NEED OUR SPECIAL ATTENTION AND HELP. O

4  COMPASSIONATE ONE, HELP US TO REMEMBER THEIR VERY LIVES MAY

5  DEPEND ON OUR DOING OUR JOBS WITH COMPASSIONATE HEARTS AND

6  BRAVE DECISIONS. HELP US TO BE WISE AND STRONG AND GENEROUS

7  AND TENDERHEARTED, SO THAT WE MAY SEE EACH PERSON THAT WE

8  REPRESENT AS OUR SISTER OR OUR BROTHER, YOUR CHILDREN ALL.

9  AMEN.

10

11  **MARNISHA E. MINTLOW:** PLEASE FACE THE FLAG. PLACE YOUR HAND

12  OVER YOUR HEART-- YOUR RIGHT HAND OVER YOUR HEART. AND IF YOU

13  ARE A VETERAN, YOU MAY RENDER A SALUTE. PLEASE JOIN ME IN THE

14  PLEDGE OF ALLEGIANCE. [PLEDGE OF ALLEGIANCE RECITED.] THANK

15  YOU.

16

17  **SUP. BARGER, CHAIR PRO TEM:** THANK YOU. NOW SUPERVISOR KUEHL

18  WILL PRESENT.

19

20  **SUP. KUEHL:** IN 2012, THE REVEREND SANDY LIDDELL JOINED THE

21  MALIBU UNITED METHODIST CHURCH, WHERE SHE'S BEEN AN INCREDIBLE

22  LEADER, ADVOCATE, AND PARTNER IN OUR FIGHT TO TRY TO END

23  HOMELESSNESS. SANDY GREW UP AT THE OTHER END OF THE THIRD

24  DISTRICT, IN THE SAN FERNANDO VALLEY, AND WAS IN THE FIRST

25  GRADUATING CLASS TO GO ALL THE WAY THROUGH CHATSWORTH HIGH

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  TO MOVE ON TO ITEM 38-C. AND HOW WOULD YOU LIKE TO DO THIS,

2  SUPERVISOR KUEHL? WOULD YOU LIKE TO SAY SOMETHING?

3

4  **SUP. KUEHL:** I WOULD, MADAM CHAIR. THANK YOU SO MUCH.

5

6  **SUP. BARGER, CHAIR PRO TEM:** AND THEN WE HAVE SHERIFF

7  VILLANUEVA IS HERE, AS WELL.

8

9  **SUP. KUEHL:** I SEE THE SHERIFF IS HERE, AND OTHERS. WELL, I

10  ASKED-- FIRST OF ALL, THANK YOU FOR ALLOWING ME TO CO-AUTHOR

11  THIS WITH YOU. I THINK THAT THERE HAVE BEEN A NUMBER OF

12  CONCERNS RAISED ABOUT THE ACTIONS OF THE SHERIFF. AND INSTEAD

13  OF SPEAKING ABOUT YOU IN THE THIRD PERSON, IF I MAY, I'LL JUST

14  SAY ABOUT YOUR ACTIONS, SHERIFF, IN TERMS OF SPECIFICALLY, AS

15  PRETTY WELL DOCUMENTED IN THE NEWSPAPERS AND IN THE EDITORIAL

16  THIS MORNING IN THE L.A. TIMES, THE REINSTATEMENT OF A

17  PARTICULAR DEPUTY ABOUT WHICH YOU'VE BEEN QUESTIONED, BUT IT'S

18  REALLY MORE THAN THAT. BECAUSE THERE HAVE BEEN A NUMBER OF

19  ARENAS IN WHICH YOU'VE BEEN QUOTED ABOUT THE WAY YOU FEEL

20  DEPUTIES WERE TREATED IN THE PAST, AND THAT INVESTIGATIONS

21  ONGOING CONCERNING DOMESTIC VIOLENCE, ALLEGATIONS AGAINST

22  DEPUTIES, OR PERHAPS A SECOND DRIVING-UNDER-THE-INFLUENCE

23  CHARGE WILL NOT BE COUNTED BECAUSE THEY DON'T REALLY RELATE TO

24  A DEPUTY'S PERFORMANCE; THE FACT THAT THERE ARE, I BELIEVE, 10

25  WOMEN IN THE DEPARTMENT WHO ARE MEMBERS OF OR ON THE BOARD OF

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



```
1   THE ASSOCIATION OF WOMEN EXECUTIVES IN CORRECTIONS, WHO HAVE
2   INDICATED THEY ARE NOT CERTAIN THAT THEY CAN SERVE ANY LONGER
3   ON THE BOARD, THAT THEY HAVEN'T BEEN TOLD THAT THEY CAN. I
4   THINK THAT'S FAIR, BUT WE WOULD WONDER ABOUT THAT. BUT THE
5   LARGER QUESTION REALLY IS THE PUBLIC TRUST, THE TRUST OF THIS
6   BOARD. AND PERHAPS IT WOULD ALSO BE GOOD FOR YOU TO TAKE INTO
7   ACCOUNT THE TRUST OF OUR CONTRACT CITIES, BECAUSE THERE ARE
8   SEVERAL LARGE AREAS, AS YOU KNOW, ON WHICH WE COUNT ON THE
9   SHERIFF TO BE THERE FOR US, IN THE JAILS, TO PROVIDE CUSTODY,
10  CONTROL, BUT ALSO CARE FOR THOSE WHO ARE FORCED TO BE THERE.
11  IN THE PAST, AS YOU KNOW, THERE'S BEEN SUIT AFTER SUIT AFTER
12  SUIT. THE FEDERAL GOVERNMENT BECAME INVOLVED, REALLY ALL
13  RELATING TO THE WAY IN WHICH OUR INMATES WERE TREATED,
14  INCLUDING EXCESSIVE FORCE. DEPUTIES, WE FELT THERE WAS A
15  CHANGE RECENTLY, THROUGH THE ACTIONS OF THE PAST SHERIFF, THAT
16  MORE ATTENTION WOULD BE PAID TO THE ACTIONS OF DEPUTIES WHO
17  WERE FOUND TO HAVE USED EXCESSIVE FORCE. SEVERAL OF THEM WERE
18  INVESTIGATED AND RECEIVED PUNISHMENT, INCLUDING, IN SOME
19  CASES, BEING TERMINATED. SOME OF THOSE CASES WENT TO THE CIVIL
20  SERVICE COMMISSION. THE CIVIL SERVICE COMMISSION WE HAVE BEEN
21  CONCERNED IN THE PAST WERE, IN OUR OPINION IN THE PAST,
22  SOMEWHAT LENIENT ABOUT-- ESPECIALLY ABOUT OFFICERS IN YOUR
23  DEPARTMENT BEFORE YOU WERE THERE. AND SO THE FACT THAT A
24  TERMINATION WAS UPHELD AFTER A HEARING IS A VERY IMPORTANT
25  POINT TO US. IN TERMS OF COMMUNITY SAFETY, WE LOOK TO THE
```

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   YEARS OF STRIP-SEARCHES OF WOMEN CONDUCTED IN A WAY THAT WHEN

2   WE READ THE DESCRIPTION OF IT, WE WERE HORRIFIED. SO I WANTED

3   TO BRING THIS UNPRECEDENTED MOTION WITH OUR CHAIR PRO TEM, IN

4   ORDER TO EXPRESS OUR DEEP CONCERN, AND HOPEFULLY TO HAVE A

5   DIALOGUE WITH YOU IN PUBLIC ABOUT THIS. I KNOW THAT THE

6   COMMENTS THAT YOU MADE AT THE CIVILIAN OVERSIGHT COMMISSION

7   WERE PUBLIC, AS WELL, AND I'M QUITE AWARE OF THEM, AND WAS

8   CONCERNED ABOUT THEM, AS WELL. AND THE OTHER PART OF THE

9   MOTION THAT ASKS COUNTY COUNSEL ABOUT OUR AUTHORITY AS A

10  BOARD, I THINK IT'S A GOOD THING TO CLARIFY FOR BOTH OF US,

11  BECAUSE EVERY EMPLOYEE OF L.A. COUNTY IS AN EMPLOYEE OF THIS

12  BOARD. AND IT IS NOT THE CASE THAT ANY DEPARTMENT HEAD, IN MY

13  OPINION, INCLUDING THE SHERIFF, THOUGH YOU'RE INDEPENDENTLY

14  ELECTED, CAN SIMPLY DO ANYTHING THEY WANT AFTER THERE'S BEEN A

15  FINDING BY THE CIVIL SERVICE COMMISSION THAT UPHOLDS A

16  TERMINATION, FOR INSTANCE. IN ANY OTHER DEPARTMENT, THEY WOULD

17  HAVE TO GO TO COURT IN ORDER TO HAVE THAT OVERTURNED. SO I

18  REALLY WANT US TO BE ABLE TO CLARIFY THAT, BECAUSE NONE OF US

19  IS SO INDEPENDENT THAT WE CAN DO ANYTHING WE DAMN WELL PLEASE

20  IN OUR PLACE, IN OUR DEPARTMENT, OR ON OUR BOARD. SO WITH

21  THAT, MADAM CHAIR, THANK YOU FOR ALLOWING ME TO OPEN ON THIS.

22  IT MAY SEEM UNDULY HARSH, BUT, YOU KNOW, WHEN I'M CONCERNED,

23  I'M CONCERNED. AND WHEN YOU START SOMETHING CALLED THE WOMEN

24  AND GIRLS INITIATIVE IN THE COUNTY, I HAVE TO SAY I'M

25  CONCERNED. SO THANK YOU VERY MUCH.

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1

2   **ATTORNEY:** SUPERVISOR, IT DOES NOT. IF THE INDIVIDUAL DEPUTY

3   WANTED TO WAIVE THEIR OWN INDIVIDUAL RIGHTS, THEY COULD DO SO.

4

5   **SUP. BARGER, CHAIR PRO TEM:** BECAUSE I DON'T KNOW ALL THE

6   FACTS. AND I GUESS MY QUESTION TO YOU, SHERIFF, IS, IS THE

7   SUBJECT DEPUTY WILLING TO WAIVE HIS RIGHT TO PRIVACY AND

8   RELEASE HIS PERSONNEL RECORDS, GIVEN THAT HE BELIEVES THE

9   FACTS DO NOT SET FORTH LEGITIMATE GROUNDS FOR TERMINATION,

10  WHICH YOU AGREE WITH?

11

12  **SHERIFF VILLANUEVA:** THE SUBJECT IS WILLING TO WAIVE HIS

13  RIGHTS.

14

15  **SUP. BARGER, CHAIR PRO TEM:** OKAY, THAT IS SIGNIFICANT, BECAUSE

16  I THINK MY FRUSTRATION IS, WHEN I GET ASKED BY THE PRESS, I

17  CANNOT RELEASE THAT. AND I DO RESPECT PEOPLE'S RIGHT TO

18  PRIVACY, INCLUDING THE VICTIM IN THIS CASE, WHO WAS ALSO

19  WEARING A BADGE, WAS ALSO PART OF L.A. COUNTY SHERIFF'S

20  DEPARTMENT, WAS ALSO PART OF YOUR FAMILY. SO I'M

21  HYPERSENSITIVE TO THAT. THE SECOND PART OF THE MOTION, ASKING

22  FOR A CLARIFICATION, I THINK IS IMPORTANT, BECAUSE FROM WHAT I

23  UNDERSTAND-- AND RUMORS ARE EVERYWHERE. I HEAR THIS, THAT

24  THERE ARE GOING TO BE MORE RE-HIRINGS. AND I THINK IT'S

25  IMPORTANT FOR US TO UNDERSTAND WHAT OUR ROLE IS, AS IT RELATES

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    TO THE CONFLICT. AND SUPERVISOR KUEHL BROUGHT UP THE CONTRACT

2    CITIES. ONE OF THE BIGGEST ISSUES CONTRACT CITIES HAVE-- AND

3    I'M SURE YOU'VE HEARD IT-- IS OVERLIABILITY. AND THEY'VE GOT A

4    LIABILITY FUND OF WHICH THEY'VE PUT A LOT OF MONEY INTO IT.

5    AND ONE OF THE THINGS THEY FOUND IS THAT IF THERE IS A NEXUS

6    BETWEEN SOMETHING THAT THIS COUNTY OR THE SHERIFF, KNOWINGLY,

7    DEPUTY HAS DONE, AND HE OR SHE IS, LET'S SAY, WITH A D.U.I.

8    AND THEY'RE IN A CAR ACCIDENT, THE CITY IS HELD LIABLE. SO

9    THERE IS A HYPERSENSITIVITY TO THE WHOLE ISSUE OF LIABILITY,

10   AS IT RELATES TO CONTRACT CITIES. ONE OF THE QUESTIONS I HAD,

11   AND I'M TRYING TO GET A CLARIFICATION ON THIS, IS I READ AN

12   ARTICLE-- AND IT'S JUST THAT, SO I DON'T KNOW IF YOU SAID IT--

13   THAT COUNTY COUNSEL WAS INVOLVED WITH THIS ACTION THAT YOU

14   TOOK. WAS COUNTY COUNSEL INVOLVED IN THE ACTION TO BRING BACK

15   THIS DEPUTY?

16

17   **SHERIFF VILLANUEVA:** SUPERVISOR, COUNTY COUNSEL LEARNED OF THIS

18   POTENTIAL REHIRING BEFORE THE HOLIDAYS, AND ADVISED THE

19   DEPARTMENT NOT TO MOVE FORWARD UNTIL THERE WAS A FULL

20   INVESTIGATION, AND UNTIL COUNTY COUNSEL WAS FURTHER CONSULTED.

21   AND THAT LATTER CONSULTATION, IN MY UNDERSTANDING, DID NOT

22   HAPPEN.

23

24   **SUP. BARGER, CHAIR PRO TEM:** BECAUSE, SHERIFF VILLANUEVA, I

25   CAN'T REMEMBER WHICH ARTICLE IT WAS, YOU MADE A COMMENT THAT

# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  YOU HAD CONSULTED WITH COUNTY COUNSEL ON THE HIRING. I AND I

2  JUST DIDN'T KNOW WHICH COUNSEL YOU DID SEEK, IN TERMS OF

3  GETTING THAT OKAY. BUT WITH THAT, I'M GOING TO LET YOU SAY

4  YOUR... OKAY. YEAH, I'LL CALL ON SUPERVISOR KUEHL, BUT I JUST

5  WANT TO SAY THAT FOR ME, THE MOTION SPEAKS FOR ITSELF. I'M NOT

6  TRYING TO DO AN "I GOT YOU." BUT TO ME, ESPECIALLY THE

7  COMMENTS THAT WERE MADE AT THE COMMISSION, ESPECIALLY WITH A

8  BOARD OF A MAJORITY OF WOMEN, SIT BACK AND NOT CHALLENGE THOSE

9  STATEMENTS. SO WITH THAT, SUPERVISOR KUEHL?

10

11  **SUP. KUEHL:** YES. I HAD A FURTHER QUESTION OF COUNTY COUNSEL,

12  BASED ON SOMETHING YOU ASKED, BECAUSE THE SHERIFF SAID

13  "SUBJECT WAS WILLING TO WAIVE HIS RIGHTS," I THINK HE SAID.

14  HYPOTHETICALLY, IF A SUBJECT WAIVED HIS RIGHT TO PRIVACY ABOUT

15  THE RECORD, WOULD THAT ALSO GIVE US ACCESS TO WHAT THE CIVIL

16  SERVICE COMMISSION DID ITS HOLDING ON?

17

18  **ATTORNEY:** YES, IT WOULD, SUPERVISOR. THE WHOLE FILE.

19

20  **SUP. KUEHL:** GOOD. AND WHAT ABOUT THE VIDEO THAT THEY WERE ABLE

21  TO SEE, THAT WE, OF COURSE, DON'T?

22

23  **ATTORNEY:** IF THE VIDEO IS IN THE FILE, AND I BELIEVE IT IS,

24  THEN YES, THAT WOULD BE AVAILABLE, AS WELL.

25

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  **SUP. KUEHL:** OKAY. BECAUSE I BELIEVE, SHERIFF, THAT YOU HAD

2  INDICATED ANYBODY WHO LIED, YOU WOULD NOT RETAIN. SO IF IT

3  CAME TO LIGHT, HYPOTHETICALLY, THAT THERE WAS A RECORD IN

4  WHICH LYING WAS A PART OF THE REASON, I'M ASSUMING THAT WOULD

5  GIVE YOU SOME REASON TO RETHINK IT, FROM WHAT YOU HAD SAID.

6  BUT THANK YOU, MADAM CHAIR, AND THANK YOU FOR BEING SO

7  PATIENT.

8

9  **SUP. BARGER, CHAIR PRO TEM:** AND I WANT TO THANK YOU FOR COMING

10  HERE TODAY. YOU DIDN'T HAVE TO. THIS WAS A REPORT-BACK, AND

11  WE'RE GOING TO ALLOW YOU TO DO THAT. SO I APPRECIATE YOU

12  COMING HERE AND HAVING A FACE-TO-FACE ON THIS. SO WITH THAT--

13

14  **SHERIFF VILLANUEVA:** WELL, IN LIGHT OF THE... LET'S JUST SAY

15  THE MISREPRESENTATION OF MY COMMENTS TO THE CIVILIAN OVERSIGHT

16  COMMISSION, AND HOW IT WAS PLAYED OUT IN THE PRESS, AND

17  SUBSEQUENTLY THIS BOARD FED ON THAT, LET ME GIVE YOU A QUOTE

18  THAT YOU CAN QUOTE ME. THE PRESUMPTION OF VULNERABILITY IS NOT

19  A LAWFUL SUBSTITUTE FOR THE PRESUMPTION OF INNOCENCE. AND THAT

20  IS A FOUNDATION OF EVERY ACTION WE'RE TAKING. OF COURSE WE

21  TREAT EVERY SINGLE ALLEGATION, DOMESTIC VIOLENCE, WITH SERIOUS

22  CONSIDERATION. WE TAKE THE ALLEGATIONS AT FACE VALUE. WE HAVE

23  TO INDEPENDENTLY ESTABLISH THE FACTS OF THE CASE, IN ORDER TO

24  BE ABLE TO MOVE FORWARD, BOTH IN THE CRIMINAL SENSE AND IN THE

25  ADMINISTRATIVE SENSE. AND UPON REVIEW OF THIS CASE IN

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  PARTICULAR-- AND OF COURSE I'M NOT RELEASING ANY INFORMATION,

2  THE PARTICULARS OF IT-- I WILL JUST SAY THAT IT FAILED ON SO

3  MANY DIFFERENT LEVELS THAT IT NEVER SHOULD HAVE LEFT THE

4  DEPARTMENT. AND AS I SAID IN THE OVERSIGHT COMMISSION, EVEN ON

5  THE STANDARD THAT WAS ARTIFICIALLY CREATED BY MY PREDECESSOR,

6  IT DID NOT RISE TO THE LEVEL OF A DISCHARGE. IT WAS

7  ARTIFICIALLY ELEVATED TO DISCHARGE AFTER THE FACT. AND ALL OF

8  THIS, YOU WILL BE PRIVY TO IN CLOSED SESSION. AND ACTUALLY, I

9  HAVE HALF A DOZEN CASES WHERE YOU'RE GOING TO DO A DOUBLE TAKE

10 AND WONDER, WHAT ON EARTH WERE WE DOING? AND THAT IS THE WHOLE

11 POINT OF TRUTH AND RECONCILIATION. WE HAVE TO OPERATE ON THE

12 FACT-DRIVEN OBJECTIVE PROCESS IN EVERYTHING WE DO TO SUSTAIN

13 ALLEGATIONS IN A CRIMINAL SENSE, WHEN WE'RE PURSUING CRIMINAL

14 CASES, AND ON THE ADMINISTRATIVE SIDE, WE STILL HAVE TO HAVE

15 THE SAME. THE LEVEL OF THE PROOF IS DIFFERENT, OBVIOUSLY:

16 PROOF BEYOND REASONABLE DOUBT. BUT A PREPONDERANCE OF

17 EVIDENCE, WHICH IS A STANDARD FOR CIVIL SERVICE COMMISSION, IS

18 STILL A STANDARD. PREPONDERANCE OF EVIDENCE. AND HISTORICALLY,

19 THE DEPARTMENT HAS ABUSED THAT STANDARD BY... AT THE ONSET OF

20 INVESTIGATION, THEY DECIDED WHAT THE OUTCOME WAS, AND SO THEY

21 IMPANELED THE INVESTIGATORS: "JUST FIND SOME FACTS YOU CAN

22 COBBLE TOGETHER THAT SHOW THEY DID IT," AND THEY IGNORED THE

23 MOUNTAIN OF THINGS THAT SHOWED THEY DIDN'T DO IT. THAT IS NOT

24 JUSTICE. THAT'S A TRAVESTY OF JUSTICE. BUT WHAT WAS

25 DISCONCERTING WAS TAKING THAT TO THE HEARING OFFICER, AND THE

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   HEARING OFFICER REPEAT THE SAME THING. EVEN WHEN THE EVIDENCE

2   IS PRESENTED TO THE HEARING OFFICER-- I'M SPEAKING IN GENERAL,

3   THIS IS MORE THAN ONE CASE-- WHERE THE HEARING OFFICER HAS THE

4   EVIDENCE, HAS THE EXCULPATORY EVIDENCE, AND HAS THE DEPARTMENT

5   BASICALLY DIRTY CONCEALING EXCULPATORY EVIDENCE, AND THEY

6   STILL PROCEED AND RULE AGAINST THE... I CALL IT THE APPELLANT.

7   AND THAT IS OF GRAVE CONCERN, BECAUSE IT UNDERMINES THE

8   INTEGRITY OF THE ENTIRE CIVIL SERVICE SYSTEM. AND UNDER OUR

9   DEPARTMENT THAT I'M INHERITING, THE ENTIRE THING HAS BEEN

10  UNDERMINED. THE CREDIBILITY, THE INVESTIGATIONS, IS NOT THERE

11  WHERE IT SHOULD BE. BECAUSE WE NEED TO SUSTAIN DISCIPLINE

12  AGAINST PEOPLE THAT EITHER ARE NOT PERFORMING UP TO STANDARD,

13  OR THEIR PERFORMANCE IS SUCH THAT IT IS INCOMPATIBLE WITH

14  BEING A PEACE OFFICER IN THE STATE OF CALIFORNIA, AND THE

15  HIGHER STANDARD OF BEING A DEPUTY SHERIFF IN LOS ANGELES

16  COUNTY. BECAUSE WE WANT TO HOLD OUR EMPLOYEES TO THE HIGHEST

17  STANDARD, BUT WE HAVE TO HAVE A STANDARD. WE CAN'T MAKE IT UP

18  AS WE GO ALONG BECAUSE IT'S POLITICALLY EXPEDIENT TO HAVE A

19  HIGH BODY-COUNT TO SHOW OFF TO THE PRESS, AND SAY "LOOK WHAT A

20  REFORMER I AM." WHEN YOU INCREASE YOUR DISCHARGES SIX-FOLD--

21  AND I'M SAYING SIX-FOLD PER YEAR-- THAT IS A PROBLEM, BECAUSE

22  YOU HAVE TO MATCH IT WITH A SIX-FOLD INCREASE IN BEHAVIOR. IN

23  A LARGE ORGANIZATION, YOU ALL KNOW VERY WELL BEHAVIOR DOESN'T

24  CHANGE SIX-FOLD IN ANY CAPACITY, GOOD OR BAD. VERY LARGE

25  ORGANIZATIONS, THEY JUST SLOWLY GO UP AND DOWN THROUGH THE



# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1   PASSAGE OF TIME. SO IF YOU HAVE A JUMP OF A SIX-FOLD INCREASE

2   IN DISCHARGE CASES, YOU BETTER HAVE SOME SOLID EVIDENCE TO

3   SUPPORT THAT SIX-FOLD INCREASE. AND IF IT EXISTS, I'LL BE THE

4   FIRST IN LINE TO MAKE SURE THAT PERSON IS PROPERLY

5   INVESTIGATED, THE CASE IS PRESENTED. AND IF THE FACTS ARE THAT

6   OF A DISCHARGE, IT GOES TO A HEARING OFFICER. AND I SURE HOPE

7   THE HEARING OFFICER UPHOLDS IT BASED ON THE PREPONDERANCE OF

8   EVIDENCE, THE STANDARD FOR CIVIL SERVICE. I DON'T EXPECT THEM

9   TO WAIVE THE STANDARD BECAUSE OF SYMPATHY. NO. WE STILL HAVE

10  TO OPERATE ON THE STANDARD. AND THE SAME THING WITH A CIVIL

11  SERVICE COMMISSION. IF THE HEARING OFFICER SUSTAINS THE MOTION

12  OF THE APPELLANT, THEN THE COMMISSION UNANIMOUSLY VOTES

13  AGAINST THEIR OWN HEARING OFFICER, I WANT TO KNOW WHY. THE

14  FACTS ARE PRETTY LAID OUT IN BLACK AND WHITE. SO WHAT IS GOING

15  ON? AND I KNOW THE TIMES TODAY PUT OUT A VERY NICE EDITORIAL

16  ABOUT EITHER I DON'T KNOW WHAT I'M DOING, OR THE BOARD-- THE

17  COMMISSION HAS ISSUES. I CAN TELL YOU BEYOND A SHADOW OF A

18  DOUBT, FROM THE INFORMATION I HAVE TO DATE, THERE ARE A LOT OF

19  ISSUES. WE'VE INCENTIVIZED HEARING OFFICERS RULING IN FAVOR OF

20  THE COUNTY, FINANCIALLY. AND THAT GOES TO THE HEART, OR THE

21  CRUX, OF THIS MATTER. WE NEED TO HAVE A SOUND SYSTEM WHERE THE

22  HEARING OFFICER IS A RELIABLE THIRD-PARTY TRYER OF FACT. AND

23  THE CIVIL SERVICE COMMISSION IS SERVING THE SAME CAPACITY AS

24  AN OVERSIGHT OVER WHAT THE HEARING OFFICER DOES. BUT THEY HAVE

25  TO BE RELIABLE THIRD-PARTY TRYERS OF FACT. WHAT HAPPENS WHEN

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   THE CASE GOES FROM THERE TO A WRIT OF MANDATE IN SUPERIOR

2   COURT, THE PRICE STARTS GOING UP. IT STARTS CLIMBING UP.

3   ULTIMATELY, WHEN THE TRUE THIRD-PARTY, NEUTRAL THIRD-PARTY,

4   SEES ALL THE EVIDENCE AND REALIZES, "OH, YEAH, THIS IS A

5   TRAVESTY OF JUSTICE," WE PAY DEARLY FOR THAT. AND THAT'S WHEN

6   WE GET THE SEVEN-FIGURE SETTLEMENTS. AND THAT'S WHAT I'M

7   TRYING TO AVOID. AND THIS IS LEGAL COST AVOIDANCE. WE'RE GOING

8   TO WORK WITH THE OVERSIGHT COMMISSION. WE'RE GOING TO WORK

9   WITH THE OFFICE OF INSPECTOR GENERAL TO MAKE SURE OUR POLICIES

10  ARE SOUND. AND WE WANT TO HAVE THE OTHER PARTY TAKE A LOOK AT

11  WHAT WE'RE DOING, AND TO PROVIDE THEIR INPUT IN THE PROCESS,

12  SO IT IS A SOUND PROCESS MOVING FORWARD. BUT THERE'S A LOT OF

13  INTERNAL DAMAGE TO THE ORGANIZATION THAT WE CANNOT DENY, AND

14  THAT DAMAGE IS CONNECTED TO A LOT OF OTHER THINGS. IN OTHER

15  WORDS, WHEN I HAVE A SYSTEM THAT IS COMPROMISED, MY EMPLOYEES

16  ARE NO LONGER GOING TO RECRUIT THEIR OWN. THEY'RE GOING TO SIT

17  ON THEIR HANDS, WHICH MEANS OUR VACANCIES START DRIVING

18  UPWARDS, MY WORKERS' COMP CLAIMS START CLIMBING UPWARDS.

19  PEOPLE ARE NOT HAPPY WITH WORK, THEY'LL FIND A WAY TO GET OUT

20  OF WORK. AND THEN WE START SHRINKING, WHICH IS EXACTLY WHAT

21  HAPPENED THE LAST FOUR YEARS. WE WERE SHRINKING, YEAR AFTER

22  YEAR. WE'RE GETTING SMALLER WHEN WE NEED TO ACTUALLY GET

23  BIGGER. IN ANTICIPATION OF OBVIOUSLY THE PROJECTED FUTURE

24  GROWTH-- OLYMPICS AND ALL THOSE THINGS-- WE NEED TO GET BACK

25  TO FULL STAFFING, IN ORDER TO PROVIDE THE TRAINING THAT WE



**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1   NEED FOR THE ENTIRE ORGANIZATION THAT WE'RE EXTREMELY

2   SUBSTANDARD IN PROVIDING. ALL THESE THINGS DON'T HAPPEN IN A

3   VACUUM, WHERE WE CAN JUST GO OFF ON A TANGENT AND ENGAGE IN A

4   MASS FIRING SCHEME, AND SOMEHOW THAT'S GOING TO SOLVE

5   SOMETHING, BECAUSE SOMEONE THINKS THAT WE'RE OUT OF CONTROL.

6   NO. BY NO STRETCH OF THE IMAGINATION. AND BEFORE I CAME HERE

7   TODAY, I LISTENED TO A TAPE-RECORDING OF MY COMMENTS TO THE

8   OVERSIGHT COMMISSION, AND I STAND BY EVERY SINGLE WORD I SAID

9   THERE. AND IF YOU GO BACK AND LISTEN TO WHAT I SAID, AND YOU

10  LISTEN TO WHAT MY DEAR FRIENDS AT THE L.A. TIMES OR OTHER

11  MEDIA OUTLETS REPORTED, YOU'RE GOING TO REALIZE YOU'RE GOING

12  TO HAVE THE MOMENT OF "OOPS." I KNOW WHAT I'M TALKING ABOUT.

13  AND WE HAVE PROBLEMS. WE'RE GOING TO FIX THEM, BUT WE'RE NOT

14  GOING TO FIX THEM BY BURYING OUR HEADS AND PRETENDING THAT

15  EVERYTHING WAS OKAY IN THE PAST. SO IN THE CLOSED SESSION,

16  THEN, I WILL DEFINITELY HAVE THE OPPORTUNITY. WE'LL SHOW YOU

17  JUST THESE SIX ONES THAT THEY'RE WORKING THEIR WAY THROUGH THE

18  SYSTEM NOW, AND IT POINTS TO ACTUALLY A BIGGER PROBLEM THAN

19  JUST THAT. FROM THE SMALL SAMPLE SIZE THAT I'VE REVIEWED SO

20  FAR, I HAVE PRETTY SOLID EVIDENCE OF SOME INSTANCES OF PERJURY

21  COMMITTED BY DEPARTMENT EXECUTIVES. AND THE QUESTION IS, DID

22  THEY DECIDE TO DO THIS ON THEIR OWN, WHEN THEY WERE ON THE

23  STAND, OR WAS THERE SOMEONE WHO SOLICITED THEM TO COMMIT AN

24  ACT OF PERJURY? AND THAT BECOMES SUBORDINATION OF PERJURY, 127

25  OF THE PENAL CODE. AND WE WILL MOVE AGGRESSIVELY TO VERIFY



1   THESE CASES. AND WE HAVE THE EVIDENCE FOR IT, INCLUDING SOME

2   UNNAMED THIRD PARTY WHO MAY BE THE ONE THAT'S SOLICITING THEM

3   TO COMMIT THE ACTS OF PERJURY, IN ORDER TO SUSTAIN AN

4   ARTIFICIALLY BAD INTERNAL INVESTIGATION. WE'LL PURSUE THAT,

5   EITHER HERE, LOCALLY, OR THROUGH THE STATE ATTORNEY GENERAL'S

6   OFFICE. BUT I'M DEAD SERIOUS THAT WE'RE GOING TO CLEAN HOUSE.

7   WE'RE GOING TO CLEAN HOUSE THE RIGHT WAY, AND THAT'S BECAUSE

8   OF THE RULE OF LAW, AND RESPECT FOR THE RULE OF LAW.

9

10  **SUP. BARGER, CHAIR PRO TEM:** SUPERVISOR KUEHL, DID YOU WANT

11  TO...?

12

13  **SUP. KUEHL:** THANK YOU VERY MUCH. THANK YOU VERY MUCH, SHERIFF.

14  I THINK THAT YOU AND I MAY HAVE SOME DEEP DISAGREEMENTS ON A

15  NUMBER OF AREAS, AND I LOOK FORWARD TO CONTINUING WHAT MIGHT

16  BE CALLED A DIALOGUE, HOPEFULLY.

17

18  **SHERIFF VILLANUEVA:** ALWAYS.

19

20  **SUP. KUEHL:** IT'S PRETTY STANDARD WHEN PEOPLE ARE ASKED OR

21  ACCUSED OF DOING SOMETHING THAT PEOPLE DON'T APPROVE OF TO TRY

22  TO DEFLECT THE BLAME ONTO OTHERS, AND YOU'RE DEFLECTING BLAME

23  TO THE CIVIL SERVICE COMMISSION. IT MAY SEEM LIKE THE RIGHT

24  MOVE FOR YOU. BUT YOU MAY BE UNAWARE THAT WE DID ABOUT AN 18-

25  MONTH-- ASKED FOR A REPORT-BACK ON A LONG HISTORY ABOUT THE

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



```
 1   PEOPLE RECRUITING. AND I DON'T MEAN THE GOOD GUYS OR THE BAD
 2   GUYS. I MEAN THE WHOLE THING ABOUT "WE WILL ASK OUR FRIENDS TO
 3   JOIN THE DEPARTMENT," AND THAT'S HOW PEOPLE GET INTO THE
 4   DEPARTMENT. WE WERE LOOKING AT THAT NOT BEING THE WAY WE
 5   WANTED TO GO, BUT TO CREATE A GREATER DIVERSITY. SO MY
 6   CONCERNS, REALLY, HAVE NOT BEEN ALLEVIATED. I'VE SPOKEN TO
 7   MEMBERS OF THE COMMISSION WHO HEARD WHAT YOU SAID AND,
 8   FRANKLY, WERE APPALLED. TO SAY THAT STANDARDS WERE
 9   ARTIFICIALLY ELEVATED BY YOUR PREDECESSOR, IT SOUNDS LIKE YOUR
10   PREDECESSOR THOUGHT THAT HE HAD THE ABILITY TO SAY, "WE'RE
11   GOING TO HOLD OUR DEPUTIES TO A HIGHER STANDARD," AND
12   THEREFORE DID. I DON'T SEE THE ARTIFICIALITY.
13
14   SHERIFF VILLANUEVA: LET ME, IF I MAY, JUST GIVE YOU TWO
15   PARTICULAR INSTANCES. THERE'S A DEFINITE CASELAW FOR
16   CALIFORNIA, IN TERMS OF WHAT CONSTITUTES FALSE STATEMENTS AND
17   WHAT CONSTITUTES PERJURY. AND IT'S A LEGAL STANDARD, AND MR.
18   HAFETZ IS AWARE OF IT. THE STANDARD WITHIN THE DEPARTMENT IN
19   INTERNAL INVESTIGATIONS WAS ALTERED. IF THERE'S A DISPUTE
20   BETWEEN EMPLOYEES, AND YOU SAY THAT EMPLOYEE LIED, AND THE
21   INVESTIGATOR TALKS TO BOTH, AND SAY, "WELL, I THINK... I LIKE
22   WHAT THEY SAID. I DON'T LIKE WHAT YOU SAID. YOU'RE GUILTY OF
23   FALSE STATEMENTS." THAT IS HOW THE DEPARTMENT PROCEEDED, AND
24   THAT IS NOT CONSISTENT WITH ESTABLISHED CASELAW. THERE'S ONE
25   PART. THE OTHER PART IS THE ONE THAT WAS FROM ERCOM, ACTUALLY,
```

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   WHICH WAS A RULING WHERE MY PREDECESSOR CHANGED THE STANDARDS,

2   THE GUIDELINES, FOR DISCIPLINE. HE ARTIFICIALLY CHANGED THEM

3   WITHOUT GOING THROUGH THE MEET-AND-CONFER PROCESS WITH THE

4   CERTIFIED UNIONS THAT OVERSEE THAT. AND THE STANDARD WAS

5   RECALLED, REAFFIRMED TO GO BACK TO THE 2012 STANDARD, BEFORE

6   HE MADE THE UNILATERAL MOVE. THESE ARE MOVES THAT HE DID ON

7   HIS OWN, AND THAT IT WAS NOT SUPPORTED BY PRECEDENT OR BY THE

8   LAW, OR HE DIDN'T HAVE THE AUTHORITY TO DO THAT UNILATERALLY.

9   AND THAT DID NOT IMPROVE THE SITUATION. IF YOU'RE MOVING THE

10  GOALPOSTS, BUT THE FACTS STILL REMAIN THE SAME, THAT IS BEING

11  AN ARTIFICIAL DRIVER. THAT IS NOT INCREASING SOMEHOW A HIGHER,

12  A BETTER DEPARTMENT, MORE ETHICAL. ACTUALLY, NO, YOU'RE

13  PLAYING GAMES WITH POLITICS. YOU'RE NOT ACTUALLY BEING DRIVEN

14  BY FACT. WE HAVE THE GUIDELINES FOR DISCIPLINE. THE POLICIES

15  THEMSELVES HAVE NOT CHANGED WHATSOEVER. WHAT WE NEED IS WE

16  NEED TO RETRAIN OUR INVESTIGATORS TO MAKE SURE THEY INCLUDE

17  ALL OF THE INFORMATION, ALL THE INFORMATION, BOTH THE POINTS

18  TOWARDS GUILT AND THE EXCULPATORY INFORMATION. WE HAVE THE

19  OBLIGATION TO DO THAT. AND WE FAILED MISERABLY DOING THAT AS

20  AN ORGANIZATION, NOT OUTSIDE THE ORGANIZATION. SO I'M NOT

21  PLACING THE BLAME IN ANOTHER ENTITY. THEY'RE JUST ACTUALLY THE

22  END USER. AND IF YOU CAN SAY "GARBAGE IN, GARBAGE OUT," WE

23  WERE GENERATING MOST OF THE GARBAGE THAT WAS FED THROUGH THAT

24  SYSTEM. WE'RE CLEANING OUT THE GARBAGE, AND WE'RE SETTING THE

25  FACTS WHERE THEY ARE. THERE'S PEOPLE, THEY'RE GOING TO TRY TO

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  COME BACK THROUGH THE OVERSIGHT, THE TRUTH AND RECONCILIATION

2  PROCESS THAT KNOW, AT FACE VALUE, NO. THERE WAS SOLID EVIDENCE

3  THAT SUPPORTS THE DECISION. IT'S A GOOD DECISION. IT'S GOING

4  TO REMAIN. IT'S THE ONES THAT DON'T EVEN COME CLOSE TO THAT,

5  THAT PUTS US IN A LEGAL BIND IN MANY, MANY WAYS, AND WHEN YOU

6  HEAR THE DETAILS OF THE CASES, YOU'RE GOING TO HAVE A CHANGE

7  OF MIND.

8

9  **SUP. KUEHL:** WELL, I THINK IF YOU WANT TO TALK ABOUT THE RULE

10  OF LAW, I KNOW A LITTLE BIT ABOUT IT-- ONLY A LITTLE. BUT,

11  FRANKLY, WHEN YOU HAVE AN EVIDENTIARY HEARING, AND THERE IS

12  SOMEONE TASKED WITH MAKING A DECISION, YES, IT IS TRUE THAT

13  THEY SAY, "WELL, LET'S LISTEN TO WHAT YOU SAY AND WHAT YOU

14  SAY," AND THEY MAKE THE DECISION BASED ON THEIR UNDERSTANDING

15  OF THE RULE. I SUPPOSE SOME PEOPLE COULD SAY THAT YOU'RE

16  ARTIFICIALLY DEFLATING THE STANDARDS IF THEY WANT TO, YOU

17  KNOW, LOOK AT ACTIONS TAKEN. SO WE'LL LOOK FORWARD TO MORE

18  DISCUSSION ON THAT. THE FINAL THING, I DIDN'T UNDERSTAND. YOU

19  SAID YOU WERE MISREPRESENTED IN TERMS OF REPORT OF WHAT YOU

20  SAID AT THE C.O.C., THAT YOU SAID, "THE PRESUMPTION OF

21  VULNERABILITY IS NOT THE SAME AS THE PRESUMPTION OF

22  INNOCENCE." WHOSE VULNERABILITY AND WHOSE INNOCENCE ARE YOU

23  TALKING ABOUT?

24

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   **SHERIFF VILLANUEVA:** WELL, THE POINT IS THAT-- IN FACT, YOU

2   YOURSELF ARE THE ONE ALLUDING TO THE FACT THAT THERE IS AN

3   ALLEGED VICTIM OF DOMESTIC VIOLENCE. AND OF COURSE VICTIMS OF

4   DOMESTIC VIOLENCE ARE A VULNERABLE COMMUNITY. I DON'T THINK

5   ANYONE DISAGREES WITH THAT.

6

7   **SUP. KUEHL:** I'D SAY ALL WOMEN ARE A VULNERABLE COMMUNITY, BUT

8   NOT ALL WOMEN ARE VICTIMS OF DOMESTIC VIOLENCE. THERE'S MORE

9   TO IT THAN THAT. WHEN SOMEONE TERRIFIES YOU, THREATENS YOU,

10  COMMITS VIOLENCE AGAINST YOU, THEN-- AND WHOSE PRESUMPTION OF

11  INNOCENCE? YOU MEAN THE PERSON WHO DID THE VIOLENCE, BUT IT

12  DIDN'T ADD UP TO DOMESTIC VIOLENCE IN YOUR MIND?

13

14  **SHERIFF VILLANUEVA:** WELL, ACTUALLY, OUR ENTIRE LEGAL SYSTEM IS

15  DRIVEN BY THE PRESUMPTION OF INNOCENCE. AND I HOPE THAT

16  INCLUDES BOTH CRIMINAL LAW AND EMPLOYMENT LAW.

17

18  **SUP. KUEHL:** YEAH, BUT REMEMBER THAT DOMESTIC VIOLENCE IS NOT

19  ONLY AN ASPECT OF CRIMINAL LAW. AND THERE I DO KNOW WHAT I'M

20  TALKING ABOUT, SINCE I WAS THE AUTHOR OF ALL OF THE EARLY

21  DOMESTIC VIOLENCE LEGISLATION IN THE STATE OF CALIFORNIA.

22  BECAUSE VICTIMS ARE SO FRIGHTENED. AND CERTAINLY, WHEN THEY'RE

23  IN LAW ENFORCEMENT THEMSELVES, THEY'RE EVEN MORE FRIGHTENED.

24  WE FOUND THAT LAW ENFORCEMENT, GENERALLY-- NOT THE SHERIFF'S

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1   DEPARTMENT ONLY-- HAD A LOT OF ABUSERS, AND PEOPLE WERE

2   TERRIFIED BECAUSE THEY WERE PRETTY WELL CONNECTED.

3

4   **SHERIFF VILLANUEVA:** OH, I AGREE, AND THAT HISTORICALLY HAS

5   ALWAYS BEEN A PROBLEM.

6

7   **SUP. KUEHL:** SO THE FACT THAT THEY DON'T BRING OR GO RIGHT TO

8   THE POLICE, AND SAY, "I'M FILING A CRIMINAL CHARGE," WAS ONE

9   OF THE THINGS THAT WE FOUND EARLY ON LED US TO CREATE THE

10   CIVIL CODE ABOUT DOMESTIC VIOLENCE, SO THAT YOU COULD GET

11   RESTRAINING ORDERS, ET CETERA, BECAUSE PEOPLE WERE NOT FEELING

12   SECURE AND SAFE TO FILE THOSE. SO, CERTAINLY SETTING A

13   STANDARD AT THE FILING OF A CRIMINAL COMPLAINT IS NOT THE SAME

14   AS WHAT YOU CALL INNOCENCE.

15

16   **SHERIFF VILLANUEVA:** WELL, THAT RIGHT THERE IS PART OF THE

17   MISREPRESENTATION OF WHAT I SAID. WE'RE NOT SETTING A STANDARD

18   THAT YOU HAVE TO FILE A CLAIM, A CRIMINAL CLAIM, OF DOMESTIC

19   VIOLENCE. NOT AT ALL. THE FACT THAT THIS PERSON IN PARTICULAR

20   WAS A DEPUTY, AND AS YOU LEARN MORE ABOUT THE INFORMATION,

21   YOU'LL HAVE A BETTER UNDERSTANDING WHAT I'M MEANING. BUT ALSO,

22   I'D CAUTION YOU THAT YOU CAN'T TAKE A SINGLE DATA POINT AND

23   SOMEHOW CREATE A TREND. YOU CAN'T DO THAT. YOU HAVE TO HAVE A

24   NUMBER INCIDENCES. AND WHEN YOU UNDERSTAND THE TOTALITY OF

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    THIS, YOU'RE GOING TO HAVE AN ENTIRELY DIFFERENT PERSPECTIVE

2    ON THAT. I PROMISE YOU THAT.

3

4    **SUP. KUEHL:** YEAH, WELL, I LOOK FORWARD TO THAT.

5

6    **SHERIFF VILLANUEVA:** OKAY.

7

8    **SUP. KUEHL:** THANK YOU, MADAM CHAIR.

9

10   **SUP. BARGER, CHAIR PRO TEM:** THANK YOU. SUPERVISOR SOLIS?

11

12   **SUP. SOLIS:** YES, MADAM CHAIR. THIS MAKES ME FEEL REALLY

13   UNCOMFORTABLE, THE SITUATION THAT WE'RE IN. BUT I DO WANT TO

14   SAY THAT WE'RE HERE BECAUSE THERE'S NO DOUBT A VERY IMPORTANT

15   ISSUE AT HAND, AND IT'S THE INTERPRETATION OF DOMESTIC

16   VIOLENCE, AND WHO ARE CONSIDERED VICTIMS IN MANY WAYS THAT ARE

17   NOT TRUSTED, NOT GIVEN THE KIND OF RESPECT AND ABILITY TO

18   SPEAK OUT. OFTENTIMES, THEY ARE DOUBTED. THEY ARE ALSO IN SOME

19   WAYS HARASSED, PERSECUTED, FIRED, BELITTLED, BERATED, BEATEN.

20   AND I THINK ABOUT THE TIME I SPENT IN THE LEGISLATURE, NOT

21   ONLY IN THE STATE OF CALIFORNIA, CARRYING VARIOUS PIECES OF

22   LEGISLATION, BUT ALSO DEVELOPING ONE OF THE FIRST COURTS IN

23   WEST COVINA, SOLELY ON THE BASIS FOR DOMESTIC VIOLENCE

24   VICTIMS. THIS IS SOMETHING THAT HITS TO THE HEART OF MUCH OF

25   WHAT WE DO HERE IN THE COUNTY, ON ALL LEVELS, AND ESPECIALLY

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    MARCHES. WE'VE SEEN WHAT'S HAPPENED TO C.E.O.S IN THE PRIVATE

2    SECTOR. WE'VE SEEN WHAT'S HAPPENING IN THE LEGISLATURE ALL

3    OVER. BUT NOW WE'RE SEEING IT PLAY OUT HERE, BEFORE US. AND

4    THIS BOARD IN THE PAST, WE HAVE WORKED VERY HARD TO TRY TO

5    ELEVATE THOSE VOICES, AND WE'VE DONE A LOT AND HELPED TO

6    EMPOWER OTHER PEOPLE AND OTHER AGENCIES, INCLUDING THE

7    LEGISLATURE. WHEN THERE'S A SEXUAL HARASSMENT OR ANY KIND OF

8    EMPLOYMENT DISCRIMINATION, I THINK WE HAVE LED THERE. AND I

9    KNOW WE HAVE COLLEAGUES IN SACRAMENTO THAT WILL SAY THE SAME

10   THING. BUT FOR US NOT TO SAY SOMETHING, I THINK, JUST REALLY

11   STRUCK ME. AND I'M NOT PERSONALIZING THIS, SHERIFF, IN THAT

12   MATTER. YOU'RE AN ELECTED OFFICIAL, AND SO AM I. BUT THERE IS

13   A LINE THAT SAYS THAT, I THINK, THAT WE REALLY HAVE TO

14   UNDERSTAND WHAT IS HAPPENING IN THE ENVIRONMENT, IN THE

15   ENVIRONMENT AROUND US, AND THAT ENVIRONMENT IS VERY SENSITIVE

16   RIGHT NOW. AND I THINK WHAT WE WANT TO SEEK IS TRUTH, AS YOU

17   HAVE SAID IN YOUR CAMPAIGNS AND TALKED TO THE PUBLIC, AND EVEN

18   TO US, INDIVIDUALLY, ABOUT TRANSPARENCY, ABOUT DUE PROCESS,

19   AND MAKING THAT PROCESS OPEN. AND ONE OF MY CONCERNS IS THAT

20   WE SPENT A GREAT DEAL OF TIME ON THIS BOARD-- ALMOST TWO

21   YEARS. IN FACT, SUPERVISOR RIDLEY-THOMAS AND I CARRIED MOTIONS

22   TO HELP CREATE REFORM WITH OUR CIVIL SERVICE COMMISSION, AS

23   WELL AS OUR CIVILIAN OVERSIGHT COMMISSION THAT EXISTS. AND WE

24   CARE VERY DEEPLY ABOUT HEARING ALL THESE VOICES. AND I THINK

25   THAT WE HAVE TO SHOW A GREAT DEAL OF PATIENCE, BUT RESPECT:

# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  **SHERIFF VILLANUEVA:** FOR THE LAST FOUR YEARS, ACTUALLY, WE HAVE

2  YET TO MEET THE STANDARDS OF P.R.E.A. IN OUR JAIL. AND MY GOAL

3  IS TO MEET THAT STANDARD, FINALLY. IT'S BEEN LONG, LONG

4  OVERDUE. I'VE SPENT MY ENTIRE CAREER CHASING BAD GUYS AND

5  TALKING TO VICTIMS OF VIOLENCE, AND TRYING TO MAKE THE WORLD A

6  SAFER PLACE, AND I DID IT HANDS-ON WITH MY OWN TWO HANDS, AND

7  TALKING, ANSWERING CALLS FOR SERVICE, SEEING PROBABLY SOME OF

8  THOSE HORRENDOUS THINGS THAT YOU FOLKS CAN PROBABLY EVER

9  IMAGINE WITH MY TWO EYES. SO I HAVE A DEEP APPRECIATION FOR

10  VICTIMS OF VIOLENCE, VICTIMS OF DOMESTIC VIOLENCE, AND I'VE

11  SPENT MANY A DAY AND NIGHT IN PLACES THAT YOU JUST CRY OUT,

12  "WOW, WHAT ON EARTH HAPPENED HERE?" AND I RECALL DISTINCTLY A

13  CASE OF DOMESTIC VIOLENCE WHERE THE VICTIM, THE GIRLFRIEND,

14  LIVED WITH THE FAMILY OF THE BOYFRIEND, AND THEY CONCEALED

15  HER, EVEN THOUGH SHE WAS AT THE HOUSE, BUT I KNEW SHE WAS

16  THERE, SO I WAS PATIENT. AND THEY FINALLY PRODUCED HER AFTER

17  ABOUT 10 MINUTES. SHE WAS HEAVILY MADE-UP. AND I SPOKE TO HER,

18  AND AFTER ABOUT FIVE MINUTES I NOTICED A CRACK APPEARED IN THE

19  MAKEUP ON HER FOREHEAD, AND THAT SHE STARTED DRIPPING BLOOD.

20  THEY TRIED TO DO A BONDO JOB WITH MAKEUP TO COVER UP THE FACT

21  THAT SHE WAS ASSAULTED WITH A CAR CLUB. SO I DO CARE ABOUT THE

22  VICTIMS OF DOMESTIC VIOLENCE. AND I WILL DO EVERYTHING IN MY

23  POWER TO ENSURE THEIR VOICES ARE HEARD, AND THE PEOPLE THAT

24  ARE RESPONSIBLE ARE BROUGHT TO JUSTICE. THAT HAS BEEN MY

25  MISSION MY ENTIRE CAREER. NOW, I'LL GIVE YOU A SCENARIO THAT'S

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   KIND OF PUT THIS IN A PERSPECTIVE, HOW SOMETIMES THE BEST OF

2   INTENTIONS CAN GO SIDEWAYS. WE'VE HAD ANOTHER CASE IN THE

3   LAST, I THINK, IN THE LAST TWO YEARS, WHERE IT WAS, AGAIN,

4   HUSBAND/WIFE ON THE DEPARTMENT, MEMBERS OF THE DEPARTMENT, OR

5   A COUPLE; MEMBERS OF THE DEPARTMENT, BOTH SWORN. THE FEMALE

6   WAS A PROBATIONER, THE MALE WAS A NON-PROBATIONER, ALREADY

7   TENURED. THERE WAS A DOMESTIC DISPUTE BETWEEN THE TWO, AND IT

8   RESULTED IN... AND IT LOOKED LIKE, FROM WHAT I READ, THAT THE

9   PRIMARY AGGRESSOR WAS THE MALE. SHE GOT FIRED BECAUSE SHE WAS

10  A PROBATIONER. SO WE FAILED IN THAT REGARD TO PROTECT HER,

11  BECAUSE WE HELD HER EMPLOYMENT TO A DIFFERENT STANDARD THAN

12  HIS, BECAUSE OF THE FACT SHE WAS A PROBATIONER. WHAT DOES THAT

13  SPEAK OF, OF THE VICTIMS OF DOMESTIC VIOLENCE? IT SPOKE VERY

14  POORLY. SO THERE'S A LOT THAT WE NEED TO RESOLVE. AND ANY TIME

15  WE ENTER INTO A SITUATION WHERE THERE'S A LARGE ORGANIZATION

16  THAT HAD A LOT OF MISCARRIAGE OF JUSTICE, YOU CAN'T PAPER IT

17  OVER, MOVE ON, AND PRETEND THAT THINGS DIDN'T GO WRONG,

18  BECAUSE YOU'RE LIVING AMONGST THE REMNANTS OF ALL THOSE

19  MISCARRIAGES OF JUSTICE. AND YOU CAN'T ESCAPE THE PAST BY

20  IGNORING IT. YOU HAVE TO ADDRESS IT AND BE ABLE TO MOVE

21  FORWARD. AND THAT'S WHAT WE'RE GOING DO. AND WE'RE GOING TO DO

22  IT IN A WAY THAT'S GOING TO BE AS TRANSPARENT AS WE CAN BE.

23  OBVIOUSLY, THERE'S LIMITATIONS TO WHAT WE CAN PROVIDE, BUT

24  WE'LL GIVE YOU ALL THE INFORMATION THAT YOU CAN LEGALLY HAVE.

25  AND BY ALL MEANS, WE WANT YOU INFORMED, WANT YOU TO

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  PARTICIPATE WHERE IT'S APPROPRIATE. AND YOU'RE GOING TO

2  UNDERSTAND THAT WE'RE MOVING THIS PLACE IN THE DIRECTION IT

3  NEEDS TO GO, AND I HEARD THAT LOUD AND CLEAR ON THE CAMPAIGN

4  TRAIL. AND I'M NOT HERE TO FIND ANOTHER CONSULTANT TO BE HIRED

5  TO RESOLVE ANOTHER ISSUE THAT SHOULD BELONG TO ME TO RESOLVE.

6

7  **SUP. SOLIS:** I THINK JUST THE LAST COMMENT IS THAT VICTIMS OF

8  DOMESTIC VIOLENCE COME FROM ALL WALKS OF LIFE. AND THEIR

9  PERPETRATORS DO, TOO, AS WAS STATED. THEY WEAR ROBES. THEY

10  WEAR UNIFORMS. THEY HIDE BEHIND A BADGE. MY QUESTION REALLY

11  IS, AT WHAT POINT DO WE SAY NO, REGARDLESS OF YOU'RE WEARING A

12  BADGE OR A UNIFORM? AND THAT, TO ME, IS ONE OF THE HIGHEST

13  STANDARDS, BECAUSE WE'RE ENTRUSTING OUR LAW ENFORCEMENT

14  OFFICERS TO DO THEIR VERY BEST. AND THE BOTTOM LINE FOR ME IS

15  GOING TO BE HOW THAT'S DETERMINED, AND HOW FAIRNESS HAS BEEN

16  REACHED, IN TERMS OF REALLY MAKING SURE THAT WE'RE RIDDING OUR

17  DEPARTMENT OF INDIVIDUALS THAT HAVE TAKEN ADVANTAGE, FOR

18  WHATEVER REASON, OF OUR PROCESSES OR POLICIES, AND THAT WE

19  PROVIDE THE SECURITY AND SAFETY THAT OUR RESIDENTS, AS WELL AS

20  OUR EMPLOYEES-- BECAUSE I HAVE TO GO BACK TO IT'S OUR

21  EMPLOYEES, AS WELL. IF WE CAN'T EVEN PROTECT OUR EMPLOYEES,

22  THAT SAYS A LOT ABOUT US, AS WELL. SO I'M HOPEFUL THAT THAT'S

23  SOMETHING THAT YOU'LL HEAR, THAT YOU'VE HEARD TODAY. SO I LOOK

24  FORWARD TO ALSO WORKING ALONGSIDE WITH YOUR DEPARTMENT AND

25  SEEING WHAT REFORMS, AND ALSO WITH AN URGENCY TO HELP US

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   BETTER UNDERSTAND THE TRUTH AND RECONCILIATION PROCESS, HOW

2   THAT'S GOING TO BE SET UP, AND WHAT ROLE WE PLAY, IF ANY, IN

3   HELPING TO UNDERSTAND HOW THAT IS GOING TO TAKE PLACE.

4

5   **SUP. BARGER, CHAIR PRO TEM:** SHERIFF, LISTENING TO ALL THIS,

6   I'M TRYING TO FIGURE THIS OUT. SO, LET'S ASSUME A DEPUTY WAS

7   FIRED IN 2016, AND YOU DECIDE TO BRING THAT DEPUTY BACK. HOW

8   DO YOU RESCIND THE FIRING, AND THEN HOW DOES IT PLAY OUT, IN

9   TERMS OF BRINGING THE INDIVIDUAL BACK? DOES A PERSON GET A

10  SUSPENSION OR PUNISHED FOR WHATEVER THE ALLEGATION WAS?

11

12  **SHERIFF VILLANUEVA:** IT BECOMES A REINSTATEMENT.

13

14  **SUP. BARGER, CHAIR PRO TEM:** OKAY. AND SO THE REINSTATEMENT, IF

15  I WAS FIRED IN 2016, AND IN 2018 YOU REINSTATED ME, AM I

16  ENTITLED TO BACKPAY?

17

18  **SHERIFF VILLANUEVA:** IT DEPENDS ON THE CIRCUMSTANCES. IT

19  DEPENDS ON WHETHER OR NOT YOU ABANDONED YOUR AVENUES OF

20  APPEAL, FOR EXAMPLE. SOMEONE WHO ABANDONED THEIR APPEALS,

21  WELL, THEY GIVE UP. IF THEY DIDN'T ABANDON, THEY WERE STILL

22  ACTIVELY PURSUING IT, THEY DO HAVE A LEGAL STANDARD TO PURSUE,

23  IF THEY WERE WRONGFULLY TERMINATED.

24



1   **SUP. BARGER, CHAIR PRO TEM:** SO IN THE CASE OF THE INCIDENT

2   WE'RE TALKING ABOUT, WHERE YOU'RE ALLEGING IT WAS WRONGFUL

3   TERMINATION, IS THAT INDIVIDUAL GOING TO BE ELIGIBLE FOR

4   BACKPAY?

5

6   **SHERIFF VILLANUEVA:** WELL, HE HAD A LAWSUIT THAT WAS ALREADY

7   FILED. AND HE WAS ELIGIBLE FOR THE BACKPAY, BUT UNDER

8   CONDITION THAT HE HAD TO WITHDRAW HIS LAWSUIT.

9

10  **SUP. BARGER, CHAIR PRO TEM:** SO THERE WILL BE NO BACKPAY?

11

12  **SHERIFF VILLANUEVA:** YES, THERE WILL BE BACKPAY IN THIS CASE.

13

14  **SUP. BARGER, CHAIR PRO TEM:** HE WILL GET RETROACTIVE PAY TO

15  2016?

16

17  **SHERIFF VILLANUEVA:** YES.

18

19  **SUP. BARGER, CHAIR PRO TEM:** SO, TRYING TO UNDERSTAND THIS

20  TRUTH AND RECONCILIATION. IS THAT BEING SET UP IN ORDER TO

21  ALLOW A PROCESS TO TAKE PLACE FOR DEPUTIES THAT FEEL THAT THEY

22  WERE WRONGLY ACCUSED OF SOMETHING, BEYOND CIVIL SERVICE?

23

24  **SHERIFF VILLANUEVA:** NO, THEY HAVE TO ESTABLISH-- IF THEY WERE

25  WRONGFULLY TERMINATED, AND THE EVIDENCE IS OBVIOUS, WHAT WE'RE

# The Meeting Transcript

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  CUTTING OUT IS THE LEGAL COST OF GOING THROUGH THE WRIT OF

2  MANDATE AND THE LIKELIHOOD THAT WE'RE GOING TO FAIL ON THAT.

3  ONCE A NEUTRAL THIRD PARTY SEES IT, WE DON'T HAVE A WHOLE LOT

4  OF ROOM TO DEFEND OURSELVES.

5

6  **SUP. BARGER, CHAIR PRO TEM:** SO THAT'S WHAT THIS IS GOING TO BE

7  SET UP FOR? THIS IS GOING TO BE AN INDEPENDENT VIEW, CORRECT?

8  I'M TRYING TO FIGURE OUT WHAT THE ROLE OF THIS TRUTH AND

9  RECONCILIATION IS.

10

11  **SHERIFF VILLANUEVA:** IT'S FOCUSING ON TWO AREAS, WHICH IS

12  WRONGFUL CONVICTIONS, WRONGFUL TERMINATIONS.

13

14  **SUP. BARGER, CHAIR PRO TEM:** RIGHT.

15

16  **SHERIFF VILLANUEVA:** PART OF THE D.A.S, THEY'VE ALREADY

17  INITIATED THAT PROCESS, BECAUSE THEY HAVE A WRONGFUL

18  CONVICTION UNIT UP AND RUNNING. HOWEVER, THERE'S STILL ISSUES

19  THAT DOESN'T ARISE TO THEM THAT FALL ON OUR HANDS, AND THEY

20  WILL REFER THEM BACK TO THE D.A.'S OFFICE. THAT'S ON THE

21  WRONGFUL CONVICTION SIDE. BUT WE HAVE, TO ENSURE PROCEDURAL

22  JUSTICE FOR EVERYBODY, DUE PROCESS. AND ALL WE'RE DOING IS

23  LOOKING THROUGH THE DUE PROCESS: DID WE MEET THE STANDARD?

24

January 29, 2019

## THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  **SUP. BARGER, CHAIR PRO TEM:** SO, FOR LACK OF A BETTER TERM,

2  THIS IS ANOTHER LAYER OF INSURANCE TO ENSURE THAT THEY'RE

3  GETTING THEIR DUE PROCESS?

4

5  **SHERIFF VILLANUEVA:** FOR THE CASES THAT HAPPENED IN THE PAST

6  THAT ARE EGREGIOUS, THOSE, YES. FOR THE CASES MOVING FORWARD,

7  THE HEARING OFFICERS, THE CIVIL SERVICE COMMISSION IS NOT

8  GOING TO COME ACROSS CASES WHERE WE HAVEN'T MET THAT

9  PREPONDERANCE OF EVIDENCE STANDARD. THEY'RE GOING TO BE THE

10 CASES BLACK-AND-WHITE, AND THEY'LL BE VERY OBVIOUS.

11

12 **SUP. BARGER, CHAIR PRO TEM:** SO, WHY IN THIS CASE WOULD YOU

13 HAVE NOT WAITED FOR THE TRUTH AND RECONCILIATION GROUP TO BE

14 FORMED, IN ORDER TO REVIEW THIS?

15

16 **SHERIFF VILLANUEVA:** WELL, THERE'S A HANDFUL OF CASES THAT WE

17 WANTED TO MOVE FORWARD.

18

19 **SUP. BARGER, CHAIR PRO TEM:** EXCUSE ME. NO CLAPPING. YEAH.

20

21 **SHERIFF VILLANUEVA:** WE WANTED TO MOVE FORWARD. THERE'S ABOUT

22 HALF A DOZEN OF THEM. THIS IS JUST THE FIRST. THERE'S ABOUT

23 HALF A DOZEN THAT THERE IS NO POINT, BECAUSE WHEN YOU LOOK AT

24 THE CASES THEMSELVES-- AND YOU'LL BE PRIVY TO EACH AND EVERY

25 ONE OF THEM-- YOU REALIZE, "YEAH, I THINK WE REALLY, REALLY

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

January 29, 2019



1  SCREWED THE POOCH ON THAT ONE." AND THAT'S-- IT'S A CORRECTIVE

2  MEASURE, AND NOTHING MORE. ONCE WE HAVE IT UP AND RUNNING,

3  WE'LL PICK UP THE PACE, OBVIOUSLY, BUT THERE'S AN END TO THIS.

4  THIS IS NOT AN ONGOING THING, BECAUSE WE'RE NOT GOING TO GO

5  BACK FOREVER, ONLY GO BACK A SPECIFIC AMOUNT OF TIME WHERE WE

6  LOST CONFIDENCE IN WHAT WAS BEING PRESENTED TO THE CIVIL

7  SERVICE COMMISSION.

8

9  **SUP. BARGER, CHAIR PRO TEM:** SO THIS IS GOING TO BE FOR THOSE

10 THAT PAST; NOT MOVING FORWARD, BUT PAST?

11

12 **SHERIFF VILLANUEVA:** YEAH. BECAUSE NOW, MOVING FORWARD,

13 OBVIOUSLY, NOW I HAVE TO TAKE OWNERSHIP OF THE RESULTS OF OUR

14 INTERNAL INVESTIGATIONS.

15

16 **SUP. BARGER, CHAIR PRO TEM:** OKAY. SO IN THOSE SITUATIONS, ARE

17 YOU GOING TO SET ASIDE A BUDGET, OR AN ESTIMATE, IN TERMS OF

18 WHAT RETROACTIVE PAY WOULD BE  FOR THOSE INDIVIDUALS.

19

20 **SHERIFF VILLANUEVA:** YES, WE WILL.

21

22 **SUP. BARGER, CHAIR PRO TEM:** AND THAT'S GOING TO BE TRANSPARENT

23 FOR EVERYONE TO SEE?

24

25 **SHERIFF VILLANUEVA:** YES.

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1

2   **SUP. BARGER, CHAIR PRO TEM:** OKAY. BECAUSE I THINK THAT'S

3   IMPORTANT TO UNDERSTAND. AGAIN, SUPERVISOR KUEHL MENTIONED IT,

4   BUT CIVIL SERVICE HAS NOT EXACTLY BEEN KNOWN FOR SIDING WITH

5   THE PUNISHMENTS THAT HAVE BEEN IN NOT JUST THE SHERIFF'S

6   DEPARTMENT, BUT ACROSS THE BOARD, AND SO FOR THEM TO UPHOLD 5-

7   0 CAUSED ME PAUSE, BECAUSE THAT IS VERY UNUSUAL, ESPECIALLY

8   WHEN IT COMES TO A FIRING. USUALLY, WITH A FIRING, THEY TEND

9   TO LOOK AT SAYING, "THAT'S TOO HARSH," AND MOVE IT TO A 30-DAY

10  SUSPENSION OR 15-DAY SUSPENSION.

11

12  **SHERIFF VILLANUEVA:** IN THIS CASE, IT NEVER WAS SUPPOSED TO BE

13  A DISCHARGE CASE.

14

15  **SUP. BARGER, CHAIR PRO TEM:** AND I LOOK FORWARD TO READING

16  THAT. IN THE END, WHAT WAS THE PUNISHMENT THAT WAS PROVIDED IN

17  THIS CASE?

18

19  **SHERIFF VILLANUEVA:** THAT, WE CAN'T DISCUSS PUBLICLY.

20

21  **SUP. BARGER, CHAIR PRO TEM:** SORRY ABOUT THAT. BEFORE YOU GO, I

22  JUST WANT TO ASK IF WE CAN AMEND THE MOTION, HEARING WHAT

23  WE'VE HEARD TODAY, TO INSTRUCT COUNTY COUNSEL TO REACH OUT TO

24  THE DEPUTY TO SIGN THE APPROPRIATE WAIVER AND PRODUCE THE

25  PERSONNEL FILE. SO I'D LIKE TO AMEND THE MOTION TO ALSO

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   INCLUDE THAT, BECAUSE I DO FEEL IT'S IMPORTANT. AND ALSO TO

2   NOTIFY THE VICTIM AND MAKE SURE THAT WE REDACT AND/OR ALLOW

3   THE VICTIM THE OPPORTUNITY TO OPT OUT AT ALL COSTS, BECAUSE I

4   DON'T WANT THIS TO BE ABOUT THAT INDIVIDUAL, AS WELL. SO WITH

5   THAT, SUPERVISOR KUEHL?

6

7   **SHERIFF VILLANUEVA:** YOU USED THE TERM "VICTIM." THAT'S A LEGAL

8   TERM.

9

10  **SUP. BARGER, CHAIR PRO TEM:** OKAY. THE DEPUTY THAT IS NO LONGER

11  WITH YOU, THAT TOOK OVER A YEAR TO REPORT, THAT WE'RE CALLING

12  INTO QUESTION HIS CREDIBILITY.

13

14  **SHERIFF VILLANUEVA:** WE WOULD SAFELY CALL HER A COMPLAINANT IN

15  THIS CASE, THIS PARTICULAR CASE.

16

17  **SUP. BARGER, CHAIR PRO TEM:** OKAY. SUPERVISOR KUEHL?

18

19  **SUP. KUEHL:** I JUST WANTED TO ASK WHETHER THE TRUTH AND

20  RECONCILIATION COMMISSION IS AN INTERNAL GROUP INSIDE THE

21  DEPARTMENT.

22

23  **SHERIFF VILLANUEVA:** YES, IT IS INTERNAL.

24

25  **SUP. KUEHL:** AND HAVE YOU CHOSEN A PERSON TO HEAD IT UP?

# The Meeting Transcript

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1

2   **SHERIFF VILLANUEVA:** WE HAVE ONE, YES.

3

4   **SUP. KUEHL:** HAVE YOU MADE IT PUBLIC YET?

5

6   **SHERIFF VILLANUEVA:** NOT YET.

7

8   **SUP. KUEHL:** ALL RIGHT. THANK YOU.

9

10  **SUP. SOLIS:** MADAM CHAIR?

11

12  **SUP. BARGER, CHAIR PRO TEM:** YES?

13

14  **SUP. SOLIS:** I WANTED TO ASK OUR C.E.O. REGARDING THE ISSUE YOU

15  RAISED ABOUT THE BACKPAY-- BUDGET, IN TERMS OF THE BUDGET.

16

17  **C.E.O. HAMAI:** IN TERMS OF THE BUDGET, I WOULD ASSUME, BECAUSE

18  IT'S RELATED TO SALARY, IT WOULD HAVE TO FALL WITHIN HIS

19  SALARY AND EMPLOYEE BENEFIT LINE ITEM. SO HE HAS A CERTAIN

20  AMOUNT THAT'S BUDGETED FOR HIS EMPLOYEES. SO IT WOULD HAVE TO

21  FALL WITHIN THAT AREA.

22

23  **SUP. SOLIS:** OKAY.

24

## The Meeting Transcript
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    MOTION TODAY IS IMPORTANT, TO GET ALL THE FACTS. THIS IS GOING

2    TO BE ONE OF, I THINK, MANY DISCUSSIONS WE'RE GOING TO HAVE,

3    AS IT RELATES TO THE FACT THAT SHERIFF VILLANUEVA SAID TODAY

4    THAT HE'S GOING TO BE LOOKING AT OTHER CASES WHERE THERE'S

5    BEEN TERMINATION, AND I THINK IT'S IMPORTANT FOR US TO GET

6    COUNTY COUNSEL TO GIVE US SOLID ADVICE AS WE MOVE FORWARD,

7    ESPECIALLY TO YOUR POINT, SUPERVISOR KUEHL, THE CONTRACT

8    CITIES. BECAUSE I DO KNOW THAT THE LIABILITY FUND HAS BEEN A

9    LARGE CONCERN AND ISSUE TO OUR CONTRACT CITIES, AND THAT

10   CONTINUES TO GO UP. AND THE QUESTION OF BRINGING BACK

11   INDIVIDUALS THAT MAY OR MAY NOT BE ASSIGNED TO CITIES THAT ARE

12   CONTRACTED WITH US, THEY'RE GOING TO WANT TO KNOW WHAT THE

13   ISSUES ARE, AS IT RELATES TO THAT DEPUTY. AND SO I THINK THAT

14   WE NEED TO REALLY DISCUSS THIS AND WORK IN CONCERT WITH

15   SHERIFF VILLANUEVA, NOT US AGAINST HIM; WORK TOGETHER.

16   BECAUSE, ULTIMATELY, IT COMES OUT OF THE GENERAL FUND, AS IT

17   RELATES TO LAWSUITS THAT WE SETTLE AND THE COSTS ASSOCIATED

18   WITH ANY DECISIONS THAT ARE MADE. SO WITH THAT, SUPERVISOR

19   KUEHL?

20

21   **SUP. KUEHL:** THANK YOU, MADAM CHAIR. I THINK THERE'S ALSO THE

22   QUESTION OF-- THAT WE FACED OVER THE PAST 25 YEARS IN DEALING

23   NOT JUST WITH DOMESTIC VIOLENCE, BUT WITH THE WHOLE ISSUE OF

24   VIOLENCE ITSELF. WHEN WE LOOK AT THE BEHAVIOR OF DEPUTIES AND

25   CALL IT "EXCESSIVE FORCE," AND HAVE HEARINGS ABOUT WHETHER

# EXHIBIT 39



# THE MEETING TRANSCRIPT OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



## Adobe Acrobat Reader

### Finding Words

You can use the Find command to find a complete word or part of a word in the current PDF document.  Acrobat Reader looks for the word by reading every word on every page in the file, including text in form fields.

### To find a word using the Find command:

1. Click the Find button **(Binoculars)**, or choose Edit > Find.
2. Enter the text to find in the text box.
3. Select search options if necessary:
   Match Whole Word Only finds only occurrences of the complete word you enter in the box.  For example, if you search for the word *stick*, the words *tick* and *sticky* will not be highlighted.

   Match Case finds only words that contain exactly the same capitalization you enter in the box.

   Find Backwards starts the search from the current page and goes backwards through the document.
4. Click Find.  Acrobat Reader finds the next occurrence of the word.

### To find the next occurrence of the word, Do one of the following:

Choose Edit > Find Again
Reopen the find dialog box, and click Find Again.
(The word must already be in the Find text box.)

## Copying and pasting text and graphics to another application

You can select text or a graphic in a PDF document, copy it to the Clipboard, and paste it into another application such as a word processor.  You can also paste text into a PDF document note or into a bookmark.  Once the selected text or graphic is on the Clipboard, you can switch to another application and paste it into another document.

**Note:  *If a font copied from a PDF document is not available on the system displaying the copied text, the font cannot be preserved.  A default font  is substituted.***

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



**To select and copy it to the clipboard:**

1.  Select the text tool T, and do one of the following:
    To select a line of text, select the first letter of the sentence or phrase and drag to
    the last letter.

To select multiple columns of text (horizontally), hold down Ctrl+Alt (Windows) or Option
(Mac OS) as you drag across the width of the document.

To select a column of text (vertically), Hold down Ctrl+Alt (Windows) or Option+Command
(Mac OS) as you drag the length of the document.

To  select all the text on the page, choose Edit > Select All.  In single page mode, all the text
on the current page is selected.  In Continuous or Continuous – facing mode, most of the text
in the document is selected.  When you release the mouse button, the selected text is
highlighted.  To deselect the text and start over, click anywhere outside the selected text.
The Select All command will not select all the text in the document.  A workaround for this
(Windows) is to use the Edit > Copy command.  Choose Edit > Copy to copy the selected
text to the clipboard.

2.  To view the text, choose Window > Show Clipboard

In Windows 95, the Clipboard Viewer is not installed by default and you cannot use the
Show Clipboard command until it is installed.  To install the Clipboard Viewer, Choose
Start > Settings > Control Panel > Add/Remove Programs, and then click the Windows
Setup tab.  Double-click Accessories, check Clipboard Viewer, and click OK.

# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    **[REPORT OF ACTION TAKEN IN CLOSED SESSION ON**

2    **TUESDAY, AUGUST 13, 2019 ON PAGE 337]**

3

4    **SUP. HAHN, CHAIR:** GOOD MORNING, EVERYBODY. GOOD MORNING, AND

5    WE WELCOME EVERYONE TO THE REGULARLY SCHEDULED MEETING OF THE

6    LOS ANGELES COUNTY BOARD OF SUPERVISORS. TODAY IS TUESDAY,

7    AUGUST 13TH, 2019, AND WE TAKE NOTE THAT THREE SUPERVISORS ARE

8    PRESENT, AND SUPERVISOR RIDLEY-THOMAS AND SUPERVISOR KUEHL

9    WILL BE JOINING US SHORTLY. AND WE ALSO HAVE NOTE THAT THE

10   CHIEF EXECUTIVE OFFICER, THE COUNTY COUNSEL, EXECUTIVE

11   OFFICER, AND OUR SERGEANT-AT-ARMS ARE ALL HERE TO ASSIST. WE

12   WILL BEGIN THIS MORNING'S MEETING WITH AN INVOCATION LED BY

13   FATHER HECTOR JEREZ, FROM THE IGLESIA LA SAGRADA FAMILIA IN

14   THE CITY OF HUNTINGTON PARK, IN OUR FIRST DISTRICT; AND THAT

15   WILL BE FOLLOWED BY THE PLEDGE OF ALLEGIANCE, LED BY STAFF

16   SERGEANT NATTAPOL CHALOYPHIAN, IN THE UNITED STATES ARMY, FROM

17   THE CITY OF PASADENA IN THE FIFTH DISTRICT. IF YOU'RE ABLE

18   THIS MORNING, PLEASE STAND WITH US FOR THE INVOCATION AND THE

19   PLEDGE.

20

21   **FATHER HECTOR JEREZ:** [SPEAKS SPANISH.]

22

23   **SUP. HAHN, CHAIR:** AMEN.

24

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   **NATTAPOL CHALOYPHIAN:** GOOD MORNING. PLEASE FACE THE FLAG,

2   PLEASE. PLACE YOUR RIGHT HAND OVER YOUR HEART. IF YOU ARE A

3   VETERAN, YOU MAY RENDER A HAND SALUTE, AND JOIN ME IN THE

4   PLEDGE OF ALLEGIANCE. [PLEDGE OF ALLEGIANCE RECITED.]

5

6   **SUP. HAHN, CHAIR:** SUPERVISOR SOLIS?

7

8   **SUP. SOLIS:** THANK YOU, MADAM CHAIR. I WISH TO THANK FATHER

9   HECTOR JEREZ FOR PROVIDING TODAY'S INVOCATION. FOR THOSE OF

10  YOU THAT DON'T UNDERSTAND OR SPEAK SPANISH, HE GAVE A VERY

11  BEAUTIFUL SERMON. IT'S ABOUT UNITY. IT'S ABOUT RESPECTING ALL

12  OF US HERE, AND WELCOMING EVERYONE IN THE COUNTY OF LOS

13  ANGELES. FATHER JEREZ WAS BORN IN MAZATENANGO, GUATEMALA, AND

14  IMMIGRATED TO THE UNITED STATES WHEN HE WAS 32 YEARS OF AGE.

15  WHILE IN GUATEMALA, HE BECAME ORDAINED IN 1987. FATHER JEREZ

16  ALSO FORMED HIS COMMUNITY, IN WHICH HE REFERRED TO THEM AS LA

17  SAGRADA FAMILIA, THE HOLY FAMILY. IN 1994, HE BEGAN HIS WORK

18  AT THE SOUTHEAST LOS ANGELES REGION, DIRECTING MASS AT THE

19  IGLESIA LA SAGRADA FAMILIA, IN THE CITY OF HUNTINGTON PARK IN

20  THE FIRST DISTRICT. LAST YEAR UNDER FATHER JEREZ'S LEADERSHIP,

21  THE CHURCH BEGAN TO OPERATE THE SHOWER OF HOPE PROGRAM, WHICH

22  HAS PROVIDED APPROXIMATELY 70 TO 100 HOMELESS INDIVIDUALS WITH

23  ACCESS TO SHOWERS, LAUNDRY SERVICES, CLOTHING, AND HOT MEALS.

24  THIS YEAR, THE HOLY FAMILY CHURCH INCORPORATED MOBILE LAUNDRY

25  SERVICES FOR INDIVIDUALS EXPERIENCING HOMELESSNESS IN THE

1   CONTRACT DICTATING ONE SET OF DESIGN, WHERE THE BOARD IS

2   FAVORING A POTENTIALLY ALTERNATE DESIGN.

3

4   **SUP. SOLIS:** MADAM CHAIR, I WOULD JUST SAY THAT, RATHER THAN

5   USE THE WORD "SLIGHT" OR "PUTTING A PEG IN A SQUARE," WE'VE

6   HAD A PROFOUND CHANGE ON THIS BOARD SINCE 2015. AND THAT'S WHY

7   WE'RE HERE TODAY: TO TALK ABOUT THIS ITEM. AND I APPRECIATE

8   YOUR DESCRIPTION. I KNOW WE'LL GO INTO DETAIL A LITTLE MORE,

9   PERHAPS ABOUT THE STUDIES THAT ARE STILL AWAITING TO BE

10  REVIEWED BY OUR BOARD, THAT WILL ALSO HELP INFORM US AS WE

11  MOVE FORWARD, IN TERMS OF THE REPLACEMENT OF THIS PROJECT. SO

12  I WANT TO DEFER TO YOU, MADAM CHAIR. I KNOW THAT THERE'S A

13  TIME SPECIFIC THAT I BELIEVE THE SHERIFF WANTED TO SPEAK. IF

14  YOU WANT TO RECOGNIZE ME, I WILL GO. I'M READY TO GO.

15

16  **SUP. HAHN, CHAIR:** RIGHT. I HAVE SOME COLLEAGUES THAT ARE ON

17  THE QUEUE, THAT ALSO WOULD LIKE TO SPEAK.

18

19  **SUP. SOLIS:** BUT BEFORE? BECAUSE I JUST WANTED TO SET THE

20  STAGE. AND I WOULD LIKE TO READ IN MY STATEMENT, MADAM CHAIR.

21

22  **SUP. HAHN, CHAIR:** OKAY.

23

24  **SUP. SOLIS:** THANK YOU SO MUCH FOR BEING GRACIOUS. I ESPECIALLY

25  WANT TO THANK SUPERVISOR KUEHL FOR BEING MY CO-AUTHOR ON THIS

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    INCARCERATION? AND WHAT DO THEY NEED IN ORDER NOT TO GO BACK?

2    I WANT TO THANK OUR C.E.O., I WANT TO THANK THE HEAD OF OUR

3    DEPARTMENT OF PUBLIC WORKS, I WANT TO THANK OUR COUNTY COUNSEL

4    FOR DOING THE ANALYSIS ABOUT THIS CONTRACT, WHICH ANOTHER

5    BOARD ON WHICH HILDA AND I DID SERVE OUR VERY FIRST YEAR, KIND

6    OF THE FIRST COUPLE OF MONTHS, I THINK, THAT WE WERE HERE, CUT

7    BACK WHAT WE THOUGHT WAS, IN A GOOD WAY, THE CAPACITY, BUT

8    OVER THOSE FOUR ADDITIONAL YEARS HAVE FELT INCREASINGLY

9    UNCOMFORTABLE WITH THAT ANSWER, PUTTING TOGETHER THE MOTION

10   THAT CONSTRUCTED THE ALTERNATIVES TO INCARCERATION WORKFORCE,

11   AND THAT IS A VERY ENTHUSIASTIC, PROFESSIONAL, SMART GROUP OF

12   PEOPLE WHO ARE SAYING, "THERE ARE OTHER WAYS TO DEAL WITH MOST

13   OF THE POPULATION." THERE ARE MENTAL HEALTH ISSUES AT VARIOUS

14   LEVELS. THERE ARE ADDICTION ISSUES. JAIL HELPS NEITHER ONE OF

15   THOSE. THERE ARE ALSO ISSUES OF PEOPLE WAITING FOR THEIR

16   TRIAL, HAVEN'T EVEN BEEN ADJUDICATED YET, AND ARE IN JAIL

17   BECAUSE THEY CAN'T PAY BAIL. SO THIS YEAR AND LAST YEAR, WE

18   STARTED PAYING MORE ATTENTION, AND I AM PROUD OF US FOR DOING

19   THAT. I AM PROUD OF THE THREE DOCS THAT RUN OUR HEALTH

20   DEPARTMENTS. I'M PROUD OF OUR GREAT JUDGE WHO RUNS O.D.R. I AM

21   PROUD TO WORK WITH THESE PEOPLE. I HAVE BEEN PROUD TO WORK

22   WITH THE SHERIFF'S DEPARTMENT. AND I KNOW THE SHERIFF IS HERE

23   WITH COLLEAGUES TO TELL US TODAY THIS IS A BAD IDEA, AND HAS

24   SAID SO, AND I HEARD THE PODCAST. AND SO, YOU KNOW, WE

25   DISAGREE. WOULDN'T BE THE FIRST TIME, AND PROBABLY WON'T BE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  THE LAST TIME, SHERIFF. BUT WE HAVE OUR JOB. AND HILDA AND I

2  HAVE SAID WE BELIEVE THAT THE RIGHT THING TO DO IS TO TRY TO

3  TURN A BIG BOAT AROUND WITH THE HELP OF THE MOVEMENT AND THE

4  ADVOCATES, WITH THE HELP OF OUR DEPARTMENTS AND ALL THOSE WHO

5  CARE ABOUT THIS ISSUE, AND HOPEFULLY WITH THE HELP OF OUR

6  COLLEAGUES. AND I THANK YOU ALL FOR YOUR WORK, AND LOOK

7  FORWARD TO THE CONVERSATION.

8

9  **SUP. HAHN, CHAIR:** THANK YOU. SUPERVISOR BARGER?

10

11  **SUP. BARGER:** THANK YOU, AND I ACTUALLY DO WANT TO HEAR FROM

12  THE SHERIFF. BUT I WANT TO FOLLOW UP ON SUPERVISOR SOLIS AND

13  SOME QUESTIONS, SO IF YOU COULD COME UP. ON THE MCCARTHY

14  CONTRACT, THE ORIGINAL CONTRACT THAT CAME FORWARD-- I DON'T

15  KNOW IF IT WOULD BE SACHI OR WHO WOULD ANSWER THIS-- WHERE DID

16  THE NUMBERS COME FROM WHEN WE CAME UP WITH THE MCCARTHY

17  CONTRACT, THAT WAS THE R.F.P.?

18

19  **SPEAKER:** SUPERVISOR, THE NUMBERS, IN GENERAL, WERE BASED ON A

20  SPECIFIED SCOPE THAT OUR SCOPING ARCHITECT AND ALL THE

21  DEPARTMENTS WORKED ON. THAT NUMBER WAS THEN TAKEN BY PUBLIC

22  WORKS WITH A LARGE NUMBER OF ESTIMATORS AND OTHERS, TO

23  ESTIMATE A PROBABLE CONTRACT COST. THAT COST WAS ULTIMATELY

24  TRANSFERRED INTO WHAT IS REFERRED TO AS A STIPULATED SUM THE

25  PROPOSERS PROPOSED, BASED ON THAT SCOPE AT THAT SUM.

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1

2  **SUP. BARGER:** SO THE NUMBER THAT CAME UP, THAT THE BOARD

3  APPROVED WITH THE R.F.P., WHERE DID THE NUMBER OF BEDS COME

4  FROM?

5

6  **SPEAKER:** THAT NUMBER WAS DICTATED BY THIS BOARD IN 2015.

7

8  **SUP. BARGER:** MADAM CHAIR AND MY COLLEAGUES, I RESPECT

9  EVERYBODY'S OPINION, AND I THINK THAT WE ALL ARE ENTITLED TO

10  HAVE OUR OPINIONS. BUT WHEN I LOOK AT THE HISTORY OF THIS, AND

11  IT'S FAR BEFORE I CAME ON BOARD, WE HAD A STUDY THAT WAS DONE

12  BY VANNER, THAT WAS BASED ON STRICTLY LOOKING AT BUILDING A

13  FACILITY, A JAIL, AND THE PRISONS THROUGHOUT THE STATE. AND

14  THEN, AT THE REQUEST OF THIS BOARD, KNOWING THAT DIVERSION,

15  WHICH IS SOMETHING THAT I WHOLEHEARTEDLY SUPPORT, I THINK IT

16  IS THE RIGHT WAY TO GO. I TELL PEOPLE THERE ARE PEOPLE IN OUR

17  JAIL RIGHT NOW THAT COMMITTED CRIMES, BUT HAVE MENTAL ILLNESS,

18  AND THEY HAD BEEN ABLE TO RECEIVE SERVICES, WHETHER IT BE

19  ADDICTION AND/OR MENTAL HEALTH SERVICES, THEY WOULD NOT BE IN

20  JAIL. SO I AM WHOLEHEARTEDLY IN SUPPORT OF A ROBUST DIVERSION

21  PROGRAM. HOWEVER, WHEN WE HIRED H.M.A., WHICH IS AN EXPERT IN

22  DIVERSION PROGRAMS, THE NUMBER THEY CAME UP WITH EXCEEDED WHAT

23  THIS BOARD AGREED TO DO. WE ACTUALLY COMPROMISED. AND I THINK

24  IT WAS 6800, AND WE CAME DOWN ALMOST 3,000 BEDS, BASED ON

25  PROJECTIONS. AND WHEN I TALKED TO THE SHERIFF, AND MY

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  COLLEAGUES HAVE HEARD THIS, WHEN I ASKED ABOUT THE MENTAL

2  HEALTH NUMBERS, BECAUSE THIS WAS DONE, I BELIEVE, IN 2015,

3  WHEN WE LOOK AT THE NUMBER THAT THEY PROJECTED FOR 2019, THE

4  COMMANDER WITH THE SHERIFF'S DEPARTMENT SAID THAT THE ACTUAL

5  NUMBER IN OUR JAILS RIGHT NOW-- AND WE CURRENTLY-- ALBEIT WE

6  DO NOT HAVE A ROBUST DIVERSION PROGRAM IN PLACE, BUT WITH

7  DIVERSION RIGHT NOW, COMMANDER, AS I RECALL, YOU SAID THE

8  NUMBER THAT H.M.A. PROJECTED IS-- YOUR NUMBERS ARE EXCEEDING

9  WHAT THE ACTUAL NUMBER WAS PROJECTED WITH THE H.M.A. STUDY.

10 CORRECT?

11

12 **SPEAKER:** THAT'S CORRECT. THEY PROJECTED 19 PERCENT. WE'RE AT

13 33 PERCENT.

14

15 **SUP. BARGER:** SO, TO MY COLLEAGUES AND TO THE PUBLIC, I THINK

16 IT'S IMPORTANT TO UNDERSTAND THAT THE MCCARTHY STUDY WAS DONE

17 WITH DIVERSION IN MIND, AND THIS BOARD ACTUALLY COMPROMISED

18 AND BROUGHT THAT NUMBER DOWN, AND ACTUALLY CUT IT IN HALF,

19 EVEN WHEN THE PRIOR SHERIFF SAID THAT THAT WAS NOT ENOUGH.

20 WHEN I LOOK AT THE ACTION THAT THIS BOARD IS TAKING, YOU KNOW,

21 AND I KNOW THAT THERE ARE THOSE OUT THERE THAT HAVE A FALSE

22 NARRATIVE THAT, BY GETTING RID OF MEN'S CENTRAL JAIL, THAT

23 THERE'S NOT GOING TO BE AN INCREASE SOMEWHERE. I GUARANTEE

24 YOU, THERE WILL BE A NEED, AND THIS BOARD WILL LOOK AT

25 INCREASING CAPACITY AT ONE OF OUR EXISTING FACILITIES. SO, FOR



1   THIS CONTRACT IS SCRAPPED TODAY, WHAT WOULD THE TIMELINE BE IF

2   WE WERE TO DO A REPLACEMENT? BECAUSE I THINK THE GOAL THAT

3   SUPERVISOR HAHN HAD WHEN THE ORIGINAL MOTION WAS BROUGHT IN

4   WITH THE MCCARTHY CONTRACT WAS TO DEVELOP A MENTAL HEALTH

5   TREATMENT FACILITY THAT WAS BLENDED WITH CUSTODY. AND THE

6   DETAILS HAD TO BE IRONED OUT, BUT, IN FACT, THAT IS WHY WE'RE

7   HERE TODAY, BECAUSE THEY COULD NOT IRON IT OUT. THERE WAS NO

8   CONCLUSION AS TO WHAT WAS ACCEPTABLE. SO IF WE HAD TO START

9   FROM SCRATCH WITH AN E.I.R., WITH, YOU KNOW, A CONSENSUS IN

10  TERMS OF THE NEED TO MOVE FORWARD, WHAT WOULD THE BEST

11  ESTIMATE BE FOR COMING BACK WITH A RECOMMENDATION TO REPLACE

12  MEN'S CENTRAL JAIL?

13

14  **SPEAKER:** SUPERVISOR, THE PROJECT IS OF SUCH SIGNIFICANCE THAT

15  YOU'RE LOOKING ANYWHERE FROM THREE TO FOUR YEARS BEFORE WE ARE

16  BACK HERE IN FRONT OF THE BOARD.

17

18  **SUP. BARGER:** SO, THREE TO FOUR YEARS. SO, NOW I WOULD LIKE TO

19  HEAR FROM THE SHERIFF, KNOWING THAT AN ACTION TODAY IS GOING

20  TO THEN KICK THE CAN THREE TO FOUR YEARS--

21

22  **SUP. HAHN, CHAIR:** I HAVE A FEW COMMENTS BEFORE WE GO TO THE

23  SHERIFF.

24



# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1    **SUP. BARGER:** -- BUT IS GOING TO DELAY MOVING FORWARD WITH

2    MEN'S CENTRAL JAIL, AND WE ALL AT THIS BOARD KNOW HOW

3    DANGEROUS MEN'S CENTRAL JAIL IS. BUT I HAVE CONCERNS, NUMBER

4    ONE, ABOUT MOVING FORWARD WITH TERMINATING A CONTRACT WHEN, IN

5    FACT, WE KNOW AS A BOARD THAT WE ARE PUTTING NOT ONLY INMATES'

6    LIVES AT RISK, BUT SHERIFFS' LIVES AT RISK, AND CUSTODY

7    ASSISTANTS' LIVES AT RISK EVERY DAY THAT WE ALLOW MEN'S

8    CENTRAL JAIL TO CONTINUE TO BE OPEN, ALTHOUGH I WILL NOT

9    SUPPORT SCRAPPING IT UNTIL WE KNOW THAT WE HAVE THE CAPACITY

10   TO SUPPORT OUR SHERIFF'S DEPUTIES AND OUR LAW ENFORCEMENT; NOT

11   JUST THE SHERIFFS, ALL OF OUR CITIES' PUBLIC POLICE

12   DEPARTMENTS, AS WELL AS THE SHERIFF'S DEPARTMENT, WHEN THEY

13   ARREST SOMEONE AND THAT INDIVIDUAL IS BROUGHT IN. I'M AT A

14   LOSS TO UNDERSTAND WHY THIS BOARD IS AFRAID TO MOVE FORWARD

15   WITH SOMETHING THAT TAKES INTO CONSIDERATION DIVERSION...

16   TAKES INTO CONSIDERATION DIVERSION. AND I ACKNOWLEDGE,

17   SUPERVISOR KUEHL, IT DOES NOT TAKE INTO CONSIDERATION BAIL

18   REFORM. BUT EVEN-- AND AGAIN, I'M TALKING TO THE PEOPLE THAT

19   ARE AT THE FRONT LINE, AND THEY TELL ME, EVEN WITH BAIL

20   REFORM, THE NEED TO REBUILD IS STILL THERE. AND SO IT'S GOING

21   TO COME DOWN TO A "WE CAN AGREE TO DISAGREE" ON THIS, BUT I'M

22   GOING TO LOOK TO MY CONTRACT CITIES WHO EXPECT US TO PROVIDE

23   SUPPORT AND LEADERSHIP ON THIS ISSUE, AND I'M GOING TO LOOK TO

24   SHERIFF VILLANUEVA TO OFFER HIS ADVICE AND HIS SOUND WORDS, AS

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   IT RELATES TO WHAT THE ACTUAL NEED IS OUT ON THE STREET. SO

2   WITH THAT--

3

4   **SUP. HAHN, CHAIR:** THANK YOU. BEFORE YOUR SOUND WORDS, SHERIFF,

5   I WANTED TO OFFER MY OWN OPENING REMARKS ON THESE ISSUES. AND

6   I APPRECIATE ALL MY COLLEAGUES SO MUCH ON THIS. THERE'S NOT

7   ONE OF US THAT DOESN'T CARE VERY DEEPLY ABOUT PUBLIC SAFETY,

8   BUT ALSO ABOUT GIVING PEOPLE THE CARE THAT WE BELIEVE THEY

9   REALLY NEED. AND SO BEFORE US TODAY WE HAVE THESE THREE

10  MOTIONS THAT REALLY WILL CHART THE PATH FORWARD FOR HOW WE

11  RESHAPE THE CRIMINAL JUSTICE SYSTEM HERE IN LOS ANGELES

12  COUNTY. THE FIRST MOTION MOVES TO CANCEL THE CONTRACT WITH

13  MCCARTHY. AND, AS HAS ALREADY BEEN STATED, THIS CONTRACT HOLDS

14  US TO AN IDEA OF CRIMINAL JUSTICE THAT REQUIRES US TO SPEND

15  BILLIONS OF DOLLARS TO BUILD ANOTHER JAIL, AND MANY OF US

16  BELIEVE THAT'S NOT WHAT LOS ANGELES COUNTY NEEDS. WE HAVE HAD

17  A PARADIGM SHIFT ON THIS BOARD OF SUPERVISORS. AND WHEN I CO-

18  AUTHORED THE MOTION TO CREATE A "CARE FIRST, JAIL LAST" MODEL,

19  IT WAS MY INTENTION TO MOVE FORWARD UNDER THIS CURRENT

20  CONTRACT, AND I THINK, SUPERVISOR BARGER, TAKE INTO ACCOUNT

21  EVERYTHING WE KNEW AT THIS POINT ABOUT DIVERSION, ABOUT MENTAL

22  HEALTH TREATMENT THAT'S BEEN NEEDED SO DESPERATELY IN OUR

23  CUSTODY SITUATIONS, AS WELL AS THE NEEDS OF LAW ENFORCEMENT TO

24  ACTUALLY STILL HAVE SOME CUSTODY. AND DESPITE MCCARTHY'S

25  EFFORTS TO WORK WITH US, I HAVE NOTHING AGAINST THIS

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    REPORTS, AND TO MAKE RECOMMENDATIONS ON WHAT OUR NEXT STEPS

2    ARE, WHAT OUR PATHWAY FORWARD IS TO BUILD IN CONCRETE THE

3    VISION THAT THIS BOARD HAS. AND WE HAVE VARIOUS STAKEHOLDERS

4    WHO WE ASSUME WILL BE IN THAT WORKING GROUP, BUT OUR HEALTH

5    DEPARTMENTS, PARTICULARLY OUR MENTAL HEALTH DEPARTMENT, OUR

6    OFFICE OF DIVERSION AND REENTRY, CERTAINLY, OUR COUNTY

7    COUNSEL'S GOT TO MAKE SURE THAT WE'RE DOING THIS CORRECTLY,

8    OUR PUBLIC DEFENDER, WHO I THINK WE'RE LUCKY TO HAVE HERE IN

9    L.A. COUNTY, HAS A REAL VOICE ON MOVING FORWARD. BUT CLEARLY

10   THIS WORKING GROUP NEEDS TO INCLUDE OUR SHERIFF, IN MY

11   OPINION, AND I WOULD LIKE TO SEE THE MEN AND WOMEN WHO ARE OUR

12   L.A. COUNTY DEPUTIES ALSO AT THE TABLE. I WANT TO SEE

13   A.L.A.D.S. AT THE TABLE, HELPING US CREATE THIS VISION. THE

14   DECISION OF WHAT SHOULD REPLACE MEN'S CENTRAL JAIL IS

15   DIFFICULT AND COMPLICATED, AND REQUIRES THE INPUT OF ALL THESE

16   DIFFERENT COUNTY DEPARTMENTS. I'M ASKING THAT ALL THESE

17   DEPARTMENTS PRIORITIZE THIS ISSUE AND REPORT BACK IN 90 DAYS

18   WITH OPTIONS ON HOW WE MOVE FORWARD. AND WE ALSO NEED TO BUILD

19   UP THE CONTINUUM OF CARE THROUGHOUT THE COMMUNITY, OR THIS

20   WHOLE VISION DOESN'T WORK. AND IN RECENT YEARS, THE COUNTY HAS

21   TAKEN GROUNDBREAKING STEPS TO INVEST IN DIVERSION AND OTHER

22   ALTERNATIVES TO INCARCERATION. BUT WE NEED TO MAKE SURE THAT

23   WE HAVE THE CAPACITY AND THE INFRASTRUCTURE IN OUR COMMUNITIES

24   TO IMPLEMENT THESE PROGRAMS TO THEIR FULL POTENTIAL. WE'RE

25   ALSO ASKING THE C.E.O. TODAY TO EXPLORE SOME REALLOCATION OF



# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1    SOME OF THE FUNDS THAT WERE GOING TO BE USED TO BUILD THIS

2    JAIL, AND PUT THEM, INSTEAD, TOWARDS BUILDING UP OUR CONTINUUM

3    OF CARE IN OUR COMMUNITIES. AND FINALLY, THE THIRD MOTION

4    CALLS FOR MUCH-NEEDED DATA AND RESEARCH ON THE TYPES OF BEDS

5    AND DIVERSION PROGRAMS THAT WE NEED TO REDUCE OUR JAIL

6    POPULATION AND PROVIDE THE MENTAL HEALTH SERVICES THAT ARE SO

7    IMPORTANT. BUT WITHOUT ALL THIS CRITICAL INFORMATION, IN MY

8    OPINION, WE CAN'T SUCCESSFULLY RESHAPE OUR CRIMINAL JUSTICE

9    SYSTEM. IT'S GOING TO TAKE TIME, IT'S GOING TO TAKE LOTS OF

10   MONEY TO ACCOMPLISH THESE GOALS, AND IT WILL NOT BE EASY. BUT

11   I HOPE EVERYONE KNOWS THAT THESE COLLEAGUES THAT I SIT WITH ON

12   A WEEKLY BASIS HAVE NEVER SHIED AWAY FROM HARD WORK OR A

13   CHALLENGE. WE'RE COMMITTED TO MOVING FORWARD WITH A DELIBERATE

14   AND THOUGHTFUL PLAN, AND ONE THAT TAKES INTO CONSIDERATION THE

15   NEEDS OF THOSE IN OUR CRIMINAL JUSTICE SYSTEM AND OUR

16   SURROUNDING COMMUNITIES. AND WITH THAT, DID ANYBODY-- ANY OF

17   MY COLLEAGUES WANT TO SPEAK BEFORE THE SHERIFF SPEAKS? DID YOU

18   WANT TO SAY SOMETHING AGAIN, SUPERVISOR SOLIS?

19

20   **SUP. SOLIS:** MADAM CHAIR, AFTER THE SHERIFF SPEAKS, I WANTED TO

21   ASK OUR HEALTH AGENCY REPRESENTATIVES TO COME AND CHIME IN.

22

23   **SUP. HAHN, CHAIR:** I THINK THAT'S A GOOD IDEA. OKAY. SHERIFF,

24   THE FLOOR IS YOURS.

25

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    **SHERIFF VILLANUEVA:** THANK YOU, MA'AM. THANK YOU, THE BOARD,

2    FOR THIS OPPORTUNITY TO ADDRESS THIS VERY IMPORTANT ISSUE. AND

3    I WANT TO START WITH WHEN I TOOK OFFICE IN DECEMBER, THE SAME

4    BOARD WAS ABOUT TO SHIP THE FEMALE INMATE POPULATION TO MIRA

5    LOMA, AND JUST REPLACE MEN'S CENTRAL JAIL WITH ANOTHER JAIL.

6    AND I SPOKE INDIVIDUALLY TO EACH OF YOU. WE SPOKE IN GROUP,

7    AND THANKFULLY THAT PROJECT AT MIRA LOMA WAS CANCELED. IT WAS

8    THE RIGHT DECISION. AND WHAT BECAME THE MENTAL HEALTH

9    TREATMENT CENTER WAS AN ADJUSTMENT OF OUR-- A PARADIGM SHIFT.

10   THAT WAS THE START OF THE PARADIGM SHIFT, WHICH WAS GOOD. IT

11   WAS HEALTHY. AND JUST REPLACING ONE JAIL WITH ANOTHER JAIL

12   WASN'T GOING TO IMPROVE THE SITUATION FOR THOSE WHO ARE

13   INCARCERATED. BUT, NOW, A PARADIGM SHIFT CAN SOMETIMES BE A

14   SHIFT THAT GOES TOO FAR. AND I'M GOING TO POINT OUT SOME

15   INFORMATION THAT YOU MAY OR MAY NOT BE AWARE OF, THAT MIGHT

16   ILLUSTRATE WHERE WE'RE AT. BUT THE SHERIFF'S DEPARTMENT

17   ENCOURAGES THE DEPARTMENT OF MENTAL HEALTH, THE DEPARTMENT OF

18   HEALTH SERVICES, AND THE BOARD TO ATTEMPT TO CREATE A

19   COMMUNITY-BASED EFFORT TO REFORM THE JAIL SYSTEM, AS A WHOLE.

20   DIVERSION IS A PROGRESSIVE APPROACH TO PLACE THOSE THAT CAN BE

21   REHABILITATED OUTSIDE OF CUSTODY INTO COMMUNITY-BASED

22   TREATMENT CENTERS. OUR DEPARTMENT IS FULLY IN SUPPORT OF THIS

23   DIVERSION EFFORT, AND WE WANT TO DO EVERYTHING WE CAN AT THE

24   FRONT END, BECAUSE EVERYONE WHO IS NOW IN THE JAIL SYSTEM GOT

25   THERE BECAUSE OF LAW ENFORCEMENT FIRST, AND A CALL TO SERVICE;



## The Meeting Transcript
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1  THAT FIRST INTERACTION IN THE FIELD THAT RESULTS, EVENTUALLY,

2  INTO AN ARREST, AND THEN NOW SOMEONE IS TRANSPORTED, THEY'RE

3  IN THE COUNTY JAIL SYSTEM. SO, AT THE FRONT END, WE'RE TYING

4  TO FIND ALTERNATIVES TO INCARCERATION EVEN BEFORE. SAME THING

5  WITH OUR JUVENILES. WE'RE TRYING TO FIND WAYS SO THEY DON'T GO

6  INTO JAIL, THEY DON'T GO INTO THE SYSTEM, THEY ARE NOT A PART

7  OF PROBATION. WE HAVE TEEN COURTS. WE HAVE RESTORATIVE JUSTICE

8  MODELS WE'RE PURSUING, SO WE'RE DOING EVERYTHING WE CAN AT THE

9  FRONT END TO MINIMIZE PEOPLE COMING INTO THE SYSTEM. BUT ONCE

10  THEY'RE IN THE SYSTEM, THEN THEY'RE OUR RESPONSIBILITY.

11  DIVERSION ALONE CANNOT BE APPLIED AS A SOLUTION TO EVERY

12  INDIVIDUAL IN THE CRIMINAL JUSTICE SYSTEM, AND THERE ARE

13  CHALLENGES. THE CRITERIA TO DETERMINE ELIGIBILITY FOR

14  DIVERSION-- THAT INCLUDES A CRIMINAL HISTORY, THE SERIOUSNESS

15  OF THE CRIME, STATE OF MENTAL ILLNESS, ET CETERA-- PROPOSITION

16  47 CHANGED THE INMATE POPULATION. AND AS A RESULT, THE

17  MAJORITY OF INMATES HELD ARE FELONS. THIS ALSO INCLUDES A.B.

18  109, AS YOU MENTIONED, MA'AM, SOLIS. WE HAVE 15,034 INMATES

19  OUT OF A TOTAL 17,559 AVERAGE DAILY POPULATION WHO ARE HELD ON

20  FELONIES OR FELONY WOBBLERS. 42 PERCENT ARE CRIMES AGAINST

21  PERSONS, 4 PERCENT ARE SEX CRIMES, 6 PERCENT ARE WEAPONS

22  CHARGES, AND 47 PERCENT ARE DRUG, PROPERTY, AND OTHER CRIMES.

23  INMATES CURRENTLY ONLY SERVE 10 PERCENT OF THEIR SENTENCE.

24  APPROXIMATELY 33 PERCENT OF ALL INMATES-- THIS IS ROUGHLY 5700

25  INMATES-- RECEIVE MENTAL HEALTH TREATMENT WHILE IN THE COUNTY

# The Meeting Transcript
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    JAIL SYSTEM. OUR CURRENT FACILITIES, MEN'S CENTRAL JAIL, WHICH

2    WAS TENTATIVELY SCHEDULED TO BE DEMOLISHED DURING THE FOURTH

3    QUARTER OF 2021, PRIMARILY HOUSES THE HIGH-SECURITY AND

4    GENERAL POPULATION INMATES. TWIN TOWERS CORRECTIONAL FACILITY

5    HOUSES THE MALE MENTAL HEALTH INMATE POPULATION. CENTURY

6    REGIONAL DETENTION FACILITY HOUSES THE FEMALE HIGH-SECURITY

7    MENTAL HEALTH GENERAL POPULATION INMATES. AND THE PITCHESS

8    DETENTION CENTER HOUSES A SMALL NUMBER OF LOWER-ACUITY MALE

9    MENTAL HEALTH INMATES AND THE MALE GENERAL POPULATION INMATES.

10   AND I SHOULD POINT OUT THAT BOTH TWIN TOWERS CORRECTIONAL

11   FACILITY, WHICH WAS COMPLETE IN 1997 AND OCCUPIED IN C.R.D.F.,

12   WAS COMPLETED AND OCCUPIED IN 1994. BOTH OF THOSE HAVE SERVED

13   MULTIPLE ROLES. AND WE'VE BEEN REPURPOSED AGAIN AND AGAIN--

14   MALE POPULATION, FEMALE POPULATION, GENERAL POPULATION, MENTAL

15   HEALTH POPULATION. SO, IF THERE'S ONE STANDARD THAT WE'VE SEEN

16   ACROSS THE LAST TWO DECADES, IS EVERY SINGLE FACILITY THAT WE

17   END UP USING HAS TO BE REPURPOSED AND HAS TO BE FLEXIBLE FOR

18   THE EVOLVING LANDSCAPE OF THE INMATE POPULATION. THE CURRENT

19   FACILITIES WERE NOT DESIGNED TO PROVIDE IN-CUSTODY MENTAL

20   HEALTH TREATMENT, BUT HAVE BEEN REPURPOSED TO ACCOMMODATE THE

21   GROWING MENTAL HEALTH POPULATION. AT THE SAME TIME, THE A.B.

22   109 ISSUE AND THEIR WHOLE REALIGNMENT SCHEME FROM THE STATE

23   HAS CHANGED THE ENTIRE COMPLEXION OF THE INMATE POPULATION, AS

24   A WHOLE. NOW, THE EFFECTS OF NOT BUILDING THE MENTAL HEALTH

25   TREATMENT CENTER. THE MENTAL HEALTH POPULATION IS EXPECTED TO

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    INCREASE AS A PERCENTAGE OF THE TOTAL INMATE POPULATION. THIS

2    IS FROM THE STUDY BY THE HEALTH MANAGEMENT ASSOCIATES, FROM

3    AUGUST OF 2015. THEY PROJECTED A NEED FOR APPROXIMATELY 6,700

4    MEDICAL AND MENTAL HEALTH BEDS BY THE YEAR 2025. THAT MARK WE

5    WILL NOT BE MEETING. NOT BUILDING THE MENTAL HEALTH TREATMENT

6    CENTER WILL FORCE THE DEPARTMENT TO CONTINUE HOUSING MEDICAL

7    AND MENTAL HEALTH INMATES IN ANTIQUATED AND DILAPIDATED

8    FACILITIES NOT DESIGNED TO SERVE THOSE VULNERABLE POPULATIONS.

9    IF THE MENTAL HEALTH TREATMENT CENTER'S NOT BUILT, THE

10   DEPARTMENT WILL CONTINUE TO HAVE DIFFICULTIES COMPLYING WITH

11   CERTAIN ASPECTS OF THE DEPARTMENT OF JUSTICE LAWSUIT, WHICH

12   YOU KNOW IS THE ROSAS SETTLEMENT, AND THAT WILL INVOLVE

13   ADEQUATE NUMBERS OF MENTAL HEALTH BEDS, TREATMENT AND

14   PROGRAMMING SPACES FOR THE POPULATION. DUE TO THE GROWTH OF

15   THE INMATE POPULATION AND THOSE REQUIRING EXTENDED MEDICAL

16   SERVICES, THE DEPARTMENT WILL CONTINUE TO REQUIRE FACILITIES

17   WITH A MINIMUM OF 3,885-BED CAPACITY, AND THAT NUMBER IS 1,000

18   BEDS LESS THAN THE ORIGINAL PROJECTED NEED WITH THE LOSS OF

19   MEN'S CENTRAL JAIL. THE DEPARTMENT'S GOAL IS TO PROVIDE A

20   TREATMENT-CENTRIC, CARE-FIRST MODEL FOR THOSE RESIDING IN THE

21   LOS ANGELES COUNTY JAIL SYSTEM, WHICH CANNOT BE DIVERTED. THIS

22   NEW MODEL SHOULD REFLECT THE NEW PARADIGM, INCORPORATING

23   DESIGN FEATURES SUCH AS NATURAL LIGHT, DEDICATED TREATMENT AND

24   PROGRAM SPACE WITHIN THE HOUSING UNITS, CREATING A MORE

25   NORMATIVE, REHABILITATIVE ATMOSPHERE. NOW, LET ME GIVE YOU

# The Meeting Transcript
of the Meeting of the Los Angeles County Board of Supervisors



1  SOME NUMBERS THAT WILL KIND OF GIVE YOU AN IDEA OF WHAT WE'RE

2  LOOKING AT. THIS IS A SNAPSHOT OF CUSTODY RIGHT NOW, AS OF THE

3  12TH. WE HAVE 2,724 INMATES IN FOR AGGRAVATED ASSAULT. WE HAVE

4  1,470 INMATES IN FOR ARMED ROBBERY. WE HAVE MISDEMEANOR

5  FELONIES, 1,223. HOMICIDE: WE HAVE 1,222 INMATES HERE FOR

6  HOMICIDE, WHICH IS GREATER THAN THE ENTIRE POPULATION IN YOUR

7  SEATING AREA, TIMES TWO. WE HAVE SEX FELONIES-- 564. RAPE, WE

8  HAVE 162. ARSON, 88. ROBBERY, STRONG ARM-- 54. AND 75.3

9  PERCENT OF THE JAIL POPULATION IS IN FOR A FELONY. AND 14.4

10 PERCENT OF THE JAIL POPULATION IS IN FOR [INAUDIBLE], AND

11 THAT'S 2525 INMATES. THIS IS THE ENTIRE JAIL POPULATION. NOW

12 WE'RE GOING TO BREAK IT DOWN TO WHAT'S INSIDE OUR MENTAL

13 HEALTH INMATES. THAT'S 5,745 INMATES. OF THOSE, 1,094 ARE IN

14 FOR AGGRAVATED ASSAULT, 537 IN FOR ROBBERY, 514 FOR OTHER

15 FELONIES, 392 FOR RESIDENTIAL BURGLARY, 359 FOR CRIMINAL

16 HOMICIDE, 180 FOR WEAPONS LAWS, 164 FOR SEX FELONIES, 127 FOR

17 OFFENSES AGAINST FAMILIES. THOSE ARE THE NUMBERS, THE RAW

18 NUMBERS. AND AS YOU CAN SEE, WHEN THE CLAIM IS THAT YOU CAN

19 DIVERT 56 PERCENT OF THIS POPULATION, I JUST DON'T SEE HOW,

20 BECAUSE THE NUMBERS DON'T BEAR OUT. THESE, ESPECIALLY IN THE

21 HIGH END OF THE FELONY SECTION, THEY ARE NOT GOING TO BE

22 DIVERTED. THAT IS A DIRECT THREAT TO THE PUBLIC SAFETY. NOW,

23 I'M GOING TO GIVE YOU-- LET ME PERSONALIZE IT. WE'LL HAVE ONE

24 PARTICULAR CASE THAT YOU MAY OR MAY NOT BE AWARE OF. I'LL

25 REFER TO THIS AS INMATE CHRIS. JULY 25TH OF 2018, HE WAS

# The Meeting Transcript
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   ARRESTED BY MARINA DEL REY SHERIFF'S STATION FOR RESIDENTIAL

2   BURGLARY AND CRIMINAL THREATS. AFTER ARRAIGNMENT, REMANDED

3   INTO CUSTODY, AND ULTIMATELY RELEASED FROM CUSTODY AS PART OF

4   THE OFFICE OF DIVERSION AND REENTRY'S INTERIM HOUSING PROGRAM.

5   SO THIS WAS ONE MARKED BY O.D.R. FOR DIVERSION. AND THEN HE

6   WAS RELEASED OCTOBER 26TH OF 2018. KEEP THAT IN MIND. SO, HE

7   WAS ORIGINALLY ARRESTED JULY 12TH. JULY 24TH, THE MOTHER OF

8   THE SUSPECT WAS PROVIDED INFORMATION ON HOW TO OBTAIN A

9   RESTRAINING ORDER, AND THE SUSPECT WAS REMOVED FROM HER

10  RESIDENCE. ON JULY 24TH, THE SUSPECT RE-ENTERED HER RESIDENCE

11  TO RETRIEVE BELONGINGS, WHICH IS FINE. BUT WHILE GATHERING

12  BELONGINGS, HE BECAME HOSTILE AND ARGUMENTATIVE, AND HE

13  REFUSED TO LEAVE. A FAMILY FRIEND INTERVENED AND HE LEFT

14  WITHOUT INCIDENT. JULY 24TH. KEEP IN MIND THE TIMEFRAME. THE

15  SUSPECT BROKE INTO HIS MOTHER'S RESIDENCE BY CRAWLING THROUGH

16  A FRONT WINDOW OF THE RESIDENCE. HE WAS TOLD TO LEAVE. HE

17  REFUSED TO LEAVE. THE SUSPECT ATTEMPTED TO PHYSICALLY ASSAULT

18  HIS MOTHER, CAUSING A BYSTANDER TO INTERVENE. IT WAS A

19  PHYSICAL CONFRONTATION, A WRESTLE AND A FIGHT. THE SUSPECT

20  FLED FROM THE RESIDENCE, CLAIMING HE WOULD RETURN AND KILL

21  THEM. THE VICTIM CALLED MARINA DEL REY SHERIFF'S STATION, AND

22  A CRIMINAL THREATS REPORT WAS TAKEN. THE MOTHER WAS GRANTED

23  ADDITIONAL EMERGENCY PROTECTIVE ORDER, WHICH INCLUDED HER

24  STATEMENT: "ONE DAY HE WILL KILL ME." JULY 25TH, THE NEXT DAY,

25  DEPUTIES RESPOND FROM MARINA DEL REY STATION, DUE TO PANIC

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  ALARM. THEY SAW THE BACK DOOR HAD BEEN KICKED IN AND HEARD A

2  COMMOTION COMING FROM INSIDE THE RESIDENCE. INSIDE THE

3  RESIDENCE, THEY FOUND THE SUSPECT WAS YELLING AND MUMBLING

4  INCOHERENTLY. AFTER PROTECTIVE SWEEP, THE SUSPECT WAS PLACED

5  UNDER ARREST FOR RESIDENTIAL BURGLARY AND CRIMINAL THREATS,

6  AND WAS BOOKED AT MARINA DEL REY STATION. OKAY. THAT WAS JULY

7  25TH. THEN HE GOES THROUGH COURT, AND HE WAS PLACED IN HIGH-

8  OBSERVATION HOUSING, AND THEN HE ULTIMATELY WENT TO DIVERSION

9  COURT, AND HE WAS DEEMED INCOMPETENT TO STAND TRIAL. COMMITTED

10 TO THE DEPARTMENT OF STATE HOSPITALS. OKAY. OCTOBER 3RD, A

11 COURT HEARING WAS CONDUCTED. THE PRESIDING JUDGE PETITIONED TO

12 HAVE THE CASE RESOLVED, AND REQUESTED THAT HE BE RELEASED FROM

13 CUSTODY WITH A GRANT OF PROBATION. THIS WAS DONE BY THE OFFICE

14 OF DIVERSION AND REENTRY. THE O.D.R. REQUESTED TO HAVE THE

15 INMATE RELEASED FROM THE SHERIFF'S DEPARTMENT CUSTODY, AND

16 SUBSEQUENTLY HOUSED IN IMMEDIATE INTERIM HOUSING PROGRAM UNTIL

17 A PERMANENT SUPPORTIVE HOUSING LOCATION WAS LOCATED. THE JUDGE

18 GRANTED THE REQUEST AND ISSUED A RELEASE ORDER. AND HE WAS

19 RETURNED TO CUSTODY, EVALUATED MENTALLY, AND THEN HE WAS...

20 HIS CONDITION HAD DETERIORATED. BUT THEN HE WAS ADVISED OF HIS

21 PROBATIONARY TERMS AND RELEASE, RETURNED TO HOUSING, AND AN

22 INTENSIVE CASE MANAGEMENT SERVICE PROVIDER LOCATED SUITABLE

23 HOUSING. THE INMATE RECEPTION CENTER RECEIVED--

24

25 **SUP. HAHN, CHAIR:** SHERIFF, IS THERE AN END TO THIS STORY?

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1

2   **SHERIFF VILLANUEVA:** YES, THERE IS. [LAUGHTER.] [APPLAUSE.]

3   [LOUD CHEERS.]

4

5   **SHERIFF VILLANUEVA:** I'M COMING TO THE END, MA'AM.

6

7   **SUP. HAHN, CHAIR:** OKAY.

8

9   **SHERIFF VILLANUEVA:** I'M COMING TO THE END.

10

11  **SUP. HAHN, CHAIR:** OKAY. COME TO THE END.

12

13  **SHERIFF VILLANUEVA:** OKAY. HE WAS RELEASED FROM CUSTODY...

14

15  **SUP. HAHN, CHAIR:** OKAY, QUIET.

16

17  **SHERIFF VILLANUEVA:** AND TRANSPORTED TO PERMANENT HOUSING

18  SOMEWHERE IN LOS ANGELES. MARCH 19TH, 2019, DEPUTIES FROM

19  MARINA DEL REY RESPOND TO A LOCATION IN LOS ANGELES IN THEIR

20  AREA, REGARDING A VIOLATION OF A PROTECTIVE ORDER CALL. THE

21  INFORMANT STATED HER SON WAS AT HER RESIDENCE, IN VIOLATION OF

22  HER RESTRAINING ORDER. UPON THE DEPUTY'S ARRIVAL, A MALE

23  SUSPECT WAS OBSERVED RUNNING AWAY FROM THE LOCATION. A SHORT

24  FOOT PURSUIT WAS INITIATED. SUSPECT WAS TAKEN INTO CUSTODY

25  WITHOUT INCIDENT. AS THE DEPUTIES RETURNED TO THE LOCATION,

# The Meeting Transcript

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   THEY SAW THE VICTIM LAYING IN A PUDDLE OF BLOOD IN THE CORNER

2   OF THE GARAGE. DEPUTY PERSONNEL BEGAN TO MEDICALLY TREAT THE

3   VICTIM BY APPLYING DIRECT PRESSURE TO THE 11 STAB/SLASHING

4   WOUNDS IN HER TORSO AREA. L.A. COUNTY FIRE PERSONNEL ARRIVED

5   TO THE LOCATION, BEGAN TO TREAT THE VICTIM, WHO WAS CONSCIOUS

6   BUT IN SHOCK. DEPUTIES CONTACTED THE WITNESS, WHO PROVIDED

7   THEM WITH AN ACCOUNT OF WHAT OCCURRED. WITNESS STATED THAT SHE

8   AND THE VICTIM WERE SITTING IN THE DINING ROOM WHEN THEY HEARD

9   A KNOCK ON THE FRONT DOOR. THE VICTIM LOOKED OUTSIDE AND SAW

10  HER SON STANDING ON THE PORCH. THE VICTIM IMMEDIATELY CALLED

11  THE STATION AND REQUESTED THEM TO RESPOND. THE VICTIM TOLD THE

12  SUSPECT THROUGH THE CLOSED DOOR THAT SHE WANTED HIM TO LEAVE

13  AND THAT SHE CALLED THE SHERIFF'S STATION. THE SUSPECT

14  SUDDENLY BECAME HOSTILE AND STARTED TO KICK OPEN THE FRONT

15  DOOR. FEARING FOR THEIR SAFETY, THE WITNESSES AND THE VICTIM

16  FLED FROM THE DINING ROOM AND INTO THE GARAGE. THE VICTIM

17  CLOSED THE INTERIOR GARAGE DOOR, AT WHICH TIME THEY HEARD THE

18  SUSPECT ENTERING THE KITCHEN. THE SUSPECT BEGAN TO PUSH OPEN

19  THE GARAGE DOOR, WHICH WAS BEING HELD BY THE WITNESS AND THE

20  VICTIM. IMAGINE THEIR PANIC, WHERE THEY'RE TRYING TO HOLD THE

21  GARAGE DOOR SHUT WHILE THIS--

22

23  **SUP. HAHN, CHAIR:** I MEAN, I THINK WE UNDERSTAND. LISTEN,

24  AUDIENCE. I WANT TO GIVE YOU THE OPPORTUNITY TO KIND OF WRAP

25  THIS UP AND TELL US WHAT YOU WANT US TO HEAR TODAY.



**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1

2    **SHERIFF VILLANUEVA:** HERE'S WHAT I WANT YOU TO DO, MA'AM. THIS

3    STORY... GRAPHIC, VERY PERSONAL, HEART-WRENCHING, AND IT

4    ILLUSTRATES THE PITFALLS AND THE DARK SIDE OF DIVERSION. IT

5    CAN BE DANGEROUS, IT CAN BE DEADLY, AND IT ALMOST WAS FOR THIS

6    LADY. THE QUESTION IS, HOW FAR DO YOU WANT TO GO AND ROLL THE

7    DICE ON DIVERSION? WHEN THE POPULATION CHANGED BECAUSE OF A.B.

8    109, WE DON'T HAVE THE PEOPLE THAT PEOPLE THINK IN THE GENERAL

9    POPULATION. IN THE COMMUNITY, PEOPLE THINK THAT WE HAVE PEOPLE

10   IN FOR MISDEMEANOR CRIMES, PROPERTY CRIMES, THAT SOMEHOW THEY

11   CAN BE DIVERTED SUCCESSFULLY. NO. IT'S A CALCULATED DECISION

12   TO DIVERT SOMEONE WHO WAS IN FOR A SERIOUS FELONY. AND THERE'S

13   A LOT OF PLAYERS INVOLVED HERE: THE DISTRICT ATTORNEY, THE

14   PROBATION DEPARTMENT, O.D.R., NOW, IN THIS CASE. SO THERE CAN

15   BE DEADLY OUTCOMES. THE QUESTION IS, HOW WILLING ARE YOU TO

16   BALANCE THE NEED FOR DIVERSION, WHICH IS IMPORTANT, WITH THE

17   SAFETY OF THE COMMUNITY? AND THE MENTAL HEALTH TREATMENT

18   CENTER IS THAT BALANCING POINT. I ENCOURAGE EACH AND EVERY ONE

19   OF YOU TO STAY THE COURSE. BUILD THE MENTAL HEALTH TREATMENT

20   CENTER FOR WHAT IT STANDS FOR. ULTIMATELY, IF DIVERSION IS

21   SUCCESSFUL, WE'RE GOING TO DEPOPULATE IT TO THE POINT THAT

22   THEN WE CAN REPURPOSE IT TO GET THE FEMALE INMATE POPULATION

23   IN C.R.D.F. INTO THE M.H.T.C., AND WE CAN DO A LOT OF THE

24   RESHUFFLING, AND WE CAN SHUT DOWN PITCHESS NORTH, PITCHESS

25   EAST, PITCHESS SOUTH, AND WE CAN THEN START CONSOLIDATING,

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   HAVE ALL OF OUR INMATE POPULATION IN MODERN FACILITIES THAT

2   ARE MORE AMENABLE TO THEIR TREATMENT. SO WE HAVE TO THINK BIG,

3   AND WE CAN'T BE THINKING SO SMALL. THAT'S MY MESSAGE.

4

5   **SUP. HAHN, CHAIR:** THANK YOU, SHERIFF, AND I APPRECIATE THAT. I

6   CAN ONLY SPEAK FOR MYSELF, I CAN'T SPEAK FOR MY COLLEAGUES,

7   BUT I KNOW, FOR ME, CERTAINLY, PUBLIC SAFETY IS FIRST AND

8   FOREMOST IN MY MIND EVERY DAY, AND ANYTHING I DO MOVING

9   FORWARD WILL TRY TO STRIKE THAT BALANCE. AND I WISH WE COULD

10  HAVE BUILT THE MENTAL HEALTH TREATMENT CENTER, TRUST ME.

11  THAT'S WHAT I WANTED TO BUILD, AND I FELT IT DID STRIKE A

12  BALANCE. BUT, YOU KNOW, WE WERE TOLD THAT WE JUST COULDN'T

13  BUILD THAT PARTICULAR FACILITY UNDER THIS CURRENT CONTRACT, SO

14  THAT'S WHY WE'RE HERE TODAY. BUT I REALLY APPRECIATE YOUR

15  WORDS, SHERIFF, AND I EXPECT YOU TO BE INVOLVED AS WE MOVE

16  FORWARD FROM TODAY, IN HELPING US DECIDE WHAT TO DO.

17  SUPERVISOR SOLIS, I KNOW YOU WANT TO HAVE THE DOCTORS.

18

19  **SUP. SOLIS:** YES, AND I ALSO WANT TO ASK JUDGE ESPINOZA, WHO

20  REPRESENTS O.D.R., TO COME. WE'LL HAVE SOME QUESTIONS

21  REGARDING THE WORK THAT HE'S DONE. AND I CERTAINLY DON'T WANT

22  TO TALK ABOUT THE DARK SIDE OF CUSTODY, OR ANYTHING RELATED TO

23  THAT. I THINK WE'RE HERE TO TRY TO TALK ABOUT SOME POSITIVE

24  THINGS-- HEALING, CARE FIRST. SO I WANT TO HEAR FROM OUR

25  EXPERTS. AND, JUDGE, MAYBE WE CAN START WITH YOU, SINCE YOUR

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  VERY MUCH, MADAM CHAIR. JUST WANTED TO ADD THAT WE'RE ALSO

2  LOOKING AT THAT OTHER POPULATION.

3

4  **SUP. HAHN, CHAIR:** OKAY. I'M AFRAID TO ASK IF THERE'S ANY MORE

5  COMMENTS FROM MY COLLEAGUES. I WANT TO THANK, CERTAINLY, OUR

6  DEPARTMENTS WHO HAVE BEEN HERE. THANK YOU TO THE SHERIFF FOR

7  BEING HERE. AND AT THIS POINT, WE WILL MOVE TO THOSE 225

8  PEOPLE THAT WOULD LIKE TO ADDRESS US ON THIS ISSUE. MADAM

9  EXECUTIVE OFFICER, PLEASE CALL THOSE MEMBERS OF THE PUBLIC

10 THAT WOULD LIKE TO ADDRESS US.

11

12 **CELIA ZAVALA, E.O.:** THANK YOU, MADAM CHAIR. WOULD THE

13 FOLLOWING INDIVIDUALS PLEASE COME FORWARD WHEN I CALL YOUR

14 NAME: ANDRE QUINTERO, ADELE ANDRADE STADLER, JOEL BRASLOW,

15 COLIN DIAS, MARK ANTHONY CLAYTON JOHNSON, EUGENE MOY, JOHNNY

16 TORRES, ADAM ZARAGOZA, MIA MORENO, DIEGO RODRIGUES, REY

17 RODRIGUEZ, JOHN VELASCO, HECTOR PEREZ PACHECO, EDWARD CHANG,

18 KEVIN CHEN, TIM KORNEGAY, JEANETTE ELLIS ROYSTON, AND JUSTIN

19 MARKS. PLEASE COME FORWARD AND STAFF WILL ASSIST YOU.

20

21 **SUP. HAHN, CHAIR:** OKAY. YOU'VE DONE SO WELL SO FAR, AUDIENCE.

22 I'M VERY PLEASED THAT WE'VE ALL BEEN ABLE TO GIVE EVERYONE

23 RESPECT. NOW COMES THE HARD PART: ACTUALLY GIVING MEMBERS OF

24 THE PUBLIC THE SAME KIND OF RESPECT. AND SINCE THERE'S 225 OF

25 YOU, WE'RE GIVING YOU ONE MINUTE. AND I KNOW THAT SEEMS THAT

EXHIBIT 40



# THE MEETING TRANSCRIPT OF
# THE LOS ANGELES COUNTY
# BOARD OF SUPERVISORS



# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

## Adobe Acrobat Reader

### Finding Words

You can use the Find command to find a complete word or part of a word in the current PDF document.  Acrobat Reader looks for the word by reading every word on every page in the file, including text in form fields.

### To find a word using the Find command:

1. Click the Find button **(Binoculars)**, or choose Edit > Find.
2. Enter the text to find in the text box.
3. Select search options if necessary:
   Match Whole Word Only finds only occurrences of the complete word you enter in the box.  For example, if you search for the word *stick*, the words *tick* and *sticky* will not be highlighted.

   Match Case finds only words that contain exactly the same capitalization you enter in the box.

   Find Backwards starts the search from the current page and goes backwards through the document.
4. Click Find.  Acrobat Reader finds the next occurrence of the word.

### To find the next occurrence of the word, Do one of the following:

Choose Edit > Find Again
Reopen the find dialog box, and click Find Again.
(The word must already be in the Find text box.)

## Copying and pasting text and graphics to another application

You can select text or a graphic in a PDF document, copy it to the Clipboard, and paste it into another application such as a word processor.  You can also paste text into a PDF document note or into a bookmark.  Once the selected text or graphic is on the Clipboard, you can switch to another application and paste it into another document.

**Note:  *If a font copied from a PDF document is not available on the system displaying the copied text, the font cannot be preserved.  A default font  is substituted.***

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



**To select and copy it to the clipboard:**

1.  Select the text tool $T$, and do one of the following:
    To select a line of text, select the first letter of the sentence or phrase and drag to the last letter.

To select multiple columns of text (horizontally), hold down Ctrl+Alt (Windows) or Option (Mac OS) as you drag across the width of the document.

To select a column of text (vertically), Hold down Ctrl+Alt (Windows) or Option+Command (Mac OS) as you drag the length of the document.

To  select all the text on the page, choose Edit > Select All.  In single page mode, all the text on the current page is selected.  In Continuous or Continuous – facing mode, most of the text in the document is selected.  When you release the mouse button, the selected text is highlighted.  To deselect the text and start over, click anywhere outside the selected text.  The Select All command will not select all the text in the document.  A workaround for this (Windows) is to use the Edit > Copy command.  Choose Edit > Copy to copy the selected text to the clipboard.

2.  To view the text, choose Window > Show Clipboard

In Windows 95, the Clipboard Viewer is not installed by default and you cannot use the Show Clipboard command until it is installed.  To install the Clipboard Viewer, Choose Start > Settings > Control Panel > Add/Remove Programs, and then click the Windows Setup tab.  Double-click Accessories, check Clipboard Viewer, and click OK.

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    **[REPORT OF ACTION TAKEN IN CLOSED SESSION ON**

2    **TUESDAY, OCTOBER 1, 2019 ON PAGE 281]**

3

4

5    **SUP. HAHN, CHAIR:** GOOD MORNING. GOOD MORNING, EVERYONE.

6    EVERYBODY IS -- GOOD MORNING. SETTLE DOWN. WE HAVE A LONG DAY.

7    GOOD MORNING, EVERYONE. AND WE WELCOME YOU TO THE REGULARLY

8    SCHEDULED MEETING OF THE LOS ANGELES COUNTY BOARD OF

9    SUPERVISORS. TODAY, UNBELIEVABLY, IS TUESDAY, OCTOBER 1ST,

10   2019. THIS YEAR'S GOING BY FAST, NOT FAST ENOUGH FOR ME. WE

11   TAKE NOTE THAT A FULL COMPLEMENT OF THE BOARD IS PRESENT AND

12   THAT THE CHIEF EXECUTIVE OFFICER, COUNTY COUNSEL, EXECUTIVE

13   OFFICER, AND OUR SERGEANT AT ARMS ARE ALL HERE TO ASSIST. WE

14   WILL NOW BEGIN WITH THE INVOCATION LED BY THE REVEREND DENYSE

15   BARNES, ASSOCIATE PASTOR AT THE HOLLYWOOD UNITED METHODIST

16   CHURCH IN LOS ANGELES IN THE THIRD DISTRICT. AND THAT WILL BE

17   FOLLOWED BY THE PLEDGE OF ALLEGIANCE LED BY KENNETH GONZALES,

18   MEMBER OF THE AMERICAN LEGION POST NO. 51 FROM THE CITY OF LOS

19   ANGELES IN THE SECOND DISTRICT. IF YOU ARE ABLE THIS MORNING,

20   PLEASE STAND.

21

22   **REV. DENYSE BARNES:** GRACIOUS AND LOVING CREATOR. AS WE GATHER

23   TOGETHER TODAY IN GRATITUDE, WE THANK YOU FOR YOUR MANY AND

24   ABUNDANT BLESSINGS. THANK YOU FOR LIFE ITSELF, FOR THE MEASURE

25   OF HEALTH WE NEED TO FULFILL OUR CALLINGS, FOR SUSTENANCE, AND

October 1, 2019

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   FOR FRIENDSHIP. THANK YOU FOR THE ABILITY TO BE INVOLVED IN

2   USEFUL WORK AND FOR THE HONOR OF BEARING APPROPRIATE

3   RESPONSIBILITIES. THANKS, AS WELL, FOR THE FREEDOM TO EMBRACE

4   YOU OR THE FREEDOM TO REJECT YOU. THANK YOU FOR LOVING US EVEN

5   SO FROM YOUR BOUNDLESS AND GRACIOUS NATURE. WE KNOW FROM YOUR

6   GUIDANCE THAT CITIZENS OUGHT TO OBEY THE GOVERNING AUTHORITIES

7   IN ORDER TO PROMOTE PEACE AND ORDER AND JUSTICE. THEREFORE, I

8   PRAY FOR EVERYONE GATHERED HERE TODAY AND ASK THAT YOU WOULD

9   GRACIOUSLY GRANT THEM WISDOM TO GOVERN AMID THE CONFLICTING

10  INTERESTS AND ISSUES OF OUR TIMES, A SENSE OF THE WELFARE AND

11  TRUE NEEDS OF OUR PEOPLE, A KEEN THIRST FOR JUSTICE AND

12  RIGHTNESS, CONFIDENCE IN WHAT IS GOOD AND FITTING, THE ABILITY

13  TO WORK TOGETHER IN HARMONY EVEN WHEN THERE IS HONEST

14  DISAGREEMENT, PERSONAL PEACE IN THEIR LIVES, AND JOY IN THEIR

15  TASK. I PRAY FOR THE AGENDA SET BEFORE THEM TODAY. HELP THEM

16  TO CONSIDER THE GOOD OF ALL AS THEY GO ABOUT THEIR WORK. BE

17  WITH THEM AS THEY MAKE THEIR DECISIONS, GUIDING THEM TO BE

18  WISE AND JUST, FAIR AND HONEST. IT IS IN YOUR MOST BLESSED

19  NAME I PRAY, AMEN.

20

21  **KENNETH GONZALES:** GOOD MORNING. PLEASE FACE THE FLAG AND PLACE

22  YOUR RIGHT HAND OVER YOUR HEART. IF YOU ARE A VETERAN, YOU MAY

23  RENDER A HAND SALUTE. PLEASE JOIN ME IN THE PLEDGE OF

24  ALLEGIANCE. [PLEDGE OF ALLEGIANCE RECITED.]

25

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   VICTIMIZED BY SCAMMERS. THAT'S SOMETHING THAT WE HAVE BEEN

2   WORKING TOWARDS FOR I THINK SOME TIME. WE COULDN'T GET IT ALL

3   DONE IN SACRAMENTO, BUT WE'RE GOING TO BEGIN TO DO THAT HERE

4   IN THE COUNTY OF LOS ANGELES. WE ALSO SAW AN INCREASE OF $3

5   MILLION AND NINE POSITIONS TO ESTABLISH THE OFFICE OF VIOLENCE

6   PREVENTION, WHICH WILL PROVIDE TRAUMA-INFORMED WORK AND HELP

7   TO REDUCE RISING GANG VIOLENCE. AND I WANT TO UNDERSCORE THAT

8   BECAUSE WE'VE SEEN AN UP TICK IN EAST, IN AZUSA, AND

9   UNINCORPORATED AREAS OF LA PUENTE AND BASSETT. THIS IS

10  SOMETHING THAT I HOPE THAT THE SHERIFF AND HIS TEAM WILL FOCUS

11  ON MORE READILY BECAUSE WE DO NEED TO PUT ALL OF OUR EFFORTS

12  TOWARDS THAT. AND, FINALLY, THE BUDGET REALLOCATES THE FUNDING

13  THAT HAD BEEN DEDICATED TO THE MENTAL HEALTH TREATMENT CENTER

14  AND A LARGER JAIL PLAN AND DIRECTS THE BUDGET TO ADDRESS ONE-

15  TIME INTERIM REPORTS AT EXISTING CUSTODY FACILITIES AND

16  DEDICATES FUNDING TO SYSTEMS OF CARE AND ALTERNATIVES TO

17  INCARCERATION AS WAS UNDERSCORED BY OUR CHAIRWOMAN. IN AUGUST,

18  WHEN THIS BOARD BOLDLY VOTED TO TERMINATE THE MCCARTHY JAIL

19  CONSTRUCTION CONTRACT, IT SIGNIFIES THAT WE RECOGNIZE THAT

20  PEOPLE WHO SUFFER FROM MENTAL HEALTH AND SUBSTANCE ABUSE

21  DISORDERS CAN'T IMPROVE, MUCH LESS THRIVE, WHILE BEING LOCKED

22  UP IN A  JAIL CELL. AND THEREFORE, THEIR CHANCES OF SUCCESSFUL

23  INTEGRATION BACK INTO OUR COMMUNITIES AND WITH THEIR FAMILIES

24  AFTER THEY RELEASE IS HIGHLY UNLIKELY. ULTIMATELY, THIS MEANS

25  THAT THEY'LL CYCLE BACK INTO INCARCERATION, HOMELESSNESS, OR

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   ALL RECOGNIZE THAT WHAT'S TAKING PLACE IN THE ANTELOPE VALLEY

2   NEEDS TO BE FOCUSED AND SUPPORTED BOTH FINANCIALLY AS WELL AS

3   THROUGH HUMAN RESOURCE EFFORTS. AND AT SOME POINT, SACHI, I

4   THINK IT'S IMPORTANT FOR THIS BOARD TO UNDERSTAND WHERE WE ARE

5   IN TITLE 4-E, BECAUSE WHILE THAT'S NOT DIRECTLY LINKED TO THE

6   ANTELOPE VALLEY, IT IMPACTS ALL OF D.C.F.S. AS WELL AS

7   PROBATION. AND WE'VE ALL BEEN VERY ENGAGED AND FOCUSED ON WHAT

8   WASHINGTON'S GOING DO WITH THAT FUNDING. WE ARE CONSTANTLY

9   REMINDED THAT OUR BOARD IS A SAFETY NET FOR THOSE IN NEED. AND

10  THIS BUDGET IS PROOF THAT WE ALL CARE A LOT ABOUT THOSE THAT

11  ARE VULNERABLE. PUBLIC SAFETY IS AT THE CORE OF EVERYTHING WE

12  DO. AND ADDING FUNDING FOR RECRUITMENT IN THE SHERIFF'S

13  DEPARTMENT IS CRITICAL TO ENSURE THAT WE HAVE ENOUGH DEPUTIES

14  TO PROTECT OUR RESIDENTS. AND I LOOK FORWARD TO THE CONTINUING

15  CONVERSATION WITH OUR SHERIFF, WHO I'D LIKE TO PUBLICLY THANK

16  FOR BEING HERE TODAY. YOU ARE AN IMPORTANT PARTNER AS WE ROLL

17  OUT OUR BUDGET. AND EACH ONE OF US HAS, IN OUR DISTRICT, AREAS

18  THAT ARE PROTECTED BY L.A.S.D. AND SO I REALLY DO APPRECIATE

19  YOU BEING HERE TO DISCUSS HOW WE CAN WORK TOGETHER. IT'S

20  CRITICAL THAT WE ARE ALLOCATED 12.5 MILLION IN FUNDING TO

21  MENTAL HEALTH RESOURCES WHERE WE NEED IT THE MOST, IN OUR

22  SCHOOLS. AND, AGAIN, THIS IS SOMETHING THAT SUPERVISOR RIDLEY-

23  THOMAS, I KNOW YOU WORKING WITH L.A. UNIFIED, BUT THIS BOARD

24  HAS PUT OUR MONEY WHERE OUR MOUTH IS AS IT RELATES TO

25  SUPPORTING OUR SCHOOL DISTRICTS AND RECOGNIZING THAT MENTAL

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   IDENTIFIED THEY HAD PUT OUT $16 MILLION OF COSTS. SO WE DID

2   FUND THEM FOR THAT. THEIR JUDGMENT AND DAMAGES, THIS IS WHERE

3   THEY HAVE LAWSUITS AND SETTLEMENTS. WE ALSO WORKED VERY

4   CLOSELY WITH THE SHERIFF'S DEPARTMENT AS WELL AS COUNTY

5   COUNSEL AND THE AUDITOR-CONTROLLER AS WE GET CLOSER TO THE END

6   OF CLOSING THE BOOKS TO SEE WHERE THE SHERIFF'S DEPARTMENT IS,

7   WHAT TYPES OF CASES ARE COMING THROUGH, AND WE ENSURE THAT IF

8   THERE ARE A NUMBER OF CASES THAT WOULD BE PAID THROUGH THE

9   FISCAL YEAR, THAT WE WOULD ADD THE COSTS OR ADD THE REVENUE

10  BACK IN FOR THEM, WHICH WE DID AT THE END OF THE FISCAL YEAR.

11  SO THE REVISED NET COUNTY COSTS OVERAGE 63.4 MILLION. IF YOU

12  GO TO THE NEXT SLIDE, I THINK WHEN WE LOOK AT THE SHERIFF'S

13  DEPARTMENT, AND AGAIN THERE ARE SO MANY FACETS TO A BUDGET,

14  BUT THIS IS JUST AT A VERY HIGH LEVEL SCREENSHOT, ONE OF THE

15  CONCERNS IS THAT IF YOU LOOK AT THE NUMBER OF VACANT DEPUTY

16  POSITIONS GOING BACK TO WHEN THE SHERIFF FIRST STARTED,

17  DECEMBER OF '18, THERE WERE VACANT DEPUTY POSITIONS OF

18  APPROXIMATELY 477 TO NOW IN AUGUST OF 2019, THERE'S

19  APPROXIMATELY 340. AND I WILL GET INTO THOSE NUMBERS. I'LL

20  BACKTRACK IN A MOMENT, BUT THE IMPORTANT THING WHAT I WANTED

21  TO SHOW HERE IS THAT AS DEPUTY POSITIONS ARE BEING FILLED, THE

22  OVERTIME IS ESCALATING. AND SO THERE SEEMS TO BE SOMETHING

23  GOING ON WITHIN THE OVERTIME BUDGET. AND THAT WE WOULD HAVE TO

24  WORK CLOSELY WITH BOTH THE DEPARTMENT AS WELL AS THE AUDITOR-

25  CONTROLLER TO FIND OUT WHAT IS HAPPENING IN THEIR OVERTIME

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    BUDGET. BUT YOU CAN SEE FROM JULY OF '18 TO JULY OF '19, THE

2    BUDGET DID GO UP BY APPROXIMATELY 1 MILLION. ONE OF THE THINGS

3    THAT THE SHERIFF AND I HAD TALKED ABOUT, AND I THINK FROM THE

4    SHERIFF'S DEPARTMENT WHEN THE SHERIFF CAME IN, WHEN WE TALK

5    ABOUT VACANCIES, THE FORMER SHERIFF HAD LISTED THE VACANCIES

6    AT 477. AND SO AGAIN IN THE FIRST COLUMN, WE UTILIZED THE 477.

7    WITH THE CURRENT SHERIFF, WHAT HE'S SAYING -- EXCUSE ME. LET

8    ME GO BACK. ON THE VACANT DEPUTY POSITIONS, THE FORMER SHERIFF

9    WOULD SAY, ACTUALLY, IF YOU TOOK THE TWO NUMBERS, THE TRAINING

10   DEPUTIES THAT ARE GOING THROUGH THE TRAINING COURSE, THE

11   FORMER SHERIFF WOULD ACTUALLY SAY HE HAD 170 VACANCIES IN

12   DECEMBER OF 2018. HE BASICALLY ACCOUNTED FOR THE TRAINING

13   DEPUTIES TO FILL A VACANT DEPUTY SPOT. BUT WE DO UNDERSTAND

14   WHAT OUR CURRENT SHERIFF IS SAYING IS THAT THOSE SPOTS ARE NOT

15   FILLED. WE'RE STILL HOLDING THE POSITION VACANT FOR THE

16   TRAINEES TO COME OUT. SO THERE MAY BE OVERTIME NEEDED UNTIL

17   SOMEBODY ACTUALLY FILLS THE POSITION. SO WE JUST WANTED TO

18   MAKE SURE THAT WE REFLECTED ALL OF THE NUMBERS HERE. BUT,

19   AGAIN, I THINK THE TAKEAWAY FROM THIS SLIDE IS THAT THE DEPUTY

20   POSITIONS ARE DECREASING. AND THIS SHERIFF HAS DONE A GOOD JOB

21   IN FILLING THE POSITIONS. BUT, YET, OVERTIME, IS RISING. ONE

22   THING I DID NOT PUT UP, AND I WILL MENTION, AND I THINK THAT

23   IT'S BEEN A QUESTION FOR ME IS THAT, OVER THE LAST FEW YEARS,

24   THAT THE SHERIFF'S DEPARTMENT'S BUDGET PARTICULARLY IN THE

25   OVERTIME AREA HAS REALLY BEEN EXCESSIVE AND EXCEEDS ITS

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1 BIG PICTURE WHERE THE SHERIFF'S DEPARTMENT STANDS. IF YOU LOOK

2 AT ANY OTHER DEPARTMENT, THE NEXT CLOSEST DEPARTMENT WHO

3 RECEIVES NET COUNTY COSTS WOULD BE THE HEALTH DEPARTMENT. AND

4 THAT GOES DOWN TO ABOUT 10 PERCENT OF THE N.C.C. SO I JUST

5 WANTED THAT AS A FRAME OF REFERENCE. THANK YOU, MADAM CHAIR

6 AND SUPERVISORS.

7

8 **SUP. HAHN, CHAIR:** THANK YOU. DID YOU WANT THE AUDITOR-

9 CONTROLLER TO --

10

11 **SUP. SOLIS:** I WANTED TO FIRST MAKE MY STATEMENT AND THEN ASK

12 QUESTIONS.

13

14 **SUP. HAHN, CHAIR:** OKAY.

15

16 **SUP. SOLIS:** BUT WE COULD DO THAT. AND AGAIN --

17

18 **SUP. HAHN, CHAIR:** ACTUALLY, I WILL LET ALL MY COLLEAGUES SPEAK

19 AT THIS POINT. AND THEN OF COURSE, AGAIN, THANK YOU TO THE

20 SHERIFF FOR BEING HERE, AND WE'LL HAVE THE SHERIFF SPEAK AFTER

21 I LET MY COLLEAGUES SPEAK. THANK YOU.

22

23 **SUP. SOLIS:** THANK YOU, MADAM CHAIR. AND THANK YOU TO OUR

24 C.E.O. SACHI HAMAI FOR THAT BUDGET DESCRIPTION. I THINK IT'S

25 REALLY CRITICAL FOR THE PUBLIC TO UNDERSTAND HOW WE ARE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  MOST DISCONCERTING IS THAT THE ISSUE CAME UP EARLIER IN THE

2  FISCAL YEAR AS YOU OUTLINED IN YOUR PRESENTATION. THERE ARE

3  CERTAIN POINTS WHERE THE DEPARTMENT NOTIFIES THE C.E.O. WHEN

4  THERE ARE BUMPS IN THE ROAD. AND THAT'S A NORMAL PROCESS THAT

5  EVERY DEPARTMENT GOES THROUGH. BUT I BELIEVE THAT WHAT HAS

6  HAPPENED HERE IS THAT WE DIDN'T GET BACK, QUITE FRANKLY, A

7  BUDGET MITIGATION PLAN AT THESE CRUCIAL PLACES. SO, YES WE

8  IDENTIFIED THERE WERE SHORTFALLS, BUT I'M NOT SURE THAT WE GOT

9  ANYTHING BACK FROM THE SHERIFF'S TEAM IN TERMS OF ANY BUDGET

10  REMEDIES OR CORRECTIVE PLAN OF ACTION. SO THAT'S WHAT I AM

11  CONCERNED ABOUT. THAT'S WHY WE HAVE THIS MOTION HERE TODAY. I

12  KNOW THAT EVERY COUNTY DEPARTMENT, THEY DON'T OPERATE

13  INDEPENDENTLY. SO WE ALL HAVE TO LOOK AT THIS IN TERMS OF HOW

14  WE ARE ALL INTERCONNECTED BECAUSE, QUITE FRANKLY, WHEN WE HAVE

15  TO PUT GENERAL FUND MONEY IN, IT MEANS THAT WE'RE GOING TO

16  NOT, THEN, BE SPENDING ON OTHER SERVICES THAT ARE OF VITAL

17  CONCERN, SOME OF WHICH YOU HEARD ALREADY OUTLINED IN TERMS OF

18  WHAT OUR PRIORITIES ARE, HOMELESSNESS, HEALTHCARE, CHILDCARE,

19  DOMESTIC VIOLENCE, TREATMENT OF OUR CHILDREN WHO ARE CURRENTLY

20  IN OUR CHILDREN AND FAMILY SERVICES UNITS. ALL OF THOSE THINGS

21  MATTER TO US. SO WHEN ONE DEPARTMENT STRUGGLES, THAT ALSO,

22  THEN, REQUIRES US TO COME TOGETHER AS A BOARD BECAUSE WE HAVE

23  A FISCAL RESPONSIBILITY, A FIDUCIARY RESPONSIBILITY, AS WELL

24  AS OUR C.E.O., TO MAKE SURE THE BUDGET HOLD. BUT ALL I CAN

25  TELL YOU IS I WAS QUITE SURPRISED WHEN I KNOW SAW THIS

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   BALLOONING DEFICIT OCCUR, AND THAT'S WHAT CAUSED ME, THEN, TO

2   SAY WHAT ARE WE GOING TO DO    RECTIFY IT. NOT TO IMPINGE OR

3   SAY THAT SOMEBODY IS NOT DOING THEIR JOB, BUT HOW CAN WE DO IT

4   BETTER? HOW CAN WE ENSURE OR PREVENT THIS FROM HAPPENING

5   AGAIN? AND I THINK ALL OF US HERE AS A BOARD LOOK TO THE

6   C.E.O. AND HER ABLE STAFF AND OUR AUDITOR AND OUR COUNTY

7   COUNSEL IN HOW WE CAN TRY TO RECTIFY THAT AND WHAT PLANS WE

8   HAVE USED WITH OTHER DEPARTMENTS BECAUSE THIS ISN'T THE ONLY

9   ONE THAT WE'VE HAD ISSUES WITH IN THE PAST, BUT I WILL TELL

10  YOU THIS IS THE ONE THAT IS MORE STAGGERING SINCE I'VE BEEN ON

11  THIS BOARD. AND THAT'S WHY I BELIEVE THAT IT REQUIRES OUR

12  JUSTIFICATION IN MAKING SURE THAT WE DO THE RIGHT THING AND

13  THAT WE HAVE THE SUPPORT OF THE SHERIFF AND HIS STAFF AND THAT

14  WE ARE LOOKING AT NOT JUST APPLES AND ORANGES, BUT THAT WE'RE

15  UNDERSTANDING TRULY WHERE WE ARE GOING AS WE MOVE AHEAD

16  BECAUSE THE LAST THING I WANT TO SEE IS THAT WE ARE NOT

17  PROVIDING THE NEEDED SECURITY AND THE SWORN OFFICERS ON THE

18  GROUND. I THINK EVERY SINGLE ONE OF US UNDERSTANDS THAT THIS

19  ITEM BEFORE US RIGHT NOW IS NOT ABOUT TAKING AWAY THE SAFETY

20  AND SECURITY OF OUR NEIGHBORHOODS. SOME OF YOU HEARD ME A

21  LITTLE BIT EARLIER SAYING THAT I'M CONCERNED ABOUT THE

22  INCREASE IN GANG VIOLENCE IN EAST L.A., IN BASSETT, AZUSA. AND

23  IT'S HAPPENING AROUND THE COUNTY. SO THIS IN NO WAY IS A

24  MESSAGE TO SAY THAT WE DON'T WANT TO SEE COPS ON THE BEAT.

25  THIS IS IN NO WAY SAYING THAT WE WANT TO SEE SWORN OFFICERS.

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

October 1, 2019



1   ALL WE'RE SAYING IS WE WANT TO TAKE SOME REMEDIATION,

2   MITIGATION. AND WE WANT TO COME UP WITH WHAT CAN WORK BEST, TO

3   COME UP WITH EFFICIENCIES SO THAT OUR BUDGET, OUR BUDGETS THAT

4   WE HAVE TO BE INVOLVED IN AND CAREFUL STEWARDS OF BECAUSE IT'S

5   NOT OUR MONEY, IT'S THE TAXPAYERS' DOLLAR, AND THE TAXPAYERS

6   IN SOME CASES ARE UPSET THAT THEY'RE NOT GETTING THEIR FULL

7   BENEFIT OF HOW THESE DOLLARS ARE BEING SPENT. SO WE HAVE TO

8   REEL THAT IN. AND I BELIEVE THAT'S WHAT WE'RE DOING HERE

9   TODAY. I JUST WANT TO SAY THAT WE HAVE DONE, AT LEAST I

10  BELIEVE ON OUR PART, AND SACHI OUTLINED THAT,  THAT WHILE WE

11  DO HAVE THE DEFICIT OF $63.4 MILLION, THAT WE HAVE GIVEN SOME

12  GENEROUS SUPPORT TO THIS SHERIFF, INCLUDING $16 MILLION THAT

13  THE C.E.O. HAS FORGIVEN THE SHERIFF AND THINGS THAT WE ADDED

14  BECAUSE OF THE WOOLSEY FIRE. I MEAN, AS SHE JUST OUTLINED, WE

15  DON'T USUALLY GET THIS MONEY FROM THE FEDS UNTIL A YEAR LATER.

16  SO WE'RE FAST FORWARDING. WE'RE ACTUALLY ADVANCING MONEY. THAT

17  SAYS SOMETHING. THAT SAYS THAT WE CARE ABOUT THE BUDGET. AND

18  ALSO THE 10.8 MILLION IN FORGIVEN LITIGATION COSTS, THOSE ARE

19  LAWSUITS THAT ARE ALLEGED OR PUT FORWARD. NOT ALLEGED, THEY'RE

20  ACTUALLY THERE. THEY'RE REAL. AND SOMEONE HAS TO PAY FOR THEM.

21  WELL, WE'RE PAYING FOR THAT, KNOWING THAT THERE'S STILL A

22  DEFICIT. SO I JUST WANT TO MAKE CLEAR THAT WE'RE DOING A LOT

23  MORE. AND EVEN IN THIS BUDGET THAT WE'RE TALKING ABOUT RIGHT

24  NOW. WE'RE TALKING ABOUT $2 MILLION IN THE COUNTY GENERAL

25  FUNDS TO SUPPORT THE DEPARTMENT'S RECRUITMENT EFFORTS FOR

October 1, 2010

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   SHERIFF DEPUTIES. SO WE'RE NOT HOLDING BACK. WE'RE ACTUALLY

2   PUTTING IN WHAT WEEK, BUT WE'RE DOING IT I THINK IN A VERY

3   COST-EFFECTIVE MANNER. THERE'S ALSO 4.7 MILLION DOLLARS FROM A

4   VARIETY OF FUNDING SOURCES FOR 50 ADDITIONAL POSITIONS TO

5   ADDRESS THE DEPARTMENT OF JUSTICE SETTLEMENT AGREEMENT. THAT'S

6   50 MORE POSITIONS THAT WE DIDN'T HAVE. SO I WOULD SAY THAT

7   WHEN PEOPLE THINK WE'RE NOT SUPPORTING OUR SHERIFF'S

8   DEPARTMENT, I'M HERE TO SAY THAT I THINK WE'RE DOING THE VERY

9   BEST THAT WE CAN AND THAT WE WANT TO CONTINUE THAT EFFORT AND

10  BE VERY PRUDENT ABOUT IT AND MAKING SURE THAT WE HAVE THE

11  COOPERATION OF THE SHERIFF'S DEPARTMENT AND THAT WE SEND A

12  MESSAGE TO ALL OF OUR COUNTY DEPARTMENT HEADS THAT WE WON'T

13  ALLOW -- WE WON'T ALLOW FOR THIS KIND OF BALLOONING DEFICIT TO

14  GO ON. WE CAN'T. IF WE DID THAT, WHAT HAPPENS WHEN WE COME UP

15  WITH, SAY, A BAD RECESSION? AND WE'RE NOT GOING TO HAVE MONEY

16  SET ASIDE FOR THOSE PARTICULAR AREAS THAT WE KNOW ARE OF GREAT

17  CONCERN. WE HAVE THOSE OBLIGATIONS, AND THAT'S WHAT WE TAKE

18  OUR OATH SERIOUSLY TO BE ABLE TO UPHOLD. SO I THINK THERE'S A

19  GREAT DEAL OF RESPONSIBILITY THAT LAYS ON THIS BOARD AS WELL

20  AS OUR C.E.O. AND WE DO KNOW THAT THE SHERIFF HAS A

21  CONSTITUTIONAL RESPONSIBILITY TO PROTECT OUR PUBLIC HEALTH AND

22  SAFETY. SO IN NO WAY DOES THIS MOTION IN ANY WAY TRY TO

23  MINIMIZE THE PROTECTION OF SWORN OFFICERS THAT WE WOULD HAVE

24  FOR PATROL. THAT'S THE LAST THING BECAUSE I KNOW SOME OF US

25  HERE EVEN PAY OUT OF OUR OWN FUNDS TO HAVE ADDITIONAL SHERIFFS

THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    IN OUR UNINCORPORATED AREAS. I KNOW I DO. AND I'VE HAD THAT

2    CONVERSATION WITH THE SHERIFF. SO I WANT TO BETTER UNDERSTAND

3    -- SACHI, THANK YOU FOR THIS PRESENTATION, BUT COULD YOU

4    PLEASE GO OVER SOME OF THE NON-SWORN POSITIONS THAT WE'RE

5    LOOKING AT IN TERMS OF POTENTIALLY HOLDING OFF ON HIRING? CAN

6    YOU JUST DESCRIBE WHAT THAT WOULD BE?

7

8    **C.E.O. HAMAI:** SO I THINK TO ANSWER YOUR QUESTION BEST IS THE

9    POSITIONS THAT WOULD BE EXEMPT FROM YOUR MOTION. AND CLEARLY

10   IN YOUR MOTION YOU INDICATED THE EXEMPT POSITIONS WOULD BE

11   SWORN. SO THOSE WOULD BE DEPUTY SHERIFFS, SERGEANTS, ALL SWORN

12   STAFF. BUT WE WOULD ALSO EXEMPT CUSTODY ASSISTANTS,

13   CRIMINALISTS, FORENSIC IDENTIFICATION SPECIALISTS, SECURITY

14   OFFICERS, AND SECURITY ASSISTANTS. SO THE POSITIONS THAT WOULD

15   BE FROZEN ARE MORE IN THE ADMINISTRATIVE AREA.

16

17   **SUP. SOLIS:** CLERICAL, OFFICE, OR DATA INPUT IN SOME WAY?

18

19   **C.E.O. HAMAI:** CORRECT.

20

21   **SUP. SOLIS:** OKAY, I JUST WANT THE PUBLIC TO UNDERSTAND THAT

22   BECAUSE I BELIEVE THERE HAS BEEN A LOT OF MISINFORMATION ABOUT

23   WHERE THIS PARTICULAR MOTION WAS GOING. ALSO, I WANTED TO ASK

24   YOU HOW DOES THE DEFICIT IMPACT THE COUNTY'S $36 BILLION

25   BUDGET OVERALL?

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1 THE BOARD AND THE C.E.O., IT MANDATES THAT YOU'RE THE STEWARDS

2 OF THE BUDGET. AND THAT FACT IS ESTABLISHED BY THE CALIFORNIA

3 CONSTITUTION, THE COUNTY CHARTER, THE L.A. COUNTY CODE, STATE

4 LAW. YOU ARE THE STEWARDS OF THE BUDGET. OTHER LAW MANDATES

5 THAT THE BOARD AND ALL COUNTY DEPARTMENT HEADS, ELECTED OR

6 OTHERWISE, CAN ONLY SPEND THAT AMOUNT OF MONEY THAT IS

7 APPROPRIATED TO THEM PER BUDGET UNIT. AND WHEN THEY DON'T DO

8 THAT, THEN THE CONSEQUENCES ARE, AS WHAT THE C.E.O. IN THIS

9 MOTION PROPOSES TODAY, THAT MEASURES HAVE TO BE PUT IN PLACE

10 SO THAT THOSE FUNDS ARE ACCOUNTED FOR. FOR DEPARTMENT HEADS

11 WHO, YOU KNOW, GO ABOVE WHAT'S APPROPRIATE AND SPEND MORE,

12 THERE'S ALSO THE POTENTIAL THAT THEY COULD BE FACING PERSONAL

13 LIABILITY FOR DOING THAT. SO THE LAW, YOU KNOW, TREATS THAT

14 VERY SERIOUSLY. AND THERE ARE CONSEQUENCES.

15

16 **SUP. SOLIS:** OKAY, THANK YOU. I WANTED TO ASK ARLENE, OUR

17 AUDITOR-CONTROLLER ALSO, GIVEN THAT THERE'S GOING TO BE AN

18 AMENDMENT, AND IT HASN'T BEEN FULLY FLESHED OUT YET, BUT I

19 GUESS WE'LL GET TO THAT.

20

21 **SUP. HAHN, CHAIR:** YES. I HOPE YOU CONSIDER IT FRIENDLY.

22

23 **SUP. SOLIS:** YEAH. I KNOW THE CHAIR'S GOING TO TALK ABOUT ZERO-

24 BASED BUDGETING AND HOW WOULD THAT IMPACT THE SHERIFF'S BUDGET

25 IF THAT'S SOMETHING THAT WE CONSIDER.

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1

2    **ARLENE BARRERA:** SO IN LOOKING AT THE SHERIFF'S BUDGET, WE

3    WOULD NEED TO REALLY ANALYZE ALL THE COMPONENTS THAT MAKE UP

4    THE SHERIFF'S BUDGET, WHETHER IT'S SALARIES AND E.B.S, S&S,

5    LOOK WHERE THE OVERAGES ARE AND REALLY TAKE AN IN DEPTH LOOK

6    TO SEE HOW THEY'RE ACCOUNTING FOR REVENUES. ARE REVENUES

7    COMING IN? YOU TALKED EARLIER ABOUT REVENUES THAT WERE NOT

8    COMING IN, AND THAT WAS AFFECTING THEIR BUDGET. THEY DID HAVE

9    SOME ISSUES WHERE THEY HAD PROJECTED REVENUES, BUT CERTAIN

10   REVENUES REQUIRE A DEPARTMENT TO HAVE COSTS ASSOCIATED TO DRAW

11   IN THOSE REVENUES. IN CUTTING CERTAIN COSTS, THEY SHOULD HAVE

12   ALSO REDUCED REVENUES. AND THAT WOULD HAVE PROVIDED THEM WITH

13   A LITTLE MORE REALISTIC PICTURE OF WHERE THEY WERE GOING TO

14   LAND ON JUNE 30TH.

15

16   **SUP. SOLIS:** SO, IN OTHER WORDS, PERHAPS IN THE BUDGETING

17   PROCESS, THEY WERE EXPECTING TO RECEIVE A CERTAIN AMOUNT OF

18   MONEY, AND THOSE DID NOT COME IN. AND I THINK, SACHI, YOU ALSO

19   TALKED ABOUT THAT, BUT COULD YOU GIVE US A SENSE OF WHAT THAT

20   MIGHT HAVE BEEN?

21

22   **C.E.O. HAMAI:** SO THERE'S -- IN THE REVENUE CATEGORY, LET ME

23   JUST FRAME THIS. CERTAINLY, I TALKED TO THE SHERIFF ABOUT

24   THIS. AND ONE OF THE THINGS -- AND THIS IS ONLY ONE EXAMPLE IS

25   ON THE GRANT FUNDING. AND/OR IT COULD BE OUTSIDE OF THE GRANT



# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1    FUNDING. IF ANY CONTRACTS ARE CUT AND/OR GRANTS ARE NOT

2    APPLIED FOR AND THE REVENUES WERE ON THE BOOKS, THOSE REVENUES

3    NEED TO ACTUALLY BE BACKED OFF AND/OR SERVICES RELATED TO IT

4    NEEDS TO BE CUT. SO THERE IS AN EXAMPLE WHERE THE SHERIFF, AND

5    THIS IS HIS DECISION, BUT CERTAINLY HE NEEDS TO COLLABORATE

6    WITH US TO TELL US, THAT HE'S NOT APPLYING FOR CERTAIN GRANTS.

7    SO THAT, THEN, THE REVENUE CAN ACTUALLY BE REDUCED. THE OTHER

8    AREAS OF REVENUE, I WANT TO SAY, IS THAT WE CLEARLY WANT TO

9    WORK WITH THE SHERIFF'S DEPARTMENT IN TRYING TO ENSURE THAT

10   ALL CLAIMABLE REVENUE IS ACTUALLY CLAIMED. SO THERE MAY BE

11   TIMES WHERE THE SHERIFF'S DEPARTMENT HAS NOT MET THEIR REVENUE

12   TARGET BECAUSE THEY HAVE NOT CLAIMED APPROPRIATELY. SO THAT'S

13   ANOTHER AREA THAT WE WOULD REALLY HAVE TO WORK WITH BOTH

14   AUDITOR-CONTROLLER AS WELL AS THE SHERIFF'S DEPARTMENT.

15

16   **SUP. SOLIS:** THANK YOU, MADAM CHAIR. AND THANK YOU.

17

18   **SUP. HAHN, CHAIR:** THANK YOU. I HAVE KATHRYN BARGER ON THE

19   QUEUE.

20

21   **SUP. BARGER:** THANK YOU. AND ACTUALLY YOU ASKED A QUESTION

22   BECAUSE I WAS A LITTLE CONFUSED ON THE REVENUE. BUT JUST OUT

23   OF CURIOSITY, IF THE BOARD TAKES AN ACTION, SACHI, THAT

24   FLATTENS OUT, FOR EXAMPLE, COURT FEES THAT A PORTION MAY HAVE

25   GONE TO THE SHERIFF, DO WE BACKFILL INTO DEPARTMENTS WHERE IT

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   ADVERSELY AFFECTS THEM? COURT FEES LIKE WHEN THE BOARD TAKES

2   ACTIONS TO NO LONGER COLLECT COURT FEES OR THINGS WHERE THE

3   SHERIFF WOULD OTHERWISE GET IT, DO WE BACKFILL ON THAT?

4

5   **C.E.O. HAMAI:** TYPICALLY NOT. WE WOULD ASK FOR THE SERVICES TO

6   EITHER BE REDUCED AND/OR, WITH COURT FEES, I DON'T KNOW IN

7   TERMS OF WE WOULD NOT BACKFILL. THIS IS A BOARD POLICY. WE

8   WOULD NOT BACKFILL ANY KIND OF FEDERAL AND/OR STATE FUNDING

9   THAT WAS COMING IN.

10

11  **SUP. BARGER:** COMPARED TO THE OVERALL BUDGET, IT'S A SMALL

12  AMOUNT. BUT THAT'S AN EXAMPLE. AND THEN E.V.O.C., THE TRAINING

13  FOR THE TRAINING ACADEMY THAT'S SUPPOSED TO BE SLATED I KNOW

14  IS NOT BUDGETED.

15

16  **C.E.O. HAMAI:** BUT I WILL JUST, SAY WITH RESPECT TO E.V.O.C.,

17  THE SHERIFF IS SITTING ON OVER $10 MILLION THAT HE HAS NOT

18  SPENT ON E.V.O.C. THAT HAS BEEN BUDGETED AT LEAST FOR TWO, IF

19  NOT THREE YEARS.

20

21  **SUP. BARGER:** BUT I THINK IT'S IMPORTANT FOR OUR RISK MANAGERS

22  TO BE INVOLVED WITH THE DISCUSSIONS BECAUSE WHEN WE'RE TALKING

23  ABOUT THE LAWSUITS, A LOT OF THAT HAS TO DO WITH DRIVING. AND

24  IF WE'RE NOT PROPERLY TRAINING OUR DEPUTIES, IT'S A LIABILITY.

25  I'M GOING ON RECORD STATING THAT I'M CONCERNED ABOUT THAT

**THE MEETING TRANSCRIPT**
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

October 1, 2019



1  LIABILITY AS IT RELATES TO TRAINING, PROPERLY TRAINING THE

2  DEPUTIES.

3

4  **SUP. HAHN, CHAIR:** TELL THE LISTENERS AT HOME WHAT E.V.O.C. IS.

5

6  **SUP. BARGER:** IT STANDS FOR, I DON'T KNOW. [LAUGHTER.] NO, I

7  ACTUALLY ASKED MY STAFF. WE JUST ALWAYS REFER TO IT AS

8  E.V.O.C. BUT IT'S CAR TRAINING FOR SHERIFF'S DEPUTIES AND

9  OTHER PERSONNEL AND ACTUALLY FOR PEOPLE I THINK IN THE D.A.S,

10  AS WELL. DO YOU KNOW WHAT I STANDS FOR?

11

12  **SPEAKER:** EMERGENCY VEHICLE OPERATION CENTER.

13

14  **SUP. BARGER:** THERE YOU GO, COMMONLY REFERRED TO IT AS E.V.O.C.

15

16  **SUP. HAHN, CHAIR:** FOR OUR LISTENERS AT HOME. WE OF COURSE ALL

17  KNEW THAT.

18

19  **SUP. BARGER:** YEAH, I KNOW. SO I CAN CERTAINLY APPRECIATE

20  WANTING TO BE FISCALLY PRUDENT AND TRIPLE CHECKING THE BOOKS

21  AND EFFICIENCIES. I MEAN WE ALL AGREE THAT'S A NECESSITY. THE

22  DEFICIT WOULD NOT COME AS A SURPRISE IF ALL INVOLVED WERE

23  DOING OUR PART. WE SHOULD HAVE ACTIVELY BEEN WORKING TO

24  ADDRESS THIS BEFORE WE HIT THIS AMOUNT. I KNOW WE TALKED ABOUT

25  THAT, SHERIFF, AND MOVING FORWARD THAT'S A COMMITMENT YOUR

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   DEPARTMENT HAS MADE. AND I APPRECIATE IT. BUT THIS PROBLEM IS

2   NOT A NEW ONE. AND I BRING THIS UP, AND I'VE SAID IT. THE

3   SHERIFF AND C.E.O.S AND BOARDS BEFORE US HAVE ALL GRAPPLED

4   WITH THE DEFICITS AND HOW TO RECONCILE THEM. THIS TIME THE

5   DEFICIT GREW VERY QUICKLY, WHICH WAS A RED FLAG FOR THE C.E.O.

6   AND FOR THIS BOARD. BUT I WOULD SAY THAT WHEN THIS HAS

7   HAPPENED IN THE PAST, THERE HAVE BEEN AUDITS CONDUCTED. IN

8   2003, WE OFFERED RECOMMENDATIONS AND ADDITIONAL AUDIT

9   CONDUCTED IN 2013 TO DO THE SAME, BOTH OF WHICH WERE DONE BY

10  OUTSIDE CONSULTANTS. I FEAR THAT WE WILL CONTINUE TO STUDY AN

11  AUDIT WITHOUT APPROPRIATE FOLLOW-THROUGH. I'M ALL FOR LOOKING

12  AT THIS. AND I DID NOT KNOW THAT YOU HAD A FRIENDLY AMENDMENT,

13  BUT I WOULD SAY THAT WE HAVE AUDITS THAT CURRENTLY I DON'T

14  THINK HAVE FULLY BEEN IMPLEMENTED. I COULD BE WRONG. AND I'D

15  LIKE TO KNOW THAT. I WANT TO UNDERSTAND WHAT THE REAL

16  INVESTMENT IS ON PRIOR AUDITS, AND IF WE DO IMPLEMENT, WHAT

17  ARE THE EXPERTS RECOMMENDING BASED ON THOSE PAST AUDITS. I

18  THINK IT'S IMPORTANT FOR US TO RECONCILE THAT AND SEE WHERE WE

19  MIGHT BETTER ALIGN THE C.E.O. AND THE SHERIFF WITH THE OVERALL

20  BUDGET. I BELIEVE IT IS BENEIFICAL TO HAVE THE C.E.O., THE

21  AUDITOR-CONTROLLER, AND THE SHERIFF TO REVIEW THESE AUDITS. I

22  DON'T KNOW IF YOU'VE SEEN THEM, SHERIFF VILLANUEVA, BUT I

23  THINK IT WOULD BE BENEFICIAL FOR YOUR TEAM TO TAKE A LOOK AT

24  THOSE. I ALSO WANT TO SAY I'M LOOKING AT THE BUDGET AUTHORITY

25  FOR THE BOARD OF SUPERVISORS, AND, MARY, IT SAYS THAT THE

# THE MEETING TRANSCRIPT
### OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   C.E.O. IS ALSO RESPONSIBLE -- THE BOARD OF SUPERVISORS AND

2   C.E.O. IS ALSO RESPONSIBLE FOR THE SUPERVISION AND

3   EXPENDITURES OF ALL DEPARTMENTS INCLUDING THE SHERIFF. HOW

4   DOES THAT WORK WHEN, IN THE PAST, WE ALLOCATE THE FUNDING AND

5   THEN THERE IS DISCRETIONARY FUNDING FOR THE SHERIFF, CORRECT?

6   SO HOW DO WE ENSURE OR HOW DO WE SUPERVISE THAT?

7

8   **ATTORNEY:** UNDER GOVERNMENT CODE 25-303 THE BOARD SHALL MONITOR

9   ALL COUNTY OFFICIALS, DEPARTMENT HEADS, AND, AMONG OTHER

10  THINGS, THE MANAGEMENT AND THE ALLOCATION OF RESOURCES. SO

11  IT'S A PARTNERSHIP.

12

13  **SUP. BARGER:** SO ONE COULD SAY THAT LIKE WHEN THE SHERIFF MEETS

14  WITH C.E.O. STAFF, THAT'S A FORM OF SUPERVISION WITH THE OTHER

15  BOARD OFFICES?

16

17  **ATTORNEY:** YES.

18

19  **C.E.O. HAMAI:** SUPERVISOR, I THINK THAT'S WHY WE HAVE VARIOUS

20  CONTROLS AND CHECKS IN PLACE. SO WHEN I SHOWED THAT FIRST

21  SCREEN ABOUT THE BUDGET SUMMARY REPORTS, THAT'S ONE CHECK, SO

22  WE COULD SEE WHERE THE DEPARTMENT IS PROJECTING TO COME IN

23  THROUGHOUT THE YEAR. SO AGAIN IT'S THE FIFTH MONTH BUDGET

24  SUMMARY, SEVENTH MONTH, NINTH MONTH, 11 MONTH, AND THEN WE

25  CLOSE. TYPICALLY, RIGHT AROUND SEVENTH MONTH, WE ARE REVIEWING

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1

2    **C.E.O. HAMAI:** I JUST WANT TO MAKE MAKE A POINT ABOUT THE

3    UNINCORPORATED AREA PATROLS. I HAVE HEARD THAT PERHAPS, LIKE

4    YOU, SUPERVISOR, THAT THERE WAS SOME TALK OF DOING REDUCTIONS

5    IN THE UNINCORPORATED AREA PATROLS. ACTUALLY, THAT WOULD NOT

6    FACILITATE ANY SAVINGS FOR THE DEPARTMENT. BASICALLY, YOUR

7    UNINCORPORATED AREA PATROLS ARE FUNDED THROUGH A DIFFERENT

8    SOURCE. IT'S NOT THROUGH THE NET COUNTY COSTS. IT'S THROUGH

9    PROP 172 FUNDS. SO REALLY, AGAIN, I THINK THAT THERE'S THIS

10   WHOLE MECHANISM OF WHERE WE NEED TO COLLABORATE WITH THE

11   SHERIFF'S DEPARTMENT ON WHATEVER DEFICIT MITIGATION PLAN IS.

12   THAT'S WITHIN HIS PURVIEW, BUT WE WOULD LIKE TO ENSURE THAT

13   WHAT DECISIONS HE MAKES REALLY DOES HAVE AN IMPACT ON TRYING

14   TO CONTROL HIS BUDGET.

15

16   **SUP. BARGER:** OKAY. AGAIN, I APPRECIATE WHY WE'RE DOING THIS,

17   AND I SUPPORT IT BECAUSE IT IS NECESSARY TO ENSURE THAT WE ARE

18   PROTECTING TAXPAYER DOLLARS, ESPECIALLY WHEN IT COMES TO

19   SPENDING. BUT I  WANT TO EMPHASIZE THAT I WANT TO SHERIFF TO

20   BE A PARTNER WITH US. AGAIN, YOU'VE COME AND TALK TO MY

21   OFFICE. YOU CAME AND TALK TO ME. AND THAT IS A COMMITMENT

22   YOU'VE MADE MOVING FORWARD. AND I THINK IT'S IMPORTANT

23   BECAUSE, AT THE END OF THE DAY, WE'RE ALL REPRESENTING THE

24   SAME CONSTITUENCY, AND THEY EXPECT US TO WORK TOGETHER TO

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   **ARLENE BARRERA:** NO, SIR.

2

3   **SUP. RIDLEY-THOMAS:** IT GETS DEEPER WITH EVERY DIMENSION YOU

4   SHARE WITH US. YOU DID SAY A MISDEMEANOR?

5

6   **ARLENE BARRERA:** YES, SIR.

7

8   **SUP. RIDLEY-THOMAS:** MADAM CHAIR.

9

10  **SUP. HAHN, CHAIR:** THANK YOU. SUPERVISOR KUEHL.

11

12  **SUP. KUEHL:** THANK YOU, MADAM CHAIR. I THINK MUCH HAS BEEN

13  SAID. AND I KNOW THAT FOURTH ESTATE ALONG WITH A NUMBER OF

14  CIVILIANS HAVE ASKED ME IS THIS A PERSONAL THING BECAUSE WE

15  UNDERSTAND THE BOARD AND THE SHERIFF ARE NOT GETTING ALONG. I

16  MET WITH THE SHERIFF YESTERDAY, AND I ASSURED HIM THIS WAS

17  CERTAINLY NOT PERSONAL. I THINK WE EACH TAKE OUR DUTIES VERY

18  SERIOUSLY. AND ONE OF THE DUTIES THAT I TAKE VERY SERIOUSLY ON

19  THE BOARD IS THE BUDGET AND HOW WE MUST STAY WITHIN IT. WE

20  HAVE 38 DEPARTMENTS. ONLY ONE OF THEM HAS ENDED THE YEAR WITH

21  A DEFICIT. THE OTHERS WERE -- COULD HAVE BEEN HEADED THAT WAY,

22  AND THEY ASKED FOR HELP. AND WE SAY HERE ARE STEPS YOU CAN

23  AVOID A DEFICIT. PUT ON YOUR BIG BOY PANTS AND TAKE THOSE

24  STEPS AND AVOID A DEFICIT. AND THEY DO. WE HAVE SEEN THE

25  HEALTH DEPARTMENTS PULL THEMSELVES OUT OVER THE DECADES. WE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    ENDING UP WITH A DEFICIT AGAIN AND HOW TO DEAL WITH THESE

2    ISSUES. I UNDERSTAND THAT IT FEELS THAT THERE ARE POSITIONS

3    THAT MUST BE FILLED. THAT'S WHAT I HEAR FROM ALL 38

4    DEPARTMENTS. AND PUBLIC HEALTH HAS A MEASLES OUTBREAK, FOR

5    INSTANCE, AND THEY'RE LOOKING AT NEEDING WHAT THEY CAN DO TO

6    MEET IT, BUT THEY DIDN'T FINISH WITH A DEFICIT. SO THESE ARE

7    SOMEWHAT SMALL STEPS, AND I THINK RESPONSIBLE STEPS ON THE

8    PART OF THE BOARD, I HOPE NOT TOO ONEROUS. I ECHO MY

9    COLLEAGUE'S HOPES THAT WE CAN WORK TOGETHER AND MAKE CERTAIN

10   THAT THE DEPARTMENT DOES NOT END IN DEFICIT POSITION AGAIN,

11   BUT THAT WE ALL MUST TAKE RESPONSIBILITY FOR STAYING WITHIN A

12   BUDGET NO MATTER WHAT THE NEED LOOKS LIKE. THAT'S WHAT WE DO.

13   YEARS AND YEARS AGO, YOU MAY REMEMBER, SHERIFF, THERE WAS A

14   REAL SETBACK FOR THE COUNTY IN TERMS OF MONEY COMING IN.

15   EVERYBODY, EVERYBODY HAD TO SEE WHAT THEY COULD DO. THERE WAS

16   JUST NO WAY TO SAY, "WELL I NEED MORE AND THE REST OF YOU CAN

17   ALL CUT YOUR BUDGETS." SO IN THAT SPIRIT, I HOPE THAT WE WILL

18   COME TO A RAPPROCHEMENT ON THIS AND BE ABLE TO LOOK FORWARD.

19   AND I LOOK FORWARD TO THE PLAN THAT WE HAVE REQUESTED FOR

20   MOVING FORWARD AND TAKING CARE OF THIS. AND I THANK THE C.E.O.

21   AND HER STAFF FOR THE WORK THEY'VE DONE ON IT. I CERTAINLY

22   THANK THE AUDITOR-CONTROLLER FOR THE WORK SHE'S GOING TO DO

23   WITH THEM AS WELL AS THE WORK SHE'S DONE. THANK YOU, MADAM

24   CHAIR.

25

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   **SUP. HAHN, CHAIR:** THANK YOU, SUPERVISOR KUEHL. AND, AGAIN,

2   CLEARLY, EVERYONE CAN UNDERSTAND THE -- LITTLE BIT OF A

3   DIFFICULTY I KNOW FOR ME PERSONALLY BECAUSE AS SUPERVISOR

4   RIDLEY-THOMAS STARTED OUT BY SAYING, YOU KNOW, OUR PUBLIC

5   SAFETY DEPARTMENTS HAVE ALMOST BEEN A SACRED COW IN THE

6   COUNTY. AND I SORT OF FEEL THAT WAY FOR ME AND MY COMMUNITIES,

7   AND I'VE TOLD THE SHERIFF THIS MANY TIMES, THEIR NUMBER ONE

8   ISSUE IS PUBLIC SAFETY. THEIR NUMBER ONE COMPLAINT ABOUT THE

9   SHERIFF'S DEPARTMENT IS THEY DON'T HAVE ENOUGH DEPUTIES IN

10  THEIR COMMUNITIES. THEY ALWAYS WANT TO SEE MORE. THEY HAVE

11  GOOD RELATIONSHIPS WITH THEIR DEPUTIES. AND I KNOW, AS

12  SUPERVISOR SOLIS SAID, I, TOO, HAVE PAID OUT OF MY

13  DISCRETIONARY BUDGET. I OWN SOME SHERIFF'S DEPUTIES IN MY

14  UNINCORPORATED COUNTY. BUT IT IS SOMETHING THAT IS ALWAYS

15  APPRECIATED. AND HONESTLY WHEN WE TALK ABOUT OUR CREDIT

16  RATING, AND WE TALK ABOUT OUR ECONOMY, TO BE HONEST, YOU KNOW,

17  PUBLIC SAFETY IS THE REASON MANY TIMES OUR ECONOMY IS DOING

18  WELL. WE KNOW THAT WE HAVE INVESTMENTS. WE HAVE MORE

19  BUSINESSES THAT LOCATE HERE. WE HAVE MORE CORPORATIONS THAT

20  WANT TO HOUSE THEIR EMPLOYEES HERE BECAUSE THERE'S A FEELING

21  THAT WE DO HAVE GOOD PUBLIC SAFETY AND THAT OUR SHERIFF'S

22  DEPARTMENT DOES PROVIDE GOOD PUBLIC SAFETY FOR COMMUNITIES.

23  FOR ME, IT IS SORT OF ONE OF THE NUMBER ONE PRIORITIES. BUT AS

24  PUBLIC SAFETY IS ALSO THE FIRE DEPARTMENT, AND AS SUPERVISOR

25  KUEHL MENTIONED, OUR FIRE CHIEF DID COME IN WITH A MITIGATION



THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1    CITIES. AND THAT IS SOMETHING WE'VE TALKED ABOUT NEED TO

2    REALLY DRILL DOWN ON IN TERMS OF THESE CONTRACT CITIES WHO ARE

3    INVOLVED IN THE CONTRACT AND WHETHER OR NOT WE'RE GETTING THE

4    MONEY THAT WE SHOULD BE GETTING FROM THEM. ALSO PROP 172, WE

5    DIDN'T GET ABOUT 32 MILLION THAT WE THOUGHT WE WOULD BE

6    GETTING. SO THERE'S AREAS. AND THE SHERIFF TALKED TO ME ABOUT

7    THE BAILIFFS IN OUR COURT AND HOW THERE'S A CAP FROM THE STATE

8    ON HOW MUCH THEY REIMBURSE US FOR THAT. THAT'S SOMETHING I

9    WOULD LIKE TO SEE THE COUNTY BE AGGRESSIVE ON IN TERMS OF OUR

10   LEGISLATIVE AGENDA, TALKING TO THE STATE ABOUT WHETHER OR NOT

11   THAT'S A REALISTIC NUMBER THAT THEY'RE REIMBURSING US FOR IF,

12   IN FACT, WE'RE PROVIDING MORE COURT SERVICES, NECESSARY COURT

13   SERVICES, BUT YET WE'RE NOT GETTING REIMBURSED FOR THAT. SO I

14   THINK, FOR ME, SHERIFF, I'M HOPEFUL THAT, YOU KNOW, AS FAR AS

15   I'M CONCERNED, I DON'T HAVE A FEUD WITH YOU. I HOPE YOU SEE

16   THIS MORE AS AN OPPORTUNITY FOR US TO REALLY WORK TOGETHER.

17   WE'RE PARTNERS. WE NEED YOU. YOU NEED US. MY COMMUNITIES NEED

18   THE SERVICES THAT THE SHERIFF'S  DEPARTMENT PROVIDES BUT MY

19   COMMUNITIES ARE ALSO GOING TO HOLD ME ACCOUNTABLE FOR BEING

20   FISCALLY RESPONSIBLE. SO IT SEEMS TO ME WE'RE MISSING AND

21   OBVIOUSLY WOULD LOVE TO HAVE YOU ADDRESS US, MISSING PIECE FOR

22   ME IS THIS PLAN THAT I THINK YOU COULD START PUTTING TOGETHER,

23   AND IT SOUNDS LIKE IF THERE'S SOME PLACES EVEN THAT ARE MAYBE

24   A LITTLE DIFFERENT THAN THE INITIATIVE TODAY, THAN THE

25   DIRECTIVES. IT'S SOMETHING THAT, AGAIN, WE CAN WORK ON AND SEE

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    KNOW IS LINGERING WITH SOME OF OUR CITIES THAT WE REPRESENT,

2    CONTRACT CITIES IN PARTICULAR. WE'VE HAD THAT ISSUE REGARDING

3    LIABILITY WITH INSURANCE THAT OUR CONTRACT CITIES HAVE TO COME

4    UP WITH. THIS WAS NOTHING NEW, BUT IT'S REAL. SO WHAT KINDS OF

5    INDICATIONS CAN WE GIVE TO THOSE CITIES THAT ARE CONTRACTING

6    THAT LIABILITY IS REALLY GOING TO BE TAKEN SERIOUSLY, AND

7    WE'RE GOING TO MAKE EVERY EFFORT TO BRING THAT DOWN? OUR

8    AGENDA TODAY, WE'RE GOING TO HAVE TO MAKE SOME DECISIONS ON

9    LIABILITY WITH RESPECT TO THE SHERIFF. SO I WOULD JUST ASK US

10   TO REALLY THINK ABOUT THAT BECAUSE THAT IS ONE SORE POINT FOR

11   SOME OF US, OR AT LEAST FOR ME WHERE I KNOW MONIES COULD BE

12   BETTER SPENT. IF WE DO GOOD TRAINING, THEN WE DON'T HAVE TO

13   RELY ON GENERAL FUND MONEY TO PAY OUT FOR LIABILITY TO KEEP

14   OUR CITIES ENGAGED WITH US SO THEY'LL CONTINUE TO WANT TO

15   CONTRACT WITH US. AND ALSO HAVE THE APPROPRIATE LEVEL OF

16   STAFF, NOT ONLY IN THE CONTRACT CITIES, BUT IN THE

17   JURISDICTION CURRENTLY PROVIDED OR SHOULD BE PROVIDED BY OUR

18   SHERIFFS. AND I SAY THAT BECAUSE I'VE HAD SEVERAL DIFFERENT

19   EXPERIENCES IN THE EAST L.A. AREA WHERE SOME OF MY OWN

20   CONSTITUENTS THERE ARE TROUBLED THAT NOT ENOUGH SHERIFFS ARE

21   PATROLLING IN THE UNINCORPORATED AREA BECAUSE THEY'RE DEPLOYED

22   OUT TO CONTRACT CITIES BECAUSE OF SHORTAGES OR WHAT HAVE YOU.

23   BUT THERE'S TWO DIFFERENT THINGS GOING ON. AND I THINK THAT

24   WHEN WE DO TAKE A LOOK AT ALL THESE REFORMS, THOSE ASPECTS



# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS

1  HAVE TO BE TAKEN SERIOUSLY, AND WE MUST COME UP WITH A PLAN OF

2  ACTION FOR THAT.

3

4  **SUP. HAHN, CHAIR:** CORRECT.

5

6  **SUP. SOLIS:** SO I ALSO WOULD STATE THAT FOR THE RECORD, MADAM

7  CHAIR.

8

9  **SUP. HAHN, CHAIR:** AGAIN, IT WILL BE HELPFUL TO HAVE THE

10 AUDITOR-CONTROLLER LOOKING AT THE -- HOW WE DO BILL OUR

11 CONTRACT CITIES BECAUSE, AGAIN, IT WAS BROUGHT TO MY ATTENTION

12 THAT THERE MIGHT BE SOME AREAS WHERE WE COULD DO A BETTER JOB

13 ON HOW WE BILL SO THAT WE CAN COLLECT THE REVENUE THAT IS

14 COMING TO US FOR CONTRACTING FOR OUR SHERIFF'S DEPARTMENT.

15 SHERIFF, WE'D LOVE TO HAVE YOU ADDRESS, MAYBE.

16

17 **SHERIFF VILLANUEVA:** GOOD AFTERNOON, EVERYONE. THANK YOU FOR

18 THE OPPORTUNITY TO ADDRESS THE BOARD ON THE IMPORTANT ISSUE OF

19 THE SHERIFF'S BUDGET AND PUBLIC SAFETY. I WANT TO THANK

20 SUPERVISORS KUEHL, HAHN, AND BARGER FOR THE OPPORTUNITY TO

21 MEET WITH YOU INDIVIDUALLY YESTERDAY. AND I LOOK FORWARD TO

22 THE OCCASION WHEN BOTH SUPERVISORS RIDLEY-THOMAS AND SOLIS YOU

23 ARE AVAILABLE TO ALSO HAVE THIS ONE-ON-ONE MEETING. IT'S VERY

24 IMPORTANT. FIRST AND FOREMOST, PUBLIC -- AND ACTUALLY BEFORE I

25 GET INTO THAT, (SPEAKING SPANISH). FIRST AND FOREMOST, PUBLIC

# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   SAFETY IS THE REASON THE LOS ANGELES COUNTY SHERIFF'S

2   DEPARTMENT EXISTS, AND IT SHOULD BE THE NUMBER ONE PRIORITY OF

3   ALL LEVELS OF GOVERNMENT, BE IT LOCAL, STATE, OR FEDERAL. WE

4   ARE CURRENTLY THE MOST UNDERSTAFFED LAW ENFORCEMENT AGENCY IN

5   THE ENTIRE UNITED STATES WITH 816 SWORN VACANCIES AND A PER

6   CAPITA DEPUTY-TO-RESIDENT RATIO OF 0.9 DEPUTIES FOR EVERY

7   1,000 RESIDENTS, WHICH IS 2-1/2 TIMES LESS THAN THE AVERAGE OF

8   2.5. WE INHERITED A BUDGET DEFICIT OF $47 MILLION FROM MY

9   PREDECESSOR, WHICH, COUPLED WITH STRUCTURAL DEFICITS IN TRIAL

10  COURT FUNDING, SWORN VACANCIES, RETIREE HEALTHCARE, WORKERS'

11  COMPENSATION, AND UNFUNDED MANDATES SUCH AS THE ROSAS

12  SETTLEMENT, LEAVES US SEVERELY UNDERFUNDED, AS WELL. AS

13  SHERIFF, I WILL DO MY PART TO ENSURE WE CONTINUE TO PROVIDE

14  CRITICAL PUBLIC SAFETY SERVICES AS WE SEEK TO REIGN IN THESE

15  STRUCTURAL DEFICITS. I WILL ASK YOU, AS A BOARD, TO FUND THE

16  TRUE COST OF PROVIDING THE CRITICAL SERVICES WE DO ACROSS ALL

17  OF OUR PATROL, INVESTIGATIVE, SECURITY, AND CUSTODIAL

18  OBLIGATIONS THAT COVER THE ENTIRE COUNTY OF LOS ANGELES. OUR

19  OPERATIONS ARE AN OPEN BOOK. AND IF ANYONE CAN IDENTIFY WHAT

20  CAN BE IMPROVED UPON, WE'RE OPEN TO CONSTRUCTIVE CRITICISM AND

21  A COLLABORATIVE EFFORT IN DELIVERING PUBLIC SAFETY SERVICES

22  EFFECTIVELY AND COST CONSCIOUSLY. THIS PUBLIC FORUM MAY NOT BE

23  THE MOST APPROPRIATE VENUE TO DO THE HARD WORK OF IDENTIFYING

24  WHAT ACTIVITIES SHOULD BE FUNDED AND AT WHAT LEVELS. SO

25  PERHAPS WE ALL NEED TO COLLABORATIVELY WORK TOGETHER TO



1   ADDRESS THESE CHANGES GOING FORWARD. THE COUNTY'S BUDGET, LIKE

2   ANY PUBLIC BUDGET, IS A POLITICAL DOCUMENT THAT SPEAKS TO THE

3   FUNDING PRIORITIES OF EACH MEMBER OF THE BOARD. I WANT TO

4   ENCOURAGE EACH AND EVERY ONE OF YOU TO COMMIT YOUR OFFICE TO

5   FUNDING THE TRUE COST OF PROVIDING PUBLIC SAFETY, WHICH IS

6   APPROXIMATELY 3.9 BILLION IN TODAY'S DOLLARS. I WILL COMMIT

7   MYSELF TO PROVIDING THAT SAFETY TO THE PUBLIC WHO DESERVES

8   NOTHING LESS. THANK YOU. NOW, I WANT TO INTRODUCE UNDERSHERIFF

9   TIM MURAKAMI, OUR BUDGET DIRECTOR CONRAD MEREDITH, AND

10  DIRECTOR OF PERSONNEL CAPTAIN JOHN MCBRIDE WILL PROVIDE

11  ANSWERS TO ANY QUESTIONS YOU HAVE SPECIFICALLY ON THIS MOTION

12  AND THE IMPACT ON THE DEPARTMENT'S OPERATIONS. AND

13  UNFORTUNATELY, I HAVE OTHER APPOINTMENTS THAT I HAVE TO ATTEND

14  TO, BUT YOU'RE IN CAPABLE HANDS WITH THEM. THANK YOU.

15

16  **SUP. HAHN, CHAIR:** THANK YOU. THANK YOU, SHERIFF. MR. MURAKAMI,

17  DO YOU WANT TO SPEAK TO ANYTHING? OR ARE YOU JUST HERE TO

18  ANSWER QUESTIONS?

19

20  **UNDERSHERIFF MURAKAMI:** I'M HERE TO ANSWER QUESTIONS, BUT I'LL

21  LET YOU KNOW THAT WE RESPECT THE POSITION OF THE BOARD AND

22  C.E.O. AND WE'RE GOING TO DO OUR UTMOST TO WORK WITH YOU IN

23  LOWERING OUR COST FACTOR. AND THAT'S I THINK THE GOAL WHAT

24  WE'RE HERE FOR, RECOGNIZING SOME COSTS SO WE CAN MAYBE REDUCE

25  AND BE AS EFFECTIVE AS POSSIBLE. BUT THANK YOU.

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  **CONRAD MEREDITH:** WORKERS' COMPENSATION, RETIREE HEALTH,

2  SEPARATION PAYMENTS, (INAUDIBLE) EARNINGS PAY INCREASED A

3  TOTAL 27 MILLION IN ONE FISCAL YEAR.

4

5  **SUP. BARGER:** I KNOW WE HAD THIS DISCUSSION. RETIREE HEALTH IS

6  NOT UNIQUE TO THE SHERIFF'S DEPARTMENT. THAT'S SPREAD ACROSS

7  ALL DEPARTMENTS. BUT TO YOUR POINT, I MEAN I'D SAY TWO WRONGS

8  DON'T MAKE A RIGHT. IF WE KNEW  THIS WAS WAS A PROBLEM LAST

9  YEAR, WE SHOULD HAVE BEEN ROLLING UP OUR SLEEVES, WE,

10  COLLECTIVELY, THE SHERIFF, WITH THE C.E.O., WITH OUR STAFF TO

11  ADDRESS THAT BECAUSE  IT'S OBVIOUS TO ME THAT YOU KNEW AND

12  KNOW THAT THIS HAS BEEN AN ISSUE. AND MAYBE THE AUDIT IS GOING

13  TO HELP ADDRESS THAT.

14

15  **CONRAD MEREDITH:** ABSOLUTELY.

16

17  **SUP. BARGER:** BECAUSE I DON'T THINK I WANT TO BE IN THIS ISSUE

18  NEXT YEAR. I DON'T THINK YOU DO EITHER.

19

20  **CONRAD MEREDITH:** RIGHT, IT HAS BEEN AN ISSUE. WE'VE JUST BEEN

21  ABLE TO ABSORB THESE COST INCREASES UNTIL  LAST TWO FISCAL

22  YEARS. SO NOW WE'VE REACHED A POINT WHERE WE JUST CAN'T ABSORB

23  THE INCREASES.

24

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1   GENERAL, AND I THINK AS THE AUDITOR DOES MORE OF A FORENSIC

2   AUDIT OR A ZERO-BASED BUDGET, YOU WILL START TO IDENTIFY OTHER

3   AREAS THAT ARE IMPACTING THE BUDGET VERSUS THESE.

4

5   **SUP. HAHN, CHAIR:** OKAY. WELL, AND THEN MY LAST COMMENT IS --

6   AND THIS HAS BEEN AN AGE-OLD ISSUE, TOO. AND THAT IS CONTRACT

7   CITIES VERSUS UNINCORPORATED. AND I KNOW THAT, AT ONE TIME,

8   BEFORE THIS BOARD, THE OTHER SUPERVISORS HAD WANTED TO ENTER

9   INTO A CONTRACT FOR UNINCORPORATED AREAS WITH THE SHERIFF SO

10  THAT YOU COULD PURCHASE AND ENSURE THAT YOU HAD THAT COVERAGE.

11  AND I THINK COUNTY COUNSEL SAID THAT THAT WAS NOT BECAUSE OF

12  SOME CHARTER, WE COULDN'T ENTER INTO A CONTRACT WITH THE

13  SHERIFF ON THIS. BUT ONCE AGAIN, WE ARE TALKING ABOUT THE FACT

14  ARE WE PROVIDING ACCURATE AND FAIR COVERAGE TO UNINCORPORATED

15  AREAS. AND I WILL TELL YOU, AS SOMEONE WHO LIVES ADJACENT TO

16  UNINCORPORATED, THE ANSWER IS NO. AND SO I WOULD LIKE, AT SOME

17  POINT, FOR US TO BEGIN DIALOGUE AS IT RELATES TO HOW DO WE

18  ENSURE THAT WHEN -- WHILE CONTRACT CITIES ARE AN IMPORTANT

19  PARTNER, I MEAN I'VE GOT CITIES, A LOT OF MY CITIES, ACTUALLY,

20  THAT CONTRACT WITH THE SHERIFF, WE NEED TO ENSURE THAT WE ARE

21  PROVIDING ADEQUATE RESOURCES, APPLES TO APPLES, FOR THE

22  UNINCORPORATED AREAS. AND THAT IS SOMETHING THAT I'M GOING TO

23  WORK WITH MY STAFF TO BRING SOMETHING FORWARD WORKING WITH THE

24  SHERIFF BECAUSE IF WE'RE NOT RECOVERING COSTS, AND SUPERVISOR

25  SOLIS YOU'RE ABSOLUTELY RIGHT, LIABILITY IS KEY. THE CONTRACT

# THE MEETING TRANSCRIPT

OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1  **C.E.O. HAMAI:** YEAH, I WOULD JUST LIKE TO MAKE THIS COMMENT.

2  WHILE THIS IS CERTAINLY A  FREEZE ON THE CIVILIAN SIDE, IT

3  DOES NOT STOP THE SHERIFF FOR PUTTING FORWARD A REQUEST TO THE

4  DEPARTMENT TO SAY THIS IS A CRITICAL NEEDED POSITION THAT WILL

5  IMPACT PUBLIC SAFETY. AND IF THAT'S THE CASE, WE WOULD TAKE A

6  LOOK AND REVIEW IT TO ENSURE --

7

8  **SUP. HAHN, CHAIR:** AND THEN WOULD WE HAVE TO COME BACK?

9

10  **C.E.O. HAMAI:** NOT BEFORE THE BOARD, YOU'RE GIVING US, THROUGH

11  THIS MOTION, DELEGATED AUTHORITY. SO IT WOULD NOT PREVENT THEM

12  FROM PUTTING THAT FORWARD TO US.

13

14  **SUP. SOLIS:** I WOULD AGREE WITH THAT. THERE'S NO WAY THAT WE

15  WANT TO STOP A GOOD THING THAT IS GOING ON.

16

17  **C.E.O. HAMAI:** CORRECT.

18

19  **SUP. SOLIS:** SO I THINK LOGICAL PEOPLE, RATIONAL PEOPLE, COULD

20  WORK ON THAT. SO THAT'S THE WHOLE POINT OF THIS WHOLE MOTION.

21  I THINK IT WAS UNDERSCORED BY MANY HERE. WE NEED TO

22  COLLABORATE. I'M GLAD TO HEAR YOU SAY THAT. I WISH THE SHERIFF

23  WOULD REALLY MEAN IT AND DO MORE ABOUT IT. I WASN'T HAPPY THAT

24  HE SAID HE WAS DISAPPOINTED THAT HE WASN'T ABLE TO SEE ME

25  YESTERDAY. BUT YESTERDAY, I WAS WITH MY CITIES, CONTRACT

# THE MEETING TRANSCRIPT
OF THE MEETING OF THE LOS ANGELES COUNTY BOARD OF SUPERVISORS



1    CITIES. AND HE HAD ONE OF HIS OFFICERS THERE, SERGEANT

2    KITCHEN, WHO IS ACTUALLY HELPING US WITH DELIVERING OUR

3    HOMELESS MET TEAM EXERCISES AND HELPING TO INFLUENCE AND

4    HELPING TO INFORM WHAT OUR CITIES ARE DOING. SO THERE'S NO WAY

5    I DON'T TAKE SERIOUS WHAT MY JOB IS AND WHAT I'M DOING EVERY

6    DAY, TOO. BUT I WOULD HOPE THAT HIS RELATIONSHIP WITH OUR

7    C.E.O. AND OUR FISCAL AGENTS THAT ARE IN CHARGE, THAT THEY

8    HAVE THOSE REGULAR MEETINGS SO THAT WE DON'T HAVE TO BE TAKEN

9    OUTSIDE OF OUR REGULAR DUTIES BECAUSE EVERYTHING IS

10   CONFORMING. AND I THINK THAT'S WHAT WE'RE TRYING TO CLARIFY

11   HERE. SO IT'S NOT A WAY OF TRYING TO SCOLD OR GET -- FOCUS ON

12   JUST ONE INDIVIDUAL. IT'S NOT ABOUT THAT. IT'S REALLY ABOUT

13   CREATING COLLABORATION, COOPERATION. THAT'S THE WAY IT'S

14   ALWAYS BEEN DONE. AND THAT'S THE WAY I THINK WE SHOULD GO

15   MOVING FORWARD. THANK YOU, MADAM CHAIR.

16

17   **SUP. HAHN, CHAIR:** SO THE TAKEAWAY IS PUT A PLAN TOGETHER AS

18   SOON AS POSSIBLE, PARTICULARLY IN A NUMBER OF AREAS, BUT I

19   WOULD SAY CERTAINLY IN THAT ONE AREA OF THE TESTING AND

20   RECRUITING. SUPERVISOR SOLIS, ANY OTHER COMMENTS? OKAY, ANY

21   OTHER COMMENTS FROM MY COLLEAGUES? OKAY, THANK YOU TO THE

22   DEPARTMENT FOR BEING HERE. I BELIEVE WE PROBABLY HAVE SOME

23   MEMBERS OF THE PUBLIC THAT WOULD LIKE TO SIGN UP, WHO HAVE

24   SIGNED UP ON ITEM 75 AND ITEM 10.

25

**VILLANUEVA v. COUNTY OF LOS ANGELES, et al.    USDC CASE NO.: 2:24 cv 04979 SVW (JC)**

## PROOF OF SERVICE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 11520 San Vicente Boulevard, Los Angeles, California 90049.

On April 28, 2025, I served the foregoing document, described as **"PLAINTIFF ALEX VILLANUEVA'S APPENDIX OF EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION, VOLUME 3 OF 5,"** on all interested parties in this action addressed as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☒    **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒    **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 28, 2025, at Los Angeles, California.

_Amelia Sanchez_
Amelia Sanchez