Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Alex DiBona, Esq., State Bar No. 265744
ADiBona@shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
320 North Larchmont Boulevard
Los Angeles, California 9004
Telephone Number:  (310) 860 0770
Facsimile Number:   (310) 860 0771

Attorneys for Plaintiff,
ALEX VILLANUEVA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEX VILLANUEVA,<br><br>    Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY BOARD OF SUPERVISORS, COUNTY EQUITY OVERSIGHT PANEL, LOS ANGELES COUNTY OFFICE OF INSPECTOR GENERAL, CONSTANCE KOMOROSKI, MERCEDES CRUZ, ROBERTA YANG, LAURA LECRIVAIN, SERGIO V. ESCOBEDO, RON KOPPERUD, ROBERT G. LUNA, MAX-GUSTAF HUNTSMAN, ESTHER LIM, and DOES 1 to 100, inclusive,<br><br>    Defendants. | Case No.:  2:24  cv 04979 SVW (JC)<br><br>**The Honorable Stephen V. Wilson**<br><br>**DECLARATION OF PLAINTIFF ALEX VILLANUEVA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>(Filed concurrently with Memorandum of Points and Authorities, Appendix of Evidence; Plaintiff's Separate Statement; Plaintiff's Objections to Evidence and [Proposed] Order on Plaintiff's Objections to Evidence])<br><br>Date:    May 19, 2025<br>Time:   1:30 p.m.<br>Dept.:   10A<br><br>Trial Date:    June 03, 2025<br>Action Filed:  June 13, 2024 |

---

DECLARATION OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# DECLARATION OF ALEX VILLANUEVA

I, Alex Villanueva, declare as follows:

1. I am the Plaintiff in this case. I am familiar with the files, pleadings, and facts in this case and could and would competently testify to the following facts on the basis of my own personal knowledge.

2. I am the former elected Sheriff of Los Angeles County. I have dedicated my entire adult life to public service. My law enforcement career spans over three decades, beginning in 1986 when I joined the Los Angeles County Sheriff's Department. I retired as a Lieutenant in February 2018, and following my retirement, I was elected by the people of Los Angeles County to serve as their Sheriff. I assumed office on December 3, 2018, becoming the first person in modern history to be elected from the rank of retired Lieutenant directly into the top leadership position. I served a full four-year term and completed my service in December 2022. My tenure as Sheriff was marked by significant efforts to reform internal policy, improve accountability, and restore the independence of the Sheriff's Department from political interference.

3. I began my career with the Los Angeles County Sheriff's Department as a Deputy Sheriff Trainee. I completed the rigorous training program at the Department's Academy, where I received comprehensive instruction across all major aspects of law enforcement. This included constitutional law, arrest procedures, search and seizure, juvenile law, report writing, cultural diversity, use of force, defensive tactics, emergency vehicle operations, firearms qualification, and ethical policing. Upon graduation, I was assigned to the Inmate Reception Center. I went on active duty in Amy National Guard 1990 to become branch qualified as an artillery officer after my commission in 1988. During my activity duty the first Gulf War started. After completing my initial assignment, I transferred to East Los Angeles Station where I served in patrol operations. I became a Field Training Officer, mentoring new deputies, and subsequently held assignments at multiple stations and bureaus including the Sheriff's Academy, Lennox Station, Carson Station, the Community

College Bureau, CRDF, and Pico Rivera. My final assignment before retirement was at Pico Rivera Station, where I served with distinction until February 2018. Over the course of my career, I rose through the ranks, earning promotions to Sergeant and ultimately Lieutenant.

4. My service in law enforcement is supported by a strong academic foundation. I earned a bachelor's degree in liberal studies, followed by a master's degree from California State University Northridge. I later obtained a doctorate in public administration from the University of La Verne. I have also served in the United States military. In January 1983, I enlisted in the U.S. Air Force. I later transitioned into the Air National Guard under the Palace Chase program and subsequently joined the Army National Guard, where I completed Officer Candidate School and was commissioned as a Second Lieutenant. I graduated from the U.S. Army's artillery school at Fort Sill, Oklahoma. This combination of military and academic training gave me a comprehensive understanding of leadership, discipline, and public accountability, all of which informed my approach to managing one of the largest law enforcement agencies in the nation.

5. From the beginning of my tenure, I made decisions based on principle and in defense of constitutional rights and public safety. I engaged in what I believed—and still believe—was protected activity as defined by the Constitution and state law. I publicly and repeatedly opposed several high-profile initiatives and policies advanced by the Los Angeles County Board of Supervisors and their political appointees. These included Ballot Measure A, Ballot Measure R, and Ballot Measure J. I also objected to the County's COVID-19 vaccine mandate for County employees and opposed the contract with Fulgent Genetics, which had been awarded a no-bid agreement to conduct COVID-19 testing on County personnel. Each of these positions was taken in good faith, grounded in facts, law, and public interest. Nevertheless, these positions placed me in direct opposition to the political agenda of the Board, and I believe they served as the catalyst for the retaliation, investigations, and efforts to discredit me that followed.

6. One of the most serious conflicts between myself and the Board of Supervisors

concerned Ballot Measure A. This measure sought to amend the County Charter to give the Board the unprecedented authority to remove an independently elected Sheriff with a four-fifths vote, using a vaguely defined "for cause" standard. "Cause" included such broad terms as neglect of duty or violation of law, without any clear process or evidentiary threshold. I opposed Ballot Measure A from its inception because I believed it was a direct attempt to circumvent the will of the voters who elected me. The Sheriff's position is a separately elected constitutional office, not a subordinate to the Board. I viewed Measure A as unconstitutional and dangerous—it would have allowed five individuals to remove a separately elected official over political disagreements. I spoke out forcefully against it at multiple Board meetings, in official press conferences, during televised interviews, in Facebook Live updates, and in other public appearances. I emphasized that this was not just a threat to my tenure—it was a threat to the principle of checks and balances and democratic accountability. Despite my opposition, Measure A was placed on the ballot and approved by voters in November 2022. I believe the Board timed and crafted this measure specifically in anticipation of my reelection campaign and as retaliation for my refusal to conform to their directives.

7. I also opposed Ballot Measure R, which expanded the investigatory and subpoena powers of the Civilian Oversight Commission and directed the County to create a plan to reduce incarceration. While oversight and accountability are essential values in any public safety system, Measure R went beyond transparency and into territory that undermined operational independence. The Commission was already receiving all records they were legally entitled to under California law. However, they demanded unrestricted access to confidential personnel files, records related to ongoing internal and criminal investigations, and information that was protected by the California Peace Officers' Bill of Rights, Penal Code 832.7, and applicable privacy laws. These requests posed serious legal and ethical concerns, including the risk of tainting criminal prosecutions, violating employee rights, and compromising sensitive investigations. On or around February 10, 2020, I directed my office to issue a public statement through Ballotpedia warning that the

1  Board had already spent over $1 million suing the Sheriff's Department and that Measure
2  R would "open the floodgates for many more ill-advised lawsuits designed to seek
3  documents that are not legally available for public release." I stated that this was
4  "weaponizing oversight" to politically target my administration. Rather than engaging
5  with my concerns, the Board and its allies responded with hostility and mischaracterized
6  my position as one of obstruction or noncompliance.

7      8. • I also opposed Ballot Measure J, which mandated that at least 10% of the
8  County's unrestricted general funds be redirected toward alternatives to incarceration,
9  including mental health treatment, housing programs, and youth development. While I
10 support these programs in principle, I strongly opposed the mandatory reallocation of
11 general funds from law enforcement, especially in the absence of proper fiscal planning.
12 The Sheriff's Department was already suffering from severe staffing shortages, declining
13 morale, and increased overtime burdens. Crime was rising countywide, and violent
14 incidents within the jail system were escalating. Measure J had no safeguards to protect
15 core public safety services. It would lead to service cuts, closures of patrol stations,
16 reduced jail staffing, and slower emergency response times. On July 22, 2020, I publicly
17 warned via social media that Measure J would produce a "dystopian future" in Los
18 Angeles that looked "like a scene from *Mad Max*." On August 5, 2020, I clarified my
19 position further, stating that while I support mental health and drug treatment, Measure J
20 was "actually out to defund law enforcement." I also stated that the measure was
21 unconstitutional and unlawful under California budgeting procedures. The backlash to my
22 position was immediate. I was accused of fearmongering, being resistant to reform, and
23 failing to support community investment. I believe my public opposition to Measure J
24 intensified the Board's political hostility toward me and was a direct factor in the Board's
25 continued campaign to discredit my administration.

26     9. Another major source of conflict was the County's COVID-19 vaccine mandate.
27 I personally received the vaccine and encouraged members of the public to consider doing
28 so. However, I opposed the mandate as applied to Sheriff's Department personnel. The

vast majority of deputies and employees—many of whom had worked through the pandemic under dangerous conditions—did not wish to be vaccinated. I received feedback from rank-and-file personnel and supervisors alike that they were prepared to quit en masse if forced to comply. I determined that enforcing the mandate would result in a catastrophic loss of staffing across patrol, custody, investigations, and administrative units. I also believed that the mandate infringed on personal privacy and medical autonomy. My decision was not ideological—it was operational. On or around October 21, 2021, I appeared on a nationally televised news program and explained that it takes over a year to recruit and train an entry-level deputy and decades to replace a seasoned homicide detective. I warned that if I enforced the mandate, LASD would lose thousands of employees and that homicides would rise, response times would suffer, and public safety would be compromised. Despite this clear and reasonable justification, the Board of Supervisors, the Inspector General, and aligned media outlets accused me of being reckless and anti-science. I stood firm because I believed enforcing the mandate would devastate the Department's capacity and cause irreversible damage to public safety.

10. Relatedly, the Board approved a no-bid contract with Fulgent Genetics for COVID-19 testing. After reviewing the contract and conducting due diligence, I became concerned that Fulgent had ties to foreign entities, including the Chinese government. The contract terms did not guarantee that biometric data—including DNA—would remain private and secure. Around Thanksgiving 2021, I attended a briefing at the FBI's Los Angeles field office, where I was informed that Fulgent had Chinese ownership and that there was a substantial risk that genetic information obtained from County employees could be shared with the Chinese Communist Party. Following this meeting, I directed that the Sheriff's Department would not participate in the Fulgent testing program. I issued a public statement and sent formal correspondence to the Board explaining my decision. I believed it was my duty to protect the personal data and privacy of my employees. Instead of taking my concerns seriously, the Board—through their legal counsel—falsely accused me of lying about the FBI briefing and claimed I acted with actual malice. These

accusations were outrageous. The FBI email confirming the contents of the meeting exists and has been shared as part of this record. My actions were reasonable, based on federal intelligence briefings, and consistent with my constitutional duty to safeguard the rights and security of County employees. The Board's response was not rooted in facts but in a continuing effort to discredit me for political purposes.

11. These decisions I made—whether opposing ballot initiatives, declining to enforce the vaccine mandate, or rejecting the Fulgent contract—were all based on my duty to protect the public, uphold the law, and maintain the operational readiness of the Sheriff's Department. Yet, these independent actions were met with a concerted campaign of retaliation by the Board of Supervisors and their political allies. The response to my independence was not one of respect for the democratic process, but of escalating hostility and a misuse of institutional power. The Board leveraged media, administrative processes, and affiliated oversight offices to vilify me in public and disrupt my leadership internally. I came to refer to these tactics as "lawfare"—using the instruments of government accountability not to uncover misconduct, but to silence and remove an elected official whose views they opposed.

12. Max Huntsman, the County's appointed Inspector General, was one of the key figures in this campaign. As Inspector General, Mr. Huntsman was supposed to function as a neutral party, monitoring the Sheriff's Department and advising the Board of Supervisors. In practice, he acted more like an adversarial political operative. He routinely issued public statements and reports that mischaracterized my decisions, omitted critical context, and cast my actions in the most negative possible light. Instead of using his platform to encourage transparency, Mr. Huntsman weaponized it to promote a false narrative that I was obstructive, authoritarian, and even dangerous. His reports went beyond oversight and became open attacks, filled with selective citations and conclusions that lacked foundation. With respect to Mr. Huntsman personally, I had every reason to believe that his full legal name was Max Gustaf Huntsman. That name appeared on the plaque on his desk, in official government directories, and in State Bar records, which I

understood to reflect his legal name. Based on information that was provided to me, I came to believe Mr. Huntsman had publicly denied the Holocaust. I had no reason to question that information at the time. My statements regarding Mr. Huntsman were not directed at his religion, ethnicity, or nationality. They were expressions of deep disagreement with how he had abused his office, and they reflected a political, not personal, conflict.

13. Another key figure in the campaign against me was Esther Lim, who served as a Field Justice Deputy in the office of Supervisor Hilda Solis. In 2023, after I had already completed my service as Sheriff and resumed my status as a retired Lieutenant, Ms. Lim filed a formal complaint against me. That complaint triggered the opening of an administrative investigation by the Department, despite the fact that I was no longer employed and was not subject to the Department's disciplinary jurisdiction. This was the first time in my knowledge that a retired officer had been investigated in such a manner. The basis for the complaint was entirely political—Ms. Lim had previously made public statements supportive of defunding law enforcement and, in my view, had used her platform to advance a policy agenda incompatible with law enforcement cooperation. Prior to her complaint, I had expressed concern to Supervisor Solis about Ms. Lim's statements on social media, including posts that could reasonably be interpreted as hostile toward deputies. My concerns were policy-based and rooted in the operational need for collaboration between the Sheriff's Department and justice deputies. I never asked that Ms. Lim be fired—I simply raised questions about her fitness to serve in a liaison role. The decision to act—or not act—on that feedback was entirely within Supervisor Solis's discretion. The suggestion that I retaliated against Ms. Lim or targeted her based on race, gender, or national origin is false.

14. From the start of my term, I believed the Board harbored animus toward me not only because of the decisions I made, but because of the way I communicated with the public. I used social media frequently, including Facebook Live, to engage directly with constituents. I did not rely on press releases or filtered talking points. I provided detailed briefings, took questions from viewers, and explained the rationale behind my decisions.

This direct line of communication threatened the Board's narrative and its control over public perception. I was often treated differently from other department heads. When I appeared before the Board, I was frequently limited to just three minutes of speaking time and was only permitted to address them as a private citizen, not in my capacity as Sheriff. Other department heads were routinely allowed to give extensive presentations lasting well over an hour. This disparity in treatment was not procedural—it was personal. It sent a clear message that my voice, though elected by the public, was not welcome in the room. I documented this disparate treatment publicly and privately, and I viewed it as further evidence of the Board's effort to marginalize me politically.

15. I have also faced false and deeply offensive accusations of sexism, racism, and ageism. I want to make it absolutely clear: I do not, and have never, discriminated against anyone on the basis of race, gender, age, or national origin. These allegations are not only factually untrue—they are personally insulting and contrary to everything I have stood for over my 30-plus years in public service. The Sheriff's Department is one of the most diverse law enforcement agencies in the nation, and I have always made it a point to support, mentor, and promote employees based on merit. During my tenure as Sheriff, I promoted women to leadership roles, supported the advancement of individuals from underrepresented communities, and made hiring decisions based on qualifications and integrity alone. The idea that I held any animus toward an all-woman Board of Supervisors is false. I criticized members of the Board not because of their gender, but because of their policies. For example, I frequently referred to Mark Ridley-Thomas—a male member of the Board—as corrupt, a characterization that was later vindicated. I used the term "woke" not to demean people based on identity, but to describe what I believe is a far-left ideology that lacks common sense, real-world experience, and practical value. I have never used terms like "dumb women" or "unqualified women" to describe the Board or justice deputies, nor have I made statements to that effect in public or private. When I used the word "flunky," I used it in the dictionary sense—to refer to someone who performs menial or subordinate tasks in an obsequious manner. It had nothing to do with gender, age, race

or ethnicity.

16. My conflict with Supervisor Hilda Solis went beyond isolated disagreements. It reflected a sustained and coordinated effort on her part to undermine my leadership and to reverse the independence of the Sheriff's Department. Throughout my tenure, Supervisor Solis publicly opposed many of my decisions, particularly those relating to immigration enforcement and the role of federal agencies in County jails. One of the key planks of my 2018 campaign for Sheriff was a promise to end the longstanding practice of cooperating with U.S. Immigration and Customs Enforcement (ICE) to facilitate the deportation of individuals in County custody. Under prior administrations, the County had accepted federal funding in exchange for granting ICE access to jail facilities. I opposed this policy because I believed it was inconsistent with the County's values, contributed to fear in immigrant communities, and undermined trust between law enforcement and the public. After taking office, I fulfilled my promise and formally ended ICE's access to jail data and facilities. This was a significant departure from past practice and represented a major policy shift. I made this decision as a Latino public official, fluent in Spanish, with personal and familial ties to Puerto Rico and Latin America. The vast majority of individuals affected by ICE detainers were Latino. My decision was motivated by a commitment to fairness and community safety—not by political pressure. Supervisor Solis had been in office for years and had never taken meaningful action to end the County's collaboration with ICE. I believe she resented that I, as an outsider to the political establishment, was able to achieve reforms she had not prioritized. My use of the term "La Malinche" to describe her stance was not gendered—it was a reference to betrayal. In Mexican history, La Malinche is seen by most as a traitor, not because she was a woman, but because she aligned herself with the oppressors of her people. My use of the term was cultural and political, not sexist.

17. I never opened or ordered a criminal or administrative investigation based on personal animus or political disagreement. Every investigation that occurred under my administration was initiated in accordance with legal authority and based on evidence of

potential misconduct. The Department has detailed protocols for initiating internal reviews, and those protocols were followed in every case. Any suggestion that I abused my position to retaliate against political opponents or critics is false. It is also important to note that I did not micromanage individual investigations—those were handled by Internal Affairs and the appropriate chain of command. I did not send any letter to Supervisor Solis or anyone else with the intent of getting Esther Lim fired. My concerns were based solely on whether someone who had made public statements that could be perceived as anti-law enforcement was appropriate for a role that required collaboration with the Sheriff's Department. Justice deputies are supposed to work closely with the Department to coordinate public safety policies. I had every right—and arguably a duty—to raise questions when that cooperation appeared to be at risk. Ultimately, it was up to Supervisor Solis to decide what, if anything, to do with the information. I received no response to my letters, which is why I followed up. That is standard protocol in law enforcement, where letters of inquiry are often followed by requests for clarification or confirmation.

18. The fact that I focused my concern on Ms. Lim was based entirely on her actions and statements—not on her gender, race, or ethnicity. I was not aware of any other justice deputy who had tweeted or publicly supported calls to defund law enforcement or posted what could be construed as hostile messages toward deputies. If another individual had done the same, I would have raised similar concerns. My letters were based on the content of her public statements, the impact those statements might have on her ability to work effectively with the Department, and the public's perception of law enforcement. I did not accuse her of misconduct; I merely asked whether appropriate steps had been taken in light of those statements. That is a standard question in any law enforcement environment. The Board often issues public statements or press releases when discipline has been imposed, and the public reasonably expects some transparency when public officials are involved in controversy. Again, the decision to act—or not act—was entirely within the Board's discretion.

19. I have never referred to the Board of Supervisors or the justice deputies as "unqualified women," nor have I ever suggested that they were unqualified because of their gender. That claim is categorically false. When I have criticized members of the Board, I have done so based on their decisions, their policies, or their public statements—not their gender. Likewise, my criticism of justice deputies has been based solely on the performance of their duties and the alignment of their actions with public safety goals. The term "flunky," which I have used in some public settings, is defined as someone who performs menial or subordinate tasks, often in an overly deferential or servile way. When I used that word, it was directed at individuals who I believed were acting in a politically motivated and uncritical manner in support of the Board's agenda. It was not related to their gender, and I would have used the same term regardless of whether the person in question was male or female. I have consistently criticized public officials who I believe have misused their authority or failed in their duties, regardless of their background.

20. I am aware that some have suggested my public criticism of elected officials, oversight bodies, and justice deputies amounts to bullying or harassment. That is not the case. I am an elected official, and I have always believed that the public has a right to hear directly from their Sheriff. I used press conferences, social media, and public statements to explain the Department's position, push back against misinformation, and expose what I viewed as political retaliation. I never used my position to threaten, intimidate, or retaliate against anyone for personal reasons. What I did was speak the truth as I saw it, based on my years of experience, my understanding of the law, and my commitment to public safety. My tenure as Sheriff was defined by transparency and honesty, even when it came at a political cost. I do not regret standing up for my principles, and I believe that the public is better served by officials who speak plainly and act decisively, rather than those who seek to appease political interests or avoid controversy at all costs.

21. With respect to Defendant Max Huntsman, at all times relevant, I believed that his legal name was Max Gustaf Huntsman. This belief was based on multiple reliable sources. First, I observed that his office desk had a nameplate that read "Max Gustaf

Huntsman." Second, I reviewed public records, including the California State Bar website, which listed his name as Max Gustaf Huntsman. I understood that the State Bar maintains accurate records of legal names for all licensed attorneys. Third, communications and County materials I received during my tenure as Sheriff consistently used that full name. I never questioned this designation, and I had no reason to believe it was inaccurate. Additionally, I made public statements regarding Mr. Huntsman's conduct and beliefs based on information I received in my capacity as an elected official. Among those were statements concerning his reported denial of the Holocaust. That information was provided to me from a source I believed to be credible at the time. I have never had any animus toward Germans, Jews, or any ethnic or religious group. My statements about Mr. Huntsman were political in nature and directed solely at his conduct as Inspector General. I believed then, and still believe now, that he abused his role to further a partisan agenda against me. My statements were expressions of political disagreement and were not meant to denigrate him based on any protected characteristic.

22. Ms. Esther Lim, as a Field Justice Deputy for Supervisor Hilda Solis, likewise used her office in ways that I believe were politically motivated. She filed a complaint against me in 2022, and it proceeded after I had already left office and returned to retirement. The Luna administrations administrative investigation of a former Sheriff was unprecedented. Despite my retired status, the Department initiated an administrative investigation. To my knowledge, this was the first time in the Department's history that a former sheriff was subjected to such scrutiny. This investigation was improper and, in my view, unlawful. It was further proof of the County's ongoing effort to punish me for my political views and independent stance. Prior to the complaint, I had expressed concern about Ms. Lim's public statements on social media, particularly those that advocated for defunding law enforcement or included language that could be interpreted as hostile toward police officers. I believed these views undermined her ability to fulfill her role as a liaison between the Board and the Department. I never made these concerns about her personal background—only her conduct and public record. My belief that she should not

serve in a liaison role with the Department was based entirely on operational and policy considerations. I did not seek her termination or discipline, but I did want to know whether Supervisor Solis considered her conduct consistent with her role. That is a fair question, and I stand by my right to ask it.

23. I want to clarify a false narrative that has been circulated regarding my purported refusal to participate in an interview with County investigator Christina Diaz Herrera. I did not refuse to be interviewed. Rather, I inquired about the subject matter of the interview so that I could properly prepare. I was retired from the Los Angeles County Sheriff's department and of course no longer Sheriff at this time. At the time, I was serving as Sheriff and had significant administrative and legal responsibilities. I wanted to be able to review any relevant documentation, consult with legal counsel if needed, and ensure that I could provide accurate and thorough answers. This is standard practice for any public official facing an inquiry, especially when the subject matter is unknown and could pertain to sensitive issues. I was not contacted directly while in office to be interviewed regarding Ester Lim or Max Huntsman.

24. On the same day that ballots were mailed out in my race against Supervisor Janice Hahn for a seat on the Los Angeles County Board of Supervisors, the Los Angeles Times published a story alleging that a "do not rehire" designation had been placed in my personnel file based on findings of discrimination and harassment. I was never notified that this designation had been made. I was not interviewed in the underlying investigation. I was never given the opportunity to respond to the allegations. I did not receive a letter, a call, or an email.. The timing of the article—coinciding exactly with the start of voting in a high-profile election in which I was a candidate—was not coincidental. It was designed to damage me politically and tarnish my reputation with voters. The use of personnel processes and media leaks to influence an election is deeply inappropriate and undermines trust in both the disciplinary system and the democratic process. I believe the leak of this information was intentional, politically motivated, and retaliatory.

25. I understand that the County is now attempting to downplay the significance of

a "do not rehire" designation, arguing that it does not actually mean what it says. That claim is not only untrue—it is, in my view, frivolous. I served as the head of an agency with over 18,000 employees. I oversaw hiring, promotions, background investigations, and personnel decisions across every division. In County government, a "do not rehire" designation is definitive. It is a red flag that disqualifies an individual from returning to County employment. It is not a suggestion. It is not symbolic. It is a formal bar to reemployment. Everyone in County administration knows what that label means. It appears in a person's record, and if they apply for a job, it automatically excludes them from consideration. To now claim otherwise is disingenuous and, frankly, insulting to the public's intelligence. The County placed that designation in my file without notifying me, without giving me an opportunity to be heard, and now seeks to deny its meaning. I reject that effort to rewrite the record.

26. Filed Concurrently as **Exhibit 3** is a true and correct copy of an email thread between myself, my then chief of staff John Satterfield and Vanessa Chow.

27. Filed Concurrently as **Exhibit 4** is a true and correct copy of a letter I had sent to Hilda Solis related to the ethical violations of Ester Lim.

28. Filed Concurrently as **Exhibit 5** is a true and correct copy of Ester Lims "tweets" that were attached to my letter as **Exhibit 4.**

29. Filed Concurrently as **Exhibit 6** is a true and correct copy of a letter I sent to County Counsel for Los Angeles requesting a Defense from a lawsuit filed against me by Fulgent.

30. Filed Concurrently as **Exhibit 7** is a true and correct copy of a letter I received from County Counsel for Los Angeles denying my request for a Defense from a lawsuit filed against me by Fulgent.

31. Filed Concurrently as **Exhibit 8** is a true and correct copy of a letter I received from County Counsel for Los Angeles denying my request for a Defense from a lawsuit filed against me by Fulgent.

32. Filed Concurrently as **Exhibit 15** is a true and correct copy of a letter I sent to

the Los Angeles County Board of Supervisors opposing the ballot measure that would allow them to remove a Sheriff by a 4/5 vote.

33. Filed Concurrently as **Exhibit 16** is a true and correct copy of an email chain between myself and Chrstine Diaz Herrera.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed on this 28th day of April, 2025, at Santa Monica, California.

*Alex Villanueva (Apr 28, 2025 11:10 PDT)*

Alex Villanueva

VILLANUEVA v. COUNTY OF LOS ANGELES, et al.        USDC CASE NO.: 2:24 cv 04979 SVW (JC)

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 11520 San Vicente Boulevard, Los Angeles, California 90049.

On April 28, 2025, I served the foregoing document, described as **"DECLARATION OF PLAINTIFF ALEX VILLANUEVA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT"** on all interested parties in this action addressed as follows:

**Louis R. Miller (State Bar No. 54141)**
**smiller@millerbarondess.com**
**Jason H. Tokoro (State Bar No. 252345)**
**jtokoro@millerbarondess.com**
**Steven G. Williamson (State Bar No. 343842)**
**swilliamson@millerbarondess.com**
**MILLER BARONDESS, LLP**
**2121 Avenue of the Stars, Suite 2600**
**Los Angeles, California 90067**

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 28, 2025, at Los Angeles, California

_Amelia Sanchez_
Amelia Sanchez